1

THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  08-60014-CR-MIDDLEBROOKS

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

VINCENT F. ARTUSO, JOHN VINCENT ARTUSO,
GREGORY ORR, ROBERT GANNON,
PHILIP FORGIONE,

        Defendants.
_____/

FILED by _____ D.C.

OCT - 9 2008

STEVEN M. LARIMORE
CLERK U. S. DIST CT
S. D. of FLA – MIAMI

ORIGINAL

TRANSCRIPT OF TESTIMONY OF WITNESS
WILLIAM LARRY HORTON FOR DELIBERATING JURY

Federal Courthouse
West Palm Beach, Florida
September 11, 2008
1:30 p.m.

        The above entitled matter came on for Jury Trial
before the Honorable Donald M. Middlebrooks, pursuant to
Notice, taken before Victoria Aiello, Court Reporter,
pages 1-88.

For the Plaintiff:  William Shockley, AUSA
                    J. Brian McCormick, AUSA

For the Defendants:
                V. Artuso:  Peter Birch, FPD, Esquire
                J.V. Artuso:  Michael Pasano, Esquire
                G. Orr:  David Markus, Esquire
                R. Gannon:  Allan Kaiser, Esquire
                P. Forgione:  Alvin Entin, Esquire

2

1           (Call to Order of the Court).

2           THE COURT:  All right.  Let's invite them in.

3           (Jury present in courtroom.)

4           THE COURT:  Welcome back.  Please continue. Be

5    seated, please.

6           MR. SHOCKLEY: Thank you, Your Honor.

7                DIRECT EXAMINATION (Continued)

8    BY MR. SHOCKLEY:

9        Q.   Mr. Horton, welcome back after lunch.  We're

10   going to pick up where we left off.  We had just concluded

11   the testimony concerning Government Exhibit 1.51. That was

12   the Purchase and Sale Agreement regarding the Pompano

13   Beach property which bore your signature on the bottom of

14   the page where you were agreeing to sell this to Efficient

15   Realty and Development Corporation. Do you remember that?

16       A.   Yes, sir.

17       Q.   I'm going to take up the second Purchase and

18   Sale Agreement.  This is called a Sale-leaseback

19   Agreement, showing you Exhibit 1.80.  We're going to try

20   something different after my debacle in the morning

21   session.  We're going to try what's called the sanctioned

22   system of displaying these items to you.  Don't display

23   it, Special Agent Watts, until we get the ruling from the

24   court.

25           MR. SHOCKLEY: Your Honor, I'm going to be

3

1    offering into evidence Government's Exhibit 1.80 at this

2    time.

3              MR. MARKUS: No objection.

4              THE COURT:  1.80 is admitted.

5              (Government's Exhibit 1.80 was admitted into

6    evidence.)

7              MR. SHOCKLEY: Display that on the sanctioned

8    system.

9    BY MR. SHOCKLEY:

10       Q.    We have here displayed on the sanctioned system

11   now.  It should be on everyones' screen in front of you.

12   The first page of the documents says Sale-leaseback

13   Agreement.  If you could you enlarge the first paragraph.

14   States, this sale-leaseback agreement is made as of this

15   11th day of October, 2001 by and between Westmore

16   Properties, Inc., a Florida Corporation, having offices

17   at-- that's left blank or its assigns as purchaser and ADT

18   Security Services, Inc., a Delaware corporation, having

19   offices at One Town Center Road, Boca Raton, Florida under

20   the following circumstances.

21              Now, this Westmore Properties, Inc., what did

22   you know about that corporation?

23       A.    No knowledge.

24       Q.    Going to the second paragraph of that document,

25   it says, seller is owner of certain land located in the

4

1    City of Palm Harbor, County of Pinellas, State of Florida

2    as later described in Exhibit A. This is the Palm Harbor

3    property; is that correct?

4        A.    That's correct.

5        Q.    You referred to that earlier in your testimony.

6    That was the property that you provided an appraisal to

7    Mr. Orr; is that correct?

8        A.    That's correct.

9        Q.    Then, to page 465, paragraph 3.1, Article 3

10   purchase price. If we can enlarge that.

11           Purchase price, 3.1.  The purchase price to be

12   paid by purchaser to seller at the closing for the

13   property shall be subject to the provisions contained in

14   this agreement, be $685,000. Then, it continues, plus or

15   minus prorated credits and other adjustments as

16   hereinafter provided.  And, again, that $685,000 was the

17   figure that you and Mr. Orr had agreed upon; is that

18   correct?

19       A.    That's correct.

20       Q.    This was, if you recall, the one where the

21   American Appraisal Associates showed a fee simple price of

22   $1,050,000. Do you recall that?

23       A.    Yes, I do.

24       Q.    So the final purchase price you and Mr. Orr

25   agreed to after reviewing the price at over $1 million,

5

1    the $685,000 that was not fee simple, was it?

2         **A.**    No, sir.

3         **Q.**    Has in the title of the document, this is a

4    sale-leaseback agreement; is that correct?

5         **A.**    That's correct.

6         **Q.**    Directing your attention to page bearing Bates

7    4066-- Excuse me.  Let's go to 4700.

8              If we could enlarge paragraph 6.1(a).  Is it

9    possible to scroll up little higher.

10             See this Article 6 conditions precedent due at

11   closing, says, purchase conditions.  Following conditions

12   precedent to purchaser obligations to purchase the

13   property.  And (a) is, prior to closing purchaser shall

14   obtain a written unconditional commitment-- loan

15   commitment to be secured by a mortgage on trust deed on

16   the property in an amount equal to 80 percent of the

17   purchase price, and it continues on after that.

18             So, there was some contemplation before this

19   deal went to closing there would been a loan to secure the

20   loan in order to get money to pay for the property; is

21   that correct?

22        **A.**    That's correct.

23        **Q.**    Go to 4.72-- excuse me-- 472.  Bates labeled

24   472. And paragraph 6.4 says.  Lease. On or before the

25   closing as a material consideration for purchaser and

6

1   seller entering into this agreement, purchaser as landlord

2   and seller as tenant-- and seller would be ADT Security?

3       **A.**    That is correct.

4       **Q.**   -- seller as tenant shall execute and deliver a

5   lease of the property in the form attached hereto as

6   Exhibit B and made a part hereof (meaning the lease) with

7   the blank therein completed there take man never

8   consistent with the provisions of this agreement, to wit:

9   A 15-year term at a monthly rent of $19,866.67, increased

10  annually by three percent during each of the first five

11  years during years eleven, three and a half percent during

12  years six through ten, four percent during years eleven

13  through fifteen thereafter.

14       So this was the general provision that the lease

15  was supposed to comply with in order for this sale and

16  leaseback agreement to be effective; is that correct?

17      **A.**    That's correct.

18      **Q.**    Again, these figures are figures that you

19  yourself had agreed to with Mr. Orr?

20      **A.**    That's correct.

21      **Q.**    Now, we go we can go to page bearing Bates label

22  477.  Go to 481.

23       There is a miscellaneous provision here under

24  Article 15.

25       If we could enlarge Article 15.1.

7

1           States, confidentiality. Seller will not

2    publicize the transactions contemplated by this agreement

3    or the identity of the purchaser or any designee of

4    purchaser in any way or make any other disclosure

5    concerning the same and shall treat the same with

6    confidentiality.  That was the term of the agreement?

7        **A.**   Yes, sir.

8        **Q.**   Were you, representing the seller, publicizing

9    any of these transactions?

10       **A.**   ADT did not want to publish anything related to

11   real estate transactions.

12       **Q.**   Explain that.

13       **A.**   Sometimes transaction from a sale can be

14   misinterpreted by the market as obviously you're shutting

15   down operations or changing your operations.  So they

16   would like to have no publication of any real estate

17   transactions.

18       **Q.**   This enterprise, Westmore Properties Inc., do

19   you know anything about that company's formation or who

20   was an owner of Westmore Properties, Inc.?

21       **A.**   No, sir.

22       **Q.**   Directing your attention to page bearing Bates

23   label 484 at 15.19, no publication again.  Neither party

24   may issue or release any press release, promotional

25   material, announcement or its statement related to this

8

1    agreement or the terms of this agreement without the prior

2    consent of the other party, which content shall be given

3    or withheld by the exercise of such parties sole

4    discretion.

5         And then at the very bottom, there is a

6    signature block.  Is that your signature on the document,

7    Mr. Horton?

8        **A.**    It is.

9        **Q.**    And the signature on the lower right-hand side,

10   you recognize who's signature that is?  Can you tell by

11   the handwriting?

12       **A.**    Looks like John Artuso.

13       **Q.**    And the title appears to be president; is that

14   correct?

15       **A.**    Correct.

16       **Q.**    It looks likes the date of execution for you was

17   October 10th of '01 and the date of execution for him was

18   October 11th of '01; is that correct?

19       **A.**    That's correct.

20       **Q.**    Were you together in the same room then or

21   somewhere else when these documents were executed?

22       **A.**    We were in separate facilities.

23       **Q.**    Was sometimes these contracts mailed back and

24   forth or sent by courier back and forth for execution?

25       **A.**    Correct.  Either we were represented by a

9

1    closing attorney outside of the property location, they

2    were either mailed or faxed or couriered, depending.

3           MR. SHOCKLEY: Your Honor, Government would like

4    to offer into evidence Government's Exhibit 6.205.

5           MR. MARKUS: No objection.

6           THE COURT:  6.205 is admitted.

7           (Government's Exhibit 6.205 was admitted into

8    evidence.)

9    BY MR. SHOCKLEY:

10    Q.    Showing you now the first page of that document,

11    purchase and sale agreement.  We just handled the purchase

12    and sale agreement regarding Pompano Beach and the

13    sale-leaseback regarding Palm Harbor.  Let's go to the

14    Lancaster property.  Up at the top it is labeled Purchase

15    and Sale Agreement.  First paragraph reads as follows:

16    This purchase and sale agreement is made this 24th day of

17    September, 2001 by and between ADT Security Services,

18    Inc., seller-- I'm skipping over some of it-- and

19    Efficient Realty and Development Corp., a Florida

20    corporation, having offices at 10571 Northwest 66th

21    Street, Parkland Florida, or its assigns.  And, again,

22    that was the address of Greg Orr; is that correct?

23    A.    That's correct.

24    Q.    The second paragraph says, sale of property.

25    Seller agrees to sell and convey to purchaser and

1    purchaser agrees to purchase and acquire from seller upon

2    the terms and conditions set forth herein the property

3    located at Lancaster County, Pennsylvania, consisting of

4    the real property described on Exhibit A attached hereto,

5    including the office building and all improvements located

6    thereon, located at 3040 Industry Drive, Lot 13a, East

7    Hempfield Township, Pennsylvania. And this is, of course,

8    what we refer to as the Lancaster property, okay. And the

9    purchase price for this, if you scan down, under paragraph

10   three is $840,000; is that correct?

11        **A.**   That is correct.

12        **Q.**   And, again, if we think about on that letter

13   which you had the offer, counter-offer where you had your

14   written note of $840,000, that was what you and Mr. Orr

15   had agreed to?

16        **A.**   Yes.

17        **Q.**   And again referring back to Government's Exhibit

18   1.223, which we addressed earlier that had an appraised

19   fee simple amount of $1 million; is that correct?

20        **A.**   That's correct.

21        **Q.**   And that was just for a fee simple but this

22   particular document is the purchase and sale agreement

23   that also carries with it a lease; is that correct?

24        **A.**   That's correct.

25        **Q.**   So flipping over to page bearing Bates label

1    ending in 41, it will be I think page 4 of the document

2    itself, if we could enlarge the section that says 8(a),

3    conditions to closing.  Purchaser obligation to close is

4    specifically contingent upon seller delivering to

5    purchaser the following prior to closing a), a fully

6    executed lease between the purchaser as landlord and

7    seller as tenant substantially in the from attached hereto

8    as Exhibit  B.  So this is a lease provision of the

9    sale-leaseback; is that correct?

10        **A.**    That's correct.

11        **Q.**    Also it has some evidence of reference under

12    (d), purchase is going to be contained on Commercial

13    Mortgage to finance 80 percent of the purchase price at

14    current market rates.  That was unless the purchaser, Mr.

15    Orr in this case, as it states on the first page,

16    Efficient Realty and Development Corp., unless they were

17    able to get an 80 percent mortgage, this agreement would

18    be null and void; is that correct?

19        **A.**    That's correct.

20        **Q.**    Directing also your attention now to Section 9,

21    the closing procedure and documents basically say that

22    you, on behalf of ADT, are going to be delivering that

23    special warranty to the property.

24            If look at 984, if we could enlarge this, this

25    is a certified resolution of seller authorizing the

12

1    entering into and execution of this agreement, the

2    execution of the Exhibit B lease and the consumation of

3    the transaction herein contemplated.  Is that what it

4    states?

5        **A.**    Yes.

6        **Q.**    Going to the following page bearing Bates label

7    42, paragraph 11.  There is another provision for

8    brokerage and closing expense.  The parties represent to

9    the other that there are no brokers involved with this

10   transaction, however in consideration of the purchaser not

11   engaging a broker for this transaction, and in

12   consideration of other purchaser's expenses not paid by

13   seller in paragraph 10, the seller shall pay the purchaser

14   the sum of six percent of the purchase price by separate

15   check or by credit at purchaser's option at closing.

16            So, again, this was similar to the last one we

17   saw.  There was going to be six percent payment by ADT to

18   the purchaser in this case and it was stated as Efficient

19   Realty and Development Corp.; is that correct?

20       **A.**    That's correct.

21       **Q.**    And ADT is not a broker in this deal; is that

22   correct?

23       **A.**    That's correct.

24       **Q.**    And, of course, it was not marketed, is that

25   true?

1    **A.**    That's correct.

2    **Q.**    And are you aware of whether there was a broker,

3    a real estate broker on the other side of the transaction?

4    **A.**    Not to my knowledge.

5    **Q.**    Now, directing your attention to page with Bates

6    label 46, again paragraph 17.  Another prohibition of

7    record not to publically record this transaction, which is

8    similar to other; is that correct?

9    **A.**    That's correct.

10    **Q.**    Going to the following page, in paragraph 25,

11    there is a reference to incorporated by reference the

12    legal description of the property and the lease

13    agreement.  So the lease agreement can't be made a part of

14    this contract; is that correct?

15    **A.**    That's correct.

16    **Q.**    Directing your attention now to page bearing

17    Bates label 50, signature page.  There is your signature

18    and the date, 9-19-01; is that correct?

19    **A.**    That's correct.

20    **Q.**    Signature of Greg Orr as president of Efficient

21    Realty and Development Corp.; is that correct?

22    **A.**    That's correct.

23    **Q.**    And the signature in the upper left-hand corner

24    says assistant or secretary.  Do you know who's signature

25    that is?

14

1    **A.**    No, sir, I don't.

2    **Q.**    Don't recall?

3    **A.**    No, sir.

4    **Q.**    Somebody who witnessed your signature; is that

5    correct?

6    **A.**    Correct.

7    **Q.**    Now you have indicated that Marjorie Desporte,

8    the attorney that worked at ADT was the one through whom

9    those offers would be received; is that correct?

10    **A.**    That's correct.

11    **Q.**    And what role, if any, did she have in setting

12    the prices and terms?

13    **A.**    They were only responsible for the terms and

14    conditions of the lease or sale.

15    **Q.**    Are you talking about the terms that are

16    physically written in the documents itself?

17    **A.**    Physically within the documents, not the pricing

18    or the lease price related to a property.

19    **Q.**    So, in other words, the agreement that you had

20    worked out with Mr. Orr, when that's reduced to the

21    contract, the contract language was going to be worked on

22    by Marjorie Desporte?

23    **A.**    Correct.

24    **Q.**    Now, we have three leases, sale and lease

25    agreement or sale-leaseback agreements or sale and

1   purchase agreements, depending on the way each one of them

2   is titled, but all three of them are entitled to convey

3   property and convey leasehold interest as well; is that

4   correct?

5       **A.**   Correct.

6       **Q.**   So two of the properties-- This contract was

7   signed in September of '01, one was signed in early

8   October of '01.  What takes place next?

9       **A.**   During this process, Greg is communicating with

10  his real estate attorneys as far as they have been

11  basically approved by Marjorie and his real state

12  attorney.  They worked out the contract language.  The

13  next thing is Greg's--

14      **Q.**   Are we talking about the contract language of

15  the final documents?

16      **A.**   The final documents.

17      **Q.**   Upon conveyance at closing?

18      **A.**   Prior to, they would be conveying.

19      **Q.**   So, again, this is just contract language that

20  discussing and working out those details; is That correct?

21      **A.**   Who's responsible, insurance, those issues that

22  will be normal contract language.

23      **Q.**   Now, is there some point in time, sir, where you

24  had conversations with Mr. Orr concerning the financing

25  that he was attempting to obtain in order to actually

16

1    purchase these three properties?

2        **A.**    At certain times, Greg would either drop by

3    after I got home or he would call, he was having problems

4    getting a loan for these three buildings.

5        **Q.**    Did there come a point in time when you had a

6    meeting over this?

7        **A.**    We talked on several occasions.  It may have

8    been outside my home or out in the driveway or at his home

9    and he obviously needed to do something because he

10   couldn't find a loan for these properties.

11       **Q.**    What he did tell you about also efforts to

12   acquire a loan?

13       **A.**    He said they had been futile.  In other words,

14   he actually indicated that he had contacted his personal

15   attorney seeing if he would have an interest of getting

16   involved in these real estate deals.

17       **Q.**    Who did he refer to as his personal attorney?

18       **A.**    Jules.  Just Jules.

19       **Q.**    Jules, J-U-L-E-S?

20       **A.**    I believe that's a correct spelling, yes.

21       **Q.**    He didn't mention that the last time, as best

22   you can recall?

23       **A.**    No.

24       **Q.**    Did he say where Mr. Jules was located?

25       **A.**    New York.

17

1      **Q.**   So he had a New York attorney he had been

2   communicating with; is that correct?

3      **A.**   My understanding, that's correct.

4      **Q.**   And your understanding is based on what he fold

5   you?

6      **A.**   That's correct.

7      **Q.**   So, tell us about the meeting you had at his

8   residence where he discussed his efforts to get credit.

9   Did he tell you who he had applied to for credit?

10     **A.**   No, he did not.  In thes meeting, he indicated

11  to me that he was going to bring in his partners for two

12  reasons.  One, he was having a very difficult time getting

13  a loan for these three properties, plus the expense to pay

14  the attorney and the loan originating fees.  So he was

15  going to bring in his two partners.

16     **Q.**   Who did he say his two partners were?

17     **A.**   Vince and Johnny Artuso.

18     **Q.**   Now, is that the way he referred to them or did

19  he refer to them as Vince and John?

20     **A.**   He referred to Vinny and Johnny.

21     **Q.**   You knew who they were, though?

22     **A.**   I did.

23     **Q.**   You had previously met them?

24     **A.**   I had previously met them.  If he had said their

25  last name, I probably would not have known who he was

18

1    talking about.  I knew Vinny and Johnny.

2        **Q.**   Now, did he say whether or not he already told

3    them about this deal?

4        **A.**   In this conversation, he indicated my percentage

5    at that time was 50 percent, was going to 30 and Vinny and

6    Johnny were going in as partners.  I had said to Greg the

7    reason I came to you was obviously to keep this within us,

8    in other words, just two people.  My concern was any

9    information or knowledge or things we had done getting

10   out.

11       So I had a real concern knowing that now there

12   was not two people involved.  So my next question to Greg

13   was, do they know what we have done relating to these

14   properties.

15       **Q.**   What did he say?

16       **A.**   He said yes, they did.

17       **Q.**   What, if anything, did you say?

18       **A.**   He said they won't talk.

19       **Q.**   After he assured you of that, despite the fact

20   Vinny and Johnny knew everything and wouldn't talk, did he

21   have a conversation with you about anyone else who was

22   going to be coming in as a new partner?

23       **A.**   Mr. Robert Gannon was coming in because Greg

24   indicated his credit was bad.

25       **Q.**   His own credit was bad?

19

1    **A.**    His personal credit, and he could not fill out

2    an application to get a loan.

3    **Q.**    So he said to you that he could not even fill

4    out an application to get a loan; is that correct?

5    **A.**    His credit was that bad.

6    **Q.**    Is this the first time he ever mentioned to you

7    about getting a loan for the properties?

8    **A.**    No, sir.

9    **Q.**    When he did first bring that up?

10   **A.**    As he was calling me wanting to get final

11   approval of these properties. In other words, Greg had

12   gone through the real estate attorney.  They worked out

13   their issues.  They had it go through ADT and Tyco.  He

14   knew the next step.  He didn't understand it would take

15   some time to get him through the corporate environment for

16   final approval.  All during this period of time, he was

17   having difficulty getting loans.

18   **Q.**    At least that is what he was telling you?

19   **A.**    That's what he was telling me.

20   **Q.**    First time he brung up the fact that he can't,

21   did not fill out an application to get a loan is after the

22   contracts are signed?

23   **A.**    After we agreed to and prior to closing, that's

24   correct.

25   **Q.**    Well, at the time that they were signed on

20

1    September 24th of 2001, and the other one on October the

2    10th and 11th, 2001, was it before or after that date that

3    you were first concerned that he was not filling out a

4    credits application?

5    **A.**    It was afterwards.

6    **Q.**    So now you have got those signed contracts and

7    he is telling you for the first time that he needs to have

8    partners, he can't do it himself; is that correct?

9    **A.**    That's correct.

10    **Q.**    And how did that jive with what you had

11    previously agreed with him about who was supposed to be

12    involved in this deal?

13    **A.**    Only he and I.

14    **Q.**    And that's what you had advised him him?

15    **A.**    Pardon?

16    **Q.**    That's what you had advised him, that it could

17    be the two of you?

18    **A.**    I was concerned, obviously, for many reasons.

19    Number one, if anything got out, I would lose my job at

20    ADT.  If ADT found out, obviously they'd dig into these

21    leases.  So there was concern at that point in time.

22    **Q.**    And concerning the digging into the leases is to

23    find out what?

24    **A.**    They would probably see things they hadn't seen

25    and approved of these deals.

21

1      **Q.**   Like you mentioned, the true value of the

2  properties?

3      **A.**   That's correct.

4      **Q.**   And the true value of the leases?

5      **A.**   That's correct.

6      **Q.**   Now, when you had this conversation with him

7  about Mr. Gannon, what did he tell you what Mr. Gannon's

8  role was to be?

9      **A.**   Mr. Gannon would apply for the loans.

10     **Q.**   Your share is then reduced from 50 percent to

11  what it?

12     **A.**   To 30 percent.

13     **Q.**   Did you know how much the shares of the other

14  people, these new partners were going to be getting?

15     **A.**   No, sir.

16     **Q.**   How did you take the news that now you have got

17  some new partners?

18     **A.**   My concern was obviously more people involved in

19  this and just more people that can talk.  It is just more.

20  So I was concerned from that standpoint of being found

21  out.

22     **Q.**   Now, there's yourself, there's Mr. Orr, there's

23  Vinny or Vincent Artuso, there's Johnny or John Artuso,

24  there's Robert Gannon.  In that same conversation, were

25  any other names brought up as new partners?

1    **A.**    Well, the two main reasons that Vinny and Johnny

2    were brought in was, one, for money.  In other words, Greg

3    didn't have sufficient funds.  And, number two, they had a

4    contact to get a loan.

5    **Q.**    Tell us about that conversation.  What did Mr.

6    Orr tell you?

7    **A.**    It was very brief.  Mr. Orr indicated in this

8    case, when we were talking that in getting the loan that

9    they new a guy named Fip.

10    **Q.**    F-I-P?

11    **A.**    I believe it is Fip.  Like Flip, but Fip. That

12    he knew a guy named Tommy and Tommy knew a guy at GE or a

13    person at GE that could help get a loan.

14    **Q.**    Now at GE, who you believe he was referring to

15    or what entity did you believe he was referring when he

16    said GE?

17    **A.**    Well, GE Credit.  We had vehicles that we leased

18    through GE or GEICO.  I was familiar with the term when he

19    mentioned GE.

20    **Q.**    So GE Capital was a large lending institution;

21    is that correct?

22    **A.**    That is correct.

23    **Q.**    Under General Electric Corporation?

24    **A.**    That's correct.

25    **Q.**    So now he's also got Fip, who's going to bring

23

1    in-- who's got connections in GE in order to get the

2    financing?

3        **A.**    That's correct.

4        **Q.**    So, at the time you leave this meeting, what is

5    your state of mind?

6        **A.**    There's just a lot of people now.  It is not

7    good.

8        **Q.**    Directing your attention-- Now, you yourself

9    were not in contact with anybody that was any of the

10   lending institutions; is that correct?

11       **A.**    No, sir.

12       **Q.**    You were sitting over there in your office at

13   ADT and somebody else completely separate was supposed to

14   be the purchaser; is that correct?

15       **A.**    Um-hmm.

16       **Q.**    So somebody completely separate from you is

17   going to be doing the purchasing.  You want to be arms

18   length; is that correct?

19       **A.**    That's correct.

20       **Q.**    So, initially, Mr. Orr's job was to get the

21   financing, handle the attorneys on the other side, and

22   that way you can stay concealed as far as your interest;

23   is that correct?

24       **A.**    That is correct.

25       **Q.**    Now, so you had no contact, then, with the

24

1    actual lending institutions?

2        **A.**    Zero contact with any lending institutions.

3            MR. SHOCKLEY: Your Honor, at this time, I offer

4    in Government's Exhibit Number 6.118.

5            THE COURT:  Any objection?

6            MR. MARKUS: Just the previously noted objection,

7    Your Honor.  I'd make those throughout the six series so I

8    don't have to keep objecting, please.

9            THE COURT:  The certified?  That's the only

10   issue?

11           MR. MARKUS: Yes, Your Honor.  And this witness

12   just said he had no contact with GE. I think it is

13   inappropriate to ask him about those documents.

14           MR. SHOCKLEY: I'm seeking permission to publish

15   the documents.

16           THE COURT: I'm trying to deal with his

17   objection.  The certified issue is overruled as it had

18   been previously.  Your other one is just the wrong

19   witness, you can't question the authenticity, is that

20   right, beyond the cert issue?

21           MR. MARKUS: Correct, Your Honor.

22           THE COURT:  All right.  6.188 is admitted and

23   you can publish it.

24           MR. SHOCKLEY: Thank you, Your Honor.

25           (Government's Exhibit 6.118 was admitted into

25

1    evidence.)

2    BY MR. SHOCKLEY:

3        **Q.**    Again, this is not a document you would have

4    seen; is that correct, Mr. Horton?

5        **A.**    No, I would not have seen any documents from GE.

6            MR. SHOCKLEY: Ladies and gentlemen of the jury,

7    we're going to publish for you now a document from GE

8    Capital Lending Institution a display of Government's

9    Exhibit Number 6.118.  And if you could enlarge the top

10   portion.  And I mean, the very top portion, the very top

11   line, the telefax line. Go further over to the left.  It

12   shows the date on the telefax line of 11-12-01, and a fax

13   number and there is another fax.  There is another fax

14   right underneath.  So it looks like it has been faxed

15   twice. And over on the right there is a reference to AFC

16   Realty.  And if we just take the top portion of the

17   heading section.

18           This is a letter from GE Capital addressed, it

19   says, to Westmore Properties, LLC.  It is scratched out

20   and written in Efficient Realty, care of Amy Stevens, AFC

21   Realty Capital, Inc., with an address in New York.

22           Says, ladies and gentlemen, we are pleased to

23   submit the following proposal for permanent financing of

24   certain real property described below.  Then in all

25   capital letters, this proposal is subject to review and

1   approval by General Electric Capital Business Asset

2   Funding Corporation.  Final terms and conditions will be

3   established by General Electric Capital Business Asset

4   Funding Corporation if approved during such review and

5   will be subject to mutually satisfactory documentation.

6           So this is, the next paragraph shows it under

7   borrower, Westmore Properties, LLC, scratched out and

8   written Efficient Realty, a limited liability company.

9           If you go down to loan amount, it says combine

10  two separate loans, $2,130,000.  Then in parens,

11  $1,290,000 and $840,000, respectively.

12          Mr. Horton, $1,290,000 was that the Pompano

13  Beach property?

14  **A.**    That's correct.

15  **Q.**    And the $840,000 was the Lancaster property?

16  **A.**    That's correct.

17  **Q.**    Scrolling down it has a payment schedule and

18  there are initial here.  Their payment schedule on the far

19  right-hand side-- far left-hand side, has got initials.

20          Can you zoom in on the written amount and

21  initials?

22          Initials TR and $7,979.50.  If we scan over

23  onto the right-hand side, we can see a figure written in,

24  $12,253.96 and the initials TR encircled.  Then, if we go

25  down to the very last line of that paragraph, it's got

27

1    scratched out, a 25-year schedule written in, 15 year

2    schedule initialed TR.

3           Now, going to the final page bearing Bates label

4    105, we can enlarge the signature section.

5           It has Westmore Properties, LLC scratched out,

6    Efficient Realty and signed Thomas Rossi. Had you ever met

7    Thomas Rossi?

8    **A.**    No, sir.

9    **Q.**    Even to this date?

10   **A.**    No, sir.

11          MR. SHOCKLEY: That's all for that publication,

12   Your Honor.  You can take it down from the screen.

13   BY MR. SHOCKLEY:

14   **Q.**    So we know then as of November 12th of 2001,

15   that there has been a bid for two of the loans for two of

16   the premises, the Palm Beach and Lancaster. GE Capital

17   pledging, subject to later approval that those loans would

18   be issued.

19          MR. SHOCKLEY: And now I would like to publish,

20   Your Honor, offer into evidence Government's Exhibit 6.45.

21          MR. MARKUS:  Maintain the previous objection,

22   Your Honor.

23          THE COURT:  6.45 is admitted over the previous

24   objection.

25          (Government's Exhibit 6.45 was admitted into

1    evidence.)

2    BY MR. SHOCKLEY:

3       **Q.**    Englaring the very top line, the telefax line,

4    shows a date of 11-13-- Well, there is 11-12 and 11-13

5    date-- wait a minute. Let me get my glasses. Both of those

6    telefax lines show 11-13-01.

7           If we could enlarge the caps of the letter.

8           This is from GE Capital to Westmore Properties,

9    LLC, care of  AFC Realty Capital, Inc. in New York, New

10   York.  Language in the first paragraph-- Can we get all of

11   the first paragraph-- We're pleased to submit the

12   following proposal for 90 percent of certain real property

13   described below.  Again, it is the same general things as

14   the last letter, subject to approval.

15          If you have go down further to the loan amount,

16   it says loan amount of $685,000 at 90 percent of the

17   purchase price or cost to construction, so on and so

18   forth.  And, again, if you go down to payment schedule on

19   the far right, there appears to be initials and some

20   handwriting.  There appears to be a correction or a change

21   to the amount of the principle and interest payments that

22   will be paid, $6,506.73 with an initial TR and then again

23   scratched out underneath on the last line of that

24   paragraph is the 25-year schedule, it is changed to

25   15-year schedule with the initials TR.  And, again, that

1    was a 15-year least that ADT was going enter into a lease

2    package on the premises; is that correct?

3        **A.**    That's correct.

4        **Q.**    Would it be fair to characterise that as a

5    long-term lease?

6            MR. MARKUS: Judge, the witness said he has not

7    seen it. It is unfair talking about them.

8            THE COURT:  Overruled.

9    BY MR. SHOCKLEY:

10       **Q.**    ADT agreed to enter into a 15-year lease with

11   Westmore Properties and Efficient Realty and Development

12   Corp., is that correct?

13       **A.**    That's correct.

14       **Q.**    Would that be characterized as a long-term lease

15   in your experience?

16       **A.**    Not unusual.

17       **Q.**    Not unusual, but it is long-term?

18       **A.**    That's correct.

19       **Q.**    Were there shorter term leases that were entered

20   into?

21       **A.**    Yes, there was.

22       **Q.**    Was that common to have short-term leases?

23       **A.**    It would vary on the conditions that you want to

24   use the real estate for.

25       **Q.**    Now, at the time that you and Mr. Orr were

1    making your agreement on these leasebacks, do you want a

2    short-term lease, did you want a long-term lease?

3        **A.**    A long-term lease.

4        **Q.**    And you wanted a long-term lease why?

5        **A.**    Loan would pay off at the same time the lease

6    ran out.

7        **Q.**    So, in essence, you would be getting payments

8    over a longer period of time; is that correct?

9        **A.**    That's correct.

10       **Q.**    More money.  If you had a five-year lease, you'd

11   be getting lease payments for how many years?

12       **A.**    For sixty months.

13       **Q.**    And a 15-year lease, you'd be collecting money

14   longer, wouldn't you?

15       **A.**    Yes, sir.

16       **Q.**    Now, with respect to the approval process, the

17   actual approval of the loans, again, you didn't take any

18   part in how these loans were eventually approved.

19            Excuse me.  Before I move on, go to the last

20   page of Government's Exhibit 6.118-- excuse me, 6.45, last

21   page, signature section.  Signed by Thomas Rossi on behalf

22   of Westmore Properties, LLC.

23            Now, directing your attention to--

24            MR. SHOCKLEY: Your Honor, offer into evidence

25   6.115.

31

1      MR. PASANO: Your Honor, with regard to that

2  document, again, I recognize it is a business record, but

3  we have agreement with the Government that the date on

4  documents should actually be January 7th, '02.

5      MR. SHOCKLEY: I'm going to cover that, Your

6  Honor, in the examination of the witness.

7      THE COURT:  All right.  We'll straighten it

8  out.

9      MR. PASANO: And the previous objection.

10      THE COURT:  All right.  The previous objection

11  which relates to the use of the certificate process is

12  overruled.  So 6.115 is admitted.

13      (Government's Exhibit 6.115 was admitted into

14  evidence.)

15  BY MR. SHOCKLEY:

16   **Q.**  Diplaying the first page of that letter.  And,

17  again, Mr. Orr, you haven't seen this before at least at

18  the time of this.

19      MR. MARKUS: That's Mr. Horton.

20      MR. SHOCKLEY: Excuse me.  Mr. Horton.

21      THE WITNESS: No, I have not.

22  BY MR. SHOCKLEY:

23   **Q.**  Let's take a look at the caps on the top.  It

24  bears a date of January 7, 2001.  We'll get to that in a

25  second.  But it is addressed to AFC Realty Capital, Inc.

32

1    in New York.  Had you met Amy Stevens?

2        **A.**    No, sir.

3        **Q.**    Even to this date?

4        **A.**    Even to this day.

5        **Q.**    Scanning down now to securing property and

6    improvement section, the loan there is being secured by

7    First Deed Trust and Mortgage, and this gives the address

8    of 2801 Gateway Drive, Pompano Beach, Florida.  And under

9    loan apartment, $1,229,400.

10            Go to the second page of the document, upper

11    left-hand corner.

12            Says, page two.  There appears the date, January

13    7th of 2002.  So the date then changes from the first page

14    of the document to the second page, succeeding page.

15            MR. MARKUS: Judge, I'm going to object.  Mr.

16    Shockley is continually commenting on what the document is

17    without asking the witness a question.

18            MR. SHOCKLEY: It is not being offered through

19    this witness.

20            THE COURT:  I think he is just reading.

21            MR. MARKUS: He keeps saying: And this is what

22    this means. It is inappropriate. The document says what

23    the document says.

24            MR. SHOCKLEY: I didn't say what it meant, I said

25    what it said.

1    THE COURT:  All right.  The objection is

2  overruled.  But please just publish the document, if you

3  would or those portions of it you wish to bring attention

4  to.

5  BY MR. SHOCKLEY:

6    **Q.**   The second page shows the date of January 7,

7  2002.

8    Go to the third page, upper left-hand corner.

9  January 7, 2002, page three of eight.  Without going all

10  through, going to Bates label 86, again that shows in the

11  upper left-hand corner, on the signature page now, January

12  7th of 2002.

13    Now, scanning down to the signature section,

14  shows a signature by Thomas Rossi, manager, Westmore

15  Properties, LLC, under borrower's federal ID number,

16  that's blank.

17    Going to the next page bearing Bates label 87,

18  go to the top telefax line, shows a date of 1-7-02 on the

19  telefax line.  And scanning down from the signature

20  section, shows borrower as Efficient Realty and

21  Development, LLC, a limited liability company, by Thomas

22  Rossi, managing director.  Shows date accepted, 1-9-02 and

23  for federal ID number this time is filled in, 65-115-8800

24  in parens (Pompano).

25    MR. SHOCKLEY: Your Honor, we offer in evidence

34

1    Government's Exhibit 6.176.

2           THE COURT: That's the same objection, Mr.

3    Markus?

4           MR. MARKUS: Yes, Your Honor.

5           THE COURT:  That's overruled. 6.176 is admitted.

6           (Government's Exhibit 6.176 was admitted into

7    evidence.)

8    BY MR. SHOCKLEY:

9       Q.   On the upper part where it says real estate

10   credit authorization, bears a date of December 18, 2001,

11   and reading-- if you scan down a little bit-- financing

12   request and those two amounts here, one is $1,209,400 and

13   the other is $824,400, totalling a little over $2 million.

14          Underneath it shows a term of 15 years. Scan

15   down. Shows a bid letter date of November 12, 2001.  And

16   under transaction summary, farther down, first paragraph

17   shows one and two, summary transaction.

18          Special Agent Watts, take the transaction

19   summary, just enlarge the actual writing here.

20          Says transaction proceeds will be used to

21   purchase two office warehouse buildings.  Lists one, shows

22   an address site in Pompano Beach, Florida and the purchase

23   price received, $1,209,000.  Number two shows an office in

24   East Hempfield, Pennsylvania, purchase price $840,000.

25          Scanning on down under borrower, says the

1    borrowing entity is a newly formed LLC with standard

2    certificates to own and operate the subject building, the

3    primary principal is John Artuso. Artuso has been in the

4    commercial investment business for over 10 years. He has a

5    25 percent interest in Boca Dominion Realty.

6           And then scanning on down under property

7    description, again, refers to the Pompano Beach, Florida

8    area.

9           We go just to the next page.  The next page

10   under lease, it shows a yet to be executed lease.

11          Can we enlarge the lease paragraph section T?

12   Refers to that yet to be executed lease, two of them.

13          Scanning down to strengths and weaknesses.

14   Under strengths, it says-- Could we enlarge half of that--

15   under strengths, is worldwide fire and security company

16   recently operating. Results have been quite strong.  ADT's

17   monitored customer base has increased significantly.

18   Figures for the last three years, FY 2000 to FY 2001.

19   More experienced r.e. Investors.  Economics are good.

20   Locations are favorable.

21          If we go to the weaknesses side.  Partnership

22   company, Tyco International will not guarantee the leases

23   over ADT (Fire and Security Services) accounting for 21

24   percent of Tyco's total revenue and nine percent of

25   operating income in the most recent FY 2000.

1            Scanning down to history, nature of business and

2    financial highlights.  Under borrower, it states.  The

3    borrowing entity is a newly formed LLC that appears to be

4    same-- scanning down-- referes to John Artuso.  Total

5    asset liquidity, total debt, net worth, AGI.  And scanning

6    down from that it says, Artuso's net worth is standard for

7    five percent ownership interest in Atlantic Magazine

8    Services, 25 percent in Boca Dominion Realty.

9            Scanning further, AGI comprised of salary and

10   rental income, dated January 3, 2002. CBRO, Artuso is

11   clean.

12           Directing your attention--

13           MR. SHOCKLEY: Your Honor, we offer into evidence

14   Government's Exhibit 6.166.

15           THE COURT:  Nothing other than the standing

16   objection?

17           MR. MARKUS: Yes, Your Honor, hearsay. It has got

18   secondary hearsay, Your Honor, and I have a Crawford

19   objection.

20           THE COURT:  A what?

21           MR. MARKUS: A Crawford objection.

22           THE COURT:  This is simply an appraisal?

23           MR. SHOCKLEY: It's an appraisal.  An outside

24   appraiser was hired by GE Capital to conduct that

25   appraisal on the premises and for GE Capital's records.

1          THE COURT:  Mr. Markus, you agree a document was

2    prepared by a third party can be part of a business

3    record. Is there anything other-- This is just an

4    appraisal, right?

5          MR. MARKUS: It is an appraisal done by someone

6    other thank GE, Your Honor.

7          THE COURT:  Is that the sole objection?

8          MR. MARKUS: And Crawford. Yes, Your Honor.

9          THE COURT:  I'm going to overrule that

10   objection.  It appears the business entity incorporated

11   the document into the records.  It's an appraisal. I think

12   that's typically relied upon by financing companies, so

13   I'm going to overrule the objection.

14         Go ahead.  (Government's Exhibit 6.166 was

15   admitted into evidence.)

16   BY MR. SHOCKLEY:

17   **Q.**   Showing you Government's Exhibit 6.166, if we

18   take a look at the first page of the document.

19         If we can enlarge that upper section so that we

20   can read it.

21         The document states complete appriasal shall

22   contain operating report to ADT at 2801 Gateway Drive,

23   Pompano Beach, Florida.  Is prepared for Candice Wilson,

24   Realty Appraiser Services at GE Captial Business Asset

25   Funding Corporation, January 11, 2002.

1          Scanning over to the left, there is a name,

2     Integra Realty Resources.

3          Scanning down the document to the next page--

4          MR. MARKUS: Judge, I would also have a 401-403

5     objection.  This was done in connecdtion to financing, not

6     in connection with the sale.  So I think it is confusing

7     and under 401-403, we object, Your Honor.

8          THE COURT:  All right.  Those objections are

9     also overruled.

10    BY MR. SHOCKLEY:

11    **Q.**    Direction your attention to the page bearing

12    Bates label 418, if you can enlarge the caption portions.

13    Date, January 29, 2002, subject market value appraisal.

14    Dear Ms. Wilson: We're pleased to transmit the

15    self-contained report of a complete appraisal that was

16    prepared on the referenced property.  The purpose of this

17    was to derive an opinion of the market value of the lease

18    fee and fee simple estate of the property as of January

19    11, 2002, the effective date of the appraisal.  The

20    attached report sets forth the data, research, analyses

21    and conclusions for this appraisal.

22          Directing your attention to the second page

23    bearing Bates label 419-- ending in 419.

24          Enlarge the top half of that page.

25          Says, first sentence, based on the analyses and

39

1    conclusions in the accompanying report and subject to the

2    definitions, assumptions and limiting conditions expressed

3    in this report, it is our opinion that the market value of

4    the lease fee and fee simple estate of the subject as of

5    January 11, 2002 is is follows:  First lease fee estate,

6    $3,770,000.  Then it lists the fee simple estate,

7    $2,250,000.  There is a figure underneath net go dark

8    value fee simple estate, $2,120,000.

9         Mr. Horton, you had not seen this?

10   **A.**   That's correct.

11   **Q.**   This is an internal document of GE Capital; is

12   that correct?

13   **A.**   That's correct.

14   **Q.**   But this has two separate appraisal figures as

15   we had previously talked about, a fee simple estate,

16   selling an empty building and a lessee estate, selling a

17   piece-- I mean a building that has an attached lease.  And

18   you explained to Mr. Orr concerning the difference between

19   the two?

20   **A.**   Selling these back certainly has a lot more

21   value to the purchase price or selling price than a simple

22   fee lease.

23   **Q.**   You have seen the sale-leaseback situation had

24   agreed to sell to Efficient Realty and Development Corp.,

25   I believe it was, the Pompano Beach property, the property

40

1    for $1,290,000 and this shows an appraised value of

2    $3,770,000.

3        Now, of course, you did not have this number at

4    the time that you were deciding upon the price; is that

5    correct?

6    **A.**    That's correct.

7    **Q.**    The appraised price that you had just from the

8    fee simple though was above the $1,290,000; is that

9    correct?

10   **A.**    That's correct.

11   **Q.**    Is these values in this appraisal are consistent

12   or inconsistent with what you had told Mr. Orr concerning

13   the relative values of the property lease fee or fee

14   simple?

15   **A.**    They're related.

16       MR. SHOCKLEY: Your Honor, we offer now

17   Government's Exhibit 6.43.   Again, in the six series,

18   Your Honor.

19       THE COURT:  6.43, just the certified issue, Mr.

20   Markus?

21       MR. MARKUS: Yes, sir.

22       THE COURT:  6.43 is admitted.

23       (Government's Exhibit 6.43 was admitted into

24   evidence.)

25   BY MR. SHOCKLEY:

41

1      **Q.**   This shows a date on this letter, January 7,

2    2001-- excuse me, 2002. Again, to Amy Stevens at AFC

3    Realty in New York City from GE Capital.

4           Says, borrower, Westmore Properties, LLC.

5    Property and improvements, it refers to property at 32100

6    U.S. Highway 19, North Palm Harbor, Florida.  Is that the

7    address of the Palm Harbor property that you had agreed to

8    sell on behalf of ADT to Gregory Orr?

9      **A.**   Yes, it is.

10     **Q.**   Showing you a loan amount, scanning down,

11   $684,900.  Under payment schedule, monthly payments of

12   $6,505.78.

13          On page bearing Bates label 98, ending in 98,

14   signature page, Thomas Rossi, manager signing on behalf of

15   Efficient Realty, LLC.

16          MR. SHOCKLEY: Government offers Government's

17   Exhibit 6.1, Your Honor.

18          THE COURT: 6.1 is admitted.

19          (Government's Exhibit 6.1 was admitted into

20   evidence.)

21   BY MR. SHOCKLEY:

22     **Q.**   On 6.1, scan down.  Date is December 18, 2001.

23   Underneath, borrower, Westmore Properties, LLC.  Loan

24   amount of $684,900. Term, 15 years. Bit letter dated

25   November 12, 2001.  Transaction summary.

1           If you can enlarge that.

2           Under transaction sum it states, transaction

3    proceeds will be used to purchase a site in Palm Harbor,

4    Florida.  Purchase price, $685,000.  The subject build or

5    100 percent leased 15 year terms, to ADT Security Systems

6    stick a wholly owned subsidiary of Tyco International,

7    Limited.

8           Underneath that, says borrower. The borrowing

9    entity is a newly formed LLC to own and operate the

10   subject buildings.  The primary principal is Robert

11   Gannon.  Gannon has been in the commercial r.e. business

12   since the early 1980s and is a banker with Barclay's Bank,

13   Chase and Heartland Financial.

14          Scanning on down to the lease section.  It says,

15   yet to be executed lease is by and between Westmore

16   Properties, LLC as landlord and and ADT Security Services,

17   Inc. as tenant.  Term is for 15 years with one five year

18   renewable option.  Landlord is responsible for only

19   structural and management expenses.  Base lease rents and

20   lease are $238,400.

21          If we can go to next page under strengths.

22   Borrower is experienced r.e. Investor.

23          Scanning down to history and nature of business

24   and financial highlights under borrower. The borrowing

25   entity-- again, this appears to be the same that was on

43

1    the previous page.

2         Scanning down it lists next to Robert Gannon,

3    total assets and liquidity, total debt.

4         And underneath that, Gannon's net worth is

5    centered on ownership in Jojo Realty, 50 percent and

6    commercial r.e. investments.

7         MR. SHOCKLEY: At this time, we offer into

8    evidence Government's Exhibit 6.92, the appraisal.

9         MR. MARKUS: Same objection with respect to the

10   appraisal, Your Honor.

11        THE COURT:  All right. The objection is

12   overruled.  6.92 is admitted.

13        (Government's Exhibit 6.92 was admitted into

14   evidence.)

15   BY MR. SHOCKLEY:

16   **A.**   Display the first page on the display screen can

17   we go to the one bearing Bates label ending in 280.   The

18   far left it says Integra Realty Resources.  On the

19   right-hand side, complete appraisal in a self-contained

20   appraisal report.  Office property, ADT Security 32100

21   Highway 19 North, Palm Harbor.

22        Prepared for Ms. Candice Wilson, GE Capital.

23   Effective date, January 10, 2002.

24        Going to the page bearing Bates label 282, going

25   right to the bottom of the document, last paragraph.

44

1    Based on the analyses and conclusions in the accompanying

2    report, and subject to the definitions, assumptions and

3    limiting conditions expressed in this report, it is our

4    opinion that the market value of the lease fee estate of

5    the property as of January 10, 2002 is $2,190,000 and in

6    parens it's got $2,190,000.

7         Go to the one bearing Bates label 283, enlarging

8    the top paragraph, the preceding value is subject to the

9    following action, assumptions and hypothetical conditions.

10   One, the lease agreement provided by the broker was not

11   signed.  This value conclusion is it based on the

12   assumption that the lease agreement will be executed.

13   Two, a survey was not provided.

14        Go to page bearing Bates label 345.  If we can

15   enlarge the top paragraph.  Final conclusion of value.

16   Based on the analyses and conclusions in the accompanying

17   report and subject to the definition, assumptions and

18   limiting conclusions expressed in this recort, it is our

19   opinion that the market value of the leased fee estate of

20   the subject as of January 10, 2002 is $2,900,000.  And in

21   parens or are the figures.  They match on this page.

22        Now, sir, this appraisal report again, you had

23   never seen before; is that correct?

24   **A.**   That's correct.

25   **Q.**   And the Palm Harbor property was sold, was going

45

1    to be sold for $684,900; is that correct?

2        **A.**    That is correct.

3            MR. SHOCKLEY: We'd offer in evidence

4    Government's Exhibit 6.91.

5            MR. MARKUS: No objection.

6            THE COURT: This is just a certificate issue?

7    This was also prepared by a third-party sent to GE

8    Capital?

9            MR. MARKUS: This is a GE--

10           THE COURT:  This is a GE document? Okay.

11           MR. MARKUS: Also, Crawford, Judge.

12           THE COURT:  All right. The objection is

13   overruled.  6.91 is admitted.

14           (Government's Exhibit 6.91 was admitted into

15   evidence.)

16   BY MR. SHOCKLEY:

17       **Q.**    If we could enlarge the top portion of this.

18           Says real estate appraisal long form review.

19           If you scan down, relates to Palm Harbor and

20   scan down farther, appraiser's value conclusions.  And

21   states, the fee simple and leased fee estate, both of

22   them, $2,090,000.

23           MR. SHOCKLEY: We'd offer in evidence, Your

24   Honor, Government's Exhibit 6.175.

25           THE COURT:  Mr. Markus, this is just a

46

1    certificate issue?

2            MR. MARKUS: Yes, Judge.

3            THE COURT:  6.175 is admitted.  Overrule that

4    objection.

5            (Government's Exhibit 6.175 was admitted into

6    evidence.)

7            MR. SHOCKLEY: Permission to publish, Your Honor.

8            THE COURT:  Go ahead.

9    BY MR. SHOCKLEY:

10       Q.    It's a letter dated January 7, 2002.  Second

11   page-- Stay on page one.  Directed from GE Capital

12   directed to Amy Stevens in New York.  Borrower.  Scan down

13   a little bit. Efficient Realty, LLC property and

14   improvements, referred to property at 3040 Industry Drive,

15   Lancaster, Pennsylvania.

16           Scanning down, loan amount, $824,400.

17           Scanning down farther.  Payment scheduled,

18   $7,830.88 monthly.  Page two, upper left-hand corner bears

19   a date of January 7, 2002.  Bates label 670, very last

20   paragraph.  Special condition, GE Capital will only fund

21   loan subject to full execution of purchase sale agreement

22   execution of lease.

23           Go to the next page.  Signature blocks.  Signed

24   by Thomas Rossi, manager, Efficient Realty, LLC. Federal

25   ID number, none.

1        Next page, very top telefax line bearing Bates

2    1027.  Scanning down to the signature block again.  Shows

3    borrower, federal ID number 52-2357558.

4        THE COURT:  Is this a convenient time to stop?

5        MR. SHOCKLEY:  Yes, Your Honor.

6        THE COURT:  Let's break for fifteen minutes,

7    return at 3:15.

8        (Whereupon, a break was taken.)

9        THE COURT:  You can have a seat. Let's invite

10    them in.

11        Welcome back.  Please continue, Mr. Shockley.

12        MR. SHOCKLEY: Thank you, Your Honor.

13        We'd offer in evidence 6.212  That's another

14    appraisal, Your Honor.

15        THE COURT:  As part of the GE Capital records?

16        MR. SHOCKLEY: Yes.

17        THE COURT:  Mr. Markus, same objection?

18        MR. MARKUS: Same objection.

19        THE COURT: I'm going to remain consistent and

20    overrule your objection.  6.212 is admitted.

21        (Government's Exhibit 6.212 was admitted into

22    evidence.)

23    BY MR. SHOCKLEY:

24    Q.  Go to Bates label ending in 233.  Integra Realty

25    Resources.  On the right-hand side, it states, complete

1    appraisal and self-contained appraisal report 3040

2    Industry Drive, East Hempfield Township, Lancaster County,

3    Pennsylvania. Prepared for GE Capital. Effective date of

4    the lease, January 20, 2002.

5         And going to the second page, bearing Bates

6    label ending in 234. Date of the letter, January 28, 2002,

7    directed again to Ms. Candice Wilson, GE Capital. Subject,

8    market value appraisal, 3040 Industry Drive, East

9    Hempfield, Township, Lancaster County, PA.  Dear Ms.

10   Wilson: Integra Realty Resources is pleased to advance its

11   self-contained report of a complete appraisal that was

12   prepared on the referenced property hereinafter referred

13   to as the property.  The purpose of this appraisal is to

14   derive the opinion of the market value of the leased fee

15   and fee simple estates of the property as of January 10,

16   2002, the effective date of the appraisal.  The attached

17   report sets forth the data, research, analyses and

18   conclusions for the appraisal.

19        Going to the next page bearing Bates label 235,

20   the top half of that enlarged, states, based on the

21   analyses and conclusions of the accompanying report,

22   subject to the definition, assumptions and limiting

23   conditions expressed in this report, it is our opinion

24   that the market value of the leased fee and fee simple

25   estates of the property as of January 10, 2002 are:

49

1    Market value of leased fee, January 10, 2002, $2,400,000.

2    Market value of fee simple, January 10, 2002, $1,250,000.

3           Bottom of the page, says the preceding value

4    conclusion is subject to the following extraordinary

5    assumptions and limiting conditions.  We were provided an

6    unexecuted copy of the lease between Efficient Realty and

7    ADT Security Systems, Inc. as well as a copy of an

8    agreement of sale between ADT Security Systems, Inc. and

9    Efficient Realty and Development Corp.  This is contingent

10   upon the lease being executed.  We assume this lease is

11   executed.

12          Now those values, Mr. Horton, again, they break

13   it down to lease fee and fee simple, but the sales price

14   for the property was $840,000; is that correct?

15   **A.**   That is correct.

16   **Q.**   So, $840,000 is beneath the fee simple amount of

17   $1,250,000; is that correct?

18   **A.**   That's correct.

19   **Q.**   And it is even far beneath the leased fee

20   appraisal value of $2,400,000; is that correct?

21   **A.**   That is correct.

22          MR. SHOCKLEY: Your Honor, we now offer 6.210.

23          THE COURT:  This is a GE document?

24          MR. SHOCKLEY: Yes, Your Honor.

25          THE COURT: So the certificate is your issue?

50

1    MR. MARKUS: No, Your Honor. This one is okay.

2    Excuse me, Your Honor--

3    MR. SHOCKLEY: It is an appraisal document.

4    THE COURT:  But it is a GE document.

5    MR. MARKUS: A GE document that relies upon--

6    THE COURT:  Again, overrule the objection.

7    6.210 is admitted.

8    (Government's Exhibit 6.210 was admitted into

9    evidence.)

10    BY MR. SHOCKLEY:

11    Q.    Please display on the screen Goverment's Exhibit

12    6.210.

13    Under borrower's name, shows Efficient Realty,

14    LLC. In the upper left-hand corner, shows the property at

15    3040 Industry Drive, again, the Lancaster property.  And

16    in the lower right-hand side of the picture is shows the

17    appraiser value conclusions, and those set forth as fee

18    simple, $1,250,000 and leased fee, $2,400,000.

19    Now, directing your attention back to --

20    MR. SHOCKLEY: Your Honor, we offer in evidence

21    Government 6.155.

22    MR. MARKUS: Same objection; Crawford,

23    confrontation, certificate.

24    THE COURT:  All right.  This is an another

25    appraisal within GE's files relied upon by GE?  Is that

51

1    what it is?

2          MR. SHOCKLEY: Another appraisal in GE files;

3    yes, Your Honor.

4          THE COURT:  Overrule the objection.  6.155 is

5    admitted.

6          (Government's Exhibit 6.155 was admitted into

7    evidence.)

8          MR. MARKUS: I guess part of my objection, just

9    because it is in the files--

10         THE COURT:  I understand that.

11         MR. SHOCKLEY: Your Honor, we would also offer at

12   this time Government's Exhibit 6.214.

13         THE COURT:  What was this one?

14         MR. SHOCKLEY: This is 6.155.

15         THE COURT:  Now your offering--

16         MR. SHOCKLEY: 6.214, another appraisal report in

17   the GE files.

18         THE COURT:  Which presents the same issue, Mr.

19   Markus?

20         MR. MARKUS: Yes.

21         THE COURT: Objection overruled to 6.214.

22         (Government's Exhibit 6.214 was admitted into

23   evidence.)

24   BY MR. SHOCKLEY:

25     Q.   If we can display the first page.

52

1    Permission to publish the exhibit back to the

2  Elmo.

3    The first page is from American Appraisal

4  Associates, dated April 16, 2001.  In the section of the

5  box, just shows an address, no person.  Under RE:, it

6  referes to 2801 Gateway Drive, Pompano Beach, Florida.

7    The next page shows a market value fee simple

8  estate as of March 1, 2001.  If I could now have

9  Government's Exhibit 1.22-- Let's see.  Government's

10  Exhibit 1.224, Your Honor.  It has been previously

11  admitted.  Now, 1.224 showing Mr. Orr Government's Exhibit

12  1.224 previously admitted, an appraisal for Pompano

13  Beach.  Do you recall the exhibits you testified to

14  earlier this morning?

15    **A.**    I do.

16    **Q.**    Showing you the second page, shows the address

17  of Gateway Drive in Pompano Beach, market value fee simple

18  estate as of March 1, 2001.

19    Next page shows April 16, 2001 to Ken Stern,

20  Executive Securities. Do you recall me showing you that

21  earlier this morning?

22    **A.**    Yes, sir.

23    **Q.**    Compare that now with the GE exhibit, 6.155, the

24  address pages.  They appear to bear the same 2441

25  Warrenville Road, Suite 600 in Illinois?

53

1          A.    I believe so.

2          Q.    So the same address is on both of these, but the

3     one from GE, the name Mr. Ken Stern, executive

4     vice-president of SecurityLink is not there; is that

5     correct?

6          A.    That is correct.

7          Q.    Now, Government's Exhibit 1.224 is the documents

8     you said a copy of which you gave to Greg Orr when you and

9     he were deciding upon the prices of the various

10    properties?

11         A.    That's correct.

12         Q.    Did you ever have direct dealings yourself with

13    GE Capital?

14         A.    No, sir.

15         Q.    Do you know how GE Capital came to have the

16    documents, a copy of the documents you gave to Mr. Orr in

17    their own internal files?

18         A.    No, sir.

19         Q.    Now, showing you Government's Exhibit Number

20    6.124, just been admitted, showing the first page of the

21    document, it has the address of Industry Drive, East

22    Hempfield.  Market value fee simple estate as of April 1,

23    2001.

24              Again, on the cover page shows a date of April

25    24, 2001, address of 2441 Warrenville Road, Suite 600 in

54

1    Illinois.  I want to show you now government's Exhibit

2    1.223.  Do you recognize this exhibit, the appraisal for

3    the Lancaster property?

4        A.    Yes, sir.

5        Q.    Did you testify that this was a copy that you

6    give to Gregory Orr?

7        A.    I did.

8        Q.    Showing the cover page on that exhibit, does it

9    appear to have the same date as the GE exhibit?

10       A.    Yes.

11       Q.    The address is the same except that Mr. Ken

12   Stern, executive vice-president of SecurityLink does not

13   appear to on the document 6.124; is that correct?

14       A.    That's correct.

15       Q.    Again, would you have any direct knowledge how

16   that document came to be in the possession of GE Capital?

17       A.    No, sir.

18       Q.    Those two ADT appraisals that you had identified

19   earlier this morning, those were in the internal documents

20   of GE Capital?

21       A.    Yes.

22       Q.    Of ADT?

23       A.    Of ADT, correct.

24       Q.    Did you ever give them to GE Capital?

25       A.    No, sir.

55

1      Q.      Showing you now Government's Exhibit 6.176--

2              MR. SHOCKLEY: We offer that into evidence, Your

3      Honor.

4              THE COURT: 6.176? I think that is already there.

5              MR. SHOCKLEY: Yes, it is already.

6              Your Honor, we ask to display that again.

7      Specifically, go to the page bearing Bates label-- well,

8      the first page.

9      BY MR. SHOCKLEY:

10     Q.      This is a real estate credit authorization dated

11     December 18, 2001, two separate properties from GE

12     Capital.

13             Directing your attention now or if we could go

14     to the last page of that exhibit bearing 078.  If we could

15     enlarge the very last paragraph.

16             It reads, the borrower provided on March 1, 2001

17     an appraisal prepared by American Appraisal Associates of

18     Irvine, California which arrived at a market value of

19     $1,573,000. BAF has ordered a new appraisal from its list

20     of appraisers.

21             And the borrower in that exhibit was, if we

22     could go back to the first page, is a newly formed LLC,

23     John Artuso.

24             MR. SHOCKLEY: We offer now Government's Exhibit

25     Number 6.11.

56

1            THE COURT:  This is just the certificate issue,

2    right?

3            MR. MARKUS: Yes, Your Honor.

4            THE COURT:  6.11 is admitted.

5            (Government's Exhibit 6.11 was admitted into

6    evidence.)

7    BY MR. SHOCKLEY:

8        **Q.**   If we could display it now.  Enlarge the very

9    top portion.

10           States, cover on the letter is AFC Realty

11   Capital, Inc., bearing date of October 29, 2001.

12   Addressed to Donald Hergemiller, General Electric Business

13   Asset Funding regarding 32100 U.S. Highway 19 North, Palm

14   Harbor, Florida.  Reads: Dear Don, in connection with the

15   ADT offer portfolio, I have enclosed a sales contract and

16   lease agreement for the above-captioned premises.  I'll

17   forward the appraisal shortly.  It is signed Amy Stevens.

18           Did you ever have any contact directly with Amy

19   Stevens?

20       **A.**   No, I did not.

21       **Q.**   You give her any appraisals?

22       **A.**   No, I did not.

23       **Q.**   The appraisal that gave, you described earlier,

24   your testimony was it was given to how many people?

25       **A.**   They would have been laywers, and the real

57

1    estate attorneys in ADT's office.

2        **Q.**   And to Greg Orr?

3        **A.**   And to Greg Orr.

4        **Q.**   Mr. Horton, did there come a point in time, sir,

5    when you were seeking approval to actually sign on the

6    bottom line, if you will, to actually convey these

7    properties to the entities that were purchasing them?

8        **A.**   Yes.

9        **Q.**   Directing your attention to Government's Exhibit

10   1.137--

11            MR. SHOCKLEY: We offer 1.137 in evidence.

12            MR. MARKUS: No objection, Your Honor.

13            THE COURT:  1.137 is admitted.

14            (Government's Exhibit 1.137 was admitted into

15   evidence.)

16            MR. SHOCKLEY:  And 1.113.

17            MR. MARKUS: No objection, Judge.

18            THE COURT:  Admitted.

19            (Government's Exhibit 1.113 was admitted into

20   evidence.)

21   BY MR. SHOCKLEY:

22       **Q.**   Display that on the screen. Enlarge ADT, the

23   bottom right-hand corner.  It has got 2.1.02, Larry

24   Horton. Is that your printing?

25       **A.**   Yes.

1      Q.    Go back and enlarge the top part.

2            What is this document?

3      A.    It is an attachment that was attached to an

4  email sent to the CFO for requesting approval.

5      Q.    Now, in here there are three locations.  One is

6  the Pompano Beach property, second, Palm Harbor property

7  and third, Lancaster; is that correct?

8      A.    That's correct.

9      Q.    Shows the sales price in the columns; is that

10  correct?

11      A.    That's correct.

12      Q.    Shows the sales prices that were eventually

13  agreed upon subject to $100 difference on the Palm Harbor

14  property; is that correct?

15      A.    That's correct.

16      Q.    In the far right-hand column, says date set for

17  closing.  Lists two separate dates in February 2002; is

18  that correct?

19      A.    That is correct.

20      Q.    Shows February 4th and February 5th, 2002?

21      A.    Yes.  These details would have come from the

22  real estate attorneys.

23      Q.    To schedule closing on the property; is that

24  correct?

25      A.    That's correct.

1    Q.   Directing your attention where it says market

2   value, now with the Gateway Drive, Pompano Beach property,

3   it shows market value of $1,410,000.  But we saw an

4   appraisal that you previously identified bearing a value

5   of $1,570,000.  Use has it got a market value of

6   $1,410,000 instead of $1,570,000?

7    A.   I placed that value in there.

8    Q.   Which was lower than the actual appraised value

9   that you yourself had; is that correct?

10    A.   That's correct.

11    Q.   And directing your attention to the second

12   property, it shows market value of $775,000 but we saw

13   earlier the Triple A appraisal showing it appraised for

14   $1,050,000; is that correct?

15    A.   That is correct.

16    Q.   And again this number that was placed here,

17   $775,000, that was the number you placed in there?

18    A.   I placed that number in there.

19    Q.   Lower than the appraised value that you knew

20   pursuant to that Triple A appraisal?

21    A.   That is correct.

22    Q.   And showing you the final one, shows an

23   appraised value of Lancaster-- or excuse me, market value

24   of $935,000, but we know that the Triple A appraisal was

25   $1 million according to the appraisal that you had; is

60

1    that correct?

2        **A.**    That is correct.

3        **Q.**    Did you also insert the lower market value in

4    this document?

5        **A.**    I did.

6        **Q.**    Now, you said that this is a spread sheet.  You

7    would have provided that to whom?

8        **A.**    To Scott McArthur, our CEO.

9        **Q.**    You referring to the Chief Financial Officer of

10   ADT?

11       **A.**    I am.

12       **Q.**    Directing your attention to Government's Exhibit

13   28.8--

14           MR. SHOCKLEY: First of all, Your Honor, I'd ask

15   permission to approach the witness.

16           THE COURT:  Yes.

17   BY MR. SHOCKLEY:

18       **Q.**    Showing you Government's Exhibit Number 28.8,

19   ask if you'd identify what this document is.

20       **A.**    This is a  copy of the email that I had

21   forwarded to Scott McArthur.  It had an attachment with it

22   we just previously saw.

23       **Q.**    Now, this particular document, Government's

24   Exhibit 28.8, it has a Bates label in the lower right-hand

25   corner WLH-78 and 79; is that correct?

61

1       **A.**    That's correct.

2       **Q.**    How did you get that document?

3       **A.**    Those were documents that were left on an old

4   laptop that I purchased from ADT some time in 2003 to use

5   at home.

6       **Q.**    So you had used this computer at work at ADT?

7       **A.**    I had.

8       **Q.**    Eventually, you purchased it yourself?

9       **A.**    That is correct.

10      **Q.**    Took it home?

11      **A.**    Correct.

12      **Q.**    Did their come some point in time you printed

13  out that document and provided it to the government?

14      **A.**    Yes, that is correct.

15      **Q.**    Through your attorney?

16      **A.**    Through my attorney.

17      **Q.**    Your attorney's name?

18      **A.**    Scott Strebnick.

19      **Q.**    So you presented this document among other

20  documents that you printed out of your personal computer

21  still had ADT documents on it?

22      **A.**    That is correct.

23      **Q.**    This document itself, you recognize that as

24  what?  Is that true an accurate copy of the printout of a

25  series of emails that took place between you and others at

1    ADT concerning the three properties that we just discussed

2    in the last exhibit?

3        A.    Yes, it is.

4              MR. SHOCKLEY: Your Honor, we offer in evidence

5    Goverment's Exhibit 28.8.

6              MR. MARKUS: No objection.

7              THE COURT:  28.8 is admitted.

8              (Government's Exhibit 28.8 was admitted into

9    evidence.)

10    BY MR. SHOCKLEY:

11        Q.    Showing you initially just the top page, we'll

12    do the best we can.  Very top bears your name.  Next to

13    from, sent Friday, February 1, 2002, 4:07 p.m. to Scott

14    McArthur.  But this is a series of emails that went back

15    and forth among you and others?

16        A.    That is correct.

17        Q.    So let's go to the second page or bottom of the

18    first page.  This says original.  Underneath that from

19    Scott McArthur, sent Friday, February 1, 2002 at 2:57 p.m.

20    to Mark Foley. Subject, building sales.  First of all,

21    Scott McArthur is CFO of ADT; is that correct?

22        A.    That's correct.

23        Q.    Mark Foley is who?

24        A.    Financial analyst for Tyco Fire and Security.

25        Q.    And Tyco Fire and Security again you said

63

1    earlier was a holding company. That's actually above ADT?

2        **A.**    That is correct.

3        **Q.**    Says:  Mark, we have three properties obtained

4    through acquisitions that have sales contracts that we

5    hope to sign early next week.  With all the excitement

6    lately, we overlooked the notification process that Mark

7    Belnick issued last year.  The sales are for $1.29 million

8    in Pompano Beach, $685,000 in Palm Harbor and $840,000 in

9    Lancaster, PA. Each of those is separate buyers.  Please

10    advise if you need further information and if there are

11    any issues in proceeding with the closing.  Thanks.

12    Scott.

13            So this would be Scott McArthur, the CFO of ADT

14    to Mark Foley of Tyco Fire and Security; is that correct?

15        **A.**    That's correct.

16        **Q.**    Time on that is February 1, 2002 at 12:15 p.m.;

17    is that correct?

18        **A.**    That's correct.

19        **Q.**    Right above that, there's a message from Mark

20    Foley sent Friday, February 1st, 3:42 p.m. to Scott

21    McArthur. Re: Building sales.  Okay.  Go ahead and sell.

22            And that was in reference to selling what?

23        **A.**    Those three properties that Scott had sent a

24    request for approval.

25        **Q.**    So then, there is a next entry from Scott

64

1    McArthur, Friday, February 1, 2002, 3:55 p.m. To P. Grey

2    Finney and Larry Horton. Subject: FW building sales.  Who

3    is this P. Grey Finney?

4        **A.**    General counsel for ADT.

5        **Q.**    The message is what?

6        **A.**    Approval to go on with the sales.

7        **Q.**    It says specifically.  Okay to go.  Scott.  Is

8    that correct?

9        **A.**    That is correct.

10       **Q.**    So these are the first three properties that you

11   had jointly agreed to purchase at the prices you had said;

12   is that correct?

13       **A.**    That's correct.

14       **Q.**    And in response to this email dated February 1st

15   at 3:55 p.m., you reply with a simple one word response.

16   What was it?

17       **A.**    Thanks.

18       **Q.**    Of course, you were thanking him for going ahead

19   with the sale but I guess also due to the fact you stood

20   to make a profit out of that personally?

21       **A.**    That's correct.

22       **Q.**    Now, from the point in time that the first email

23   was sent at 12:15 p.m. to the reply, that was on the same

24   day; is that correct?

25       **A.**    That's correct.

65

1    Q.    At any point in time did you send anything up

2    for review other than that document you previously

3    identified where you had placed the lower market values on

4    the property?

5    A.    Only that document.

6    Q.    Did either Scott McArthur or Mark Foley ask to

7    see any appraisals?

8    A.    No, sir.

9    Q.    Now, from the point in time that the email was

10   first sent, 12:15 to the reply at 3:42, that's two hours

11   and 45 minutes -- By the way, where was Scott Foley?

12   A.    One floor up.

13   Q.    And the decision was made in that period of time

14   based just on what you had sent?

15   A.    That's correct.

16   Q.    Showing you now-- Now that you have approval,

17   did the sales proceed?

18   A.    The sales and closing; yes, sir.

19   Q.    Showing you now Government's Exhibit Number

20   1.144--

21       MR. SHOCKLEY: We offer that one.

22       MR. MARKUS: No objection.

23       THE COURT: 1.144 is admitted.

24       (Governmentn's Exhibit 1.144 was admitted into

25   evidence.)

66

1   BY MR. SHOCKLEY:

2       **Q.**   If we could display it on the screen.   If we

3   could enlarge the very top portion of this.

4           This is an ADT document consent in lieu of

5   meeting of board of directors.   Could go you done to the

6   resolved section, first resolved paragraph.

7           Resolve that the corporation hereby authorizes

8   the sale of fee simple title to certain real property

9   located in Broward County, Florida, as more particularly

10  described on Schedule 1 attached hereto, the property, to

11  Efficient Realty and Development, LLC, a Florida limited

12  liability company, and then says continues on, to make,

13  execute and deliver any and all conveyance documents to

14  effect the sale of the property and to execute a lease

15  between this corporation and Efficient.   Is that what it

16  states?

17      **A.**   Yes.

18      **Q.**   At the very bottom left-hand side, signed by

19  Jerry Bogess.

20          The next page is identical, just signed by

21  different members of the board?

22      **A.**   I believe those are all Tyco Fire and Security

23  executives Mr. Bogess was president of Tyco Fire and

24  Security.

25      **Q.**   So this the second one signed by Brian Moross

67

1    and the third one is signed J. Brad McGee; is that

2    correct?

3        **A.**    That's correct.

4        **Q.**    At any point in time, did you ever provide an

5    appraisal or support document showing the true market

6    value of the properties?

7        **A.**    No, sir.

8        **Q.**    Did any of them ask for it from you?

9        **A.**    No, sir.

10       **Q.**    Showing you Government's Exhibit 1.143.

11            MR. SHOCKLEY: We'd offer this into evidence,

12    Your Honor.

13            MR. MARKUS: No objection.

14            THE COURT: 1.143 is admitted.

15            (Government's Exhibit 1.143 was admitted into

16    evidence.)

17    BY MR. SHOCKLEY:

18       **Q.**    Display that on screen. If you would enlarge the

19    top portion.

20            This is entitled secretary, P. Grey Finney, duly

21    qualified account executive of ADT Security Services,

22    Inc., and goes on here so forth and so on.

23            Now, you have mentioned P. Grey Finney was

24    corporate counsel of ADT; is that correct?

25       **A.**    That's correct.

68

1    Q.    He was also a secretary of the corporation?

2    A.    I wasn't aware of that.  But, yes.

3    Q.    That's what the document says?

4    A.    That's correct.

5    Q.    Scrolling down, says resolved, this corporation

6    hereby authorizes the sale, and basically the same wording

7    that you can execute a lease between this corporation and

8    Efficient; is that correct?

9    A.    That's correct.

10    Q.    And if you scan down to the bottom, it is dated

11    the 31st day of January, 2002, P. Grey Finney, secretary.

12         Now, it is actually signed on the 31st of

13    January, 2002.  At least what it appears to be according

14    to this document.  But you have the exchange of emails

15    that actually took place on February 1st, the previous

16    exhibit you identified between Scott McArthur and Mark

17    Foley, then back to you. Why is that this would have be

18    signed and resolved before the approval was given?

19    A.    I have no answer for those difference in dates.

20    Q.    If the authorization had not been given, would

21    there be any need for this document?  Withdraw the

22    question.

23         Directing your attention now to Government's

24    Exhibit Number 6.123.

25         MR. SHOCKLEY: A GE document, Your Honor, 6.123.

1              THE COURT:  6.123 is admitted.

2              (Government's Exhibit 6.123 was admitted into

3    evidence.)

4    BY MR. SHOCKLEY:

5       Q.    We can display the first page on the sanctioned

6    system.  If you enlarge the very top portion.

7              Reads, commercialized agreement.  This is made

8    as of the 5th day of February, 2002, by and between

9    Efficient Realty and Development, LLC, a Florida limited

10   liability company hereinafter referred to as the landlord

11   and ADT Security Services, Inc., a Delaware corporation,

12   hereinafter referred to as tenant.

13             The next paragraph refers to the property

14   located at 2801 Gateway Drive in the City of Pompano

15   Baeach, Broward County, State of Florida; is that correct?

16      A.    That's correct.

17      Q.    The second paragraph shows the term of 15 years

18   to commence on February 5th of 2002; is that correct?

19      A.    That's correct.

20      Q.    Under rental, under paragraph 3.1, minimum

21   rental refers to Exhibit B, a lease payment schedule; is

22   that correct?

23      A.    That's correct.

24      Q.    Directing your attention to page bearing Bates

25   label ending 128, paragraph 3.6, security deposits. Shows

1    simultaneously with the execution of this lease, tenant

2    shall pay the sum of $55,971.93 payable upon lease

3    execution to be held by landlord as security for the

4    performance by tenant of all terms, covenants and

5    conditions and payment of rent or any other sum due

6    landlord hereunder.

7              Directing your attention now to page bearing

8    Bates label 129.  Go to the section that says tenant's

9    obligation, paragraph five.

10             If we could enlarge tenant's obligations.  This

11   is ADT now; is that correct, under this lease?

12        **A.**   Correct.

13        **Q.**   Tenant's obligation to pay when they shall be

14   due and payable shall include but not be limited to the

15   following:  Utilities.  ADT would now be paying utilities

16   for the premises; is that correct?

17        **A.**   That's correct.

18        **Q.**   And 5.2(a),  ADT would be taking the sales use

19   and present taxes; is that correct?

20        **A.**   That's correct.

21        **Q.**   Paragraph 5.3, ADT would be responsible for

22   repairs, maintenance and alterations of the premises; is

23   that correct?

24        **A.**   That's correct.

25        **Q.**   Now, this at the very top of the page is

71

1 referred as a treble net lease. And again, remind us what

2 a treble net lease is.

3     **A.**   Tenant is responsible for taxes, maintenance,

4 anything related to the operating expenses of the

5 building.

6     **Q.**   Directing your attention now to page bearing

7 Bates label 147. You were saying there was a no publicity

8 clause in this document as well; is that correct?

9     **A.**   That's correct.

10     **Q.**   And scanning on down to the very bottom

11 signature block, is signed by landlord, Efficient Realty

12 Development, LLC by Robert M. Gannon, its manager and

13 signature on the left, Mark L. Gaeta and Christopher J.

14 Green. And the Robert M. Gannon referred is the same

15 Robert Gannon you identified earlier this morning?

16     **A.**   Yes.

17     **Q.**   Now, this says Efficient Realty and Development,

18 LLC. The contract was entered into by Efficient Realty

19 and Development Corp.; is that correct?

20     **A.**   Yes.

21     **Q.**   Did you know anything about how the corporation

22 was going to set up and names and things of that nature?

23     **A.**   No, sir.

24     **Q.**   That's again who's responsibility?

25     **A.**   Greg Orr.

72

1      Q.   Now, after Greg -- well, directing your

2   attention to the next page, Bates label 148,  the

3   signature again, your signature?

4      A.   Yes.

5      Q.   And the two signatures on the left, are they two

6   of ADT's attorneys?

7      A.   Yes, they are.

8      Q.   To the best of your knowledge, where they

9   totally ignorant of the deal that you had worked out with

10   Gregory Orr?

11      A.   Yes.

12      Q.   Let's go to the execution page, next to your

13   signature, 1-25-02; is that correct?

14      A.   That's correct.

15      Q.   These were done in preparation for the actual

16   closing date; is that correct?

17      A.   That's correct.

18      Q.   Showing you now Government's Exhibit Number

19   1.43.

20          MR. SHOCKLEY: We offer into evidence, Your

21   Honor, 1.43.

22          MR. MARKUS: No objection.

23          THE COURT:  1.43 is admitted.

24          (Government's Exhibit 1.43 was admitted into

25   evidence.)

73

1    BY MR. SHOCKLEY:

2        **Q.**    Display it on the screen. If we just enlarge the

3    top of it.

4            This is the settlement statement; is that

5    correct?

6        **A.**    Yes, it is.

7        **Q.**    This relates to the property at Pompano Beach?

8        **A.**    Yes.

9        **Q.**    Directing your attention to the second page,

10   bottom right-hand corner, does it bear your signature, you

11   have seen this document before; is that correct?

12       **A.**    I have, yes.

13       **Q.**    Your signature is on the bottom corner, second

14   page?

15       **A.**    Yes, it is.

16       **Q.**    Appears to be dated 2-4-05. Just a mistake

17   writing in the date?  When was the actual date?

18       **A.**    2-4-02.

19       **Q.**    Did you actually attend the closing or no?

20       **A.**    No, sir, I attended no closings.

21           MR. SHOCKLEY: We offer 1.145.

22           MR. MARKUS: No objection.

23           THE COURT:  1.145 is admitted.

24           (Government's Exhibit 1.145 was admitted into

25   evidence.)

74

1    BY MR. SHOCKLEY:

2        **Q.**    Could you display it on the screen? Enlarge the

3    upper portion.

4            Shows personal warranty deed and it says dated

5    this 31st day of January, 2002 by ADT Security Services to

6    Efficient Realty and Development, LLC, guarantee.

7            And as you scan down the page, says that

8    grantor, referring to ADT for and in consideration for the

9    sum of $10 and other available consideration, the receipt

10   and adequacy of which is hereby acknowledged, hereby

11   grants, bargains, sells, so on, so forth the property

12   described as follows, and provided the real property

13   description, basically refers to the Pompano Beach

14   property; is that correct?

15       **A.**    Yes.

16       **Q.**    I stated the date. It was actually before the

17   closing date, January 31st of 2002?

18       **A.**    Yes, it is.

19       **Q.**    Now this is not going to be delivered unless the

20   closing actually takes place; is that correct?

21       **A.**    That's correct.

22       **Q.**    Would you go to the second page, to the

23   signature block on the right, says signed on behalf of ADT

24   Security Services, P. Grey Finney, senior vice-president

25   and secretary; is that correct?

75

1        **A.**    That's correct.

2              MR. SHOCKLEY: Your Honor, we offer in evidence

3    Government's Exhibit Number 1.41.

4              MR. MARKUS: No objection.

5              THE COURT:  1.41 is admitted.

6              (Government's Exhibit 1.41 was admitted into

7    evidence.)

8        **Q.**    If with could display it on the screen. If we

9    could enlarge just the top portion on the left-hand side.

10             Shows ADT Security Services, and as we see when

11   we later scan down Efficient Realty Development, LLC, a

12   check in the amount of $174,351.20.

13             Now, the property had just been sold for $1.29

14   million; is that correct?

15       **A.**    That's correct.

16       **Q.**    So this was a check for $174,000 plus that cover

17   underneath states first months rent of $4,979.27, security

18   deposit of over $55,000, almost $56,000 really, state

19   brokerage fee credit of six percent, sale, $77,400; is

20   that correct?

21       **A.**    That's correct.

22       **Q.**    These were all pursuant to the terms of the

23   agreement that you had worked out with Gregory Orr; is

24   that correct?

25       **A.**    That's correct.

1    **Q.**    And showing you now the portion of the check,

2    check number 1673.    The check is issued in the amount of

3    $174,351.20 payable, drawn on the account of ADT, payable

4    to Efficient Realty and Development, LLC and signed by

5    whom?

6    **A.**    Signed by myself.

7    **Q.**    So you're signing off a check where, in effect,

8    this money, a portion of which is going to go in your own

9    pocket; is that correct?

10    **A.**    That's correct.

11    MR. SHOCKLEY: Government's Exhibit Number 1.30

12    we offer into evidence.

13    MR. MARKUS: No objection.

14    THE COURT:    1.30 is admitted.

15    (Goverment's Exhibit 1.30 was admitted into

16    evidence.)

17    BY MR. SHOCKLEY:

18    **Q.**    If we could display this. This is an internal

19    document that was kept at ADT, sir?

20    **A.**    Yes.

21    **Q.**    States at the top, enlarge the top, ADT Security

22    Service, says recurring payment request.    Explain for the

23    ladies and gentlemen of the jury what the nature of this

24    document is.

25    **A.**    This is to set up automatic payments monthly for

1    real estate or for lease equipment.

2        **Q.**    Within that page, it says billed rent located at

3    2801 Gateway Drive, Pompano Beach, Florida.

4            As you scan down a little further, it says, base

5    rents plus six percent taxes, $45,980.27 with a

6    commencement date/termination date, and the payee is

7    Efficient Realty and Development, LLC.  It shows an

8    address of 10571 Northwest 66th Street, Parkland, Florida,

9    and then as you scan down even further on the left-hand

10   side, there is an X next to first and says first payment

11   due 3-1-02.

12           Now, this would have been the monthly rent

13   that's going to be due now on a monthly basis; is that

14   correct?

15       **A.**    That's correct.

16       **Q.**    And as you look at the bottom of the page, the

17   signature block is signed off by Marjorie Desporte and

18   also signed by you?

19       **A.**    Myself.

20       **Q.**    Paying initially $774,000 plus for the security

21   deposit, first months' rent and six percent fee with

22   renewal set up payment from ADT to be paid to Efficient

23   Realty, LLC; is that correct?

24       **A.**    That's correct.

25           MR. SHOCKLEY: Your Honor, we offer Government's

78

1    Exhibit Number 1.36.

2         MR. MARKUS: No objection.

3         THE COURT:  1.36 is admitted.

4         (Government's Exhibit 1.36 was admitted into

5    evidence.)

6    BY MR. SHOCKLEY:

7    **Q.**   Does this appear to be a series of prepaids that

8    eventually came to you?

9    **A.**   Yes.

10   **Q.**   If we could start off with the bottom of the

11   first page.  If we could enlarge just the address section.

12        It says original message, Mark Gaeta. Did you

13   ever meet with Mark Gaeta?

14   **A.**   No, I did not.

15   **Q.**   From the documents in the case, though, he

16   appears to be who?

17   **A.**   Real estate attorney.

18   **Q.**   It is sent Thursday, March 28, 2002 to Marjorie

19   Desporte. Subject, Efficient Realty and Development, LLC.

20   Dear Ms. Desporte: I have received and reviewed your

21   various email communications regarding my request that two

22   separate checks be issued for monthly rents from ADT

23   Security Services, Inc. In that regard, please note the

24   following:  One, Efficient Realty and Development, LLC, a

25   Florida limited liability company, and give it to FEI.

79

1    Mr. Horton, what is FEI?

2        **A.**    I'm not sure.

3        **Q.**    Gives FEI's number of 65-115880 and then gives

4    another number to Efficient Realty Development, LLC, a

5    limited liability company, gives a different FEI number of

6    52-2357558.  And then on the next page it says, please

7    forward this email to your accounts payable department so

8    that they can note the two separate FEI numbers for the

9    two separate LLCs.  Sincerely, Mark Gaeta.

10           So, it appears that there are two Efficient

11   Realty and Development, LLCs, one in Pennsylvania, one a

12   Florida company; is that correct?

13       **A.**    That's correct.

14       **Q.**    So are they asking for two separate checks

15   because these are two separate properties and two separate

16   companies?

17       **A.**    Accounts payable thought it was one company.

18   They didn't realize it was set up in Pennsylvania and

19   Florida so only one check went out.

20       **Q.**    So this was to correct that problem; is that

21   correct?

22       **A.**    That's correct.

23       **Q.**    And eventually, the problem was related to you,

24   as this indicates, and you asked Marjorie to straighten

25   out the problem with the different names; is that correct?

80

1      **A.**   That was my understanding.

2      **Q.**   So at this juncture, we have a Pompano Beach

3   property, we have just gone through the closing, the check

4   that was issued by ADT for the security deposit, first

5   months rents and the brokerage fee, and the set up for the

6   payments.  That finishes off, at least it gets started the

7   payments to go out monthly to Efficient Realty and

8   Development, LLC of the corporation; is that correct?

9      **A.**   That's correct.

10      **Q.**   Let's go down, if we could, to the Palm Harbor

11   property, Government's Exhibit 1.138.

12          MR. MARKUS: No objection.

13          THE COURT:  1.138 is admitted.

14          (Government's Exhibit 1.138 was admitted into

15   evidence.)

16   BY MR. SHOCKLEY:

17      **Q.**   Another secretary certificate signed by Grey

18   Finney authorizing the sale and leaseback of the Palm

19   Harbor.  Isn't that what it states?

20      **A.**   That is correct.

21          MR. SHOCKLEY: We offer Exhibit Number 1.139.

22          MR. MARKUS: No objection.

23          THE COURT:  1.139 is admitted.

24          (Government's Exhibit 1.139 was admitted into

25   evidence.)

81

1    BY MR. SHOCKLEY:

2        **Q.**    Display that.  This is another ADT consent by

3    the board of directors authorizing the sale of the Palm

4    Harbor property to Westmore Properties, Inc.?

5        **A.**    Yes, it is.

6        **Q.**    Directing your attention now to Government's

7    Exhibit 6.53.

8            MR. SHOCKLEY: We would offer into evidence, Your

9    Honor, Exhibit Number 6.53.

10           MR. MARKUS: No objection.

11           THE COURT:  Let me find it. 6.53 is admitted.

12           (Government's Exhibit 6.53 was admitted into

13   evidence.)

14   BY MR. SHOCKLEY:

15       **Q.**    If we could display on the display screen.

16           States at the top-- if we could enlarge the top

17   paragraph.  It shows a lease dated entered into on the 5th

18   day of February, 2002 by and between Westmore Properties,

19   LLC. I think the last document says Westmore Properties,

20   Inc. This is on the lease, it shows Westmore Properties,

21   LLC; is that correct?

22       **A.**    Yes, that's correct.

23       **Q.**    Scan down to the paragraph.  It refers, pursuant

24   to a certain real estate sale-leaseback agreement dated

25   October 11, 2001, by and between landlord as purchaser and

82

1  tenant as seller, landlord has acquired the following

2  property and refers to the Palm Harbor property; is that

3  correct?

4      **A.**  That's correct.

5      **Q.**  Going to the page bearing Bates label 148.

6  Enlarge the section that says term.

7          Again, the term begins on February 5, 2002 for

8  15 years; is that correct?

9      **A.**  That is correct.

10     **Q.**  Basic rent right underneath, $238,400 per year.

11 Is that what it states?

12     **A.**  Yes, sir, it does.

13     **Q.**  Top of the next page, monthly advance

14 installments of $19,866.67 as shown there in parenthesis;

15 is that correct?

16     **A.**  That is correct.

17     **Q.**  Under article three, taxes, assessments, it is

18 listed as additional rents, 3.1 as you scan down, the

19 tenant is going to be paying all taxes and assessments

20 water, things of that nature.  This a triple net lease as

21 well?

22     **A.**  Yes, that is correct.

23     **Q.**  3.2, other taxes, tenant is paying the taxes as

24 well; is that correct?

25     **A.**  That's correct.

83

1    Q.   Bates label 151, insurance liability and casual

2    insurance paid by who?

3    A.   Paid by ADT.

4    Q.   Maintenance and repairs.  Who pays maintenance

5    and repairs of the building?

6    A.   ADT.

7    Q.   It shows on page bearing Bates label 162, page

8    16 of the document, if there should be any notices of one

9    party to the other, it shall go to the address of ADT at

10   One Town Center Road, Boca Raton, Florida, with a copy to

11   the rent premises in Palm Harbor, Florida; is that

12   correct?

13   A.   That's correct.

14   Q.   Now, if you to to the next page, The landlord

15   shows for Westmore Properties and this says Inc. instead

16   of Westmore Properties, LLC, which is the first page,

17   shows Atlas Perlman, P.A., in Boca Raton and says Kenneth

18   Wurtenburger, Esquire. Did you have any contact with

19   Kenneth Wurtenberger?

20   A.   No, I did not.

21   Q.   Bates label 168, page 22 of the document, the

22   signature block, signed by John Artuso and Westmore

23   Properties, LLC; is that correct?

24   A.   Yes, that is correct.

25   Q.   And on the following page bearing Bates label

84

1    169, your signature dated 2-25-02; is that correct?

2        A.    That is correct.

3        Q.    And then there's a scribble under attest.  I

4    believe we may have seen that before. And under that is a

5    printed name.

6        A.    That's Grey Finney, I believe.

7        Q.    And Grey Finney was the corporate counsel and

8    secretary; is that correct?

9        A.    That is correct.

10       Q.    While Mr. Finney is the corporate counsel is

11   signing off on these documents, had you ever told P. Gryy

12   Finney the true circumstances of this sale that had been

13   work out with Mr. Orr?

14       A.    No, sir.

15       Q.    Had I told him anything about the role of John

16   Artuso who had signed the previous page?

17       A.    No, sir.

18             MR. SHOCKLEY: We offer Government's Exhibit

19   1.83, the settlement statement.

20             MR. MARKUS: No objection.

21             THE COURT: 1.83 is admitted.

22             (Government's Exhibit 1.83 was admitted into

23   evidence.)

24   BY MR. SHOCKLEY:

25       Q.    Again at the top it indicates this is the

85

1    property in Palm Harbor; is that correct?

2        **A.**    That's correct.

3        **Q.**    Again, did you attend this closing?

4        **A.**    No, sir.

5        **Q.**    It bears your signature; is that correct?

6        **A.**    That's correct.

7        **Q.**    And 2-5-02 is the date?

8        **A.**    That's correct.

9        **Q.**    Is it fair to say the closing took place on or

10   about February 5, 2002 even though you were not there?

11       **A.**    That is correct.

12           MR. SHOCKLEY: We offer Exhibit 1.82 in evidence,

13   Your Honor.

14           MR. MARKUS:  No objection.

15           THE COURT: 1.82 is admitted.

16           (Government's Exhibit 1.82 was admitted into

17   evidence.)

18   BY MR. SHOCKLEY:

19       **Q.**    If you would enlarge the top. Warranty deed

20   conveying the property.

21           Scan down.

22           This actually has an attachment Exhibit A

23   showing the actual official location of the property in

24   Palm Harbor.  We can go right down.  You signed off on

25   behalf of ADT; is that correct?  That's your signature?

86

1      **A.**   Yes,, that is correct.

2      **Q.**   Witnessed by Maggie Carbo and Amy Hymes.  Who's

3    Amy Hymes?

4      **A.**   Amy worked in the real estate group.

5      **Q.**   Was she at that time?

6      **A.**   At this time, yes.

7      **Q.**   Had you ever told Maggie Cargo or Amy Hymes the

8    terms you worked out with Greg Orr concerning this

9    property?

10     **A.**   No, sir.

11     **Q.**   You signed off conveying the property to

12   Westmore Properties, LLC; is that correct?

13     **A.**   That's correct.

14     **Q.**   Showing you now government Exhibit 1.71--.

15          MR. SHOCKLEY: We'd offer that into evidence,

16   Your Honor.

17          MR. MARKUS: No objection.

18          THE COURT:  1.71 is admitted.

19          (Government's Exhibit 1.71 was admitted into

20   evidence.)

21   BY MR. SHOCKLEY:

22     **Q.**   If we could display that.  At the very top could

23   you highlight that in regard to reimbursement of seller's

24   closing costs.

25     **A.**   Yes.

1    Q.   First months rents and all that listed was all

2    to be payable to Westmore Properties, LLC; is that

3    correct?

4    A.   That's correct.

5    Q.   Take a look at the check that's payable to

6    Westmore Properties, LLC. Who's signature is that?

7    A.   Bears my signature.

8    Q.   Now directing your attention to Government's

9    Exhibit 1.67--

10        MR. SHOCKLEY: We'd offer that exhibit.

11        MR. MARKUS: No objection.

12        THE COURT:  1.67 is admitted.

13        (Government's Exhibit 1.67 was admitted into

14   evidence.)

15   BY MR. SHOCKLEY:

16   Q.   I'm going to display that.

17        Did you go through the same process with this as

18   you set up the procedure by which ADT would make monthly

19   payments on those properties?.

20        THE COURT:  We're going to finish in five

21   minutes. Somebody need a stretch? You need to stand?

22   Anybody needs to stand up?  Stand up for a second.

23        Go ahead.  In fact, tell you what, we're going

24   to stop in five minutes anyway, why don't we stop now, Mr.

25   Shockley. Why don't we stop five minutes early.  We'll

1    start again at 9:00.

2            COURT SECURITY OFFICER: All rise for the jury.

3                    ******************

4            I hereby certify the foregoing is a true and

5    correct transcript of proceedings in the above-titled

6    matter.

7

8

9

10   _____

11   Victoria Aiello, Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25