```
 1                     UNITED STATES DISTRICT COURT
                       SOUTHERN DISTRICT OF FLORIDA
 2
     UNITED STATES OF AMERICA,       )   Case No.
 3                                    )   08-60014-CR-MIDDLEBROOKS
                         Plaintiff,   )
 4                                    )
              -v-                     )
 5                                    )
     VINCENT F. ARTUSO, JOHN VINCENT  )
 6   ARTUSO, GREGORY ORR, ROBERT M.   )
     GANNON, AND PHILIP EDWARD FORGIONE,)
 7                                    )
                         Defendants.  )   West Palm Beach, Florida
 8                                    )   September 19, 2008
     _____)
 9
                          PAGES 1 - 130
10
                  TRANSCRIPT OF TRIAL PROCEEDINGS
11                   TESTIMONY OF LEWIS KASMAN
           BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
12              U.S. DISTRICT JUDGE, AND A JURY

13   Appearances:

14   For the Government:       J. BRIAN MCCORMICK
                               WILLIAM T. SHOCKLEY
15                             Assistant United States Attorneys
                               500 East Broward Boulevard
16                             Fort Lauderdale, Florida  33394

17   For the Defendant:        PETER VINCENT BIRCH
     Vincent F. Artuso         Assistant Federal Public Defender
18                             450 Australian Avenue, Suite 500
                               West Palm Beach, Florida  33401
19
     For the Defendant:        CARLTON FIELDS
20   John Vincent Artuso       BY:  MICHAEL S. PASANO, ESQ.
                               100 SE 2nd Street, Suite 4000
21                             Miami, Florida  33131

22


23
     Reporter:                 Karl Shires, RPR
24   (561) 514-3728            Official Court Reporter
                               701 Clematis Street, Suite 258
25                             West Palm Beach, Florida  33401
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1    Appearances: (Continued)

 2    For the Defendant:           DAVID OSCAR MARKUS, ESQ.
      Gregory Orr                  ROBIN ELLEN KAPLAN, ESQ.
 3                                 169 E. Flagler Street, Suite 1200
                                   Miami, Florida  33131
 4
      For the Defendant:           ALLAN B. KAISER PLLC
 5    Robert M. Gannon             BY:  ALLAN BENNETT KAISER
                                   111 NE 1st Street, Suite 902
 6                                 Miami, Florida  33132

 7    For the Defendant:           ENTIN & DELLA FERA
      Philip Edward Forgione       BY:  ALVIN ERNEST ENTIN, ESQ.
 8                                 110 SE 6th Street, Suite 1970
                                   Fort Lauderdale, Florida  33301
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1       (Proceedings were had which are not herein transcribed.)

2      LEWIS KASMAN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

3             DIRECT EXAMINATION (RESUMED)

4  BY MR. McCORMICK:

5  Q    Good morning.

6  A    Good morning.

7  Q    I think we left off when you were in New York and you

8  were about to leave for Florida; is that correct?

9  A    Yes.

10  Q    And do you remember what year that was more or less?

11  A    Approximately 2003.

12  Q    Now, were you still holding money for -- on behalf of

13  John Gotti when you traveled to Florida?

14  A    Yes, I was.

15  Q    Do you remember about how much money you were holding at

16  that time?

17  A    About, approximately, several hundred thousand dollars

18  at that point.

19  Q    And did you move your family down or did you just come

20  down?

21  A    My family as well.

22  Q    And who moved down with you?  Can you -- your wife and

23  children?

24  A    Yes.

25  Q    Did you have a job?

4

```
 1   A     No.

 2   Q     Were you still associated with the administration at

 3   that time?

 4   A     Yes.

 5   Q     Where did you settle when you came down here initially

 6   in about 2003?

 7   A     Boca Raton.

 8   Q     And were you looking for a job or investment, or

 9   anything like that?

10   A     Not when I first came down here.  No.

11   Q     And first of all, there's a question I forgot to inquire

12   of you.  Did you have a nickname for John Gotti at the time

13   that you were so close to him before his death?

14   A     Yes.

15   Q     What did you call him?

16   A     Grandpa.

17   Q     And what did you call Peter Gotti?

18   A     Uncle Pete.

19   Q     And those were your terms; is that right?

20   A     Yes.

21   Q     You had a lot about with and associated people.  Who

22   were you with when you came down to South Florida?

23   A     I was always with John Gotti Senior.

24   Q     And after he died?

25   A     After he died, I was with Peter Gotti.
```

1  Q    There's another term that you -- I don't know if you

2  brought it up yet, but what does "service" mean in organized

3  crime parlance?

4  A    If you're with someone and that person is either

5  incarcerated or you have a falling out with that person, you

6  can be assigned to another crew or another captain, to be

7  serviced by that other individual than the individual you

8  were originally with.

9  Q    Okay.  And for the -- that's who you were assigned to?

10  A    It went from John J. Gotti, the boss of the family; then

11  I went to John Junior Gotti; and then I was with Peter Gotti.

12  Q    Did there come a time you were contacted by anyone of

13  your old acquaintances from New York after you relocated to

14  Florida?

15  A    Yes.

16  Q    And who was that?

17  A    Carlo Vaccarezza.

18  Q    Is that the same Carlo Vaccarezza that you identified in

19  the Ravenite Social Club video?

20  A    Yes.

21  Q    How was that contact made, Mr. Kasman?

22  A    He wrote me a letter.  He wrote me a short note.

23  Q    And where was it addressed to?

24  A    A post office box that I had while I was living in New

25  York.

```
 1              MR. McCORMICK:  May I approach the witness, your

 2   Honor?

 3              THE COURT:  Yes.

 4   BY MR. McCORMICK:

 5   Q    Let me show you Government's proposed Exhibit 43.11.  If

 6   you could generally identify those two pieces of paper?

 7   A    Yes, this is the note that Carlo sent me.

 8   Q    And you identified the writing and the --

 9   A    Yes.

10   Q    -- postmark?

11   A    Yes.

12              MR. McCORMICK:  Your Honor, I would offer into

13   evidence Government proposed Exhibit 43.11.

14              MR. BIRCH:  No objection.

15              THE COURT:  43.11 is admitted.

16        (Received in evidence Government's Exhibit(s) 43.11.)

17   BY MR. McCORMICK:

18   Q    That's the envelope?  43.11 is the envelope; is that

19   correct?

20   A    That's correct.

21   Q    Can you make out the postmark on that?

22   A    Woodbury, New York.  I really can't detect the date.

23   But, it's postmarked Woodbury, New York.  P.M.

24   Q    Does that help you at all?  Do you see the date on that,

25   2004?  June 5?
```

```
 1    A    It looks like June, yes.

 2    Q    Okay.  That's approximate time that you received this

 3    note from Carlo Vaccarezza?

 4    A    Yes.

 5    Q    Okay.  Let me just get to the substance of the note.

 6    Okay?

 7              Okay.  Can you read that to the jury if you would?

 8    A    Lewis:  Call me.  Carlo Vaccarezza.  (561)714-6019.

 9    Q    This is the first person you've had contact with from

10    the Gambino family in Florida?

11    A    Yes.

12    Q    After you received that note, Mr. Kasman, what did you

13    do?

14    A    I gave Carlo a call.

15    Q    And how much time elapsed between June of '04 and the

16    time that you made -- that you called Carlo Vaccarezza.  If

17    you could just approximate that for us, please?

18    A    Probably a few weeks.

19    Q    What happened after you called Carlo Vaccarezza?

20    A    Carlo and I got together.

21    Q    Where did you meet?

22    A    Somewhere's in Boca.

23    Q    And what was the purpose of the meeting?

24    A    He started to tell me about, you know, how he was doing

25    in Florida and what was going on.  He was interested in
```

1   opening up a restaurant and looking -- he asked me if I would

2   be interested.  Initially, I told him I really wasn't

3   interested, and that's really how we left it for that

4   particular meeting.

5   Q    What was Carlo Vaccarezza's background?  Was he a

6   restaurateur?

7   A    Yes, he was a maitre d' restaurant manager most of his

8   life.

9   Q    How did you respond, again, when he indicated he was

10  interested in pursuing, acquiring a restaurant?

11  A    We had met again and I told him, I says I really wasn't

12  interested.  I didn't want to come to Florida to do a

13  restaurant.  But I did say to him, I says, you know, if you

14  find something that's very appealing, and we can get it at

15  the right price, let me know.

16  Q    Where was your prior history with restaurants?

17  A    Well, working for the Basiles, which were nightclubs and

18  restaurants, I had management experience and I knew the

19  restaurant business.

20  Q    And that would be the Hudson McCoy restaurant?

21  A    Correct, Hudson & McCoy, and Spratts and the other

22  restaurants.

23  Q    During this meeting with Carlo Vaccarezza, did you

24  discuss at all Vincent Artuso?

25  A    Not at that particular meeting.  No.

1    Q    Did you meet him at a subsequent meeting?

2    A    Yes.

3    Q    And this all had to do with looking for a restaurant?

4    A    Yes.

5    Q    How much time elapsed between that meeting and the next

6    meeting with Carlo Vaccarezza?

7    A    Probably a few days.

8    Q    And what was going on in the meantime before you met a

9    second time with Carlo Vaccarezza?

10   A    He was scouting out locations around South Florida.

11   Q    And within a few days you met with him again.  Did you

12   find a restaurant?

13   A    Ultimately, we did.  Yes.

14   Q    And did -- at that time did you have conversations

15   with -- a conversation with Carlo Vaccarezza about Vincent

16   Artuso?

17   A    Yes.

18   Q    What was that conversation about?

19            MR. BIRCH:  Objection.  Hearsay.

20            THE COURT:  What do you rely upon?

21            MR. McCORMICK:  I'm relying upon not for the truth

22   of the matter contained there.  It's a conversation.  It's

23   also -- it's under 801(d)(2)(E).

24            THE COURT:  Well, those are contradictory.  So

25   which ones?

1              MR. McCORMICK:  There are two bases.

2              THE COURT:  All right.  The objection is overruled.

3    Go ahead.

4    BY MR. McCORMICK:

5    Q    You can answer.

6    A    Could you repeat that question, please?

7    Q    What was the conversation between you and Carlo

8    Vaccarezza about Vincent Artuso?

9    A    He wanted to set up a breakfast meeting with Mr. Artuso,

10   myself, and him at a restaurant in Parkland, Florida, on 441.

11   Q    Okay.  Did the conversation involve Mr. Artuso and any

12   relationship that Mr. Artuso had with Mr. Vaccarezza?

13   A    Yes.

14   Q    What was that?

15   A    Carlo had indicated to me that Vinnie was servicing him

16   on behalf of Jackie D'Amico.  Jackie Nose.

17   Q    What did you understand that to mean in organized crime

18   parlance?

19   A    Carlo had a falling out with Jackie Nose, and Jackie

20   Nose assigned him to Vinnie.  Meaning that Carlo's in

21   Florida, if Carlo had any problems or anything, that Vinnie

22   Artuso would handle them for Carlo Vaccarezza.

23   Q    Now, in connection with that did you -- you mentioned

24   that there was going to be a breakfast meeting.  Did that

25   occur?

1    A    Yes, it did.

2    Q    More or less, how much time elapsed between this second

3    meeting with Carlo Vaccarezza and the breakfast meeting that

4    you've described?

5    A    Approximately a week.

6    Q    Now, what happened at that particular time, a week

7    later?

8    A    We met at that restaurant in Parkland; myself, Vinnie

9    Artuso, and Carlo.  And I met Vinnie, you know, formally now.

10   And we were talking.  You know, welcoming me to Florida and,

11   you know, Carlo spoke very highly of him to me prior to that,

12   the breakfast meeting.  And Vinnie says, you know, I've a lot

13   of good things going on down here.  You know, I'm the guy

14   down here, so if you need anything, don't hesitate to, you

15   know, don't hesitate to reach out to me.

16   Q    You indicated that Mr. Artuso said to you, I'm the guy

17   down here.

18   A    Right.

19   Q    What did you understand that to mean?

20        MR. BIRCH:  Objection as to what he understood.

21        THE COURT:  Overruled.

22        THE WITNESS:  That means that Vinnie was the

23   captain in charge of South Florida on behalf of the -- he was

24   representing the Gambino family.  He is a member of the

25   Gambino family.

BY MR. McCORMICK:

Q    Just backing up a little bit.  At the Ravenite Social

Club in 1988 video that you testified about yesterday, to

your knowledge, was Mr. Artuso a captain then?

A    In the Ravenite time?

Q    Yes.

A    No, he was not.

Q    What was he?

A    He was a soldier.

Q    So somewhere between then, 1988 and 2003 -- or '4,

excuse me, something happened; is that right?

A    Yes.

Q    Now, when Mr. Artuso said, I've got a couple good things

going on down here, what did you understand that to mean?

A    That he had a couple of business dealings or something

going on down here.  At that particular breakfast meeting we

weren't -- he wasn't specific as to what was going on.

Q    Was that the extent of the conversation you had with

Mr. Artuso and Mr. Vaccarezza that first meeting?

A    Yes.

Q    And what happened -- at the conclusion of that meeting

did you have further meetings with Carlo Vaccarezza?

A    Yes.

Q    And what were those meetings about?

A    I told Carlo, I says, you know, while I -- you know, was

1    nice to me, Vinnie Artuso.  The purpose I came to Florida is

2    because I really don't want to get back into that situation

3    again.  And I said to Carlo if we're going to do this

4    restaurant deal, I says, you know, we're just going to do a

5    straight deal.  I don't want to get involved in all of this

6    other kind of goings on.  And he understood that.

7    Q    And what about, did you find the restaurant?

8    A    Yes.

9    Q    Where was that located at?

10   A    499 South Federal Highway in Boca Raton.

11   Q    Did you discuss with Carlo Vaccarezza how the ownership

12   in that restaurant would be handled on paper?

13   A    Yes.

14   Q    And what did you say and what did he say about that?

15   A    My brother-in-law was going to be the person going on

16   the license, and --

17   Q    And what was his name?

18   A    Adam Kula.

19   Q    Would you tell that for the Court Reporter?

20   A    K-U-L-A.  First name Adam.  Adam was going to go on the

21   license and Adam and myself were going to be the owners, and

22   Carlo was going to be the general manager.

23   Q    So you and your brother-in-law were going to be owners?

24   A    Yes.

25   Q    And why weren't you on the record or on the documents

1    for purchasing the restaurant?

2    A    Due to my conviction in New York.

3    Q    Now, you're conviction in New York for perjury?

4    A    Yes.

5    Q    And that's a felony conviction, correct?

6    A    Yes.

7    Q    Okay.  At or about that time when you found a restaurant

8    to buy, did you have a conversation down here with Danny

9    Marino?

10    A    Yes.

11    Q    And there were two -- could you tell us, please, what

12    Danny Marino's status was with the Gambino family?

13    A    Danny Marino is a captain.

14    Q    And where did the conversation take place?

15    A    At the restaurant, while it was under construction.

16    Q    Did the construction of the restaurant you're referring

17    to, is that renovations?

18    A    Yes, renovations.

19    Q    And can you tell -- were you alone with Danny Marino

20    when you had this conversation?

21    A    Yes.

22    Q    What was the -- can you tell the jury what you said and

23    what he said?

24              MR. BIRCH:  Objection.  Hearsay.

25              THE COURT:  Overruled.

1       THE WITNESS:  Danny had a message to deliver to me

2   from the administration of the Gambino family from Arnold

3   Spaterri (phonetic) at that point, who was the acting boss.

4   Offering their services if I needed anything, and if anybody

5   approaches me or if I have any problems, I'm with the

6   administration and that, you know, Danny is down here as

7   well.  If I didn't -- you know, if I didn't want to fly to

8   New York to bring it to their attention, I could always go

9   see Danny, and Danny also mentioned to me if you can't reach

10  me, he says you could have Carlo reach Vinnie Artuso on your

11  behalf.

12  BY MR. McCORMICK:

13  Q    Now, after that conversation with Danny Marino, did you

14  have a further conversation with Carlo Vaccarezza concerning

15  certain interests in the restaurant that you were about to

16  open?

17  A    Yes.

18  Q    Who did you have -- where did you have this

19  conversation?

20  A    At the location, at the restaurant.

21  Q    Both you and Carlo Vaccarezza were talking together?

22  A    Yes.

23  Q    And what was the -- can you tell the jury what you said

24  and what he said?

25          MR. BIRCH:  Objection.  Hearsay.

```
 1              THE COURT:  Overruled.

 2              THE WITNESS:  Carlo indicated to me that Vinnie

 3  Artuso was interested in putting up $40,000 to become an

 4  undisclosed owner in the restaurant.

 5  BY MR. McCORMICK:

 6  Q    And what did you say to that?  What was your response?

 7  A    I told Carlo I wasn't interested in the deal at all.

 8  Q    Did you meet with Mr. Vinnie Artuso on that particular

 9  subject after you spoke to Carlo Vaccarezza?

10  A    Yes.

11  Q    And was it in close proximity in time?

12  A    Probably a day or so after.

13  Q    Who was there at that meeting?

14  A    It was myself, Vinnie Artuso, and Carlo.

15  Q    Okay.  Can you tell the jury, please, what was spoken

16  about at that meeting and who said what?

17  A    Vinnie wanted to know if Carlo brought it to my

18  attention that he was interested in investing in the

19  restaurant.  I said that he did.  And I told Vinnie at that

20  point that I would think about it, and that was basically the

21  crux of that conversation.

22  Q    And did there come a time that you met with Vinnie

23  Artuso after that at the construction site?

24  A    Yes.

25  Q    How many days later was that, just approximately?  I
```

```
 1    know it's difficult to recall.

 2    A    Two or three days.  It could be -- while we were under

 3    constriction Vinnie was stopping by, so it could have been a

 4    few days after.

 5    Q    Did he visit the construction site?

 6    A    Yes.

 7    Q    Describe what happened, please?

 8    A    At this next meeting?

 9    Q    Yes.

10    A    Yes.  Again, he approached me about the investment and I

11    said to him, I said, you know, you know I'm with the

12    administration.  If I needed money, there are numerous people

13    I can go to for money.  I don't need the money for the

14    investment.  And I told him that I was going to bring it to

15    the attention of the administration that he wanted to invest

16    in the restaurant.

17    Q    Why did you tell him that?  Could you explain that to

18    the jury, please?

19    A    Because he knew I was with the administration and it was

20    just not protocol for him to approach me to invest in the

21    restaurant because I was with someone.  And in organized

22    crime parlance, you're not supposed -- especially, a captain.

23    You're not supposed to approach another associate who's with

24    someone and go into a business deal with them, unless you've

25    already got permission from the administration.
```

1    Q    And what did Vinnie Artuso, or how did he respond when

2    you said that to him?

3    A    Something to the effect, do what you have to do.  And I

4    think he said he was going up to New York a few days from

5    that, our conversation, so he was going to make them aware of

6    it as well, I'm sure.

7    Q    Now, did you meet with Mr. -- after that conversation at

8    the construction site, did you again meet with Mr. Artuso

9    within a few days?

10   A    Yes.

11   Q    And where was that meeting at?

12   A    That was also at the restaurant.

13   Q    Okay.  Can you -- did you meet anybody else at this

14   particular meeting at the construction site at the

15   restaurant?

16   A    Not at the beginning, no.

17   Q    Tell me about the meeting and who was present initially

18   at the meeting?

19   A    Carlo was present, myself, and Vinnie Artuso.

20   Q    Now, did -- was there a conversation at that time about

21   investment in the restaurant?

22   A    Carlo was talking to me on the side again, that I should

23   either tell Vinnie I'm interested or I'm not interested.  And

24   not to prolong it.

25   Q    And did someone else attend that meeting at a later

1    time?

2    A    A few minutes later, yes.

3    Q    Who was that?

4    A    Greg Orr.

5    Q    Did you know Greg Orr before you met him at this

6    meeting?

7    A    No.

8    Q    Who introduced you to Greg Orr?

9    A    Vinnie Artuso.

10    Q    How did he introduce you to Greg Orr?

11    A    This is my friend and business partner, Greg Orr.

12    Q    By the way, is Greg Orr in the courtroom today?

13    A    Yes, he is.

14    Q    Could you identify him for the jury, please?

15    A    He is -- that's Mr. Orr there, with the glasses on in

16    the brown suit or black suit there.  Yes.

17    Q    With glasses?

18    A    Yes.

19    Q    A lot of people with glasses.

20         THE DEFENDANT:  I'll stand up for you.

21         THE WITNESS:  Thank you.  That's Mr. Orr.

22         MR. McCORMICK:  Thank you.

23         The record should reflect the witness has

24    identified Greg Orr.

25

```
 1   BY MR. McCORMICK:

 2   Q    Now, so there's you, Greg Orr, Vinnie Artuso, and Carlo

 3   Vaccarezza at this meeting?

 4   A    Yes.

 5   Q    Can you tell the Grand Jury -- excuse me.

 6              Can you tell the jury what was spoken about at that

 7   meeting?

 8   A    Vinnie had said to me, I want you to talk to Greg Orr,

 9   we have some good stuff going on.  Greg's going to explain it

10   to you.

11   Q    Okay.  And was that the extent of what was spoken about?

12   A    Yes.

13   Q    And what happened after that?

14   A    I believe the next day Greg came by the restaurant and I

15   went in Greg's car and we took a ride to an office that he

16   had in Delray Beach, Florida.

17   Q    By "he" you mean whom?

18   A    Greg Orr.

19   Q    So was that Delray Beach office building discussed at

20   the meeting with Vinnie Artuso and Greg Orr, or did you learn

21   about that through Greg Orr?

22   A    Vinnie had indicated to me that Greg was going to take

23   me to show me the office.

24   Q    Okay.  And how soon after that meeting -- sorry, did

25   you --
```

1    A    I believe it was the next day Greg came by and picked me

2    up.

3    Q    And where did you go at that point?

4    A    We went to Delray Beach, to an office building.

5    Q    Can you describe the office building; what occurred,

6    please?

7    A    It was in Delray Beach.  You pull up, parking lot.  I

8    believe it was a one-story building.  You walk in, there's a

9    receptionist, and cubicles set up, like a telephone bank kind

10   of a setup.  And he introduced me to his financial

11   controller.  I believe it was a heavyset man.

12   Q    Do you remember his name?

13   A    I do not.

14   Q    And what else did you observe when you were there?

15   A    He showed me his office.  He showed me his computer and

16   just the whole setup.  He just took me on like a dog and pony

17   show all around the property, and what have you.

18   Q    And did you see -- when you say a dog and pony show,

19   could you be a little bit more explicit as to what occurred?

20   A    He showed me the property, the offices.  Just the whole

21   physical aspect on the interior at that point.

22   Q    And did you have discussions with Greg Orr about the

23   office as you were touring the space?

24   A    Yes.

25   Q    And what was spoken about?

1    A    They were interested in buying the adjoining properties,

2    to expand the building.

3    Q    The adjoining property.  Can you describe that to the

4    jury, please?

5    A    Yes.  There was some ramshackled houses that were up for

6    sale.  It was an estate sale Mr. Orr had told me and they

7    were interested in purchasing those properties and either

8    building houses on it or expand the office building.

9    Q    And was it discussed with you as to why you were being

10   informed of these facts on your trip to Delray Beach?

11   A    Yes, then Greg told me they were looking for an investor

12   with approximately $200,000 available.

13   Q    And was it explained to you what that translated to as

14   it related to you?

15   A    He wanted -- he asked me if I could come up with

16   $200,000.  I believe the total investment they were looking

17   for was 400, but they only needed 200 from me.

18   Q    And was there any other discussion about financing that

19   took place during this initial meeting at the Delray Beach

20   office?

21   A    Not at that particular meeting, no.

22   Q    Did you discuss how the title would be handled in terms

23   of the ownership of this property and the adjacent piece of

24   property?

25            MR. MARKUS:  Judge, objection, relevance to this

```
 1   case.

 2           THE COURT:  Overruled.

 3           THE WITNESS:  I did say to Greg, I said, if we were

 4   to do this deal, I said, and you have Vinnie and myself as

 5   owners, down the road if we ever applied for a mortgage and

 6   the bank was to do background checks, I told Greg it would be

 7   a problem.

 8   BY MR. McCORMICK:

 9   Q    Did you indicate that you had interest in getting

10   involved in this deal at this particular time?

11   A    I said I was interested but I would have to explore it a

12   little bit further in terms of how we would structure the

13   ownership and the titlement of the properties.

14   Q    Did there come a time during this period, during this

15   period, that you met John Artuso?

16   A    Yes.

17   Q    How did you meet John Artuso?

18   A    I met him at the office.

19   Q    Before or after this discussion with Greg Orr?

20   A    I believe it was after.

21   Q    Is John Artuso in the courtroom today?

22   A    Yes, he is.

23           Yes, that's John.

24           MR. McCORMICK:  The record should reflect that John

25   Artuso has been identified.
```

BY MR. McCORMICK:

Q    Did you -- turning your attention to a few days after

that initial meeting in Delray Beach -- incidentally, did you

know the name of the company that you toured with Greg Orr?

A    I think it was AMS or AMR.  I'm not quite sure.

Q    Did there come a time that you met with Greg Orr again

on this particular topic?

A    Yes.

Q    How much time elapsed?

A    I would say a week to ten days would have elapsed at

that point.

Q    Now, within that period -- you had a meeting?

A    Yes.

Q    And who attended that meeting?

A    That was just me and Greg.

Q    Where did the meeting take place; can you recall that?

A    Yes.  At the Boca Resort.

Q    Who belonged to the Boca Resort?

A    I did.

Q    You had joined that when you first came to Florida?

A    Yes.

Q    Is that the correct name, Boca Resort, or do you know?

A    I think it's called Boca Resort and Club or Boca Resort.

Q    When you say you had a meeting, what type of meeting was

it?

1    A    We met in the -- by the breakfast room overlooking the

2    water, and we were discussing the 200,000 investment.  And I

3    again went over with Greg my concerns about the titlement and

4    how the property would be titled, and going down the road,

5    future refinancing or financing would become a problem.

6    Q    When you say it would become a problem, what did you

7    mean by that?

8    A    If you fill out a mortgage application, you apply for a

9    loan from a bank, they're going to do a background check.

10   Q    Did you -- when you did that, did you also talk about

11   any type of seizures or anything like that?

12   A    I indicated to Greg that if we did do a refinance and we

13   didn't -- we weren't truthful on the mortgage application, I

14   said I don't -- you know, I don't really need this.  It's not

15   going to make my life, and I think we're going to wind up in

16   a Jackpot here with law enforcement and we'll wind up losing

17   our money and losing the properties.

18   Q    And what did Greg Orr say to you when you made that

19   warning to him?

20   A    He told me that he wanted me to go see this lawyer that

21   might put my mind at ease and alleviate my concerns.

22   Q    During that meeting at the Boca Club did Mr. Orr produce

23   any letters or documentation that he provided to you?

24   A    Yes.

25            MR. MARKUS:  No objection, Judge.

1          THE COURT:  What's the number?

2          MR. McCORMICK:  43.12, 43.13, and 43.14.

3          THE COURT:  Those are admitted without objection.

4     (Received in evidence Government's Exhibit(s) 43.12,

5     43.13, 43.14.) received

6     BY MR. McCORMICK:

7     Q    Showing you 43.12, it's in evidence, Mr. Kasman.  Was

8     that one of the documents or letters that was provided to

9     you?

10    A    Yes.

11    Q    And in the discussion you had with Greg Orr can you tell

12    the jury why -- how this letter came up in the conversation?

13    A    Yes.  Greg was trying to show me that they had sent a

14    letter to Lehman and another mortgagee to go over the amount

15    of parking spaces they needed to expand the properties and

16    that the refinancing, we probably would be able to refinance

17    this property down the road.

18    Q    And that particular letter was given to you for what

19    purpose, if you know?

20    A    I think just to reassure me that they were doing this

21    and that it is viable.

22          MR. ENTIN:  Judge, give me a continuing objection

23    to this entire line of testimony on behalf of my client.

24          THE COURT:  Basis?

25          MR. ENTIN:  Outside of scope, course, and

```
 1    furtherance.

 2              THE COURT:  Overruled.

 3    BY MR. McCORMICK:

 4    Q     And 43.13, which is also from Lehman Brothers,

 5    presumably in better days, that's the letter that you also --

 6    A     Right.

 7    Q     And in terms of that letter, that was one of the -- the

 8    second letter that was provided to you for the same reason?

 9    A     Right.

10    Q     As far as you know?

11    A     Right.

12    Q     And lastly, apparently is an e-mail with the title,

13    Robert Gannon, on the top of the e-mail.  That was also

14    provided to you?

15    A     Yes.

16    Q     And could you publish that e-mail, please?

17    A     From Barry Maureen to Bob at AtlanticMagazine.com.

18    Q     Is that better?

19    A     Yes.  Do you want me to read it?

20    Q     Yes.

21    A     The whole thing?

22    Q     Yes.

23    A     Okay.  Subject is 1203 Wallace Avenue.  Bob Gannon,

24    Atlantic Magazine.  Bob, following your discussion with Lee

25    Waring (phonetic), I would like to confirm that there is
```

1    nothing in your first mortgage that precludes obtaining a

2    second mortgage on the property located at 1203 Wallace

3    Drive, Delray Beach.  Maureen Barry, Assistant to Lee Waring,

4    Gulfstream Business Bank, Delray Beach.

5    Q    Now, I'm going to refer to the top of 43.14.  The very

6    top, which is a fax number.  I don't know if you can see it.

7    I will try to make it larger.

8    A    I can see it.

9    Q    Was that your number:  (561)367-4644?

10   A    That was the fax number of the restaurant, yes.

11   Q    And there's a number next to it that presumably is the

12   number that you faxed, if you faxed it.  Did you fax this?

13   A    Yes.

14   Q    718-286-7361.

15   A    Yes.

16   Q    And whose number was that?

17   A    That's the number of the FBI.

18   Q    Now, on these three documents, you faxed these three

19   documents to the FBI?

20   A    Yes.

21   Q    At or about -- on the date that it says?

22   A    On the date that it said.  Yes.

23   Q    Had you also advised the FBI of the initial meetings

24   were Vincent Artuso, also?

25   A    Yes.

```
1    Q    When Mr. Orr provided you with these three letters, did

2    he tell you who Robert Gannon was at all?

3    A    I believe he did, yes.

4    Q    Do you recall what he said?

5    A    He was the CFO.

6    Q    CFO of what?

7    A    Of their business.

8    Q    Had you met Robert Gannon at that point?

9    A    I never formally met him.  We just passed.

10   Q    By passing, passing in the aisle way?

11   A    Passing when I was with Greg in the office, I saw him.

12   Q    Now, after you were provided with these three letters

13   back at this meeting you were having, what else was discussed

14   concerning either the financing or refinancing that -- with

15   Mr. Orr?  Do you recall?

16   A    They needed the financing and he wanted me to give him

17   an answer either way because if I couldn't do it, you know,

18   they were going to look elsewhere and that's when we, a day

19   or two or three later we went to, he took me to go see an

20   attorney.

21   Q    Okay.  Now, when -- that's a day or two later.  Can you

22   describe how you went to see the attorney?

23   A    Yes.  Greg came by the restaurant, picked me up, and we

24   drove in Greg's car.

25   Q    Do you remember where the attorney had his offices?
```

1  A    Somewheres in Miami, in that area.  I don't recall the
2  exact location.
3  Q    Do you recall the attorney's name?
4  A    I do not.
5  Q    Do you remember anything about the age of the attorney?
6  A    It was an older gentleman, distinguished.  Very nice
7  office, beautiful offices.
8  Q    Older or younger than I am?
9  A    Same age.
10  Q    That is old.
11          MR. SHOCKLEY:  Let the record reflect that's an
12  older gentleman.
13          MR. McCORMICK:  I can't even argue that.
14  BY MR. McCORMICK:
15  Q    You drove down with Greg Orr.  Did you -- describe the
16  law office that this gentleman practiced out of?
17  A    It was an office building.  You walk in.  There was a,
18  some sort of, like a portico you walked into.  Very nice
19  building.  We went up to his office.  Like I said, a very
20  well appointed office.
21  Q    And was there a -- more than one attorney there or do
22  you remember?
23  A    Greg and I only met with the one attorney.  There could
24  have been a paralegal or a secretary working there, which I
25  saw a secretary, but I don't know if there was other

1  attorneys working there.  But we only met with the one.

2  Q    Did Mr. Orr indicate his relationship with the attorney

3  that you were meeting with?

4  A    Yes.  Driving down, he told me what this attorney, you

5  know, was about.

6  Q    What did he tell you?

7  A    He forms corporations, shell corporations, and shelters

8  them, and the ownership is very hard to be detected the way

9  this attorney forms these corporations.

10 Q    Did he indicate that he had done business with the

11 attorney in the past?

12 A    Yes.

13 Q    And what did he say?

14 A    That he did business with him and he's done this and you

15 should listen to what he has to say.

16 Q    And at that point you had already said to Greg Orr that

17 you weren't interested in involving yourself in the AMS

18 project, shall we say?

19 A    I was meeting the attorney.  We were meeting the

20 attorney.  So that part of the conversation I didn't have yet

21 with Mr. Orr.

22 Q    Okay.  Well, you were negative on the deal before that

23 though; is that correct?

24 A    Yes.

25 Q    Okay.  Now, did you sit down with the attorney?

1    A    Yes.

2    Q    Who was present there?

3    A    Greg, myself, and the attorney.

4    Q    Can you recall what was spoken about by each party?

5    A    Yes, the attorney was explaining to me about the

6    formation of these corporations and how he shelters the

7    owners of these corporations, and he went on to explain that

8    to me for about 20 or 25 minutes.

9    Q    And did you say anything to him when this theory of

10   sheltering corporations was brought forth?

11   A    Yes.

12   Q    What did you say?

13   A    I told him he was out of his mind.  I explained to him,

14   I says, you know, being around John Gotti for so many years

15   and knowing these systems just don't work, I said, it's going

16   to be founded.  And there's no such thing as hiding the

17   ownership.  There's no such thing as hiding corporations.

18   Because it comes out.  And he listened to what I had to say,

19   the attorney.  And that's basically what I said to this

20   attorney.

21   Q    And was that pretty much what occurred at this meeting?

22   A    Basically, yes.

23   Q    Did you tell -- did you give the attorney -- did you

24   tell the attorney whether you were interested in being

25   involved or not?

1  A    I told the attorney at that point that I didn't think

2  his -- the advice he was giving Greg was correct; that these

3  corporation would be found out, and I told him that, you

4  know, I would not go forward with sheltered corporations.  I

5  told him I would rather me and Vinnie go on the record with

6  our names, if we're going to do it, than look to be deceitful

7  and try and hide all the ownership of these different

8  entities.

9  Q    And did -- after that meeting with the attorney, did you

10 have any conversation with Greg Orr on the ride back --

11 A    Yes.

12 Q    -- from the law office?

13 A    Yes.

14 Q    Can you recall what was spoken about during that

15 particular ride?

16 A    Yes.  I expressed to Greg again, as I told the attorney,

17 I told Greg, I -- it's not going to work.  I said, it's hocus

18 pocus.  It sounds good.  And I just don't think it's going to

19 work, I said, and you know what, any money you're going to

20 make on these deals, put the money on the side to hire a good

21 criminal defense attorney because you're going to need it.

22 Q    And what did Greg Orr say to you when you made that

23 statement to him?

24 A    He listened very intently to what I had to say.

25 Q    Did he say anything?

1    A    He really didn't say anything at that point.  He

2    acknowledged what I said at that point.

3    Q    Okay.  When you got back to the, back to your

4    restaurant, was there further discussion in the car or was

5    that pretty much it?

6    A    When we got back to the restaurant we spoke again.

7    Q    And did you continue the conversation about the meeting

8    with the attorney?

9    A    Yes.

10   Q    And do you recall what you said and what he said?

11   A    I said to Greg again, I went through the whole thing.  I

12   said, Greg, it's not going to work.  I said we're all going

13   to wind up losing a lot of money.  I said I think, you know,

14   if we're going to do, let's just try and do it the right way.

15   But you know, to have Vinnie and myself as owners, it's just

16   not going to work.  Because we're never going to get the

17   financing we need, we're never going to get the refinancing,

18   and it won't work.

19          And at that point Greg acknowledged what I was

20   saying.  He didn't disagree with me.  And I went on to say to

21   him, you know, I really need to think about this as to how we

22   could proceed, if we could proceed.

23   Q    At this point, was the restaurant still under

24   construction?

25   A    Yes.

```
 1   Q    Did there come a time that you met with Vincent Artuso
 2   after that ride down to talk to the lawyer?
 3   A    Yes.
 4   Q    How many days passed between that and when you met with
 5   Vincent Artuso?
 6   A    I think that might have been about a week later.  Five
 7   days later.
 8   Q    Where did that conversation take place?
 9   A    At the restaurant.
10   Q    Do you remember what year?  If June of 2004 was the
11   Carlo Vaccarezza note, how much time from that point to when
12   you met with this meeting with Vincent Artuso?
13   A    Months later.  Months later.
14   Q    Was it the next year?
15   A    Definitely 12 -- 11, 12 months later.
16   Q    Okay.  Several months then?
17   A    Yes.
18   Q    Okay.  You're not very good on dates though, are you?
19   A    No.
20   Q    So when you say you're approximating, you really are?
21   A    Yes.
22   Q    Okay.  Tell me about the meeting you had with Vincent
23   Artuso at the restaurant because it was still under
24   constriction then, wasn't it?
25   A    Yes.
```

1    Q    That, you remember?

2    A    That, I remember.

3    Q    Okay.

4    A    He said to me, he says, he asked me what I thought of

5    the lawyer.  I gave him the same comment that I gave to Greg

6    about what I thought of the lawyer.  And then he said to me,

7    he says, I want you to meet with Greg in a day or two, he

8    says, he is going to -- we have something very good cooking

9    and happening, and Greg's going to make you aware of it.

10   Q    Okay.  Were you just with Vincent Artuso at that point

11   or was Greg there, too, or do you recall?

12   A    It was just me and Vinnie at that point.

13   Q    Okay.  And did you again meet with Greg Orr?

14   A    Yes.

15   Q    Where did you have this meeting?

16   A    At the Boca Resort.

17   Q    Who was present at that meeting, sir, if you can recall?

18   A    Greg and myself.

19   Q    And can you recall the discussion that you had as to who

20   said what, please?

21   A    Yes.  Greg was making me aware of a situation that they

22   have regarding Tyco.

23   Q    And what did Mr. Orr say about Tyco to you?

24   A    The vice president of real estate, Greg is friends with

25   him.  He lives in Parkland, he is a neighbor, and this

1  gentleman is in charge of disposing of Tyco properties, and

2  that sort.

3  Q    Okay.  Can you describe any more specifics about the

4  properties?

5  A    Yes.

6  Q    What did he say?

7  A    That they could buy the properties, we could buy the

8  properties below value and then Tyco would come in and lease

9  the properties back from us with 15-year leases, triple net

10  pass-through leases, and Tyco pays everything.  So basically,

11  all you're doing is just collecting rent.

12  Q    And did Mr. Orr say anything about the terms of the

13  lease when he was describing it to you, do you recall?

14  A    Yes.  That they were 15-year leases.

15  Q    How about any terms of the lease?

16  A    Triple net.

17  Q    Did you know what triple net was at that time?

18  A    Yes.

19  Q    Was there any discussion about deals being made, or

20  excuse me -- strike that.

21        Did you discuss with Mr. Orr the present condition

22  of the Tyco deals?  In other words, were they finished, were

23  they to be done, or anything like that?

24  A    They had several deals that they've already completed

25  with Tyco and that they were willing to bring me in to any

1    future deals that come their way.

2    Q    By future deals you mean with Tyco?

3    A    Yes.

4    Q    Was there any discussion about refinancing at that time?

5    A    Yes.

6    Q    Explain to the jury what that discussion was.

7    A    Greg wanted to -- on some of the deals that were

8    completed with Tyco, Greg wanted to refinance the deals

9    because the properties were bought below price, below market

10   value.  And what happens is, you can pull out substantial

11   cash.  You go to a bank, you show them the lease from Tyco,

12   show them it's a 15-year lease.  Tyco is a triple A rated

13   company, big company, public company.  And the bank will

14   refinance the deal, give you a first or even a second

15   mortgage on the property, and you're able to pull out cash

16   that way.

17   Q    Now, in connection with these conversations you're

18   having with Mr. Orr and Mr. Artuso, were you notifying the

19   FBI of that?

20   A    Yes.

21   Q    And you were notifying the FBI, the agents you were

22   reporting to?

23   A    Yes.

24   Q    Now, the next meeting you had with Mr. Artuso, can you

25   recall approximately how much time passed since the last

1    meeting?

2    A    Not much time passed.  Probably about a week.  Five days

3    to seven days.

4    Q    And where was that conversation?

5    A    At the restaurant.

6    Q    And were you alone with Mr. Artuso at that time?

7    A    Yes.  Carlo was there but he was off to the side.  He

8    didn't participate in the conversation.

9    Q    Okay.  Can you relate to the jury what you said and what

10   Mr. Artuso said?  We're speaking of Vincent Artuso.

11   A    Yes.  Vincent Artuso.  He wanted an answer whether I

12   wanted to do the deal, not do the deal, come up with the

13   200,000, not come up with the 200,000.  And give him a final

14   answer on the $40,000 for the restaurant.  He just wanted to

15   know what I wanted to do either way.

16            MR. BIRCH:  Excuse me, your Honor.  Can we have a

17   time frame on this?

18   BY MR. McCORMICK:

19   Q    Can you estimate the time?  I think you were talking

20   about sometime in 2005.  But can you be more specific if you

21   can?  Was it before the restaurant opened or --

22   A    This last conversation, we were probably getting ready

23   to open.

24   Q    Do you remember when you opened?

25   A    I don't recall the date we opened.  No.

1   Q    Okay.  In terms of the $40,000, did you respond to

2   Mr. Artuso about whether or not you were going to take his

3   money as an undisclosed owner?

4   A    Yes, at that conversation I did.  I told him that I

5   think -- I told him I'm going to pass on the $40,000.

6   Q    Did you have any discussions about Tyco at that -- at

7   that particular meeting?

8   A    He asked me if -- what I thought of the conversation I

9   had with Greg.  And I told him, I said I thought it was a

10  great situation to have someone on the inside and that down

11  the road possibly I would be interested.

12  Q    Now, somebody on the inside, what were you referring to?

13  A    The guy that was on the inside, the vice president of

14  real estate development.

15  Q    Did you indicate to Mr. Artuso any problems down the

16  road in terms of the inside guy at Tyco?

17  A    Yes, I did.

18  Q    What did you say?

19  A    I said, when something goes wrong here, I said, you know

20  this guy is going to flip.  And I said to Vinnie, I said, you

21  know, he's not with our family.  He's -- he is a civilian.

22  And you know, what's going to happen when this guy flips?

23  And Vinnie didn't seem to think he was going to flip.

24  Q    What did he say specifically, as best you can recall, to

25  make you draw that conclusion?

```
 1    A    Well, he said, you know, he's a neighborhood guy.  He

 2    lives by Greg.  Greg knows him.  He says -- you know, he

 3    didn't seem to have any concern about that.

 4    Q    Now did you have --

 5              THE COURT:  Is this a convenient time to stop.

 6              MR. McCORMICK:  Sure it is, your Honor.

 7              THE COURT:  Let's break for 15 minutes and return

 8    at 11:00 o'clock.

 9         (Jury out at 10:45 a.m.)

10              THE COURT:  We will be in recess 15 minutes.

11         (Recess at 10:45 a.m.)

12              THE COURT:  Okay.  As soon as we get our witness,

13    we'll be ready to go.

14              Go ahead and invite the jury in, and hopefully, our

15    witness will show up.

16              MR. PASANO:  Am I right in terms of the hearsay

17    objection, we all have that continuing objection that your

18    Honor ruled about in furtherance.  Because, for instance, all

19    of this testimony about what other people are saying, not

20    John Artuso.

21              THE COURT:  I think you need to make them.  So far,

22    you all have been making objections and I've been ruling on

23    them.  So if you have one, make it.  Because it changes a

24    little bit depending on whose talking and what's said.

25              MR. ENTIN:  With regard to my client, it's a
```

1    continuing objection to the entire line.

2              THE COURT:  Well, that's not helpful, the entire

3    line kind of objections.

4              MR. ENTIN:  Well --

5         (Jury in at 11:00 a.m.)

6              THE COURT:  Welcome back.  Please be seated.

7              And please continue, Mr. McCormick.

8    BY MR. McCORMICK:

9    Q    Okay.  Mr. Kasman, when we broke I believe you were

10   testifying about a meeting with Mr. Artuso at the restaurant

11   and it was in the process of being still renovated; is that

12   right?

13   A    Yes.

14   Q    You used the word flipped, it has been used often in

15   this trial.  Could you tell the jury what flipped means to

16   you?  What you understand it to mean?

17   A    That's when someone decides to cooperate with the

18   Government.

19   Q    It's jargon?

20   A    Yes.

21   Q    Now, did you meet Mr. Orr again after that meeting with

22   Mr. Artuso at the Boca -- at the club, if you recall?

23   A    Yes.

24   Q    Who was there?

25   A    It was just me and Greg at that meeting.

```
1    Q    And time-wise, within how long a period of time after

2    you met with Mr. Artuso?

3    A    Probably a week later.  A few days later.

4    Q    And all of these meetings are more or less compressed,

5    are they not?

6    A    Yes.

7    Q    Okay.  Could you tell the jury what you spoke about and

8    what Mr. Orr spoke about at this particular meeting

9    concerning the deals that you were talking about previously?

10   A    Yes.  I went over with Mr. Orr the -- what my opinion

11   was with the lawyer and the status of those shell

12   corporations.  And I also discussed the Tyco situation, my

13   concerns about the Tyco situation regarding the officer of

14   Tyco that could become a Government informant, if this ever,

15   you know, if this ever came out and was ever divulged.  And

16   Greg --

17             MR. PASANO:  Objection, your Honor, hearsay on

18   behalf of John Artuso.  Also 401 and 403.

19             THE COURT:  Overruled.

20             THE WITNESS:  Greg was very secure about his

21   relationship with the Tyco fellow.

22   BY MR. McCORMICK:

23   Q    Did he explain to you why he was so secure about his

24   relationship in answer to your question?

25   A    Yes.  That he lived --
```

```
 1              MR. PASANO:  Same objection, your Honor.  May I
 2    have a continuing objection on this line of questions?
 3              THE COURT:  Yes.  Overruled.
 4              MR. KASIER:  Objection on behalf of Bob Gannon,
 5    your Honor, 801(D)(2)(e).
 6              THE COURT:  Objection is overruled.
 7              MR. ENTIN:  Join in both, your Honor.
 8    BY MR. McCORMICK:
 9    Q    Go ahead.
10    A    That he's an neighbor.  He lived in Parkland.  I know
11    his family.  The guy will be okay.  The guy will be fine.
12    Q    And what did you say to that response?
13    A    I didn't agree with him and I told him, like I told him
14    in the car, I said with the money you're making, put some
15    money on the side because when this guy does go to the
16    Government, you're going to need a lawyer.
17    Q    Now, after that meeting at the club is that pretty much
18    the discussions that you had with Mr. Orr at this meeting?
19    A    At that particular meeting, yes.
20    Q    Did you have a further meeting with Mr. Artuso at the
21    restaurant Campagnola?
22    A    Yes.
23    Q    Was the restaurant open at that point or do you recall?
24    A    We were just -- we were just about opening at this
25    point.  We were almost done.
```

1    Q    And who was at this meeting with Mr. Artuso?

2    A    It was Carlo, myself, and Mr. Artuso.

3    Q    Did you talk with Mr. Artuso about your decision on the

4    Delray Beach office building and adjoining property?

5    A    Yes.

6    Q    What did you say?

7    A    I told him how I felt about the lawyer and I told him

8    how I felt about the undisclosed ownership or the secret

9    ownership with these various corporations, that we would not

10    be able to get financing, or that if we did get financing and

11    it was found out that it was done fraudulently, we would have

12    a lot of problems from that.

13    Q    Did you have discussions about Mr. Artuso and his son on

14    documents?

15    A    Could you repeat that?

16    Q    Did you have any discussion about Mr. Vinnie Artuso and

17    his son John on documents?

18    A    Yes.

19    Q    What was the nature -- what was said in that regard?

20         MR. PASANO:  Objection, your Honor.  Again, hearsay

21    401, 403 as to Mr. Artuso, and reserve a motion for

22    severance.

23         MR. ENTIN:  Objection, your Honor, 801.

24         THE COURT:  Objections are overruled.

25         MR. KASIER:  Objection on behalf of Gannon, 801 and

```
 1   relevance.

 2             MR. BIRCH:  Excuse me, your Honor.  Can we clarify

 3   that we previously agreed an objection by one is an objection

 4   by all?

 5             THE COURT:  We did clarify.

 6             MR. BIRCH:  Pardon me?

 7             THE COURT:  We did clarify that, although at times

 8   postures may change with respect to different clients, so I'm

 9   not going to preclude people from making --

10             MR. BIRCH:  I wasn't suggesting that.  I was trying

11   to avoid the repeated objections.

12             THE COURT:  All right.  In some areas I don't know

13   that we can avoid it, in those areas where interests may --

14   the postures of lawyers may be different.

15   BY MR. McCORMICK:

16   Q     Go ahead.

17   A     Okay.  Repeat the question, please.

18   Q     I was hoping you wouldn't say that.  Did you have a

19   discussion with Mr. Vincent Artuso about Mr. Vincent Artuso

20   and his son being on documents?

21   A     Yes, I did.

22   Q     What was said, if you recall?

23   A     I explained to him, I said with you being on document

24   and me being on a document and your son, I didn't know if

25   John had a criminal record or anything, but I just said just
```

1    the fact that he is your son, it just adds to the problems

2    with getting refinancing or straight financing.

3    Q    And how about, did you talk with Mr. -- was Mr. Orr

4    there, too?

5    A    No, not at this particular conversation.

6    Q    Did you speak with Mr. Vincent Artuso about anything to

7    do with Tyco and refinancing?

8    A    Yes.

9    Q    Can you tell the jury what you spoke about at this

10   meeting?

11   A    Vinnie was interested on some of the deals that they had

12   concluded already on refinancing and he wanted to use some of

13   my banking contacts to perhaps refinance some of the deals

14   that they have already completed.  And they have rent rolls

15   coming in, so they could show that to a bank.

16   Q    What did you say?

17   A    I said that I would try and assist them with that in

18   locating a bank or a lender to see if they can do that.

19   Q    Let me ask you, did you see any bank records from any

20   bank that Mr. Vincent Artuso was banking at?

21   A    When I was in the office, Greg showed me a checkbook

22   from, I think it was Gulfstream Bank.  Gulf something.  And

23   he said it was a small, like a neighborhood bank, and that

24   particular bank isn't a major lender or they couldn't go back

25   to them again for additional financing or more financing.

1    Q    Did you have any conversations at this meeting we're

2    speaking of about contacting the administration of the

3    Gambino family?

4    A    Yes.

5    Q    What did you say to Mr. Artuso at that time?

6    A    I said to Vinnie if we go forward on these deals, I said

7    we definitely, you know, you definitely have to post the

8    administration.  And that I would do the same.  Because it

9    wouldn't be looked upon in a good light if we did this in a

10   sneaky way, and the administration did not know.

11   Q    Was that pretty much what you spoke about?

12   A    At that meeting, yes.

13   Q    Now did you meet again that day with Mr. Artuso?

14   A    The very next day.

15   Q    Next day?  Where was that meeting at?

16   A    It was at the restaurant again.

17   Q    And can you tell -- what was the nature of the

18   conversation you had with Mr. Artuso Vinnie Artuso?

19   A    He came into the restaurant and he seemed somewhat

20   agitated.  He said to, would you take a walk with me?  And I

21   said yes.  We walked through the kitchen and went by the

22   back.  We had an office in the back.  He says to me, he says,

23   listen --

24          MR. PASANO:  Objection, your Honor again, hearsay,

25   same objections 401, 403, and the 801 objection.

```
 1                THE COURT:  Overruled.
 2    BY MR. McCORMICK:
 3    Q    Go ahead.
 4    A    He said to me, listen, I'm going to give you $100,000 in
 5    cash, you write me a check for $100,000 the way you used to
 6    do for John.  And he said it in a very aggressive and
 7    dictatorial way.
 8    Q    And what did you say?
 9    A    I told him he was out of order.  I said I don't think
10    you should speak to me this way.  You know my relationship
11    with the Gambino family.  I said I'm going to New York and
12    take it up with them.  He said do what you want, go and do
13    what you got to do.
14    Q    Now, again, did you advise the FBI in the totality of
15    your dealings with Mr. Artuso?
16    A    Yes.
17    Q    Now, you were still doing things on your own though; is
18    that correct?
19    A    Yes.
20    Q    And those you weren't advising the FBI about, is that
21    also true?
22    A    Correct.
23    Q    Now, did you open the restaurant?
24    A    Yes, we did.
25    Q    And for how long did you have the restaurant open, if
```

1    you recall?

2    A    11 months, I believe.

3    Q    And what happened to the restaurant?

4    A    When I opened the restaurant I decided to make Carlo the

5    manager.  I said to Carlo, if we're going to do this

6    restaurant let's do it wise guy free.  Let's just get vendors

7    of our own in, straight deal, because otherwise it's not

8    going to work.  And sure enough -- and I should have known

9    better.  Sure enough, Carlo had wise guy vendors in there.

10    It just -- we were doing good at the beginning, and it just

11    wound up to be everything that I didn't want it to be.

12    Q    Did you end your partnership with Carlo Vaccarezza at

13    that time?

14    A    I had gone to Danny Marino first.  And I gave Carlo a

15    severance package and I terminated him down the road.  Yes.

16    Q    How much money did you give to Carlo Vaccarezza?

17    A    I gave Carlo a check for $30,000.

18    Q    Did you eventually sell the restaurant in Boca Raton?

19    A    The restaurant was ultimately sold.  Yes.

20    Q    And who sold it, you or your brother-in-law?

21    A    Carlo sold it.

22    Q    Explain that, if you would.

23    A    Carlo is also a real estate broker.  He had brought me a

24    deal for $850,000.  Two weeks later, the deal went down to

25    $650,000.  He then introduces me to a gentleman by the name

1    of Michael Riccio (phonetic).  Michael Riccio then makes me

2    an offer of $350,000, down from the $800,000, and then

3    guarantees to pay certain vendors.  And the certain vendors

4    turned out to be Carlo's friends.

5    Q    So you didn't get as much money for the restaurant as

6    you thought you should?

7    A    We went from 8, 850 to 350.  We got nothing from the

8    restaurant.

9    Q    Did you complain to the administration about that?

10   A    Yes, I did.

11   Q    Did you discuss that with members of the administration?

12   A    I did.

13   Q    Let me ask you, in 2005, turning your attention to that

14   year, later on in the year July of 2005, did your status with

15   the FBI change in terms of being a cooperating -- a

16   confidential informant to that of being a cooperative

17   witness?

18   A    Yes.

19   Q    Did you decide -- why did you decide to change your

20   status with the FBI?

21   A    The intimidation, the shakedowns of money, the threats

22   of violence from members of the Gambino family.

23             MR. ENTIN:  Judge, I'm going to object.  Again, 801

24   and 403 with regard to my client.

25             MR. MARKUS:  403, your Honor.

1                   THE COURT:  Overruled.

2     BY MR. McCORMICK:

3     Q     Go ahead.

4     A     It just became more and more apparent that with John's

5     death and with the turmoil within the administration and a

6     lot of these skippers, captains, just not having respect and

7     not conducting themselves the way John had always said it

8     should be, that it was just -- you couldn't function.  I

9     couldn't function anymore.  I was being driven out of my

10    mind.

11    Q     So did you go to New York to talk to law enforcement and

12    the United States Attorney's office?

13    A     Yes, I did.

14    Q     That would be in July?

15    A     Yes.

16    Q     And did you participate in a proffer agreement with the

17    United States Attorney's office on July 7 of 2005?

18    A     Yes, I did.

19                   MR. McCORMICK:  That would be Government Exhibit

20    43.1.

21    BY MR. McCORMICK:

22    Q     I don't know if I asked you this, what was the name of

23    the restaurant again?

24    A     Campagnola.

25    Q     Can you spell that?

1    A    C-A-M-P-A-G-N-O-L-A, Campagnola.

2            MR. McCORMICK:  May I approach the witness, your

3    Honor.

4            THE COURT:  Yes.

5    BY MR. McCORMICK:

6    Q    Let me show you Government's proposed exhibit 43.1 which

7    is entitled proffer agreement.  Did you sign that agreement

8    when you met with the United States Attorney and the Federal

9    Bureau of Investigation on July 7 of 2005?

10   A    Yes.

11           MR. McCORMICK:  I would offer 43.1 into evidence at

12   this time.

13           MR. BIRCH:  No objection.

14           THE COURT:  43.1 is admitted.

15       (Received in evidence Government's Exhibit(s) 43.1.)

16   BY MR. McCORMICK:

17   Q    Now, when you were interviewed on July 7th of 2005, you

18   gave what is customarily called a proffer; is that correct?

19   A    Yes.

20   Q    And you were interviewed by the FBI and the federal

21   prosecutors?

22   A    Yes.

23   Q    Were you also interviewed on a second date in terms of

24   continuing day in terms of being interviewed?

25   A    Yes.

1   Q    And you signed a separate proffer agreement for that

2   day, too?

3   A    Yes.

4           MR. McCORMICK:  May I approach, your Honor?

5           THE COURT:  Yes.

6           MR. ENTIN:  Is that 43.2, Brian?

7           MR. McCORMICK:  Yes, it is.

8   BY MR. McCORMICK:

9   Q    Government's proposed Exhibit 43.2 is a proffer

10  agreement for -- signed by you, I believe.  It's dated

11  July 19th of 2005.  Is that the proffer agreement you were

12  referring to a minute ago?

13  A    Yes, it is.

14          MR. McCORMICK:  Offer 43.2 also into evidence, your

15  Honor.

16          MR. BIRCH:  No objection.

17          THE COURT:  43.2 is admitted.

18      (Received in evidence Government's Exhibit(s) 43.2.)

19  BY MR. McCORMICK:

20  Q    Now, after you were -- after you were interviewed on

21  those two occasions, did you then change your status with the

22  Federal Bureau of Investigation?

23  A    Yes.

24  Q    And what change in status were you aware of after you

25  were interviewed on those two occasions by the federal

1    prosecutors and the FBI?

2    A    I would become a cooperating witness.

3    Q    What did that mean to you, what you would have to do,

4    and what was expected of you?

5    A    You would have to testify truthfully in any federal

6    court or state court that they requested you to.

7    Q    What else?

8    A    Be truthful.  Testify.

9    Q    And refrain from breaking the law?

10    A    Obviously, yes, refrain from breaking the law.

11    Q    And did you have a signed agreement with the Federal

12    Bureau of Investigation or the United States Attorney's

13    Office for the Eastern District of New York before you began

14    recording, making consensual recordings on behalf of the FBI?

15    A    No.

16    Q    Did you eventually get a -- receive a, what they call a

17    no pros agreement --

18    A    Yes.

19    Q    -- with the US Attorney's Office in the Eastern District

20    of New York?

21    A    Yes.

22    Q    And do you remember being in the US Attorney's office

23    when that agreement was signed by you and by your attorney?

24    A    Yes.

25         MR. McCORMICK:  May I approach, your Honor?

1          THE COURT:  Yes.

2     BY MR. McCORMICK:

3     Q     Let me show you Government's proposed Exhibit 43.3,

4     which is a letter dated November 11, 2005.  Ask you if you

5     can identify that letter?

6     A     Yes, that's the document I executed on November 10th.

7     Q     Do you understand, in principle, what this letter is

8     about?

9     A     Yes.

10    Q     Just in principle, why don't you explain the, what the

11    consequences of the letter are?

12    A     You have to cooperate truthfully and honestly and

13    testify, and if you don't, you could be charged with any and

14    all crimes that you've proffered to and any new crimes that

15    they want to charge you with that you've committed.

16    Q     So when you were interviewed on July 7 and July 19th,

17    you informed the FBI and the federal prosecutors in Brooklyn,

18    New York, of the various crimes that you had committed while

19    an associate of the Gambino crime family?

20    A     Yes.

21          THE COURT:  What number is that?

22          MR. McCORMICK:  43.3, your Honor.

23          THE COURT:  Did you want to admit it?

24          MR. McCORMICK:  I'm sorry, I thought I offered it.

25          MR. BIRCH:  No objection.

1          THE COURT:  43.3 is admitted.

2      (Received in evidence Government's Exhibit(s) 43.3.)

3   BY MR. McCORMICK:

4   Q    Again, this letter is dated November 11 of 2005.

5   Correct?

6   A    Yes.

7   Q    And it is addressed to your attorney, Mr. Gold?

8   A    Yes.

9   Q    Michael Gold?

10  A    That's correct.

11  Q    He represented you at the proffers, which ended up being

12  a nonpros letter that you received on November 11, 2005,

13  correct?

14  A    Yes.

15  Q    Now, I'm going to publish some of this and ask you if

16  that was your understanding when you entered into this

17  cooperation agreement.  It begins with:

18          Dear Mr. Gold:  This letter constitutes an

19  agreement between the United States Attorney's office for the

20  Eastern District of New York, the office, and your client,

21  Lewis Kasman.

22          Number one, the witness will provide truthful,

23  complete, and accurate information and will cooperate fully

24  with the office.  This cooperation will include, but is not

25  limited to, the following:

1           A.   The witness agrees to be fully debriefed and to

2    attend all meetings at which his presence is requested,

3    concerning his participation in and knowledge of all criminal

4    activities.

5           B.   The witness agrees to furnish to the office all

6    documents and other material that may be relevant to the

7    investigation and that are in the witness' possession or

8    control and to participate in undercover activities pursuant

9    to the specific instructions of law enforcement agents or

10   this office.

11          Do you understand that to be a part of this

12   agreement, right?

13   A    Yes.

14   Q    C.   The witness agrees not to reveal his cooperation, or

15   to reveal his -- or any information derived therefrom, to any

16   third party without prior consent of the office.

17          D.   The witness agrees to testify at any proceeding

18   in the Eastern District of New York or elsewhere as required

19   by the office.

20          You understood that?

21   A    Yes.

22   Q    And e.   The witness agrees to cooperate fully with the

23   Internal Revenue Service in the ascertainment, computation,

24   and payment of his correct federal income tax liabilities for

25   the years 1988 through 2004.   To that end, the witness will

```
 1    file amended tax returns for the years 1998 through 2004 and

 2    consents to the disclosure to the Internal Revenue Service of

 3    information relating to his financial affairs that is in the

 4    possession of third parties.

 5            You understood that to be part and parcel of your

 6    agreement?

 7    A    Yes.

 8    Q    F.  The defendant agrees to complete a financial

 9    disclosure form supplied by the office within 60 days of the

10    date of this agreement.

11            You understood that?

12    A    Yes.

13    Q    Now, Paragraph 2.  The office agrees that:

14            A.  Except as provided in Paragraphs 5 and 6, no

15    criminal charges will be brought against the witness for his

16    heretofore disclosed participation in criminal activity

17    involving bribery of various public officials from

18    approximately 1986 to approximately 1993.

19            You understood that?

20    A    Yes.

21    Q    And that's based upon information you provided to the

22    Federal Bureau of Investigation?

23    A    Yes.

24    Q    What bribery cases were you referring to when you

25    referred -- when you made that disclosure?
```

1    A    Bribing of certain attorney, bribing of a -- building

2    inspectors and bribing of an elected official.

3    Q    And were you involved in bribing a witness to it or

4    what?

5    A    Pardon me?

6    Q    Were you involved in the bribing?  Were you involved in

7    the bribing activity?

8    A    Not directly.  But in one instance, yes, I was.

9    Q    And that occurred when?

10    A    The year that that occurred?

11    Q    Yes.  Approximately.

12    A    In the late 1980s.  Mid to late 1980s.

13    Q    Okay.  The second area we're going to talk about, money

14    laundering, extortion, and mail and wire fraud in the garment

15    center in New York City from 1986 through 1999.  Is that

16    the -- what you testified to before this jury, about that

17    criminal activity?

18    A    Yes.

19    Q    Extortion and mail and wire fraud at the garment

20    center -- strike that.

21        Money laundering on behalf of the Gambino crime

22    family from 1986 through 2004.  Is that the money laundering

23    that you spoke of with John Gotti's money and how it was

24    disposed of?

25    A    Yes.

```
 1   Q     Any and all financial activity in connection with the

 2   undisclosed ownership of the following places of business:

 3   Verago Bar in Rockville Center, New York, from approximately

 4   1998 to 2002.

 5         Were you involved in concealing undisclosed

 6   ownership -- concealing ownership in that place of

 7   establishment?

 8   A     Yes.

 9   Q     Who were you concealing it for?

10   A     Peter Gotti Senior.

11   Q     And that's the Verago Bar?

12   A     That's the Verago Bar, yes.

13   Q     Campagnola Restaurant in South Florida from

14   approximately 2003 to 2005.  Were you involved in that?

15   A     Yes.

16   Q     And that's what you testified with the jury, that your

17   brother-in-law was the owner?

18   A     Yes.

19   Q     Or purported owner.  You were the owner.

20   A     Yes.

21   Q     From approximately 2003 -- Hudson and McCoy in New York

22   from approximately 1990 to 2002; is that correct?

23   A     Yes.

24   Q     And is that the Hudson & McCoy restaurant that you

25   testified in this court about?
```

1    A    Yes.

2    Q    Okay.  The assault of Rudolph Pissola while in the FCI,

3    Lewisberg.  Is that the assault that you testified to in

4    front of the jury?

5    A    Yes, it is.

6    Q    The assaults of -- assault of Roger Basile in 2000 or

7    2001.  When did you -- when were you involved in the assault

8    of Roger Basile?

9    A    Approximately 2001.  That involved, he was one of the

10   partners of Hudson & McCoy in Freeport.  And he was becoming

11   unhappy with the money I was taking with the skimming, so I

12   had him assaulted.

13   Q    How was he assaulted?  Could you describe that to the

14   jury, please?

15   A    He was just slapped, backhanded.

16   Q    And the failure to file accurate federal income tax

17   returns and any criminal charges arising from the failure to

18   file accurate federal income tax returns from 1986 through

19   2004.

20   A    Yes.

21   Q    And you promised -- or excuse me, you're not being

22   prosecuted for that but you promised to file accurate tax

23   returns; is that correct --

24   A    That's correct.

25   Q    -- as a result of a subsequent plea agreement?

1    A    That's correct.

2    Q    I'm going to skip ahead a little bit.

3    A    Okay.

4    Q    I'm referring you now, Mr. Kasman, to Paragraph 5 of the

5    cooperation of nonprosecution agreement.

6         And that reads as follows:

7         The witness must at all times give complete,

8    truthful, and accurate information and testimony, and must

9    not commit or attempt to commit any further crimes.  Should

10   it be judged by the office that the witness has failed to

11   cooperate fully, has intentionally given false, misleading,

12   or incomplete information or testimony, has committed or

13   attempted to commit any further crimes, or has otherwise

14   violated any provision of this agreement, the office will be

15   released from its obligations under this agreement.

16        The witness will also be subject to the prosecution

17   for any federal criminal violations of which the office has

18   knowledge, including, but not limited to, the criminal

19   activity described in Paragraph 2 above, perjury, and

20   obstruction of justice.

21        You understood that particular paragraph?

22   A    Yes.

23   Q    And you also understand that that violation of that

24   paragraph resulted in your being charged with various crimes

25   that we're going to talk about in a minute?

1    A    Yes.

2    Q    Now, after you signed this agreement, I should say after

3    your proffer in July of 2005, you began to cooperate with the

4    Federal Bureau of Investigation and ultimately you signed a

5    nonpros agreement in November.  And beginning in July of

6    2005, did you begin to wear consensual recording devices

7    against high level and members and associates of the Gambino

8    crime family?

9    A    Yes.

10   Q    For how long did you carry out that activity for the

11   Federal Bureau of Investigation?

12   A    From 2005 to 2007.

13   Q    And do you have any idea how many people you recorded

14   during that period of time?

15   A    Numerous people.

16   Q    Did you record anybody that was associated with or part

17   of the administration of the Gambino crime family?

18   A    Yes, I did.

19   Q    And who in the administration did you record during this

20   period of time?

21   A    Jackie Nose, Jackie D'Amico.  Joseph Jo Jo Corozzo, the

22   consigliere.

23              MR. McCORMICK:  May I have just one second, your

24   Honor?

25              THE COURT:  Yes.

1          (Pause in Proceedings.)

2     BY MR. McCORMICK:

3     Q     Would you repeat that answer, please?

4     A     Jackie D'Amico and Joseph Corozzo.

5     Q     And they were in the administration in 2005?

6     A     Yes.

7     Q     All right.  Again, would you identify in this wedding

8     picture of 1987 where Joseph Corozzo is in terms of the

9     photograph?

10    A     He's the second from the left, next to the lady in the

11    white.

12    Q     Is that my little pointer on him?

13    A     That's correct.

14    Q     And how about Jackie Nose or The Nose D'Amico?

15    A     He is in the middle between Joseph and John Gotti.

16    Q     So those two individuals you recorded after July of 2005

17    when you became a cooperating witness with the FBI?

18    A     Yes.

19    Q     Now, over the course of your cooperation with the FBI

20    between July of 2005 till July of 2007, did you violate the

21    terms of the nonpros agreement that you signed in November of

22    2005?

23    A     Yes.

24    Q     And could you explain -- first of all, before we get

25    into the specifics of your violations, could you explain what

1  possessed you to violate that agreement with the FBI?

2  A    The one instance where I obstructed a State

3  investigation it involved someone that was a friend of mine,

4  and the other instances was scamming somebody for money; and

5  that's what I did.

6  Q    Well, you did a little more than that, because you were

7  questioned by the FBI during the pendency of your

8  cooperation.  What did you do with them?

9  A    I didn't tell them the truth.  I lied to them.

10  Q    First of all, let's get back to the scamming somebody

11  for money.  Why did you do that?

12  A    He -- he's an associate of the Gambino family with

13  Joseph Corozzo.  And he was -- I was introduced to him

14  through Joseph.  And he wanted to go into business, and he

15  kept saying, let's go into business, let's go into business.

16  So I took the money from him fraudulently and told him we

17  were going into business, but we never went into business and

18  I just kept the money.

19  Q    How much did you keep?

20  A    $80,000.

21  Q    And that transaction was talked about frequently on the

22  recordings that you were making on behalf of the FBI; is that

23  right?

24  A    That's correct.

25  Q    And were you interviewed at length about those

1    transactions as they were discerned from the recording

2    that -- recordings that you were making by the controlling

3    agents?

4    A    Yes.

5    Q    What did you tell the controlling agents when they asked

6    you about the legitimacy of the investment of Harvey Shear

7    (phonetic); is that right?

8    A    Harvey Shear, yes.  My original conversations with

9    the -- my handling agent, I lied to him.  I did not tell him

10   from the outset what I was doing with Harvey Shear, at the

11   beginning.

12   Q    And why did you lie to him?

13   A    Because I wanted to keep the $80,000.

14   Q    Beyond that, why did you lie to him?

15   A    I thought I would be able to -- I didn't want him to

16   detect a violation of my agreement.

17   Q    And at that time -- let's get back to the individual

18   that you forewarned about the investigation that he was

19   under.  Would you tell the jury a little bit about that?

20   A    He is a friend of mine.  He is the fellow that slapped

21   Roger Basile.  And he worked for me for many years.  And I --

22   that's how I warned him.

23   Q    So you --

24   A    Why I warned him.

25   Q    You warned him about another investigation?

1    A    Yes.

2    Q    Had you already recorded your friend -- what's your

3    friend's name?

4    A    Matthew Vogelman.

5    Q    Had you already recorded Matthew Vogelman for the FBI?

6    A    Yes.

7    Q    On several occasions?

8    A    On several occasions.

9    Q    And you recorded him in terms of evidence about loan

10   sharking?

11   A    Loan sharking.  Yes.

12   Q    As well as steroids?

13   A    Steroids.

14   Q    Steroid sales?

15   A    Uh-huh.

16   Q    Yet, you warned him about another investigation about

17   the same thing?

18   A    Yes.

19   Q    Why did you do that?

20   A    Because there, was -- I was with him one day and there

21   was so much surveillance around that, I just -- it just

22   started to become overwhelming and I just told him, I don't

23   know what else you're doing but, you know, you definitely

24   have a problem here.

25   Q    Okay.  Now, when the FBI found out about you warning

```
 1    Matthew Vogelman and eventually about the Harvey Shear fraud,
 2    did you go back to New York?
 3    A    Yes.
 4    Q    And what happened when you went back to New York?
 5    A    They ripped up my agreement.
 6    Q    This ripped up this agreement?
 7    A    Yes.
 8    Q    And did they rely upon Paragraph 5 that we talked about
 9    and it was read to you in court?
10    A    Yes, they did.
11    Q    And what did they tell you as a result of the fact that
12    this no pros agreement was being ripped up?
13    A    I was going to be charged with additional crimes, plus
14    obstruction and plus the wire fraud and the stealing of the
15    Harvey Shear.
16    Q    And did you enter into a plea agreement with the United
17    States concerning that activity and your violation of the
18    cooperation agreement?
19    A    Yes, I did.
20            MR. PASANO:  Judge, while we're doing that, as
21    fascinating as that 1987 wedding photo is, if the Government
22    is not using it, could we ask it be removed from the screen.
23            MR. McCORMICK:  I'm going to put the plea agreement
24    on it.
25            THE JUROR:  But you might go ahead and take it off
```

1    at his request.

2              MR. PASANO:  Thank you, your Honor.

3              MR. McCORMICK:  I certainly will bow to his

4    request.

5    BY MR. McCORMICK:

6    Q    On September 27th of 2007 did you enter into a plea

7    agreement with the Government concerning the three criminal

8    acts that you described to the jury?

9    A    Yes.

10              MR. McCORMICK:  Can I approach the witness, your

11   Honor.

12              THE COURT:  Yes.

13   BY MR. McCORMICK:

14   Q    Let me show you proposed Exhibit 43.5.  Is that the plea

15   agreement that bears your signature?

16   A    Yes, it is.

17              MR. McCORMICK:  We would offer 43.5 into evidence,

18   your Honor.

19              MR. BIRCH:  No objection.

20              THE COURT:  43.5 is admitted.

21       (Received in evidence Government's Exhibit(s) 43.5.)

22   BY MR. McCORMICK:

23   Q    All right.  Mr. Kasman, 43.5 is the first plea agreement

24   you entered into with the Government.  You recognize that,

25   correct?

1    A    Yes.

2    Q    Let me ask you a few questions from that plea agreement.

3            Paragraph 1, I'm going to start by reading:

4            The defendant will waive indictment and plead

5    guilty to an information to be filed in this district

6    charging a violation of 18 USC Section 1512(c)(2) obstruction

7    of justice, 18 USC Section 1001, (a)(2), false statements,

8    and 18 USC 1343, wire fraud.

9            Count 1, obstruction of justice carries the

10   following statutory penalties:  Maximum term of imprisonment,

11   20 years.  18 USC Section 1512(c)(2).

12           Subparagraph B.  Minimum term of imprisonment, zero

13   years.

14           Subparagraph C.  Maximum supervised release term,

15   three years, to follow any term of imprisonment.  If a

16   condition of release is violated, the defendant may be

17   sentenced up to two years without credit for prerelease

18   imprisonment or time previously served on post release

19   supervision under 18 USC 3583(b)(e).

20           Paragraph d.  The maximum fine is $250,000 under 18

21   USC 3571.

22           E.  Restitution as determined by the Court.

23           And f.  $100 special assessment under 18 USC 3013.

24           It continues:

25           Count 2, false statements, carries the following

1    statutory penalties:

2          Maximum term of imprisonment, five years under 18

3    USC 1001(a)(2).

4          Minimum term of imprisonment, zero years, 18 USC

5    1001(a)(2).

6          Maximum supervised release term, three years, to

7    follow any term of imprisonment; if a condition of release is

8    violated, the defendant may be sentenced to up to two years

9    without credit for prerelease imprisonment or time previously

10   served on post release supervision.  18 USC 3583(b)(e).

11         The maximum fine is $250,000, 18 USC 3571.

12         Restitution as determined by the Court, 18 USC 3663

13   and 3663A.

14         And finally, subparagraph f is $100 special

15   assessment under 18 USC 3013.

16         Count 3, wire fraud carries the following statutory

17   penalties:

18         Maximum term of imprisonment is 20 years.

19         I'll omit the citation.

20         Subparagraph b.  Minimum term of imprisonment is

21   zero years.

22         And subparagraph c is maximum supervised release

23   term three years; to follow any term of imprisonment.

24         If any term -- if a condition of release-- if a

25   condition of release -- okay.

```
1              If a condition of release is violated the defendant

2    may be sentenced up to two years without credit for

3    prerelease imprisonment or time previously served on post

4    release supervision, and the other terms and conditions are

5    identical or -- with the other offenses that you were

6    pleading guilty to.

7              Do you understand that's what you pled guilty to?

8    A    Yes.

9    Q    The next paragraph I'm going to omit, and that's

10   Paragraph 2.  And what that -- what Paragraph 2 does is

11   calculate by the United States Sentencing Guidelines the

12   possible sentence to be imposed.  And this, at the bottom of

13   that particular paragraph it says, this level carries a range

14   of imprisonment of 18 to 24 months, assuming that the

15   defendant falls within criminal history category one.  If a

16   defendant pleads guilty on or before September 28, 2007, the

17   Government will move the Court, pursuant to United States

18   Sentencing Guideline 3E1.1(b) for an additional one level

19   reduction, resulting in an adjusted offense level of 14.

20             Do you understand that?

21   A    Yes.

22   Q    That's your agreement with the Government?

23   A    Yes, it is.

24   Q    Paragraph 3 reads:

25             The guidelines estimate set forth in Paragraph 2 is
```

```
 1   not binding on the offices, the Probation Department, or the

 2   Court.  If the guidelines offense level advocated by the

 3   offenses or determined by the Probation Department or the

 4   Court is different from the estimate, the defendant will not

 5   be entitled to withdraw his plea.

 6           In other words, that's an estimate in this plea

 7   agreement.  You understand that?

 8   A    Yes, I do.

 9   Q    And the probation office and the Court will determine

10   what the guideline sentence is?

11   A    Yes.

12   Q    Paragraph 6 reads as follows:

13           If the defendant requests, and in the office's

14   judgment the request is reasonable, the office will make

15   application and recommend that the defendant and, if

16   appropriate, other individuals, be placed in the witness

17   security program.  It being understood that the office has

18   authority only to recommend, and that the financial decision

19   to place an applicant in the witness security program rests

20   with the Department of Justice, which will make its decision

21   in accordance with applicable department regulations.

22           You understand that, too?

23   A    Yes.

24   Q    You understand the restrictions on that?

25   A    Yes.
```

1    Q    Now, you entered -- pursuant to this plea agreement, you

2    did plead guilty; is that correct?

3    A    Yes, that's correct.

4    Q    And your sentencing -- you haven't been sentenced yet in

5    that case?

6    A    No.

7    Q    And you're expecting to be sentenced sometime in the

8    near future; is that correct?

9    A    That's correct.

10   Q    Now, also as a result of violating Paragraph 5 of the

11   nonprosecution agreement that you entered into in November of

12   2005, you understood that the Government could also charge

13   you with crimes that you admitted during the proffer session?

14   A    Yes.

15   Q    And one of those crimes -- two of those crimes had to do

16   with extortions at Hudson McCoy restaurant and Sprats, is it?

17   A    Spratts.

18   Q    Spratts.  And you understood that even though you gave

19   that information to the Government, because you didn't keep

20   your word on this nonprosecution agreement, you were bound to

21   be charged for that, too, for that crime?

22   A    Correct.

23   Q    Did you enter into a plea agreement for the plea of

24   guilty as to that crime?

25   A    Yes.

```
 1              MR. McCORMICK:  May I approach the witness, your
 2    Honor.
 3              THE COURT:  Yes.
 4    BY MR. McCORMICK:
 5    Q    Let me show you Government's proposed Exhibit 43.7.
 6    It's a document entitled United States versus Lewis Kasman,
 7    and it's called a coop -- captioned a Cooperation Agreement
 8    or Cooperation Agreement.  Do you recognize that document?
 9    A    Yes, I do.
10    Q    What is it?  Exactly what I said?
11    A    Cooperation Agreement.
12    Q    And is it signed by you?
13    A    Yes, it is.
14    Q    Is it dated?
15    A    March 25, '08.
16              MR. McCORMICK:  Your Honor, offer into evidence
17    Government's Exhibit 43.7.
18              MR. BIRCH:  No objection.
19              THE COURT:  43.7 is admitted.
20        (Received in evidence Government's Exhibit(s) 43.7.)
21    BY MR. McCORMICK:
22    Q    Okay.  Mr. Kasman, the cooperation agreement is in
23    reality a plea agreement that you signed in order to plead
24    guilty to various -- to an offense against the United States
25    that resulted from information that you provided in your
```

1    proffer; is that correct?

2    A    That's correct.

3    Q    And the offense that you pled guilty to was a violation

4    of RICO, of the RICO -- a RICO conspiracy.

5    A    That's correct.

6    Q    And I turn your attention to Paragraph 2 where it reads:

7            The defendant will waive indictment and plead

8    guilty to a one-count superseding information to be filed in

9    this district charging RICO conspiracy, in violation of Title

10    18 United States Code Section 1962(d).  The count carries the

11    following statutory penalty:

12            Maximum term of imprisonment, 20 years.

13            I'll delete the statutory citation in the interest

14    of time.

15            B.  Minimum term of imprisonment, zero years.

16            C.  Maximum supervised release term, three years,

17    to follow any term of imprisonment; if a defendant may be

18    sentenced to up to two years without credit for release

19    imprisonment or time previously served on post release

20    supervision.

21            D.  Maximum fine of $250,000 or twice the gross

22    profits.

23            E.  Restitution:  Mandatory, in an amount to be

24    determined by the Court.

25            F.  $100 special assessment.

1           Now, Paragraph 4 reads as follows:

2           That's the paragraph where you're agreeing to be

3    truthful in your cooperation with the United States.

4           Paragraph 4 reads as follows:

5           The defendant will provide truthful, complete, and

6    accurate information and cooperate fully with the office.

7    This cooperation will include, but is not limited to the

8    following:

9           A.   The defendant agrees to be fully debriefed and

10   to attend all meetings at which his presence is requested,

11   concerning his participation in and knowledge of all criminal

12   activities.

13          B.   The defendant agrees to furnish to the office

14   all documents and other material that may be relevant to the

15   investigation and that are in the defendant's possession or

16   control and to participate in undercover activities pursuant

17   to the specific instructions of law enforcement agents or

18   this office.

19          C.   The defendant agrees not to reveal his

20   cooperation, or any information derived therefrom, to any

21   third party without prior consent of the office.

22          D.   The defendant agrees to testify at any

23   proceeding in the Eastern District of New York or elsewhere

24   as requested by the office.

25          E.   The defendant consents to adjustments of his --

1    adjournments of his sentencing as requested by the office.

2              F.   The defendant agrees to cooperate fully with

3    the Internal Revenue Service in the ascertainment,

4    computation, and payment of his correct federal income tax

5    liability for the years 1988 through 2005.   To that end, the

6    defendant will file amended tax returns for the years 1988

7    through 2005 prior to his sentence and consents to the

8    disclosure to the Internal Revenue Service of information

9    relating to his financial affairs that is in the possession

10   of third parties.

11             You've agreed you understand what you're required

12   to do in this area?

13   A    Yes.

14   Q    And have you done that yet?

15   A    No.

16   Q    And are you prepared to do that?

17   A    Yes.

18   Q    Pursuant to the agreement?

19   A    Of course.

20   Q    5.   The office agrees that:

21             Except as provided in Paragraph 2, 9, and 10, no

22   criminal charges will be brought against the defendant for

23   his heretofore disclosed participation in bribery of various

24   public officials from approximately 1986 to approximately

25   1993.

```
 1              Now, this particular provision is the same
 2     provision you had in the nonpros agreement; isn't that right?
 3     A     Yes.
 4     Q     And with the exception of what you're pleading to the
 5     extortion of Hudson & McCoy and the Spratts case which are
 6     the predicate acts in the RICO conspiracy, it's identical to
 7     that agreement?
 8     A     Yes.  Correct.
 9     Q     Do you understand that?
10     A     I do.
11     Q     Now, in this particular agreement it reads in
12     Paragraph 7:
13              If the office determines that the defendant has
14     cooperated fully, provided substantial assistance to law
15     enforcement authorities and otherwise complied with the terms
16     of this agreement, the office will file a motion pursuant
17     to -- United States sentencing guideline 5K1.1 with the
18     sentencing court setting forth the nature and extent of his
19     cooperation.
20              You understand that?
21     A     Yes.
22     Q     You understand what that means?
23     A     I do.
24     Q     Such a motion will allow the Court when applying the
25     advisory guidelines to consider a range below the guideline
```

1  range that would otherwise apply for the above described

2  count and for the charges covered by the prior agreement.

3      And by the prior agreement you're referring to the

4  other plea of guilty that you entered into?

5  A    Yes.

6  Q    In this connection, it is understood that a good faith

7  determination by the office as to whether the defendant has

8  cooperated fully and provided substantial assistance and has

9  otherwise complied with the terms of this agreement, and the

10  office's good faith assessment of the value, truthfulness,

11  completeness, and accuracy of the cooperation, shall be

12  binding upon him.

13      The defendant agrees that, in making this

14  determination, the office may consider facts known to it at

15  this time.  The office will not recommend to the Court a

16  specific sentence to be imposed.  Further, the office cannot

17  and does not make a promise or representation as to what the

18  sentence will be imposed by the Court.

19      You understand what that means in terms of your

20  expectation of a reduction of your sentence?

21  A    Yes.

22  Q    You understand that the Government will evaluate your

23  truthfulness and your cooperation in this or any other

24  proceeding?

25  A    Yes.

1  Q    And you understand that there's been no promises and

2  that evaluation will be made independent of you?

3  A    I do.

4  Q    And you understand further that the Court will

5  ultimately make the decision, regardless of what the

6  Government -- if the Government decides to file a 5K Motion

7  for reduction?

8  A    Yes.

9  Q    Paragraph 9, Mr. Kasman reads as follows -- I wanted to

10  make sure you understood this, too.  Okay?

11       Paragraph 9 reads:

12       The defendant must at all times gives complete,

13  truthful, and accurate information and testimony, and must

14  not commit or attempt to commit, any further crimes.  Should

15  it be judged by the office that the defendant has failed to

16  cooperate fully, has intentionally given false, misleading,

17  or incomplete information or testimony, has committed or

18  attempted to commit any further crimes, or has otherwise

19  violated any provision of this agreement, the defendant will

20  not be released from his plea of guilty, but this office will

21  be released from its obligation under this agreement,

22  including A not to oppose a downward adjustment of two levels

23  for acceptance of responsibility described in Paragraph 3

24  above and to make the motion for an additional one-level

25  reduction described in Paragraph 3 above and B to file the

1    motion described in Paragraph 7 above.

2              Moreover, this office may withdraw the motion

3    described in Paragraph 7 above, if such motion has been filed

4    prior to sentencing.  The defendant will also be subject to

5    prosecution for any federal criminal violation of which the

6    office has knowledge, including, but not limited to, the

7    criminal activity described in Paragraph 5 above, perjury and

8    obstruction of justice.

9              Do you understand that?

10   A    Yes.

11   Q    And you understand that in the event that you aren't

12   truthful, that the same consequence of violating Paragraph 5

13   of the no pros agreement would be yours to answer to?

14   A    Yes, I do.

15   Q    Paragraph 11 again reads as follows:

16             If the defendant requests, and in the office's

17   judgment the request is reasonable, the office will make

18   application and recommend that the defendant and, if

19   appropriate, other individuals be placed in the witness

20   security program.  It being understood that the office has

21   authority only to recommend and that the final decision to

22   place an applicant in the witness security program rests with

23   the Department of Justice, which will make its final decision

24   in accordance with applicable department regulations.

25             You understand that?

1    A    Yes.

2    Q    Have you requested that?

3    A    Yes.

4    Q    Now, shortly after signing this cooperation or plea

5    agreement, did you enter into a plea of guilty as to RICO

6    conspiracy also?

7    A    Yes, I did.

8    Q    Just turning your attention to the first plea of guilty,

9    I note that it is a plea to a superseding information.  Are

10   you familiar with that?

11   A    Yes.

12   Q    And do you know why it is a superseding information and

13   not an information?

14   A    I think they were consolidating the two.

15   Q    Well, when you first were called to task for violating

16   your nonprosecution agreement, do you recall because you

17   committed the state obstruction of justice?

18   A    Yes.

19   Q    And that's what you were going to plead guilty to?

20   A    Yes.

21   Q    And within a time period it was learned you fessed up

22   and told the FBI that you had indeed been involved in the

23   Harvey Shear wire fraud too?

24   A    Yes.

25   Q    And then you went back and that was added into the

1    information?

2    A     I believe so.  Yes.

3    Q     Now, during the pendency of -- when did the

4    cooperation -- excuse me.

5          I think you stated that you recorded most -- the

6    majority of your recordings occurred between July of 2005 and

7    July of 2007?

8    A     Correct.

9    Q     And was the FBI -- were the FBI provided -- was the FBI

10   providing you with any funds after July of 2007 having to do

11   with the original cooperation agreement?

12   A     After '07?

13   Q     Yes, after the summer of '07 when you violated the terms

14   of the --

15   A     No.

16   Q     So at that particular time did you remain in Florida?

17   A     Yes.

18   Q     And at that time your wife did file for divorce against

19   you?

20   A     Yes.

21   Q     And I think you indicated -- do you remember about when

22   that filing took place?

23   A     I really don't.  I don't know when she filed.

24   Q     Well, in early 2008 were you involved in depositions

25   having to do with --

```
 1   A    Yes.

 2   Q    -- having to do with the divorce?

 3   A    Yes.

 4   Q    And were you deposed in that particular case?

 5   A    Yes.

 6   Q    And were you asked in 2008 about your spending patterns

 7   that occurred in 2005, 2006, 2007?

 8   A    Yes.

 9   Q    Do you remember that?

10   A    Yes.

11   Q    And where was much of your money coming from during that

12   period of time?

13   A    From 2005 through -- and '7?

14   Q    Yes.

15   A    The FBI.

16   Q    And the FBI was providing you -- do you remember the

17   amount of money per month the FBI was providing you?

18   A    $12,000.

19   Q    You were getting paid for expenses, too?

20   A    Yes.

21   Q    What kind of expenses were you talking about?

22   A    Travel affair, hotels.  I had to rent a car.

23   Q    Now, when you were deposed in the private law offices in

24   West Palm Beach, you were asked about the genesis or source

25   of your income.  Did you tell the truth there?
```

```
1    A    I lied.

2    Q    Why?

3    A    For the security of myself and my family, I could not

4    disclose that information.

5    Q    Why not?

6    A    Because it would have been found out that I was working

7    for the Government.

8    Q    What would that have done?

9    A    That would have outed me and put my life in danger and

10   my family's life in dangers.

11   Q    Where was this deposition taken?

12   A    In a law office I believe in Boca Raton, Florida.

13   Q    So you say you lied because you were afraid?

14   A    Yes.

15   Q    You weren't afraid of the attorney that was doing the

16   deposition?

17   A    No.

18   Q    Explain that in a little more detail for the jury,

19   please.

20   A    In other words, a deposition ultimately becomes a public

21   document.  And if I had disclosed my relationship financially

22   or otherwise that I had with the Government, it would have

23   gotten out into the public domain and it would have put my

24   life in jeopardy and my children and my wife.  So I did

25   not -- I had to lie during that deposition.
```

1    Q    Have you thought about that since doing that?

2    A    I have thought about it, yes.

3    Q    And what have you thought about it?

4    A    I should have went to the FBI and asked them what I

5    should do before I was deposed, or the lawyer at the time

6    representing me, I should have told him.  But I didn't trust

7    him, so I went and -- you know, I lied.  I went in and I

8    lied.

9    Q    And as a result of your appearance in West Palm Beach,

10    you were also incarcerated for five or six days or seven days

11    or something like that?

12    A    Yes.

13    Q    Could you explain that to the jury?

14    A    Yes.  There was is a pronouncement by a circuit court

15    judge here in Palm Beach County, and in Florida, the Florida

16    law is a pronouncement in a state court is not an order.  It

17    has to be reduced to paper and then signed by that particular

18    judge.  So what happened was, it was represented to -- my

19    wife's attorney represented to the judge that, to hold me in

20    contempt, we have an order.

21    Q    What I'm asking you, did the judge find that you

22    violated the order?

23    A    Yes.  So based upon that representation, he held me in

24    civil contempt and incarcerated me on the spot and I went to

25    the sheriff -- on Gun Club Road.

1    Q    Did you eventually pay the money that the judge ordered

2    you to pay or pay over to your wife?

3    A    Yes.

4    Q    Okay.  Have you always supported your children?

5    A    Yes.

6    Q    There's an allegation that you took money out of a trust

7    fund that was set aside for your children.  Could you explain

8    that to the jury, please?

9    A    Yes.  There was money we had in some of the children's

10   accounts that was all commingled money from all over the

11   years.  And that money was then taken -- I took that money

12   out of there and I deposited that into our joint account to

13   pay living expenses and bills, and things for the children.

14   Q    And so that money wasn't -- you didn't leave town with

15   the money; you used it for living expenses?

16   A    That's correct.

17   Q    And after you were incarcerated, did you contact the

18   FBI?

19   A    Yes.

20   Q    And what happened then?

21   A    They -- I told them what had happened and the next

22   situation is that the judge took my passport and also

23   wouldn't let me leave the state of Florida.  He restricted my

24   location to the state of Florida.  And there was a --

25   everything was breaking in New York with my being a

1    confidential witness and so that they -- I had to get

2    protection because it was going to -- I was going to be outed

3    very shortly.

4    Q    Now when you say everything was breaking in New York,

5    were there people that were charged in New York having to do

6    with the Gambino crime family?

7    A    Yes, there was a massive roundup in New York of members

8    of the Gambino family.

9    Q    And are you telling the jury that your identity was

10   being turned over or going to be exposed?

11   A    Yes.  This all happened approximately March 20th, and by

12   March 23 it was all over New York that I was a confidential

13   witness.

14   Q    And you say you needed protection of the FBI.  Was it

15   given to you?

16   A    Yes.

17   Q    Provided?

18   A    Yes.

19   Q    Now, let's turn your attention to some of these

20   recordings that you made, Mr. Kasman.

21        MR. McCORMICK:  May I have one second, your Honor.

22        THE COURT:  Beg your pardon?

23        MR. McCORMICK:  Just one second to set up the first

24   recording.

25        THE COURT:  Okay.  Well, if it's going to take you

```
 1    a minute, why don't we -- since we are going to stop early

 2    today, let's' stop a little earlier for lunch.  We'll break

 3    now and return at 1:15.  It will be an hour and two minutes.

 4

 5        (Jury out at 12:12 p.m.)

 6            THE COURT:  Okay.  We will be in recess one hour.

 7        (Recess at 12:12 p.m.)

 8            THE COURT:  Okay.  Ready for the jury?

 9            MR. BIRCH:  One thing, your Honor.

10            THE COURT:  Have a seat.

11            MR. BIRCH:  The reason I asked when one attorney

12    makes an objection that can be considered for all, it was to

13    avoid, as you know what we agreed before, that, you know,

14    having five lawyers jump up.  Now it may turn out down the

15    road that an attorney needs to object if he feels he needs

16    to, but rather than make a decision right here and now should

17    that objection apply as well to --

18            THE COURT:  Well, my problem with your

19    suggestion -- I mean for some, it is an admission.  For some,

20    it's 801D2E.  At least one of you was making a relevance

21    objection.  And so I just didn't see how the one for all

22    approach worked in that area.

23            MR. BIRCH:  Was it just for that area of

24    questioning?  I just wanted to make sure it is not taken as

25    some sort of waiver or negate our prior understanding.
```

```
 1              THE COURT:  No.  That's fine.  But we got into an

 2    area where it's clearly different lawyers had different bases

 3    for their arguments.  And so, I -- when we get into these

 4    statements of defendants and statements of people in the

 5    Gambino family, interests seem to diverge, and I think in

 6    that area you need to make sure you protect the --

 7              MR. BIRCH:  Very well.  I think I understand.

 8              THE COURT:  -- the record in that area.

 9              At one point Mr. Entin said he wanted a continuing

10    objection, but the objection he had made was relevance based

11    on the magazine portion.  I think you were arguing that the

12    magazine --

13              MR. ENTIN:  The financing of whatever it was.

14              THE COURT:  -- of the magazine was irrelevant.  And

15    so to say you then want a continuing objection is kind of the

16    same as saying, I object to being here, as I heard your

17    objection.

18              MR. PASANO:  And we do, your Honor.  As a matter of

19    fact, what's now going to happen is the Government is going

20    to play, in accordance with the Court's rulings, the

21    tape-recordings.  Other than the objections that I think

22    we've already made, if we have a particular objection to

23    something, we will rise.  But I take it that we do not have

24    to rise to repeat those other objections which we still

25    maintain --
```

```
 1              THE COURT:  Right.

 2              MR. PASANO:  -- in furtherance of all of that.

 3              THE COURT:  If you are going to get into those, I

 4    don't have a transcript of these.  So if you're going to deal

 5    with that, I'm going to need a transcript.

 6              MR. ENTIN:  Mr. Shockley will read to you.

 7              MR. MARKUS:  Judge, was the Court -- had the Court

 8    made a final decision on those tapes and transcriptions?

 9              THE COURT:  Well, someone said there were some 403

10    portions.  I haven't as to that.  But as to conversations

11    with members of the Gambino family, I have.  I think that

12    they do come in for the reasons I stated earlier.  And if

13    there's a particular portion you want me to look at, I will.

14              MR. PASANO:  And Judge, will the Court instruct the

15    jury now about how to use transcripts?

16              THE COURT:  Yes.  I'll do that.

17              MR. PASANO:  Thank you.

18              THE COURT:  Are we at that point now?

19              MR. McCORMICK:  Yes, your Honor.

20              THE COURT:  Okay.  And are we then ready for the

21    jury?

22              MR. BIRCH:  Yes, your Honor.

23              THE COURT:  Please invite them in.

24         (Jury in at 1:16 p.m.)

25              THE COURT:  Welcome back.  Please be seated.
```

1          In a couple of minutes, I've been advised we're

2     going to be listening to some tape recordings of

3     conversations.  And you will also be provided some

4     transcripts.  The transcripts purport to be transcripts of

5     the conversations of the oral conversation that can be heard

6     on the tape recording.  And the transcript also purports to

7     identify speakers engaged in the conversation.

8          The transcripts have been admitted for the, or will

9     be admitted for the limited and secondary purpose of aiding

10    you in following the content of the conversation as you

11    listen to the tape recording.  And also to aid you in

12    identifying the speakers.  However, you are instructed that

13    whether the transcript correctly or incorrectly reflects the

14    content of the conversation or the identity of the speakers

15    is entirely for you to determine based upon your own

16    evaluation of the testimony you hear concerning preparation

17    of the transcripts and from your own examination of the

18    transcript in relation to your hearing of the tape recording

19    itself, as the primary evidence of its own contents.

20         If you should determine that the transcript is in

21    any respect incorrect or unreliable, you should disregard it

22    to that extent.

23         Okay.  Mr. McCormick.  I guess we need the witness.

24     (Pause in Proceedings.)

25

1    BY MR. McCORMICK:

2    Q    Mr. Kasman, I think when we broke we started to talk

3    about some of the recordings that you made on behalf of the

4    FBI; is that correct?

5    A    Yes.

6    Q    I'm turning your attention now to October 11, 2005 and

7    the conversation, recorded conversation that you had with

8    Joseph Corozzo.  Do you recall that conversation?

9    A    Yes.

10   Q    And you also recall -- you've heard that tape and you've

11   also read that transcript before coming to court; isn't that

12   right?

13   A    Yes.

14         MR. McCORMICK:  Your Honor, with the Court's

15   permission, we'll pass out the transcript, or your clerk, or

16   however you want to do this.

17         THE COURT:  Go ahead.

18         MR. McCORMICK:  I will have her do it.

19         THE COURT:  As we go through this, let me ask you,

20   don't page ahead in this because there may be some objections

21   as we go through this that I will have to deal with.  So

22   follow along as we go through the tape recording, but don't

23   go ahead, please.

24      (Pause in Proceedings.)

25         THE COURT:  You may hear some drilling.  Try to

```
 1    ignore that.  There's a leak and they're trying to fix it.
 2         (Pause in Proceedings.)
 3              MR. McCORMICK:  May I approach the witness, your
 4    Honor?
 5              THE COURT:  Yes.  Do you have an extra?
 6              Do you have another one?
 7              MR. McCORMICK:  Here is a whole stack.
 8              THE COURT:  Okay.  Thank you.  Or is it -- this it?
 9    I just didn't find them.
10    BY MR. McCORMICK:
11    Q    This is Government Exhibit 46.1 and -- A and B.
12         (Audiotape now being played in open Court.)
13              MR. MARKUS:  Judge, we would renew our motion and
14    move to strike under 401, hearsay, 403.
15              THE COURT:  Motion is denied.
16    BY MR. McCORMICK:
17    Q    Mr. Kasman --
18    A    Yes.
19    Q    -- turning your attention to page 5 of the transcript.
20    At the bottom of the page the passage that begins, you did
21    Carlo.  Can you read that to yourself and explain to the jury
22    what you understood that to mean?
23    A    That's when Carlo was promoting Vinnie Artuso to me to
24    try and get Vinnie -- get me close to Vinnie so that we could
25    go into business in the restaurant, and that's when the
```

1  introduction took place with Greg Orr.  Carlo was trying to

2  put that together.

3  Q    Now, the words you used were "creep in."  Can you

4  explain that, what that means?

5  A    Get friendly, get close.

6  Q    Above that in the paragraph you indicate that:  I'm not

7  with this Vinnie.  I have no relationship with him; you're

8  with him.  That's your deal.

9        Could you explain what you meant by that to the

10  jury?

11  A    Yes.  As I've said before, I was, I was with Peter

12  Gotti.  Carlo was originally with Jackie, but transferred

13  over or being serviced by Mr. Artuso.  So the distinction

14  being, is that it would have been protocol for me and Vinnie

15  to go to New York to see if we could establish a business

16  relationship, rather than do it on our own, or at least post

17  them and get approval from the administration, being that I

18  was with the administration.

19  Q    On Page 6, Mr. Kasman, at the top of the page, the

20  statement by Joseph Corozzo, Frankie and you say, exact, he

21  was Franco, Frankie's guy, right?

22  A    Yes.

23  Q    And there is a statement.  Can you explain that?

24  A    When Vinnie Artuso was a soldier he was with Frankie Lo.

25  Frankie Lo ultimately wound up to be the consigliere of the

1  Gambino family during the John Gotti Senior era.  And Vinnie

2  was part of Frankie LoCascio's crew.

3  Q    Frankie Lo Casio is the full name of Frankie Lo?

4  A    That's correct.

5  Q    Thank you.

6        On Page 7, Mr. Kasman, at the top of the page, Mr.

7  -- Joseph Corozzo says to you, I'm retired, I don't want no

8  aggravation; and you state, right, so I went, I should have

9  did that.  Or I shoulda went and saw you.  So.

10        And Mr. Corozzo says, yeah, right.  You say, right,

11  and that would put an end to it, one, two, three.  And Joseph

12  Corozzo says yes.

13        Could you explain what that meant?

14  A    Yes.  When Vinnie and I and Greg were getting together,

15  rather than have all of these conversations I should have

16  just -- Joe Corozzo says you should have told them you're

17  retired and you don't want any aggravation, you're not

18  interested in these deals, and if there wouldn't have stopped

19  it, then I should have went to him, at the time and still is,

20  the consigliere of the Gambino family.

21  Q    And how would that have put an end to it, what was your

22  understanding?

23  A    Well, the consigliere at this point in time of the

24  Gambino family really runs the day-to-day, so Corozzo would

25  have directed Vinnie Artuso to back off.

1   Q    Turning your attention to Page 9, middle of the

2   paragraph -- middle of the page, excuse me.  Beginning with

3   Carlo says, I'm not sticking up for -- Carlo says

4   (unintelligible) I'm not sticking up for Carlo, and the

5   ensuing statement.  Could you take a second to read that?

6   A    Where I say, yeah, right?

7   Q    Yes.

8   A    Okay.

9   Q    And under that, too.

10  A    Okay.

11  Q    Now, this last statement by Joseph Corozzo and all, you

12  say you -- for 20 years, I know, I was down there.

13          Can you explain to the jury what that pass -- those

14  passages, what you understood those to mean?

15  A    Carlo had an issue with Jackie D'Amico, the street boss

16  of the family.  And Carlo -- Jackie was badmouthing him and

17  Carlo got wind of it and what that is -- and what Jo Jo is

18  saying he tried to make peace because if a street boss or

19  anyone in the administration or even a captain, if they

20  continually badmouth you, it's appropriate for some sort of

21  action to occur against you.  Whether it be financial or

22  whether it be violence.

23          Because for boss or an underboss or a consigliere

24  to constantly talk bad about an associate or a member or a

25  captain or any one part of that organization, it's

```
 1    inappropriate.  And it makes them look less of a person

 2    that's holding that position.

 3    Q    Now, that's the significance of that passage?

 4    A    Yes.

 5    Q    Going to Page 12, the first full paragraph from you, you

 6    state, Danny do me a favor.

 7    A    What page?

 8    Q    Page 12.

 9    A    Okay.

10    Q    I'm sorry, I'm moving too fast.

11         In the last few sentences of that paragraph, it

12    says, I grabbed Danny.  Do me a favor.  And then Danny comes

13    and says to me, he's:  Listen, I have a message for you.

14    He's over at the administration.  Whatever you want, whatever

15    you need, bah, bah, bah.

16         What did you mean by that when you stated that in

17    the tape-recorded conversation?

18    A    What paragraph did you read, sir?

19    Q    I'm sorry.  It's page 12.

20    A    Right.

21    Q    First full paragraph.

22    A    Where I'm not his partner.

23    Q    It begins, I said Murray.

24    A    Okay.

25    Q    Page 12.
```

1    A    Okay.  Give me a moment.

2          Okay.  That's when Danny Marino, captain of the

3    family, comes to me and tells me that he has a message from

4    the administration, that I am with the administration and

5    that whatever I need or any problems that I have, to go

6    directly to the administration or seek him out.

7    Q    Turning your attention to Page 15 when you're stating to

8    Joseph Corozzo in the middle of the paragraph -- middle of

9    the page when you begin, I gave him his money, here.

10    A    Yes.

11    Q    Okay.  The last part of that passage you say, you

12    remember, the Auricchio (phonetic), Auricchio is the same

13    people from VIPs.  They got Frankie Altimari (phonetic) and

14    the whole Lucchese bunch.  Can you explain what you were

15    referring to in that conversation?

16    A    Yes.  At that point in time there was a dispute going on

17    between the Gambino family and the Lucchese family.  VIPs was

18    a men's club in New York City, and it was controlled for a

19    long-standing time by the Gambino family, by John A. Gotti,

20    and then it was moved over to Peter Gotti Senior.

21          Then the Luccheses made a move on the Gambino

22    family and at the same time that they made that move on the

23    Gambino family, there was a whole big conflict going on

24    between the Gambinos and the Luccheses.

25    Q    That was going on at the time of this recording?

1    A    Yes.

2    Q    Let me ask you, Page 17, middle of the paragraph --

3    page, excuse me.

4    A    Okay.

5    Q    You stated:  Right, wrong, or indifferent, Artuso should

6    have said, Carlo, be a man, do it like a man.  If there's any

7    beefs, it will be resolved on a different, in a different

8    way.

9         And the few passages that follow that.  Can you

10   read that to yourself?

11   A    Okay.

12   Q    And can you explain to the jury what that, what you

13   understood that to mean?

14   A    Okay.  Carlo Vaccarezza, being a displaced associate and

15   being assigned to so many different people over the years for

16   his treacherous behavior, was now being serviced by

17   Mr. Artuso, and Carlo took the purchase price of the

18   restaurant from $850,000 to $350,000.  So what I am saying in

19   this conversation is, Carlo would not have done that unless

20   Mr. Artuso was giving him the green light to do that and

21   behave that way because Artuso was his only oxygen tank.  His

22   own way to breathe was Vinnie Artuso.

23   Q    What did Mr. Joseph Corozzo say to that, what did you

24   understand his comment?

25   A    He -- I'm going to read it.  It says --

1    Q    Just what he said.  What his comment was, what you

2    understood it to mean.

3    A    That he didn't give a fuck.

4    Q    Is that what you understood, you understood he didn't

5    care?

6    A    I'm just reading what he said.  Yes.  That he didn't

7    care.  Correct.

8    Q    And Page 21, midway down the page, Joseph Corozzo says,

9    I never said Jackie.  If you read that paragraph to yourself

10   and then explain to the Grand Jury -- to the jury, what that

11   passage, what you understood it to mean?

12   A    When the dispute was going on with Mr. Vaccarezza, Joe

13   Jo Corozzo had said to Jackie, you know, I'll handle it

14   because it was becoming embarrassing because every time they

15   got together, Jackie would constantly complain about Carlo.

16   And like I indicated before, for a boss or a street boss or

17   anyone in the administration to constantly complain about

18   someone and not take any action is, doesn't make them look

19   good.

20   Q    Page 23 midway down the paragraph or the page when you

21   say, oh, he does, he, you know, he plays that game.  And

22   Joseph Corozzo makes a comment, he got a few million off

23   (unintelligible), so he didn't need nothing.

24           And the following paragraphs or pages or

25   statements, too.  Could you explain what, in context, what

1    that meant to you?

2    A    Joseph was saying, you know, that Vinnie plays golf

3    because Vinnie did play golf every day.  And my comment is,

4    yes, he does, he plays that game.  So Joseph -- there was a

5    gentleman by the name of Richard Martino who was in the phone

6    business.  And Mr. Corozzo was indicating that Mr. Artuso got

7    a few million dollars from Mr. Martino and Frankie Lo Casio's

8    son, Sal Lo Casio.

9              MR. ENTIN:  Objection.  403.

10             THE COURT:  Overruled.

11   BY MR. McCORMICK:

12   Q    On Page 26 at the bottom, you mention an individual by

13   the name of Frankie the Hat.  Who is that?

14   A    Frankie the Hat is a soldier in the Gambino family who

15   is on the shelf.

16   Q    What does that mean?

17   A    He didn't act in accordance with the Gambino family's

18   regulations so they put you on the shelf, meaning that you

19   don't function in your capacity or your status in the family.

20   Q    Turning your attention to Page 31.  Joe Corozzo, a third

21   down the page, states:  Had junk yards.  They all had deals

22   with Carmine, but they were paying an extra amount of money a

23   month.

24             And you state:  That's, that's probably reneged on

25   all of that.

1          Can you explain what you understood that to mean?

2     A    Carmine Agnello at the time was John Gotti Senior's

3     son-in-law, married to Victoria Gotti.  They were going

4     through a divorce and he had all of these junk yards and

5     there was some litigation going on with the federal

6     government with regard to him.  So they, there wasn't any

7     money -- he alleged there wasn't any money coming out of the

8     junk yards at that time.  And then, further down --

9     Q    Referring to 30,000 a month that Joseph Corozzo says.

10    Could you explain that passage?

11    A    Yes.  Joe had a friend that sold his business to Carmine

12    Agnello and he was paying him 30,000 a month, I guess for the

13    purchase price, and what had happened was the guy stopped

14    paying the 30,000 a month.

15    Q    Now, Page 32, Joseph Corozzo makes the statement:  To

16    tell you the truth, Pete (phonetic), might not be the

17    brightest guy.  Could you read that passage to yourself and

18    explain to the jury what that meant to you?

19    A    Yes.  That's Joseph Corozzo's comment on that Peter

20    Gotti Senior, the boss of the Gambino family, might not be

21    the brightest guy; and he wasn't the brightest guy.

22    Q    Explain what's in here?

23    A    That's what I'm saying.  In other words, he wasn't an

24    intelligent man.  He just wasn't an intelligent guy.

25    Q    But he's the best I've ever, what does that mean.

1    That's what I'm asking you?

2    A    Okay.  And then he went on to say:  But he's the best.

3    Meaning he liked him as a person.  Joe always felt that Pete

4    wasn't a money hungry guy, so he was -- that's the inference

5    was when he says he was the best that he's ever seen.

6    Q    On Page 33, midway down, you state:  Thank God Ronnie.

7    And big question mark Ronnie.

8            Could you explain who Ronnie was in context of this

9    conversation?

10   A    Ronnie was an acting captain -- is an acting captain of

11   the Gambino family, assigned to Joseph Corozzo.

12   Q    On Page 34 there is a statement by Joseph Corozzo, a

13   third of the way down saying:  Carmine Agnello had Joe.  What

14   did you understand that to mean?

15   A    I don't know.  I would have to hear that tape.  You

16   know, I have to put the -- I don't know what that means.

17   Q    I'm not asking the unintelligible.  What did he mean by

18   "had Joe," do you know?

19   A    In that context Carmine Agnello had Joe, that's the same

20   context when you're with someone.  Meaning, I was with John

21   Gotti, so Carmine Agnello had Joe.  Meaning that fellow Joe

22   was with Carmine, who was a made member of the Gambino

23   family.

24   Q    Turn your attention to Page 39.  The conversation that

25   begins a third down the page, he wants to know why everybody

```
 1   comes to you.  That's Joe Corozzo.  And then read the rest of
 2   that passage to yourself and explain what that passage, how
 3   you understood that passage in this context?
 4            THE COURT:  Mr. McCormick, are you going to focus
 5   on those things that you think relate to this case, though,
 6   right?
 7            MR. McCORMICK:  Yes -- well, your Honor, in terms
 8   of the enterprise.
 9            THE COURT:  Go ahead.
10            MR. MARKUS:  Well, we would continue to make an
11   objection, your Honor.
12            THE COURT:  Well, then make one.  I didn't hear an
13   objection.
14            MR. MARKUS:  Objection.
15            THE COURT:  Sustained.
16            MR. McCORMICK:  I'll cut it back a little bit.
17            THE COURT:  Thank you.  Remember your time
18   commitments.
19            MR. McCORMICK:  We'll make them, Judge.  We're
20   right on time.
21            THE COURT:  All right.
22   BY MR. McCORMICK:
23   Q    Page 44.  One-third down.  The conversation begins:  Got
24   Johnny.  Gene."
25            MR. MARKUS:  Same objection, your Honor.
```

```
 1                  THE COURT:  Sustained as to Gene.

 2                  MR. McCORMICK:  Maybe it's time to start the next

 3     tape.

 4                  MR. MARKUS:  No objection.

 5                  MR. McCORMICK:  Your Honor, that exhibit would be

 6     46.2 and A and B.

 7                  MR. BIRCH:  Your Honor, before that tape is played,

 8     I want to make it clear I'm renewing my 403 objection as to

 9     this tape.

10                  THE COURT:  Is there something specific about it?

11                  MR. BIRCH:  There is, your Honor.

12                  THE COURT:  You want to tell me what page?  I'm not

13     sure -- tell me first the transcript number so I can --

14                  MR. BIRCH:  It's 46.2A.

15                  THE COURT:  I don't have -- the exhibit numbers are

16     not on this one.

17                  MR. PASANO:  March 10, 2006, your Honor.

18                  THE COURT:  Okay.  Tell me what page.

19                  MR. BIRCH:  Page 234.

20                  THE COURT:  And it's just the derogatory comments?

21     Is that your problem with it?

22                  MR. BIRCH:  Well, it's a little more than that, if

23     you look halfway down the page.

24                  MR. ENTIN:  Which page?

25                  MR. BIRCH:  Your Honor, I --
```

1          MR. PASANO:  Your Honor, there is a word there and

2    there is an explanation and the explanation we submit is 403.

3    We may have to explain that to, your Honor.

4          THE COURT:  All right.  Let's take a short break

5    and this will be our afternoon break.  Let's make it ten

6    minutes though because we're going to stop at 4:00.

7          (Jury out at 2:36 p.m.)

8          THE COURT:  Okay.  Have a seat.  I don't understand

9    the problem --

10         MR. BIRCH:  Your Honor --

11         THE COURT:  -- other than I mean, there are some

12   derogatory comments not made by this witness, but apart from

13   that, what?

14         MR. MARKUS:  Can we exclude the witness, Judge?

15         THE COURT:  Just tell me what the problem is.

16         MR. BIRCH:  The jamming refers to a firearm

17   jamming.  And the Cossamini is actually Castellano.  That's

18   referring to Mr. Castellano being murdered in 1985.  And that

19   is how John Gotti, I believe, became boss of the family.  And

20   the allegation is that Mr. Artuso was present at that time

21   and that his gun jammed.

22         THE COURT:  Is that what that's about,

23   Mr. McCormick?

24         MR. McCORMICK:  It is.  I didn't intend to ask any

25   questions about it though, your Honor.  It isn't obvious from

1    the content.

2              THE COURT:  What's the point of any of this tape?

3    I'm having a --

4              MR. McCORMICK:  Well, it is relevant, your Honor.

5    I can point that out to the Court.  If you go to Page 236 --

6    well, I should go from the beginning because it is relevant.

7    On Page 232 --

8              MR. ENTIN:  232?

9              MR. McCORMICK:  232.  There's a statement by Pete

10   Gotti to the witness that if he has any problems while he is

11   down in Florida, he should contact captain Danny Marino or

12   the consigliere, Joseph Corozzo.  That's nearly -- that's

13   about three lines above the end of the page, which is

14   relevant to this, the testimony in this case.

15             And also, your Honor, on Page 236 there's

16   discussions about -- between Mr. Kasman and Pete Gotti about

17   taking down -- telling Jo Jo, Joseph Corozzo, to take down

18   Vincent Artuso.  What that means, according to the FBI expert

19   as well as this witness, is to demote the individual from

20   captain to --

21             THE COURT:  Where are you now?

22             MR. McCORMICK:  On Page 236.

23             MR. PASANO:  It actually starts at 235, your Honor.

24             MR. McCORMICK:  That's true.

25             MR. PASANO:  You'll see the expression five lines

1    down:  They should take him down.

2              THE COURT:  And -- and who does that refer to?

3              MR. McCORMICK:  Mr. Artuso.  And the administration

4    of the Gambino family reacting to Mr. Artuso.

5              MR. BIRCH:  And the prejudice of this tape is

6    compounded by the top of 236, where it talks about Mr. Artuso

7    raping who he can rape, when frankly, there's absolutely no

8    evidence of any wrongdoing by Mr. Artuso, other than from

9    this witness.  And so we've got the allegation to murder and

10   then we've got raping who he can rape, whatever that is

11   supposed to mean.  This is clearly prejudicial.

12             It goes way outside the scope of the Government's

13   proposed reason for introducing this tape to show an

14   enterprise.  Now what they're really showing is 404(b)

15   evidence against Mr. Artuso with the Castellano shooting

16   that's referred to on Page 232 and this raping on Page 236.

17   That has nothing to do with whether there was an enterprise

18   called the South Florida Gambino crime family.  So we're

19   going way outside the scope of the Government's --

20             THE COURT:  Well, some of it is relevant in terms

21   of -- if there is a connection between Mr. Artuso and this

22   family, this would tend to prove that.  Now, whether --

23             MR. PASANO:  Your Honor, if I could ask the Court,

24   at 236, what's interesting is that Peter Gotti who is reputed

25   to be the head of the family is telling Kasman, that's why I

1    say stay away from him, meaning Vince Artuso.  I mean instead

2    of saying we're doing work with Artuso who is a member of our

3    organization, the head of the organization is saying, don't

4    do anything with him.

5              MR. McCORMICK:  Your Honor, this isn't --

6              MR. PASANO:  So it's guilt by association.  It has

7    no ongoing pertinence to any of the charges or any of the

8    allegations.

9              MR. McCORMICK:  This isn't General Motors though,

10   your Honor.  This corporation isn't as fluid as General

11   Motors.  There are bad times, good times, ebbs and flows with

12   the people who are in the various -- at various points in the

13   structure of the family.  This is the way the family's run.

14             THE COURT:  You agree this reference in the middle

15   of 234 is to Castellano?  Is it more legible on the tape than

16   it is here?  This is Cossamini (phonetic).

17             MR. McCORMICK:  I believe that's what it is.  It

18   wasn't our intention to --

19             THE COURT:  Is it Castellano on the tape?

20             MR. McCORMICK:  I don't think it's clear on the

21   tape either.  We weren't going to inquire of it.  But we can

22   probably --

23             Excuse me one second.

24        (Pause in Proceedings.)

25             MR. PASANO:  And Judge, the other aspect, which is

1    the cumulative objection.  They've got three as I counted

2    them, more transcripts and tapes that they seek to play that

3    say literally the same sort of things.  This one is chalked

4    full of problems.  And the only purpose is to show

5    relationships, if they haven't done it in the first tape and

6    they're not doing it in the other four that they're playing,

7    this one certainly doesn't add to that, but it is cumulative

8    and it's full of problems.

9              THE COURT:  Well, this is with a fellow who,

10   apparently, they allege is the head of the group.

11             MR. McCORMICK:  I might add, your Honor, that the

12   witness being here -- I would represent to the Court that

13   this witness couldn't decipher what was on the tape when he

14   listened to it.  He can -- I believe that's -- it's very

15   illegible on the tape.

16             MR. PASANO:  And, Judge, that problem implicates my

17   other objection I made the other day.  Because you have whole

18   gaps of hard to understand conversations.  The danger is that

19   the jury misinterprets and applies the tapes in a context

20   that none of us could have even imagined, to the detriment of

21   these defendants.

22             THE COURT:  This is better than a lot of tapes I've

23   been listening to lately, in terms of crack cocaine cases.

24             Well, I agree with you as to the concept of the

25   Castellano issue.  But I'm not quite sure how to fix it.

1          MR. BIRCH:  Play the other tapes.

2          THE COURT:  Well, I'm sure -- but there are some

3  aspects of this tape that are relevant.  So I'm looking for a

4  suggestion from somebody about how we can solve it.

5          MR. McCORMICK:  I think our capable agent can skip

6  that conversation, just while she is playing it, and for the

7  record, we'll make another redacted tape after this trial, if

8  it's necessary.

9          MR. PASANO:  If we do it, they're going to have

10  pull the page out of the transcript because even though

11  jurors have been told not to page ahead, it would be

12  dangerous.

13          THE COURT:  Except here, it is clear -- that

14  doesn't relate to -- I certainly didn't figure that out, and

15  I at least had heard the Castellano story.

16          MR. PASANO:  Judge, if you started for instance on

17  the next page, with all respect, I would say the Government's

18  lost nothing, but the Court has avoided a huge risk of

19  prejudice.  You avoid the comment "piece of expletive," if

20  you will and the references to "jammed."

21          Why not start at 235?  You've got the conversation

22  with the man they say is the boss.  They get everything in

23  they want.

24          THE COURT:  Except there is no reference to Artuso.

25  The Artuso --

1      MR. PASANO:  The bottom of 235.  What's his name?

2   Artuso.  Page 236.  Artuso.  He is nothing.  There you've got

3   the raping, who he can rape comment, which is a problem.

4      MR. McCORMICK:  I don't see that as a problem, your

5   Honor, the raping, who he can rape.  The fact of the matter

6   is the head of the family is talking about a taking down --

7   taking Vincent Artuso down, and we would suggest is extremely

8   relevant.

9      THE COURT:  Where are you talking about now?

10      MR. McCORMICK:  236.  It starts at the --

11      THE COURT:  So you agree you want to start at 235?

12      MR. McCORMICK:  It starts at 235 -- I think what

13   Mr. Pasano is saying to eliminate Page 236.

14      THE COURT:  No, he wants to take out 234.

15      MR. PASANO:  Start the tape at 235.

16      MR. McCORMICK:  Pardon me?

17      MR. PASANO:  Start at Page 235.  They're still a

18   problem in this that I know my co-counsel objects to, but at

19   least you get past the gun jammed issue.

20      MR. McCORMICK:  Your Honor, the problem with that

21   is on the page 232 is where Peter Gotti, exercising his

22   authority as head of the family, directs Kasman if he has any

23   problems with anyone that he could go see either the

24   consigliere of the Gambino family or to Danny Marino, a

25   highly placed captain.  That's at the bottom of page 232.

1           We can skip that, the agent tells me, as well as

2    Mr. Shockley, who is an expert on electronics.

3           THE COURT:  So you can skip 234?  Everything on

4    234?  Is that what you can do?

5           MR. McCORMICK:  Let me make sure we can, Judge.

6           Your Honor.

7           MR. SHOCKLEY:  Your Honor, it's my understanding

8    that the agent can play up to that point.  She has headsets.

9    She can then stop the tape, with her headset, start it again,

10   proceed up to where she wants to restart the tape, and then

11   turn it on again.  So that's the way to skip over those two

12   lines on Page 234 where it says:  Him and who, this guy, it

13   says Cossamini and then Kasman says:  Yeah, that's where it

14   jammed (unintelligible) he jammed.

15          The agent can just neatly skip over that with no

16   problem.

17          MR. MARKUS:  But what about the transcripts?

18          MR. McCORMICK:  The transcripts are very unclear as

19   to what they do say.  I would suggest there is no prejudice

20   if they kept the transcripts.

21          MR. SHOCKLEY:  And we could black it out on the

22   transcripts.  There's only --

23          MR. ENTIN:  It would only take five minutes.

24          THE COURT:  All right.  Recover -- where are the

25   transcripts?  Are they here?  Did any of them take them back?

```
 1              MR. ENTIN:  They haven't been given to them yet.

 2              THE COURT:  Oh, they don't even have this one yet.

 3    Okay.  Just block through that part of it.

 4              MR. BIRCH:  Your Honor, why not just tear that page

 5    out?

 6              THE COURT:  Well, apparently, they're going to have

 7    a lit bit of it in there.

 8              MR. BIRCH:  What's the little bit we're talking

 9    about?

10              MR. MARKUS:  Judge, could Mr. Orr use the restroom?

11              THE COURT:  Sure.

12              MR. PASANO:  And, in fact, your Honor, may any of

13    the defendants who wish to run to the bathroom, in

14    particular, Mr. John Artuso, run for a moment?  I'll stay

15    here.

16              THE COURT:  Yes.  Yes.

17              MR. PASANO:  The problem, and we're not trying to

18    overcomplicate this for the Court is even when you in good

19    faith black something out, most of the time you can read

20    underneath it.  It's dangerous.  And we're just trying to

21    reach an accommodation that makes sense.

22              THE COURT:  I agree with that.  Although, I don't

23    think -- I think the chances anybody would have ever

24    understood, at least what's written on this page, is remote.

25    I hadn't heard the tape yet, but what's here is
```

1    indecipherable.

2            MR. PASANO:  With all respect, your Honor, we

3    weren't certain that then the question wouldn't have been

4    asked about it had we not objected and so we needed to

5    object.

6            THE COURT:  Right.  Okay.

7        (Pause in Proceedings.)

8            MR. BIRCH:  So, what's being crossed out?  Those

9    two lines?

10           MR. McCORMICK:  You're welcome to examine what's

11   being crossed out.

12       (Pause in Proceedings.)

13           MR. PASANO:  Judge, would it be appropriate for

14   your staff to retrieve the first set of transcripts since

15   they're not being used anymore?  I always worry that juries

16   sometimes go back to reading other things if they have them

17   there.

18           THE COURT:  What's the harm of that?  They've

19   already heard it.

20           MR. PASANO:  Then they're not listening to the new

21   one.  It's hard to police these things, Judge.  That's why I

22   simply point it out.

23           MR. BIRCH:  While they're doing that, can I have

24   two minutes to run to the restroom?

25           THE COURT:  Yes.  There will be four by the time

```
 1    you're all finished.

 2              MR. PASANO:  That's our strategy, your Honor.

 3              THE COURT:  Running Mr. McCormick's time out on

 4    him?

 5              MR. PASANO:  He said he is on schedule, Judge.

 6              THE COURT:  That's what he says.  I just hope he is

 7    counting days the way I am.

 8         (Pause in Proceedings.)

 9              THE COURT:  Okay.  All right, let's try to get

10    organized again.  We have another hour.

11              MR. BIRCH:  Your Honor, if I may, I just want to be

12    sure it's clear I'm not withdrawing my objection to the

13    language on Page 236 of the transcript about the raping, who

14    he can rape.

15              THE COURT:  Okay.  That portion is denied.

16              Okay.  Let's invite the jury in.

17              As you hand out the new ones, why don't you pick up

18    the old ones.

19         (Jury in at 3:57 p.m.)

20              THE COURT:  Welcome back.  Please be seated.

21              Okay.  Mr. McCormick.  Next tape.

22              MR. McCORMICK:  Thank you.

23              THE COURT:  Ladies and gentlemen, there's a small

24    part of this tape that I sustained an objection concerning.

25    They've marked through it on a transcript.  Please don't try
```

```
 1   to speculate what that was.  And there will be a break in the

 2   tape at the same point.

 3           MR. McCORMICK:  Your Honor, the next tape is 46.2A

 4   and B.

 5       (Pause in Proceedings.)

 6           THE COURT:  Go ahead.

 7           MR. McCORMICK:  Thank you, your Honor.

 8   BY MR. McCORMICK:

 9   Q   Mr. Kasman, I refer you now to a recording that you made

10   of Peter Gotti on March 10, 2006.  Do you recall making that

11   recording?

12   A   Yes, I do.

13   Q   Where were you when you made the recording?

14   A   Federal prison.

15   Q   And were you wearing a recording device?

16   A   Yes.

17   Q   Okay.  And you've heard that tape before --

18   A   I have.

19   Q   -- coming to court, also?

20   A   Yes.

21   Q   You have the part of the redacted transcript in your

22   possession?

23   A   I do.

24           MR. McCORMICK:  And the jury has their's.

25           Go ahead.
```

1        (Audiotape now being played in open Court.)

2   BY MR. McCORMICK:

3   Q     Just a few questions, Mr. Kasman.  On Page 232 the

4   sentence beginning from you:  I have nothing, you know, like

5   I say, I'm respectful.  And the ensuing statements that

6   follow.

7            Could you explain what you understood those to

8   mean?

9   A     Meaning if -- I was saying if I had a problem, you know,

10  whoever I'm with I'm respectful and then Pete comes back and

11  says to me, well, if you have a problem, go see Danny or Jo

12  Jo.

13  Q     To resolve any problem?

14  A     Yes.

15  Q     How about Page 236.  At the top of that page:  And a lot

16  of guys left you alone because of Frankie Lo.

17            Could you explain what --

18  A     What page?

19  Q     236.  Let me back up.  Let me ask it a different way.

20  A     Okay.

21  Q     At the bottom of that page, first of all, you indicate

22  that -- to Peter Gotti, tell Jo Jo to take him down.

23  A     What page are you on?

24  Q     On Page 236 at the bottom.  Can you find it?

25  A     Not on Page 236.

```
 1   Q    236.

 2            MR. McCORMICK:  Can I assist the witness, your

 3   Honor?

 4            THE COURT:  Yes.

 5            THE WITNESS:  Okay.  I'm sorry, I see it now.

 6   BY MR. McCORMICK:

 7   Q    Okay.  Read the last two statements by you and Peter

 8   Gotti to yourself.

 9   A    Okay.

10   Q    And would you explain to the jury how you understood

11   that to money?

12   A    I was telling Peter Gotti, the boss of the family, to

13   take Mr. Artuso down, take him out of his position as captain

14   and to demote him.

15   Q    And what did Peter Gotti say?

16   A    Without a doubt.

17            MR. McCORMICK:  Your Honor, at this time we would

18   present tape -- redacted Tape No. 46.3A and B.

19            THE COURT:  Is that 4/2?

20            MR. ENTIN:  Is this the Marino tape?

21            MR. McCORMICK:  Yes, it is, your Honor.  4/2.

22      (Pause in Proceedings.)

23   BY MR. McCORMICK:

24   Q    On April 2, 2006, Mr. Kasman, you met with Danny Marino;

25   isn't that correct?
```

```
 1    A     Yes.

 2    Q     Daniel Marino.  And who is he again, for the jury?

 3    A     He is a captain in the Gambino family.

 4    Q     Where did you meet him, do you recall?

 5    A     I believe I was at his home.

 6    Q     Okay.  And you reviewed the tape and you reviewed the

 7    transcript also before court today?

 8    A     Yes.

 9    Q     It's accurate as far as you know?

10    A     Yes, it is.

11          (Audiotape now being played in open Court.)

12    BY MR. McCORMICK:

13    Q     Just a couple questions, Mr. Kasman.

14          On Page 18 in the discussion beginning with:  So

15    our friend was down last week.  And the ensuing conversation.

16          Who were you speaking of with Mr. Marino?

17    A     Joseph Corozzo.

18    Q     On Page 24, bottom of the paragraph, Daniel Marino is

19    saying:  I don't, I don't understand.

20          Just read that passage to yourself.

21          MR. MARKUS:  Judge, objection.  Relevance.

22          THE COURT:  Where are you?  Page what?

23          MR. McCORMICK:  Page 24, at the bottom of the

24    paragraph -- or bottom of the page, your Honor.

25          THE COURT:  Overruled.
```

1    BY MR. McCORMICK:

2    Q    Read that paragraph to yourself, please.

3    A    Okay.  Okay.

4    Q    Could you -- what was your understanding about what

5    Daniel Marino was speaking about to you during that recorded

6    session?

7    A    Johnny Gotti's attorney, Charlie Carnesi, was in contact

8    with Danny Marino.  The administration had a concern that

9    Johnny Gotti perhaps was going to cooperate with the

10   Government and Mr. Carnesi was providing Danny Marino updates

11   on Mr. Gotti's status?

12        MR. MARKUS:  Judge, I move to strike that.

13   Relevance.

14        THE COURT:  What's the relevance of that,

15   Mr. McCormick?

16        MR. McCORMICK:  Well, it's the operation of the

17   very high, highest level of the organization.

18        THE COURT:  All right.  The objection is sustained.

19   Please disregard the question and answer.

20   BY MR. McCORMICK:

21   Q    Okay.  No. 46.7A and B, please.

22        MR. MARKUS:  Judge, I move to strike this tape as

23   irrelevant and has nothing to do with this case.

24        THE COURT:  All right.  That motion is denied.

25        (Pause in Proceedings.)

1          MR. McCORMICK:  Oh, 46.4A and B.

2          THE COURT:  Okay.  Mr. McCormick, which one are you

3    on?

4          MR. McCORMICK:  I'm sorry.  July 27, 2006.

5    BY MR. McCORMICK:

6    Q    On July 27, 2006, did you record Joseph Corozzo in a

7    meeting?

8    A    Yes.

9    Q    And you've examined the transcript and the redacted

10   tapes, and are they accurate --

11   A    Yes, I did.

12   Q    -- as far as you know?

13        (Audiotape now being played in open Court.)

14   BY MR. McCORMICK:

15   Q    Just one question on this transcript, sir.  On Page 71,

16   at the bottom of the page.

17   A    Yes.

18   Q    When you indicate that you could fit into arms length

19   deals, could you explain what that means in terms of

20   organized crime parlance?

21   A    In this particular conversation, I was referring that

22   Joe would come in as my partner in the deal if I did the Tyco

23   deal, and he would be arms length.  Meaning his name would be

24   removed from it.  Never would appear on any documents or

25   anything.

```
 1            MR. McCORMICK:  Your Honor, the next and last tape

 2   is 46.7A and B.

 3        (Pause in Proceedings.)

 4   BY MR. McCORMICK:

 5   Q    Mr. Kasman, on February 15, 2007, you had a meeting with

 6   Emil Pellino; is that correct?

 7   A    Yes.

 8   Q    Who was Emil Pellino?

 9   A    Emil Pellino is an associate directly with Joseph

10   Corozzo, the consigliere of the family.

11   Q    And did you -- before coming to court, did you review

12   the redacted transcript and the redacted tape?

13   A    Yes.  I did.

14   Q    And they are accurate as far as you know?

15   A    Yes.

16        (Audiotape now being played in open Court.)

17            THE COURT:  Let me interrupt you a second.

18   Mr. McCormick, is any of this tape you believe to be related

19   to this transaction?

20            MR. McCORMICK:  It is mainly structure, your Honor,

21   of the enterprise.

22            MR. MARKUS:  Objection.

23            THE COURT:  Sustained.  Unless you can show me

24   something.

25            MR. McCORMICK:  Just give me one second, please.
```

1       (Pause in Proceedings.)

2              MR. McCORMICK:  Other than structure, your Honor,

3    no.

4              THE COURT:  All right.  To that -- if that's it,

5    it's duplicative and this fellow isn't in this, at least the

6    organization you outlined earlier, so I'm going to sustain

7    the objection as to this tape, the February 15, 2007 tape

8    with Pellino.

9              Okay.  What's next?

10             MR. McCORMICK:  No further questions of this

11   witness.

12             THE COURT:  I'm sorry?

13             MR. McCORMICK:  No more questions of this witness

14   on direct, your Honor.

15             THE COURT:  Okay.  Do you want to start your

16   cross-examination now; anybody?  We only have about 20

17   minutes.

18             MR. BIRCH:  Your Honor, with the Court's

19   indulgence, this is a critical witness.

20             THE COURT:  So you want to start Monday?

21             MR. BIRCH:  Yes, your Honor.

22             THE COURT:  Fine with us.  9 o'clock Monday.  Have

23   a great weekend.  Leave any notes in the jury room.  Those of

24   you who are traveling, have a safe trip.

25             THE JUROR:  Thank you.

1          (Jury out at 3:34 p.m.)

2                THE COURT:  Okay.  Have a good weekend.  See you at

3    9 o'clock Monday.

4                MR. MARKUS:  Thank you, your Honor.

5                MR. PASANO:  Thank you, your Honor.

6          (Recess at 3:33 p.m., until 9:00 a.m., September 22,

7    2008.)

```
 1                          I N D E X

 2   WITNESS                                            PAGE

 3   LEWIS KASMAN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN .......3
     DIRECT EXAMINATION (RESUMED) BY MR. McCORMICK ..............3
 4

 5

 6   EXHIBITS                                       RECEIVED

 7   GOVERNMENT'S EXHIBIT(S) 43.11 ..............................6
     GOVERNMENT'S EXHIBIT(S) 43.12, 43.13, 43.14 ...............26
 8   GOVERNMENT'S EXHIBIT(S) 43.12, 43.13, 43.14 ...............26
     GOVERNMENT'S EXHIBIT(S) 43.1 ..............................53
 9   GOVERNMENT'S EXHIBIT(S) 43.2 ..............................54
     GOVERNMENT'S EXHIBIT(S) 43.3 ..............................57
10   GOVERNMENT'S EXHIBIT(S) 43.5 ..............................70
     GOVERNMENT'S EXHIBIT(S) 43.7 ..............................76
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                    C E R T I F I C A T E

2       I, Karl Shires, Registered Professional Reporter, certify

3  that the foregoing is a correct transcript from the record of

4  proceedings in the above-entitled matter.

5       Dated this 30th day of September, 2008.

6

7       s\Karl Shires
        Karl Shires, RPR
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25