```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2
     UNITED STATES OF AMERICA,        )  Case No.
 3                                    )  08-60014-CR-MIDDLEBROOKS
                         Plaintiff,   )
 4                                    )
                -v-                   )
 5                                    )
     VINCENT F. ARTUSO, JOHN VINCENT  )
 6   ARTUSO, GREGORY ORR, ROBERT M.   )
     GANNON, AND PHILIP EDWARD FORGIONE,)
 7                                    )
                         Defendants.  )  West Palm Beach, Florida
 8                                    )  September 22, 2008
     _____)
 9
                         PAGES 1 - 134
10
                 TRANSCRIPT OF TRIAL PROCEEDINGS
11                 TESTIMONY OF LEWIS KASMAN
           BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
12              U.S. DISTRICT JUDGE, AND A JURY


13
     Appearances:
14
     For the Government:        J. BRIAN MCCORMICK
15                              WILLIAM T. SHOCKLEY
                                Assistant United States Attorneys
16                              500 East Broward Boulevard
                                Fort Lauderdale, Florida  33394
17
     For the Defendant:         PETER VINCENT BIRCH
18   Vincent F. Artuso         Assistant Federal Public Defender
                                450 Australian Avenue, Suite 500
19                              West Palm Beach, Florida  33401

20   For the Defendant:         CARLTON FIELDS
     John Vincent Artuso        BY:  MICHAEL S. PASANO, ESQ.
21                              100 SE 2nd Street, Suite 4000
                                Miami, Florida  33131
22


23
     Reporter:                  Karl Shires, RPR
24   (561) 514-3728            Official Court Reporter
                                701 Clematis Street, Suite 258
25                              West Palm Beach, Florida  33401
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1   Appearances: (Continued)

 2   For the Defendant:          DAVID OSCAR MARKUS, ESQ.
     Gregory Orr                 ROBIN ELLEN KAPLAN, ESQ.
 3                               169 E. Flagler Street, Suite 1200
                                 Miami, Florida  33131
 4
     For the Defendant:          ALLAN B. KAISER PLLC
 5   Robert M. Gannon            BY:  ALLAN BENNETT KAISER
                                 111 NE 1st Street, Suite 902
 6                               Miami, Florida  33132

 7   For the Defendant:          ENTIN & DELLA FERA
     Philip Edward Forgione      BY:  ALVIN ERNEST ENTIN, ESQ.
 8                               110 SE 6th Street, Suite 1970
                                 Fort Lauderdale, Florida  33301
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  Please be seated.

 2              We're waiting for a juror who called and is a

 3    little late, but will be here shortly.

 4              MR. SHOCKLEY:  Your Honor, if I could bring the

 5    Court up to what the status is of the Government's case.  For

 6    the next two days, we hope to rest tomorrow, we plan on --

 7    we're going to be seeking permission from the Court to recall

 8    Larry Horton to testify; Donald C. Race is going to be a

 9    witness; Katherine Lisack, who has tax returns and business

10    records to present; Michael Snyder, the former present of

11    ADT; Karen Rantsau, who is a senior manager in the accounts

12    payable section at ADT, to testify concerning checks and

13    electronic fund transfers; and Alphonse deMario, who is an

14    accountant.

15              He is here now.  We might be able to work out a

16    stipulation with respect to his testimony concerning tax

17    returns.  And also Robert Passero, who is a financial

18    auditor, a summary financial witness.

19         (Pause in Proceedings.)

20              THE COURT:  That sounds ambitious.  You think

21    you're going to do all of that by tomorrow?

22              MR. SHOCKLEY:  I think so.

23              MR. McCORMICK:  They're all short witnesses, your

24    Honor.  Catherine Lisack, we're trying to work out a

25    certification with her through her attorney.  So that may
```

1    obviate the need to call her.  Your Honor, I've talked with

2    defense attorneys and I'm asking permission of the Court to

3    ask about one and a half to two minute's worth of questions

4    still on direct of Mr. Kasman, with your permission.

5            THE COURT:  Any objection?  You all hadn't started

6    yet, so ---

7            MR. PASANO:  Judge, I think we told him it was up

8    to the Court.

9            MR. ENTIN:  Judge, I would have a motion under

10   Federal Rule 601 to strike the testimony of the witness

11   Kasman.  I don't believe he is competent under 601 to

12   testify.  I believe that the testimony he has been convicted

13   once for perjury and committed perjury again recently

14   indicated he does not understand or comprehend or appreciate

15   the oath.  I move to strike his testimony.

16           THE COURT:  Okay.

17           MR. MARKUS:  I don't want to say anything about

18   that.

19           THE COURT:  Okay.  That motion is denied.

20           MR. MARKUS:  What I want to address, I don't know

21   if the jurors are here but if they're not, recalling Horton,

22   I don't believe anything has changed since the beginning of

23   the trial.

24           THE COURT:  Let's talk about that a little later.

25   But I think I left the door open to that.  We'll have some

```
 1   further discussions about it.  But I will permit the -- the
 2   cross didn't begin, so we'll permit your few questions.  And
 3   then we'll do the cross.
 4        Let me double-check.  I'm trying to figure out our
 5   schedule.  If they finish tomorrow, I think you all told me
 6   no one here takes two days for the Holidays?
 7        MR. PASANO:  That's correct, Judge.
 8        MR. ENTIN:  That's the 30th.  It would be, I think
 9   September 30th is the first day of Rosh Hashana.
10        MR. PASANO:  The Tuesday would be the black day,
11   not the Wednesday.
12        THE COURT:  So just Tuesday, the lawyers -- the
13   parties here, it is just Tuesday, right.  Okay.  We'll check
14   with the jury.
15        MR. PASANO:  Judge, we do have this bit of
16   optimism.  If the Government ends on time and depending on
17   what else they present, assuming that then the defense is
18   able to effectively caucus after the arguments on Rule 29,
19   we're hopeful that we will be shorter rather than longer in
20   our trial estimate.  And it's conceivable that it could be
21   very short.
22        THE COURT:  Okay.
23        MR. PASANO:  Depending on the --
24        THE COURT:  We have a conflict Friday, too, so to
25   the degree that that fits in your assessments.  But it is
```

1    helpful for you all to give me an idea about these issues.

2              MR. PASANO:  And then, Judge, the only other thing

3    that's pending, before the next witness whose name is Race

4    comes up and that won't be until maybe this afternoon at the

5    earliest, there may be some issues as to things he may say

6    about the RICO statute.

7              THE COURT:  Who is Race?

8              MR. SHOCKLEY:  Donald Race was a person who was

9    trying to obtain some financing to build a building -- the

10   AMS building.  They had a different piece of property and so

11   he was introduced to some of the defendants.  He then became

12   involved in trying to obtain financing for the ADT deals.

13   Not the first three properties, but some of the future

14   properties.  So he had direct conversations with various of

15   the defendants concerning the ADT deals.

16             THE COURT:  Why would he be talking about the RICO

17   statute?

18             MR. PASANO:  I can proffer, your Honor.  Because

19   the Government was kind enough to share his Grand Jury

20   testimony with us, although it was Mr. Shockley asking the

21   questions at the Grand Jury.  But apparently, he claims, if

22   he is consistent with that testimony, that at some point in

23   time he talked with a lawyer, maybe a DA, about whether or

24   not his involvement would be a violation of RICO because he

25   is familiar with the RICO statutes because he grew up around

1    Italians, if you will.  And that the lawyer told him, no, no,

2    he was okay.

3         And then I think he is later going to claim that he

4    may have warned at least one of the defendants, Mr. Forgione,

5    about this possibly being a RICO.  It's something like that.

6         MR. SHOCKLEY:  I can talk with defense counsel

7    about that.  It may not even be -- I don't see where it is

8    particularly necessary to get into that.  He just indicated

9    that in the past because he was working with people who had

10   mob associations, he became concerned that just even working

11   with these people may cause him criminal liability.  So he

12   got an attorney to see just how far this RICO statute

13   worked -- would reach, since he'd heard about it.

14        And so when he eventually learned about the insider

15   at ADT that was involved in this deal, he warned Mr. Forgione

16   that he could be wrapped up under the RICO statute and he was

17   exposing himself to criminal liability.  I don't see where

18   it's particularly necessary to get into the RICO.  Just that

19   he may be exposing himself to criminal liability.

20        THE COURT:  All right.

21        MR. SHOCKLEY:  So I don't see it as a big issue.

22        THE COURT:  If you can resolve it, that would be

23   great.  I only try to decide the issues that you all are

24   unable to resolve.

25        How are we doing?  Is our jury ready?

```
 1                    THE MARSHAL:  Yes, sir.

 2                    THE COURT:  Our jury is ready.  Let's invite them

 3        in.

 4             (Jury in at 9:07 a.m.)

 5                    THE COURT:  Good morning.  Welcome back.  Please be

 6        seated.

 7                    Are we missing someone?

 8                    THE COURTROOM DEPUTY:  Juror No. 8.

 9                    THE COURT:  I thought everybody was here?

10                    THE COURTROOM DEPUTY:  He is not coming back.

11                    THE COURT:  Because of his illness?

12             (Pause in Proceedings.)

13                    THE COURT:  I misunderstood a portion of Angela's

14        message to me earlier.  Mr. Gittleman, Juror No. 8, became

15        ill this weekend and was hospitalized.  And requires medical

16        care, and so he will not be with us today or the remainder of

17        the trial.  And we hope he is okay.  And so I misunderstood

18        about who was at Palm Beach Lakes Boulevard.  I thought she

19        told me he had been ill but was coming, but I misunderstood.

20                    Okay.  Do we have our witness?

21                    MR. SHOCKLEY:  I think he is waiting.

22                    THE COURT:  Okay.

23             (Pause in Proceedings.)

24                    THE COURT:  Well, welcome back.  The prosecution

25        has told me they have a couple more questions for this
```

1    witness before we begin cross.  As you recall, we were

2    getting to begin Mr. Birch's cross Friday afternoon but since

3    it hadn't begun and they have a couple more questions, we'll

4    continue with direct examination.  Briefly.

5            LEWIS KASMAN, GOVERNMENT WITNESS, PREVIOUSLY SWORN

6                    DIRECT EXAMINATION (RESUMED)

7    BY MR. McCORMICK:

8    Q    Mr. Kasman, I forgot to ask you a couple of questions.

9    I'm going to ask them you them now.  During the time that you

10   were a confidential informant for the FBI the second time,

11   going from 2002 to 2005, July of 2005, did you receive any

12   compensation from the FBI for your services?

13   A    In 2002?  Yes.

14   Q    From 2002 until 2005.

15   A    Yes.

16   Q    Do you recall how much you received for the information

17   that you provided to the FBI?

18   A    Approximately $51,000.

19   Q    Okay.  Is that in one lump sum or over a period of time?

20   A    Over a period of time.

21   Q    Now, secondly, since July of 2007, did the FBI cease

22   providing you with the $12,000 a month that you told the jury

23   about?

24   A    Since '07, yes.

25   Q    Okay.  And since that time you have been provided with

1    some compensation by the FBI; isn't that correct?

2    A    Yes.

3    Q    And that would be in the form of subsistence?

4    A    Subsistence.  Yes.

5    Q    Could you approximate on a weekly basis how much the FBI

6    has provided you under the definition of subsistence?

7    A    $250 per week.

8    Q    And what is that, what is subsistence?  Groceries?

9    A    Groceries, food, sodas; things of that nature.

10             MR. McCORMICK:  Thank you, I have nothing further.

11             THE COURT:  Okay.  Cross-examination.  Mr. Birch.

12             MR. BIRCH:  Yes, your Honor.  Thank you.

13                        CROSS-EXAMINATION

14    BY MR. BIRCH:

15    Q    Mr. Kasman, my name is Peter Birch.  I represent

16    Mr. Vincent Artuso.  The prosecutor on Friday mentioned about

17    you testifying and committing perjury before the Grand Jury

18    in 1990, correct?

19    A    Yes.

20    Q    And you said that you did, correct?

21    A    Yes.

22    Q    In fact, back in 1990 -- let me ask you this first.  We

23    know you have been committing crimes since at least 1986,

24    correct?  If not before.

25    A    I don't believe it was in '86.  No.

1    Q    Do you remember telling the agents during one of your

2    meetings with them that you had been laundering money for the

3    Gambino family since 1986?

4    A    It was more like '86, '87.

5    Q    Okay.  86, '87.  At least been committing crimes since

6    1987 then, correct?

7    A    Correct.

8    Q    And we'll get to your plea agreements in a minute, but

9    the crimes committed during that time from 1987 as you recall

10   to 2005, you have an agreement whereby you won't be

11   prosecuted for any of those crimes, correct?

12   A    Yes.

13   Q    Now, you did admit to committing perjury in 1990, right?

14   A    Yes.

15   Q    Actually, what you did, Mr. Kasman, was go before a

16   Grand Jury on three separate occasions in 1990, correct?

17   A    I believe so.

18   Q    April 10th, October 4th, and October 11th, 1990.  Does

19   that sound familiar?

20   A    If that's what the court documents reflect.  Yes.

21   Q    Okay.  Three times before the Grand Jury in 1990, and

22   each time you were given immunity, were you not?

23   A    Yes.

24   Q    And immunity means that as long as you tell the truth,

25   nothing you say can be used against you, correct?

1    A    Yes.

2    Q    So being given immunity and being before the Grand Jury,

3    you were placed under oath before this Grand Jury, correct?

4    A    Yes.

5    Q    On each time, correct?

6    A    Yes.

7    Q    And you were given immunity each time, meaning as long

8    as you told the truth, you would be fine?

9    A    Yes.

10    Q    And despite being given immunity and despite being

11    placed under oath on each of those three occasions before the

12    Grand Jury, you lied?

13    A    Yes.

14    Q    That's really what perjury means, it's lying, correct?

15    A    Yes.

16    Q    And not only did you lie once, twice, three times, you

17    lied at least six times before the Grand Jury on those three

18    separate occasions, correct?

19    A    I don't know how many times I lied before the Grand

20    Jury.  But I lied in the Grand Jury.

21    Q    Okay.  Well, now, this perjury conviction that you had

22    actually was, initially, you were charged with six counts of

23    perjury, correct?

24    A    Do you have the document, Mr. Birch?

25    Q    Sure.

```
 1                    MR. BIRCH:  If I may, Judge?

 2                    THE COURT:  Yes.

 3    BY MR. BIRCH:

 4    Q    I'm going to show you this information, or indictment,

 5    rather, from 1993.  You take all of the time you want to look

 6    through it.  And tell me if there are six counts of perjury

 7    in that indictment.

 8    A    I only count three, Mr. Birch.

 9    Q    Take your time.

10    A    Yes, that's correct.

11    Q    Okay.  Don't stop looking at the indictment, please.

12    There's also a Count 7 for obstructing justice, is there not?

13    A    Yes, there is.

14    Q    Okay.  Now, don't put it away just yet.  Look at the

15    first page, read it to yourself to refresh your memory of

16    what this Grand Jury investigation was about, please.

17    A    Page 1?

18    Q    Yes.

19    A    Okay.

20    Q    All right.  So you were charged with appearing before

21    the Grand Jury on three separate occasions and lying at least

22    six times, correct?

23    A    Yes.

24    Q    And obstructing justice in Count 7, correct?

25    A    Yes.
```

```
 1   Q    Now, the investigation that you were before the Grand

 2   Jury was about, they were investigating John Gotti, correct?

 3   A    Yes.

 4   Q    And they were investigating racketeering activity of

 5   John Gotti, correct?

 6   A    Yes.

 7   Q    Including murders committed during the course of

 8   racketeering activity, correct?

 9   A    Yes.

10   Q    That's what this Grand Jury is investigating, but with

11   your grant of immunity, you lied to protect John Gotti,

12   correct?

13   A    Yes, I did.

14   Q    He was a friend of yours?

15   A    Yes.

16   Q    A dear friend?

17   A    Yes.

18   Q    You actually -- you testified you called him grandpa?

19   A    Yes.  That's correct.

20   Q    And for that man you lied repeatedly, correct?

21   A    Yes.

22   Q    Not only did you consider him a dear friend, you

23   considered him a kind man, correct?

24   A    Yes.

25   Q    After lying to the Grand Jury and being prosecuted or
```

```
1    charged with these counts of perjury, you worked out an

2    agreement where you pled guilty to the perjury and -- one

3    count of perjury and one count of obstructing justice,

4    correct?

5    A    Yes.

6    Q    And there came a time when you went for sentencing

7    before a judge by the name of Glasser?

8    A    Correct.

9    Q    In federal court up in New York?

10   A    Yes.

11   Q    And when you appeared before Judge Glasser, before

12   appearing before Judge Glasser you wrote him a letter,

13   correct?

14   A    Yes.

15   Q    Told him how sorry you were for what you had done?

16   A    Yes.

17   Q    It was a mistake?

18   A    Yes.

19   Q    Your lawyers described it as an aberration, correct?

20   A    Correct.

21   Q    That you were actually a decent man, correct?

22   A    Yes.

23   Q    And this was something you would be regretting for the

24   rest of your life, correct?

25   A    Yes.
```

```
1   Q    And while you were apologizing to Judge Glasser for your
2   actions, this would be now in about 1994, correct?
3   A    Yes.
4   Q    While you are apologizing before Judge Glasser and your
5   lawyers are pleading to be merciful upon you, a plea which
6   resulted in a sentence of six months in jail, correct?
7   A    Yes.
8   Q    And while you and your lawyers are engaging in this plea
9   for mercy, you are, in fact, committing more crime, correct?
10  A    Yes.
11  Q    So when you told the Judge Glasser that you were truly
12  sorry and that your lawyers told Judge Glasser that this was
13  a mistake that you would regret for the rest of your life,
14  that it was an aberration, that too was all a lie, correct?
15  A    Yes.
16  Q    Now, John Gotti not only was like a father to you, this
17  kind man, but you worked for him for several years, correct?
18  A    What do you define as work?
19  Q    Well, he gave you money to hold for him, correct?
20  A    Correct.
21  Q    You paid out the money when he wanted you to pay out the
22  money?
23  A    Correct.
24  Q    Let's call that working for John Gotti.  Would you agree
25  that that's working for John Gotti?
```

1    A    That was a relationship that I had with John Gotti.

2    Q    Okay.  During your relationship with the kind man John

3    Gotti that you had, you paid out money at his direction,

4    correct?

5    A    Yes.

6    Q    You held money at his direction, correct?

7    A    Yes.

8    Q    You laundered money for him, correct?

9    A    Yes.

10    Q    Laundering money is more crime, correct?

11    A    Yes.

12    Q    And we're not talking a few dollars, we're talking

13    millions of dollars, correct?

14    A    Correct.

15    Q    And this laundering of money that you did encompassed,

16    that is, it carried over a period of several years, several

17    millions of dollars, correct?

18    A    Yes.

19    Q    Now, after serving your six months in jail in '94 and

20    '95 you get out and you go back and you're working for the

21    Gambino family, correct?

22    A    Yes.

23    Q    Then there comes a time in 2005 -- well, you worked with

24    the FBI, you already testified to, in 1996 I believe for a

25    period of time?

1    A    Yes.

2    Q    And during that time you testified you were playing both

3    sides of the fence.

4    A    Yes.

5    Q    And during that time you lied to the FBI about certain

6    things, told them the truth about some things but you

7    certainly lied to them, correct?

8    A    Yes.

9    Q    And then you stopped working with them, what was it,

10    about 1998?

11    A    Yes.  Approximately.

12    Q    And then you picked it up again in 2000, was it 2002?

13    A    Approximately, yes.

14    Q    And then you stopped again, but during this time you

15    were still lying to the FBI, correct?

16    A    Yes.

17    Q    And then in 2005, they gave you another try so to speak,

18    right?

19    A    In 2005?

20    Q    Yes.

21    A    Yes.

22    Q    And in 2005 they decide to give you another try, and on

23    July 7th of 2005, you sign what the Government introduced,

24    proffer agreement, where you were cooperating, and the

25    cooperation understood that you would tell the truth,

1    correct?

2    A    Yes.

3    Q    And for telling the truth and cooperating you could

4    possibly benefit by not being charged with certain criminal

5    activity, correct?

6    A    Yes.

7    Q    No promises, but as long as you tell the truth and

8    cooperate, that that's a possibility, correct?

9    A    Yes.

10    Q    Now, that was July 7th of 2005, where you signed this

11    agreement to tell the truth, correct?

12    A    Yes.  Can I see that, please?

13            MR. McCORMICK:  Excuse me, what Exhibit number,

14    Mr. Birch?

15            MR. BIRCH:  He has the July 7th.

16            MR. McCORMICK:  All right.  Thank you.

17    BY MR. BIRCH:

18    Q    Enough time?

19    A    Yes, I just wanted to see that.  Thank you.

20    Q    You did sign that in July of 2005, July 7th, correct; is

21    that right?

22    A    Yes.

23    Q    You signed another one July 19th, 2005, correct?

24    A    Yes.  You're speaking of the two proffers now?

25    Q    Right.  But both understood that you would tell the

1    truth, correct?

2    A     Correct.

3    Q     Something you agreed to, to tell the truth, correct?

4    A     Correct.

5    Q     And then on November 11th, it gets a little more

6    specific where the United States Attorney's office up in New

7    York agrees to have you cooperate and agrees for your

8    cooperation, that you would not be charged with a number of

9    crimes, correct?

10   A     Yes.

11   Q     So July 7th, July 19th, and November 11th, 2005, you

12   signed these documents with the understanding that your part

13   of the bargain at least required you to tell the truth,

14   correct?

15   A     Yes.

16   Q     And despite those three agreements, you continued to

17   lie, correct?

18   A     Correct.

19   Q     Now, you said that the FBI questioned you about $80,000

20   that you stole from a businessman and that you initially lied

21   about it, correct?

22   A     Yes.

23   Q     Well, you didn't just initially lie about it, you lied

24   about it repeatedly, correct?

25   A     Yes.

1    Q    You lied and lied and lied over a period of several

2    months to the FBI, correct?

3    A    Correct.

4    Q    While you're cooperating with the FBI, while you have

5    signed three separate documents agreeing to tell the truth,

6    while the FBI is telling you you cannot lie, you kept lying,

7    correct?

8    A    Correct.

9    Q    In fact, from at least February 1st of 2007, just about

10   a year and a half ago, to July 31st, 2007, just over a little

11   more than a year ago, you kept lying to the FBI, correct?

12   A    I don't know that those dates are correct, but regarding

13   the Harvey Shear matter, I lied to the FBI.

14   Q    Well, that's what I'm talking about, the Harvey Shear

15   matter.

16   A    Okay.  The Harvey Shear matter, Mr. Birch, Mr. Shear's

17   is an associate of the Gambino family.  He is around Joseph

18   Corozzo, the consigliere of the Gambino family, and

19   Mr. Corozzo and myself were going to engage in a windows

20   deal.

21   Q    Did you lie to the FBI?  That's what I want to know,

22   Mr. Kasman?

23          MR. McCORMICK:  Objection.  The witness should be

24   able to answer the question.

25          MR. BIRCH:  He shouldn't be allowed to give

```
 1   gratuitous comments.

 2              THE COURT:  Please proceed.

 3              MR. BIRCH:  Thank you.

 4   BY MR. BIRCH:

 5   Q    Did you lie to the FBI?

 6   A    Mr. Shear was an associate of the family.  The $80,000

 7   that I took from him initially was to be invested in a window

 8   company with Mr. Corozzo, the third in command of the family,

 9   and myself.  Mr. Corozzo was going to take the money as well.

10   I took the money first.  Okay?  And that was $80,000 that I

11   took.  Yes, I did take it.  And I did keep it, and I did lie

12   to the FBI.  But I just want you, Mr. Birch, to be aware of

13   the whole picture regarding the $80,000, sir.

14   Q    Okay.  I understand.  You stole it instead Mr. Corozzo.

15   What I want to know is that from February 1, 2007, to July

16   31, 2007, I want to show you the information that was charged

17   against you, and look at Count 2 of this information.

18              MR. McCORMICK:  Can I have the exhibit number of

19   that?

20       (Pause in Proceedings.)

21              MR. BIRCH:  May I, Judge?

22              THE COURT:  Yes.

23   BY MR. BIRCH:

24   Q    I'm going to ask if this is the information that you

25   pled guilty to after lying to the FBI?
```

 1    A    Yes.

 2    Q    You pled guilty to that, right?

 3    A    Yes.

 4    Q    Okay.  Now, it says information, and information charges

 5    you with these crimes, correct?

 6    A    Correct.

 7    Q    Indictment, information, same thing, correct?

 8    A    Yes.

 9    Q    Except one is brought by a Grand Jury and one is filed

10    by the prosecutor, correct?

11    A    Yes.

12    Q    So you were charged with those crimes.  In Count 2 you

13    were charged with lying to the FBI from February 1st, to July

14    31st, 2007, correct?

15    A    Yes.

16    Q    And you pled guilty to that?

17    A    Yes.

18    Q    And what you lied about was this $80,000, correct?

19    A    Yes.

20    Q    And you kept that $80,000, correct?

21    A    Well, Mr. Shear got $10,000 back.

22    Q    So now Mr. Shear got 10,000 of the 80,000?

23    A    No, he was owed 80.  Ten was returned to him.

24    Q    Okay.  On Friday you said he got 80,000.  You told the

25    FBI you kept the 80,000.  But now you're saying you only kept

1    70,000?

2    A    No, the initial amount that was taken or stolen from

3    Mr. Shear was 80.  He received $10,000 back approximately a

4    year ago.

5    Q    But you still lied about it, correct?

6    A    Lied about stealing the $80,000?

7    Q    Correct.

8    A    Yes.

9    Q    Now, you were charged with obstructing justice when you

10   told a friend during the time that you're cooperating with

11   the FBI, you told a friend about an investigation, and then

12   they charged you with obstructing justice, correct?

13   A    Yes.

14   Q    We already talked about the lying to the FBI.  But you

15   were also charged with devising a scheme to defraud, correct?

16   Mr. Shear?  Were you not charged with devising a scheme to

17   defraud Mr. Shear?

18   A    Yes.

19   Q    And those are the crimes you pled guilty to?

20   A    Yes.

21   Q    In one information, you also pled guilty to a conspiracy

22   to commit racketeering, correct?

23   A    Yes.

24   Q    Over a nine-year period, correct?

25   A    Yes.

1    Q    And that nine-year period being from January 1996 to

2    July of 2005, correct?

3    A    If that's what the document says, yes.

4    Q    It's very important that we be accurate.  Let me show

5    you the racketeering and conspiracy charge and make sure

6    we're in agreement with those dates?

7              MR. PASANO:  I think it is 43.8 for ID.

8              MR. BIRCH:  That's correct.

9              MR. McCORMICK:  43.8.

10             THE WITNESS:  Yes.  The dates on these documents,

11   those are the dates.

12   BY MR. BIRCH:

13   Q    Okay.  So you pled guilty.  We can verify now that you

14   pled guilty to a racketeering charge committed over a

15   nine-year period from January 1996 to July of 2005, correct?

16   A    Yes.

17   Q    Now, the racketeering charge included two other crimes,

18   did it not?

19   A    Yes.

20   Q    And that involved extorting money, correct?

21   A    Yes.

22   Q    Money -- extortion is taking money from someone by

23   threatening them, correct?

24   A    Yes.

25   Q    Now, we have four crimes that you have pled guilty to,

1   the racketeering, the obstruction of justice, the perjury,

2   and the fraud, correct?

3   A    Yes.

4   Q    You have not been sentenced yet on those charges,

5   correct?

6   A    Correct.

7   Q    Those charges carry up to 65 years in prison, do they

8   not?

9   A    They do.

10   Q    Those are the maximum penalties, correct?

11   A    Those are the statutory penalties, yes.

12   Q    And if this or these prosecutors were to think you were

13   lying and if they informed the judge in New York that you

14   were lying, you could get up to 65 years in prison, couldn't

15   you?

16   A    Yes.

17   Q    Now, that's what you've pled guilty to, correct?

18   A    Yes.

19   Q    But part of the deal is that if these prosecutors think

20   you're telling the truth and tell the judge in New York that

21   you're telling the truth, not only do you have this

22   agreement, but this agreement includes not being charged with

23   a number of other crimes, correct?

24   A    Yes.

25   Q    And the crimes that we're talking about -- now, let me

1    ask you this.  You agreed under these deals that you made

2    that you would not be charged with bribery of public

3    officials, correct?  That's one of the charges they're not

4    going to charge you with?

5    A    Are you reading from those documents, Mr. Birch?

6    Q    No.  I'm asking you.

7    A    Well, those are one of the charges.  But I would like to

8    see the documents.

9    Q    Well, let's verify if we can, then.

10            Take a look at this.  2A.  Did you agree that you

11   would not be charged with bribery of public officials from

12   1986 to 1993?

13   A    Yes.

14   Q    Or money laundering from 1986 to 1999?

15   A    Yes.

16   Q    Or mail fraud or wire fraud during those years?

17   A    Yes.

18   Q    Or money laundering on behalf of the Gambino family from

19   '86 to 2004?

20   A    That's correct.

21   Q    Or assault --

22            MR. McCORMICK:  Excuse me.  Is this 43.5?

23            MR. BIRCH:  I honestly don't know.

24            MR. PASANO:  Or 43.7.

25            MR. McCORMICK:  Okay.  There are two.

1          MR. BIRCH:  There are two.  I gave him the other

2     one.

3     BY MR. BIRCH:

4     Q    Or an assault that you committed on Mr. Randolph

5     Pissola, correct?

6     A    Yes.

7     Q    Or an assault on Roger Basile, correct?

8     A    Yes.

9     Q    Or extortion, excuse me.  Extortion, yes, from Jay

10    Spratts Dining Saloon, correct?

11    A    Yes.

12    Q    Or extortion from the Hudson McCoy, correct?

13    A    Yes.

14    Q    Over a period of several years, correct?

15    A    Yes.

16    Q    And neither you nor your wife are to be charged for tax

17    evasion, correct?

18    A    Yes.

19    Q    From 1986 to 2005, correct?

20    A    Yes.

21    Q    May I have that, please?

22    A    Sure.

23    Q    From July of 2005 to July of 2000 -- or May of 2007,

24    thereabouts -- no, I think it was July.  For about a 24-month

25    period there you were doing much better than $250 a week, you

1    were actually getting $12,000 a month, correct?

2    A    Yes.

3    Q    From the FBI?

4    A    Yes.

5    Q    For your cooperation, correct?

6    A    Yes.

7    Q    And certainly that would include all of 2006, correct?

8    A    Yes.

9    Q    If you're receiving $12,000 a month from the FBI for

10   2006, alone, that would be $144,000, correct?

11   A    If that's what it adds up to, yes.

12   Q    But it was for two years that you received that money.

13   You actually, all total, from the FBI have received over

14   $400,000 in either cash or reimbursement for expenses,

15   correct?

16   A    Either cash or reimbursement, yes.

17   Q    Now, this amount of money, this 400,000, was not

18   reported on any tax return by you, was it?

19   A    No.

20   Q    And that money that we've just talked about, that

21   400,000, that's separate and apart from the 80,000 that you

22   took from Mr. Shear, although you did give him 10,000 back,

23   correct?

24   A    Correct.

25   Q    We're talking about separate money, correct?

1    A    Correct.  However, as I am compelled to file amended

2    returns, as I'm sure you aware, as you see in my agreement.

3    Q    You're compelled to file amended returns.  Are you

4    compelled to return the $400,000?

5    A    No.

6    Q    Now, you are in the middle of a divorce with your wife,

7    correct?

8    A    Yes.

9    Q    We've talked about your lying and you were given, or you

10   gave, rather, a deposition earlier this year, correct?

11   A    Yes.

12   Q    And you were under oath at that deposition, correct?

13   A    Yes.

14   Q    Just like now, to tell the truth, correct?

15   A    Correct.

16   Q    And at that deposition during your divorce you decided

17   to lie, correct?

18   A    Yes.

19   Q    You also, did you not, in this divorce prepare a

20   financial affidavit?

21   A    Yes.

22   Q    And specifically, in that financial affidavit for the

23   period of 2006 you were required to report your income,

24   correct?

25   A    Yes.

1    Q    Did you report one dollar of the thousands of dollars,

2    the $144,000 that you received during 2006, alone, on your

3    financial affidavit for 2006?

4    A    No, I did not.  And the reason being, had I disclosed

5    the money I was receiving from the Government, it would have

6    put myself and my children and my wife in danger, and it was

7    something that I could not do.

8    Q    Your wife --

9    A    I should -- excuse me Mr. Birch.  I should have went to

10   the FBI, Government, and asked what to do, and I did not.  I

11   took it upon myself to lie in the deposition for safety

12   reasons and for fear that I would be outed on both the

13   financial disclosure form and on my depositions.  And it was

14   wrong.  And I should have went and got guidance to ask what

15   to do in a matter like that.  However, I didn't and I wound

16   up lying on both of those documents.  In the deposition and

17   in the financial disclosure form.

18   Q    How many times have you met with the prosecutors in this

19   case?

20   A    Several times.

21   Q    Any idea?  I know we can't verify it, but any idea as to

22   how many times?

23   A    Maybe twice, three times.

24   Q    Two or three times.  Okay.  How many hours in those two

25   or three times?

1    A    Five hours a day, four hours a day.

2    Q    Now, you've decided today, while sitting here, that

3    these things were wrong, but at the time you didn't consult

4    with the FBI, you just went ahead and lied at the deposition,

5    lied in an affidavit, lied to the divorce judge, just lied

6    because you thought that's what you should do at the time to

7    protect your wife, who also filed contempt charges against

8    you, correct?

9    A    Correct.

10   Q    To hold you in contempt, to actually throw you in

11   jail --

12         MR. McCORMICK:  Objection, your Honor.  It is

13   irrelevant.

14         THE COURT:  Overruled.

15   BY MR. BIRCH:

16   Q    To hold you in contempt, to throw you in jail for not

17   paying her any alimony, correct?

18   A    Correct.

19   Q    So to protect her and deprive her of the money that she

20   thought she was entitled to, she went ahead or -- or you,

21   rather, lied and didn't pay her any of the money she claimed

22   to owe, correct?

23   A    However, Mr. Birch, you're leaving part of the story

24   out.

25   Q    Did your wife file contempt charges against you last

```
 1    February 27th, where there was a hearing and there was a

 2    claim that you owed $42,500 of which you had not paid,

 3    correct?

 4    A    That's correct.

 5    Q    In fact, you gave her $16,500 check that bounced,

 6    correct?

 7    A    I didn't know it bounced.  I told her not to deposit it.

 8    I don't know that it bounced.

 9    Q    Now, in addition to that, though, you had borrowed money

10    from your mother in the neighborhood of $200,000, correct?

11    A    Some years ago, yes.

12    Q    Well, you paid a substantial portion of that to your

13    divorce lawyers, correct?

14    A    Over time, yes.

15    Q    Okay.  Did you give any of that money to paying the

16    alimony toward your wife?

17    A    Yes.  When I sold my home, my wife got $402,000, which

18    was approximately 90 percent of the proceeds of the sale of

19    our house in Boca Raton.  When I was incarcerated on a purge,

20    a $42,000, my family came up with the $42,000 and I gave that

21    to my wife as well, and I was released from jail.  So my wife

22    got a total of approximately 442, 43,000 dollars of money to

23    take care of her and the children.

24    Q    Now, in March -- excuse me, February of this year, she

25    claimed that you had not paid $42,500, correct?
```

```
 1              MR. McCORMICK:  Objection.  Improper impeachment.

 2              THE COURT:  Overruled.

 3   BY MR. BIRCH:

 4   Q    Correct?

 5   A    Mr. Birch, I was incarcerated.  The only way to get out

 6   of incarceration was to pay the purge.

 7   Q    You got incarcerated because you weren't paying the

 8   $42,500, correct?

 9   A    Correct.  But it has since been paid.

10   Q    I understand.  And you are now out of jail.  Did you

11   also agree to reimburse your children's accounts moneys that

12   had been taken from those accounts?

13   A    Yes.

14   Q    And it was also -- and this money, by the way, there was

15   about $20,000 in an account in your child's name of Ryan,

16   correct?

17   A    Correct.

18   Q    Is that a daughter of yours?

19   A    Yes.

20   Q    You took that money.  And you took $64,000 from an

21   account under the name of your child, Skyler, correct?

22   A    Correct.

23   Q    And you took $19,000 from the account of Casey?

24   A    Cassie.  Yes.

25   Q    Cassie.  Forgive me.
```

1            And you were agreeing in July of -- you agreed to

2    reimburse those accounts by July 31st, of 2007, correct?

3    A    Correct.

4    Q    And as of February 27th, 2008, when you were thrown in

5    jail for contempt, you had not done so, correct?

6    A    Correct.

7    Q    And when you took that money out of the accounts of the

8    children, you signed your ex-wife's signature, correct?

9    A    Correct.  And that money went into our joint checking

10   account so that my wife and children and myself could live.

11   That money was not spent by me, Mr. Birch.  That money was

12   spent by my wife, myself, and my three daughters.

13   Q    Which was why she claimed -- filed the motion for

14   contempt claiming that it had not been put back, correct?

15   A    As you're aware, that's subject to litigation as we're

16   speaking right now.

17   Q    Now, you wore a wire for the Gambino family, excuse me,

18   you wore a wire for the FBI to record members of the Gambino

19   family for a period of about two years, correct?

20   A    Yes.

21   Q    And you were close to these members of the Gambino

22   family that you recorded, correct?

23   A    Yes.

24   Q    I think we've heard of Peter Gotti, Jo Jo Corozzo, and

25   others, correct?

1    A    Yes.

2    Q    During these two years you were given this recording

3    device to record these conversations, but you could turn it

4    on or off however you saw appropriate, correct?

5    A    Yes.

6    Q    And you didn't turn it on when you were engaged in

7    conversations with this Mr. Shear, correct?  Mr. Shear.  You

8    did not record your conversations with Mr. Shear, correct?

9    A    I don't believe I was recording conversations with

10   Mr. Shear.

11   Q    Okay.  Over two years you recorded hundreds of

12   conversations, correct?

13   A    Yes.

14   Q    Hundreds of conversations and hundreds of hours,

15   correct?

16   A    Yes.

17   Q    Do you have one second of a recorded conversation with

18   Vincent Artuso?

19   A    No.

20   Q    Do you have any letters from Mr. Artuso?

21   A    No.

22   Q    Any e-mails from Mr. Artuso?

23   A    No.

24   Q    Any phone calls, phone records from Mr. Artuso?

25   A    None.

1    Q    Any checks to you from Mr. Artuso?

2    A    No.

3    Q    Or any photographs with you and Mr. Artuso?

4    A    No.

5            MR. BIRCH:  That's all I have.

6            THE COURT:  Further cross-examination.

7            MR. PASANO:  May I, your Honor?

8            THE COURT:  Certainly.  Mr. Pasano.

9            MR. PASANO:  Thank you, sir.

10           MR. BIRCH:  Your Honor, could Mr. Artuso use the

11   restroom?

12           THE COURT:  Certainly.  Can we go ahead --

13           MR. BIRCH:  Yes, your Honor.

14           THE COURT:  -- in his absence?

15           MR. PASANO:  May I proceed, your Honor?

16           THE COURT:  Yes.

17           MR. PASANO:  Good morning, ladies and gentlemen.

18                    CROSS-EXAMINATION

19   BY MR. PASANO:

20    Q   Mr. Kasman, good morning.  My name is Mike Pasano.  I

21   represent John Artuso, and I think you told Mr. McCormick and

22   the jury on Friday and again Mr. Birch today, that you lied

23   at the depositions in your divorce case, right?

24    A    Yes.

25    Q   And I think you told us that you lied because you say

```
 1    you were afraid that you and your wife and family would be in

 2    danger; is that right?

 3    A     That's correct.

 4    Q     And these were lies that happened in depositions in

 5    January and February of this year, right?

 6    A     Yes.

 7    Q     Just a few months ago?  Just a few months ago?

 8    A     Yes.  Well, the depositions were back then.

 9    Q     And the reason that you were afraid was because you

10    didn't want to be outed, right?

11    A     Yes.

12    Q     But now you're testifying publicly, right?

13    A     Right.

14    Q     You're outed, right?

15    A     Right.

16    Q     Your wife and your children aren't in protective

17    custody, correct?

18    A     I really don't want to discuss -- there.

19    Q     They're not in protective custody.  Your wife is in

20    court.

21    A     I don't see her in court.

22    Q     They're not in protective custody, are they, sir?

23    A     I really don't want to talk about my family.

24    Q     Sir, they're not in protective custody.  You said you

25    were lying to protect your wife and family?
```

```
 1   A    That's correct.

 2   Q    You lied --

 3             MR. McCORMICK:  Objection, your Honor.

 4             THE COURT:  One at a time.

 5             MR. McCORMICK:  He is arguing with the witness.

 6             THE WITNESS:  I really don't want to discuss the

 7   security arrangements for my wife and children.

 8   BY MR. PASANO:

 9   Q    Sir, you were scared at the deposition in February but

10   not scared today, right?  That's your testimony?  Not outed

11   then, outed now.

12   A    My testimony --

13   Q    The only person you are afraid for is yourself.  You

14   don't care about your wife and family?

15   A    Would you like me to answer?

16             MR. McCORMICK:  Objection, your Honor.

17             THE WITNESS:  Would you like me to answer or do you

18   want to answer for me?

19   BY MR. PASANO:

20   Q    I would be happy to here what you want to say, sir.

21   A    Okay.  At the time the deposition was taken, I was very

22   concerned if I would have disclosed my relationship with the

23   Government in that deposition, that was my statement before,

24   and that was my statement now, for fear of being outed and

25   for the fact that it could pose a serious security concern
```

1  for my wife and children.  And that was my prior testimony,

2  and I stand by that testimony.

3  Q    And I think you told us on Friday that you were also

4  concerned because a deposition was a public document, didn't

5  you tell us that?

6  A    Yes.

7  Q    Didn't think about whether documents in divorce cases

8  can be sealed, right?

9  A    I didn't think about it.

10  Q    I mean, the fact of the matter is that divorce cases,

11  pleadings, and depositions aren't necessarily public

12  documents at all, are they, Mr. Kasman?

13  A    But as you know in Florida, to get documents sealed is

14  very difficult in a matrimonial case.

15  Q    So you knew you could seal them, it was just going to be

16  hard, and it was easier to lie; is that your testimony?

17  A    At the time I didn't know that we could seal them.

18  However, I am testifying that I lied in that deposition.

19  Yes.

20  Q    It was easier to lie?

21  A    I lied during the deposition.  Correct.

22  Q    Not my question, sir.  It was easier to lie, correct?

23  A    For the sake of my children I lied.

24  Q    You also told the jury that you lied because you didn't

25  trust your own lawyer, right?

1  A    That's correct.

2  Q    So you didn't just lie under oath to your wife's lawyer,

3  you were also lying throughout this period of time, according

4  to you, to your own lawyer?

5  A    I found out that my lawyer represented members of

6  organized crime, so that posed a problem for me to divulge to

7  him my relationship with the Government.  That's correct.

8  Q    The lawyer you hired with your mom's money --

9  A    No, no, no, no.

10  Q    -- that you didn't give your kids --

11  A    No.

12  Q    -- you say you found out --

13  A    Mr. Pasano.

14  Q    I haven't finish my question, sir.

15  A    But you're not telling --

16  Q    Let me finish my question and I'll let you answer.

17  A    Thank you.

18  Q    The lawyer that you paid using your mom's money that you

19  didn't give to your wife and kids you're saying you later

20  found out was somebody who had represented mobsters, and that

21  therefore made you want to lie to him?

22  A    Okay.

23  Q    Right?

24  A    Now I will answer your question.  The original lawyer

25  that I had was Barry Rodderman(phonetic).  I discovered

1    during the time of my depositions that Barry Rodderman

2    represented members of organized crime, which he disclosed to

3    me at that time.  So it put me in a very precarious position.

4    I could not say to Mr. Rodderman, you know, I have a

5    relationship with the Government, this is -- this testimony

6    is going to be a problem.  So it put me in the position of

7    having to lie during those depositions.

8    Q    Because it was easier to lie than to replace your

9    lawyer, right?  I mean you hired four different lawyers in

10    that divorce case.  You certainly don't have in trouble

11    hiring and firing lawyers, do you, Mr. Kasman?

12    A    Absolutely not.

13    Q    Okay.

14    A    Not when they have conflicts, I certainly do not.

15    Q    Okay.  So it was easier to lie and keep your lawyer than

16    to replace him, that's what you're telling the ladies and

17    gentlemen?

18    A    No, that's not what I'm telling them.  That's what

19    you're telling them.  I'm trying to tell them, and you keep

20    putting words in my mouth, what I --

21    Q    It was easier to lie?

22    A    What I'm saying is when I found out that he represented

23    members of organized crime, I could not divulge to my

24    attorney my relationship with the Government, so, yes, I then

25    at that point made a conscious decision to lie.  And I did

1    lie.

2    Q    Lied to your wife, lied to your wife's lawyer, lied to

3    your own lawyer, and even lied to the Court during these

4    divorce proceedings, right?

5    A    During the deposition -- if you're speaking of the

6    deposition, I lied.  So if you want to just move it along and

7    just go to the next step, I'll respond to that question.

8    Q    Let me try my question again.

9    A    Okay.

10    Q    Lied to your wife's lawyer, lied to your own lawyer,

11    lied to your wife, and lied to the Court during your divorce

12    proceedings, correct?

13    A    You're speaking of Mr. Rodderman, the first lawyer that

14    I discovered who had represented gangsters?

15    Q    Did you lie to other lawyers?

16    A    Are you speaking of Mr. Rodderman?

17    Q    Sir, I asked if you lied to your lawyer.  I'm asking

18    now, did you lie to other lawyers in the divorce case?

19    A    No.  Mr. Rodderman, I could not disclose to

20    Mr. Rodderman my relationship with the Government.

21    Q    Let me ask my question again to see if you'll answer.

22    You lied to your wife, your wife's lawyer, your own lawyer,

23    and the Court during your divorce case, yes or no?

24    A    During that deposition I lied.  And on my financial

25    statement I lied.  Correct.

1    Q    And I think you told this jury on Friday that you've

2    always supported your children, is that your testimony?

3    A    Yes.

4    Q    That's why you stole money from them, right?

5    A    I didn't steal money from them.

6    Q    Well, wait a second, sir.  Your kids had three different

7    bank accounts.  I think the accounts were up in New York,

8    weren't they?

9    A    They started in New York and then they came down here.

10   Q    And this was money that was supposed to be there for

11   your kids, and from each of those accounts you took all of

12   the money, right?

13   A    And deposited in my joint checking account with my wife,

14   and spent it on my children and my wife and myself.  That's

15   correct, counselor.

16   Q    That's what you say, Mr. Kasman.  But if that's the

17   case, can you explain to the ladies and gentlemen of the jury

18   why the judge when you told her that, ordered you to replace

19   the money in the kids' accounts?

20   A    I think you're misrepresenting what Judge Colon said.

21   Q    The judge ordered you to replace the money?

22   A    I don't think that's what was said, counselor.

23   Q    You're saying that the judge did not order you to

24   replace the money?  Yes or no?

25   A    On the day of the purge -- it's not a simple answer as

1    that, counselor.

2    Q    Yes or no.  How much simpler does it get, sir?

3    A    Well, either you want the truth or you don't want the

4    truth.  So you tell me.

5    Q    Well, with all respect, sir, you don't want me to answer

6    what I think is coming from you?

7    A    I'm telling you the truth.

8         MR. McCORMICK:  Your Honor, objection.  This is

9    argument.

10         MR. PASANO:  I apologize, your Honor.  Let me back

11    up.

12    BY MR. PASANO:

13    Q    The judge ordered you to put the money back, yes or no?

14    A    When I was incarcerated and I got out, the judge

15    indicated to my accountants -- my accountant, find out where

16    the money went, I want an accounting.  That's what Judge

17    Colon said.

18    Q    By the way, did I hear you just a little bit ago try to

19    tell the ladies and gentlemen of the jury that out of the

20    kindness of your heart, you gave your wife most of the

21    proceeds from your house?

22    A    No.  I said most of -- 90 percent of the proceeds went

23    to my wife.

24    Q    Isn't it a fact, sir, that all that time that you are

25    getting Government money, which is supposed to go, among

1    other things to paying your mortgage, you in fact miss

2    mortgage payments, the house ended up in arrears and

3    foreclosure, you had to agree to a forced sale, and your wife

4    had to leave the house because of the way you managed the

5    money, right?

6    A    The house went into foreclosure.  However, it was not a

7    forced sale.  The house was sold voluntarily.  It was not a

8    forced sale.  So you're misrepresenting.

9    Q    And the reason that your wife got most of the money was

10   because the judge ordered it.  Not because you wanted to give

11   it to her.  The judge had to order you to that; isn't that

12   right?

13   A    No, you're wrong again, sir.

14   Q    There's not an order in the divorce file?

15   A    The judge never ordered me to give the proceeds of the

16   house to my wife.  I voluntarily gave her 90 percent of the

17   proceeds.  That was not by judicial order.

18   Q    When the judge told you that this was a rare case where

19   more than half should go to the wife, you then agreed to do

20   it, right?  That's your testimony?

21   A    I don't recall the judge saying that.  I would like it

22   to see those documents if, you have them, because I think

23   you're misrepresenting.

24   Q    You've asked a number of times both Mr. Birch and now me

25   to show you documents, right?

1    A    Correct.

2    Q    Some of those documents are some of the agreements that

3    you've made with the Government, right?

4    A    Correct.

5    Q    And now you're asking me to show you some of the

6    documents or the agreements that you made with the Court,

7    right?

8    A    Correct.

9    Q    It is sort of hard for to you keep track of all of these

10   agreements that you've made when you continually are breaking

11   them; isn't that right, sir?

12   A    Well, you're making statements that are false.

13             MR. McCORMICK:  Objection, your Honor.

14             THE WITNESS:  You're embellishing statements and

15   exaggerating.  So to clarify, show it to me.

16   BY MR. PASANO:

17   Q    By the way, have you turned over all of your documents

18   to the Government?

19   A    Yes.

20   Q    So if Mr. McCormick wants to show you anything he can do

21   it on redirect, right?

22   A    I guess so.  Yes.

23   Q    Fair enough.  But let me show you something that

24   Mr. McCormick did actually show you.  It's in evidence, it's

25   Government's 43.7.

1          This document, sir, which you see up on the screen,

2    this is one of those cooperation agreements.  Do you see

3    that?

4    A    Yes.

5    Q    It even says, Cooperation Agreement, right?

6    A    Right.

7    Q    This is the one that's in evidence, 43.7.  And this

8    agreement has a provision in it that says you agree that

9    you're going to tell the truth, right?  It's Paragraph 4.

10   Truthful, complete, accurate information, right?

11   A    Yes.

12   Q    Now, this agreement that the Government put in evidence

13   was the agreement that was signed by you in March 2008.  Do

14   you see that, sir?

15   A    Yes.

16   Q    Your signature right there, right?  Your signature down

17   there?

18   A    Oh, yes.  Yes.

19   Q    Now, that's not the first of these kinds of agreements

20   you've signed, right?

21   A    No.

22   Q    In fact, Mr. Birch showed you a whole bunch of different

23   immunity letters and agreements that you had, including some

24   in '07, right?  Do you remember signing agreements in 2007?

25   A    Yes.

1    Q    And this one which is in evidence as well is 43.3.

2    November 11, 2005 -- let me go back all of the way.

3    November 11, 2005.  You had agreements in 08, '07, and '05,

4    right, sir?

5    A    Yes.

6    Q    Now, this one, November 11, 2005, right at the front of

7    it, has that same language.  You're going to provide

8    truthful, complete, and accurate information, right?

9    A    Correct.

10   Q    So the agreement that you have into '08, like the

11   agreement in '07, like your agreement in '05, each time is

12   saying, you say to the Government, the FBI agents,

13   prosecutors you, Lewis Kasman, are going to be truthful,

14   right?

15   A    Yes.

16   Q    You signed this agreement, right?  You signed it?

17   A    Yes.

18   Q    Now, your lawyer signed it, right?

19   A    Yes.

20   Q    Now, that's a lawyer you told the truth to or lied to?

21   A    Told the truth to.

22   Q    Okay.  Looked the Government in the eye when you signed

23   this agreement and said, I'm going to be truthful, right?

24   A    Correct.

25   Q    And immediately lied to them?

1    A    Yes.

2    Q    So whether there's a piece of paper that you sign where

3    you promise to be truthful, the fact of the matter is, you

4    can't keep your word, right, sir?

5    A    I lied to the Government regarding those certain matters

6    that we spoke about.  Yes, I did.

7    Q    Different question.  You actually sit down and

8    negotiated with prosecutors and agents.  In '05, you're not

9    just negotiating a deal, you're negotiating money.  And all

10   the while you know in your heart you're going to lie to them,

11   and as soon as you sign the agreement you start lying to

12   them; isn't that right?

13   A    I don't know if it was as soon as I signed it, but

14   thereafter, yes.

15   Q    Same language in each of these agreements, language that

16   you have not been able to honor.  Correct, sir?

17   A    Yes.

18   Q    But this most recent one, you're asking this jury to

19   accept that when you signed in '08 that you're going to be

20   truthful, this time you really mean it?

21   A    That's correct.

22   Q    I think you talked about this man, Carlo Vaccarezza.  Is

23   that the name you used?

24   A    Yes.

25   Q    And I think you told the jury that after you moved down

1    here to Florida, late '03 or early '04, this man,

2    Mr. Vaccarezza, he approached you about opening a restaurant.

3    Was that your testimony?

4    A    He wrote me a note and asked me to call him and then we

5    went -- then he approached me about the restaurant.

6    Q    That's that note that the Government put in evidence,

7    right?

8    A    Yes.

9    Q    And the idea of opening a restaurant was his, you say,

10    not yours, right?

11    A    Correct.

12    Q    And then it even came down to this restaurant,

13    Campagnola, and that's the one you actually opened, right?

14    A    Yes.

15    Q    And did you tell the ladies and gentlemen of this jury

16    on Friday that it was Mr. Vaccarezza who told you that you

17    and Mr. Kula, your brother-in-law -- excuse me, your

18    father-in-law, were going to be owners of the restaurant and

19    he was going to be the general manager?

20    A    Correct.

21    Q    But then you tell the ladies and gentlemen of the jury

22    that when Mr. Vaccarezza wants to bring in people to put in

23    investment money, you tell him no, right?

24    A    Correct.

25    Q    So the guy that told you what the deal was, you're now

1    telling what the deal is, right?  That's what you told the

2    ladies and gentlemen.

3    A    The deal was my brother-in-law and myself and my

4    father-in-law, Carlo was the general manager.

5    Q    Yes.  But it was Carlo's deal to you, but now you're

6    telling the ladies and gentlemen that you're telling

7    Mr. Vaccarezza what to do, I don't want investment money, and

8    worse, you're telling the ladies and gentlemen you fire him,

9    right?

10    A    At a point in time Carlo was terminated.

11    Q    The guy that set it up, you're saying later you fired?

12    A    Correct.

13    Q    And what's more, the guy that told you what to do but

14    now you're telling what to do and then you fire, ends up

15    selling the restaurant out from under you?

16    A    There was a reason why I fired him though.

17    Q    I'm not interested in the reason, sir.  I'm interested

18    in who's on first.

19    A    But I think the reason is important for the jury to

20    hear.

21    Q    Well, I'll allow Mr. McCormick to ask you that again.

22    Because, sir, I'm asking you, is it true that you say that

23    this man told you what to do, then you told him what to do,

24    then you fired him, and then he sold the restaurant?

25    A    No, that's what you're saying.

1    Q     No, I'm asking you?

2    A     I fired Carlo Vaccarezza for a reason.

3    Q     Didn't like all those wise guys?

4    A     And other things that he was doing.

5    Q     And after you fired him, this man that apparently didn't

6    have the authority to tell you what to do, he then apparently

7    has the authority to sell the restaurant; that's your

8    testimony?

9    A     He went --

10   Q     Is that your testimony, sir?

11           MR. McCORMICK:  Your Honor, the witness is trying

12   to answer.

13           MR. PASANO:  He is trying to answer, your Honor.

14           THE WITNESS:  But you're not letting me.

15   BY MR. PASANO:

16   Q     Is that your testimony?

17   A     Carlo came to me with a deal from Michael Auricchio, for

18   $850,000 to sell the restaurant.  The deal went from 850 to

19   350, and we sold the restaurant at 350.  My brother-in-law

20   and my father-in-law were very upset, that how do we go from

21   850 to 350.  And they had a right to be upset.

22           The caveat on the deal was is that I had said to

23   Mr. Vaccarezza, pay some of the vendors so not all of them

24   would get hurt, and $60,000 was allocated.  Carlo selected

25   the vendors to be paid and he allocated the $60,000 from

1    Mr. Auricchio to pay those vendors.  So that's how we went

2    from 850 to 350.

3    Q    So the answer to my question is yes?

4    A    What's your question?  I explained to you what

5    Mr. Vaccarezza did.

6    Q    My question was, the guy that was the decision maker,

7    that then wasn't the decision maker, that then you fired,

8    sold the restaurant; and I think you answer is yes?

9    A    Yes.

10   Q    Okay.  Thank you.

11   A    He put the parties together.

12   Q    Now, that envelope and that correspondence you say you

13   got from this man, it is Government Exhibit 43.11.  It's in

14   evidence.  That's Mr. Vaccarezza.  I'm circling his name,

15   correct, sir?

16   A    Yes.

17   Q    And this is the correspondence that you get from him in

18   October of 2004; is that right, sir?

19   A    Yes.

20   Q    I'm sorry, I have the date wrong.  It's June 5, 2004.

21   It's hard to see.  It actually says June in there.  I think.

22   If you look real hard.  Do you agree with me, it's about June

23   of '04?

24   A    It looks like June.  Yes.

25           MR. PASANO:  If I can approach, your Honor.

1    BY MR. PASANO:

2    Q    Just so you're sure of that date.  Do you see that

3    postmark?  June of '04, right?

4    A    Yes.

5    Q    And that's the -- that's this piece of evidence:

6    "Lewis:  Call me.  Carlo Vaccarezza," and a phone number.

7    Right?

8    A    Yes.

9    Q    The note doesn't say what to call you about, right?

10   A    No.

11   Q    And that note is from Mr. Vaccarezza, not from Vincent

12   Artuso, right?

13   A    No.

14   Q    Certainly not from Johnny Artuso, right?

15   A    No.

16   Q    In fact, you never got any note from John Artuso at any

17   time, correct?

18   A    No.

19   Q    Not in 2004, right?  Not ever, fair to say?

20   A    Yes.

21   Q    But this note, it would be after this point in time that

22   any conversations you say you had with Mr. Vincent Artuso or

23   anybody about any deals in Florida happened, right?  It's

24   after this?

25   A    Yes.

Q    And I think you told the ladies and gentlemen that a few
weeks after getting this note you had a breakfast meeting and
that's the meeting that you claim Mr. Vincent Artuso attended
with Mr. Vaccarezza; is that right?

A    Carlo and I had a meeting or two prior to our breakfast
meeting with Mr. Artuso.

Q    Right.  The first time that you say Vincent Artuso shows
up, weeks later, breakfast meeting.  Right?

A    Yes.

Q    And I think you told the Government that each of the
meetings over time that you had with Mr. Vaccarezza, or what
you say you have with Mr. Vincent Artuso, you always told
your FBI handlers about, right?

A    Yes.

Q    And you've also told us that at least beginning in the
middle of 2005, you began to have a tape recorder that you
could make recordings with, right?

A    Yes.

Q    So you're telling the FBI about all of these meetings,
the FBI is giving you a tape recorder, you're taping for more
that two years, and I think you told Mr. Birch you don't have
one tape on which Vincent Artuso is talking, right?

A    Correct.

Q    Certainly no tape with Johnny Artuso, right?

A    Correct.

1    Q    And if you're reporting all of this to the FBI like you

2    say, can you explain why there are no surveillance reports of

3    any of these meetings?

4    A    I don't know that I'm the person you should -- I don't

5    know that I'm qualified to answer that question.

6    Q    In preparing you to testify, you didn't read over the

7    FBI 302s and reports?

8    A    I've read certain reports, but I don't -- I don't know

9    that I'm qualified to answer that question.

10   Q    Fair enough.  The reports you read, you didn't see one

11   report in what you read that was a surveillance that the FBI

12   had engaged in in any of these so-called meetings that you

13   say you have with Vincent Artuso, right?  There's not even

14   one report?

15   A    Like I said --

16          MR. McCORMICK:  Your Honor, no foundation to ask

17   this question.

18          THE COURT:  Sustained.

19          THE WITNESS:  I don't know that I'm qualified to

20   answer the question.

21          THE COURT:  If I sustain an objection, don't answer

22   it.

23          THE WITNESS:  Okay.  Sorry.

24   BY MR. PASANO:

25   Q    Do you remember when you would come out of one of those

```
 1    meetings that you say you had, then going to the FBI car in

 2    the parking lot or going over to the FBI table at the Boca

 3    Resort, or walking around to the back of Campagnola

 4    Restaurant and meeting with the FBI?

 5    A    At what point in time?

 6    Q    After any of these meetings that you claim happened.

 7    A    With Mr. Artuso?

 8    Q    To your knowledge, were they surveilling you during

 9    these meetings?

10    A    I don't recall.

11    Q    Meaning you don't ever remember an FBI agent being

12    around when you were having these meetings, right?

13             MR. McCORMICK:  Your Honor, asked and answered.

14             THE COURT:  Overruled.

15    BY MR. PASANO:

16    Q    Right, you don't remember it?  Correct?

17    A    I don't recall.

18    Q    Okay.  Now, the Government had also shown you an

19    exhibit, Government's Exhibit 43.14 in evidence.  This is a

20    fax that you got from Atlantic Magazine.  January 21, 2005,

21    is the set date on the e-mail, do you see that, sir?

22    A    Yes.

23    Q    But what happens is in April of '05, you're faxing it

24    somewhere, correct?

25    A    Yes.
```

1    Q    You're faxing it to the FBI?

2    A    Yes.

3    Q    So for sure at least by April of 2005 the FBI knows

4    something about whatever it is that you say you know about

5    these ADT deals, correct?

6    A    Based on that fax, yes.

7    Q    Fair to say that before that fax, you never heard of

8    ADT/Tyco; or do you remember?

9    A    I've heard of ADT, sure.

10   Q    The deals that you're talking about in this courtroom.

11   A    I would have to look at the dates.

12   Q    Isn't it true, sir, that the FBI is the one who told you

13   that when they gave you that tape recorder and you started

14   taping people beginning in the middle of 2005, for you to

15   bring up the ADT/Tyco deals to the people you were talking

16   to?

17   A    That's not true.

18   Q    Isn't it true, sir, that ADT/Tyco as far as the FBI was

19   concerned in 2005 was bait for people like Jo Jo Corozzo?

20          MR. McCORMICK:  Objection.  No foundation for the

21   question.

22          THE WITNESS:  No, that's not true.

23          MR. McCORMICK:  He's answered, Judge.  Do you want

24   me to respond to the objection?

25          THE COURT:  No.

BY MR. PASANO:

Q    You certainly were bringing it up, the existence of some ADT/Tyco deals on these tape-recordings when you were talking to Mr. Corozzo, correct?

A    Correct.

Q    And I think, didn't you tell the ladies and gentlemen on Friday that the first time that ADT/Tyco and deals involving Mr. Vincent Artuso and others were brought up to you, according to you, was about 11 or 12 months after you had gotten that letter from Carlo Vaccarezza?

A    That was an approximate number I gave them.  Yes.

Q    Right.  So if June of '04 is the letter, in approximately May or June of '05 was when you first heard about it, which was after the fax that I talked to you about a second ago?

A    You're saying those dates.  I'm saying approximately. Those are your words.

Q    And this meeting that you say you had at the Boca Resort in June of '05, this is where you say Vincent Artuso said he has something very good cooking, right?  Wasn't that your language?

A    Yes.

Q    Now, could you explain to the ladies and gentlemen how in or around May or June of '05 you can have something good cooking for a meal that was done and eaten by September of

```
1    2003?

2    A    Because Mr. --

3              MR. McCORMICK:  Objection, your Honor.

4              THE COURT:  Basis?

5              MR. McCORMICK:  There's no foundation to ask this

6    witness that question.

7              THE COURT:  Overruled.

8    BY MR. PASANO:

9    Q    You can answer, sir.

10   A    Would you repeat it?

11   Q    Yeah.  If you're claiming that in June approximately of

12   '05 you're told something good is cooking, I'm asking you to

13   explain how that can be to the jury when the meal has already

14   been served and eaten by at the latest September of 2003?

15             MR. McCORMICK:  Objection.  Argument.

16             THE COURT:  Overruled.

17   BY MR. PASANO:

18   Q    You can answer.

19   A    Oh, okay.  Mr. Artuso wanted to borrow $200,000 from me.

20   That's how the ADT deal comes into play, as a lure to get me

21   to put up the $200,000.

22   Q    So he was lying to you?

23   A    I don't know what he was -- you'll have to ask him.  But

24   that's when he instructed Greg Orr to tell me about the ADT

25   deals --
```

1    Q    So?

2    A    -- as an enticement for me to put up the $200,000.

3    Q    So it really had nothing to do with the ADT deals; it

4    was an enticement?

5    A    No, I'm going to tell you again.  Mr. Artuso told me to

6    see Greg, there's something good cooking.  As an enticement,

7    they threw the ADT deal at me so that I would put up the

8    $200,000 on future ADT deals.

9    Q    So you're telling the ladies and gentlemen that you

10   understood in the middle of '05 that there were future deals

11   on the table?

12   A    That's what Greg Orr told me.

13   Q    No.  That's what you're telling the ladies and

14   gentlemen.

15   A    Correct.

16   Q    Now, you were shown and listened to a variety of

17   tape-recordings during the day on Friday.  One of which is

18   Government Exhibit 46.3A and B.  It's the transcript, I'll

19   just show it here to you, of an April 2nd, 2006, meeting you

20   had at the house of one Danny Marino.

21          Do you remember that meeting?

22   A    Yes.

23   Q    Now, Danny Marino is not the former quarterback of the

24   Miami Dolphins, correct?  It's somebody different?

25   A    No.  Danny Marino is a captain in the Gambino family.

1    Q    Same name, different guy?

2    A    Same name, different guy.

3    Q    And while I know it was a conversation you had a few

4    years ago, you listened to it on Friday.  Can we agree that

5    in the tape and the transcript that we have of this April 2,

6    2006, meeting over at Danny Marino's house, not the Dolphin,

7    no discussion of ADT or Tyco or anything about the deal; do

8    you remember that?  Just not discussed with Mr. Marine?

9    A    Is that reflected in that?

10   Q    That's what the -- the transcript doesn't have anything

11   about it in there.

12   A    If that's what the transcript says, yes.

13   Q    Okay.

14   A    I would have to read the entire transcript to testify to

15   that.  But if you're telling me there is no mention of that,

16   then --

17   Q    As you sit here now, you don't remember there was one,

18   and again, Mr. McCormick can show it to you if I'm wrong;

19   fair to say?

20   A    Like I said, the transcript speaks for itself.

21   Q    Okay.  There was another transcript, this one was with

22   this individual, Peter Gotti.  And this one was a little bit

23   earlier than the Danny Marino meeting.  This one is March 10,

24   2006.  Do you remember listening to the tape on this one and

25   following along with the transcript on Friday?

1    A    Yes.

2    Q    Now, on this one, it's Page 232.  Do you remember in

3    talking to Mr. Marino, or excuse me, to Mr. Peter Gotti:  If

4    you've got a problem, see Danny or Jo Jo, right?

5    A    Correct.

6    Q    Those are the people you're to talk to if you have a

7    problem?

8    A    Correct.

9    Q    That conversation with Peter Gotti, he doesn't say talk

10   to Carlo Vaccarezza, right?  Right?  He does not tell you to

11   talk to Carlo Vaccarezza?

12   A    Carlo Vaccarezza is an associate.  He is not a ranking

13   member of the family.

14   Q    Not my question.  He doesn't tell you to talk to Carlo

15   Vaccarezza?

16   A    No.

17   Q    He doesn't tell you to talk to Vincent Artuso, right?

18   A    No.  Pete did not.

19   Q    Certainly doesn't tell you to talk to John Artuso,

20   right?

21   A    No.

22   Q    And again as best you can recall, sir, fair to say that

23   in this entire conversation on March 10th, as best you can

24   recall, with Peter Gotti not a mention of anything about

25   ADT/Tyco a deal real estate?  As best you can remember, you

1    don't remember that in the conversation, do you, sir?

2    A    Mr. Artuso is mentioned.

3    Q    No mention of ADT/Tyco, correct, sir?

4    A    I would have to hear the tape and look at the transcript

5    to testify to that.

6    Q    As you sit here now, do you remember it being mentioned

7    to Peter Gotti?

8    A    I don't recall if that was.

9    Q    Okay.  But for sure, it's mentioned when you meet with

10   Jo Jo Corozzo, right?

11   A    Yes, when I met with Jo Jo Corozzo it was mentioned.

12   Q    And one of those times that you met with him that the

13   Government put in evidence is this tape 46.4, July 27, 2006.

14   The conversation that you had with, among other people, Jo Jo

15   Corozzo, correct?

16   A    Yes.

17   Q    Now, this conversation -- excuse me, starts at Page 70.

18   And let me get this off the screen.  You see that number down

19   there?

20   A    Yes.

21   Q    Page 70.

22          And you are talking in this conversation about the

23   Tyco deal, do you remember that?

24   A    I do.

25   Q    Okay.  And first thing on this transcript -- and the

1    "LK," that's you, right?

2    A    Yes.

3    Q    And you say:  This guy goes, you know, he came to me

4    about a year ago with a Tyco deal.

5         Now, you said that for sure in July of '06, right?

6    A    Yes.

7    Q    Wearing a wire in a meeting that the FBI knows about,

8    right?

9    A    Yes.

10   Q    They've sent you in to talk to Mr. Corozzo, right?

11   A    Yes.

12   Q    And before they send you in, they talk with you about

13   the things they want you to talk about, right?

14   A    No.

15   Q    They just say whatever you want to talk about, Lewis,

16   fine with us?

17   A    No, they didn't say that, but they don't orchestrate

18   what you're going to talk about the way you're making it

19   sound to the jury.

20   Q    You are telling the ladies and gentlemen of the jury

21   that the FBI didn't give you instructions as to the topics

22   that they wanted to make sure that you covered?

23   A    Not in the language that you're speaking.

24   Q    Well, let's take a look at what you say on the tape to

25   Mr. Corozzo.  You start off by saying:  He came to me a year

```
 1   ago with a Tyco deal.  Right?

 2             And Mr. Corozzo says:  Tyco, I don't know Tyco,

 3   right?  I don't know what a Tyco deal is.  Correct?

 4   A    Correct.

 5   Q    But then, sir, fair to say, you can't even keep straight

 6   in this conversation when it was you're telling Mr. Corozzo

 7   you first heard about the Tyco deal?

 8             MR. McCORMICK:  Objection.  Characterizing the

 9   testimony of the witness.

10             THE COURT:  Overruled.

11   BY MR. PASANO:

12   Q    You can't keep it straight, can you?

13   A    As far as what?

14   Q    Well, sir, seconds later, look at this.  So Vinnie came

15   to me like two years ago.  So first you're telling Corozzo

16   it's a year ago, and then seconds later, because it's hard to

17   follow the script when they're not whispering in your ear?

18   A    There was script.

19             MR. McCORMICK:  Objection.

20             THE WITNESS:  There was no script.

21   BY MR. PASANO:

22   Q    You're telling two years ago --

23   A    There was no script.

24             MR. McCORMICK:  Objections.  It's argument, your

25   Honor.
```

```
 1              THE COURT:  Overruled.
 2    BY MR. PASANO:
 3    Q    One year ago, two years ago.  You can't keep it
 4    straight, right?
 5    A    Let me explain to you.  When you talk in organized crime
 6    parlance and you talk to members of organized crime, a year
 7    can then become six months or two years.  Only in the
 8    reference of how you're talking.  It's the same conversation,
 9    it's the -- he didn't even know -- when I was mentioning it
10    to Joe, he never even heard of Tyco until I explained it to
11    him.
12    Q    Right.  Because Tyco was bait, right, sir?  The FBI was
13    trying to get you to bait Jo Jo Corozzo into a crime and if
14    they couldn't get it, one way or another way, tell him about
15    Tyco?
16    A    You're wrong.  My inference of going to Joe to tell him
17    about Tyco is the fact that Vinnie Artuso never told the
18    administration about Tyco and he had a responsibility as a
19    captain to post the administration that he had an inside deal
20    with Tyco.  That was my reference.
21              And if you listen to the Pete Gotti tape where Pete
22    says, yes, Artuso should be taken down, he's agreeing that
23    the administration was not posted to that sham.
24    Q    According to Lewis Kasman?
25    A    No, according to Peter Gotti, the boss of the Gambino
```

```
 1    family.

 2    Q     Sir, on this meeting --

 3    A     Listen to the tape.

 4    Q     On this meeting with Jo Jo Corozzo on July 27, 2006,

 5    after Mr. Corozzo tells you, I don't know Tyco, you keep

 6    promoting the deal to him, right?  I have a page that I'm

 7    going to ask about in a second, but first, my question.  You

 8    keep promoting the deal to him, correct?

 9    A     Correct.

10    Q     And when he moves off to other topics and it's at that

11    last page that the Government had played, it's Page 76 of the

12    transcript, you come back to it and you try to get him

13    interested again by telling him, this Tyco thing is huge,

14    right?

15    A     That's correct.

16    Q     A deal that you said no to, that you tell the jury was

17    brought up to you as an enticement to get you to loan some

18    money, now a year later you're bringing up to Jo Jo Corozzo

19    as a huge deal, correct?

20    A     Correct.

21    Q     And that was a lie, right?

22    A     No, it was not a lie.

23    Q     You were promoting it to Mr. Corozzo to try to get him

24    to take action that the FBI could then act on, fair to say?

25    A     Wrong.  Wrong.  Mr. Corozzo's being coming to me for the
```

1  longest time to get into a business.  Let's do something.

2  That's how the Harvey Shear deal starts.  So when the Tyco

3  deal was brought to my attention, that's how Jo Jo and myself

4  engage in that conversation.  And quite frankly, I was

5  shocked that the consigliere didn't know his captain was

6  doing the Tyco deal.

7  Q    Now, you and the FBI are working together at this point

8  in time, right?

9  A    Correct.

10  Q    This conversation is July of 2006, right?

11  A    Correct.

12  Q    Did you know, sir, that in January of 2006 the FBI had

13  paid a visit to a guy named Larry Horton?

14  A    No.

15  Q    But your testimony is that in July of '06 the FBI wasn't

16  telling you to promote this Tyco deal, this was your idea?

17          MR. McCORMICK:  Asked and answered, your Honor.

18          THE COURT:  Overruled.

19          MR. McCORMICK:  Objection.

20  BY MR. PASANO:

21  Q    This was your idea?

22  A    Like I told you before, Jo Jo was pressing me to get

23  into some businesses and get some deals.  So I brought it to

24  his attention, the Tyco deal.  Just as I told you previously.

25  Q    Your idea?

1  A     The Tyco idea.  It's Mr. Artuso's deal, not my deal.  He

2  brought it to me.

3  Q     By the way, in this tape, weren't you urging Jo Jo

4  Corozzo to call up Vince Artuso or meet with him to see about

5  getting into the Tyco deal?

6  A     Yes.

7  Q     Okay.  And that was in July.  But do you remember having

8  a meeting with Jo Jo Corozzo in September, in fact, a year

9  earlier, September of '06, and Mr. Corozzo told you he wasn't

10  interested in meeting with Vinnie Artuso or talking about any

11  deal, right?

12  A     Well, I think you should read that transcript.  You're

13  taking a snippet of the whole transcript.

14  Q     It wasn't one of the ones you listened to on Friday,

15  right?

16  A     Like I said, you took a snippet of the transcript.

17  Q     After this transcript --

18  A     Why don't you read the whole transcript?

19  Q     I have.

20  A     Why don't you read it to the jury.

21  Q     After this transcript -- if Mr. McCormick wants to, to

22  help you out, I'm sure he will.

23  A     Because you're just taking a snippet of a whole story.

24  Q     Fair enough.  Let's deal with this part of the story.

25  July 7, after you tried to get Jo Jo Corozzo to take the

1    bait, fair to say he doesn't, right?  He doesn't contact

2    Vincent Artuso.  Nothing happens?

3            MR. McCORMICK:  No foundation to ask that question,

4    your Honor.  Objection.

5            THE COURT:  Overruled.

6    BY MR. PASANO:

7    Q    As far as you know, right, sir?  He never acts on it?

8    A    I don't know if he acted on it.

9    Q    He didn't tell you?

10   A    He didn't tell me.  That's a fair answer.

11   Q    There is one other tape that the Government did play.

12   It's Government Exhibit 46.1.  And this was the one with the

13   four dates.

14   A    What -- oh, okay.

15   Q    October 11, 12, 13, and 14 of 2005., do you remember

16   that one, sir, listening to that one on Friday, reading

17   along?

18   A    Yes.

19   Q    You talk about snippets.  Fair to say that this

20   transcript actually, and the tape that was played, were

21   snippets of a bunch of conversations that happened over four

22   different days in October of 2005, right?

23   A    Yes.

24   Q    And these conversations, like the other ones being

25   played to the jury, don't involve you talking directly with

1   Vincent Artuso.  We've established that, right, sir?

2   Certainly no tape of you talking to Johnny Artuso, right?

3   A    No.

4   Q    And there's a reference.  It's at Page 23 and 24 of this

5   tape, let me just pull that out.

6        You were talking about Mr. Artuso plays golf; do

7   you remember that part of the conversation?

8   A    Yes.

9   Q    And then just down below it, you're talking.

10       He's got his kid down their working in the joint.

11  A    Uh-huh.

12  Q    And then on the next page, which is Page 24 of this

13  transcript, the joint we're talking about magazines or

14  something, telemarketing, right?

15  A    Right.

16  Q    Now, the kid that you're referencing in this

17  conversation is my client, John Artuso, right?

18  A    Yes.

19  Q    The only time in any tape that's been played to this

20  courtroom in which John Artuso is even mentioned, am I right,

21  is when you say on this particular series of conversations

22  that John Artuso works in the magazines, right?

23  A    Correct.

24  Q    Okay.  And in this and other conversations if there are

25  references to people's sons or to the name John or whatever

1    it is, we're not talking about John Artuso, fair to say?

2    A    Fair to say.  Yes.

3    Q    Now, on this tape there are a few things that I just

4    wanted to go over with you.  Page 5.  And again, this is to

5    the guy that you say is the consigliere of the Gambino

6    family?  That's Jo Jo Corozzo you say?

7    A    Yes.

8    Q    Okay.  And on Page 5, there's a reference where you're

9    talking about, I'm not with this Vinnie.  Do you remember

10   saying that?

11   A    Where are you reading from?

12   Q    I have no relationship with him.

13        Let's see where I can find that.

14        I'm not with this Vinnie, I have no relationship

15   with him.

16   A    Right.

17   Q    That's you talking, right?

18   A    That's correct.

19   Q    Okay.  And then on Page 7 of this document, the

20   transcript of the tape recording, you are talking about the

21   conversations that you had with him.  And here you're saying:

22   I says, Vinnie, we know each other for three weeks.

23        Do you see where you said that?

24   A    Right.

25   Q    Right?

```
 1    A     Yes, I see that.

 2    Q     Okay.  And then as an example of what I was asking you

 3    just a moment ago, at Page 9 of this transcript, there's a

 4    reference to Carlo, that's Carlo Vaccarezza, correct?

 5              Carlo was supposed to help the son.

 6              Do you remember saying that?  But the son you're

 7    talking about is Jackie the Nose's son, right?

 8    A     That's correct.

 9    Q     Not Johnny Artuso?

10    A     No.

11    Q     We can look high and dry through these tapes and

12    transcripts, and we're not going to see anything about Johnny

13    Artuso anywhere, right?

14    A     No, I had no dealings with John Artuso.

15    Q     Okay.  And one last question about this particular

16    transcript.  It's where you're talking about the restaurant

17    and your contacts with Vinnie, that's, according to you,

18    Vinnie Artuso, correct?

19    A     That would be Vinnie Artuso.

20    Q     As soon as I told him no on the restaurant, that was it.

21    He was done with me.

22              Right?  That's what it says?

23    A     Yes.

24    Q     Now, Mr. Birch asked you about the different lies that

25    you've been telling over the many years of your life, and
```

1   fair to say, sir, that over the many years of your life

2   you've told a lot of lies?

3   A    Yes.

4   Q    So many lies it's hard to even keep them all straight,

5   right?

6   A    I've told many lies.

7   Q    And you've learned over the years to actually become a

8   very good liar; isn't that right, sir?

9   A    I told many lies.

10  Q    You've learned to become a very good liar, right?

11  A    I have told many lies, like I told you.

12  Q    Do you disagree that you're a very good liar?

13  A    I don't know what the definition is of a good liar or a

14  bad liar.

15  Q    Well, how about a guy who can lie to John Gotti Senior's

16  face or to guys in the mob who kill people, and stay alive;

17  that would be a pretty good liar, right?

18  A    Who lied to John Gotti Senior's face?

19  Q    You did, sir.

20  A    No, I didn't.

21  Q    You're cooperating with the FBI.  You're still working

22  with John Gotti, holding his money, laundering his money.

23  Did you ever tell John Gotti Senior, oh, by the way, Grandad,

24  I'm on the side, playing both ends?

25  A    No.

1    Q    Didn't tell him that?

2    A    No.

3    Q    You lied to him, right?

4    A    Right.

5    Q    Okay.  You over the years because you were dealing with

6    dangerous people like John Gotti Senior, people who kill

7    people, you learned when you lied to them to be a very good

8    liar, right?

9    A    That's the life of organized crime.

10    Q    It was your life, to be able to get away with playing

11    both sides, right?

12    A    It's the life of organized crime.  You lie.  You steal.

13    You cheat.  That's what it is.

14    Q    That's you?

15    A    That's me.  That's Mr. Artuso.  That's many people.

16    That's what we do.

17    Q    Well, my questions are about you, sir.

18    A    But I'm just letting you know that's what organized

19    crime is all about.

20    Q    And I appreciate that, sir.  My question is, we wanted

21    to look lie, cheat, steal in the dictionary, look for a

22    picture about it, we're going to see Lewis Kasman's face,

23    right?

24    A    And possibly, Mr. Artuso's.

25    Q    Thank you for adding that, sir.  My questions are about

```
 1   you.  You are a liar, correct?

 2   A    In the questions that you've asked me where I testified

 3   that I lied, yes, sir I have lied.

 4   Q    Did I miss one?

 5   A    Pardon me?

 6   Q    Did I miss a lie?

 7   A    I don't know.

 8   Q    There's more out there?

 9   A    You might have.

10   Q    You have become, and this is the question I started

11   with, by nature of how you have cheated and deceived people,

12   a very good liar, yes or no?

13   A    By being associated with organized crime you become a

14   good liar.  Yes.

15   Q    Well, you haven't only been associated with organized

16   crime, you've been associated with the Federal Bureau of

17   Investigation, right, sir?

18   A    Yes.

19   Q    And you've also had to learn to be a very good liar when

20   you talked to the FBI because, as you've told this jury, you

21   have repeatedly lied them as well, right, sir?

22   A    Yes.

23   Q    I mean those guys are human lie detectors, right?

24   A    I lied to them --

25   Q    I mean you gotta to be a good liar to fool an FBI agent,
```

1    right?

2    A    I've lied to them.

3    Q    You have to be good liar to fool an FBI agent, correct,

4    sir?

5    A    I testified that I lied to the FBI.

6    Q    My question is different.  You've got to be a good liar.

7    You can lie to the FBI and get caught and put in handcuffs

8    immediately.  That's not Lewis Kasman, right?

9    A    I --

10   Q    You get away with it?

11   A    I lied to the FBI.  I got away with it?  I'm facing 65

12   years in jail.

13   Q    Only because you were foolish enough to talk on a tape,

14   not realizing you were admitting to something you've been

15   lying about for six months.

16   A    You're probably right.  However, I'm still facing

17   serious penalties for my lying.

18   Q    All right.  So, for a lot of years and for a lot of

19   months, you were very good at lying to the FBI and then you

20   got caught?

21   A    I lied to the FBI; yes, I did.

22   Q    And your lies -- you've lied under oath, and not under

23   oath, correct?

24   A    Yes.

25   Q    Lied to criminals and lied to honest businessmen, right?

1    A    Yes.

2    Q    Lied to judges and lawyers, FBI agents, prosecutors,

3    right?

4    A    Yes.

5    Q    And that oath back in the Grand Jury back in New York,

6    that oath didn't stop you from lying, right?  I mean, when

7    it's in your interest, you lie, oath or not?

8    A    That's what people associated with organized crime do.

9    We lie.

10   Q    And Lewis Kasman does that, correct, sir?

11   A    Yes.

12   Q    Okay.  Now, you started working with the FBI in around

13   October of 1996 providing them with information, right?

14   A    Yes.

15   Q    But you've told us --

16             THE COURT:  Find a convenient time, unless you --

17             MR. PASANO:  This is a perfect time, Judge.

18             THE COURT:  Let's take 15 minutes and return at

19   11 o'clock.

20        (Jury out at 10:44 a.m.)

21             THE COURT:  We'll be in recess 15 minutes.

22        (Recess at 10:45 a.m.)

23             THE COURT:  Let's find the witness.  And invite the

24   jury when in.

25             MR. PASANO:  May I approach the lectern, your

1    Honor?

2              THE COURT:  Certainly.

3              MR. BIRCH:  Your Honor, Mr. Artuso is not here.  He

4    is still in the restroom, but there is no problem starting

5    without him.

6              THE COURT:  He'll probably beat the rest of them

7    here.

8              MR. BIRCH:  Yes.  He just did.  He is walking in

9    right now.

10        (Pause in Proceedings.)

11        (Jury in at 11:01 a.m.)

12             THE COURT:  Welcome back.  Please be seated.

13             And please continue.

14   BY MR. PASANO:

15   Q    Mr. Kasman, I just have a few additional questions to

16   ask you about.  Did I hear you say that when you and Mr. Kula

17   opened Campagnola, the restaurant, about three years ago or

18   so, that you used Mr. Kula as the front, if you will, because

19   you had a felony conviction?

20   A    Yes.

21   Q    Now, that's not what you told your wife's divorce lawyer

22   under oath at deposition, was it?

23   A    I don't, I don't recall what I told her.

24   Q    Well, would you have any reason to protect yourself and

25   you wife to not say that your father-in-law was the front?

1   A    No, my brother-in-law was the front.

2   Q    Your brother-in-law, I'm sorry.  Adam Kula was the

3   front?

4   A    Adam Kula was the front.

5   Q    But isn't it a fact, sir, that at the deposition

6   January 8th, 2008 -- for counsel.  It's Page 60 -- under

7   oath, the following questions were asked and the following

8   answers where given:

9           And what was your position in Campagnola?

10          Answer:  I had no position.

11          Question:  Were you an officer director?

12          No.

13          Manager?

14          Eileen was.

15          Eileen is your wife, correct?

16  A    Correct.

17  Q    Investor?

18          Eileen was.

19          When was Campagnola opened?

20          About two or three years ago.

21          So Eileen, how was she involved?

22          She was the front.  She was the front.  Couldn't

23  put the license in my name.  I'm a felon.

24  A    Correct.

25  Q    So you tell the jury your brother-in-law is the front,

```
 1    but in the deposition under oath to your wife's lawyer,

 2    you're telling her your wife was the front?

 3    A    No, you're taking that out of context.  Adam was the

 4    front for the liquor license.  Eileen -- Part of the funding

 5    that I put in was coming from Eileen.  So maybe that's just

 6    requires a different explanation.  So Adam was the front for

 7    the licensing procedure.  I had -- was putting up money.  The

 8    money couldn't come from me because if the licensing board

 9    saw the money coming from me, it's the same thing as applying

10    for a license.

11    Q    Under oath at the deposition in January of 2008, when

12    you told your wife's lawyer that your wife was the front

13    because you were a felon, that was a lie?

14    A    It wasn't a lie.  Adam was the front and some of the

15    funding to put our percentage was coming from my wife.

16    Q    Whoever was the front, it was a fraud on the City of

17    Boca, right?

18    A    Yes.

19    Q    Did you tell the FBI that?

20    A    Afterwards, yes.

21    Q    Did you tell the FBI about cheating Stephen Helfner

22    (phonetic), the guy that did all of this work to open up

23    Campagnola, out of money?

24    A    No.

25    Q    The interior decorator?
```

1    A    No.

2    Q    I mean you got him to put not only stuff in the

3    restaurant, but stuff in your home and you cheated him out of

4    money.  Did you tell the FBI that?

5    A    No.

6    Q    How about Tom Krakus (phonetic), the broker who was

7    running around trying to help you find restaurants, you

8    bounced a check on him.  Did you tell the FBI that?

9    A    He got paid though.

10    Q    Did you tell the FBI you bounced a check?

11    A    No.

12    Q    You know it's a crime to write a check on insufficient

13    funds, right?

14    A    Yes.

15    Q    Did you tell the ladies and gentlemen earlier that you

16    gave your wife a check, told her not to cash it, and so you

17    didn't know that it bounced?  Was that your testimony?

18    A    I told her not to deposit the check, and she deposited

19    it.

20    Q    You wrote a check with insufficient, knew it was

21    insufficient funds --

22          MR. McCORMICK:  Objection, asked and answered.

23          THE WITNESS:  At the time --

24          THE COURT:  Overruled.

25

BY MR. PASANO:

Q    Knew it was insufficient funds, it was your wife's fault?

A    At the time I wrote the check, I told her do not deposit the check.

Q    Did you tell the FBI that you bounced a check on your wife?

A    No.

Q    How about Warren Daniel (phonetic).  Now here's a guy who you told, give me $100,000 and you can be one of the investors in Campagnola.  You took his money, never paid it back.  Tell the FBI about that?

A    That's not what happened.

Q    Did you take a hundred thousand dollars from Warren Daniel?

A    Would you like me to tell you the story?

Q    Let me break it down.  Did you take $100,000 from Warren Daniel?

A    The initial $100,000 was to buy property.  When we weren't property he said to me, take my end of the 100,000 put it into the restaurant.  When the restaurant was going under, I said to him, I says, Warren, you know what I'm going to do because you put up this money with no promissory note, no nothing.  I then signed a promissory note to him personally and I reduced the debt to $66,000 and I didn't pay

1    any further because I had no proceeds to pay it from.  So

2    that's what happened.

3    Q    That $12,000 a month the FBI is giving you, that

4    wouldn't have been a good source to pay back Mr. Daniel,

5    right?

6    A    It wasn't enough.  Correct.

7    Q    You also have told us about taking that $80,000 from

8    Harvey Shear?

9    A    Right.

10   Q    10,000 of which you say you paid back, right?

11   A    Correct.

12   Q    Were you telling the ladies and gentlemen it's okay to

13   cheat a guy if another mobster is already planning to cheat

14   the guy?  Is that what you were trying to tell us?

15   A    No.

16   Q    I mean it wasn't okay to take Harvey Shear's money?

17   A    No.

18   Q    You answered Mr. Birch that over the years you laundered

19   a lot of money, millions for John Gotti Senior, right?

20   A    Yes.

21   Q    In fact, it was about $11 million or so, total, correct?

22   That's what you told the FBI?

23   A    It was millions and millions and millions of dollars.

24   Q    11 million, give or take?

25   A    Correct.

1    Q    And you talked about how you ended up paying for John

2    Gotti Senior's funeral because somebody else reneged on an

3    agreement to pay for it?

4    A    It's a little bit more involved than that, but that's

5    what happened.

6    Q    The reason it was more involved than that was at the

7    time John Gotti died, you only had $800,000 to give Gotti's

8    wife, Victoria, and the family was saying, where's the rest

9    of the money, Mr. Kasman?  You stole it.  And that's why you

10   ended up having to pay for the funeral because you'd stolen

11   millions from the Gottis?

12   A    That's wrong.  That's incorrect.

13   Q    You claim at some point that you had a conversation with

14   Vincent Artuso where you say Vincent Artuso said, I've got a

15   hundred thousand dollars for you, give me a check.  You're

16   saying that happened?

17   A    That happened.

18   Q    And you're saying that you're talking to the FBI and

19   taping people during this whole period, right?

20   A    Right.

21            MR. McCORMICK:  Mischaracterizing the testimony.

22   BY MR. PASANO:

23   Q    No.  In or around July of '06, you say you have this

24   conversation and in that time period you're already -- you've

25   been taping people, right?

1  A    Correct.

2  Q    Okay.  And you're telling the FBI about these

3  conversations, right?

4  A    Correct.

5  Q    What you're asking these ladies and gentlemen to believe

6  is that the FBI, being told that this guy Vincent Artuso

7  wants to give you a hundred thousand dollars for a check,

8  didn't tell you, write him the check, we'll be outside, we'll

9  arrest him when he comes out?

10        That conversation never happened?

11  A    No.

12  Q    You just said no?

13  A    I told Mr. Artuso I wasn't writing him a check.

14  Q    No.  Okay.

15        MR. PASANO:  No other questions, your Honor.  Thank

16  you.

17        THE COURT:  Further cross examination.

18        MR. MARKUS:  Good morning, ladies and gentlemen.

19  Good morning, your Honor.

20                    CROSS-EXAMINATION

21  BY MR. MARKUS:

22  Q    Mr. Kasman, my name is David Markus and I represent Greg

23  Orr.

24  A    Okay.

25  Q    I have some questions for you.  We've heard a lot about

```
 1    this $12,000 a month you've been getting paid by the FBI?

 2    A    Yes.

 3    Q    That was in exchange for your services, correct?

 4    A    Yes.

 5    Q    I mean, so that you could help the FBI agents?

 6    A    Yes.

 7    Q    And to be honest with them, we've heard, and not to

 8    commit crimes, correct?

 9    A    Yes.

10    Q    But the 12,000 wasn't enough for you, right?  You

11    committed crimes and lied during that period, correct?

12    A    Yes.

13    Q    How much would they have had to pay you not to lie and

14    commit crimes, would 20,000 have been enough?

15    A    I don't know.

16    Q    25,000?

17    A    I really couldn't tell.

18    Q    50,000, if they paid a you a month, would that have kept

19    you from lying and committing crimes?

20    A    I don't know.

21    Q    I mean, the fact of the matter is they could have paid

22    you a whole lot of money and that's what was in you, that's

23    what kind of person you are, right?

24    A    That's organized crime.  You're right.

25    Q    Right.  That's what kind of person you are, Mr. Kasman.
```

1    They could have paid you --

2    A    No, that's how I was brought up.  That's how I was

3    raised, being associated with mobsters.

4    Q    And it was part of you?

5    A    It became part of me.  You're absolutely right.

6    Q    Let me show you -- you've reviewed with prosecutors the

7    tapes you've made in this case, right?

8    A    Yes.

9    Q    There's 98 CDs, correct?

10   A    I don't know how many CDs.

11   Q    Okay.  Lots of CDs where you made recordings, correct?

12   A    Yes.

13   Q    And on each one of these there could be lots of phone

14   calls and tape-recordings, correct?

15   A    Yes.

16   Q    You were able to get into people's homes and tape them,

17   yes?

18   A    Yes.

19   Q    Into the jail with the recorder and tape them, right?

20   A    Yes.

21   Q    We heard you walking on the beach with a recorder; we

22   heard those waves in the background, right?

23   A    Yes.

24   Q    You recorded lots of people in lots of different places?

25   A    Yes.

1   Q    And we've heard about people you haven't taped.  You

2   haven't taped Greg Orr, correct?

3   A    No.

4   Q    There is not one conversation in all of these 98 CDs and

5   hundreds of phone calls and thousand of hours of

6   tape-recordings with Greg Orr?

7   A    None.

8   Q    Okay.  So I guess where we're at is, we just have to

9   take your word for it, right?

10  A    Yes.

11  Q    Let's talk about the Wallace property for a second.  Do

12  you remember that testimony?

13  A    The Wallace property?

14  Q    Right.  1215 Wallace.  Do you remember talking about

15  that?

16  A    (Witness shaking head.)

17  Q    You do not remember?

18  A    Do you have a document?

19  Q    I'm asking, do you remember discussing --

20  A    I may not know -- what town is it located in?

21  Q    The property that you say you discussed with Greg Orr,

22  the ramshackled houses next to them.

23  A    The building where the telemarketing magazine place was?

24  Q    Yes.

25  "A    In Delray Beach.

```
1   Q    You remember talking about that?

2   A    Yes.

3   Q    Let's clear some things up for the jury.  That had

4   nothing to do with ADT, correct?

5   A    To my knowledge, it didn't, no.

6   Q    Okay.  And I think what you told this jury about your

7   restaurant was that you were the -- one of the true owners of

8   the restaurant, correct?

9   A    Myself and my brother-in-law.  Yes.

10  Q    I'm asking about you though.  You were one of the true

11  owners?

12  A    Yes.

13  Q    And you weren't concerned about having a secret

14  ownership in the restaurant, I mean you did it?  You used a

15  front person, correct?

16  A    I don't understand your question.

17  Q    Okay.  When you -- when you were testifying about the

18  Wallace properties, the properties in Delray Beach --

19  A    Right.

20  Q    -- you claim to this jury that you told Greg, listen, I

21  don't want to be -- I don't want to have a secret ownership

22  interest because they might find me out, correct?

23  A    Correct.

24  Q    But you were concerned about that with the restaurant

25  and the liquor license, correct?
```

```
 1   A    It's much easier to be undisclosed with a restaurant and

 2   liquor license than it would be for the amount of financing

 3   and other things that Greg was looking for, it would have

 4   been found out much easily -- much easier than just having a

 5   liquor license.

 6   Q    I'm going to mark Greg Orr Exhibit 34.  I'm going to

 7   show you what's been marked Greg Orr Exhibit No. 34.  I mean,

 8   certainly on the 1215 Wallace property nothing was hidden

 9   about Greg Orr or John Artuso, correct?

10   A    Correct.

11             MR. McCORMICK:  Objection.  This is not in

12   evidence, your Honor.

13             THE COURT:  Well, he hasn't -- so far, the

14   objection is overruled.

15             MR. MARKUS:  Well, I'll move it in.  Do you have

16   any objection?  I move Greg Orr Exhibit 34.

17             MR. McCORMICK:  On relevancy, your Honor.

18             THE COURT:  Could I see it.

19             MR. MARKUS:  Sure, Judge.

20             THE COURT:  Relevancy objection is overruled.  34

21   is admitted.

22       (Received in evidence Defendant Gregory Orr Exhibit(s)

23   34.)

24   BY MR. MARKUS:

25   Q    Okay.  Let me just put this on the screen then so we can
```

```
 1   all see it.  This is -- I'm going to show you the SunBiz
 2   document for 1214 Wallace LLC.  You see that at the top of
 3   the page there?
 4   A    Yes.
 5   Q    Okay.  Now, whose names, who do you see as the
 6   registered agent about halfway down the page?
 7   A    Greg Orr.
 8   Q    Okay.  Certainly his interest wasn't hidden, right?  You
 9   just go on the computer and print this document up?
10   A    Correct.  But going forward on refinancing, counselor,
11   that's when they needed to dispose of John Artuso's name on
12   there because it would have -- if it would have come up as an
13   associate or if he had any criminal background which I didn't
14   know, that's how we got into that conversation further on.
15   Q    Mr. Kasman, my question to you is very simple.  Greg Orr
16   and John Artuso are on this document for everyone to see,
17   correct?
18   A    On this document, yes, both their names are there.
19   Q    Okay.  Now, you claimed you met with a lawyer with Greg
20   Orr, correct?
21   A    Yes.
22   Q    All right.  That was an office in Miami I think you
23   said?
24   A    I believe so.  Yes.
25   Q    Okay.  It wasn't in New York, right?
```

95

```
 1   A    No.

 2   Q    It wasn't in Fort Lauderdale?

 3   A    No.

 4   Q    It was in Miami?

 5   A    (Witness nodding head.)

 6   Q    Did you tell the FBI about this meeting?

 7   A    Not at the time I had the meeting, but afterwards, yes.

 8   Q    And I'm sure you told them the name of the lawyer?

 9   A    I don't remember the name of the lawyer.

10   Q    I'm sure you got a business card --

11   A    No.

12   Q    So you could give the --

13   A    -- I did not take a business card and I don't remember

14   the name of the lawyer.

15   Q    You got an address?

16   A    I don't even know the address.

17   Q    I mean, you got something, right?

18   A    I remember a little bit what the office looked like and

19   the entranceway to the building.  I don't remember what the

20   man looks like.  Or, or his name or -- and I did not take a

21   business card.

22   Q    Okay.

23   A    I know he charged Greg $500 for us to go see him though.

24   That I know.

25   Q    The prosecutor showed you -- so it would be reflected in
```

```
 1    his time records, right?

 2    A    I believe so.

 3    Q    Okay.

 4    A    I mean I don't know if he kept time records.

 5    Q    Okay.  It certainly was a nice office?

 6    A    Well appointed office, yes.

 7    Q    And a lawyer who looked like he knew what he was doing?

 8    A    I don't know what -- how should a lawyer look?

 9    Q    I don't know.  I guess, not like me.

10    A    Many lawyers look good, and they don't know what they're

11    doing.

12    Q    The prosecutor showed you, did he not, in preparing your

13    testimony, a picture of an office?

14    A    Yes.

15    Q    Okay.  Let me show you what I'm going to mark as Greg

16    Orr 35.  Is this the picture he showed you, sir?

17    A    That who showed me?

18    Q    The prosecutor or an agent, somebody sitting at that

19    table over there?

20    A    Yes.

21    Q    Okay.  Is that the office?

22    A    Well, it's the -- I believe that's the entranceway to

23    the office, yes.

24            MR. MARKUS:  I move in Greg Orr exhibit 35, Judge.

25            MR. McCORMICK:  No objection.
```

```
 1              THE COURT:  35 is admitted.

 2         (Received in evidence Defendant Gregory Orr Exhibit(s)

 3    35.)

 4    BY MR. MARKUS:

 5    Q    Are you aware that this is Martin Genauer' office?

 6    A    I don't know who Martin Genauer is.

 7    Q    Did the prosecutor use that name with you?

 8    A    Never.

 9    Q    By the way, you've taped lawyers before, have you not?

10    A    Yes.

11    Q    On those 98 CDs there's conversations with lawyers?

12    A    Yes.

13    Q    Your lawyers?

14    A    My lawyers?

15    Q    Didn't you tape your lawyers on some of those calls?

16    Did you ever tape a lawyer in a bathroom in New York?

17    A    I don't know who you're referring it to; could you be

18    more specific?

19    Q    Did you ever tape any of your lawyers, if you know?

20    A    Lawyers that worked for me?

21    Q    Yes.

22    A    That were on retainer by me?

23    Q    Yes.

24    A    Not that I can recall.

25    Q    But you did tape lawyers, just not that worked for you?
```

```
 1    A    Yes.

 2    Q    This supposed meeting that you say happened with Greg

 3    Orr and a lawyer in Miami, you didn't tape that one?

 4    A    No.

 5    Q    So again, we'll just have to take your word for it?

 6    A    What year was it?

 7    Q    I don't know.  You tell me.

 8    A    Well, I was taping in '05.

 9    Q    What year did you go see the lawyer?

10    A    In the '04s.

11    Q    Oh, now, you say you went to the lawyer in '04.  Just

12    happens before you started taping, right?

13    A    I wasn't taping in '04.

14    Q    Right.  And so, just convenient that now the date has

15    gone from '05 to '04, from direct to cross-examination?

16    A    I never said that.  I said I was recording from '05

17    through '07.

18    Q    By the way, speaking of recordings, you recorded

19    Victoria Gotti, John Gotti's wife, right?

20    A    Yes.

21    Q    You went into her hospital room and recorded her, did

22    you not, Mr. Kasman?

23    A    That's incorrect.

24    Q    You recorded her right after she had a stroke?

25    A    I did not record her in her hospital room.  You are
```

1  misrepresenting to the jury.

2           MR. McCORMICK:  Objections on relevancy, your

3  Honor.

4           THE COURT:  Overruled.

5  BY MR. MARKUS:

6  Q    Did you record her right after she had a stroke,

7  Mr. Kasman?

8  A    She had a minor stroke, and I saw her three to four

9  weeks later and it was not in the hospital room.  It was in

10 the residence with her daughter, where she wanted me to give

11 her some money.  That's what the recording was.  It was not

12 in a hospital room.

13 Q    So it was a minor stroke and it was three to four weeks

14 later so --

15 A    Yes, at her request.  At her request, she asked to see

16 me.

17 Q    Okay.  So you decided to tape her?

18 A    I was giving her money at her request, three to four

19 weeks after she had this minor stroke, and it was not in a

20 hospital room.  Correct.

21 Q    Mr. Kasman, you had no limit on who you would record,

22 where you would record them, and how you would record them,

23 correct?

24 A    Correct.

25 Q    You recorded everybody you wanted to record?

1    A    Who I wanted to record?

2    Q    That's right.  I mean up until -- John Gotti's wife, you

3    decided to record.

4    A    I wouldn't say it was who I wanted to record.  It was

5    who I was directed to record.  I didn't wake up in the

6    morning and decide who to record.

7    Q    Perfect.  Thank you.

8         By the way, I think Mr. Birch asked you how many

9    times you spoke to the agents and prosecutors here in

10   Florida, correct?

11   A    Correct.

12   Q    I mean you've spoken to lots of agents and prosecutors

13   to prepare for this trial and your upcoming trial in Tampa,

14   right?

15   A    I wouldn't say lots, but several.

16   Q    In fact, there are agents and prosecutors who have been

17   here in the court to watch you, right?

18   A    I don't know who all the agents are.

19   Q    Do you recognize some of the agents from New York and

20   from Tampa who have been present in court?

21   A    I don't know any agents from Tampa, no.

22   Q    What about New York?

23   A    New York, I know agents from New York, yes.

24   Q    Have they been here during your testimony both last week

25   and this week?

1    A    Yes.

2    Q    In fact, they're sitting here today?

3    A    Yes.

4         MR. MARKUS:  I'm not sure if the marital agreement

5    was entered into evidence.  I'm going to mark this as Greg

6    Orr 36.

7    BY MR. MARKUS:

8    Q    Sir, let me show you Greg Orr 36.  This is the marital

9    agreement that you entered into with your wife, correct?

10   A    Yes.

11   Q    Okay.

12        MR. MARKUS:  Judge, we move in Greg Orr 36.

13        MR. McCORMICK:  Your Honor, relevancy.  It's

14   irrelevant.

15        THE COURT:  Sustained, unless you show some

16   relevance to it.

17   BY MR. MARKUS:

18   Q    Okay.  Part of the agreement, sir, was it not, was to

19   dispose of the marital home?

20   A    Yes.

21   Q    Okay.  And I think you explained in the agreement itself

22   that there was problems with the current real estate market,

23   right?

24   A    Yes.

25   Q    Okay.  And because of the problems with the current real

1    estate market, you sold the house for less than what it was

2    worth, did you not?

3    A    No, the house was appraised at approximately 1.5 and I

4    believe we sold it for approximately 1 -- close to 1.8.  Or

5    1.750.

6    Q    But you thought you could get more for it.  You put in

7    the agreement that due to the real estate market and the

8    speed for which you had to sell it, you sold it for 1.8?

9    A    Correct.

10   Q    Instead of for much higher?

11   A    There was no much higher.  The market was faltering.

12   Q    When the market is bad, you sell for what you can get,

13   right?

14   A    When the market is bad, you have to sell, if you need to

15   sell.

16   Q    Right.  Now, you spoke about snippets of conversations

17   with Mr. Pasano.  Do you remember that?

18   A    Yes.

19   Q    And you said it's not fair to use snippets of

20   conversation, yes?

21   A    Yes.

22   Q    I mean it's better to listen to the whole transcript,

23   right?

24   A    I suppose.  Yes.

25   Q    That's what you said?

 1    A    Yes.

 2    Q    Right?

 3    A    Yes.

 4    Q    I mean, the conversations that the prosecutor played for

 5    you, those were just snippets of different conversations,

 6    correct?

 7    A    Yes.

 8    Q    And, in fact, on this particular transcript that we've

 9    heard from the prosecutor, this was a conversation with

10    Joseph Corozzo, correct?

11         MR. McCORMICK:  Which transcript are you referring

12    to?

13         MR. MARKUS:  Oh, this is the one that has four

14    different dates on it, Mr. McCormick.

15         MR. PASANO:  46.1.

16         MR. MARKUS:  46.1.

17    BY MR. MARKUS:

18    Q    Right.

19    A    Yes.

20    Q    This transcript is snippets of four different

21    recordings, correct?

22    A    Well, I don't know how it's broken down.  You know, I

23    don't know how it's transcribed.  I'm not privy to how it's

24    broken down.

25    Q    You've listed to this with the prosecutor, have you not?

1    A    Yes.

2    Q    And when you listen to it, they made four different

3    recordings.  See at the top there where it says date of

4    recording 10/11/'05, 10/12/'05, 10/13/'05, and 10/14/'05?

5    A    Yes, I see the different dates.

6    Q    They took snippets from four different recordings and

7    made it sound like one conversation when they played it for

8    us, correct?

9    A    I don't know that that's correct.

10    Q    Well, you listened to it in court, correct?

11    A    I can only testify to what the recordings are played and

12    what's there.

13    Q    Okay.  Let me show you 46.4, which is a conversation

14    that you had with Joseph Corozzo.  Correct?

15    A    There are other participants.

16    Q    Right.  With Jackie D'Amico and Tony, last name unknown

17    well, correct?

18    A    Correct.

19    Q    We know exactly what was said because it was recorded,

20    yes?

21    A    Yes.

22    Q    I mean if it wasn't recorded, we wouldn't know exactly

23    what was said?

24    A    Apparently.

25    Q    Well, not apparently.  I mean that's why you record

1    things, correct?

2    A    Whatever was recorded is recorded.

3    Q    One of the reasons that you recorded things is so that

4    there would be no question later about what was said?

5    A    The transcripts speak for themselves.

6    Q    But my question to you is, one of the reasons you record

7    certain things is so there is no question when you come in

8    court and tell a jury what was said?

9    A    Correct.

10   Q    We can corroborate it with a transcript?

11   A    Correct.

12   Q    Okay.  And in this particular transcript, Mr. Kasman, on

13   the very last page, Mr. Pasano showed you this as well, what

14   you said here is:

15          But this Tyco thing is huge and he's got about four

16   deals pending.

17          That's the words you used.  Right?

18   A    Yes.

19   Q    Now, this tape was made in July of '06, correct?

20   A    That's what it says.  Yes.

21   Q    After the FBI had already visited Mr. Horton, I think we

22   heard, correct?

23   A    Who is Mr. Horton?

24   Q    You don't know who Mr. Horton is, do you?

25   A    I never met -- no.

1   Q    Okay.  Let me show you -- I think we heard about your

2   wedding picture, correct?

3   A    Yes.

4   Q    Do you remember what your wife was wearing on her

5   wedding day?  It was a white dress, was it not?

6   A    On her -- her wedding day?

7   Q    Yes.  That's right.

8           MR. McCORMICK:  Relevancy, your Honor.  Objection.

9           THE COURT:  Overruled.

10  BY MR. MARKUS:

11  Q    I mean that's what brides wear on their wedding day?

12  A    White dresses.  Yeah.

13  Q    And that's what your wife wore on her wedding day,

14  correct?

15  A    I would think so, yeah.

16  Q    It turns out that that picture that the Government put

17  in wasn't really your wedding, was it?  This was someone

18  else's wedding, wasn't it, Mr. Kasman?

19  A    No, I believe that was my wedding.

20  Q    Which one is your wife?

21  A    My wife is standing next to Mike Coiro.

22  Q    The second one on the top here?

23  A    Yes.

24  Q    She's not wearing her white wedding dress, is she?

25  A    No, she's not.

```
1    Q    That's because you can't even tell the truth about your

2    own wedding picture, can you, Mr. Kasman?

3    A    I believe that was my wedding picture.  My wife could

4    have changed.

5    Q    Oh, she changed out of her wedding dress?

6    A    Well, it's possible.  She had several dresses.

7    Q    By the way, Mr. Kasman, you have been speaking to

8    reporters about your testimony, have you not?

9    A    No.

10   Q    You haven't called one reporter since the time you've

11   testified?

12   A    One reporter.  Nothing to do with this though.  It had

13   to do with my matrimonial matter.

14   Q    So you spoke to a reporter during your testimony?

15   A    Through my lawyer, yes.

16   Q    And, in fact, you're planning on writing a book after

17   all these trials are over, are you not, Mr. Kasman?

18   A    I'm thinking of it.  I'm not sure.

19   Q    You want to profit from your testimony?

20   A    I haven't made that decision yet.

21   Q    But certainly you've been speaking to reporters, have

22   you not?

23   A    One reporter regarding my divorce through my attorney.

24   Q    Okay.  Let's talk about for a second -- I want to go

25   through with you -- I'm going to put on the screen -- okay.
```

```
1    I'm going to go through with you -- sorry for the header --

2    crimes you've committed.  I think we talked about some of the

3    them, but I want to summarize for the jury.  You've committed

4    perjury, correct?

5    A    Yes.

6    Q    A number of times?

7              MR. McCORMICK:  Objection.  This is duplicative of

8    other cross-examination.

9              THE COURT:  All right.  Overruled.  I mean lawyers

10   are entitled to do some of it.  Please don't -- let's not do

11   the same thing.

12             MR. MARKUS:  Very quick, your Honor.

13   BY MR. MARKUS:

14   Q    You've committed perjury a number of times?

15   A    Yes.

16   Q    Obstruction of justice?

17   A    Yes.

18   Q    A number of times?

19   A    Yes.

20   Q    Bribing of public officials?

21   A    Yes.

22   Q    Well you hesitated?

23   A    Because it was indirect.  But, yes, bribing of public

24   officials.

25   Q    You don't like to admit to that one, do you?
```

1    A    No, I admit to that one.  I'd admit to whatever I did.

2    Q    I just wondered because you hesitated?

3    A    No.  No problem.

4    Q    Assault?

5    A    Yes.

6    Q    Number of times?  Right?

7    A    Two times.

8    Q    Two times.

9         By the way, you decided to pay somebody to do the

10   assault for you?

11   A    Through commissary.  When you're in jail, it was

12   commissary.  Tuna fish and stamps.

13   Q    You couldn't engage the person in a fight yourself, you

14   paid somebody to go get in a fight for you?

15   A    Correct.

16   Q    Money laundering?

17   A    Yes.

18   Q    Lots of that?

19   A    Lots of that.

20   Q    Okay.  Extortion?

21   A    Yes.

22   Q    Mail fraud?

23   A    Yes.

24   Q    I've put wife fraud at the beginning, it's really wire

25   fraud, right?

```
 1    A     Yes.  Wire fraud.

 2    Q     Freudian slip.

 3    A     Yeah.

 4    Q     And RICO?

 5    A     Yes.

 6    Q     Tax evasion?

 7    A     Yes.

 8    Q     False statements?

 9    A     Yes.

10    Q     I started writing others, like overbilling that we heard

11    about on Friday, correct?

12    A     Yes, I engaged in that with my father-in-law.

13    Q     Bouncing checks we heard about today?

14    A     Yes.

15    Q     Forgery of your wife's signature?

16    A     With her permission, yes.

17    Q     You forged your wife's signature?

18    A     With her permission, yes.

19    Q     And I'm sure there's other crimes that I'm forgetting

20    about here, correct?  Is that enough?

21    A     That's enough.

22    Q     Okay.  How many days have you spent in jail for all of

23    these crimes, Mr. Kasman?

24    A     I was sentenced to six months.  I served six months for

25    perjury.  And now I'm waiting to be sentenced.  I'm facing a
```

1  lot of jail time for my crimes.

2  Q    Okay.  And you're hoping that's going to get reduced,

3  correct?

4  A    Well, I'm hoping my cooperation will help.  But there's

5  no guarantees.

6  Q    Okay.  I want to just end with a little test I'm going

7  to give you and I want to see how you do on this test,

8  Mr. Kasman?

9          MR. McCORMICK:  Objection to this line of

10  questioning, a test.

11  BY MR. MARKUS:

12  Q    Okay.  I'll just ask some questions then, Mr. Kasman.

13  Let me ask you a question.  Are you an honest man or are you

14  a liar?

15  A    I am a liar.

16  Q    Okay.  Let's circle that then.

17          Are you a law-abiding person or are you a criminal?

18  A    I'm a criminal.

19  Q    Are you a moral person or immoral person?

20          MR. McCORMICK:  Objection to relevancy, your Honor.

21          THE COURT:  Overruled.

22          THE WITNESS:  Based on my crimes, I guess I would

23  be an immoral person.

24  BY MR. MARKUS:

25  Q    You're passing the test so far.  Are you trustworthy or

1    untrustworthy?

2    A    Based on these crimes, I suppose I'm untrustworthy.

3    Q    And are you a good man or a bad man, Mr. Kasman?

4    A    I'm a bad man.

5              MR. MARKUS:  I have nothing further, your Honor.

6              THE COURT:  Further cross-examination.

7              MR. ENTIN:  Just very briefly, Judge.

8                        CROSS-EXAMINATION

9    BY MR. ENTIN:

10   Q    Mr. Kasman, my name is Alvin Entin.  I represent Philip

11   Forgione.  You don't know Philip Forgione?

12   A    No.

13   Q    Never met him?

14   A    Never met him.

15   Q    Never had anything to do with him?

16   A    Never had anything to do with him.

17   Q    Just want to ask you a couple of other questions.

18            In your initial cooperation agreement which was the

19   2005 cooperation agreement, didn't you agree at that time to

20   file amended tax returns and pay taxes?

21   A    Yes.

22   Q    And isn't it a fact that you did absolutely nothing on

23   that until 2007 when you signed another agreement?

24   A    Yes.

25   Q    And therefore, nobody from 2005 to 2007 when you were

1    cooperating with the Government, tried to make you comply

2    with that provision of your plea agreement, correct?

3    A    I believe my counsel who represented me with my

4    cooperation agreements had some conversation with the

5    Government.  I don't know what transpired.

6    Q    During that entire period of time when you moved to

7    Florida, you did not engage an accountant and you did not

8    prepare amended returns; isn't that correct?

9    A    During that time period, no.

10   Q    Since you signed the 2007 agreement, have you filed the

11   amended returns?

12   A    No.

13   Q    And even if you were to file the amended returns, would

14   it be fair to say that you do not have the funds with which

15   to pay the taxes?

16   A    I do not.

17   Q    So, therefore, even your agreement in your cooperation

18   agreement that you're going to file the amended returns and

19   pay the taxes that you owe the Government is not a kind of a

20   commitment that you are capable of keeping; isn't that

21   correct?

22   A    It's a commitment that I will keep because you'll make a

23   payment arrangement with them.

24   Q    Okay.  How much do you assume you owe them in taxes?

25   A    I have no idea.

1    Q    Would it be in the millions?

2    A    I have no idea.

3    Q    Do you know how many -- strike that.

4         You've also told us that you've told the truth in

5    your testimony here today and yesterday; is that correct?

6    A    That's correct.

7    Q    Or Friday.

8         And you understand that telling the truth is

9    telling the whole truth and not just a shade or a portion of

10   it, correct?

11   A    Correct.

12   Q    Isn't it a fact that you didn't tell the whole truth in

13   your testimony the last two days that you testified?

14   A    I told the truth.

15   Q    Do you remember telling Mr. McCormick on Friday and

16   Mr. Pasano today that when you lied in front of the Grand

17   Jury back in 1992 or '3, you lied because you were there to

18   protect John Gotti, do you remember that?  And that's why you

19   lied and committed perjury?

20   A    Correct.

21   Q    Well, that's not the whole truth is it, sir?

22   A    That's the truth as I know it to be.

23   Q    Well, you had received immunity from prosecution,

24   correct?

25   A    Correct.

1    Q    And your choice in front of the Grand Jury was not just

2    whether or not you would lie or tell the truth, wasn't there

3    a third choice, sir?

4    A    Lie, tell the truth, or you have contempt.

5    Q    And what would happen if you -- by the way, contempt

6    meant you just didn't testify, correct?

7    A    Correct.

8    Q    If you just didn't testify, would that have also

9    protected Mr. Gotti?  If you said nothing about him; isn't

10   that correct?

11   A    I don't know.  I don't know how that works.

12   Q    Well -- and if you committed contempt, you would have

13   gone to jail, correct?

14   A    If that's what the judge ordered, yes.

15   Q    So the real reason you lied was not to protect

16   Mr. Gotti, but to protect yourself from going to jail for

17   contempt; isn't that correct?

18   A    That's not correct.  Because at the end of the day, I

19   went to jail anyway.

20   Q    But that's because you didn't expect to get convicted of

21   committing perjury, did you?

22   A    I took a plea, counselor.  I took a plea.

23   Q    At the time that you committed the perjury, you didn't

24   expect to get caught, did you, sir?

25   A    I really don't know.  I don't know what my frame of mind

1    was at that point.

2    Q     You understand that you agreed to tell these folks the

3    truth, and you're sitting here not telling them the truth?

4    A     No, I am telling them the truth.  I lied in the federal

5    grand jury, and I testified to that.

6    Q     But the reason was you didn't want to stay silent

7    because you would have been held in contempt?

8    "A     How do you know what the reason was?  Are you in my

9    head?  The reason was is I had to protect John.

10   Q     And could you have done that by saying nothing and not

11   lying?

12   A     No.

13   Q     Yes or no?

14   A     No, because John directed me to go into that Grand Jury

15   and perjure myself and lie.  Correct.

16   Q     John directed you to go in there and lie?

17   A     Correct.

18   Q     Did Barry Rodderman direct you to lie in your deposition

19   that you took last year in the divorce case?  Yes or no?

20   A     Barry Rodderman --

21   Q     Did Barry Rodderman direct you to lie, yes or no?

22   A     No.

23   Q     And isn't it a fact, sir, when you took that deposition,

24   if you didn't want to tell your wife's lawyer or the judge

25   about receiving money from the FBI, you had the same choice?

1    You could tell the truth, you could commit perjury, or you

2    could take a chance of being held in contempt and going to

3    jail; isn't that correct?

4    A    Incorrect.

5    Q    Not correct?

6    A    Not correct.

7    Q    What would have happened if you refused to answer?

8    A    When I -- when I discovered Barry -- let me --

9    Q    What --

10   A    Let me answer your question.

11           MR. McCORMICK:  Your Honor, the witness should be

12   permitted to answer the question.

13   BY MR. ENTIN:

14   Q    The question is, what would happen if you refused to

15   answer?

16   A    You're asking the questions and answering for me.  Let

17   me answer.

18           MR. McCORMICK:  Your Honor --

19   Q    Answer the question I asked --

20   A    But you're not letting me; you're not allowing me.

21   Q    The question I'm asking you is what would have happened

22   if you hadn't answered the question?

23           MR. McCORMICK:  There's no foundation to ask that

24   question, your Honor.

25           THE COURT:  Overruled.

1    BY MR. ENTIN:

2    Q    What would have happened if you hadn't answered the

3    question?

4    A    When I discovered that Mr. Rodderman represented wise

5    guys, I knew that I could not divulge during that deposition,

6    for putting my wife and children in jeopardy, my relationship

7    with the FBI.  And I didn't know that until after the fact,

8    that Rodderman represented wise guys.

9    Q    You didn't know that he represented wise guys until

10   after?

11   A    When -- at the time I took my deposition, I learned

12   that -- I'm sorry.  Prior to the deposition, I learned that

13   Rodderman was representing wise guys, and I could not say to

14   Rodderman, hey listen, Barry, I'm working with the FBI.

15   Because it would put my family in jeopardy.

16   Q    Could you have said to Rodderman, Mr. Rodderman, I've

17   spent my entire life as a gangster and a member of organized

18   crime, and I don't choose to tell them where I got my money

19   because that might affect my staying out of jail.  Therefore,

20   I want to refuse to answer on Fifth Amendment grounds?  Did

21   you think of that?

22   A    I told him that.

23   Q    And what did he say?

24   A    On certain items we did take the Fifth, and then he said

25   he was going to file for protective order.  And we never did

1    that.

2    Q    So therefore, you went in because he failed to file a

3    protective order and instead of taking the Fifth Amendment or

4    saying nothing, you chose to lie, correct?

5    A    I lied.  Correct.

6         THE COURT:  Mr. Kaiser, do you have questions?

7         MR. KAISER:  No questions, your Honor.

8         THE COURT:  Is there redirect?

9         MR. McCORMICK:  Yes, your Honor.

10                    REDIRECT EXAMINATION

11   BY MR. McCORMICK:

12   Q    Two counsel went over the recording you made with Joseph

13   Corozzo; isn't that right, on October 11, 2005?

14   A    Yes.

15   Q    And in that recording you were asked about your comments

16   you made about Vincent Artuso?

17   A    Yes.

18   Q    And Carlo Vaccarezza, correct?

19   A    Yes.

20   Q    Just to get our timing down here, when these events were

21   taking place, at the time that you met with Vincent Artuso

22   and Carlo Vaccarezza and Greg Orr over there, were you

23   recording for the FBI?

24   A    No.

25   Q    So you recorded sometime after you had these meetings?

1    A    Yes.

2    Q    And at the time that you met with these individuals, as

3    you've told the jury about and as recited in these

4    transcripts at length, did there come a time that you became

5    in disfavor with Vincent Artuso?

6    A    Yes.

7    Q    And why was that?  Could you tell the jury why you

8    became in disfavor?

9    A    He became -- he was becoming -- once I didn't give him

10   the 200,000, once I didn't allow him to invest into the

11   restaurant, once I didn't launder the money for him for

12   $100,000, he started to get nasty and belligerent, and that's

13   how it went from there.  It went downhill.

14   Q    And when that all occurred, was that before you agreed

15   to start -- before you agreed to become a cooperating witness

16   and start recording?

17   A    That's correct.

18   Q    Could you have recorded Vincent Artuso after that, after

19   you got in the outs with him?

20   A    There was -- we had no relationship.  There was no

21   communication.

22   Q    Now, Mr. Pasano, I think at great lengths, talked about

23   the fact that you stole all kinds of money from John Gotti

24   Senior --

25   A    Right.

1    Q    -- while he was in prison and just before he died; is

2    that correct?

3    A    Correct.

4    Q    During the period of time that John Gotti was in prison

5    and when he ultimately died, did you keep records yourself of

6    what your -- of what disbursements you made on behalf of John

7    Gotti Senior?

8    A    I did.

9        (Pause in Proceedings.)

10            MR. McCORMICK:  May I approach the witness, your

11    Honor?

12            THE COURT:  Yes.

13    BY MR. McCORMICK:

14    Q    Let me show you Government's proposed exhibit 43.15.

15    It's a bulk exhibit really.  It contains 16 pages.  And ask

16    you if you can generally identify that exhibit.  It's 43.15.

17    A    Each page individually?

18    Q    Look at the 16 pages individually and tell me whether

19    you can identify that exhibit, what it is, without going into

20    the contents of that exhibit?

21    A    Yes.

22            MR. McCORMICK:  That's 46.15.

23    BY MR. McCORMICK:

24    Q    Let me ask you, when you made disbursements on behalf of

25    John Gotti to either family members or lawyers on his behalf,

1    did you -- when you were able to, did you record those

2    disbursements in 43.15 -- proposed Exhibit 43.15?

3    A    Yes, I did.

4    Q    And kept those records?

5    A    Yes, I did.

6    Q    Why did you keep these records?

7    A    So that I could have somewhat of an accounting of the

8    money that I was disbursing at John's direction or on behalf

9    of John from his prior orders before he left to Marion.

10   Q    And where did you keep these records?

11   A    In my, in my desk in my house.

12   Q    And you gave these records over to the FBI when you

13   began cooperating with them?

14   A    Yes, I did.

15   Q    And are they accurate in terms of the actual

16   disbursements you made on John Gotti Senior's behalf --

17   A    Yes, sir.

18   Q    -- to members of the family?

19   A    Yes.

20   Q    Is that the money that you were referring to Mr. Past --

21   Mr. Pasano was referring to that you used and squandered?

22   A    Yes.

23   Q    Did you use some of the money that John Gotti gave you

24   on your own behalf?

25   A    Yes, his instructions to me for my entire relationship

1   with John Gotti Senior, was that any money I was holding of

2   his, I had the availability to use it at my discretion.

3   Q    And did you use it predominantly for yourself or for the

4   members of the families or the attorneys of John Gotti?

5   A    I used it for members of his family, for myself, for my

6   family, for his attorneys, personal bills, gambling debts,

7   clothing, whatever I was instructed to pay by him I used it

8   for.

9   Q    But with John Gotti in prison, why did you keep these

10  records?  What were you afraid of, if anything?

11  A    Well, what was happening was there was a dispute

12  developing between Richard Gotti Senior, Peter Gotti, and

13  John A. Gotti over money, and it was just a constant dispute

14  who had this and who had that.  So I felt records better

15  be -- records need to be kept.

16          MR. McCORMICK:  Your Honor, at this point I would

17  offer Government proposed exhibit 43.15, the 15 pages.

18          MR. PASANO:  No objection, your Honor.

19          THE COURT:  43.15 is admitted.

20      (Received in evidence Government's Exhibit(s) 43.15.)

21  BY MR. McCORMICK:

22  Q    I'm just going to highlight just a -- let me get this

23  off of here.  I guess this is yours, too.  I'm sorry.

24          I'm not going to publish every one of these pages,

25  however, I'm going to ask that you identify the page that I

1    do put on the ELMO for the jury.  Okay?

2    A    Yes.

3         MR. McCORMICK:  If I can just have one second, your

4    Honor.

5       (Pause in Proceedings.)

6    BY MR. McCORMICK:

7    Q    Okay.  That is a portion of the Government Exhibit

8    43.15.  Is that correct, Mr. Kasman?

9    A    Yes.

10   Q    Okay.  Can you explain -- it's on a piece of paper that

11   has a logo, Copymatic Corporation.

12   A    Uh-huh.

13   Q    Is that your corporation?

14   A    Yes, that was a company that I was partners in in the

15   garment center.

16   Q    Now, could you explain the jotting, what you jotted on

17   there and the numbers on that particular exhibit, in terms of

18   hopefully explaining the other exhibits by an example?

19   A    This is money that was given to an attorney in New York,

20   different increments, 5,000, 5,000 to the other side

21   sometimes 15,000.  Where there's check numbers denoted, those

22   are check numbers of which I got the cash back and wrote the

23   check on behalf of John Gotti.

24   Q    Now, what attorney did this particular exhibit refer to?

25   A    This attorney was Gerald Shargel.

1    Q    Who did Gerald Shargel represent?

2    A    Shargel represented Gravano.  He represented John Gotti.

3    He represented myself.  He represented John A. Gotti.  He

4    represented numerous ranking members of the Gambino organized

5    crime family.

6    Q    And the date at the upper left corner appears to be

7    May 7 of 1993.  Is that accurate?

8    A    Yes.

9    Q    And when you could, you made that, such entires in these

10   notes and records?

11   A    Yes.

12   Q    And you have similar entries in other parts of the

13   exhibit that we talked about?

14   A    Yes.

15   Q    Now, in terms of the plea agreements you've made with

16   the United States, both plea agreements, as counsel has asked

17   you about, you are going to be required to file truthful and

18   complete income tax returns as part of your plea agreements;

19   is that correct?

20   A    That's correct.

21   Q    And you haven't been sentenced yet on either of those

22   pleas, have you?

23   A    No.

24   Q    And what is your understanding, what is your

25   understanding if you don't comply with that provision of both

1    plea agreements?

2    A    There won't be a plea agreement.

3    Q    Well, what is your understanding in terms of the

4    consequences of it?

5    A    Well, you face substantial jail time, restitution,

6    penalties, and it's a very, very bad situation.  So you have

7    to comply.  You must comply.

8    Q    Now, in terms of the restaurant that you had with Carlo

9    Vaccarezza, did Mr. Vaccarezza ever put any money into the

10   restaurant that you opened with your brother-in-law?

11   A    He used to charge certain things on his credit card and

12   be reimbursed, but he never was an investor or an owner, no.

13   Q    By the way, Carlo Vaccarezza, I think counsel,

14   Mr. Pasano, talked about a letter that was sent to you and --

15   asking you to contact him.  Do you remember that?

16   A    Yes.  I got the letter in '04 from Vaccarezza through my

17   post office box.

18   Q    That's the letter that apparently helps you to remember

19   the timing of when some of these things occurred; is that

20   correct?

21   A    That's correct.

22   Q    Your testimony throughout Friday -- Thursday, Friday,

23   and today, you're using this as a milestone, June of 2004; is

24   that correct?

25   A    Correct.

1    Q    And you're approximating dates for counsel when they

2    cross-examined you, as you did with me?

3    A    Yes.

4    Q    And the only thing -- are you certain of the fact that

5    prior to you becoming a cooperating witness, all of these

6    transactions were at an end?

7    A    Correct.

8    Q    And let me just talk -- let me put this on the ELMO for

9    one minute.

10         Now, in terms of the Carlo Vaccarezza letter or

11   note that you received and I think Mr. Pasano correctly read

12   it as June of 2005 -- or four, excuse me.

13   A    Four.

14   Q    Yes.  Now, that's the first time you got involved with

15   anybody having to do with -- Artuso down here; is that

16   correct?

17   A    That's correct.

18   Q    And Mr. Pasano asked how -- this has nothing to do with

19   Vinnie Artuso, this note from Carlo Vaccarezza, do you recall

20   that?

21   A    Yes.

22   Q    Well, let me ask you this, though.  When Carlo

23   Vaccarezza contacted you, you went to breakfast with him, did

24   you not?

25   A    Yes.

1  Q    And you had a conversation at that time or shortly

2  thereafter, concerning his relationship with Vinnie Artuso,

3  didn't you?

4  A    Yes.

5  Q    And what did Carlo Vaccarezza tell you about his

6  relationship with Vinny Artuso?

7  A    I want you to meat Vinnie, he's the guy down here.  He's

8  a nice guy.  He's --

9         MR. BIRCH:  Objection, hearsay.  Excuse me.

10  Objection, hearsay.

11         THE COURT:  Overruled.

12         THE WITNESS:  He's servicing me down here.  Because

13  Carlo had that falling out with Jackie D'Amico.  And you

14  know, that's when I said to Carlo, Carlo, I moved down here

15  to get away, get away from this.  I said I really -- you

16  know, I don't want to get drawn back into this.  I just want

17  to come down here and be left alone.  And you know, I, I

18  didn't pursue Mr. Artuso.  They -- this Carlo and Vinnie,

19  they orchestrate -- I didn't ask for them.  I -- you know,

20  they sent this letter to me.

21  BY MR. McCORMICK:

22  Q    And when they sent that letter to you, you met with them

23  concerning the restaurant; is that correct -- excuse me.  You

24  met with them concerning the Delray Beach property?

25  A    When I first met with Vinnie?

1    Q    Yes.

2    A    It was an introductory meeting.

3    Q    Okay.  And after that, you ended up at Delray Beach at

4    the Atlantic magazine service?

5    A    Yes.

6    Q    Now, all of that you discussed in tape-recorded

7    conversations with the consigliere of the Gambino crime

8    family?

9    A    The consigliere and the boss.

10   Q    And the boss?

11   A    Yes.

12   Q    Why did you discuss that with them?

13   A    Because Vinnie Artuso knew the rules, and there was --

14   he should not have approached me to go into business with

15   him.  Even if it was a great business deal.  He should have

16   went to the administration.  He should have got permission.

17   My conversations with Joseph Corozzo and with Peter Gotti,

18   the boss of the family, indicate that he did not get such

19   permission.

20          And then once he asked me to launder $100,000, it

21   was time to go and make my feelings known to Peter Gotti.

22   And I did do that.

23   Q    And you raised it also with Joseph Corozzo?

24   A    Yes.

25   Q    In that regard though, you were doing a lot of recording

1    and there is an accusation, for want of a better word, that

2    you were choosing who you were going to record on behalf of

3    the FBI.  Will you explain, is that true or is it not true

4    and if so, explain it?

5    A    It's not true.

6    Q    Explain why it's not true.

7    A    Because you don't -- I didn't get up in the morning and

8    was handed a device and say, okay today, I'm going to go to

9    Publix and record the cashier.  It's -- you are directed, you

10   are controlled and told what to do, where to go.  There are

11   strict rules and regulations.

12   Q    Who selected the subjects of the recording, you or the

13   FBI?

14   A    The FBI.

15   Q    Did you have any choice in terms of who you were going

16   to record and who you weren't going to record?

17   A    Absolutely not.

18   Q    In terms of the conversations that you did have with

19   Joseph Corozzo, much was said about that by Mr. Pasano and I

20   guess Mr. Markus.  Were you under a duty bound pledge to tell

21   Joseph Corozzo the truth while you're participating in an

22   undercover operation on behalf of the FBI?

23   A    Of course not.

24   Q    You distinguish that from talking to a jury, don't you?

25   A    Absolutely.

1    Q    And you distinguish that at this point in your life from

2    talking with the FBI, too?

3    A    Of course.

4        MR. McCORMICK:  Can I just have one second, your

5    Honor?

6        (Pause in Proceedings.)

7        MR. McCORMICK:  I just have one more question.  One

8    area of questions.

9    BY MR. McCORMICK:

10   Q    Mr. Kasman, you've admitted that your whole life has

11   been that of an associate of a very large organized crime

12   family for at least from the mid 1980s until into the 2000s;

13   is that correct?

14   A    Yes.

15   Q    And you explained to the jury that your life during

16   those years was actually a life of lies?

17   A    Yes.

18   Q    And would you tell the jury now, right here as you sit

19   here right now, why should they believe you now?

20   A    Where did it get me?  I, I -- I have no family.  I

21   haven't seen my children in seven months.  I'm not going to

22   say that I didn't have a good time with John.  I did have a

23   good time with John.  But I committed these crimes.  And

24   hopefully, I can put this behind me one day.

25        You know, incarceration is prevalent.  And perhaps

```
 1    I can become a better citizen and a better person down the

 2    road.  But it's -- it was just -- when I do the look back --

 3    none of it was worth it.  None of it was worth it.  Not the

 4    money, not the power, none of it.  It just -- it just was --

 5    like I said, it was -- from my background, yes, it was very,

 6    very wild, for lack of another word.  But to be sitting in

 7    this witness stand today and not seeing my family and not

 8    seeing my children and not doing all of the things that I

 9    would love to do for my children, it's, it's a very sad, it's

10    a very sad day for me.

11    Q    If you lie from the witness stand and it's determined

12    that you lied from the witness stand, where do you have to go

13    from here?

14    A    To jail.

15    Q    Anywhere else?

16    A    More jail.

17            MR. McCORMICK:  That's all I have.

18            THE COURT:  You may step down, sir.

19        (Proceedings were had which are not herein transcribed.)

20

21

22

23

24

25
```

```
1                    I N D E X

2    WITNESS                                           PAGE

3    LEWIS KASMAN, GOVERNMENT WITNESS, PREVIOUSLY SWORN ........9
     DIRECT EXAMINATION (RESUMED) BY MR. McCORMICK ..............9
4    CROSS-EXAMINATION BY MR. BIRCH ..........................10
     CROSS-EXAMINATION BY MR. PASANO .........................37
5    CROSS-EXAMINATION BY MR. MARKUS .........................88
     CROSS-EXAMINATION BY MR. ENTIN .........................112
6    REDIRECT EXAMINATION BY MR. McCORMICK ..................119

7

8

9    EXHIBITS                                      RECEIVED

10   DEFENDANT GREGORY ORR EXHIBIT(S) 34 .....................93
     DEFENDANT GREGORY ORR EXHIBIT(S) 35 .....................97
11   GOVERNMENT'S EXHIBIT(S) 43.15 ..........................123

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1            C E R T I F I C A T E

2        I, Karl Shires, Registered Professional Reporter, certify

3    that the foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter.

5        Dated this 30th day of September, 2008.

6

7        s\Karl Shires
         Karl Shires, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25