```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3   UNITED STATES OF AMERICA,          )  Case No.
                                        )  08-60014-CR-MIDDLEBROOKS
 4                      Plaintiff,      )
                                        )
 5            -v-                       )
                                        )
 6   VINCENT F. ARTUSO, JOHN VINCENT    )
     ARTUSO, GREGORY ORR, ROBERT M.     )
 7   GANNON, AND PHILIP EDWARD FORGIONE,)
                                        )
 8                      Defendants.     )  West Palm Beach, Florida
                                        )  September 10, 2008
 9   _____ )   9:00 a.m.

10              Volume 1 of 17 - PAGES 1 - 264

11               TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
12               U.S. DISTRICT JUDGE, AND A JURY

13
     Appearances:
14
     For the Government:        J. BRIAN MCCORMICK
15                              WILLIAM T. SHOCKLEY
                                Assistant United States Attorneys
16                              500 East Broward Boulevard
                                Fort Lauderdale, Florida  33394
17
     For the Defendant:         PETER VINCENT BIRCH
18   Vincent F. Artuso         Assistant Federal Public Defender
                                450 Australian Avenue, Suite 500
19                              West Palm Beach, Florida  33401

20   For the Defendant:         CARLTON FIELDS
     John Vincent Artuso       BY:  MICHAEL S. PASANO, ESQ.
21                              100 SE 2nd Street, Suite 4000
                                Miami, Florida  33131
22

23   Reporter:                  Karl Shires, RPR
     (561) 514-3728            Official Court Reporter
24                              701 Clematis Street, Suite 258
                                West Palm Beach, Florida  33401
25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1    Appearances: (Continued)

 2

      For the Defendant:          DAVID OSCAR MARKUS, ESQ.
 3    Gregory Orr                 ROBIN ELLEN KAPLAN, ESQ.
                                  169 E. Flagler Street, Suite 1200
 4                                Miami, Florida  33131

 5    For the Defendant:          ALLAN B. KAISER PLLC
      Robert M. Gannon            BY:  ALLAN BENNETT KAISER
 6                                111 NE 1st Street, Suite 902
                                  Miami, Florida  33132
 7
      For the Defendant:          ENTIN & DELLA FERA
 8    Philip Edward Forgione      BY:  ALVIN ERNEST ENTIN, ESQ.
                                  110 SE 6th Street, Suite 1970
 9                                Fort Lauderdale, Florida  33301

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  This is the case of the United States
 2    versus Vincent Artuso, John Artuso, Gregory Orr, Robert
 3    Gannon, and Philip Edward Forgione, Case No. 08-60014.
 4              And I think everyone is present.  Is that right?
 5              IN UNISON:  Yes, your Honor.
 6              THE COURT:  Okay.  Angela is gathering our jurors
 7    to begin selection.  But I thought I would report to you
 8    some -- a few issues that arose, that sometimes jurors raise
 9    issues with her, and I wanted to pass those on to you.
10              No. 8 said he has some sort of drunken driving
11    issue.  No. 15 is a minister who has some religious problems,
12    he says, sitting in judgment.  No. 3 is a sexual -- said they
13    were a sexual assault victim in a doctor's appointment.
14    No. 47 had a close family member convicted of a child abuse
15    situation.  No. 43 has language problems.  No. 52 said -- has
16    an incarcerated spouse who is about to be deported.  And
17    41 --
18              MR. MCCORMICK:  That number I missed, the last
19    number.
20              THE COURT:  52.
21              MR. MCCORMICK:  Thank you.
22              THE COURT:  And 41, I can't read her writing.
23    There's some sort of problem with some sort of accusation.
24    And I'll try to figure out what the first word is.  Those are
25    the issues that they've raised with her.
```

```
 1              I usually don't do sidebar discussions with jurors.
 2   I try to work around the problem so you get the information
 3   that you need.  But it doesn't really offer any real privacy
 4   since there is a record of everything, and I think it doesn't
 5   really advance the cause.  You can get the information you
 6   need in terms of your challenges without getting too far down
 7   the road, usually.
 8        (Pause in Proceedings.)
 9              THE COURT:  Okay.  Forty-one, the accusation is
10   disorderedly conduct.
11        (Pause in Proceedings.)
12              THE COURT:  Are we ready?
13              THE COURTROOM DEPUTY:  Ready, if you're ready.
14              THE COURT:  Okay.  We're going to invite the jury
15   in.
16        (The following proceedings were held in open court in the
17   presence of the prospective jury:)
18              THE COURT:  Okay.  Welcome.  Please be seated.
19              Welcome to court today, ladies and gentlemen; and
20   thank you for coming.
21              We actually ended up being delayed a couple of days
22   because we were afraid the hurricane was going to come, and
23   we're all glad it didn't.  But thank you for being here
24   today.
25              I'm Don Middlebrooks, the judge of the district
```

1    court.  You met Angela Rodriguez.  She is the courtroom

2    deputy clerk.  While you're here she would be glad to assist

3    you in anything that you need.

4        Our court reporter is Karl Shires.  Using this

5    equipment, he's taking notes on everything that's said in

6    court today.  He also uses a form of shorthand.  With that,

7    after the trial, he can prepare a transcript of everything

8    that has occurred.  In a few minutes we'll get to a point

9    where we will be asking you for some information.  Please

10   speak up because he needs to hear you.  If he doesn't

11   understand something, he may call out to you and ask you to

12   repeat it.  Don't get surprised if that happens.

13       Let me ask the lawyers to introduce themselves and

14   those seated with them at counsel table.

15       MR. MCCORMICK:  Yes, your Honor.  I'm Brian

16   McCormick.  I'm an Assistant United States Attorney.

17       MR. SHOCKLEY:  Good morning, ladies and gentlemen.

18   I'll Bill Shockley.  I'm another Assistant United States

19   Attorney.

20       SPECIAL AGENT HOPEWELL:  Good morning, I'm Special

21   Agent Eric Hopewell from the Federal Bureau of

22   Investigations.

23       THE COURT:  Thank you.

24       MR. BIRCH:  Good morning, everyone.  My name is

25   Peter Birch, and I am representing Mr. Vincent Artuso, this

```
 1   gentleman right here.

 2           MR. PASANO:  Good morning, everyone.  My name is

 3   Michael Pasano.  I represent John Artuso, who is right next

 4   to me.

 5           MR. MARKUS:  Good morning, ladies and gentlemen.

 6   My name is David Markus, and along with Robin Kaplan, we

 7   represent Greg Orr.  Good morning.

 8           MR. KAISER:  Good morning, ladies and gentlemen.

 9   My name is Allan Kaiser.  To my left, I represent Robert

10   Gannon.

11           MR. ENTIN:  Good morning, ladies and gentlemen.  My

12   name is Alvin Entin, and I represent Phil Forgione, who is

13   sitting to my left.

14           THE COURT:  Thank you.  Ladies and gentlemen, the

15   name of this case is the United States versus Vincent Artuso,

16   John Vincent Artuso, Gregory Orr, Robert Gannon, Philip

17   Edward Forgione.  It's brought to us by way of a superseding

18   indictment from the grand jury.  And the indictment is

19   lengthy and somewhat complicated, so I'm not going to read it

20   to you at this point.  You're going to learn a lot more about

21   this case when the -- when the lawyers present opening

22   statements to you.  Let me at this point just give you, I

23   guess, a thumbnail sketch of what this case is about.

24           The -- I may have said the indictment actually is

25   41 counts.  The -- and it essentially involves a number of
```

```
 1    real estate transactions and also ADT Security Services.  So

 2    if we get into -- as we go through jury selection if you've

 3    got some relationships with ADT Security Services, which is a

 4    subsidiary of Tyco International, we need to know that.

 5            The indictment alleges, Count 1 charges a type of

 6    crime called RICO conspiracy.  The RICO or racketeering laws

 7    are somewhat complicated and at the end of the case, I'll

 8    give you jury instructions and you'll learn a lot more about

 9    this area of the law.  These statutes were originally passed

10    to deal with organized crime, although they've been applied

11    in all sorts of circumstances.  Essentially, the type of

12    charge is that there must be a enterprise or some sort of

13    organization, and that organization must be involved in

14    racketeering activity.

15            And it requires the Government to show a pattern of

16    racketeering activity involving certain, what are called

17    predicate acts, which are types of crimes.  The crimes in

18    this case involve wire fraud, mail fraud, money laundering.

19    As I say, we'll get more into the instructions and tell you

20    more about the law at the end of the case.  But Count 1

21    charges RICO conspiracy, which would be an agreement to

22    commit this type of crime.

23            Count 2 charges -- Counts 2 through 10 charge mail

24    fraud, which is essentially fraud through the use of the

25    mails.
```

```
 1              Counts 11 through 25 charge wire fraud.  Again,

 2    requires a scheme or artifice to defraud, obtaining money by

 3    false and fraudulent pretenses, representations, and

 4    promises, and use of the wires.

 5              Counts -- that's Counts 11 through 25.

 6              Counts 27 through 41 charge money laundering.  That

 7    the defendants, knowing that property involved represented

 8    proceeds of some form of unlawful activity knowingly and

 9    willfully conducted and attempted to conduct financial

10    transactions, which were designed in whole or in part to

11    conceal and disguise the nature, location, source, ownership,

12    and control of proceeds of said specified unlawful activity.

13              That's a very brief thumbnail sketch of the

14    superseding indictment, just to really let you know the type

15    of case we're called upon to deal with.  As I say, the

16    instructions on the law will be at the end of the case.

17    You'll learn more about both the facts in the opening

18    statements and as we go through the trial.  But that's the

19    type of case that is presented here.

20              Let me hasten to add that an indictment is not

21    evidence.  It's simply the charge.  Defendants start out with

22    a clean slate and it will up to the Government to prove guilt

23    beyond a reasonable doubt.  So it's important for everyone to

24    realize that because I've told you something about the case

25    and you're hear in a federal court, that until you start
```

1    hearing evidence that means anything.  It's the evidence that

2    counts, and the Government has the burden of proof.  We'll

3    talk more about that, too, as we go forward.  But that's an

4    important principle for all of us to apply.

5          I've talked to the lawyers quite a bit about the

6    length of the trial.  They tell me that we will finish this

7    case within 15 days.  That's three weeks.  As we go through

8    jury selection, if you have particular problems during this

9    period of time tell me about it.  Don't wait until you're

10    selected to raise problems.  That's a relatively long case,

11    although it's not the longest we'll have jury selections for.

12    You know, there are cases that last months.  I don't minimize

13    what we're asking of each of you in terms of this case, which

14    is going to be three weeks.  I realize that is a -- affects

15    people's jobs and family lives.

16          But it's an important case and so I ask that if you

17    can reschedule something, that you do so.  But if you've got

18    a family vacation, something that's been scheduled for quite

19    a while, tell us about it.  A doctor's appointment you can't

20    change.  But, you know, think also about the person next to

21    you and whether you think your excuse is more compelling than

22    that one.

23          The Government doesn't ask us to do very many

24    things.  We've got a number of people, of course, overseas

25    serving, the National Guard and things, where they had a

1    tremendous burden placed on their families that they never

2    did think that they would encounter.  So this is important

3    service.

4         We're now going to start the process of selection.

5    I've got questions for each of you.  My questions are on the

6    form that Angela handed to you when you came in.  And I think

7    as we go forward, you can give us this information pretty

8    much without prompting.  I may follow up on some of the

9    things you tell us.  When I finish with my questions, the

10   lawyers will have a few minutes to follow-up and ask

11   questions of you.  And then we'll select the jury.

12        This will take us a good while today, and I ask you

13   to be patient.  We'll take some breaks as we go forward.  The

14   parties feel this is one of the most important parts of the

15   trial, though.  So please -- and please be candid about the

16   answers to these questions.  We're not trying to get too

17   deeply into anyone's personal life.  If we get into a

18   sensitive area, tell me and we can usually work around and

19   get the information we need for the lawyers to make their

20   judgments without getting too deeply into anyone's life.

21        But it is important.  We're trying to find a jury

22   who comes into it without any axes to grind and who can

23   decide the case on the facts of this case.  Sometimes

24   somebody's had something in their own life that makes a

25   particular kind of case not the right kind of case for them

 1    to sit on.  And if you have a feeling such as that, the

 2    lawyers deserve to know it.  And so, please don't hold back

 3    as we go forward.

 4          My questions are as follows:  Name, occupation,

 5    general part of the county you live in.  We don't need a

 6    specific address, but if you live in Jupiter or Wellington or

 7    West Palm Beach, tell us what town you live in.  How long

 8    you've been in the community?  Marital status.  Spouse's

 9    occupation.  Children.  Don't worry about children's age.

10    But children who are working, please telling us what they're

11    doing.  How you spend your spare time.  Do you have military

12    service?  Do you have family members or friends employed in

13    the criminal justice system as police officers, probation

14    officers, judges, et cetera?

15          Have you been a victim of a crime?  Have you been a

16    witness in a criminal case?  Have you, a family member, or

17    close friend ever been accused of a crime?  Fourteen, do you

18    have any religious or moral belief that would keep you from

19    sitting in judgment?  We don't need to know anyone's

20    religious belief unless you hold as a belief you should not

21    serve on a jury.  If you believe that, please tell us.

22    Otherwise, we don't need to know whether you're Baptist or no

23    religion at all or any other type of religion.

24          Fifteen, have you ever served on a jury before?

25    Was it criminal or civil?  Was the jury able to reach a

1    verdict?  We don't need to know what it was, but did you

2    reach one?  And were you the foreperson?  Sixteen, do you

3    have any physical, emotional, or language problem that might

4    hamper performance as a juror?  Seventeen is the bottom line

5    question.  Do you know of any reason why you couldn't sit on

6    this jury and render a fair verdict based on the evidence and

7    the law as I will provide you the law?

8            That's what I need to know from each of you.

9            Angela, would you please administer the oath to the

10   prospective jury.

11       (The prospective jury panel was duly sworn.)

12           THE COURT:  Okay.  As you see, this is a large

13   room.  We have a handheld mike which the security officer

14   will hand you.  But again, if Karl can't hear you he'll

15   remind you of that fact.

16           And Ms. Tesman, let's start with you.  Please tell

17   us about yourself.

18           PROSPECTIVE JUROR:  I'm Sheri Tesman.  I'm an

19   executive secretary for the Palm Beach County Sheriff's

20   Office.  I've been with them nine years.  I work for the

21   major of operations.  I live in West Palm Beach.  I've been

22   in this particular home about five years.  I've lived here in

23   South Florida for 14.  I am married.  My husband is

24   self-employed as a handyman.  I have two school age children.

25   A middle schooler who thinks he knows everything, and an

1    elementary school.  Hobbies, I like reading, cooking,

2    gardening.  No military experience.

3         The majority of my friends work in the criminal

4    justice system, just due to my job.  So law enforcement

5    officers, clerical, as well as myself.  No, I've never been a

6    victim of a crime -- well, yes.  Years ago I was mugged.  So

7    yes.  Never a witness in a criminal matter.  Never been

8    accused of a crime, nor has a family member.  No, I don't

9    have any religious beliefs that would stop me from doing my

10   job.

11        Yes, I have served on a civil jury but I was the

12   alternate so I truly don't know the outcome.  No, I have no

13   difficulties that would hamper me and no, I don't think

14   there's any reason that I couldn't be fair in judgment.

15        THE COURT:  Okay.  Thank you.

16        I'll take advantage of your answer in terms of

17   friends in law enforcement to mention, often in criminal

18   trials we have testimony of police officers or agents.  It's

19   important for everyone to evaluate that person's testimony

20   the same as they would anyone else.  I mean we have got

21   people from every walk of life, as you can imagine, as

22   witnesses.  And you want to judge each person's credibility

23   individually and don't assume because somebody is a police

24   officer, they're either necessarily telling the truth or not

25   telling the truth.

```
 1              You need to look at each person and their testimony
 2     and how it fits into the overall case.  Sometimes that's
 3     particularly hard when people have friends who are police
 4     officers and there might be a tendency to, I guess, give a
 5     benefit of the doubt.  It's important to examine each
 6     person's testimony on its own merits.
 7              And Mr. Potsander, how are you?
 8              PROSPECTIVE JUROR:  I'm good, how about you?
 9              THE COURT:  Good.  Good morning.
10              PROSPECTIVE JUROR:  Shawn Potsander is my name.  I
11     am an automotive service parts manager.  I've been doing that
12     similar same occupation for 19 years.  I live in Lake Worth,
13     Florida.  I've lived there for just over -- well, four years,
14     and I've lived in Royal Palm Beach in the West Palm area
15     for -- since 1992.  I'm single.  No spouse.  Engaged.  No
16     children.  Hobbies and spare time, some automotive related
17     stuff.  Dabble a little bit in the stock market.  A little
18     bit of woodworking, stuff like that.
19              No military service.  I don't have any friends
20     employed in the criminal justice system.  I have a friend
21     whose husband is a police officer in West Palm.  Kind of an
22     acquaintance.  Never been convicted of a crime.  Never been a
23     witness in a criminal matter.  Never been accused of a crime
24     nor any family members that I know of.  No religious or moral
25     beliefs that would preclude me from sitting in judgment.  I
```

1    have never served on a jury.  No physical or emotional

2    difficulties that could hamper.  And other than the time

3    commitment, there is nothing that could prevent me from being

4    fair.

5              THE COURT:  Thank you.

6              Ms. Bottinelli, are you today.

7              PROSPECTIVE JUROR:  Good morning.  Fine, thank you.

8              My name is Joanne Bottinelli.  I am a Spanish

9    teacher in a high school in Boca Raton and I've been teaching

10   for 28 years.  I'm about to retire, actually.  I live in Boca

11   Raton and have for 23 years.  I'm in my current house for 12

12   years.  I am divorced.  I have two grown children.  My

13   daughter is an artist.  My son works in computers.  Hobbies

14   are anything artistic.  I have not served in the military

15   service.  I have no family members in the criminal justice

16   system.

17             I have been a crime victim.  When I was in college

18   I was assaulted.  I have not been a witness in a criminal

19   matter.  I have never been accused of a crime.  I could sit

20   in and make a judgment of a person in a court.  I have served

21   on a jury approximately ten years ago.  I believe it was

22   civil.  We did reach a verdict.  I was not the foreperson.  I

23   may have some problems because I had a car accident four

24   months ago and my memory is somewhat impaired.  Although I

25   still seem normal.

 1              I don't see any reason why I couldn't serve on a

 2    jury, although I don't like the thought of leaving my

 3    students for three or more weeks with a substitute because I

 4    think that they would suffer.

 5              THE COURT:  What school were you at?

 6              PROSPECTIVE JUROR:  I'm at Olympics Heights High

 7    School in Boca.

 8              THE COURT:  Okay.  Teachers are always tough.

 9    Partly because it's hard for them to be away from their

10    students on the one hand, but on the other hand the school

11    system is, I guess better than a lot of employers in terms of

12    understanding the requirements of teaching.

13              PROSPECTIVE JUROR:  I think my students might not

14    be too understanding.

15              THE COURT:  Yes.  You mentioned your memory

16    problems.  Are these a hard time remembering things that

17    happened to you before the accident or are they still causing

18    you problems remembering things you hear, for example,

19    something you learned today?

20              PROSPECTIVE JUROR:  Today.

21              THE COURT:  Can you quantify that a little bit more

22    for us?

23              PROSPECTIVE JUROR:  I can't vocalize as well as I

24    could before the accident.  I can't find words to express

25    what I need to express.  Because I was knocked out during the

```
 1   accident.

 2            THE COURT:  Right.

 3            PROSPECTIVE JUROR:  And if I walk from one room to

 4   another and pick up something, I don't know what I'm doing.

 5   So I have to go back to where I was.  I know we all suffer

 6   that occasionally, but it seems to be a little more extreme

 7   now after the accident.  I'm hoping it will get better, but

 8   it has been four months, five months.

 9            THE COURT:  But in terms of, for example,

10   comprehending testimony of witnesses and remembering that

11   over this period of time, do you think that's going to be a

12   problem?

13            PROSPECTIVE JUROR:  I can comprehend.  I'm not sure

14   I can remember the details.

15            THE COURT:  All right.  Thank you.  And Mr. Pabisz,

16   is it?

17            PROSPECTIVE JUROR:  Pabisz.

18            THE COURT:  How are you?

19            PROSPECTIVE JUROR:  Very good.  My name is Ron

20   Pabisz.  I'm a director of engineering.  Mechanical engineer.

21   I've been in that position for 12 years.  I live in Boca

22   Raton -- excuse me.  Boynton Beach.  I've lived in Boca Raton

23   previously.  I've been in Boynton Beach for the last four

24   years.  Previously, Delray and Boca.  I'm married.  My wife

25   does not work.  I have children 11, 7, and 4.  I don't have
```

1    much hobbies at this point, with young kids.  I was in the US

2    Army.  In 1985 to 1988.

3         I do not have any family members employed in the

4    criminal justice system.  Never been a victim of a crime.

5    I've never been a witness to a criminal matter.  I do not

6    have any friends or family that have been accused of a crime.

7    And I don't have any religious beliefs that would preclude me

8    from sitting on a jury.  I have not served on a jury.  I have

9    no physical, emotional, or language difficulties to hamper me

10   as a juror.  And other than the time commitment, I don't have

11   any problem with sitting on the jury.

12            THE COURT:  Okay.  Thank you, sir.

13            And Mr. Tuchak.

14            PROSPECTIVE JUROR:  How are you, sir.

15            THE COURT:  Good.

16            PROSPECTIVE JUROR:  My name is Ted Tuchak.  I'm a

17   sales manager at a car dealership.  I have been for about 25

18   years in that business.  I've lived in this area in West Palm

19   Beach for 30 years.  I am married.  My wife's a housewife.  I

20   have one son who is a veterinarian.  I dabble a little bit in

21   photography.  No military service.  I have quite a few

22   friends that are police officers or have been police

23   officers.  I've never been a victim of a crime.  I've never

24   been a witness in a criminal matter.  I've never been accused

25   of a crime.

```
1              I have no religious problems sitting on a jury.  I

2    have been on a jury before.  I believe it was a criminal

3    matter.  I was not a foreperson.  We did reach a verdict.  I

4    have no physical, emotional, or language difficulties that

5    might hamper my performance as a juror.  As far as sitting on

6    the jury for 15 days, it would be real difficult for the

7    other people that work with me.  I am a sales manager and

8    there are two other sales managers, one of which is due to

9    start a vacation tomorrow and he would have to not go on

10   vacation.  And it's a very difficult job for just two people

11   to do.  So 15 days would be very, very difficult for the

12   other people that I work with.

13             THE COURT:  What type of dealership is it?

14             PROSPECTIVE JUROR:  It's a Ford dealership.

15             THE COURT:  How big a company?

16             PROSPECTIVE JUROR:  Wayne Akers Ford down in Lake

17   Worth.  Very large.

18             THE COURT:  Do you have just the one location or

19   are there other locations?

20             PROSPECTIVE JUROR:  Just one location.

21             THE COURT:  How do they cope with the absence of a

22   sales manager?  Are there other people that can step in?

23             PROSPECTIVE JUROR:  No, not really.  There's three

24   of us.  We've -- you know, the car business is slow now so

25   we've cut back to virtually a skeleton crew.  So it's -- it
```

```
 1    would be very difficult.  And there really isn't anybody else
 2    that can -- there's three of us.  The hours are very long.
 3    You know, we get about five days off a month as it is.  And
 4    we work long hours.  So it would be very difficult for the
 5    other people if I were here for 15 days.
 6                THE COURT:  All right.  Thank you.
 7                And Mr. Velez.  My order may be -- who is next?
 8                PROSPECTIVE JUROR:  I'm Velez.
 9                THE COURT:  You're Velez.
10                PROSPECTIVE JUROR:  And I'm Mike Reinhardt.
11                THE COURT:  If you don't all mind switching seats.
12                Everybody is on a list, so it helps us keep track
13    of who's who.  Thank you.
14                Please tell us about yourself, Ms. Velez.
15                PROSPECTIVE JUROR:  My name is Nadine Velez.  I'm a
16    nail technician.  I live in Lake Worth for about six years.
17    I am recently divorced.  I have two children.  One of high
18    school age.  My hobbies include cooking and gardening.  I
19    have no military time.  I have no family or friends in the
20    criminal justice system.  I have never been a victim of a
21    crime.  I've never been a witness to a crime.  I have never
22    been accused of a crime, however, I do have family members
23    who have.
24                I do not have any religious or moral beliefs to
25    preclude me from sitting.  I have never been on a jury.  I
```

```
 1    have no physical or emotional difficulties that might hamper

 2    my performance.  And as for question No. 17, since I am

 3    recently divorced and have no other income other than my own

 4    which is strictly on commission, if I'm here for 15 days,

 5    there's a lot to lose in my household.

 6              THE COURT:  You mentioned family members accused of

 7    crime.  Were any of those in federal court?

 8              PROSPECTIVE JUROR:  I have no idea.

 9              THE COURT:  Okay.  These aren't close family

10    members then?

11              PROSPECTIVE JUROR:  They are.

12              THE COURT:  Did you follow the cases or --

13              THE WITNESS:  Not at all.

14              THE COURT:  So you don't even know what type of

15    crime it was?

16              PROSPECTIVE JUROR:  I have an idea.

17              THE COURT:  But you don't know if it was state or

18    federal?

19              PROSPECTIVE JUROR:  No.

20              THE COURT:  Give us -- tell us what's the nature of

21    the crime.

22              PROSPECTIVE JUROR:  Drugs and alcohol.

23              THE COURT:  All right.  Thank you.  And if you can

24    pass the mic to Mr. Reinhardt.  How are you, sir.

25              PROSPECTIVE JUROR:  Very good.
```

```
 1              THE WITNESS:  Thank you.  My name is Mike
 2    Reinhardt.  My occupation is I'm a graphic designer at the
 3    Palm Beach County Convention and Visitors Bureau.  General
 4    areas of residence:  I've been in Palm Beach County 41 years
 5    of my life.  Marital status, married.  My wife works at
 6    Publix.  I have two children.  Nine and 11.  My hobbies and
 7    spare time, I swim, bike, and run whenever I can.  No prior
 8    military service.  None of my family members or friends
 9    employed in the justice system.  I have not been a victim of
10    a crime.  I have never been a witness in a criminal matter.
11    Never been -- no family members I know been accused of a
12    crime.
13              My religious, moral beliefs would not preclude me
14    from judgment.  I've never sat on a jury.  I have no
15    physical, emotional difficulties that would hamper my
16    decision.  And the only thing about No. 17 you mentioned the
17    ADT Security, I used to have that in my house and I canceled
18    it.
19              THE COURT:  Okay.  Basically, was there any
20    particular dispute with them or it was just --
21              PROSPECTIVE JUROR:  The way they started doing
22    their billing.
23              THE COURT:  All right.  Do you have a problem
24    sitting and hearing a case that may involve people that --
25              PROSPECTIVE JUROR:  It was a problem canceling it.
```

1    It was the way they changed the billing and then the way

2    they -- I wanted to cancel it and you had to go through hoops

3    and ladders.  It was like, I just want to cancel it, and

4    there were like, well, you have to fill out this paperwork

5    and this paperwork, now you've gone beyond the month and now

6    you have to pay another month.  And I didn't feel that was

7    right.

8         THE COURT:  Right.  And I can see the aggravation

9    of it, but in terms of hearing this case which doesn't

10   involve their billing practices, can you set that aside and

11   decide this case based on the facts of this case?

12        PROSPECTIVE JUROR:  That I can't be a hundred

13   percent guarantee of because I felt that I should have gotten

14   some money back knowing that I didn't want the service and I

15   didn't get anything resolved.

16        THE COURT:  What was the amount of the dispute?

17        PROSPECTIVE JUROR:  Well, it was they changed their

18   billings to every month to every three months, so it went

19   from obviously paying every month to three months, $96.  I

20   wanted to cancel it.  And they were like, well, you went

21   beyond the date so it's going to be another month or two of

22   active billing service, and I never liked the service to

23   begin with.

24        THE COURT:  Okay.  Thank you.

25        Let's pass the mic to Ms. Pryluck.

```
 1              PROSPECTIVE JUROR:  Is this working?

 2              THE COURT:  It isn't.  Why don't you see if you can

 3     fix it -- I mean not you.  The security officer.

 4              PROSPECTIVE JUROR:  I'm a teacher, so it's okay.  I

 5     can project pretty far.  If you can't hear me, let me know.

 6     My name is Randi Pryluck.  Like I said, I'm a teacher.  I've

 7     been teaching for five years.  I lived in Royal Palm for

 8     about four years and before that I lived in Delray.  I'm

 9     single.  So 6 and 7, I can skip.  Eight, I do -- I run, cook,

10     and read.  I have no military service.  I have several

11     friends who are officers, law enforcement, probation, and

12     lawyers.

13              I have been a victim of two crimes.  I've never

14     been a witness in a criminal matter.  No family members

15     accused of a crime.  No religious beliefs that would alter

16     my -- from sitting on a jury.  I've never been on a jury

17     before.  No physical, emotional, or language difficulties.

18     And any reason, the only thing like she said before, is

19     leaving my students for three weeks.  It's going to be chaos

20     because they're fifth graders and they think they rule the

21     school.  Also, I'm presently an ADT customer.

22              THE COURT:  At what school are you at?

23              PROSPECTIVE JUROR:  Bershire Elementary.

24              THE COURT:  All right.  Thank you.

25              And we are to Ms. -- they're trying to fix the
```

1    microphone.  Let's give it a second, Ms. Campbell.

2             PROSPECTIVE JUROR:  My name is Tiffany Campbell.

3    I'm a full-time student and I'm also a server at Bruzzi's

4    City Place.  I live in West Palm Beach.  I have for 11 years.

5    I am single.  My hobbies are I study, I read, I swim.  No

6    military experience.  My boyfriend and my uncle are both law

7    enforcement officers, and I was previously employed for a

8    personal injury attorney.  Never been a victim of a crime.

9    Never been a witness.  Never had anyone accused of a crime.

10   No religious beliefs that would prevent me from sitting in

11   judgment.  Never served on a jury.  No physical, emotional,

12   or language difficulties.

13             And the only thing I can think of is the time

14   commitment, is I'm a full time college student and I'm on a

15   hundred percent scholarship and I would lose that.

16             THE COURT:  Where do you go to school?

17             PROSPECTIVE JUROR:  I go to Palm Beach Community

18   College and FIU.

19             THE COURT:  Are there classes in the day?

20             PROSPECTIVE JUROR:  They're both; they're day and

21   night.

22             THE COURT:  Thank you.

23             And we are to Mr. Champey.

24             PROSPECTIVE JUROR:  Yes.  My name is Joseph

25   Champey.  I'm retired for 13 years.  I was a production vice

1    president for a financial publisher.  I live in Lake Worth.

2    I'm married.  My wife is retired also.  I have two sons.  One

3    is an office manager and one works for a laundry company.  I

4    like to cook.  I was never in the service.  I have a

5    brother-in-law who is a retired police officer.  I've never

6    been a victim of a crime.  I've never been a witness to a

7    crime.  I've never had a friend who was accused of a crime.

8    I have no religious problems serving.  I was on a jury for a

9    civil case and we did come to a conclusion.  I have no

10   physical problems.  And I see no problem giving a fair

11   answer.

12            THE COURT:  All right.  Thank you, sir.

13            Let me ask the Government, are you going to have

14   any local law enforcement officers, Mr. Shockley?  What

15   police agencies?

16            MR. SHOCKLEY:  Your Honor, it's going to be Federal

17   Bureau of Investigation and Internal Revenue Service.

18            THE COURT:  All right.  Thank you.

19            Okay.  And we are to Mr. McManus.

20            PROSPECTIVE JUROR:  Good morning.  My name is Jim

21   McManus.  My occupation is, I'm a commercial real estate

22   investor and manager of property.  I live in Boca Raton.

23   I've been there just about ten years.  I'm married.  My wife

24   does not work.  I have three children.  All school age.

25   Hobbies:  I'm a pilot and I collect and restore antique

```
 1    motorcycles.  No military service.  Nobody employed in the

 2    criminal justice system.  Not a victim, not a witness.  Not

 3    accused.  No religious or moral beliefs would preclude me.  I

 4    have not served on a jury.  No difficulty serving.  And

 5    there's no reason why I couldn't sit on this jury.

 6              THE COURT:  All right.  Thank you, sir.

 7              And Mr. Drake.

 8              PROSPECTIVE JUROR:  My name is Camden Drake.  I

 9    work at the Palm Beach County Sheriff's Office, clerical

10    staff, headquarters.  I've lived in Jupiter about 10 years.

11    I'm single.  My hobbies are triathlons, soccer.  No prior

12    military service.  My father is also law enforcement officer

13    at the Palm Beach County Sheriff's Office and then several

14    uncles and my grandfather, were Oregon State Police.  The

15    only crime I've been a victim of is vehicle burglary.  I've

16    never witnessed a criminal matter.  No family members that I

17    know of have been accused of a crime.

18              I have no religious or moral beliefs that would

19    prohibit me from deliberating.  I have not previously served

20    on a jury.  And no physical or language difficulties that

21    would hamper my performance.  The only thing I could see

22    being a problem as far as time is concerned is, I'm a student

23    at the Palm Beach County College Fire Academy and missing

24    time from that would be my termination from the program.

25              THE COURT:  When are the classes?
```

1          PROSPECTIVE JUROR:  From 6 to 10 at night.  So as

2     long as it wouldn't interfere with that, I could -- do it.

3          THE COURT:  Okay.  Thank you.

4          And Mr. Soto.

5          PROSPECTIVE JUROR:  My name is Raul Soto.  I'm a

6     senior graphic artist at Office Depot.  I'm been there about

7     13 years.  I live in Boca Raton.  I've been there about 15

8     years.  I'm married.  My wife is a nurse at Boca Community.

9     No children.  Hobbies:  Photography, swim, walk.  No military

10    service.  None -- I've never been a victim or family members

11    employed in the criminal justice system.  Never been a

12    victim.  Never -- I've been a witness.  No family members or

13    close friends been accused of a crime.  I have no religious

14    or moral beliefs, beliefs to prevent me from serving.  Never

15    been on a jury.  I have no physical or emotional, language

16    difficulties.

17          Seventeen, the only thing is, I'm going on vacation

18    at the end of October.  So that's --

19          THE COURT:  Well, we're not going to be here the

20    end of October.

21          PROSPECTIVE JUROR:  That was my only concern.

22          THE COURT:  All right.  Thank you.

23          And Ms. Diaz.

24          PROSPECTIVE JUROR:  I just changed my name after

25    divorcing; it's Lidia Monti.

```
 1            THE COURT:  Ms. Monti then, how are you?

 2            PROSPECTIVE JUROR:  I'm doing well, thank you.

 3            THE COURT:  Good.

 4            PROSPECTIVE JUROR:  I am an interior designer.

 5   I've been manager of the Center for about 12 years.  I live

 6   in Lake Worth, and I've been in the community about 12 years

 7   also.  I am recently divorced.  I have two children.  They

 8   are actually one living overseas, the other one living here

 9   in this country.  I cook and do sports in my spare time.  I

10   have no military service involvement.  I have -- I had two of

11   my family members and my daughter and my son-in-law serving

12   in this community for several years in criminal investigation

13   and being an attorney.

14            I do have friends that are attorneys or in law

15   enforcement.  I've never been a victim of a crime.  I have

16   not witnessed -- been a witness in a criminal matter.  I

17   don't have family members that have been accused of a crime.

18   I don't have any religious beliefs or moral beliefs that

19   would (sic) not impede me from sitting in this court.

20            I have not served in a jury previously.  I have no

21   physical, emotional, or language difficulties that might

22   hamper my performance.  And the only reason for which I --

23   the only reason it would hamper my ability to sit in the, in

24   this court would be, not the time, but I have a job that is

25   basically commission based and it will hamper me not being in
```

```
 1   my job to be able to attract the business that I need to

 2   provide the financial needs that I have at the end of the

 3   month, and I have no support from anybody.

 4           THE COURT:  What type of business are you in?

 5           PROSPECTIVE JUROR:  Interior design.

 6           THE COURT:  And you're on your own then?

 7           PROSPECTIVE JUROR:  Yes.

 8           THE COURT:  Not affiliated with a company?

 9           PROSPECTIVE JUROR:  No, I'm affiliated with a

10   company but we work on a commission base only.

11           THE COURT:  Only commissions?

12           PROSPECTIVE JUROR:  Yes.

13           THE COURT:  You mentioned a son and daughter in law

14   as an attorney.  Who is the attorney?

15           PROSPECTIVE JUROR:  The attorney is my son-in-law.

16           THE COURT:  Your son-in-law.  What type of lawyer?

17           PROSPECTIVE JUROR:  He was a -- he did part of

18   criminal and -- criminal -- yeah, criminal attorney.

19           THE COURT:  As a prosecutor or defense lawyer?

20           PROSPECTIVE JUROR:  No, he was defense.

21           THE COURT:  Did he do cases, or does he do cases in

22   federal court or state court?

23           PROSPECTIVE JUROR:  No, it was here in state court

24   in Palm Beach County.

25           THE COURT:  And who was the other person?
```

1          PROSPECTIVE JUROR:  My daughter.  Criminal

2    investigator for Palm Beach County Public Defender.

3          THE COURT:  Okay.  Thank you.

4          And we are to Mr. Kearney.

5          PROSPECTIVE JUROR:  Yes.

6          THE COURT:  How are you today?

7          PROSPECTIVE JUROR:  Fine, sir, how are you?

8          THE COURT:  I'm good.  Please tell us about

9    yourself.

10          PROSPECTIVE JUROR:  My name is James Kearney.  I am

11    currently unemployed but I work as an alarm technician for 12

12    years.  Prior occupation was at Pratt Whitney Aircraft.

13    Sheet metal mechanic for ten years.  I live in Riviera Beach.

14    I've been in Palm Beach County for 37 years.  I'm married.

15    My spouse is self-employed.  I have seven children.  My

16    hobbies, fishing and golfing.  I'm a Vietnam era veteran.

17          I do have some family members that are serving time

18    right now.  I've never been convicted of a crime.  I have

19    never witnessed a criminal matter.  I've never been accused

20    of a crime.  I am a minister of the gospel.  I never served

21    on a jury before.  I have no physical, emotional, or language

22    difficulties.

23          And the only reason that I might not be able to

24    serve is because I am a minister of the gospel and it depends

25    on what type of case is presented, I might not be able to

```
 1    render a judgment.

 2            THE COURT:  Explain that a little more to me.

 3    Usually people -- most religions teach that their members can

 4    serve on juries and a few don't.  It sounds like your kind

 5    of -- some cases you could and some you can't.  I don't

 6    understand that part of it.

 7            PROSPECTIVE JUROR:  Well, I listen to the news

 8    quite frequently and it bothers me when someone has served 30

 9    years, DNA said he was not guilty, I couldn't live with

10    myself if I was sitting on a jury and we helped convict

11    somebody and then you come up later and say that, well, we

12    had the wrong person.

13            THE COURT:  Right.  Well, I suspect most people

14    sitting here would share that view.  And of course we want

15    people of conscious to serve on juries and who would be

16    concerned about making sure somebody wasn't wrongfully

17    convicted.  And this is not -- I don't think this is a DNA

18    type case or a case of that type.  I mean, do you feel like

19    you can serve?

20            PROSPECTIVE JUROR:  Yes, I'm just -- as I stated, I

21    wouldn't want to be on the jury where someone that was

22    convicted or was accused of killing somebody and we was going

23    to send him to the gas chamber or electric chair if he was

24    found guilty.  I don't think I could sit on a case like that.

25            THE COURT:  There is no death penalty in this case.
```

```
 1    It's a conspiracy-
 2              PROSPECTIVE JUROR:  Well, that would be the only
 3    one I wouldn't want to sit on.
 4              THE COURT:  All right.  Thank you.  And appreciate
 5    your help in explaining that to us.
 6              Okay.  Mr. Pantone, how are you?
 7              PROSPECTIVE JUROR:  Good morning.  I'm doing great,
 8    thank you.  I'm David Pantone.  I'm the Dean at the Florida
 9    Culinary Institute.  I've been -- I live in Royal Palm Beach.
10    I've been in this community for 18 years.  I'm married.  My
11    wife has recently taken a position as the office manager at a
12    very small property security business, just a one-person
13    deal.  Three school age children.  My hobbies are everything
14    that have to do with food, and I'm a scout master.  So lots
15    of boy scout stuff.  No prior military service.  Family
16    members employed, a few friends, scouting friends who are
17    police officers.
18              Never been a victim.  Never been a witness.  Never
19    accused of a crime.  Religious beliefs would not interfere.
20    Never served on a jury.  Physically, emotionally, language,
21    all okay.  And three weeks away from the college would be a
22    lot, but I would go to work before and after if I was
23    selected to serve.
24              THE COURT:  Okay.  Thank you, sir.
25              Mr. Brown, how are you?
```

```
 1              PROSPECTIVE JUROR:  Very well.  James or Jim Brown

 2    is my name.  My occupation is, I'm a general manager of Zane

 3    Grey Collections.  My residence is in Boca Raton -- excuse

 4    me, not Boca Raton.  I just traveled from there.  Residence,

 5    Boynton Beach.  Boynton Beach for the past four years.  Prior

 6    to that Beverly Hills, Florida, that is.  My marital status

 7    is married.  My wife is a -- what is she?  She got elevated

 8    now.  She is a director of human resources.  No kids.  No

 9    military service, but the hobbies are fishing and cooking.

10    They're not necessarily related.

11              No family members are involved in the criminal

12    justice system.  However, a friend of mine is a special

13    investigator for the Coral Springs police department.  I have

14    been a victim of a crime.  It was just a simple break-in but

15    they did get away with some good stuff.  And I have not been

16    a witness to a criminal matter.  Nor have any of my family

17    members or close friends ever been accused of a crime.

18              Religious and moral beliefs, there are none that

19    would preclude me from serving.  And yes, I have served on a

20    jury before.  It was a civil case and we did reach a verdict.

21    And I was not the foreperson.  And I do not have any

22    emotional or language difficulties that would hamper me.  And

23    there's no reason why I could not sit on the jury and reach a

24    fair verdict.

25              THE COURT:  I'm familiar with Zane Grey.  What are
```

1    Zane Grey Collections?  What is that?

2           PROSPECTIVE JUROR:  Zane Grey Collections is a new

3    company, and.  Forgive me, I've been with that company now

4    for six months.  That is something I skipped over.  Prior to

5    that I was in the blood banking business for about a year,

6    and then prior to that, several years in commercial sales in

7    terms of pest control.  But Zane Grey Collections is a

8    company that, long story made short, it's a document that was

9    discovered.  It's been in a box and it's an original

10   document.

11          It's called Tales of the Gladiator, an original

12   work of Zane Grey, the author.  And I am the general manager

13   and international marketing manager for the company.

14          THE COURT:  Thank you.

15          Okay.  Ms. Zanders, how are you?

16          PROSPECTIVE JUROR:  Good morning.

17          THE COURT:  Good morning.

18          PROSPECTIVE JUROR:  My name is Constrella Zanders.

19   My occupation is head teller for a bank.  My general

20   residence is Boynton Beach.  I have been living in Boynton

21   Beach two years.  I've been living in South Florida all my

22   life in Delray.  My marital status is divorced.  Children is

23   middle school age and I have a son that works for Publix.  My

24   hobbies is reading.  No military services.  I do have friends

25   that are police officers.  Never been a victim of a crime.

```
 1   Never been a witness in a criminal matter.

 2           No family members that I know of accused of a

 3   crime.  No religious or moral beliefs from sitting in

 4   judgment of a person deliberating.  Never served as a juror.

 5   No physical, emotional, language difficulties.  And there is

 6   no reason why I couldn't sit in on a jury and give a fair

 7   verdict.

 8           THE COURT:  All right.  Thank you.

 9           And Ms, is it Courter?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  How are you?

12           PROSPECTIVE JUROR:  All right.  My name is Marisie

13   Courter.  I'm an accountant.  I live in Lake Worth.  I've

14   been there for about four years.  Prior to that I lived in

15   Boca.  I'm married.  I have two school age children.  Hobbies

16   are cooking, sewing.  No prior military service.  I have a

17   cousin who is a law enforcement officer.  No, I have not been

18   a victim of a crime.  No, I have not been a witness.  No

19   moral beliefs.  And no, I never served on a jury before.  No

20   physical, emotional, language difficulties.

21           Well, the only thing I can think of is that I'm

22   pregnant right now, so that might be difficult for me to sit

23   on the jury.

24           THE COURT:  Okay.  It's 15 days.  Are you able to

25   do it or not?
```

```
1                    PROSPECTIVE JUROR:  Well --

2                    THE COURT:  You need to tell us whether you think

3      you could -- basically, our day is, we usually start at 9,

4      take a 15-minute break in the morning.  We take an hour for

5      lunch, 15-minute break in the afternoon and we try to stop at

6      4:45 to give you a little bit of a jump on the traffic.  You

7      need to tell me whether you think you can do that or not.

8                    PROSPECTIVE JUROR:  Well, there is the frequent

9      urination problem, so I don't know.

10                   THE COURT:  Other than that, you're all right?

11                   PROSPECTIVE JUROR:  And the nausea and all of that

12     good stuff.

13                   THE COURT:  You're still have nausea and things?

14                   PROSPECTIVE JUROR:  Occasionally.

15                   THE COURT:  Okay.  Tell me, do you think you can do

16     it or not?

17                   PROSPECTIVE JUROR:  No.

18                   THE COURT:  All right.  Thank you.

19                   And Ms. Rutherford.

20                   PROSPECTIVE JUROR:  My name is Michelle Rutherford.

21     I'm a medical transcriptionist.  I work two jobs.  Twelve

22     hours day.  I live in West Palm.  I've lived here for 20 some

23     years.  I'm a single mother.  Divorced.  My son just

24     graduated.  No hobbies.  I work.  No military service.  No

25     family members.  Yes, I have been a victim of a crime.  Never
```

```
 1    a witness.  A cousin who committed a federal crime.  No
 2    religious.  Yes, I have served on a jury.  No physical or
 3    emotional.  And, actually, because I am the primary
 4    breadwinner, it would be a financial problem.
 5              THE COURT:  What do you do?
 6              PROSPECTIVE JUROR:  I do medical transcription.
 7              THE COURT:  At home or --
 8              PROSPECTIVE JUROR:  I work 7 to 3 and 4 to 9.
 9              THE COURT:  Seven to 3 and 4 to 9?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  And how do you get paid?  Commission?
12              PROSPECTIVE JUROR:  I get paid production in the
13    evening and I'm a salaried worker for a doctor during the
14    day.
15              THE COURT:  What's the doctor's -- do you know what
16    his policy is on jury service?
17              PROSPECTIVE JUROR:  Oh, I don't get paid for it.
18              THE COURT:  They don't pay for jury service?
19              PROSPECTIVE JUROR:  No.
20              THE COURT:  And you had a relative, a cousin
21    convicted of a federal crime you said.
22              PROSPECTIVE JUROR:  Yes, he served prison time.
23              THE COURT:  What type of crime?
24              PROSPECTIVE JUROR:  It was drugs.
25              THE COURT:  Where was your cousin prosecuted?
```

```
 1                  PROSPECTIVE JUROR:  Right here in Florida.

 2                  THE COURT:  How long ago was that?

 3                  PROSPECTIVE JUROR:  Probably about ten or 15 years

 4       ago.

 5                  THE COURT:  Does that cause you any problem?  I

 6       mean here, these prosecutors are from the same office that

 7       perhaps prosecuted your cousin.

 8                  PROSPECTIVE JUROR:  Yeah I got a problem with that.

 9       Yes, I do.

10                  THE COURT:  Your problem is you don't want to

11       serve.

12                  PROSPECTIVE JUROR:  These guys are not guilty.

13       Okay?  I vote with the masses, so I can get out of here.  I

14       don't get paid for it.  Okay?

15                  THE COURT:  All right.  Thank you for that

16       commitment to citizenship.

17                  Ms. Pargan.  Is it Pargan?

18                  PROSPECTIVE JUROR:  Yes.

19                  THE COURT:  How are you?

20                  THE WITNESS:  Good, thank you.  My name is Vindra

21       Pargan.  I work at a hospital.  I'm a secretary.  Right now I

22       live in Royal Palm Beach.  I've been there four years.

23       Before that I lived in Brooklyn, New York.  I am married.  My

24       husband also works at the hospital.  He works in the

25       emergency department.  I have three children.  One is 24.  He
```

```
 1    is working.  My middle one is 19.  He just started college.

 2    And I have a nine year old who is in fifth grade.  I don't

 3    really have time for any hobbies.  No military service.

 4          No friends or family employed in the criminal

 5    justice system.  Never been convicted of a crime.  Never been

 6    a witness to a criminal matter.  I have a brother-in-law that

 7    was convicted of drug smuggling.  He served ten years and he

 8    is out now.  I don't know the details.  I don't have any

 9    religious or moral beliefs that would -- I have never served

10    on a jury.  I don't have any physical, emotional, or language

11    difficulties.

12          My only problem is the time commitment.  For two

13    reasons.  My nine year old, I'm responsible for dropping him

14    at school in the morning and then I usually pick him up two

15    o'clock on my lunch break.  And at work also, there's just

16    three of us in the department and one is due to go on

17    vacation next week.  So if I'm serving, there will just be

18    one person there, which would be very difficult to run the

19    department on one person.

20          THE COURT:  What company is it?

21          PROSPECTIVE JUROR:  I work for Palms West Hospital.

22          THE COURT:  And is there -- who else is there that

23    can pick up your child in the afternoon?  I assume in the

24    morning -- what time --

25          THE WITNESS:  I drop him at school for 8.  He -- 10
```

1    to 8 he's at school and I'm at work for 8.  So it's all on

2    the way.  And then I take my lunch break at 2.  I pick him up

3    from school and take him back to work with me until I get off

4    at 4:30.

5                THE COURT:  Is there any way you can care for him

6    in the afternoon and serve on the jury?

7                PROSPECTIVE JUROR:  Uhm, I have no arrangements for

8    childcare because I'm usually the one responsible.  I would

9    have to pay someone to watch him, if I can find someone

10   around.

11               THE COURT:  Okay.  Well, thank you.

12               And Mr. Becker, how are you?

13               PROSPECTIVE JUROR:  Fine, your Honor.  Thank you.

14   My name is Steve Becker.  I'm a operations manager for a

15   hazardous waste facility in Pompano Beach, Florida.  It's a

16   small company.  I've lived in Boynton Beach the last three

17   years.  Wellington before that.  Florida since '86.  Up north

18   before then.  Marital status, I'm married.  My spouse works

19   at Target in the bakery.  I have two children.  One 28 and

20   one 27.  Hobbies:  I enjoy cooking on weekends outside on the

21   grille.

22               Prior military experience, I'm on discharge, United

23   States Marine Corps.  My son-in-law is a police officer in

24   North Palm Beach, Florida.  I have been a victim of a crime.

25   It was a break in of my home in Wellington.  Never been a

1    witness.  Family member, it was my son that broke in.  I had

2    him put in jail for a year because I believe in tough love.

3    Straightened him out.  He is now doing fine.

4        I do have a close friend that's in the federal

5    prison for drugs.  I have no religious or moral beliefs that

6    would stop me from serving.  I never served on a jury before.

7    Physical, emotional, no problems.  Physically, I've had three

8    back surgeries.  I'm currently not under a doctor's care but

9    I do find it difficult to sit for long periods of time.

10        No. 17, the only reason would be time.  I work in a

11    small company, four people.  One driver, one secretary, and

12    I'm responsible for doing all the paperwork to do the jobs.

13    So that would be a problem to be off for three weeks.

14        THE COURT:  How do they cope with that?

15        PROSPECTIVE JUROR:  Excuse me, sir?

16        THE COURT:  How could they cope with that?

17        PROSPECTIVE JUROR:  Normally, if I go on vacation I

18    have to do things ahead of time, prepare paperwork up to two

19    weeks ahead of time.  Other than that, they can't.  No one

20    else does what I do.  The owner goes out and does sales

21    calls.  We have another salesperson.  Jobs come in.  I have

22    to do the scheduling.  Paperwork together.  That type of

23    thing.

24        THE COURT:  What kind of company is this?

25        PROSPECTIVE JUROR:  It's a hazardous waste

```
 1    facility.  We deal with universal waste from hospitals,

 2    prescription drugs and things like that that expire.

 3              THE COURT:  Thank you.

 4              And if we can pass the microphone to Mr. Allred.

 5              PROSPECTIVE JUROR:  Good morning.  My name is Steve

 6    Allred.  My occupation, I'm a licensed antiques broker,

 7    conservator, and restorer.  I live here in West Palm Beach.

 8    I've been here for about 24 years.  Single.  No kids.  My

 9    hobbies are, I restore historic homes.  Thanks to the market,

10    I seem to collect them now, not sell them.  I have no prior

11    military service.  I do have friends that are employed in the

12    criminal justice system.  I have been a victim of crime.  I

13    have been a witness in a criminal matter.  I do not have any

14    family members or friends that have been accused of a crime

15    or neither have I.

16              No religious or moral beliefs that would preclude

17    me.  I have not served on a jury before.  I have no physical

18    or emotional difficulties.  And I don't see any reason why I

19    could not sit on a jury.

20              THE COURT:  All right.  Thank you, sir.

21              And Ms. Parent.

22              PROSPECTIVE JUROR:  Good morning.

23              THE COURT:  Good morning.

24              PROSPECTIVE JUROR:  My name is Marie Ange Parent.

25    I'm a licensed practical nurse.  I live in Lantana for about
```

```
 1   eight years.  I am married.  My husband is a singer.  I have

 2   two children.  One in high school, one in middle school.  I

 3   like to cook and watch TV.  I have no prior or present

 4   military service.  I don't have any family members or close

 5   friends employed in the criminal justice system.  I have

 6   never been a victim of a crime.  I have never been a witness

 7   in a criminal matter.  And family member or close friends

 8   been accused of a crime.  No religious belief or moral

 9   beliefs that would preclude me from sitting in judgment.

10           I have never served on a jury.  I have language

11   difficulty.  I can say English is my third language.  I am

12   not that proficient in English.

13           THE COURT:  Well, you sound pretty good.  You speak

14   very well.  I would hate to tell what you my third language

15   would be.  I'm able to understand you clearly.  Do you have

16   problems understanding others, or are you pretty good.

17           PROSPECTIVE JUROR:  Not really.  Sometimes when you

18   are talking fast.  Like if I'm talking French or Creole, I'm

19   talking really fast.  If you are talking fast and you might

20   say some words that I might miss.

21           THE COURT:  Right.

22           PROSPECTIVE JUROR:  Or -- for now, I'm the only one

23   that is working.  My husband is not working.  And we are

24   falling behind on the house.  I'm the only one working for

25   now.  I think I might have difficult to come here every day.
```

```
 1              THE COURT:  So your problem is more work than
 2   language it sounds like.  Tell me about the work problem.
 3              PROSPECTIVE JUROR:  I am the only one working now.
 4   And we are falling the house.  My husband and my two
 5   children.
 6              THE COURT:  And what is it you're doing?  You're a
 7   nurse?
 8              PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  Okay.  All right.  Thank you.
10              Mr. Morrin, how are you?
11              PROSPECTIVE JUROR:  Good morning.  How are you.  My
12   name is Michael Morrin.  I work for the Broward Sheriff's
13   Office currently.  I work in the correctional facility in
14   Pompano Beach.  I live in Wellington.  I have lived in
15   Wellington for five years.  Before that I lived in Broward
16   County.  I'm married.  My wife works for a company.  She does
17   payroll.  I have two children in school right now.  My
18   hobbies are anything sports related.  I have no prior
19   military service.
20              I do have lots of friends who are in law
21   enforcement and who are lawyers and attorneys.  I have been a
22   victim of crime a long time ago.  I had a house broken into.
23   I have never been a witness in a criminal matter.  I do have,
24   unfortunately, family members that have been accused of
25   crimes.  None of my religious beliefs would hinder me from
```

1    making any decision.

2          I have served on a jury quite some time ago in

3    Broward County.  And it did reach a verdict.  I was not a

4    foreperson.  I have no language difficulties.  And the only

5    issue on No. 17 is I have a nonrefundable cruise coming up in

6    about three or four weeks, so if it should run longer than

7    that it might interfere with it.

8          THE COURT:  But you're okay for 15 days?  That

9    takes us through the end of September.

10          PROSPECTIVE JUROR:  Well yeah, the cruise is not

11    until like the second week of October.

12          THE COURT:  We'll be all right with that.  Are you

13    a law enforcement officer or a civilian employee?

14          PROSPECTIVE JUROR:  No, I'm civilian.

15          THE COURT:  You mentioned some, I don't remember if

16    they were family members or friends, were they in federal or

17    state court?

18          PROSPECTIVE JUROR:  They were in state.

19          THE COURT:  All right.  And is there anything about

20    what happened with your friends that causes you to worry

21    about whether you can be fair as a juror?

22          PROSPECTIVE JUROR:  Not off the top of my head.

23    No, sir.

24          THE COURT:  Okay.  Thank you.

25          And we are to Mr. Neubert.

1                    PROSPECTIVE JUROR:  Yes.  Good morning.

2                    THE COURT:  Good morning.

3                    PROSPECTIVE JUROR:  My name is John Neubert.  I am

4        retired.  Most of my career was in sales and in the insurance

5        industry.  I live in Palm Beach Gardens.  I've lived there

6        for less than two years.  Before that I lived in Central

7        Florida in Altamont Springs.  I am single.  I do have two

8        children.  My daughter is head of human resources for the

9        British Embassy in Washington, DC, and my son is an

10       electrical engineer.  Hobbies:  Reading and investing.

11                   I am a Vietnam era veteran.  I served in the air

12       force.  I don't have any friends in the criminal justice

13       system.  The only crime I've been a victim of is my home was

14       burglarized about 20 years ago, but we believe it was just

15       children and nothing of value was taken.  I've never been a

16       witness in a criminal matter.  And I don't have a family

17       member or close friends whose been accused of any crime.

18                   No. 14, though presents a problem for me.

19       Religious or moral beliefs.  I espouse what might be called a

20       social gospel.  And what I mean by that is that I believe

21       that institutions, both Government and corporate, should be

22       existing for one purpose and that is the good of all.  And

23       when they break that promise, they deserve to be punished.

24                   And if I may just drop it down to 17, which is also

25       is there any reason I could not sit on this jury and give you

```
 1    a fair verdict.  We're talking about a corporation here

 2    that's owned by Tyco.  And if you recall about five years ago

 3    or six years ago Tyco's corporate president practically

 4    destroyed the company by taking billons of dollars illegally

 5    and leaving a lot of people without their life savings

 6    because of their investment in that company trustworthy.  And

 7    in that company's trustworthiness.

 8            I would find it very difficult for me to find in

 9    favor of that company or its subsidiary.

10            Going back to question 15, the -- I have not --

11    I've never served on a jury before.  Question 16, the only

12    physical problem I would have is, I have a hearing loss and

13    it's difficult for me to hear clearly in a large room.

14            THE COURT:  All right.  Of course, the person

15    bringing or the entity bringing the charges in this case is

16    the United States.  Do you have a particular problem with

17    them?

18            PROSPECTIVE JUROR:  No, I'm in favor of the United

19    States.

20            THE COURT:  All right.  Thank you.

21            PROSPECTIVE JUROR:  Not particularly it's

22    leadership in Washington, but --

23            THE COURT:  All right.  We don't have time to get

24    into all of that.  And we are to Ms. Is it Bouwens?

25            PROSPECTIVE JUROR:  Bouwens, yes.
```

```
 1                THE COURT:  How are you?

 2                THE WITNESS:  Very good, thank you, your Honor.

 3           My name is Kyle Bouwens.  My occupation is

 4  architect.  I've been doing that about 15 years.  I live in

 5  Boynton Beach.  Before that I lived in Naples.  My marital

 6  status is married.  My husband is a full-time graduate

 7  student and he also is an adjunct professor.  I have a

 8  toddler.  Right now my hobbies are fixing up my house.  No

 9  military service.  No family members or criminal, in the

10  criminal justice system.  I have been a victim of a crime.  I

11  have never witnessed a criminal matter.  I do not have any

12  family members that have been involved in a crime.

13           I have no religious beliefs that would preclude me

14  from making a judgment.  I have never served on a jury.  I

15  have no physical or emotional, language difficulties.  And

16  yes, I could be fair.

17                THE COURT:  Okay.  Thank you.

18           Mr. Russell.

19           PROSPECTIVE JUROR:  Hi.  I'm Lawrence Russell.  Aka

20  Sunny Russell.  Occupation, I'm an occupational therapist

21  assistant.  I have been for ten years.  I'm also a singer

22  song writer entertainer.  Working seven or eight days a week,

23  depending.  I live in Jupiter.  I've lived in West Palm Beach

24  area 25 years.  I'm single.  I play golf.  I fish, garden,

25  cook.  And different hobbies.  Very varied.  No military
```

1    service.  I don't have any family in the criminal justice

2    system.  I.

3          I've got some friends that are law enforcement

4    officers.  One FBI agent.  I have been a victim of a crime

5    and I was a witness to the same crime.  And even though I had

6    the license plate and everything else, they did nothing.  I

7    don't have any family members that I know of that have been

8    accused of a crime.  There are no religious or moral beliefs

9    that would preclude me from sitting in judgment of another

10   person.  I've been on a jury before.  It was a civil matter.

11   And we did reach a verdict.  I was not the foreperson.

12         The only physical problem I have right now is my

13   low back is not very good.  It went out Monday.  I hope it

14   comes back.  And the only reason I can think of not being

15   able to be here is the 15 days might throw a problem at work.

16   I wouldn't have a problem with being here, but they might.

17         THE COURT:  What kind of company is it?

18         PROSPECTIVE JUROR:  It's a rehab facility in

19   Stuart.  That's where I work.  Parkway Hilton Rehab.  And

20   they have to find substitutions for me when I'm away.  I have

21   a vacation coming up in October which is already scheduled.

22   And they have coverage for that.  It's sort of making them do

23   two vacations at once.

24         THE COURT:  Right.  How big a company is it?

25         PROSPECTIVE JUROR:  It's called Florida Therapy

```
 1    Professionals and they have different facilities in different

 2    areas of the state of Florida.  And the rehab department I'm

 3    in is like 14, 15 therapists divided amongst speech.  There

 4    are only two of those.  Physical therapist and occupational

 5    therapist making up the bulk is about six of us.  Five to

 6    six.

 7                THE COURT:  Okay.

 8                PROSPECTIVE JUROR:  Patient load, we have 170 bed

 9    facility.  Anywhere from 45 to 50 patients on board every

10    day.

11                THE COURT:  Sizable business.  Thank you, sir.

12                And Mr. is it Caughey.

13                PROSPECTIVE JUROR:  Caughey.

14                THE COURT:  How are you.

15                PROSPECTIVE JUROR:  Good, good.  Thank you, your

16    Honor.  My name is Jim Caughey.  I'm the owner of a Quiznos

17    Sub in Boca.  I've been living in Loxahatchee for about ten

18    years.  I'm single, no kids.  Hobbies, I like to play poker,

19    fish, and cook.  No military service.  I do have family

20    members and friends in the criminal justice system.  My store

21    was robbed once.  I've never been a witness.  And I have no

22    family members accused of a crime.  I have no problems with

23    religious or moral beliefs.  Never been on a jury before.  I

24    have no physical, emotional, or language difficulties, other

25    than being nervous.
```

```
 1              And two reasons.  One, I was a member of ADT.  I
 2  did have a few problems there.  And if I were to leave my
 3  store alone for three weeks, I would probably lose the store
 4  and my home.  Honestly, it's that close.  It's tough right
 5  now.  That's the only thing.
 6              THE COURT:  Who takes care of your store when
 7  you're not there?
 8              PROSPECTIVE JUROR:  I'm -- pretty much nobody.  I
 9  have a manager that's there with me, but you just can't get
10  good help nowadays pretty much --
11              THE COURT:  So you don't think your business can
12  survive --
13              PROSPECTIVE JUROR:  I honestly think I would
14  probably go out of business and lose my house.
15              THE COURT:  All right.  Thank you, sir.
16              And Mr., is it Humeston?
17              PROSPECTIVE JUROR:  Humeston.
18              THE COURT:  Humeston.  How are you?
19              PROSPECTIVE JUROR:  Very good, how are you today.
20              THE COURT:  Good.
21              PROSPECTIVE JUROR:  My name is Charles Humeston.
22  I'm a plumbing contractor in Boca.  I've lived in Boca over
23  20 years, or over 30 years actually.  Married.  Two girls.
24  High school and college.  My wife's occupation is, she's an
25  accountant for a management and development company.  I like
```

```
 1   to fish, hunt, ski, anything that's fun.  No military

 2   experience.  I have quite a few friends in the criminal

 3   justice system.  I've been a victim of a crime at my

 4   business.  I've never been a witness.  No family members in a

 5   crime.  No problem with religious beliefs.  Never been on a

 6   jury.  No physical or emotional.

 7            And the only problem would be running my business

 8   as far as -- I do have a partner though, but running the

 9   business with my plumbing company for 15 days.

10            THE COURT:  How big a company do you have?

11            PROSPECTIVE JUROR:  Twenty-five employees.

12            THE COURT:  And can your partner carry on for you

13   when you're not there?

14            PROSPECTIVE JUROR:  He probably could.  He would be

15   a little cranky, but he would get over it.

16            THE COURT:  All right.  Thank you, sir.

17            If we can pass the microphone to Mr. Gittleman.

18   How are you?

19            MR. MARKUS:  Judge, is there any way to turn the

20   air on?  It's really hot.

21            THE COURT:  I'll pass on your request.  I don't

22   know the answer to that.  We'll try to.

23            PROSPECTIVE JUROR:  Good.  My name is Abe

24   Gittleman.  I was self-employed.  I'm retired now.  I live in

25   Boynton Beach.  Twelve years.  I'm married.  My wife is
```

1   retired.  I have three adult children.  I ride the bike for a

2   hobby, and I play chess.  Prior military, army.  Any other

3   family members or friends employed in the -- no.  Have you

4   ever been a victim of crime?  No.  Have you ever been a

5   witness in a criminal matter?  No.  Do you have any family

6   members or close friends been accused of a crime?  No.  Would

7   any of the religious or moral beliefs preclude you from

8   sitting in judgment of another person or deliberating with

9   others?  No.  Have you ever previously served on a jury?  No.

10          Have you any physical, emotional, or language

11  difficulties that might hamper your performance as a juror?

12  No.  Can you think of any reason why you should not sit on a

13  jury and render a fair verdict based on the evidence and the

14  law as the Court will instruct you on the law?  No.

15          THE COURT:  All right.  Thank you, sir.

16          And Ms. Samuels.

17          PROSPECTIVE JUROR:  Is this working?

18          THE COURT:  It is.  We hear you quite well.

19          PROSPECTIVE JUROR:  I'm Nancy Samuels.  I'm a

20  certified public accountant for about 19 years.  I've been

21  with the Palm Beach County school district for one year.

22  I've lived in the Lake Worth, Boynton Beach area for 20

23  years.  I'm not married.  I have two children that are under

24  ten.  Hobbies are camping and baking.  And can I answer no to

25  the rest, or do I have to go through each one?

```
 1                THE COURT:  No, if your answer is no --
 2                PROSEPCTIVE JUROR:  No.
 3                THE COURT:  And you can serve then?
 4                PROSPECTIVE JUROR:  No times ten, I guess.  There
 5      are ten more.
 6                THE COURT:  All right.  Well, thank you.
 7                And we are to Ms. Lawrence.
 8                PROSPECTIVE JUROR:  Hi.  I'm Charlee Lawrence.  I'm
 9      a police dispatcher and training officer for Jupiter Police
10      Department.  Been there about eight and a half years.  I live
11      in the Gardens area.  I've been here about eight years.  I'm
12      married.  My husband is a police officer for a local agency.
13      I have a four year old child.  During my spare time, mostly
14      school, going to college.  No prior military service.
15           I do have my husband who is a police officer.
16      Along language with that my job is, we have plenty of friends
17      that are police officers.  Never been a victim of a crime.
18      Witness only when it pertains to my job.  If I've been on the
19      radio or taken a phone call for a crime.  My father, who is
20      now deceased, was accused of an alcohol related crime.  No
21      religious or moral beliefs.  I've never served on a jury.  No
22      difficulties.
23           The only reason I can think of I'm supposed to
24      leave Tuesday for vacation and maybe a little biased with law
25      enforcement due to my closeness.
```

```
 1              THE COURT:  Okay.  Tell me about the vacation.
 2   This has been planned a while and --
 3              THE WITNESS:  It has been planned since June.
 4              THE COURT:  It's a family vacation that you're
 5   going on?
 6              PROSPECTIVE JUROR:  Yes.
 7              THE COURT:  And I assume you're going somewhere
 8   else?
 9              PROSPECTIVE JUROR:  I'm going out of state.  Yes.
10              THE COURT:  Okay.  Well, thank you.
11              And if we could pass the microphone to Mr. Serio.
12              PROSPECTIVE JUROR:  My name is Michael Serio.  I
13   have two jobs.  Daytime, I'm an account executive.
14   Nighttime, I work for UPS.  I live in Loxahatchee 11 years.
15   Married.  Two children under ten.  I'm a musician for a
16   hobby.  I've had prior Army service.  I have family and
17   friends in law enforcement.  Never been a victim -- well,
18   yes, I've been a victim of crime.  Never been a witness.
19   Never had a friend or family member accused.  My religious
20   beliefs will not preclude.  Never previously served on a
21   jury.  No physical problems.  And no reason.
22              THE COURT:  All right.  No reason you couldn't be
23   fair?
24              PROSPECTIVE JUROR:  Correct.
25              THE COURT:  All right.  Thank you.
```

```
1              And Ms. Alfele.

2              PROSPECTIVE JUROR:  Alfele.

3              THE COURT:  Alfele.  How are you.

4              PROSPECTIVE JUROR:  Good morning.  Trish Alfele.

5   I'm in real estate.  Just recently started in real estate.

6   Prior to that I was in the beer industry for about 12 years.

7   I live in North Palm, Palm Beach Gardens.  I just moved there

8   from Lantana.  I'm recently divorced.  I have one five-year

9   old son.  My hobbies are tennis and ping pong.  No military

10  service.  My dad is a judge.  Never been -- well, recently a

11  very small crime.  I was a victim of.  I've never been a

12  witness.  Never had family members accused of a crime.  No

13  religious or moral beliefs that would hinder me.  I've never

14  been on a jury.

15             I don't have any physical, emotional, or language

16  difficulties.  And the only difficulty would be picking up my

17  son by 4 every day, but I can work it out.

18             THE COURT:  All right.  Well, thank you.

19             And Ms. Hemmingway.

20             PROSPECTIVE JUROR:  Hi.  I'm Carol Hemmingway.  I

21  work part time in food service.  I live in Boynton Beach.

22  I'm widowed.  I have three adult children.  My hobbies are

23  reading, crossword puzzles, and I do a number of volunteer

24  things through my church.  I have no prior military service.

25  I have no friends in the criminal justice system.  I have
```

1    been a victim of a crime.  And I was once a witness in one of

2    the crimes.  I have family members who have been accused of a

3    crime.  I don't have any moral beliefs that would prevent me

4    from sitting on a jury.

5            I have served on juries before in both criminal and

6    civil cases.  We were able to reach judgment in at least a

7    couple of them.  But I did not serve as foreman.  I have no

8    physical or emotional or language problems.  And I don't have

9    any reason why I couldn't sit on this jury.

10            THE COURT:  Okay.  You mentioned family members

11    accused of crime.  Were those in state or federal court?

12            PROSPECTIVE JUROR:  State.

13            THE COURT:  State court?

14            All right.

15            PROSPECTIVE JUROR:  Not this state either.

16            THE COURT:  I'm sorry?

17            PROSPECTIVE JUROR:  Not in this state either.

18            THE COURT:  All right.  Thank you.

19            And we are to Ms. Roundy.  How are you?

20            PROSPECTIVE JUROR:  Hi.  I am Kari Roundy.  I have

21    a home based business as an interior design consultant, so

22    I'm a one-man show.  I've been doing that just over three

23    years.  I live in Boca Raton and have been there 11 years.

24    Married.  My husband is a college professor.  No children.

25    Hobbies are yoga, travel, decorating.  No prior military

1    service.  No family members and friends employed in the

2    criminal justice system.  Never been a victim of crime.

3    Never witnessed a criminal matter.  Never had a family member

4    or friend accused of a crime.  No religious or moral beliefs

5    to keep me from sitting in judgment.  Never been on a jury.

6    And no physical, emotional, or language difficulties.

7            The only reason it would be difficult to sit in the

8    next two days is, I have a new client that I've committed to

9    being with all day long while the movers come.  But I mean I

10   would probably lose that job.  So, next week, I'm free.

11           THE COURT:  Can you work around it?  Is this

12   person -- I mean your client either after we close or --

13           PROSPECTIVE JUROR:  They're coming tomorrow at

14   9:00 a.m. I'm supposed to there.

15           THE COURT:  To help the movers, is that the idea?

16           PROSPECTIVE JUROR:  To help place the furniture.

17           THE COURT:  All right.  Well, I recognize that's an

18   imposition.  Can you get by it or not?

19           PROSPECTIVE JUROR:  It would be unfortunate for me.

20   I would lose money, probably this month's money.  I mean, I

21   don't know what to say.

22           THE COURT:  All right.  Well, the only way I have

23   to assess it, a lot of people have some problems.  I need to

24   try to be able to assess the impact on you.  And that's what

25   I'm trying to understand.  And you think this is a serious

1    impact then?

2              PROSPECTIVE JUROR:  Yeah, I mean she would say,

3    well, I can't use you and thank you.  I mean I would lose the

4    client.

5              THE COURT:  All right.  Thank you.

6              And Ms. Cohen.  How are you?

7              PROSPECTIVE JUROR:  Good.  My name is Myrna Cohen.

8    I'm retired five years.  I was previously employed by Social

9    Security for 37 years.  I live in Delray Beach.  I'm there

10   five years.  I'm married.  My husband is retired, and he

11   worked for the Department of Transportation for 30 years.  I

12   have adult children.  One is a Special Ed teacher.  And one

13   is an administrative assistant.  My hobbies are knitting and

14   playing mahjong.  I've never been in the military.  No family

15   members in the criminal justice system.  Never been a victim

16   of a crime.  Never witnessed one.  No family members have

17   been accused of a crime.

18             I would be able to sit on the jury regarding any

19   deliberations.  I served on a criminal, I'm sorry, not a

20   criminal.  A civil case.  I was not the foreperson.  I have

21   no emotional or language difficulties.  And I would be able

22   to sit.

23             THE COURT:  Okay.  Thank you.

24             And if we can pass the microphone to Ms. Cox.

25             Good morning.

1          PROSPECTIVE JUROR:  Good morning.  My name is

2    Debora Cox.  I've work in the IT profession for 25 years as

3    products cord. and also as a products manager.  I live in

4    Royal Palm Beach.  I have so for ten years.  I've been in the

5    community for 30 years in Palm Beach County.  I am married.

6    My husband is a schoolteacher.  He teaches history.  I do

7    have two sons.  One is married, the other one is a senior in

8    high school.  My hobbies are bike riding.  I have not served

9    in any military services.  None of my families or friends are

10   in the criminal justice system.

11         I have been a victim of a crime.  It was a break-in

12   about 20 years ago.  I do not have any family members or

13   close friends that have been accused of any crimes.  I would

14   not have any issues with religious or moral beliefs to serve.

15   I have served on a previous jury.  It was a criminal court.

16   We did not reach a verdict.  And I was not the foreperson.  I

17   do not have any physical emotional or language difficulties.

18   And there's no reason for me not to sit on the jury.

19         THE COURT:  All right.  Thank you.

20         And Mr. Rovner.

21         PROSPECTIVE JUROR:  Yes, my name is Joe Rovner.

22   I'm a videographer, and I live in Boynton Beach for the last

23   six years.  I'm married.  My wife is retired.  I have three

24   grown children.  My hobby is stained glass.  I've served in

25   the military in the reserves.  I don't have any family

1    members in the criminal justice system.  I've been a victim

2    of a crime.  That was a break-in years ago.  I've never been

3    a witness in a criminal matter.  I don't have any family

4    members or myself or close friends that have been accused of

5    crimes that I know of.  I don't have any religious or moral

6    beliefs that would preclude me from sitting in the jury.

7    I've never served in a jury.

8              I don't have any physical, emotional, or language

9    difficulties that would hamper my performance as a juror.

10   And I don't any other reasons for not sitting on the jury,

11   except for that it would be an extreme financial hardship for

12   me if I had to serve 15 days.  In fact, anything beyond this

13   week.

14             THE COURT:  Tell me why.  What's the problem?

15             PROSPECTIVE JUROR:  I'm a videographer and I'm an

16   independent contractor.  I videotape depositions.  Firstly, I

17   had surgery on July 1st and I was out of work for two months.

18   I was recuperating, and I've just gotten back the last week

19   of August.  And this week and this last week I couldn't take

20   any work because I have to know before three o'clock if I'm

21   available for the following day.  And I had to wait until

22   5:30 to call up to see if I was on call for jury duty.  So

23   working --

24             THE COURT:  I thought -- didn't it just start

25   Monday?

1              PROSEPCTIVE JUROR:  No, September 2nd.  Tuesday,

2    September 2nd.

3              THE COURT:  All right.  Go ahead.

4              PROSPECTIVE JUROR:  And so I haven't worked.  I've

5    only take three jobs in the last -- in the afternoon that I

6    knew I didn't have any jury duty.  And aside from the fact

7    that I haven't worked for two months and it would be an

8    extreme hardship for me.

9              THE COURT:  All right.  Thank you.

10             And Mr. Locurto.

11             PROSPECTIVE JUROR:  Yes, sir.  Good morning.

12             THE COURT:  Good morning.

13             THE MARSHAL:  My name is John Locurto.  I'm a

14   commissioned sales representative for a large group health

15   insurance.  Before that I worked at Boca West Security.  I've

16   lived in Boca Raton for 30 years.  Married.  My wife works at

17   Macy's.  I have one child in high school, senior.  Spare

18   time, sports.  No prior military service.  No family members

19   employed in the criminal justice system.  I do have friends,

20   since I worked at security, I had a lot of Palm Beach County

21   Sheriff's Department friends.

22             Never been a victim of a crime.  I've never

23   witnessed a crime.  I was convicted of a misdemeanor,

24   disorderedly conduct, in 1966 when I was 19.  I have no

25   problems with religious or moral beliefs.  I never served on

1    a jury previously.  No physical or emotional or language

2    problems and I can't think of any reason why I could not sit

3    on the jury.

4              THE COURT:  Thank you, sir.

5              And Mr. Anesca.

6              PROSPECTIVE JUROR:  My name is Samuel Anesca.  I

7    work for a tree company.  I live in (unintelligible) for 17

8    years.  Married.  Three kids.  My wife doesn't have a job.

9              THE COURT:  Would you hold the mike a little

10   closer?

11             PROSPECTIVE JUROR:  Closer?

12             MR. ENTIN:  And if he would start over.

13             THE COURT:  He works for a tree company.

14             PROSPECTIVE JUROR:  My wife doesn't work.  I have

15   three children.  Seventeen, 15, and 9.  No hobby.  No

16   military service.  No family members or friends in the

17   criminal justice system.  No victim -- I've never been a

18   victim of crime.  Never been a witness in a criminal matter.

19   No family member, friends, including myself, been accused of

20   a crime.  No religious or moral belief.  I've never been in

21   the jury.  No physical, emotional, language problem.

22             The only thing I can think of that would keep me

23   from being a part of it, my wife doesn't have a job now and

24   it's hard for me to not -- to miss a day off work.

25   Otherwise, I lose my house.

```
 1              THE COURT:  Okay.  And your job is you work for a
 2    tree trimming.
 3              PROSPECTIVE JUROR:  For a tree company.
 4              THE COURT:  Uh-huh.  And so you don't think -- I
 5    know we don't pay a lot for jury service, but you don't think
 6    you can get by for the 15 days?
 7              PROSPECTIVE JUROR:  I don't think so.
 8              THE COURT:  How big a company do you work for?
 9              PROSPECTIVE JUROR:  It's not that big a company.
10    Seventeen people.
11              THE COURT:  All right.  Thank you.
12              And Mr. Perez.
13              PROSPECTIVE JUROR:  Yes.  Good morning.
14              THE COURT:  Good morning.
15              PROSPECTIVE JUROR:  My name is Roman Perez.  I got
16    problem for the English.  I'm sorry.  I work for 50 years as
17    a mechanic.  I live in the West Palm for 32 year.  I live in
18    West Palm.  I'm married.  My wife is -- work in the house.  I
19    got four children.  Son, 47, 44, 32, and my daughter is 44 --
20    44 or 45.  I don't remember.  The hobbies, my hobby is
21    helping my son every day.  No military.  No, I don't got the
22    family that work in the system, criminal.  No problem.  I no
23    have criminal.  I no understand No. 12.
24              THE COURT:  No. 12 is, have you ever been a witness
25    in a criminal case?
```

```
1              PROSPECTIVE JUROR:  No, no.  No.  No. 14, I don't

2    understand No. 14, too.

3              THE COURT:  Do you have a religious belief that

4    would keep you from serving on a jury?

5              PROSPECTIVE JUROR:  No.

6              THE COURT:  Okay.  Have you ever been on a jury

7    before?

8              PROSPECTIVE JUROR:  I got the -- no problem for the

9    emotional.  The big problem for the English.

10              THE COURT:  Have you been able to understand the

11    other jurors here as they've been talking?

12              PROSPECTIVE JUROR:  Excuse me?

13              THE COURT:  Have you been able to understand the

14    other jurors when they've been talking?

15              PROSPECTIVE JUROR:  Maybe 35, 40 percent.

16              THE COURT:  Thirty-five or 40, you think?

17              PROSPECTIVE JUROR:  Yeah.

18              THE COURT:  Because you speak pretty well.

19              PROSPECTIVE JUROR:  My problem is I live in the

20    more -- in the United States for 1973.  '73.  But the

21    problem, I working in the company, they no speak English.

22    Okay.  For a long time.

23              THE COURT:  All right.  So you think you would have

24    hard time understanding the witnesses and the lawyers?

25              PROSPECTIVE JUROR:  Yes.  Very limited for my
```

English.

THE COURT:  Okay.  Well, thank you, sir.

PROSPECTIVE JUROR:  Thank you, sir.

THE COURT:  Ms. Goldbaum, how are you?

PROSPECTIVE JUROR:  I'm very good, thank you.  My name is Linda Goldbaum.  I work full time at the Rand Eye Institute as a medical transcriptionist.  I also work part time in the evening at the Isle of Capris Casino in their gift shop.  I've lived in Boca Raton for over 20 years.  I now live in Boynton Beach.  My marital status is happily divorced.  I have three college aged children.  They're all in college, thank God.  My hobbies are traveling in my spare time when it happens.  No military service.

No friends employed by the criminal justice system. I've never been a victim.  Never been a witness.  Don't know anyone that's been accused of a crime.  Except on TV.  No religious or moral beliefs that would preclude me.  I have served on a jury in a criminal case that was -- that we did reach a verdict.  I was not the foreperson.  I have no physical, emotional, or language difficulties.

And No. 17, the only reason is that my employer would be upset with me, but I have tons of vacation days that I would be happy to use.

THE COURT:  All right.

PROSPECTIVE JUROR:  And would be honored.

```
 1                    THE COURT:  Well, thank you.

 2             Okay.  Mr. Pruitt.  How are you?

 3             PROSPECTIVE JUROR:  I'm good.  How are you?

 4             THE COURT:  Good.

 5             PROSPECTIVE JUROR:  My name is Lowell Pruitt.  I'm

 6   the visitors services manager at the Norton Museum of Art.

 7   I've been there for 7 years.  I've been living in West Palm

 8   Beach for 11 years.  I'm single.  No kids.  Hobbies are

 9   playing video games and basketball.  Never been in the

10   military.  I don't think I have any friends that are

11   currently in the criminal justice system.  I've had my check

12   card number stolen.  Never been a witness.  Never been of a

13   crime.  My beliefs would not preclude me.

14             Never been on a jury.  And don't have any physical,

15   emotional, or language difficulties.  And as long as it's not

16   on weekends, it would be fine for me to serve.

17             THE COURT:  Okay.

18             PROSPECTIVE JUROR:  I do have a wedding where I'm a

19   groomsman in a couple of weeks and -- but that's on the

20   weekend.

21             THE COURT:  We aren't going to be here on weekends.

22             PROSPECTIVE JUROR:  Okay.  Good.

23             THE COURT:  Other than that you're okay then?

24             PROSPECTIVE JUROR:  Yes, sir.

25             THE COURT:  Great.  Thank you.
```

```
 1                    And Mr. Canas.

 2                    PROSPECTIVE JUROR:  Yes, sir.

 3                    THE COURT:  How are you?

 4                    PROSPECTIVE JUROR:  Just fine.  Noah Canas.  I've

 5     been a sales representative for different companies for 13

 6     years.  I live in Boynton Beach.  Not married.  Single.  No

 7     kids.  Hobbies:  Anything sports related.  No military

 8     service.  No family members in the criminal justice system.

 9     Never been a victim of a crime.  Never witnessed a crime.  I

10     do have family members that were accused of a crime.  No

11     religious or moral issues.  Never served on a jury before.

12     No physical or emotional issues.

13                    Seventeen, the only reason I could not sit on the

14     jury is that I've been out of work for four months and I was

15     just recently hired at a new company and I start on Monday.

16     So being out for more time, the financial strain would just

17     be tougher.

18                    THE COURT:  Okay.  Will your job still be there?

19     Will they hold the job for you?

20                    PROSPECTIVE JUROR:  I would assume yes, but, again,

21     I haven't worked for four months.

22                    THE COURT:  All right.  And so you don't think you

23     can cope with it?

24                    PROSPECTIVE JUROR:  For a longer time, it just --

25     just the financial strain.
```

```
 1              THE COURT:  Okay.  Thank you, sir.

 2              Let's pass the microphone to Ms. Tower, who is back

 3    in the corner.  How are you, Ms. Tower?

 4              PROSPECTIVE JUROR:  Good morning.  Liliana Davidson

 5    tower.  I'm a fundraiser for University of Miami;

 6    specifically, the libraries.  I live in Palm Beach Gardens.

 7    I'm a native of Palm Beach County.  I'm married.  My spouse

 8    is a computer geek, self-employed.  I have two children.  One

 9    is an employee screener for nuclear power plants.  My hobbies

10    are art, books, and gardening.  I have no military service.

11              I have lots of friends who are lawyers.  My home

12    has been a victim of a crime.  Twenty some years ago.  I have

13    not been a witness to a criminal matter.  I do not have any

14    family members who have been accused of crimes.  I don't have

15    any religious or moral preclusions.  And I have served on a

16    jury.  And I was not the foreperson.  And it settled.

17              No physical or emotional or language difficulties.

18    And it will be difficult to sit for three weeks, but the

19    University is very civic minded and I would not -- my job

20    would not be in jeopardy.

21              THE COURT:  Okay.  Good.

22              The lawyers, are any of them prosecutors or

23    criminal defense lawyers?

24              PROSPECTIVE JUROR:  Negative.  They're trust.

25              THE COURT:  Thank you.
```

1            And Mr. Harris.  How are you?

2            PROSPECTIVE JUROR:  I'm fine, sir.  My name is

3  Jerome Harris.  I'm a painter for the last 30 years.  I live

4  in Belle Glade.  I've been there all my life.  Single.  I

5  have three adult children.  No hobbies.  No military service.

6  No families and friends in the criminal justice system.  I

7  have been a victim of crime.  I have not been a witness in a

8  criminal matter.  I have no family and friends in the -- that

9  have been accused of crime.  I have no religious or moral

10  preclusions about sitting on a jury.

11            I have been on a jury before.  Criminal case --

12  make that a civil case.  And we did reach a verdict.  And I

13  wasn't the foreman.  I have no physical or emotional or

14  language difficulties that might hamper my performance as a

15  juror.  And I have no reason why I couldn't sit on a jury.

16            THE COURT:  All right.  Thank you, sir.

17            And Ms. Bergman.

18            PROSPECTIVE JUROR:  Yes.  My name is Martha

19  Bergman.  I'm a Palm Beach County School Board bus driver.

20  My previous job, which is Palm Beach County courthouse, civil

21  circuit law department, co-clerk.  Various, marriage license.

22  I did it all.  I live in Riviera Beach.  I've been there 36

23  years.  I'm divorced.  My ex-spouse is deceased.  I have two

24  adult children.  My daughter is a schoolteacher for 14 years.

25  She is 42.  My son is 34.  My hobby is reading.  I have no

1    military service.

2            I do have family members and friends in the

3    criminal justice system.  My ex-husband was a law enforcement

4    officer for the sheriff's department.  My niece is a

5    sheriff -- works for the sheriff's department in Dade County.

6    I do have friends that's in the public -- I mean working in

7    the court system.  I know lawyers and judges, et cetera.  I

8    have been a victim of a crime.  I have not witnessed a

9    criminal matter.  I have no family members that's been

10    accused of a crime.  I have no religious or morals to keep me

11    from sitting on the jury.

12            I have previously served on a jury.  It was a

13    criminal case.  We did reach a verdict.  I was not a

14    foreperson.  I have no physical or emotional or language

15    barrier.  And I can sit -- have no reason for not sitting on

16    the jury.

17            THE COURT:  All right, thank you.

18            Mr. Joyce.

19            PROSPECTIVE JUROR:  Yes.

20            THE COURT:  How are you?

21            PROSPECTIVE JUROR:  Very well, thank you.  My name

22    is Alfred Joyce.  I'm an irrigation pump technician.  I also

23    practice chiropractic part time.  I live in North Palm Beach,

24    Florida.  I've been in Palm Beach County for about 15 years.

25    I'm single.  I have no children.  In my spare time I play

1   golf and scuba dive and I practice yoga.  I've not been in

2   the military.  I have no family members or friends in the

3   criminal justice system.  I have been a victim of a crime.  I

4   have not witnessed any significant criminal matters.  None of

5   my family members have ever been accused of any crimes.  I

6   have no religious problems with sitting on a jury.

7          I have sat on two juries.  One federal, one state.

8   We -- I was not the foreperson.  And we did come to

9   conclusions on both of those juries.  I have no physical

10  problems sitting for a jury.  The last question, three weeks

11  is a long stretch for me.  I work for a small company with

12  four employees.  And I know I wouldn't get paid for it.

13  Three weeks would be a long time.

14          THE COURT:  Can you do it?

15          PROSPECTIVE JUROR:  Begrudgingly, yeah.

16          THE COURT:  I understand it would be -- I'm trying

17  to understand how big a hardship it is for you, whether it is

18  something you can cope with or whether it's --

19          PROSPECTIVE JUROR:  It would be a financial strain

20  on me.  I mean I could do it and it would be a financial

21  strain.

22          THE COURT:  Will they pay you?

23          PROSPECTIVE JUROR:  I believe not.

24          THE COURT:  How big a company is it?

25          THE WITNESS:  Four employees, and I'm the lead guy

1    in the field.

2              THE COURT:  All right.  Thank you, sir.

3              PROSPECTIVE JUROR:  Thank you.

4              THE COURT:  And Mr. Livingston.

5              PROSPECTIVE JUROR:  Good morning.  My name is

6    Norman Livingston.  My occupation is website designer,

7    graphic designer.  Prior to that I was -- did residential

8    maintenance.  I've lived in Boynton Beach area now for about

9    15 years.  I'm divorced.  No children.  My hobbies are golf,

10   fishing, tennis.  No military service.  None of my family

11   members work for the criminal justice system.  I've never

12   been a victim of a crime.  I've never witnessed a crime.  My

13   family members or friends have not been accused of a crime.

14   I've been accused of DUI.  I have no religious beliefs that

15   would prevent me.

16             I've never served on a jury.  And I have no

17   physical, emotional problems that would prohibit me from

18   doing this.  The last one though, I just started

19   incorporating my business four months ago for full time and

20   if this goes on, without being able to accept new contracts

21   in the three-week period, it will devastate me.

22             THE COURT:  Are you the -- are you the only person

23   in your business?

24             PROSPECTIVE JUROR:  Yes, I have no employees other

25   than myself.

```
 1                THE COURT:  And how do you get paid?  By the job?
 2                PROSPECTIVE JUROR:  Yes, I get paid by contract.
 3                THE COURT:  And you don't think you can -- 15 days
 4      is too much.
 5                PROSPECTIVE JUROR:  Yes, I have no income other
 6      than the $40 that the Court gives you.  Plus, on top of that
 7      I'll lose additional contracts that will come in during this
 8      three week period for the future.
 9                THE COURT:  All right.  Thank you, sir.
10                And we are to Ms. Blye, how are you?
11                THE WITNESS:  I'm fine.
12                THE COURT:  Please tell us about yourself.
13                PROSPECTIVE JUROR:  My name is Karen Blye.  I'm a
14      certified nursing assistant.  My general residence is Belle
15      Glade, Florida.  I've been there all my life.  I'm married.
16      I have three children.  Seventeen, 16, and 13.  No hobbies.
17      No prior military experience.  I know no one in the criminal
18      justice system.  I have been a victim of a crime.  I haven't
19      been a witness of a crime.  I do have a close family member
20      in the criminal system.  No religious beliefs.
21                I have been on a jury, civil.  I wasn't the
22      foreperson.  And we came to a conclusion.  No physical,
23      emotional.  And no for 17.
24                THE COURT:  Okay.  You feel you can serve then and
25      be fair to both sides?
```

```
 1                    PROSPECTIVE JUROR:  Excuse me?

 2              THE COURT:  You can serve and be fair to both

 3    sides?  I'm trying to understand what you said to 17, the

 4    last question.  Is there any reason you can't serve?

 5              PROSPECTIVE JUROR:  No.

 6              THE COURT:  I think you said you had a close friend

 7    accused of a crime?

 8              PROSPECTIVE JUROR:  Family member.

 9              THE COURT:  Was that a state or federal court?

10              PROSPECTIVE JUROR:  Federal.

11              THE COURT:  Federal court?  What kind of case?

12              PROSPECTIVE JUROR:  Drugs.

13              THE COURT:  And was it local?

14              PROSPECTIVE JUROR:  No.

15              THE COURT:  It was somewhere else other than the

16    Southern District?

17              PROSPECTIVE JUROR:  Yes.

18              THE COURT:  Is there anything about that experience

19    that causes you to worry about whether you could be fair as a

20    juror, fair to both sides, the Government and the defense?

21              PROSPECTIVE JUROR:  I don't think so.

22              THE COURT:  Okay.  All right.  Thank you.

23         And Ms. Hoffmann.

24              PROSPECTIVE JUROR:  Good morning.  My name is Heidi

25    Hoffmann.  I've been in the private security now for five
```

| | |
|---|---|
| 1 | years.  I live in Loxahatchee.  Previously in West Palm. |
| 2 | Single.  No children.  In my spare time I train horses, bare |
| 3 | race, go fishing and hunting.  No prior military.  Both my |
| 4 | parents work for Broward County Correctional Office.  I've |
| 5 | never been a victim of a crime.  Never been a witness.  No |
| 6 | family or friends been accused.  I have no religious beliefs, |
| 7 | nor I have no any reason to not be a juror.  I've been in one |
| 8 | federal, two criminal, one civil.  Never a foreman.  And we |
| 9 | all came to a verdict. |
| 10 | THE COURT:  Okay.  And the answer to 17, can you |
| 11 | serve and be fair to both sides? |
| 12 | PROSPECTIVE JUROR:  Yes, sir. |
| 13 | THE COURT:  Great.  Thank you. |
| 14 | And we are to Ms. Chapman. |
| 15 | PROSPECTIVE JUROR:  That's me.  Thank you. |
| 16 | THE COURT:  How are you? |
| 17 | PROSPECTIVE JUROR:  Maria Chapman.  My occupation, |
| 18 | I work for Hertz Rent a Car at the West Palm Beach Airport |
| 19 | for about 8 years.  I live in West Palm Beach.  I'm here |
| 20 | about 16 years.  I'm divorced.  I have four adult children in |
| 21 | their 30s.  My spare time, I love hanging out with my |
| 22 | grandchildren.  I have never been in the military.  I do have |
| 23 | a son that is a Palm Beach County Sheriff.  I've never been a |
| 24 | victim of a crime.  I have never witnessed any.  I have had a |
| 25 | family member that has been accused of a crime. |

```
 1              I have no religious or moral beliefs.  I have
 2    served on a jury maybe 20 years ago.  I think it was civil.
 3    I have no physical, emotional problems.  And I can serve.  I
 4    work for a union, so there is no problem there.  They must
 5    let me go.
 6              THE COURT:  Your family member, was that state or
 7    federal court?
 8              PROSPECTIVE JUROR:  It was out of state.  For the
 9    state.
10              THE COURT:  All right.  Thank you.
11              And we are to Mr. Cerola.  Wait for the microphone,
12    which Ms. Chapman is kind enough to bring you.
13              PROSPECTIVE JUROR:  Hi.
14              THE COURT:  Hi.
15              PROSPECTIVE JUROR:  Joseph Cerola.  I'm a
16    self-employed biomedical engineer.  My -- I live in Delray
17    Beach.  Have lived there about 12 -- around 12 years.  I'm
18    married.  My wife is an estate manager.  We have six adult
19    children.  Hobbies, I restore antique cars and show them.  No
20    prior or present military service.  No members employed in
21    the criminal justice.  I have never been a victim of crime.
22    The witness, I was questioned by a -- the FBI involving a
23    client.  It was about 20 years ago.  They were involved with
24    something that I'm not sure what it was.
25              But my wife was also involved in a RICO case
```

1    involving her employer and this was -- it was quite a large

2    case.  This was in Indiana.  We never have been accused of a

3    crime.  I have no problems with religious or moral beliefs.

4    Never served on a jury.  No physical or emotional problems.

5    And the only reason I could give is basically three weeks of

6    no billable hours, you know, that might be a problem.

7              THE COURT:  Is it something that you can cope with?

8              PROSPECTIVE JUROR:  Yeah, I can cope with it.

9              THE COURT:  And tell me, your wife, you said she

10   was involved.  Was she a witness or how was she involved in

11   that case?

12             PROSPECTIVE JUROR:  She was the administrative

13   assistant to the chairman and president of a company that was

14   involved in drug -- they were a drug brokerage and they

15   falsified the dates on sample drugs and were selling them.

16   And she was questioned about that.  She was a witness.

17             THE COURT:  All right.  Okay.  Thank you.

18             It's -- the things we've got -- the lawyers will

19   have some questions for you and I'm not sure quite how long

20   they're going to be.  They'll be more than a few minutes.

21   Let's stop and take a break.  It's important to come back to

22   the seat that you're in.  And let's keep it to 15 minutes.

23   If we're not back in 15 minutes, we're going to have a tough

24   time finishing by lunch.  And we'd like to get this process

25   finished by lunch so we can -- some of you can get about your

1  business.  So we'll be in recess until 11:15.

2       (Pause in Proceedings.)

3            THE COURT:  Okay.  If anyone wants to step outside

4  you can.  If you want to stay here and stretch, that's fine

5  too.  Fifteen minutes.

6       (Recess at 10:59 a.m.)

7            THE COURT:  Okay.  Please have a seat.

8            I think we still have a couple people coming in.

9  Before we see what questions the lawyers have for you, a

10  couple of you mentioned something you overlooked to Angela.

11  Let's see.  Juror No. 4, Mr. Pabisz.

12            PROSPECTIVE JUROR:  Pabisz.

13            THE COURT:  Sorry.  Tell me what the -- you

14  overlooked something, apparently.

15            PROSPECTIVE JUROR:  Yes, your Honor.  I failed to

16  remember that my father was convicted of tax evasion back in

17  1993.  He served time for that.

18            THE COURT:  Where was that?

19            PROSPECTIVE JUROR:  In New York State.

20            THE COURT:  Is there anything about what happened

21  to him that causes you to worry about whether you could be --

22            PROSPECTIVE JUROR:  No, there is not.

23            THE COURT:  -- serve and be fair?

24            And Ms. Bottinelli, you remembered something as

25  well.

```
 1              PROSPECTIVE JUROR:  Yes, I'm originally from New

 2   Jersey and a good friend, a couple, a husband and wife, lived

 3   in a very nice section where organized crime members lived.

 4   And the husband arranged to have his wife murdered.  That was

 5   in 1985.

 6              THE COURT:  And tell me about --

 7              PROSPECTIVE JUROR:  He is in jail for the rest of

 8   his life.  There was a big trial.  Newspapers.  Story

 9   written.  Film on TV.

10              THE COURT:  Now, this is a case under the

11   racketeering laws.  There may be testimony concerning

12   organized crime in this case.  How do you feel about serving?

13              PROSPECTIVE JUROR:  I'm not real happy with

14   organized crime people.

15              THE COURT:  Well, can you decide this case though

16   based on the facts of this case?

17              PROSPECTIVE JUROR:  I'm very prejudiced against

18   organized crime because I lost a good friend.

19              THE COURT:  All right.  Let's see if the lawyers

20   have questions for you.  Does the Government have questions?

21              MR. MCCORMICK:  We do, your Honor.  Thank you.

22              Hello, ladies and gentlemen.  Again, my name is

23   Brian McCormick.  And Bill Shockley and I are the two

24   prosecutors.  You'll be hearing us if you're sworn as a jury.

25   Periodically, we'll be alternating who does what in the
```

1    courtroom.

2              This is about the only time we have a chance to

3    really talk to you and find out what you think about certain

4    issues.  And it is important to both sides that you be

5    candid.  I know you have been in terms of the Court asking

6    questions.  I just have a few additional questions.  And the

7    main thing that we need from you is your assurances that

8    you're going to be fair and impartial.  That's all either

9    side can ask.  We can only ask that you decide the case on

10   what occurs in this courtroom.  Not what occurs and what you

11   know from your own experiences or what you may have seen in a

12   movie or read in the paper years ago.

13             Right here is what we want you to pay particular

14   attention to.  This case, it's a very important case for both

15   sides.

16             I noticed that when you were questioned by the

17   judge he was under the impression you were only serving, you

18   just began your service this week.  And yet, I believe you

19   did -- you were on service last week.  Did any of you serve

20   on a jury last week?

21             This is really your first jury in this term then,

22   correct?

23             Okay.  In this case, ladies and gentlemen, as the

24   Court has already told you, it's an organized crime case in

25   the sense that it's a RICO conspiracy charge.  Now, the same

```
 1   presumptions apply.  The men sitting here are innocent until

 2   proven guilt, until we have proven to your satisfaction that

 3   they're guilty.  However, the racketeering charge in this

 4   case, you're going to hear evidence about organized crime.

 5   You're going to hear evidence about the Gambino crime family.

 6   There's going to be witnesses testifying about that.

 7         I know this is the 21st Century and you read the

 8   newspapers, you hear things.  What I'm asking you to do is to

 9   put aside anything that you ever read or saw on a TV series

10   or things of that nature, that has nothing to do with this

11   case.  You can only consider what the evidence is in this

12   case and the reasonable inferences that you can draw from

13   that evidence.

14         Now, can you do that?  Can you assure both sides

15   that you have no preconception that this case, because it's

16   an organized crime case, that the defendants are guilty?

17   Because that's not the case.  It's up to the Government to

18   prove it.  I'm asking for your assurances that's what you

19   will do and that's the duty you will have.  The judge will

20   give you the law in the case, you will have heard the

21   evidence, and it will be up to you to decide the guilt or

22   innocence of these defendants.

23         Now, in this case you're also going to hear from

24   witnesses testifying from the witness stand who are operating

25   under an agreement, a plea agreement with the Government.
```

1    Now, what that means is, these witnesses have agreed to

2    testify in return for being able to plead guilty and a high

3    expectation or hope that they may get a reduced sentence.

4    That's going to be up to a whole other series of decisions

5    made.  What I'm asking you is, do you have any preconception

6    that because somebody pled guilty and agrees to testify, that

7    they're testimony isn't believable?

8            Because I'll tell you, the judge is going to tell

9    you that you can believe that testimony but you've got to

10   scrutinize it very, very carefully because they have a reason

11   to testify.  And what I'm asking you is, do you have any

12   pre-conception that it's just unbelievable because somebody

13   broke the law and they've agreed to testify?

14           We want and we urge you to look at this testimony

15   and scrutinize it.  And we also urge you to use common sense

16   and use the other facts in the case to determine whether this

17   is credible testimony.  Can all of you do that?  Can all of

18   you make that commitment up front?  Because that's all we can

19   ask for.

20           You're also going to hear testimony from people who

21   have lied in the past.  Now, the judge is also going to tell

22   you you have to view that testimony with -- very carefully

23   and with scrutiny too.  But there again, we ask you, yes,

24   view it very carefully.  And we ask you also to judge that on

25   the circumstances of the case.  Is it credible?  That's your

1    decisions.  But what I'm concerned about and what I would

2    like your assurances is that you're just not going to say I

3    don't believe a witness because they lied in the past.  We

4    ask you to take it into context.

5            PROSPECTIVE JUROR:  Will we know what kind of deal

6    they made to testify?

7            MR. MCCORMICK:  Yes, sir, you will.  Given that

8    question, does anybody else have any question about whether

9    or not they can assess this evidence in the light that I've

10   just described?

11           You've got other evidence that is going to come

12   in -- from the witness stand.  People who are recorded.

13   People who are -- and the subjects of the recording don't

14   know they're being recorded.  Now you're going to find this

15   is a perfectly permissible law enforcement technique to

16   gather evidence.  A very favorable way of gathering evidence.

17   That's going to be presented to you probably in this case,

18   too.

19           Does anybody have any preconception about that,

20   that because there is a recording, because a Government agent

21   or a cooperating witness wears a wire and obtains evidence in

22   that manner, that they don't like that kind of evidence, it

23   shouldn't be believed, it shouldn't be used in a court?

24   Notwithstanding the fact that it's perfectly permissible.

25           Does anybody have that feeling about recordings

1    that I've just described?

2            Now, the only thing the Government can ask and the

3    only thing anyone can ask is that you view that evidence as

4    any other evidence.  It's up to you, you're the triers of the

5    fact here, and your decision is going to be to weigh all the

6    testimony that's provided and to decide who's telling the

7    truth, who's not, how much credit to be given to one witness,

8    how much credit to be given an issue in the case.  And

9    that's -- as long as you can give that assurance, the

10   Government is satisfied.

11           Now, I know we talked or the judge talked at some

12   length about ADT.  Let me ask you, who has ADT in their home,

13   burglary?  You, ma'am.

14           Anybody else have ADT?

15           I'm going -- I have a question for you, too.  But

16   do you have ADT in your home also, sir?

17           PROSPECTIVE JUROR:  Yes.  It's a unique situation

18   but.

19           MR. MCCORMICK:  Okay.  I'll get to that.  Maybe we

20   should get to it now.

21       (Pause in Proceedings.)

22           MR. MCCORMICK:  Sir.

23           PROSPECTIVE JUROR:  Yes.

24           THE WITNESS:  I'm all ears.

25           MR. MCCORMICK:  What exactly -- could you identify

1    yourself, sir, please?

2            PROSPECTIVE JUROR:  My name is Jim Caughey.

3            MR. MCCORMICK:  Okay.

4            PROSPECTIVE JUROR:  I got ADT in 1998 or 1999.  I

5    had it for like three or four years.  And I stopped paying

6    the bill.  And they continued to monitor my store or my home,

7    I'm sorry.  They continued to monitor.  And they're still

8    doing it now.  I don't know.  I don't pay for it.  But it --

9    they just -- I got the cops coming to me all the time and

10   stuff, so.

11           MR. MCCORMICK:  So you're getting it for free?

12           PROSPECTIVE JUROR:  Yes.

13           MR. MCCORMICK:  You're not complaining about that,

14   are you?

15           PROSPECTIVE JUROR:  No.  No, I tried canceling it

16   but the sheriff's department wants me to send money or

17   something like that.

18           MR. MCCORMICK:  So you are dissatisfied with ADT

19   because you canceled them.

20           PROSPECTIVE JUROR:  I'm not, I'm not happy.  I'm

21   just telling you that I have it and I'm not paying for it.

22           MR. MCCORMICK:  You're just surprised that it's

23   happening?

24           PROSPECTIVE JUROR:  Yeah.

25           MR. MCCORMICK:  But other than that, you have

1    nothing against ADT per se?

2            PROSPECTIVE JUROR:  I have nothing against them.

3            MR. MCCORMICK:  Okay.  And you, sir, you had a

4    problem with ADT that you've already mentioned.

5            PROSPECTIVE JUROR:  Right.

6            MR. MCCORMICK:  This case, sir, involves ADT as a

7    victim in this case, having to do with certain real estate

8    transactions.  It has nothing to do with the service that ADT

9    provides to any customer.  What I'm asking you, sir, is,

10    that's not going to be relevant to this case.  What you gave

11    information.  With that fact in mind, with ADT as a victim in

12    a real estate transaction, can you be fair and impartial to

13    both sides, particularly the Government, based upon your

14    responses to Judge Middlebrooks?

15            PROSPECTIVE JUROR:  Yes.

16            MR. MCCORMICK:  And you'll decide the facts as they

17    come out from the witness stand, and your preconception of

18    ADT, you're willing to put aside, and you realize how it has

19    nothing to do with this case?

20            PROSPECTIVE JUROR:  Yes.

21            MR. MCCORMICK:  You'll be fair and impartial?

22            PROSPECTIVE JUROR:  Yes.

23            MR. MCCORMICK:  Okay.  Another juror had a question

24    about Tyco.  I want to first of all generally talk about Tyco

25    and indicate that, yes, ADT is owned by Tyco.  Tyco has been

```
 1   in the newspapers, as this juror has spoken.  The

 2   transactions that Tyco was involved in, everybody understands

 3   that was a fraud against the shareholders of Tyco.  And does

 4   everybody understand also that has no place in this case, it

 5   has no bearing or relevance to this case whatsoever.  The

 6   fact that Tyco may or may not have violated the law or some

 7   high people involved with Tyco may or may not have violated

 8   the law has no bearing on whether ADT Tyco is a victim.

 9            MR. MARKUS:  Judge, objection.  We believe it does,

10   and we would object.

11            THE COURT:  Well, I'm going to overrule the

12   objection.  You will get a chance to explore it on your own

13   if you think it somehow is related.

14            Go ahead, Mr. McCormick.

15            MR. MCCORMICK:  Thank you, your Honor.

16            If I can have a second.  I lost my place here.

17            This question I'm addressing is to Mr. Neubert,

18   Mr. John Neubert.

19            PROSPECTIVE JUROR:  Yes.

20            MR. MCCORMICK:  I'm going to directly ask you the

21   same question that I asked the other jurors.  You indicated

22   you had some hard feelings about Tyco and what may or may not

23   have occurred in the past.  Are you willing to sit as a juror

24   in this case and decide this case on what you hear from the

25   witness stand, and the fact that from the witness stand
```

1    you're going to learn during this trial that ADT Tyco is a

2    victim in a real estate fraud case.  That's the allegation in

3    the indictment?

4           PROSPECTIVE JUROR:  I'm confused, to be frank.

5    Maybe I didn't hear well.  You talked about organized crime,

6    Gambino crime family.  I didn't understand or hear that

7    earlier.  I was under the impression we were talking about a

8    RICO, mail fraud, wire fraud, money laundering, and that ADT

9    was a defendant in this case.

10          MR. MCCORMICK:  No.  They're not a defendant.  The

11   indictment, and the Court can re-state this.  The indictment

12   charges a RICO conspiracy and the enterprise involved in that

13   RICO conspiracy is written in the indictment as the South

14   Florida crew of the Gambino crime family.

15          PROSPECTIVE JUROR:  I'm sorry.  I don't understand

16   that.

17          MR. MCCORMICK:  That is the enterprise that is

18   charged.  Now, what is charged in the indictment also are

19   certain crimes, predicate acts, that are charged in the

20   indictment also.  And those crimes or predicate acts list --

21   these are allegations again, but it lists certain mail and

22   wire fraud violations having to do with these defendants and

23   the ADT/Tyco as being a victim in those particular

24   transactions.  That isn't the RICO that's being charged, if

25   you're confused on that.

 1              Do you understand what I'm saying?

 2              PROSPECTIVE JUROR:  Frankly, no.  How can they be a

 3    victim?  That I don't understand.

 4              MR. MCCORMICK:  Well, the indictment alleges that

 5    ADT is a victim.  The defendants in this case are accused of

 6    being -- of conspiring to being members of a particular

 7    enterprise, the enterprise charged in the indictment is the

 8    South Florida crew of the Gambino crime family.  Does that

 9    help you?

10              THE WITNESS:  And they victimized ADT by using

11    their services illegally?

12              MR. MCCORMICK:  No.  The indictment itself charges

13    that ADT was defrauded in certain land deals, and the

14    allegations in the indictment are that the defendants, as

15    part of this enterprise, defrauded ADT.  If you thought from

16    Judge Middlebrooks' statement that ADT Tyco is a defendant,

17    that's not correct.  They're considered a victim, as written

18    in the indictment.  It's all allegations again, I tell you.

19    But that's what the allegation is in the indictment.

20              PROSPECTIVE JUROR:  Well, basically, I still do

21    have a prejudice against the people who are considered a

22    victim here.

23              MR. MCCORMICK:  Okay.  Are you saying then that if

24    you hear the evidence in this case and it's as I represent to

25    you, you still can't be fair and impartial because ADT or

 1  Tyco is going to be mentioned in the trial?

 2          PROSPECTIVE JUROR:  Yeah, honestly, I believe --

 3          MR. MCCORMICK:  You can't put that aside and render

 4  a fair and just verdict?

 5          PROSPECTIVE JUROR:  It would be very difficult for

 6  me.

 7          MR. MCCORMICK:  Thank you.

 8          Now, Judge Middlebrooks also asked you, and it's

 9  written in the questionnaire, too, about having a religious,

10  moral, or philosophical reason why you couldn't reach a

11  verdict.  I have a backup question to that that I wanted to

12  ask all of you.  Given that, all of you understand that the

13  obligation or duty to punish if somebody is convicted, lies

14  solely with the Court and not with you?  That's not to be

15  confused.

16          Because when you render a verdict, it's going to be

17  on the facts that are presented at trial.  You have no

18  concern about what sentence will be imposed.  Do you

19  understand what I'm saying?  A punishment should not enter

20  into your verdict deliberations.  Will everybody do that and

21  assure us you'll do that in this case?

22          Is there anybody that can't do it or doesn't want

23  to do it and thinks that the jury should have some

24  responsibility on what the punishment is.

25          PROSPECTIVE JUROR:  Yes.

1          MR. MCCORMICK:  Yes, sir?

2          PROSPECTIVE JUROR:  I think that -- I feel like --

3    I'll make it real simple.  If I was told my brother stole a

4    piece of candy and he would just going to get a spanking, I

5    would tell it.  But if I told you my brother stole a piece of

6    candy and you going to cut his finger off, then I won't tell

7    it.  So sure, I think what's going to happen to the person

8    would pay a big factor in my decision.

9          MR. MCCORMICK:  Sir, you don't think you could be

10   fair in terms of deciding the facts in this case because

11   your -- you don't know what the punishment is going to be?

12         PROSPECTIVE JUROR:  I think I have a right to know

13   what the punishment is going to be.

14         MR. MCCORMICK:  As a juror, you think you should?

15         PROSPECTIVE JUROR:  Yes.

16         MR. MCCORMICK:  And as a juror, you don't think you

17   can separate those two ideas and just listen to the facts and

18   the evidence, the witnesses, and decide on guilt or

19   innocence.  And of course, you realize the Government still

20   has to prove the case beyond a reasonable doubt, every

21   element of the crime?

22         PROSPECTIVE JUROR:  Well, after you finish talking

23   I still feel the same way.  I think I have a right, if you

24   want me to sit on the jury, to know what's going to be the

25   implications of all of this.

```
 1              MR. MCCORMICK:  And if you --

 2              PROSPECTIVE JUROR:  It's like if you draft a kid

 3    into the military, he should know whether or not he is

 4    subject to go to Iraq or he don't have to go there or

 5    otherwise, you asking him to volunteer.  Why should I

 6    volunteer and think I'm going to stay stateside.  You put me

 7    in a uniform, send me over to Iraq.  I think you should have

 8    the opportunity to know what's going to come from that.

 9              MR. MCCORMICK:  So you don't -- what you're saying

10    then is, I guess, you don't think you can follow the Judge's

11    instructions that you just decide the facts of this case and

12    punishment is a separate issue that he decides?

13              PROSPECTIVE JUROR:  Well, if I was accepted on the

14    jury, I think I can.  But the question is, I think that I

15    should have a right to know the consequences that the person

16    is going to have to stand for.

17              MR. MCCORMICK:  Sir, if I'm telling you you're not

18    going to know that when you serve as a juror, is that going

19    to cause you not to be able to decide the case fairly for

20    both sides?

21              PROSPECTIVE JUROR:  No.  Whatever I do would be

22    fair.  I'm just saying I don't think you're being fair when

23    you won't tell me.  I'm going to be fair.  I'm a minister of

24    the gospel.  I don't know one but one thing to do is to be

25    fair.
```

1          MR. MCCORMICK:  I have no doubt about that.

2          PROSPECTIVE JUROR:  But then I want you to be fair

3    to me when you asking me to do something.

4          MR. MCCORMICK:  But, sir, what I'm telling you is,

5    the judge is going to instruct you just on the law of this

6    case, he is not going to tell you what the punishment is

7    going to be if the defendants are convicted in this case.

8          PROSPECTIVE JUROR:  I understand what you're

9    saying.  It seems like you just can't understand what I'm

10   saying.

11         MR. MCCORMICK:  I understand it.

12         PROSPECTIVE JUROR:  I understand well what you're

13   saying.  It's like I'm saying, if the judge ask me that and

14   if I feel like I couldn't do it, I would tell him.  But my

15   thing still is I don't see why we don't have a right to know

16   the consequences or the punishment for such a thing.

17         It's like right now a stop sign, if I run a stop

18   sign they have a fee for me running the stop sign.  If I run

19   a red light they're going to tell me what's going to be the

20   consequence.  If I'm speeding in the school zone, they tell

21   me it's going to be more.  I think we should have a right to

22   know whatever person do what consequence is that going to

23   carry.

24         MR. MCCORMICK:  But what I'm telling you, sir,

25   you're not going to have that information when you serve as a

1    juror.  Is that going to cause you not to be a fair and

2    impartial -- do you want to serve as a juror in this case,

3    given those grounds rules?

4         THE COURT:  Let me interrupt a minute.  Because

5    some of it may be -- and explain to you a little bit about

6    the process.  Because it's not that he's withholding

7    information from you.

8         If a defendant is convicted in a case, a sentence

9    does not follow immediately.  I don't know myself what

10   sentence might be imposed.  I know what the statutory

11   maximums are and what Congress has set forth as possible

12   punishments in a case.  But if a defendant is convicted,

13   there is then a study made.  I learn a lot more about a

14   defendant than I do now.  I basically know now what you know.

15        But I would learn about such things as history, a

16   number of things.  I know quite a lot then about a person,

17   and then need to decide a sentence.  There are things called

18   sentencing guidelines which set forth the punishments.  I

19   have some discretion to vary from those guidelines but I have

20   to set forth my reasons.

21        And I have to look at, Congress's has passed some

22   laws related to sentencing.  It's how serious the crime is,

23   something about the victims, whether it's likely to reoccur,

24   whether a person or -- whether imprisonment is the best

25   alternative.  I have to look at those factors and then impose

1    sentence.  That usually happens 60, 70 days after a trial.

2    And so no one can say at this point they know what the

3    punishment would be if convicted.

4         I can say that it's likely that upon conviction,

5    that there will be a lengthy prison term.  There's no death

6    penalty in this case.  Nobody is cutting off fingers in terms

7    of the two things that you raised.  But -- and that's the way

8    the process works.

9         I mean there is an argument in favor of what you

10   say, that jurors ought to know.  But we have now spent, you

11   know, a hundred years doing it this way.  I've given you

12   pretty much all the guidance can tell you about these

13   particular crimes.  If convicted, there would likely be a

14   serious prison term with respect to these crimes.  And beyond

15   that, neither Mr. McCormick, the defense lawyers, or I can

16   tell you anything with more specifics.

17        PROSPECTIVE JUROR:  Thank you.

18        MR. MCCORMICK:  Mr. Kearney, what Judge

19   Middlebrooks said to you, does that have you have any pause

20   in terms of being able to sit in this jury?

21        PROSPECTIVE JUROR:  No, that's all right.  The only

22   jury I wouldn't want to sit on is if it was a criminal case

23   with somebody had killed someone.  Things like that.  That

24   death would possibly enter into the verdict.

25        MR. MCCORMICK:  Just one more question I have.  I

1    think you indicated that you have a family member that was

2    convicted and is serving time or has served time; is that

3    correct?

4            PROSPECTIVE JUROR:  Yes.

5            MR. MCCORMICK:  How close a family member was that?

6            PROSPECTIVE JUROR:  Well, it was a stepson.

7            MR. MCCORMICK:  And were you satisfied with the

8    treatment that he got from the criminal justice system?

9            PROSPECTIVE JUROR:  Well, like I said, it was a

10   stepson.  I married a son -- my wife had grown children.  And

11   I had -- I played no part in the decision that he made.  And

12   he was habitual, so they put him away.

13           MR. MCCORMICK:  So you have no complaints about the

14   treatment he received?  The system was fair to him?

15           PROSPECTIVE JUROR:  That wouldn't enter in on

16   anything I did.  Like I said, I had no part to do in this

17   kid's upbringing.  And I think a criminal should be punished.

18           MR. MCCORMICK:  Thank you.

19           Now, Ms. Rutherford.

20           PROSPECTIVE JUROR:  Yes.

21           MR. MCCORMICK:  I know you were asked by Judge

22   Middlebrooks several questions and I think you made a

23   statement you didn't think these men were guilty or you'd

24   vote that they not be found guilty.  Did you mean even if the

25   evidence showed or demonstrated --

```
 1              PROSPECTIVE JUROR:  Yes.  I just want to get out of

 2     here.

 3              MR. MCCORMICK:  You don't want to be a juror, do

 4     you?

 5              PROSPECTIVE JUROR:  No, I don't.  I don't get paid

 6     for this.

 7              MR. MCCORMICK:  Well, no one does.

 8              PROSPECTIVE JUROR:  Well, I am solely -- I'm the

 9     only breadwinner in my house.  We're sitting here making $40

10     a day isn't going to cut it.

11              MR. MCCORMICK:  You're saying this so you don't

12     have to serve as a juror.

13              PROSPECTIVE JUROR:  No.  I can't be partial.  I had

14     another friend who was killed in federal prison.  Do I think

15     that this Government is doing the good job?  I don't think

16     so.

17              MR. MCCORMICK:  Right across the board?

18              PROSPECTIVE JUROR:  Right across the board.  I'm

19     pretty disgusted.

20              MR. MCCORMICK:  You don't even know us and you

21     don't think we're doing a good job; is that correct?

22              PROSPECTIVE JUROR:  No, not so far.

23              MR. MCCORMICK:  So you can't be a fair and

24     impartial juror?

25              PROSPECTIVE JUROR:  I have no confidence in this
```

```
 1    Government anymore.  Not in the justice system, or anything.

 2    All the way --

 3              MR. MCCORMICK:  Everybody's a member of the

 4    Government, you have no confidence in; is that right?

 5              PROSPECTIVE JUROR:  No.

 6              MR. MCCORMICK:  Thank you.

 7              Mr. Pabisz.

 8              PROSPECTIVE JUROR:  Pabisz.

 9              MR. MCCORMICK:  I'm sorry.  You indicated that

10    you -- your father was convicted of tax evasion.

11              PROSPECTIVE JUROR:  That's correct.

12              MR. MCCORMICK:  Years ago in New York City.  Was

13    that state tax evasion or federal?

14              PROSPECTIVE JUROR:  Both.

15              MR. MCCORMICK:  And did that experience that your

16    father had and you experienced, too, does that cause you any

17    concern in terms of whether you can be a fair and impartial

18    juror?

19              PROSPECTIVE JUROR:  No.

20              MR. MCCORMICK:  And you have no preconceived notion

21    about it?

22              PROSPECTIVE JUROR:  No, I don't.

23              MR. MCCORMICK:  This is just something that

24    happened to your family and you made it known to the Court?

25              PROSPECTIVE JUROR:  Yes.
```

1          MR. MCCORMICK:  Thank you.

2          Mr. Cough -- excuse me.  Mr. Coffee -- I don't know

3    if I'm pronouncing it correctly.

4          PROSPECTIVE JUROR:  Jim Caughey.

5          MR. MCCORMICK:  Yes.  I know we talked about ADT.

6    What I neglected to ask you about was the fact that you

7    indicate that your store would go out of -- would close if

8    you sat as a juror.

9          PROSPECTIVE JUROR:  There's a possibility, yes.

10          MR. MCCORMICK:  Could you explain that?

11          PROSPECTIVE JUROR:  It's tight right now.  I mean,

12    if I wasn't there running day-to-day operations -- I mean, I

13    suppose I could work at night, but, you know, I'd be lacking

14    sleep and everything, but -- it's hard.  I mean, I'm on the

15    verge -- my home value went down.  I lost my equity loan.  I

16    don't have any fluff money.  I'm week to week.

17          MR. MCCORMICK:  So you have to be on the premises

18    all the time?

19          PROSPECTIVE JUROR:  Yeah.  I mean --

20          MR. MCCORMICK:  Would that be on your mind if you

21    sat on the jury.

22          PROSPECTIVE JUROR:  I'm sorry?

23          MR. MCCORMICK:  Would that be on your mind in you

24    sat as a juror, where you couldn't concentrate on the

25    evidence?

```
 1              PROSPECTIVE JUROR:  To be honest with you, yeah.  I
 2    mean, I would be concerned.  Yeah.  I mean if they were doing
 3    good and their sales were okay and the State didn't shut me
 4    down for something.
 5              MR. MCCORMICK:  But given that though, you still
 6    would be fair and impartial?
 7              PROSPECTIVE JUROR:  Yes.  I would be fair and
 8    honest.
 9              MR. MCCORMICK:  So that would be a difficulty you
10    think you could overcome; is that right?
11              PROSPECTIVE JUROR:  Yeah.
12              MR. MCCORMICK:  Can I have one minute, your Honor?
13              THE COURT:  Yes.
14         (Pause in Proceedings.)
15              MR. MCCORMICK:  Ms. Blye -- Ms. Blye, you indicated
16    that a close family member was accused of a crime.  Can you
17    elaborate on that, ma'am?
18              PROSPECTIVE JUROR:  Elaborate?  How?
19              MR. MCCORMICK:  Well, you indicated that a close
20    family member -- how close a family member was it, first of
21    all?
22              PROSPECTIVE JUROR:  My husband.  My husband.
23              MR. MCCORMICK:  Was he ever charged or just
24    accused?
25              PROSPECTIVE JUROR:  Charged.
```

1           MR. MCCORMICK:  And was he convicted, or what

2    happened.

3           PROSPECTIVE JUROR:  Yes.

4           MR. MCCORMICK:  Were you satisfied with the way

5    your husband was treated --

6           PROSPECTIVE JUROR:  No.

7           MR. MCCORMICK:  -- in the criminal justice system?

8           PROSPECTIVE JUROR:  No.

9           MR. MCCORMICK:  You were not?

10          PROSPECTIVE JUROR:  No.

11          MR. MCCORMICK:  Would that hamper you to be fair

12   and unbiased in this case in terms of sitting as a juror?

13          PROSPECTIVE JUROR:  Maybe.  I don't know.

14          MR. MCCORMICK:  Well, think about it because it's

15   an important decision.  Important to answer what I'm asking

16   you.  In other words, are you willing to sit here, ma'am, and

17   be -- listen to the evidence and decide just on the evidence

18   and what the judge tells you the law you have to follow, and

19   the fact that your husband was convicted of a crime can't

20   enter into the process.  Are you willing to make that

21   commitment?

22          PROSPECTIVE JUROR:  I can try.  I don't know.  I

23   really don't.

24          MR. MCCORMICK:  I'm sorry.  I didn't hear you.

25          PROSPECTIVE JUROR:  I said I really don't know.

1          MR. MCCORMICK:  You don't know if you can do that?

2     Well, let me ask you this.  Was your husband unjustly

3     convicted?  Is that what your difficulty is with this?

4          PROSPECTIVE JUROR:  Well, I think so.  Everyone

5     else might not, but I think so.

6          MR. MCCORMICK:  And the treatment he received, what

7     was it, federal or state?

8          PROSPECTIVE JUROR:  I think it's state.

9          MR. MCCORMICK:  So is it Palm Beach County?

10         PROSPECTIVE JUROR:  Not in this state.  It was in

11    New York.

12         MR. MCCORMICK:  Oh, New York.  And you don't know

13    if you can shake that from your mind in terms of being

14    unbiased?

15         PROSPECTIVE JUROR:  No.

16         MR. MCCORMICK:  And will you try though, if you sit

17    as a juror?

18         PROSPECTIVE JUROR:  I can try.

19         MR. MCCORMICK:  Or is that something that's going

20    to be with you always?

21         PROSPECTIVE JUROR:  It will be.  It will be.

22         MR. MCCORMICK:  It will be with you always?

23         PROSPECTIVE JUROR:  (Nodding head.)

24         MR. MCCORMICK:  Just one more question, your Honor.

25         Juror 36, Ms. Hemmingway.

1                    PROSPECTIVE JUROR:  Yes.

2                    MR. MCCORMICK:  You indicated that you had a member

3       of your family that was accused of a crime also.  Is that

4       correct?

5                    PROSPECTIVE JUROR:  Yes.

6                    MR. MCCORMICK:  Can you be a little more specific

7       in what that was about and who the family member was, if you

8       don't mind, ma'am?

9                    PROSPECTIVE JUROR:  It was my son and he was

10      involved in a shooting.  There was a girl present and her

11      boyfriend was going to hurt her or attack her, and my son

12      shot at him to stop him.

13                   MR. MCCORMICK:  I'm sorry.  I didn't hear that.

14                   PROSPECTIVE JUROR:  My shot the boyfriend to stop

15      him from attacking the girl.

16                   MR. MCCORMICK:  Was he charged?

17                   PROSPECTIVE JUROR:  Yes.

18                   MR. MCCORMICK:  Was he convicted?

19                   PROSPECTIVE JUROR:  Yes.

20                   MR. MCCORMICK:  Were you satisfied with the

21      treatment he received in the criminal justice system?

22                   PROSPECTIVE JUROR:  Yes.

23                   MR. MCCORMICK:  You bear no malice towards the law

24      enforcement agency that charged him?

25                   PROSPECTIVE JUROR:  No.

```
 1              MR. MCCORMICK:  And that's not going to enter into

 2    your judgment as you assess the facts of this case; is that a

 3    fair statement?

 4              PROSPECTIVE JUROR:  Unfortunately, he was involved

 5    in drugs at the time, and he has to be responsible for what

 6    he does.

 7              MR. MCCORMICK:  Thank you.

 8              That's all I have, your Honor.

 9              THE COURT:  All right.  Thank you.

10              Mr. Birch, do you have questions?

11              MR. BIRCH:  Yes, your Honor.  Thank you.

12              THE COURT:  Let me first ask, are you all going to

13    handle your time yourself.  Do you want help from me?  We had

14    an agreement as to how long each person would take.  I gave

15    you -- by agreement you were able to share that time if you

16    chose.

17              MR. BIRCH:  Yes, your Honor.

18              MR. PASANO:  Judge, I think we never turned down

19    the Court's help.  We are going to try our best to police

20    ourselves to stay within the time suggested.

21              THE COURT:  All right.  Thank you.  Don't let the

22    person at the end be left hanging then.

23              MR. PASANO:  That's why I'm going second, your

24    Honor.

25              MR. BIRCH:  Okay.  Good morning everyone.  Again my
```

```
 1    name is Peter Birch and I've got ten minutes to talk to you.

 2    And until the end of this -- well, I get a couple of

 3    opportunities to talk to you.  One is right now.  One is at

 4    the beginning of the trial, what's called opening statements.

 5    And then the other is at the end of the trial called closing

 6    argument.  Other than that, if for some reason you and I

 7    cross paths in the hallway of the courthouse, we are

 8    controlled by the rules of ethics to avoid even the

 9    appearance of impropriety.  We will act like you're not

10    there.

11           It's not to be rude or impolite.  It's to stay

12    within the rules of ethics and make sure everybody is not

13    affected in any way.

14           Now -- so please don't be offended.  Because let me

15    tell you right up front, we are all very, very grateful for

16    your willingness to serve.  It is a three-week trial and

17    that's a hardship on everyone, and we appreciate it very

18    much.

19           Now, there are a couple of other things here.  I

20    have ten minutes.  I can't talk to 50 people in ten minutes

21    individually.  So I'm going to rely on you.  Let me tell you

22    a couple of things.  This is going to help the other lawyers

23    as well.  They'll get into the heart of the questioning.  But

24    let me say this.  The great thing about this system is, there

25    is no wrong answer.  Everybody will give me a right answer,
```

```
1    provided one thing.  It's an honest answer.  That's all we're

2    asking to you do, is be honest, to be honest, as candid as

3    you can.

4          You hear this talk about, well, can you follow the

5    law.  If you raise your hand and say, no, I can't, I'm

6    breaking the law.  No, you're not.  The great thing about

7    this country -- one great thing is that you do have a right

8    to an opinion.  And you can disagree with the system.  You

9    can disagree with the principles of law that the judge would

10   instruct to a juror.

11         The only thing you can't do is sit on this jury.

12   That's all you can't do.  So if you get up and you say, I

13   think they're all guilty, I don't know why we're even

14   bothering with this, that's perfectly okay.  I'm not going to

15   put you on the defensive.  I'm not going to ask you anything

16   at all.  I just want you to say, this isn't for me.  Okay?

17   And I appreciate it very much if you can do that.  There is

18   no wrong answer as long as it's an honest answer.

19         Now, that having been said, I'm asking you now,

20   please, for the benefit of Mr. Vincent Artuso who I represent

21   and the other defendants, you have heard that -- these

22   allegations of organized crime.  Okay?  Now, a lot of people

23   have a lot of different thoughts about organized crime.

24   We're not going to get into a discussion about organized

25   crime.  But I want all of you to be honest with me, as honest
```

 1    as you can.

 2          When you hear allegations of organized crime, do

 3    you think you can be fair and impartial?  And if you can't,

 4    that's perfectly okay.  Just raise your hand.

 5          Okay.  Yes, ma'am.  Yes, ma'am.  Let me make sure.

 6    Does everybody know their number?  Okay, your number is.

 7          PROSPECTIVE JUROR:  Can or cannot?

 8          MR. BIRCH:  Cannot.  If you hear this case involves

 9    allegations of organized crime and that the defendants are

10    accused of being associated with organized crime, are your

11    feelings about organized crime such that you could not be

12    fair and impartial?  That's all I need to know.  We're not

13    going to ask you to defend it or justify it.

14          But I'm just asking you to kind of look into your

15    own minds and hearts and decide for yourselves.

16          So cannot, cannot be fair and impartial.

17          THE COURT:  Before you ask this, let me ask you to

18    do another thing.  I mean, really, what we want is people who

19    can decide the case on the facts of this case and be fair to

20    both sides.  The question isn't, do you dislike organized

21    crime.  We don't want to have a jury composed of only people

22    who might treat it favorably.  What we want are people who

23    are going to be fair, fair to both sides.

24          Fair to the Government, fair -- sometimes I hear

25    these questions -- let me give another example, removed from

1    this, about drug cases.

2          And so a defense lawyer will say, who feels

3    strongly about drugs.  A lot of people don't like drugs and

4    they'll raise their hands.  I mean in those cases we don't

5    want only jurors who I guess like drugs.  And so it's not a

6    question of whether you like it or don't like it.  It's a

7    question of whether you feel so strongly about the topic that

8    you can't decide the case based on the facts of this case.

9    And so that's the question.

10          Go ahead, Mr. Birch.

11          MR. BIRCH:  Okay.  Can we have the show of hands

12    again.  Yes, ma'am, your number is?

13          PROSPECTIVE JUROR:  Eight.

14          MR. BIRCH:  And yes, ma'am.

15          PROSPECTIVE JUROR:  Three.

16          MR. BIRCH:  I don't mean to be rude, by the way, by

17    just getting numbers, but we are short on time.  Your number,

18    sir.

19          PROSPECTIVE JUROR:  Five.

20          THE COURT:  Wait.  Slow down.  I can't -- it was

21    Mr. Tuchak, you had your hand up?

22          PROSPECTIVE JUROR:  Yes, sir.

23          MR. BIRCH:  And your?

24          PROSPECTIVE JUROR:  Seven.

25          MR. BIRCH:  Okay.  Anybody -- okay.  The front row.

```
 1    Your number, ma'am?

 2              PROSPECTIVE JUROR:  Nineteen.

 3              MR. BIRCH:  Anybody else in the front row?  Second

 4    row?

 5              THE COURT:  Wait a minute.  I got 19.  Was there

 6    somebody else?

 7              MR. BIRCH:  Twenty.

 8              PROSPECTIVE JUROR:  Twenty-six.

 9              PROSPECTIVE JUROR:  Thirty-eight.

10              MR. BIRCH:  Let's stay in the second row.

11              PROSPECTIVE JUROR:  Thirty.

12              MR. BIRCH:  Thirty.  The next row.

13              PROSPECTIVE JUROR:  Thirty-seven.

14              MR. BIRCH:  Thirty-seven.

15              PROSPECTIVE JUROR:  Thirty-eight.

16              MR. BIRCH:  Thirty-eight.  Okay.  The next row.

17    Anybody higher than 38?

18              PROSPECTIVE JUROR:  Fifty.

19              MR. BIRCH:  Fifty.  Anybody else?

20         Okay.  Listen, I really appreciate it.  It's a

21    candid answer and it is a fair answer if that's how you feel.

22    Now having said that, as Judge Middlebrooks just told you,

23    organized crime is not on trial.  Vincent Artuso is on trial

24    with the other four gentlemen.  But thank you for your

25    answer.
```

1           Now, the other thing I want to tell you is related

2      to organized crime, John Gotti, you've all heard I'm sure the

3      name, John Gotti.  This is my question.  And again, I'm not

4      going to ask you to justify it or -- if you hear that

5      Mr. Vincent Artuso, the gentleman I'm representing, knew John

6      Gotti and knew him well, will you at that point be unable to

7      listen to the evidence fairly and impartially and decide

8      whether, in fact, he is guilty of the crimes charged beyond a

9      reasonable doubt?  Anybody feel that way?

10          MR. MCCORMICK:  Your Honor, I would object to that.

11     That's arguing the evidence.

12          THE COURT:  Overruled.

13          MR. BIRCH:  Anyone feel that way?

14          Okay.  Now if you've already raised your hand, I

15     don't need you to answer or raise it again, I don't think.

16     So let's just go with that second question.  If you did not

17     raise your hand the first time, if you raise your hand now

18     about hearing that Mr. Artuso knew John Gotti.  Okay.

19          Let's go the first row.  Your number, ma'am?

20          PROSPECTIVE JUROR:  Six.

21          MR. BIRCH:  Okay.  Is that second row?

22          PROSPECTIVE JUROR:  Thirteen.

23          MR. BIRCH:  Thirteen.  And 14?

24          PROSPECTIVE JUROR:  Yes.

25          MR. BIRCH:  And the next row.  Your number, sir?

```
 1                    PROSPECTIVE JUROR:  Twenty-two.

 2                    THE COURT:  I didn't hear that.

 3                    MR. BIRCH:  Twenty-two.  Okay.  And the next row,

 4    your number ma'am -- or sir, sorry.

 5                    PROSPECTIVE JUROR:  Twenty-eight.

 6                    MR. BIRCH:  Your number.

 7                    PROSPECTIVE JUROR:  Twenty-eight.

 8                    MR. BIRCH:  Twenty-eight.  Okay.  The next row?

 9    All right, anybody else in the second row.  Next row behind.

10    Yes, ma'am, your number.

11                    PROSPECTIVE JUROR:  Thirty-three.

12                    MR. BIRCH:  Thirty-three.  The next row.  Yes, sir.

13                    PROSPECTIVE JUROR:  Thirty-six.

14                    MR. BIRCH:  And the row back.  Yes, sir.

15                    PROSPECTIVE JUROR:  Fifty-one.

16                    THE COURT:  Okay.  Again, I appreciate your

17    answers.  And that's what we're looking for, people who can

18    be fair and impartial.  If you can't be, that's perfectly

19    okay.  This is a very serious case.  As you already heard,

20    Judge Middlebrooks told you that these people are, these

21    gentlemen are looking at serious prison time.  Now, you all

22    have a different definition of serious perhaps.  We all know

23    this makes this a very serious case.  So I appreciate it.

24    Thank you very much.

25                    Now, the next question I have, you know, you got an
```

1    indictment, you heard racketeering, money laundering, wire

2    fraud, mail fraud.  My question is this:  There are 41

3    counts.  That's a lot of counts.  Now, some people feel where

4    there is smoke, there is fire.  Now, you've also heard and

5    the other lawyers are going to talk to you about the

6    presumption of innocence, reasonable doubt, that sort of

7    thing.  What I want to know, when you hear 41 counts, the

8    size of the indictment which is handed down by a grand jury,

9    and as Judge Middlebrooks has already told you it's not

10   evidence.  But some people say, well, that's a lot of counts,

11   and they must have done something wrong.

12            And it's okay to feel that way.  And I would think

13   you would have to feel that way.  It would be human nature.

14   What I want to know in the last 30 seconds that I have, is

15   there anyone here who feels that based on the number of

16   counts and the type of charges, that they could not be fair

17   and impartial?  You put on top of it organized crime, John

18   Gotti, and then number of counts.  Anyone here feel, well

19   now, you've reached the point where I can't be fair and

20   impartial?  If you can't, that's fine.  We just need to know.

21   Anyone here?

22            Okay.  Let's go, your number?

23            PROSPECTIVE JUROR:  Nine.

24            PROSPECTIVE JUROR:  It's the same question you're

25   asking.

```
 1              MR. BIRCH:  No, actually, it's a little different.

 2   What I'm saying is, what I'm saying -- which is fine -- is

 3   that I first talked about organized crime.  Then I talked

 4   about John Gotti who obviously is connected with organized

 5   crime.  Now I'm just talking about the number of counts.  You

 6   know, like if you couldn't be fair and impartial because

 7   there's just way, way too many allegations here for me to

 8   weigh the evidence fairly and impartially and decide whether

 9   a man's guilty beyond a reasonable doubt.  That's all.

10              PROSPECTIVE JUROR:  Well, I feel that I could be

11   partial in a trial like this?

12              MR. BIRCH:  Fair and impartial.

13              PROSPECTIVE JUROR:  Fair and impartial.  But, you

14   know, when you're talking 47 counts against somebody.

15              MR. BIRCH:  Forty-one.

16              PROSPECTIVE JUROR:  Forty-one, whatever --

17              MR. BIRCH:  Whatever.

18              PROSPECTIVE JUROR:  -- in my mind, it's obvious

19   they can't be innocent of all of them.  Okay?

20              MR. BIRCH:  That's my point.  Yes, sir.

21              PROSPECTIVE JUROR:  So if they're guilty of one,

22   they're guilty of all 41 of them.  You know, in my mind.

23              MR. BIRCH:  That's fine.

24              PROSPECTIVE JUROR:  If I felt that part of it was

25   true and part of it wasn't, I could say the part that's not
```

```
 1   true I agree with.  But the other half, they're guilty.  Or

 2   presumed guilty.  I'm sorry.

 3           MR. BIRCH:  What I'm asking you is that at the

 4   outset.  You obviously haven't heard the evidence.  For some

 5   people it's just a little too much for them to be fair and

 6   impartial, listen to the evidence and render a fair and

 7   impartial verdict based on the number of counts.  I'm not

 8   saying that it's one or all or nothing.  That's not the type

 9   of situation.  I'm asking if by the number of counts alone

10   and the type of crime, if you feel that that would make you

11   unable as a person and only you know, whether you could still

12   be fair and impartial, listen to all the evidence, render a

13   just verdict on each count, or it's like too much in this

14   case.

15           PROSPECTIVE JUROR:  No, I could render the parts

16   true.  But the part that's untrue, I don't know which way to

17   go on.  I made a statement earlier, you know, I had my own

18   son arrested, okay?  And the prosecution just got up and

19   stated that some of these people are cutting deals.  Okay?  I

20   don't know if I could sit on a jury knowing that somebody is

21   going to get off and somebody else is going to go to jail,

22   and they were just as guilty, but they're cutting a deal with

23   the prosecution or whatever.

24           I have a real hard time with that, you know.  I had

25   my son put in prison because he robbed my house with my guns,
```

 1    and it was a felony.

 2              MR. BIRCH:  Right.

 3              PROSPECTIVE JUROR:  And you know, I labeled my son

 4    as a felon.  But he needed to be straightened around.  And I

 5    just, I find it hard to let somebody get off for something

 6    they did based off of, you know, cutting a deal.

 7              MR. BIRCH:  Okay.

 8              PROSPECTIVE JUROR:  I didn't cut a deal with my

 9    son.

10              MR. BIRCH:  Yes, sir.  I understand.  Okay.  But as

11    to that question if I could because I'm actually over my ten

12    minutes, I want to sit down and give everybody else a chance.

13    The number of counts alone, if I can just get an answer on

14    that.  I thought I saw one up here.  Okay.  Yes, ma'am,

15    No. 7.  I got you.  Anybody else in this row?  Six.  Okay.

16    You're not seven, what's your number?

17              PROSPECTIVE JUROR:  Nine.

18              MR. BIRCH:  Okay.  Sorry.  First row.

19              PROSPECTIVE JUROR:  Fifteen.

20              THE COURT:  Let me ask, what -- Mr. Kearney -- the

21    number of count issue, tell me why you feel that way.  I mean

22    it's up to the Government how many counts to charge.  Whether

23    they charge one or whether they charge three, I'm having a

24    hard time understanding why that makes a difference to you.

25              PROSPECTIVE JUROR:  Well, if he is going to bring

```
 1   that many counts before me I don't think that my little brain

 2   can handle it and dissolve that many cases.  I'm not a

 3   lawyer, and that would be too much and I would like to be

 4   fair.  But if there is too much put on my plate, I don't

 5   think that I can resolve that and be fair.  It's just too

 6   much for me.  Forty-one cases?

 7           THE COURT:  Okay.  You think it's just the amount

 8   of work involved, kind of?  I mean a count is a charge.

 9   You've got to consider each one separately.  Although some of

10   them --

11           PROSPECTIVE JUROR:  That's what I'm saying.  With

12   all of this, you know, just from you saying, forget the TV

13   and the movies and stuff.  But just from the experience that

14   I seen from that type of stuff, I don't think that I could

15   handle this, keeping this $40 over here separate from this

16   40 million over here versus that -- I don't know if I can

17   phantom all of this, even in my thinking.

18           THE COURT:  All right.  I understand your thought

19   process.

20           PROSPECTIVE JUROR:  I don't even like the number

21   41.  That's too big.

22           MR. BIRCH:  Anyone else in that row?  Mr. Kearney's

23   row?

24           PROSPECTIVE JUROR:  Seventeen.

25           MR. BIRCH:  Okay.  The next row.  Anyone in that
```

 1    row?  Okay.  How about the next row after that?  Okay.  Yes,

 2    sir.  Your number.

 3              PROSPECTIVE JUROR:  Forty.

 4              MR. BIRCH:  Thank you.  Anyone else?  Okay.  I went

 5    over.  I apologize.  And I am finished.  Thank you.

 6              MR. PASANO:  May I, your Honor?

 7              THE COURT:  Yes.  Please.

 8              MR. PASANO:  If I talk fast, I apologize to all of

 9    you.

10              THE COURT:  You all got five minutes to make up.

11              MR. PASANO:  Mr. Birch said there are no wrong

12    answers here.  There's just honest answers.  So let me begin

13    with, primarily ask you all questions, but I'm going to

14    address the group.  If I don't hear an answer, then I'm going

15    to assume that the answer is no.

16              Now, this indictment alleges that my client, John

17    Artuso, and that's who I'm going to talk to you about, that

18    he is part of some South Florida crew of an organized crime

19    family.  But like Judge Middlebrooks has said, no one is

20    being asked to sit as a juror in this trial and say that they

21    like organized crime.  So my question is, does anybody here

22    think just because the Government has charged somebody with a

23    crime, that that means they must be guilty?

24              Now leave aside 41 counts.  Let's just imagine it

25    was one count.  Just because the Government charges a

```
 1    defendant, brings him here to court, puts him in front of the

 2    jury, does that mean automatically that person must be

 3    guilty?  Anybody think that?

 4          Okay.  Now, does anybody think that the indictment

 5    in this case, if it's long or short, is anything more than

 6    what Judge Middlebrooks told you it was, an allegation,

 7    something the Government has to prove?  Anybody have any

 8    problem understanding that all this piece of paper is that's

 9    called an indictment is the way we start this case; it's an

10    allegation.  Anybody have any problem with that?

11          Now, does anybody think, and I'll pick for a moment

12    Ms. Rutherford, I think you've already told us this.  My

13    question to the group is, does anybody think the Government

14    doesn't make mistakes?  I guess I heard you tell me

15    already --

16          PROSPECTIVE JUROR:  They're all crooks.

17          MR. PASANO:  Well, everybody makes mistakes, right,

18    ma'am?

19          PROSPECTIVE JUROR:  Yes.

20          MR. PASANO:  Anybody here, if we ask you to sit as

21    a juror who would come in as a juror and think the Government

22    is infallible.  It doesn't make mistakes?  Anybody think

23    that?

24          Okay.  Now, the reason I ask, the reason I ask is,

25    this is my next question.  I want you to take a moment and
```

1    think about it.  John Artuso is being accused in this

2    allegation, this indictment of being part of a crew of a mob

3    gang.  As you sit here right now, not having heard anything

4    and His Honor having told you there is this thing called the

5    presumption of innocence, do any of you think that John

6    Artuso is a mobster?  As you're sitting there right now?  Are

7    you willing to give him a fair trial?  That's really the

8    question.  Will you keep an open mind?  Anybody who can't

9    keep an open mind and hear the evidence?

10           I got a couple of other questions.  Now, if you're

11   picked as a juror, at the end of the case, you all sit and

12   deliberate.  And you come up with verdicts.  Either guilty,

13   not guilty.  And Mr. Reinhardt, let me sort of ask you.

14           If you're asked to sit as a juror, how could a

15   person be found, in your mind, not guilty?

16           PROSPECTIVE JUROR:  To be found not guilty, I would

17   have to say that there was not enough evidence to convict

18   him.

19           MR. PASANO:  Fair enough.  Everybody agree, if the

20   Government doesn't prove its case, that's a good reason shy

21   somebody could be found not guilty?  Anybody not think that?

22   Or how about they didn't do it?  Would you agree, Mr.

23   Reinhardt, that's a good reason as well?

24           PROSPECTIVE JUROR:  Yes.

25           MR. PASANO:  So, if he didn't do it, that would be

1    a good reason to be found not guilty.  Fair enough?  Anybody

2    not think that?

3         Here is a tougher question.  And Ms. Pryluck, let

4    me ask you.

5         How could someone that didn't do it get charged

6    with a crime?  What do you think?  I mean there is that

7    smoke, there's fire question.  And all of you are thinking

8    it.  Whether you're really thinking about it or not.  We're

9    here in this courtroom.  How could someone who didn't do it

10   get charged with a crime?  Can you imagine any reason?

11        PROSPECTIVE JUROR:  Yes.  Wrong place, right time.

12        MR. PASANO:  Everybody agree?  Sometimes you're

13   just in the wrong place, wrong time?

14        How about mistakes?

15        PROSPECTIVE JUROR:  Yes, sure.

16        MR. PASANO:  People make mistakes.  The Government

17   might make a mistake.  I just asked you, can the Government

18   make a mistake.  How about people lying about you?  Could

19   that be a reason how someone who didn't do it could be

20   charged with a crime?

21        PROSPECTIVE JUROR:  Absolutely.

22        MR. PASANO:  Anybody think that people who didn't

23   do it in this country get charged with crimes because other

24   people tell lies about them?  Anybody think that can happen?

25        Now His Honor asked you, some of the witnesses in

1    this case are going to be perhaps police officers or perhaps

2    they're going to be people, and the Government prosecutor,

3    Mr. McCormick told you, who made deals.  Do you think just

4    because the Government calls somebody as a witness --

5    Ms. Campbell, I'll ask you this question.  Just because the

6    Government calls somebody as a witness, that that

7    automatically means they're telling the truth?

8              PROSPECTIVE JUROR:  No.

9              MR. PASANO:  If any of you are chosen as jurors,

10   could you agree with me to listen carefully to the testimony

11   from the witness stand and make your independent judgment as

12   to whether or not that person is telling the truth?  Anybody

13   who can't do that, if they're called as a Government witness?

14             Just a couple other questions and then I'll sit

15   down.

16             Ms. Bottinelli, I wanted to ask you a question.

17   Suppose that we pick you as a juror and you listen to

18   somebody on that witness stand and you decide that the person

19   is not telling the truth about something.  Do you rely on

20   that person's testimony?

21             PROSPECTIVE JUROR:  Yes.

22             MR. PASANO:  Even if you decided they lied?

23             PROSPECTIVE JUROR:  If I decide that they're lying?

24             MR. PASANO:  That's my question.  You make your

25   independent judgment, you might think somebody's telling the

1    truth, you might think they're lying.  They're on the witness

2    stand.  But they're called by the Government.  If you decide,

3    hearing them, I think this person is a liar, what do you do

4    with their testimony?  Because you're going to be asked as a

5    juror to consider everybody's testimony.  Do you rely on it

6    or don't you rely on it?

7            PROSPECTIVE JUROR:  You mean if they have

8    designated in the past as a liar.

9            MR. PASANO:  Perhaps they admit that they're lying,

10   or they're caught in a lie on the stand.  You're going to

11   make that judgment.  If in your mind, if you hear somebody

12   and you say, wait a second, I don't believe that person.  My

13   question is, what do you do with their testimony?  Do you

14   still rely on it or do you want something more?  That's

15   really my question.

16           PROSPECTIVE JUROR:  I would want more.

17           MR. PASANO:  Anybody here that wouldn't want more?

18   If you listen to a witness on the stand and concluded that

19   person's not telling me the truth about something important,

20   you would want more?  Anybody who wouldn't want more?

21           Last question and I'm going to sit down.

22           If at the end of this case and this is something

23   I'm going to ask all of you, if at the end of this case, if

24   you're asked to sit as jurors, you decide that the Government

25   witnesses are not worthy of belief and that the Government

1    has not proven its case beyond a reasonable doubt, anybody

2    here who could not return verdicts of not guilty?

3            They don't prove their case, you don't think the

4    witnesses are credible or believable, anybody here who can't

5    return a verdict of not guilty?

6            Thank you, your Honor.

7            THE COURT:  Thank you.

8            Mr. Entin.

9            MR. ENTIN:  Thank you, Judge.

10           Hi.  I'm Allen Entin.  I represent Mr. Forgione.

11   And I'm going to try and talk slower than everybody else

12   because I swear I just thought I was in a tobacco auction for

13   about the last half hour.

14           I want to ask one or two individual questions

15   first.  Mr. Gittleman, you indicated you had retired from a

16   job.  What was the job that you retired from?

17           PROSPECTIVE JUROR:  Ford Motor Company.

18           MR. ENTIN:  Pardon?

19           PROSPECTIVE JUROR:  Ford Motor Company.

20           MR. ENTIN:  Ms. Alfele, you had indicated that your

21   father is a judge.

22           PROSPECTIVE JUROR:  Yes.

23           MR. ENTIN:  Is that down here?

24           PROSPECTIVE JUROR:  West Virginia.

25           MR. ENTIN:  Does he sit on criminal cases?

```
 1                    PROSPECTIVE JUROR:  Yes.  On the Circuit Court.

 2                    MR. ENTIN:  Have you discussed criminal cases with

 3       him often or what comes before him, that sort of thing?

 4                    PROSPECTIVE JUROR:  I've discussed some of his

 5       interesting cases with him.

 6                    MR. ENTIN:  Okay.  Anything from that experience

 7       that might affect you one way or another?

 8                    PROSPECTIVE JUROR:  No.

 9                    MR. ENTIN:  Okay.  I'm going to talk to you all

10       about some principles that everybody has been throwing

11       around, and I think that it's important that we slow down for

12       a half a second and try and understand what we're talking

13       about.

14                    Mr. Kearney, you've heard the discussion about

15       presumption of innocence.  Do you know what presumption of

16       innocence is or what it means to you?

17                    PROSPECTIVE JUROR:  You're innocent unless it's

18       proved otherwise.

19                    MR. ENTIN:  Well, no.  Presumption of innocence

20       means that the law presumes that everybody that is sitting

21       here right now accused of one count or 42 counts is presumed

22       to be innocent until proven guilty beyond a reasonable doubt.

23       Does everybody understand that?  So that there is a

24       presumption --

25                    THE COURT:  Well, that's what Mr. Kearney just
```

```
 1   said, wasn't it?

 2           MR. ENTIN:  That's correct.  But from a practical

 3   standpoint, Mr. Kearney, if you were asked to go out right

 4   now and render a verdict in this case, what verdict would you

 5   render, having heard nothing but what you've heard so far

 6   today?

 7           PROSPECTIVE JUROR:  I wouldn't have no evidence to

 8   convict anyone.

 9           MR. ENTIN:  So you would have to find them not

10   guilty because the presumption of innocence is there; is that

11   correct?

12           PROSPECTIVE JUROR:  Right.

13           MR. ENTIN:  And there has to be evidence that would

14   come in to this court that would be necessary to prove

15   somebody guilty.  Does anybody know what the burden of proof

16   is in a criminal case?  Ms. Bottacelli?

17           PROSPECTIVE JUROR:  Bottinelli.

18           MR. ENTIN:  Bottinelli.

19           PROSPECTIVE JUROR:  Whoever is prosecuting has to

20   prove by virtue of evidence they have done the crime.

21           MR. ENTIN:  Do you understand that the sole

22   individual that has any burden of proving anything in a

23   criminal case is the prosecution?  Do you understand that?

24   Mr. Becker?

25           PROSPECTIVE JUROR:  Yes, I understand that.  But
```

1    the defense has to prove they're innocent, also.

2        MR. ENTIN:  No.  The judge will tell you that they

3    have to prove somebody guilty and that the defense doesn't

4    have to do anything.  Do you understand that?  That we

5    lawyers could sit there the entire trial and just molt and if

6    they didn't prove their case, you would have to find them not

7    guilty.  Do you understand that?

8        PROSPECTIVE JUROR:  Yes.

9        MR. ENTIN:  Okay.  So if they didn't prove them

10   guilty, you understand they don't have to prove anything at

11   all, correct?

12       PROSPECTIVE JUROR:  Correct.

13       MR. ENTIN:  Okay.  Does anybody here think that a

14   defendant in a criminal case needs to testify?  Anybody?

15   Anybody at all?  Would anybody hold it against any defendant

16   in this case if their lawyer made a decision that they didn't

17   need to testify?  Yes, ma'am.

18       PROSPECTIVE JUROR:  I think it's fishy.

19       MR. ENTIN:  Okay.  Ma'am, do you agree with what a

20   burden of proof is, that they have the burden of proof.

21       PROSPECTIVE JUROR:  Yeah, I'm pretty judgmental --

22       MR. ENTIN:  Can I have your number, ma'am, please.

23       PROSPECTIVE JUROR:  Thirty-seven.

24       MR. ENTIN:  So No. 37, so if a defendant didn't

25   testify, you would find that fishy and you would hold that

1    against him, correct?

2            PROSPECTIVE JUROR:  Probably, yes.

3            MR. ENTIN:  No matter what the instruction is, that

4    they don't have to, correct?

5            PROSPECTIVE JUROR:  Yes.  Yeah.

6            MR. ENTIN:  Does anybody else agree with Juror 37?

7    Raise your hand and we'll do the same thing Mr. Birch did.

8    Your number, ma'am?

9            PROSPECTIVE JUROR:  Six.

10           MR. ENTIN:  Your number, sir.

11           PROSPECTIVE JUROR:  Seven.

12           MR. ENTIN:  13.  Fourteen.  Anybody else?  26.

13           Ma'am?

14           PROSPECTIVE JUROR:  Twenty-one.

15           PROSPECTIVE JUROR:  Thirty-eight.

16           MR. ENTIN:  Next row.  Forty-five and 46.  Anybody

17   else?

18           PROSPECTIVE JUROR:  Three.

19           MR. ENTIN:  Okay.  Does anybody here understand

20   when Mr. Birch asked you about the number of counts, that

21   those number of counts come out of a document that's called

22   an indictment, do you all understand that an indictment is

23   not proof of anything?  Does anybody believe that an

24   indictment proves anything?  That just the fact that there's

25   an indictment means that there is something that happened?

```
 1   Anyone?
 2              PROSPECTIVE JUROR:  How many people sit on a grand
 3   jury for indictment?
 4              MR. ENTIN:  Pardon?
 5              PROSPECTIVE JUROR:  How many people sit on a grand
 6   jury for indictment?
 7              MR. ENTIN:  Well, there's a maximum -- they need a
 8   majority of whatever is sitting there to return it, but they
 9   only hear one side of the story.  Have you ever sat on a
10   grand jury, sir?
11              PROSPECTIVE JUROR:  No.  I'm just curious.
12              MR. MCCORMICK:  I object to this, your Honor.
13              MR. ENTIN:  That an indictment is not evidence?
14              MR. MCCORMICK:  No.  It's stating the law on the
15   grand jury, how the grand jury operates.
16              THE COURT:  Well, the objection is overruled.  Let
17   me spend a second on this just so -- but we also need to move
18   along.
19              The grand jury only hears essentially -- the
20   defense lawyers are not there.  They hear the Government's
21   evidence.
22              PROSPECTIVE JUROR:  I'm just curious.
23              THE COURT:  Their termination is one of probable
24   cause.  They don't decide if somebody is guilty or not
25   guilty.  They make a preliminary decision about whether the
```

 1    charge can go forward.  But -- so don't place weight in their

 2    decision in terms of evidence.  The indictment is just the

 3    charge.  This is going to be the jury that decides whether

 4    somebody is guilty or not guilty.

 5             MR. ENTIN:  Yes, sir.

 6             THE COURT:  And so in terms of the fact of, you

 7    know, there were a number of people on the grand jury should

 8    not be considered in deciding whether there's merit to the

 9    charge.  It's important that everybody start fresh in

10    deciding whether the defendants did or didn't do the things

11    charged in the indictment under the instructions I give you

12    here during this trial.  Because otherwise you're abdicating

13    your role to some other group of people.

14             MR. ENTIN:  Sir, you had a question?

15             PROSPECTIVE JUROR:  The indictment only shows

16    probable cause?

17             MR. ENTIN:  At best.  Okay.  And the last question

18    is, does everybody understand that the evidentiary standard

19    in a criminal case is beyond and to the exclusion of a

20    reasonable doubt?  Everybody heard that term?  A number of

21    you have just sat on civil juries where the determination was

22    made based upon a preponderance of the evidence.

23             Do you all understand that beyond and to the

24    exclusion of a reasonable doubt is a heavier burden than

25    merely preponderance of the evidence?

```
 1                    Anybody have a problem with that?
 2                    PROSPECTIVE JUROR:  I don't understand the
 3       difference.  I don't understand the words you are saying,
 4       what you mean.  Put it in lay terms.
 5                    MR. ENTIN:  Okay.  The judge will ultimately
 6       instruct you on the law.  And I think Ms. Goldbaum?
 7                    PROSPECTIVE JUROR:  Yes.
 8                    MR. ENTIN:  And he is going to tell you that beyond
 9       a reasonable doubt means that the Government has to prove the
10       case so that when you make the decision in your own mind it
11       would -- it would have to be something that would cause you
12       to hesitate in maybe the most important of your own affairs.
13       That kind of doubt is the kind of doubt which is a reasonable
14       doubt.  And it's a fairly heavy burden.
15                    Would you have any problem applying that and
16       following his instruction?
17                    PROSPECTIVE JUROR:  No, I don't think so.
18                    MR. ENTIN:  Okay.  Anybody else have a problem?
19                    Nothing further, Judge.  Thank you.
20                    THE COURT:  Mr. Kaiser.
21                    MR. KAISER:  Has Mr. Entin used all my time or do I
22       have a few minutes?
23                    THE COURT:  You do have a few minutes.  You might
24       want to save some for Mr. Markus though.
25                    MR. KAISER:  I will do that.  I'll be quick and to
```

1    the point.  Good morning, or good afternoon, ladies and

2    gentlemen.  My name is Allen Kaiser.  I represent Robert

3    Gannon, who is seated behind me.

4            Let me just start off individually.  Mr. McManus,

5    can I bother you just for a minute.  You said you were an

6    investor in commercial real estate.

7            PROSPECTIVE JUROR:  Correct.

8            MR. KAISER:  When you buy real estate, commercial

9    real estate, do you use attorneys to do that?

10            THE MARSHAL:  Yes.

11            MR. KAISER:  You don't see any problem with using

12    an attorney to do that, do you?

13            PROSPECTIVE JUROR:  No.

14            MR. KAISER:  When you buy commercial real estate do

15    you sometimes have ownership in corporate entities?

16            PROSPECTIVE JUROR:  I don't.

17            MR. KAISER:  You've heard of that being done with

18    LLCs?

19            PROSPECTIVE JUROR:  Yes.

20            MR. KAISER:  You understand it might be done for

21    tax purposes or for whatever reason?  Just because people do

22    that, do you see anything sinister in that?

23            PROSPECTIVE JUROR:  No.

24            MR. KAISER:  Anyone have any problems with that?

25            Anyone else have experience buying real estate,

1    dabbling in real estate?

2           Nobody else?

3           PROSPECTIVE JUROR:  Do what?

4           MR. KAISER:  Buy and sell real estate.  Anyone have

5    any experience in doing that?  Yes, sir; what is your number?

6           PROSPECTIVE JUROR:  Twenty-three.

7           MR. KAISER:  What experience do you have in real

8    estate?

9           PROSPECTIVE JUROR:  I purchase historic homes.  I

10   have six right now.  I restore them, fix them up and

11   hopefully sell them.

12          MR. KAISER:  You're saying because of the market

13   now, you haven't had much luck selling them?

14          PROSPECTIVE JUROR:  Absolutely.  Amen.

15          MR. KAISER:  Do you use the services of attorneys

16   when you buy your real estate?

17          PROSPECTIVE JUROR:  Yes.

18          MR. KAISER:  Nothing sinister about that, correct?

19          PROSPECTIVE JUROR:  Not that I know of.

20          MR. KAISER:  Do you see any problems with having

21   ownership in corporate names as opposed to individuals?

22          PROSPECTIVE JUROR:  No, not at all.

23          MR. KAISER:  Anybody else see any problems in that

24   at all?

25          Now, it has already been gone over rather quickly.

1  You're going to hear the Government's case.  They're going to

2  put on witnesses, you're going to hear testimony, you will

3  see exhibits.  There will documentary evidence that you are

4  to consider during the case.  Having said that, when the

5  Government gets done with its case, does anyone here expect

6  that Mr. Gannon should get on that stand because you want to

7  hear what his story is?

8           Mr. Soto, what do you think about that?

9           PROSPECTIVE JUROR:  Yes.

10          MR. KAISER:  You expect Mr. Gannon to get on that

11  stand?

12          PROSPECTIVE JUROR:  Yes.

13          MR. KAISER:  Why would you expect him to get on the

14  stand?

15          PROSPECTIVE JUROR:  I want to hear what he has to

16  say.

17          MR. KAISER:  How about, do you believe in the

18  presumption of innocence?

19          PROSPECTIVE JUROR:  Yes.

20          MR. KAISER:  Do you believe in the Government

21  having the burden of proof to prove its case beyond a

22  reasonable doubt?

23          PROSPECTIVE JUROR:  Yes, I do.

24          MR. KAISER:  You accept that principle?

25          PROSPECTIVE JUROR:  Yes, I do.

```
 1              MR. MCCORMICK:  By wanting to hear from my client

 2    the presumption is going away, isn't it?

 3              PROSPECTIVE JUROR:  Well, I want to hear from him

 4    because that's what I want.  You know.  For my peace of mind,

 5    I want to hear from him.

 6              MR. KAISER:  I understand.  How about Ms. Monti?

 7              PROSPECTIVE JUROR:  I would like to hear both sides

 8    of the story, too.

 9              MR. KAISER:  So in other words, even though the

10    burden is exclusively on the Government, you would still need

11    to hear from Mr. Gannon or any other defendant?

12              PROSPECTIVE JUROR:  Yes.

13              MR. KAISER:  Mr. Reinhardt, how about you?

14              PROSPECTIVE JUROR:  I agree with that

15    wholeheartedly.  I have two little girls.  I can't go to one

16    and say what happened.  Okay, that's it.  We're done.  The

17    other one gets to talk.  I have to hear both sides.  I would

18    have to hear that.

19              MR. KAISER:  How about Ms. Velez?

20              PROSPECTIVE JUROR:  I agree.

21              MR. KAISER:  Anyone here disagree?  Miss Tesman?

22              PROSPECTIVE JUROR:  I would still be able to

23    withhold my opinion and make a fair and impartial judgment

24    regardless of how I feel.  I could separate that.

25              MR. KAISER:  How many people would agree or be able
```

1    to deal with what Ms. Tesman just said?  That is, listen and

2    make a fair and impartial verdict without considering the

3    defendant testifying?

4            By a show of hands.  Who would be able to listen to

5    the testimony and if the Government can't prove its burden,

6    doesn't meet its burden, instead of wanting to hear from

7    Mr. Gannon, you would acquit him?

8            By a show of hands, how many people accept that?

9            All right.  Very good.  Thank you very much.  I

10   have nothing further.

11           THE COURT:  Mr. Markus.

12           MR. MARKUS:  Good afternoon, everybody.  They stuck

13   me at the end.  Right at lunchtime.  After a long morning.

14   So I'll try to be quick.

15           And I have to be quick anyway I guess, your Honor.

16   I only have about ten minutes.

17           THE COURT:  Nine.

18           MR. MARKUS:  Nine minutes.

19           Let me pick on Mr. Cerola for a second, if I could.

20   Sir, you mentioned that your wife worked at a company that

21   was charged in a RICO case?  Just because she worked at that

22   company, is she guilty of a crime?  Does that make her guilty

23   of a crime?

24           PROSPECTIVE JUROR:  No.

25           MR. MARKUS:  Okay.  Does everybody agree with that?

1    Just because you were working at a place or associated with a

2    place that did bad things, that doesn't make you guilty of

3    anything, right?

4             Everybody agrees?

5             Anybody disagree with that?

6             Because my mom would say, you know, birds of a

7    feather flock together.  You know, bad people stick with bad

8    people.  I say no guilt by association.  Who agrees with my

9    mom, birds of a feather flock together?  If you hang out with

10   bad people or work at a bad company or even do business with

11   somebody who pleaded guilty to a crime, you must have done

12   something wrong.?  Anybody agree with my mom?

13            PROSPECTIVE JUROR:  If you have knowledge of it and

14   you keep your mouth shut, yes, you're guilty.  If something

15   doesn't feel right and you just kind of keep your mouth shut

16   because you want to stay below the radar, you're guilty.

17            MR. MARKUS:  Very important here, right?  You

18   have -- a knowledge element.  You have to know what's going

19   on to be guilty of a crime.  We've heard from the judge this

20   is going to be a complicated case.  Forty-one counts.  RICO,

21   mail fraud, wire fraud.  At the end of the day in every

22   criminal case, the Government has to prove two things.  A

23   criminal act occurred, right, the company did something bad

24   or somebody robbed a bank, or there was a criminal act and

25   what you said, right?  Knowledge of a crime.

1          You have to knowingly do something wrong.  You

2     can't be unknowingly or mistake or anything like that.  You

3     have to know.

4          Let me give an example.  Suppose somebody asked

5     another person for a ride to the bank.  In their mind they

6     were going to go rob the bank.  The driver didn't know.  Gave

7     a ride to a buddy and finds out afterwards that the bank was

8     robbed.  Has the driver committed a crime?  Anybody think the

9     driver committed a crime?  Yeah, in the back.

10          PROSPECTIVE JUROR:  Isn't there a fact that you

11     can't plead ignorance to the law?

12          MR. MARKUS:  The judge is going to instruct you on

13     that but you have to know that a crime was occurring.  You

14     have to know you were doing something bad.  To be guilty of

15     something, you have to have a bad intent.  The judge is going

16     to explain that you have to act with bad intention.  If you

17     always acted in good faith, you're not guilty of a crime for

18     the reason we heard in the corner here.

19          Yes?

20          PROSPECTIVE JUROR:  One thing that I do want to,

21     that raise a red flag.  If your friend is robbing a bank and

22     you drive away, yes, you're guilty.

23          MR. MARKUS:  Okay.  We can all agree on that.

24          PROSPECTIVE JUROR:  They have common knowledge.

25          MR. MARKUS:  Once you find out about something if

1    you keep participating, you're guilty.

2              PROSPECTIVE JUROR:  Yes.

3              MR. MARKUS:  But if they don't find out until after

4    everything is done.

5              PROSPECTIVE JUROR:  What are they going to, run off

6    on foot?

7              MR. MARKUS:  Right.  So do we all agree on these

8    basic principles?  You have to do a criminal action and you

9    have to have a criminal mind.  Everybody agree with that?

10             Okay.  Let me turn to Mr. Allred for a second.  You

11   mentioned that you sell property, antique properties; is that

12   right?

13             PROSPECTIVE JUROR:  Historic homes.

14             MR. MARKUS:  Historic homes.  Let's -- it's a bad

15   market right now I assume, right?

16             PROSPECTIVE JUROR:  Yes.

17             MR. MARKUS:  In a bad market do you sell that

18   prompt for less money?

19             PROSPECTIVE JUROR:  I don't.  No.

20             MR. MARKUS:  Okay.  Do some people?  I guess if

21   somebody needed the money in a bad market they might sell it

22   for less money.

23             PROSPECTIVE JUROR:  Absolutely sure.

24             MR. MARKUS:  Anything wrong with selling property

25   for less than what somebody else says it's worth, if you need

1    the money?

2            PROSPECTIVE JUROR:  I don't think so.  If you can

3    afford to sell it, sell it for less.

4            MR. MARKUS:  There are lots of reasons why people

5    sell property for less than what other people think it's

6    worth.  Right?

7            PROSPECTIVE JUROR:  Sure.  There could be a lot of

8    reasons.

9            MR. MARKUS:  Okay.  We all have that experience in

10   bad markets.  People make decisions about what to sell and

11   why they're selling it for lots of different reasons.  Right?

12   Everybody agree on that?

13           Okay.  Mr. Reinhardt, you mentioned you have two

14   little girls.  I have two little girls.

15           PROSPECTIVE JUROR:  Okay.

16           MR. MARKUS:  And you're right, you always want to

17   hear from both sides.  Let's say you made some cookies,

18   cookies are missing.  And both girls say the other one ate

19   the cookies, right?  If you asked one of them, I need to know

20   the truth, who ate the cookies, and she said the other

21   daughter did, but all over her mouth are the chocolate chips,

22   do you really need to hear from the other one or you sort of

23   know what happened?

24           PROSPECTIVE JUROR:  No, I would still need to hear

25   from the other one.

```
 1              MR. MARKUS:  Okay.  Fair enough.  Fair enough.  I'm
 2     nearing the end.  Let me ask just two more quick questions.
 3     Is it Mr. Neubert?  How do you say your last name?
 4              PROSPECTIVE JUROR:  It's Neubert.  Yes.
 5              MR. MARKUS:  You mentioned about the fraud going on
 6     at Tyco and that the CEO has pled guilty and serving time and
 7     all of the fraud going on at Tyco.  Have the rest of you read
 8     in the papers about what's going on, what had happened with
 9     Tyco?  Has anybody else heard about this?
10              Okay.  Let me ask this question.  If somebody did
11     business with Tyco, and somebody did business with ADT, does
12     that make them guilty of a crime, just because Tyco and ADT
13     were doing all kinds of fraud?  Anybody think that?
14              All right.  Last question, and I'll sit down.
15              Mrs. Goldbaum.
16              PROSPECTIVE JUROR:  Yes.
17              MR. MARKUS:  Where are you?  There you are back
18     there.  You said you would be honored to serve on the jury.
19     You want to serve on this jury.  And I understand that.  I
20     mean, other than serving in the military, serving on a jury,
21     as the judge has said, is a high, high public service.
22     Probably the highest after serving in our military.
23              Who else here wants to serve on this jury?  Just by
24     a show of hands.  Who else here wants to serve on this jury?
25              Okay.  I'm not going to go through and ask the
```

 1    numbers.  I hope my colleagues are catching -- just hands up

 2    real high, so I can try to get a look.

 3              You all want to serve on this jury?

 4              They're telling me to get the numbers, so I'll get

 5    the numbers and then I'll sit down.

 6              PROSPECTIVE JUROR:  Ten.

 7              MR. MARKUS:  No. 10.  We'll go first row here.

 8              PROSPECTIVE JUROR:  Seventeen.

 9              MR. MARKUS:  Seventeen.

10              PROSPECTIVE JUROR:  Twenty-nine.

11              MR. MARKUS:  Twenty-nine.

12              PROSPECTIVE JUROR:  Twenty-three.

13              MR. MARKUS:  Twenty-three.

14              PROSPECTIVE JUROR:  Thirty-four.

15              MR. MARKUS:  Thirty-four.

16              PROSPECTIVE JUROR:  Thirty-five.

17              MR. MARKUS:  36 -- oh 18, sorry.

18              PROSPECTIVE JUROR:  Thirty-nine.

19              PROSPECTIVE JUROR:  Forty-four.

20              MR. MARKUS:  In the back.

21              PROSPECTIVE JUROR:  Fifty-three.

22              PROSPECTIVE JUROR:  Fifty-four.

23              MR. MARKUS:  Fifty-three and 54.

24              PROSPECTIVE JUROR:  Forty-nine.

25              PROSPECTIVE JUROR:  Forty-seven.

```
 1              MR. MARKUS:  It will be my honor to be with you
 2     here the next few weeks.
 3              PROSPECTIVE JUROR:  And 55.
 4              MR. MARKUS:  And 55.  And thank you very much.
 5     Have a nice lunch and we'll see each other soon.
 6              THE COURT:  Maybe I didn't hear the numbers right.
 7     Mr. Caughey, you're 29, right?
 8              PROSPECTIVE JUROR:  Yes.
 9              THE COURT:  And you said yes?
10              PROSPECTIVE JUROR:  Yes.
11              THE COURT:  You want to serve?
12              PROSPECTIVE JUROR:  Yes.
13              THE COURT:  A minute ago you said your business was
14     going to fail.  So I need to understand whether you want to
15     serve or not serve.  I mean if you're willing to serve, I
16     think that's great.  But you know, I'm also --
17              PROSPECTIVE JUROR:  You made a statement about
18     serving your country, the highest level, other than being in
19     the Service.
20              THE COURT:  That's true.  And if you're willing to
21     risk it, that's wonderful.  Because I think that is a true
22     statement he made in terms of the importance of jury duty.
23     But also, I don't want somebody going -- ruining their family
24     because of it.  So that's the thing I have to try to deal
25     with.  And that's why I ask all of you and tried to get as
```

```
 1    much information as I could about your personal situations.

 2    Because it is an important to serve.

 3            Okay.  They're going to take a minute and think

 4    about their case.  I have a couple of questions.

 5            Ms. Pryluck, you -- tell me about -- you answered a

 6    couple of different ways.  Can you be fair in this case or

 7    not?

 8            PROSPECTIVE JUROR:  Because of previous

 9    experiences, I can tell you I've had really close friend's

10    father killed by organized crime.

11            THE COURT:  So you don't think you can be fair?

12            PROSPECTIVE JUROR:  I don't think it's fair to the

13    defendants because I will have a bias feeling.  Because I

14    have a negative outlook on personal experience.

15            THE COURT:  Thank you.

16            PROSPECTIVE JUROR:  Forty-nine.

17            THE COURT:  Sorry?

18            PROSPECTIVE JUROR:  I don't think I want to serve

19    either because --

20            THE COURT:  Ms. Bergman?

21            PROSPECTIVE JUROR:  Yes.

22            THE COURT:  You don't want to serve either, or you

23    want to serve?

24            PROSPECTIVE JUROR:  I worked 17 years at Palm Beach

25    County courthouse.  I was a court clerk.
```

```
 1                THE COURT:  Well, you of all people, ought to be

 2      fair.  Tell me what the thing is.  You don't think you can be

 3      fair.

 4                PROSPECTIVE JUROR:  I can be fair.  I can be fair.

 5      But --

 6                THE COURT:  But what?

 7                PROSPECTIVE JUROR:  I'm trying to figure out this

 8      $40.  I'm a school bus driver now.

 9                THE COURT:  Okay.  And Mr. Reinhardt, you don't

10      think you can be fair in this case?

11                PROSPECTIVE JUROR:  My main part about being fair

12      is I would have to hear what the other party has to say.  I

13      understand how the --

14                THE COURT:  You understand how the system operates?

15                PROSPECTIVE JUROR:  Yes.

16                THE COURT:  You can be willing to -- a person has a

17      right to testify.  And it's understandable that if someone

18      wants to testify, you want to hear their side.  But if you --

19      you've got to honor the way the system is set up, that the

20      Government has to prove guilt.  If they don't do it, if Mr.

21      Kaiser over there thinks they haven't proved it, I advise you

22      not to testify because you might make a mistake, you might

23      get flustered, you may not be a good public speaker.  There

24      may be a lot of reasons he might advise it.

25                But if a juror is not willing to insist that the
```

1    Government prove guilt, and do it beyond a reasonable doubt,

2    I mean, that's the other side of this issue of -- and a

3    defendant just doesn't have to testify.  They can.  And if

4    they do, you can certainly want to hear their side of it.

5    But you can't require them to and you can't hurt them because

6    they didn't testify.  That's the way --

7              PROSPECTIVE JUROR:  I fully understand that.  But

8    just my --

9              THE COURT:  You don't think you can accept that?

10             PROSPECTIVE JUROR:  If I'm hearing this testimony

11   and all of this stuff building up and this person is not

12   going to defend himself in anyway, in my mind, then I have --

13   I have to say almost kind of guilty because you would have to

14   represent yourself.  But I understand how the Court works.  I

15   understand how they don't have to come and say anything.

16   They can sit back and do nothing.

17             But I personally feel you have to stand up for

18   yourself.  If someone is accusing you of all of this stuff,

19   you have to defend yourself.

20             THE COURT:  I appreciate your opinion on that, and

21   I'll accept it.  Please understand, this is a principle

22   that's in the Constitution of the country.  And it goes back

23   to history where, you know, in the early days and some of the

24   things we tried to escape in setting up this country.  There

25   was torture and all kinds of things that occurred.

```
 1              And so the way we set our criminal justice system

 2    up is, the Government has to prove guilt and a defendant has

 3    a right, a constitutional right not to testify.  And you

 4    can't consider the fact that they may not testify in deciding

 5    your verdict.  And so that's a principle really the country,

 6    one of the principles the country is founded on.

 7              Yes, sir.

 8              PROSPECTIVE JUROR:  I have a question.  This

 9    question has been with me a long time.  I noticed in the

10    court of law if I sat in the jury box up there, you actually

11    are sworn to tell the truth, the whole truth, and nothing but

12    the truth.  My question is why shouldn't the attorneys tell

13    the truth, the whole truth, and nothing but the truth.  If

14    they did, then our justice system would work?

15              THE COURT:  Well, they're not going to give you

16    evidence.  Their job is to represent their clients.  They

17    have ethical rules that require them to do it.  And they have

18    to do it in an honorable fashion, and these are all good

19    lawyers and they will.

20              But what they say and I'll give you instructions on

21    this in a short while, the things the lawyers say, they're

22    going to be asking questions.  That's not evidence.  You've

23    got to decide the case based on the evidence that comes in

24    from the witness stand.  What the witnesses say.  Not what

25    the lawyers say.  And the lawyers will present argument to
```

```
 1    you and they'll base their argument on what the witnesses

 2    have said.

 3            But it's not their personal opinion, they're not

 4    under oath.  They're not -- their job is to argue on behalf

 5    of their clients.  Their job is not to testify.  And so these

 6    lawyers will act honorably.  But you can't consider the way

 7    they ask a question.

 8            For example, if I were to ask you something like,

 9    when did you stop beating your brother?  Don't take from that

10    question anything.  It's the answer that counts.  Not the

11    question.  Okay.  Let's give the lawyers a chance to make

12    some decisions about their choices in this and we'll try to

13    then -- then we'll break for lunch.

14            MR. PASANO:  Judge, a question.  Cause first, then

15    peremptory?

16            THE COURT:  Yes.

17            MR. PASANO:  The one may be much quicker than the

18    other.  What's the Court's preference?

19            THE COURT:  We're going to go through it as I

20    indicated at our status conference.  I will tell you those I

21    am inclined to excuse for cause.  Tell me if there is

22    disagreement, and then we will take peremptories.  And I

23    expect it all to go quickly.  So you all take a minute and

24    confer.

25            MR. PASANO:  Can we go outside, your Honor?
```

```
 1              THE COURT:  For five minutes.

 2              MR. PASANO:  Five minutes?  Wherever His Honor

 3   wants us?  Is outside better?  The jury room.

 4              THE COURT:  I think there is a conference room out

 5   there.  Let's get back to it in five minutes.  If you all

 6   want to stand up and stretch, do so.  I'm trying to get

 7   finished with this so those who aren't selected can go to

 8   lunch and go about their business.

 9        (Recess at 12:35 p.m.)

10              THE COURT:  Okay.  Ladies and gentlemen, it's --

11   let's try to keep the noise down.  I'm going to take this up

12   with the lawyers over at sidebar.  If you want to stand and

13   stretch that's all right, but I have to be able to hear them.

14   As I said, we're trying to finish this so -- before we break

15   for lunch.

16        (The following proceedings were held at the bench:)

17              THE COURT:  Okay.  No. 3, Bottinelli, I'm inclined

18   to excuse for cause.  Any disagreement?

19              Hearing none.

20              No. 5, Tuchak, I'm inclined to excuse for cause.

21   Work and his answer.  Any disagreement?

22              MR. KAISER:  No.

23              THE COURT:  No. 6, Velez, I'm inclined to excuse

24   for her work in the nail salon, as well as her statements

25   with respect to Mr. Gotti.
```

```
 1              Any disagreement?

 2         MR. KAISER:  No.

 3         THE COURT:  Does anyone want Reinhardt excused for

 4  cause?  Either side?

 5         MR. KAISER:  Yes.

 6         THE COURT:  I'm inclined to excuse him.

 7         MR. KAISER:  I thought I might want him as a juror.

 8         THE COURT:  I think given his answers, seven is

 9  excused for cause.

10         No. 8, I'm inclined to excuse for cause.  Any

11  disagreement?

12         MR. KAISER:  No.

13         THE COURT:  Nine, Ms. Campbell.  Because she is a

14  student, I'm inclined.  Any disagreement?

15         MR. SHOCKLEY:  No.

16         THE COURT:  No. 14, Ms. Monti, says she has a work

17  problem and also answered with respect to Mr. Gotti.  Any

18  disagreement?

19         MR. SHOCKLEY:  No.

20         MR. KAISER:  No.

21         MR. PASANO:  Would the Court please take a look at

22  13 and 12 with similar answers, the organized crime

23  questions?

24         THE COURT:  The Government's position on 13?

25         MR. MCCORMICK:  Your Honor, on this organized crime
```

1    question, I believe the Court should ask jurors just coming

2    in here if they have any bias, not that they could put aside

3    the bias.

4            THE COURT:  You disagree with 13; is that right?

5            MR. MCCORMICK:  Yes, your Honor.

6            THE COURT:  I'm going to leave that at least for

7    further argument.

8            No. 19, Ms. Courter, has a pregnancy.  Any

9    disagreement?

10           MR. MCCORMICK:  No.

11           MR. KAISER:  No.

12           THE COURT:  Mr. Rutherford has work and also

13   answered with respect to one of Mr. Birch's raise your hand

14   if you don't want to serve on the jury questions.

15           Any disagreement on 20?

16           MR. KAISER:  No.

17           THE COURT:  Pargan, the child care problem, I'm

18   inclined to excuse.  Any disagreement?

19           MR. KAISER:  No.

20           THE COURT:  Becker says he has back problems, work

21   problems, and -- any disagreement on 22?

22           MR. KAISER:  No.

23           THE COURT:  No. 24, Parent, has a work problem.

24   Any disagreement?

25           MR. KAISER:  No.

1          THE COURT:  Twenty-six, Neubert, says he can't be

2     fair.  Any disagreement?

3          MR. MCCORMICK:  No.

4          MR. KAISER:  No.

5          THE COURT:  No. 33, Lawrence, has a vacation

6     scheduled.

7          MR. ENTIN:  Set for next week.

8          THE COURT:  No. 40, the videographer, primary

9     reason why, but he answered favorably to all your answers

10    about not being able to be fair.  I'm inclined to excuse him.

11    Any disagreement?

12         MR. KAISER:  No.

13         THE COURT:  Anesca has a work problem, No. 42.  Any

14    disagreement?

15         MR. KAISER:  No.

16         THE COURT:  Perez has a language problem.

17    Forty-three.  Any disagreement?

18         MR. KAISER:  No.

19         THE COURT:  November No. 46 had a work problem and

20    also answered affirmatively to Mr. Birch's questions.  Any

21    disagreement on Canas?

22         MR. KAISER:  No.

23         THE COURT:  Forty-six -- forty-nine said he had a

24    work problem.  Any disagreement?  Sorry, that's 50.

25         MR. MCCORMICK:  Joyce.

```
 1                    MR. KAISER:  No.

 2                    THE COURT:  No. 51 had a work problem.  Any

 3       disagreement?

 4                    MR. MCCORMICK:  No.

 5                    THE COURT:  Okay.  Those are the ones that I am

 6       inclined to excuse for cause.  Any additional ones?

 7                    First, the Government?

 8                    MR. MCCORMICK:  Was that 50, Joyce?

 9                    THE COURT:  Fifty was for cause.

10                    MR. MCCORMICK:  Okay.

11                    THE COURT:  Does the Government have any additional

12       challenges for cause?

13                    MR. MCCORMICK:  No.

14                    THE COURT:  Let's hear any additional challenges

15       from the defense.  I need to know from the Government whether

16       they agree or don't agree.

17                    MR. SHOCKLEY:  Yes, your Honor.  We do.  No. 12.

18                    THE COURT:  What was the problem?

19                    MR. BIRCH:  Organized crime, Gotti.  I have that

20       down for 12.  He raised his hand when asked about organized

21       crime or John Gotti.

22                    MR. MCCORMICK:  Your Honor, I don't agree.  We

23       asked on other voir dire about this and this witness wasn't

24       asked if he could put aside any bias or prejudice.

25                    THE COURT:  I don't believe there is a basis for 12
```

```
 1    for cause.  I don't even have him answering affirmatively to

 2    those questions.  But I think it would be incumbent to

 3    follow-up to some degree, given the questions I asked and the

 4    Government asked.  So if you're right, he raised his hand --

 5    my notes show he didn't.  I'm not going to excuse 12 for

 6    cause.

 7              MR. KAISER:  Thirteen we have excuse based on the

 8    problem with the Gotti and Mr. Artuso is Vincent Artuso

 9    having known him.

10              MR. MCCORMICK:  Your Honor, no follow-up questions

11    asked.  The only question that was asked, whether that would

12    be a consideration.  It wasn't asked if after all of the

13    evidence in the case if a juror would assess that in terms of

14    rendering a verdict.  There was no follow-up question that

15    was asked Mr. --

16              MR. SHOCKLEY:  Judge, we're under time constraints.

17    Maybe you can make inquiry further because we couldn't --

18              THE COURT:  I think there was time.  I'm not

19    inclined to excuse 13 for cause.

20              MR. SHOCKLEY:  He also indicated a problem with not

21    being able to consider the evidence if the defendants didn't

22    testify.

23              MR. BIRCH:  Strike 13.  We struck 13.

24              THE COURT:  No.  Fourteen, I did strike for cause,

25    but not 13.
```

```
 1              MR. BIRCH:  Thirteen raised his hand on the Gotti

 2    organized crime problem and he also said he wants the

 3    defendants to testify.

 4        (The following proceedings were held in open court:)

 5              THE COURT:  Mr. Soto, I need to understand what

 6    your answer was.  Are you -- do you feel like you can be fair

 7    in this case or do you have a problem based on the questions

 8    that were asked by counsel?

 9              PROSPECTIVE JUROR:  No, I feel I can be fair.

10              THE COURT:  And you could have a preconception

11    starting out, or can you decide the case based on the

12    evidence in this case?

13              PROSPECTIVE JUROR:  I believe I can.  Yes.

14              THE COURT:  Thank you.

15        (The following proceedings were held at the bench:)

16              THE COURT:  Anybody else?  From the defense.

17              MR. BIRCH:  Fifteen.  Same thing.

18              THE COURT:  Who?

19              MR. BIRCH:  Mr. Kearney, No. 15.

20              THE COURT:  His only answer was about how much work

21    the counts took.  That was no basis for a cause.

22              MR. BIRCH:  Okay.  My mistake.

23              THE COURT:  Anybody else from the defense?

24              MR. SHOCKLEY:  Judge, while they're looking --

25              THE COURT:  Try to do it in order, if you can.
```

 1              MR. BIRCH:  Seventeen.

 2              THE COURT:  Seventeen is what?

 3              MR. BIRCH:  Seventeen.  I have in my notes that he

 4      raised his hand when asked the Gotti organized crime.

 5              THE COURT:  No, he raised his hand about number of

 6      counts.  You didn't follow up on that. I don't think a

 7      for-cause basis.

 8              MR. BIRCH:  Okay.

 9              THE COURT:  Anybody else?

10              MR. BIRCH:  So you struck all of the ones asked

11      about the Gotti organized crime but not the counts?  Because

12      I did have overlapping notes.  I want to make sure I

13      understood.

14              THE COURT:  I tried to.  I mean, to be fair, the

15      only other one I have not stricken who I had answering the

16      Gotti question that way was 28.  But I didn't see any basis

17      for it otherwise.  That's the only other one that I had that

18      note on.  Anybody else?  Any other cause challenges from the

19      defense?

20              MR. SHOCKLEY:  Thirty-seven, she is the one who

21      said she has clients coming in.

22              THE COURT:  That's 37.  Yes, I did have a note

23      about that.  Did anybody agree on No. 37?

24              MR. SHOCKLEY:  Is that designer?

25              THE COURT:  Yes.  I'm going to excuse 37 for cause.

```
 1              MR. PASANO:  Twenty-nine was the man who said he is

 2     the only guy who can't get good help.  It's his store.

 3              THE COURT:  He changed his -- Mr. --

 4              MR. PASANO:  Now he wants to do it.

 5              THE COURT:  He wants to serve now.

 6              MR. MARKUS:  No. 38 said they would have to --

 7     No. 38, she said she would have to hear from the defendant

 8     when asked that question.

 9              THE COURT:  Well, she raised her hand at one point.

10     I think without more there's not a basis.  I mean, I haven't

11     given them instructions yet.  I need to further talk to them

12     about the obligation not to consider the defendant not

13     testifying.  So I don't see a basis for cause on 38.  Unless

14     there is an agreement.

15              Anybody else?

16              Let get to peremptories, if we can.  Anybody else?

17              MR. ENTIN:  We have only gotten as far as Juror No.

18     18 because we were doing causes too.

19              THE COURT:  All right.  Let's take the jurors one

20     by one with the Government going first until we've seated

21     however many we get.  I've excused quite a few.

22              No. 1.  Government?

23              Mr. McCormick, what's your position on Juror No. 1?

24              MR. MCCORMICK:  Accept.

25              THE COURT:  Defense?
```

```
 1            MR. KAISER:  We would strike.

 2            THE COURT:  Two, Potsander.  Government?

 3            MR. MCCORMICK:  That's fine, your Honor.

 4            THE COURT:  Defense?

 5            MR. KAISER:  We accept.

 6            THE COURT:  No. 4, Pabisz.  Government?

 7            MR. MCCORMICK:  It's okay, Judge.

 8            MR. KAISER:  We accept.

 9            THE COURT:  No. 10, Champey.  Government?

10            MR. MCCORMICK:  That's fine.

11            THE COURT:  Defense?

12            MR. KAISER:  We accept.

13            THE COURT:  No. 11.  Government?

14            MR. MCCORMICK:  That's fine, Judge.

15            THE COURT:  Defense?

16            MR. KAISER:  We accept.

17            THE COURT:  No. 12, Drake.  Government?

18            MR. MCCORMICK:  That's fine, Judge.

19            THE COURT:  Defense?

20            MR. KAISER:  We strike.

21            THE COURT:  No. 13, Soto.  Government?

22            MR. MCCORMICK:  That's fine, Judge.

23            THE COURT:  Defense?

24            MR. KAISER:  We strike.

25            THE COURT:  No. 15, Kearney.  Government?
```

```
 1                    MR. MCCORMICK:  Strike.

 2                    THE COURT:  No. 16, Pantone.  Government?

 3                    MR. MCCORMICK:  Fine, Judge.

 4                    THE COURT:  Defense?

 5                    MR. KAISER:  We accept.

 6                    THE COURT:  Seventeen is Brown.  Government?

 7                    MR. MCCORMICK:  That's fine, Judge.

 8                    THE COURT:  Defense?

 9                    MR. KAISER:  We strike.

10                    THE COURT:  No. 18, Zanders.  Government?

11                    MR. MCCORMICK:  Fine, Judge.

12                    THE COURT:  Defense?

13                    MR. KAISER:  We strike.

14                    MR. BIRCH:  Eighteen is gone.

15                    THE COURT:  The next one I seem to have is 23.

16      Allred.  Government?

17                    MR. MCCORMICK:  Strike.

18                    THE COURT:  Twenty-five, Morrin.  Government?

19                    MR. MCCORMICK:  Strike.

20                    THE COURT:  What was your position?  Morrin.

21                    MR. MCCORMICK:  Strike.

22                    THE COURT:  Twenty-seven is Bouwens.  Government?

23                    MR. MCCORMICK:  Swear her.  She's good.

24                    THE COURT:  All right.  Defense?

25                    MR. KAISER:  We accept.
```

```
 1                  THE COURT:  No. 28, Russell.  Government?

 2             MR. MCCORMICK:  That's fine, Judge.

 3             MR. BIRCH:  Did you say fine or strike?

 4             MR. MCCORMICK:  Fine.

 5             MR. KAISER:  We strike.

 6             THE COURT:  Caughey, 29.  Government?

 7             MR. MCCORMICK:  Strike.

 8             THE COURT:  Thirty is Humeston.  Government?

 9             MR. MCCORMICK:  That's fine, Judge.

10             THE COURT:  Defense?

11             MR. PASANO:  The Government has accepted?

12             THE COURT:  Right.

13             MR. MCCORMICK:  Yes.

14             MR. KAISER:  We accept.

15             MR. BIRCH:  I had a question mark, but I didn't

16   have an "X," so all right.

17             THE COURT:  Thirty-one is Gittleman.  Government?

18             MR. MCCORMICK:  That's fine, Judge.  Yes.

19             THE COURT:  Defense?

20             MR. KAISER:  We accept.

21             THE COURT:  Samuels is 32.  Government?

22             MR. MCCORMICK:   We strike her, Judge.

23             MR. PASANO:  The Government struck 32?

24             MR. MCCORMICK:  Yes.

25
```

```
 1                    MR. PASANO:  So they have one strike left?

 2                    MR. MCCORMICK:  Two.

 3                    MR. PASANO:  One.

 4                    THE COURT:  All right.  Thirty-four is Serio.

 5       Government?

 6                    MR. MCCORMICK:  That's fine, Judge.

 7                    THE COURT:  That's fine?

 8                    MR. MCCORMICK:  Yes.

 9                    MR. KAISER:  We accept.

10                    THE COURT:  Thirty-five is Alfele.  Government?

11                    MR. MCCORMICK:  She's fine, Judge.

12                    THE COURT:  Defense?

13                    MR. KAISER:  We accept.

14                    THE COURT:  Thirty-six is Hemmingway.  Government?

15                    MR. MCCORMICK:  That's fine, Judge.

16                    THE COURT:  Defense?

17                    MR. ENTIN:  We strike.

18                    THE COURT:  Cohen is 38.  Government?

19                    MR. MCCORMICK:  Fine, Judge.

20                    THE COURT:  Yes, what?

21                    MR. MCCORMICK:  We'll take her.

22                    THE COURT:  Okay.  Defense?

23                    MR. KAISER:  We strike.

24                    THE COURT:  Cox is 39.  Government?

25                    MR. MCCORMICK:  She's fine, Judge.
```

```
 1                  THE COURT:  Defense?

 2                  MR. KAISER:  We accept.

 3                  THE COURT:  Locurto.  Government?  Forty-one.

 4                  MR. PASANO:  Judge, am I right, do we have 11

 5     jurors at this point?

 6                  THE COURTROOM DEPUTY:  Yes.

 7                  MR. MCCORMICK:  She is fine, Judge, or he is fine,

 8     Judge.

 9                  THE COURT:  Okay.  Locurto.  Government?  I mean

10     defense?

11                  MR. BIRCH:  How many do we have left?

12                  MR. SHOCKLEY:  We have two left.  We strike.

13                  THE COURT:  Locurto you strike?

14                  MR. SHOCKLEY:  Yes.

15                  THE COURT:  Thirty-four is Serio.  Government --

16     no.  Wait.  Forty-four is Goldbaum.  Government?

17                  MR. MCCORMICK:  She's all right, Judge.

18                  THE COURT:  Defense on Goldbaum?

19                  MR. KAISER:  We strike.

20                  THE COURT:  So that's all of your strikes.  I think

21     the Government has one.

22                  And we are to Pruitt.  How many do we have?

23                  THE COURTROOM DEPUTY:  We have 11 jurors.

24                  THE COURT:  All right.  We have 11.  Pruitt?

25                  MR. MCCORMICK:  That one is fine, Judge.
```

```
 1                    MR. SHOCKLEY:  You struck or took?

 2                    MR. MCCORMICK:  Took.

 3                    THE COURT:  You took Pruitt.

 4                    MR. MCCORMICK:  Yes.

 5                    THE COURT:  That's 12, right?

 6                    MR. ENTIN:  How many alternates?

 7                    THE COURT:  We were going to try for three.  If you

 8      have three that you can accept.  You have a challenge each.

 9      And so we are to Tower.  Government?

10                    MR. MCCORMICK:  Are we on 46?

11                    MR. ENTIN:  47.

12                    THE COURT:  First alternate.

13                    MR. MCCORMICK:  Swear her.

14                    THE COURT:  Okay.  Tower is accepted.

15                    MR. ENTIN:  We accept.

16                    THE COURT:  Harris.  Government?

17                    MR. SHOCKLEY:  Your Honor, did you say one strike a

18      piece for all of the alternates?

19                    THE COURT:  Yes.

20                    MR. PASANO:  We each have one and only one.

21                    MR. SHOCKLEY:  We lost our other one.

22                    THE COURT:  Yes.  They don't carry over.

23                    MR. ENTIN:  I like that.  That's pretty good.

24                    THE COURT:  What are you doing on Harris?  Did you

25      accept Harris or no?
```

```
1                    MR. MCCORMICK:  Yes.

2                    THE COURT:  You accept?

3                    MR. MCCORMICK:  Accept.

4                    MR. KAISER:  We accept.

5                    THE COURT:  That's two alternates.  We'll try to

6       get a third.  We have plenty left.  Neither of you used any

7       challenges.  Bergman.

8                    MR. PASANO:  49.  It's their call.

9                    MR. MCCORMICK:  We're only going to get one more,

10      right, one more alternate?

11                   MR. KAISER:  Yes.

12                   MR. MCCORMICK:  We'll take her, Judge.

13                   THE COURT:  Defense?

14                   MR. KAISER:  We'll strike.

15                   THE COURT:  So the next one was Blye, 52.  Blye.

16                   MR. MCCORMICK:  We strike.

17                   THE COURT:  So the third one is Hoffmann then,

18      right?

19                   MR. PASANO:  Yes.

20                   THE COURT:  So we have three alternates.  Hoffmann

21      is our third, and 12 jurors.  And we'll break and come back

22      after lunch.

23                   THE COURTROOM DEPUTY:  Do you want them to come

24      back here or downstairs?

25                   THE COURT:  Let's come back here.  We'll finish
```

1    today here.

2                    THE COURTROOM DEPUTY:  Okay.

3        (The following proceedings were held in open court:)

4                    THE COURTROOM DEPUTY:  I'm going to call a few

5    names.  When I call your name, please stand.  And I apologize

6    if I mispronounce anybody's name.

7                    Potsander, Pabisz, Champey, McManus, Pantone,

8    Bouwens, Humeston, Gittleman, Serio, Alfele, Cox, Pruitt,

9    Tower, Harris, and Hoffmann.

10                   Those of you who are standing were selected to sit

11   on this jury.  Those of you who are still seated were not

12   selected; however, you're still on call for the remainder of

13   your summons period, which I believe is until Friday.  So you

14   have to continue to call in until Friday.  But you are gone

15   for the day.  You're free to go.

16                   If you need an attendance form, please go down to

17   the clerk's office on the second floor.  Just follow the

18   signs to the clerk's office, and they will give you an

19   attendance form.  Those of you who are still standing, please

20   stay where you are for the moment.  Those of you who are not

21   standing, you're excused.

22                   THE COURT:  Thank you very much, ladies and

23   gentlemen.

24       (Pause in Proceedings.)

25       (The jury was duly impaneled and sworn.)

 1          THE COURT:  Okay.  As promised, our first order of

 2    business will be a break.  As one of the lawyers said, if you

 3    encounter them or somebody you associate with the case out in

 4    the hall, they can't have any contact at all with you while

 5    you're serving on the jury.  Don't be offended if they don't

 6    talk to you.  And you can't have any discussions with them.

 7          You've been sitting a long time and this is our

 8    first time in terms -- we usually take an hour.  We will take

 9    a few minutes more than that because you need to accumulate

10    yourself where to eat lunch and things like that.  We will

11    break until 2:30.  That's an hour and 20 minutes.

12          When you return, we'll hear the -- some preliminary

13    instructions and start the opening statements of the lawyers.

14          If you step out this way, Angela will show you the

15    jury room.  We'll be back at 2:30.

16      (Jury out at 1:10 p.m.)

17          THE COURT:  Okay.  We'll be in recess until 2:30.

18          MR. SHOCKLEY:  Your Honor, can I ask one question?

19          THE COURT:  Yes, sir.

20          MR. SHOCKLEY:  It appears from the time that we

21    will probably not get to --

22          THE COURT:  Go ahead and have a seat.

23          MR. SHOCKLEY:  We will probably not get to the

24    Government's first witness this afternoon.  Is that probably

25    the Court's understanding?  I'm just wondering if I should

1    have the first witness here late in the day.  I'm thinking

2    the opening statements and the Court's instruction to the

3    jury initially may take us through the end of the day.

4              THE COURT:  Remind me.  I don't have my notes.  How

5    long did we agree on?

6              MR. PASANO:  I think you gave three hours to each

7    defendant, your Honor.

8              THE COURT:  No, I didn't do that.

9              MR. PASANO:  That was 30 minutes.

10             THE COURT:  I'm going to have to ask someone with

11   more credibility from now on.

12             MR. SHOCKLEY:  Thank you, your Honor; it's nice to

13   be recognized.

14             MR. BIRCH:  We have 30 minutes each.

15             THE COURT:  Are you all going to take it?  Are they

16   safe waiting until tomorrow morning for their first witness

17   or not?

18             MR. BIRCH:  Candidly, I'm not going to come in

19   close.  Somebody wants my time, they can have it.  I will be

20   no more than 15 minutes.

21             MR. PASANO:  Judge, if the Government is taking 45

22   minutes to an hour?

23             MR. SHOCKLEY:  Yes.  We will.

24             MR. BIRCH:  We have collectively, you gave us two

25   and a half hours total that we could divide up.  And you did

 1    say that anybody that doesn't use their 30 minutes can give

 2    it to someone else.

 3            THE COURT:  Right.  I'm trying to figure out if

 4    you're going to use it or not.

 5            MR. PASANO:  Judge, here is the good news.  It

 6    appears two of the five defendants are going to reserve

 7    openings.

 8            THE COURT:  Better have your witness, it sounds

 9    like.

10            MR. SHOCKLEY:  Okay.

11            MR. PASANO:  Just in case because it's possible it

12    would be late in the day, but we might be done before 4:45.

13            THE COURT:  Let's try to have a witness here.

14            MR. SHOCKLEY:  Thank you, your Honor.

15            THE COURT:  All right.  Thank you all.  See you at

16    2:30.

17        (Recess at 1:12 p.m.)

18            MR. BIRCH:  Judge, I was going to ask that the

19    Government in its opening not make reference to a video that

20    I believe they intend to play or attempt to play during the

21    trial.  It is a video of approximately 20 years old showing,

22    among others, Mr. Vincent Artuso with Mr. Gotti.  When the

23    time comes I'm going to object to that as being irrelevant

24    and make also a 403 objection that its prejudice outweighs

25    its relevance.

```
 1              If the Government mentions it during the opening,

 2      and the Court sustains my objection, I think we've caused a

 3      mistrial.  And that's why I'm requesting that the Government

 4      refrain from making reference to the video until it is

 5      actually admitted.  If it is actually admitted.

 6              MR. SHOCKLEY:  Your Honor, during the course of my

 7      opening statement I am going to be talking about Lewis

 8      Kasman.  He is an admitted perjurer.  He went to prison, as a

 9      matter of fact, in order to protect John Gotti when he lied

10      on his behalf in front of the grand jury.  So I'm going to be

11      talking about Lewis Kasman.  And I believe it is appropriate

12      to allow me to point out the corroboration of his testimony

13      because we will be hearing from the FBI agents who can

14      identify the tapes that were made back in the late '80s of

15      Mr. Artuso actually at the Ravenite Social Club with John

16      Gotti.

17              Now, I don't see where there can be a really

18      legitimate basis for challenge of that testimony and of those

19      exhibits because, in fact, the defendant is charged with

20      being a member and, in fact, a captain in the Gambino

21      organized crime family.  Merely allowing the Government to

22      present its proof to establish that which has, in fact, been

23      charged would seem to be an appropriate to thing to allow me

24      to discuss in opening statement.

25              THE COURT:  What's the -- if that's the allegation,
```

1   if he is entitled to prove this membership in the

2   organization, what's the prejudice from the video?  Because

3   it's Gotti?  Is that your --

4        MR. BIRCH:  Well, one, because it is Gotti.  No. 2,

5   it is 20 years old.  The conspiracy is charged from late 2001

6   to today's date, something to that effect.  The video is from

7   1988, 1989.  My position is that the length of time from that

8   video to today makes it irrelevant.  And of course, the

9   prejudicial impact, I would submit, is self evident, that

10  seeing a video with Mr. Artuso with John Gotti clearly is

11  prejudicial to the extent that it outweighs any relevance

12  they could have.

13       We're talking about a video 20 years ago to try to

14  prove something that happened in 2002.

15       THE COURT:  I'm not going to preclude the mention

16  of it in opening statement.  I want to make sure I hear the

17  openings.  I'm not at this point deciding the issue of its

18  admissibility in trial, but I'm not going to preclude them

19  from referring to it.  I don't agree that because he mentions

20  a videotape that would, even if it weren't to be admitted,

21  would require a mistrial.

22       MR. BIRCH:  Very well.

23       THE COURT:  Are you ready?  Do you have your

24  equipment ready yet?

25       MR. SHOCKLEY:  I think what we have to do is move

1   that screen around here.  I want to make sure that defense

2   counsel and the defendants will be able to see it on their

3   individual monitors and I'm trying to think of a way to place

4   it over here so it will not be blocking their view of the

5   jury as well.

6           THE COURT:  Well, let's get it done because it is

7   2:30.  If we're going to use it, let's move it.

8       (Pause in Proceedings.)

9           THE COURT:  All right.  Ready for the jury?

10      (Pause in Proceedings.)

11          THE COURT:  Okay.  Let's invite the jury.

12      (Jury in at 2:34 p.m.)

13          MR. BIRCH:  Your Honor, can we invoke the rule?

14          THE COURT:  Sure.  The rule is invoked.  All

15  lawyers are responsible for making sure their witnesses abide

16  by it.

17          You're not including the case agent though, right?

18          MR. BIRCH:  Not the one case agent.  No.

19          THE COURT:  Is there any other witness in here?

20          MR. SHOCKLEY:  No, your Honor.  And as a matter of

21  fact, we can address the Court later but we have a sanctioned

22  system for displaying some of the exhibits.  We need another

23  agent to work that.

24          MR. PASANO:  Judge, on the defense side in court is

25  an investigator who might be a summary witness.  It would not

1    be a fact witness.  We'd ask that the Court view him as our

2    case agent, if the Court would.

3            THE COURT:  Do you have a problem with that?

4            MR. McCORMICK:  We don't know who you're speaking

5    about.

6            MR. PASANO:  It's Mr. Dryblatt (phonetic), who is

7    sort of in the back.  He may or may not be a summary witness,

8    as I say, depending upon the presentation of the defense

9    case, to summarize certain documents.

10           MR. McCORMICK:  Rule 615 doesn't provide for that,

11   your Honor.  We're complying with Rule 615, your Honor.

12           THE COURT:  And you have a problem with their

13   investigator if he is a summary witness?  That's the

14   question.

15           MR. SHOCKLEY:  I don't know if he was going to be

16   tendered as an expert or a summary witnesses, to tell you the

17   truth, your Honor.  It is kind of unclear to the Government

18   exactly what they intend to do with him.

19           THE COURT:  Well --

20           MR. PASANO:  Your Honor, the truth is if the

21   Government is going to make us jump through that hoop and the

22   Court believes it is appropriate, then if we decide to use

23   the summary witness -- he is covered by 615(3).  But we can

24   deal with that issue later, your Honor, if the Court would

25   prefer.

1              THE COURT:  All right.

2              MR. PASANO:  He'll remain, but we're confident

3    either 615(3) covers it, or we'll replace him.

4              We'll take it up after openings.

5         (Jury in at 2:37 p.m.)

6              THE COURT:  Welcome back.  Please be seated.

7              Members of the jury, now that you've been sworn I

8    will give you some preliminary instructions to guide you in

9    your participation in the trial.  It will be your duty to

10   find from the evidence what the facts are.  You and you alone

11   are the judges of the facts.  You will have to then apply to

12   those facts the law as I provide it to you, and you should

13   follow the law whether you agree with it or not.

14             Nothing that I may say or do during the course of

15   the trial is intended to indicate what your verdict should

16   be.

17             The evidence from which you will find facts will

18   consist of testimony of witnesses, documents, and other

19   things received into the record as exhibits, and any facts

20   that the lawyers agree to or stipulate to or that I may

21   instruct you to find.  Certain things are not evidence and

22   must not be considered.  I'll list them for you now.

23             First, statements, arguments, or questions by the

24   lawyers are not evidence.  Second, objections to questions

25   are not evidence.  The lawyers have obligations to their

1    clients to make objection when they believe that some item of

2    evidence is improper under the rules of evidence, and you

3    should not be influenced by the objection or by my ruling

4    upon it.

5         If the objection is sustained, ignore the question.

6    If the objection is overruled, treat the answer as you would

7    any other.

8         If you are instructed that some item of evidence

9    should be considered for only a limited purposes, you should

10   follow that instruction.

11        Third, testimony that I exclude or tell you to

12   disregard is not evidence.  And must not be considered.

13        Fourth, anything you may say or hear outside the

14   courtroom is not evidence.  You must decide the case solely

15   on the evidence presented here in the courtroom.  There are

16   two kinds of evidence:  Direct and circumstantial.

17        Direct evidence is direct proof of a fact, such as

18   the testimony of an eyewitness.  Circumstantial evidence is

19   proof of facts from which you may infer or conclude that

20   other facts exist.  I'll give you further instruction on this

21   as well as other matters at the end of the case.  But have in

22   mind you may consider both kinds of evidence.

23        It will be up to you to decide which witnesses to

24   believe, which witnesses not to believe and how much of any

25   witness' testimony to accept or reject.  I'll give you some

1    guidelines for determining credibility of witnesses at the

2    end of the case.

3            As you know, this is a criminal case.  There are

4    three basic rules to keep in mind about a criminal case.

5    First, a defendant is presumed innocent unless proven guilty.

6    The indictment against a defendant brought by the Government

7    is only an accusation, nothing more.  It is not proof of

8    guilt or anything else.  The defendant therefore starts out

9    with a clean slate.

10           Second, the burden of proof is on the Government

11   until the very end of the case.  A defendant has no burden to

12   prove his innocence.  Or to present any evidence.  Or to

13   testify.  Since a defendant has the right to remain silent,

14   the law prohibits you in arriving at your verdict from

15   considering a defendant may not have testified.

16           Third, the Government must prove a defendant's

17   guilt beyond a reasonable doubt.  I'll give you further

18   instruction on this point later, but bear in mind that in

19   this regard a criminal case is different than a civil case.

20           During the trial it may be necessary for us to

21   interrupt and for me to hear an issue of law or procedure

22   outside of your hearing with the lawyers.  I'll try to keep

23   any such interruptions to a minimum.  Please be patient if

24   that happens.

25           A few words about your conduct as jurors.  First,

 1  during the trial you should not discuss the case with anyone

 2  or permit anyone to discuss it with you.  Until you retire to

 3  the jury room at the end of the case, you should not talk

 4  about the case.  That's not only with people outside the

 5  jury, but even with each other.  One of the things you want

 6  to do is make sure you've heard everything, heard the final

 7  arguments of the lawyers, my instructions on the law before

 8  you begin deliberations.

 9          So if you get into talking about a witness or

10  whether you believe or don't believe a witness as the trial

11  goes on, that will get you into deliberations too early.  So

12  with respect to the merits of the case, please don't even

13  discuss that with each other until you've heard everything.

14          Second, don't read or listen to anything touching

15  on this case in any way.  You know, sometimes there's

16  something written in the newspaper about cases.  I don't know

17  if that will happen in this case.  But you need to be careful

18  of that.  Because you want to decide the case solely on

19  what's presented here in the courtroom.  And if something

20  should appear in the press, you want to make sure you avoid

21  it.  Please make sure you don't read anything touching on the

22  case if there is anything -- such publication.

23          Third, don't try to do any research or make any

24  investigation about the case on your own.  Sometimes people

25  feel tempted to, particularly now with computers, to try to

1    research terms or issues, and it is really important that you

2    make sure you decide the case, again, only on the evidence

3    here presented here in the courtroom and don't give into that

4    temptation to try to do your own investigation.

5         Fourth, if you would like to take notes during the

6    trial you may do so.  On the other hand, you're not required

7    to take notes.  That's left to each juror individually.  If

8    you decide to take notes, don't get so wrapped up in note

9    taking you lose track of the proceedings.  And if you don't

10   take notes rely on your own memory and don't be unduly

11   influenced by the notes of other jurors.

12        Finally, don't form any opinion until all of the

13   evidence is in.  Keep an open mind until you start your

14   deliberations at the end of the case.

15        The trial will now begin.  First, the Government

16   will make an opening statement.  An opening statement is

17   simply an outline to help you understand the proof as it

18   comes in because sometimes it doesn't come in in

19   chronological order, both because of the witness order and

20   sometimes to accommodate witnesses.  So the opening statement

21   is really to help you understand the case.  But remember, the

22   opening statement is not evidence.  It is also not supposed

23   to be argument.

24        Following the Government's opening statement, the

25   defendants may, if they choose, present opening statements.

```
 1    The Government will then present its witnesses, counsel for
 2    the defendants may cross-examine those witnesses.  Following
 3    the Government's case, the defendants, again if they choose,
 4    may present witnesses.  If they do, the Government lawyers
 5    can cross-examine those.
 6         After all the evidence is in, the attorneys will
 7    present closing arguments, I'll give you instructions to you
 8    on the law, and at that point the case will be in your hands.
 9         Is the Government prepared to present opening
10    statement?
11         MR. SHOCKLEY:  Yes, your Honor.  Thank you.
12         THE COURT:  Please proceed.
13         MR. SHOCKLEY:  Good afternoon, ladies and gentlemen
14    of the jury.  My name is Bill Shockley.  I'm an Assistant
15    United States Attorney here in the Southern District of
16    Florida, and it is my duty and privilege to be standing
17    before you today representing the people of the United
18    States.
19         The defendants in this case are charged in a
20    multi-count indictment, the first count being RICO conspiracy
21    or a conspiracy to violate the RICO statute, which, as Judge
22    Middlebrooks explained to you earlier, it was basically a
23    statute that was set up to combat organized crime in this
24    country.  The second through the tenth counts are mail fraud.
25         In order to prosecute anyone for a federal offense,
```

1   you have to have some kind of a federal nexus or federal

2   connection to a federal crime.  In this case it's the use of

3   the United States mails.  And I'll explain more about this as

4   we proceed in my opening statement.

5           Counts 11 through 25 are wire fraud.  And that's

6   the use of the wires or telephones, something that goes

7   across interstate lines to give us jurisdiction to prosecute

8   this case.

9           We also have a conspiracy to commit money

10  laundering and actual money laundering counts.  And again,

11  I'll get to those in a little bit in my opening statement.

12          But the indictment, as the Judge indicated, is not

13  evidence of guilt.  It's merely the mechanism by which we

14  bring these men to answer for what is alleged that they have

15  done in this case.  And my opening statement will be a

16  discussion about the evidence that the Government does intend

17  to present.

18          As Judge Middlebrooks explained, what I say is not

19  evidence.  But the purpose of an opening statement is to give

20  you a preview of the evidence so that as you hear the

21  evidence piece by piece, document by document, witness by

22  witness, you'll understand how it fits into the whole.  It's

23  kind of like the jigsaw puzzle you got as a child.  If you

24  look at the picture on the front of the box, you get an idea

25  about what the picture is supposed to look like when it's

1   assembled.  Without that picture, it makes it much more

2   difficult to understand where each particular piece is

3   supposed to go.  So if I do my job right, by the conclusion

4   of the opening statement you will have some general

5   understanding of where -- of the evidence that the Government

6   is going to present.  And when you hear each individual

7   witness, you'll understand how his testimony and his evidence

8   will fit in with evidence that is yet to be presented.

9         During this trial the Government will prove,

10  present evidence, documentary and oral testimony, tapes, to

11  prove that Vincent Artuso, the lead defendant in this case,

12  is a captain in the Gambino organized crime family of La Cosa

13  Nostra.  We will show that his son John Artuso, Gregory Orr,

14  Robert Gannon, and Philip Edward Forgione were also members

15  of that crew, the South Florida crew of the Gambino family.

16        Now, the center of the conspiracy is one thing to

17  have the organization and, again, I'll get to the mob

18  organization later, but it's one thing to have the

19  organization.  Let's talk about the underlying crimes.  At

20  its heart the crime in this case, the underlying crime of the

21  RICO conspiracy, is a fraud directed against ADT.  And I'm

22  sure most of you are familiar with ADT.  It's the alarm

23  company that you can have install alarms in your house in

24  case someone should try to break in or the fire goes off.

25  Some people have maybe good experiences with ADT.  Maybe some

1    don't.  But in any event, this is the alarm company.  And

2    it's a national and international company.  It's actually ADT

3    Security Services, Inc., but just for the purpose of brevity

4    I'm going to refer to it as ADT during the course of this

5    opening statement and during the course of the trial.  Now,

6    ADT was headquartered in Boca Raton, Florida, although it had

7    branches around the world.

8         The fraud that was planned and executed in this

9    case was accomplished by using an inside guy.  There's --

10    many times it's more profitable to steal if you have someone

11    on the inside.  And that's what Larry Horton was in this

12    case.  Larry Horton was the vice president at ADT, and he was

13    in charge of the real estate at ADT.  So if ADT needed to

14    purchase or sell real estate, it was Larry Horton's -- it was

15    his office that made the decision about what those terms

16    would be.

17         So if ADT made a decision to buy property, then it

18    was turned over to him to work out the sales agreement.  And

19    if ADT was to lease premises for their business purposes, he

20    would be the one that would enter into the leases.  He would

21    decide the terms.  Now, that was subject to approval of

22    others above him, but in truth and in fact and in practice,

23    and in actual practice, he was a vice president of ADT.  When

24    he said this is a good lease or this is a good purchase or

25    this is a good sale, people paid deference to him.

1          You will hear testimony from Larry Horton, who will

2    be the Government's first witness in this case, that as a

3    matter of fact if he made a decision to buy premises, to sell

4    premises, to lease premises at a certain price, at certain

5    lease terms, as a practical matter it was done.  His

6    superiors did not micromanage him.  They had hired him, and

7    he rose through the ranks and was in a trusted position so

8    that they could rely upon his integrity and his judgment.

9    But he betrayed ADT.

10          Now, the scheme was successful for a number of

11   years until now.  At all times material to this superseding

12   indictment, the members and associates of the Gambino

13   organized crime family of La Cosa Nostra, which I'm going to

14   refer to for brevity sake as the Gambino family, was an

15   organized criminal group that operated out of New York and

16   even down here in the Southern District of Florida.  The

17   Gambino family operated through groups of individuals

18   referred to as "crews."  And to assist me, I'm just going to

19   put a summary chart.  We'll see if this technology works and

20   we'll be able to see this.  But here's a chart that just

21   gives you an overview of the Gambino family.  And I

22   understand that some of you can see this on the monitors.

23   For those who have trouble, there is a larger monitor at the

24   end of the jury box.

25          The crews -- and that's what level we're talking

1   about here -- were made up of -- this is not big enough.

2   Let's see what happens here.  The very bottom -- no, let's go

3   down a little bit more.  You can see this is done without a

4   dress rehearsal.  Okay.  We had a big screen up here.  The

5   big screen doesn't work.  And so hopefully everybody is going

6   to be able to follow this.  With the big screen, Mr. Pointer,

7   I could just point to things, and you would be able to see

8   it.  I can't point to those individual screens, so welcome to

9   day one of trial.

10          Okay.  On the monitor here, the very bottom line,

11   "associates" or "nonmembers."  Sometimes called "earners."

12   At the very bottom.  They're not "made" members of the

13   family.  They're not formally inducted members.  But they

14   work on behalf of the crew that they're in.

15          Above them you have "soldiers" or "made men,"

16   formally inducted members of the crime families.  In this

17   case the Gambino organized crime family.  They swear an oath.

18   They have an oath of omerta where they are not to reveal

19   under penalty of death any secrets of La Cosa Nostra.  They

20   are not to betray a confidence.  They are not to cooperate

21   with law enforcement.

22          Above them you have their "captain" or "capo."  The

23   capo would have a number of soldiers, earners working

24   underneath them.  This is a pyramid structure.

25          Above him you have the "underboss."  Above the capo

1    is the underboss, the administration of the family.  The very

2    top is boss.  You have the "consigliere" who is the counselor

3    or adviser to the boss and the underboss.

4         This is essentially a pyramid.  More soldiers than

5    capos.  Only one underboss, one boss, and one consigliere for

6    the administration.  The money flows up.  Everybody takes --

7    the earners pay tribute to the soldiers and to the capos.

8    The capos in turn take a portion of those funds, pay it up to

9    the underboss and the boss.  That's how the structure of the

10   mob is set up.

11        Vincent Artuso is at the capo level.  We will show

12   that through evidence that's presented during the course of

13   this trial.

14        Now, with respect to the specific details of the

15   offenses, I'm going to spend a fair amount of time talking

16   about the ADT fraud that was committed in this case because

17   you have to understand the underlying criminality that took

18   place.  And then you will take that in conjunction with the

19   mob structure, how it works, how it operates, how it gets

20   money, how it conceals its funds, how it tries to hide its

21   transactions from the watchful eye of law enforcement.

22        As I said, the Government's first witness in this

23   case will be Larry Horton.  Larry Horton, full name William

24   Larry Horton, he goes by the middle name Larry, is a

25   60-year-old man who's born in Tennessee.  I'm going to spend

1   a little bit of time talking about his background so you can

2   see how he came to where he eventually -- the heights he

3   eventually achieved and to the depths where he is at today.

4   He has already pleaded guilty to that first indictment that

5   was returned in this case.  We're here before you, ladies and

6   gentlemen of the jury, on a superseding indictment.  It's the

7   second indictment.  But he initially pled guilty in the first

8   indictment.  He faces possible recommended term of

9   imprisonment under the sentencing guidelines of eight years,

10  one month to ten years, one month.  He has agreed to

11  cooperate and testify as a Government witness.  And you will

12  hear during the course of his testimony details concerning

13  the plea agreement that he has made with the Government.

14          His college education was interrupted when he was a

15  young man by a two-year hitch in the army.  He served in the

16  First Infantry Division in Vietnam.  When he came back out,

17  he got a job at Ryder Truck.  He saw a better opportunity

18  with ADT.  In 1980 he started working for ADT.  He was first

19  hired in Memphis, Tennessee.  Worked in commercial sales.

20  Went to work for ADT in Chattanooga, Tennessee, as a branch

21  manager from '82 to '83.

22          '83 to '87 he was a general manager in Louisville,

23  Kentucky, a larger facility.  '88 to '90 he's a general

24  manager in Kansas City, Missouri.  This was a promotion with

25  a larger facility with more revenue.  In 1990 to 1995 he was

1    working in Heywood, California, which is close to

2    San Francisco.  He was a regional general manager.  He had

3    other branch managers and general managers then reporting to

4    him.

5            In 1995 to 1997 he was promoted to vice president

6    of operations.  There were five vice presidents of operations

7    in the entire United States in ADT.  He was one of those

8    five.  He was in charge of the installation of security

9    systems, repairing and servicing those systems, and the

10   monitoring.  He is no longer involved directly in sales.

11           In 1997 he lost his job.  There was a shake-up in

12   the company.  Virtually all of the vice presidents of

13   operations were released.  He probably stayed on the longest.

14   He was put in charge of administration for all of ADT for a

15   time, but it would have required him to relocate to Boca

16   Raton, Florida, where the company was now headquartered.  He

17   felt that he was eventually going to be released like the

18   other vice presidents of operations, so he was concerned

19   about making the move and then being released after he had

20   made the move.  So, he refused to move and he was fired.

21           Then he went to work for SecurityLink in Seattle,

22   Washington, then in Marietta, Georgia.  But then there was

23   another event that took place.  Tyco International merged

24   with ADT.  With that merger ADT got a new president who was

25   known for many years to Larry Horton, so he was rehired to go

1    back to ADT.  And as a matter of fact, now he's down here in

2    South Florida working at the their Boca Raton facility.  He's

3    brought on as vice president of planning and implementation.

4    So he's a vice president of the company at that point in

5    time.

6          At this point in time he was going to be taking

7    care of communications, expenses, network trafficking, T1

8    lines, T3 lines, many of the nuts and bolts of the mechanics

9    of how these gadgets work, you know, in order to protect your

10   home on security matters.  So initially he was living in an

11   apartment.  He moved down from Marietta, Georgia.  The

12   following year he moved the rest of his family down, and he

13   had kids in school.

14         In approximately August of 1998 he moved into a new

15   residence in Parkland, Florida.  One of his neighbors was

16   Gregory Orr, the defendant in this case.  He eventually got

17   to know Gregory Orr.  He had to drive by Gregory Orr's place

18   to get to Mr. Horton's residence where he lived.  He got to

19   know Mr. Orr through his own wife who became friends with

20   Mr. Horton's wife because their kids would be at the same bus

21   stop to catch the bus to school.

22         Eventually the Orrs and the Hortons would attend

23   social events together, be a guest over to Mr. Orr's

24   residence.  He would have parties periodically, invite some

25   neighbors over, and Larry Horton and his wife would attend.

```
 1    It was through those occasions that he was introduced by

 2    Mr. Orr to Vincent Artuso and to Vincent Artuso's son John

 3    Artuso and to Robert Gannon as well who was married to

 4    Mr. Orr's sister.

 5         Now, the -- Mr. Orr was involved and had been

 6    involved in a number of businesses.  He would describe --

 7    have conversations with Mr. Horton about some of those

 8    businesses.  One of them was he was involved in refinancing

 9    of mortgages for some period of time.  He was involved in the

10    salvage business up in New York.  He had done some

11    construction work remodeling some banks.  He eventually was

12    in a telemarketing business selling magazines subscriptions

13    over the telephone.  That business was Atlantic Magazine

14    Service.  And I'm going to just refer to that for brevity as

15    AMS.

16         So we've got ADT, the alarm company, and we've got

17    AMS, the magazine telemarketing company.  Well, at AMS John

18    Artuso was the director, president, and registered agent of

19    the company.  Gregory Orr was the manager.  And Robert Gannon

20    was the vice president of AMS.  So it's fair to state that

21    based upon the information that was given to Mr. Horton that

22    the three were partners or worked together in that business,

23    in AMS.  As a matter of fact, John Artuso was for a time

24    100 percent owner of AMS.  Gregory Orr eventually got a

25    one-third ownership interest in the business.
```

1          Also, we have V & G Marketing Consultants Corp.

2    This is a corporation that Vincent Artuso was the vice

3    president of.  Gregory Orr was the director, president, and

4    registered agent.  So was John Artuso.  He was the director,

5    president, secretary and treasurer.  The owners of that

6    company were Vincent Artuso, 50 percent ownership, and

7    defendant Gregory Orr, 50 percent ownership.  Some of the

8    magazine proceeds, sales proceeds in AMS would then go to

9    V & G Marketing Consultants Corp. for their consulting.  In

10   any event, all but Forgione worked together in these

11   businesses.

12         Now, Larry Horton, he is vice president of planning

13   and implementation of ADT.  You would think he has the world

14   by the tail.  Respected member of society.  Influential

15   person at ADT.  Risen through the ranks to the level of vice

16   president.  But he gets some additional duties in 2000.  Now,

17   in 2000 with the -- with John Curlew being relocated, another

18   one of the vice presidents, Larry Horton took over

19   responsibility for real estate matters at ADT.  There was a

20   storm on the horizon, and it was heading his way, and a lot

21   of it's his fault.

22         Larry Horton is a felon.  He has pled guilty to a

23   felony.  That's what he is.  He cheated his own company.  And

24   he took advantage of the trust that had been placed in him

25   concerning these real estate matters.  He was the inside guy,

1    somebody who could steal effectively from ADT.

2         In May of 2001, a corporate resolution was passed

3    by ADT basically giving him authority, subject only to the

4    approval of corporate counsel, to sell properties without

5    even going back to the board of directors.  As a practical

6    matter, it didn't matter because the corporate counsel

7    generally would get the permission of the board of directors

8    to sell properties anyway.  But it shows the trust that was

9    placed in him and the discretion that he had.  As a practical

10   matter, things to be sold, properties to be sold or leased,

11   he had considerable discretion to carry out those directives

12   on his own terms.  And his decisions were not closely

13   scrutinized or reviewed.  After all, he had risen through the

14   ranks and was now vice president at ADT.

15        Then in 2002, ADT acquired SecurityLink.  This was

16   a company that he had worked for very briefly in 19978 before

17   he was rehired back at ADT.  It's another alarm security

18   firm.  Now, with taking in this new company there are going

19   to be some duplications because they're in the same business,

20   they have the same kind of monitoring technology, or very

21   similar, they have buildings in the same area that you do.

22   So, a decision was made at ADT that not only are we going to

23   sell some of their buildings, we're going to sell some of the

24   buildings that we're acquiring from SecurityLink.  The storms

25   approaching.

1              For whatever reasons, greed -- you'll hear from

2     Larry Horton himself -- he decides this is an opportunity to

3     make money.  I'm in a position in charge of real estate where

4     I can control these sales, and they're going to be selling

5     off some properties.  Let's see.  Who can I get to assist me,

6     because I can't do it directly.  I've got to hide my interest

7     from ADT.  They have conflict of interest standards of

8     conduct that would bar me.

9              Now, in theory you could go to ADT.  He could --

10    and he'll testify to this.  He could have gone to ADT and

11    said, listen, you want to sell property?  I'm interested in

12    buying some of this property myself even though I work here.

13    It will all be aboveboard.  You can go over the facts and

14    figures, make sure you've satisfied yourselves that

15    everything is okay.  Maybe he would have gotten permission to

16    do that so long as it's on the up and up.  He had something

17    else in mind.  He had in mind stealing from ADT, their

18    property and their money, through selling off this real

19    estate through a strawman.  In essence, selling it to himself

20    at below fair market value.  Because there were millions of

21    dollars to be made in this.

22             And then the most favorable of all things to do is

23    lease back the properties to ADT.  So, for example, if

24    they've got a property that they were occupying, ADT is

25    occupying this property or SecurityLink, they want to keep

1    the property but they want to get the cash in.  They want to

2    sell the property, take the cash, and then just enter into a

3    lease.  Because in truth and in fact most of the properties

4    of ADT were leased.  They didn't own most of their

5    properties.  So you could sell off some of these companies --

6    I mean some these properties, particularly the ones you were

7    getting from SecurityLink, and then lease them back.

8          So the guy that's working in the office one day,

9    he's working in building that ADT owns, the next day he's

10   working in a building somebody else owns.  Other than the

11   fact that it's a different owner, he's just going about his

12   business as normal.  That's the sale-leaseback.  And that's

13   what's at the heart of this case.  Because in a direct sale,

14   if you just sell property, if you just sell an empty

15   commercial building, you've got to find a tenant.  You've got

16   to get somebody in there to get that income stream coming to

17   pay the mortgage, to pay the bills, to pay the freight.  So

18   the ideal thing is to get a business deal where you buy the

19   property, it's got a tenant already in it, you just lease it

20   back to him, and then you've got the building and you've got

21   this flow of income from the new tenant.  Well, the old

22   tenant.  Well, ADT.  So this is basically what the scheme was

23   about.

24         So he went to Gregory Orr.  Based on the

25   conversations he had with Orr previously, he felt that he

1    would be able to trust Gregory Orr, that Gregory Orr

2    certainly wouldn't blow the whistle on him.  And Gregory Orr

3    stood to make a buck out of this as well.  He did not go to

4    ADT and seek their permission because he planned to cheat

5    ADT.

6         Initially, after hearing this suggestion Orr was

7    impressed.  He thought this is a good opportunity.

8    Eventually Mr. Horton gave a list of properties that were

9    possibly going to be sold.  Some of them were just outright

10   sales.  Some of them were sale-leasebacks, which were the

11   most profitable.  That's a good deal, if you can get that

12   sale-leaseback.  They decided, well, gee, the sale-leaseback

13   is the way to go.  We can make more money on this.

14        Now, what's Larry Horton going to get out of it?

15   50 percent of the profits.  50 percent of the profits.  And

16   why?  Because he was the inside guy.  He controlled the deal.

17   He was the one that could make this deal take place.  He

18   could sell the property at below fair market value.  That's

19   worth a lot in the scheme.

20        Mr. Orr's job was to handle everything else.  The

21   hiring the attorneys to go over the paperwork, things of that

22   nature.  Attorneys who had no idea about Larry Horton's

23   hidden interest.  They think it's just a straight business

24   deal to set up companies to do the things, coordinate with

25   ADT.  Larry Horton explained to him, listen, they've got to

1    be arm's length transactions.  I can't have anything to do

2    with this.  I've got to be completely hidden.

3            You have your lawyers contact their lawyers.

4    They'll come to me with the offer, and then I'll accept it or

5    reject it.  And, of course, we'll have a little bidding

6    process.  You know, set the price.  Start out low on the

7    sales.  I want the building for this.  I'll reject it.  You

8    rise it to this.  I'll reject it.  Then you get it up to

9    this.  I'll accept this.  But this is still going to be way

10   below fair market value.  But at least this way with the

11   offers, counteroffers I'll be able to fool people into

12   thinking that I'm really working on behalf of ADT and I've

13   got their best interest at heart.  Hey, I rejected these

14   offers.  They're too low.  Get it up there to just half a

15   million dollars under fair market value, whatever it is.  And

16   you'll see the figures later.

17           Mr. Horton had the appraisals for the properties.

18   Appraisals had been done.  Just for fee simple.  Just for

19   selling without a sale-leaseback.  And these are lower

20   appraised values because they don't take into account the

21   valuable lease on the property.  He took these appraisals,

22   went over, met with Gregory Orr, and gave him the appraisals,

23   the inside information from ADT.

24           The approval process -- actually, Mr. Horton knew

25   that as a practical matter he could grease this right past

1    the CFO, the chief financial officer, the corporate counsel,

2    and board of directors without any problem.  And that's what

3    happened.

4         They met.  They set the prices.  The lease prices

5    were going to be above fair market value.  The sales prices

6    were going to be below fair market value.  ADT is getting the

7    business at both ends of the transaction.

8         They incorporated -- or Mr. Orr went to an

9    attorney, arranged to file articles of incorporation to set

10   up Efficient Realty and Development Corp.  Now, eventually

11   you're going to get overwhelmed by all of these names.  I'm

12   going to put a diagram up on the monitor that will assist you

13   in following this.  But in any event, Efficient Realty and

14   Development Corp. was set up.  Initially, Gregory Orr owned

15   100 percent of it.  Later on you'll see that Vincent Artuso

16   owned 100 percent of it.  Gregory Orr was the director,

17   president, secretary, treasurer.  Eventually Vincent Artuso

18   took over those roles as well.  This was a corporation that

19   would enter into the agreement with ADT to buy the

20   properties.

21        Also important in the scheme, what Larry Horton was

22   bringing to the table for his 50 percent interest in the

23   profits without investing a dime, was the fact that he wasn't

24   going to market the properties.  He wasn't going to solicit

25   other bids.  He wasn't going to refer it to ADT's real estate

1    company to actively market these companies.  Because, you

2    know, if it were marketed, somebody may very well outbid

3    these rock-bottom prices, below fair market value that he and

4    Orr were tendering.  And that took place.  No marketing.  No

5    other bids.  So there were no other bids, and you had the

6    inside guy approving the prices with no allegiance whatsoever

7    to ADT.

8          The offers came in.  They did their kabuki play.

9    Everybody's walking around carrying out their role.  He's

10   rejecting.  No, this is too low.  This is too low.  Take it

11   back.  You know, more calls among the attorneys and

12   everything.  All the time chuckling because he knew what the

13   final price was going to be because he and Mr. Orr had worked

14   it out.

15         Eventually, on September of 2001 they signed the

16   deal to sell two of the properties; a Pompano Beach property

17   and a property in Lancaster, Pennsylvania.  And just a couple

18   weeks later, on October the 11th of 2001, they entered into

19   an agreement, ADT, to sell a property in Palm Harbor,

20   Florida, on the West Coast of Florida.  All of these were far

21   beneath fair market value.

22         The incentive that Larry Horton had to get the best

23   price possible for ADT was zero because he was on the other

24   side of the transaction.  There were also bids placed on --

25   bids.  Offers, negotiations.  Not really.  But on other

1  properties as well.  But ADT eventually decided not to sell

2  some of these other properties, so those bids went nowhere.

3         Then sometime in -- after the deals had been

4  signed -- now, there's financing that has to be obtained in

5  order to come up with the money to actually make these

6  purchases.  Even though they're beneath fair market value,

7  you've got to come up with the money in order to buy these

8  properties.  So they go to a lender, GE Capital.  Part of

9  General Electric Corporation, but it's the lending portion of

10  that organization.

11         Now, here's the bad news.  Horton gets a call from

12  Orr saying, hey, come on over.  We've got to talk.  We've got

13  some problems.  Horton goes over to Orr's house.  He

14  explains, listen, I've got bad credit.  I can't get credit.

15  So I'm bringing in my partners.  Now, what had been two

16  people in secrecy, now Horton finds out he has partners.  He

17  did not know it at the time, but he was always going to have

18  partners.  Because in that crew, and we will present evidence

19  to show, Gregory Orr was in Vincent Artuso's crew.  The money

20  he made he paid portions of that up to his captain.  The

21  captain would then pay it up to the boss and the underboss.

22  That's the way the mob works.

23         He says, Vinnie and Johnny are coming in, meaning

24  Vincent Artuso and John Artuso.  They're his partners, of

25  course, in the telemarketing business.  They can help me out

1   with the funds.  They can help pay the attorneys' fees.  And

2   we're going to bring in the vice president of AMS too, Robert

3   Gannon, because he's got good credit, and we'll put his name

4   on the credit applications just like he's buying the

5   property.  And, in fact, for a time Efficient Realty and

6   Development, LLC, another company, we'll get to that later,

7   was actually 100 percent owned by Robert Gannon.  Of course,

8   that all changed because in truth and in fact he was a member

9   of the crew as well, and the ownership changed.

10          Now, Mr. Horton was flabbergasted.  Now it was

11  important that he be kept hidden.  Now he's partners.  So he

12  asks, what do they know about me, about my story, what I'm

13  doing?  Orr says, they know everything.  But he said, don't

14  worry.  They won't talk.  They've been involved in other

15  deals with me before.  You can trust them.  They're not going

16  to talk.

17          He said also, I'm bringing in somebody else, a guy

18  that he referred to as Fip, and we will show is Philip Edward

19  Forgione, the final defendant in this case.  He says, Fip can

20  help us get credit because he's got a contact up in New York

21  named Tommy, and Tommy has a contact at GE Capital.  So,

22  between the two of them we can actually get the loan to be

23  able to buy these properties that we've signed the contract

24  on that we want to buy.  Again, Larry Horton, he's staying

25  out of this because that's not his role.  Eventually they got

```
 1    the loans.  Eventually they bought the properties.
 2            Now, GE Capital, before they lent the money, they
 3    were going to get their own appraisals and see what these
 4    properties are worth.  Now, these appraisals take into
 5    account the lease.  They're called leased fee estate as
 6    opposed to fee simple estates.  Fee simple is you just sell
 7    the property.  Leased fee estate, you sell the property with
 8    the least attached.  Makes it more valuable.  You've got that
 9    income flow.
10            Okay.  Here's what the appraisals showed.  With the
11    Palm Beach premises, it was sold for $1,290,000.  The leased
12    fee appraisal was $3,770,000.  And even their fee simple, if
13    you didn't have a lease attached, was $2,250,000.  Well above
14    $1.29 million.
15            The Palm Harbor property, that was sold for
16    $684,900.  The leased fee was over $2 million.
17            The Lancaster property up in Pennsylvania, it was
18    sold for $840,000.  The leased fee appraisal, 2.4 million.
19    Fee simple would still be $1,250,000.  Well above the
20    purchase price of $840,000.
21            Now, Larry Horton did get approval to sell these
22    properties.  You know what the approval was?  A series of
23    e-mails that took a couple of hours on a single day.  Would
24    you like to sell these properties?  Sure, Larry.  Go ahead.
25    They made the decision to sell.  We're relying upon Larry
```

1    Horton.  He's the vice president.  They rely on his judgment.

2    He was a trusted member of ADT, until now.

3          The sale went down in early 2002.  They signed off

4    on that triple net lease where ADT had to pay for everything.

5    They had to pay for utilities, the electricity, maintenance,

6    taxes.  Basically, they paid for everything.  So the owners,

7    all they had to do is collect the checks.  So the checks

8    would come in from ADT.  He'd take a portion out of it, pay

9    the mortgage.  He'd pocket the rest.  Every one of the

10   defendants in this case shared in the proceeds of that fraud.

11         Larry Horton signs off on the first check.  It's

12   got his signature on the check.  Sends it off to pay for the

13   first month's rent, the security deposit, and they threw in a

14   brokerage fee too.  It varied from like 50,000 to $77,000

15   based on the property.  It was a sweetheart deal, the deal of

16   a lifetime.

17         Now, Mr. Orr says, listen, you know, at first, you

18   know, we were just going to be paid as consultants.  This is

19   going to be owned, titled in someone else's name.  You had

20   Gannon who owned 100 percent of Efficient Realty Development

21   Corp.  You had John Artuso who owned 100 percent of Westmore

22   Properties, LLC, or Westmore Properties, Inc.  There's going

23   to be some confusion when you look at some of these names on

24   these documents.

25         But in any event, Orr says we need to get a vested

1    interest in this property.  We need to get an ownership

2    interest.  I'm going to see a lawyer.  Which he did.  He went

3    to a different lawyer this time; Martin Genauer.  Martin

4    Genauer drew up some papers to file with the Florida

5    Secretary of State setting up various corporations.  Not

6    corporations.  Limited liability companies so they could take

7    ownership in these properties.

8            Now, Larry Horton is sitting there one day and he

9    gets a call.  Hey, listen, I'm at the lawyer's office.  You

10   need to come up with a name for a company.  Eventually, he

11   came up with the name KCGF.  So KCGF was going to be set up

12   for Larry Horton to receive these proceeds.  And he's going

13   to be hidden in this corporation so he can get the money

14   without anybody knowing his identity.  And that's why they

15   wanted to set up this series of companies.

16           Then one day the year later Larry got on the

17   Internet.  He checks Florida Secretary of State, Division of

18   Corporations' website and finds out my name is on the

19   company.  Now he's on the worldwide web.  He calls up Orr.

20   Hey, what is this?  You were supposed to keep my secret.

21   Orr, I'll call the attorney and we'll see what happened here.

22   He calls hill back and says it's a mix-up.  His secretary or

23   one of his legal assistants put the name on there as one of

24   the members.  You didn't even have to put in who owned the

25   company.  All you had to do was put who the manager was.  And

1    that was Orr.  It was a slipup.  And there, his name on the

2    worldwide web.  He was not feeling real happy about this.

3            Eventually, though, he did go through with another

4    deal.  It's the fourth property; Oak Brook, Illinois.  Same

5    type of situation.  Sold it for below fair market value.

6    Interestingly enough, this property, sale-leaseback, it was

7    sold for $2.1 million, for below fair market value.  They got

8    a loan of $3 million.  The lender gave them $38 million.

9    They recognized that this property is worth a lot more than

10   $2.1 million.  So then they divided up the difference

11   between -- of course, there were some expenses here and

12   there.  But almost $900,000, split it up.  Larry Horton, one

13   check, $219,000.  Well, not in his pocket.  In KCGF, which

14   hides his identity.

15           There begins to be more scrutiny at work.  He

16   decides, listen, this is getting too risky.  I've got too

17   many partners.  Enough is enough.  We've got a good flow of

18   money coming in.  But Mr. Orr wants to refinance companies --

19   these properties.  He also wants more properties.  He says

20   his partners want more properties.  It doesn't work out,

21   though.  Finally Mr. Horton says, no, that's it.  We sold all

22   of the properties we can.

23           Now, I just want to show you very briefly some

24   diagrams here that hopefully will shed some light on this.  I

25   want to show you -- this is only marked as an exhibit, but it

```
 1   is not in evidence.  It's meant for -- just to use in this

 2   opening statement for explanation purposes.

 3            Okay.  At the very top, this is the Pompano Beach

 4   property.  You see Efficient Realty and Development

 5   Corporation.  We'll go over this later during the course of

 6   the trial, but you can see that Robert Gannon owned

 7   100 percent of it initially.  And then there was an amended

 8   operating agreement and these other companies or some of

 9   these other companies beneath it were set up by Martin

10   Genauer.

11            And what you have here, if you looked at the right

12   side, you can see GE Electric making a loan of 1 point --

13   well, $1,229,400, and taking a mortgage back.  And you have

14   in here the leased fee worth about $3,700,000.  And even the

15   fee simple, $2,250,000.

16            So on the other side you have Efficient Reality

17   selling it -- I mean, excuse me, ADT selling it to Efficient

18   Realty.  They get 1.29 million for it from Efficient Realty.

19   And then they make their lease payments of $38,660.67 a

20   month.  The mortgage payments are only $11,667.92 a month.

21   The rest of it gets split up, and it goes down.  And you'll

22   see the ownership interest that the different companies have.

23            And here on the far right, Property Futures.

24   Mr. Gannon's company.  He was the one who went on the paper

25   as the purchaser.  He was getting 9.9 percent of the deal.
```

```
1    Thomas Rossi, one of the individuals up in New York who had

2    this connection with GE Capital, gets 10 percent.  CAE

3    Enterprises.  That owner down there, P. Forgione, that's a

4    little bit misleading because it's not this Philip Forgione.

5    That's his son.  But money went through there directly to the

6    defendant Mr. Forgione.  Longhill Holdings -- this is out of

7    focus -- which is John Artuso's company.  Initially he owned

8    it 100 percent.  Eventually he owned 50 percent of it.  And

9    Efficient Realty and Development, Inc., or Corp. owned the

10   other 50 percent.  And we know that's Vincent Artuso's

11   company.

12         On, then, the far left, J & G Associates.  Now,

13   this was Gregory Orr's company it would appear.  But one of

14   the members was KCGF Associates.  I don't know how to make

15   that focus any better.  If we can just get through this one,

16   I won't show you the rest.  But, actually, J & G Associates,

17   the owners, 60 percent KCGF, which is Gregory Orr as the

18   manager on paperwork.  But, oops, it slipped through that

19   Larry Horton and his wife were actually the owners.  They

20   were the members of the company.  Larry Horton was getting

21   60 percent of 50 percent.  So he was getting 30 percent of

22   the whole deal because his split had to be cut because of the

23   additional requirements of the deal.  And Gregory Orr was

24   getting 40 percent, 50 percent, or 20 percent.  So that's how

25   it was split up.
```

 1              And in order to find Larry Horton you've got to go

 2     through Efficient Realty, J & G, KCGF to find him.  That's

 3     how it was hidden.  And that's how the mob works too, trying

 4     to hide ownership interest so nobody knows who's getting what

 5     money.  That was the great divide.

 6              Eventually, the FBI comes knocking on Larry

 7     Horton's door.  They want to know if he knows anything about

 8     Vincent Artuso and if he knows anything about some real

 9     estate deals involving Gregory Orr.  Larry Horton denied it.

10     Don't know anything about it.  You know, I know Gregory Orr.

11     He is a neighbor and everything.  We socialize, but, you

12     know, don't really know anything about any real estate deals

13     with him.

14              He's shaken up.  He goes to Orr.  Hey, what's

15     happening?  The FBI coming knocking on my door.  Then he gets

16     a second piece of bad news.  He says, well, Larry, they're

17     really not after you, you see.  They're after Vincent Artuso

18     because he's involved in organized crime.  This is the first

19     time Larry Horton knows that the guy he picked out to be his

20     partner, his partner is an organized crime member.  He says,

21     yeah, the FBI is really only interested in Vinnie.  You don't

22     have to worry.  He's not going to -- you're not going to get

23     into any trouble.  He says, listen, I've known Vinnie, you

24     know, for a long time from the neighborhood back in New York.

25     He says, you know, there was a lot of people like Vinnie

1    walking around at that time and you needed somebody like

2    Vinnie to do business.  And if you didn't know people like

3    Vinnie, you're going to have to pay somebody else to do

4    business.

5         He says, but why are they showing up at my

6    doorstep?  He says well, you know, really, you know, they're

7    just interested in Vinnie.  You don't have anything to worry

8    about it, but maybe you should get a lawyer.

9         MR. BIRCH:  Your Honor, at this time I'm going to

10   make a Bruton objection as to statements by Gregory Orr

11   implicating Mr. Artuso.

12        THE COURT:  I'm sorry.  What did you say?  Did

13   someone else say something besides Mr. Birch?

14        All right.  I'm going to overrule the objection at

15   this point.

16        Again, ladies and gentlemen, the statements of

17   counsel are not evidence.  So we're going to have to deal

18   with this a little later in the case.  But at this stage of

19   the case I'm overruling the objection.

20        MR. SHOCKLEY:  Again, then he was filled in on

21   Vincent Artuso and who he is and what he is.

22        Then Orr came around.  And the operating agreements

23   would show the split in the ownership of these various

24   companies was -- even though Larry Horton hadn't dealt with

25   the attorneys, he actually set up his own company.  That was

1    just done by Orr.  He did get a copy of the operating

2    agreement which showed the ownership interest of himself and

3    his wife.  He also had gotten a copy of the J & G Associates

4    because KCGF owned 60 percent of J & G Associates.  Well,

5    these operating agreements, Orr came around and collected

6    them.  He says, I'll put them in a safe place.  Again, those

7    operating agreements show the ownership, who owns what.

8            Eventually, Mr. Horton gets called into the front

9    office.  The investigation has gone to ADT.  They start

10   finding out about things that are going on.  They start

11   asking Horton questions.  He doesn't want to answer.  He says

12   I have an attorney now.  He is suspended and then fired.

13           Now, after he was terminated, after the visit from

14   the FBI, Orr kept telling him, now, just stay cool.  Again,

15   stay cool.  You know, he's got partners, and we're concerned

16   about you flipping.  I've told my partners that you're an

17   okay guy.  They don't have to worry about you flipping.

18           Larry Horton's thinking, well, gee, this guy's

19   involved in organized crime and he's concerned about me

20   flipping.  I'm not taking that as a compliment.  I'm taking

21   it as a threat.  I better not flip.  And he didn't.  And he

22   was in fear for his self and for his family.

23           As a matter of fact, eventually when the indictment

24   was returned in January 22 of '08 -- this is the first

25   indictment.  The one he pled guilty to -- he was arrested.

1    He attended a bond hearing.  After the hearing he was in the

2    lockup.  It was everybody except for Mr. Forgione who is not

3    arrested at the time.  There's a conversation.  Orr says to

4    Vinnie, hey, Tommy called.  He left a message on the phone

5    saying he hoped everything was okay, give him a call.  Vinnie

6    in the presence of the others says, when you get out, call

7    Tommy.  Tell him everything's okay.  We're just waiting for

8    the list of the people who flipped.  He was smiling at the

9    time.  Larry Horton wasn't smiling.

10        On pretrial release -- eventually, everyone was

11   released on bail.  Mr. Horton goes over to the pretrial

12   services office.  He finds out -- he runs into Vincent

13   Artuso.  Vincent says, you did well in the lockup.

14   Eventually, he pleaded guilty, decided to cooperate.

15        You will have to decide whether or not you believe

16   these were legitimate arm's length transactions or whether

17   they were fraudulent deals by a corrupt inside ADT official

18   who was ripping off the company.

19        Now, we will present additional facts and witnesses

20   during the course of this trial, people that had direct

21   knowledge of what was taking place.  One of those is Lewis

22   Kasman.  Now, Lewis Kasman had direct contact with Vincent

23   Artuso, and he heard directly from Vincent Artuso about this

24   scheme.  Vincent Artuso was not hiding back in the bushes

25   behind some corporate entities at the time.  He was talking

1    face-to-face with this guy Lewis Kasman.  And Lewis Kasman

2    was in a unique position to have direct contact and direct

3    conversations with Vincent Artuso.  And here is why.  Kasman,

4    although he's not Italian but a Jewish businessman, had a

5    very close relationship with perhaps one of the most

6    notorious members of the Gambino family; John Gotti, the

7    former boss.

8         In the mid 1980s 8 Kasman had become acquainted

9    with John Gotti.  He gave him a no-show job where he's just

10   paying him like a salary to make it appear that John Gotti

11   has legitimate employment when he isn't really working there.

12   He keeps John Gotti's money, some of his money stored in shoe

13   boxes in his attic; millions of dollars.  When called upon to

14   testify before the grand jury, Lewis Kasman perjured himself

15   in order to protect John Gotti and the Gambino family.  Went

16   to prison about six months.

17        You will hear the testimony of Lewis Kasman.  And

18   you will see evidentiary proof of his association with the

19   Gambino family.  His wedding.  This is not your usual wedding

20   photograph.  You see on his wedding day Lewis Kasman sitting

21   there with John Gotti and other members of the Gambino family

22   administration.

23        Now, when John Gotti eventually went to prison,

24   Kasman was managing his finances, distributing money as Gotti

25   directed.  When Gotti died, he flew down to Springfield,

1    Missouri, took his body, and flew it back to New York.  At

2    John Gotti's funeral he delivered the eulogy.  Even after

3    John Gotti died, he was very closely connected with the

4    Gambino organized crime family, dealing with the top echelon

5    members of that family.

6         In 2004 he came down to South Florida.  He moved

7    down here.  He was going to open a restaurant.  He's

8    introduced then to the defendant Vincent Artuso.  He joins

9    him for breakfast.  Artuso lets him know that he's the guy in

10   the Gambino family that's in charge down here in South

11   Florida.  Initially he offers money to Kasman because he

12   wants to be a secret partial owner of a restaurant that

13   Kasman's going to open.  Kasman refused.  Eventually he

14   offers him a hundred thousand dollars.  Says let me give you

15   a hundred thousand cash.  You give me the check back.  A type

16   of money laundering thing that Kasman also refused.  He tried

17   to get him involved in some refinancing of the AMS building

18   or renovating the property, buy an adjacent property.  Again,

19   Kasman refused.

20        Finally he says, well, listen, I've got this other

21   deal that's cooking.  We've already bought some properties.

22   We've got an inside guy at Tyco or ADT, and we're buying the

23   property cheap and leasing it back at above market value

24   rates.  Maybe you would be interested in getting into this.

25   We could use you to be a front on some of these.  Again,

1    Kasman refused.  He actually spoke to an attorney and was

2    absolutely convinced that eventually some law enforcement

3    would be able to get through that layer -- those layers of

4    corporations and find out who was behind -- who was actually

5    receiving the money.  So things kind of cooled off with him

6    after that.

7         Now, Kasman had been cooperating with the FBI.  And

8    in about July of 2005 he actually started making recordings,

9    recording under the FBI's direction his conversations with

10   these top echelon members of the Gambino family.  Now, none

11   of those recordings are with any of the defendants in this

12   case, but they discuss some of the portions of the ADT

13   transactions and Kasman's frustration with the fact that he

14   was even approached by Artuso because -- and, again, you'll

15   hear about the rules that the Gambino family has.  But he

16   should not have been approached directly without going to

17   seek permission to approach him to get involved in this

18   illegal activity.

19        You'll also hear from FBI agents, FBI agents who --

20   at one point in time John Gotti had a place called the

21   Ravenite Social Club on Mulberry Street in New York City.

22   That's where he would gather, meet with his associates,

23   fellow mob members.  And they would be out there on the

24   street going in and out of the building.  This is not the

25   kind of building that, you know, you can just walk in, hey,

```
 1    bartenders, give me a beer.  No.  This was kind of a private

 2    club, if you know what I mean.

 3          In any event, the FBI -- since John Gotti was out

 4    there with his associates and fellow mobsters, they went down

 5    the street, set up a video camera, started recording.

 6    They've got recordings of Lewis Kasman with John Gotti.

 7    They've also got recordings of the defendant Vincent Artuso

 8    with John Gotti outside the Ravenite Social Club.

 9          You'll hear testimony about the mob.  You'll also

10    hear --

11          I'm running out of time here, your Honor.  I have,

12    what, about three minutes left?

13          THE COURT:  Well, that was a self-limitation.  I

14    mean, you've got the time -- the collective time of the

15    defendants, as you recall.  So you're all right on time.

16          MR. SHOCKLEY:  I'll wrap it up very quickly.

17          THE COURT:  All right.

18          MR. SHOCKLEY:  Donald Race.  In the early 1980s 8

19    Donald Race also met John Gotti.  Race was a guy who's

20    involved in various real estate development ventures.  He

21    took a loan from a loan shark.  Eventually was introduced to

22    Philip Forgione.  Became friends with Forgione.  In spring or

23    early summer of 2001, Race was down here in South Florida.

24    Forgione took him over and introduced him to John Artuso and

25    Gregory Orr at AMS, the magazine telemarketing business.
```

 1              Eventually, they were discussing an opportunity to

 2      buy buildings from ADT.  As Race is -- as this is being

 3      explained to him, eventually he learns that they've got an

 4      inside guy at ADT.  Race backs off.  Tells Forgione, listen,

 5      you're crazy.  This inside guy that you're ripping off ADT

 6      and stockholders, you're going to get indicted.  You know,

 7      there's no way you can hide this.  Forgione says, oh, no, no.

 8      No.  See, I've got it set up where it's going to -- money is

 9      not going to come directly to me.  It goes to another

10      corporation.  It goes to my kids, you know, so my

11      fingerprints aren't really on it.  Of course, the funds do

12      flow through that and come to him.

13              So you'll hear the testimony of Donald Race who

14      when offered an opportunity to try to assist them in coming

15      up with loans and trying to get financing, because Tom Rossi

16      was still working on getting his financing from GE, you'll

17      hear that, yeah, this was a deal that could probably make a

18      lot of money, but, no, got to walk away from this one.  As

19      tempting as it sounds, you guys are going to get arrested for

20      this.  And that's what happened.

21              So in a nutshell, ladies and gentlemen of the jury,

22      you will have to decide whether the mob was involved in this

23      operation, whether they were using their tactics, whether

24      this was the type of RICO conspiracy.  And you'll hear the

25      Court explain that to you later.  But it's a group of

individuals associated in fact who worked together in order

to try to raise money, continuing in nature, like the Gambino

family itself.  One property after another.  Three on one

hit.  One on the second hit.  Possibly more coming.  This is

an ongoing operation by the Gambino South Florida crew of the

Gambino family.

        The defendant Vincent Artuso is the captain, the

head of that crew.  The remaining codefendants are members of

that crew.  They -- we will prove that they ripped off ADT

out of millions of dollars in the scheme, tried to hide their

ownership interest, but it didn't work.

        Now, during the course of this trial you're going

to hear testimony from people that will disturb you.  One of

them that comes to mind is Lewis Kasman.  Hey, he was one of

them, one of the Gambino associates.  Not a nice guy.  But

he's the kind of guy who can give you inside information.  He

is pending sentencing in two cases up in New York.  He hopes

to lessen his sentence as a result of his cooperation.  And

the same is true with Larry Horton, who hopes to get a

sentence reduction in exchange for his testimony in this

case.

        You'll have an opportunity to weigh their

testimony.  You will get an instruction that someone who has

made a deal with the Government, you should judge their

credibility more carefully than an honest, law-abiding person

```
 1   who comes in here to testify.  I wholeheartedly agree.  Look

 2   at the corroboration.  Look at the facts.  Look at the

 3   companies.  Look at what you will see.  And at the conclusion

 4   of this case I'll have an opportunity to again address you in

 5   closing argument where I can present argument as opposed to

 6   just talking about the facts.  And I look forward to that,

 7   and I thank you for your time and attention.

 8            MR. PASANO:  Judge, may I reserve a motion until a

 9   time when we can argue?

10            THE COURT:  All right.

11            MR. MARKUS:  Same here, Judge.

12            MR. BIRCH:  Same as well.

13            THE COURT:  Mr. Birch, do you wish to present

14   opening statement?

15            MR. BIRCH:  Yes, your Honor.

16            MR. ENTIN:  Judge, just for the future, an

17   objection of one is of all unless somebody opts out?

18            THE COURT:  I think that was the agreement.

19            MR. BIRCH:  Good afternoon, ladies and gentlemen.

20            Let me thank you once again for being willing to

21   serve on this jury.  We do appreciate it very much.  And

22   it's -- as you can probably see, it's a tough case.  And

23   you're going to have to decide whether from the evidence

24   you're convinced beyond all reasonable doubt of the guilt of

25   these defendants.  Particularly, I represent Mr. Vincent
```

1    Artuso.

2         Now, what this case is really about is a sale and

3    leaseback of four buildings by ADT to these companies that

4    were set up, with legal advice, by Mr. Orr, Mr. John Artuso,

5    and perhaps Mr. Gannon.  The four gentlemen were involved as

6    well.  But it was a legitimate sale and leaseback of four

7    buildings.  That's really what this case is about.

8         Much of that time I won't be saying a whole lot,

9    because Mr. Vincent Artuso had absolutely nothing, absolutely

10   nothing to do with the sale and leaseback of these four

11   buildings.  Nothing.  He wasn't involved in any appraisals.

12   He wasn't involved in any negotiations.  He wasn't involved

13   in any closings.  He had absolutely nothing to do with ADT

14   and the sale and leaseback.

15        And he never spoke once to this Mr. Larry Horton

16   about selling or buying or anything to do with ADT.  So, the

17   others will tell you during the course of this trial how it

18   was a legitimate business transaction.  For the most part, I

19   won't be saying much at that point.

20        The allegation here, as you've already heard, is

21   that Mr. Vincent Artuso is a member of organized crime.

22   You're going to hear evidence to establish that he is a

23   member of organized crime, this allegation.  But there's two

24   things.  Mr. Vincent Artuso had nothing to do with the sale

25   and leaseback of ADT; and organized crime had nothing to do

1    with the sale and leaseback of ADT.  And there will be little

2    evidence to show that Mr. Artuso has anything to do with

3    organized crime.

4           You will hear evidence, you will see pictures,

5    pictures that are 20 years old, of Mr. Vincent Artuso with

6    John Gotti outside the Ravenite Club.  There will be a

7    20-year -- a video 20 years old.  So there will be that to

8    show that Mr. Artuso supposedly is a member of organized

9    crime.  And there will be Lewis Kasman.

10          Now, you didn't quite get the whole story about

11   Lewis Kasman.  He is going to be the main witness, I submit,

12   who's trying to convince you that, yes, Vincent Artuso is a

13   member of organized crime.  And Lewis Kasman will freely

14   admit that he was a member of organized crime because he was

15   so closely associated with Mr. Gotti.  And what you're going

16   to hear about Mr. Lewis Kasman is that he is a liar, a liar,

17   a liar, a liar, a liar.  He has been lying for years and

18   years and years.  He has stood in a courtroom and lied.  And

19   he keeps on lying.

20          Lewis Kasman, not only does he lie, he can cut

21   incredible deals for himself.  You're not going to just hear

22   about him getting, oh, a hope of a reduced sentence by

23   pleading guilty.  What you're going to hear is that he struck

24   himself -- talk about good deals.  You're going to hear that

25   Lewis Kasman, by agreeing to plead guilty to a couple of

1    cases up in New York and now hoping for a reduced sentence,

2    avoided charges, avoided entirely:  Bribery, extortion, money

3    laundering in the number of millions of dollars for 18 years

4    that he did.  Not going to be charged at all.  He assaulted

5    people.  At least two people.  Not going to be charged at

6    all.  He committed mail fraud.  He committed wire fraud.  He

7    committed tax evasion over a number of years.

8          Lewis Kasman, Gotti's supposed adopted son, who's

9    going to come in here and tell you, oh, yeah, Mr. Vincent

10   Artuso, that guy on the video of 20 years ago, he is the

11   organized crime guy.  That's who you're going to hear from,

12   Lewis Kasman.  And while this is going on, Lewis Kasman is

13   lying and lying and lying and getting out from all of these

14   charges, charges that he, as a member of the mob, committed.

15         He also received, now listen to me closely, nearly

16   $400,000.  They paid him that, the Government.  Not only

17   that.  While Mr. Kasman in 1990 is standing before a judge --

18   it wasn't 1990.  About 1994 -- saying, jeez, Judge, I'm

19   sorry, this really wasn't -- this isn't me, he's still

20   committing crime.  While he's telling a judge how sorry he

21   is, he's still committing crime.

22         And then, yes, he agrees to cooperate with the FBI.

23   And he has a recording device.  Nobody controls him.  He

24   turns on the recording whenever he wants.  Says whatever he

25   wants.  And while he's doing that, he's lying to the FBI.

```
 1    I'm not making this up.  You will hear evidence that he lied
 2    to the FBI while he's cooperating with the FBI, and he did
 3    that so he could steal $80,000.  Now, that's in addition to
 4    the nearly $400,000 that he was paid by the Government.  This
 5    is the man the Government is going to use to try to convince
 6    you that Mr. Vincent Artuso has anything to do with organized
 7    crime.
 8            He had nothing to do with the sales of these
 9    buildings.  And there will be no evidence, but Lewis Kasman,
10    to even suggest that he had anything to do with organized
11    crime except for this 20-year-old video.  And there will not
12    be -- the Government will not show you -- you hear about
13    money being paid.  Not a nickel, not a nickel will they show
14    of money going up to New York as this so-called tribute.
15            So I ask you to keep an open mind.  It's a
16    difficult, complicated case.  Keep an open mind.  Because
17    there is more.  Allow me to argue to you why there is
18    reasonable doubt that Mr. Artuso, of all 41 charges against
19    him, is not guilty.
20            Thank you.
21            THE COURT:  Does any other counsel wish to present
22    opening statement?
23            MR. PASANO:  I do, and I think I'm next, your
24    Honor.  With the Court's permission, you want me to continue?
25            THE COURT:  Go ahead.
```

1          MR. PASANO:  If it please the Court.  Good

2     afternoon, ladies and gentlemen.

3          My name is Mike Pasano.  As I told you, I have the

4     privilege of representing one of the accused in this case,

5     John Artuso.

6          Now, I say "accused" to make a few points.  One is

7     this thing that His Honor told you about, this thing called

8     the presumption of innocence.  That while Mr. Artuso is

9     accused of all of these crimes, as he came in here today, you

10    are to presume him innocent.  As he sits here now, you are to

11    presume him innocent.  Tomorrow when he comes into court, you

12    are to presume him innocent.  And he remains innocent in the

13    eyes of the law until or unless the Government proves his

14    guilt beyond and to the exclusion of every reasonable doubt.

15         I used the word "accused" to emphasize that in this

16    day and age it's just too darn easy for people to accuse

17    other people of just about anything.  And I used the word

18    "accused" to continue to underline that that indictment,

19    those charges, all 41 of them, are just a piece of paper, an

20    accusation.  Nothing less and nothing more.

21         Now, Mr. Shockley, he tells you that the Government

22    is going to prove all sorts of things.  They won't.

23    Mr. Shockley tells you that this case is about the mob and

24    the South Florida crew of the Gambino crime family.  It

25    isn't.  This is not, as the evidence will show in this case,

 1    some episode of the Sopranos.  This is real life and real

 2    people's lives.  And ladies and gentlemen, with all respect,

 3    the evidence will show that there is no such thing as a South

 4    Florida crew of the Gambino crime family, let alone that John

 5    Artuso is a member of any such crew or a mobster.  He is not.

 6    That will be the truth of this case.

 7            Now, opening statements are a time for the lawyers

 8    to tell you what they expect the evidence will show.

 9    Mr. Shockley mentioned to you it's kind of like a preview.

10    And in a way you can think of this like a movie preview of

11    coming attractions.  And as you listen to the evidence in

12    this case over the next many days, I'm going to ask you to

13    think, like so many movie previews that when you actually go

14    and see the movie, it turns out to be nothing like the

15    preview.  And that's, I submit, what the evidence will tell

16    you the Government case is here, a series of empty promises.

17            In a way, it's kind of like that big screen that

18    Mr. Shockley told you couldn't work during the Government's

19    opening.  During this case the Government's theory of

20    prosecution and its evidence won't work.

21            MR. SHOCKLEY:  Objection, your Honor.  This is

22    beyond opening statement.  This is argument now.

23            THE COURT:  Sustained.  Let's get to --

24            MR. PASANO:  Let me do that.

25            Let me tell you what the evidence will show, ladies

1    and gentlemen, as to John Artuso.  And I submit that what you

2    will hear is a legitimate business deal engaged in by a

3    legitimate businessman.

4         Now, I'm going to ask you as you hear the evidence

5    to keep in mind certain concepts as to what the evidence will

6    be telling you.  The first thing I'm going to ask you to

7    listen for as you hear the evidence is what I call

8    transparency, which is to say the ability to look through, in

9    this case, the transactions.  Because what the evidence will

10   show is that the paperwork in these various deals -- and if

11   you weren't sure, there's four of them.  The fourth piece of

12   property is up in Illinois.  Three properties closed in early

13   2002, and underline that, early 2002, February.  The fourth

14   piece of property closed in September of 2003.  That was the

15   one up in Illinois.

16        And that's what the evidence is going to show you.

17   And what the evidence will tell you is that the paperwork in

18   each and every one of those four deals said who the owners

19   were.  And if ADT cared to find out who actually owned those

20   different limited liability companies, you will hear they

21   could have asked.  They chose not to.

22        But more importantly as to John Artuso, what you'll

23   hear is you'll see his name everywhere.  There's nothing

24   hidden.  John Artuso is going to be associated, you will

25   hear, with two companies.  One, a company called Westmore,

1    ended up as the owner of one of those first three pieces of

2    property that closed.  It's the one up in Palm Harbor.  And

3    on its closing papers, in its operating agreement, in the

4    lease agreement, in the deed, in the closing statement, you

5    will see everywhere John Artuso's name.  There's nothing

6    hidden.

7         He signs as resident agent.  He signs with the

8    Secretary of State.  He files that he is part of this company

9    and that he is, in fact, the owner.  And you heard that, in

10   fact, there's another company you're going to hear called

11   Longhill.  Because later when lawyers get involved, they add

12   a layer to the ownership of the companies, you're going to

13   hear, for asset protection and estate planning purpose.  And

14   John Artuso's name is all over that as well.  Transparency.

15   In these deals John Artuso hid nothing.  And that's the truth

16   of this case as to John Artuso.

17        Another thing you're going to hear:  ADT, Tyco,

18   knew what they were doing.  And as you hear the evidence,

19   we're going to ask you to consider just exactly what was

20   going on.  Every relevant term of the purchase of the

21   leasebacks were vetted, negotiated, disclosed.

22        Westmore, that company that John Artuso's name is

23   on, there's a leaseback agreement in October of 2001, and the

24   deal closes five months later, and ADT has all the time in

25   the world to check out whatever it chooses to check out.

1    Plenty of time to do its due diligence.  They knew the square

2    footage of the deal.  They knew the terms of the deal.  They

3    knew the rent.  They knew the rent escalation.  It's vetted

4    throughout ADT.  And not for a second will the evidence tell

5    you otherwise.

6          This was a deal in which multiple people at ADT for

7    each of these pieces of property looked at and was involved.

8    Not just Larry Horton, but Larry Horton's boss and his legal

9    department and the board of directors.  These were deals that

10   made business sense for ADT.  You're going to hear that.

11   That is the truth of this case.  ADT knew what they were

12   doing.  They also knew the value of these properties.

13         And I'll ask you, as you hear the evidence, to hear

14   and listen for that.  Because these were properties in which

15   there were appraisals.  And not just one set of appraisals,

16   but multiple appraisals.

17         And the truth of this case, and you'll hear more

18   about this from my co-counsel and during the time the

19   evidence is presented, is that ADT in the year 2000 and 2001

20   were selling lots of properties.  If you're sitting here, you

21   might think that we're just talking about four properties.

22   We're not.  We're talking about lots of properties.  Because

23   ADT, you will hear, wanted cash.  ADT knew the value of these

24   four properties.

25         They knew what they were appraised at.  They knew

1  that the prices they were being offered to sell them at were

2  below value.  They knew that the leasebacks were above market

3  value.  They had their reasons to do it.  Everything about

4  the value of these properties ADT knew.  These deals made

5  good business sense for ADT.  They knew the values.  They

6  knew what they were doing.

7          Another thing I'll ask you to listen for as you

8  hear the evidence, all the lawyers and professionals involved

9  in these real estate transactions.  Because you're going to

10  hear lawyers handled everything.  Any number of lawyers.  The

11  submission of the bids and the offers, the formation of the

12  initial companies, the formation of second companies, the

13  closings.  The structure from the beginning to the end of

14  these deal was looked at not just by lawyers on the buyer's

15  side, not just by lawyers on the ADT side.

16          ADT had its own inside lawyers and they hired Broad

17  and Cassel, a big law firm here in Palm Beach.  And not just

18  those lawyers from Broad and Cassel, but the mortgage

19  company.  You heard about GE Capital.  They had lawyers.  And

20  all the other title companies had lawyers.  And each place

21  where this property was, Pennsylvania, Illinois, Florida,

22  there were lawyers everywhere.  Lawyers handling the business

23  deal and the closing.  Lawyers advising on the structure of

24  the companies to take this legitimate tax planning.

25          What you will hear is that professionals, lawyers,

1    and accountants, were all around these deals advising Johnny

2    Artuso and the other defendants.   Perfectly legal.   Lawyers

3    and professionals everywhere.

4         Now, I'm also going to ask you to listen for

5    something else:   Risk and reward.   Because in any legitimate

6    business deal you will hear legitimate businessmen make

7    decisions on what to do based upon an analysis of risk and

8    reward.   You'll hear ADT did that.   But John Artuso and his

9    father, you'll hear, they did that as well.   And what the

10   evidence will show you is that to get these properties,

11   people had to own companies.   But the problem was those

12   companies were really only valuable with the properties they

13   held if ADT was going to lease the buildings back.   But what

14   happens if ADT stops paying on the lease?   And you'll hear in

15   the years 2000 and 2001 and 2002, ADT began to have problems.

16        John Artuso and his dad faced risk.   They put their

17   money in to help acquire these properties knowing that they

18   could get stuck with a huge mortgage and no tenant.   But they

19   got reward.   Because if ADT continued to stay on the

20   properties and pay the rent, they'd make a good profit.

21   Legitimate business deal.   Risk and reward.   I'll ask you to

22   listen for that.

23        And as you're listening, I'll ask you to listen for

24   the indicia of good faith by John Artuso in these deals.   In

25   essence, as the evidence is presented, you're going to have

```
 1   five different trials here.  I represent John Artuso.  And

 2   I'll be asking you to look at the evidence through the eyes

 3   of John Artuso.  What did he know?  What does the evidence

 4   tell you that he knew?

 5         That ADT and Tyco were selling properties to get

 6   cash that they wanted.  That appraisals existed and everybody

 7   knew the values.  That ADT had its lawyers, and the buyers

 8   had their lawyers.  That GE Capital, a big company, reviewed

 9   the deals and agreed to finance the three properties.  And

10   another company agreed to finance the Illinois property.

11   They have lawyers.  The lawyers said sign.  John Artuso

12   signed.  The evidence will establish for you John Artuso's

13   good faith in participating in this deal.

14         And there's something else I'll ask you to listen

15   for:  Fathers and sons.  Because I suggest to you that what

16   this evidence will establish is that John Artuso and his

17   father put in money and took a risk on the business together.

18   John helped his father.  His father helped him.  That's what

19   the evidence in this case will be.  There will be nothing

20   hidden.  And as you see pile after pile of documents come

21   into evidence during this case, what you're going to see are

22   checks signed by John Artuso, written to either John Artuso

23   or written to his dad, names on it.  Nothing hidden.  John

24   Artuso and his father together in a business deal as passive

25   investors who got 20 percent, because they were willing to
```

```
 1    put up the money to take care of buy off of the appraisal

 2    costs or pay certain closing costs or fund the deposits that

 3    had to be funded to GE Credit.  That's what the evidence will

 4    show.  Fathers and sons in a legitimate business deal.

 5            Now, I'll have a chance when this case ends, to

 6    come back in front of you again.  And at that time I'm going

 7    to have a chance to talk to you a lot more about what the

 8    evidence shows and what this concept of the Government's

 9    burden of proof means and what proving a case beyond a

10    reasonable doubt means.  And I'll talk to you about that and

11    how John Artuso doesn't have to prove a thing.

12            But as I'm about to leave you now in this preview

13    that I'm giving you of what the case will be, I'm going to

14    ask you especially to keep your eyes and your ears open as

15    the Government presents its case and to watch for what

16    evidence, if any, if any, there is as to anything John Artuso

17    did, said, or knew, let alone anything that he did, said, or

18    knew that seemed to be wrong.

19            Because what John Artuso did, I submit to you, is

20    what businessmen in this country do each and every working

21    day.  They make deals.  They take chances.  Sometimes it

22    works out.  Sometimes it doesn't.

23            But the Government says they're going to prove

24    crimes.  And they've charged 41 of them.  But all of those 41

25    charges, I submit to you the evidence will tell you boils
```

```
 1    down to one basic charge.  I submit to you the evidence will
 2    tell you at the end of this case that John Artuso is really
 3    charged with DWI, "Driving While Italian."  John Artuso is an
 4    Italian American.  And for certain, the evidence will
 5    establish that.  And like me, he has a vowel at the end of
 6    his name.
 7            But as I told you when I was asking you questions
 8    as we picked you as jurors, just because you're Italian
 9    doesn't mean you're in the mob.  And yet, I submit to you
10    that at the end of this case all that the Government will
11    have proven to you, all that the evidence will establish is
12    that John Artuso is an Italian American.  And what you will
13    conclude, I submit to you, based on the evidence, is that the
14    Government's theory of crimes here is a fiction.
15            Listen to the evidence, ladies and gentlemen.
16            MR. SHOCKLEY:  Objection, your Honor.  Counsel is
17    just arguing his case.
18            THE COURT:  Sustained.  We will count this time
19    against the end, Mr. Pasano?
20            MR. PASANO:  And I'm going to wrap it up now, your
21    Honor.
22            THE COURT:  Thank you.
23            MR. PASANO:  I submit to you what the evidence in
24    this case will establish is not what the Government has
25    previewed to you.  They said that Mr. Horton didn't realize
```

1    he was dealing with the South Florida crew of the Gambino

2    family.  And as you hear the evidence, I ask you to listen

3    for, well, what was that so-called South Florida crew of the

4    Gambino family up to for all of these years, from 1999

5    through 2000, 2001 --

6            MR. SHOCKLEY:  Objection.  Counsel is still

7    arguing, your Honor.

8            THE COURT:  Sustained.

9            MR. PASANO:  Your Honor --

10           Ladies and gentlemen, I submit to you that when you

11   hear the evidence, what the evidence will show you in those

12   years is not some South Florida crew of the Gambino family.

13   It's not going to show you union kickbacks or strip club

14   operations --

15           MR. SHOCKLEY:  Objection, your Honor.

16           MR. PASANO:  -- or highjacks.

17           Your Honor, I'm trying to go with what the evidence

18   will establish.

19           THE COURT:  Well, Mr. Pasano, you're arguing your

20   case at this point.

21           MR. SHOCKLEY:  I didn't argue mine.

22           THE COURT:  If you have evidence to discuss, go

23   ahead.

24           MR. PASANO:  Ladies and gentlemen, what the

25   evidence will tell you in all these years is that what these

1    defendants were doing was selling magazines.  That's what the

2    evidence is going to establish.  That, I submit to you is the

3    truth in this case.

4            But you will hear from real crooks, for certain.

5    You're going to hear from Lewis Kasman and Larry Horton and

6    Donald Race.  Liars, thieves, and crooks who Mr. Shockley

7    tells you are people who will disturb you.  And they should.

8            And you heard mention that there were tapes, that

9    Lewis Kasman, a cooperating Government witness, made tapes,

10   and this you will hear during the trial, 2005, 2006, 2007.

11   This is a man working with the FBI.  This is a man who's out

12   there to ferret out, supposedly, crime.

13           In 2005, 2006, 2007, with the tape rolling, how

14   many conversations with the South Florida crew of the Gambino

15   family are on the Kasman tapes?  Zero.  The evidence in this

16   case will tell you that not once in the three years that the

17   tapes were rolling did Mr. Kasman obtain any conversation

18   with any of the defendants in this case.  And that will be

19   the truth in this case.  He's taping lots of bad men.  He is

20   not taping these defendants.

21           So when I come back to you at the end of this case,

22   I'll go over all of this with you.  I'll talk to you about

23   what the Government has established and whether all it

24   established is that John Artuso is an Italian American or

25   whether they've established anything else.  And at that time

1    based upon all of these things that I've asked you to listen

2    for, I'm going to come back and ask you to return the only

3    fair and proper verdict in this case, a verdict that tells

4    the truth of this case.  And as to John Artuso, as to each

5    and every one of those 41 counts, that verdict should be not

6    guilty.  And I will be asking you for that verdict.  And I

7    thank you for your time now.

8            Thank you, your Honor.

9            THE COURT:  Mr. Markus.

10           MR. MARKUS:  Judge, is it an appropriate time for

11    an afternoon break or should I proceed?

12           THE COURT:  Everybody all right?  We're going to go

13    to 4:45, so I would like to go ahead and get as far as we can

14    with the closings.

15           MR. MARKUS:  Very well, Judge.

16           THE COURT:  I'm sorry -- openings.  Mr. Pasano led

17    me astray there for a moment.

18           MR. PASANO:  Judge, I will raise my hand and swear

19    an oath, because I think that was a good suggestion.  And I

20    will never do that again.

21           THE COURT:  Mr. Markus.

22           MR. MARKUS:  Ladies and gentlemen, this is Greg

23    Orr, and he is not guilty.  I've been waiting an awful long

24    time to say that.  Ms. Kaplan and I have been representing

25    Greg for a while now, and so I'm going to say it again.  Greg

1    Orr is not guilty.  He's innocent.

2            It's my honor, it's Ms. Kaplan's honor, to be

3    representing him today and to be before you this afternoon.

4    And I always get stuck last, right before I have to go to

5    lunch or leave.  So I'll try to keep it as short as I can.  I

6    don't want to say how much time I have, because the judge

7    will say I have less.

8            But let me start out by just thanking you first and

9    foremost.  Because this is going to be a long trial.  Three

10   weeks is a long time to be away from your jobs, your family,

11   your kids, your responsibilities.  It's tough on you.  It's

12   tough on all of us, the Government table, the agents, the

13   defense lawyers, and all of us.  So I thank you at the

14   beginning.  It's an unbelievable responsibility and an honor

15   and a privilege, and I thank you.

16           You know, Mr. Shockley gave a wonderful opening

17   statement about Larry Horton.  Larry Horton is guilty.  He is

18   guilty of fraud, of being a racketeer, and lots of other

19   things.  And we heard a lot about him in Mr. Shockley's

20   opening statement.  And that's because that man, and you'll

21   hear from him tomorrow in that chair, is absolutely,

22   100 percent guilty.  He defrauded ADT.  He worked at ADT.  He

23   kept information from ADT.  And he did those things.

24           Greg Orr, on the other hand, is 100 percent not

25   guilty.  And before I get into the specific facts of this

1    case, let me tell you a little bit about Greg Orr.  You heard

2    a lot from Mr. Shockley about who Larry Horton was.  Let me

3    tell you about Greg Orr.  Because unlike Larry Horton, Greg

4    Orr is not a criminal.  No felony record like Larry Horton.

5    His wife Janine Orr is here.

6            If you could stand up, Janine.

7            They've been married for 18 years this past Monday.

8    He has two children -- thanks -- 16 and 12.  Greg's father

9    was a police officer in New York.  He's on the board of

10   different charities, including Helping Hands.  And he's a

11   good man, ladies and gentlemen.  He's not a criminal.  He's a

12   good man who's always acted in good faith.

13           And, you know, Greg Orr is as much a member of the

14   Gambino crime family as I'm the quarterback for the Miami

15   Dolphins.  It is just an absurd claim.  Greg Orr has nothing

16   to do with the Gambino crime family.  He has nothing to do

17   with organized crime.  Maybe the Dolphins could use me as

18   their quarterback, but it's just a silly claim.

19           This case is really about four buildings.  You

20   heard that from the other lawyers.  Actually, it's quite

21   boring.  Lots of numbers and charts and figures and

22   documents.  You see, what they're hoping at this table is

23   that if they mention "Gambino" enough --

24           MR. SHOCKLEY:  Judge, your Honor, counsel is

25   arguing the case.

 1              THE COURT:  Sustained.

 2              MR. MARKUS:  The evidence is going to show, ladies

 3    and gentlemen, that this case has nothing to do with Gambino.

 4    You're not going to see one dollar, not one dollar go from

 5    Greg Orr to anybody in New York.

 6              Where's that chart, Mr. Shockley?  Here it is.

 7              This chart that they put on the screen with

 8    different -- and then they said this is a pyramid and the

 9    money flows up.  Remember, they put this up on the screen?

10    You will not see one dollar from Greg Orr going to New York,

11    going to Gambino, going to an underboss, or anything like

12    that.  Why?  Because this case has nothing to do with the

13    mob.

14              Let me tell you what the evidence is with respect

15    to Greg Orr.  You won't see one wiretap or hear one wiretap

16    with Greg Orr's voice on it.  Not one.  Not one offshore bank

17    account.  Nothing about hiding money.

18              MR. SHOCKLEY:  Judge, counsel is arguing the case

19    rather than stating facts.

20              THE COURT:  That objection is overruled.

21              MR. MARKUS:  Let me repeat that.  You will not see

22    one piece of evidence, not one, about Greg Orr hiding any

23    money, nothing about offshore accounts, nothing about -- you

24    heard about videotapes from 1988.  1988.  By the way,

25    Ms. Kaplan was eight.  I was just getting my learner's

 1    permit.

 2              MR. SHOCKLEY:  Objection.  Relevance.

 3              THE COURT:  Sustained.

 4              MR. MARKUS:  You will not see Greg Orr on any

 5    absurd video from 1988 or on any video for that matter.  No

 6    pictures of Greg Orr.  No guns.  No violence.  No prior

 7    felonies.  No threats.  No scheme to defraud anyone, ladies

 8    and gentlemen.  No crime in this case.

 9              This case is about two witnesses.  And you heard

10    the Government tell you a little bit about them.  Larry

11    Horton and Lewis Kasman.  It's really the battle of

12    heavyweight liars.  On the one hand, you have Larry Horton,

13    and on the other you have Lewis Kasman.  Larry Horton is a

14    born liar.  Lewis Kasman is a convicted perjurer.

15              And you're going to hear -- let me tell you, you've

16    heard a lot about Lewis Kasman from the other lawyers.  Let

17    me tell you a little bit about Larry Horton.

18              Remember when Mr. Shockley said the FBI came at his

19    door and Larry Horton was surprised by that?  The first words

20    out of Larry Horton's mouth to the FBI, lies.  He lied to the

21    FBI.  He got charged with that.  Charged by this table with

22    lying.  And guess what?  As part of his deal for getting up

23    on the stand tomorrow, they dropped that charge.  They

24    dropped the charge of lying.  He's lied to the FBI.  He'll

25    admit that on the stand tomorrow, that he lied to the FBI.

    1    He lied to a judge, just like Judge Middlebrooks, to a Court.

    2    He's lied to his bosses at ADT.  You heard that from the

    3    Government themselves.

    4         He's lied to his family, to his wife.  And when he

    5    gets on that stand tomorrow, you're going to hear lies

    6    directly to you.  That's Larry Horton, ladies and gentlemen.

    7         You heard about concealment from Mr. Shockley.  The

    8    only person whoever concealed anything is Larry Horton.  He

    9    didn't want anybody to know what he was doing.  Larry Horton

   10    was hiding.  Greg Orr was an open book.  He paid his taxes

   11    the evidence will show.  He met with lawyers and accountants.

   12    He was an open book.  In fact, his name was on all of

   13    corporations.  I think you'll see -- Mr. Shockley even told

   14    you about it.  They took Larry Horton's name and put Greg

   15    Orr, because Greg Orr had nothing to be afraid about.  What

   16    he was doing was legitimate, unlike Larry Horton.

   17         You heard about ADT and Tyco.  ADT was a subsidiary

   18    of Tyco.  They were purchased by Tyco.  And they reviewed --

   19    Tyco and ADT reviewed everything in this case, reviewed

   20    everything.

   21         Now, you're going to hear -- you heard from

   22    Mr. Shockley a little bit that Larry Horton was the person

   23    who signed off on these deals.  Well, that's simply not true.

   24         If I may, you know, an opening statement -- you

   25    heard Mr. Shockley tell you, opening statement is a little

1   like a jigsaw puzzle and Mr. Pasano said it is like the movie

2   previews that don't turn out like the movies.  Both sides

3   sort of make promises to you all about what they're going to

4   prove.  And during this election season we've heard a lot of

5   promises from politicians.  We vote based on the promises we

6   hear, and the politicians do whatever they want after we

7   vote.

8          A criminal trial is very different.  You see, both

9   sides make promises to you in opening statement.  And at the

10  end you don't vote until you see if we've delivered.  I'm

11  telling you Mr. Shockley promises, he can't deliver on.

12         MR. SHOCKLEY:  Objection.  Counsel is again

13  arguing.

14         THE COURT:  Sustained.

15         MR. MARKUS:  Let me show you the actual documents

16  in evidence, some of them that you'll see in this case.

17         You heard about the approval process that had to

18  happen at Tyco.  I'm going to set this up here, if I could.

19  This is just one e-mail that you'll see in this case.  Don't

20  worry, during the trial you'll have a chance to review this

21  closely.

22         MR. SHOCKLEY:  Your Honor, again, we object to --

23         THE COURT:  Sustained, if that's -- if you're

24  showing them a document that will later be -- someone will

25  seek to introduce --

```
 1              MR. MARKUS:  Absolutely, Judge.

 2              THE COURT:  -- the objection is sustained.  Without

 3   agreement, this isn't a time to be showing evidence.

 4              MR. MARKUS:  Judge, I mentioned to Mr. McCormick

 5   that I would be using exhibits, just like Mr. Shockley used

 6   summary charts in his opening.

 7              MR. McCORMICK:  About 20 seconds before the Court

 8   started its session.  I never saw them.

 9              MR. SHOCKLEY:  I wasn't sure what he was showing.

10   I was looking at the next chart.

11              THE COURT:  Well, you all quickly go over them.  If

12   you can reach agreement, otherwise, let's move on.

13              MR. SHOCKLEY:  This is a piece of evidence that

14   will -- it could be offered in the trial.

15              THE COURT:  Do you object to him using it or not?

16              MR. SHOCKLEY:  No.

17              THE COURT:  All right.

18              MR. SHOCKLEY:  Not that one.

19              MR. MARKUS:  This is an e-mail that you'll see from

20   people in the real estate department about all of the

21   procedures that had to happen before a piece of property

22   would be sold.  And what you'll see here is that -- and I'm

23   sorry if I'm rushing.  We'll go through this in detail in the

24   next few weeks.  Trust me.  But what you'll see is an e-mail

25   from Laure Roy to Marjorie Desporte.  These are both ADT/Tyco
```

1    employees in the real estate division.

2          And what it says is, Marjorie, here is what we have

3    to do before we can sell the property.  Larry has to get --

4    this is Larry Horton, the person we heard about -- has to get

5    Tyco financing approval to sell.  She, Laure Roy, then

6    receives a request to obtain board approval.

7          And then Laure -- I'm sorry, Marjorie has to get

8    confirmation that Tyco finance has approved, copies of the

9    purchase and sale agreement.  And it goes on through all of

10   the steps that have to happen.  Very detailed process before

11   property could be sold at ADT/Tyco.

12         The point is, and what the evidence will show,

13   ladies and gentlemen, is that ADT and Tyco knew exactly the

14   terms of these transactions, knew the sale price, the lease

15   price, all of the terms.  In fact, there were swarms of

16   lawyers from Tyco and ADT looking through these contracts on

17   both sides.  And -- I mean, I have a chart of all of the

18   lawyers.  I can show it to you now or I can show it to you in

19   closing if there is going to be an objection.

20         MR. SHOCKLEY:  There is going to be an objection.

21         MR. MARKUS:  Okay.  So I'll just tell you, then,

22   because it's silly.  Let me tell you what the evidence is

23   going to show.  The evidence is going to show that there are

24   teams of lawyers from law firms billing hundreds of hours

25   going through the terms of these contracts, reviewing them to

1    make sure they're proper, reviewing to make sure the price is

2    okay, reviewing them to make sure that Tyco and ADT were

3    getting an appropriate deal.  That's what you're going to

4    hear about.

5         Let me just give you one example of what these

6    lawyers were doing.  This e-mail is to Peter Economos.  Peter

7    Economos was the lawyer for Greg Orr and the others on the

8    Chicago, Oak Brook deal, the Illinois deal.  Peter was

9    representing them.  By the way, Peter Economos was a

10   5 percent owner as well in this deal.  And it's to Randi

11   Joseph at ADT.  He's in the real estate division.  He's a

12   lawyer.

13        And this is just classic.  Randi Joseph is telling

14   Peter Economos, the lawyer, the guaranty was reviewed by Tyco

15   European counsel, then sent to Tyco treasury in New York, and

16   then forwarded to Tyco counsel in New York City.  I requested

17   a status of the New York Tyco counsel review and will get

18   back to you when I have an answer.

19        This is just over one small clause in one contract,

20   and we have Tyco European counsel reviewing it, Tyco treasury

21   in New York, and Tyco counsel in New York City.  Can you

22   imagine the teams of lawyers and the hours that they're

23   spending looking at these contracts?  And they claim that

24   ADT/Tyco was a victim.

25        You see, you have to put everything in context and

1    what was going on at the time.  What was happening at the

2    time was, Tyco was gobbling up these other companies;

3    SecurityLink, ADT, and lots of other places.  And their stock

4    price was going up through the roof.  But then in 2000, 2001,

5    their stock price started to drop, and they had all of these

6    extra buildings.  You heard from Mr. Shockley about it.  Some

7    right across the street from each other.  And you're going to

8    hear an expression in this trial that was the motto at Tyco

9    and ADT.  And that expression is "cash is king."  Remember

10   that.  Cash is king.  You're going to hear it a lot in this

11   trial.

12          And what the directive was from the higher-ups at

13   Tyco and ADT to Larry Horton and everybody else was sell,

14   sell, sell.  Get rid of these properties as fast as you can

15   because our stock price is dropping.  We need cash.  We need

16   to inflate what we're looking at.  And even if you lose

17   money, we need to sell.  It was a fire sale at Tyco and ADT.

18   You're going to see how quickly they were selling their

19   properties.

20          This is a document from ADT.  And you're going to

21   see in 2001 they had 552 different properties.  In one year,

22   from 2001 to 2002, they sold 101 properties.  In one year,

23   they sold 100 commercial properties.  They're trying to get

24   rid of these things.  This is right when Greg and the others

25   buy the few buildings.  Right at the end of 2001, beginning

```
 1    of 2002.  And ADT is selling.  It is a fire sale.  Get rid of

 2    it.

 3            And it's interesting, because the prosecution

 4    admits this.  Who's getting the knock on whose door?  They

 5    say this is organized crime.  Larry Horton knocked on Greg

 6    Orr's door, his neighbor, to see if Greg was interested in

 7    purchasing some buildings.  That's how this case started.  It

 8    started with Larry Horton knocking on our door.

 9            MR. SHOCKLEY:  I would like to see it first.

10        (Pause in Proceedings.)

11            MR. SHOCKLEY:  Your Honor, I'll object on relevancy

12    grounds.

13            THE COURT:  All right.  Well, sustained as to

14    showing a document.  If you want to discuss it in opening,

15    you may.  But without some agreement, at this point you

16    can't.

17            MR. MARKUS:  Let me tell you what the documents are

18    going to show, and you're going to see these in the trial.

19    So I'll just tell you about it.

20            We have documents that showed -- and these are the

21    documents that the Government seized and that were open to

22    everybody, because these were transparent deals.  Okay?

23    Documents that show that ADT and those other hundred

24    buildings that they were selling at the time were losing

25    money, losing money.  In fact, on the document that you will
```

1   see in trial they lost about $500,000 on other buildings that

2   Greg Orr and the others had nothing to do with, selling to

3   other people.  ADT and Tyco lost about $500,000.

4          But on the document you'll see what was important

5   to them.  Cash is king.  Because they got revenue from

6   selling that.  Even though they were taking a loss of

7   500,000, they were getting an infusion of cash.  And that was

8   what was important to Tyco and ADT.  And you'll see the

9   document.

10          The summary charts that Mr. Shockley showed you and

11   put up on the screen, these charts with all the arrows going

12   different ways and appraisals on one end and he told you the

13   huge numbers of the appraisals.  What he didn't tell you,

14   ladies and gentlemen, and what the evidence is going to show

15   is that the appraisals that ADT had, for example, from Grubb

16   & Ellis, show much different numbers than the appraisals that

17   Greg and others got from GE Capital.  So, for example --

18          MR. SHOCKLEY:  Objection, your Honor.  They were

19   not appraisals that he's talking about.  He is referring to

20   them as appraisals.  Factually, we object.

21          THE COURT:  Overruled.  Again, what the lawyers say

22   in opening is not evidence.

23          MR. MARKUS:  What you'll hear at trial is that

24   these are called "broker opinion of value."  Okay?  Broker

25   opinion of value.  It's written here, that I wrote on the

```
 1    screen.  And what ADT and Tyco did is they asked Grubb &

 2    Ellis to say what are these things worth.  SecurityLink did

 3    that.  They were part of Tyco and ADT.

 4              And what you'll see -- for example, the Palm Harbor

 5    property where Mr. Shockley said the property sold for

 6    684,000 and the property was appraised for 2 million, well,

 7    Grubb & Ellis told ADT, you know, a low value that you could

 8    get is 640,000 and the recommended sale price is 799.  And

 9    that's true for all four of the properties.  You'll see the

10    numbers and the broker opinion of value throughout this case.

11              You didn't hear the whole story.

12              MR. SHOCKLEY:  Objection, your Honor.  Counsel is

13    arguing.

14              THE COURT:  Sustained.  Let's finish up.  It's

15    getting late in the day.

16              MR. MARKUS:  The evidence is also going to show,

17    ladies and gentlemen, that Greg acted in good faith.  He met

18    with lawyers to discuss whether he could do these deals.  He

19    met with a lawyer named Julius Cohn in New York.

20              When Larry Horton first knocked on Greg's door --

21    the deals didn't take place the next day.  Greg met with his

22    lawyer up in New York, Julius Cohn, and asked him, if there's

23    a guy from ADT who's trying to sell us these properties and

24    he works there, can we do it?  And Mr. Cohn told Greg in no

25    uncertain terms you can do it so long as Larry isn't the one
```

1    making the final decisions.  As long as he's not the final

2    decision maker, you can do it.

3           And Greg went back to Larry Horton and asked him,

4    are you the final decision maker, because my lawyer says I

5    can do it if you're not.  And Larry told Greg he was not the

6    final decision maker.

7           You also heard that there were other deals, other

8    properties that were bid on.  If the fix was in, if ADT was

9    not reviewing all of these properties, Greg and the others

10   would have gotten all seven or eight of these buildings.  But

11   they didn't because ADT was reviewing these and because

12   four -- they only got four of those buildings.  Not the seven

13   or eight that Mr. Shockley discussed.

14          You heard a little from Mr. Pasano about, there was

15   risk involved in these buildings.  You're going to see the

16   contracts themselves.  Greg Orr was responsible and the

17   others were responsible for keeping the roof maintained,

18   keeping the walls maintained.  If there was a hurricane or

19   fire, getting the building back online.  If ADT and Tyco went

20   under, which they were rated very low at the time because of

21   all the fraud going on at Tyco and because their stock price

22   was plummeting, if they went under, bankrupt, guess what?

23   They get to stay in the building, because that's what happens

24   with bankrupt companies.  And they don't have to pay the

25   rent.  They don't have to pay the leases.  And then Greg Orr

 1   is stuck with four buildings with a tenant who's bankrupt and

 2   not paying the rent.

 3        You're also going to hear that Tyco and ADT,

 4   because of all the fraud going on at Tyco and ADT, was

 5   audited by Price Waterhouse Cooper, by Boyce Schiller, and

 6   thousands of attorney hours and millions of dollars were

 7   spent reviewing all of the deals done at Tyco and ADT.  And

 8   guess what?  Nothing was said about these four deals.

 9   Nothing.  That's because they were legitimate, and ADT is not

10   a victim.

11        And you know what, ladies and gentlemen?  What you

12   you're going to hear when you hear from ADT witnesses, ADT

13   hasn't sued Greg Orr, hasn't sued anybody.  ADT has paid the

14   rent for all these years.  They're using the buildings.  And

15   if there's a problem, they can sue us.  This is a criminal

16   case.  You're going to hear from the judge about what a

17   criminal case is.  Remember, we talked about it at the very

18   beginning.  Criminal act, criminal mind.  Not some breach of

19   contract.  Not coming years later and saying, well, now that

20   we're a healthy company, we want to get our buildings back

21   through the Government.  If they're not happy, you'll hear

22   that there's a remedy.  They can sue.  They can sue.  But

23   they haven't, because they're happy and they're not a victim.

24             MR. SHOCKLEY:  Objection.

25             MR. MARKUS:  That's what the evidence will show.

1          THE COURT:  Sustained.  Mr. Markus, this is all

2     argument.  Let's finish up your opening statement, please.

3          MR. MARKUS:  Ladies and gentlemen, if I've strayed

4     a little bit, I apologize.  I'm excited and anxious to be

5     here with Mr. Orr.  He is not guilty.  I'm going to sit down

6     now.  I ask that you listen to the evidence, that you ask

7     yourself throughout this case, did ADT know the terms of the

8     contract, the price and lease, and so on.  Did ADT have the

9     lawyers and real estate people looking at the contract?  And

10    did ADT do other deals just like the ones with Greg and the

11    others where they lost tons of money?  If the answers are

12    yes, which they will be, I'm going to ask you to return a

13    verdict of not guilty.

14          Greg isn't guilty.  He is an innocent man.  This

15    case has nothing to do with the mob or RICO or gangsters.  It

16    is a boring real estate case, where Greg did nothing wrong.

17          Thank you, ladies and gentlemen.

18          THE COURT:  Mr. Kaiser, is it your intention to

19    present opening statement at this point of the case?

20          MR. KAISER:  On behalf of Robert Gannon, we will

21    reserve opening statement at this time.

22          THE COURT:  Mr. Entin.

23          MR. ENTIN:  On behalf of Mr. Forgione, we will

24    reserve our opening statement at this time.

25          THE COURT:  All right.  Thank you.

1          You've heard the opening statement, at least those

2     that are going to be presented at this time.  A defendant has

3     an opportunity, if he chooses, to reserve opening statement.

4     Two of them have done that, to a later point in the case.

5          It is -- rather than start a witness with 7 minutes

6     left, let's stop.  Leave any -- well, if you have notes,

7     let's give those to Angela.  Tomorrow morning, instead of

8     coming here we're going to go down to the second floor.  The

9     technology is a little better.  The room is not as big.  But

10    everyone will have their own screens and I think it will work

11    better down there.

12         We're going to be in the courtroom on the second

13    floor.  So go to the jury room on the second floor.  We'll

14    start at 9 o'clock.  It is important, if you can, please be

15    prompt.  We'll have coffee down there.  We can't start trial

16    until everyone is here.  And if you do your best to be on

17    time, we'll try to start on time.  And move through and take

18    as little of your time as we can.  So we'll see you tomorrow

19    morning at 9 o'clock on the second floor of this building.

20         Have a good night.

21       (Jury out at 4:39 p.m.)

22         THE COURT:  Okay.  Please have a seat.

23         A couple of you mentioned something about motions,

24    as I recall.

25         MR. PASANO:  Judge, I had jumped up so let me

1   start, and then I'll defer to my brother counsel.  During the

2   Government's opening statement on a number of occasions

3   Mr. Shockley alluded to alleged statements that the witness,

4   Mr. Horton, claims were made to him.  Some in lockup

5   apparently after the initial appearances by these defendants.

6   Mr. Birch made a Bruton objection, which I'll join, although

7   I'll let Mr. Birch argue that.

8           THE COURT:  Well, wait, wait, wait, wait.  The

9   Bruton objection didn't relate to a statement in lockup, did

10  it?  I thought the Bruton objection --

11          MR. PASANO:  His earlier statement, but then they

12  kept going, if you will, your Honor.  So what we have are

13  lots of alleged statements made by Mr. Orr, by Vince Artuso

14  on behalf of John Artuso, who was apparently not making any

15  of those statements.  I submit they're not in furtherance of

16  any alleged conspiracy to which he is a member and therefore

17  as to him they are unduly prejudicial, should not have been

18  offered, or if offered and the Court thought they were

19  proper, should have been accompanied then by a cautionary

20  instruction that those alleged statements do not apply to

21  Mr. John Artuso.

22          THE COURT:  Wait.  The only objection during the

23  opening was a Bruton objection by Birch as to an Orr

24  statement, "they're coming after Vinnie."  Is that -- and so

25  other than that, there were no objections.  Let's not combine

1    everything into -- your notion is what it is.  But let's be

2    specific in terms of what the objection was.

3            MR. PASANO:  I appreciate that, your Honor.  After

4    that objection then the Government continued to relay

5    statements that they say Mr. Horton will testify to and then

6    we heard additional statements attributed to both Mr. Orr and

7    Mr. Vince Artuso.  All of those statements, I submit, are

8    inadmissible as to John Artuso because they're hearsay.

9    They're not his statements.  And they're not in furtherance

10   of any conspiracy given the time period and the content of

11   the statements, which has occurred after the investigation

12   was begun.

13           So as to John Artuso, I submit that the

14   introduction of them in the opening as well as when the

15   witness testifies are unduly prejudicial.

16           I urge the Court on join Artuso's behalf to grant

17   the mistrial, at a minimum to instruct the jury at an

18   appropriate time with regard to how it can use these kinds of

19   statements.  That's my objection.

20           THE COURT:  All right.  Well as to a mistrial, that

21   motion is overruled.  I point out there were not objections

22   made in opening.  I think it is true we need to sort through

23   this in terms of the testimony at trial and I want to

24   understand argument on that.  But in terms of the motion for

25   mistrial, that's denied.

 1            Mr. Markus.

 2            MR. MARKUS:  Judge, I reserved a motion because I

 3    have an issue a little bit before that.  And that is, I heard

 4    for the first time in Mr. Shockley's opening statement,

 5    supposed statements by Mr. Orr, repeated statements by him

 6    that were never turned over or disclosed to the defense.  I

 7    never got a summary under Rule 16 of what Mr. Orr supposedly

 8    said.  I'm hearing for the first time in opening statement

 9    about all of these statements that Greg Orr supposedly made

10    to Larry Horton in lockup, and so on.

11            And those statements should have been disclosed to

12    me, your Honor, under Rule 16.

13            THE COURT:  What about that, Mr. Shockley?

14            MR. SHOCKLEY:  Your Honor, it is my understanding

15    that it deals with statements made to law enforcement

16    officers.  It quite simply does not apply to the standing

17    rules of discovery.

18            THE COURT:  Is he accurate?  Tell me what the rule

19    says.

20            MR. PASANO:  Judge, I think that there's a section

21    in 16 that talks about oral statements and that is made to a

22    then known Government agent.  And then there is a section in

23    16 talks about typed or recorded statements, and that is more

24    broad.  I think that what's Rule 16 says.

25            MR. McCORMICK:  Your Honor, at the time, Mr. Horton

1    was not an agent of the Government's.  The rule that

2    Mr. Pasano was trying to apply just is inapposite.

3            THE COURT:  What's the rule say?

4            MR. MARKUS:  Judge, I'm looking at it now.  16A,

5    defendant's oral statement, says that the Government must

6    disclose to the defendant the substance of any relevant oral

7    statement made by the defendant before or after arrest in

8    response to interrogation by a person the defendant knew was

9    a Government agent if the Government intends to use the

10   statement at trial.  So that's what Rule 16 says.

11           I have to go back and look at the local rule

12   because I think it may be more broad.  I'm not sure.

13           You know, I think the Government should have

14   disclosed statements by Greg Orr if they intended to use them

15   at trial to us.  I mean --

16           THE COURT:  Well, not under that rule.  Let's look

17   at the discovery rule.  But that rule would not encompass the

18   statement as I understand their opening.

19           MR. MARKUS:  I would just ask the Court as a matter

20   of fairness to order the Government to give me any statements

21   that it intends to, that my client supposedly made, Judge.

22           THE COURT:  Your response?

23           MR. SHOCKLEY:  Your Honor, I prefer to follow the

24   rules of discovery, which I have done in this case, and I

25   object to having to try to ferret out whatever --

1          THE COURT:  Well, I guess you're calling Horton in

2     the morning though.

3          MR. SHOCKLEY:  Yes.

4          THE COURT:  You probably have a pretty good idea in

5     terms of Horton.  Are there more statements other than those

6     you've disclosed in opening?

7          MR. SHOCKLEY:  He talked with him throughout the

8     entire, you know, matter.  I hardly know how to respond, when

9     his whole testimony is going to be about conversations he had

10    with Orr about this crime.

11         THE COURT:  It would be virtually impossible along

12    those lines, Mr. Markus.

13         What other issues are there?

14         MR. BIRCH:  Your Honor, I made an objection to

15    Bruton.

16         THE COURT:  Wouldn't it need to be testimonial?  It

17    doesn't sound like that was, in terms of your Bruton

18    objection.  Why wouldn't that be an 801(d)(2)(E).

19         MR. BIRCH:  I think testimonial relates to

20    Crawford.  It is not -- Bruton --

21         THE COURT:  Why wouldn't a coconspirator statement

22    be able to come in?

23         MR. BIRCH:  I would submit it was not in

24    furtherance of any conspiracy for Mr. Orr to tell Mr. Horton,

25    don't worry about it, they're after Vinnie Artuso, they're

 1    not after you.  I would submit that's not made in the course

 2    of a conspiracy or in the furtherance of any conspiracy.

 3              THE COURT:  Sounds like it might be.

 4              Mr. Shockley, what's your position on that?

 5              MR. SHOCKLEY:  Your Honor, throughout this there

 6    have been efforts on the part of the defendants to keep

 7    Horton in line, to keep him silent, to not panic --

 8              THE COURT:  Wasn't there a case on that in terms of

 9    whether the cover up is part of the initial conspiracy?

10              MR. MARKUS:  It's not.  There is a supreme court

11    case and a case right out of the Eleventh Circuit, United

12    States versus Magluta.  And the Magluta case dealt with the

13    cover up and the Court of Appeals even in United States

14    versus Salvador Magluta, found error in a separate

15    conspiracy.

16              MR. SHOCKLEY:  A separate conspiracy -- this was --

17              MR. MARKUS:  To cover up.

18              MR. SHOCKLEY:  No.  But this was the same

19    conspiracy.

20              THE COURT:  So you think this is ongoing and

21    still --

22              MR. SHOCKLEY:  Absolutely.  They were still paying

23    the money.  They had to keep him quiet.  He was the one that

24    they definitely had to hide because if Horton were revealed,

25    everything would fall apart.  If his role were revealed.

1          THE COURT:  So you're relying on the coconspirator

2     exception to get this in.

3          MR. SHOCKLEY:  Absolutely.  Absolutely.

4          THE COURT:  You need to bring me some authority on

5     that in the morning and please, if I can see that before

6     9 o'clock, I'll be in a better position to rule.  Because I

7     don't remember precisely what that case says.

8          MR. BIRCH:  Based on that, what I allege is a

9     Bruton violation, I would move for a mistrial.

10          THE COURT:  Well, your request for a mistrial is

11     denied.  Obviously, I've instructed them several times that

12     what was said in opening is not evidence.  We need to deal

13     with it though and so to the degree you think Bruton would

14     apply to that type of statement, I need to understand why.

15          And so if you've got additional case law I'll look

16     at that in the morning, too.  I want to be in a position to

17     rule on that.  Apparently, Orr is going to -- there are going

18     to be testimony from Horton as to Orr's statements about his

19     belief that the FBI is after your client.  So anything you

20     want me to look at, let me look at it in the morning.

21          MR. BIRCH:  Yes, sir.

22          THE COURT:  Any other issues that you all see that

23     we're going to need to deal with early?

24          MR. MARKUS:  Judge, we haven't been given a witness

25     list by the Government yet.  All we know is who their first

1     witness list is.  I'd ask for the Jencks who their next

2     couple witnesses are or a witness list so we can get

3     prepared.

4          MR. SHOCKLEY:  Your Honor, I suspect that Larry

5     Horton is going to take us through to the weekend now.  But

6     certainly, we would be more that happy to give them, you

7     know, a day or two in advance who the witnesses are going to

8     be.  Sometimes we don't know because of scheduling problems

9     that we have with the witnesses.  But certainly, we'll give

10    them the Jencks material so there won't be any delay in the

11    trial.

12         THE COURT:  Yes, I'm not going to order you to do

13    it early.  But I sure don't want delays.  If they were to be

14    surprised, I would have to delay their cross-examinations.

15         MR. SHOCKLEY:  I understand.

16         THE COURT:  And with great unhappiness in terms of

17    our schedule.  You're still going to be limited if we have to

18    do that to your time expectations.

19         MR. SHOCKLEY:  I understand.

20         THE COURT:  So let's try to deal with those things

21    ahead of time.

22         MR. PASANO:  And your Honor --

23         THE COURT:  The more you can on exhibits -- we've

24    got wonderful lawyers in this case.  The more you all can

25    review exhibits and get agreements --

```
 1              MR. PASANO:  Judge, we have a stipulation that has

 2      been executed by the defense and we'll hand it back to the

 3      Government.

 4              MR. McCORMICK:  Perfect timing.

 5              THE COURT:  Okay.

 6              MR. PASANO:  Judge, there are two Brady issues.

 7      The reason I raise it now is I think the witnesses are going

 8      to be coming next week, but there is a chances that the

 9      Government may take a position, but they haven't gotten the

10      answers back.

11              As to Mr. Kasman, we specifically requested the

12      Government reports of payments to him up to date.  We've been

13      given a figure but not those CI reports that exist in the FBI

14      when moneys are paid to informant.  And the figure we were

15      given was four or five or six months old.  So we believe

16      Mr. Kasman who was getting expense moneys as well as moneys

17      for his services, has been paid more in the last six months

18      than what we know.

19              So we've made a specific Brady/Acres request for

20      that information.

21              I know the Government doesn't have it yet.

22              MR. McCORMICK:  Well, I do have some of it, your

23      Honor.  The way the FBI has categorized it is, Mr. Birch said

24      he wants it further broken down.  I don't think I can break

25      it down any further.  And that -- the figure that I have
```

```
 1    right now that I'm trying to be getting in contact with the

 2    control agent on is about $401,000, that broken down in

 3    certain ways that -- FBI ways.

 4              MR. PASANO:  Judge.

 5              MR. McCORMICK:  The FBI agent, one of the FBI

 6    agents will be on the stand and counsel certainly can inquire

 7    as to any other further breakdowns.  But the FBI I don't

 8    think has the apparatus to break it down further than what I

 9    can provide to the defendants.

10              MR. PASANO:  And Judge, while it has been a while,

11    I admit since I've been in the Government's position, I've

12    seen forms that the agencies maintain because nobody gets

13    money without forms being filled out and a file being

14    created.  And typically, both the FBI and other agencies,

15    there is a CI or informant file.  And they keep very close

16    records on payments because they get audited.

17              And what we're requesting are those reports.  Now,

18    if the answer that Mr. McCormick has been given is the FBI is

19    telling them they don't exist, all I can ask through the

20    Court is that Mr. McCormick ask a little harder because I

21    believe those forms do exist and they often are different

22    than the numbers we get when we're given an aggregate.

23              MR. McCORMICK:  It isn't aggregated.  It is

24    services and expenses.  That's the way the FBI breaks it

25    down.  Unfortunately, some of the services that the -- excuse
```

1    me -- expenses that the cooperating witnesses or CI is given

2    is an amalgam of -- for instance, maybe a mortgage payment,

3    it may be food payment, it may be hotel payments.  It is all

4    in one total amount.  As I say, the agent, one of the agents

5    who has been responsible for Mr. Kasman will be testifying.

6    I will attempt to break it down further.

7              THE COURT:  All right.  See if you can resolve it.

8    Waiting until he testifies is, I suspect, too late.

9              MR. McCORMICK:  That should be next week.  We

10   should have an answer to that.

11             MR. PASANO:  And I thank you, Counsel.  The other

12   witness who you heard his name mentioned in the Government's

13   opening, is a man named Donald Race.  At this point we're

14   advised that there are no other Brady disclosures regarding

15   Mr. Race except what the Government had provided, which are

16   some tape-recordings and some information orally about, or a

17   sum of money that he was paid.

18             Our specific Brady/Acres request as to Mr. Race,

19   with all respect to the South Florida US Attorney's Office,

20   is that an individual who's tape-recorded by the FBI in

21   Philadelphia, must have been either a subject or a target of

22   an investigation to have allowed an informant to be tape

23   recording him.  And while we will accept whatever the

24   truthful answer is as to what exists as to Mr. Race, we find

25   it hard to believe that he has not been subject to

1    investigation or charges, and thus, we believe not in South

2    Florida, necessarily, but in either Philadelphia or New York,

3    there is information that would be Brady and that we're

4    entitled to.

5         It is in the Government files.  It may not be in

6    Mr. McCormick's file.  But we urge the Court to ask the

7    Government to make diligent inquiry under the Griggs case and

8    those old cases that talked about how if it is in somebody's

9    file, it is deemed to be in Mr. McCormick's file.

10        MR. McCORMICK:  Your Honor, we have made inquiry of

11   that, and Mr. Race has not been charged, he has not been

12   indicted -- or excuse me, he is not a subject of a case.  He

13   was recorded because he was -- at that time he was a subject.

14   No case was made as a result of it.  We have the recordings.

15   There were no further criminal proceedings.

16        I'll double-check it again, your Honor, but that's

17   the answer I provide to defense counsel.

18        MR. PASANO:  And I appreciate that answer and I

19   guess the follow-up then would be, your Honor -- and I

20   apologize for taking the Court's time -- if in 2002, which is

21   an important time period for us, Mr. Race was the subject of

22   an investigation, then the acts which he was alleged to have

23   committed are likely to lead to discovery of impeachable

24   information and qualify as Brady/Acres, and should be

25   disclosed.  So that's our request.

1          MR. McCORMICK:  The recordings that counsel has, I

2     believe has -- any of the allegations are contained in the

3     recordings between Mr. Race and --

4          MR. PASANO:  See, Judge, the problem -- and I

5     apologize -- is that the first recording starts in March of

6     2002.  What we want to know is, what did the FBI know about

7     him that led them to send in an informant to tape-record him.

8     We've got the tapes.  There is stuff that happened before.

9     And if this man is an advanced fee scam artist or otherwise

10    committing fraud and thieveries, we're entitled to know it,

11    at least for purposes of potential impeachment.  And that's

12    the request.

13         THE COURT:  Even if that was a suspicion, as

14    opposed to some evidence that he did it?

15         MR. PASANO:  There's a scale there.  I accept that

16    there is, your Honor.  But the inquiry needs to be made, and

17    perhaps depending on what that evidence is, it might even be

18    something your Honor would have to review in camera.  But I

19    think we need to know.  And right now we don't.

20         MR. McCORMICK:  As far as I know, a preliminary

21    investigation was opened up and it was closed because there

22    was lack of evidence.  I think that should put an end to it.

23    But I'll doublecheck it again, your Honor.

24         THE COURT:  Okay.  Remember we're going to start

25    downstairs.  Try to come a little early because we're going

1    to have to figure out how we're going to deal with the space

2    issue.  I think her initial thought was we'd try to be around

3    the table so some people would be facing each other across

4    the table.  If that is not satisfactory, we'll have to bring

5    in another table.  But then that will be a little more

6    cramped.

7            So you all need to get there early enough to make

8    sure your accommodations are satisfactory.

9            MR. PASANO:  8:30 a good time, your Honor, or

10   sooner?

11           THE COURT:  Yeah, we'll be here at that early.  We

12   will not start until 9, but, you know, make sure you're as

13   comfortable as we can make you there.  If it doesn't work we

14   could come back up here, but as you can see, the technology

15   is a problem, sound's a problem.  And we then will have to

16   juggle competing commitments.

17           Okay.  Let's -- unless there is something we need

18   to do today, someone, Mr. McMillan is here for a change of

19   plea.

20           MR. McCORMICK:  Your Honor, we'll offer the

21   stipulation tomorrow.  It's all signed.

22           THE COURT:  Great.  Have a good night.

23           MR. McCORMICK:  Thank you.

24       (Recess at 4:57 p.m., until 9:00 a.m., September 11,

25   2008.)

1                    C E R T I F I C A T E

2        I, Karl Shires, Registered Professional Reporter, certify

3   that the foregoing is a correct transcript from the record of

4   proceedings in the above-entitled matter.

5        Dated this 5th day of February, 2009.

6

7   _____

    Karl Shires, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25