```
1                 UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
2

3    UNITED STATES OF AMERICA,        )  Case No.
                                      )  08-60014-CR-MIDDLEBROOKS
4                       Plaintiff,    )
                                      )
5              -v-                    )
                                      )
6    VINCENT F. ARTUSO, JOHN VINCENT  )
     ARTUSO, GREGORY ORR, ROBERT M.   )
7    GANNON, AND PHILIP EDWARD FORGIONE,)
                                      )
8                       Defendants.   )  West Palm Beach, Florida
                                      )  September 11, 2008
9    _____)  9:00 a.m.

10             Volume 2A of 17 - PAGES 1 - 143

11               TRANSCRIPT OF TRIAL PROCEEDINGS
            BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
12               U.S. DISTRICT JUDGE, AND A JURY


13
     Appearances:
14
     For the Government:        J. BRIAN MCCORMICK
15                              WILLIAM T. SHOCKLEY
                                Assistant United States Attorneys
16                              500 East Broward Boulevard
                                Fort Lauderdale, Florida  33394
17
     For the Defendant:         PETER VINCENT BIRCH
18   Vincent F. Artuso          Assistant Federal Public Defender
                                450 Australian Avenue, Suite 500
19                              West Palm Beach, Florida  33401

20   For the Defendant:         CARLTON FIELDS
     John Vincent Artuso        BY:  MICHAEL S. PASANO, ESQ.
21                              100 SE 2nd Street, Suite 4000
                                Miami, Florida  33131
22

23   Reporter:                  Karl Shires, RPR
     (561) 514-3728             Official Court Reporter
24                              701 Clematis Street, Suite 258
                                West Palm Beach, Florida  33401
25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1   Appearances: (Continued)

 2

     For the Defendant:          DAVID OSCAR MARKUS, ESQ.
 3   Gregory Orr                 ROBIN ELLEN KAPLAN, ESQ.
                                 169 E. Flagler Street, Suite 1200
 4                               Miami, Florida  33131

 5   For the Defendant:          ALLAN B. KAISER PLLC
     Robert M. Gannon            BY:  ALLAN BENNETT KAISER
 6                               111 NE 1st Street, Suite 902
                                 Miami, Florida  33132
 7
     For the Defendant:          ENTIN & DELLA FERA
 8   Philip Edward Forgione      BY:  ALVIN ERNEST ENTIN, ESQ.
                                 110 SE 6th Street, Suite 1970
 9                               Fort Lauderdale, Florida  33301

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  Please be seated.

 2              A little crowded over there?

 3              MR. BIRCH:  A little bit.

 4              MR. PASANO:  Judge, we're pretty sure that we're

 5   not going to ask for any more tables.  We think we've stolen

 6   every one we can.

 7              THE COURT:  Well, it looks like it will work.  I

 8   mean the equipment is better here.  I think the acoustics

 9   are.  And we won't have to worry about moving other things

10   around.  So if you all could make it work, let's do it this

11   way.

12              You decided against having people on the other

13   side?  That's what Angela had thought would work better, was

14   to have some people over --

15              MR. PASANO:  In the first row?

16              THE COURT:  No.  Along this side.

17              MR. PASANO:  It is the backs to the jury issue,

18   Judge.  It's awkward.  So we thought this gives us a better

19   flow with the clients.

20              THE COURT:  Okay.  Well, however you all want to do

21   it is fine with me.

22              Let me ask you, I didn't get any additional cases

23   on that question yesterday.  I guess I'm a little worried

24   about this statement, I know, the FBI is not after you,

25   they're after Mr. Artuso, as I understand was the statement
```

1    from the opening.  Why is that -- even if you assume that

2    there's some sort of conspiracy, ongoing conspiracy or effort

3    to conceal, which is not clear to me it is, but why is that

4    even in furtherance of a conspiracy?

5            MR. McCORMICK:  It is in furtherance of the

6    conspiracy to calm down Mr. Horton, who's just got approached

7    by the FBI and to dissuade him into not panicking and doing

8    something that would be contrary to the conspiracy, your

9    Honor.  That statement is directly, has direct bearing on

10   that.  And Mr. --

11           THE COURT:  And isn't it over?  Haven't they

12   already done all the projects?

13           MR. McCORMICK:  The conspiracy is not over when

14   that was -- when Mr. Horton was approached -- this conspiracy

15   has been ongoing.  As a matter of fact, it is ongoing since

16   January of '08.

17           THE COURT:  Well, what else was happening?  I mean

18   the four properties are bought.  What else?

19           MR. McCORMICK:  They're bought.  What's happening

20   is on a monthly basis the fraudulent lease payments were

21   being made, ADT was making these lease payments to the

22   governing LLCs in each particular case, and that was ongoing.

23   That was a payday for 15 years, your Honor.  And of course,

24   they are also talking about refinancing these properties and

25   cashing out.

```
 1              The record is going to be clear that they did cash

 2    out on Oak Brook.  Got about $900,000, and the plan was to

 3    cash out on the other properties too because of the heavy

 4    weight in terms of the equity because of the fraud committed

 5    on ADT.  It was an ongoing fraud from the point that the

 6    sales -- before the sales were made and when the leases were

 7    signed and when the payments were made.  Right up to January

 8    of '08 when we indicted the case.  And then the lease

 9    payments ceased.  So it is ongoing conspiracy at that point

10    on both particular predicate acts.

11              THE COURT:  And why is that in furtherance, that

12    statement?  It sounds like maybe it's wishful thinking more

13    than anything else, if that's what the statement said.  It's

14    speculation about why the FBI is looking at -- showed up at

15    your door, isn't it?

16              MR. McCORMICK:  Yes.  And the problem was the

17    coconspirators were fearful that that might trigger Larry

18    Horton to change his position and not go along with the

19    conspiracy.

20              THE COURT:  How does that reassure him, that

21    they're really not after you, they're after Artuso?

22              MR. McCORMICK:  Because if what he is telling them

23    is the ADT fraud is not in question here, they're after

24    Mr. Artuso, a totally different matter.  Relax.

25              THE COURT:  Why would they be there at his door
```

1    then, Horton's door, if they're after Artuso?  Other than the

2    ADT --

3              MR. McCORMICK:  That wasn't what the knock on the

4    door was.  That is what Mr. Orr told Mr. Horton, to assuage

5    him.

6              THE COURT:  So you think it comes in under 801 and

7    comes in against all defendants, is your position?

8              MR. McCORMICK:  Yes, your Honor.

9              THE COURT:  Let me hear from the defendants on

10   this.  Why doesn't it come in and if it does, who can it come

11   in against?

12             MR. BIRCH:  Your Honor, I have a copy of the United

13   States versus Magluta for the Court, if the Court wishes, 418

14   F.3d 1166 decided by the Eleventh Circuit 2005, July of 2005.

15   And Part 3 of that opinion, it goes exactly to the issue we

16   have here, a statement made --

17             THE COURT:  Well, that was a little different

18   because the bribe of the juror was over.

19             MR. BIRCH:  Well, the bribe of the juror was over

20   that's correct, but here the sales were over as well, the

21   transactions of the --

22             THE COURT:  How about his argument they're still

23   paying these mortgages or the leaseback payments.  As long as

24   that's going on.  It's a continuing conspiracy.

25             MR. BIRCH:  Well, even if that were true, the

```
 1   statement is certainly not in furtherance of any conspiracy,

 2   that that -- that has nothing to do with the leaseback

 3   payments, the statement, "They're not after you, they're

 4   after Artuso" I would submit is not furtherance of any

 5   conspiracy regarding the business transaction or the

 6   leaseback payments that are pretty much self-executing at

 7   this point.  That statement is in no way has any impact on

 8   the payment of the leases.

 9           THE COURT:  Well, to the degree it kept everybody

10   quiet --

11           MR. BIRCH:  We're talking several years after the

12   incident.  If they could show that there was some other

13   business transaction about to occur, that they were about to

14   close the next day on some business transaction involving the

15   lease back payment and then Horton indicates he doesn't want

16   to do it because the FBI knocked on his door, then I can see

17   it.

18           But if we're talking about transactions that

19   occurred years earlier that are going on by themselves

20   regardless of what anybody does, there's nothing else

21   happening and then several years after the business

22   transactions have been concluded, that the statement they're

23   not after you, they're after Artuso, is certainly not in

24   furtherance of any conspiracy involving those transactions.

25           THE COURT:  What about the threats in the lockup?
```

```
1    What's your position on those?

2            MR. BIRCH:  See, now that -- I would submit that's

3    not in furtherance of any conspiracy.  But the problem I have

4    there, I -- is it's allegedly a statement by Mr. Artuso.

5    That's a different situation.

6            THE COURT:  Okay.  Those are Artuso's statements?

7            MR. BIRCH:  That's what I heard from the opening.

8            THE COURT:  But apparently then --

9            MR. MARKUS:  We have an objection.

10           THE COURT:  All right.  And what's your answer to

11   that there've going -- on the threats in the lockup, do they

12   come in only against Artuso or who do they come in against?

13           MR. McCORMICK:  No, your Honor.  Our position is

14   they come in against all defendants.  Obviously against

15   Artuso under 801, a party.  But they come in against all of

16   the defendants.  This conspiracy --

17           THE COURT:  Why isn't Magluta on point with that

18   though?

19           MR. McCORMICK:  Because this superseding

20   indictment, Paragraph 33 of that particular indictment -- of

21   this indictment says expressly that.  That's the language of

22   the manner and means.

23           THE COURT:  But didn't Magluta say that if

24   concealment is enough, that that basically does away with any

25   kind of any -- end of any conspiracy or any statute of
```

```
 1    limitations, that it just opens the door to whatever is

 2    said --

 3              MR. McCORMICK:  That's unless --

 4              THE COURT:  -- ad infinitum.

 5              MR. McCORMICK:  That's correct.  But this is during

 6    the period of the conspiracy.  Your Honor, the Court is

 7    relating the conspiracy to the mail wire fraud.  This is an

 8    enterprise conspiracy.  Paragraph 33, which is also part of

 9    the original indictment that the defendants or coconspirators

10    would use their reputation to coerce and intimidate other

11    possible witnesses, that's right in the indictment.  It's

12    during the course of this indictment, or excuse me, during

13    the course of the conspiracy.

14              THE COURT:  Where is that?

15              MR. KAISER:  It does not name all of the defendants

16    in Paragraph 33.  It names two.

17              THE COURT:  Give me a second to find that.

18              MR. McCORMICK:  That's correct.  It's manner and

19    means of the conspiracy, though, your Honor.  That's pretty

20    graphically described in Paragraph 33, which was returned in

21    August of this year.

22       (Pause in Proceedings.)

23              MR. PASANO:  It's Page 19, your Honor.

24              THE COURT:  Okay.  Thank you.

25              Did you say everybody is not named, Mr. Kaiser?
```

1    Isn't everybody in 32?

2            MR. KAISER:  Thirty-three, there are only two

3    defendants specifically named in that act.

4            THE COURT:  Okay.  But 32 -- all right.  You're

5    saying assigned to prevent detection, and 33 is threats is

6    the point you're making.

7            MR. McCORMICK:  Your Honor, if I would just respond

8    to Mr. Kaiser.  These are the manner and means of conspiracy.

9    All coconspirators needn't be mentioned in every paragraph.

10   This is something that's done in furtherance and as part of

11   the conspiracy, therefore, it's applicable to all

12   coconspirators.

13           MR. KAISER:  I don't accept that, your Honor.

14   Under the Grunewald case, specifically the Supreme Court said

15   that in all conspiracies there is always some element of

16   concealment.  But the only way that could really be used

17   against all of the defendants is if the concealment is

18   specifically charged as part of the conspiracy.  Overt act

19   No. 33 does not specifically mention, name, charge my client

20   with any acts of concealment, threats, or anything.

21           So that would not be -- any statements would not be

22   admissible against Robert Gannon.

23           MR. McCORMICK:  Grunewald is exceptionally not on

24   point, your Honor.  That's outside the scope of the

25   conspiracy.  Ours is within the scope of the conspiracy, and

1   there is no case law that can be cited that would show

2   differently.

3          THE COURT:  All right.  I want to -- please don't

4   get into this with the witness until I read Grunewald.  I

5   haven't read that.  I read Magluta this morning and I've

6   asked that that be pulled, but I haven't read it yet.  I want

7   to look at that again.

8          So your position, Mr. Kaiser, is while it might

9   come in against Artuso and Orr, it doesn't come in against

10  your client.  Is that your position on this?

11         MR. KAISER:  Correct.  I'm saying unless it was

12  specifically charged that my client did anything to further

13  threats or concealment, it shouldn't come in against him.

14         MR. McCORMICK:  And your Honor, 32 does state that,

15  for all that's worth, your Honor.  Thirty-two and 33.  And I

16  would suggest to the Court that it wouldn't have to

17  specifically plead that language to be admissible.  But it is

18  pled and makes it all the more obvious that it should be

19  admissible.

20         MR. ENTIN:  Judge, with regard to Forgione, he is

21  in the same position there as is Gannon.  But I would go one

22  step further and that is, the alleged statement that they're

23  proffering as this threat is nothing more than a thank you

24  for not having flipped to this point.  It has nothing to do

25  about future.  And it relies totally on the subjective

1    interpretation of Mr. Horton, and it has nothing to do with

2    containing any overt threat or threat in futuro to keep the

3    thing quiet.

4            And I don't think you can take a subjective

5    approach by the witness and make that an overt act by any

6    defendant.  It has to be something more than thank you for

7    not saying anything to this point.

8            THE COURT:  Okay.  Well, stay away from lockup

9    discussions and the FBI, why the FBI is on the door until we

10   have a chance to discuss it further.

11           MR. McCORMICK:  We will, your Honor.

12           THE COURT:  I want to read through more.

13           MR. McCORMICK:  If I make one comment.

14           THE COURT:  Is the jury ready?

15           THE COURTROOM SECURITY OFFICER:  Waiting on one,

16   sir.

17           THE COURT:  I don't want to keep them waiting.  We

18   need to start on time, or we will be waiting for them the

19   rest of the trial.

20           MR. McCORMICK:  I'm just saying the burden for

21   what's in furtherance is part of the --

22           THE COURT:  We're going to hear further from you.

23           MR. PASANO:  And Judge, not to delay the jury.

24           THE COURT:  We're waiting on the jury.  Go ahead

25   and finish your comment then, Mr. McCormick.

13

```
 1              MR. McCORMICK:  What I was saying, your Honor, is

 2      the burden or the threshold that has to be satisfied, and

 3      we've cited cases to the Court in the prior motions,

 4      answering prior motions of the defendant, the threshold is

 5      very, very simply addressed in those cases.  And this would

 6      fully meet the threshold of what is in furtherance of a

 7      conspiracy to be admissible.  I would cite those cases.  I

 8      don't have those briefs because I didn't know this was going

 9      to be argued.

10              THE COURT:  We talked about it last night, that it

11      was going to be argued.

12              MR. McCORMICK:  Pardon me?  I'm talking about

13      the -- what the burden is in furtherance of the conspiracy,

14      your Honor.

15              THE COURT:  All right.

16              MR. PASANO:  Judge, there's one other wrinkle and

17      I'll identify it and when we have a chance, to argue it in

18      somewhat more detail.

19              I think Mr. McCormick is correct when he tells the

20      Court that the language of these two paragraphs is the same

21      as what was in the original indictment.  What that raises is

22      a question of whether or not this statement, which was not

23      available to the Government at the time of the original

24      indictment, it only became available after Mr. Horton pled

25      was, in fact, facts presented to the grand jury on which they
```

1    indicted.

2            In other words, once you start to go down the road

3    of whether this is or isn't an ongoing conspiracy with these

4    acts as part of it, it raises the question of whether that's

5    what the grand jury returned the indictment on and it might

6    require in camera review.  It raises the variance or

7    constructive amendment argument.  And on that basis as well

8    it becomes problematic.

9            MR. MARKUS:  And that's because Paragraphs 32 and

10   33 relate to the object of the conspiracy, which is to

11   supposedly obtain these properties by fraud.  Not to cover up

12   what had happened.  And so the manner and means, yes, states

13   generally about covering up, but it's related to the object

14   of the conspiracy.  This is a separate conspiracy now, this

15   supposed lockup conversation after they're arrested.

16           So I think the Court has to read the manner and

17   means in connection with the object of the conspiracy.

18           One other objection, Judge, I note that the

19   Government has two case agents today and we would object

20   under the rule and ask that the Government be limited to one

21   case agent in court.

22           MR. McCORMICK:  Your Honor, the rule is

23   sequestration of the witness.  The Government has not named

24   an agent yet.  Have we?

25       (Pause in Proceedings.)

1              MR. McCORMICK:  We didn't name him as being --

2   Mr. Hopewell is not going to be a witness in the case.

3   Ms. Beth Watts, Ms. Beth Watts may be a witness in the case.

4   And I guess for that reason we would name her as the designee

5   that would be exempt under 615.  She has to be operating the

6   sanctions.  She really doesn't have to qualify to operate the

7   sanctions, but we would --

8              THE COURT:  Operate what?

9              MR. McCORMICK:  The sanction apparatus or equipment

10  Ms. Watts will be operating, she is also one of the case

11  agents.

12             THE COURT:  You're saying sanctions, that's the

13  name of this?

14             MR. McCORMICK:  That's what they call it.  I don't

15  know why.  It's the -- using the CD ROM for the jury in terms

16  of pointing out different exhibits.

17             THE COURT:  All right.  Look, I don't --

18  particularly, if she's not going to be a witness, it's not an

19  issue.  Or he isn't going to be a witness --

20             MR. McCORMICK:  She well might be a witness, your

21  Honor.

22             THE COURT:  What is this debate really about?  Did

23  you work out their investigator issue?  I don't really see

24  how any of this is -- means a hill of beans, frankly.

25             MR. McCORMICK:  We will concede that.

```
 1              MR. MARKUS:  Okay.
 2              THE COURT:  All right.  Our jury is now here.
 3    Let's invite them in.
 4         (Jury in at 9:07 a.m.)
 5              THE COURT:  That's all right.  Just go on in.
 6    We're not going to worry too much about the order.
 7         (Pause in Proceedings.)
 8              THE COURT:  As you can see, we're a little more
 9    crowded down here, but hopefully, the equipment is going to
10    work a little better.
11         (Pause in Proceedings.)
12              THE COURT:  Okay.  Welcome back.  Please be seated.
13              And Mr. McCormick, if you'll please call your
14    witness.
15              MR. McCORMICK:  Your Honor, before that, the Court
16    please, I would like to introduce Special Agent Beth Watts of
17    the IRS.  She's one of the case agents and she will be
18    sitting in court, also.
19              THE COURT:  Welcome.
20              MR. SHOCKLEY:  Good morning, your Honor, ladies and
21    gentlemen.  We would like to call our first witness, Larry
22    Horton.
23              Mr. Horton, if you could please step through here.
24         WILLIAM LARRY HORTON, GOVERNMENT'S WITNESS, SWORN
25
```

```
 1                    DIRECT EXAMINATION

 2   BY MR. SHOCKLEY:

 3   Q    Mr. Horton, would you please state your name and spell

 4   your last name for the record.

 5   A    My full name is William Larry Horton.

 6   Q    What do you go by?

 7   A    I go by Larry.  Spelling the last name is H-O-R-T-O-N.

 8   Q    Your age?

 9   A    I hate to say, I'm 60.

10   Q    Okay.  Congratulations.  Just turned 60 this year?

11   A    Yes, sir.

12   Q    You were born where?

13   A    I was originally born in Lewisberg, Tennessee.

14   Q    Are you married?

15   A    Yes, sir.

16   Q    Children?

17   A    I have four boys.

18   Q    Any college education?

19   A    Yes, sir.  BS.

20   Q    In what?

21   A    Majored in finance, minored in economics and accounting.

22   Q    Now, you attended school in what state?

23   A    I attended high school in Arkansas.

24   Q    And where did you go after high school?

25   A    I went to Southern Baptist College, a junior college in
```

1    Walnut Ridge, Arkansas.

2    Q    Were your studies interrupted for some period of time?

3    A    I was drafted in 1968.  I reported to the US Army in

4    January of 1969.  Served in Vietnam, came back, served in

5    Lawton, Oklahoma, and was released December of '70.

6    Q    What was your unit in Vietnam?

7    A    Big Red One.

8    Q    And that's the First Infantry Division?

9    A    That's correct.

10   Q    Your role was what?

11   A    I carried a radio in the field for ten months.

12   Q    And you're combat?

13   A    Yes, sir.

14   Q    Now, when you returned after your stint in the US

15   military, you took a job where?

16   A    When I returned from the Army -- from Vietnam to Fort

17   Sill, Oklahoma, I had the opportunity to get into a program

18   called Project Transition, where I actually was still in the

19   military but I actually worked downtown for a finance

20   company.  It's called Project Transition.

21   Q    How was it that you were still in the military and

22   working for a private firm?

23   A    The Army wanted to try to transition military people

24   back into civilian employment, and that was their method of

25   doing that.

1    Q    Did there come a point in time when you were eventually

2    released and you started working for Ryder Truck Lines?

3    A    After -- after releasing from the military, I started

4    college in '71.

5    Q    I'm sorry.  That's when you finished college?

6    A    I finished college in 1973.

7    Q    Then you graduated with a major in finance and minor in

8    what?

9    A    Economics and accounting.

10   Q    And this was from what college?

11   A    Middle Tennessee State University in Murfreesboro,

12   Tennessee.

13   Q    Okay.  Now, tell us about your employment with Ryder

14   Truck Lines.  When roughly were you employed?

15   A    I started with Ryder Truck Lines immediately after

16   college.  It would have been in June.

17   Q    Of 1973?

18   A    In 1973.

19   Q    Did there come a point in time when -- well, what were

20   you doing with Ryder Truck?

21         MR. MARKUS:  Judge, objection.  This is a lot of

22   background material.  If we could just move it along.

23         THE COURT:  All right.  Overruled.

24   BY MR. SHOCKLEY:

25   Q    What did you do with Ryder Truck?

1  A    I was responsible for balancing freight; in other words,

2  loads of freight moving throughout the United States.

3  Q    Did there come a point in time when you left Ryder Truck

4  and went with ADT?

5  A    I did.  Ryder relocated me to Memphis, Tennessee, in

6  1974 to another larger operation, and I left Ryder in

7  approximately 1980 and went to work for ADT.

8  Q    At that time it was named American District Telegraph

9  Company; is that correct?

10  A    That's correct.

11  Q    Its name has changed a couple of times over the years?

12  A    Due to either acquisition or name change, correct.

13  Q    So in 1980 you started working for ADT.  What type of

14  work were you doing for ADT when you first started?

15  A    When I first started for ADT it was in sales, commercial

16  sales; car alarm, burglary alarm.  That was their program

17  back then to get into management.

18  Q    You said that you had been living in Memphis, Tennessee.

19  Is that where you started working with ADT?

20  A    Originally hired in Memphis with the understanding that

21  I would move to Greenville, South Carolina, and work in that

22  area.

23  Q    And did you move to Greenville, South Carolina?

24  A    I physically moved myself.  That was during the time

25  when interest rates on homes jumped up to 16 to 18 percent.

1  I couldn't sell my home in Memphis, so I had to resign and

2  move back to Memphis.

3  Q    But after resigning and moving back to Memphis, you were

4  eventually rehired by ADT; is that correct?

5  A    I was rehired back in Memphis about seven months later.

6  That's correct.

7  Q    When you were working with ADT in Memphis, you indicated

8  you were in commercial sales.  That would be commercial sales

9  regarding what?

10 A    It could have been fire alarm systems, smoke detector

11 systems, sprinkler systems, or security systems.

12 Q    Directing your attention to the period of 1982 to 1983,

13 did you have occasion to work for ADT in Chattanooga,

14 Tennessee?

15 A    After my training there in Memphis, I was relocated to a

16 branch in Chattanooga, which was a training facility for

17 management.  I stayed there approximately 12, 13 months.

18 Q    And what did your duties entail there?

19 A    Full operation.  Responsible for sales, service, and

20 installation of security systems.

21 Q    So you were the branch manager of that facility?

22 A    That's correct.

23 Q    Directing your attention to 1983 to 1987, did you work

24 for ADT in Louisville, Kentucky?

25 A    I was later relocated to Louisville, Kentucky.  Again, a

```
 1   larger branch.  Correct.

 2   Q    And you worked as what there?

 3   A    A general manager.

 4   Q    Again, you're responsible for sales services, servicing

 5   and monitoring, the whole thing; is that correct?

 6   A    The whole thing.  Yes, sir.

 7   Q    Now, directing your attention to approximately 1987, was

 8   ADT acquired by the Hawley Group Limited, a British company?

 9   A    That's correct.  Michael Ashcroft was the CEO of Hawley.

10   Q    Hawley, is that H-A-W-L-E-Y?

11   A    That's correct.

12   Q    Headquarters for ADT at that time were located where?

13   A    In Parsippany, New Jersey.

14   Q    For the record, is that P-A-R-S-I-P-P-A-N-Y?

15   A    That's correct.

16   Q    Okay.  Now, when -- were the headquarters, like,

17   relocated to Parsippany, New Jersey, from somewhere else?

18   A    Originally, we were in the Twin Towers.

19   Q    In New York City?

20   A    That's correct.  For probably 14 years.

21   Q    Now, you say "we."  You're talking about the company?

22   A    The company.

23   Q    But you, yourself, did not work in the Twin Towers; is

24   that correct?

25   A    No, sir.
```

1   Q    Okay.  Directing your attention now to 1988 to 1990, did

2   you have occasion to work for ADT in Kansas City, Missouri?

3   A    I was later asked to relocate to Kansas City, Missouri.

4   Q    You worked in the Kansas City, Missouri, office at ADT

5   as what?

6   A    A general manager.  Larger scope of responsibility.

7   Q    And this was a larger facility with more revenue?

8   A    That's correct.

9   Q    Directing your attention to 1990 to 1995, did you have

10  occasion to relocate to Hayward, California?

11  A    Correct.  I was asked again to relocate to California.

12  I physically moved in 1990 .

13  Q    Now, this place in Hayward, California, this facility --

14  first of all, where is that in reference to a larger city

15  that the jurors would know?

16  A    San Francisco is probably about 30, 34 miles outside of

17  Hayward.

18  Q    So in 1990 you relocated to Hayward, California.  What

19  was your title then with ADT?

20  A    Regional general manager.

21  Q    Was this a promotion?

22  A    Yes, it was.

23  Q    What did your duties entail as regional general manager

24  at the Hayward facility?

25  A    I then had several general managers reporting to me over

1    operations within Northern California.

2    Q    What type of work were you doing as a regional general

3    manager at ADT?

4    A    Responsible for P & L responsibility, sales, and also

5    the training of branch and general managers to run their

6    operations.

7    Q    And by "P & L" you're referring to what?

8    A    Profit and loss statement.

9    Q    What type of technology were you responsible for in that

10   facility?

11   A    The facility had monitoring facilities for alarms,

12   whether it be a burglary alarm or fire alarm, that came in to

13   our facility.  They were located there in Hayward, along with

14   Sacramento.  We had network responsibilities also for our

15   area in case a router went down, along with, obviously,

16   maintaining customer service of all of their technology.

17   Q    And at that point in time we're talking like 1990 to

18   1995, that time period, were there any changes in technology

19   regarding communicating with your agents who were out in the

20   field?

21   A    Northern California was one of the first facilities to

22   go fully laptop for service work orders back in 1990.

23   Obviously, I believe most of that was because of the

24   technology in California.  And that was later adopted by ADT.

25   Q    And could you explain that, what you mean by that

1   statement about laptops out in the field?

2   A    Prior to placing laptops in the field, a service request

3   was received from a customer to a monitoring facility, they

4   would handwrite it down or type it into a computer,

5   technician would then have to call in to get that work order.

6   By going laptop technology, the technician could then dial in

7   and get his work orders and actually close them out with the

8   repairs, so that we obviously didn't have to talk to an

9   individual.

10  Q    Now, you indicated that you're also responsible

11  for P & L or profit and loss.  How did that facility change

12  under your direction?

13  A    It went from actual loss, which is unusual for an

14  operation, when I got there, to being very profitable in five

15  years.

16  Q    Directing your attention now to 1995 to 1997.  Are you

17  still in Hayward, California?

18  A    Yes, sir.  I am.

19  Q    Were you promoted during those years?

20  A    I was promoted to vice president of operations.

21  Q    What are the duties of vice president of operations of

22  ADT?

23  A    There was a structural change during that period of

24  time.  Hawley obviously was more involved in our operation,

25  being ADT, and they decided to separate sales from the

1    responsibilities.  So you had one side, which was vice

2    president of operations, responsible for the installation of

3    service of a customer, and then you had obviously another

4    side over here, that was vice president of sales, responsible

5    for strictly sales.

6    Q    So, which side were you on?

7    A    Operations.

8    Q    Okay.  And as vice president of -- well, how many vice

9    presidents of operations were there for ADT in the United

10   States?

11   A    Five.

12   Q    And you were one of the five?

13   A    Correct.

14   Q    Now, directing your attention to that time period around

15   1995 to 1997, did ADT have occasion to relocate its

16   headquarters to Boca Raton, Florida?

17   A    Sometime in 1996 Hawley made a big change.  Certainly

18   got more involved in ADT.  They internally put one of their

19   people in as president.  His name was Steve Rezika

20   (phonetic).  Les Beraldi (phonetic) who had been the

21   president and CEO of ADT for probably 13 to 14 years, had

22   indicated that he was not going to relocate to Florida

23   because they were going to move the corporate headquarters

24   from Parsippany to Boca Raton, Florida.

25   Q    And what was the ADT new president's name?

1   A    Steve Rezika.

2   Q    Can you help us out with the spelling of that?

3   A    I wish I could.

4   Q    Okay.  That will go down as phonetic then.

5         Now, headquarters was now on the East Coast of the

6   United States in Boca Raton, Florida.  You're physically

7   located on the West Coast of the United States; is that

8   correct?

9   A    That's correct.

10  Q    As vice president of operations, who was your immediate

11  superior?

12  A    I reported to an executive vice president.  His name was

13  Brian McCarthy.

14  Q    He was the executive vice president of operations?

15  A    That's correct.

16  Q    And how many executive vice presidents of operations

17  were there in ADT?

18  A    One.

19  Q    Okay.  So then all of the five vice presidents of

20  operations around the country reported to that one

21  individual?

22  A    That's correct.

23  Q    Was he physically located in your facility or somewhere

24  else?

25  A    He was actually located at that time in Parsippany.

1  Q    Okay.  Did there come a point in time when there was an

2  internal corporate shakeup at ADT?

3  A    Sometime in the latter part of 1996, Mr. Rezika decided

4  that he was going to obviously clean out ADT.  In doing so he

5  had a meeting with Mr. Brian McCarthy in Chicago, indicating

6  that Mr. McCarthy would be leaving very shortly, along with

7  his five vice presidents of operations.

8  Q    And that would include you; is that correct?

9  A    That's correct.

10 Q    Eventually, it -- was Brian McCarthy released from ADT?

11 A    Correct.

12 Q    What about the other four directors -- vice president of

13 operations?

14 A    They were released very shortly.  I was the last one

15 left.

16 Q    And did your title change?

17 A    Not at that time.

18 Q    At some point in time did -- were you reassigned to work

19 in Boca Raton, Florida?

20 A    I commuted for a period of time between San Francisco

21 and Boca Raton, Florida.

22 Q    Now, you know, commuting across the entire country as

23 opposed to say Fort Lauderdale to West Palm Beach, that's

24 quite a big commute.  How did you manage to pull that off?

25 A    Very little sleep.

1   Q    How often would you be traveling back and forth across

2   the country?

3   A    I would try to stay down here at least seven days.  In

4   other words, I stayed through one week end and then go back

5   and take three days off.

6   Q    How long did that continue?

7   A    About two months.

8   Q    Were you supposed to be relocating your family and

9   moving here?

10  A    They had indicated they wanted me to, but obviously with

11  prior conversations, the intent all along was to restructure

12  us out.  I felt very uncomfortable relocating my family again

13  from California to Florida with this possibly still hanging

14  over my head, that I would be restructured out of the

15  company.  I chose not to relocate.

16  Q    And they chose to do what with you?

17  A    They gave me a severance package, very liberal severance

18  package.  Eighteen months.  Paid monthly, as long as I was

19  not employed by another security company.

20  Q    So then you could sit back and relax for 18 months

21  before you started working again, you would be paid your full

22  salary or partial salary?

23  A    Full salary and all medical benefits.

24  Q    But did you go out and seek other employment?

25  A    I went to work within three months.

1    Q    Okay.  And where did you start working?

2    A    I went to work for SecurityLink, which is a large at

3    that time security company that was owned by Ameritech, which

4    is a telephone communication company located up in Chicago.

5    Q    And what kind of -- exactly what kind of business did

6    SecurityLink do?

7    A    Same type as ADT, on a much smaller scale.

8    Q    So again --

9        (Pause in Proceedings.)

10   BY MR. SHOCKLEY:

11   Q    Okay.  Now directing your attention to SecurityLink.  It

12   handled the same type of technology that ADT did as far as

13   home and business burglar alarms, fire alarms, things of that

14   nature; is that correct?

15   A    That's correct.

16   Q    Also have monitoring sections where people would man it

17   and wait by the phone in case alarms went off?

18   A    That's correct.

19   Q    Now, you relocated then from California up to where?

20   A    Originally, I was going to relocate to Seattle.  We

21   visited Seattle, and my family was not happy with the area.

22   I asked if there was another location that I could work for

23   them, and they replied that I could move to Marietta,

24   Georgia.

25   Q    So after working in Seattle -- how long were you in

1    Seattle?

2    A    Probably about two months.

3    Q    What was your job with SecurityLink in Seattle?

4    A    Same type job as a regional general manager would have

5    been.  I had branch managers that reported to me, sales

6    service and installation.  I did not have a monitoring

7    facility.

8    Q    But you were a new hire, but you still were regional

9    general manager?

10    A    Correct.

11    Q    Then you relocated to Marietta Georgia you say?

12    A    Correct.

13    Q    When did that take place roughly?

14    A    That would have been sometime in June or July of 1997.

15    Q    And you were released from ADT when?

16    A    I believe it was in February of 1997.

17    Q    So in February of 1997 you were released from ADT, then

18    you go to SecurityLink in Washington for a few months, and

19    then to Marietta, Georgia, in approximately what month?

20    A    I believe it was somewhere in June or July.

21    Q    What was your -- of 1997?

22    A    Correct.

23    Q    Where was your family living at that time, Mr. Horton?

24    A    In the same home in Pleasanton, California, that we had

25    been there since 1990.

```
 1    Q    So you were working at Marietta -- at SecurityLink in
 2    Marietta, Georgia.  You're living then here on the Eastern
 3    Coast or out in -- commuting again from --
 4    A    I'm actually living in Marietta, Georgia, and my family
 5    is in Northern California.
 6    Q    Did there come a point in time when they moved to
 7    Marietta, Georgia?
 8    A    That would have been shortly during that same period of
 9    time, June or July.
10    Q    How long did you work at SecurityLink in Marietta,
11    Georgia?
12    A    I left them in November of 1997.
13    Q    And why?
14    A    I received a call sometime in October from the new
15    president.  Mr. Rezika, did not make it as president.  During
16    that period of time Tyco had acquired ADT.
17    Q    In 1997?
18    A    Yes, sir.
19    Q    So Tyco International Limited was a company that took
20    over, merged with; how did that take place?
21    A    Hawley was incorporated in Bermuda.  When they bought
22    ADT, ADT became a Bermuda-based company.  Tyco was registered
23    in the United States.  It was a reverse acquisition with a
24    name change.  In other words, ADT bought Tyco and then there
25    was a name change back to Tyco.
```

1    Q    So the net result of this was what?

2    A    Tyco then became an island-based incorporated company.

3    Q    The chairman and chief executive officer of Tyco was

4    who?

5    A    Dennis Kozlowski.

6    Q    For the record, that's K-O-Z-L-O-W-S-K-I?

7    A    Correct.

8    Q    Now, you indicated that you were rehired by the new

9    president.  Who was the new president of ADT in 1997 after

10    Tyco and ADT merged?

11    A    Mr. Mike Snyder.

12    Q    S-N-Y-D-E-R?

13    A    Correct.

14    Q    Had you known Mike Snyder before?

15    A    Yes.

16    Q    For how long?

17    A    Approximately 15, 18 years.

18    Q    And what had been his role at ADT before?

19    A    He originally was a branch manager, as I.  He was

20    located in Cincinnati.  I was in Louisville.  We had

21    obviously communicated back and met on certain occasions to

22    discuss ADT business.

23    Q    Who is Jeff Ahrenstein?

24    A    Jeff Ahrenstein originally worked for Hawley as an

25    auditor.  He came in to audit different locations that were

1  doing extremely bad for Hawley when they made the acquisition

2  of ADT.  I got to know Jeff.  Jeff later -- when Hawley sold

3  to Tyco, Jeff became CFO for ADT.

4  Q    Now, CFO, that's chief financial officer; is that

5  correct?

6  A    That's correct.

7  Q    So you knew both Jeff Ahrenstein, the chief financial

8  officer, as well as Mike Snyder, the new president of ADT; is

9  that correct?

10  A    That's correct.

11  Q    So you received a call.  Do you recall which one it was

12  that initially made contact with you?

13  A    Both.  They called me on a conference call.

14  Q    Okay.  And at that time you had put in less than one

15  year with SecurityLink; is that correct?

16  A    That's correct.

17  Q    Did you travel down to Boca Raton to meet with

18  Mr. Snyder and Mr. Ahrenstein?

19  A    I did.  Within the month of October I met them at a

20  restaurant.  We obviously discussed my possibility of coming

21  back; my responsibilities, salary, and title.

22  Q    Your job title would be what?

23  A    Vice president of implementation and -- planning and

24  implementation.

25  Q    As vice president of planning and implementation, what

1  would your duties entail at ADT?

2  A    Pretty much responsible for all corporate functions

3  related to purchasing telecommunications.  Biggest challenge

4  they wanted me to get involved in is since Parsippany

5  corporate office was moving to Boca, there was thousands of

6  leases out there and bills that nobody knew who and what, and

7  they wanted me to clean it up.

8  Q    So your duties would entail expenses related to

9  communications, network trafficking, the T1 and T3 lines I

10  believe you referred to earlier?

11          MR. KAISER:  Objection to counseling testifying.

12          THE COURT:  Overruled.

13  BY MR. McCORMICK:

14  Q    Is that correct?

15  A    That's correct.  Network.

16  Q    And network meaning?

17  A    Telecommunications.  It would be business lines, fax

18  lines, T1s, T3s, DSL.  Anything related to tying in alarm

19  systems and communication.

20  Q    Were you happy to return to ADT?

21  A    Yes and no.

22  Q    And why was that?

23  A    Again, it was a big responsibility, something new,

24  challenging.  So, you always have, I guess you would call,

25  stomach issues taking on a new challenge.  Yes, I was glad to

1    be back with ADT.

2    Q    When was it that you relocated from Marietta, Georgia,

3    down to Florida?

4    A    The house in Parkland was completed sometime in August,

5    and we moved in close to that date of 1998.

6    Q    You started working when at ADT in South Florida?

7    A    November of '97.

8    Q    Where did you live between the time that you began

9    working at ADT in South Florida and the time that your house

10    was completed in 1998?

11    A    ADT had secured an apartment for me on Military, towards

12    the end of Military and Clint Moore, and I stayed in that

13    apartment until we relocated to Parkland.

14    Q    And the expenses were covered by ADT; is that correct?

15    A    Yes, sir.

16    Q    What about the expense of the move of your family from

17    Marietta, Georgia, down to the Boca Raton area in --

18    A    Fully paid for by ADT.

19    Q    Okay.  ADT at that time was located where in Boca Raton?

20    A    They were located off of Clint Moore in a small facility

21    there.

22    Q    Eventually, did that change?

23    A    Due to the corporation moving the headquarters from

24    Parsippany, more space was needed.  ADT secured a swap with

25    Grace who was located on Military in a ten-story facility.

1    They moved to our building because, obviously, they had some

2    issues, needed a smaller facility, we needed a larger one.

3    And I was responsible for that transition.

4    Q    And eventually, they moved again; is that correct?

5    A    They eventually moved to New Jersey and combined into

6    one of their businesses up there.

7    Q    What about ADT, did it move again?

8    A    We're still located in the old Grace building, which is

9    now called the Tyco Building.

10   Q    And the address is what?

11   A    One Boca Raton, I believe.

12   Q    Then did there come a point in time that -- well, let me

13   show you Government's Exhibit 1.1.

14         MR. SHOCKLEY:  Your Honor, we also have a

15   stipulation I would like to present to the Court concerning

16   various records.  Could I pass it up to the Court?

17         THE COURT:  All right.  A stipulation, as we -- I

18   think we may have mentioned earlier, is an agreement between

19   the parties.

20         MR. SHOCKLEY:  Can I read that into the record,

21   your Honor, after you've reviewed it?

22         THE COURT:  Certainly.

23       (Pause in Proceedings.)

24         THE COURT:  Go ahead.

25         MR. SHOCKLEY:  Thank you, your Honor.  The

```
 1   stipulation among all counsel here, counsel for the

 2   defendants, and counsel for the Government, reads as follows:

 3            "United States of America through its undersigned

 4   attorneys, and defendants Vincent F. Artuso, John Vincent

 5   Artuso, Gregory Orr, Robert M. Gannon, and Philip Edward

 6   Forgione, through their undersigned attorneys hereby

 7   stipulate and agree that the following trial exhibits are

 8   authentic and admissible as business records in evidence at

 9   trial pursuant to Rules 901 and 803(6) of the Federal Rules

10   of Evidence.

11            "It is understood that the defendants may make

12   objections to any of the exhibits included in this

13   stipulation as to relevancy."

14            MR. MARKUS:  There are a couple more words.

15            MR. SHOCKLEY:  I believe there are a couple more

16   words on the original copy.  Apparently, I was given the

17   wrong copy.

18            THE COURT:  It says "relevancy, 403, or other

19   grounds."

20            MR. SHOCKLEY:  Thank you, your Honor.

21            The exhibit numbers are:  Government's Exhibit

22   No. 1, records provided by ADT Security Services,

23   Incorporated.  No. 11, records provided by Bank Atlantic.

24   Exhibit 12, records provided by Colonial Bank.  Exhibit 13,

25   records provided by Gulfstream Business Bank.  Government's
```

```
 1    Exhibit 14, records provided by Penn Security Bank and Trust

 2    Company.  Government's Exhibit No. 16, records provided by

 3    SunTrust Bank.  Government's Exhibit -- did I say 15?  That's

 4    15.  Government's Exhibit 16, records provided by TCF

 5    National Bank.

 6            Government's Exhibit No. 17, records provided by

 7    Washington Mutual.  Government's Exhibit 18, records provided

 8    by Wachovia Bank.  Government Exhibit No. 19, records

 9    provided by JP Morgan Chase Bank.  And Government Exhibit No.

10    20, records provided by American Express.

11            Thank you, your Honor.

12    BY MR. SHOCKLEY:

13    Q    Now, the first item on that stipulation was Government's

14    Exhibit No. 1, records provided by ADT.  I'm showing you now

15    Government's Exhibit No. 1.1.

16            THE COURT:  I wonder if we -- since it looks like

17    you've got agreement on many of these documents, I wonder if

18    you can show the document to your opposition, both ways.  If

19    there is no agreement, then just go ahead and put it on the

20    screen and go forward.  If there is disagreement, then he

21    will have to lay an evidentiary predicate.  Is that

22    acceptable?

23            MR. MARKUS:  They can just put it on the screen,

24    Judge.  We'll object if there is an objection.

25            MR. PASANO:  For example, 1.1, we have no objection
```

```
 1   to.
 2              THE COURT:  Okay.  Why don't we do that, and we
 3   might be able to speed-line things.
 4              MR. SHOCKLEY:  Yes, your Honor.
 5        (Pause in Proceedings.)
 6              MR. SHOCKLEY:  Your Honor, I have a Government's
 7   Exhibit list.  I had a Government's Exhibit list for the
 8   Court.
 9   BY MR. SHOCKLEY:
10   Q    Mr. Horton, at any point in time -- I'm going to just
11   lay these documents down here on what's called the ELMO, some
12   kind of display device, and see if it works.  And if you have
13   any problems reading it, just ask me and I'll bring it, with
14   the Court's permission, to you to examine it yourself.
15   A    All right.
16   Q    Showing you now Government's Exhibit 1.1, it says "New
17   Employee Data Record" at the top.
18        (Pause in Proceedings.)
19              THE COURT:  All the screens working for the jury?
20        (Pause in Proceedings.)
21              MR. SHOCKLEY:  Your Honor, I have a Government
22   Exhibit list for the Court.
23              THE COURT:  All right.
24              MR. SHOCKLEY:  If I can pass that up.
25              THE COURT:  Surely.
```

BY MR. SHOCKLEY:

Q    Okay.  Mr. Horton, directing your attention to
Government's Exhibit 1.1, and at the top of the document it
bears the notation "New Employee Data Record" and your name,
"William Larry Horton."

A    Correct.

Q    The -- is this in your handwriting?

A    Yes, it is.

Q    Okay.  I want to direct your attention down -- of
course, it lists your address along here.  In case of
emergency, Janie Marie Horton.  That's your wife; is that
correct?

A    That's correct.

Q    Farther down it says "Personal data."  It says, "Have
you ever been employed here before?"  You've got "yes"
checked off.  You give the dates 9/1/80 to 6/12/97; is that
correct?

A    That's correct.

Q    How does that jibe -- excuse me, J-I-B as in Bravo-E --
how does that jibe with your testimony about the SecurityLink
moving from Seattle and everything?  What do these dates
represent, roughly?

A    These show my residence changing from Pleasanton,
California, to Marietta, Georgia, as far as my permanent
address.

1    Q    Okay.  But roughly, you've been working for ADT since

2    9/1/1980; is that correct?

3    A    The date gets a little confusing because I left

4    Greenville, South Carolina, they bridged time there and then

5    my leaving California, and then they're going to bridge time

6    there.  So sometimes the date, start date gets confusing with

7    myself and HR.

8    Q    Okay.  But, in fact, you had been -- during some of

9    those months, early months of 1997, you had been working at

10   SecurityLink; is that correct?

11   A    That's correct.

12   Q    And you referred to "bridge date."  Is that something

13   like a service computation date where you're trying to figure

14   out the total amount of time you have with the company?

15   A    That's correct.

16   Q    You have, "List any friends or relatives working for

17   us," and you circled "friends," and you list among your

18   friends Jeff Ahrenstein, Mike Snyder?

19   A    Phil Neal.

20   Q    And you have a relative, Ronnie Horton.  Who is Ronnie

21   Horton?

22   A    He's my only brother.

23   Q    He worked for ADT?

24   A    He did for a period of time.  That's correct.  In

25   Atlanta.

1    Q    Now initially, when you come back to ADT in 1997, did

2    you also have occasion to enroll in the profit sharing

3    savings plan with ADT?

4    A    Correct.  I had to redo all of the documents again on

5    the rehire.

6    Q    Had you been participating in that before you left ADT?

7    A    Ever since I first started with the company.

8    Q    I want to show you now Government's Exhibit 1.6.

9            I'm going to put this on the ELMO display device

10   again.

11           THE COURT:  Are you seeking to admit these as

12   you --

13           MR. SHOCKLEY:  Your Honor, they were admitted by

14   stipulation.  These are all Government Exhibit No. 1 series.

15           THE COURT:  Is that your all's understanding?

16           MR. PASANO:  No.

17           MR. MARKUS:  No.

18           MR. PASANO:  I think the understanding is they're

19   authentic and business records but may be subject to

20   objection, and we'll object as we go.  I don't believe we

21   object to 1.2.

22           MR. MARKUS:  Correct.

23           THE COURT:  So 1.1 -- at some point just ask to

24   admit them, and we'll go ahead and make sure the record is

25   clean then.

1          MR. SHOCKLEY:  Very well.

2          THE COURT:  So 1.1 is in?  Without objection.

3          MR. PASANO:  Yes.

4          MR. SHOCKLEY:  1.6 and 1.1.

5          THE COURT:  Okay.  1.1 and 1.6 are admitted.

6      (Received in evidence Government's Exhibit(s) 1.1 and

7  1.6.)

8  BY MR. SHOCKLEY:

9  Q    Government's Exhibit No. 1.6, ADT Enrollment Form, it

10  says on the form at the top.  And if you zoom in at the very

11  top, it says "Enrollment Form, Profit Sharing and Savings

12  Plan"; is that correct?

13  A    That's correct.

14  Q    Oh.  And it lists under there a bridge date, too,

15  11/17/97.  That reflects what?

16  A    That would reflect the date I actually started back,

17  rehire with ADT.

18  Q    And the profit sharing and savings plan, can you explain

19  for the ladies and gentlemen of the jury exactly what that

20  was?

21  A    It was a contribution that the company matched.  You had

22  to contribute so much for them to match, depending on the

23  dollar amount.  It shows that I was in for the full amount

24  for after-tax and before-tax contribution.

25  Q    Four percent of your salary?

1    A    Of each.

2    Q    And you also have an investment choice.

3    A    Correct.

4    Q    And so whatever money you were putting into the plan,

5    you could choose what investment you wanted to place that

6    money in; is that correct?

7    A    That's correct.

8    Q    What did you choose?

9    A    I chose stock.  Fully invest all of my contributions and

10   the company's contributions into stock.

11   Q    Which stock?

12   A    ADT.

13   Q    Now, you have 100 percent written next to "A," ADT

14   Limited Fund, on the form; is that correct?

15   A    That's correct.

16   Q    So all of the money for your profit sharing and savings

17   plan was then in ADT stock; is that correct?

18   A    From that date of purchase, that's correct.

19   Q    Now, I would like to show you Government's Exhibit 1.5.

20           MR. SHOCKLEY:  And we would offer Government's

21   Exhibit 1.5.

22           THE COURT:  Without objection, 1.5 is admitted.

23      (Received in evidence Government's Exhibit(s) 1.5.)

24           MR. SHOCKLEY:  Government's Exhibit 1.5.  It's

25   offered, your Honor.

1          THE COURT:  1.5 I think has been admitted.

2   BY MR. McCORMICK:

3   Q    Showing you on the ELMO display device the document.

4   It's entitled at the top "Tyco, Employee Stock Purchase Plan

5   Enrollment and Change Form."  Now, this has the word "Tyco"

6   at the top as opposed to "ADT."

7   A    Correct.

8   Q    And in 1997 what had happened?

9   A    Tyco had made the acquisition of ADT from Hawley

10  Limited.

11  Q    Now, this is labeled "Tyco Employee Stock Purchase Plan

12  Enrollment and Change Form."  How did that -- how does this

13  form differ from the last form we saw?

14  A    This is totally separate from a 401 program, where you

15  can actually purchase Tyco stock, rather than ADT stock, now

16  it's Tyco stock, outside of the 401 program.

17  Q    So on this form it reflects that you were purchasing how

18  much Tyco stock?

19  A    Well, I was contributing $250 per pay period, which was

20  every two weeks, to buy stock.

21  Q    Now, as a stockholder in ADT, what is your desire about

22  the profitability of Tyco and ADT?

23  A    The more profitable they are on earnings and cash,

24  the -- hopefully, the stock will certainly go higher.

25  Q    So it was in your own vested interest to make money for

```
 1   ADT and Tyco; is that correct?

 2   A    Absolutely.

 3   Q    Now, would selling ADT property for less than its fair

 4   market value and bringing in less cash, would that somehow

 5   help the financial status of ADT and its stockholders?

 6            MR. MARKUS:  Objection.  Leading, Judge.

 7            THE COURT:  Overruled.

 8   BY MR. SHOCKLEY:

 9   Q    You may answer.

10   A    No, sir.

11   Q    Now, you indicated that you were living in an apartment

12   on Military Trail in Boca Raton for approximately how long?

13   A    From November of -- sometime in November of '97 to

14   sometime in August of '98.

15   Q    Is that when you moved your family down from Marietta,

16   Georgia, to Parkland, Florida?

17   A    That's correct.

18   Q    You said that you were having a home built, or was it

19   already built?

20   A    Toll Brothers (phonetic) built the home in Parkland.  It

21   was being built.

22   Q    Directing your attention to Government's Exhibit

23   No. 1.2.

24            MR. SHOCKLEY:  We would offer it into evidence,

25   your Honor, Government's Exhibit 1.2.
```

1          THE COURT:  Without objection 1.2 is admitted.

2       (Received in evidence Government's Exhibit(s) 1.2.)

3   BY MR. SHOCKLEY:

4   Q    It says "personnel data maintenance form."  In the lower

5   right-hand corner it says "change of address only."  Upper

6   right-hand corner it says -- at least the date of this form

7   is -- on the form is, excuse me, 9/10/1998; is that correct?

8   A    That's correct.

9   Q    And it shows an address of 6547 Northwest 104 Terrace in

10  Parkland, Florida, 33076.  Is that the new home you were

11  moving your family into?

12  A    Correct.

13  Q    Showing you now Government's Exhibit 37.1.

14         THE COURT:  37.1 is admitted.

15      (Received in evidence Government's Exhibit(s) 37.1.)

16         MR. SHOCKLEY:  We would offer it.

17         THE COURT:  It's admitted without objection.

18  BY MR. SHOCKLEY:

19  Q    Is that the home you moved your family into?

20  A    Yes, sir.

21         MR. SHOCKLEY:  Government's Exhibit 37.2.  Offer it

22  in evidence, your Honor?

23         MR. MARKUS:  Judge, I'm not sure why we need three

24  different photos of Mr. Horton's home.

25         THE COURT:  Well, we'll look at them more quickly

1    than we'll debate it.  37.2 is admitted.

2              MR. SHOCKLEY:  Thank you, your Honor.

3          (Received in evidence Government's Exhibit(s) 37.2.)

4    BY MR. SHOCKLEY:

5    Q    View of a different side of the house?

6    A    That's my home.

7    Q    See there's a 'Vette parked in the garage; is that

8    correct?

9    A    Yes, sir.

10   Q    Is that your Corvette?

11   A    Yes, sir.

12   Q    You purchased that when?

13   A    October of 1998.

14   Q    So you moved down to South Florida, ADT paid for your

15   move, you purchased a new home, and a new 'Vette; is that

16   correct?

17   A    That's correct.

18   Q    Were you making a pretty good salary at ADT at that

19   time?

20   A    Yes.

21   Q    Showing you Government's Exhibit 37.3.

22             MR. SHOCKLEY:  We would offer that as well, your

23   Honor.

24             THE COURT:  37.3 is admitted.

25

1        (Received in evidence Government's Exhibit(s) 37.3.)

2    BY MR. SHOCKLEY:

3    Q    This another view of the house, of your house; is that

4    correct?

5    A    That's correct.  That's the rear of the home.

6    Q    Now, also in that same neighborhood who else resided?

7    Did there come a point in time when you met Gregory Orr?

8    A    Yes.

9    Q    Do you see Mr. Orr in the courtroom?

10   A    Yes, I do.

11   Q    Can you please identify him?

12        MR. MARKUS:  This is Mr. Orr.  We have no

13   objection, Judge.

14        MR. SHOCKLEY:  Let the record reflect, your Honor,

15   that the witness has identified, and for the record, the

16   defendant Gregory Orr.

17   BY MR. SHOCKLEY:

18   Q    Was he one of your neighbors?

19   A    Yes, he was.

20   Q    Where did he live in reference to where you lived?

21   A    Approximately one street over.  You had to go by Greg's

22   home to get to my home.

23   Q    Showing you now Government's Exhibit 37.4.

24        MR. SHOCKLEY:  We would offer that into evidence,

25   your Honor.

```
 1              MR. MARKUS:  No objection.

 2              THE COURT:  37.4 is admitted.

 3         (Received in evidence Government's Exhibit(s) 37.4.)

 4    BY MR. SHOCKLEY:

 5    Q    Is this a MapQuest map or diagram of the neighborhood

 6    that you resided in?

 7    A    Yes, it is.

 8    Q    Zoom in farther, there is a star placed on the map.  How

 9    does that star and that dot jibe with where your home was

10    located?

11    A    It needs to be a little bit closer to the corner.  My

12    home is right there on the corner, when you turn right into

13    that cul-de-sac.

14    Q    Actually, the dot is in the middle of the street there,

15    and your house is not in the middle of the street, right?

16    A    No, sir.

17    Q    Could you take a pen and actually put on this map

18    exactly where your house is located?  I'm going to give you a

19    red pen so it would be easier to see.  Just put "LH --"

20    A    Okay.

21    Q    -- where the -- your house is located?

22              MR. MARKUS:  Judge, if it will speed it along, I'll

23    stipulate that these two men were neighbors.

24    BY MR. SHOCKLEY:

25    Q    So your house is located on the corner.  Now, you
```

```
 1   indicated that in order to get into where your house was you

 2   actually had to pass by Gregory Orr's residence; is that

 3   correct?

 4   A    The most closest route to get to my home, correct.

 5   Q    Showing you now Government's Exhibit No. 38.4.

 6            MR. SHOCKLEY:  We would offer into evidence, your

 7   Honor, Government's Exhibit 38.4.

 8            MR. MARKUS:  No objection.

 9            THE COURT:  38.4 is admitted.

10      (Received in evidence Government's Exhibit(s) 38.4.)

11   BY MR. SHOCKLEY:

12   Q    Also a MapQuest diagram.  This is also the same

13   neighborhood in Parkland, Florida; is that correct?

14   A    That's correct.

15   Q    Now, as you zoom in on this, it looks like there's a

16   star and a dot on that diagram as well; is that correct?

17   A    That's correct.

18   Q    Does that depict where Gregory Orr's house was?

19   A    No.

20   Q    Could you mark in on this diagram exactly where his

21   house is located?

22   A    Yes.

23   Q    Also taking the red pen, could you mark on this diagram

24   "GO" for where Gregory Orr's house was located?

25   A    (Witness complies.)
```

1    Q    Thank you.  Showing again on the ELMO, could you -- when

2    you would come into your neighborhood, what street would you

3    take?

4    A    You would turn right there on 105th Lane that came

5    across, and then you would make another right there on

6    Northwest 66th Street, which would take you by Greg's home,

7    bearing around to your right, taking your first left, and

8    then coming in off the -- Northwest 65th Drive is my side

9    driveway to my garage.

10   Q    Showing you now Government's Exhibit -- by the way,

11   during the course of the next several years did you have

12   occasion to socialize with Gregory Orr and his wife?

13   A    I'm sorry?  Could you repeat?

14   Q    After you eventually met Greg Orr, did you have occasion

15   to socialize with him and his wife?

16   A    Yes.

17   Q    Did you have occasion to go over to their residence?

18   A    Yes.

19   Q    Did they live at two separate residences eventually in

20   the same neighborhood, generally?

21   A    Yes.

22   Q    Showing you now Government's Exhibit No. 38.1, 38.2, and

23   38.3.  I ask you if you can identify these.

24           MR. MARKUS:  Judge, just to clear up, Mr. Orr and

25   his wife never lived at two separate residences.  I think

```
 1    that question was confusing.

 2              MR. SHOCKLEY:  I'll rephrase it, your Honor.

 3    BY MR. SHOCKLEY:

 4    Q    Did they move from one residence into another residence

 5    in the same neighborhood?

 6    A    Repeat.  He was --

 7    Q    Did -- well, let's show you.

 8              MR. SHOCKLEY:  We would offer into evidence, your

 9    Honor, Government's Exhibit 38.1, 2, and 3.

10              MR. MARKUS:  Objection, your Honor.

11              THE COURT:  Basis?

12              MR. MARKUS:  Relevance and 403 grounds and other

13    grounds.  This is inappropriate.

14              THE COURT:  Could I see -- this is a picture of the

15    house.  Is that what this is?

16              MR. MARKUS:  Mr. Orr's house.

17              THE COURT:  Can I see the picture?

18              You want to tell me anymore about your problem?  I

19    mean, it looks like a picture of a house.

20              MR. MARKUS:  That's what it is, your Honor.  But

21    it's not relevant to this case.

22              THE COURT:  The objection is overruled.  What are

23    the numbers again?

24              MR. SHOCKLEY:  Government's Exhibit 38.1, 38.2, and

25    38.3.
```

1          THE COURT:  Those are admitted.

2      (Received in evidence Government's Exhibit(s) 38.1, 38.2,

3  and 38.3.)

4  BY MR. SHOCKLEY:

5  Q    Showing you 38.1, does that depict Greg Orr's house

6  where he lived at the time you initially moved into Parkland?

7  A    Yes, sir.

8  Q    And 38.2, does that also depict his residence?

9  A    Yes.

10  Q    And 38.3, does that also depict his residence?

11  A    Yes.

12  Q    And if you zoom in there, you can see the numbers 10571

13  on one of the columns in front of the house.  Was that the

14  street address of Mr. Orr's residence at the time you

15  initially moved into the Parkland area?

16  A    Yes.

17  Q    How was it that you came to meet Gregory Orr?

18  A    I met Gregory through my wife meeting his wife Janine.

19  Q    Was that at the bus stop?

20  A    It was a bus stop in front of their home, and the wives

21  in the morning would have children out there.

22  Q    And did you have school-age kids at that time?

23  A    I had two.

24  Q    They were in roughly what ages at that time?

25  A    Lance was a junior at that time, and Carrington would

```
 1   have been in fourth grade -- third grade.  Third grade.

 2   Q    As a result of the wives meeting, you eventually came to

 3   know Mr. Orr as well as his wife; is that correct?

 4   A    Yes, I did.

 5   Q    Now, Mr. Orr and his wife occasionally would have social

 6   functions at their house; is that correct?

 7   A    That's correct.

 8   Q    Tell us the general nature of the social functions that

 9   you attended with Mr. and Mrs. Orr?

10   A    I think the first one was possibly a Christmas holiday

11   function, and later, there was summer parties or --

12   Q    On those occasions, would you have occasions to meet

13   additional neighbors from the neighborhood?

14   A    There would be quite a few friends there.

15   Q    And neighbors as well?

16   A    And neighbors also.

17   Q    And you and your wife, you were the new ones on the

18   block, so to speak, in that neighborhood; is that correct?

19   A    I think we both were pretty new to that neighborhood.

20   Correct.

21   Q    Did there come a point in time when you had occasions to

22   speak with any of Mr. Artuso's business associates?

23           MR. PASANO:  I think he misspoke, your Honor.

24   BY MR. SHOCKLEY:

25   Q    Excuse me.  With Mr. Orr's business associates.
```

1    A    It was a Christmas function, I believe.

2    Q    Describe the circumstances.

3    A    Shortly before Christmas holidays we were invited to a

4    function, and there, I met Vinnie Artuso, Johnny Artuso.    I

5    believe Mr. Robert Gannon was there, and certainly, a bunch

6    of the neighbors.

7    Q    How were they introduced to you?

8    A    Just introduced.

9    Q    Okay.  You see Vincent Artuso in the courtroom?

10    A    Yes, I do.

11    Q    Can you please identify him?

12    A    Sitting next to me.

13            MR. SHOCKLEY:  Let the record reflect the witness

14    has identified the defendant Vincent Artuso.

15    BY MR. SHOCKLEY:

16    Q    Do you recognize John Artuso in the courtroom?

17    A    Yes, I do.

18    Q    Can you please indicate -- is he the gentleman that just

19    stood up?

20    A    Correct.  David -- correct.  Next to David.

21    Q    Okay.  Next to David Markus?

22    A    Correct.

23            MR. SHOCKLEY:  Okay.  Let the record reflect the

24    witness has identified the defendant John Artuso.

25

BY MR. SHOCKLEY:

Q    And you see Robert Gannon in the courtroom?

A    Yes, I do.  Down at the end of the table.

Q    Okay.  The gentleman who just nodded to you?

A    That's correct.

          MR. SHOCKLEY:  Let the record reflect the witness

has identified the defendant Robert Gannon.

BY MR. SHOCKLEY:

Q    What type of festivity was this that you first met them?

A    It was basically fish, all different types of fish that

was provided for the guests.

Q    Was there any kind of a name for the holiday?

A    I -- I wouldn't -- I don't remember the name of the type

holiday it was.

Q    Okay.  Was it -- did there come a point in time -- what

was Mr. Artuso doing when you first saw him, Vincent Artuso?

          MR. PASANO:  Can we have a date, your Honor?

BY MR. SHOCKLEY:

Q    Directing your attention to -- you said it was around

Christmas.  Of what year?

A    I believe it was in 1998.

Q    Okay.  Shortly after you moved into the neighborhood; is

that correct?

A    Correct.

Q    What was Mr. Vincent Artuso doing when you first saw him

1    at this festivity?

2    A    He was in the kitchen, cooking.

3    Q    What was he cooking?

4    A    Some type of fish.

5    Q    It had something to do with fishes?

6    A    Correct.

7    Q    Okay.  Now, in your conversations with Mr. Orr did you

8    have occasions to be discussing what kind of businesses he

9    was in?

10   A    Gradually, over time, there was dialogue between Mr. Orr

11   and myself as far as what I did and certainly what he did.

12   Q    And you told him how you were employed; is that correct?

13   A    Correct.

14   Q    What did he tell you that he was doing?

15   A    At the time Greg -- I didn't hear this from Greg.  I

16   heard it certainly from my wife, that he was --

17            MR. MARKUS:  Objection.

18   BY MR. SHOCKLEY:

19   Q    Let's talk about the conversations you had with Mr. Orr.

20   Did you have any conversations with Mr. Orr about the kind of

21   businesses he was either in or had been in?

22   A    Yes, I did.

23   Q    What did Mr. Orr tell you?

24   A    That he had been in the construction business, mortgage

25   business, and then the last one was telemarketing business.

1    Q    What kind of telemarketing?

2    A    At that time I didn't know what type of telemarketing he

3    was doing.  He didn't share.

4    Q    Eventually, over time did he tell what kind of

5    telemarketing he was in?

6    A    Later.  It was the magazine telemarketing business.

7    Q    What did he explain to you about the magazine

8    telemarketing business?  What was he selling?

9    A    Selling subscriptions to different magazines to

10   different customers, whether it be commercial or possibly

11   residential.

12   Q    Did he have any other conversations with other

13   businesses he had been in in the past?

14   A    He had mentioned that he had been in the auto salvage

15   business prior to moving to Florida.

16   Q    And where was he living or where was that business

17   located, if you recall?

18   A    I'm not sure if it was New York or New Jersey.

19   Q    And did he explain to you anything about the details of

20   the salvage business?

21   A    Only that they had -- would purchase cars or vehicles

22   that either had water damage or some type weather-related

23   damage and then resell them.

24   Q    Fix them up and resell them?

25   A    Yes, sir.

1    Q    Did there come some point in time when you had

2    discussions with Mr. Orr about his communication facilities

3    at the telemarketing business that he had?

4                MR. MARKUS:  Judge, I'm going to object.

5                THE COURT:  Basis?

6                MR. MARKUS:  Relevance.

7                THE COURT:  Is this relevant to the case or what

8    are we -- what's the point of this?

9                MR. SHOCKLEY:  I'll tie it in later on, your Honor.

10               THE COURT:  All right.  Overruled.

11               THE WITNESS:  Yes, Greg had, in our discussion,

12   knew I was involved in networking and telecommunication.

13   Obviously, ADT being a large company, we try to get the best

14   rates for our telecommunications.

15   BY MR. McCORMICK:

16   Q    Was there some point in time later, not when you first

17   moved in, when he was soliciting you to invest in his

18   telemarketing business?

19   A    Later.

20   Q    Okay.  But before that, before he solicited you to

21   invest, did he show you the facilities?

22   A    Yes, he did.

23   Q    Did he show you -- well, showing you now Government's

24   Exhibit No. 40.

25               MR. SHOCKLEY:  We would offer it into evidence,

1    your Honor, Government's Exhibit No. 40.

2            MR. MARKUS:  Relevance, Judge.  Objection.

3            THE COURT:  Can I see it?

4            MR. SHOCKLEY:  Yes, your Honor.

5            THE COURT:  The objection is overruled.  40 is

6    admitted.

7        (Received in evidence Government's Exhibit(s) 40.)

8    BY MR. SHOCKLEY:

9    Q    Showing you Government's Exhibit No. 40, what is that?

10   A    The facility originally that I was taken to where he had

11   his telemarketing operation.

12   Q    Why was it that -- you said you were taken.  Who took

13   you?

14   A    Mr. Orr.

15   Q    Describe what happened.

16   A    We just toured his facility there, where he had

17   telemarketing people taking calls and outbounding calls and

18   just --

19   Q    You said taking calls and outbounding calls.  By

20   outbounding you mean what?

21   A    Dialing out as well as taking calls in.

22   Q    Did you have discussions with him about the

23   telecommunications equipment and rates?

24   A    We talked about telecommunication and rates, what he was

25   getting and what ADT was able to get.

1    Q    Did he -- also on that occasion when he took you by the

2    telemarketing business, did he refer to any other businesses

3    that he was in or either participated in or had an ownership

4    interest in?

5    A    He drove me down Federal, and there was a facility down

6    there, multi-apartment type, that was supposedly a rehab

7    facility that he indicated he was partners in.

8    Q    Like a drug or alcohol rehab facility?

9    A    Yes, sir.

10   Q    When you had discussion with Mr. Orr about his business

11   concerning mortgages, what was the nature of his business as

12   he described it to you?

13   A    I don't quite understand the question.

14   Q    You mentioned earlier in your testimony that Mr. Orr had

15   indicated that he had some involvement in some business that

16   somehow related to mortgages.  I'm just asking for some

17   details of what he advised you.

18   A    Only reference that I can recall is he refinanced

19   mortgage loans at a period of time when he had this company.

20   Other than that, I'm a little unclear as far as --

21   Q    Do you know even the name of the company?

22   A    No, sir.  I do not.

23   Q    Now, these conversations with Mr. Orr, they would take

24   place over a period of time; is that correct?

25   A    That's correct.

1    Q    I want to direct your attention now, if I can, back to

2    ADT.  You said that initially when you were hired at ADT --

3    rehired, I should say, in late 1997, your responsibility as

4    vice president of planning and implementation dealt mostly

5    with communications equipment and leases and relocating the

6    headquarters from Parsippany, New Jersey, down to Boca Raton,

7    Florida; is that correct?

8    A    That's correct.

9    Q    Okay.  Now, at that point in time were you responsible

10   for -- well, to what extent were you responsible for matters

11   dealing with real estate purchases and leases?

12   A    Very little.  Only responsible for locations that may

13   have what we call bridge sites, which are telecommunications

14   centers that can be very small.  They can be from 200 square

15   feet to 5,000 square feet.  And all they are are just

16   retransmission of either voice or data for alarm signals that

17   I would be responsible for, but not responsible to maintain

18   the leases on.

19   Q    So these bridge sites that you're explaining, did they

20   have people actually working in these rooms or just

21   equipment?

22   A    Just equipment.

23   Q    So the signals that would come in and go out to the

24   companies that were being monitored or the locations that

25   were being monitored by ADT, those signals would come through

 1    these bridge sites as you called them?

 2    A    And all these bridge sites at one time were manned by

 3    people.  Technology allowed us to, in a sense, take the

 4    people out and redirect those signals to large centers which

 5    may have five to 800 people monitoring across the United

 6    States.

 7    Q    So then there would be bridge sites in numerous

 8    locations around the United States feeding into just a

 9    relatively few monitoring sections where you would have live

10    people to answer the phones?

11    A    That's correct.

12    Q    How many monitoring offices did you have around the

13    country, ADT?

14    A    At one time we had four.  Presently, it was reduced to

15    three.

16    Q    Now, these leases that you said you were responsible for

17    or dealt with, the leases where these different bridge sites

18    were located; is that correct?

19    A    I dealt with facilities.  At that time I was not

20    responsible for the leases.

21    Q    Oh, okay.  And what did your duties entail then in

22    dealing with these different properties where there were

23    bridges?

24    A    Making sure that they were secure, weatherproof.

25    Obviously, if we lost one of these, we would lose the

1    monitoring of possibly a bank or a grandmother's fire alarm

2    or burglar alarms.  So it was very vital that they be

3    maintained as weatherproof and secure as possible.

4    Q    Now, directing your attention to approximately July of

5    2000.  What happened with regard to your responsibility at

6    ADT concerning real estate matters?

7    A    During this period of time there was a change made.

8    Mr. John Curlew, who was responsible for real estate, was

9    taken out of that role and it was put under my

10   responsibility.

11   Q    For the record John Curlew, C-U-R-L-E-W, is that how you

12   spell his last name?

13   A    Yes.

14   Q    Now, he was transferred from South Florida; is that

15   correct?

16   A    Correct.

17   Q    And you took over as -- did your job title remain the

18   same?

19   A    Job title remained the same.  Just additional

20   responsibility.

21   Q    So you were still the vice president of planning and

22   implementation, but your duties now included John Curlew's

23   old duties that dealt with handling real estate for ADT; is

24   that correct?

25   A    That's correct.

1    Q    ADT at that point in time -- can you give us an idea how

2    many buildings it owned?

3    A    From the period of time of my relocation and being

4    rehired back at ADT in Boca, a series of large acquisitions

5    had started by Tyco.  At one point we were making

6    acquisitions daily.  We bought up -- and I say "we," I'm

7    talking about Tyco -- the largest alarm companies out there,

8    from Homes to Wells Fargo to SecurityLink to Smith Alarm, the

9    list went into the, probably the hundreds when you look at

10    all the acquisitions.

11         All of these locations had property.  Most of these

12    property locations were leased.  ADT had grown from 200 and

13    something properties to well close to 600 properties due to

14    these acquisitions.

15    Q    Roughly, what percentage would you say of the properties

16    that ADT occupied for business purposes were leased versus

17    owned by ADT?

18    A    Somewhere in the 90 percent, 95 percent were leased.

19    About 5 percent would have been owned, and the owned

20    facilities normally were our monitoring centers, which had

21    large capacity of people working in them, large parking area

22    because of the amount of people that were there, and what we

23    call our customer service centers for collections or service

24    requests.  These were all owned.  And some of our bridge

25    sites.

1   Q     And some of the bridge sites?

2   A     And some of the bridge sites.

3   Q     So these properties would include bridge sites?

4   A     Correct.

5   Q     And a bridge site, again, could be just a room in some

6   building somewhere?

7   A     It could be from 200 square feet to 5,000.

8   Q     So someone could be working at a typewriter in some

9   completely unrelated business and you just got the equipment

10  in a room, chugging along, sending signals switching; is that

11  correct?

12  A     That's correct.

13  Q     During the point in time that you assumed your

14  responsibilities as handling real estate matters, what were

15  you basically doing with these properties?

16  A     At the same time of acquisition we were creating what we

17  call acquisition reserves.  All property that were designated

18  by either the field or corporate decisions were put into

19  these acquisition reserves, because we were not going to be

20  using them.  ADT at the same time would close some of their

21  facilities, and they would go into a restructure reserve.  So

22  during this period of time we had properties acquisition

23  reserve and restructuring reserve.

24        Within six months a new property that we had just

25  moved into, we may be moving out of because we made another

1    acquisition.  It's like you have another child.  You had

2    capacity for four in your car and now you need capacity for a

3    fifth child.  So now you have to move to a van.  So there was

4    a lot of changing of buildings during this four-year period.

5    Q    I show you now Government's Exhibit 1.147.

6            MR. SHOCKLEY:  We would offer this into evidence,

7    your Honor.

8            THE COURT:  1.147 is admitted.

9        (Received in evidence Government's Exhibit(s) 1.147.)

10   BY MR. SHOCKLEY:

11   Q    Showing you on the ELMO, it says "ADT Security Services,

12   Inc., Consent in Lieu of Meeting of Board of Directors."

13   That's the title.  Is that correct?

14   A    Yes, it is.

15   Q    This document actually covers two pages that are stapled

16   together.  The bottom of the first page it bears two

17   signatures, at the bottom of the second page there is a third

18   signature on the identical consent form.  Is that correct?

19   A    Yes.

20   Q    Starting from the top, it states -- does it state as

21   follows:

22           "The undersigned being all of the board of

23   directors of ADT Security Services, Inc., a Delaware

24   corporation, (the corporation), do hereby consent to the

25   following action and agree that such action shall have the

1   same effect as if duly taken at a meeting of the board of

2   directors held for the purpose:

3          "Resolved, that Larry Horton, vice president of

4   planning and implementation, is hereby authorized subject to

5   further order of this board, to enter into, execute, and

6   deliver in the name and on behalf of the corporation, any and

7   all real estate lease agreements, together with any related

8   documents, as approved by corporate counsel, without further

9   act or resolution of this board, and that the secretary or

10  assistant secretary are directed, whenever required, to

11  attach the corporate seal thereto and to attest the seal by

12  his signature."

13         That's the second paragraph I just completed.  Is

14  that correct?

15  A    That's correct.

16  Q    And does the third paragraph state:

17         "Further resolved that, Larry Horton, vice

18  president of planning and implementation, is hereby

19  authorized, subject to further order of this board, to enter

20  into, execute, and deliver in the name and on behalf of the

21  corporation, any and all real estate sale and purchase

22  agreements, together with any related documents as approved

23  by corporate counsel, without further act or resolution of

24  this board, and that the secretary or assistant secretary are

25  directed, whenever required, to attach the corporate seal

1   thereto and to attest the seal by his signature.

2           "In witness whereof, each of the undersigned has

3   executed this consent, which may be signed in one or more

4   counterparts, which taken together, shall constitute one and

5   the same content as of the 9th day of May, 2001."

6           And you see there are actually two separate pages

7   where they were signed separately and placed together.

8           So directing your attention now to the second

9   paragraph of that authorizes you to enter into lease

10  agreements, and the third paragraph to enter into real estate

11  sale and purchase agreements.  Is that correct?

12  A    Yes.  Yes, sir.

13  Q    And that is in conjunction with, as approved by

14  corporate counsel as opposed to the board itself; is that

15  correct?

16  A    That's correct.

17  Q    Who was corporate counsel at the time that this was

18  executed, if you recall?

19  A    Mr. Gray Finney.

20  Q    You indicated you had previously worked for

21  SecurityLink; is that correct?

22  A    Yes, sir.

23  Q    Did there come a point in time in 2002 when SecurityLink

24  was also acquired by ADT, or actually Tyco that was above

25  ADT?

1    A    I believe the date was in 2001.

2    Q    2001.  Okay.  And so now your former employer was a part

3    of your company?

4    A    That's correct.

5    Q    Did ADT acquire also the properties owned and leased by

6    SecurityLink consistent with that takeover?

7    A    Acquired all assets.  That's correct.

8    Q    Did there come a point in time that ADT began

9    considering selling some of those corporate assets?

10   A    The usual procedure on the acquisitions -- and, again,

11   they were stacking up -- was the regions, and we had five,

12   and we have five presidents in each one of these regions,

13   through their meetings, they would determine buildings that

14   they needed or did not want, along with vehicles, manpower.

15   Because you're acquiring manpower in all different capacities

16   of sales, service, and installation.

17         Those would be forwarded up to corporate.  At the

18   same time corporate would be meeting to either agree or

19   disagree with these decisions, along with decisions that they

20   were making related to this acquisition.

21   Q    So your duties was not to decide what properties to sell

22   or keep; is that correct?

23   A    That's correct.  I was not from an operational side

24   decision-maker.

25   Q    So the decision -- but once the decision had been made

1    to sell or lease properties, what did your duties entail?

2    A    My duties entailed maintaining the facility, cleaning

3    out the facility because normally they were left in a bad

4    situation, evaluation of the facility through either

5    appraisal that we had prior to the acquisition or a broker's

6    opinion of value that may be applied later, and then moving

7    that facility over to our real estate company to either sell

8    or possibly buy out the lease, depending on what type of

9    facility.

10   Q    You referred to your real estate company that could

11   possibly sell it or lease it.  What real estate company was

12   that?

13   A    At that time it was Grubb & Ellis, a national company

14   that Tyco was using when they acquired ADT.

15   Q    Now, Grubb & Ellis, that -- if you had a property that

16   corporate headquarters decided should be sold, what was your

17   role in the actual execution of the sale?

18   A    I may directly call the national account rep and advise

19   them of the property location.

20   Q    What national account rep, with what company?

21   A    With Grubb & Ellis.  That was our national company that

22   we used.  He, in turn, would assign one of his local reps to

23   review the building and the area to determine -- again, if it

24   was a sale, if it was -- we're asking him to contact the

25   landlord on possibly buying out a lease, because we could

1    have buildings that had two months left on them as far as the

2    leases or five years.

3        So there was communication back and forth between

4    either my office, myself, and Jeff Reed.  He was the national

5    account rep at that time.  Or it could have been Maggie Carbo

6    who assisted me with the real estate at that time.

7    Q    Now, we've already seen Government's Exhibit No. 1.147,

8    the corporate resolution.  As a practical matter, what

9    authority did you have to sell property and to execute leases

10   leasing the properties?

11   A    In reference to that document you just showed, I did not

12   know that document existed.

13   Q    How did it affect your job duties?

14   A    It did not affect my job duties because the normal

15   procedure was, I had to have approval above my level, that

16   was my understanding, either the CFO, Tyco Fire, or Tyco.

17   Q    Okay.  Now, as a practical matter, how difficult was it

18   to get the approval of the CFO above you or corporate

19   counsel?

20   A    The normal procedure that was operated under John

21   Curlew, and I continued, was e-mail.  Information would be

22   sent related to an e-mail or an attachment.  That e-mail

23   would go to the CFO.  The CFO, in turn, would then either

24   forward it or retype portions of it to Tyco Fire and Security

25   to get their approval.  Normally, it was very quick.

1    Q    And was there -- to what extent were your

2    recommendations scrutinized by those above you?

3            MR. MARKUS:  Objection, your Honor, as to how would

4    he know what other people would do.

5            THE COURT:  Well, he can report his observations.

6    Overruled.

7    BY MR. SHOCKLEY:

8    Q    You may answer.

9    A    I can't remember of any being rejected.

10   Q    On how many occasions, if any, do you remember someone

11   coming down and asking to see your supporting documentation,

12   your appraisals, how you came up with a certain

13   recommendation concerning the sale of property or the lease

14   of property?

15   A    No request.

16   Q    How big was the unit that you were working on?

17   A    I'm not sure I understand the question.

18   Q    Okay.  You were working as vice president of planning

19   and implementation.  How many coworkers and subordinates did

20   you have?

21   A    Within the corporate building I actually only had at

22   that time three employees that reported to me directly.

23   Q    And those were who?

24   A    Maggie Carbo, Amy Hines, and Danny Martino.  The two

25   real estate attorneys were dotted lined to me and reported

1    directly to Gray Finney.

2    Q    Now, a couple questions here.  You say the two real

3    estate attorneys were dotted lines to you.  Is that reference

4    to like a organizational chart?

5    A    That's organizational chart structure, correct.

6    Q    So what do you mean by dotted lines to you?

7    A    I had no ability to fire them.  I had no ability to give

8    them raises.  They only supported me in the contract language

9    of leases or sales.

10   Q    So they reported to ADT's corporate counsel; is that

11   correct?

12   A    That's correct.

13   Q    But they were used by you to service your unit

14   concerning sales and leasebacks of properties; is that

15   correct?

16   A    Along with just generic leases, also.

17   Q    Now, what decision-making authority, if any, did they

18   have concerning the sale or leaseback of properties?

19   A    The two attorneys, Randi Joseph and Marjorie Desporte,

20   their primary function was contract language.  They had no

21   authority to make decisions related to pricing.

22   Q    So if you received a directive from corporate

23   headquarters that a property was to be sold or leased, then

24   you would just execute that order by attempting to either

25   contact the Grubb & Ellis Company which could market it, or

1  try to sell it yourself; is that correct?

2  A    Grubb & Ellis was affiliated with Tyco.  It was not at

3  that point in time mandated that we had to use them.  We

4  could use other companies if we weren't getting the service,

5  or not use them.

6  Q    As a general rule, did you use Grubb & Ellis?

7  A    As a general rule, we used Grubb & Ellis.

8  Q    Did you have authority to try to market the property

9  yourself or try to seek out offers yourself?

10  A    I had that ability.  It was never discussed as far as I

11  could not do that.

12  Q    Okay.  So it was never stated to you that you could not

13  do that?

14  A    That's correct.

15  Q    Okay.  Mr. Horton, at this point in time you're a vice

16  president of ADT.  You're drawing a pretty good salary; is,

17  that correct?  Roughly, how much, if you recall?

18  A    At that time I had been with ADT going on 22 years.  I

19  relocated with them six times.  A lot of these were very hard

20  moves.  And I was at that time making a good salary.

21  Q    Can you recall generally how much you were making, let's

22  say, in 2001?

23  A    Well over 200,000 a year.

24  Q    At the time that you assumed responsibility, John

25  Curlew's responsibility for selling, disposing of properties,

1    did you have an idea about how to further advance your own

2    finances?

3    A    It wasn't immediately after Mr. Curlew left the real

4    estate and relocated.  It was a short period after that.

5    Q    Well, he left and relocated in 2000; is that correct?

6    A    Sometime in 2000.  That's correct.

7    Q    That's when you assumed his responsibilities?

8    A    That's correct.

9    Q    And 2001 is when SecurityLink was acquired by ADT?

10   A    That's correct.

11   Q    With the addition of the SecurityLink properties, did

12   you get a directive that some of the SecurityLink properties

13   would be sold?

14   A    Not only sold, but the CFO was looking to sell

15   leasebacks.  Some of these locations we were actually going

16   to stay in because he was looking for more cash.

17   Q    Okay.  So ADT at this point in time is looking for more

18   cash.  They want to sell some of the properties that ADT

19   employs now.  They could have been SecurityLink in the past,

20   but now they're ADT employees.  They're going to sell some of

21   the properties that they're in.  And they're going to stay in

22   them and lease them back; is that correct?

23   A    That's correct.

24   Q    Did eventually you form some idea about personally

25   enriching yourself at the benefit of ADT, at the expense of

```
 1    ADT?

 2    A    I did.

 3    Q    Tell us about that.

 4    A    It would have been sometime in -- after the acquisition

 5    of SecurityLink.  The CFO had indicated that not only were we

 6    looking to -- our normal to buy out leases, sell properties

 7    that no manpower was located in, but also looked to do some

 8    facilities, sell and then lease them back and keep our ADT

 9    employees in.

10    Q    And what was your idea?

11    A    My idea was to possibly look for somebody that I could

12    partner with.  They would buy these facilities and lease them

13    back with ADT, and I would share in some of the profit.

14    Q    Now, ethically, were you even permitted to do that?

15    A    No, sir.

16    Q    Showing you Government's Exhibit 1.7.

17              MR. SHOCKLEY:  We would offer Government's

18    Exhibit 1.7, your Honor.

19              MR. MARKUS:  No objection.

20              THE COURT:  1.7 is admitted.

21        (Received in evidence Government's Exhibit(s) 1.7.)

22    BY MR. SHOCKLEY:

23    Q    It is an acknowledgment form.  Does it state -- well, at

24    the bottom, is that your signature?

25    A    Yes, it is.
```

1    Q    And the date is 4/10/01; is that correct?

2    A    Yes, it is.

3    Q    And this is in the same year that SecurityLink was being

4    acquired by ADT?

5    A    Yes, sir.

6    Q    By the way, you referred to actually Tyco acquiring

7    these properties, and you also referred in your testimony to

8    Tyco Fire and Security.  Could you explain what Tyco Fire and

9    Security was?

10   A    Tyco Fire and Security was a holding company with no

11   assets.  ADT reported to a president of Tyco Fire and

12   Security.  SimplexGrinnell, a separate unit, reported to Tyco

13   Fire and Security.  So it was an umbrella.

14        Above that was Tyco, which Tyco did -- out of the

15   major acquisitions, which were probably about ten -- when I

16   say "major acquisitions," that included Wells Fargo, Smith,

17   Homes, SecurityLink.  Tyco made all these acquisitions, and

18   we later, later, went out to look and kick the tires to see

19   how good they were.  And a lot of times the tires were not

20   good.

21   Q    Now, directing your attention back to this form.  It

22   states:  "

23        "I acknowledge that I have received a copy of

24   Tyco's Standards of Conduct dated October, 2000.  I have read

25   carefully and understand the Standards of Conduct and I agree

1    to abide by all of these Standards of Conduct as a condition

2    of my employment and continued employment at Tyco.  I

3    understand that if I have questions at any time concerning

4    Tyco's standards of conduct, I will consult with my immediate

5    supervisor, my local human resources representative, the

6    general manager of my unit, or any other member of senior

7    management.  If I am more comfortable speaking with someone

8    outside of my business unit, I may call Tyco's toll-free

9    concern line" -- and it gives the telephone number --

10   "provided for this purpose, which is accessible seven days a

11   week and 24 hours a day from anywhere in the world.

12          "I may also contact Tyco's corporate human

13   resources department."  It gives a phone number.  "Or Tyco's

14   legal department."  It also gives a phone number.  Is that

15   what it states?

16   A    Yes, sir.

17   Q    It refers to Tyco's Standards of Conduct dated October

18   of 2000.  I show you now Government's Exhibit 1.10.

19          MR. SHOCKLEY:  We would offer that into evidence,

20   your Honor.

21          MR. PASANO:  Judge, there is a delay.  I think we

22   have an agreement to redact the exhibit, and that's what

23   they're discussing at counsel table.

24          THE COURT:  Okay.  1.10 is admitted pursuant to

25   your agreement as to redaction.

1            MR. SHOCKLEY:  Thank you, your Honor.

2        (Received in evidence Government's Exhibit(s) 1.10.)

3    BY MR. SHOCKLEY:

4    Q    Showing you the front of Government's Exhibit No. 1.10,

5    Tyco Standards of Conduct.  It is dated October, 2000; is

6    that correct?

7    A    Yes, it is.

8    Q    Now, I want to direct your attention to page -- the

9    numbers are at the very bottom of the page.  Do you recognize

10   this as Bates labeled numbers?  Sometimes they're called

11   Bates labels.  It's cut off on this one, but it's

12   ADT-LH-0039.

13           Do you know that to be like a one up sequential

14   numbering system where you can number documents so each page

15   is unique?

16   A    Yes, sir.

17   Q    Okay.  Going to the page bearing Bates label number

18   ADT-LH-44, in the middle of that page does it state:

19           "Tyco vigorously enforces its standards.  Violation

20   of these standards will result in corrective action,

21   including possible termination of employment."

22           Is that what it states?

23   A    Yes, sir.

24   Q    Going to the page bearing the Bates label 48.  Is there

25   a section that refers to core ethical standards?

1    A    Yes, sir.

2    Q    It says:

3         "Tyco requires its employees to adhere to the

4    highest standards of ethical conduct in all business and Tyco

5    related matters, and at all times on Tyco premises."

6         Is that correct?

7    A    Yes, sir.

8    Q    And then going to the page bearing Bates label 50.  At

9    the very bottom of the page -- actually, there are two Bates

10   labels on this one.  The original document and then at the

11   very bottom, the ADT-LH, referring to you, Mr. Horton,

12   ADT-LH-00050.  On that page there's a section on conflicts of

13   interest; is that correct?

14   A    Yes, sir.

15   Q    And under conflicts of interest does it state:

16        "Tyco employees should avoid situations in which

17   their personal interests could conflict or appear to conflict

18   with Tyco's business.  To this end, Tyco employees may not

19   acquire a financial interest, direct or indirect, in the

20   business of any Tyco customer, consultant, supplier, or

21   competitor, unless such financial interest is disclosed to

22   and approved by Tyco's legal department."

23        Is that what it states?

24   A    Yes, sir.

25   Q    If you go to the other side of the page -- it's kind of

1    difficult to read this side of the page -- but upon closer

2    inspection, and I'll bring it up to you to see it closer if

3    you need it, but does it state:

4              "Tyco employees may not enter into a business

5    relationship on Tyco's behalf with an immediate family

6    member."  And it lists a bunch of different types of family

7    members.

8              "Or with a company in which the employee or an

9    immediate family member has a substantial financial interest,

10   or with a trust or estate in which the employee or an

11   immediate family member has a substantial beneficial

12   interest, unless such relationship is disclosed to and

13   approved by Tyco's legal department."

14             Is that what it states?

15   A    Yes.

16   Q    Now, what you just testified to about acquiring an

17   interest in some of the properties that might be sold, how

18   did that jive with the Standards of Conduct of Tyco?

19   A    It was a violation of both.

20             THE COURT:  Find a convenient time to stop.

21             MR. SHOCKLEY:  This is.

22             THE COURT:  Is this all right?

23             MR. SHOCKLEY:  Sure.

24             THE COURT:  Let's take our morning break and return

25   in 15 minutes.  That's two minutes after 11:00.

```
 1          (Jury out at 10:47 a.m.)

 2              THE COURT:  Okay.  We'll be in recess 15 minutes.

 3          (Recess at 10:48 a.m.)

 4              THE COURT:  Okay.  Mr. Shockley, are you ready?

 5              MR. SHOCKLEY:  Yes, I am.  If we can get a witness,

 6      your Honor.

 7              THE COURT:  All right.  Invite the jury in.

 8          (Jury in at 11:04 a.m.)

 9              THE COURT:  Welcome back.  Please be seated.  And

10      please continue.

11              MR. SHOCKLEY:  Thank you, your Honor.

12      BY MR. SHOCKLEY:

13      Q    Mr. Horton, that monitor will actually fold up and down

14      so when we're not actually using it, you may want to fold

15      that down.

16      A    Okay.  Thank you.

17      Q    Maybe that's as far as it goes.

18              Before we broke, we went over some ethical

19      obligations that you were required to abide by as an employee

20      at ADT, and specifically the conflict of interest.

21              How would you, acquiring an interest in property

22      that you were going to sell on behalf of ADT, jive with the

23      Standards of Conduct and particularly the conflict of

24      interest provisions?

25      A    It would violate both.
```

1    Q    Now, it said in there that you could -- and let me have

2    the exhibit back again.  On page Bates labeled 50, under the

3    Conflicts of Interest section, it did say you can have

4    these -- cannot have these conflicts of interest -- let's try

5    this -- unless such financial interest is disclosed to and

6    approved by Tyco's legal department.

7         So there is a provision in the Standards of Conduct

8    by which you can ask for permission to engage in conduct that

9    would otherwise be a conflict of interest; is that correct?

10   A    Yes, sir.

11   Q    At any point in time did you ever ask for permission

12   from anyone at Tyco or in their legal department concerning

13   the propriety of you engaging in a transaction in which you

14   would hold a hidden interest in Tyco sales?

15   A    No, sir.

16   Q    Why not?

17   A    It would have just brought more scrutiny to the

18   transactions.

19   Q    Did you want any scrutiny on the transactions?

20   A    No, sir.

21   Q    Why not?

22   A    The transactions were not in the best interest of ADT.

23   Q    Were you cheating ADT out of money?

24   A    Yes, sir.

25   Q    Were you cheating them out of property?

1    A    Yes, sir.

2    Q    So what likelihood did you think that ADT was ever going

3    to approve you selling their property at less than fair

4    market value?

5    A    Zero.

6    Q    And what interest -- what likelihood, if any, did you

7    think ADT was ever going to grant you to enter into leases in

8    which you would pay above fair market value for the leases?

9    A    Zero.

10   Q    Now, you indicated that you had to come up with a

11   partner in order to make this work.  Why was that necessary?

12   A    I needed someone obviously that could make the bids or

13   offers on the properties, somebody that could get the

14   financing for the buildings to buy them, and leave me at

15   arm's length away from the transaction.

16   Q    Who did you decide upon?

17   A    Mr. Greg Orr.

18   Q    Why?

19   A    Being in Florida for a very limited time, the only real

20   people that I associated with was ADT people, other than some

21   neighbors.  Mr. Orr was the only one that I knew was either

22   owner or a partner in several businesses, indicating that he

23   understood real estate and appeared to have the financing to

24   make these transactions happen.

25   Q    Tell us about your initial approach or conversation with

1    Mr. Orr concerning this venture.

2    A    It would have been sometime in '01, during the early

3    summer months, at one of his social functions outside.    I

4    asked him would he have an interest in purchasing property

5    from ADT and leasing it back to ADT.

6    Q    Tell us more about that conversation.

7    A    He said he would have an interest.    And I said if those

8    opportunities came up, I would get back with him later.

9    Q    Did you have any discussions at that time about the

10    SecurityLink acquisitions, if you can recall?

11    A    I don't know that we actually discussed SecurityLink

12    transactions at that time, but we did at a later date.

13    Q    You said this was in the early part of the summer of

14    2001.    What was the occasion on which you had the opportunity

15    to speak with him about the possibility of purchasing ADT

16    property?

17    A    It was just a summer get-together party.    I don't know

18    that it was a special occasion.

19    Q    Was it at his residence?

20    A    Yes, it was.

21    Q    Was that the same residence you previously identified on

22    the MapQuest diagram and in the pictures?

23    A    Yes.

24    Q    Did there come a point in time, sir, then when you found

25    that some properties would possibly be sold by ADT?

 1    A     Yes.   After the SecurityLink acquisition made by Tyco, a

 2    determination was -- several properties would be sold and

 3    several would be put up for sale-leaseback.

 4    Q     Did these properties include properties in Pompano

 5    Beach, Palm Harbor, Lancaster, later on, Oak Brook,

 6    Bradenton, Jacksonville, and Aurora, Colorado?

 7    A     Yes, it did.

 8    Q     Did there come a later point in time when you met with

 9    Mr. Orr at his residence?

10    A     Yes.

11    Q     Did you have with you a list of some kind?

12    A     The next meeting was just really dialogue between

13    Mr. Orr and myself as far as his interest, that he had

14    indicated in possibly purchasing these buildings or leasing

15    them back.  I discussed with him how I could be kept at an

16    arm's length away from the transaction if he was looking to

17    do this by using real estate attorneys, and that all I wanted

18    was a percent of the profit.

19    Q     Where did this conversation take place?

20    A     It took place in his study in his home.

21    Q     You indicated that you had to be kept at arm's length.

22    What, if anything, did you explain to him about why you would

23    have to be kept at arm's length?

24    A     Well, in the first dialogue I knew that I was violating

25    the Tyco ethics code by being a partner possibly in a

1    transaction that dealt with either ADT or Tyco.

2    Q    Now, your decision went considerably beyond that; is

3    that correct?

4    A    In the next meeting that -- in that meeting I asked Greg

5    for 50 percent of the profit, and he agreed.  I didn't quite

6    understand why he agreed at 50 percent, because I really only

7    expected maybe ten or five as a finder's fee for giving him

8    this information.  So when I walked out of his home that

9    evening, I was somewhat mystified by why he agreed to

10   50 percent.  But later, I understood why.

11   Q    What was your understanding?

12   A    In the next meeting more questions related to duties,

13   have to go out for bid, will there be any other bidding

14   companies or individuals for these properties, do you have

15   appraisals on these properties?  So I understood that the

16   50 percent was to do more than just provide him with

17   information.

18   Q    So initially, providing him with information, what

19   information was that?

20   A    That was a list of properties along with building size,

21   location.  Whereas, he could actually go out and hire real

22   estate people to do appraisals for these properties for him

23   related to how he should bid on them.

24   Q    Now, you mentioned a list.  Is this a one-page document

25   or is this many pages?

1    A    The list would have actually been one page.

2    Q    And it would list approximately how many properties that

3    ADT was considering selling?

4    A    Best recall, seven.

5    Q    What, if anything, did you explain to Mr. Orr concerning

6    what you would be able to do in exchange for your 50 percent

7    interest?

8    A    Later in our conversations, for my 50 percent it was --

9    we had actually agreed on prices, that he would bid on the

10   purchase of these properties and lease monthly charges that

11   he would charge to lease these properties back.  I would, in

12   turn, make sure within the real estate group that I had that

13   these prices matched up on his offer.

14   Q    Okay.  Let's get to that in a little bit more detail.

15   First of all, you mentioned sales and leasing back the

16   properties.  Were some properties for sale and others for

17   sale-leaseback?

18   A    There was a combination of properties for sale and no

19   leaseback, a combination of properties for sale and

20   leaseback.  That's correct.

21   Q    So two types.  One, you would just sell a building which

22   would be an empty building?

23   A    That's correct.

24   Q    Is that called a fee simple sale?

25   A    It's called a fee simple.  Correct.

1   Q    And then the other type of transaction would be a

2   transaction in which you would sell the building but there

3   would be a lease attached, so you're still occupying the

4   building and paying a lease payment; is that correct?

5   A    That's correct.

6   Q    And that would be called a leased fee?

7   A    A sale-leaseback.

8   Q    Okay.  A sale-leaseback or a leased fee in the

9   appraisals; is that correct?

10  A    That's correct.

11  Q    Now, what -- tell us about the conversations you had

12  with Mr. Orr concerning the differences between those two

13  kinds of transactions.

14  A    First of all, Mr. Orr had no desire for the purchase of

15  just a building.

16  Q    Can you explain what -- tell us about the conversations

17  you had with Mr. Orr about just selling a building.  What

18  problems did that present?

19  A    Just buying a building indicated issues relating to

20  finding a tenant if he had no tenant, possibly rehabing the

21  building for a tenant, a specialized tenant that may want it

22  in this condition.  So you had issues related to cost,

23  purchasing issues related to rehabbing the space for the new

24  tenant, and finding a tenant.

25  Q    Now, tell us about the conversations you had with

1    Mr. Orr concerning the sale-leaseback.

2    A    Sale-leaseback is related to the lease price and the

3    condition of the building.  As we all know, related to the

4    commercial market and real estate market here, there are

5    certain variables.  Traditionally on a sale-leaseback it's an

6    eight to ten times the lease payment as far as for the

7    purchase price.

8             A quick example would be if you're paying $37,000 a

9    month for a facility that is say 30,000 square feet, you

10   possibly would want $3.7 million for that piece of property.

11   And it also is related to the term of the lease.

12   Q    So when you're trying to determine what price to get

13   property at that has a lease attached, do you take into

14   consideration the value of the lease?

15   A    Absolutely.  That is the value.

16   Q    If you -- if one has a favorable lease on a piece of

17   property, would that increase or decrease the value of the

18   property itself?

19   A    It would definitely increase the value of the property.

20   Q    If you have a sale-leaseback situation, what effort then

21   would you have to expend in trying to find a tenant for the

22   premises?

23   A    Zero.  You already have a captured tenant.

24   Q    So if ADT were to remain in the premises and now pay

25   rent, you would have a tenant at the time that you purchased

1    the property; is that correct?

2    A    That's correct.

3    Q    And what, if anything, did you and Mr. Orr decide would

4    be the best approach as far as purchasing property from ADT?

5    A    The purchase and leaseback of the properties.

6    Q    Now, what, if anything, did you tell him concerning your

7    ability to make this happen?

8    A    In our conversations -- and I can go -- I can make

9    reference back to that document that I did not know existed

10   that supposedly gave me the authority to pretty much do

11   everything with the real estate.  I didn't know that existed.

12   My conversation with Mr. Orr was that these had to be

13   approved by the CFO, Tyco Fire, and Tyco.

14   Q    Now, as a practical matter, what did that approval

15   process entail?

16   A    I continued the same procedure that Mr. Curlew had used

17   for over five years, which was an e-mail to the CFO giving

18   him specific information, primarily no documents, asking for

19   his approval.

20   Q    And generally, that would be -- permission would be

21   granted; is that correct?

22   A    That's correct.

23   Q    Did there come a point in time, sir, that you provided

24   additional information, internal information, and documents

25   of ADT to Mr. Orr?

1    A    Well --

2    Q    Before you answer that, let me just withdraw that

3    question and ask you another one.

4            What conversations, if any, did you have with

5    Mr. Orr concerning whether you would attempt to market these

6    properties with Grubb & Ellis or any other real estate

7    company?

8    A    The agreement with Mr. Orr and myself was that these

9    would not go out for bid, that his would be the only offer.

10    Q    So there would be no competition; is that correct?

11    A    That's correct.

12    Q    Was there any discussion concerning the strategy for how

13    this would take place, how that these bids, if you will,

14    against no one would take place?

15    A    We agreed on a price for each location that he made an

16    offer on the purchase price and on the lease.  He would make

17    his first offer low on the purchase price.  He would make his

18    lease payment high.  Those would be adjusted up, in other

19    words, on his purchase price.

20    Q    Let's take each one separately.  Purchase price.  On the

21    purchase price, you would be back at ADT not having direct

22    contact with Mr. Orr; is that correct?

23    A    All proposals or letters of intent would come through

24    his real estate attorneys.

25    Q    And they would go to whom?

1    A    Designated real estate attorney that was responsible for

2    that property.

3    Q    And by designated real estate attorney, did different

4    real estate attorneys handle different areas of the country?

5    A    Correct.  Marjorie Desporte, for an example, handled

6    Florida.  Randi Joseph handled the Chicago area.

7    Q    So the bid would come in from the attorney and it would

8    go to the attorney at ADT; is that correct?

9    A    That's correct.

10   Q    The attorney at ADT would take the bid to whom?

11   A    To me.

12   Q    And then you would do what?

13   A    I would review it, and I would give them two numbers

14   that they could either go -- could not go no higher or no

15   lower on as far as the purchase price or the lease.

16   Q    So you would either accept or reject the offer; is that

17   correct?

18   A    That's correct.

19   Q    In making that decision, was anybody above you taking

20   any part in your decision-making process?

21   A    No, sir.

22   Q    So when the bid would come in, you would look at the

23   price and you would determine if ADT would accept or reject

24   that bid; is that correct?

25   A    That's correct.

1    Q    Now, what was the arrangement you had with Mr. Orr about

2    the escalation in the bid prices for the actual purchase of

3    the property, leaving the lease aside?

4    A    On the purchase price he would go in low.

5    Q    And what would you do?

6    A    I would counter higher.

7    Q    So you would reject that and make a counteroffer; is

8    that correct?

9    A    That's correct.

10    Q    And you would make a much higher offer; is that correct?

11    A    That's correct.

12    Q    What would he do then?

13    A    He would counter his original low price, bringing it up

14    slightly.

15    Q    And what would you do?

16    A    I would counter again.

17    Q    So this back and forth between you two through the

18    attorneys; is that correct?

19    A    That's correct.

20    Q    Did the attorneys that were coming to you at ADT have

21    any idea that you were negotiating or dealing with Gregory

22    Orr?

23    A    No, sir.

24    Q    Did the attorneys who brought these new offers to you

25    from the attorneys representing Mr. Orr, did you ever tell

1    them at any point in time that you already had a number that

2    you would be selling this property at?

3    A    I'm sorry.  I don't quite understand that question.

4    Q    In other words, were there back and forth -- were there

5    a number of offers and counteroffers?

6    A    On some of the properties there was several back and

7    forth.

8    Q    Okay.  Now, how did that make it appear to the people

9    who were bringing you these -- what were you trying to

10   portray in this Kabuki play, if you will?

11   A    A real transaction between a buyer and a seller.

12   Q    So it made it appear, at least to someone who was

13   bringing you these offers, that you were actually negotiating

14   and trying to get higher prices for ADT; is that correct?

15   A    That's correct.

16   Q    Was it true or false?

17   A    It was false.

18   Q    Because you had already agreed upon the prices?

19   A    Yes, sir.

20   Q    With whom?

21   A    Mr. Greg Orr.

22   Q    What, if anything, did you use to assist you in

23   determining what the prices should be?

24   A    There was only two related documents, but they were for

25   simple sales.  So, they really had no impact to the

1   sale-leaseback.

2   Q    Okay.  We've gone through the sales price.  Let's talk

3   about the lease terms now.

4           You indicated that initially there would be a

5   low-ball bid from Mr. Orr, you would counter, that would go

6   back and forth until you reached an agreement upon price; is

7   that correct?

8   A    On the purchase.

9   Q    On the purchase.  As far as the lease terms -- now, you

10  wanted to lease the terms back.  The initial offer that

11  Mr. Orr would make would be what?

12  A    Very high.

13  Q    And you would counteroffer with something lower because

14  you wanted a cheaper lease on behalf of ADT, ethnically

15  representing the interest of ADT; is that correct?

16  A    That's correct.

17  Q    Then would it go back to him for a counteroffer?

18  A    Yes, it would.

19  Q    So this went back and forth with the play acting until

20  you got the numbers that you and he agreed to; is that

21  correct.

22  A    That's correct.

23  Q    Now, showing you Government's Exhibit No. 1.224 --

24  excuse me, 223, 224, and 225.

25          MR. MARKUS:  What numbers again?

1           MR. SHOCKLEY:  1.223, 224, and 225.  We would offer

2    these three exhibits into evidence, your Honor.

3           THE COURT:  Any objection?  Without objection,

4    1.223, 224, and 225 are admitted.

5       (Received in evidence Government's Exhibit(s) 1.223,

6    1.224 and 1.225.)

7    BY MR. SHOCKLEY:

8    Q    Showing you, first of all, Government's Exhibit 1.224.

9    It's labeled on the front cover "Property Appraisal, Pompano

10   Beach, Florida," and it says in the upper left-hand corner

11   "SecurityLink"; is that correct?

12   A    That's correct.

13   Q    Showing you Government's Exhibit 1.223.  Excuse me.

14   225.  Property appraisal, Palm Harbor, Florida.  Is that

15   correct?

16   A    That's correct.

17   Q    And then 1.223.  This is a property appraisal, East

18   Hempfield, Pennsylvania, and it has, in parentheses,

19   underneath it Lancaster.  Does that refer to Lancaster

20   County?

21   A    Lancaster, Pennsylvania.

22   Q    Okay.  This is a property up in Pennsylvania?

23   A    That's correct.

24   Q    Okay.  And it also says "SecurityLink."  These were

25   three appraisals that you had in your possession; is that

1    correct?

2    A    Along with the other locations that SecurityLink owned.

3    I had copies of those also.

4    Q    How would itt be that the appraisals of these properties

5    would come into your possession?

6    A    These were sent to me as part of the due diligence

7    package on the acquisition of SecurityLink.

8    Q    Now, SecurityLink, it says -- it actually has

9    "SecurityLink" in the upper left-hand corner.  They had been

10   an independent company but now they were owned by ADT in

11   2001; is that correct?

12   A    That's correct.

13   Q    Or at least they were in the process of being acquired,

14   and it was actually completed during the year 2001; is that

15   correct?

16   A    Early 2001, correct.

17   Q    Early or late?

18   A    I believe it was early.  I think it was in June or July.

19   Q    Oh, okay.  Now, so then you gained access to appraisals

20   of the properties that had been done on behalf of

21   SecurityLink; is that correct?

22   A    That's correct.

23   Q    Because SecurityLink was now within ADT?

24   A    That's correct.

25   Q    Did you have occasion to make copies of these three

1    exhibits?

2    A    Yes, I did.

3    Q    And what did you do with them?

4    A    I gave those to Mr. Orr at one of our meetings.

5    Q    Okay.  Now, I want to direct your attention to a meeting

6    at his residence when these were delivered.

7         Who had access at ADT to these appraisals?

8    A    Just myself.  They were in my office, locked up.

9    Q    What about the attorneys that would be handling real

10   estate matters?

11   A    They later would have a copy based upon the sale of a

12   property.

13   Q    But initially it would be in your exclusive possession?

14   A    That's correct.

15   Q    So in order to get these appraisals, the attorneys would

16   actually have to come to you?

17   A    Yes, they would.

18   Q    These were internal documents that ADT prepared on

19   behalf of SecurityLink and subsequently ADT; is that correct?

20   A    That's correct.

21   Q    But you gave them to Gregory Orr?

22   A    Yes, I did.

23   Q    And why was that?

24   A    He kept asking about the sale price of these properties,

25   so I gave him copies of them.

1    Q     And so.  Did you use these documents with Mr. Orr in an

2    attempt to determine what the sale price and the lease prices

3    would be on these properties?

4    A     These were simple sale appraisals, so they really didn't

5    have a lot of bearing related to a sale-leaseback.

6    Q     Okay.  Well, tell us about when you took these over to

7    his house.  Describe the circumstances.

8    A     It would have been two or three days, possibly four or

9    five, after we met.  And I gave him the list, and we had

10   discussed these properties.  He asked me if I had appraisals.

11   I said, yes.  And so, I brought copies over.  I met with him

12   in his study and laid them on his desk.

13   Q     Okay.  During the course of this conversation what

14   information or what discussions, if any, did you have with

15   Mr. Orr concerning the appraised values as set forth in these

16   appraisals?

17   A     I shared with him a sale-leaseback is based on a cap

18   rate, either 8 to 10, depending on certain variables.  A

19   healthy company that you're buying from, length of the term

20   of the lease, and obviously different variables that could

21   affect it.

22   Q     Did there -- can you explain for us exactly how then you

23   arrived at a price?

24   A     It was pretty much just put a price down -- Greg liked

25   the square footage costs -- by the number of square feet on

1    the lease side.

2    Q    Now, in making the decision about what the prices would

3    be both for the sale and the lease, what considerations did

4    you have about setting the sale price way too low?

5    A    A red flag that may pop up at any time.

6    Q    And if it were set higher, though, how would that affect

7    your bottom line personally, financially?

8    A    Not knowing at that time what my profit would be, it

9    would have lowered it, whatever the profit was.

10   Q    So your intent was to do what with respect to the fair

11   market price of the sale of the property?

12   A    The lower the sale price, the higher the lease price,

13   supposedly, the more profit.

14   Q    Okay.  For you?

15   A    For me, too.

16   Q    Showing you Government's Exhibit 1.224 and directing

17   your attention to the page that bears Bates label 3075, the

18   property appraisal for the Pompano Beach property.  We have

19   to go to the preceding page first.

20           Let's go to Bates label 3073, SecurityLink from

21   Ameritech, 2801 Gateway Drive, Pompano Beach, Florida.  This

22   says, market value fee simple estate as of March 1, 2002

23   (sic).

24           Again, the fee simple estate is just selling an

25   empty building; is that correct?

1    A    That's correct.

2            MR. PASANO:  For the record, since we have a court

3    reporter, could that be March 1, 2001?

4            MR. SHOCKLEY:  I'm sorry.  March 1, 2001.  What did

5    I say?

6            MR. PASANO:  Two.

7    BY MR. SHOCKLEY:

8    Q    Okay.  Directing your attention now to the bottom of the

9    page it says, "Prepared for SecurityLink."  But it was in

10   your possession because ADT had acquired SecurityLink; is

11   that correct?

12   A    That's correct.

13   Q    On the following page, 3074, this is a letter from

14   American Appraisal Associates dated April 16, 2001, correct?

15   A    That's correct.

16   Q    And on the second page of that letter bearing Bates

17   labels ADT-LH-3075, does it state:

18           "As a result of our investigation, it is our

19   opinion that the as is fee simple market value of the

20   subject, effective March 1, 2001, was:  Fee simple value:

21   $1,570,000?  Is that what it states?

22   A    Yes, sir.

23           MR. MARKUS:  Judge, I would object.  It's

24   misleading if you don't read the preceding paragraph,

25   paragraph one, the special assumption.

1          THE COURT:  Overruled.

2     BY MR. SHOCKLEY:

3     Q    Now, not wanting to mislead anyone, I want to direct

4     your attention to the paragraph above it.  I'll figure out

5     how to work this later.  It says:

6          "The building was damaged by a fire.  Damage from

7     this fire is physically evident from the exterior of the

8     building.  For purposes of this analysis, a hypothetical

9     assumption has been made that the damage has been repaired

10    and the building is in marketable condition.  This appraisal

11    assumes the fire damage is repaired."

12         Now, tell us about how that affected -- have you

13    ever been to that facility?

14    A    Yes, I have.

15    Q    Okay.  Tell us about the fire and how it related to the

16    value.

17    A    The fire was a structural fire back in the back middle

18    part of the building.  It damaged part of the roof.  I

19    believe when -- I wasn't there, but I believe that the

20    building had not been painted when this appraisal was done.

21    The repairs were done and completed.

22    Q    Before the sale was made?

23    A    Correct.

24    Q    Okay.  So as not to mislead anyone, this $1,570,000,

25    which was their assessment of the fair market value of only

1    the building itself, at the time of the sale the fire damage

2    had been repaired; is that correct?

3    A    That's correct.

4    Q    So this assumption turned out to be -- this hypothetical

5    assumption turned out to be right; is that correct?

6    A    That's correct.

7    Q    It looks like I'm left with a circle.  I'm going to have

8    to line up everything with a circle on the screen, I think.

9            By the way, that property -- which even the empty

10   building was valued at least in this appraisal at $1,570,000,

11   was it eventually sold for $1,290,000?

12   A    Yes, it was.

13   Q    And that was leased fee; is that correct?

14   A    That was a sale-leaseback, correct.

15   Q    And again, did you have these discussions with Mr. Orr

16   concerning what -- how the values would change when you had a

17   lease on the premises?

18   A    Yes, I did.

19   Q    And it was based upon those discussions that you and he

20   decided what?

21   A    To present the prices that we had previously agreed on.

22   Q    For a sale-leaseback; is that correct?

23   A    For a sale-leaseback.

24   Q    Showing you now Government's Exhibit No. 1.225.  I'm

25   stuck with it now.  Property appraisal, Palm Harbor, Florida.

1    Is that correct?

2    A    That's correct.

3    Q    It says on the next page:

4         "SecurityLink from Ameritech, the address, 32100 US

5    Highway 19 North, Palm Harbor, Florida, market value, fee

6    simple estate, as of March 1, 2001, prepared for

7    SecurityLink."  Is that correct?

8    A    That's correct.

9    Q    On the next page, American Appraisal Associates, letter

10   to Dennis Stern, executive vice president, SecurityLink,

11   dated April 16, 2001; is that correct?

12   A    That's correct.

13   Q    And on the next page bearing Bates label ADT-LH-3159,

14   does it state:

15        "As a result of our investigation, it is our

16   opinion that the as-is fee simple market value of the

17   subject, effective March 1, 2001, was:  Fee simple estate

18   $1,050,000?"  Is that correct?

19   A    Yes, sir.

20   Q    And again, this is for an empty building; is that

21   correct?

22   A    That's correct.

23   Q    And eventually, this was sold by ADT not for that price,

24   but instead for $684,900; is that correct?

25   A    That's correct.

1    Q    And that was in -- the sale was for a sale-leaseback?

2    A    That's correct.

3    Q    Showing you now Government's Exhibit 1.223, property

4    appraisal, East Hempfield, Pennsylvania, in Lancaster County.

5    Second page, 3040 Industry Drive, East Hempfield,

6    Pennsylvania.  Market value, fee simple estate as of April 1,

7    2001, prepared for SecurityLink.

8         The letter on the next page, American Appraisal

9    Associates, dated April 24, 2001, to Dennis Stern, executive

10   vice president of SecurityLink.  The second page of that

11   letter states -- does it state:

12        "As a result of our investigation, it is our

13   opinion that the as-is fee simple market value of the subject

14   effective April 1, 2001, was $1 million."  Is that correct?

15   A    Yes.

16   Q    And that property was eventually sold; is that correct?

17   A    Yes.

18   Q    And that was sold for $840,000; is that correct?

19   A    Yes.

20   Q    And the sale was for a sale-leaseback, not just a fee

21   simple; is that correct?

22   A    That's correct.

23   Q    In addition to these three appraisals, did you also

24   provide other appraisals to Gregory Orr?

25   A    Other locations, yes.

```
 1    Q    Okay.  And they were for what locations?

 2    A    Oak Brook, Illinois; Jacksonville, Florida; Aurora,

 3    Colorado --

 4    Q    Bradenton?

 5    A    And Bradenton, Florida.

 6    Q    That was also located in Florida.  What kind of facility

 7    was that?

 8    A    Bradenton was a hundred thousand square feet property

 9    that was built specially for SecurityLink.

10    Q    I want to direct your attention to then the Aurora,

11    Colorado, facility.  Was that eventually sold?

12    A    No, sir.

13    Q    So ADT decided -- or the people above you in the chain

14    of command at ADT decided not to sell that property in

15    Aurora; is that correct?

16    A    That's correct.

17    Q    What about the facility in Jacksonville, Florida?

18    A    The same.

19    Q    Again, they decided not to sell that property?

20    A    Correct.

21    Q    And finally, the Bradenton?

22    A    They decided not to sell it.  Two years later they ended

23    up selling it.

24    Q    So they changed their mind and then changed their mind

25    again?
```

1    A    That's correct.

2    Q    But had you provided at least to Mr. Orr the appraisals

3    on some of those properties as well?

4    A    All of them.

5    Q    What was your purpose in providing these internal

6    documents of ADT to Gregory Orr, the person who's -- was

7    going to be the potential purchaser of these properties?

8    A    He had asked for them.  I think there was a comfort

9    level.  He wanted to see what the pricing was.

10   Q    Now, did there come a point in time when -- well, let's

11   take the first three properties that we've discussed here;

12   Pompano Beach, Palm Harbor, and Lancaster.  Those three

13   properties, did you, Mr. Horton, as vice president of

14   planning and implementation, ever refer those properties out

15   to Grubb & Ellis or any other real estate company for

16   marketing purposes?

17   A    No, I did not.

18   Q    Did you try to find any other potential buyers for these

19   properties?

20   A    No, I did not.

21   Q    And Grubb & Ellis was the company that would routinely

22   work on behalf of ADT in order to market its properties if it

23   had been asked; is that correct?

24   A    That's correct.

25   Q    Would Grubb & Ellis have been able to market these

```
 1    properties and solicit other bids?

 2    A    Yes.

 3    Q    And you did not refer any of these properties to Grubb &

 4    Ellis; is that correct?

 5    A    No, I did not.

 6    Q    Was there any marketing whatsoever of these properties

 7    by ADT?

 8    A    No, sir.

 9    Q    And why was that?

10    A    Without my marketing we controlled the price.

11    Q    And what else allowed you to control the price?

12    A    There was only one offer.

13    Q    There was only one offer, and that would be the offer

14    that what?

15    A    That was accepted from Mr. Greg Orr.

16    Q    By you?

17    A    Correct.

18    Q    On his and your behalf?

19    A    That's correct.

20    Q    So you controlled the price and there was no marketing.

21    So your game was the only game in town; is that correct?

22    A    That's correct.

23    Q    Okay.  Now, did there come a point in time, sir, after

24    you and -- by the way, how did you keep these numbers

25    straight for lease amounts and purchase amounts, lease terms
```

1    that you and Mr. Orr had worked out?

2    A    The sale price and lease price was just written on a

3    piece of paper duplicated, one for him to work with his real

4    estate attorney, and one for me whenever the --

5    Q    So when you were in the office, all you would have to do

6    is pull out your little piece of paper and look at the price

7    you and Mr. Orr agreed upon and use that so that you are able

8    to coordinate; is that correct?

9    A    I with the real estate attorneys, and he with his real

10   estate attorneys.  Correct.

11   Q    Okay.  Now, but you with your real estate attorneys, are

12   you sharing with the real estate attorneys at ADT the fact

13   that you've got a piece of paper here with agreed-upon

14   prices?

15   A    No.

16   Q    So to the best of your knowledge, the real estate

17   attorneys at ADT had no clue that the prices had already been

18   determined, even though you're going through this negotiation

19   process?

20   A    That's correct.

21   Q    Did there come a point in time when ADT started

22   receiving these offers?

23   A    Yes.

24   Q    And the offers you indicated would go from Mr. Orr's

25   attorney to the attorney for ADT?

1    A    That was handling that geographic location.

2    Q    So for example, all three of these properties that we're

3    referring to now, the Pompano Beach, the Palm Harbor, and

4    Lancaster, they would be within the areas of which attorney

5    at ADT?

6    A    Margie Desporte.

7    Q    And did, in fact, offers come in for these premises?

8    A    Yes, they did.

9    Q    What did -- did they go to Marjorie Desporte?

10   A    Yes, they did.

11   Q    She did what?

12   A    She came to me with those offers.

13   Q    Showing you Government's Exhibit 1.136, which we would

14   offer into evidence, your Honor.

15          MR. MARKUS:  Objection, Judge.  This isn't

16   Mr. Horton's document.  This is a letter from lawyer to

17   lawyer.  This is a letter from Donald Spadaro --

18          THE COURT:  I thought you agreed to authenticity.

19   Is this an authenticity objection?

20          MR. MARKUS:  It's not an authenticity objection.

21   It is a relevance objection to this witness, your Honor.

22          MR. SHOCKLEY:  Can I show you the document, your

23   Honor, so you're not in a vacuum?  It's a letter addressed to

24   Marjorie Desporte.

25          THE COURT:  Relevance doesn't go to the witness,

1    does it, Mr. Markus?  Is this a relevant document to the

2    case?  I'm trying to understand your objection.

3              MR. MARKUS:  I just don't think this is the

4    appropriate witness for this document, your Honor.

5              THE COURT:  All right.  The objection is overruled.

6         (Received in evidence Government's Exhibit(s) 1.136.)

7    BY MR. SHOCKLEY:

8    Q    Showing you now Government's Exhibit 1.136.  Can you

9    read this?  Does it say at the top "Law Office of Donald

10   Spadaro"?

11   A    Yes.

12   Q    It's dated August 9, 2001, directed to ADT Security

13   Services, Inc., Attention:  Marjorie Desporte.  And she is

14   the attorney that would be handling that section of the

15   country that dealt with, in this case, Pompano Beach and the

16   Lancaster properties; is this correct?

17   A    Correct.

18   Q    It reads:

19              "Property No. 1, an offer to purchase Pompano

20   Beach.  And No. 2 is an offer to purchase the property in

21   Lancaster."  Is that correct?

22   A    Yes.

23   Q    Now, sir, you have seen this document before; is that

24   correct?

25   A    I have.

1    Q    And that document was presented to you by whom?

2    A    By yourself.

3    Q    During the course of preparing for trial?

4    A    In the review of documents.

5    Q    Okay.  Now, before that, had you ever seen this

6    document?

7    A    Yes, I had.

8    Q    When is the first time you saw it?

9    A    When Marjorie brought me the offer.  I don't know what

10   date it would have been.  It would have been after the date

11   of the letter.

12   Q    Okay.  Now, when you reviewed this document with me

13   prior to trial, it didn't have the -- excuse me, when

14   Marjorie Desporte brought this document to you, it did not

15   have, of course, the Government Exhibit sticker in the upper

16   right-hand corner; is that correct?

17   A    That's correct.

18   Q    So other than that, I want to direct your attention to

19   the document itself.  It says:

20        "Dear Ms. Desporte:  Regarding the purchase of the

21   above-referenced properties, the following language outlines

22   the general terms under which my client's company, Efficient

23   Realty Development, Corp., or assigns, purchaser, will

24   purchase the above described properties from seller.  The

25   following general terms and conditions are intended:"

```
 1              And then if you go down -- it refers, of course, to
 2   Property No. 1 and Property No. 2.
 3              First of all, purchase prices.  It says, "The
 4   purchase price Property No. 1 shall be $1,210,000 and --
 5   okay.  $1,210,000 in cash at closing, subject to normal and
 6   customary prorations."  And the purchase price --
 7              THE COURT:  I think you might be doing that.
 8              MR. PASANO:  I'm pretty sure he is, your Honor.
 9              MR. SHOCKLEY:  I like the old brown shoe Army days,
10   your Honor.  Is it maybe clothing hitting the microphone or
11   something?
12              THE COURT:  I don't know how you were doing it,
13   frankly.  I'm pretty sure it was you.
14              MR. SHOCKLEY:  It's a talent, your Honor.
15   BY MR. SHOCKLEY:
16   Q    Directing your attention to the purchase price on
17   Property No. 2, it says, shall be $815,000 in cash at
18   closing.
19              I want you to direct your attention, if you will,
20   to the handwriting on the letters -- on this letter.  First
21   of all, there is an arrow from the $1,210,000.  It goes up
22   and says, no, 8/14/01.  Is that correct?
23   A    That's correct.
24   Q    Whose handwriting is that?
25   A    That's mine.
```

1    Q    So you're rejecting that first offer; is that correct?

2    A    That's correct.

3    Q    And also, there's an arrow going up from $815,000,

4    there's the word handwritten in there, "no," and again,

5    8/14/01.  Is that correct?

6    A    That's correct.

7    Q    And again, that's your handwriting?

8    A    That's correct.

9    Q    And you're rejecting that offer?

10   A    Yes, I am.

11   Q    These initial lower figures, are those figures that have

12   already been agreed upon between you and Mr. Orr when the

13   first offer would be made?

14   A    The only number we agreed on would have been the

15   purchase price.  I didn't know what offer he was going to

16   come in at.  I knew it was going to be lower.

17   Q    Okay.  And then it would be just back and forth until

18   you came upon the agreed number?

19   A    Correct.

20   Q    Directing your attention to the writing in the

21   right-hand side.  It says, "me," M-E, and then a bracket, and

22   then it says "reply, $1,320,000."  Is that correct?

23   A    That's correct.

24   Q    Was that your counteroffer?

25   A    That was me going back to Marjorie.  That's correct.

1    Q    Which would then be relayed to the attorney on the other

2    side?

3    A    That's correct.

4    Q    Or actually, as it turns out, on your side; is that

5    correct?

6    A    That -- well, that's correct.

7    Q    And then the next is written underneath there "offer,

8    $1,270,000."  Is that correct?

9    A    That's correct.

10   Q    And then there's "reply, $1,300,000."  Is that correct?

11   A    That's correct.

12   Q    So this is your counteroffer to the offer on the other

13   side of $1,270,000?

14   A    Correct.

15   Q    And then an offer comes in at $1,290,000, and that's

16   underlined; is that correct?

17   A    That's correct.

18   Q    And that was the final offer that was, in fact,

19   accepted?

20   A    That's correct.

21   Q    By you?

22   A    That's correct.

23   Q    And this is the number that had already been agreed

24   upon?

25   A    That's correct.

1    Q    Is this all in your handwriting that we just read?

2    A    All of that is in my handwriting.  I'm writing down the

3    information I'm getting back from Marjorie Desporte, and

4    I'm --

5    Q    And again, this is just an act, is it not?

6    A    It has already been determined what the price is going

7    to be.

8    Q    So it was -- but rather than just make the offer of

9    $1,290,000 and you accepting it, why did you go through this

10   little charade?

11   A    To obviously make it look as it was an actual purchaser

12   countering and countering back.

13   Q    To make it look like a legitimate deal?

14   A    Absolutely.

15   Q    Directing your attention to the handwriting underneath

16   that.  Now, this is going to be for a leased fee; is this

17   right?  Excuse me.  That price of $1,290,000.  That's for a

18   leased fee.  That's going to be not the sale of an empty

19   building, but the sale of a building with a lease attached;

20   is that correct?

21   A    That's correct.

22   Q    And showing you the price on the previous appraisal,

23   Government's Exhibit 1.224.  The appraised value for even an

24   empty building was 1,570,000, which was above the $1,290,000;

25   is that correct?

1    A    That's correct.

2    Q    Now, taking the figures underneath that it says,

3    Property No. 2.  The initial offer was $815,000; is that

4    correct?

5    A    That's correct.

6    Q    We have similar handwriting in the right-hand margin.

7    This is still your handwriting?

8    A    Yes, it is.

9    Q    It says "me," and then a bracket reply, $890,000; is

10   that correct?

11   A    That's correct.

12   Q    So that was your counteroffer to the first offer that

13   had come in of 815,000?

14   A    Correct.

15   Q    So then an offer comes from Mr. Orr's attorney offering

16   830,000; is that correct?

17   A    Correct.

18   Q    So then you make a reply of $840,000; is that correct?

19   A    Correct.

20   Q    And that was the final, they accepted that offer on the

21   other side; is that correct?

22   A    That's correct.

23   Q    So that was actually the sale then of that leased fee

24   estate, the sale of the property with an accompanying lease;

25   is that correct?

1    A    That's correct.

2    Q    And directing your attention again back to Government's

3    Exhibit 1.225.  The appraisal for an empty building was not

4    $840,000, but it was $1,050,000 for just a fee simple; is

5    that correct?

6    A    That's correct.

7    Q    Excuse me.  I'm sorry.  Got the wrong exhibit.  It's for

8    the Lancaster property.  It's Government's Exhibit 1.223.  I

9    apologize.  It didn't sound right when I put it up on the

10   screen.

11        I want to direct your attention to Government's

12   Exhibit 1.223.  Instead of $840,000, an empty building would

13   be worth, at least according to this appraisal, $1 million;

14   is that correct?

15   A    Correct.

16   Q    There's also other writing, handwriting on this

17   typewritten letter.  At the top it says, "notes 8/14/01,

18   8/20/01.  Agreement, check purchase contract, check lease

19   contract."  Whose handwriting is this in?

20   A    That's mine.

21   Q    Now, when you're saying "check purchase contract and

22   check lease contract" and they're underlined, who is that

23   directed to?

24   A    Marjorie.

25   Q    Okay.  So you're directing her to make sure you check on

1    what?

2    A    All the contract language.

3    Q    Okay.  Again, this would portray you as what?

4    A    Totally separate from the purchaser.

5    Q    Directing your attention to the third page of that

6    letter.  They don't have any page numbers on it, but it

7    appears to be the third page.  It bears Bates label

8    ADT-LH-1146.  It says, "Contract Contingencies."

9    Contingencies on the purchaser's obligation to close this

10   contract include what under A?  Purchaser's ability to lease

11   back the properties to seller; is that correct?

12   A    That's correct.

13   Q    So that was the term of the offer?  We will sell -- buy

14   this property from you for this price if you lease the

15   properties back from us; is that correct?

16   A    That's correct.

17   Q    And B says, "triple net lease."  What does a triple net

18   lease mean?

19   A    That means that the only obligation that the owner of

20   the building has is actually to provide the building.  The

21   tenant is responsible for all maintenance, taxes, any

22   expenses related to the property.

23   Q    "C" is the purchaser receiving financing adequate to

24   cover 80 percent of the purchase price from a qualified

25   lender.

1    Did you have any direct contact with any of the

2    lenders who would be providing financing for the purchase of

3    these properties?

4    A    No, sir.  That was Greg's responsibility.

5    Q    Was it also his responsibility to deal with the

6    attorneys who would be representing the purchaser?

7    A    Yes, sir.

8    Q    Did you put even a nickel into this yourself?

9    A    No, sir.

10   Q    It's -- your contribution was what?

11   A    My contribution was to make sure that the prices were

12   agreed upon and they would get to the approval stage by ADT

13   and Fire and Security and Tyco.

14   Q    And you would do the best you could to get those

15   approved; is that correct?

16   A    That's correct.

17   Q    Because it was in your interest?

18   A    Correct.

19   Q    And Greg Orr's interest?

20   A    Correct.

21   Q    And additionally, did you agree you would not even

22   market these properties?

23   A    That's correct.

24   Q    Also it says:

25        "This purchase price is based on seller leaseback

1    agreements signed prior to purchase of above property."

2            So in other words, before the actual purchase took

3    place, ADT was required, if they wanted to take advantage of

4    this offer, to enter into that lease agreement either before

5    or simultaneously to the sale of the property, is that

6    correct?

7    A    Based upon the closing.

8    Q    So you and Greg Orr were not buying an empty building,

9    were you?

10   A    That's correct.

11   Q    It says, the leaseback agreement is market

12   rate/increase.  It's based on present market conditions.  Is

13   that how it worked out?

14   A    Yes, sir.

15   Q    And -- well, we'll get to that in a second.  Final

16   approval from Efficient Realty Development Corporation.  What

17   did you know about Efficient Realty Development Corporation?

18   A    Did not know anything.

19   Q    There's also some writing on, I guess it's the fourth

20   page, Page 4, bearing Bates label No. 1147.  At the very top

21   in the upper right-hand corner it says, "me, reply."  And

22   this is dealing with Property No. 1.  It says, "lease term."

23   And it's broken down to the first two years, the next two

24   years, so on and so forth.

25            And there's monthly installments.  Is that supposed

1    to be monthly lease prices?

2    A    That's correct.    Monthly lease prices.

3    Q    Now, the first one says $41,083.33.    That was the

4    initial offer in this letter; is that correct?

5    A    That's correct.

6    Q    In the upper right-hand corner it says "me, reply."    So

7    when you look on the right-hand side, eventually, it's

8    $38,666.67.    And it says underneath it, "save 360K plus" --

9    and I can't really make that out.    And it says 2 1/2 percent

10   increase every 12 months, 3 percent last five years.

11             Can you explain what that is to the jury?

12   A    Starting with the 38,667, if you subtract it from the

13   4103, it gives you somewhere around 2,000 and something

14   dollars savings a month.    Times 15 years would have been the

15   360,000.

16   Q    Okay.

17   A    And --

18   Q    So your indication here indicates that you're saving ADT

19   $360,000 by your counteroffer?

20   A    That's correct.    And the increase is 2 1/2 percent

21   increase every 12 months, 3 percent the last five years.

22   Q    This says in parentheses "bridge."    And underneath it

23   "lab."    What does that mean?

24   A    We had a facility in Deerfield.    We were going to close

25   that one.    But we had a bridge and a lab over there for

1    software engineering.  We were going to move over to Pompano

2    Beach.

3    Q    But again, this is all your handwriting?

4    A    That's correct.

5    Q    And then underneath that it has Property No. 2, lease

6    term.  And there are figures in there as well.  Monthly

7    installments.  It starts out, the top figure, $24,720.  And

8    on the right-hand side of that figure there's a figure,

9    $21,000 with a downward arrow.  And to the right of that,

10   3 percent increase every 12 months, 3 1/2 percent last five

11   years, and the letters "OK" and underlined.

12         Is that all your handwriting?

13   A    Yes, it is.

14   Q    Was that your counteroffer?

15   A    That was my counteroffer.

16   Q    Underneath that there's an arrow down that says, "lower

17   rate, square foot, save $400,000 plus."  And there is a

18   scribble underneath it.  What's that?  Just a scribble?

19   A    Just a scribble.

20   Q    But that's like an underline.  I see there's underlines

21   under square foot and then scribbles underneath that.  Was

22   that for emphasis?  Is it your handwriting?

23   A    It's my handwriting.

24   Q    Okay.

25   A    It is just scribbles.

1   Q    Okay.  So this is what you would send back to Marjorie

2   Desporte, who would relay that back to the attorney for

3   Gregory Orr; is that correct?

4   A    That's correct.

5   Q    Now, it shows here -- did you ever have any

6   conversations yourself with this attorney, Donald R. Spadaro,

7   attorney for Efficient Realty Development Corp.?

8   A    No, sir.

9   Q    Showing you now Government's Exhibit --

10          MR. SHOCKLEY:  Your Honor, at this time if I could

11  have Government's Exhibit 30.5.  We would offer into evidence

12  Government's 30.5, a certified copy of a public record.

13          MR. MARKUS:  No objection.

14          THE COURT:  30.5 is admitted.

15      (Received in evidence Government's Exhibit(s) 30.5.)

16          MR. SHOCKLEY:  Your Honor, with the Court's

17  permission, it's not being offered through this witness,

18  could I publish it nevertheless to the jury?

19          THE COURT:  All right.

20  BY MR. SHOCKLEY:

21  Q    First page of the document, Government's Exhibit 30.5

22  says:

23          "State of Florida, Department of State.  I certify

24  the attached is a true and correct copy of the complete file

25  of Efficient Realty and Development Corp., a corporation

1  organized under the laws of the State of Florida, filed on

2  August 2, 2001, as shown by the records of this office."

3           And the last line is:

4           "I further certify that said corporation was

5  administratively dissolved on September 15, 2006."

6           The third page bearing Bates label FL-52 states:

7           "Articles of Incorporation.  The name of this

8  corporation is Efficient Realty and Development Corp."

9           It says:  "The mailing address of this corporation

10  shall be 10571 Northwest 66th Street, Parkland, Florida,

11  33076."

12           Now, 33076, is that your zip code?

13  A    Yes, it is.

14  Q    In Parkland.  Is that where you reside?

15  A    Yes, it is.

16  Q    Who resides at or resided at that time at 10571

17  Northwest 66th Street?

18  A    Greg Orr.

19  Q    It says:

20           "The registered office -- the street address of the

21  initial registered office of this corporation is 3732

22  Northwest 16th Street, Fort Lauderdale, Florida, and the

23  registered agent is Filings, Inc., a Florida corporation."

24           Is that what it states?

25  A    Yes.

1   Q     Directing your attention to the next page.  It says:

2         "Initial board of directors.  The corporation shall

3   initially have one director.  The name and address of the

4   initial director is Gregory Orr, P/S/T."

5         Are you familiar with records maintained by Florida

6   Department of State concerning corporations and various

7   companies?

8   A     Yes, sir.

9   Q     What does the "P" and the "S" and the "T" stand for?

10  A     I'm not familiar with it.

11  Q     Okay.

12  A     I don't know.

13  Q     Directing your attention down farther.  Directing your

14  attention bearing the Bates label FL-57.

15        "Filed on August 10th, 2001, is a statement of

16  change of registered office and registered agent.  New

17  registered agent is Donald R. Spadaro, Esquire."

18        You're familiar that "esquire" refers to an

19  attorney?

20  A     Earlier, yes.

21  Q     And "1000 South Federal Highway, Suite 103,

22  Fort Lauderdale, Florida."

23        Was this -- does this appear to be the same Donald

24  Spadaro who provided the offer letter?

25  A     It appears to be.

1    Q    There's a signature under -- in the bottom right-hand

2    corner, it says -- above the printed name "Gregory Orr" there

3    appears to be a signature.  It says next to Gregory Orr,

4    president/director, date 8/6/01.

5          So the Efficient Realty Development Corp. that was

6    going to be the purchaser in that offer letter that Donald

7    Spadaro sent in that you identified and you wrote the figures

8    in the right-hand column, that Efficient Realty and

9    Development Corp. is -- was the corporation of Gregory Orr,

10   at least as a director -- a president and -- director and

11   president, is that correct, according to this document?

12   A    According to the document, yes.

13   Q    Okay.  Now, showing you the page bearing Bates label

14   FL-59.  There is an indication -- this is filed on April 1,

15   2002.  And it says:

16          "Officer/director resignation.  I, Gregory Orr,

17   hereby resign as president, secretary, treasurer, and

18   director of Efficient Realty and Development Corp."

19          I'm not going to read the rest of the sentence.  It

20   says:  "Gregory Orr, resigning officer/director," and a

21   signature dated March 8th, 2002.  Is that correct?

22   A    Yes.

23   Q    Do you recall when the closing was on the premises that

24   were sold to Efficient Realty -- well, what date was closing

25   on the Pompano Beach and Lancaster properties, if you recall?

1    A    February, 2002.

2    Q    Okay.  So this would have been the following month

3    Gregory Orr, at least from this document, appears to resign

4    from Efficient Realty Development Corp. as officer and

5    director; is that correct?

6    A    Yes.

7    Q    Directing your attention to Page FL-60.  This is filed

8    May 1, 2003, the following year.  This is entitled:  "2003

9    For-Profit Corporation Uniform Business Report" or a UBR.  In

10    the section where it says "officers and directors," it now

11    states:  "Vincent Artuso, 3390 South Ocean Boulevard, West

12    Palm Beach, Florida."  And next to the title is written

13    "PSTD."  Is that correct?

14    A    Yes.

15    Q    And then directing your attention to page bearing the

16    Bates label FL-61, 2004, For-Profit Corporation Annual

17    Report, filed on April 28, 2004, with the Secretary of State.

18         The current principal place of business is the

19    same.  The mailing address is the same.  And officers and

20    directors, it shows Vincent Artuso at an address on South

21    Ocean Boulevard.

22         Also, on that document it states:

23         "Name and address of new registered agent, John

24    Artuso," and an address of 900 Southeast 8th Street,

25    Deerfield Beach, Florida.

1          Do you recall what's located at 900 Southeast 8th

2    Street in Deerfield Beach?

3    A    Offhand, no.

4    Q    Directing your attention now -- or directing the jury's

5    attention to page Bates label FL-62, filed May 16th, 2005,

6    with the Secretary of State.  Again, it shows registered

7    agent of John Artuso, and officers and directors, PSTD,

8    Vincent Artuso.

9          MR. SHOCKLEY:  That completes the publication, your

10   Honor.  Thank you.

11   BY MR. SHOCKLEY:

12   Q    So now you have an offer on behalf of Efficient Realty

13   and Development Corp., the acceptance by yourself on behalf

14   of ADT for $1,290,000.  Showing you now Government's

15   Exhibit 1.51.

16         MR. PASANO:  If I can just reserve a motion with

17   regard to the previous exhibit to take up when the Court has

18   time.

19         MR. SHOCKLEY:  We would offer into evidence

20   Government's Exhibit 1.51.

21         THE COURT:  Is there objection to 1.51?

22         MR. MARKUS:  No objection, your Honor.

23      (Received in evidence Government's Exhibit(s) 1.51.)

24   BY MR. SHOCKLEY:

25   Q    Showing you now, Mr. Horton, Government's Exhibit 1.51.

1    It's entitled "Purchase and Sale Agreement."  First page of

2    it indicates in the opening paragraph:

3              "This agreement is made this 24th day of September,

4    2001, between ADT Security Services, Inc., the seller, having

5    offices at One Town Center Road in Boca Raton, and Efficient

6    Realty and Development Corp., a Florida corporation, having

7    offices c/o 1000 South Federal Highway, Suite 103,

8    Fort Lauderdale, Florida, or its assigns."

9              Is that what the first paragraph states?

10   A    Yes.

11   Q    Now, you've seen this document before; is that correct?

12   A    I have.

13   Q    And as a matter of fact, the original document you

14   signed?

15   A    Yes.

16   Q    On behalf of ADT?

17   A    Correct.

18   Q    First paragraph -- the paragraph numbered number one

19   says, "sale of property."  And this refers to an Exhibit A,

20   which is attached which describes the property.  And that's

21   the Pompano Beach property; is that correct?

22   A    Correct.

23   Q    And instead of calling it by the whole address, I'm

24   going to refer to it as the Pompano Beach property.  But it's

25   always -- when I ask you a question about the Pompano Beach

1    property, I'm going to be referring to the property at 2801

2    Gateway Drive, Pompano Beach, Florida.  Do you understand

3    that?

4    A    Yes.

5    Q    Directing your attention now down to the third

6    paragraph, the paragraph numbered three.  And again, it shows

7    that purchase price, $1,290,000.  Is that correct?

8    A    Yes.

9    Q    Directing your attention to the page bearing Bates label

10    ending in 274.  Next to No. 7 it has a contingency clause.

11    It says:

12         "Purchaser's obligation to close is specifically

13    contingent upon seller delivering to purchaser the following

14    prior to closing:  A, a fully executed lease between the

15    purchaser and landlord and seller as tenant in the form

16    attached hereto as Exhibit B."

17         Is that what it states?

18    A    Yes.

19    Q    Directing your attention to the next page bearing Bates

20    label 275.  Under Paragraph 8 -- obviously, at the closing,

21    8A, the seller, ADT, is going to have to present a deed to

22    the property.  But looking at No. 3, 8A3, it says:

23         "The seller shall deliver, quote, a certified

24    resolution of seller authorizing the entering into and

25    execution of this agreement, the execution of Exhibit B, the

1   lease, and the consummation of transaction herein

2   contemplated."  Is that correct?

3   A    Yes.

4   Q    So again, there's got to be a lease attached to this

5   purchase; is that correct?

6   A    They're binding together.  Correct.

7   Q    Directing your attention to the page bearing Bates label

8   276, paragraph 10 says:

9          "Brokerage and closing expense credit.  Parties

10  represent to the other that there are no brokers involved

11  with this transaction."

12         And of course with -- on the ADT side, was there

13  any broker involved?

14  A    No, there was not.

15  Q    Are you aware of any broker that was involved on the

16  other side?

17  A    No.

18  Q    No, you're not aware or, no, there was not a broker?

19  A    To my knowledge, there was no broker involved.

20  Q    So it states:

21         "The parties represent to the other that there are

22  no brokers involved with this transaction; however, in

23  consideration of the purchaser's expenses, the seller shall

24  pay the purchaser the sum of 6 percent of the purchase price

25  by separate check or by credit at purchaser's option at

 1    closing."

 2            So this was an agreement that ADT would also pay

 3    6 percent of the purchase price to the purchaser.  And that

 4    would be to Efficient Realty and Development Corp.; is that

 5    correct?

 6    A    That's correct.

 7    Q    Directing your attention to Page 8 of the document

 8    bearing Bates label 279.  Paragraph No. 16 states:

 9            "Prohibition of recording.  If any attempt to

10    record this agreement or any memorandum thereof or any

11    reference hereto in the public records is made by purchaser

12    or any agent or representative of purchaser, seller shall

13    have the right to terminate this agreement, in which event,

14    escrow agent shall deliver the deposit to seller and the

15    parties shall be relieved of any further liability or

16    obligation hereunder except as otherwise specifically

17    provided herein."

18            Now, what intention, if any, did you have to

19    publicize this agreement?

20    A    I don't -- myself, I don't really understand No. 16, why

21    it would be there.

22    Q    But if -- the writing speaks for itself; is that

23    correct?

24    A    Yes, it does.

25    Q    Directing your attention to Page 9 --

 1          THE COURT:  Find, when you can also, a convenient

 2     place to stop.

 3          MR. SHOCKLEY:  I serve the Court's pleasure.

 4     Excuse me.  I can finish up this document in just a second.

 5          THE COURT:  All right.

 6     BY MR. SHOCKLEY:

 7     Q    Showing you Page 9280, paragraph 24.  It actually

 8     incorporates the legal description and a sample lease

 9     agreement; is that correct?

10     A    Yes, it does.

11     Q    Now, the lease agreement itself is going to be executed

12     at the time of closing on the property; is that correct?

13     A    That's correct.

14     Q    Would there be occasions where leases would be signed

15     even in advance of the lease date?

16     A    It was common to sign leases in advance of dates,

17     whether it be a simple lease, not owning the building, or

18     possibly a sale, so that the owner or buyer could go out and

19     get bank financing.

20     Q    And showing you finally Page 11 -- last thing, your

21     Honor -- Page 11 bearing Bates label 282.  The signature of

22     the parties.  On the right-hand side under seller, is that

23     your signature?

24     A    Yes, it is.

25     Q    And next to it is "VP 9/18/01"; is that correct?  Or am

1    I reading that right?  I can't tell.  I'm sorry, Mr. Horton.

2    But anyway, sometime in September of '01?

3    A    That would have been after the legal issues had been

4    addressed through the real estate attorney.  That's correct.

5    Q    And in reference to the real estate attorney, Marjorie

6    Desporte and Maggie Carbo, you said Maggie Carbo worked for

7    you or in your section?

8    A    She worked in my group, helped manage real estate.

9    Q    And Marjorie Desporte, she was the real estate attorney

10   that was going to be handling this for ADT?

11   A    That's correct.

12   Q    Under purchaser, Efficient Realty and Development Corp.

13   on the second line, it wrapped around so it was scratched out

14   and "Corp." was written on the top line, Efficient Realty and

15   Development Corp., the signature underneath that is Gregory

16   Orr, president; is that correct?

17   A    Yes.

18   Q    And it says, under the witnesses, someone named Mark

19   Gaeta.  Did you know who Mark Gaeta was?

20   A    No, I do not.

21   Q    Did you at that time?  Excuse me.  Do you know now?

22   A    I know now that he is a real estate attorney.

23   Q    But at that time you didn't know what he was?

24   A    No, I did not.

25   Q    Just someone witnessing that; is that correct?

1    A    That's correct.

2    Q    The other signature underneath it bears the signature of

3    Donald Spadaro.  Does that appear to be the Donald Spadaro

4    that sent in the offer letter?

5    A    It appears to be.

6         MR. SHOCKLEY:  Your Honor, I have no other

7    questions at this time.

8         THE COURT:  Let's stop for lunch and return at

9    1:30.

10    (Jury out at 12:31 p.m.)

11         THE COURT:  Okay.  Have a seat for a minute.

12    Mr. Pasano, you had an issue.

13         The witness can step down if you would like.

14         MR. PASANO:  Judge, it is a Rule 105 issue and it

15    related to Exhibit 30.5.  And the issue is whether or not

16    inadvertently the jury was being misled with regard to

17    Efficient Realty and Development Corp.

18         The questions put to the witness at the time were

19    in the context of this offer that's made in September of '01.

20    But as the document was published you began to see an '03 and

21    '04 the name of either John or Vincent Artuso.  The potential

22    misleading aspect of the manner in which it was presented was

23    what while Efficient Realty and Development Corp. was the

24    initial entity that made the offer when the three properties

25    were purchased, by that time, actually lawyers had created

1    other entities, including with regard to Efficient two LLCs.

2    One of them a Florida and one of them a Pennsylvania LLC.

3         And so, the ownership or the purchase of these

4    properties actually occurred through a different entity.

5         The jury is being left with the impression that

6    John and Vincent Artuso through Efficient Corp came to own

7    those entities when in fact the facts are something

8    different.

9         We'll be able to argue it.  But in the nature of a

10   105 objection, I ask through the Court that the Government,

11   since the witness is on the stand now and the document was

12   presented, at least clear up so no one has the confusion that

13   as of February of 2002, when these closings occurred, it was

14   a different entity that actually took ownership of two of

15   these properties.  Otherwise, the jury is left with an

16   impression that somehow these properties were bought in one

17   name, flipped into another name; and that's not the way it

18   happened.

19         MR. SHOCKLEY:  Your Honor, we'll have the

20   additional documents and future documents will be presented

21   to show how the assignment was made.  But, you know, it's all

22   going to be clear in time.  And certainly, defense counsel

23   can handle this on cross-examination if there's any lingering

24   doubt that's left after the Government has concluded with all

25   of its exhibits.

1          THE COURT:  All right.  Okay.  We'll see you at

2    1:30.  Have a good lunch.

3        (Recess at 12:35 p.m.)

```
 1                          I N D E X

 2   WITNESS                                            PAGE

 3   WILLIAM LARRY HORTON, GOVERNMENT'S WITNESS, SWORN ........16
     DIRECT EXAMINATION BY MR. SHOCKLEY ......................17
 4

 5

 6   EXHIBITS                                       RECEIVED

 7   GOVERNMENT'S EXHIBIT(S) 1.1 AND 1.6 ......................44
     GOVERNMENT'S EXHIBIT(S) 1.5 ..............................45
 8   GOVERNMENT'S EXHIBIT(S) 1.2 ..............................48
     GOVERNMENT'S EXHIBIT(S) 37.1 .............................48
 9   GOVERNMENT'S EXHIBIT(S) 37.2 .............................49
     GOVERNMENT'S EXHIBIT(S) 37.3 .............................50
10   GOVERNMENT'S EXHIBIT(S) 37.4 .............................51
     GOVERNMENT'S EXHIBIT(S) 38.4 .............................52
11   GOVERNMENT'S EXHIBIT(S) 38.1, 38.2, AND 38.3 .............55
     GOVERNMENT'S EXHIBIT(S) 40 ...............................62
12   GOVERNMENT'S EXHIBIT(S) 1.147 ............................69
     GOVERNMENT'S EXHIBIT(S) 1.7 ..............................79
13   GOVERNMENT'S EXHIBIT(S) 1.10 .............................82
     GOVERNMENT'S EXHIBIT(S) 1.223, 1.224 AND 1.225 ..........100
14   GOVERNMENT'S EXHIBIT(S) 1.136 ...........................115
     GOVERNMENT'S EXHIBIT(S) 30.5 ............................128
15   GOVERNMENT'S EXHIBIT(S) 1.51 ............................133

16

17

18

19

20

21

22

23

24

25
```

1              C E R T I F I C A T E

2        I, Karl Shires, Registered Professional Reporter, certify

3   that the foregoing is a correct transcript from the record of

4   proceedings in the above-entitled matter.

5        Dated this 5th day of February, 2009.

6

7   _____

8   Karl Shires, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25