```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF FLORIDA
 2

 3   UNITED STATES OF AMERICA,        )  Case No.
                                      )  08-60014-CR-MIDDLEBROOKS
 4                     Plaintiff,     )
                                      )
 5            -v-                     )
                                      )
 6   VINCENT F. ARTUSO, JOHN VINCENT  )
     ARTUSO, GREGORY ORR, ROBERT M.   )
 7   GANNON, AND PHILIP EDWARD FORGIONE,)
                                      )
 8                     Defendants.    )  West Palm Beach, Florida
                                      )  September 12, 2008
 9   _____)  8:55 a.m.

10              Volume 3 of 17 - PAGES 1 - 247

11              TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
12                U.S. DISTRICT JUDGE, AND A JURY

13
     Appearances:
14
     For the Government:        J. BRIAN MCCORMICK
15                              WILLIAM T. SHOCKLEY
                                Assistant United States Attorneys
16                              500 East Broward Boulevard
                                Fort Lauderdale, Florida  33394
17
     For the Defendant:        PETER VINCENT BIRCH
18   Vincent F. Artuso         Assistant Federal Public Defender
                               450 Australian Avenue, Suite 500
19                             West Palm Beach, Florida  33401

20   For the Defendant:        CARLTON FIELDS
     John Vincent Artuso       BY:  MICHAEL S. PASANO, ESQ.
21                             100 SE 2nd Street, Suite 4000
                               Miami, Florida  33131
22

23   Reporter:                 Karl Shires, RPR
     (561) 514-3728            Official Court Reporter
24                             701 Clematis Street, Suite 258
                               West Palm Beach, Florida  33401
25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1    Appearances: (Continued)

 2

      For the Defendant:          DAVID OSCAR MARKUS, ESQ.
 3    Gregory Orr                 ROBIN ELLEN KAPLAN, ESQ.
                                  169 E. Flagler Street, Suite 1200
 4                                Miami, Florida  33131

 5    For the Defendant:          ALLAN B. KAISER PLLC
      Robert M. Gannon            BY:  ALLAN BENNETT KAISER
 6                                111 NE 1st Street, Suite 902
                                  Miami, Florida  33132
 7
      For the Defendant:          ENTIN & DELLA FERA
 8    Philip Edward Forgione      BY:  ALVIN ERNEST ENTIN, ESQ.
                                  110 SE 6th Street, Suite 1970
 9                                Fort Lauderdale, Florida  33301

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  Please be seated.

 2              Looks like everyone is here.

 3              And the Government has filed a memorandum on this

 4    issue that we've been discussing.  Has everyone seen that.

 5              MR. PASANO:  Yes, sir.

 6              MR. MARKUS:  Yes.

 7              THE COURT:  Do you all have anything else you

 8    wanted me to look at?  What's the defense position with

 9    respect to these issues?

10              MR. MARKUS:  I think everyone will want to say a

11    couple words about it, Judge.  I think actually the most

12    instructive thing about the memo is that the cases the

13    Government cites actually end up excluding similar

14    statements.  Like the Posner case at the very end that

15    Mr. McCormick cites says that, in rare cases these statements

16    can be admissible but not in that case or the many others in

17    the Eleventh Circuit, like Magluta.

18              Concealment, like the Court said, can be part of,

19    as Grunewald said, any conspiracy.  So those sorts of

20    statements are not admissible and there's all sorts of

21    reasons.  I don't know if you want to hear from all of the

22    defense counsel.  But there are all sorts of reasons other

23    than not in furtherance of the conspiracy that these

24    statements are not admissible.  I mean talk about a newspaper

25    article.  Some of the statements that we're hearing for the
```

```
1   first time are inadmissible on lots of other grounds as well

2   so . . .

3           MR. PASANO:  Judge, just on behalf of John Artuso,

4   reading quickly the Government's reply gives me even greater

5   pause than yesterday when we were just arguing based on what

6   we knew then.  The salacious nature of these statements and

7   the attenuated argument that the Government makes trying to

8   connect them to some ongoing conspiracy in which my client

9   John Artuso suffers not because he is a speaker or a

10  participant, but because somebody else is purportedly saying

11  something that's outrageous, severally threatens his due

12  process rights.

13          So it is sort of like what I said yesterday times

14  ten, if I can say that, your Honor.  And I note that the

15  Government's responses don't view any cases after Magluta.

16  And in fact, tend to cite to the Court cases that are 10 or

17  20 years old.  A lot of jurisprudence has occurred in the

18  last five years in particular, and while the Eleventh Circuit

19  has traditionally been somewhat liberal about coconspirators'

20  statements after the supreme court's rulings in a variety of

21  cases, it is not so clear.

22          Roberts is no longer the law, for example, and

23  there's a great slippery slope that the Government is

24  inviting this Court to go down.

25          THE COURT:  There's a distinction with Magluta.  In
```

```
 1    Magluta the case was basically the bribe had been paid up to
 2    the juror.  Here, their argument is, they're still continuing
 3    to reap the benefits of this, of the payments from ADT and
 4    they also have this contribution to the defense fund issue
 5    that would also seem to extend it.
 6            What's your response to that?
 7            MR. PASANO:  And I'll give my response on behalf of
 8    John Artuso.  I don't mean to usurp my brother counsel.
 9            The first question I think that's raised is at this
10    stage of the evidence or by the time the case ends, where
11    will the Government's proofs be about what this so-called
12    conspiracy was and when, if it ever operated, it ended?  The
13    concerns the Court expressed yesterday about Grunewald and
14    how open-ended notion of concealment could literally extend
15    an alleged crime forever, actually applies as well to the
16    Government theory here.
17            The Government says that the purpose of this
18    conspiracy was to make money.  So as long as people were
19    trying to make money, this thing goes on.  Which really means
20    this is a conspiracy in perpetuity as far as the Government
21    is concerned.
22            Our position is that actually whatever is alleged,
23    if it is, in fact, part of any conspiracy, literally stops at
24    the moment that Horton has done his magic, according to the
25    Government's theory, and now you're on automatic pilot.  And
```

1    that's the testimony.  They're on automatic pilot after these

2    deals close and Horton is having nothing to do with the fact

3    that every month checks issue.  And these people could be in

4    Alaska and they'd still be getting checks.  They don't even

5    have to have ever talked to each other again and they would

6    still be getting checks.  The idea that somehow this

7    conspiracy can continue year in year out without the

8    conspirators actually doing something to the objects of the

9    conspiracy, I believe extends the conspiracy far beyond where

10   it should go.

11         So I start with the idea that the Government's

12   wrong on when this conspiracy is operating.  Even if it was

13   the way they've alleged, that it is ongoing, the idea, for

14   instance, of asking people to pay money to a defense fund is

15   itself a problem because of what it implicates in terms of

16   constitutional rights.  And we struggled a lot about, you

17   know, why does somebody hire a defense lawyer.  And now even

18   have jury instructions where we have to tell jurors, it's

19   okay.  And now that's introduced in these statements as well.

20         THE COURT:  Although, the fact that Horton is

21   contributing to that would have some evidentiary, certainly

22   some relevance in terms of the relationship among these

23   individuals, wouldn't it?

24         MR. PASANO:  And I don't deny that, your Honor, in

25   terms of that fact.  The statements associated with it, I

```
 1   think, are problematic and of course, what's interesting is

 2   it's apparently in the context of we didn't do anything

 3   wrong, but we have had to hire lawyers.

 4          You know, I mean, what -- if we were to assume the

 5   hypothetical, which I know is anathema to the Government,

 6   that these are innocent men who are under investigation if

 7   they hire a lawyer, is that wrong?  And if they contribute to

 8   a joint defense fund, is that wrong?  And we already agree

 9   and concede and would, I suspect, stipulate -- these people

10   know each other.  They're certainly in business together on

11   this group.

12          What does that fact add to anything that the

13   Government's proving except potentially to taint the jury.

14   So that's the 403 side of what the Government is urging this

15   Court is marginally relevant under 401.

16          But there are so many different issues that are

17   popping up here --

18          THE COURT:  All right.

19          MR. PASANO:  -- that I'm suggesting that it's just

20   a series of dangerous moments.

21          THE COURT:  All right.  Let me --

22          MR. PASANO:  While the Government says -- the thing

23   that concerns me the most is, Judge, and then I'll shut up,

24   is the notion that either on the Internet or otherwise there

25   are statements that my client John Artuso has been in jail.
```

```
 1    Now the Government says in a footnote they don't intend to

 2    elicit that, but we don't know what this witness is going to

 3    say.  And the Government often puts those footnotes in

 4    because then when the witness says it, they're going to say

 5    it was an invited response and we warned you.

 6         Well, that's not right, your Honor.  It's a very

 7    dangerous proposition once you begin to allow anything to be

 8    said after the FBI shows up, unless we strictly police it.

 9    And I know your Honor has indicated yesterday concerns in

10    that regard, and I would suggest that this proffer should

11    only exacerbate those concerns rather than allay them.

12         THE COURT:  Let me ask, Mr. Kaiser and Mr. Entin,

13    we haven't heard as much about your clients so far.

14         MR. ENTIN:  Judge, clearly --

15         THE COURT:  Wait a second.  Let me ask you the

16    question before you answer it.

17         I'm curious if these statements are coming in, your

18    reaction to an instruction -- I mean, that -- at least at

19    this point, they could only be used against the speaker and

20    not to your clients.  A cautionary instruction is essentially

21    the question.

22         MR. ENTIN:  My problem with the cautionary

23    instruction is in the context of this case in which the

24    Government is charging that my client is a member of a South

25    Florida Gambino family crew, that such an instruction would
```

 1    be totally insufficient and then I think that the only

 2    appropriate thing would be to sever Mr. Forgione from this

 3    case and at least to put me in a position where I don't have

 4    to deal with whether or not this instruction is going to be

 5    of any effect in the context of the indictment that I already

 6    have to face.

 7            THE COURT:  Mr. Kaiser, what's your view?

 8            MR. KAISER:  Your Honor, I agree.  If you were to

 9    allow these statements to come in, even with a limited

10    instruction, I feel that the spillover affect from such

11    compelling evidence would be such that I don't think the

12    jurors would, despite the instruction --

13            THE COURT:  But under the admission rule, I mean

14    how are they kept out under the -- most any kind of analysis,

15    don't they come in?  At least against --

16            MR. KAISER:  Against my client?

17            THE COURT:  No.  Against the --

18            MR. KAISER:  Well, I would say no.  I don't think

19    so.

20            THE COURT:  -- against -- I guess the speaker at

21    least initially is Orr, it sounds like.

22            MR. KAISER:  But I don't think they would come in

23    necessarily as statements in furtherance of the conspiracy

24    because I think independent of those statements by one

25    conspirator doesn't have to be evidence --

10

```
 1              THE COURT:  All right.  But then it is not
 2    admissible as to your client.  But I'm trying to figure out
 3    an analytical framework.  If it comes in against Orr, why
 4    isn't -- why is not a limiting instruction appropriate?
 5              MR. PASANO:  Judge, I think the only thing --
 6              THE COURT:  And doesn't it come in against Orr, I
 7    guess, is my question.
 8              MR. PASANO:  Judge --
 9              THE COURT:  Let me stick with Kaiser a minute.
10              MR. KAISER:  If you're saying that it's going to
11    come in against Orr because he made the statements --
12              THE COURT:  Don't they?
13              MR. KAISER:  That very well might be.
14              THE COURT:  Let's walk down that -- I'm not asking
15    you to argue on behalf of the other.
16              MR. KAISER:  Assuming it does, that's fine.
17              THE COURT:  Right.
18              MR. KAISER:  But then I would say it certainly
19    doesn't come in against my client.  And you're suggesting a
20    limited instruction to the jurors and they're not to consider
21    that evidence against my client, correct?
22              THE COURT:  Correct.  I mean if it is an admission
23    against one then, it would come in with a limiting
24    instruction as to the others.  Wouldn't that be the remedy?
25              MR. KAISER:  That would be the remedy but I'm
```

 1    saying there are certain situations where the remedy just

 2    doesn't fit, and this is one of those cases where such

 3    evidence of this type of nature, I think, would be just so

 4    compelling that the jury would necessarily not follow your

 5    instruction and group everybody together when they hear that

 6    kind of evidence.

 7             And while jurors are presumed to follow the Court's

 8    instructions, we all know that's Eleventh Circuit law, that

 9    doesn't apply in all cases.  Particularly, for example,

10    Bruton.  A violation of Bruton can't be cured with an

11    instruction.  I say when the evidence is this compelling and

12    that type of nature that would be sought by the Government, a

13    simple limiting instruction I don't think suffices.

14             THE COURT:  But Bruton wouldn't apply here, would

15    it?

16             MR. KAISER:  No, no.  It would not.  But I'm just

17    as an example, sometimes jurors just cannot follow

18    instructions.  I'm saying on a case like this with that type

19    of evidence, my fear will be they'll just lump everybody

20    together.  And that's why I would ask for a severance because

21    I don't think a limiting instruction is enough.

22             THE COURT:  All right.

23             MR. PASANO:  And Judge, if I could --

24             THE COURT:  Well, let's --

25             MR. PASANO:  -- Bruton may apply.

1          THE COURT:  Why?

2          MR. PASANO:  If it's an admission, and if the Court

3   says I'm laying it as an admission, that's akin to a

4   confession.  And if the statements are interlocking such that

5   in the course of that admission other defendants are

6   implicated, then Courts have held that's a reason either to

7   redact the statements or not allow them in.

8          THE COURT:  Is there any case that says that Bruton

9   applies in a circumstance such as this with an admission that

10  is not testimonial in nature?  Not a statement made to law

11  enforcement, but a statement made to allegedly other

12  participants.  Do you have any case on that?

13         MR. PASANO:  As I stand here now I do not, your

14  Honor.

15         THE COURT:  All right.

16         MR. BIRCH:  Your Honor, if I may something.  First

17  of all, I want to make sure it's clear I'm adopting the

18  arguments that's already been made by counsel for the

19  codefendants.  I'm not opting out.

20         But I submit that Bruton would apply to any

21  statements by a codefendant that implicates another

22  defendant.  It doesn't have to be a statement to a law

23  enforcement officer.  I haven't -- I walked in --

24         THE COURT:  Do you have a case that Bruton

25  basically takes 801 out of play?

```
 1              MR. BIRCH:  As far as a coconspirator statement, is

 2    that what you're saying?

 3              THE COURT:  Or an admission.

 4              MR. BIRCH:  I don't have one with me right at the

 5    moment but I would like some time to research it because I

 6    don't think Bruton is limited to just statements that fall

 7    outside of 801, or anything else.  I think a statement by a

 8    codefendant that implicates a defendant --

 9              THE COURT:  All right.  I'll give you a chance

10    to -- Mr. McCormick, I don't want to get into -- after the

11    FBI appears on the scene, at this stage of the case, I'm not

12    prepared to find 801(d)(2)(E) applies without further proof

13    of a conspiracy.  So far, you've got some evidence of a

14    conspiracy that probably meets the preponderance stage as to

15    Orr and Horton.  We haven't heard really no evidence about

16    Forgione or Gannon.

17              MR. McCORMICK:  As to Artuso though you have heard

18    evidence, your Honor.

19              THE COURT:  Not much.  Cooking fish in the kitchen

20    and --

21              MR. McCORMICK:  No.  No.  When Orr spoke with

22    Horton at one of these several meetings, Mr. Orr advised him

23    that both Artusos were in on it and they knew of the

24    existence and the plan to defraud ADT.  Now, that's one thing

25    that can be used to establish the conspiracy as at least
```

1    these two defendants, as well as Orr and Horton.

2            However, the other point I want to make, your

3    Honor, these statements, as the Court well knows, you can use

4    those statements for further evidence of the conspiracy under

5    existing law.

6            THE COURT:  But frankly, I'm worried about the tail

7    wagging the dog.  Your most explosive evidence it sounds to

8    me is after the FBI appears on the scene, at least from what

9    I've seen so far.  And at some point what I'm concerned about

10   is the possibility of everyone being swept into a conviction,

11   a racketeering conviction, because one guy knows John Gotti.

12           MR. McCORMICK:  We're not even at that point, your

13   Honor, but --

14           THE COURT:  Well --

15           MR. McCORMICK:  But the point I'm trying to make,

16   your Honor, is that that's what conspiracy law is.  Where

17   it's appropriate, these coconspirator statements do implicate

18   people who aren't there.

19           THE COURT:  But you're on dangerous ground trying

20   to prove your case with concealment type evidence.  I mean

21   there are some cases that stand in your way.  Now, whether or

22   not your ongoing conspiracy theory can take you past that, at

23   least we know it's tenuous ground.  And you're trying to do

24   that before you've even established the initial conspiracy in

25   my view, at least as to Gannon and Forgione.  You have a

```
 1   little testimony about the Artusos, but not much at this

 2   stage.

 3            MR. McCORMICK:  Well, the only way we can get that

 4   evidence in through this witness is what the Court -- my

 5   point is, your Honor, once the FBI contacted Horton, that's

 6   irrelevant as to what's said after that, other than that

 7   triggered what's said after that.  These coconspirators,

 8   these statements that --

 9            THE COURT:  But it's all concealment, isn't it?

10            MR. McCORMICK:  Well --

11            THE COURT:  It's all concealment after that stage.

12   None of it goes to whether or not -- none of it goes to

13   whether they engaged in the initial conspiracy to rip off

14   ADT.  It's all concealment or obstruction, intimidation type

15   evidence.  Correct?

16            MR. McCORMICK:  Thus far.  That you've heard, yes,

17   your Honor.  Now, this witness is also going to testify about

18   the setting up of LLCs and things like that this morning,

19   that -- and the LLCs, by way of proffer, were also set up for

20   the coconspirators.  There were further tiered LLCs for

21   Artuso, Forgione.

22            THE COURT:  All right.  Well, let's go down that

23   road as far as we can.  I'm not prepared at this point, so

24   you know, to find 801(d)(2)(E) applies to these statements

25   after the FBI appears.  I may, down the road, reconsider that
```

```
 1   based on the other evidence in the case.

 2              MR. McCORMICK:  And the party admission?

 3              THE COURT:  I'm sorry?

 4              MR. McCORMICK:  And the party admission under 801?

 5              THE COURT:  Well, I mean that gets you squarely

 6   into the severance.  I assume you oppose severance; is that

 7   right?  Or do you want a severance?

 8              MR. McCORMICK:  Of course, we don't want a

 9   severance, your Honor, but this evidence should come before

10   the jury.

11              THE COURT:  Well, why can't you wait on the

12   remainder of Horton's testimony until after you have proved

13   your initial conspiracy?  Or is this it?  Is this all the

14   evidence you have on the others?

15              MR. McCORMICK:  No, it's not, your Honor.  But the

16   Bourjaily case teaches we don't have to do that.  We proceed,

17   and there's conclusions that are reached while we're

18   proceeding and these types of statements are being admitted.

19              THE COURT:  I'm not going to tell you how to try

20   your case, but I've also told you how I'm likely to rule if

21   you push forward at this point.

22              MR. McCORMICK:  I understand.  Well, obviously,

23   Judge, we've depended upon pushing forward --

24              THE COURT:  Okay.  Well, if that's the route you

25   go --
```

 1              MR. McCORMICK:  I don't know that it is.  But --

 2      what I'm advising the Court is I know the Court is a stickler

 3      for scheduling, so I'd have to speak with Mr. Shockley.  I

 4      just don't know if we're prepared to do, to proceed with

 5      Mr. Horton on the grounds that the Court is directing us to.

 6              THE COURT:  Well, you've got a lot of ground, I

 7      assume, to cover with Horton before the FBI arrives on the

 8      scene, don't you?

 9              MR. McCORMICK:  We do, I guess.  Mr. Shockley says

10      we do.

11              THE COURT:  Well, you all talk quickly and figure

12      out what you want to do.

13              MR. McCORMICK:  All right.

14              THE COURT:  But if we get to that point, on this

15      record, 801(d)(2)(E) I don't think will be available to you,

16      and then the question will be squarely faced as to severance

17      if they ask for it.

18              Okay.  Let's invite the jury in.

19          (Jury in at 9:12 a.m.)

20              THE COURT:  Welcome back.  Please be seated.

21              Thank you for your patience in waiting.  The

22      lawyers were here and working.  We were trying to deal with

23      some legal issues that we're faced with, to avoid having to

24      interrupt the proceedings and deal with it then.

25              Mr. Shockley, please continue.

```
 1              MR. SHOCKLEY:  Thank you, your Honor.  We would

 2     recall Larry Horton to the witness stand.

 3        WILLIAM LARRY HORTON, GOVT'S WITNESS, PREVIOUSLY SWORN

 4                    DIRECT EXAMINATION (RESUMED)

 5     BY MR. SHOCKLEY:

 6     Q    Mr. Horton, I'm going to see if I can try to remember

 7     where I left off.

 8              MR. SHOCKLEY:  I believe, your Honor, the last

 9     exhibit that was admitted was -- did the Court admit 1.71,

10     Government's Exhibit 1.71?

11              THE COURT:  Well, let me take a second to get

12     organized here.

13              MR. PASANO:  Judge, I think and 1.67 were the last

14     two.

15              MR. SHOCKLEY:  I'm confused about whether or not we

16     actually covered 1.67.

17              THE COURT:  I don't have 1 point -- you say 1.167?

18              MR. SHOCKLEY:  No, your Honor.  1.67.

19              MR. MARKUS:  That was admitted.

20              MR. SHOCKLEY:  It may have been admitted.  I'm not

21     sure that we actually covered that.  I'm going to just start

22     --

23              THE COURT:  I show it admitted, but I don't know if

24     you covered it.

25              MR. SHOCKLEY:  That's where I am.
```

 1              THE COURT:  Okay.

 2              MR. SHOCKLEY:  So if your Honor, the Court please,

 3    I would like to publish that exhibit.  This is Government's

 4    Exhibit 1.67.

 5    BY MR. SHOCKLEY:

 6    Q    Mr. Horton, I want to direct your attention to the

 7    exhibit that's now displayed on the screen.  At the top it

 8    says "ADT Security Services Recurring Payment Request."  And

 9    it indicates for building rent.  And you see, there's a

10    reference to location.  This relates to the Palm Harbor

11    property that you previously testified to; is that correct?

12    A    That's correct.

13    Q    And again, to refresh our recollections, this recurring

14    payment request is what?  What kind of document is that at

15    ADT?

16    A    It's an internal document that's transmitted to Aurora,

17    Colorado, from Boca to set up an account for repeated

18    payments.

19    Q    Okay.  And these would be the repeated monthly payments;

20    is that correct?

21    A    That's correct.

22    Q    Now, you mentioned it's set up so payments can commence

23    in Aurora, Colorado.  What is it that's located in Aurora,

24    Colorado, that would facilitate these payments?

25    A    Aurora, Colorado, contained our back office operation,

1    which was our accounts payable, receivable, and we had a

2    large monitoring office there for alarms; fire or burglary.

3    Q    And again, when you say "monitoring," you're talking

4    about a location where people physically work and answer

5    telephones and monitor alarms; is that correct?

6    A    That's correct.

7    Q    This is as opposed to these bridge facilities that are

8    located around the country that merely transmit information?

9    A    That's correct.

10   Q    And also, directing your attention to the top portion

11   that says, base rent plus 7 percent taxes, and it gives a

12   figure of $21,257.67.  Now, the plus 7 percent taxes, is this

13   something that ADT had agreed to pay pursuant to the triple

14   net lease it entered into with, in this case, Westmore

15   Properties, LLC?

16   A    Leases in Florida are subject to a tax on the lease

17   payments, and all leases that I have worked with, that number

18   is always a plus.

19   Q    Okay.  So at least in Pinellas County where Palm Harbor

20   is located, it indicates the rent would be plus 7 percent

21   taxes; is that correct?

22   A    That's correct.

23   Q    So when one were to -- if one were to look back and see

24   what the payment schedules were on a lease, those figures

25   would not jibe exactly with what's here on this form because

1  this form also includes the taxes that ADT was paying?

2  A    That's correct.

3  Q    If you look farther down, there is a reference to

4  Westmore Properties.  That would be the payee; is that

5  correct?

6  A    That would be correct.

7  Q    Again, there's a reference to a vendor contact, Ken

8  Wurtenberger.  Do you recall his name coming up yesterday

9  during the course of the testimony?

10  A    Yes, I do.

11  Q    Do you recall that he is an attorney that is involved in

12  one of the transactions?

13  A    Yes, I do.

14  Q    And again, did -- as these payments are being made and

15  he's listed as a contact person, did you ever have any direct

16  contact with that attorney?

17  A    No, I did not.

18  Q    And again, when you get down to the bottom of the

19  document, there's a reference to your name.  Is that your

20  signature on the form?

21  A    Yes, it is.

22  Q    And the date appears to be 2/20/02; is that correct?

23  A    That's correct.

24  Q    So after the initial payment was made by check of the

25  first month's rent along with the security deposit and the

1   credit for the brokerage fee or closing costs, however it was

2   referred to, this would actually engage the mechanism by

3   which the checks or the electronic money funds transfers

4   would commence on a monthly basis?

5   A    Automatically, that's correct.

6   Q    Okay.  Do you recall whether -- well, did you have any

7   direct involvement in how the money would be paid, either by

8   check or wire transfer?

9   A    No, sir.

10  Q    Now, this recurring money request was dated

11  February 20th of 2002.  If I can go now --

12          MR. SHOCKLEY:  Your Honor, we would offer into

13  evidence Government's Exhibit No. 1.52.

14          MR. MARKUS:  No objection.

15          THE COURT:  1.52 is admitted.

16      (Received in evidence Government's Exhibit(s) 1.52.)

17          MR. SHOCKLEY:  Your Honor, permission to publish

18  the exhibit?

19          THE COURT:  Yes, go ahead.  Thank you.

20  BY MR. SHOCKLEY:

21  Q    Mr. Horton, now showing you Government's Exhibit 1.52.

22  Again, this is referred to at the top as an "ADT Security

23  Services Recurring Payment Request;" is that correct?

24  A    That's correct.

25  Q    Now, this one -- I'm going to find a white piece of

1    paper to stick underneath this.  Maybe we can see it a little

2    bit more clearly.  Let's take this temporarily.  See if that

3    helps.

4              Now, this refers to, again, the Palm Harbor

5    property and Westmore Properties, LLC; is that correct?

6    A    That's correct.

7    Q    Now, you had already set up a recurring payment request

8    initially for the second month's rent payment, is that

9    correct, back in 2002?

10   A    That's correct.

11   Q    And as we look down -- skipping over a number of years.

12   As we look down in the lower right-hand corner, it shows a

13   date of January 10 of 2006; is that correct?

14   A    That's correct.

15   Q    And on the left-hand side is your name; is that correct?

16   A    That's correct.

17   Q    If you had already set up the recurring payments

18   request, why was it necessary, or why was this form done

19   years later in 2006?

20   A    Anytime there's a change in the payment schedule,

21   whether it be an increase in taxes or an increase in just the

22   rent, a 113 document is required to change that so it gets to

23   accounts payable to change the payment schedule.

24   Q    Well, a 113 document, is that what's been -- being

25   displayed here now?  That's entitled "Recurring Payment

1    Request"?

2    A    That's correct.

3    Q    And if you go into the upper right-hand corner, you see,

4    form 113.  That's what you're referring to?

5    A    Yes, sir.

6    Q    Now, these lease payments that were -- or the lease

7    agreements that were entered into concerning all three of the

8    properties, the Pompano Beach, the Palm Harbor, and the

9    Lancaster, did all of those leases provide for annual yearly

10   rent increases?

11   A    Yes, sir.

12   Q    Now, the annual increases, they would change over the

13   years by different percentages; is that correct?

14   A    That's correct.

15   Q    So, for example, the first year -- well, year number two

16   might be a 2 1/2 or 3 percent increase over the previous

17   year; is that correct?

18   A    That's correct.

19   Q    And that would be divided up into segments.  So each

20   year there would be some kind of an upward bump in the rent

21   payment that ADT was required?

22   A    That's correct.

23   Q    So in essence, every year you would have to take some

24   kind of action; is that correct?

25   A    That's correct.

1   Q    So every year would you fill out one of these recurring

2   payment requests?

3   A    Yes.

4   Q    So this went in 2006.  Just by way of example, that

5   indicates that on January 10, 2006, you had taken some action

6   to authorize the increase of payments in to, in this case,

7   Westmore Properties; is that correct?

8   A    Yes.

9   Q    And while you were making these changes over the years

10  on the form 113, the agreement that you had with Mr. Orr to

11  continue making these payments, that was ongoing; is that

12  correct?

13  A    Yes.

14  Q    Going to Government's Exhibit No. 1.12.

15          MR. SHOCKLEY:  And, your Honor, in my notes I have

16  a question mark beside it.  So I think I might have skipped

17  over that one.  We would offer it into evidence if --

18          THE COURT:  Is there objection to 1.12?

19          MR. MARKUS:  It's not in, and we have no objection.

20          THE COURT:  All right.  1.12 is admitted.

21      (Received in evidence Government's Exhibit(s) 1.12.)

22  BY MR. SHOCKLEY:

23  Q    Directing your attention now to the display device,

24  Government's Exhibit 1.12.  Again, another ADT recurring

25  payment request; is that correct?

1    A    That's correct.

2    Q    And this one -- we're going back to some of the exhibits

3    we covered yesterday.  This refers to Efficient Realty and

4    Development, LLC, correct?

5    A    Correct.

6    Q    And it says in "location," Pompano Beach, Florida; is

7    that correct?

8    A    That's correct.

9    Q    If you look down -- well, there is an "X" marked under

10   "change;" is that correct?

11   A    Correct.

12   Q    Supplier contact, Robert Gannon.  Is that stated under

13   the change?

14   A    Yes, it is.

15   Q    And then it says, "last payment dated this rate 1/1/17;"

16   is that correct?

17   A    That's correct.

18   Q    Now, it shows a base rent there of $42,674.15.  That

19   would be per month?

20   A    That's correct.

21   Q    And then the monthly taxes would be $2,773.82; is that

22   correct?

23   A    That's correct.

24   Q    So then you get this final total.  That's the recurring

25   amount that's going to take place for this year coming up; is

1    that correct?

2    A    That's correct.

3    Q    So this would be an increase over the previous year?

4    A    Yes.  Again, it could be because of taxes or a rate

5    increase in the property.

6    Q    On the left-hand side of the form it says -- it's got

7    both first and revised payment due.  Both blocks appear to

8    have a black mark in them.  This is not the first payment,

9    though, is it?

10    A    On this property, no, sir.

11    Q    So, for example, in the lower right-hand corner we see

12    the date 1/5/06; is that correct?

13    A    That's correct.

14    Q    So this is a change; is that correct?

15    A    That's correct.

16    Q    It says, revised payment due 2/1/06.  Was it required

17    that ADT pay the monthly lease payments on the first of the

18    month, at least according to this document?

19    A    We tried to get all changes in on the first of the month

20    so that they would be paid whenever accounts payables sent

21    out the funds.

22    Q    At the very bottom of the page, at least it bears the

23    name Larry Horton; is that correct?

24    A    That's correct.

25    Q    Now, there were numerous forms like this for all three

```
 1   properties, is that correct, where every year you would have

 2   to take some kind of action to authorize the increase in

 3   payments to, in effect, yourself and Mr. Orr?

 4   A    That's correct.

 5   Q    So although we've only displayed here the initial one

 6   and the one that applies in 2006 for these two properties

 7   thus far, the Pompano Beach and Palm Harbor properties, every

 8   year you were taking action in order to increase these rent

 9   payments; is that correct?

10   A    That's correct.

11   Q    If we can go to the Lancaster property now.  I would

12   like to show you Government's Exhibit No. 1.141.

13           MR. SHOCKLEY:  We would offer into evidence

14   Government's Exhibit No. 1.141.

15           MR. MARKUS:  No objection.

16           THE COURT:  1.141 is admitted.

17      (Received in evidence Government's Exhibit(s) 1.141.)

18   BY MR. SHOCKLEY:

19   Q    Now, Mr. Horton, going to the third property here, do

20   you recall from your testimony from yesterday, we had your

21   testimony concerning the actual closing on the Pompano Beach

22   property and the Palm Harbor property; is that correct?

23   A    Correct.

24   Q    And you testified yesterday concerning the

25   authorizations that were obtained to sell those properties;
```

1  is that correct?

2  A    Yes, I did.

3  Q    And do you recall testifying concerning that series of

4  e-mails on the one exhibit that went between Scott McArthur,

5  Mark Foley, back to Scott McArthur, and then to yourself?

6  A    Yes.

7  Q    Now, you testified about the closing of the other two

8  properties.  We're going to go to the closing on the

9  Lancaster property now.

10        Showing you Government's Exhibit No. 1.141.  This

11  is entitled at the top "ADT Security Services, Inc., Consent

12  in Lieu of Meeting of Board of Directors."  Is that correct?

13  A    Yes, it is.

14  Q    It starts out:

15        "The undersigned, being all of the members of the

16  board of directors of ADT Security Services, Inc.," and so on

17  and so forth, and then picking it up again it states:

18        "Hereby consent to the following action:  And agree

19  that such action shall have the same effect as if duly taken

20  at a meeting of the board of directors held for that

21  purpose:"

22        So in essence, this is not something that took

23  place at an actual board meeting; this was done by signature

24  and this Resolution; is that correct?

25        MR. PASANO:  Objection.  It's leading.

1          THE COURT:  Sustained.  Please restate your

2    question.

3    BY MR. SHOCKLEY:

4    Q    Okay.  Explain for the ladies and gentlemen of the jury

5    what that first paragraph means.

6    A    First paragraph indicates that they did this by this

7    document, and they didn't actually have a meeting of the

8    board of directors.

9    Q    Now, the paragraph underneath that states:

10         "Whereas, the board of directors deem it to be in

11   the best interest of the corporation to sell, convey, and

12   transfer all of its right, title, and interest in and to the

13   parcel of real estate situated at 3040 Industrial Drive, Lot

14   13A, East Hempfield Township, Pennsylvania, parens, (the

15   property,) to Efficient Realty and Development Corp.," and

16   then it refers to that as Efficient.

17         Do you recall the testimony or the document that

18   was displayed yesterday concerning Efficient Realty and

19   Development Corp. that was filed with the Florida Secretary

20   of State?

21   A    Yes.

22   Q    Okay.  So initially, the contract to sell had been

23   entered into with Efficient Realty and Development Corp.; is

24   that correct?

25   A    That's correct.

```
 1   Q    But the actual sale did not -- was there -- could you

 2   explain to the ladies and gentlemen of the jury how there was

 3   some kind of a change at the actual closing between the Corp.

 4   and the LLC?

 5   A    I depended on the real estate attorneys.  Obviously,

 6   they handled the closing.  That was not my involvement.  And

 7   sometime shortly before closing, there was documents that

 8   came to me to be signed to change from a Corp. to an LLC.

 9   Q    So, in other words, ADT was going to be conveying these

10   properties or at least some of the properties not to

11   Efficient Realty and Development Corp. but to Efficient

12   Realty and Development, LLC, which although the name sounds

13   the same, it's really a different legal --

14             MR. KAISER:  Objection to counsel testifying.  I

15   would like to have it from the witness stand.

16             THE COURT:  It is leading.  Please restate your

17   question.  A leading question is one that suggests an answer,

18   and normally on direct you can't do that.  On cross you can.

19   Sometimes it's permitted to move things along, but let's hear

20   from the witness, Mr. Shockley.

21             MR. SHOCKLEY:  Okay, thank you, your Honor.  I

22   apologize.

23   BY MR. SHOCKLEY:

24   Q    Can you just explain then the changes, as best you can

25   recall, about these different entities?
```

1          Well, withdraw the question.

2          MR. SHOCKLEY:  If I can have again Government's

3  Exhibit No. 30.5.

4  BY MR. SHOCKLEY:

5  Q    Government's Exhibit 30.5 was admitted yesterday.  This

6  is a certified copy of the Florida Department of State

7  exhibit incorporating Efficient Realty and Development Corp.

8  Do you recall this exhibit?

9  A    Yes.

10  Q    And, again, did you take any part whatsoever in the

11  actual incorporation of this company?

12  A    No, sir.

13  Q    Showing you the page bearing Bates label FL-052, it

14  indicates Articles of Incorporation.  The mailing address of

15  the corporation, that 10571, to refresh our recollection, is

16  whose address?

17  A    Mr. Orr's.

18  Q    I direct your attention to the page of that document

19  bearing Bates label FL-059, Florida Department of State,

20  Secretary of State, officer/director resignation.  It states:

21          "I, Gregory Orr, hereby resign as president

22  secretary, treasurer, and director of Efficient Realty and

23  Development Corp., a corporation organized under the laws of

24  the State of Florida, and affirm that the corporation has

25  been notified in writing of the resignation."

1              It bears the name, Gregory Orr; is that correct?

2   A    That's correct.

3   Q    Now, the date here is March 8th of 2002; is that

4   correct?

5   A    That's correct.

6   Q    So the March 8, 2002, would that be actually after the

7   closing on the Lancaster property?

8   A    Yes, it was.

9   Q    And it would be after the closing on the Pompano Beach

10  property; is that correct?

11  A    Yes, it was.

12  Q    Do you recall the name of the corporation that was on

13  those purchase and sale agreements for those two properties?

14  A    Efficient Realty Corp., I believe.

15  Q    Directing your attention to Government's Exhibit 1.51.

16          If I can have that again, Government's

17  Exhibit 1.51.

18          And again, Government's Exhibit 1.51, it was

19  previously admitted in evidence, it states:

20          "Purchase and Sale Agreement.  This purchase and

21  sale agreement is made this 24th day of September, 2001, by

22  and between ADT Security Services, Inc., seller, and

23  Efficient Realty and Development Corp., a Florida

24  corporation."  Do you recall that now?

25  A    Yes, I do.

```
1   Q    Now, this related to the sale of the Pompano Beach

2   property; is that correct?

3   A    That's correct.

4   Q    So ADT had entered into a contract to sell this property

5   to whom?

6   A    Efficient Realty and Development Corp.

7   Q    Now, looking at Government's Exhibit No. 30.50.  That

8   document, as we reviewed it, and without taking the time to

9   review it again today, would it indicate anywhere in that

10  exhibit who actually owned the shares in that corporation as

11  opposed to being the actual officers on the corporation?

12  A    I --

13  Q    Well, let me --

14        MR. SHOCKLEY:  Your Honor, can I have permission to

15  approach the witness to show him the document?

16        THE COURT:  Yes.

17  BY MR. SHOCKLEY:

18  Q    Mr. Horton, if you can just take a couple minutes and

19  look through that document and see if any of the filings in

20  the Florida Department of State would indicate whether, or

21  who owned the stock in that corporation, or alternatively,

22  whether it just indicates who are the officers or directors

23  of the company.

24        Okay.  Have you examined the document?

25  A    I have.
```

1   Q    Does it state anywhere in that document who owns the

2   stock of the corporation?

3   A    Mr. Gregory Orr.

4   Q    Where does it show it?

5   A    FL-057, I believe.

6   Q    Okay.  Directing your attention to the page that bears

7   Bates label FL-057.  Are you referring to where he's signing

8   it as president/director?

9   A    Yes.

10  Q    Okay.  Now, can someone be a director of a corporation

11  without owning any stock in it?

12  A    I'm not knowledgable about that.

13  Q    So do you see anywhere in this document that indicates

14  any reference to who is a stockholder as opposed to who's an

15  officer or a director?

16  A    I didn't notice.

17  Q    Now, directing your attention to Government's

18  Exhibit 6.205.

19          MR. SHOCKLEY:  Your Honor, this was admitted

20  yesterday.

21  BY MR. SHOCKLEY:

22  Q    This is the purchase and sale agreement.  Also dated

23  September the 24th of 2001.  This is also between what

24  corporate entities, ADT and who else?

25  A    Efficient Realty and Development Corp.

1    Q    And this relates to the sale of what property?

2    A    Lancaster, Pennsylvania, I believe.

3    Q    So, again, as far as, just like in the Pompano Beach

4    situation, with the Lancaster situation ADT was selling the

5    property to what corporation?

6    A    Efficient Realty and Development Corp.

7    Q    Now, getting back to Government's Exhibit 1.141, where

8    we left, the Resolution of the board of directors again

9    refers to the Lancaster property; is that correct?

10    A    That's correct.

11    Q    Being sold to Efficient Realty and Development Corp.; is

12    that correct?

13    A    That's correct.

14    Q    Is that consistent or inconsistent with the sale

15    agreement that you just saw?

16    A    Both are consistent.

17    Q    And, in fact, under the words, "Now, therefore, it is

18    hereby resolved," does it state that, "The Corporation be and

19    hereby is authorized and directed to convey to Efficient all

20    of its right, title, and interest in and to the property,

21    pursuant to the terms and conditions set forth in a certain

22    purchase and sale agreement dated as of September 24, 2001,

23    by and between the corporation and Efficient parens (the

24    Purchase Agreement)."

25        Is that correct?

1  A    That's correct.

2  Q    And is that referring to the same purchase agreement we

3  just saw here in the courtroom?

4  A    Yes, it is.

5  Q    And then underneath that it says, resolved:

6         "That the corporation be, and hereby is, authorized

7  and directed to enter into a certain lease in substantially

8  the same form as Exhibit B to the purchase agreement

9  parens(the lease)."

10        And this refers to the leaseback provision; is that

11  correct?

12  A    That's correct.

13  Q    The third paragraph that says "Resolved" states:

14        "That in connection with the purchase agreement,

15  Larry Horton, vice president of the corporation, is

16  authorized and directed to execute and deliver to Efficient

17  the purchase agreement" -- oh, excuse me -- "and deliver to

18  Efficient the purchase agreement, a special warranty deed to

19  the property and the lease; and is further authorized and

20  directed to execute any documents and take all other actions

21  as may be necessary to consummate the sale, including but not

22  limited to receipt of payment and execution of any powers of

23  attorney."

24        So this relates to you and your duties pursuant to

25  the sale; is that correct?

1    A    That's correct.

2    Q    This is a three-page exhibit.  Yes, three-page exhibit.

3    On the second page there bears a signature of Jerry R.

4    Boggess?

5    A    That's correct.  President of ADT Securities Services.

6    Q    And then the next page is the signature of M. Brian

7    Moroze?

8    A    Correct.

9    Q    And then the third signature is on the next page, J.

10   Brad McGee; is that correct?

11   A    That's correct.

12   Q    And above each one of those signature it says:

13          "In witness whereof each of the undersigned has

14   executed this consent, which may be signed in one or more

15   counterparts which taken together shall constitute one and

16   the same consent as of the 28th of January, 2002."

17          Is that what it states?

18   A    Yes, it is.

19   Q    So once we have these three signatures on these various

20   signature payments, taken together, this document authorizes

21   you to do what?

22   A    Sell and sign the lease on that property.

23   Q    Okay.  Directing your attention to Government's

24   Exhibit 1.130.

25          MR. SHOCKLEY:  We would offer this into evidence,

1    your Honor.

2              MR. MARKUS:  No objection.

3              THE COURT:  1.130 is admitted.

4        (Received in evidence Government's Exhibit(s) 1.130.)

5    BY MR. SHOCKLEY:

6    Q    Showing you this exhibit.  It is entitled, "Secretary's

7    Certificate."  Refresh our recollection.  Who is P. Gray

8    Finney?

9    A    P. Gray Finney is the corporate counsel for ADT.

10   Q    And he was signing this document under his title as

11   secretary of the corporation; is that correct?

12   A    That's correct.

13   Q    So he had two separate hats, so to speak, in the

14   corporation?

15   A    Yes.

16   Q    Okay.  Directing your attention to the second paragraph,

17   it refers to:

18              "This certificate is being delivered pursuant to"

19   -- I'm going to skip over some of this language -- "refers to

20   an agreement between the corporation and Efficient Realty and

21   Development Corp. dated September 24th, 2001, the purchase

22   agreement."  Is that correct?

23   A    That's correct.

24   Q    And this relates to the -- well, at the bottom it has

25   the signature date of January 29th, 2002; is that correct?

1   A    That's correct.

2   Q    So, now, with respect to the Lancaster property, do you

3   have the consent of the board of directors to sell the

4   property?

5   A    Yes.

6   Q    And the secretary's certificate regarding the sale of

7   that property; is that correct?

8   A    That's correct.

9   Q    Directing your attention now to Government's Exhibit No.

10  1.191.

11          MR. SHOCKLEY:  We would offer that into evidence,

12  your Honor.  1.191.

13          MR. MARKUS:  No objection.

14          THE COURT:  1.191 is admitted.

15      (Received in evidence Government's Exhibit(s) 1.191.)

16  BY MR. SHOCKLEY:

17  Q    At the top of this document it bears the title

18  "Commercial Lease Agreement, Triple Net Lease;" is that

19  correct?

20  A    Yes, it is.

21  Q    Directing your attention to the top paragraph, it says:

22          "This lease made as of the 25th day of January,

23  2002, by and between Efficient Realty and Development Corp.,

24  a Florida corporation, or it's assignee, hereinafter referred

25  to as landlord, and ADT Security Services, Inc., a Delaware

1    corporation, hereinafter referred to as tenant."

2            So this is the actual final triple net lease that

3    was entered into by whom?

4    A    Efficient Realty and Development Corp. and ADT.

5    Q    It bears the date of January the 25th of 2002.  Is

6    that -- when was that in reference to the actual closing?

7    A    Closing was in February of 2002.

8    Q    So approximately a week or a little bit more later?

9    A    It could have been two weeks.  I'm not quite sure of the

10    actual closing date.

11    Q    Now, it refers to, under paragraph numbered one:  "The

12    property located at 3040 Industry Drive, East Hempfield

13    Township, Lancaster County, Commonwealth of Pennsylvania."

14            Is that correct?

15    A    That's correct.

16    Q    The term of the lease is 15 years; is that correct?

17    A    That's correct.

18    Q    And that's reflected in the second paragraph; is that

19    correct?

20    A    Correct.

21    Q    For the rent, it refers you to Exhibit B of the

22    attachment; is that correct?

23    A    That's correct.

24    Q    Is that -- what is Exhibit B, generally?

25    A    Generally speaking, Exhibit B is a lease payment

1    schedule starting from year one through term of the lease.

2    Q    And we flip to the back page.  There's a reference to

3    Exhibit B to lease.  Is that correct?

4    A    That's correct.

5    Q    Does this break down the initial rent payment and then

6    the payments over the years?

7    A    That's correct.

8    Q    So, for example, if you go year by year, the monthly

9    rent, what happens to the monthly rent?

10   A    After year one it increases.

11   Q    And then the percentage increases are set forth where?

12   In another column?

13   A    In a separate column, correct.

14   Q    So this gives you a breakdown by year; is that correct?

15   A    That's correct.

16   Q    So you have both the month and the year breakdown?

17   A    That's correct.

18   Q    The final column is titled "Total For Lease;" is that

19   correct?

20   A    That's correct.

21   Q    And as you go down this column, eventually, it gives you

22   how much?  "Total" is what?

23   A    Total payments made to the owner of that facility or

24   building.

25   Q    So over the 15-year period, this would indicate --

1    15-year term of the lease, I should say, this would indicate

2    that ADT would have paid Efficient Realty and Development

3    Corp. how much?

4    A    4,713,803.40.

5    Q    Okay.  Going back to the beginning of the lease, on the

6    second page there's a reference to a security deposit.  In

7    this case, is it $32,542.89?

8    A    Yes, it is.

9    Q    Going to the third page of the lease, under "tenant's

10   obligations," was it ADT's obligations to pay under the terms

11   of the lease the utilities, taxes, and maintain and repair

12   the facility?

13   A    Yes, they were.

14   Q    Directing your attention to the eighth page.  Was it

15   ADT's -- who had to pay the insurance on the premises?

16   A    ADT was responsible for the liability insurance on the

17   property.

18   Q    In addition to the liability, directing your attention

19   to the next page, did ADT also have to maintain insurance

20   against loss or damage to the premises?

21   A    Yes.

22   Q    Directing your attention to the twelfth page of the

23   exhibit.  Again, it says -- go back to the bottom of 11.

24   This regards any notices between the landlord and tenant; is

25   that correct?

1    A    That's correct.

2    Q    And at the top of Page 12 as to the landlord, it states:

3          "Notice shall be sent to Efficient Realty and

4    Development Corp. c/o Donald K. Spadaro, PA, office in

5    Fort Lauderdale, Florida."  Is that correct?

6    A    That's correct.

7    Q    And it also shows with a copy to Arnold B. Kogan,

8    Esquire, at an address in Harrisburg, Pennsylvania; is that

9    correct?

10   A    That's correct.

11   Q    As to the tenant, ADT was the tenant; is that correct?

12   A    That's correct.

13   Q    So any notice should go to ADT Security Services, Inc.,

14   at One Town Center Road in Boca Raton, Florida; is that

15   correct?

16   A    Yes.

17   Q    Page 17 of the document, "recording of lease."

18          Does it state:

19          "This lease shall not be recorded, but a memorandum

20   of this lease may be recorded, in accordance with" -- and it

21   gives a Pennsylvania statute -- "if such recording is

22   required by any mortgagee of landlord."

23          Is that what it states?

24   A    Yes.

25   Q    Directing your attention to Page 19 of the lease, under

1   "broker's commission."  Does it state:

2           "Each party represents and warrants that it is

3   caused and incurred no claims for brokerage commissions or

4   finder's fees in connection with the execution of this lease,

5   and each party shall indemnify and hold the other harmless

6   against and from all liabilities arising from any such claims

7   caused or incurred by it including, without limitation, the

8   cost of attorney's fees in connection therewith."

9           And in truth and in fact when you and Mr. Orr met

10  to arrange this deal, neither one of you had a broker; is

11  that correct?

12  A    That's correct.

13  Q    And the deal was consummated where?

14  A    At his home.

15  Q    Page 20 in Paragraph S.  Again, it's is a no publicity

16  clause; is that correct?

17  A    Yes.

18  Q    On Page 21, is that your signature?

19  A    Yes, it is.

20  Q    Do you recognize the signature of the secretary?

21  A    I do not.

22  Q    And then also on a second Page 21 that's attached, your

23  name is not on this copy of the signature page; is that

24  correct?

25  A    That's correct.

1    Q    But there are other signatures; is that correct?

2    A    Yes, there are.

3    Q    And under "Landlord signing on behalf of Efficient

4    Realty and Development Corp.," does it bear the printed name

5    "Gregory Orr"?

6    A    Yes, it does.

7    Q    As president?

8    A    Yes.

9    Q    And there's a signature above that; is that correct?

10   A    That's correct.

11   Q    Now, at the very bottom in the right-hand corner it

12   says:

13            "Landlord's assignee, Efficient Realty and

14   Development, LLC, a Pennsylvania limited liability company,

15   by Robert M. Gannon, manager."  And there's a signature above

16   that; is that correct?

17   A    Yes, there is.

18   Q    So these previous documents that you've identified

19   referring to Efficient Realty and Development Corp., was

20   there some kind of a change shortly before the conveyance of

21   the property actually took place?

22   A    They were changed from a Corp. to an LLC.

23   Q    Well, the change in the agreement to sell, not a change

24   in the entity themselves; is that correct?

25   A    That's correct.

1    Q    Okay.  So -- well, if I can direct your attention now to

2    Government's Exhibit 1.132.

3         MR. SHOCKLEY:  Your Honor, we would offer into

4    evidence Government's Exhibit No. 1.132.

5         MR. MARKUS:  No objection.

6         THE COURT:  1.132 is admitted.

7         (Received in evidence Government's Exhibit(s) 1.132.)

8    BY MR. SHOCKLEY:

9    Q    Showing you now this document, it says at the top --

10   it's entitled, "Assignment of Purchase and Sale Agreement and

11   Landlord's Interest in Lease Annexed To That Agreement."

12        The first paragraph reads:

13        "For value received, the undersigned, assignor,

14   Efficient Realty and Development Corp., a Florida

15   corporation, with its principal place of business at 10571

16   Northwest 66th Street, Parkland, Florida, 33078, parens

17   (assignor) hereby assigns, transfers, and sets over to

18   Efficient Realty and Development, LLC, a Pennsylvania limited

19   liability company, with its principal place of business at

20   10571 Northwest 66th Street, Parkland, Florida, 33078

21   (assignee) the following:"

22        Now, the 10571 Northwest 66th Street in Parkland is

23   whose address?

24   A    Mr. Greg Orr.

25   Q    And so paragraph numbered one it says:

1          "All rights, title, and interest held by the

2   assignor in and to that certain purchase and sale agreement

3   between the assignor as purchaser and ADT Security Services,

4   Inc., a Florida corporation, having offices at"- so, and on

5   so forth -- "for the property at"-- and it gives the

6   Lancaster County address; is that correct?

7   A    That's correct.

8   Q    The second paragraph -- the first paragraph, did that

9   deal with the assignment of the purchase and sale agreement?

10  A    Yes.

11  Q    From one to the other?

12  A    Yes, it did.

13  Q    The second paragraph, what does that relate to?  It

14  reads follows:

15          "All rights, title, and interest in the lease from

16  the purchaser or its assignee as landlord to the seller as

17  tenant, attached to the above purchase and sale agreement to

18  be executed at closing by the assignee.  The assignor

19  warrants and represents that said agreement is in full force

20  and effect and is fully assignable."

21          Is that what it states?

22  A    Yes, it does.

23  Q    So the second paragraph, what does that do with respect

24  to the lease that was to be entered into at the time of

25  closing?

1    A    It's reassigned it.

2    Q    From Efficient Realty and Development Corp. to what?

3    A    Efficient Realty, LLC, I believe.

4    Q    Efficient Realty and Development, LLC; is that correct?

5    A    That's correct.

6    Q    On the second page, signing under Efficient Realty and

7    Development Corp. does it state, Gregory Orr, president, and

8    Gregory Orr, secretary?

9    A    Yes.

10    Q    And a signature above those -- both of those lines; is

11    that correct?

12    A    Yes.

13    Q    Also, it shows the name Mark L. Gaeta.  If you can

14    refresh our recollection, who was Mark Gaeta?

15    A    Real estate attorney.

16    Q    And again, did you ever meet or have any conversation

17    with Mark Gaeta?

18    A    No, I did not.

19    Q    But you knew of his existence based upon documents that

20    came back and forth between -- well, how did you know of his

21    existence?

22    A    Only name -- name was on documents related to offers

23    made on properties.

24    Q    On the Page 3 of this exhibit there's a reference in the

25    upper right-hand corner to Efficient Realty and Development,

1    LLC, the assignee, and this states:  "By Robert M. Gannon,

2    member"-- excuse me -- "manager and sole member."

3        Is that correct?

4    A    That's correct.

5    Q    Now, you yourself had an LLC, a company -- sometimes we

6    refer to them as LLCs instead of corporations just for

7    shorthand.  But were you an owner of KCGF Associates, LLC?

8    A    Yes, I was.

9    Q    So you were a member then; is that correct?

10   A    I was a member.  Correct.

11   Q    And was your wife also a member?

12   A    Yes, she was.

13   Q    So as members, you owned the business; is that correct?

14   A    That's correct.

15   Q    As a manager, need a manager actually own the business?

16   A    Could you repeat that, please?

17   Q    Can one manage a company without being an owner?

18   A    Yes, he can, or she.

19   Q    So this states as far as Efficient Realty, LLC, the

20   assignee, the member -- the manager and sole member is who?

21   A    Robert Gannon.

22   Q    So pursuant to this assignment of this contract,

23   purchase and sale agreement and the lease, the conveyance is

24   supposed to be to what entity, Efficient Realty and

25   Development Corp. or Efficient Realty and Development, LLC?

```
 1    A    LLC.

 2    Q    Whose sole member is who?

 3    A    Robert Gannon.

 4         MR. SHOCKLEY:  Your Honor, we would offer into

 5    evidence Government's Exhibit 1.133.  1.133.

 6         MR. MARKUS:  No objection.

 7         THE COURT:  1.133 is admitted.

 8       (Received in evidence Government's Exhibit(s) 1.133.)

 9    BY MR. SHOCKLEY:

10    Q    What is this, Mr. Horton?

11    A    I can't see it all.  It looks likes a settlement

12    statement.

13         MR. SHOCKLEY:  Your Honor, permission to approach

14    the witness so I can show him the document up close.

15         THE COURT:  All right.

16         MR. SHOCKLEY:  The printing is not all that good.

17         THE WITNESS:  Settlement statement on Lancaster,

18    Pennsylvania.

19    BY MR. SHOCKLEY:

20    Q    And when you're referring to "Lancaster," that's the

21    property at Industry Drive, the property that's being

22    conveyed; is that correct?

23    A    That's correct.

24    Q    Looking at the last page, does it bear your signature?

25    A    Yes, it does.
```

1   Q     It shows a date of 2/4/02; is that correct?

2   A     That's correct.

3   Q     Also, there's -- what is that line across the top of the

4   exhibit?  Is that a telefax line?

5   A     I see a date and a time and a name right there.

6   Q     Let me show you the exhibit again.

7   A     All right.

8   Q     So you can see it up close and not on the display.

9   A     Thank you.

10  Q     What is that line across the very top?

11  A     It looks to appear to be a fax.

12  Q     Okay.  Did you attend the closing yourself?

13  A     No, I did not.

14  Q     So although your name is on this settlement statement,

15  you did not attend the closing?

16  A     No, I did not.

17  Q     Do you know where the closing took place?

18  A     Actually, I do not.

19  Q     Showing you again the same exhibit, Government Exhibit

20  1.133, if we could zoom into the Section E of that statement,

21  settlement agent.  Does it read:  "Place of settlement, 320

22  Market Street, Harrisburg, Pennsylvania?"

23  A     Yes, it does.

24  Q     So Mr. Horton, did you attend the settlement for any one

25  of these three properties?

```
 1   A    No, sir.

 2   Q    Showing you now Government's Exhibit 1.128.

 3        MR. SHOCKLEY:  We would offer into evidence, your

 4   Honor, Government's Exhibit 1.128.

 5        MR. MARKUS:  No objection.

 6        THE COURT:  1.128 is admitted.

 7      (Received in evidence Government's Exhibit(s) 1.128.)

 8   BY MR. SHOCKLEY:

 9   Q    As in the previous two sales, Mr. Horton, I'm directing

10   your attention now to a check.  This check appears to be --

11   is it check No. 1672?

12   A    That's correct.

13   Q    And directing your attention to the upper left-hand

14   corner, it says, ADT Security Services, Inc., and then

15   underneath that typed in is Efficient Realty and Development,

16   LLC, $103,942.89.  First month's rent, $21,000.  Real estate

17   brokerage fee credit, 6 percent, $50,400.  And security

18   deposit, $32,542.89.  Is that what it states?

19   A    Yes.

20   Q    And directing your attention to the actual check that's

21   displayed underneath that, is that a check dated February 1,

22   2002, in that same amount, $103,942.89, payable to Efficient

23   Realty and Development, LLC?

24   A    Yes, it is.

25   Q    And the authorized signature is who?
```

1    A    Myself.

2    Q    So, again, this is the third check we've seen during the

3    course of your testimony signed by you for the initial

4    payment to one of the three companies that actually purchased

5    the ADT properties that you've described, the Palm Harbor,

6    the Pompano Beach, and the Lancaster; is that correct?

7    A    That's correct.

8    Q    Again, with your signature on the bottom of this check

9    you were writing out a check to pay money to the corporation,

10   and you were a derivative beneficiary; is that correct?

11   A    That's correct.

12   Q    Directing your attention to Government's Exhibit No.

13   1.119.

14            MR. SHOCKLEY:  We would offer into evidence this

15   exhibit, your Honor, Government's Exhibit 1.119.

16            MR. MARKUS:  No objection.

17            THE COURT:  1.119 is admitted.

18        (Received in evidence Government's Exhibit(s) 1.119.)

19   BY MR. SHOCKLEY:

20   Q    Showing you this document on the screen.  Again, as in

21   the other two situations, what is this?

22   A    This is a 113 form used to -- for a commencement date of

23   accounts payable.

24   Q    And it shows at the top the location is 3040 Industry

25   Drive, Lancaster, Pennsylvania; is that correct?

1    A     That's correct.

2    Q     And this is for building rent, correct?

3    A     That's correct.

4    Q     Does it state sale/leaseback effective or EFF, 2/1/02?

5    A     That's correct.

6    Q     The date of the conveyance was, however, shortly after

7    that; is that correct?  I believe you signed a settlement

8    statement on what date?

9    A     2/4, I believe.

10            MR. BIRCH:  Excuse me, your Honor.  May Mr. Artuso

11   step out to the restroom?

12            THE COURT:  Certainly.  Can we go ahead, Mr. Birch?

13            MR. BIRCH:  Yes, your Honor.

14            THE COURT:  All right.

15   BY MR. SHOCKLEY:

16   Q     Now, directing your attention to the payee, it lists

17   Efficient Realty and Development, LLC; is that correct?

18   A     That's correct.

19   Q     It shows an address of 10571 Northwest 66th Street; is

20   that correct?

21   A     That's correct.

22   Q     The vendor contact is listed as Mark Gaeta; is that

23   correct?

24   A     That's correct.

25   Q     On the left-hand side is there an "X" in the blank

1    marked first versus revised payment?

2    A    Yes.

3    Q    So this would reflect the first payment, and it's due on

4    3/1/02; is that correct?

5    A    Yes.

6    Q    The monthly amount is listed as $21,000?

7    A    Correct.

8    Q    And at the bottom does it bear your name and signature?

9    A    Yes, it does.

10   Q    And the date is what?

11   A    2/20/02.

12   Q    So just as in the other two cases, you were signing up

13   and authorizing monthly payments of rent to Efficient Realty

14   and Development, LLC, this time for the Lancaster property;

15   is that correct?

16   A    Yes.

17   Q    As in the other two cases, as time would pass, what

18   actions would you take on a yearly basis?

19   A    Normal was rent increases or taxes or CAM related to

20   properties.

21   Q    And would there be occasions where issues would come up

22   about payments for taxes or insurance, things of that nature?

23   A    Correct.

24   Q    For all three properties?

25   A    All three properties, correct.

1   Q    Okay.  And in your position would you sometimes be asked

2   questions concerning the developments on these three various

3   properties about, you know, there's a problem here, or we

4   need to pay this bill; things of that nature?

5   A    I was made aware of most major issues or maintenance

6   issues possible with buildings.

7   Q    And when money had to be disbursed by ADT, these

8   documents that you've just seen, the form 113, are these

9   documents that you would have to complete in order to

10  authorize the payments?

11  A    I signed 95 percent of all those documents.

12  Q    I want to direct your attention now to Government's

13  Exhibit No. 1.189.  Excuse me.  I'm sorry.

14          MR. SHOCKLEY:  Your Honor, 1.89.  We would offer

15  into evidence, your Honor, Government's Exhibit 1.89.

16          MR. MARKUS:  No objection.

17          THE COURT:  1.89 is admitted.

18      (Received in evidence Government's Exhibit(s) 1.89.)

19  BY MR. SHOCKLEY:

20  Q    Is this another form 113 regarding the Lancaster

21  property?

22  A    Yes, it is.

23  Q    It says at the top, "This 113 is for rent increase

24  effective 2/1/06;" is that correct?

25  A    Yes, it does.

1    Q    And there's various boxes:  New, changed, canceled.

2    There is an "X" over the box "changed."  Is that correct?

3    A    Yes, it is.

4    Q    It lists the supplier contact as who?

5    A    Mr. Robert Gannon.

6    Q    It shows a post office box for Efficient Realty and

7    Development, LLC; is that correct?

8    A    Yes, it does.

9    Q    And the post office box is in Deerfield Beach, Florida?

10   A    Yes, it is.

11   Q    This is a revised payment due on 2/1/06; is that

12   correct?

13   A    Yes.

14   Q    At the bottom, is that your name?

15   A    Yes, it is.

16   Q    And the date is what?

17   A    January 5, '06.

18   Q    Now, between the 2002 and 2006 and, as a matter of fact,

19   continuing right up until the point in time that you were

20   fired, were you signing off on these forms authorizing the

21   rent increases?

22   A    Yes, I was.

23   Q    We've seen reference now, I believe, to Efficient Realty

24   and Development Corp., now Efficient Realty and Development,

25   LLC, and we also had the conveyance to Westmore Properties,

1    LLC.  That was the Palm Harbor property; is that correct?

2    A    Yes.

3    Q    Okay.  Let's --

4             MR. SHOCKLEY:  Your Honor, we would ask to

5    publish -- we would offer into evidence and ask to publish

6    Government's Exhibit 30.6.  30.6.  It's a certified copy of

7    Articles of Organization of Efficient Realty and Development,

8    LLC.

9             MR. MARKUS:  No objection.

10            THE COURT:  30.6 is admitted.

11       (Received in evidence Government's Exhibit(s) 30.6.)

12            MR. SHOCKLEY:  And permission to publish it, your

13   Honor.

14            THE COURT:  Yes.

15            MR. SHOCKLEY:  Okay.  This, ladies and gentlemen,

16   of the jury, that I'm showing you now is from the -- on the

17   first page, State of Florida, Department of State.

18            "I certify the attached is a true and correct copy

19   of the complete file of Efficient Realty and Development,

20   LLC, a limited liability company, organized under the laws of

21   the State of Florida, as shown by the records of this

22   office."

23            And in the lower right-hand corner, the

24   certification states:

25            "Given under my hand and the Great Seal of the

1    State of Florida at Tallahassee, the capitol, this, the 27th

2    day of November, 2007."  And it's signed -- got a stamp of

3    Kurt S. Browning, Secretary of State.

4            The second page of the certification, it shows

5    corporation's name, Efficient Realty and Development, LLC.

6            The third page states:

7            "Articles of Organization for Florida limited

8    liability company.  Article one, name.  The name of the

9    limited liability company is:  Efficient Realty and

10   Development, LLC."

11           The mailing address is given as 10571 Northwest

12   66th Street in Parkland.  The registered agent -- registered

13   office and registered agent's signature shows Donald R.

14   Spadaro at an address in Fort Lauderdale, and his signature

15   under the line marked, Donald S. Spadaro, Esquire.

16   Q    Do you recall his name earlier in your testimony?

17   A    Yes, I do.

18   Q    And Donald Spadaro was who?

19   A    A real estate attorney.

20   Q    What document was it that you saw of his?

21   A    It was on a offer to purchase property and leaseback.

22   Q    Was that the same one that you made the notations in

23   the -- on the right-hand side margins showing the offers and

24   counteroffers offers back and forth, if you recall?

25   A    That's correct.

1          MR. SHOCKLEY:  Underneath that it says

2     "management."  And it has an "X" in the box.  The limited

3     liability company is to be managed by one manager or more

4     managers and is therefore a manager-managed company.  And it

5     bears the signature of Robert Gannon as signature of a member

6     or an authorized representative of a member.

7          The next page bearing Bates label FL-66 -- excuse

8     me, go back to the last page.  It shows a file date of

9     December 6, 2001, with the Florida Secretary of State.

10          The following page bearing Bates label FL-66.

11     Upper right-hand corner says, filed June 5, 2002, with the

12     Secretary of State.  Upper left-hand corner states, limited

13     liability company, uniformed business report, or UBR.

14     Efficient Realty and Development, LLC.

15          Principal place of business is listed as 1690

16     Southwest 2nd Avenue, Boca Raton, Florida.  The mailing

17     address is PO Box 8511, Deerfield Beach, Florida.

18          Name and address of the current registered agent is

19     listed as Robert Gannon at an address of 1690 Southwest 2nd

20     Avenue, Boca Raton, Florida.

21          Underneath that it says, managing members/managers.

22     And in the first box it says, manager/member, Robert Gannon,

23     1690 Southwest 2nd Avenue Boca Raton, Florida.

24          And in Box 7 -- okay.  Excuse me.

25          Going to the next page bearing Bates label FL-067.

1    It shows filed April 30, 2003, the following year.  Efficient

2    Realty and Development Corp.  It -- excuse me, Efficient

3    Realty and Development, LLC.  Principal place of business,

4    1690 Southwest 2nd Avenue, Boca Raton, Florida.  Registered

5    agent, Robert, it says Cannon with a "C."  Then under

6    managing member/managers, it's got MGRM, Robert Gannon, and

7    the same address.

8         Going to 2004, the next page, filed July 26, 2004.

9    Limited liability company annual report.  Efficient Realty

10   and Development, LLC.  Again, the current principal place of

11   business at 1690 Southwest 2nd Avenue, Boca Raton.

12   Registered agent, Robert Cannon, with a "C."  Registered

13   agent, Robert Gannon, with a "G."  Lower left-hand side, or

14   middle left-hand side, Robert Gannon, MGRM.  And the name

15   Robert Gannon at the bottom.

16        Going to the following year, the next page, May 9,

17   2005, limited liability company annual report.  Efficient

18   Realty and Development, LLC.  Same address on 2nd Avenue in

19   Boca Raton.  Registered agent, Robert Gannon.  And managing

20   members/managers as MGRM, Robert Gannon.  And the signature,

21   Robert Gannon, at the bottom with a date 4/20/05.

22        The next page filed April the 12th, 2006, 2006

23   limited liability company annual report.  Same principal

24   place of business.  Same registered agent, Robert Gannon.

25   Same MGRM, Robert Gannon in the middle of the page.

1           The following page, the last page of the document,

2    states, filed February 9, 2007, 2007 limited liability

3    company annual report.  Efficient Realty and Development,

4    LLC.  Mailing address is PO Box 8511, Deerfield Beach,

5    Florida.  It shows a registered agent of Robert Gannon.

6    MGMR, Robert Gannon.

7    Q    Now, Mr. Horton, back to you.  Efficient Realty and

8    Development, LLC, is that the company that that Lancaster

9    property was sold to?

10   A    That's correct.

11           MR. SHOCKLEY:  Can I have now Government's

12   Exhibit 31.2.

13           Excuse me, let me restate my last question.

14   BY MR. SHOCKLEY:

15   Q    Two properties were sold to businesses named Efficient

16   Realty Development, LLC; is that correct?

17   A    That's correct.

18   Q    And do you recall yesterday we had a document from Mark

19   Gaeta asking for two separate rent payments, one to a

20   Efficient Realty and Development, LLC, a Florida company, and

21   another separate payment to Efficient Realty, LLC, a

22   Pennsylvania company, both of them with the same names but

23   different federal employee identification numbers; is that

24   correct?

25   A    That's correct.

```
 1   Q     Okay.  So the Pompano Beach property was sold to which

 2   of the Efficient Realty and Development LLCs?

 3   A     The Florida.

 4   Q     The Florida or the Pennsylvania?

 5   A     The Florida.

 6   Q     Okay.  So for the interest of simplicity, can we just

 7   refer to them as Efficient Realty Florida and Efficient

 8   Realty Pennsylvania, so we don't have the same problems that

 9   Mr. Gaeta and ADT had in telling these two identically named

10   companies apart?  Is that okay?

11   A     Yes.

12   Q     So when I refer to Efficient Realty Florida, you'll know

13   I'm talking about Efficient Realty and Development, LLC, the

14   Florida limited liability company?  You understand that?

15   A     Yes.

16   Q     Okay.

17              MR. SHOCKLEY:  We would offer into evidence

18   Government's Exhibit No. 31.2.

19              MR. MARKUS:  No objection.

20              THE COURT:  31.2 is admitted.

21        (Received in evidence Government's Exhibit(s) 31.2.)

22              MR. SHOCKLEY:  Permission to publish it, your

23   Honor.

24              THE COURT:  Go ahead.

25
```

1          MR. SHOCKLEY:  Government's Exhibit 31.2.

2    Certification from the Pennsylvania Department of State.  On

3    the first page, certificate of organization, domestic limited

4    liability company.  It bears a name, Arnold B. Kogan of

5    Kogan, Katzman and Shipman, PC, in Harrisburg, Pennsylvania.

6    In the block it says, document will be returned to the name

7    and address you enter to the left.  It shows filed in the

8    Department of State on November 16, 2001.

9          In block No.1 midway down the page it states, the

10   name of the limited liability company, Efficient Realty and

11   Development, LLC.  Under No. 2, it's the name and address --

12   excuse me, the address -- there we go.  No. 2.  The address

13   of the limited liability company's initial registered office

14   in this commonwealth, that's blank.

15         But you go down to Section B and it says the name

16   of commercial registered office provider, it says, c/o of CT

17   Corporation System.  And you go down farther at the bottom of

18   the page, it shows the name and address, including street and

19   number, if any, of each organizer is -- it shows a name --

20   two names; Gregory Orr and Janine Orr.  And an address at

21   10571 Northwest 66th Street Parkland, Florida.  Wrong

22   spelling of Janine.

23         On the second page in block No. 5 it states,

24   management of the company is vested in a manager or managers.

25   And at the lower right-hand corner it bears two signatures,

```
 1   very faint.

 2            And the very last page, the actual certification

 3   from the Commonwealth of Pennsylvania, Department of State.

 4   Q    So again, Mr. Horton, this would be the certificate of

 5   organization for Efficient Realty Pennsylvania?

 6   A    That's correct.

 7   Q    You understand that?

 8   A    That's correct.

 9            MR. SHOCKLEY:  Okay.  Now, if I can have

10   Government's Exhibit 30.15.

11            MR. MARKUS:  No objection.

12            THE COURT:  What was the number again?

13            MR. SHOCKLEY:  30.15, your Honor.

14            THE COURT:  30.15 is admitted.

15       (Received in evidence Government's Exhibit(s) 30.15.)

16            MR. SHOCKLEY:  Permission to publish it, your

17   Honor.

18            THE COURT:  Go ahead.

19            MR. SHOCKLEY:  Ladies and gentlemen of the jury,

20   this is a certification, certified copy of records from the

21   State of Florida, Department of State.  First page of the

22   document reads:

23            "I certify the attached is a true and correct copy

24   of the complete file of Westmore Properties, LLC, a limited

25   liability company, organized under the laws of the State of
```

1    Florida, as shown by the records of this office."  The

2    certification is dated the 27th day of November of 2007.

3            Showing you the page that's Bates labeled FL-139.

4    It shows filed, Secretary of State, Tallahassee, Florida,

5    January 11, 2002.  Or '02.

6            It states:

7            "Articles of Organization of Westmore Properties,

8    LLC.  (Westmore Properties).  Article 1, name.  The name of

9    this limited liability company is Westmore Properties, LLC

10    (the company)."  It shows address -- the company's mailing

11    address and street address of the principal office of the

12    company as -- it looks like 555 Southeast 6th Avenue,

13    Apartment 5F, Delray Beach, Florida.  Registered agent and

14    office reads, the name of the initial registered agent of the

15    company is John Artuso, and his address is 555 Southeast 6th

16    Avenue, Apartment 5F, Delray Beach, Florida, 38483.

17            Under management, Article 5, it states the company

18    will be a manager-managed company.

19            On the next page it shows -- it states the

20    undersigned executed these articles of organization on this

21    11th day of January, 2002.  And it's signed by John Artuso or

22    it says, by John Artuso.  And there is a signature which

23    appears to be the words John Artuso.

24            Page bearing FL-142 shows the following year a

25    filing on May the 22nd of 2003, 2003 limited liability

```
 1   company, uniformed business report, Westmore Properties, LLC.

 2   Principal place of business, the same address in Delray

 3   Beach.  Current registered agent, John Artuso.  And then

 4   managing member, John Artuso.  And a signature at the bottom.

 5          The next page, a filing the following year dated

 6   April the 28th, 2004, an annual report, Westmore Properties.

 7   Same address in Delray Beach.  Registered agent, John Artuso

 8   at the same address.  And then MGRM, John Artuso at the same

 9   address.

10          The next page, the following year, filing on

11   July 5, 2005.  Annual report, Westmore Properties.  Same

12   address.  Registered agent, John Artuso at the same address.

13   MGRM, John Artuso, same address.

14          The following year, a filing April 14, 2006, annual

15   report, Westmore Properties.  Same address.  Registered

16   agent, John Artuso.  Same address.  MGRM, John Artuso.  Same

17   address.

18          The next page, filing on the following year,

19   February 9, 2007, annual report, Westmore Properties.  The

20   address of the place of business is now 6161 Northwest 2nd

21   Avenue, Apartment 417, Boca Raton, Florida.  Same mailing

22   address as the new address in Boca Raton.  Current registered

23   agent, John Artuso.  Showing an address of 6161 Northwest 2nd

24   Avenue, Apartment 417, Boca Raton, Florida.  MGMR, John

25   Artuso at that same address.
```

```
 1    BY MR. SHOCKLEY:

 2    Q    So, Mr. Horton, the Palm Harbor property was sold to

 3    what entity?

 4    A    Westmore Properties, LLC.

 5           THE COURT:  It's quarter till.  Is this a good time

 6    to stop?

 7           MR. SHOCKLEY:  Oh, gosh, your Honor, I guess.

 8    Yeah, that's fine.  I was on a roll.  You can tell.

 9           THE COURT:  All right.  Let's --

10           MR. SHOCKLEY:  Thank you for your mercy.

11           THE COURT:  Let's return at two minutes after

12    11:00.  15 minutes.

13        (Jury out at 10:46 a.m.)

14           THE COURT:  Okay.  We'll be in recess 15 minutes.

15           MR. PASANO:  You asked me for a case on Bruton

16    issues nonpolice.  I found one US versus Veltmann.  I'll give

17    the cite to the Government.  If I can tender it to the Court.

18           THE COURT:  Okay.

19           MR. PASANO:  Thanks.

20        (Recess at 10:47 a.m.)

21           THE COURT:  Okay.  Have a seat a second.

22           I plan to -- I wanted to mention there was a

23    newspaper article in the local section of the Post today.  I

24    don't know if you all saw it.

25           MR. MARKUS:  I don't read it.
```

```
 1              THE COURT:  Probably a lot of people don't.  But I
 2    think I'll remind them of the obligation not to read the
 3    paper.  The story today doesn't say much more than what you
 4    all talked about in yesterday before the jury, but there's
 5    always the possibility something might come up in the future.
 6    So I'm going to remind them of that, if no one has objection.
 7              All right.
 8              MR. SHOCKLEY:  Your Honor may want to tell them not
 9    to hit the Internet either.
10              THE COURT:  I told them that before.
11              MR. SHOCKLEY:  I know you did.  But especially
12    after hearing the testimony -- well, it's going to be a while
13    before I get to that area, your Honor.  I don't see us
14    getting there until after lunch because we've got a fair
15    amount of ground.  We've got a third property sale -- I mean
16    the fourth property sale now to take care of.
17              THE COURT:  Okay.  That testimony is again after
18    the FBI, right?
19              MR. SHOCKLEY:  No, that's before the FBI.  The
20    fourth property is sold in 2003.
21              THE COURT:  I'm talking about the Internet.  You
22    made reference to the Internet.
23              MR. SHOCKLEY:  Yes.  Excuse me.  That is after the
24    FBI visit.
25              THE COURT:  Okay.
```

1          MR. SHOCKLEY:  We don't believe that's going to

2     come before lunch.

3          THE COURT:  All right.  Let's invite the jury in.

4        (Jury in at 11:02 a.m.)

5          THE COURT:  Welcome back.  Please be seated.

6          Before we resume, I want to mention one more thing

7     to you again.  We talked about this a little bit before.

8     There may be some newspaper coverage of this case and again,

9     it's important to avoid it.  If you see a story, please don't

10    read it.  The reason for that is, newspaper reporters

11    obviously aren't governed by the rules of evidence.  They may

12    cover things in their stories that aren't properly before the

13    jury.  If they did that and if you were to look at it, you

14    wouldn't all be deciding the case based on the evidence

15    presented here at trial, and it's really important to do

16    that.

17         So if there is a story that comes up, please don't

18    read it.  Don't know whether it will or not but if it does,

19    please don't read it.

20         Mr. Shockley.

21         MR. SHOCKLEY:  Thank you, your Honor.

22    BY MR. SHOCKLEY:

23    Q   Mr. Horton, we've gone through three separate sales now,

24    the Pompano Beach property, the Palm Harbor property, the

25    Lancaster property.  We've now gone through and published to

1    the jury certified copies of the Articles of Organization for

2    Efficient Realty and Development, LLC, in Florida, Efficient

3    Realty LL -- and Development LLC in Pennsylvania, Westmore

4    Properties, LLC, the Articles of Organization in Florida, and

5    the Articles of Incorporation of Efficient Realty and

6    Development Corp., a Florida corporation.

7              So we've got four entities.  But, in fact, the

8    sales were to three separate entities; is that correct?

9    A    That's correct.

10   Q    The sales were -- the Pompano Beach was sold to

11   Efficient Realty, Florida?

12             MR. KAISER:  Objection, Judge.  I think we've been

13   through this about five times now.

14             THE COURT:  Well, overruled.  I'll permit him to at

15   least transition into this section.  Go ahead.

16   BY MR. SHOCKLEY:

17   Q    Efficient Realty Florida purchased the Pompano Beach

18   property; is that correct?

19   A    Efficient Realty of Florida, correct.

20   Q    Efficient Realty of Pennsylvania purchased the

21   Pennsylvania property, the Lancaster?

22   A    The Lancaster.  That's correct.

23   Q    And Westmore Properties, LLC, purchased what?

24   A    The Palm Harbor location.

25   Q    Okay.  Now, did there come some point in time after

1    the -- or around -- say, around the time of the closing on

2    those first three properties, this was the -- the closings

3    were in early February of 2002; is that correct?

4    A    That's correct.

5    Q    Now, sometime around the time of the closings were you

6    having conversations with Mr. Orr concerning the ownership of

7    these, or how you and he were to be paid?

8    A    There was three or four conversations.  The first one

9    was shortly before closing, Greg indicated that we would be

10   paid as consultants.  We had no ownership of these

11   properties, as far as I knew.

12   Q    Okay.  You yourself knew that you hadn't seen any

13   corporate documents at that time giving you any ownership; is

14   that correct?

15   A    That's correct.

16   Q    Could you push down that screen in front of you.  Yes,

17   so we can see you.  Okay.

18            So at this point in time and even up to the point

19   in time when the transactions took place conveying the

20   properties to these three separate entities, did you have --

21   what legal documents, if any, did you have giving you a

22   vested ownership interest in the profits that were going to

23   be obtained by these three different companies, Efficient

24   Realty Florida, Efficient Realty Pennsylvania, or Westmore

25   Properties, LLC?

1    A    I had no documents.  Just verbal understanding.

2    Q    That was a verbal understanding with whom?

3    A    Mr. Orr.

4    Q    And directing your attention again back to -- you said,

5    I believe, it was in October or November, but sometime after

6    the initial purchase and sale agreements were signed in

7    September and early October, you had a conversation with

8    Mr. Orr concerning partners; is that correct?

9    A    It was September or October.  That's correct.

10   Q    Okay.  Now, the partners he indicated to you were whom?

11   A    Vinnie and Johnny.

12   Q    Okay.  And Vinnie and Johnny were supposed to do what

13   pursuant to their partnership?

14   A    They provided cash that Greg indicated he didn't have

15   for the attorneys and also for loan applications, along with

16   a contact to get the loan.

17   Q    Okay.  Now, you also mentioned the name Fip and the name

18   Tommy.  What did Mr. Orr tell you their roles were to be?

19   A    The name Fip was only mentioned as a contact that knew

20   somebody named Tommy that knew somebody with GE to facilitate

21   the loans.

22   Q    Okay.  And, in fact, you have seen previously admitted

23   into evidence GE Capital records authorizing the loans; is

24   that correct?

25   A    That's correct.

1    Q    Now, as a result of these -- well, when Mr. Orr was

2    telling you about Vinnie and Johnny, his partners, what, if

3    anything, did he say that they knew about you and the deal

4    you had with Mr. Orr?

5    A    In this conversation when Greg stated to me that there

6    was going to be a reduction in my percentage and that Vinnie

7    and Johnny were coming in as partners, concern obviously was

8    there was more than two of us now.  It was now four.  And I

9    said, what do they know about our transaction with these

10   properties?

11   Q    And he responded how?

12   A    Everything.

13   Q    Now, also he mentioned to you the name Robert Gannon; is

14   that correct?

15   A    Later he mentioned Mr. Gannon was coming in because

16   Mr. Orr's credit was not good.  Mr. Gannon would be the

17   individual to apply for the loan, my understanding.

18   Q    Now, you said "later."  That was on a later date or --

19   A    Same conversation, later time.

20   Q    So, in other words -- first of all, he told you about

21   which partners?

22   A    Vinnie and Johnny.

23   Q    And then he told you about whom?

24   A    Mr. Robert Gannon.

25   Q    And then he told you about who else?

1    A    Later -- later, I knew that Fip and Tommy were partners,

2    but not in that conversation.

3    Q    Okay.  When did you learn that they were partners?

4    A    It was sometime later.  It could have been 30 days or 40

5    days.

6    Q    As a result of these additional partners that you now

7    had, what happened to your share of the proceeds, according

8    to Mr. Orr?

9    A    My proceeds went from 50 percent to 30 percent of the

10   profit.

11   Q    Now, you yourself were inside ADT and you were actually

12   authorizing the payments --

13           MR. PASANO:  Your Honor, I apologize.  If it starts

14   that way, it's leading.  I object.

15           THE COURT:  It is starting out as a leading

16   question.  Let's try to make sure we hear from the witness.

17           MR. SHOCKLEY:  Okay.

18   BY MR. SHOCKLEY:

19   Q    Form 113.  I'm trying to think of the form number.

20   Those form 113s, again, what were those forms?

21   A    Those forms were to start either a new vendor for

22   payment, recurring, or one time payment, or changes in

23   payments.

24   Q    And those form 113s that we reviewed in this case that

25   were signed by you, do you recall those?

1   A    Yes.

2   Q    The purpose of those forms that you've identified in

3   this case was to do what?

4   A    To make payments to Efficient Realty Florida, Efficient

5   Realty Pennsylvania, and Westmore Properties.

6   Q    And in looking at these forms as you are signing them,

7   did you notice or not the amount of money that was going to

8   be paid out to Efficient Realty Florida, Efficient Realty

9   Pennsylvania, and Westmore Properties?

10  A    Yes, I did.

11  Q    So were you aware then of the money that was at least

12  going out to those three companies being paid out by ADT?

13  A    Yes, I was.

14  Q    Were you aware or did you know what the mortgage

15  payments were?

16  A    At that time I did not.

17  Q    And you had what, if anything, to do with securing the

18  mortgages?

19  A    Zero.

20  Q    But as the payments started to begin, these monthly

21  payments, what happened with your bank account?

22  A    First month I received my percentage of the profit, and

23  my bank account was started.

24  Q    Okay.  So you actually had to open a bank account; is

25  that correct?

1    A    That's correct.

2    Q    It was in what name?

3    A    KCGF.

4    Q    Okay.  Now KCGF Associates, LLC, what is that company?

5    A    It's a company that's owned by myself and my wife.

6    Q    Now, you indicated that you had no written document,

7    even though you were supposed to get 30 percent of the

8    proceeds.  You had actually no written document or proof that

9    you were entitled to these proceeds; is that correct?

10   A    At that time, that's correct.

11   Q    And why was that?

12   A    I didn't -- I didn't have a company.  I didn't have

13   anything at that time when we got the first check, I believe,

14   or the closing, prior to the closing, or after the closing.

15   Q    Did you ever have a written document or agreement with

16   any of the companies that took title to these three

17   properties authorizing you to receive a payment?

18   A    I'm not quite sure I understand your question.

19   Q    How many contracts, if any, did you sign with either

20   Efficient Realty and Development Corp., Efficient Realty

21   Pennsylvania, Efficient Realty Florida, or Westmore

22   Properties where they were obligated legally to pay you any

23   share of the proceeds that they received in rent?

24   A    I had none.

25   Q    Why is it that you didn't have a contract entitling you

 1   to the money that you rightfully deserved pursuant to the

 2   agreement you made with Gregory Orr?

 3   A    It was not a legal transaction.

 4   Q    So is this something that you wanted to have in writing?

 5   A    No, sir.

 6   Q    So you were -- were you taking it on faith then that you

 7   would get your 30 percent share?

 8   A    Yes.

 9   Q    But yet, you still worked at ADT; is that correct?

10   A    Yes.

11   Q    Still its vice president?

12   A    Yes.

13   Q    Still signing these authorizations to make the payments?

14   A    Yes.

15   Q    Up until the point in time that you were fired,

16   Mr. Horton, did you have authority to sell properties of ADT?

17   A    I had the ability to sell property with the approval of

18   ADT/Tyco Fire and Tyco.

19   Q    And that was the same authority you had when you signed

20   off on these documents authorizing the sale of these three

21   properties we've been discussing thus far; is that right?

22   A    That's correct.

23   Q    Up until the point in time that you were fired, did ADT

24   own -- continue to own properties?

25   A    Yes.

1    Q    And continue to lease properties?

2    A    Yes.

3    Q    Continue to sell properties?

4    A    Yes.

5    Q    Now, sir, as the payments started going out, tell us

6    about a conversation you had with Mr. Orr concerning -- you

7    said that being paid as a consultant -- tell us about that

8    conversation.

9    A    It was shortly after closing.  Sometime in February.  I

10   don't know the exact date.  Greg had stopped by the house and

11   he was talking about how we would be paid, that it would be a

12   consultant, and he had some concerns about that.  And he

13   stated also he had some concerns about the people that owned

14   the properties.

15   Q    And what did he say his concerns were?

16   A    He had no ownership.

17   Q    Okay.  So he had -- he himself said he had no ownership

18   in any of these companies that purchased the properties?

19   A    Correct.

20   Q    And what did he suggest that you or he or both of you

21   would do?

22   A    He didn't suggest to me.  He indicated that he had got a

23   name of an attorney and he was going to visit that attorney.

24   Q    When did this conversation take place you say?

25   A    Best I can recall, it would have been sometime late

1    February.  It could have been second week in February.  I'm

2    not sure.

3    Q    Okay.  Now, the transactions had actually taken place in

4    early February; is that correct?

5    A    That's correct.

6    Q    And this is of 2002?

7    A    That's correct.

8    Q    Those three big checks had gone out for the first

9    month's rent, the security deposit and the credit for closing

10   costs, or whatever, those had gone out also in early February

11   of 2002; is that correct?

12   A    That's correct.

13   Q    At that point in time did you have KCGF Associates, LLC,

14   set up?

15   A    No, sir.

16   Q    So then you had no bank account associated with that

17   company; is that correct?

18   A    No, sir.

19   Q    Was there -- before the first check was sent out, were

20   there any agreements with exactly the mechanism by which you

21   were to get paid, cash, check, wire transfer?  Was any of

22   that worked out?

23   A    No, sir.

24   Q    After Mr. Orr indicated that he was going to consult

25   with an attorney, did there come a point in time that you

1    received a call from Mr. Orr?

2    A    I did.  He indicated that he was at an attorney's

3    office, his name was Marty Genauer, and that Marty Genauer

4    was going to set up a company for me.  He had indicated that

5    I should have my wife on this company from Marty Genauer and

6    he needed a name and my wife's Social Security number and

7    mine.

8    Q    So he needed -- obviously, he knew your name.  He needed

9    your wife's name and Social Security number?

10   A    Along with --

11   Q    And your Social Security number, and the name of what?

12   A    That would be on the company.

13   Q    Okay.  Now, prior to receiving this call from Mr. Orr

14   who said he was at an attorney by the name of Marty Genauer's

15   office, what instructions, if any, had you given him

16   concerning whether you wanted a company set up for yourself?

17   A    I hadn't discussed it with him as far as a company.

18   Q    So at the time that you received a call from Mr. Orr

19   stating that he was at an attorney's office and was going to

20   set up a company for you, is that the first time that you

21   ever heard of this?

22   A    Yes.

23   Q    How did you respond?

24   A    I said I need some time to think about the name of the

25   company.  Plus, at that point I don't have my wife's Social

1    Security number memorized.  She has mine.  So I would have to

2    find the Social Security number.

3    Q    You had her birth date and anniversary dates; is that

4    correct?

5    A    I know those two.

6    Q    That's all that's legally required.  But you didn't have

7    her Social Security number?

8    A    No, I did not.

9    Q    So you had to go somewhere to get her Social Security

10   number to report back; is that correct?

11   A    That's correct.

12   Q    Did you give some thought to what name you would want to

13   name your company?

14   A    Not a lot.

15   Q    How did you come up with KCGF?

16   A    I just picked the last four places that I lived

17   state-wide.

18   Q    And those were?

19   A    Kansas, California, Georgia, and Florida.

20   Q    So that's how you came up with KCGF Associates, LLC; is

21   that correct?

22   A    That's correct.

23   Q    Now, at the point in time you received a call from

24   Mr. Orr had you ever met this Martin Genauer?

25          For the record, his last name is spelled -- is it

1   spelled G-E-N-A-U-E-R, if you know?

2   A    I'm not sure.

3   Q    Did you ever meet him?

4   A    No.

5   Q    Did you ever talk to him?

6   A    No.

7   Q    So Gregory Orr said that he wanted a name of a company

8   and the Social Security numbers.  Did you provide them to

9   him?

10  A    I did.

11  Q    How much afterwards, if you recall?

12  A    It could have been later that day or possibly, it could

13  have been the next day.  It was very quick.

14  Q    Roughly, how long after the closing was this, if you

15  recall?

16  A    Best I can recall, it was -- it could have been five

17  days.  It could have been two weeks after the closing.  I'm

18  not quite sure.

19  Q    This was back in 2002; is that correct?

20  A    That's correct.

21  Q    Now, were there any discussions -- tell us about the

22  next discussions you had with Mr. Orr after you had received

23  this call concerning coming up with a name of this new

24  company for yourself.

25  A    In a later conversation I had given him the name,

1    initials, my wife's Social Security number, my Social

2    Security number.  He also mentioned that Marty Genauer said

3    that he could be listed as manager of this LLC, which would

4    hide my identify and my wife's identity on the form.

5    Q    Okay.  And "he could be listed."  That was who could be

6    listed as the manager?

7    A    Mr. Greg Orr.

8    Q    Okay.  So Greg Orr was suggesting to you that he,

9    himself, could be the manager in order to hide your identity?

10   A    That's correct.

11   Q    Why was it essential to hide your identity?

12   A    My concern was, obviously, doing business with ADT/Tyco,

13   and there was an ethics violation, to start with.

14   Q    And as a result of the sales that you made, were there

15   any other problems?

16   A    Obviously, it led further to a criminal issue that I was

17   concerned about.

18   Q    And as a matter of fact, if, in fact, your identity

19   should be uncovered, what was your understanding of what

20   might happen to these three deals?

21   A    It would -- certainly, a domino affect could take place.

22   There would be more scrutiny taking place related to these

23   deals.

24   Q    Okay.  Did you agree to have Mr. Orr listed as the

25   manager on your new company?

1    A    I did.

2    Q    Showing you now --

3            MR. SHOCKLEY:  Your Honor, at this time we would

4    like to offer into evidence Government's Exhibit 30.10, a

5    certified copy of KCGF Associates records in the State of

6    Florida, Department of State.  30.10.

7            MR. MARKUS:  No objection.

8            THE COURT:  30.10 is admitted.

9        (Received in evidence Government's Exhibit(s) 30.10.)

10            MR. SHOCKLEY:  I'm publishing that for the jury.

11            First page of the document, it states:

12            "State of Florida, Department of State.  I certify

13    the attached is a true and correct copy of the complete file

14    of KCGF Associates, LLC, a limited liability company,

15    organized under the laws of the State of Florida, as shown by

16    the records of this office."

17            Certification date in the lower right-hand corner

18    says:

19            "Given under my hand and Great Seal of the State of

20    Florida, at Tallahassee, the capital, this 27th day of

21    November, 2007."  And a signature there for the Secretary of

22    State.

23            On the very next page bearing Bates label FL-093,

24    it reflects a filing date March 18, 2002, Secretary of State,

25    Tallahassee, Florida.  It shows customer, Ms. Maria Elena

1    Dieguez, Karp and Genauer, PA.  And an address in Coral

2    Gables, Florida.

3         The next page is titled, Articles of Organization

4    for Florida limited liability company.  Article 1.  Name,

5    KCGF Associates, LLC.  Address.  The mailing address and

6    street address of the principal office of the limited

7    liability company is Two Alhambra Plaza, Suite 1202, Coral

8    Gables, Florida, 33134.

9    BY MR. SHOCKLEY:

10   Q    Mr. Horton, that is not your address, is it?

11   A    No, it's not.

12        MR. SHOCKLEY:  Article 3.  Registered agent,

13   registered office, and registered agent's signature shows

14   Alhambra Registered Agents, Inc., Two Alhambra Plaza, Suite

15   1202, Coral Gables, Florida.  Underneath that, a signature

16   above the name Martin J. Genauer, vice president, Alhambra

17   Registered Agents, Inc.

18        Article 4, "management" is checked off on the box.

19   The limited liability company is to be managed by one manager

20   or more managers and is, therefore, a manager-managed

21   company.  And it bears the signature, Martin Genauer.  Again,

22   the filing date is March 18, 2002.

23        And the following year, the next page, filed

24   January 30, 2003, Secretary of State, 2003 limited liability

25   company, Uniform Business Report, UBR, KCGF Associates, LLC.

1    Principal place of business, Two Alhambra Plaza, Suite 1202,

2    Coral Gables, Florida.

3    BY MR. SHOCKLEY:

4    Q    Now, I'm going to stop the publication right there and

5    come back to this.  But right now, Mr. Horton, I would like

6    to ask you a few questions about that company.

7            So we know now that it was formed on March the 18th

8    of 2002, according to this certified record from the Florida

9    Department of State; is that correct?

10   A    That's probably correct.  Obviously, it is.

11   Q    And how was it -- if you never dealt with this attorney,

12   Martin Genauer, how was it that you actually received any

13   documents concerning this company?

14   A    Best I can recall, the documents was brought to my home

15   by Greg.  I signed them, my wife signed them, and either I

16   mailed them back or returned them back to Greg.

17   Q    What kind of documents was it that Mr. Orr brought to

18   you to your home for signature?

19   A    The actual setup of the company which required your

20   signature and your wife's signature.

21   Q    Are you referring to the operating agreement?

22   A    That's correct.

23   Q    I show you now Government's Exhibit 3.65.

24           MR. SHOCKLEY:  Your Honor, at this time we would

25   offer into evidence Government's exhibit 3.65.

1          MR. MARKUS:  No objection.

2          THE COURT:  3.65 is admitted.

3      (Received in evidence Government's Exhibit(s) 3.65.)

4   BY MR. SHOCKLEY:

5   Q    Showing you the first page of this document, operating

6   agreement of KCGF Associates, LLC, a Florida limited

7   liability company.

8          Second page states:  "Operating Agreement of KCGF

9   Associates, LLC."  The top paragraph commences:

10         "This operating agreement of KCGF Associates, LLC,

11  (agreement), dated effective as of the 18th day of March,

12  2002, is hereby adopted, approved, ratified, and confirmed as

13  the operating agreement of KCGT Associates, LLC, a Florida

14  limited liability company, by the parties signing this

15  agreement as the initial members of the company."

16         I'm going to go now to the Page 3 of the document

17  bearing Bates label G-49.

18         And Mr. Gannon (sic), I want to direct your

19  attention to No. 19.  Does it state in the operating

20  agreement:  "Member means one of the parties listed as

21  members on Schedule 1 of this agreement or any successor or

22  successors to all or part of any such members' interest or

23  any party admitted as an additional member of the company in

24  accordance with this agreement and the act, each in the

25  capacity as a member of the company"?  Is that what it

1    states?

2    A    Yes, it does.

3    Q    And then right above that:

4         "Manager" -- it says, "Manager means any person or

5    persons that are elected to act as managers of the company as

6    provided herein.  Managers means all such persons

7    collectively in their capacity as managers of the company."

8         So that's defined in this operating agreement; is

9    that correct?

10   A    That's correct.

11   Q    Going right to the back page, Schedule 1, Page 28, Bates

12   label G-514.  At the top it says, KCGF Associates, LLC,

13   Schedule 1, names, addresses, initial capital contributions,

14   and sharing ratios.  It says, names and addresses.  It

15   lists -- is that you and your wife?

16   A    That's correct.

17   Q    As tenants by the entireties in care of Gregory Orr.

18   And is that his address at that time?

19   A    Yes, it is.

20   Q    The next column shows initial capital contributions,

21   $1,000.  And then sharing ratios, 100 percent.  Is that what

22   this document states?

23   A    Yes, it does.

24   Q    So 100 percent of this company is owned by whom?

25   A    Myself and my wife.

1    Q    And holding that as tenants by the entireties?

2    A    That's correct.

3    Q    And Gregory Orr is in care of Gregory Orr at his

4    address, though; is that correct?

5    A    That's correct.

6    Q    So your address is not even on this document?

7    A    No, it's not.

8    Q    Directing your attention to -- so as a member, then, not

9    a manager, but as a member you had an ownership interest,

10   correct?

11   A    Yes.

12   Q    And your membership interest was 100 percent together

13   with your wife?

14   A    That's correct.

15   Q    Showing you Page 5, Bates labeled G-491.  Under

16   Section 2.2 it says:

17         "The name of the company is KCGF Associates, LLC,

18   although such business may be conducted under any other name

19   to the extent permitted by local law.  The company shall

20   initially maintain its principal office at the following

21   address:  Two Alhambra Plaza, Suite 1202, Coral Gables,

22   Florida, 33134."

23         And again, that's not your address, correct?

24   A    It's not.

25   Q    Neither home or business; is that correct?

1    A    It is not.

2    Q    It says at the bottom, Section 2.4 -- the document

3    reads:

4           "The company's initial registered office shall be

5    Two Alhambra Plaza, Suite 1202, Coral Gables Florida, 33134.

6    And the name of its initial registered agent at such address

7    is Alhambra Registered Agents, Inc."  Is that what it states?

8    A    Yes, it does.

9    Q    Showing you now the next page, Page 6, bearing Bates

10   label G-492.  Under Section 2.5, "Purposes and character of

11   business and powers.  Section A2, it says, "To establish,

12   acquire, or invest directly or indirectly in partnerships,

13   corporations, joint ventures, limited liability companies,

14   associations, trusts and other entities engaged in all or any

15   of the foregoing activities, including, without limitations,

16   the following, collectively the property owners:"

17          And it lists six different -- it has six different

18   categories underneath it in Roman numerals I through VI.

19          Go to number three.  Does it state, "Efficient

20   Realty and Development, LLC, a Florida limited liability

21   company"?

22   A    Yes, it does.

23   Q    And that's Efficient Realty Florida that took ownership

24   of the Pompano Beach property?

25   A    That is Pompano.

1   Q    Number four is Westmore Properties, LLC, a Florida

2   limited liability company.  And that's the one who took

3   ownership of?

4   A    Palm Harbor.

5   Q    Okay.  Number five, Efficient Realty and Development,

6   LLC, a Pennsylvania limited liability company.  And that's

7   the company that took ownership of what?

8   A    Lancaster, Pennsylvania.

9   Q    And it also has listed J & G Associates, LLC, a Florida

10  limited liability company.  What is that?

11  A    That's Mr. Orr's LLC.

12  Q    Actually, who had the majority ownership interest in

13  that?

14  A    I did.

15  Q    Through what?

16  A    I don't know the correct --

17  Q    Well, what entity had an ownership interest in J & G

18  Associated, LLC?

19  A    KCGF had a major ownership of J & G.

20  Q    Now, I see that numbers one and two are blacked out.  Is

21  this the original copy of the ownership -- of the Articles of

22  Organization -- excuse me, the original copy of the operating

23  agreement that Mr. Orr delivered to you?

24  A    This is not the original.

25  Q    Okay.  The original, did it have those areas blocked

1    out?

2    A    No, it did not.

3    Q    In preparation for trial, in reviewing this document,

4    did you bring this document to the Government?

5    A    No, I did not.

6    Q    Did the -- well, what happened then to the operating

7    agreement that you had that was delivered by Mr. Orr to you?

8    A    Mr. Orr had requested that document back.

9    Q    Okay.    Now, this is at some future date; is that

10   correct?

11   A    That's correct.

12   Q    So this particular document did not come from you; is

13   that correct?

14   A    That's correct.

15   Q    It came from some other source?

16   A    That's correct.

17   Q    But you can identify your signatures on this document;

18   is that correct?

19   A    Yes.

20   Q    And you recognize the document as the document you have

21   seen before, correct?

22   A    Without the two blocked out lines.

23   Q    Directing your attention to Page 14, bearing Bates label

24   G-500.    Under Article 6, does this allocate or specify how

25   money is to be shared among the members of the company?

1    A    I think it starts describing it.  I don't see where the

2    distribution is.

3    Q    Well, directing your attention to Section 6.1C --

4    A    Okay.

5    Q    -- where it says "any remaining amount shall be

6    distributed to the members based on their respective sharing

7    ratios."

8    A    That's correct.

9    Q    And the sharing ratios in this case -- going back to

10   Page 28 -- is 100 percent sharing ratio to whom?

11   A    To myself and my wife as joint tenant.

12   Q    So then as members of the company, you actually owned

13   it; is that correct?

14   A    That's correct.

15   Q    Now, in this company, did you manage it?  Were you

16   listed as a manager?

17   A    No.

18   Q    Now, although you owned this company, why was it that

19   you did not want to be listed as the manager?

20   A    As suggested through that conversation with Mr. Orr from

21   Marty Genauer's office, this would hide my name within the

22   Internet structure if you was to go search this company.

23   Q    And directing your attention now to Page 27 of that

24   document Bates labeled G-513.  It's a signature page.  It

25   says:

1          "In witness whereof, the undersigned, being the

2    members and the initial managers of the company, have caused

3    this agreement to be duly adopted by the company effective as

4    of the day first above written."  And under "members" it has

5    got -- is that your signature?

6    A    Yes, it is.

7    Q    Is that your wife's signature?

8    A    Yes, it is.

9    Q    And it says underneath those signatures, you and your

10   wife respectively, as tenants by the entireties with the

11   other, and then it says "as member."  Is that correct?

12   A    That's correct.

13   Q    So as member you owned it; is that correct?

14   A    That's correct.

15   Q    Look on the left side of the page.  It says "managers."

16   There's a block that says Gregory Orr as manager and his

17   signature.  Is that correct?

18   A    Yes.

19   Q    As manager, did he own any of KCGF?

20   A    No.

21   Q    Mr. Orr (sic), you indicated that after you had executed

22   these documents --

23           MR. MARKUS:  That's Horton.

24           MR. SHOCKLEY:  Excuse me.  I'm sorry.

25

BY MR. SHOCKLEY:

Q    Mr. Horton, I apologize.  After you had executed these documents, what did you do with them?

A    In trying to recall, I'm not sure if I returned these back to Greg or if I mailed them in.

Q    Mailed them to who?

A    Envelope that was included in the packet.

Q    Addressed to who?

A    Best I can recall, it would have been Marty Genauer's office.

Q    The attorney who had set these up?

A    Yes.

Q    Or set this up?

A    Correct.

Q    As of this date, have you ever spoken to Marty Genauer?

A    No, I have not.

Q    Had any contact with his office?

A    No, I have not.

Q    Now, again, directing your attention back to Government's Exhibit No. -- well, before I leave this Exhibit 3.65, when you signed it, you knew about this agreement you had with Gregory Orr; is that correct?  You signed the operating agreement?

A    I did.

Q    Now, your wife signed it as well.  What, if anything,

1  did you tell her about what kind of business you were in?

2  A    Just that it was a real estate business --

3  Q    Okay.

4  A    -- with Mr. Orr.

5  Q    Did you confide in her anything about the details of the

6  agreement to sell ADT properties?

7  A    No, I did not.

8  Q    So after she had signed off on the operating agreement,

9  that's when you returned it to Mr. Orr or to Marty Genauer;

10  is that correct?

11  A    That's correct.

12  Q    Now, again, you testified that you had an ownership or

13  at least KCGF had an ownership interest in J & G Associates,

14  LLC; is that correct?

15  A    Yes.

16  Q    Did you ever have that operating agreement?

17  A    Yes, I did.

18  Q    Do you have it now?

19  A    No, I do not.

20  Q    What happened to that?

21  A    Mr. Orr requested it back.

22  Q    During the entire time that you received payments from

23  ADT through these companies, did you ever receive any checks

24  payable to Larry Horton?

25  A    I think they were all addressed to KCGF.

1    Q    And payable to KCGF?

2    A    Correct.

3    Q    Why did you not want to have any of these funds going to

4    you in your name?

5    A    There was not a thought given on actually coming to me,

6    my name, when the company was set up by Mr. Orr.  That's how

7    the checks came.

8    Q    So the checks came out as KCGF.  And how was your

9    identity concealed using KCGF?

10   A    Mr. Orr was listed as the manager.

11   Q    Now, if I could, I would like to go back to Government's

12   Exhibit 30.10.

13          Do you recall this as the Florida Department of

14   State document filed March 18, 2002, Articles of Organization

15   for KCGF, Martin Genauer's name on there for Alhambra

16   Registered Agents in 2002?

17          Let's go to the following year, January 30, 2003.

18   You filed with the Secretary of State, 2003 Uniformed

19   Liability Company, Uniform Business Report.  Entity named,

20   KCGF Associates, LLC.  Principal place of business, same

21   address in Coral Gables.  Name and address of current

22   registered agent, same address in Coral Gables.  Managing

23   members/managers:  As member, Janie Marie Horton.  That

24   address, 6547 Northwest 194th Terrace, Parkland, Florida,

25   33076.  Whose address is that?

 1    A    That's 6547 Northwest 194th Terrace?

 2    Q    Yes.

 3    A    That's an incorrect address.

 4    Q    Do you live in Parkland?

 5    A    I do.

 6    Q    What's your address?

 7    A    Mine is 6547 Northwest 104th Terrace.

 8    Q    This appears to be possibly a typo?

 9    A    That's correct.

10    Q    Other than that one digit, is it your address?

11    A    That's correct.

12    Q    Underneath that, member, Larry Horton, and the same

13    address listed; is that correct?

14    A    That's correct.

15    Q    And underneath that it says, manager, Gregory Orr, and

16    his address; is that correct?

17    A    Yes, it is.

18    Q    And on the right-hand side under the additions or

19    changes it has a change, manager, Gregory Orr, and a

20    different address; is that correct?  6710 Northwest 101st

21    Street Terrace?

22    A    Yes.

23    Q    101st Terrace Parkland, Florida, 33076; what is that

24    address?

25    A    I think that's his second home there in Parkland.

1    Q    So he had moved from one home to another?

2    A    Yes.

3    Q    So now on January 30th of 2003, your name and your

4    wife's name is listed on a public filing with a Florida

5    Secretary of State; is that correct?

6    A    In 2003, that's correct.

7    Q    When was it that you found out, if you can recall?

8    A    I don't recall the time line on it, but I was in a

9    meeting with Mr. Gray Finney, who was corporate counsel, and

10   he was looking at some LLCs related to -- and again, I don't

11   know what it was related to, that he was investigating, and I

12   said, you can actually go online and search by name or

13   company?  And he said, yes, it's a nice system.

14            So at later date I went online and searched, just

15   put in my name.  And all of a sudden, my KCGF popped up.

16   Q    How did you react to that?

17   A    I was a little taken back because I understood through

18   Greg, again through Marty Genauer, that as manager I would

19   not be or my wife would be shown on a publication through the

20   Internet.

21   Q    You mean only a manager and not a member?

22   A    No members.  My understanding was you wouldn't be shown.

23   Q    So as a member, meaning an owner, of KCGF, it was your

24   understanding that that did not have to be displayed on any

25   public documents?

1    A    Through the Internet, that's correct.

2    Q    The manager?

3    A    Just the manager.

4    Q    And your company and the operating agreement listed the

5    manager as whom?

6    A    Mr. Greg Orr.

7    Q    And that was set up with him as a manager specifically

8    for what purpose?

9    A    To hide my identify within the company.

10    Q    Did there come some point in time after you observed

11    this that you made a telephone call?

12    A    I called him at --

13    Q    "Him" meaning who?

14    A    I called Mr. Orr at home.  I indicated through this

15    conversation that I brought up my name on the Internet, it

16    showed KCGF, and I didn't quite understand how if he was

17    listed as manager, why I would show up.  He said he would

18    check on it.

19    Q    And was this a calm conversation?

20    A    It was calm.

21    Q    You were not upset at all?

22            MR. MARKUS:  Objection, Judge.  Leading.  The man

23    just said it was calm.

24            THE COURT:  Sustained.

25            Please don't argue your motion.

```
 1   BY MR. SHOCKLEY:

 2   Q    After all the great care that you had taken to conceal

 3   my name -- your name, why did you even call Mr. Orr?

 4   A    Being familiar with computers and the Internet through

 5   my role at ADT, once something is published out there, it's

 6   forever.  So what are you going to do about it?  I certainly

 7   called him.  I asked him to get it changed, and -- but it was

 8   there.

 9   Q    What was your understanding, if any, whether or not this

10   could be undone?

11   A    At that time I had no understanding until a call was

12   placed back from Greg.

13   Q    Did Mr. Orr later get back in touch with you?

14   A    He did.  He indicated that it was a secretarial error,

15   that Mr. Marty McGuire --

16   Q    Genauer?

17   A    Genauer was going to make a change.  But I understood

18   the change would not be for a period of time.

19   Q    Directing your attention now --

20        MR. SHOCKLEY:  Your Honor, if I can go back to

21   publishing the document.  The following page bearing Bates

22   label FL-0896, it shows a filing on January 30, 2004,

23   Secretary of State, 2004 limited liability company, annual

24   report for KCGF.  Registered agent, still Alhambra Registered

25   Agents, Inc.
```

1         Going down to the managing members/managers

2    section, the filing the following year shows manager with a

3    line through it so you can still read manager, Horton, Janie

4    M. with a line through it, so you can still read Janie M.

5    Horton.  The address with lines through it so you can still

6    read it, and the word beside it "delete."

7    BY MR. SHOCKLEY:

8    Q    Is that correct?

9    A    That's correct.

10   Q    And underneath that the same thing with you, the

11   manager, Horton, William L., and the address with lines

12   through it so you can still read it, and it says "delete"; is

13   that correct?

14   A    That's correct.

15   Q    So when you went on the Internet, could you see you had

16   been deleted at least the following year?

17   A    I didn't look anymore.

18   Q    And the manager is still listed as Gregory Orr at 6710

19   Northwest 101 Terrace, Pompano Beach, Florida.  It says

20   Pompano Beach; is that correct?

21   A    Pompano Beach is our post office.  That's correct.

22   Q    And at the bottom it bears a signature and a date on

23   1/24/04.  Do you know whose signature that is?

24   A    I can tell you the cell phone.

25   Q    I'm asking about the signature.

```
 1    A     It appears to be Mr. Orr's.

 2    Q     Okay.  Oh, when you said you can tell the cell phone,

 3    what were you referring to?

 4    A     He listed his cell phone number over there, which is

 5    Mr. Orr's.

 6    Q     The one that's listed as 954-44 --

 7    A     Eight.

 8    Q     Eight?

 9    A     2823.

10    Q     Okay.  Filed the filing year, January 17, 2005, KCGF

11    Associates, LLC.  The following year this listed Gregory Orr

12    as manager, and his same address, but your name does not

13    appear on that year; is that correct?

14    A     That's correct.

15    Q     In 2006, the filing, same registered agent, same

16    manager.

17          2007, annual report, KCGF.  Same registered agent.

18    Same manager, Gregory Orr.

19          Were you ever listed as a manager on your own

20    company?

21    A     I'd have to go back and look.  I believe it only listed

22    as a member and not a manager.

23    Q     Okay.  If I could show you the document then,

24    Government's Exhibit 30.10.

25          MR. SHOCKLEY:  Your Honor, can I have permission to
```

 1    approach?

 2              THE COURT:  Yes.

 3              THE WITNESS:  Only listed as a member and not a

 4    manager.

 5    BY MR. SHOCKLEY:

 6    Q    Even when you saw your name was on the Internet, did you

 7    ever contact Marty Genauer's office?

 8    A    No, sir.

 9    Q    Now, you've had occasion to set up your own company, did

10    you have occasion to set up a bank account for KCGF

11    Associates, LLC?

12    A    I did.

13    Q    And is that the bank account through which you received

14    the proceeds of these lease payments as they came eventually

15    to you?

16    A    That's the bank I used to deposit.

17    Q    Can you tell us generally how it was that the funds were

18    distributed after they were sent out from ADT?

19    A    Greg would drive by with a check in an envelope or he

20    would call and say it would be in your mailbox.

21    Q    And the checks were listed are payable to KCGF

22    Associates, LLC?

23    A    Yes.

24    Q    And the company that issued the check, that was what

25    company?

1    A    J & G, I believe.

2    Q    Is that the same J & G Associates, LLC, you referred to

3    earlier in your testimony?

4    A    Yes.

5    Q    And you indicated that you also had an ownership

6    interest in that; is that correct?

7    A    Yes.

8             MR. SHOCKLEY:  We would offer into evidence now,

9    your Honor, Government's Exhibit No. 30.8.

10            MR. MARKUS:  No objection.

11            THE COURT:  30.8 is admitted.

12        (Received in evidence Government's Exhibit(s) 30.8.)

13            MR. SHOCKLEY:  It's a certified copy, State of

14   Florida, Department of State.

15            "I certify the attached is a true and correct copy

16   of the complete file of J & G Associates, LLC, a limited

17   liability company, organized under the laws of the State of

18   Florida as shown by the records of this office.

19   Certification date is November 30th of 2007."

20            The second page shows a filing date, March 15,

21   2002, Division of Corporation.  Customer, Maria Elena

22   Dieguez, Karp and Genauer PA, address in Coral Gables.

23            The next page, Articles of Organization.  Name of

24   the limited liability company is J & G Associates, LLC.  The

25   address again on Alhambra Plaza in Coral Gables.  Registered

1    agent is Alhambra Registered Agents, Inc.  Signed on behalf

2    of them by Martin Genauer, vice president.  Management is,

3    the limited liability company is to be managed by one manager

4    or more managers and is, therefore, a manager-managed

5    company.

6         The next page is a filing date the following year,

7    January 30, 2003, 2003 limited liability company, J & G

8    Associates.  Registered agents in Coral Gables.  It lists

9    under managing members/managers, first manager/member,

10   Gregory Orr, and an address at 10571 Northwest 66th Street in

11   Parkland, Florida.  Underneath that, member, Janine Orr, same

12   address.  And member, KCGF Associates, LLC, with an address

13   in Coral Gables.

14   BY MR. SHOCKLEY:

15   Q    Now, if I could go away from the document a second now

16   and ask you, Mr. Horton, this last entry, the member KCGF

17   Associates, LLC, that's your company, correct?

18   A    That's correct.

19   Q    You and your wife as tenants by the entirety own

20   100 percent of that company; is that correct?

21   A    That's correct.

22   Q    But your name is not on this document anywhere, is it?

23   A    No, sir.

24   Q    Percentage-wise, how much did KCGF own of J & G

25   Associates, LLC?

1    A    60 percent.

2    Q    So as far as the sharing ratios are concerned, for J & G

3    Associates if $100 came in, how much was -- if it was to be

4    distributed, how much would go to KCGF Associates?

5    A    The ratios are somewhat misleading.  My actual is

6    30 percent.  And the way the distribution would be, 60 of 50

7    would have been 30 percent.  So I'm not quite sure how that

8    works.

9    Q    Okay.  Let me ask the question again.  Overall from the

10   total profits that would come to you from any one of these

11   business entities that were set up, you were to get

12   30 percent; is that correct?

13   A    That's correct.

14   Q    How much of J & G associates, LLC, did you own?

15   A    I believe it was 60 percent.

16   Q    So whatever they brought in, you would get 60 percent of

17   that; is that correct?

18   A    That's correct.

19   Q    And then the 60 percent of what they got would amount to

20   supposedly 30 percent of the total amount of money coming in;

21   is that correct?

22   A    That's correct.

23   Q    Were you aware at that time what the share of the other

24   partners in this venture were?

25   A    No, I was not.

1   Q     You just knew that you were supposed to get 30 percent

2   of the profits?

3   A     That's correct.

4   Q     Also on page bearing Bates label FL-082, the filing on

5   January 30 of 2003, it shows manager/member, Gregory Orr, the

6   address at 10571 Northwest 66th Street.  On its immediate

7   right it shows a change and a change to Gregory Orr at 6710

8   Northwest 101 Terrace, Parkland, Florida, and the same for

9   Janine Orr, a change to that second address.

10          The following page, filing on January 29, 2004.

11  Annual report, J & G Associates, LLC.  Manager -- excuse

12  me -- MGRM, Gregory Orr.  MGR, it says Janile Orr.

13          His wife's name is not Janile, is it?

14  A     No, it's Janine.

15  Q     The signature at the bottom is whose signature?

16  A     It appears to be Greg Orr.

17  Q     And the telephone number?

18  A     Cell phone Greg Orr.

19  Q     The filing the following year shows January 17, 2005.

20  Annual report, J & G Associates.  Manager -- MGRM, Gregory

21  Orr.  MGR, again it says Janile Orr.

22          The filing the following year on April 11, 2006.

23  Again, MGRM, Gregory Orr.  MGR, Janile Orr.

24          And finally, the filing on February 8th, 2007.

25  Same information as the previous year.

1                Mr. Horton, when was it that you actually began

2    receiving the payments then that came from, originally from

3    ADT lease payments for these three properties?

4    A    I'm not sure of the exact date when I got the check,

5    first check.  It could have been the end of February.  It

6    could have been the first of March.

7    Q    Of 2002?

8    A    Of 2002.

9    Q    And those checks, did they come basically on a monthly

10   basis over the years?

11   A    Yes, they did.

12   Q    Up until when?

13   A    Up until January of '08.

14   Q    And in January of 2008 you were indicted; is that

15   correct?

16   A    That's correct.

17   Q    And that's when the checks stopped?

18   A    Yes.

19   Q    Not until then?

20   A    Yes.

21   Q    Now, you've got three properties that you had sold on

22   behalf of ADT.  Did there come a point in time where a fourth

23   property was sold in the same agreement you had with Gregory

24   Orr?

25   A    Yes.

1    Q    What property was that?

2    A    It was a location in Oak Brook, Illinois, outside of

3    Chicago.

4    Q    Have you ever been to those premises?

5    A    I had visited that premises on the original acquisition

6    of SecurityLink.

7    Q    So this was a SecurityLink property?

8    A    Yes, it was.

9    Q    And SecurityLink was acquired during the year 2001; is

10   that correct?

11   A    That's correct.

12   Q    This -- after the first three sales had been concluded,

13   tell us about your conversations with Mr. Orr concerning

14   purchasing more properties?

15   A    Shortly after the conclusion of the first three

16   closings, Greg was wanting to know when there would be more,

17   in other words.  And I said, I can't answer that date.  I

18   don't know when there will be more.  And the conversations

19   continued to the point where he said his partners had

20   expected more of these locations.

21   Q    Did he specify who he was referring to as his partners?

22   A    No, he did not.

23   Q    Okay.  Now, did there come some point in time when you

24   had more conversations concerning Tommy or Fip?

25   A    Later in the conversation, I can't exactly give you the

1    time line, Greg had indicated that Tommy and Fip were both

2    percentage partners in these previous three transactions.

3    Q    And what, if anything, did he say about how they were

4    receiving their payments?

5    A    The only one that he identified somewhat unusual as far

6    as receiving his payments was Fip.  He indicated that the

7    payment was going to his children.  Tommy was just getting

8    his check.

9    Q    What, if anything, did he say about how anybody else

10    were receiving their payments?

11    A    At that point in time that was pretty much the only

12    thing I knew about the additional partners that was brought

13    in.

14    Q    Referring to which additional partners?

15    A    Fip and Tommy.

16    Q    And even as of this date, had you ever met or been

17    introduced to either one of those individuals?

18    A    No, I have not.

19    Q    So you wouldn't even know what they look like; is that

20    correct?

21    A    No, I would not.

22    Q    Now, during the time period after you sold the first

23    three properties, were there any discussions concerning this

24    Oak Brook deal?

25    A    Oak Brook was one of the original seven properties

 1    listed on the spreadsheet when we first talked back in 2001.

 2    Q    And by "we" you're referring to yourself and who?

 3    A    Greg Orr.  I'm sorry.

 4    Q    Okay.  So Oak Brook was one of the properties that was

 5    on the list of what?

 6    A    Of potential sale-leasebacks.

 7    Q    And what had happened between that initial time when you

 8    had provided that list to Mr. Orr and 2002 after the sale of

 9    the first three projects?

10    A    Again, corporate environment is, it can change from one

11    week to another.  It can say go, stop, back up.  So I was

12    waiting for corporate to say really go fast.

13    Q    So in any event, you -- what authority did you have to

14    decide which properties to sell?

15    A    I didn't have the authority to make that decision.

16    Q    Once that decision was made, your responsibility was to

17    do what?

18    A    To move the property as fast as possible for the best

19    profit for the company.

20    Q    Did that take place with respect to these first three

21    properties?

22    A    No, it did not.

23    Q    Now, did there come a point in time when you had some

24    discussions with Mr. Orr concerning how the profits would be

25    split up on the Oak Brook property when it eventually came on

1    for sale?

2    A    There was a later discussion with Mr. Orr, and he

3    indicated that Mr. -- or Fip and Tommy were not included in

4    these deals as partners.

5    Q    And what did he say?  How did he explain that?

6    A    He indicated that Peter Economos, who was at that time

7    the real estate attorney handling this property, was handling

8    the financing also.

9    Q    Now, this property, you're referring to which property?

10    A    Oak Brook.

11    Q    And what, if anything, was said concerning what his --

12    how he would be paid?

13    A    Eventually, I found out that Peter Economos was getting

14    a percentage profit plus being paid for his time in handling

15    this transaction.

16    Q    And who told you that?

17    A    Greg Orr.

18    Q    And what did Mr. Orr tell you was the percentage that

19    Mr. Economos would get for his services?

20    A    Five percent.

21    Q    Now, what, if anything, did Mr. Orr tell you about how

22    that compared with the percentages that Fip and Tommy were

23    receiving?

24    A    Again, my understanding were Fip and Tommy were getting

25    ten each.  That would have been 15 percent difference.

1  Q    So that was your understanding based upon what Mr. Orr

2  told you?

3  A    Yes.

4  Q    So with the first three deals it was your understanding

5  that Mr. -- you, yourself, were supposed to be getting

6  30 percent, and it was only later that you found out that the

7  10 percent was going to Fip and to Tommy?

8  A    Yes.

9  Q    And that conversation came up as a result of the

10  conversations about the changing in financing?

11  A    It could have been prior to that, but that -- that's

12  what led into more discussion related to the percentage.

13  Q    So in those discussions with Mr. Orr, you indicated he

14  said that instead of paying Fip 10 percent and Tommy 10

15  percent, now they would be dropped out and they would be

16  paying Economos what?

17  A    5 percent.

18  Q    Saving what?

19  A    15 percent.

20  Q    Which would then be spread out among who?

21  A    He didn't indicate.

22  Q    Let's go to the Oak Brook property then.  Did there come

23  a point in time when a decision was made to sell the

24  Oak Brook property by ADT?

25  A    Yes, it was.

1    Q    Being the vice president of planning and implementation,

2    did you take steps to try to market the property?

3    A    No, I did not.

4    Q    Why was that?

5    A    An agreement with Greg and I as far as how we would

6    handle this transaction proceeded as the other three.

7    Q    And how was that worked out?  How were you going to

8    handle it?

9    A    Agreed-upon price again upon a sale price.  Agreed-upon

10   lease price.  I would obviously share my information with the

11   real estate attorneys on what would be the highest that we

12   would go up on the lease payment and the lowest we would go

13   on the sale.  Same scenario as the first three.

14   Q    And, again, the figures you gave to the attorneys was

15   the figures that you had worked out with whom?

16   A    Mr. Greg Orr.

17   Q    The attorneys -- who was the attorney that would be

18   handling this transaction in Oak Brook, Illinois, on behalf

19   of ADT?

20   A    Mr. Randi Joseph.

21   Q    So it was Marjorie Desporte who handled the first three

22   transactions; is that correct?

23   A    That's correct.

24   Q    Now it's Randi Joseph?

25   A    That's correct.

1    Q    Why was that change?

2    A    His area of responsibility, geographically.

3    Q    So he handled that area of the country, so the Oak Brook

4    sale would come to him to handle what?

5    A    The contract language.

6    Q    Again, the terms of the contract were decided by whom?

7    A    The pricing was determined by myself.  His role was more

8    in, obviously, communicating these prices and, obviously,

9    responsible for the contract language.

10   Q    Directing your attention now to Government's

11   Exhibit 28.13.

12        MR. SHOCKLEY:  We would offer into evidence, your

13   Honor, Government's Exhibit 28.13.

14        MR. MARKUS:  No objection.

15        THE COURT:  28.13 is admitted.

16    (Received in evidence Government's Exhibit(s) 28.13.)

17        MR. SHOCKLEY:  If I could approach the witness with

18   the exhibit?

19        THE COURT:  All right.

20   BY MR. SHOCKLEY:

21   Q    Just let you see it first before I put it up on the

22   ELMO.  Are you familiar with that exhibit?

23   A    Yes, I am.

24   Q    Okay.  Is this -- how did the Government receive this

25   exhibit?

1   A     From my laptop.

2   Q     Okay.  Again, you had identified earlier, I believe, in

3   your testimony another Government Exhibit labeled 28-point

4   something.  Did this come from the same source, your laptop?

5   A     The same laptop.  That's correct.

6   Q     So after you entered a plea of guilty, you provided

7   these documents to the Government?

8   A     Yes, I did.

9   Q     Showing you now Government's Exhibit 28.3 on the ELMO

10  device.  This is again a series of e-mails back and forth; is

11  that correct?

12  A     Yes, it is.

13  Q     Let's start on the second page, which would be the

14  earliest e-mail.

15          Okay.  I'm going to direct your attention to the

16  portion now where it says, from Randi Joseph.  It shows a

17  date of April 30, 2002, to Peter Economos.  Is this the same

18  Peter Economos you were referring to in your testimony, the

19  attorney out in Chicago?

20  A     In Oak Brook, I believe.  Yes, that's correct.

21  Q     Oak Brook?

22          Okay.  And so he would be the attorney on the other

23  side of the transaction, not on the ADT side?

24  A     That's correct.

25  Q     It says, cc'd there to you.  That means you received a

1    copy of this; is that correct?

2    A    That's correct.

3    Q    CC, carbon copy.  It doesn't work anymore.  It's just

4    still a reference, though, to you actually getting what the

5    message is; is that correct?

6    A    That's correct.

7    Q    It says, subject:  111 Windsor Drive, Oak Brook,

8    Illinois.  Is that the Oak Brook property that ADT was going

9    to sell?

10   A    111 Windsor.  That's correct.

11   Q    Okay.  It says:

12            "Peter, it was a pleasure speaking with you

13   concerning the transaction.  Per our phone conversation, I

14   will briefly touch upon the points that the buyer must agree

15   upon to make the deal happen.  The amounts quoted are bottom

16   line amounts rather than inflated amounts with room to

17   compromise.  Purchase price:  $2,100,000.  Initial rent:

18   $318,800 annual NNN.  $26,500 per month NNN."

19            What does the "NNN" mean?

20   A    Triple net.

21   Q    Okay.  Again, that refers to the terms of the lease?

22   A    That refers to the terms of the lease.

23   Q    It shows rent increases years two through ten,

24   2.5 percent annual increases compounded.  Years 11 through

25   15, 3 percent annual increase compounded.  And purchaser's

1    closing credit, 4.5 percent of the -- I hate to say this out

2    loud.

3    A    Purchase price.

4    Q    Purchase price?  Is that what it stands for?

5    A    Yes.

6    Q    Okay.  Or $94,500.  It says:  "Once we were in agreement

7    with the above-stated terms, we can addresses the LOI."  What

8    does that stand for?

9    A    Letter of intent.

10   Q    P & S agreement, which refers to what?

11   A    Purchase and sale.

12   Q    And leaseback.  Thank you, Randi Joseph, senior real

13   estate administrator, ADT Security Services, Inc.

14        And that's the address where you were located in

15   Boca Raton; is that correct?

16   A    That's correct.

17   Q    So, again, this bears the date several months after the

18   actual transactions in the other three properties, correct?

19   A    Correct.

20   Q    The next e-mail, directing your attention to the first

21   page.  It shows from Peter Economos, the same date, April 30,

22   2002.  This is at 5:10 p.m.

23        "To Randi Joseph.  Subject:  111 Windsor Drive, Oak

24   Brook, Illinois.  Randi:  Per our discussion this afternoon,

25   the following is the purchaser's response:  Purchase price:

1    Purchaser will reply following agreement on remaining

2    business points; initial rent $346,500 annual NNNN, $28,875

3    per month rent increases:  Years two through five,

4    3.75 percent annual increases compounded.  Years six to ten,

5    4 percent annual increases compounded.  Years eleven through

6    fifteen, 4.25 percent annual increases compounded.

7    Purchaser's closing credit 5 percent of, again, purchase

8    price."

9    A    Correct.

10   Q    "I look forward to hearing from you so that we may

11   finalize.  Regards, Peter Economos."

12           The next e-mail from Randi Joseph on May the 1st,

13   2002 to you, Larry Horton.

14           "Subject:  111 Windsor Drive, Oak Brook, Illinois.

15   Larry:  Please comment on the buyer's reply to ADT's

16   counteroffer.  How firm should I stand on the figures you

17   penciled in on the buyer's offer letter.  Thank you, Randi

18   Joseph."

19           And then above that, following day, May 2, 2002,

20   from yourself to Randi Joseph.  Same subject.

21           "Randi:  We can discuss Monday.  I will be out of

22   the office Friday.  Thanks, Larry Horton."

23           So this document, does it reflect that Mr. -- what

24   does it reflect about Randi Joseph concerning whether he had

25   authority to control the price?

1    A    It indicates that Randi had zero control.  He was going

2    back to the original document that I had provided to him as

3    far as the price they were willing to take on the purchase

4    and on the leaseback.

5    Q    So you controlled the price?

6    A    I did.

7    Q    Showing you now Government's Exhibit 28.15.

8         MR. SHOCKLEY:  We would offer into evidence, your

9    Honor, Government's Exhibit 28.15.

10        MR. MARKUS:  No objection.

11        THE COURT:  28.15 is admitted.

12   (Received in evidence Government's Exhibit(s) 28.15.)

13   BY MR. SHOCKLEY:

14   Q    Again, showing this to you first, if I could.  Are you

15   familiar with that document?

16   A    Yes, I am.

17   Q    Is that another document that you printed out of your

18   laptop and provided to the Government after your plea of

19   guilty?

20   A    I did.

21   Q    Going to the second page, the earlier e-mail.  Original

22   message from Peter Economos on May 13, 2002, to Randi Joseph.

23        "Subject:  111 Windsor Drive, Oak Brook, Illinois.

24   Randi:  I don't think I ever received a response to my e-mail

25   of April 30.  Please let me know the status of this

1    transaction at your earliest opportunity.  Thanks, Peter C.

2    Economos."

3         Above that, message from Randi Joseph, same date,

4    May 13, to Peter Economos.  Regarding same subject.

5         "Peter:  My e-mail of April 30, 2002, clearly

6    stated that the figures quoted were bottom line amounts.  You

7    replied with a counteroffer that is not acceptable.  I

8    suggest you put your best offer on the table and we'll go

9    from there.  Thanks, Randi Joseph."

10        The next e-mail above that from Peter Economos,

11   same date, May 13, 2002, to Randi Joseph.  Same subject

12   matter.

13        "Randi:  The following is my client's response to

14   our discussion earlier today.  Purchase price:  $2,050,000.

15   Initial rent:  $330,000/annual NNNN $27,500 per month.  Rent

16   increases:  Years two through five:  3.5 percent annual

17   increases compounded.  Years six through ten: 3.75 annual

18   increases compounded.  Years eleven through fifteen: 4.0

19   percent annual increases compounded.  Purchaser's closing

20   credit:  5 percent.  Do we have a deal?  I look forward to

21   hearing from you on Tuesday, May 14, so we can finalize.

22   Regards, Peter C. Economos."

23        Working our way up the form from Randi Joseph,

24   May 14, 2002, to Peter Economos.  CC to you, Larry Horton.

25   Subject:  Same subject.

1          "Peter:  These are the numbers that will make the

2    deal work.  Purchase price:  $2,100,000.  Lease back:  15

3    years.  Initial rent:  $27,000 per month NNN.  Rent increases

4    years two through five, 3.5 percent annual increases.  Years

5    six through ten, 3.75 percent annual increases.  And years

6    eleven through fifteen, 4.0 percent annual increases.

7    Closing credit:  4.5 percent.  Please advice yes or no.

8    Thank you, Randi Joseph."

9          Top message, the next message up, from Peter

10   Economos, same date, May 14, 2002, to Randi Joseph.  Same

11   subject.

12         "Randy:  The revised business terms per your

13   5/14/02 e-mail are acceptable to my clients.  Thank you for

14   working with me with respect to the closing credit.  It was a

15   major point with my people.  I would like you to finalize the

16   contract documents as soon as possible for execution.  Do you

17   have any further comments to the agreement, et cetera?

18   Please call me to advise how you would like to proceed.  In

19   the meantime, I will revise the letter of intent to

20   incorporate the changed terms and I will e-mail it to you

21   this afternoon.  Please fax a signed copy to me as soon as

22   possible.  I look forward to working with you towards

23   consummation.  Regards, Peter C. Economos."

24         And finally, the top e-mail from Randi Joseph, same

25   date, six minutes later, to you.  Subject:  Same subject.

126

1          "Larry:  This just came in.  Randi."

2          Now those documents, sir, indicates what?

3   A    Indicates ongoing negotiation with a finalized and the

4   agreed-to sale price.

5   Q    And the sale price of the final terms were set by whom?

6   A    By myself and Greg Orr.

7          THE COURT:  Is this a convenient time to stop?

8          MR. SHOCKLEY:  Yes, your Honor.  Thank you.

9          THE COURT:  Let's stop for lunch and return at

10  1:30.

11      (Jury out at 12:31 p.m.)

12         THE COURT:  Okay.  We'll be in recess until 1:30.

13         MR. MARKUS:  Can we ask how much longer the

14  Government has so we can sort of get ready for cross, whether

15  it will be today or Monday.

16         THE COURT:  Okay.  Have a seat.  Where do we stand?

17         MR. SHOCKLEY:  Your Honor, I think I'm certainly

18  going to finish with him this afternoon.  We intend to call

19  Michael Cannon, one of the appraisers on Monday and I have to

20  confer with Mr. McCormick to see exactly what additional

21  witnesses we're going to be calling, but I suspect the next

22  round of witnesses will be most likely appraisers.

23         THE COURT:  What did you decide to do about whether

24  you want to go forward on this inquiry about after the FBI --

25         MR. SHOCKLEY:  I think I need to talk to

```
 1   Mr. McCormick over the lunch hour, your Honor.  Again, we

 2   believe that we're presenting additional evidence to show

 3   certain finances and things of that nature through this

 4   witness that may assist the Court, but we have --

 5            THE COURT:  So you think you're going to take the

 6   rest of the afternoon anyway?

 7            MR. SHOCKLEY:  Your Honor, I think they're going to

 8   get to cross examination this afternoon.

 9            THE COURT:  You think they are?

10            MR. SHOCKLEY:  They are.  That's what I believe.

11            THE COURT:  All right.  Okay.  See you at 1:30.

12       (Recess at 12:33 p.m.)

13            THE COURT:  Please have a seat.

14       (Pause in Proceedings.)

15            THE COURT:  Okay.  The jury is ready.  Let's invite

16   them in.

17       (Jury in at 1:29 p.m.)

18            THE COURT:  Welcome back.  Please be seated.

19            Please continue, Mr. Shockley.

20            MR. SHOCKLEY:  Thank you, your Honor.

21   BY MR. SHOCKLEY:

22   Q    Mr. Horton, directing your attention to Government's

23   Exhibit No. 1.175.

24            MR. SHOCKLEY:  And we would offer that into

25   evidence, your Honor, Government's Exhibit 1.175.
```

1          MR. MARKUS:  No objection.

2          THE COURT:  1.175 is admitted.

3      (Received in evidence Government's Exhibit(s) 1.175.)

4  BY MR. SHOCKLEY:

5  Q    Displaying now on Mr. ELMO here, Government's Exhibit

6  No. 1.175.  It's entitled "Oak Brook Properties, LLC

7  Agreement of Purchase and Sale of Real Estate."

8          MR. SHOCKLEY:  Your Honor, may I first approach the

9  witness and ask him to inspect this himself?

10         THE COURT:  Yes.

11 BY MR. SHOCKLEY:

12 Q    Mr. Horton, can you look at this particular page?  Are

13 you familiar with this exhibit?

14 A    Yes, I am.

15 Q    The first page of the document states:

16         "Oak Brook Properties, LLC, agreement of purchase

17 and sale of real estate.  This agreement (the agreement) is

18 made and entered into this 18th day of July, 2002, by and

19 between Oak Brook Properties, LLC, an Illinois limited

20 liability company, or its designee (purchaser), with its

21 registered offices at 6 West Hubbard Street, Suite 800,

22 Chicago, Illinois, 60610, and ADT Security Services, Inc., a

23 Delaware corporation," and it goes onto describe ADT.

24         It says:  "And SecurityLink from Ameritech, Inc,

25 FKA, or formally known as, Ameritech Monitoring Services,

1    Inc., a Delaware corporation (SecurityLink), with offices

2    at," and it gives the address in Boca Raton.  "ADT and

3    SecurityLink are hereinafter collectively referred to as

4    seller."

5            Now, SecurityLink, Mr. Horton, I believe you

6    indicated was the company that you had previously worked for

7    and that ADT had acquired in 2001?

8    A    That's correct.

9    Q    This refers to -- later on in the document refers to

10   property.  First to a parcel and to a building known as 111

11   Windsor Drive, Oak Brook, DuPage County, Illinois, more

12   particularly described on Exhibit A, which is a property

13   description.  Is that correct?

14   A    Yes.

15   Q    Now, is this the Oak Brook property that you referred to

16   in your testimony just before lunch that you and Mr. Orr had

17   agreed upon the prices and was eventually sold to Oak Brook

18   Properties, LLC?

19   A    That's correct.

20   Q    Directing your attention to the page bearing Bates label

21   1725, section 4.01.  Does it indicate that the purchase price

22   for the property is $2.1 million?

23   A    That's correct.

24   Q    Directing your attention to the following page under

25   Section 4.04.  It reads:

1      "The purchaser shall receive a direct credit in the

2    amount of 4 1/2 percent against the purchase price, or the

3    sum of $94,500 at closing.  The purchaser's closing credit

4    shall be paid out of seller's proceeds at closing and paid to

5    the purchaser by Chicago Title Insurance Company check or by

6    cashier's check or wire transfer of immediately available

7    funds."

8          And this $94,500 represented what kind of payment?

9    A    Implied broker expense.

10   Q    Directing your attention now to the page bearing Bates

11   label 1747.  Under section -- well, under Article 11, closing

12   and escrow, Section 11.02, this states:  "The seller shall

13   provide or deliver the following at closing:"

14         And in addition to A, which is the stamped special

15   warranty deed conveying fee simple title to the property to

16   the purchaser, going down, it also says under H, as in Henry,

17   original, executed lease.

18         So, Mr. Horton, was this a sale-leaseback situation

19   as the other three properties had been?

20   A    Yes, that's correct.

21   Q    Directing your attention now to the page bearing Bates

22   label 1755.  Article 20, the lease.  It states:

23         "111 Windsor lease.  Seller acknowledges that one

24   of purchaser's primary incentives for acquiring the property

25   is"-- it says predicted -- "upon ADT's occupancy and rental

1    of the property from purchaser after closing.  Accordingly,

2    as a material inducement to purchaser to enter into this

3    agreement, ADT covenants and agrees to lease the property

4    from purchaser at closing in accordance with the terms and

5    provisions of the 111 Windsor Drive lease (the lease), a copy

6    of which is attached hereto and made a part hereof as

7    Exhibit 20.01."

8            And then underneath that at 20.02 it states, lease

9    contingency.  The last line or the last two sentences.  ADT's

10   failure to execute the lease or seller's failure to obtain

11   the guaranty shall be a default under this agreement.

12   Release shall be executed concurrently with this agreement

13   but shall be contingent upon consummation of the closing of

14   the transaction contemplated by this agreement.

15           So does this make it clear that the property is

16   supposed to be sold as well as the leaseback provision at the

17   same time?

18   A    One would not work without the other.  That's correct.

19   Q    Directing your attention to the next page, the notice

20   section, where notices should be sent concerning any issues

21   arising out of this transaction, it shows, if notice to the

22   seller, to send the notice to you, Mr. Horton; is that

23   correct?

24   A    That's correct.

25   Q    With a copy to Randi Joseph.  He is the ADT counsel that

1  would handle this section of the country in Chicago?

2  A    That's correct.

3  Q    But more specifically in Oak Brook?

4  A    That's correct.

5  Q    And it says:  "If to purchaser, to Oak Brook Properties,

6  LLC, c/o of Laser, Pokorny, Shwartz, Friedman, and Economos,

7  and an address 6 West Hubbard Street, Suite 800, Chicago,

8  Illinois 60610, attention Peter C. Economos."

9          Now, is that the Peter Economos you've referred to

10 in your earlier testimony that would be getting 5 percent of

11 the proceeds?

12 A    That's correct.

13 Q    And finally, directing your attention to the page I

14 showed you when I approached the witness stand bearing Bates

15 label 1758.  The signature page, does it bear your signature?

16 A    Yes, it does.

17 Q    And your signature is dated -- or the date next to it,

18 is that 7/22/02?

19 A    That's correct.

20 Q    Next to your printed name it says VP P/I.  Is that what

21 it says?

22 A    Planning implementation I believe it stands for.

23 Q    Oh, Okay.  By the way, underneath that it says

24 "SecurityLink.  DNA."  Actually, SecurityLink at that point

25 in time, did it exist as a corporation, if you know?

1    A    I'm not sure at that point in time.

2    Q    The merger had taken place when, though?

3    A    The purchase was sometime back in June or July of '01.

4    But I think we'll later find out that some of these

5    properties are still showing in SecurityLink's name.

6    Q    But anyway, nobody from SecurityLink signed that; is

7    that correct?

8    A    That's correct.

9    Q    DNA, did not apply, is that what that stands for?

10    A    That's my understanding.

11    Q    And it has P. Gray Finney, secretary, underneath it.  He

12    was not the secretary of SecurityLink, was he?

13    A    Not to my knowledge.

14    Q    And then we have a signature on the other side, Oak

15    Brook Properties, LLC, an Illinois limited liability company,

16    by 111 Windsor, LLC, an Illinois limited liability company,

17    its managing member, and a signature by a manager.  Could you

18    tell us who that signature is?

19    A    No, sir.

20    Q    Okay.  Again, did you have any conversations with either

21    Mr. Economos or anyone in his law firm?

22    A    No, I did not.

23    Q    So at least according to this document, ADT is selling

24    the properties to Oak Brook Properties, LLC, and signing on

25    behalf of Oak Brook Properties, LLC, is someone who is a

1    manager of another LLC, 111 Windsor, LLC?

2    A    Correct.

3    Q    Now, the property -- next to your signature was a date.

4    7/22/02.  If you look at the first page, this says, "The

5    agreement is made and entered into this 18th day of July,

6    2002."  How do you explain that apparent contradiction?

7    A    The documents that I signed would have been provided to

8    me by Randi Joseph.  Evidently he felt comfortable enough

9    that it was going to work out whatever issues, if they had

10    any at that point in time, and that's when I signed them.

11    Q    Now, directing your attention to Government's

12    Exhibit 1.171.

13            MR. SHOCKLEY:  We would offer into evidence at this

14    time, your Honor, government's Exhibit No. 1.171.

15            MR. MARKUS:  No objection.

16            THE COURT:  1.171 is admitted.

17        (Received in evidence Government's Exhibit(s) 1.171.)

18    BY MR. SHOCKLEY:

19    Q    Showing you this exhibit, displaying it on the ELMO.  On

20    the front cover page it says, 111 Windsor Drive, Oak Brook,

21    Illinois, lease between Oak Brook Properties, LLC, an

22    Illinois limited liability company, landlord, and ADT

23    Security Services, Inc., a Delaware corporation, tenant.

24            And going to the first -- going to the page bearing

25    Bates label 1605, it states, "111 Windsor Drive lease.  This

1    lease is entered into as of the blank" -- it's not filled

2    in -- "day of June, 2002, by and between Oak Brook

3    Properties, LLC, and ADT Security Services."

4         It describes the property as 111 Windsor Drive, Oak

5    Brook, Illinois; is that correct?

6    A    That's correct.

7    Q    The term is 15 years, is that correct, 180 calendar

8    months?

9    A    That's correct.

10   Q    The base rent for the first lease year is $324,000; is

11   that correct?

12   A    Yes, it is.

13   Q    And that specifies in there the terms of the increases,

14   years two through five, increased by 3 1/2 percent.  Six

15   through ten, increased by 3.75 percent.  And eleven through

16   fifteen, increased by 4 percent.  Is that correct?

17   A    That's correct.

18   Q    Directing your attention to the page Bates label 1607,

19   part of 5.1C where it says "operating expenses."  It says:

20   "Operating expenses shall mean for any calendar year that

21   costs or expenses paid are incurred by or on behalf of

22   landlord for the payment of all premiums for maintaining the

23   landlord's insurance as set forth in Section 18.1 hereof.

24   Provided, however, that the parties acknowledge that this is

25   a triple net lease and tenant shall be responsible for all

1    costs and expenses relating to the operation, maintenance,

2    repair, and restoration of the property."

3              Is that what it states?

4    A    Yes.

5    Q    So in that single paragraph ADT is responsible for

6    paying for the insurance, the operation, maintenance, repair,

7    and restoration?

8    A    That's correct.

9    Q    The next paragraph under that, 5.2, tax amount, does

10   that require ADT to pay for the taxes?

11   A    Yes, it does.

12   Q    The following page.  Again, ADT is responsible for

13   paying the operating expenses; is that correct?

14   A    Yes.

15   Q    And under "Services:  Landlord shall not be obligated to

16   provide any services to tenant or to the property under this

17   lease.  No interruptions of any service, including utilities

18   such as water, sewer, electric, natural gas service and the

19   like, shall be deemed an eviction.  Constructive or actual or

20   disturbance of tenant's use and possession of the premises or

21   any part thereof or render landlord libel to tenant for

22   damages or abatement of rent or relieve tenant from

23   performance of tenant's obligation under this lease," and

24   that one other sentence.

25              So is the tenant responsible for paying all

1    utilities as well?

2    A    Yes, they are.

3    Q    Under seven it says, "No security deposit shall be

4    required;" is that correct?

5    A    Yes.

6    Q    Directing your attention to Page 9 of the lease bearing

7    Bates label 1611.  Section 12.1.  "Tenant shall at its own

8    expense keep and maintain the property," and it continues on.

9    So the tenant pays for all repairs and maintenance.  Is that

10   correct?

11   A    Yes, that's correct.

12   Q    Go to the Page bearing Bates label 1621.  Again, for

13   notice, you were the one to be contacted; is that right,

14   Mr. Horton?

15   A    That's correct.

16   Q    And with respect to the landlord, it's Peter C. Economos

17   of Oak Brook Properties, LLC?

18   A    That's correct.

19   Q    Going to the page bearing Bates label 1629.  Contingency

20   upon closing.  Skip over that.

21            Go to page bearing 1630.  Basically, this lease

22   contemplates the property is going to be sold; is that

23   correct?

24   A    That's correct.

25   Q    The signature page bears your signature?

1  A    Yes, it does.

2  Q    It's dated 7/22/02?

3  A    Yes.

4  Q    And for the landlord, Oak Brook Properties, that's

5  another signature.  Do you know the name attached to that

6  signature?

7  A    I do not.

8  Q    The next page is a schedule of the base rent amount; is

9  that correct?

10  A    That's correct.

11  Q    Directing your attention to Page 16 or Page 1 of Exhibit

12  F, bearing Bates label 1638.  This document is entitled,

13  "Guaranty of Lease."  It says, "Guaranty is made as of the

14  blank day of blank 2002 by Tyco International, LTD, a Bermuda

15  corporation, guarantor, to and for the benefit of Oak Brook

16  Properties, LLC," and continues on.

17        And this refers to the Oak Brook property; is that

18  correct?

19  A    That's correct.

20  Q    It states in Section B:  "Landlord has required as a

21  condition to its execution and performance of the lease that

22  the guarantor execute and deliver this guaranty of all

23  obligations of tenant arising and all sums due by tenant

24  under the lease.  The execution and delivery of this guaranty

25  by guarantor is a material inducement to landlord for its

1    execution and performance of the lease."

2            Is that what it states?

3    A    Yes.

4    Q    And furthermore, pursuant to this guaranty it says in

5    Section C, guarantor hereby covenants and agrees as follows:

6    And under two it says, guarantor absolutely, unconditionally

7    and irrevocably guarantees to landlord:  A, the full

8    payment -- full and prompt payment when due, whether by

9    acceleration or otherwise, and at all times thereafter, of

10   any and all rentals, debts, and obligations of tenant for the

11   payment of money due by tenant to landlord under the lease,

12   including, without limitation, all rents, late money due by

13   tenant to landlord under the -- excuse me, rents, fee

14   adjustments, payments with respect to real estate taxes, and

15   it goes on and on and on.

16           So can you explain to the ladies and gentlemen of

17   the jury, in essence, what this guaranty was supposed to do?

18   A    During this period of time Tyco was in the news quite a

19   bit as far as its finances.  This guaranty from Tyco, if ADT,

20   being a company under an umbrella, filed for bankruptcy, the

21   surviving Tyco company would be responsible to pay the lease.

22   Q    And the page bearing Bates label 1641, there's a

23   signature, Tyco International Limited by Irvin Gutin, it's

24   senior vice president and general counsel.  Is that correct?

25   A    That's correct.

1    Q    Now, both the purchase agreement and the lease were

2    executed in July of 2002.  When did the actual sale take

3    place?

4    A    I believe it actually closed sometime in September of

5    '03.

6    Q    Directing your attention now to Government's

7    Exhibit 1.176.

8            MR. SHOCKLEY:  Government would offer that exhibit

9    into evidence, Government's Exhibit 1.176.

10            MR. MARKUS:  No objection.

11            THE COURT:  1.176 is admitted.

12        (Received in evidence Government's Exhibit(s) 1.176.)

13    BY MR. SHOCKLEY:

14    Q    As in the other previous sales, we have a Secretary

15    certificate reporting that the sale had been authorized by

16    the board of directors?

17    A    That's correct.

18    Q    At the bottom it's dated January 29, 2003, and it bears

19    a signature above the line, P. Gray Finney, secretary.  Is

20    that correct?

21    A    Correct.

22            MR. SHOCKLEY:  Your Honor, next Government's

23    Exhibit No. 1.174.  We would offer into evidence Government's

24    Exhibit 1.174.

25            MR. MARKUS:  No objection.

1          THE COURT:  1.174 is admitted.

2      (Received in evidence Government's Exhibit(s) 1.174.)

3  BY MR. SHOCKLEY:

4  Q    Showing you an e-mail message printed out from Randi

5  Joseph on Friday, September 19th of 2003 to you, Mr. Horton,

6  and to Amy Hymes.  Who is Amy Hymes?

7  A    Amy Hymes worked in the real estate group for me.

8  Q    It says:

9          "Larry:  The Oak Brook closing was finalized today.

10  The Chicago Title Escrow Trust disbursement statement is

11  attached.  Net proceeds to ADT is $1,932,741.92, and will be

12  wired to ADT today.  Randi."

13          Does that help pin down the date of the closing?

14  A    Yes, in September of '03.

15          MR. SHOCKLEY:  Your Honor, next Government's

16  Exhibit 1.168.  We would offer that into evidence,

17  Government's Exhibit 1.168.

18          MR. MARKUS:  No objection.

19          THE COURT:  1.168 is admitted.

20      (Received in evidence Government's Exhibit(s) 1.168.)

21  BY MR. SHOCKLEY:

22  Q    Mr. Horton, pursuant to the same procedures that had

23  previously been employed in the other real estate properties,

24  is this a form 113, ADT Security Services recurring payment

25  request?

1    A    Yes, it is.

2    Q    And it says "location."  That's the Oak Brook property;

3    is that correct?

4    A    That's correct.

5    Q    It says "reason for payment."  And there's an "X" beside

6    "building rent."  Is that correct?

7    A    That's correct.

8    Q    It shows commencement date, 10/1/2003?

9    A    Yes, that's correct.

10    Q    The base rent of $27,000 a month; is that correct?

11    A    Correct.

12    Q    It also shows taxes that are to be paid by the tenant,

13    ADT?

14    A    That's correct.

15    Q    So at least as far as this setup is concerned, it looks

16    like the total monthly payments pursuant to the lease will be

17    $30,255.66; is that correct?

18    A    That's correct.

19    Q    It shows the payee as Oak Brook Properties and at the

20    bottom there is a signature.  Is that your signature?

21    A    Yes, it is.

22    Q    And in the lower right-hand corner by vice president, it

23    has a date, 10/10/2003.  Is that the date you signed it?

24    A    Yes, it is.

25    Q    Just as in the other three properties, you're

1    authorizing monthly payments to Oak Brook Properties, LLC,

2    all the while intending to receive part of the proceeds?

3    A    Yes, that's correct.

4    Q    Now, this recurring payment request shows that -- shows

5    it was initiated in October of 2003, which is more than a

6    year after the contract to sell had been initially executed;

7    is that correct?

8    A    That's correct.

9    Q    Those yearly recurring payment request forms, just as in

10   the other properties, did you continue on a yearly basis

11   executing such forms for the rent?

12   A    Yes.

13   Q    Directing your attention now to Government's

14   Exhibit 1.161.

15        MR. SHOCKLEY:  We would offer that into evidence,

16   your Honor.

17        MR. MARKUS:  No objection.

18        THE COURT:  1.161 is admitted.

19     (Received in evidence Government's Exhibit(s) 1.161.)

20   BY MR. SHOCKLEY:

21   Q    Again by way of example, this is a later recurring

22   payment request for the same property.  Now, the base rent --

23   let's see.  The date in lower right-hand corner, is it

24   August 25, 2005?

25   A    Yes.

1   Q    And there's your name in the lower left-hand corner; is

2   that correct?

3   A    That's correct.

4   Q    Near the top it has checked revised payment due,

5   10/1/05.  And the payment at this time is up from $27,000 a

6   month to $28,923.08, with taxes of $3,255.66, making the

7   total payment per month of $32,178.74.  Is that correct?

8   A    Yes, it is.

9   Q    So as you -- over the course of time, over the course of

10  the years as you keep authorizing these recurring payment

11  requests, the payments that actually come to you derivatively

12  increase over time as well; is that correct?

13  A    That's correct.

14  Q    Now, with this particular transaction, again, did you

15  have anything whatsoever to do, or what, if anything, did you

16  have to do with securing the financing to purchase the

17  property?

18  A    I was not involved in any financing.

19  Q    Did there come some point in time when you had a

20  conversation with Gregory Orr concerning the first payment

21  you would be getting pursuant to this deal?

22  A    Yes.  It was sometime in either September or October

23  after the closing, that the property was financed for

24  approximately 1 million more than the purchase price, and I

25  would be getting a lump-sum check.

1    Q    So how did he explain this to you?  What was the amount

2    of the loan, as he explained it to you?

3    A    My understanding was it was $3 million.

4    Q    So Oak Brook Properties, LLC, had obtained a

5    3 million-dollar loan to buy a property worth or to be sold

6    for $2.1 million; is that correct?

7    A    Correct.

8    Q    So then the spread or the difference between the

9    $3 million, the amount of the loan, and the amount of the

10   purchase price, what was going to happen to that difference?

11   A    That would be distributed to the partners.

12   Q    And your share --

13        If I can see now Government's Exhibit 18.25,

14   bearing Bates label WB4444.

15        Did there come a point in time, Mr. Horton, when a

16   check was delivered to you?

17   A    Yes, it was.

18   Q    And that the method of delivery was what?

19   A    Hand-carried.

20   Q    By whom?

21   A    Mr. Greg Orr.

22   Q    To whom?

23   A    To myself.

24   Q    At what location?

25   A    At my home.

1   Q    Directing your attention to Government's Exhibit 18.25,

2   which has been previously admitted by stipulation.

3             THE COURT:  Is that correct, Mr. Markus?

4             MR. MARKUS:  Well, the authenticity.  We have no

5   objection.

6             THE COURT:  All right.  18.25 is admitted.

7        (Received in evidence Government's Exhibit(s) 18.25.)

8             MR. SHOCKLEY:  Permission to publish, your Honor?

9             THE COURT:  Go ahead.

10  BY MR. SHOCKLEY:

11  Q    Showing you now on the ELMO display device, it has a

12  check drawn on the account of GJO Associates, LLC, showing an

13  address of 6710 Northwest 101st Terrace Parkland, Florida.

14  That's the address of whom?

15  A    That's the address of Greg Orr.

16  Q    It shows a date of 9/25/03.  The amount, $219,557.74

17  drawn on the account of GJO Associates payable to KCGF

18  Associates, which is your company; is that correct?

19  A    That's correct.

20  Q    And bearing the signature of whom, if you can recognize

21  it?

22  A    It appears to be Mr. Greg Orr.

23  Q    Okay.  Mr. Orr then delivered to you this check for

24  $219,557.74; and what had you done to earn this check?

25  A    A property sale and leaseback of Oak Brook to Oak Brook,

1    LLC.

2    Q    So it was again -- again, had you -- how had you been

3    able to authorize the sale of Oak Brook Properties -- of the

4    Oak Brook property for $2.1 million?  Had you been able to

5    get approval from your superiors?

6    A    Yes, I had.

7    Q    Had any of your superiors asked you any questions

8    concerning any appraised values of the property?

9    A    Not at the point of approval.  No, sir.

10   Q    And did any of them see your -- the appraisals for the

11   Oak Brook property?

12   A    Not to my knowledge.

13   Q    Showing you now the -- Government's Exhibit No. 1.224.

14   Excuse me, 1.222.

15          MR. SHOCKLEY:  Your Honor, we would offer into

16   evidence Government's Exhibit No. 1.222.

17          MR. MARKUS:  No objection.

18          THE COURT:  1.222 is admitted.

19      (Received in evidence Government's Exhibit(s) 1.222.)

20   BY MR. SHOCKLEY:

21   Q    This is the property appraisal for Oak Brook.  It says

22   on the cover page, SecurityLink, and the address of 111

23   Windsor Drive, Oak Brook, Illinois.  Market value, fee simple

24   estate as of March 1, 2001.  On the letter, it's dated

25   April 4, 2001, directed to Dennis Stern, executive vice

1    president, SecurityLink.  Is that correct?

2    A    That's correct.

3    Q    And it shows on the second page of that letter bearing

4    Bates label ending in 2908, Paragraph 2:

5              "As a result of our investigation, it is our

6    opinion that the as-is fee simple market value of the subject

7    effective March 1, 2001, was, $2,600,000."

8              Is that what it states?

9    A    That's correct.

10   Q    So did you have this in your possession at the time of

11   the sale?

12   A    Yes, I did.

13   Q    Had you ever shown this to Gregory Orr?

14   A    I had given a copy to Mr. Greg Orr.

15   Q    So you had in your possession a document that showed the

16   property fee simple value as of March 1, 2001, was valued by

17   American Appraisal Associates at $2.6 million; is that

18   correct?

19   A    That's correct.

20   Q    Did you have occasion to show this particular appraisal

21   to anybody above you in the chain of command at the time you

22   were seeking authorization to sell this property for

23   $1.2 million?

24   A    No, I did not.

25   Q    Why was that?

1    A    It was not asked for.

2    Q    Were you going to volunteer it?

3    A    No, sir.

4    Q    And why was that?

5    A    It was a fee simple price on a sale-leaseback.

6    Q    And the fee simple price compared how with the actual

7    sale price?

8    A    Very low.

9    Q    The sale price was very low as compared to the appraised

10   value?

11   A    Correct.

12   Q    And, in fact, the -- I direct your attention now to

13   Government's Exhibit No. 28.18.

14           MR. SHOCKLEY:  Excuse me.  It's Government Exhibit

15   1.3, your Honor.  We would offer into evidence Government's

16   Exhibit 1.3.

17           MR. MARKUS:  No objection.

18           THE COURT:  1.3 is admitted.

19       (Received in evidence Government's Exhibit(s) 1.3.)

20   BY MR. SHOCKLEY:

21   Q    Directing your attention to this document.  It shows an

22   effective date of 9/27/03; is that correct?

23   A    That's correct.

24   Q    And entitled "update people assignment"; is that

25   correct?

1    A    That's correct.

2    Q    And it has got your name in there, William Horton; is

3    that correct?

4    A    That's correct.

5    Q    It says "job change."  And now it says "DIR."  Does that

6    stand for "director"?

7    A    That does.

8    Q    Okay.  Director, planning and implementation.  And then

9    it says "IT."  Could you explain what this document

10    represents?

11    A    Tyco had brought in Mr. Bream as CEO after Mr. -- Dennis

12    Kozlowski had resigned.  Prior to this they were going

13    through all the organizational charts.  We had a president of

14    ADT in the corporate named Mike Snyder and we had president

15    titles in the field also, only in the field.  They were

16    really executive vice presidents, but they carried the title

17    of president.

18         So to clean all of this up, they took layers out.

19    People that were executive vice presidents reporting to

20    presidents who really didn't have a title of president was

21    reduced down to vice president.  Vice presidents were reduced

22    down to directors.

23    Q    So you were reduced from a vice president of the company

24    to a director then, correct?

25    A    Because I was then reporting to a vice president instead

1  of an executive vice president.

2  Q    How did that affect your pay duties and

3  responsibilities?

4  A    Salary didn't change.  Only the bonus level.

5  Responsibilities continued the same.

6  Q    You said "bonus level."  That differed from your salary;

7  is that correct?

8  A    That's correct.

9  Q    So the salary was the same but would you receive any

10  bonuses at all?

11  A    Yes, I went from I think a 40 to a 25 percent bonus.

12  Q    You've already identified the first check you received

13  for approximately $219,000 as a result of this sale.  As the

14  months progressed, would you receive checks also from this

15  GJO Associates, LLC?

16  A    Yes, I would.

17  Q    Your conduct in the sale of Oak Brook Properties -- of

18  the Oak Brook property for one point -- excuse me,

19  $2.1 million, was that basically the same as your conduct

20  with respect to the other three properties?  In other words,

21  who had you made the arrangements with to set the price?

22  A    All of these were made with Mr. Orr.

23  Q    The appraisal that we just saw that you had in your

24  presence at the time that this sale took place by American

25  Appraisal Associates, you responded to one of my questions,

1    that again, this was a fee simple estate; is that correct?

2    A    Yes.

3    Q    So by that appraisal of $2.6 million, that was just to

4    sell an empty building; is that correct?

5    A    That's correct.

6    Q    And instead, what this sale represented was a leased fee

7    estate where the sale also included a lease; is that correct?

8    A    That's correct.

9    Q    And the addition of that lease for the sale of that

10   property, did it increase or decrease the value of the

11   property?

12   A    It increased the value.

13   Q    So now, Mr. Horton, you're receiving on a monthly basis

14   four checks; is that correct?  Excuse me.  Checks concerning

15   four separate properties?

16   A    Yes.

17   Q    One check is from this GJO Associates, LLC; is that

18   correct?

19   A    That's correct.

20         MR. SHOCKLEY:  Your Honor, at this time we would

21   offer into evidence Government's Exhibit 32.3.

22         MR. MARKUS:  No objection.

23         THE COURT:  32.3 is admitted.

24      (Received in evidence Government's Exhibit(s) 32.3.)

25         MR. SHOCKLEY:  Permission to publish it to the

1    jury, your Honor?

2            THE COURT:  All right.

3            MR. SHOCKLEY:  Certified copy stating State of

4    Illinois, Office of the Secretary of State.  It says:

5            "I, Jesse White, Secretary of State of the State of

6    Illinois, do hereby certify that attached hereto is a true

7    and correct copy, consisting of two pages, as taken from the

8    original on file in this office for GJO Associates, LLC."

9            It's dated in the lower right-hand corner

10   November 28, 2007.

11           The next page it shows, Illinois Limited Liability

12   Company Act, Articles of Organization filed November 14,

13   2002.  Limited liability company name, GJO Associates, LLC.

14   Principal place of business, 111 Windsor Drive, Oak Brook,

15   Illinois.  Registered agent named, Peter C. Economos, and an

16   address in Chicago.

17           On the next page, Section 9, management is by

18   managers checked yes.  And underneath, if yes, list names and

19   business addresses.  Greg Orr, 6710 Northwest 101st Terrace,

20   Parkland, Florida.  And there is a signature above the line

21   that says Peter C. Economos.

22   BY MR. SHOCKLEY:

23   Q    Mr. Horton, your share of the proceeds from the Oak

24   Brook property sale, did they come through that company, GJO

25   Associates, LLC?

1    A    My recollection -- yes.

2    Q    And they were payable to what entity?

3    A    KCGF.

4    Q    Now, did there come some point in time, sir, when you

5    had discussions with Gregory Orr concerning refinancing any

6    of these properties?

7    A    The discussion came up after the Chicago closing and

8    distribution of cash.  There was conversation related to Greg

9    talking about refinancing or possibly selling the first three

10   properties.

11   Q    How did he explain that to you; what he wanted to do?

12   A    The conversations that took place, he repeated Peter

13   Economos' name as far as, you should take your assets and --

14   if you have them in a building like that, and reinvest them.

15   Q    And he suggested -- Mr. Orr suggested to you to do what?

16   A    He was looking to refinance the buildings.

17   Q    What was your position?

18   A    At that time I really didn't want to do it.

19   Q    And did you explain to him why not?

20   A    This was monthly income that we could live on.

21   Q    And by monthly income, you're talking about monthly

22   income from what source?

23   A    The four properties.  The profit from those four

24   properties.

25   Q    Did there come some point in time when the attempts to

1    refinance went beyond mere discussion?

2    A    I believe it was in '06.  Greg had indicated that he was

3    looking to refinance the properties and had forward with it.

4    Q    On how many occasions would you estimate you had

5    discussions with Mr. Orr over the years about refinancing one

6    or more of these properties?

7    A    It could have been three, four, five times.

8    Q    Was your position always the same?

9    A    Yes.

10   Q    Now, directing your attention to 2006.  You indicated

11   that there was some discussions about -- with Mr. Orr about

12   refinancing some of the properties, one or more of the

13   properties.  Tell us about those discussions.

14   A    The three properties were Pompano, Palm Harbor, and

15   Lancaster.

16   Q    What did he say?

17   A    That he had approached a finance company.  I believe it

18   was through -- and again, I'm not sure -- Peter Economos, and

19   that they had secured "X" amount of dollars based upon a

20   higher payback to end at the end of the term of these leases.

21   They would pull out, I'm not sure, 6 to $8 million worth of

22   supposedly assets.

23   Q    And, again, what was your position?

24   A    I didn't want to refinance the buildings.

25   Q    What eventually happened with that attempt to refinance

1    the building?  Did you have to pay any out-of-pocket money

2    yourself?

3    A    Yes.

4    Q    Did the refinance deal go through?

5    A    No.

6    Q    Were there any penalties to pay for the fact that the

7    refinance did not go through?

8    A    My understanding, again through Greg, there was

9    penalties.

10    Q    And that was how much according to Mr. Orr?

11    A    Close to $180,000.

12    Q    And did he tell you what your share of these expenses

13    should be?

14    A    About $60,000.

15    Q    How was -- did you end up losing, or paying $60,000 as a

16    result of that refinance attempt?

17    A    I didn't get a check, monthly check for May, June, and

18    July of '06.

19    Q    Okay.  So in May, June, and July of '06 you lost three

20    rental payments -- or three checks because of what?

21    A    My understanding of the possible refinancing and

22    non-refinancing of these buildings as far as the penalty.

23    Q    So instead of paying $60,000 out of your own pocket, you

24    did not receive checks for three months?

25    A    That's correct.

1    Q    Now, how many checks are we talking about here to total

2    up to around $60,000?

3    A    I got two checks each month, one from each of those

4    LLCs, and they added up to, I think about 58, $59,000.

5    Q    The months you said were like May, June, and July of

6    2006?

7    A    I believe it was May, June, and July of 2006.  It would

8    have reflected on my taxes that were filed in '07.

9    Q    Would it also reflect on your bank statements those

10   months that you did not receive those checks?

11   A    It should reflect on my bank statement also.

12   Q    Now, you were still, of course, employed by ADT in the

13   same position, other than as of 2003 you were reduced from

14   vice president to director of planning and implementation; is

15   that correct?

16   A    Slash IT, correct.

17   Q    The "IT" refers to what?

18   A    I was responsible for the part of the network that ADT

19   operated on as far as wiring and signal traffic.

20   Q    Did you still handle real estate matters?

21   A    Yes, I did.

22   Q    So again, your duties, had they changed?

23   A    My duties had not changed.  That's correct.

24   Q    What about your authority?

25   A    A vice president has less authority than -- excuse me, a

1   vice president has more authority in our company than a

2   director, based upon the title.

3   Q    As far as selling properties, how did your authority

4   change, if at all?

5   A    I don't know that it changed.

6   Q    So you're still employed by ADT, still drawing the same

7   salary.  Now, you're getting two checks a month, one from Oak

8   Brook -- GJO Associates, LLC, and the other check from what

9   entity?

10  A    G & J, I believe.

11  Q    Okay.  Showing you Government's Exhibit 18.25 bearing

12  Bates label WB-4424.

13          MR. SHOCKLEY:  Your Honor, we would -- I believe

14  this has been previously admitted by stipulation.

15          MR. PASANO:  It is.

16          MR. SHOCKLEY:  If I can display that for the

17  witness?

18          THE COURT:  Yes.  This is 18.25?

19          MR. SHOCKLEY:  Yes.

20          THE COURT:  All right.

21  BY MR. SHOCKLEY:

22  Q    Just pulling out at random a check out of that exhibit.

23  This looks like a check dated 12/2/02 to KCGF Associates,

24  LLC, and it's drawn on the account of J & G Associates, LLC;

25  is that correct?

```
1    A    That's correct.

2    Q    Okay.  So the two checks each month were coming from

3    J & G Associates, LLC, and GJO Associates LLC; is that

4    correct?

5    A    That's correct.

6    Q    And J & G Associates, LLC, was covering three

7    properties?

8    A    Correct.

9    Q    Pompano --

10   A    Palm Harbor and Lancaster.

11   Q    And the GJO Associates, LLC, covered what property?

12   A    Oak Brook property in Illinois.

13   Q    So you've got this income coming in.  You've got your

14   salary.  Did there come a point in time you had discussions

15   with Mr. Orr concerning any other business opportunities?

16   A    Greg had brought up about his cousin.

17   Q    Before we get to that, directing your attention to some

18   conversations concerning telemarketing.  Did you have any

19   conversations with him about becoming -- anything to do with

20   telemarketing?

21            MR. MARKUS:  Objection.  Relevance, Judge.

22            THE COURT:  Overruled.

23   BY MR. SHOCKLEY:

24   Q    You may answer.

25   A    There was some discussions about the telemarketing
```

1    operation, but that was later.

2    Q    Okay.  So the first discussions were what?

3    A    First discussions was about Greg's cousin, as far as who

4    had worked in a funeral home and he had lost his job and he

5    had approached Greg about purchasing a funeral home and

6    wanted to know if I would be a partner.

7              MR. ENTIN:  Judge, I have an objection because this

8    is clearly outside the scope and furtherance certainly as it

9    relates to my client.  And it would be inadmissible hearsay

10   with regard to anything said by Mr. Orr.

11             THE COURT:  Does the funeral home have anything to

12   do with this?

13             MR. SHOCKLEY:  Only it shows the working

14   relationship, if you will, between this witness and Gregory

15   Orr.

16             THE COURT:  Sustained.

17   BY MR. SHOCKLEY:

18   Q    Did there -- did there ever come any occasions where

19   Mr. Orr sought any money from you?

20   A    Only as possible investments, again, in some enterprises

21   that he was looking to get into.

22   Q    Did you invest in any of his other suggestions?

23             MR. ENTIN:  Again, Judge, objection.  Outside of

24   the scope and furtherance as to my client.  Hearsay.

25             THE COURT:  Well, that question wasn't hearsay.

1    That objection is overruled.

2    BY MR. SHOCKLEY:

3    Q    Did you invest in any other opportunities presented to

4    you by Mr. Orr?

5    A    Other than the All Faith Funeral Home, no.

6    Q    Now, sir, did there come some point in time, though,

7    when -- moving onto another area.

8         The split of the profits.  With respect to the

9    first three properties, you indicated that you were supposed

10   to receive 30 percent; is that correct?

11   A    That's correct.

12   Q    And how did the split change with the fourth property,

13   Oak Brook property sale?

14   A    I continued to get my 30 percent.

15   Q    The -- do you know how the split with any other partners

16   took place?

17   A    The only one I know for sure is Greg.  The only one I

18   know Greg stated was Peter Economos getting 5 percent.

19   Q    And that was based upon -- excuse me.  Withdraw that

20   question.

21        Okay.  Directing your attention now to Government's

22   Exhibit No. 34.1.

23        MR. SHOCKLEY:  Ask permission to approach the

24   witness, your Honor.

25        THE COURT:  All right.

BY MR. SHOCKLEY:

Q    I'm going to ask you if you can look at that document.

A    (Witness complies).

Q    Are you familiar with that document?

A    I think the document was presented sometime possibly in our bond hearing.

Q    Or one similar to that?

A    Or similar to it.

Q    Have you reviewed that document with me?

A    We have looked at that document, correct.

Q    And without commenting upon the contents of the document, just inspecting the very top line, based upon the testimony that you provided here in court, without commenting on the contents of this, can you tell me whether or not the purchase prices reflected on the top of that document accurately reflects the purchase price that ADT received for selling the Oak Brook -- the Pompano Beach property to Efficient Realty and Development, LLC?

        Upper left-hand corner.

A    Yes.

Q    Directing your attention to the -- right underneath the purchase price, where it says "lease payments," does that figure accurately reflect the year one monthly payment pursuant to the lease provisions between ADT and Efficient Realty and Development, LLC?

1    A    Yes.

2    Q    As you go down the chart, the middle row, far left-hand

3    side, without commenting on the contents of it, what percent

4    of J & G Associates, LLC, did KCGF Associates own?

5    A    60 percent.

6    Q    And KCGF Associates, LLC, that was owned 100 percent by

7    a combination of you and your wife; is that correct?

8    A    That's correct.

9    Q    Directing your attention now to Government's Exhibit

10   No. 34.2.  Again, without commenting on the contents of this

11   document, I just want you to look at that document.  Do you

12   recognize that document?

13   A    I do.

14   Q    Is this another document that you reviewed with me prior

15   to your testimony?

16   A    Yes.

17   Q    The top horizontal row, drawing your attention to that

18   row, was the purchase price accurately reflected on this

19   document for the purchase by West Brook (sic) Properties,

20   LLC, of the Palm Harbor property from ADT?

21   A    Yes.

22   Q    With respect to the lease payments that are reflected on

23   this document, are those accurate for the first year -- for

24   the monthly rent for the first year of the lease under that

25   lease agreement between ADT and Westmore Properties, LLC?

1    A    Yes.

2    Q    Directing your attention to the second row, horizontal,

3    far left-hand side, does that appear to be the same as the

4    other document?

5    A    Yes.

6    Q    And the bottom row, does that appear to be the same as

7    the first document?

8    A    Yes.

9    Q    Showing you now Government's Exhibit 34.3.  Again,

10   without commenting on the contents of the document, this has

11   not been admitted, directing your attention to the top row,

12   does this document accurately reflect the purchase price by

13   Efficient Realty and Development, LLC, this time of

14   Pennsylvania, of the property in Lancaster County from ADT?

15   A    Yes.

16   Q    And where it's reflected on lease payments, does this

17   accurately reflect the lease payments per month in the first

18   year that ADT was going to be paying to Efficient Realty of

19   Pennsylvania pursuant to that same property?

20   A    Yes.

21   Q    And on the far left-hand side, second row, does that

22   appear to be accurate?

23   A    Correct.

24   Q    And the bottom row, does that also appear to be

25   accurate, at least based upon your knowledge of KCGF?

1    A    Yes.

2    Q    Showing you now Government's Exhibit 34.4.  Again,

3    without commenting on the contents of this document which has

4    not yet been admitted into evidence, on the top row,

5    "purchase price," does this accurately reflect the purchase

6    price that Oak Brook Properties paid for the Oak Brook

7    property that it purchased from ADT?

8    A    Yes.

9    Q    And where it reflects "lease payments," does this appear

10   to be an accurate account of the amount of the monthly lease

11   that was being paid the first year by ADT to Oak Brook

12   Properties, LLC, for the Oak Brook property sale?

13   A    Yes, it does.

14   Q    The far left-hand side, second tier, the contents of

15   that block, do they appear to be accurate?

16   A    Yes.

17   Q    And the bottom tier, far left-hand side, do the contents

18   of the box labeled "KCGF Associates" appear to you to be

19   accurate?

20   A    Yes.

21   Q    And that's based upon your own knowledge of your own

22   company; is that correct?

23   A    That's correct.

24   Q    Mr. Horton, during the course of receiving all of these

25   monthly checks, when you filed your income tax returns, did

1    you declare that income?

2    A    Yes, I did.

3    Q    Who did you use as your accountant?

4    A    I used a friend that Greg had recommended, that he used.

5    Q    That you use?

6    A    I used the friend that Greg knew, a CPA.

7    Q    Okay.  What was his name?

8    A    Giulio.

9    Q    Do you recall the last name?

10   A    I had it.  I don't now.

11   Q    Okay.  Giulio, the first name, is it spelled

12   G-I-U-L-I-O?

13   A    Yes.

14   Q    He has an accounting firm located where?

15   A    I believe at that time it was off of Cypress Creek exit.

16   Q    Tell us about the conversation you had with Mr. Orr

17   concerning consulting Mr. -- well, let's call him Giulio for

18   now.

19   A    The conversation would have taken place sometime in

20   2002.  It could have been the latter part prior to getting

21   ready to file taxes.  He indicated, who I've used and I said

22   I've used various CPAs and he says, well, I've used Giulio in

23   my business and they do my personal, why don't you go talk to

24   him.

25   Q    And were there any discussions concerning the moneys

1    that you were receiving through the various LLCs at that

2    time?  In 2002, did you start receiving payments through

3    KCGF?

4    A    I did.

5    Q    Were you going to be consulting with him about the tax

6    returns for KCGF now?

7    A    Yes.

8    Q    So it was not only your personal tax returns but the tax

9    returns for KCGF Associates, LLC?

10   A    Correct.

11   Q    What, if anything, did Mr. Orr advise you concerning

12   the, well, feasibility of using Giulio?

13   A    In that conversation Greg said that Giulio would be

14   handling the businesses.  I took that as these companies,

15   LLCs.

16   Q    And, in fact, did there come a point in time when you

17   did consult Giulio to do the tax returns for yourself, your

18   wife personally, as well as KCGF?

19   A    My 2002 taxes was filed by Giulio and continued on.

20   Q    And did Giulio have the figures concerning the source of

21   your income concerning the payments that you received from

22   GJO Associates and J & G Associates?

23   A    That's correct.

24   Q    I want to direct your attention now to a date in 2006,

25   January of 2006.  As you were leaving your house early one

1    morning to go to work, describe what happened.

2    A    I opened the garage door to go out to get the morning

3    paper, and I was met by two gentlemen walking across from the

4    other side of the street, towards my house, asking if I was

5    Larry Horton.

6    Q    Did they identify themselves?

7    A    They did, as two FBI agents.

8    Q    Do you see one of them in the courtroom now?

9    A    I do.

10   Q    And that's who?

11   A    Mr. Art Hopewell.

12   Q    And he is the gentleman seated in the back row on the

13   right-hand side of the courtroom as you look to the back?

14   A    That's correct.

15   Q    When they identified themselves to you as police

16   officers -- excuse me, as FBI agents, wrong case -- as FBI

17   agents, how did you react?

18   A    A little startled.  Certainly nervous.

19   Q    Describe the conversation you had with Special Agent

20   Hopewell.

21   A    There was a second gentleman there, also.  I don't

22   remember his name.  Some pretty rapid fired questions from

23   Mr. Hopewell.

24   Q    Did he ask you if you had any association or business

25   ties with Gregory Orr?

```
 1              MR. KAISER:  Objection.  Hearsay as to what the FBI
 2    agent asked.
 3              MR. SHOCKLEY:  Not offered for the truth, your
 4    Honor.  Offered merely for the fact that it was made.
 5              MR. KAISER:  Well, if that's the case and if you're
 6    going to allow that, I would like an instruction to the jury.
 7              THE COURT:  As to the questions, not the answer.
 8    I'm -- the questions are going to be admitted only for the
 9    purpose of providing a context for the answer.  The
10    questions -- the statements about what the FBI agent asked
11    are not offered for the truth of the matters contained in
12    those questions, only to place his answers to those questions
13    in context.
14              Is that acceptable, Mr. Kaiser?  Is that what you
15    had in mind?
16              MR. KAISER:  Yes, your Honor.
17              THE COURT:  All right.
18    BY MR. SHOCKLEY:
19    Q    Did the agents ask you if you had any social or business
20    ties with Gregory Orr?
21    A    Yes, they did.
22    Q    How did you response?
23    A    Negative.
24    Q    And what, if anything, did you say about any parties or
25    things of that nature?
```

1    A    They wanted to know did I socialize with Greg outside of

2    what would be normal social events, and I indicated no.

3    Q    Did you -- did Special Agent Hopewell ask you if you

4    conducted any personal, professional real estate, or such

5    transactions with Gregory Orr or any other company that may

6    have represented Orr?

7    A    I indicated no.

8    Q    Did he ask you if you knew anything about an individual

9    by the name of Vincent Artuso?

10   A    I knew Vincent.  At that time "Artuso" didn't click

11   because I already -- I always heard the first name, "Vinnie"

12   or "Johnny."  So I probably answered no.

13   Q    Now, at the time that you were answering these

14   questions, you knew in truth and in fact, you had conducted

15   some professional and real estate business with Gregory Orr;

16   is that correct?

17   A    Yes.

18   Q    And as a matter of fact, it went even beyond ADT; is

19   that correct?

20   A    Yes.

21   Q    As a matter of fact, it dealt with a funeral home as

22   well; is that correct?

23   A    Yes.

24   Q    So you were basically lying across the board to the FBI

25   concerning any business relationships you had with Gregory

1    Orr; is that correct?

2    A    That's correct.

3    Q    And you did that why?

4    A    I didn't want ADT to find out.

5    Q    And did you want the FBI to find out?

6    A    No, I didn't want the FBI either.

7    Q    Why not?

8    A    They would go to ADT more than likely.

9    Q    Now, sir, the transactions that you had conducted on

10   behalf of ADT, you were secretly receiving payments, was that

11   an ethical violation?

12   A    Was that an ethical -- yes.

13   Q    Was that a criminal violation?

14   A    Yes.

15   Q    And why is that?

16   A    I did not put out the properties for bid to secure the

17   highest price I could for ADT, the best bid price.

18   Q    As a matter of fact, you sold the properties to yourself

19   for less than fair market value; is that true?

20   A    That's correct.

21            MR. MARKUS:  Objection.

22            THE COURT:  Basis?

23            MR. MARKUS:  Leading.

24            THE COURT:  Leading objection sustained.  Please

25   restate the question.

```
 1   BY MR. SHOCKLEY:

 2   Q    Did you sell the properties for fair market value?

 3   A    I didn't.

 4   Q    And did you enter into leases for fair market value?

 5   A    I did not.

 6   Q    This was to the detriment of whom?

 7   A    ADT and Tyco.

 8   Q    And for whose benefit?

 9   A    Myself.

10   Q    And who else?

11   A    Greg Orr.

12   Q    And who else?

13   A    Partners associated with that.

14   Q    After the conversation with the FBI had concluded --

15   roughly, how long did this conversation take?

16   A    It was very quick.  It seemed like hours, but it was

17   probably about 10 or 15 minutes.

18   Q    Did you go to work or do something else?

19   A    I made a call to Mr. Orr, told him I would like to talk

20   to him later that day, and I went to work.

21   Q    Did you speak to your wife about the visitors you just

22   had spoken to in the driveway?

23   A    I did.

24   Q    What did you tell your wife?

25   A    As little as possible.
```

1    Q    Now, you indicated that you left a message for Mr. Orr

2    that you wanted to speak to him.  That evening did, in fact,

3    you speak with Mr. Orr?

4    A    I did briefly.

5    Q    Where?

6    A    At his home.

7    Q    Is this the same home you previously identified?

8    A    This is -- would be the second home.

9    Q    Okay.  Showing you now Government's Exhibit 39.1, 2,

10   3 -- Government's Exhibit No. 39.1, 39.2, 39.3.

11           This house, was it -- while she's getting out the

12   exhibits, where was this house located in reference to your

13   house?

14   A    It was called The Estates.  In the back portion of our

15   development.

16   Q    How close was it to your residence?

17   A    Distance-wise, it could be a half mile.  I'm not sure.

18   Quarter mile.

19   Q    Still the same general development?

20   A    In the same general development.

21           MR. MARKUS:  Judge, I have an objection to these

22   exhibits.  And although I hate to ask for a sidebar, I ask

23   for a sidebar.

24           THE COURT:  What's the nature of the objection?

25           MR. MARKUS:  It's 401 and 403, but I would like it

1    to expand on that.

2              THE COURT:  Could I see them?

3              MR. SHOCKLEY:  Yes, your Honor.

4         (Pause in Proceedings.)

5              THE COURT:  Aren't these just pictures of a house,

6    Mr. Markus?

7              MR. MARKUS:  Yes, your Honor.

8              THE COURT:  You want to have a sidebar about this?

9              MR. MARKUS:  Yes, your Honor.

10             THE COURT:  We'll take our break early.  A

11   15-minute break.  Return at ten after 3:00.

12        (Jury out at 2:54 p.m.)

13             THE COURT:  Okay.  Have a seat.

14             What's the problem with the pictures?

15             MR. MARKUS:  Your Honor, this is evidence of wealth

16   that the Government is trying to get in to prejudice the jury

17   against Mr. Orr and there's --

18             THE COURT:  It looks likes the other house.  I

19   thought it was the same picture, frankly.

20             MR. MARKUS:  That's why I objected to the last

21   house, the pictures of the last house as well, your Honor.

22   They're not relevant to this case.  The reason the Government

23   wants to use these pictures is to try to show that Mr. Orr

24   lives in a big house and to prejudice the jury against him.

25   And there's cases on this point, your Honor.

```
1              THE COURT:  Well, go find the case.  I think it's

2     almost a frivolous objection.

3              MR. MARKUS:  It's not --

4              THE COURT:  It's basically a house.

5              MR. MARKUS:  I know, but evidence of wealth, your

6     Honor, there is a long line of cases that say evidence of

7     wealth is under 403 improperly used.  There is no reason.

8     What basis is to show the jury --

9              THE COURT:  Probably to confirm his testimony he

10    went there and talked to him.  I mean, almost every case you

11    end up with -- the Government always shows the picture of the

12    house, the neighborhood.  I kind of wonder whether sometimes

13    it's necessary, but it seems to me there's no more than that

14    in this.

15             MR. MARKUS:  The only reason it's relevant, your

16    Honor, is to prejudice the jury on evidence of wealth.  There

17    is no reason to show the jury the picture of the house.  What

18    fact does that tend to prove in this case?  There is no fact

19    that it helps under 401.

20             MR. SHOCKLEY:  Your Honor, we plan to present later

21    testimony that -- from one of the future witnesses, that when

22    he learned about ADT's inside guy, that he lived in the same

23    neighborhood as Gregory Orr.  We're attempting to show that

24    they did live in the same neighborhood.  Particularly, these

25    houses.  This is where meetings took place in the houses.
```

```
 1            MR. MARKUS:  I'll stipulate to that.

 2            THE COURT:  I don't see how this shows anything

 3    significant in terms of wealth, looking at the pictures.  I

 4    mean there are lots of houses -- it's a nice house.  There

 5    are lots of them in South Florida.  Almost every house in

 6    Boca looks pretty much like this house, and so I don't see a

 7    basis to exclude it under 403.

 8            MR. SHOCKLEY:  Your Honor, we're at that point

 9    where we plan on getting into the next area.  I just had a

10    couple of thoughts.  We've -- with respect to the --

11            THE COURT:  You have almost no evidence in against

12    Mr. Forgione, for example.  I assume -- is that Fip or Flip

13    or Fip?

14            MR. SHOCKLEY:  Fip, your Honor.  The later evidence

15    that will be presented is through a later witness, and we

16    believe that under Bourjaily, we can show eventually to the

17    Court's satisfaction that there is sufficient evidence to go

18    forward.  Particularly, through a witness that we plan to

19    call, Donald Race, who will have specific, direct

20    conversations with Mr. Forgione over this very deal.

21            So these are things that we are going to be able to

22    connect up later and show is relevant.  We will be able to

23    show that he received proceeds through -- I'm reluctant to

24    talk in front of Mr. Horton.  If we could excuse him from the

25    courtroom, your Honor?
```

 1          THE COURT:  Well, I guess my question is why not

 2     call him back after you put on this other evidence so we are

 3     in a better position to determine the elements.  I mean, I

 4     have to find -- by a preponderance standard there is a

 5     conspiracy, that the defendants were members of it, it's made

 6     during the duration of it, and for the purpose of advancing

 7     it.  How do I make those findings other than your

 8     representation that you're going to make -- present that

 9     evidence down the line?

10          MR. SHOCKLEY:  That's a point well-taken and I

11     suppose that's why on occasion in the past they used to have

12     James hearings.  And I understand the Court's reluctance in

13     this case.  But if the Court prefers to take it in that

14     order, we do have that option open.  Just call him back.

15          THE COURT:  Well, that's what I thought you all

16     were going to talk about and decide.

17          MR. SHOCKLEY:  Well, actually, we did.  I was going

18     to make one last ditch effort because I felt, your Honor,

19     particularly with the severance issue, that the severance

20     issue, I fail to see how the defendants Gannon and Forgione

21     would be prejudiced by hearing testimony that Gregory Orr

22     made about Vincent Artuso.  So I just --

23          THE COURT:  How can that be?

24          MR. SHOCKLEY:  I just don't see that, the prejudice

25     that they would suffer as a result of conversations about

1    Vincent Artuso.

2              THE COURT:  I mean the point of it is they're part

3    of the South Florida crew of the Gambino crime family, you

4    don't see how that could be possibly prejudicial?

5              MR. SHOCKLEY:  Yes, your Honor, upon further

6    reflection, I understand now what you're saying.  But I

7    really felt that -- for example, later on, later on, we'll be

8    hearing testimony from Lewis Kasman about that South Florida

9    crew.

10             THE COURT:  And about them?  Is he going to tie

11   them to it?

12             MR. SHOCKLEY:  No, your Honor.  He is going to be

13   talking about specifically Vincent Artuso, Gregory Orr.  He

14   did have some -- understand conversations or -- with Mr. John

15   Artuso and Robert Gannon possibly, but I'm not really

16   familiar with that side of the case, quite frankly.

17             THE COURT:  My worry is that whether a defendant

18   can be -- as I told you before, there's some case law against

19   you on the point of these -- of whether or not this is after

20   the conspiracy.  I recognize your theory and I think there is

21   a lot to it, that this is ongoing.  Because the payments are

22   still coming in.  So it's not over.  So I do recognize that

23   part of it.

24             But you still have -- and that may get passed

25   Magluta.  You still have that Supreme Court case which at

1    least causes me to question that testimony.  So without a

2    firmer position with respect to -- because I'm either going

3    to give an instruction they can't consider it against certain

4    defendants or not, based upon this issue.  And Mr. Kaiser

5    argues that that instruction, a jury would have a hard time

6    following it in any event.

7         MR. SHOCKLEY:  So that gets us to the severance

8    issue.

9         THE COURT:  At some point it would.  Yeah.  I mean,

10   we have to deal with that issue, either now or at a later

11   point in your case.  And the question is, from my standpoint,

12   it made sense to deal with it at a later point where at least

13   I can evaluate all of the evidence that has come in or not

14   come in.

15        MR. SHOCKLEY:  Your Honor, I appreciate it.  I

16   can't say that I'm hitting on all cylinders today.  It's been

17   a long day.  But I think I understand the issue a little bit

18   better now.

19        THE COURT:  Well, you do the modesty routine better

20   than anybody I've ever seen, Mr. Shockley.  I'm not sure I

21   buy all of it.

22        MR. SHOCKLEY:  I have a lot to be modest about.

23        THE COURT:  I'm not sure that's quite the case.

24   But you all figure out --

25        MR. SHOCKLEY:  We will, over the break; and we'll

1  be in a position to go forward and, your Honor, I can't talk

2  to Mr. Horton now because he --

3         THE COURT:  Let me interrupt.  Do defense counsel

4  agree to that approach, that he come back, be allowed to come

5  back later for that portion of his testimony, or do you want

6  to force the issue now?

7         MR. ENTIN:  Judge, it's really, from my standpoint,

8  I don't mind if he comes back later.  But understand, he's

9  testified in one sentence about my client.  So I don't have a

10  need to get up and cross-examine him.  I don't know that I'm

11  not in a different position on this issue than Mr. Markus and

12  Mr. Pasano.  I think Allen probably feels the same way.

13         THE COURT:  Well then I want to make sure I

14  understand how you do feel, because if you don't have a

15  problem with the testimony, I mean the testimony I'm most

16  concerned about as it relates to your clients, frankly.

17         MR. ENTIN:  My position, Judge, is I would prefer

18  that he come back later.  That's my feeling.  I don't know

19  that that's the feeling that Mr. Markus and Mr. Pasano have.

20         THE COURT:  Well, that's why I'm trying to find out

21  what your positions are.

22         MR. KAISER:  I say later so that you will see that

23  there's no other evidence they're going to offer against

24  Mr. Gannon than what you've heard today.

25         MR. PASANO:  Judge, since, even though it wasn't

1    clear perhaps on the record, for John Artuso I join in the

2    severance argument that's made because I submit he is in the

3    same position as Mr. Forgione and Mr. Gannon on that issue.

4         I certainly don't urge the testimony to occur now.

5    If the Government chooses to recall him in the hopes of

6    convincing the Court that statements are admissible under 801

7    or otherwise admissible against Mr. Orr, for example, I think

8    the Court in its discretion may allow the Government to do

9    that.  My concern is that we don't seem to be endorsing

10   cumulative testimony.  I mean so that literally, it would

11   have to be entirely new stuff.

12        And if we're opening the door to allowing any part

13   of this exam to be repeated again because of the split, then

14   I would object to it.

15        THE COURT:  No, I understand.  Basically, it's the

16   conversation, as I understand it, that took place after this,

17   after the FBI showed up --

18        MR. SHOCKLEY:  Yes, your Honor.

19        THE COURT:  -- with Mr. Orr, and then later on in

20   the lockup.  Are those the areas you haven't gotten to.

21        MR. SHOCKLEY:  Right.  We can pick up at that

22   juncture.

23        THE COURT:  All right.  Mr. Birch, do you want to

24   take a position at all?

25        MR. BIRCH:  I feel the same as the others, Judge.

```
 1                 THE COURT:  All right.  The other advantage of it

 2     is gives them a chance -- you filed a memorandum.  It gives

 3     them a chance to do that, if they want to, and for me to have

 4     a better chance to look at all of the law.

 5                 MR. SHOCKLEY:  Thank you.

 6                 THE COURT:  So if you're amenable to that, I would

 7     prefer that.

 8                 MR. McCORMICK:  We don't have to talk.  We agree.

 9                 THE COURT:  All right.  Let's take --

10                 MR. PASANO:  And Judge, one last thing.  Cautionary

11     instruction.  The witness has admitted to ethical violations

12     and to criminal wrongdoing, and they may be asking him about

13     his plea.  It may or may not be coming up.  I'd ask for the

14     instruction that those are statements that may considered for

15     his credibility, can't be used to assert guilt as to any

16     other person.

17                 THE COURT:  That comes at the -- that's part of the

18     instructions at the close of the case.  I don't see a point

19     in giving that witness by witness.  Is that what you're

20     requesting, that I give it now?

21                 MR. PASANO:  As to this witness, I'm requesting you

22     give it now.  I wouldn't be requesting it for other witnesses

23     because it will be obvious.  But he is saying I committed an

24     ethical violation, I committed a criminal violation, and the

25     jury may not know how to use that now and it will be a while
```

1    until your final instruction.

2            THE COURT:  What's your position?  Do you want an

3    instruction now?

4            MR. McCORMICK:  Your Honor, there should be no

5    instruction on that.  It's a statement by the witness.  There

6    is no reason for an instruction.

7            THE COURT:  At the end of the case I, of course,

8    tell them the fact that a witness has pled guilty should not

9    be considered in any way against the other defendants.  I

10    give that type of instruction.

11            MR. SHOCKLEY:  I don't have a problem with --

12            MR. McCORMICK:  But we haven't even gotten into the

13    plea agreement.

14            MR. SHOCKLEY:  But it's going to be coming, and so

15    I don't have a problem with that instruction, your Honor.

16            Also, your Honor, I haven't been able to speak with

17    Mr. Horton since he hit the witness stand because, you know,

18    once he commences his testimony I understand that I'm

19    precluded from speaking with him.  So I think that he

20    understands; I just want to take this opportunity that maybe

21    the Court can explain to him that I am not going to be

22    inquiring about those conversations I had -- that he had with

23    Gregory Orr relating to the criminal organization, I mean the

24    organized crime background of Vincent Artuso and I'm not

25    going to be asking about the statements in the lockup, at

 1   least at this juncture, so please even in response to defense

 2   counsel's questions, unless they specifically ask you, don't

 3   refer to the prior record of any of these defendants.

 4          MR. PASANO:  Judge, and his lawyer, Susan Van

 5   Duzen, is a very capable criminal defense lawyer,

 6   experienced, is in court and I'm sure she can also explain to

 7   her client what the Court's rules are.

 8          MR. SHOCKLEY:  I just didn't want an accident to

 9   happen because I can't even talk to the witness now.  That's

10   all.

11          THE COURT:  All right.

12          MR. SHOCKLEY:  Thank you, your Honor.

13          THE COURT:  Let me make sure you all understand the

14   cross can't be repetitive, too.  Are you going to cross now?

15          MR. MARKUS:  I am, Judge.

16          THE COURT:  So the cross also, likewise, shouldn't

17   be repetitive in terms if he comes back later in the case.

18          MR. MARKUS:  Yes, your Honor.  There's one other

19   issue with -- I don't know if the Government plans on

20   introducing the plea agreement but we would object to certain

21   portions of it as self-serving and dealing with, for example,

22   fear and organized crime.  There's sections about keeping --

23   able to keep certain assets because he's afraid and he needs

24   to relocate.

25          I would object to those portions coming in, your

1    Honor.

2            MR. PASANO:  And there a proffer that's attached to

3    it.  I'm assuming the Government doesn't seek to introduce

4    the proffer as part of the plea agreement.

5            MR. SHOCKLEY:  I don't see where that's

6    particularly necessary.

7            MR. McCORMICK:  Your Honor, we would be arguing

8    that much of the plea agreement, if not all of it, should be

9    admitted based upon the opening statements of defense counsel

10   in this case.  The case law supports that.

11           I wanted to just inquire of the Court, Mr. Shockley

12   asked if we could be -- if we could speak with Mr. Horton

13   prior to cross.  It's my understanding that the --

14           THE COURT:  I didn't hear him say that.  Did he?

15   Did you ask that?

16           MR. SHOCKLEY:  No, I didn't ask it; I just assumed

17   that I could not.

18           MR. McCORMICK:  I think it's just the opposite.  We

19   have a big controversy here.  I think that --

20           MR. MARKUS:  There's no case in controversy between

21   the two of them.

22           MR. McCORMICK:  I believe we can, unless the Court

23   says differently, we can speak with our witness until he is

24   open for cross-examination.

25           MR. SHOCKLEY:  I've heard it both ways and I never

1    wanted to take a chance, Judge.

2            THE COURT:  Are you asking for -- which one of you

3    want to talk to him?

4            MR. McCORMICK:  I think he would support me, but --

5            MR. KAISER:  We'll go along with Shockley's

6    position on that.

7            MR. SHOCKLEY:  He is my witness, Judge.

8            THE COURT:  All right.  Let's take five more

9    minutes.  We'll return at 3:15.  You all talk about the plea

10   agreement, see if you want to redact some part of it.

11       (Recess at 3:08 p.m.)

12           THE COURT:  How much longer will you be?

13           MR. SHOCKLEY:  Not as long as I thought.  I'm

14   trying to quickly go through here now to see exactly what we

15   can cut.  And there is a fairly sizable chunk.  We also have

16   agreed on the plea agreement.  We're going to excise for the

17   time being, have no reference to the relocation or the

18   witness security program.

19           THE COURT:  All right.

20           MR. SHOCKLEY:  So that would take that issue off

21   the table.

22       We --

23           THE COURT:  I ask mainly to say that it's 3:15.

24   Jurors -- I don't mind if you find a natural breaking point a

25   little early to let them go home a little early on a Friday

```
 1    afternoon.

 2              MR. SHOCKLEY:  That would be great.

 3              THE COURT:  Either in your direct or your all's

 4    cross, whoever has started.

 5              MR. SHOCKLEY:  Oh, your Honor, Mr. McCormick

 6    reminded me to say that we do plan at a later point in time

 7    to recall the witness.  So that is our intention at this

 8    time.

 9              THE COURT:  All right.

10              Okay.  Let's -- is every one here?

11              MR. PASANO:  Yes, your Honor.

12              THE COURT:  Let's invite the jury in.

13         (Jury in at 3:15 p.m.)

14              THE COURT:  Welcome back.  Please be seated.

15              Please proceed.

16              MR. SHOCKLEY:  Thank you, your Honor.

17              We would offer into evidence Government's Exhibit

18    No. 39.1, .2, and .3.

19              THE COURT:  Those are admitted over objection.

20         (Received in evidence Government's Exhibit(s) 39.1, 39.2,

21    and 39.3.)

22    BY MR. SHOCKLEY:

23    Q    You indicated, Mr. Horton, that the evening that -- in

24    the morning you had a conversation with FBI agents and they

25    questioned you; is that correct?
```

1    A    That's correct.

2    Q    You stated that you made a call to Gregory Orr and set

3    up a meeting that evening; is that correct?

4    A    I had a brief conversation with Mr. Orr on the phone and

5    set up the meeting to talk to him later that evening.

6    Q    Okay.  Now, that evening when you went over to speak to

7    Mr. Orr, you went over to his second residence.  He had

8    moved, relocated from the first residence; is that correct?

9    A    That's correct.

10   Q    Showing you Government's Exhibit No. 39.1, it appears on

11   the mailbox the number 6710.  Is this the residence to which

12   you went to speak to Mr. Orr that evening?

13   A    Yes.

14   Q    And Government's Exhibit 39.2, is that the same

15   residence?

16   A    Yes.

17   Q    And 39.3, is that the same residence?

18   A    Yes.

19   Q    Okay.  Now, when you -- you described this as somewhere

20   in the general neighborhood of your own residence.  Showing

21   you now Government's Exhibit 39.4 -- showing you Government's

22   Exhibit No. 39.4, have you seen that exhibit before?

23   A    Yes, I have.

24   Q    Is that another MapQuest map of the general area?

25   A    Yes.

1    Q    Is there -- does that depict at least a location where

2    Mr. Orr's subsequent residence was located?

3    A    Are we talking about the first or the second?

4    Q    The second now.

5    A    The second home there shows a star.  It's -- it looks to

6    be off.

7    Q    Can you take this red pen and put the initials "GO" on

8    the location where his house was located in that

9    neighborhood?

10   A    (Witness complies).

11            MR. SHOCKLEY:  Let the record reflect the witness

12   has written in red ink with the initials "GO" on Government's

13   Exhibit No. 39.4.

14   BY MR. SHOCKLEY:

15   Q    Now, this exhibit with your initials on it, does it

16   fairly and accurately show in relative terms where the

17   position of Mr. Orr's house was located in the neighborhood?

18   A    Yes.

19            MR. SHOCKLEY:  Your Honor, we would offer into

20   evidence Government's Exhibit No. 39.4.

21            MR. MARKUS:  No objection.

22            THE COURT:  39.4 is admitted.

23       (Received in evidence Government's Exhibit(s) 39.4.)

24   BY MR. SHOCKLEY:

25   Q    We've gone through this on the previous MapQuest

1    exhibit.  This is not very clear.  Are you even able to see

2    that, the numbers of the streets, from your vantage point?

3    Can you make them out?

4    A    101st Street.  Next to the star is the only thing I can

5    see there.  101st Street or 104th.  101st Terrace.  I'm not

6    sure what it is under the star.

7    Q    Can you make out Pine Island Road?

8    A    Yep.

9    Q    Can you make out Northwest 66th Drive?

10   A    Yes.

11   Q    There's a notation right here that says "gate" and in

12   parens "permission."  Is that a gate leading into your

13   neighborhood?

14   A    Security gate, correct.

15   Q    Okay.  As you would be coming into your house, you would

16   be going in which direction?

17   A    I would be traveling towards your pointing your pen.

18   Q    Yes.

19   A    Coming all the way -- you passed it.  I'm sorry.  Turn

20   right.  Back up.  Back up.  Okay.  Right.  And then make

21   another right.  There you go.  And then make another left

22   right there.  And my house would be on the corner.

23   Q    Okay.  So this is where you live.  Now, where is the

24   house that Mr. Orr lived on that evening that you paid that

25   visit?

1    A    Again, if you go straight up --

2    Q    Well, you can see it there.  You can see that, can't

3    you, the "GO"?

4    A    That's correct.

5    Q    Okay.  Did you have a conversation with Mr. Orr about

6    your visit by the FBI?

7    A    I did.

8    Q    Were you later arrested?

9    A    I was.

10   Q    I direct your attention to Thursday, January the 24th of

11   2008.  Were you arrested by agents of the Federal Bureau of

12   Investigation?

13   A    I was.

14   Q    And directing your attention to the 25th of January,

15   2008.  Did you have your initial appearance in this very

16   courthouse on those charges?

17   A    I did.

18   Q    In addition to yourself, were -- who else was present as

19   far as the charges in that first indictment?

20   A    Are we talking about here?

21   Q    In the bond hearing, were other people in the same case

22   arrested at that time?

23   A    Yes.

24   Q    Okay.  Now, eventually, sir, were you released on

25   pretrial release?

1    A    I was.

2    Q    As a condition of your release were you required to wear

3    a monitoring bracelet, anklet, I guess it would be called?

4    Around your ankle?

5    A    I was.

6    Q    At a later point in time, sir, did you have occasion to

7    enter a plea of guilty in -- to the original indictment that

8    was issued in this case?

9    A    Yes.

10   Q    And that was before Judge Middlebrooks?

11   A    Yes, it was.

12   Q    Was that on July the 15th of 2008?

13   A    I believe it was, sir.  Yes, sir.

14   Q    In entering the plea of guilty, was that pursuant to a

15   written plea agreement?

16   A    Yes.

17   Q    Showing you now Government's Exhibit No. 29.  Is this a

18   true and accurate copy of your written plea agreement?

19   A    It's signed by myself, yes.

20   Q    Now, directing your attention to the last four pages,

21   there's a statement of facts.  I'm going to remove that from

22   this exhibit, so just the terms of the plea agreement are now

23   on this exhibit.

24        With that modification, and we're specifically not

25   going to be inquiring about some sections that I have to

1    excise at the present time, but is it a true and accurate

2    copy of the original agreement that you signed?

3    A    Yes, it is.

4            MR. SHOCKLEY:  Your Honor, we would offer, subject

5    to the redaction of one section, Government's Exhibit No. 29.

6            MR. MARKUS:  No objection.

7            THE COURT:  29 is admitted under that

8    understanding.

9        (Received in evidence Government's Exhibit(s) 29.)

10           MR. SHOCKLEY:  Your Honor, we just worked this out.

11   I need a black pen so I can excise one --

12       (Pause in Proceedings.)

13           MR. SHOCKLEY:  Judge, the computers are bad enough

14   that I can't even operate a pen anymore.  We'll get to that

15   page later, and I'll work on a cut and paste here.

16   BY MR. SHOCKLEY:

17   Q    Showing you the first page of the document, Government's

18   Exhibit No. 29, it says:  "United States District Court,

19   Southern District of Florida, Case No. 08-60014-CR-

20   Middlebrooks/Johnson."

21           Do you know that Johnson is Magistrate Judge

22   Johnson, who is a magistrate judge in this courthouse?

23   A    I did not.

24   Q    You didn't know that was a reference to her?

25   A    No, I did not.

```
1    Q    You don't remember the bond hearing?

2    A    I do.

3    Q    You don't remember the name of the magistrate judge?

4    A    I do now.

5    Q    Okay.  It's entitled, United States of America versus

6    William Larry Horton, Defendant.  Plea agreement.  The

7    opening paragraph says:

8             "The United States Attorney for the Southern

9    District of Florida (hereinafter referred to as United

10   States, Government, and this office) and the defendant,

11   William Larry Horton, enter into the following plea

12   agreement:

13            "The defendant agrees to plead guilty to Count 1 of

14   the indictment, which count charges the defendant with

15   conspiracy to violate the RICO (racketeering influenced and

16   corrupt organizations) statute, in violation of Title 18,

17   United States Code Section 1962(d).  An agreed statement of

18   facts supporting this guilty plea is attached to this plea

19   agreement and is incorporated by reference herein."

20            Now, you just witnessed me take off the statement

21   of facts from this plea agreement; is that correct?

22   A    That's correct.

23   Q    So it no longer has that statement of facts.  You

24   understand that?

25   A    Yes.
```

1    Q    Paragraph 2 states:

2          "The United States agrees to seek dismissal of all

3    remaining counts, that is, Counts 2 through 42 of the

4    indictment, as to the defendant, after sentencing.

5          "Count No. 3 states, the defendant is aware that

6    the sentence will be imposed by the Court after considering

7    the United States Sentencing Commission Guidelines, policy

8    statements, and commentary (hereinafter sentencing

9    guidelines, guidelines, and USGG).

10          "The defendant acknowledges and understands that

11    the Court will compute an advisory sentence under the

12    sentencing guidelines and that the applicable guidelines will

13    be determined by the Court, relying in part on the results of

14    a presentence investigation conducted by the United States

15    Probation Office, which investigation will commence after the

16    guilty plea has been entered.

17          "The defendant is also aware that, under certain

18    circumstances, the Court may depart from the advisory

19    guideline range that has been computed, and may raise or

20    lower that advisory sentence under the sentencing guidelines.

21          "The defendant is further aware and understands

22    that the Court is required to consider the advisory guideline

23    range determined under the sentencing guidelines, but is not

24    bound to impose that sentence.  The Court is permitted to

25    tailor the ultimate sentence in light of other statutory

1  concerns, and such sentence may be either more severe or less

2  severe than the sentencing guidelines' advisory sentence.

3        "Knowing these facts, the defendant understands and

4  acknowledges that the Court has the authority to impose any

5  sentence within and up to the statutory maximum authorized by

6  law for the crime charged in Count 1 of the indictment, and

7  that the defendant may not withdraw his guilty plea solely as

8  a result of the sentence imposed.

9        "Paragraph 4, the defendant understands and

10 acknowledges that at sentencing as to Count 1, the Court may

11 impose a statutory maximum term of imprisonment of up to 20

12 years, followed by a term of supervised release of up to

13 three years, and a fine of up to $250,000.  In addition, the

14 Court must order restitution.

15       "No. 5, the defendant understands and acknowledges

16 that, in addition to any sentence imposed, a special

17 assessment in the amount of $100 will be imposed on the

18 defendant pursuant to Title 18, United States Code,

19 Section 3013.  The defendant agrees that the special

20 assessment shall be paid at the time of sentencing.

21       "Paragraph 6, the United States reserves the right

22 to inform the Court and the probation office of all facts

23 pertinent to the sentencing process, including all relevant

24 information concerning the offenses committed, whether

25 charged or not, as well as concerning the defendant and the

1   defendant's background.  Subject only to the express terms of

2   any agreed-upon sentencing recommendations contained in this

3   plea agreement, the United States further reserves the right

4   to make any recommendation as to the defendant's sentence.

5            "Paragraph 7, the United States agrees that it will

6   recommend at sentencing that the Court reduce by two levels

7   the guidelines level applicable to the defendant's offense,

8   pursuant to Section 3E1.1(a) of the sentencing guidelines,

9   based upon the defendant's recognition and affirmative and

10  timely acceptance of personal responsibility.  If at the time

11  of sentencing the defendant's offense level is determined to

12  be 16 or greater, the Government will make a motion

13  requesting an additional one-level decrease pursuant to

14  Section 3E1.1(b) of the sentencing guidelines, stating that

15  the defendant has assisted authorities in the investigation

16  or prosecution of his own misconduct by timely notifying

17  authorities of his intention to enter a plea of guilty,

18  thereby permitting the Government to avoid preparing for

19  trial and permitting the Government and the Court to allocate

20  their resources efficiently.

21           "The United States will not be required to make

22  this motion and this recommendation, however, if the

23  defendant:  One, fails or refuses to make a full, accurate,

24  and complete disclosure to the probation office of the

25  circumstances surrounding the relevant offense conduct; two,

1    fails or refuses to make a full, accurate, and complete

2    disclosure of his financial condition; three, is found to

3    have misrepresented facts to the Government prior to entering

4    into this agreement; or four, commits any misconduct after

5    entering into this plea agreement, including, but not limited

6    to, committing a state or federal offense, violating any term

7    of release, or making false statements or misrepresentations

8    to any governmental entity or official.

9         "Paragraph 8, the defendant agrees that he shall

10   cooperate fully with this office by:

11        "A.  Providing truthful and complete information

12   and testimony, and producing documents, records, and other

13   evidence when called upon by this office, whether in

14   interviews, before a grand jury, or at any trial, or other

15   court proceeding; and

16        "B.  Appearing at such grand jury proceedings,

17   hearing, trials, and other judicial proceedings, and at

18   meetings as may be required by this office.

19        "Paragraph 9.  This office reserves the right to

20   evaluate the nature and extent of the defendant's cooperation

21   and to make the defendant's cooperation, or lack thereof,

22   known to the Court at the time of sentencing.  If, in the

23   sole and unreviewable judgment of this office, the

24   defendant's cooperation is of such quality and significance

25   to the investigation or prosecution of other criminal matters

```
1    as to warrant the Court's downward departure from the

2    advisory sentence calculated under the sentencing guidelines,

3    this office may, at or before sentencing, make a motion

4    consistent with the intent of Section 5K1.1 of the sentencing

5    guidelines prior to sentencing, or Rule 35 of the Federal

6    Rules of criminal procedure subsequent to sentencing,

7    reflecting that the defendant has provided substantial

8    assistance, and recommending that the defendant's sentence be

9    reduced from the advisory sentence suggested by the

10   sentencing guidelines.

11           "The defendant acknowledges and agrees, however,

12   that nothing in this plea agreement may be construed to

13   require this office to file any such motions and that this

14   office's assessment of the nature, value, truthfulness,

15   completeness, and accuracy of the defendant's cooperation

16   shall be binding insofar as the appropriateness of this

17   office's filing of any such motions is concerned.

18           "Paragraph 10.  The defendant understands and

19   acknowledges that the Court is under no obligation to grant

20   the motions referred to in this agreement should the

21   Government exercise its discretion to file such motions -- to

22   file any such motions.  The defendant also understands and

23   acknowledges that the Court is under no obligation to reduce

24   the defendant's sentence because of the defendant's

25   cooperation.
```

1    "Paragraph 11.  The United States and the defendant

2    agree that, although not binding on the probation office or

3    the Court, they will jointly recommend that the Court make

4    findings and conclusions set forth in this paragraph as to

5    the sentencing guidelines.  The United States and the

6    defendant agree that the applicable section to establish the

7    base offense level is USSG, Section 2E1.1(a)(2) (unlawful

8    conduct relating to racketeering influenced and corrupt

9    organizations) and that the offense level applicable to the

10    underlying racketeering activity is determined by reference

11    to USSG Section 2B1.1 (fraud and deceit) and USSG

12    Section 2S1.1 (money laundering)."

13    Underneath that it states:  Section 2B1.1, fraud

14    and deceit:

15    "A, base offense level, one.  Seven, if, A, the

16    defendant was convicted of an offense referenced to this

17    guideline; and B, that offense conviction has a statutory

18    maximum term of 20 years or more."

19    You see on the right-hand side there's a number

20    seven for base offense level.

21    "B, specific offense characteristics.  A, if the

22    loss exceeded $5,000, increase the offense level as follows:

23    "Loss (apply the greatest).

24    "K, more than $7 million.

25    "Plus 20 in the right-hand column.

1            "9C, the offense otherwise involves sophisticated

2    means, increase by two levels.

3            "Plus two in the right-hand column.  Subtotal 29.

4            "Adjustment, Section 3B1.3, abuse of position of

5    trust.

6            "Plus two in the right-hand column."

7            The top of the next page, total of 31.

8            Then underneath that:

9            "Section 2S1.1, laundering of monetary instruments.

10            "A, base offense level 1.  The offense level for

11    the underlying offense from which the laundered funds were

12    derived.  Right-hand column, No. 31.

13            "B, specific offense characteristics.  Two.  Apply

14    the greatest.  B, if the defendant was convicted under 18 USC

15    Section 1956, increase by two levels.  Plus two in the

16    right-hand column.  Total 33.

17            "Section 2E1.1, unlawful conduct relating to

18    racketeering influenced and corrupt organizations.  A, base

19    offense level.  Two.  The offense level applicable to the

20    underlying racketeering activity.  33 in the right-hand

21    column.

22            "Adjustment Section 3E1.1, acceptance of

23    responsibility.  Minus three.  Total offense level 30.

24            "Overall guideline range:  The applicable guideline

25    range under all of the circumstances of the offense committed

1   by the defendant, assuming a deduction of three levels for

2   acceptance of responsibility and based upon a total offense

3   level of 30 and a criminal history category of one, (zero

4   criminal history points), is a term of imprisonment of 97 to

5   121 months.  The Government and the defendant agree that no

6   other specific offense characteristics or Chapter 3

7   guidelines adjustments are applicable.

8           "Paragraph 12, the Government understands and

9   acknowledges that the defendant may request that the Court

10  impose a term of imprisonment that is less than the

11  recommendation of the Government, and that is less than the

12  advisory sentence suggested by the sentencing guidelines,

13  based upon the factors set forth in Title 18, United States

14  Code, Section 3553.

15          "13, the defendant agrees that he will assist this

16  office in all proceedings, whether administrative or

17  judicial, involving the forfeiture to the United States of

18  all rights, title, and interest, regardless of their nature

19  or form, in all assets, including real and personal property,

20  cash and other monetary instruments, wherever located, which

21  the defendant or others to his knowledge have accumulated as

22  a result of illegal activities.

23          "Such assistance will involve an agreement on the

24  defendant's part to the entry of an order enjoining the

25  transfer or encumbrance of assets that may be identified as

1    being subject to forfeiture, including, but not limited to,

2    those specific real and personal properties set forth in the

3    forfeiture counts of the indictment.  Additionally, the

4    defendant agrees to identify as being subject to forfeiture

5    all such assets, and to assist in the transfer of such

6    property to the United States by delivery to this office upon

7    this office's request, all necessary and appropriate

8    documentation with respect to said assets, including consents

9    to forfeiture, quitclaim deeds, and any and all other

10   documents necessary to deliver good and marketable title to

11   said property.

12          "Paragraph 14, the defendant agrees, in his

13   individual and company member capacity, to voluntarily and

14   immediately forfeit to the United States all of his right,

15   title, and interest in the following assets, which may be

16   applied toward restitution in this case:

17          "A.  The real estate properties at the following

18   addresses:

19          "1.  2801 Gateway Drive, Pompano Beach, Florida.

20          "2.  32100 US Highway 19 North, Palm Harbor,

21   Florida.

22          "3.  3040 Industry Drive, East Hempfield, Lancaster

23   county, Pennsylvania.

24          "4.  111 Windsor Drive, Oak Brook, Illinois.

25          "B.  The following limited liability companies:

1              "KCGF Associates, LLC.

2              "Efficient Realty and Development, LLC (Efficient

3    Realty Florida.)

4              "3.  Westmore Properties, LLC.

5              "4.  Efficient Realty and Development, LLC

6    (Efficient Realty Pennsylvania.), and

7              "5.  Oak Brook Properties, LLC."

8              Then it lists the following accounts which I'm not

9    going to read into the record, but there are a number of

10   accounts, first in the name of KCGF Associates, accounts in

11   the name of Efficient Realty of Florida, an account in the

12   name of Westmore Properties, an account in the name of

13   Efficient Realty of Pennsylvania, an account in the name of

14   Oak Brook Properties, an account in the name of Janie M.

15   Horton and William Larry Horton, and an account in the name

16   of -- another account in the name of Janie M. Horton and

17   William Larry Horton.

18             Your Honor, I need to make some more alterations

19   before I start the next paragraph because it carries over to

20   the next page.

21     (Pause in Proceedings.)

22        MR. SHOCKLEY:  This is where all that time and

23   attention in cut and paste in elementary school paid off,

24   your Honor.

25             I'm going to show this to defense counsel before I

1    proceed, to make sure they're satisfied that our agreement

2    has been met.

3        (Pause in Proceedings.)

4            MR. SHOCKLEY:  With agreement of counsel, your

5    Honor, I'm going to proceed.

6    BY MR. SHOCKLEY:

7    Q    "Paragraph 15, the defendant acknowledges that during

8    the course of the conspiracy that he used a portion of the

9    fraud proceeds obtained from the victim of Count 1, ADT

10   Security Services, Inc. (ADT), to make payments on a first

11   mortgage loan on his residence located at 6547 Northwest 104

12   Terrace, Parkland, Florida, which residence is jointly owned

13   by the defendant and his wife.  The defendant agrees to use

14   sufficient funds from his IRA accounts at Fidelity

15   Investments, in an account number, and/or at Edward Jones, in

16   an account number, hereinafter, the IRA accounts, to repay

17   ADT the amount of fraud proceeds that were used to make

18   payments on his residential mortgage.

19           "The Government agrees that after the defendant

20   provides these funds to ADT, his residence at 6547 Northwest

21   104 Terrace, Parkland, Florida, and the aforementioned IRA

22   accounts will be exempt from any further collection action in

23   this case.

24           "No. 16, the defendant knowingly and voluntarily

25   agrees to waive any claim or defense he may have under the

 1   Eighth Amendment of the United States Constitution, including

 2   any claim of excessive fine or penalty with respect to the

 3   forfeited assets.

 4          "No. 17, the defendant is aware that Title 18,

 5   United States Code, section 3742, affords the defendant the

 6   right to appeal the sentence imposed in this case.

 7          "Acknowledging this, in exchange for the

 8   undertakings made by the United States in this plea

 9   agreement, the defendant hereby waives all rights conferred

10   by Section 3742 to appeal any sentence imposed, including any

11   restitution order, or to appeal the manner in which the

12   sentence was imposed, unless the sentence exceeds the maximum

13   permitted by statute or is the result of an upward departure

14   and/or an upward variance from the guideline range

15   recommended by the parties in Paragraph 11 of this plea

16   agreement.

17          "The defendant further understands that nothing in

18   this plea agreement shall affect the Government's right and

19   or duty to appeal, as set forth in Title 18, United States

20   Code, Section 3742(b).  However, if the United States appeals

21   the defendant's sentence pursuant to Section 3742(b), the

22   defendant shall be released from the above waiver of

23   appellate rights.

24          "By signing this plea agreement, the defendant

25   acknowledges that he has discussed the appeal waiver set

1    forth in this plea agreement with his attorney.  The

2    defendant further agrees, together with the United States, to

3    request that the Court enter a specific finding that the

4    defendant's waiver of his right to appeal the sentence be

5    imposed -- to be imposed in this case was knowing and

6    voluntary.

7           "No. 18, the defendant is aware that the sentence

8    has not yet been determined by the Court.  The defendant also

9    is aware that any estimate of the sentencing range or

10   sentence that the defendant may receive, whether that

11   estimate comes from the defendant's attorney, the Government,

12   or the probation office, is a prediction, not a promise, and

13   is not binding on the Government, the probation office, or

14   the Court.

15          "The defendant understands further that any

16   recommendation that the Government makes to the Court as to

17   sentencing, whether pursuant to this plea agreement or

18   otherwise, is not binding on the Court and that the Court may

19   disregard the recommendation in its entirety.  The defendant

20   understands and acknowledges that he may not withdraw his

21   guilty plea based upon the Court's decision not to accept a

22   sentencing recommendation made by the defendant, the

23   Government, or a recommendation made jointly by both the

24   defendant and the Government.

25          "No. 19, the defendant agrees that if he

1    intentionally breaches any material term of this plea

2    agreement, the Government is no longer bound by the terms of

3    this plea agreement and may seek the maximum sentence

4    provided by statute, and that such action by the Government

5    is not a basis for permitting the defendant to withdraw his

6    guilty plea.

7         "The last page, Paragraph 29, this is the entire

8    agreement and understanding between the United States and the

9    defendant.  There are no other agreements, promises,

10   representations, or understandings."

11        It bears the signatures of J. Brian McCormick,

12   William T. Shockley, Scott A. Srebnick, who is your attorney.

13        Is that correct, Mr. Horton?

14   A    That's correct.

15   Q    And your own signature at the very bottom as the

16   defendant; is that correct?

17   A    That's correct.

18        MR. PASANO:  Judge, we request a cautionary

19   instruction, if the Court is so inclined.

20        THE COURT:  Ladies and gentlemen, as I will inform

21   you at the end of the case, the fact that a witness has pled

22   guilty to the crime charged in the indictment is not evidence

23   in and of itself of the guilt of any other person.

24   BY MR. SHOCKLEY:

25   Q    Okay.  Now, Mr. Horton, this plea agreement, do you have

 1    any agreements other than what's in this plea agreement?

 2    A    I do not.

 3    Q    Is it pursuant to this plea agreement that you came

 4    before the Court today to testify and yesterday, of course?

 5    A    I'm sorry?

 6    Q    Was it pursuant to the terms of this plea agreement that

 7    you came before the Court yesterday and today to testify?

 8    A    Yes.

 9    Q    Do you have a sentencing date, a date that sentence will

10    be imposed upon you?

11    A    I do.

12    Q    And the sentence is going to be imposed by what member

13    of the Court?

14    A    Judge Middlebrooks.

15    Q    And for the record, he is the presiding judge in this

16    very trial; is that correct?

17    A    Yes.

18    Q    Now, pursuant to this plea agreement, it refers to Count

19    1 of the indictment.  Now, this was the first indictment that

20    was filed in this case; is that correct?

21    A    Yes.

22    Q    This is not the superseding indictment that we are on

23    trial in this particular case; is that correct?

24    A    That's correct.

25    Q    Pursuant to this plea agreement, did you have occasion

1  to sit down and speak with Assistant United States Attorney

2  Brian McCormick, who is seated behind me and myself?

3  A    I did.

4  Q    Did you have occasion to review many of the documents

5  that you have provided before or identified before the Court

6  today?

7  A    Hundreds.

8  Q    And did you also provide those documents that you

9  previously identified in the Government Exhibit 28 series of

10  exhibits that you had printed off your laptop computer and

11  provided to the Government?

12  A    I did.

13  Q    Did there come some point in time, sir, when I asked you

14  questions about the various counts of the indictment?

15  A    Yes.

16  Q    And did there come some point in time when you were

17  questioned concerning various financial transactions that you

18  engaged in pursuant to the scheme to defraud ADT and in

19  violation of the RICO statute?

20  A    Yes.

21  Q    I'm going to ask you a series of questions concerning

22  specific transactions, financial transactions.

23        You indicated that at some point in time you opened

24  a bank account under the name of KCGF; is that correct?

25  A    Yes.

1    Q    And the purpose of opening a bank account was to do what

2    under the name KCGF?

3    A    That was the company that was established by myself and

4    my wife.

5    Q    Showing you now Government's Exhibit No. 18.24 bearing

6    Bates label WB-4276 to WB4402.

7         Did we have occasion to go over some exhibits from

8    your bank account that was opened under the name of KCGF

9    Associates?

10   A    Yes.

11   Q    Showing you now Government's Exhibit No. 18.24.

12        MR. SHOCKLEY:  This has been previously admitted,

13   your Honor, by stipulation.  Subject to objections --

14        MR. MARKUS:  No objection.

15        MR. SHOCKLEY:  -- of relevance.

16        THE COURT:  So there is no objection to 18.24?

17        MR. MARKUS:  No objection.

18        THE COURT:  18.24 is admitted.

19     (Received in evidence Government's Exhibit(s) 1824.)

20        MR. SHOCKLEY:  18.25 now, your Honor.

21        THE COURT:  I think that was already in.

22        MR. MARKUS:  That's already in.

23        MR. SHOCKLEY:  And 18.26.  That should already be

24   in.

25        THE COURT:  Not yet.  Is there an objection to

```
 1    18.26?

 2              MR. PASANO:  No objection.

 3              THE COURT:  18.26 is in, is admitted then.

 4         (Received in evidence Government's Exhibit(s) 18.26.)

 5    BY MR. SHOCKLEY:

 6    Q    Showing you from 18.24 bearing Bates label 4278, is this

 7    a deposit account application bearing your name and the name

 8    of your wife Janie M. Horton at First Union Bank?

 9    A    It is.

10    Q    And that account eventually -- or that bank was

11    eventually taken over by Wachovia; is that correct?

12    A    That's correct.

13    Q    And the Bates labels for this series of exhibits bear

14    "WB," for Wachovia Bank, and then dash and then a series of

15    numbers; is that correct?

16    A    That's correct.

17    Q    The date that this account was opened, does that appear

18    to be March the 21st of 2002?

19    A    That's correct.

20    Q    It's opened in the name of KCGF Associates, LLC, with an

21    address that is not your own; is that correct?

22    A    6547 Northwest 104th Terrace.

23    Q    Oh, that is the address?

24    A    That is my address.  Right.

25    Q    Okay.  What was the other number that was --
```

1    A    194.

2    Q    Ah.  So this is accurate?

3    A    This is correct.

4    Q    Okay.  As a matter of fact, under KCGF Associates, LLC,

5    it says Tax ID number applied for, date of birth, 3/18/2002.

6    That's the date of birth of the formation of that company; is

7    that correct?

8    A    Yes.

9    Q    Showing you now Government's Exhibit 18.24 bearing Bates

10   label WB-4406.

11          MR. SHOCKLEY:  Your Honor, I believe that's in the

12   next series, Government's Exhibit 18.25, bearing Bates label

13   WB-4406.

14   BY MR. SHOCKLEY:

15   Q    Does this appear to be the initial check that was

16   deposited in that account back on, or at least the check is

17   drawn effective 3/19/02?

18   A    Yes.

19   Q    Drawn on the account of J & G Associates, LLC?

20   A    Yes.

21   Q    And payable to KCGF Associates, LLC?

22   A    Yes.

23   Q    For $16,054.68; is that correct?

24   A    That's correct.

25   Q    And the signature on the check appears to be that of

 1   whom?

 2   A    Gregory Orr.

 3   Q    And directing your attention to the Bates label WB-4401,

 4   Government's Exhibit 18.24, the first statement.  It shows an

 5   opening balance on 3/22.  This is actually the year 2002; is

 6   that correct?

 7   A    That's correct.

 8   Q    An opening balance of zero and then deposits and other

 9   credits, $16,054.68.  That was the initial check deposited

10   into that account; is that correct?

11   A    That's correct.

12   Q    Sir, did I have occasion to review with you various

13   accounts of a superseding indictment?

14   A    Yes.

15   Q    Directing your attention now to Government's Exhibit

16   SI-28.

17          MR. SHOCKLEY:  Your Honor, which is at the very end

18   of the exhibit list.  Your Honor, I'm going to review with

19   the witness a series of exhibits that I can draw defense

20   counsel's attention to now:  SI-28, SI-29, SI-31, SI-34,

21   SI-36, SI-37, SI-38, SI-39, SI-40, SI-41.

22          Your Honor, these are all composite exhibits drawn

23   from Government's Exhibit No. 18.24, Government's

24   Exhibit 18.25, and Government's Exhibit 18.26.

25          At this time we would offer into evidence all of

1    those exhibits that I just offered into evidence which have

2    previously been admitted.  These are just photocopies broken

3    down by groups.

4              MR. MARKUS:  I think they're in under 18.24, 25 and

5    26, your Honor.

6              THE COURT:  Is there an objection to this?

7              MR. MARKUS:  There is no objection.

8              THE COURT:  All right.  Those just named SI

9    numbers, 28, 29, 31, 34, 36, 37, 38, 39, 40, and 41 are

10   admitted.

11      (Received in evidence Government's Exhibit(s) SI-28, 29,

12   31, 34, 36, 37, 38, 39, 40, and 41.)

13   BY MR. SHOCKLEY:

14   Q    In each of those exhibits do they relate to certain

15   financial transactions that were entered into based on

16   deposits of checks from either GJO Associates, LLC, or J & G

17   Associates, LLC, into the account of KCGF Associates, LLC?

18   A    Yes.

19   Q    And all of these deposits into the KCGF account, were

20   these proceeds of what you had obtained pursuant to the

21   illegal agreement you had to rip off or steal money and

22   property from ADT and its stockholders?

23             MR. MARKUS:  Objection, Judge.

24             THE COURT:  Basis?

25             MR. MARKUS:  Leading and argumentative.

```
 1              THE COURT:  Overruled.

 2   BY MR. SHOCKLEY:

 3   Q     You may answer.

 4   A     Yes.

 5   Q     And you indicated earlier in your testimony that KCGF --

 6   that -- when it was set up, did you or did you not intend

 7   that your name be publicly associated with that company?

 8   A     I did not.

 9   Q     And was that with the intent to conceal the payments

10   that you would receive from GJO Associates, LLC, and J & G

11   Associates, LLC?

12   A     Yes.

13         (Pause in Proceedings.)

14   BY MR. SHOCKLEY:

15   Q     These payments that were received by you through J & G

16   and GJO, did they continue after you were fired from your

17   job?

18   A     Yes, they did.

19   Q     Directing your attention now back to August -- excuse

20   me, April the 25th of 2006.  Were you summoned to the office

21   of David Bleish, deputy general counsel Tyco, and Ed McDunna

22   (phonetic), director of Global Security for Tyco, for an

23   interview?

24   A     Yes, I was.

25   Q     Were you questioned about various real estate
```

1  transactions relating to this case?

2  A    I was.

3  Q    Did you refuse to answer their questions?

4  A    Some of the questions, yes.

5  Q    Did you indicate that you had an attorney that

6  represented you?

7  A    I did.

8  Q    Were you suspended from your job at that time?

9  A    I was.

10 Q    Shortly thereafter were you terminated from employment

11 from ADT?

12 A    I was.

13        MR. SHOCKLEY:  Your Honor, I have no other

14 questions.

15        THE COURT:  All right.  Thank you.

16        Cross-examination.

17        MR. MARKUS:  Thank you, your Honor.

18        Happy Friday afternoon, ladies and gentlemen.

19                    CROSS-EXAMINATION

20 BY MR. MARKUS:

21 Q    Mr. Horton, are you an honest person?

22 A    Yes and no.

23 Q    The answer is, no, you're not, are you?

24 A    Everybody wants to think they are.

25 Q    You used to think you were, but you're really not an

1    honest person, are you, sir?

2    A    In these transactions, that's correct.

3    Q    And more than that.  I mean, you're a convicted felon

4    now, right?

5    A    Yes.

6    Q    You're a fraudster?

7    A    Yes.

8    Q    You're a racketeer?

9    A    Yes.

10   Q    And I think we heard that you were interviewed by the

11   FBI back in '06, the FBI agent back there?

12   A    That's correct.

13   Q    You lied to him?

14   A    Yes.

15   Q    Numerous times?

16   A    Twice.

17   Q    Only two lies to him?

18   A    Yes.  I believe.

19   Q    You told him you never had done a real estate deal with

20   Greg Orr, correct?

21   A    I said I had done no business dealings with Greg Orr.

22   Q    That was a lie?

23   A    Correct.

24   Q    You said you had never met Vinnie and Johnny.  That was

25   a lie?

1    A    He didn't ask me if I had met.

2    Q    What did he ask you?

3    A    If I knew John and Vinnie Artuso.  And the last name I

4    did not know.

5    Q    So you said no?

6    A    I said no.

7    Q    Okay.  And that was not true?

8    A    At that time it was correct.  I did not remember

9    Artuso's last name.

10    Q    Okay.  They asked you about meeting Greg and talking to

11    Greg and other -- things other than parties; is that correct?

12    A    I said no, and that was not true.

13    Q    That was a lie?

14    A    That was, too.

15    Q    Right.  And I think you told this jury that you didn't

16    talk to your wife about it, correct?

17    A    I said I told her as little as possible.

18    Q    What did you tell her about it specifically, sir?

19    A    Related to what, David?

20    Q    About the interview.  I'm going to call you Mr. Horton.

21    Why don't you call me Mr. Markus for today.

22    A    Mr. Markus.  I apologize.

23    Q    Okay.  Did you speak to her about what the FBI agents

24    had asked you?

25    A    I spoke to her in terms of the questions that I could

1    remember.

2    Q    So when you told this jury that you spoke to her as

3    little as possible, you actually had a full conversation with

4    your wife about the questions that the FBI agents asked you

5    and the answers that you gave, correct?

6    A    No.  I said I talked to her as little as possible.  I

7    discussed, as best as I can remember, because she was wanting

8    to know what was going on.

9    Q    Okay.

10   A    It was not a full discussion.

11   Q    You told her, did you not, the questions that the FBI

12   agents had asked and the answers that you gave?

13   A    I was there talking to my wife.  I know what I said to

14   my wife; and I told her very little.  And I discussed some of

15   the questions with her.

16   Q    How long was the conversation with your wife?

17   A    It wasn't no more than two or three minutes.

18            MR. MARKUS:  Your Honor, may I approach?

19            THE COURT:  Yes.

20   BY MR. MARKUS:

21   Q    Mr. Horton, I'm going to show you a document that I'm

22   going to mark Defense Exhibit 1.  Do you recognize that

23   document?

24   A    It is.

25   Q    How do you recognize it?

1    A    It's my conversation with the FBI agent.

2    Q    Whose handwriting is that?

3    A    That's mine.

4    Q    This is an interview of -- your summary of an interview

5    with the FBI and yourself, correct?

6    A    That's correct.

7    Q    And you went over this with your wife that night?

8    A    We were talking this morning.  Now you're moving till

9    tonight.

10    Q    No, no, no.

11    A    You said, you had a full discussion with her that

12    morning.

13    Q    Sir, that very day, you went over the questions and

14    answers with your wife that the FBI asked you, did you not?

15    A    Later.

16    Q    That very day?

17    A    Later that day, correct.

18    Q    Okay.  So now your testimony is in the morning you told

19    her a little bit, and then later that day you told her

20    everything?

21         MR. SHOCKLEY:  Objection.  Mischaracterizes the

22    answer.

23         THE COURT:  Well, overruled.  Let the witness

24    answer.

25         THE WITNESS:  I indicated I tried to tell my wife

1  as little as possible that morning about the FBI coming to

2  the house.

3  BY MR. MARKUS:

4  Q    Okay.  And then, when did you write this with your wife?

5  A    I didn't write it with my wife.  I wrote it myself.

6  Q    And when did you review it with your wife?

7  A    Later that evening.

8  Q    Okay.  So --

9         MR. MARKUS:  Judge, I move to admit Defense Exhibit

10  1.

11         THE COURT:  Is there objection?

12         MR. SHOCKLEY:  Relevance, your Honor -- no.

13  Withdraw the objection.  No objection.

14         THE COURT:  All right.  One -- Defense 1 is

15  admitted.

16     (Received in evidence Defendant Gregory Orr Exhibit(s)

17  1.)

18  BY MR. MARKUS:

19  Q    By the way, did you ever show this to the prosecutors?

20  A    Yes.

21         THE COURT:  And I need an exhibit list from you.

22         MR. MARKUS:  I don't have an exhibit list, Judge.

23  This is -- I can prepare it over the weekend.

24         THE COURT:  All right.  Thank you.

25

```
1    BY MR. MARKUS:

2    Q    When did you write this summary out, sir?

3    A    Later that day.

4    Q    And just so that we're clear, this summary that you

5    wrote out later that day, that evening you went over this

6    summary with your wife?

7    A    I went over most all the questions with my wife.

8    Q    Okay.  Because I can imagine she was upset that the FBI

9    had shown up at your house, correct?

10   A    She was.

11   Q    All right.  And so when you got home that evening, I

12   assume that she had a lot of questions for you?

13   A    She had questions, yes.

14   Q    And so you told her the answers to those questions,

15   right?

16   A    I told her as best I could some of the answers to her

17   questions.

18   Q    And at this point she must realize that you've lied to

19   the FBI, right?

20   A    I don't know what she's thinking right now.

21   Q    By the way, on the very bottom of this page --

22   A    I can't see it.

23   Q    I'm going to zoom in for you.  Do you see where it says,

24   "not sure what direction they are coming -- they are coming

25   from"?
```

1    A    I can't read it.

2    Q    That's your handwriting, isn't it?

3    A    I can't -- this is related to questions I felt like I

4    should have asked them.

5    Q    And the very last thing you wrote on there says, "not

6    sure what direction they are coming from"?

7    A    Correct.

8    Q    Referring to -- "they" is referring to the FBI?

9    A    That's correct.

10    Q    So you didn't understand why they would be questioning

11    you about these real estate deals?

12    A    They, at that time didn't mention real estate deals.

13    Q    You didn't understand why they would be questioning

14    about doing business with Greg Orr?

15    A    Not at that time.

16    Q    It didn't come up in your head?

17    A    They talked about the telemarketing operation.  They

18    talked about various things.

19    Q    And the real estate deal didn't come into your head?

20    A    Not at that time.

21    Q    No.  By the way, in the original indictment you were

22    charged with lying to the FBI agent, correct?

23    A    That's correct.

24    Q    Count 42 of that indictment charged you with lying; yes?

25    A    That's just what you went over, those two lies, lies

1  that I told the FBI.

2  Q    And these prosecutors charged you in Count 42 in the

3  first indictment with making those lies?

4  A    Yes.

5  Q    And that count, Count 42, had a ten-year maximum penalty

6  for lying, correct?

7  A    I don't know that it had a ten-year.

8  Q    Well, you do know they dropped it, right?

9  A    I do know that.

10  Q    Even though you lied to an FBI agent, they dropped the

11  count, right?

12  A    I was advised by my attorney that I pleaded to the most

13  serious offense, and that that offense didn't really matter

14  at that point.

15  Q    Didn't matter.  So lying to the FBI doesn't matter?

16  A    I'm just going by what my attorney told me in the plea

17  bargain.

18  Q    By the way, you have another attorney here, right,

19  Ms. van Dusen, another fine criminal defense lawyer?

20  A    I do.

21  Q    She's been here the whole time you've been testifying?

22  A    She has.

23  Q    And they didn't just drop Count 42, they dropped 40

24  counts in the indictment, Counts 2 through 42, correct?

25  A    Correct.

1    Q    That's what -- that's the deal that your fine attorneys

2    struck with these prosecutors, correct?

3    A    Correct.

4    Q    Forty counts gone for getting up on the witness stand

5    today and yesterday, right?  That's part of the deal?

6    A    It was part of the plea bargain.

7    Q    You testify, they drop 40 counts, right?  That's part of

8    the plea bargain?

9    A    Part of it.

10    Q    Including lying to the FBI agent who's here with you?

11    A    They dropped that count.

12    Q    Right.  How many times have you met with the prosecutors

13    and Mr. Hopewell, the agent, to prepare for today?

14    A    Eleven times.

15    Q    Eleven times.  How many hours have you spent with them?

16    A    I don't know the total hours.

17    Q    Each time a couple hours at least, I assume?

18    A    At least.

19    Q    Sometimes a whole day with them?

20    A    Occasionally.

21    Q    At least 50 hours, would you say?

22    A    It could have been more.

23    Q    In addition to lying to the FBI, we've heard about lies

24    to your bosses, correct, to ADT?

25    A    That's correct.

1   Q    Okay.  Let's start with the very first exhibit we saw,

2   Government's Exhibit 1.1.  This is your employment

3   application when you were coming back to ADT.  Do you

4   remember that application?

5   A    At which point?  I came back twice.

6   Q    All right.  Let's just look at it.  Do you remember this

7   new employee data record?

8   A    Yes.

9   Q    Okay.  And this is the form you filled out when you were

10  coming back to ADT?

11  A    Correct.

12  Q    Okay.  You remember you had left ADT, they gave you this

13  generous 18-month severance package, right?

14  A    Correct.

15  Q    You were going to get paid for 18 months?

16  A    Correct.

17  Q    You just had to do one thing, right?

18  A    Uh-huh.

19  Q    Which is that one thing?  Not work for anybody else,

20  right?

21  A    Correct.

22  Q    No other security company?

23  A    Correct.

24  Q    And within three months, what do you do?  You're back at

25  a security company, a competitor, SecurityLink, right?

1    A    They stopped the benefits.

2    Q    Okay.  But they asked you not to work for a competitor,

3    and within three months you were with a competitor, correct?

4    A    But the agreement with that severance was if I went to

5    work for a competitor, it stopped.  If I would have went to

6    work for any other, it would have continued on.  I would have

7    got paid twice.

8    Q    But you decided to go work for a competitor?

9    A    That's where I had been working for 20 years.

10   Q    Right.  And when you went back to ADT, they asked you to

11   fill out the dates you had been there, right --

12   A    Correct.

13   Q    -- on the personal data?

14            9/1/80 to 6/12/97, right?

15   A    Correct.

16   Q    That wasn't correct, was it?

17   A    Can we back it up?  Let me see that again.

18   Q    Have you ever been employed here before?  Yes.  And then

19   the dates, September 1, 1980, to June 12, '97.  That was not

20   correct, was it?

21   A    I believe I left in February.

22   Q    But you put June there because you didn't want to lose

23   your pension payments and your 401K plan; isn't that true,

24   Mr. Horton?

25   A    No.  My pension plan was already vested, and my 401 --

1    there's no affect on my 401 leaving.

2    Q    So you lied on there because you wanted to show that you

3    had come back within six months of leaving, correct?

4    A    I -- no.

5    Q    You just lied because you wanted to lie?

6    A    There was no lie there.

7    Q    Well, whoa.  On here you wrote you were there from

8    June -- you were there until June 12th, '97, and you just

9    told the jury that you were actually there until February.

10   A    We would have to go back and look at ADT and see when my

11   last payment was received.  It may have been ending May.

12   Q    Not June 12, 1997?  That was incorrect, what you wrote

13   on that form?

14   A    That was incorrect.

15   Q    And after that, you hid many things from ADT, correct?

16   You didn't tell them about your end of the deals?

17   A    That's correct.

18   Q    You were the one who had a fiduciary duty to ADT,

19   correct?

20   A    That's correct.

21   Q    Now, a fiduciary duty means a duty of loyalty.  Since

22   you were the employee there and you had worked your way up,

23   you had a duty to your bosses and to your employer, correct?

24   A    Correct.

25   Q    In fact, they took that so important that they made you

1    sign forms every year saying that you had a duty to ADT,

2    correct?

3    A    Correct.

4    Q    Now, you signed that, right?

5    A    I did.

6    Q    Greg Orr didn't sign those forms, right?

7    A    No.

8    Q    Greg Orr didn't have any duty to ADT, right?

9    A    Not to my knowledge.

10   Q    Well, you know he didn't work there, right?

11   A    No.

12   Q    He had no fiduciary duty or any duty to ADT?

13   A    No.

14   Q    You were the one?

15   A    Correct.

16   Q    You were the one who broke your duty to ADT?

17   A    That's correct.

18   Q    You were the one who signed those things about ethics

19   and everything else, and broke them, right?

20   A    Every year.

21   Q    And violated them?

22   A    Every year.

23   Q    Not Greg Orr, right?

24   A    No.

25   Q    Let's talk about this time period.  You also lied to

1   your wife, correct?

2   A    About?

3   Q    About what you were doing.

4   A    Could you expand?

5   Q    Did you tell her where this money was coming from?

6   A    Real estate transactions.

7   Q    You didn't tell her the whole story, did you?

8   A    What part, sir?

9   Q    Well, you know what I'm talking about, don't you?

10  A    I'm asking.

11  Q    Did you tell your wife the whole story about these real

12  estate transactions?

13  A    What part?

14  Q    Did you tell her that you were on the buy and the sell

15  side of ADT deals?

16  A    No, I did not.

17  Q    So, so far we have you lying to the FBI, lying to your

18  boss, and lying to your wife, right?  You agree with me on

19  those?

20  A    That's correct.

21  Q    All right.  You also lied to the pretrial services

22  officer when you were arrested, correct?

23  A    No, I think that's in the statement.

24  Q    Okay.  Let's talk about this.  When you're first

25  arrested, they put you in handcuffs, right?

```
 1   A     Yes.

 2   Q     They take you to jail?

 3   A     Yes.

 4   Q     You make a first appearance in a courtroom very much

 5   like this one?

 6   A     Right.

 7   Q     On the fourth floor?

 8   A     Okay.

 9   Q     Right?

10   A     Yes.

11   Q     They bring you in handcuffs, right?

12   A     Yes.

13   Q     And you have to come before a judge and ask for a bond,

14   right?

15   A     Correct.

16   Q     Before you asked for that bond the judge sends somebody

17   called the pretrial officer to interview you about your

18   background and your finances and your history, correct?

19   A     Right.

20   Q     Do you remember that interview?

21   A     Briefly.

22   Q     And you spoke to the pretrial officer about your

23   finances, did you not?

24   A     I think I was asked some questions about my finances,

25   yes.
```

1    Q    You lied to that pretrial officer, didn't you?

2    A    No, I didn't.

3              MR. MARKUS:  Page 6, counsel, of the bond hearing.

4    BY MR. MARKUS:

5    Q    Do you remember at your bond hearing this prosecutor,

6    Mr. McCormick, saying, one disturbing fact is that Mr. Horton

7    continued his false statements to the Government when he

8    spoke to the pretrial services officer.  He indicated since

9    his discharge in May of '06, he has been living off of his

10   savings.  You can tell by looking at the schematic that

11   Mr. Horton has gotten 30 percent of all the overages going

12   through the various LLCs since 2002 carrying up to the date

13   of the indictment.  That's a false statement.

14             That's what this prosecutor was saying about you

15   talking to the pretrial services officer.  Do you remember

16   that?

17   A    If you'll read the rest of the statement from my

18   attorney, then you'll see the complete statement.

19   Q    So he got it wrong?

20   A    Yes.

21   Q    Mr. McCormick got it wrong when he called you a liar?

22   A    If you'll read the last of the statement of Scott

23   Srebnick, you'll see the final answer.

24   Q    Mr. Horton, what you're saying is Mr. Srebnick argued

25   with Mr. McCormick, correct, about whether you were lying or

1    not?  He gave another argument?

2    A    He did.

3    Q    Okay.  But the argument of this prosecutor was that you

4    were lying?

5    A    The argument, as you state, that I was lying.

6    Q    Okay.  And what you're arguing now is -- and what

7    Mr. Srebnick argued is that he made a mistake?

8    A    That there was a misunderstanding.

9    Q    So sometimes this prosecutor makes mistakes on what he

10   says?

11   A    A misunderstanding.

12   Q    Okay.  Another thing that Mr. McCormick said at that

13   bond hearing --

14        MR. SHOCKLEY:  Objection to what Mr. McCormick

15   said.

16        MR. MARKUS:  Well, let me ask it this way, Mr.

17   Horton.

18   BY MR. MARKUS:

19   Q    Are you the architect of this case?

20   A    I would say coconspirator.

21   Q    Okay.  My question to you -- and let me be very specific

22   with my words.  Mr. Horton is the architect.  There is no

23   doubt about it.  Do you agree or disagree with that?

24   A    I'm not sure I understand the word "architect."

25   Q    How about leader?  The one who dreamt this up?

```
 1              MR. SHOCKLEY:  Objection to the definition of

 2    "architect."  I have a different definition.

 3              THE COURT:  I think he has changed topics now.  Are

 4    we still on "architect" or are we on something else now?

 5              MR. MARKUS:  I'll move on, your Honor.

 6    BY MR. MARKUS:

 7    Q    Despite being the person who came up with this,

 8    Mr. Horton, the prosecutors decided to cut you a break,

 9    correct?

10    A    I made a plea deal.  Eight years and one month, and ten

11    years and one month.

12    Q    You struck a deal with who?

13    A    With the prosecutors.

14    Q    Okay.  You entered into a contract with them, right?

15    A    Yes.

16    Q    The maximum you could get on that first count -- putting

17    aside the other 40 that they dismissed, the maximum sentence

18    you could get on the first count is 20 years in prison,

19    correct?

20    A    That's my understanding.

21    Q    Okay.  And I think you just said you cut a deal for a

22    sentence of between eight and ten years, correct?

23    A    Eight year one month, ten year one month.

24    Q    Right.  But you're hoping to get much less than that,

25    aren't you?
```

```
 1    A    I hope so.

 2    Q    Right.  Because -- let's rewind a second.  When you were

 3    first arrested in this case, it took about a week to get out

 4    on bond, right?

 5    A    Yes.

 6    Q    During that week you were in jail?

 7    A    Correct.

 8    Q    Slept in a very small room, right?

 9    A    Big room.

10    Q    With lots of people?

11    A    Lots of people.

12    Q    Other criminals?

13    A    There was other people in there.

14    Q    It was cold in that room, wasn't it?

15    A    Big and cold.

16    Q    Yeah.  You didn't like it too much?

17    A    No, sir.

18    Q    The food was terrible, wasn't it?

19    A    It was very good.

20    Q    Good food?

21    A    Oh, absolutely.

22    Q    Are you being sarcastic now?

23    A    I am.

24    Q    I can't tell.  It was terrible food, right?

25    A    It was -- it was flavored, yes.
```

237

1    Q    You had to take a shower in front of other people, did

2    you not?

3    A    If you got up early in the morning, you didn't.

4    Q    You had to go to the bathroom in front of other people?

5    A    Again, if you got up early in the morning, you didn't.

6    But normally, yes.

7    Q    It was one of the worst weeks of your life?

8    A    I don't know that it was the worst week of my life, but

9    it was pretty bad.

10   Q    You certainly don't want to go back to a place like that

11   for eight to ten years, right?

12   A    I don't think anybody wants to go anywhere for eight to

13   ten years.

14   Q    Right.  And as part of your deal today you're hoping

15   that by getting up on that stand, the prosecutors are going

16   to do something very special for you, right?

17   A    They're not obligated to do anything.

18   Q    Listen to my question, Mr. Horton.  You're hoping that

19   they're going to do something very special for you, right?

20   A    Absolutely.

21   Q    And that something special is filing a motion for you,

22   correct?

23   A    That's correct.

24   Q    Filing a motion with this judge, right?

25   A    That's correct.

1    Q     To reduce your sentence?

2    A     That's correct.

3    Q     And once they file that motion to reduce your sentence,

4    the judge can go all the way down to zero, can't he?

5    A     The judge can do that, and certainly, the judge is going

6    to listen to my testimony in front of him, along with the

7    people in this courtroom.  And that final day is just going

8    to be based on his interpretation of did I tell the truth.

9    Q     But before he --

10   A     And the whole objective here is to tell the truth.

11   That's my only goal, sitting here today, sir.

12   Q     Your only goal is to tell the truth.  You're not hoping

13   to get out of jail, let alone early.  Is that what you're

14   telling the jury?

15   A     I'm saying my whole goal here is to tell the truth

16   and -- and hope that my sentence is reduced.

17   Q     Let's back up, because this is important.

18   A     Yes, sir.

19   Q     You want to get out of jail earlier?  Tell this jury

20   about that.  You want to get out of jail earlier, correct, or

21   not?

22   A     I would like to spend as least amount of time in jail.

23   Q     Okay.  We agree on that; yes?

24   A     Yes.

25   Q     All right.  The only way to get under those eight to ten

1    years is if they file a motion, correct?

2    A    That's my understanding.

3    Q    Okay.  So you're hopeful that by getting on the stand

4    yesterday and today and by meeting for maybe over 50 hours,

5    11 times, that they're going to file this motion, correct?

6    A    I don't know that they're going file any motion.

7    Q    I didn't ask that, Mr. Horton.  You don't need to fight

8    with me.

9    A    I'm not.  I'm just answering your question as best I

10   can.  I don't know.

11   Q    My only question is, that's what you're hoping for?

12   A    I'm absolutely hoping for less time in jail.

13   Q    You don't want to go back to that cold room where you

14   had to shower in front of people, go to the bathroom in front

15   of people, and eat that flavored food, right?

16   A    It was pretty bad.  Yes, sir.

17   Q    And I think when the FBI first knocked on your door, you

18   lied to them because you got a little nervous.  That was your

19   testimony, correct?

20   A    I --

21   Q    Back in '06?

22   A    '06.

23   Q    Yes.  You were willing to lie because you were a little

24   nervous, right?

25   A    I didn't want ADT to find out about --

1    Q    Oh, no.  No, no, no, no, no.  That's not what you said a

2    couple minutes ago.  You said the real estate deals didn't

3    pop up in your head.  Do you remember that?

4    A    No, no, I said ADT.  I just said ADT to find out about

5    this.

6    Q    You said a couple minutes ago that when the FBI knocked

7    on your door, the real estate deals did not pop in your head.

8    A    It wasn't real estate.  I said I didn't want ADT to find

9    out about this.

10   Q    Find out about what, Mr. Horton?

11   A    FBI being at my door.

12   Q    About what?

13   A    Just being at my door.

14   Q    So you didn't want -- you were willing to lie to protect

15   your job because of ADT, correct?

16   A    Correct.

17   Q    That was your lies to the FBI.  You were willing to lie

18   to ADT to make a couple extra bucks, right?

19   A    I did.

20   Q    Okay.  And you're willing to lie to get out of jail a

21   little earlier, aren't you, sir?

22   A    No.

23   Q    So you were willing to lie for money, you were willing

24   to lie for your job, you were willing to lie for nerves, but

25   now what you're telling this jury is you're not willing to

```
 1    lie for your liberty.  That's your testimony?
 2    A    If we could go back to that --
 3    Q    Answer my question first, sir.
 4    A    I'm not willing to lie.  My agreement was to come in
 5    here and tell the truth.
 6    Q    I know what your agreement says, sir.
 7    A    And that's what I'm doing.
 8    Q    Let's start at the beginning of this case.  Okay?
 9    A    Uh-huh.
10    Q    You met Greg Orr as your neighbor, right?
11    A    Correct.
12    Q    You became friendly with him?
13    A    Yes.
14    Q    You knew him as a business person?
15    A    Yes.
16    Q    Your wives became friends?
17    A    Yes.
18    Q    And this whole case started with you knocking on his
19    door to ask about real estate transactions, right?
20    A    It started at first at one of his social functions.
21    Q    You asked him?
22    A    If he would have an interest.
23    Q    Right.
24    A    In purchasing real estate from ADT.
25    Q    Greg didn't come to you about this, right?
```

 1    A    No.

 2    Q    You were the one who dreamt this up?

 3    A    I'm the one that went to Greg, correct.

 4    Q    And dreamt this up?

 5    A    I'm the one that went to Greg.

 6    Q    And came up with this?

 7    A    About, would he want to buy real estate from ADT.

 8    Q    Right.  And I think you mentioned that at that point

 9    Greg had some questions for you, right?  Do you remember

10    saying that, or no?

11    A    I don't know which part.

12    Q    When you asked Greg about real estate, he had some

13    questions for you, correct?

14    A    Go ahead.  I'm --

15    Q    You don't remember that?

16    A    I'm trying to.  I --

17    Q    You didn't seem to have any problem remembering when the

18    prosecutors asked you questions.  Is that because of the 50

19    plus hours you spent with them reviewing your testimony?

20    A    If you'll just explain a little bit, I'm --

21    Q    Let me ask you this, Mr. Horton.  Did Mr. Shockley go

22    over with you the questions and answers he was going to ask?

23    A    No, he did not.

24    Q    He went through each exhibit with you?

25    A    He went through a lot of the documents.

```
 1  Q    You're aware, I think you said, that Mr. Orr decided

 2  after that conversation to meet with a lawyer, I think you

 3  referred to as Juels, correct?

 4  A    Juels.  That's correct.

 5  Q    A lawyer in New York.

 6  A    Correct.

 7  Q    You know that lawyer's name is Julius Cohn, correct?

 8  A    I heard the last name, but I wasn't sure of it.

 9  Q    But now you remember it?

10  A    Now that you say it.

11  Q    Sure.  And Mr. Orr told you he was going to see a lawyer

12  and talk about this?

13  A    At some point during our conversation.

14  Q    Right.  He said he needed to go see a lawyer, correct?

15  A    He said he was going to go see a lawyer.

16  Q    And he did?

17  A    He said he did.

18  Q    He told you he did when he came back from New York,

19  right, that he met with this lawyer, Julius Cohn, who he told

20  you about?

21  A    He said he had met with two attorneys up there.

22  Q    Right.  To discuss these transactions; yes?

23  A    That's correct.

24  Q    All right.

25              MR. MARKUS:  Judge, I don't know if this is an
```

1    appropriate time to break or if you want me to keep going.

2         THE COURT:  We're going to stop at least by quarter

3    till.  If you're ready now, I think the jury probably is.

4         MR. MARKUS:  I'm definitely ready, and I bet you

5    guys are, too.

6         THE COURT:  Let's stop and start again Monday,

7    9 o'clock.  Have a great weekend.  Leave notes in the jury

8    room.

9         (Jury out at 4:40 p.m.)

10        THE COURT:  Okay.

11        MR. PASANO:  Judge, a question.  Is it possible to

12   ask through the Court if the prosecutor is thinking, even

13   though we've only been going for two days, if we're on

14   schedule?

15        THE COURT:  Are we?

16        MR. SHOCKLEY:  I believe we are.

17        MR. McCORMICK:  It's possible?

18        MR. SHOCKLEY:  It's possible.

19        THE COURT:  You all need to get together.  Talk to

20   each other occasionally.

21        MR. SHOCKLEY:  Do we have to, Judge?

22        MR. McCORMICK:  One half hour after the Court is

23   done.

24        THE COURT:  Okay.

25        MR. McCORMICK:  We're on schedule, your Honor.

1          THE COURT:  Okay.  Great.  Have a good weekend.

2          MR. PASANO:  Thank you, your Honor.  You.  Too.

3     (Recess at 4:41 p.m., until 9:00 a.m., September 15,

4     2008.)

```
 1              I N D E X

 2  WITNESS                                          PAGE

 3  WILLIAM LARRY HORTON, GOVT'S WITNESS, PREVIOUSLY SWORN ....18
    DIRECT EXAMINATION (RESUMED) BY MR. SHOCKLEY ..............18
 4  CROSS-EXAMINATION BY MR. MARKUS .........................217

 5


 6


 7  EXHIBITS                                     RECEIVED

 8  GOVERNMENT'S EXHIBIT(S) 1.52 ..............................22
    GOVERNMENT'S EXHIBIT(S) 1.12 ..............................25
 9  GOVERNMENT'S EXHIBIT(S) 1.141 .............................28
    GOVERNMENT'S EXHIBIT(S) 1.130 .............................39
10  GOVERNMENT'S EXHIBIT(S) 1.191 .............................40
    GOVERNMENT'S EXHIBIT(S) 1.132 .............................47
11  GOVERNMENT'S EXHIBIT(S) 1.133 .............................51
    GOVERNMENT'S EXHIBIT(S) 1.128 .............................53
12  GOVERNMENT'S EXHIBIT(S) 1.119 .............................54
    GOVERNMENT'S EXHIBIT(S) 1.89 ..............................57
13  GOVERNMENT'S EXHIBIT(S) 30.6 ..............................59
    GOVERNMENT'S EXHIBIT(S) 31.2 ..............................64
14  GOVERNMENT'S EXHIBIT(S) 30.15 .............................66
    GOVERNMENT'S EXHIBIT(S) 30.10 .............................86
15  GOVERNMENT'S EXHIBIT(S) 3.65 ..............................89
    GOVERNMENT'S EXHIBIT(S) 30.8 .............................107
16  GOVERNMENT'S EXHIBIT(S) 28.13 ............................118
    GOVERNMENT'S EXHIBIT(S) 28.15 ............................123
17  GOVERNMENT'S EXHIBIT(S) 1.175 ............................128
    GOVERNMENT'S EXHIBIT(S) 1.171 ............................134
18  GOVERNMENT'S EXHIBIT(S) 1.176 ............................140
    GOVERNMENT'S EXHIBIT(S) 1.174 ............................141
19  GOVERNMENT'S EXHIBIT(S) 1.168 ............................141
    GOVERNMENT'S EXHIBIT(S) 1.161 ............................143
20  GOVERNMENT'S EXHIBIT(S) 18.25 ............................146
    GOVERNMENT'S EXHIBIT(S) 1.222 ............................147
21  GOVERNMENT'S EXHIBIT(S) 1.3 ..............................149
    GOVERNMENT'S EXHIBIT(S) 32.3 .............................152
22  GOVERNMENT'S EXHIBIT(S) 39.1, 39.2, AND 39.3 .............187
    GOVERNMENT'S EXHIBIT(S) 39.4 .............................189
23  GOVERNMENT'S EXHIBIT(S) 29 ...............................193
    GOVERNMENT'S EXHIBIT(S) 1824 .............................211
24  GOVERNMENT'S EXHIBIT(S) 18.26 ............................212
    GOVERNMENT'S EXHIBIT(S) SI-28, 29, 31, 34, 36, 37, ......215
25  38, 39, 40, AND 41
```

1                          I N D E X

2       DEFENDANT GREGORY ORR EXHIBIT(S) 1 ......................222

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2        I, Karl Shires, Registered Professional Reporter, certify

3    that the foregoing is a correct transcript from the record of

4    proceedings in the above-entitled matter.

5        Dated this 5th day of February, 2009.

6

7    _____

8    Karl Shires, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25