```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3    UNITED STATES OF AMERICA,        )  Case No.
                                       )  08-60014-CR-MIDDLEBROOKS
 4                      Plaintiff,     )
                                       )
 5              -v-                    )
                                       )
 6    VINCENT F. ARTUSO, JOHN VINCENT  )
      ARTUSO, GREGORY ORR, ROBERT M.   )
 7    GANNON, AND PHILIP EDWARD FORGIONE,)
                                       )
 8                      Defendants.    )  West Palm Beach, Florida
                                       )  September 15, 2008
 9    _____)  9:00 a.m.

10                 Volume 4 of 17 - PAGES 1 - 283

11                 TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
12                 U.S. DISTRICT JUDGE, AND A JURY

13
      Appearances:
14
      For the Government:        J. BRIAN MCCORMICK
15                               WILLIAM T. SHOCKLEY
                                 Assistant United States Attorneys
16                               500 East Broward Boulevard
                                 Fort Lauderdale, Florida  33394
17
      For the Defendant:         PETER VINCENT BIRCH
18    Vincent F. Artuso          Assistant Federal Public Defender
                                 450 Australian Avenue, Suite 500
19                               West Palm Beach, Florida  33401

20    For the Defendant:         CARLTON FIELDS
      John Vincent Artuso        BY:  MICHAEL S. PASANO, ESQ.
21                               100 SE 2nd Street, Suite 4000
                                 Miami, Florida  33131
22

23    Reporter:                  Karl Shires, RPR
      (561) 514-3728             Official Court Reporter
24                               701 Clematis Street, Suite 258
                                 West Palm Beach, Florida  33401
25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1    Appearances: (Continued)

 2

      For the Defendant:           DAVID OSCAR MARKUS, ESQ.
 3    Gregory Orr                  ROBIN ELLEN KAPLAN, ESQ.
                                   169 E. Flagler Street, Suite 1200
 4                                 Miami, Florida  33131

 5    For the Defendant:           ALLAN B. KAISER PLLC
      Robert M. Gannon             BY:  ALLAN BENNETT KAISER
 6                                 111 NE 1st Street, Suite 902
                                   Miami, Florida  33132
 7
      For the Defendant:           ENTIN & DELLA FERA
 8    Philip Edward Forgione       BY:  ALVIN ERNEST ENTIN, ESQ.
                                   110 SE 6th Street, Suite 1970
 9                                 Fort Lauderdale, Florida  33301

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Good morning.  Is our jury ready?

 2              THE COURTROOM SECURITY OFFICER:  We're missing one.

 3              THE COURT:  Go ahead and have a seat then.

 4              MR. PASANO:  Judge, if we're missing one, may we

 5    bring up an issue?

 6              THE COURT:  Sure.

 7              MR. PASANO:  And it's not something that

 8    necessarily the Court thinks we need to argue now.  We

 9    understand after Mr. Horton finishes, the next four witnesses

10    are appraisers.  Depending upon who they are and what they

11    say, there may be objections either as to cumulativeness or

12    as to 401, 403, or as to -- well, specifically, the prejudice

13    of appraisers testifying to matters which the defendants had

14    no knowledge of.

15              Which is to say if an appraiser tells GE Capital,

16    for example, that the property is worth $10 million, in this

17    case what does that mean, unless someone on the defense table

18    knew it.  Otherwise, it is just compounding and taking the

19    jury down the road --

20              THE COURT:  Well, I'm not sure I agree with that.

21    It seems like the value of the property would have some

22    relevance to the claim that the property was being sold at

23    less than market value.  But what about the cumulative

24    objection?

25              MR. SHOCKLEY:  Your Honor, there are four separate
```

1    properties.  Each appraiser will testify about a different

2    property.  By the way, one of the appraisers we had a little

3    bit of problem with over the weekend.  He had a matter at

4    home he had to attend to.  So it might be that we're only

5    going to call two or three initially for this afternoon or

6    tomorrow.

7            Your Honor, also because of some scheduling issues,

8    we may very well call Mark Gaeta and Martin Genauer, two

9    attorneys, tomorrow.  So just letting the defense attorneys

10   know that these are the witnesses that are coming up.

11           Excuse me.  And Gray Finney, we plan on calling him

12   probably tomorrow.

13           THE COURT:  All right.

14           MR. PASANO:  I take it that Mr. Shockley agrees

15   it's cumulative, your Honor?

16           THE COURT:  No, I think he said they're doing an

17   appraiser a property, so it would not be cumulative.

18           MR. PASANO:  And the reason I urge it is, is I

19   think, over our objection, but the Court recognized them as

20   business records, the appraisers -- the appraisals are in.

21   And so what a witness wants to say about that work which is

22   in, then actually it is hearsay or it is cumulative because

23   all he's doing is repeating what's in his opinion.  So that's

24   why we urge it is cumulative.

25           The Government didn't have to put them in the way

```
1    they did and publish them.  But having chosen to do that --

2              THE COURT:  All right.  Make your objection when it

3    comes up.  My reaction is, I don't think it is cumulative --

4              MR. PASANO:  Thank you, your Honor.

5              THE COURT:  -- for an appraiser to present that

6    view.

7              How are we doing?  Still waiting for one?

8              THE COURTROOM SECURITY OFFICER:  Waiting for one.

9              MR. MARKUS:  Judge, one other issue.  On Friday,

10   the defense would like to call one witness out of turn that

11   will be out of the country next week, and we'd ask permission

12   to call a witness out of turn.

13             THE COURT:  Have you talked to them about it?

14             MR. MARKUS:  No, I haven't yet.

15             THE COURT:  See if you can work it out.

16        (Pause in Proceedings.)

17             MR. MARKUS:  They don't agree to it.

18             THE COURT:  What's the problem with that?  I mean,

19   if there's somebody that's unavailable, why wouldn't you --

20   we interrupt?

21             MR. McCORMICK:  Your Honor, this is the first we

22   heard about it.

23             THE COURT:  So you want to consider it further, is

24   that the answer?

25             MR. McCORMICK:  We'll consider it, but, you know,
```

1  at first blush, it seems like putting a witness like that in

2  the Government's case in chief doesn't really make a lot of

3  sense to us.

4          THE COURT:  Well, try to talk about it.  As a

5  general rule, we try to accommodate witnesses.  So, if there

6  is a problem, you need to be able to articulate it.

7      (Pause in Proceedings.)

8          MR. SHOCKLEY:  Your Honor, since we're waiting for

9  a witness, perhaps we could ask Mr. Horton to step outside so

10 I can take up a matter with the Court?

11         THE COURT:  What's the issue?

12         MR. SHOCKLEY:  It's an issue that relates to his

13 testimony.  So, you know, I just didn't want him to hear the

14 comments.

15         THE COURT:  All right.  Do you mind stepping out,

16 Mr. Horton?

17     (Pause in Proceedings.)

18         MR. SHOCKLEY:  Your Honor, if the Court please,

19 last Friday on cross-examination Mr. Markus asked Mr. Horton

20 whether he had given -- and I don't recall the number of the

21 defense exhibit.  It was a page -- Exhibit 1?  Okay.  It was

22 a page of notes that he had taken and written down concerning

23 the questions --

24         THE COURT:  I recall that.

25         MR. SHOCKLEY:  Okay.  In any event, he said he had

1    given that to the Government.  Your Honor, that's not

2    accurate.  The Government had not yet received that.  It

3    turns out that he had given a number of documents to his

4    attorneys and they had given most of those documents to me,

5    but they had not given them to me.  So although apparently

6    from conversations with Ms. van Dusen, who is one of the

7    attorneys that represents him, she advised me that it was an

8    oversight on the part of her and Scott Srebnick that the copy

9    was not given to the Government.

10          In any event, technically although he may think

11   that it was given to the Government like the other documents

12   were, it was not.  So I did not have that document.  I wanted

13   to bring that to the Court's attention.

14          In addition, your Honor, Ms. van Dusen advised me

15   over the weekend that Mr. Horton was looking through some of

16   his records and he found three additional exhibits that I

17   plan on giving to defense counsel this morning.  They, again,

18   have just come into our possession.  I don't know if the

19   defense has any use for them or not, but I'm certainly going

20   to turn them over.

21          THE COURT:  All right.  Our jury is all here.  Are

22   we ready for them, Mr. Markus?

23          MR. MARKUS:  Yes, your Honor.  I just -- I don't

24   know if I should take a look at those exhibits first or at

25   the next break.

```
 1              THE COURT:  Well, take a look at them.  See if

 2   there's --

 3       (Pause in Proceedings.)

 4              THE COURT:  Ready?

 5              MR. MARKUS:  Yes.  Thanks, Judge.

 6              THE COURT:  Okay.  If we can get the witness.  And

 7   please invite the jury in.

 8       (Jury in at 9:06 a.m.)

 9              THE COURT:  Welcome back.  Please be seated.

10              I hope you had a good weekend.  And I think we are

11   in Mr. Markus' cross-examination.

12              MR. MARKUS:  Thank you.

13              Good morning, ladies and gentlemen.  Good morning,

14   your Honor.

15     WILLIAM LARRY HORTON, GOVT'S WITNESS, PREVIOUSLY SWORN

16                   CROSS-EXAMINATION (RESUMED)

17   BY MR. MARKUS:

18   Q    Mr. Horton, there was a lot of talk on your direct last

19   week about the difference between a fee simple purchase and a

20   purchase with a leaseback.  Do you remember all those

21   questions and answers?

22   A    Most of them.

23   Q    Okay.  Let's talk about those differences for a couple

24   minutes.  There were appraisals done by GE Capital, correct,

25   for the four properties?
```

```
 1    A    Yes.

 2    Q    Okay.  And those appraisals were done for the lender,

 3    correct?

 4    A    I assumed they were done for the lender.

 5    Q    All right.  You had never seen those appraisals when you

 6    were employed at ADT, right?

 7    A    I did not.

 8    Q    Right.  They weren't done for ADT's and Tyco's purposes?

 9    A    No.

10    Q    They were done for the lender?

11    A    Yes.

12    Q    ADT and Tyco had their own appraisals?

13    A    Yes.

14    Q    In fact, a number of different appraisals and broker

15    opinions of value, correct?

16    A    Yes.

17    Q    Okay.  And you would agree with me, wouldn't you,

18    Mr. Horton, that a piece of property is worth different

19    things to different people, correct?

20    A    Yes.

21    Q    It might be worth one thing to a seller, right; one

22    thing to a buyer; and one thing to a lender, correct?

23    A    Yes.

24    Q    All right.  And that's why different parties get

25    different appraisals, because depending on the wants and
```

1   needs and circumstances of each party, they may appraise a

2   piece of property differently, correct?

3   A    Possible.

4   Q    Right.  And just because something is appraised

5   differently doesn't mean one appraisal is right and one is

6   wrong, correct?

7   A    It would be based upon which method you're going to use

8   to sell the property.

9   Q    Sure.  And let's use a hypothetical, for instance, and

10  tell me if you're with me.  Suppose I have a house that is a

11  teardown house.  Okay?  And I want to sell it.  With me so

12  far?

13  A    Yes.

14  Q    All right.  Let's say I get the teardown house

15  appraised, and my appraiser comes back and says, you know,

16  for this teardown house you could sell it for $50,000.  Fair

17  enough?

18  A    Uh-huh.

19  Q    Okay.  Let's say you want to buy that teardown house and

20  build a mansion on it and you get plans drawn up, permits in

21  place, contractors in place, and the demolition in place, and

22  you go get it appraised with all of those different things in

23  place.  An appraiser might tell you based on what you want to

24  build, we're going to appraise it at $500,000, fair?

25  A    (Witness nodding head.)

1    Q    Yes?  You have to answer for the court reporter.

2    A    I'm going with your theory.

3    Q    Okay.  Now, the seller -- to the seller, the house isn't

4    worth $500,000, correct?  It's only worth the teardown, the

5    50 grand, right?

6    A    (Witness nodding head.)  Go ahead.

7    Q    Is that fair?

8    A    I'm -- I'm with you.

9    Q    Okay.  So in that hypothetical a lender might say I'm

10   willing to lend the buyer $500,000, even though the purchase

11   price for the teardown is only 50,000.  There wouldn't be

12   anything criminal or wrong or anything bad about that, would

13   there?

14            MR. SHOCKLEY:  Objection.  Ambiguous.

15            THE COURT:  Overruled.

16            THE WITNESS:  If they value it, that's the value, I

17   guess.

18   BY MR. MARKUS:

19   Q    Right.  And the buyer wouldn't have to tell the seller,

20   hey, listen, I plan on knocking your house down and building

21   a mansion and it's going to be worth 500,000, right?  In

22   fact, the buyer would want to keep that to himself, right?

23   A    Yes.

24   Q    Okay.  So in our case, when we have a lender appraising

25   properties with the sale and leaseback, that's different than

```
 1   what ADT got the property appraised for because ADT can't

 2   lease it back from themselves, correct?

 3   A    Again, it depends on the different transactions going to

 4   take place.

 5   Q    Okay.  We agree on that.

 6   A    We agree that the transaction sometimes basis is the

 7   price of the property.

 8   Q    And the transaction is different for each of the parties

 9   involved, right?  The buyer -- what's motivating the buyer is

10   different than what's motivating the seller, which is

11   different than what's motivating the lender?

12   A    Again, it depends on the sale.  If it's a simple sale or

13   a sale-leaseback, those are two variables that determine the

14   price of the property.

15   Q    Right.  But in the case of these four properties, ADT is

16   only -- they cannot lease it from themselves, correct?

17   A    No, but ADT could have had bidders on the properties,

18   which, again, was the third -- a third avenue that would

19   allow the properties to be determined as far as value.

20   Q    That's a separate question.  We're going to get to that

21   in a minute.  My question is, ADT couldn't lease it from

22   themselves, right?  They could only sell the building and

23   then lease it back to somebody else?

24   A    ADT could have leased it to themselves.

25   Q    Okay.  But then it's worth something different
```

1    altogether?

2    A    But I'm answering your question.  They could have.

3    Q    Okay.  Let's talk about Government Exhibit 28.8.  This

4    was a Government Exhibit --

5              MR. MARKUS:  I'm sorry.  Do you guys have 28.8

6    available?

7    BY MR. MARKUS:

8    Q    Mr. Horton, this was an e-mail, 28.8, that you pulled

9    off of your laptop computer, correct?

10    A    That's correct.

11    Q    And the back page is the original page of that, the

12    first part of the e-mail, right?

13    A    That's correct.

14    Q    And this is from Scott MacArthur to Mark Foley, right?

15    A    Yes.

16    Q    And then the next e-mail -- I'm sorry, that's the bottom

17    part.  From Scott MacArthur to Mark Foley, and then Mark

18    Foley back to MacArthur saying, go ahead and sell?

19    A    Yes.

20    Q    All right.  We don't have the original e-mail of you

21    writing to Mr. MacArthur with the recommendations, do we?

22    That wasn't part of this e-mail?

23    A    It was only a spreadsheet attached to the e-mail that

24    went to Mr. Scott MacArthur.

25    Q    Okay.  That's -- that's this spreadsheet with the three

1    different properties, correct?

2    A    That's correct.

3    Q    Okay.  Let's talk about this spreadsheet for a second.

4    The Palm Harbor property, the one in the middle --

5         THE COURT:  Give us a second.  The jury is having a

6    heard time seeing the witness, so they're trying to move the

7    monitor a little bit.

8         MR. MARKUS:  This is Government Exhibit 1.137.

9         THE COURT:  Is that better?

10        MR. MARKUS:  Okay.  Can you all see the exhibit on

11   the TV, on the monitors?  Okay.

12   BY MR. MARKUS:

13   Q    This is Government Exhibit 1.137.  This is the

14   attachment that you drafted, correct, Mr. Horton?

15   A    That's correct.

16   Q    All right.  And I think you said on the Palm Harbor

17   property -- on the Palm Harbor property, where it says 775,

18   market value --

19   A    Yes.

20   Q    -- there was an appraisal for about a million bucks,

21   correct?

22   A    That ADT had.

23   Q    That ADT had?

24   A    That's correct.

25   Q    Okay.  What you didn't talk about with the Government

1    was that there was also something prepared called a broker

2    opinion of value, correct?

3    A    That's correct.

4    Q    All right.  And why don't you tell us what a broker

5    opinion of value is.

6    A    A real estate company that you either may work with as a

7    national account or an independent, you ask them to go out

8    and look at the market and see what the property would be

9    valued at.

10   Q    And you had these prepared for the different properties,

11   correct?

12   A    All the properties.

13   Q    Right.  In fact, these were -- these weren't the

14   appraisals done for SecurityLink.  Now you're at ADT and

15   you're asking Grubb & Ellis to do broker opinion of value on

16   these properties?

17   A    That's correct.

18   Q    Okay.

19          MR. MARKUS:  Judge, at this point we would move in

20   Greg Orr Exhibit 20, which is the Grubb & Ellis broker

21   opinion of value for Palm Harbor.

22          MR. SHOCKLEY:  If I could see it, perhaps it

23   relates to --

24          MR. MARKUS:  This is provided by the Government.

25   William Larry Horton No. 11.

1        (Pause in Proceedings.)

2            THE COURT:  Did you respond?  Do you have an

3    objection?

4            MR. SHOCKLEY:  I'm sorry.  No, your Honor.  I was

5    just trying to figure out which --

6            THE COURT:  All right.  20 is admitted.

7        (Received in evidence Defendant Gregory Orr Exhibit(s)

8    20.)

9    BY MR. MARKUS:

10   Q    Okay.  And let's just look at this letter for a second.

11   This was a letter sent to you by Grubb & Ellis on January 15,

12   2001?

13   A    That's correct.

14   Q    Regarding a Palm Harbor property?

15   A    That's correct.

16   Q    And what this letter explains, it's Grubb & Ellis'

17   opinion of what the property can be sold for?

18   A    After the property was sold.

19   Q    What it's worth?

20   A    After the property was sold.  It shows January the 15th,

21   2001.

22   Q    And this is what they believe the property is worth?

23   A    On January 15, 2001.

24   Q    This was -- this Palm Harbor property was sold in '02.

25   A    Oh, you're correct.  I'm sorry.

1    Q    So this was prepared before it was sold?

2    A    That's correct.

3    Q    And it was written to you to explain what Grubb & Ellis

4    believed the property could sell for?

5    A    As a simple sale.

6    Q    Right.  And what Grubb & Ellis said is that a low asking

7    price that Tyco/ADT could ask for is $640,000, correct?

8    A    Could you replace the document, please.

9    Q    Why don't you take a look at it.

10   A    Thank you.  I see sale valuation at 797,000 to 799.  Did

11   I miss the 640?

12   Q    That's the recommended sale price, right, up to 799?

13   That's the recommended sale price.  But they also list low,

14   medium, and high valuations for the property.  Do you see

15   that on there?

16   A    No, I don't.

17   Q    Here we go.  The different -- high asking price, low

18   asking price, and median asking price for the property, they

19   list $70 a square foot, $40 dollars a square foot, and $55 a

20   square foot?

21   A    That's based on, my guess, what's in the market for

22   sale.

23   Q    And that's a legitimate way to determine what a piece of

24   property is worth?

25   A    And that's how they arrived at the 700 to $800,000 sale

1    valuation of the property.

2    Q    Okay.  So on this chart where you said market value for

3    Palm Harbor was 775, that falls right in line with what the

4    broker opinion of value said, correct?

5    A    It is correct.  And I placed that value in there.  And

6    that would have been as a simple sale.  These were not simple

7    sales.  These were sale-leasebacks.

8    Q    I understand that, Mr. Horton.  But stick with me.  My

9    question was, you asked Grubb & Ellis to prepare a report to

10   explain to you and ADT what the property was worth, and Grubb

11   & Ellis came back between 700 and 800,000, and you put in

12   your attachment 775, which is right in line with the broker

13   opinion of value?

14   A    And that's for just a sale.

15   Q    I understand.

16   A    Okay.  No leaseback.

17   Q    Okay.  But that's what's in there, correct?

18   A    That's what's in there.

19   Q    By the way, ADT and Tyco knew this was a sale-leaseback,

20   right?  Your superiors knew what it was?

21   A    I don't believe Mr. Scott MacArthur or Mr. Foley knew

22   they were leasebacks.

23   Q    They didn't know ADT was going to be leasing the

24   properties back right after you sold them?

25   A    My spreadsheet did not reflect that.  It just reflected

 1    a sale price, sir.

 2    Q    So it's your testimony -- I want to be very clear on

 3    this.  Your testimony is that ADT believed they would sell

 4    the properties and then vacate and not lease it back.  That's

 5    what your testimony is?

 6    A    I'm saying I never had a discussion with Mr. Scott

 7    MacArthur on a leaseback.  I never had a discussion as far as

 8    selling these properties -- or Mr. Foley.  It was a

 9    spreadsheet attached to it that stated that these were for

10    sale.  And you'll see that in the other documents on the

11    other properties.

12    Q    Mr. Horton, at closing there was a lease agreement that

13    was executed, correct?

14    A    That was seen by the real estate attorney and by the

15    closing attorneys.

16    Q    Okay.  So real estate attorneys at ADT executed a real

17    estate agreement to lease the property back?

18    A    Because the lease was tied to the sale.  If you sold it,

19    then it was tied back.  But in none of these documents that

20    you show going to Mr. Scott MacArthur or Mr. Foley show a

21    lease.

22    Q    So I just want to be clear.  You're saying that at

23    closing this would have come up and it would have been to the

24    great surprise of ADT that they were leasing these properties

25    back?

```
 1   A    I did not say it would be a big surprise.

 2            MR. SHOCKLEY:  Objection as to --

 3            THE COURT:  You all spoke at once, so I don't think

 4   the reporter got any of it.  And I didn't hear what you said.

 5            MR. SHOCKLEY:  Objection.  Ambiguous as to who at

 6   ADT it was unknown to.

 7            MR. MARKUS:  I'll move on, Judge.

 8   BY MR. MARKUS:

 9   Q    Fair to say, Mr. Horton, that the price on this list --

10   and I understand that it's for fee simple.  We will get to

11   the leasebacks in a second.  The price on this list was right

12   in line with the broker opinion of value that you had done;

13   yes or no?

14   A    As a fee sample.

15   Q    Yes.  Okay.  Let's talk about Lancaster.  Lancaster on

16   here, market value, 935.  Correct?

17   A    Yes.

18   Q    You had mentioned last week that there was an appraisal

19   done for about a million bucks?

20   A    I believe it was close to a million.  Yes, sir.

21   Q    Right.  On that property as well you asked for a broker

22   opinion of value from Grubb & Ellis?

23   A    That's correct.

24            MR. MARKUS:  At this point we move in Greg Orr

25   Exhibit 21.
```

```
 1              MR. SHOCKLEY:  No objection, your Honor.

 2              THE COURT:  21 is admitted.

 3         (Received in evidence Defendant Gregory Orr Exhibit(s)

 4    21.)

 5    BY MR. MARKUS:

 6    Q    Similar document done for the Lancaster property,

 7    correct, Mr. Horton?

 8    A    Correct.

 9    Q    Okay.  In fact, on this one -- let me just get my

10    numbers.  On this piece of property the broker opinion of

11    value came in -- the low asking price was 481,000, all the

12    way up to 717,000, correct?

13    A    I believe if you multiply it out, it was approximately a

14    million dollars.  As far as the valuation, they recommended

15    that it would sell at $60 a square foot; and it was about

16    17,000 square feet.

17    Q    Let's look at it together.

18    A    Last page.

19    Q    That's the recommended price?

20    A    That's what we would have put it on the market at, sir.

21    Q    And they also have on here, compared to other pieces of

22    property in the area, correct?

23    A    All real estate and appraisal companies look at the

24    market value of all properties in an area.  It could be like

25    that teardown that you talked about is only worth $50,000 and
```

1  next door is a $5 million property.  They're recommendation

2  was $60 a square foot times 17,000 square feet.

3  Q    They also listed in the neighborhood all the way down to

4  $27 a square foot, up to $41 a square foot?

5  A    And again, those could have been sold two years ago,

6  three years ago.  The market could have went up.  As you

7  stated earlier, there are variables.  But their recommended

8  price was $60 a square foot that we would have listed the

9  building, which would have been roughly a million dollars.

10 Q    Mr. Horton, my question is very simple.  Did they also

11 explain that there was a $27 a square foot for low asking

12 prices in the area, up to 41?

13 A    Sir, we never used that on listing with a real estate

14 company.  It's always their recommended price as far as the

15 valuation of the property, which is the $60 a square foot.

16 Q    Mr. Horton, there is no reason to fight.  My question --

17 A    I'm not.  I'm just answering your question as far as

18 what happens in the real estate market related to sales.

19 Q    My question was simply what this document reflected.

20 This document reflects, does it not, all the way down to $27

21 a square foot up to $41 a square foot?  It's a simple

22 question.  Does it reflect that?

23 A    It does reflect that.

24 Q    Okay.  Let's talk about Oak Brook.  This was not on

25 these three -- this is the separate property, correct?  This

1  is the fourth property, the Oak Brook deal?

2  A    Oak Brook.  Yes, sir.

3  Q    That was sold after these first three?

4  A    Yes, sir.

5  Q    You also had a broker opinion of value done for Oak

6  Brook, correct?

7  A    Correct.

8         MR. MARKUS:  At this point I move in Greg Orr

9  Exhibit 21, which is the broker opinion of value for Oak

10  Brook.

11         MR. SHOCKLEY:  No objection, your Honor.

12         THE COURT:  Well, 21 is in, so what --

13         MR. MARKUS:  I'm sorry.  22.  My apologies, your

14  Honor.

15         THE COURT:  22 is admitted.

16     (Received in evidence Defendant Gregory Orr Exhibit(s)

17  22.)

18  BY MR. MARKUS:

19  Q    Do you remember this document?

20  A    Yes, I do.

21  Q    The recommended price was right around 2 million bucks,

22  right?

23  A    Correct.

24  Q    And it sold for $2.1 million?

25  A    Correct, on a simple sale.

1  Q    By the way, this building, the Oak Brook building, was

2  purchased for $1.4 million, correct?

3  A    I don't know the purchase price.  It was acquired

4  through an acquisition of SecurityLink.

5  Q    All right.  Let me show you --

6      (Pause in Proceedings.)

7          MR. MARKUS:  Judge, we move in Greg Orr Exhibit 7,

8  please.

9          MR. SHOCKLEY:  No objection, your Honor.

10          THE COURT:  7 is admitted.

11      (Received in evidence Defendant Gregory Orr Exhibit(s)

12  7.)

13  BY MR. MARKUS:

14  Q    Do you recognize this e-mail?

15  A    Yes, I do.

16  Q    Okay.  And you see here what Oak Brook sold for?

17  A    That's a cost.  It's not a sale price.

18  Q    What it cost ADT/SecurityLink?

19  A    That's the cost of the building that was being

20  depreciated.  It does not show the land cost, which was about

21  a million one.

22  Q    So the cost that you were taking depreciation was

23  1.4 million?

24  A    That's the cost that we derived from SecurityLink that

25  they had on their books, that we put on our books to

1  depreciate the building, because the land is not depreciated.

2  Total cost would have been somewhere around $2.6 million.

3  Q    But the cost on this e-mail that you're cc'd on where it

4  says, Oak Brook, Illinois, building cost 1.412, that's what

5  it says there, correct?

6  A    If you move it over a little bit, you'll see it says

7  depreciation.

8  Q    And you're depreciating it for $2,979 --

9  A    Per month.  On the building.  That's correct.  But

10  that's not the cost of the building.  That's the depreciated

11  cost.

12  Q    That's what's on the books at ADT, correct?

13  A    That's the depreciated cost, which does not include the

14  land.

15  Q    For -- that's the cost that's on the books at ADT,

16  correct?

17  A    Without the land.  That's correct.

18  Q    By the way, the Pompano building had a number of issues,

19  did it not?

20  A    I think all the buildings had a few issues, as any

21  construction would be in a commercial property.

22  Q    Let's talk about the issue at Pompano.  There was a fire

23  we had discussed last week.

24  A    There was, sir.

25  Q    Right.  There was an easement down the middle of the

1    property, correct, an FP & L easement?

2    A    I -- I take your word for that.

3    Q    Do you remember?

4    A    There probably -- there could have been an easement.

5    There could have been an easement on a lot of properties.

6    I'm just not familiar with it.

7    Q    Do you remember whether it was in a good neighborhood or

8    a bad neighborhood?

9    A    I don't know what would determine that.

10   Q    Do you remember getting e-mails about whether Pompano

11   was in a good neighborhood or in a bad neighborhood?

12   A    I could have.

13   Q    You also remember about Pompano, that there was this --

14   it used to be a bank in that building, correct?

15   A    It had a vault in it.  I assume it was a bank.

16   Q    Right.  And it would cost a lot of money to get that

17   vault out of the building?

18   A    It could.

19   Q    Right?

20   A    It could.  Yes.

21   Q    It was supposed to cost many tens of thousands of

22   dollars to move that vault.  Do you remember that?

23   A    I don't remember ever seeing a cost of what it would.

24   But again, I could have had the document, but I don't

25   remember the cost.

```
 1        (Pause in Proceedings.)

 2              MR. MARKUS:  Judge, we move in Greg Orr Exhibit 4.

 3              MR. SHOCKLEY:  No objection, your Honor.

 4              THE COURT:  Four is admitted.

 5        (Received in evidence Defendant Gregory Orr Exhibit(s)

 6     4.)

 7     BY MR. MARKUS:

 8     Q    This was an e-mail -- well, you see at the top, this is

 9     an e-mail from Ed Nollinger to you?

10     A    Yes.

11     Q    And this was discussing the Pompano Beach location?  You

12     see in the subject line it says Pompano Beach location?

13     A    Yes.

14     Q    What it explains is that Nollinger actually went out to

15     Pompano Beach, correct?

16     A    Yes.

17     Q    He says he has concerns about the neighborhood and

18     safety at night?

19     A    That's correct.  Because his team was going to be

20     working 24 hours by seven.

21     Q    Right.  So this wasn't in the best of neighborhoods,

22     correct?

23     A    Mr. Nollinger didn't feel comfortable with it.

24     Q    And that would affect the price of the property, would

25     it not?
```

1    A    Mr. Nollinger is not a real estate attorney or an

2    appraiser so . . .

3    Q    I understand.  But common sense would tell you that

4    would affect the price of the property, would it not?

5    A    Again, that's from an employee that didn't want to

6    relocate his team to the building.  That's why he stated

7    that.  His team did not go to that building.

8    Q    So you're fighting me on whether --

9    A    No, sir, I'm not.  I'm trying to --

10   Q    -- whether the neighborhood would affect the purchase of

11   the property?

12   A    Again, that was an ADT employee.  If it, obviously, came

13   from a real estate appraiser or a real estate company, I

14   would have taken it more seriously.

15   Q    So you didn't take it seriously?

16   A    I didn't put his team there.

17   Q    Other things that would affect the purchase price of a

18   property and the sale-leaseback is the problems Tyco and ADT

19   were having, correct?

20   A    What period of time are we talking about, sir?

21   Q    2001 and 2002.

22   A    I think most of the facts came out in 2002.

23   Q    And those facts would have an issue, they would have an

24   affect on a purchaser, correct?

25   A    These bids were finalized or offers were finalized in

1    2001, sir.

2    Q    Not for Oak Brook.

3    A    Oh, we're talking about Oak Brook?  I thought you said

4    sales.  I'm sorry.

5    Q    Sale-leaseback for Oak Brook, for example, the Tyco/ADT

6    problem might have an affect on the purchaser, correct?

7    A    It could possibly.

8        (Pause in Proceedings.)

9            MR. MARKUS:  Judge, without objection, we move in

10   Greg Orr 9.

11           MR. SHOCKLEY:  No objection, your Honor.

12           THE COURT:  9 is admitted.

13       (Received in evidence Defendant Gregory Orr Exhibit(s)

14   9.)

15   BY MR. MARKUS:

16   Q    This is just one example, Mr. Horton, of an e-mail about

17   the Oak Brook property, about the purchaser having problems

18   with getting a loan due to the headlines about Tyco.  That

19   was an e-mail that you wrote, correct?

20   A    That's correct.  From me to Chris.  The question was why

21   did it take so long for the closing of the facility.  And it

22   had to do with a clearing of a Phase I environmental impact

23   on asbestos, which was cleared.

24   Q    And -- I don't need to put this back up, do I -- the

25   problems with the headlines of Tyco?

1    A    I'm sorry, could you put it back up?

2    Q    "Then, Legal had issues with the guaranty.  And along

3    the way, the purchaser had problems with getting a loan due

4    to the headlines about Tyco."

5    A    Yes, that's what it stated.

6    Q    That's what you wrote?

7    A    Yes.

8    Q    Okay.

9    A    I just didn't read it down at the bottom.

10    Q    All right.  You were fired back in '06, correct?

11    A    May, correct.

12    Q    Rent was still being paid by ADT to Greg Orr, correct?

13    A    Yes.

14    Q    To the different companies?

15    A    What period of time?

16    Q    In '06.

17    A    Yes.

18    Q    And even after you're fired, you're still getting your

19    checks?

20    A    Yes.

21    Q    All right.  You didn't say, you know, the FBI has been

22    to my house, ADT has fired me, maybe I should stop taking

23    these checks?  You kept receiving them, right?

24    A    Yes.

25    Q    Cashing them?

1    A    Yes, sir.

2    Q    For all of the rest of '06?

3    A    Yes, sir.

4    Q    And all of '07?

5    A    Yes, sir.

6    Q    By the way, Tyco and ADT have never sued you for those

7    moneys back, have they?

8    A    No, sir.

9    Q    All right.  They continued to pay the lease even after

10    they fired you in May of '06, right?

11    A    Yes.

12    Q    And they paid it for all of '06 and all of '07, did they

13    not?

14    A    Yes.

15    Q    All right.  And they're still in the buildings to this

16    day, as far as you know?

17    A    As far as I know.

18    Q    I'm going to show you Government Exhibit 30.1.  I'm

19    sorry, 30.10.  Remember this document from last week?

20    A    Yes, sir.

21    Q    This is the document where on KCGF you're listed as a

22    member -- your wife and you are listed as members, and Greg

23    Orr is listed as a manager, correct?

24    A    Yes.

25    Q    And what we see here on the bottom, in January of '03,

1    Greg Orr changes his address, correct?

2    A    Yes.

3    Q    But he doesn't delete you from this form, does he?

4    A    No, sir.

5    Q    That was the next year only after you complained to Greg

6    Orr, right?

7    A    This is 2003.  I had brought up online and saw that I

8    was shown, correct.  I went to Mr. Orr because he had

9    indicated he was going to be shown as manager on my company.

10   Q    Right.  So at least in '03 Greg Orr knows that you're on

11   this document, but he doesn't say --

12        MR. SHOCKLEY:  Objection, your Honor.  Assumes a

13   fact not in evidence.

14        THE COURT:  Sustained.

15   BY MR. MARKUS:

16   Q    Well, Greg Orr signed this document on the bottom,

17   correct?  You identified that as Greg Orr's signature?

18   A    That appears to be Mr. Orr's signature.

19   Q    And you recognize his handwriting?  He was changing his

20   address here, correct?

21   A    Yes.

22   Q    Okay.  And so he would have, when he was doing this,

23   seen you and your wife listed as members, correct?

24   A    I assume yes.  It's on the document.

25   Q    Right.  And he didn't delete you and your wife in '03,

1    did he?

2    A    I don't understand the question.

3    Q    Did he cross your name out and write "delete" like we

4    saw the year following?

5    A    No, he did not.

6    Q    Okay.  The only time he did that was the following year

7    after you complained about it, correct?

8    A    That I was -- showed up.

9    Q    That you were listed on the documents and showed up on

10   the Internet.

11   A    That's correct.

12   Q    Right.  Greg Orr didn't see any problem with you being

13   on this document in '03, did he?

14   A    He went and changed it.

15   Q    After you complained the next year, correct?

16   A    Mr. Orr didn't know that I was showing up.  He was

17   surprised as I was.

18   Q    He changed it the following year after you complained;

19   yes or no?

20   A    Yes.

21   Q    You spoke to the prosecutors about Oak Brook and getting

22   a lump sum payment, I think, of 200 something thousand

23   dollars.  Do you remember that?

24   A    Yes.

25   Q    That's not free money.  That was a loan, correct?

1    A     I don't understand "loan."

2    Q     You had to pay that money back as part of the loan?

3    When you closed Oak Brook, there was a $3 million loan?

4    A     Yes.

5    Q     Okay.  As part of that $3 million loan you got a check?

6    A     Yes, sir.

7    Q     You have to pay that money back, correct?  That was a

8    loan from the lender?

9    A     Correct.

10   Q     That wasn't free money?  You had to pay it back?

11   A     Correct.

12   Q     Okay.  Now, last week you had invited me to read some of

13   the statements from your attorney Scott Srebnick at the bond

14   hearing.  Do you remember that?

15   A     I asked you if you would read the bottom statement,

16   correct, of Mr. Srebnick.

17   Q     Let me ask you this.  The statements your lawyer made at

18   that bond hearing were true and correct?

19   A     I don't think Mr. Srebnick would have lied.

20   Q     Okay.  I'm going to read you some of the statements that

21   you asked me to read from last week, and you tell me whether

22   these are true or false statements.  Okay?  Fair enough?

23   A     Yes.

24          MR. SHOCKLEY:  Your Honor, objection.  Hearsay.

25          MR. MARKUS:  Judge, this is to impeach what he said

1    last week, and I'm going to read what his -- what's an

2    adoptive admission for this witness.

3              THE COURT:  Overruled.

4              MR. MARKUS:  Okay.

5    BY MR. MARKUS:

6    Q    I'm going to read you statements.  You tell me true or

7    false.

8    A    Yes, sir.

9    Q    All right.  Tyco which was the public -- Page 4,

10   counsel --

11             "Tyco, which was the public company I think the

12   Court may have read about in the paper with Kozlowski and

13   company, having those big toga parties.  Tyco had purchased

14   ADT, which was a security company."  True or false?

15   A    True.

16   Q    "Tyco had also purchased Wells Fargo Security and

17   SecurityLink.  It had acquired many, many real estate

18   properties in connection with those acquisitions."

19   A    Correct.

20   Q    "It had to sell them off within the year to raise cash."

21   A    They had to sell them off within the year due to

22   acquisition reserves, to be able to not be penalized on any

23   assets.

24   Q    So they had to be sold off within the year?

25   A    For the accounting purposes.

1    Q    "Those were the marching orders, to sell dozens and

2    dozens of properties quickly within a year to raise cash."

3    A    Correct.

4    Q    "Tyco's counsel, ADT's counsel, and ADT CFO, they all

5    knew the terms of these deals.  The financial terms were

6    known to them."  True or false?

7    A    Correct.

8    Q    Okay.

9             "The appraised values were known to all of the

10   executives in the power structure of ADT.  The essential

11   terms were known."

12   A    Correct.

13   Q    "The Government's evidence is that what was not known

14   was that Mr. Horton had an interest on the buy side."

15   A    Correct.

16   Q    "So, in other words, he had a conflict of interest, and

17   there's going to be -- so, in other words, he had a conflict

18   of interest."  Correct?

19   A    Correct.

20   Q    "ADT knew the value of the lease payments.  It knew the

21   value of the amounts that it was being paid for the

22   properties."

23   A    Correct.

24   Q    "It knew what the appraised values were."

25   A    Correct.

1    Q    "It knew what the tax assessed values were."

2    A    I don't know that they knew that.

3    Q    It was -- "it knew what the book value was."

4    A    Correct.

5    Q    "Everybody in the hierarchy knew."

6    A    Correct.

7    Q    "It did go up to the board of directors of Tyco for

8    approval."

9    A    Correct.

10   Q    "With the approval of ADT's financial officers who were

11   above Mr. Horton in the line of command."

12   A    Correct.

13   Q    "So when the Government puts on a witness to say that

14   ADT was unaware of the swindle, I think it is important to

15   distinguish between ADT being unaware of the terms of the

16   deal, which it was aware of, with ADT's lack of knowledge of

17   Mr. Horton's interest in the deal, and that's a significant

18   distinction."

19   A    Different executives knew different parts of these

20   deals.  As I stated earlier, Mr. Scott MacArthur did not see

21   the appraisals.  Randi Gray, Randi Joseph, Marjorie Desporte.

22   Q    Did they ever ask for the appraisals, Mr. Horton?

23   A    No, sir.

24   Q    If they asked for the appraisals, would you have given

25   them to them?

1    A    Yes, sir.

2    Q    They would have seen the appraisals?

3    A    Yes, sir.

4    Q    Let's talk about Bradenton for a minute.  Do you

5    remember that property?

6    A    I do.

7    Q    Bradenton was one of the seven properties that you had

8    informed Mr. Orr about?

9    A    Yes.

10   Q    This was also a sale-leaseback?

11   A    It would have been.  Yes, sir.

12   Q    Well, it was.  It sold and was leased back to someone

13   other than Mr. Orr, correct?

14   A    In '04, I believe.

15   Q    The question was, it was sold and leased back to someone

16   other than Greg Orr?

17   A    That's correct.

18   Q    Okay.

19          MR. MARKUS:  Judge, without objection, we move in

20   Greg Orr 24.

21          MR. SHOCKLEY:  No objection, your Honor.

22          THE COURT:  Did you say 24?

23          MR. MARKUS:  Yes, your Honor.

24          THE COURT:  24 is admitted.

25

1        (Received in evidence Defendant Gregory Orr Exhibit(s)

2    24.)

3    BY MR. MARKUS:

4    Q    Let me show you, Mr. Horton.  This is the purchase and

5    sale agreement for Bradenton, correct?

6    A    Yes.

7    Q    This is one of the seven you told Mr. Orr about that

8    went to somebody else in 2004?

9    A    That's correct.

10   Q    I would like to show you one of the provisions at Bates

11   stamp ADT-LH4692.  The very top of the page, Paragraph 13,

12   prohibition of recording.

13        Do you remember all of the questions that

14   Mr. Shockley asked you for each of the leases about not

15   recording those leases?

16   A    Yes, sir.

17   Q    And those purchase agreements?

18   A    Yes, sir.

19   Q    That's standard, isn't it?

20   A    Yes, sir.

21   Q    That's in every purchase, in every lease contract that

22   ADT and Tyco did?

23   A    Yes, sir.

24   Q    For all the hundreds of properties you sold, even ones

25   that weren't going to Greg Orr, you had a provision in there

1    to prohibit recording of those documents?

2    A    To my knowledge, it was in all of the contract language.

3    Q    It was standard?  There was nothing wrong about doing

4    that, was there?

5    A    No, sir.

6    Q    Okay.  By the way, on the first three properties, there

7    was no guarantee on the lease, was there?

8    A    There was not.

9    Q    So if Tyco/ADT went bankrupt, what would happen?

10   A    If Tyco/ADT went bankrupt, quite possibly, they could

11   move out of the properties.

12   Q    Right.  Well, you would be stuck with a building with no

13   tenant for a while, right?

14   A    When you go bankrupt, you file a reorganization.  You

15   have to go in front of a Court, obviously, and they have to

16   approve your plan of breaking leases and closing property

17   locations.  But it's possible.

18   Q    It wouldn't be a good thing for the owner, the landlord

19   of the building?

20   A    Quite possibly not.

21   Q    Right.  In fact, we -- right now, if you're the landlord

22   for Lehman Brothers, you're not too happy this morning, are

23   you?

24   A    I haven't seen the news, but it didn't look good.

25   Q    Yeah.  Okay.  By the way, the escalation in lease

1    prices, the ones Mr. Shockley showed you, those Excel

2    spreadsheets where the lease goes up every couple of years --

3    A    Yes, sir.

4    Q    -- that's also standard, escalation in leases, correct?

5    A    There's some increase per year or every five years or it

6    varies.  But there's normally some increase in all leases.

7    Q    That's pretty standard?

8    A    Yes.

9    Q    All right.  And, in fact, those lease numbers were

10   attached to the document, to the closing documents, correct?

11   A    They were attached to, I believe, the closing documents.

12   Correct.

13   Q    So everybody knew what the values -- everybody at the

14   closing, the real estate lawyers and so on, knew what the

15   prices of the lease were going to be over the course of the

16   lease?

17   A    The real estate attorneys negotiated that.

18   Q    So they knew it?

19   A    Yes.

20   Q    Right.  Nothing wrong with lease prices going up over

21   the course of a lease?

22   A    No.

23   Q    All right.  Okay.

24        (Pause in Proceedings.)

25             MR. MARKUS:  Judge, without objection, we move in

```
 1   Greg Orr Exhibit 19.

 2              MR. SHOCKLEY:  No objection, your Honor.

 3              THE COURT:  19 is admitted.

 4        (Received in evidence Defendant Gregory Orr Exhibit(s)

 5   19.)

 6   BY MR. MARKUS:

 7   Q    Do you recognize this document, Mr. Horton?

 8   A    Yes.

 9   Q    These were the different bidders for the Bradenton

10   property?

11   A    That's correct.

12   Q    Okay.  Number of different bids were received for

13   Bradenton?

14   A    Yes.

15   Q    By the way, to go back to the leases for a second, the

16   lease in this case -- in these cases for these four

17   properties, I believe, were 15-year leases?

18   A    Yes.

19   Q    Mr. Shockley asked you if those were extraordinarily

20   long leases.  Those are pretty standard, 15 years, correct?

21   A    No, sir.

22   Q    What's a standard lease?

23   A    Five to seven years.

24   Q    Well, you mentioned there was nothing unusual last week

25   about a 15-year lease.
```

1    A     Properties that ADT had were generally in the five to

2    seven years.

3    Q     But you did say last week there was nothing unusual

4    about a 15-year lease, correct?

5    A     There's nothing unusual about a 20-year lease or a

6    50-year lease or a 30-year lease, but generally speaking,

7    they're five to seven years.

8    Q     Okay.  And in these cases they were 15 years?

9    A     That's correct.

10    Q     Nothing wrong with a 15-year lease?

11    A     Again.

12    Q     Okay.  Let me show you Government Exhibit 6.123.  This

13    is the Pompano lease.  You had mentioned that these -- these

14    were triple net leases, correct?

15    A     My understanding, yes.

16    Q     And you said that the tenant or ADT was responsible for

17    everything in a triple net lease?

18    A     On a triple net lease normally the --

19    Q     Okay.  But they weren't responsible for everything,

20    right?  Bates stamp GE2-1.130.  For example, look at the

21    underlined language.

22         "The tenant"-- that would be ADT/Tyco -- "was not

23    responsible for the roof or the structure of the building,"

24    correct?

25    A     That's correct.

1   Q    Okay.  So there were things that the tenant was

2   responsible for, that ADT and Tyco was responsible for,

3   correct?

4   A    That's correct.

5   Q    If the roof blew off in a hurricane, who had to put it

6   back on?

7   A    The tenant.

8   Q    No, no.  The landlord had to put that back on, right?

9   The tenant wasn't responsible for the roof.  Do you need to

10  see that again?

11  A    Yes, please.  Correct.  I believe in there ADT carried

12  insurance on that building also.

13  Q    Okay.  But who had to maintain the roof?

14  A    Maintain it would have been the tenant.

15  Q    Who had to maintain the structure of the building?

16  A    The tenant.

17  Q    No, no, no.

18  A    ADT.  I'm sorry.

19  Q    The tenant shall not be responsible, right?  If the

20  tenant wasn't responsible, who was responsible for it?

21  A    The landlord.

22  Q    Okay.  So that would be the purchaser of the building,

23  the owner of the building?

24  A    That's correct.

25  Q    Not ADT and Tyco?

1    A    Correct.

2    Q    So when you said last week that ADT and Tyco was

3    responsible for everything, that was not correct?

4    A    That was not correct.

5    Q    Let's talk about ADT and Tyco for a couple of minutes.

6    Last week you mentioned there's all sorts of Tyco companies;

7    Tyco Fire and Security, Tyco Europe.  Lots of Tyco companies.

8    Correct?

9    A    Correct.

10   Q    Lots of layers to Tyco?

11   A    Correct.

12   Q    There's nothing wrong or illegal about having a company

13   with different layers, is there?

14   A    No, not to my knowledge.

15   Q    Pretty standard in the business, right?

16   A    Large corporations.

17   Q    Right.  And ADT, I think you said, was a subsidiary of

18   Tyco?

19   A    Correct.

20   Q    All right.  In 1999, Tyco as well as ADT began to

21   aggressively buy other companies; yes?

22   A    Correct.

23   Q    Pretty aggressive?  They were buying as much as they

24   could?

25   A    Correct.

1    Q    Including SecurityLink, right?

2    A    Correct.

3    Q    And I think you mentioned that the real estate

4    acquisitions jumped from 245 to 500, right?

5    A    The portfolio of properties that -- had grown

6    substantially, correct.

7    Q    To over 500?

8    A    Correct.

9        (Pause in Proceedings.)

10            MR. MARKUS:  Judge, we move in Greg Orr Exhibit 2

11    without objection.

12            MR. SHOCKLEY:  No objection, your Honor.

13            THE COURT:  Two is admitted.

14        (Received in evidence Defendant Gregory Orr Exhibit(s)

15    2.)

16    BY MR. MARKUS:

17    Q    Do you recognize this spreadsheet, Mr. Horton?

18    A    I do.

19    Q    This is a spreadsheet showing real estate at ADT and

20    Tyco?

21    A    Correct.

22    Q    And what it shows is that in 2001 Tyco and ADT had 552

23    properties?

24    A    Correct.

25    Q    And it had gotten rid of over a hundred of those

1    properties between '01 and '02?

2    A    Correct.

3    Q    Down to 451 in '02, correct?

4    A    Correct.

5    Q    And it kept selling properties and selling properties

6    all the way through 2005?

7    A    These are not owned properties, sir, that's going away.

8    99 percent of them are leased properties that we're buying

9    leases out --

10   Q    Either buy the leases --

11   A    -- or lease expires.

12   Q    So either buy the lease out, lease expires, or sell the

13   building, right?

14   A    That's correct.

15   Q    Get out of those buildings?

16   A    If we could.

17   Q    Right.  Well, you did for over a hundred between '01 and

18   '02, correct?

19   A    Some, we just had to wait for the lease to run out.

20   Q    Right.  Between '01 and '02 you got out of over a

21   hundred of them?

22   A    Correct.

23   Q    And there was a reason for that, was there not?

24   A    One of the reasons was based, again, on acquisition

25   reserves and restructuring reserves.  You have a period based

```
 1    on accounting --

 2    Q    Mr. Horton, do you remember Scott MacArthur giving

 3    directives to sell what you could sell, correct?

 4    A    Cash.  Yes, sir.

 5    Q    Because cash was king?

 6    A    Cash.

 7    Q    You remember the expression "cash was king," do you not?

 8    A    Yes.

 9    Q    That's what Scott MacArthur said to you?

10    A    Yes.

11    Q    Sell because cash was king?

12    A    Yes.

13    Q    And you remember that the stock price started to drop at

14    Tyco, correct?

15    A    I don't know the time line on it dropping.  Yes.

16    Q    Between 2001 and 2002 you remember the stock price at

17    Tyco plummeted, correct?

18    A    I think it was later.  I may be wrong.

19         (Pause in Proceedings.)

20    BY MR. MARKUS:

21    Q    I'm going to show you Greg Orr's Exhibit 25.  Sorry for

22    the chart.  I'm going to block the jury for a second.  Is

23    that a chart of the Tyco stock price?

24    A    Where is the price?  $200?

25    Q    I think that's the percentage.
```

1    A    That's not the stock price.

2    Q    This is a fair chart of what was going on with the

3    stock?

4    A    I don't see a price.  How can I say that's a fair price?

5    Q    So let me ask it this way.  Did you own Tyco stock?

6    A    I did in my 401 program.

7    Q    Okay.  You would have watched the price of --

8        (Interruption in proceedings.)

9            THE COURT:  I don't know what's happening.

10   Everyone, try to be careful of the mikes for a minute.

11   BY MR. MARKUS:

12   Q    You're aware, are you not, sir, that the Tyco -- there

13   were problems at Tyco and ADT in -- that became public in

14   2001 and 2002?

15   A    I believe the problem came out in 2002, latter part of

16   2002.

17   Q    But internally at Tyco and ADT, MacArthur was telling

18   you to sell and that cash was king at least in '01, correct?

19   A    Every business goes through periods of cash or earnings,

20   do acquisitions.  Obviously, they wanted cash.

21   Q    This wasn't an ordinary period at a company, was it?

22   A    I don't know how you would classify "ordinary," because

23   a lot of acquisitions, that was their growth pattern.

24   Q    Let me show you a different chart that has the actual

25   price and see if you can recognize this one.  I know these

1    are light, Mr. Horton, but this chart reflects a price down

2    here at 12 and all the way up to close to a hundred, correct?

3    A    Yes.  Tyco stock got up to 100 and split.

4    Q    So in --

5    A    And then it came down from the split, which was about

6    $49, I believe.

7    Q    In 2000, we're up to close to around a hundred, correct?

8    A    2003?

9    Q    2000, 2001, 2002, 2003.  In 2000, we're up to close to

10   around a hundred?

11   A    Okay.  A hundred, correct.  The split.

12   Q    And we dropped to close to $12 a share?

13        MR. SHOCKLEY:  Objection, your Honor.  Until the

14   exhibit is admitted into evidence, I don't think it's proper

15   to publish it.

16        MR. MARKUS:  I'll ask the backup questions.

17   BY MR. MARKUS:

18   Q    Is this a fair and accurate representation of the stock

19   price for Tyco?

20   A    By that document.

21   Q    Well, do you remember that this would be an accurate

22   reflection?

23   A    I only know that it split sometime in 2000.  I thought

24   it was two.

25        MR. PASANO:  Judge, for the sake of the record, can

1    we mark that 25A or -- to at least keep it in the record

2    since he has been shown the document?

3        (Pause in Proceedings.)

4    BY MR. MARKUS:

5    Q    Okay.  Let's get back to Tyco and ADT.

6    A    All right.

7    Q    There were such problems at Tyco and ADT, that they were

8    selling lots of things at losses, correct?

9    A    I don't -- I don't quite understand your question.

10   Q    Well, let's talk about a company named CIT.  You know

11   that Tyco bought CIT for over $9 billion in 2001, correct?

12   A    If that's the price.

13   Q    And you know they sold it for $4 billion the following

14   year, right?

15   A    If -- I don't know what year they sold it in.

16   Q    But you remember that they took a huge loss, over

17   4 billion in loss in one year on one company?  You remember

18   that?  You were there at the company.  Do you remember that?

19   You were senior vice president, I think, of the company.

20   A    I was not involved in Tyco.  I was not a senior vice

21   president.  I was a vice president.

22   Q    I think you told Mr. Shockley you were one of five vice

23   presidents of the company?

24   A    That was in California in 1997.

25   Q    Okay.  So you weren't a senior person or you were a

1    senior person?

2    A    I was a vice president.

3    Q    Were you a senior person or not a senior person at the

4    company?

5    A    I was not a senior vice president.  I'm just answering

6    your question.

7    Q    My question is, were you an upper-level person or not at

8    ADT and Tyco?

9    A    I was a vice president.  We had senior vice presidents

10   and we had presidents.

11   Q    Did you consider yourself upper management or not?

12   A    Yes.

13   Q    So you would have known what was going on at the

14   company?

15   A    Not at Tyco.  I was not employed in Tyco.  I was ADT.

16   Tyco made the acquisition, sir.

17   Q    So you were -- you didn't care to follow what was going

18   on at Tyco?

19   A    It's not that I didn't follow it.  I was not included in

20   their discussions or their meetings.  I was ADT.

21   Q    Did you read the papers?

22   A    Yes, sir.  I certainly read the papers.

23   Q    And you know from reading the papers that Tyco was

24   having serious problems?

25   A    I knew internally that ADT was making money and we were

```
 1    selling.   I did not know Tyco's financial situation other

 2    than what was published at quarterly earnings.

 3    Q    And you knew that Tyco's -- you may not know the exact

 4    price, but you knew it began to plummet, the stock price,

 5    right?   Right?

 6    A    The stock went down.

 7    Q    You knew the CEO Dennis Kozlowski got indicted?

 8    A    I did.

 9    Q    You knew he had to resign?

10    A    I did.

11    Q    You knew Tyco's rating dropped from an A company and it

12    dropped to a B company?   Correct?

13    A    I don't know what the actual rating was.

14    Q    You knew that Tyco pulled out of the commercial real

15    estate market, correct?   I'm sorry, the commercial paper

16    market?

17    A    It could have been in the paper.   I didn't --

18    Q    You knew that Tyco had to draw down on its loans,

19    correct, on its backup loans?

20    A    Whatever was stated in the quarterly that I listened to

21    was the news that I heard from Tyco.

22    Q    And you knew from watching the news and reading the

23    papers, that this -- that the CEO of your company -- I mean,

24    you were a subsidiary of Tyco, correct?

25    A    Correct.
```

1  Q    The CEO, the main boss, Dennis Kozlowski, was indicted,

2  correct?

3  A    Yes, I did.

4  Q    And at the same time he was sued by investors, the very

5  same time?

6  A    Lawsuit.

7  Q    There was a lawsuit filed?

8  A    Correct.

9  Q    Because investors were upset that he was spending money

10  on toga parties and so on?

11  A    As stated in the paper.

12  Q    Right.  This was the culture at Tyco at the time?

13  A    I wasn't Tyco.  I was ADT.

14  Q    Part of Tyco.

15  A    But I was a subsidiary.  I was ADT.

16  Q    And Tyco needed cash as well as ADT needed cash,

17  correct?

18  A    Everybody, I believe, was looking for cash.

19  Q    And as a result of these -- of what was going on at

20  Tyco, Tyco and its subsidiaries were audited, correct?

21  A    Tyco was audited when Mr. Ream (phonetic) came in.

22  Q    There was an internal audit, right?

23  A    I believe.

24  Q    They hired a company named Boyce -- a law firm named

25  Boyce Schiller, right?

 1   A    I don't know the actual name of the law firm.

 2   Q    They spent millions of dollars and thousands of

 3   attorneys' hours to look at what was going on at Tyco and its

 4   subsidiaries, correct?

 5   A    I knew we had an audit.

 6   Q    Right.  In fact, you were asked many times for documents

 7   about the sale of buildings?

 8   A    Correct.

 9   Q    The Government, the SEC, the Security and Exchange

10   Commission, also conducted an audit, correct?

11   A    I don't -- I was not involved in that, so I don't know.

12   Q    You know that they hired a company called Price

13   Waterhouse Cooper to come in and look at the books of Tyco

14   and its subsidiaries like ADT?

15   A    Very well could have.

16   Q    Well, you got e-mails from people at Price Waterhouse

17   asking for certain documents.  Do you remember that?

18   A    Offhand, I do not.

19   Q    Okay.

20       (Pause in Proceedings.)

21           MR. MARKUS:  Judge, I have a new exhibit that's not

22   on the list, Greg Orr Exhibit 27, which I'm offering without

23   objection.

24           MR. SHOCKLEY:  No objection, your Honor.

25           THE COURT:  27 is admitted.

1      (Received in evidence Defendant Gregory Orr Exhibit(s)

2    27.)

3    BY MR. MARKUS:

4    Q    This is an e-mail to you, Mr. Horton, correct?

5    A    Correct.

6    Q    From a woman, at the bottom, it looks like her name is

7    Kim -- I don't know how to pronounce her last name --

8    Barackman.

9    A    Barackman.

10   Q    She's asking you here -- well, she is telling you that

11   the Price Waterhouse -- "PWC" is Price Waterhouse Cooper?

12   A    Correct.

13   Q    "The auditors are looking for closing settlement

14   documentation for this building sale in Oak Brook, Illinois"?

15   A    Correct.

16   Q    And she's asking for documents on that, correct?

17   A    Correct.

18   Q    So the auditors were looking and asking you for

19   documents all the way back in 2003?

20   A    What was the date on that e-mail, sir?

21   Q    October 7, 2003.

22   A    I believe they were trying to do the final closing on

23   the year.

24   Q    So the auditors were asking for documents all the way

25   back in 2003 for these sales, correct?

1   A    For that sale, correct.

2   Q    Okay.  And did the auditors come to you and say, oh, my

3   goodness, this was a sale-leaseback and the prices are all

4   out of whack?  Did that happen in 2003?

5   A    That e-mail, I believe, was related to the assets that

6   they had wrote off, and that's why they were wanting the

7   documents relating to the sale.  She is in fixed assets.

8   Q    Mr. Horton --

9   A    Yes, sir.

10  Q    -- did the auditors come to you or anybody else in 2003

11  and say, these sales are out of whack?

12  A    I don't recall any auditors coming to me.

13  Q    You would have recalled that, wouldn't you have?

14  A    I don't recall them ever coming to me in 2003 and saying

15  these are out of whack.

16  Q    Or 2004 or 2005, right?

17  A    No, sir.

18  Q    With both auditing coming from the Government at the

19  SEC, with Price Waterhouse Cooper, and auditing from an

20  internal audit with David Boyce and his law firm, nobody ever

21  said, man, these deals are crazy high on the leases and crazy

22  low on the sales?  Nobody said anything like that, did they?

23  A    No, sir.

24  Q    You had mentioned last week that there was a board

25  resolution that you weren't aware of authorizing sale of the

1    property, correct?

2    A    That's correct.

3    Q    Actually, what that resolution said was that you also

4    needed to get approval from counsel, correct?

5    A    We can go over the document and look at it.

6    Q    Sure.

7         (Pause in Proceedings.)

8    BY MR. MARKUS:

9    Q    Okay.  This is the document that you said you were not

10   aware of, correct?

11   A    That's correct.

12   Q    This was dated -- at the bottom we see May 9, 2001?

13   A    Correct.

14   Q    Okay.  And what we see on here in the second paragraph

15   is that you could enter into and deliver real estate lease

16   agreements.  And it says here, as approved by corporate

17   counsel, right?

18   A    Correct.

19   Q    So even this document that you weren't aware of said

20   that corporate counsel had to approve it, correct?

21   A    Correct.

22   Q    And there were other documents, Mr. Horton, that you

23   were aware of.  I'm going to show you Government Exhibit

24   1.157.  This is an e-mail explaining the policy at Tyco,

25   correct?  Take a look for a second.

```
 1              MR. PASANO:  Your Honor, can I ask the Court's

 2     assistance?  I'm not sure that's in evidence.

 3              MR. MARKUS:  I'm sorry.  I thought it was.  I'd

 4     move in at this point, Judge, what's listed on the

 5     Government's exhibit list as Government's Exhibit 1.157.

 6              MR. SHOCKLEY:  No objection, your Honor.

 7              THE COURT:  Government's 1.157, was it?

 8              MR. MARKUS:  Yes, your Honor.

 9              THE COURT:  Is admitted.

10        (Received in evidence Government's Exhibit(s) 1.157.)

11              MR. MARKUS:  Thank you.

12     BY MR. MARKUS:

13     Q    This is an e-mail that same month in May '01 explaining

14     the policy at Tyco for disposing of assets, correct?

15     A    Correct.

16     Q    And what it says here on the bottom is:  "If in doubt,

17     do not proceed, but contact Mark Belnick immediately.  Err

18     always on the side of caution.  This policy is to be strictly

19     applied."  Correct?

20     A    Yes.

21     Q    And this e-mail dealt with -- would have applied to ADT

22     as well -- disposing of assets at Tyco and its subsidiaries?

23     A    It appears to go to all finance departments.

24     Q    Including you?  Correct?

25     A    I don't -- is my name on that?
```

1    Q    Well, it says on the e-mail that it goes -- well, do you

2    remember seeing this document?

3    A    I've seen the document.

4    Q    Okay.

5         (Pause in Proceedings.)

6              MR. MARKUS:  Judge, without objection, we move in

7    Greg Orr No. 6.

8              MR. SHOCKLEY:  No objection, your Honor.

9              THE COURT:  Six is admitted.

10        (Received in evidence Defendant Gregory Orr Exhibit(s)

11   6.)

12   BY MR. MARKUS:

13   Q    You do remember this e-mail?  You're on it, correct?

14   A    Yes, I do.

15   Q    This is an e-mail from Laure Roy to Marjorie Desporte,

16   correct?

17   A    Correct.

18   Q    Is it Desporte or Desporte?

19   A    People pronounce it differently.

20   Q    How do you pronounce it?

21   A    Marjorie Desporte.

22   Q    Okay.  And this is an e-mail in November of '02

23   explaining the process for selling real estate?

24   A    That's correct.

25   Q    And it goes through three paragraphs, with all those

1    subparts, correct?

2    A    Correct.

3    Q    And what it explains is that, first, you get finance,

4    Tyco finance approval to sell the property, right?

5    A    Correct.

6    Q    Then Ms. Roy receives a request from Ms. Desporte to

7    obtain Board approval?

8    A    Correct.

9    Q    At the same time Ms. Roy needs to receive from

10   Ms. Desporte confirmation that Tyco finance approved?

11   A    Correct.

12   Q    Copy of the purchase and sale agreement?

13   A    Correct.

14   Q    Legal description of the property?

15   A    Correct.

16   Q    And the name of that purchaser?

17   A    Correct.

18   Q    Then Ms. Roy does a short check on the buyer?

19   A    Correct.

20   Q    Prepares Board resolutions?

21   A    Correct.

22   Q    Sends the resolutions back up to the board members and

23   their assistants, reviewers, and appointees for their review

24   and signature?

25   A    Correct.

1    Q    Then when she gets the signatures back, Gray has to sign

2    it?

3    A    Correct.

4    Q    That's Gray Finney?

5    A    That's the corporate counsel.

6    Q    Right.  And then she sends the secretary's certificate

7    to Ms. Desporte?

8    A    Correct.

9    Q    And then she explains that there are a number of steps

10    and people involved.  It's difficult to predict how long it

11    will take.

12    A    Correct.

13    Q    And then in the next paragraph she says that this is

14    pretty typical in the corporate world, this approval process?

15    A    Correct.

16    Q    Okay.  So even though there's this e-mail that you're

17    unaware of, there is this procedure in place on how to

18    dispose of real estate?

19    A    Correct.

20         (Pause in Proceedings.)

21         MR. MARKUS:  Judge, without objection, we move in

22    Greg Orr No. 10.

23         MR. SHOCKLEY:  No objection, your Honor.

24         THE COURT:  10 is admitted.

25

1      (Received in evidence Defendant Gregory Orr Exhibit(s)

2   10.)

3   BY MR. MARKUS:

4   Q    I want to show you an e-mail, Mr. Horton, from Randi

5   Joseph to Joe Cabera.  You see that e-mail?

6   A    Yes, I do.

7   Q    You're cc'd on it, correct?

8   A    Correct.

9   Q    This e-mail is about the Oak Brook property, correct?

10  A    Correct.

11  Q    And this is an e-mail from Randi Joseph telling somebody

12  at Cushwake that you have a potential buyer for Oak Brook?

13  A    ADT has a potential buyer, correct.

14  Q    Right.  And what it says -- I'm going to put the bottom

15  part -- the very last sentence says, "Please advise if your

16  investor is willing to come in with a better offer," correct?

17  A    Correct.

18  Q    So Randi Joseph is asking somebody else about their

19  potential buyer/investor?

20  A    Correct.

21  Q    Okay.  And what you respond here is, that you didn't

22  like that they gave the actual numbers to this other

23  investor, correct?

24  A    That's correct.

25  Q    That it bordered on ethics?

1   A    Correct.

2   Q    You were concerned about ethics?

3   A    Correct.

4   Q    And what's interesting is your second line says, any

5   investment group can bid on any project, but we will not

6   provide them the prices to make their price better.

7   A    Correct.

8   Q    So what you're telling Randi Joseph, listen, it's okay

9   if these people from Cushwake want to bid on Oak Brook, we

10  just can't give them the prices?

11  A    Correct.

12  Q    This isn't Greg Orr's group?  This is a separate group?

13  A    Separate group.

14  Q    Right.  Somebody else bidding on the Oak Brook property?

15  A    An e-mail asking them if they wanted to bid on it.

16  Q    Right.  And you say, listen, no problem with other

17  people bidding, we just can't give them the numbers?

18  A    Correct.

19       MR. MARKUS:  Judge, one of the documents that the

20  Government gave me this morning I'm going to mark as Greg Orr

21  Exhibit 28, and I will move its admission.

22      (Pause in Proceedings.)

23       MR. MARKUS:  No objection?

24       MR. SHOCKLEY:  No.

25      (Pause in Proceedings.)

1          MR. MARKUS:  I'm going to mark this and offer its

2     admission, Judge, without objection, as Greg Orr 28.

3          MR. SHOCKLEY:  No objection, your Honor.

4          THE COURT:  28 is admitted.

5       (Received in evidence Defendant Gregory Orr Exhibit(s)

6     28.)

7     BY MR. MARKUS:

8     Q    Mr. Horton, do you recognize this letter and the

9     attached document?

10    A    I do.

11    Q    Okay.  This is a letter to Randi Joseph on September 10,

12    2001, correct?

13    A    Correct.

14    Q    From a law office and a lawyer named John Purdy.

15    A    Correct.

16    Q    And this letter is an offer for the Oak Brook property?

17    A    That's correct.

18    Q    From a group called Orion Property Management Services,

19    Inc.?

20    A    Correct.

21    Q    And --

22         MR. MARKUS:  Judge, may I have one moment?

23         THE COURT:  Yes.

24       (Pause in Proceedings.)

25

```
 1   BY MR. MARKUS:

 2   Q    I'm going to show you what's been marked as Greg Orr 29

 3   and ask you if that's your handwriting, sir?

 4   A    Which?  This?

 5   Q    Yes.

 6   A    I believe it is.

 7   Q    Okay.  We'll come back to that in a couple of minutes.

 8           Now, I think you had mentioned earlier that ADT was

 9   selling -- we had spoken about a number of properties,

10   getting out of properties, buying out leases, correct?

11   A    Correct.

12   Q    Okay.  I'm going to show you Greg Orr Exhibit 11.

13       (Pause in Proceedings.)

14           MR. MARKUS:  Without objection, we move in 11,

15   Judge.

16           MR. SHOCKLEY:  No objection, your Honor.

17           THE COURT:  11 is admitted.

18       (Received in evidence Defendant Gregory Orr Exhibit(s)

19   11.)

20   BY MR. MARKUS:

21   Q    This is an e-mail -- well, let's start at the bottom.

22   From Scott MacArthur to you regarding the Aurora property,

23   correct?

24   A    Correct.

25   Q    By the way, Mr. MacArthur is asking who reviewed the
```

 1    lease.  So he was aware of the lease on this property,

 2    correct?

 3    A    Correct.

 4    Q    Okay.  It was your testimony before that he didn't look

 5    at the leases or just, he didn't look at some of the leases?

 6    A    I answered that very quickly.  I don't know if Mr. Scott

 7    MacArthur had ever seen this property.  He was CFO.  I don't

 8    know what time line he came in to be CFO and what time this

 9    property came online as far as leased.

10    Q    Well, here we are in '01, correct?

11    A    Correct.

12    Q    He was CEO by at least November of '01, because he's

13    writing the e-mails --

14    A    Correct.

15    Q    -- about leases?

16    A    Correct.

17    Q    About the Aurora lease?

18    A    Correct.

19    Q    And you had entered into a lease with Aurora, right, an

20    Aurora property?

21    A    Correct.

22    Q    And what this says when you write back a couple hours

23    later at 8:41 a.m., regarding the Aurora lease, that the

24    lease was reviewed by an outside attorney Loren Newman,

25    correct?

1    A    Correct.

2    Q    Gray Finney must have also reviewed the lease because he

3    referred the contract to Mr. Newman, John Curlew, and Mark

4    Spillane's attorney, correct?

5    A    Correct.

6    Q    Okay.  So now we have Scott MacArthur and Gray Finney

7    looking at this Aurora lease, correct?

8    A    Again, I don't know if Mr. Scott MacArthur ever saw the

9    lease, sir.

10    Q    Well, at the bottom he asks who reviewed the lease?

11    A    That's correct.

12    Q    So he was concerned about this particular lease?

13    A    Correct.

14    Q    By the way, this Aurora property had nothing to do with

15    Greg Orr, correct?

16    A    I believe Mr. Orr was going to, or did make an offer on

17    Aurora.

18    Q    He didn't get it?

19    A    That's correct.

20    Q    Somebody else got it?

21    A    It was never -- never sold, sir.

22    Q    Somebody else leased it?

23    A    There's two facilities in Aurora.  Now, one we've always

24    owned, and the second one was built, which involved

25    Mr. Spillane.  This is not the property that Mr. Orr bid on.

1    Q    Okay.  I want to talk about this one.

2    A    Okay.

3    Q    ADT had somebody named Mark Spillane build a property in

4    Aurora?

5    A    That's correct.

6    Q    And then it was leased?

7    A    That's correct.

8    Q    Okay.  And what you say in this e-mail is that the

9    contract was not written in our, ADT, best interest, correct?

10   A    Correct.

11   Q    Even though Randi Joseph reviewed the contract, even

12   though it was approved by Mr. Loren, even though Gray Finney

13   referred it out, here is a lease and a contract that was not

14   written in ADT's interest?

15   A    Correct.

16   Q    That had nothing to do with Greg Orr?

17   A    And, again, that was my opinion.

18   Q    Your opinion that there's a lease that was not written

19   in ADT's best interest that had nothing to do with Greg Orr?

20   A    That's correct.

21   Q    Okay.  ADT had entered into a bad lease that was not in

22   ADT's interest?

23   A    From an operational standpoint, and not an attorney,

24   that was my opinion.

25   Q    Right.  And this is what was going on at ADT and Tyco,

1    you were selling things and leasing things that were not in

2    ADT's interest all the time, across the board, correct?

3    A    No.

4    Q    All right.  Let's talk about another one then.  By the

5    way, before we get to the next one, who is Mark Spillane?

6    A    He is a contractor located, I believe, here in Florida.

7    Q    He built a bunch of properties for ADT?

8    A    He did.

9    Q    And he got pretty favorable terms on those properties?

10   A    I was not involved in those negotiations.

11   Q    I know.  But you reviewed them, haven't you?

12   A    I reviewed them, correct.

13   Q    Yes.  And they weren't written in ADT's best interest,

14   were they?

15   A    They weren't favorable to ADT.

16   Q    And there were a number of contracts that you, Mr. Orr

17   weren't involved in, that ADT entered into with this man Mark

18   Spillane that weren't favorable to ADT?

19   A    I was not involved in those negotiations or contracts.

20   Q    I understand, Mr. Horton.  But you reviewed them and you

21   have an opinion about them.

22   A    And obviously that was my opinion.

23   Q    That they weren't favorable to ADT?

24   A    But that was not ADT's opinion evidently.

25   Q    ADT could have a different opinion about what was

1    favorable and not favorable because of their own

2    circumstances, correct?

3    A    Correct.

4    Q    Okay.  So even though you may not think something is

5    favorable, ADT may come back and say, you know what, we need

6    cash or we need this facility or whatever the reasoning is,

7    they might believe it's worth doing, even though they may

8    take a short-term loss or whatever the circumstance is,

9    correct?

10   A    They make the decisions.

11   Q    They make the decisions.  Exactly.

12            Let's talk about Greg Orr Exhibit 13.

13       (Pause in Proceedings.)

14            MR. MARKUS:  Judge, without objection, move in Greg

15   Orr 13.

16            MR. SHOCKLEY:  No objection.

17            THE COURT:  13 is admitted.

18       (Received in evidence Defendant Gregory Orr Exhibit(s)

19   13.)

20   BY MR. MARKUS:

21   Q    Here is another property, Sassafras, Erie, Pennsylvania,

22   correct?

23   A    Correct.

24   Q    This is an e-mail from Daryl Terella to Jeff Read,

25   correct?

1    A    Correct.

2    Q    You see this e-mail chain, because later on you get this

3    e-mail, correct?

4    A    Correct.

5    Q    This is an e-mail where Daryl Terella goes to Sassafras

6    to look at the property?

7    A    Correct.

8    Q    And he says the interior is outdated, correct?

9    A    Right.

10   Q    To move down that paragraph, I'm not sure of the current

11   condition of the HVAC, electrical, plumbing, roof, correct?

12   A    Right.

13   Q    He says the property is currently assessed at a value of

14   71,000 for land and building, right?

15   A    For taxes, correct.

16   Q    It's this man's opinion that it's assessed too high,

17   right?

18   A    We're trying to sell it.  He indicated it would sell for

19   possibly 55,000.

20   Q    And the next line he says, maybe between 55 and 58 is

21   what it should list at, right?

22   A    Correct.

23   Q    And you should consider any offer in excess of $40,000,

24   right?

25   A    Correct.

1    Q    And you move down.  He talks about drawbacks of the

2    property, like onsite parking?

3    A    Correct.

4    Q    There's an area in front of the building that only will

5    accommodate a couple of cars?

6    A    Again, this is a simple sale.  No leaseback.

7    Q    Okay.  Stick with me?

8    A    I am.

9    Q    Next paragraph says that they have a cash offer of

10   25,000 for this Sassafras property, correct?

11   A    Correct.

12   Q    He believes a potential buyer might pay a little more,

13   right?

14   A    Correct.

15   Q    But this man at Baldwin Brothers, Daryl Terella, says,

16   actually, he has a buyer who might be interested to pay

17   35,000, right?

18   A    Correct.

19   Q    And even though the assessed value is 71,000, you're

20   talking about selling the property for somewhere in the

21   $35,000 range, correct?

22   A    Simple sale.  That's correct.

23   Q    I understand.  That's what -- ADT is going to take a hit

24   on this property; yes?

25   A    Correct.

1   Q    That was what was going on at ADT at the time, correct?

2   A    It was to our interest to move the properties and not

3   try to continue to maintain them when they costly

4   deteriorate.   That's correct.

5   Q    Greg Orr had nothing to do with that Sassafras property?

6   A    No, he did not.

7            MR. MARKUS:   Greg Orr Exhibit 14.

8        (Pause in Proceedings.)

9            MR. MARKUS:   Judge, there's a relevancy objection

10   to Greg Orr No. 14.

11            THE COURT:   Can I see it?

12            MR. MARKUS:   Yes, sir.

13        (Pause in Proceedings.)

14            THE COURT:   What is this?   Just another property?

15   Is that the point?

16            MR. MARKUS:   This is a similar chart, Judge, to the

17   chart he prepared on the three properties showing those sales

18   for a loss.

19            MR. SHOCKLEY:   We object.   It's not relevant to the

20   four sales in this case.

21            THE COURT:   Overruled.   14 is admitted.

22        (Received in evidence Defendant Gregory Orr Exhibit(s)

23   14.)

24   BY MR. MARKUS:

25   Q    You prepared spreadsheets like the ones you did for the

1    three properties for other properties, right, Mr. Horton?

2    A    Yes.

3    Q    Okay.  And this was actually produced by you.  We see

4    your "WLH" at the bottom, right?

5    A    Yes.

6    Q    Okay.  I'm going to try to fix that mike one more time.

7          This dealt with two properties, Hartford,

8    Connecticut, and a Massachusetts property, right?

9    A    Correct.

10   Q    Okay.  And we have the offer prices, the sale prices,

11   the market value, the asset value.  And wait.  The loss on

12   the sale.  Correct?

13   A    That was the sale price versus the assets listed against

14   the property.

15   Q    And this spreadsheet that you sent to your superiors

16   showed that on these two properties -- on one of them you

17   were losing 211,000, and on the other 295,000?

18   A    That's correct.  And again, these were simple sales with

19   no leaseback.

20   Q    So you're willing to lose money on simple sales, just

21   not on other sales.  Is that your testimony?

22   A    These buildings were in the same condition as you had

23   previously reported.  They came through acquisitions.  They

24   had been sitting with the acquisition, and the buildings were

25   obviously very -- as stated by that other one, the interior

1    was terrible.  Rather than continue to let the buildings

2    deteriorate, they made the decisions to sell.

3    Q    Lots of reason why you might want to sell a building at

4    a loss?

5    A    That's correct.

6    Q    All right.  And in this case you sold the building -- it

7    says, loss on sale, $551,000?

8    A    That's correct.  And these properties again was handled

9    by Grubb & Ellis, and these were bidders that had bid on

10   these buildings.

11   Q    Mr. Horton.

12   A    I'm just letting you know.

13   Q    Thanks for letting me know.  But my question to you is,

14   the losses --

15   A    This is the best price we could get.

16   Q    Excuse me, sir.  The loss on these two properties was

17   551,000?

18   A    That's correct.  The best price we could get.

19   Q    ADT was willing to lose 551,000 because, if we see here,

20   the total cash from the sale was 590,000?

21   A    Correct.

22   Q    So even though you lost $551,000, you got an inflow of

23   cash?

24   A    Again, the 551 was assets that were written off.

25   Q    Okay.  But, Mr. Horton, this isn't difficult.  You were

```
 1   willing -- ADT, your superiors, were willing to take a loss

 2   of $551,000 on two buildings to get an inflow of cash of

 3   590,000?

 4   A    That's correct.

 5   Q    In fact, if they wanted to -- if they didn't like these

 6   prices, they could have said, don't sell like they did with

 7   other buildings, correct?

 8   A    They could have not approved them.

 9   Q    Right.  But they approved them even at a loss of over a

10   half a million bucks?

11   A    That's correct.

12             MR. MARKUS:  Greg Orr Exhibit 15.

13        (Pause in Proceedings.)

14             MR. SHOCKLEY:  Again, objection, relevancy, your

15   Honor.

16             MR. MARKUS:  It's another one, your Honor.  I'm

17   going to hand it up.

18        (Pause in Proceedings.)

19             THE COURT:  All right.  Overruled.  Is this 15 or

20   18?

21             MR. MARKUS:  15, your Honor.

22             THE COURT:  15 is admitted.

23        (Received in evidence Defendant Gregory Orr Exhibit(s)

24   15.)

25
```

1    BY MR. MARKUS:

2    Q    I'm going to show you an e-mail that you wrote in

3    October of '03.  You see this e-mail?

4    A    Yes.

5    Q    Dealt with the property 301 Franklin?

6    A    Yes.

7    Q    We see the sale price in that e-mail is 125,000?

8    A    Yes.

9    Q    The assets on the building and land, 277,000?

10   A    Yes.

11   Q    How much did ADT lose on the deal?

12   A    152,106.99.

13   Q    Even though you were losing 152,000 on that deal, did it

14   get approved?

15   A    Yes.

16   Q    Did that deal have anything to do with Greg Orr?

17   A    No.

18        MR. MARKUS:  Greg Orr 16.

19      (Pause in Proceedings.)

20        MR. MARKUS:  Judge, without objection, we move in

21   Greg Orr 16.

22        MR. SHOCKLEY:  No objection, your Honor.

23        THE COURT:  16 is admitted.

24      (Received in evidence Defendant Gregory Orr Exhibit(s)

25   16.)

1    BY MR. MARKUS:

2    Q    I'm going to show you a chart that you made.  Do you

3    recognize this chart?

4    A    That's my spreadsheet.

5    Q    Your Excel spreadsheet for a property at 335 West 16th

6    Street, New York?

7    A    That's correct.

8    Q    Now, this was a lease, correct?

9    A    This was an actual lease.

10   Q    This was an actual lease.  We see on this side of the

11   chart the lease numbers going up every year, correct?

12   A    With escalations.

13   Q    Nothing hinky about that?

14   A    No, sir.

15   Q    Now, what's interesting about this New York property is,

16   ADT extends the lease from 15 to 20 years, correct?

17   A    Correct.

18   Q    Why did ADT do that?

19   A    To receive $1.3 million in cash.

20   Q    This is what you wrote on the chart?

21   A    That's correct.

22   Q    ADT extend the 15-year lease to a 20-year lease after

23   just moving in, which added additional long-term cost for the

24   five years of 17 million plus dollars to get 1.3 million cash

25   from the landlord to pay bills.

```
 1   A     That's correct.

 2   Q     So let me make sure I understand this.  ADT made -- this

 3   deal has nothing to do with Greg Orr, does it?

 4   A     No, it does not.

 5   Q     ADT made a decision to increase the rent for five years

 6   at a cost of over $17 million to get a check for 1.3 million?

 7   A     That's correct.

 8   Q     Was that good business sense?

 9   A     ADT made that decision.  I didn't.

10   Q     ADT seemed to be making lots of decisions which cost it,

11   in this case, 16 million bucks, huh?

12   A     In the future, that's correct.

13   Q     Right.  $16 million is a lot of money, isn't it?

14   A     That was ADT's decision.

15   Q     ADT's money?

16   A     That was ADT's decision.

17   Q     Right.  They made a decision to give 1.3 million now --

18   sorry, to get 1.3 million now and spend $17 million later?

19   A     That was their decision.

20   Q     That's pretty good for that landlord; no?

21   A     Again, that was ADT's decision.

22   Q     I know.  But do you think that was a pretty good deal

23   for that landlord?

24   A     I wasn't involved in that lease.

25   Q     I know.  But do you think that was a good deal for the
```

1    landlord?

2    A    You would have to ask the landlord.  I don't know.

3    Q    You don't know whether paying 1.3 million to get

4    17.3 million is a good deal?

5    A    I didn't do the math.

6    Q    No, no, no.  You did do the math.  This was your --

7    A    No, no.  I don't know what return.  In other words,

8    that's future dollars.  I don't know.  ADT was going to pay

9    that 16 years in the future.  That could have been worth

10   $2 million based on inflation.

11   Q    So your testimony is you don't know whether it's a good

12   deal to pay 1.3 now to get 17 million later.  That's your

13   testimony?

14   A    They tell you future dollars, the way inflation is going

15   is going to be worth almost nothing.  So ADT made the

16   decision.  I have to leave it up to them.

17   Q    Fair enough.  ADT made the decision?

18   A    Yes.

19   Q    Good.

20            THE COURT:  Find a convenient time to break.

21            MR. MARKUS:  This is a convenient time, Judge.

22            THE COURT:  We'll take a 15-minute recess and

23   return at 11 o'clock.

24        (Jury out at 10:44 a.m.)

25            THE COURT:  We'll be in recess 15 minutes.

```
 1                    MR. MARKUS:  Thank you.

 2          (Recess at 10:44 a.m.)

 3                    THE COURT:  Okay.  Are we ready for the jury,

 4      Mr. Markus?

 5                    MR. MARKUS:  I am, Judge.

 6                    THE COURT:  Please invite them in.

 7                    How are you coming?

 8                    MR. MARKUS:  Half hour more.

 9          (Jury in at 10:58 a.m.)

10                    THE COURT:  Welcome back.  Please be seated.

11                    Please continue, Mr. Markus.

12                    MR. MARKUS:  Thank you, your Honor.

13                    Judge, without objection, we move in Greg Orr 26.

14                    MR. SHOCKLEY:  No objection, your Honor.

15                    THE COURT:  26 is admitted.

16          (Received in evidence Defendant Gregory Orr Exhibit(s)

17      26.)

18      BY MR. MARKUS:

19      Q    Let me show you this spreadsheet.  This is a spreadsheet

20      you prepared, Mr. Horton?

21      A    I did.

22      Q    Now, let's -- a lot of numbers on this piece of paper

23      and sort of hard to see.  But is this spreadsheets of the

24      leases for Jacksonville, Aurora, Fisher, Henrietta, and New

25      York?
```

1    A    That's correct.

2    Q    These are all leased properties, correct?

3    A    Correct.

4    Q    These are all leases, I see, for 20 years?

5    A    Correct.

6         THE WITNESS:  I'm sorry.  I think that's me.

7         (Interruption in proceedings.)

8    BY MR. MARKUS:

9    Q    Maybe you should turn it off.  Maybe that's what's

10   affecting the microphone.

11   A    I did.

12   Q    Okay.  So these are the leases for those five

13   properties?

14   A    That's correct.

15   Q    Okay.  And these were all for 20 years, I think, right?

16   A    That's correct.

17   Q    Okay.  Nothing untoward or unusual about a lease for 15

18   years or more?

19   A    That's correct.

20   Q    Okay.  And Greg Orr had nothing to do with these five

21   properties?

22   A    He did not.

23   Q    Okay.  These were leased to somebody else, correct?

24   A    These were leased to ADT.

25   Q    Okay.  Bought by somebody else?  Purchased by ADT and

1    leased by ADT?

2    A    These were all built-to-suits.

3    Q    Built-to-suit by this guy Mark Spillane?

4    A    Yes.

5    Q    And over the 20 years of these leases, ADT was going to

6    pay $216 million plus?

7    A    Yes.

8    Q    Now, KCGF, I think you said was your company?

9    A    That's correct.

10   Q    I want to ask you about the checks from KCGF to either

11   you, your wife, or to Cash.  Okay?

12   A    Okay.

13   Q    All right.  These are all from Government's

14   Exhibit 18.26.

15            Now, did your wife know what KCGF was?

16   A    It was a company I set up to invest in real estate.

17   Q    Okay.  And she was a co-signer on the account, was she

18   not?

19   A    She was.  Through the recommendation of Marty Genauer as

20   shared to me by Mr. Greg Orr.

21   Q    Okay.  Let's go through some these checks.

22            MR. MARKUS:  These are all in, Judge, under 18.26

23   of the Government.

24   BY MR. MARKUS:

25   Q    Here's a check in '03, right?

```
 1    A    Correct.

 2    Q    From KCGF?

 3    A    Correct.

 4    Q    Made out to Cash?

 5    A    Correct.

 6    Q    For how much?

 7    A    $20,000.

 8    Q    Who signed it?

 9    A    My wife.

10    Q    A couple months later, another check.  How much is this

11    one for?

12    A    $2,100.

13    Q    Made out to?

14    A    Cash.

15    Q    Signed by?

16    A    My wife.

17    Q    Here, we have a big one, huh?

18    A    Yes.  100,000 signed by my wife.

19    Q    To Cash?

20    A    Cash.

21    Q    So you pulled out 100,000 in cash from KCGF?

22    A    They were transferred to two other accounts.  One is

23    Atlantic -- Bank Atlantic and the other one was SunTrust.

24    Q    These checks aren't written to Bank Atlantic or

25    SunTrust, they're written to Cash?
```

```
 1    A    I understand.  That's where the money ended up going.

 2    Q    And you asked your wife to do this?

 3    A    I asked my wife to do this.

 4    Q    We're still in '03 now.  Here is more cash.  2400 bucks.

 5    A    Correct.

 6    Q    Signed by your wife, correct?

 7    A    Correct.

 8    Q    Here is another big one for 50,000.  Still in '03.

 9    Signed by your wife?

10    A    That's correct.

11    Q    Now, who were you using this cash to pay off at ADT,

12    Mr. Horton, when you pulled this money in?

13    A    These were going into other accounts, sir.

14    Q    That's your testimony?

15    A    SunTrust, Bank Atlantic.

16    Q    You weren't using this cash to pay your superiors at

17    ADT?

18    A    These funds were being deposited into two other bank

19    accounts, SunTrust and --

20    Q    Okay.  But my question was --

21    A    No, sir.

22    Q    Here is another one for 50,000 signed by your wife?

23    A    Correct.

24    Q    Okay.  By the way, that's still in '03, correct?

25    A    Yes.
```

1    Q    Okay.  More -- here is another one.  Now we start right

2    at the beginning of '04.  Your wife's writing it to herself

3    for $100,000?

4    A    Yes, sir.

5    Q    By the way, at the very beginning of this case before

6    you were indicted, there were talks about your wife also

7    being indicted, were there not?

8              MR. SHOCKLEY:  Objection, your Honor.

9              THE COURT:  Sustained.

10              MR. MARKUS:  Judge, this goes to the deal he

11    struck.

12              THE COURT:  The objection is sustained.

13    BY MR. MARKUS:

14    Q    Well, let me ask you about the deal you struck, sir.  As

15    part of the deal you struck with the Government, you're aware

16    that your wife will not be indicted in this case, correct?

17    A    My wife was never indicted.

18    Q    Okay.  And you're aware that before the indictment came

19    down in this case, you struck a deal so that your wife would

20    not get indicted, correct?

21    A    No, sir.

22    Q    More checks to your wife and to Cash for 18,000 and then

23    2,000, correct?

24    A    Correct.

25    Q    To your wife for 18,000?

```
 1    A    Correct.

 2    Q    32,000 to Cash --

 3    A    Correct.

 4    Q    -- signed by your wife?

 5    A    Correct.

 6    Q    2,000 and 17,000 to Cash signed by your wife?

 7    A    Correct.

 8    Q    We're in '04 now, correct?

 9    A    Correct.

10    Q    Again in '04, 2,000 and 18,000 to Cash signed by your

11    wife?

12    A    Correct.

13    Q    Next month, again, 2,000 and 18,000?

14    A    Correct.

15    Q    Next month, 3,000 and 18,000?

16    A    Correct.

17    Q    That was all '04, right?

18    A    Correct.

19    Q    We have the same thing in '05, right?  You want to see

20    the checks?

21    A    Yes, please.

22    Q    Here is the checks starting in '05.  Let me zoom in for

23    you.  18,000 signed by your wife, right?

24    A    Okay.

25    Q    And here is another one for 18,000 signed by your wife
```

1    in '05?

2    A    Correct.

3    Q    You lied to your wife during the course of all of those

4    years about what that money was, correct?

5    A    I did not tell my wife the truth about the real estate

6    companies.

7    Q    And when you don't tell the truth, that's what we call a

8    lie?

9    A    That's correct.

10   Q    Okay.  Now, we had discussed at the very beginning on

11   Friday afternoon when I first started questioning you, the

12   handwritten notes from your FBI interview.  Do you remember

13   that?

14   A    Yes, I do.

15   Q    And the lies that you told to the FBI?

16   A    Yes.

17   Q    And you agreed with me that your handwritten statement

18   was not accurate, was not the truth?  Correct?

19   A    My statements to the FBI was not the truth.

20   Q    Your statements to the FBI were not the truth?

21   A    That's correct.

22   Q    And after that you decided to type up what really

23   happened, didn't you, Mr. Horton?

24   A    I typed up a document.

25   Q    Of what really happened in this case?

```
 1   A    I typed up a document.

 2   Q    Of what really happened in this case, correct?

 3   A    I would have to see the document.

 4        MR. MARKUS:  I'm going to mark this Greg Orr 30,

 5   your Honor.

 6   BY MR. MARKUS:

 7   Q    This is a document that you typed up, correct?

 8   A    Correct.

 9   Q    And, in fact, on Page 2, that was the handwriting I

10   showed you earlier where it says Randi Joseph, that was your

11   handwritten note?

12   A    Correct.

13   Q    Okay.

14        MR. MARKUS:  Judge, at this point we move in Greg

15   Orr Exhibit 30.

16        MR. SHOCKLEY:  Your Honor, I haven't had an

17   opportunity to read the whole document, but I would like to

18   have the witness identify this document as far as what the

19   circumstances were.  I just don't know right now.

20        MR. MARKUS:  I'll get there, Judge.

21   BY MR. MARKUS:

22   Q    Did you write this, Mr. Horton?

23   A    I typed up this document.

24        MR. SHOCKLEY:  I move it in, Judge -- oh, he has a

25   copy up there.
```

1              MR. MARKUS:  Yes.

2              MR. SHOCKLEY:  No objection.

3              THE COURT:  30 is admitted.

4         (Received in evidence Defendant Gregory Orr Exhibit(s)

5    30.)

6    BY MR. MARKUS:

7    Q    I want to go through this document with you sentence by

8    sentence of what you typed up after you lied to the FBI

9    agents.  Let's go through this document about what you typed

10   up about what really happened.

11             ADT acquisition history.

12             MR. MARKUS:  Can everybody see this okay on the TV?

13   BY MR. MARKUS:

14   Q    Okay.  You wrote, in 1999, Tyco/ADT started aggressively

15   the acquisition of security companies.  These acquisitions of

16   security companies could include only revenue or revenue with

17   assets.  Correct?

18   A    Correct.

19   Q    Next sentence.

20             "As a result of the Tyco/ADT's acquisitions over

21   the next two years, the ADT real estate locations increased

22   from 245 to over 500."

23   A    Correct.

24   Q    "In 2000, Tyco changed ADT's CFO, Jeff Ahrenstein was

25   replaced with Scott MacArthur, who came from Tyco."  Right?

1          So, by the way, MacArthur was the CEO in 2000.  We

2     know now, right?

3     A    Yes.

4     Q    "Over the next two weeks, Scott MacArthur and I had

5     several meetings and one of the areas he wanted acted on

6     quickly was the sale of any equipment not needed, along with

7     the buyout of any equipment leases that were still listed in

8     the acquisitions or restructuring reserves."

9          You wrote that, right?

10    A    Yes.

11    Q    Next paragraph.  "Late 2000, Scott reassigned" --

12    that's Scott MacArthur, correct?

13    A    Correct.

14    Q    "Scott reassigned the responsibility for ADT's real

15    estate group over to my department."

16         By the way, that little three, that's a footnote

17    you dropped on this paper?

18    A    That's correct.

19    Q    We'll get to those in a second.

20         "In the next meeting Scott said these real estate

21    properties must be moved out by either buyout of leases,

22    property sales, or sale-leaseback of the identified

23    locations."  You wrote that, did you not?

24    A    I did.

25    Q    "In mid 2001, Tyco acquired SecurityLink, the fourth

1    largest alarm company, which came with more than 150 property

2    locations.  After the acquisition and in the next meeting,

3    Scott said, cash was king."  You wrote that, did you not?

4    A    I did.

5    Q    And he, Scott, MacArthur, would review any offers, lease

6    buyout, property sales, or SLB, to move out these properties.

7    Right?

8    A    Correct.

9    Q    Scott was going to review those is what you wrote,

10   right?

11   A    He indicated he would.

12   Q    Yes.  And it said, "Scott said Tyco wants these

13   properties gone."  Right?  You wrote that?

14   A    I did.

15   Q    "Real estate history.  At a holiday party, late 2000, I

16   had a casual conversation with Greg Orr to question his

17   interest in purchasing real estate from ADT."

18          You wrote that?

19   A    Yes.

20   Q    All right.  "Greg had a few questions; what is the

21   timing on these properties?  What are the locations?  My

22   responses to the questions were; I did not know when this

23   would happen, I do not make the decision on which locations,

24   and I do not have the ability to approve any of these

25   transactions.  Approval will come from ADT and Tyco."

1        You wrote that, did you not, Mr. Horton?

2   A    I did.

3   Q    "Greg indicated an interest.  I then said I would get

4   back to him."  You wrote that as well?

5   A    I did.

6   Q    "The next time I contacted Greg Orr was sometime in

7   August of 2001 to discuss if he still wanted to bid on the

8   ADT properties."  Correct?

9   A    Correct.

10  Q    So now we're -- you had first mentioned the holiday

11  party in late 2000.  Now we're six months later, and you're

12  the one going back to Greg to see if he was interested,

13  correct?

14  A    That's correct.

15  Q    You wrote, "I gave Greg a spreadsheet that had

16  addresses, square footage, and age of seven or eight

17  properties.  These locations were a combination of sale and

18  sale-leaseback."  You wrote that?

19  A    I did.

20  Q    Okay.  Before we go to the next sentence, let's just

21  make sure -- I want to make sure.  You wrote all four of

22  those footnotes, right?

23        Let's take each one.

24  A    That's correct.  All four.

25  Q    Let's start with the last one, because here we see a

1    little four next to Greg Orr, right?

2    A    Yes.

3    Q    So we would look at footnote four.  You describe Greg

4    Orr, which says, "neighbor, I met him through my wife,

5    meeting his wife along with several invitees to social

6    gatherings.  At these functions, I heard Greg was involved in

7    several businesses, along with owning some commercial

8    property."

9    A    Correct.

10   Q    Right.

11           Footnote three discusses -- let's read it.

12           "The group" -- talking about the real estate group

13   -- "was composed of two employees, Marjorie Desporte and

14   Randi Joseph, both real estate attorneys.  Margie and Randi

15   handled all lease renewals directly with the landlords, lease

16   buyouts with the landlords, property sales, and SLBS with the

17   landlord's representative.  Margie and Randi reported to

18   ADT's general counsel and dotted line to me."

19   A    That's correct.

20   Q    Footnote two is talking about the growth of properties.

21           "This growth in property locations was due to

22   acquisitions, along with the consolidation of field offices.

23   This consolidation of properties left hundreds of empty owned

24   and leased properties unusable."

25   A    Correct.

1    Q    And footnote one, just so that we know what we're

2    talking about here, was up at the top, where you said, "These

3    acquisitions of security companies could include only revenue

4    or revenue with assets," you dropped a footnote that said,

5    "This could include any owned real estate property, empty or

6    occupied"?

7    A    Correct.

8    Q    Let's move on with the actual document.  The last

9    sentence on the first page said, this is -- now we're

10    talking -- you were talking with Greg Orr.

11           "I stated that he" -- you're talking about Greg

12    Orr, right?

13    A    Correct.

14    Q    -- "needed to do his own research on the properties and

15    then forward any written offer to Marjorie Desporte at ADT."

16           You wrote that, did you not, Mr. Horton?

17    A    I did.

18    Q    You wrote this after you lied to the FBI?

19    A    I wrote this --

20    Q    You lied to the FBI?

21    A    Lied to the FBI.  This went to my attorney.

22    Q    Okay.  To explain what happened?

23    A    Correct.

24    Q    Okay.  I also stated that if he, Greg, was lucky enough

25    to get any of these properties, you wanted a percentage of

1    the profit.  That's what you wrote, correct?

2    A    Correct.

3    Q    "Sometime in September 2001, Margie Desporte received

4    seven or eight offers from properties from Greg Orr's

5    representatives," right?

6    A    Correct.

7    Q    "Out of these seven or eight offers sent in to ADT, only

8    three properties:  Palm Harbor, Florida; Lancaster; and

9    Pompano, Florida, were negotiated based on prior appraisals

10   that came with the acquisition, along with brokers opinion of

11   value provided by Tyco's real estate company, Grubbs-Ellis."

12   A    Correct.

13   Q    Let's look at those footnotes that we have.  We have a

14   "five" after appraisal and "six" after broker opinion of

15   value.  Let's read it as we go.

16          No. 5 says:  "SecurityLink did appraisals on the

17   properties prior to being acquired by ADT.  These documents

18   should be part of the closing documentation.  Sales in the

19   area similar to our property were the primary model used to

20   value the property."

21          That's what you wrote, right?

22   A    Correct.

23   Q    And No. 6:  "The broker opinion of value" -- footnote

24   says -- "BOV, broker's opinion of value, provide additional

25   information as to the value of the property.  Sales in the

1    area similar to our property were the primary model used for

2    sale."  Correct?

3    A    Correct.

4    Q    Let's get back to the text.  Next paragraph says:  "Once

5    Margie finalized the offers, all documentation was forwarded

6    to Scott MacArthur, ADT CFO, for his review and approval."

7    You wrote that?

8    A    I did.

9    Q    "If Scott approved, the documentation would then be

10    forwarded to Tyco for approval, along with copies to Laure

11    Roy."  You wrote that?

12    A    I did.

13    Q    Let's just see what footnote seven says since we have a

14    notation there.  "This is Tyco/ADT's approval process for

15    real estate transactions."  Right?

16    A    Correct.

17    Q    The next sentence, we're right here:  After Tyco

18    approved, Laure Roy would then go to the Tyco board for

19    approval to finalize the secretary certificate for general

20    counsel's signature."  Right?

21    A    Correct.

22    Q    "Once the secretary certificate is signed by general

23    counsel, legal would then release the original sale and lease

24    documents for my signature.  Once the documents had my

25    signature, legal would then forward the documents to the

1    outside attorneys handling the closing.  After closing, all

2    the documentation would then be sent back to either treasury

3    with the check, the ADT real estate lawyers, Laure Roy, ADT

4    legal, or Tyco."  You wrote that, correct?

5    A    I did.

6    Q    "In the first quarter of 2001 an offer from Greg Orr's

7    representative was sent in for the property located at Oak

8    Brook, Illinois.  The same procedure was followed for

9    approvals."  You wrote that, did you not?

10   A    I did.

11   Q    And finally the last paragraph said:  "A total of four

12   properties were purchased and leased back to ADT.  Margie

13   Desporte and Randy Joseph handled the negotiations, which

14   included the final sale price and legal requirements related

15   to the contracts."

16            You wrote that, did you not, Mr. Horton?

17   A    I did.

18            MR. MARKUS:  I have nothing further, your Honor.

19            THE COURT:  Mr. Birch, do you have questions?

20            MR. BIRCH:  Your Honor, I believe Mr. Pasano is

21   going next.

22            MR. PASANO:  Actually, your Honor, if we could, I

23   think the order was Mr. Kaiser, Mr. Entin, and then me, and

24   then Mr. Birch.

25            THE COURT:  Well, is there anyone who would like to

1    cross-examine?

2              MR. KAISER:  Yes, your Honor, I would.

3              THE COURT:  Mr. Kaiser, go ahead.

4                         CROSS-EXAMINATION

5    BY MR. KAISER:

6    Q    Good morning, Mr. Horton.

7    A    Good morning.

8    Q    You and I have not had an opportunity to meet or speak

9    prior to today, have we?

10   A    We have not.

11   Q    We have not gone over any questions that I have to ask

12   of you and you have no idea what I'm going to ask?

13   A    I do not.

14   Q    I don't either, but I'll get there.

15              Just a few questions for you.

16              Did you have concerns that your wife faced

17   liability in this case?

18   A    When a threat's made, you -- I think you would have a

19   concern.

20   Q    Well, when you had her write checks of $100,000 and

21   amounts less than that to what you say deposit into other

22   banks, did you have concerns that this might be a problem for

23   her?

24   A    I never thought about it.

25   Q    Did you have concerns she was also listed as an owner by

1    tenancy of the entireties as KCGF?

2    A    I never thought about it.

3    Q    Now, being your wife, you did not feel the need to

4    disclose everything about this scheme that you orchestrated?

5    A    I didn't want to disclose everything.

6    Q    And, in fact, you didn't tell her everything?

7    A    That's correct.

8    Q    You lied to her?

9    A    That's correct.

10   Q    You said basically that KCGF was a real estate

11   investment?

12   A    That's -- real estate investment vehicle for real

13   estate.

14   Q    For which you were getting, according to these checks

15   we've seen, substantial returns on your investment?

16   A    Correct.

17   Q    Your wife certainly would have known you were making

18   hundreds of thousands of dollars in such a short time?

19   A    That's correct.

20   Q    And I think we've seen on the checks, there were almost

21   weekly checks that were written to what you say went to your

22   different bank accounts?

23   A    Monthly.

24   Q    Every month?

25   A    That's correct.

1    Q    I think we saw at least two of them for June?

2    A    Quite possibly, but normally, monthly I would get a

3    check from Greg.

4    Q    Who determined the amount of the checks that your wife

5    was going to write on the KCGF account to transfer those

6    funds?

7    A    I did.

8    Q    What was the reasoning?

9    A    Amount of money in one bank.  In other words, as far as

10   being insured.

11   Q    You weren't happy with the federal bank insuring

12   deposits?

13   A    No.  Up to a hundred thousand dollars.

14   Q    And so you would spread out these payments into

15   different bank accounts?

16   A    I had three that I turned over to the federal

17   government.

18   Q    What was the reason that you weren't writing these

19   checks to the different bank accounts that you were going to

20   deposit them into?

21   A    I always wrote them to Cash for myself in the past when

22   we had moved funds, so I didn't think anything about it.

23   Q    When you -- when were these bank accounts opened?

24   A    2002 I believe was the first one.

25   Q    Aside from the KCGF account is what I'm asking.

1    A    Shortly after that.  In other words, I don't know the

2    time line.  It could have been six months, eight months, nine

3    months when I opened up the second account.

4    Q    What you're saying is all of the cash that went into the

5    KCGF accounts went out of that account into those two other

6    bank accounts that you opened?

7    A    Not all of it.  There was 160 some thousand dollars that

8    was in a KCGF when it was turned over to the Government.

9    Q    Have you given the bank statements and the canceled

10   checks to the Government from these other accounts?

11   A    They have those.  That's correct.

12   Q    And you've substantiated all of the cash that went into

13   those accounts?

14   A    I personally haven't balanced it, sir.

15   Q    Did you personally write checks at all or was that for

16   your wife to do?

17   A    I wrote checks also.

18   Q    Did your wife ever question what was going on with these

19   transactions?

20   A    No, sir.

21   Q    Did she know she was a member or manager on KCGF?

22   A    She knew she was a member.

23   Q    And that was all you told her?

24   A    That was all I told her.

25   Q    So the fact is -- let me just get this straight.  The

1   fact that she was included on KCGF?

2   A    Correct.

3   Q    Along with you?

4   A    Correct.

5   Q    The fact that she wrote checks for lots of money on KCGF

6   accounts?

7   A    Correct.

8   Q    And thereafter deposited those cash proceeds into other

9   bank accounts that you opened for that purpose?

10  A    Correct.

11  Q    Didn't necessarily mean that she was doing anything

12  wrong, did it?

13  A    I didn't think about it --

14  Q    Well --

15  A    -- as being wrong.

16  Q    -- plus, you never told her that what she was doing was

17  wrong?

18  A    That's correct.

19  Q    So on its face, while it might look like she is on

20  various documents, the fact that you never told her anything

21  was wrong sufficed for you?

22  A    That's correct.

23  Q    So that in your mind, at least, you thought she was not

24  doing a thing wrong; she's doing what I'm asking her?

25  A    Correct.

1    Q    And it was a need-to-know basis with her?  She needed to

2    know what you told her?

3    A    Correct.

4    Q    And that was anything but the truth?

5    A    Related to KCGF, that's correct.

6    Q    Now, you have maintained, and I heard you throughout

7    your direct examination maintain, that what you did was a

8    conflict of interest?

9    A    A conflict of interest and also it later turned in, but

10   we wouldn't get into it now, obviously, a crime.

11   Q    Well, when you were asked and prompted time and time

12   again on direct examination, what you said is you feared

13   being fired by ADT if ADT found out about this because it was

14   an obvious conflict of interest?

15   A    And it would open up Pandora's box.

16   Q    And you were worried about that?

17   A    Correct.

18   Q    Because primarily you said and you maintained, it was a

19   conflict of interest?

20   A    Originally when it started it was, sir.

21   Q    And you signed that conduct policy that talked about

22   different conflicts of Interest?

23   A    Every year.

24   Q    Where you were going to abide by that?

25   A    That's correct.

1   Q     That conduct policy, by the way, wasn't that signed by

2   the CEO Dennis Kozlowski?

3   A     Was the policy put into effect by him?

4   Q     Right.

5   A     I believe so.

6   Q     Isn't that ironic, that he is the person that's probably

7   one of the largest fraudsters in the United States because of

8   the fraud on Tyco and ADT and --

9   A     Correct.

10  Q     -- he's signing that?

11  A     Correct.

12  Q     Did you know him?

13  A     No, personally I don't.

14  Q     You never went to his wedding party in Sardinia?

15  A     No, I did not.

16  Q     You didn't get the invite to that?

17  A     No, I was ADT.

18  Q     When you -- by the way, do you know anything about the

19  acquisition, the Tyco/ADT acquisition?

20  A     Only that Tyco bought ADT and it was a reverse

21  acquisition with a name change.

22  Q     A reverse merger?

23  A     That's correct.

24  Q     Where ADT maintained the Bermuda-based incorporation?

25  A     That's correct.

```
 1    Q    Do you know why that was done?

 2    A    Taxes, I assume.

 3    Q    Taxes.  Also to limit liability, ADT liability and Tyco

 4    liability for shareholder suits possibly?

 5    A    I would not have been aware of that in my capacity.

 6    Q    But you believed it was for tax purposes?

 7    A    That's correct.

 8    Q    Now, you have given the Government different documents

 9    from your laptop, I believe you testified about?

10    A    That's correct.

11    Q    Did you not give your entire laptop or hard drive to the

12    Government for the Government to selectively go through it to

13    see what was important?

14    A    I did not.

15    Q    You just gave what you thought was important?

16    A    Those documents came from my attorney, I believe, that I

17    had given my attorney.

18    Q    What I'm asking you is, did you ever give your laptop to

19    the Government with any kind of access code and tell them, go

20    through all of these?

21    A    I did not.

22    Q    And, in fact, I believe you have still been looking over

23    documents as late as over the weekend?

24    A    That's correct.

25    Q    And you've come up with additional documents that you
```

1    disclosed to us just today?

2    A    Not out of the laptop.

3    Q    Just other documents that you happened to look through

4    after -- how long has this been going on?

5    A    Two years.  Two and a half years.

6    Q    Are there any other documents that you would like to

7    share with us?

8    A    Not at this time.

9    Q    So in -- have you given all those documents that you

10    have been able to find, either on your laptop or independent

11    of your laptop, to the Government?

12    A    I haven't gone through every e-mail in my laptop or

13    attachments, so I don't . . .

14    Q    Now, when you were approached by the FBI and ultimately

15    indicted in this case, did you fear that your wife was going

16    to face indictment as well?

17    A    At that point, I didn't think of my wife.  I only knew

18    what I had done.  I didn't think I put her in harms way.

19    Q    Did you have any concern because of the documents that

20    were going to show up that she might have exposure?

21    A    At that point in time I didn't think about checks or

22    deposit slips, no.

23    Q    Did you ever think about checks and deposit slips in her

24    name being on these documents as well as on the KCGF

25    documents?

1    A    Sometime later.

2    Q    Did it ever enter into your mind when you decided to

3    plead guilty in this case?

4    A    I'm sorry?

5    Q    Did you ever -- did it ever enter into your mind as part

6    of your equation to plead guilty in this case --

7    A    No.

8    Q    -- to know that she would not be indicted?

9    A    No, sir.

10   Q    So as we sit here today, you have no idea whether she

11   will be indicted or not?

12   A    No, sir.

13   Q    You're certainly hoping that she's not, right?

14   A    I have no document indicating she would not be indicted.

15   Q    And I'm asking you, you're certainly hoping as you sit

16   here today testifying over the last three or four days, that

17   she doesn't get indicted, correct?

18   A    Absolutely.

19   Q    That's one of the hopes and expectations you have,

20   right?

21   A    I have no indication she is going to be indicted.  I

22   certainly hope she is not indicted.

23   Q    You had no indication that you were going to be indicted

24   at one time, did you?

25   A    No, sir.

1    Q    And one time the FBI knocked on your door and arrested

2    you, didn't they?

3    A    They did.

4    Q    You have that same wariness about your wife at this

5    time, don't you?  You have no idea what may or what is going

6    to happen?

7    A    I have no idea.

8    Q    All you can do is hope?

9    A    That's correct.

10            MR. KAISER:  That's all I have.  Thank you.

11            THE COURT:  Mr. Entin.

12            MR. ENTIN:  I will be very brief, Judge.

13                          CROSS-EXAMINATION

14    BY MR. ENTIN:

15    Q    By the way, just to follow-up on one question that

16    Mr. Kaiser asked you, has the Government ever asked you to

17    turn over your laptop so that they could go through it and

18    look for documents that would be relevant to this case?

19    A    No, sir.

20    Q    And you did sign a plea agreement with them in which you

21    agreed to cooperate with any of their reasonable requests,

22    correct?

23    A    I did.

24    Q    And at no time neither of these gentlemen or any of the

25    FBI agents have asked you to turn over the laptop to see what

```
 1   other e-mails or other documents might be there, correct?

 2   A    Correct.

 3   Q    Okay.  Now, have you ever met Mr. Forgione?

 4   A    No, sir.

 5   Q    Have you ever spoken to Mr. Forgione?

 6   A    No, sir.

 7   Q    Have you ever seen Mr. Forgione before coming into court

 8   today?

 9   A    No, sir.

10              MR. ENTIN:  Nothing further.

11              MR. PASANO:  May I, your Honor?

12              THE COURT:  Mr. Pasano.

13              MR. PASANO:  Thank you, sir.

14                         CROSS-EXAMINATION

15   BY MR. PASANO:

16   Q    Mr. Horton, my name is Mike Pasano, and I represent

17   Johnny Artuso.  And other than perhaps having seen each other

18   around the courthouse, we've never really spoken before,

19   correct?

20   A    No, we have not.

21   Q    Now, you say you met John Artuso back around 1998; is

22   that correct?

23   A    I think it was 1998.  Pre-Christmas party.

24   Q    Just before Christmas.  Was that your testimony?

25   A    I think so.
```

1    Q    That was at Greg Orr's house?

2    A    Correct.

3    Q    But you only knew him as "Johnny"; was that your

4    testimony?

5    A    I only knew them as Vinnie and Johnny.

6    Q    You only knew Mr. John Artuso as Johnny --

7    A    I'm sorry.  That's correct.

8    Q    Is that correct?  And you understood either then or over

9    time that Johnny, as you knew him, was a business partner

10   with Mr. Orr in a magazine business, they were selling

11   magazines, a telemarketing business, correct?

12   A    Telemarketing business.

13   Q    Involving magazines?

14   A    Correct.

15   Q    And at that holiday party over at the Orr house in 1998

16   did I hear you tell the jury that you were just introduced to

17   Johnny, right?

18   A    That's correct.

19   Q    That's all?  Just an introduction?  No other real

20   conversation, correct?

21   A    Correct.

22   Q    Am I right that the next time after that holiday party

23   in 1998 that you saw John Artuso was when you all were

24   arrested?

25   A    I may have saw him one other time at a function, but not

113

1     a hundred percent.

2     Q     Not sure if you ever saw him around, but the next time

3     you saw him in anything that mattered to you was after the

4     arrests?

5     A     That's correct.

6     Q     Now, on Friday Mr. Markus asked you whether or not you

7     were an honest person, and I think you answered him yes and

8     no.  Do you remember that?

9     A     Yes, sir.

10    Q     Now, you agree that at least for a lot of years you've

11    told a number of lies, right?

12    A     Are we talking about the FBI?  Are we talking about my

13    wife?  Are we talking about --

14    Q     ADT.

15    A     ADT?  Yes, sir.

16    Q     So at least a lot of lies to ADT, to FBI, to your wife.

17    You already talked to us about that, right?

18    A     Yes.

19    Q     But did I hear you tell Mr. Markus that -- and to the

20    jury as you sit here Thursday, Friday, today, you're not

21    lying in this courtroom?  That's your testimony, right?

22    A     I'm stating as best the facts that I remember them.

23    Q     Did you tell us the other day that your goal -- I think

24    this was in answer to a question that was asked both by the

25    Government and by Mr. Markus.  Your goal was to tell the

1    truth and to hope that your possible sentence would get

2    reduced?

3    A    Correct.

4    Q    Is that what you said?

5    A    That's correct.

6    Q    Now, if, sir, you could tell just one lie in this

7    courtroom and know that you wouldn't get caught and that it

8    would cause your sentence to get reduced, would you tell it?

9    A    Well, I'm going to answer that as best I can.  I don't

10    believe you wouldn't get caught today, in other words.

11    There's too many facts in this case today.

12    Q    But if you knew you wouldn't get caught, would you tell

13    a lie?

14    A    There is no "if you knew."

15    Q    More delicately, sir, would you lie in this courtroom to

16    protect your wife?

17    A    My wife --

18    Q    That's an easy question.

19    A    It is.  It really is.

20    Q    Yes or no?

21    A    She has not been indicted.  I don't think she is going

22    to be indicted, and it has no -- no answer to you.

23    Q    Well, actually, sir, I get to ask you.  And I'm going to

24    ask you to answer my question.  Would you lie in this

25    courtroom to protect your wife?  It's a yes or no, sir.

1    A    No.

2    Q    Now, you were asked a lot of questions the other day

3    about your plea agreement, and the Government even put it up

4    on the screen.  That's Government Exhibit 29.  Do you

5    remember going through that --

6    A    Yes, sir.

7    Q    -- with the Government prosecutor?

8         I would like to show you one page of that document.

9    It's Page 4.  Let me put it up on the screen.  It's

10   Paragraph 9.  Can you see that all right, sir?

11   A    I can.

12        MR. PASANO:  Everybody see this okay?

13   BY MR. PASANO:

14   Q    Now, am I right, sir, that in Paragraph 9 of this

15   document that you signed and your lawyer signed, right?

16   A    Yes.

17   Q    It spells out how the office is going to reserve the

18   right to evaluate the nature and extent of your cooperation.

19   You see that, sir?

20   A    Yes.

21   Q    And the office, that's the US Attorney's Office, right?

22   Do you remember that?

23   A    I take it as being the US Attorney's Office.

24   Q    And what it really means is these two prosecutors

25   sitting in court today?

```
 1    A    Okay, sir.

 2    Q    No.  Is that right?

 3    A    Yes.

 4    Q    Okay.  Now, in there it goes on to explain what that

 5    means and what the Government can do.

 6    A    Okay.

 7    Q    Do you remember that?

 8    A    Yes.

 9    Q    And what the Government can do, meaning these

10    prosecutors, depending upon their assessment of your

11    assistance, is file a motion recommending that your sentence

12    be reduced, right?

13    A    Yes.

14    Q    Now, you see where it starts:  "The defendant

15    acknowledges and agrees, however"?

16    A    Yes.

17    Q    That nothing in this plea agreement may be construed to

18    require the Government -- these prosecutors -- to file any

19    such motions, right?  It says that?

20    A    Correct.

21    Q    And that the prosecutors', this office, assessment of

22    the nature, value, truthfulness, completeness, and accuracy

23    of your cooperation shall be binding as far as whether they

24    file that motion or not, right?

25    A    Correct.
```

1    Q    So am I right, sir, that what this agreement does and

2    what you understood, was that when you cooperate, whether or

3    not you are telling the truth in terms of the recommendation

4    that might give you a lower sentence is going to be based on

5    what the prosecutors think, right?

6    A    Yes.

7    Q    I mean, they file a motion to help you get a lower

8    sentence depending upon how they assess your testimony,

9    right?

10   A    All of those items.

11   Q    And you know and you understand that, right?

12   A    Yes.

13   Q    I mean, you knew it when you came in here on Thursday,

14   right?

15   A    Yes.

16   Q    It was part of those 11 different sessions of hours and

17   hours that you had with the prosecutors before you even came

18   in court, right?

19   A    Yes.

20   Q    Do you understand, sir, based upon this agreement, that

21   if you tell the truth but the prosecutors think you're lying,

22   they can decline to file that motion to reduce your sentence?

23   A    Yes.

24   Q    And likewise, sir, do you understand that if you tell a

25   lie that the prosecutors think is the truth, they can file

1    the motion?

2    A    The document leaves it up to the prosecutors, sir.

3    Q    And for you, fair to say, that's a scary thing?

4    A    All of this is scary.

5    Q    And particularly scary whether the prosecutors believe

6    to you, right?  If they don't believe you, you're looking at

7    eight to ten years, right?

8    A    That's correct.

9    Q    And you could have been looking at a lot more, but

10   that's the deal, eight to ten years, and maybe lower if they

11   file the motion, right?

12   A    Possibly.

13   Q    And you know how scary it is as to whether the

14   prosecutors believe you or not because back in January, in a

15   different courtroom in this building, you heard the

16   prosecutor get up and accuse you of telling a lie about

17   something that you thought you were telling the truth about,

18   right?

19   A    What are you making reference to?

20   Q    Pretrial services --

21   A    Right.

22   Q    -- spoke to you and reported that you told them that you

23   were living off of savings, and Mr. McCormick, the

24   prosecutor, got up in front of Her Honor Judge, Linnea

25   Johnson upstairs and accused you in that courtroom of lying

1    to pretrial services?

2    A    And my attorney at the time handled that situation and,

3    obviously, it was corrected.

4    Q    My question, sir, is at that time you got a firsthand

5    example of how you could say something that you thought was

6    the truth but the Government could think it to be a lie,

7    correct?

8    A    At that time I was totally confused about what they were

9    saying, so to try to answer your question is, yes.

10   Q    Well, what part of "it's a lie" didn't you understand

11   that day?

12   A    I didn't understand how what I said was construed as a

13   lie.

14   Q    Right.  And that told you, uh-oh, if these prosecutors

15   can get something as simple as how you were living off of

16   your savings wrong, whoa, they could really get it wrong if

17   you started telling them that those prices were legitimate,

18   right?

19   A    I didn't understand that procedure at all, and

20   obviously, Scott Srebnick handled it in the courtroom.

21   Q    Let me ask you something else.  The Government showed

22   you, and you were briefly asked about it by my brother

23   counsel, those documents that I think you told us you signed

24   year in/year out over there at ADT, basically telling them

25   that you were an ethical guy, right?

1    A    Correct.

2    Q    One of them is Government Exhibit 1.7 -- was this form.

3    It says "Acknowledgment" at the top, correct?

4    A    Correct.

5    Q    That's your handwritten and signed signature, right?

6    A    That's correct.

7    Q    April 10, 2001, right?

8    A    That's correct.

9    Q    Now, as of April 10, 2001, had the idea come into your

10   mind that given the opportunity, you were going to

11   participate in buying properties that ADT was selling?

12   A    Yes.

13   Q    And a moment ago we saw something you typed up and gave

14   your lawyer that indicated that you had had an initial

15   conversation about it as early as December or so of 2000?

16   A    That's correct.

17   Q    But that the real conversations happened in the summer

18   of 2001, right?

19   A    Correct.

20   Q    So while all this is being signed you're starting to

21   think about what you're going to do, right?

22   A    Yes.

23   Q    And that acknowledgment, 1.7, it had you acknowledging

24   that you had understood Tyco's Standards of Conduct and would

25   follow them, right?

1    A    Yes.

2    Q    And that was Government Exhibit 1.10 that's in evidence.

3    Let me put it up here for a moment.  That was this document.

4    Do you remember seeing this document?

5    A    I do.

6    Q    And one of the pages of that document that Mr. Shockley

7    showed you was this section that dealt with Conflicts of

8    Interest, right, sir?

9    A    Correct.

10    Q    And you knew, did you not, consistent with what that

11    policy said, that you weren't supposed to engage in

12    transactions that might be a conflict of interest, right?

13    A    That's correct.

14    Q    But the policy didn't say you couldn't do it; am I

15    right?

16    A    No.

17    Q    Meaning I'm correct, right?

18    A    That's correct.

19    Q    What the policy said in that section that I've circled

20    on this page that's the Government's Exhibit 1.10, is that

21    you could do it as long as two things happened, right?

22    A    Yes.

23    Q    Disclosure and approval?

24    A    Approval, correct.

25    Q    So if you wanted to be a business partner in a company

1    that was buying property from ADT, you, Larry Horton, could

2    have disclosed that interest to your superiors, right?

3    Correct?

4    A    Uh-huh.

5    Q    You have to say out loud.

6    A    Yes.

7    Q    And then if your superiors had said, go ahead, cash is

8    king, you could have done just that, right?

9    A    Correct.

10   Q    And had you done it that way, you would not have

11   committed this violation of Tyco's standards, right?

12   A    Correct.

13   Q    By the way, do you remember those standards sort of

14   telling you all the things that you were supposed to do in

15   terms of how to resolve these kinds of questions?

16   A    Not the complete list.

17   Q    Well, for instance, didn't they tell you you could

18   consult with your immediate supervisor?

19   A    Correct.

20   Q    You didn't do that, right?

21   A    I did not.

22   Q    You could contact your local human resources rep, right?

23   A    Correct.

24   Q    You didn't do that, right?

25   A    Correct.

1   Q    You could talk to the general manager of your unit.

2   They told you that, right?

3   A    Yes.

4   Q    You didn't do that, right?

5   A    No, sir.

6   Q    You could talk to any member of senior management.  They

7   told you that, right?

8   A    I did not.

9   Q    And you didn't do that.

10           You could even call the Tyco Concern line.  They

11   had a phone number --

12   A    Correct.

13   Q    -- that you could call --

14   A    Correct.

15   Q    -- if you had these kinds of questions, correct?

16   A    Correct.

17   Q    You didn't do that?

18   A    No.

19   Q    You could call the corporate human resources department?

20   A    Correct.

21   Q    Didn't do that?

22   A    No, I didn't.

23   Q    And you could even call Tyco legal department if you had

24   a question, right?

25   A    Yes.

1    Q    You didn't do that?

2    A    No.

3    Q    Now, did I hear you on Thursday and Friday say that in

4    connection with the offers that were coming in on these

5    various properties:  Pompano Beach, Palm Harbor, Lancaster,

6    and then later with regard to Oak Brook, that in essence, you

7    performed a little dance with the sales prices to make it

8    look like offers and counteroffers were coming in?

9    A    That's correct.

10   Q    I think Mr. Shockley called it a kabuki play.

11   A    That's correct.

12   Q    Do you even know what that is?

13   A    I didn't at the time.

14   Q    But you're telling this jury that it wasn't real?  I

15   mean, in essence, that's what you're saying, that those

16   weren't real offers and counteroffers?

17   A    They were real offers, but agreed-on pricing.

18   Q    Well, if that first offer when it came in, ADT could

19   have said yes, but they counteroffered through you, through

20   the legal department, right?

21   A    No, sir.

22   Q    Let me back it up.

23   A    It doesn't go to legal.

24   Q    The lawyers and the real estate department.

25   A    Correct.

1   Q    Marjorie Desporte and Randi Joseph, depending on which

2   property, right?

3   A    Correct.

4   Q    And in doing the things that you've told the jury you

5   did with these prices, you did it primarily for one reason;

6   isn't that true, sir?

7   A    What's the reason?

8   Q    Well, your idea, I think you told the jury, was you were

9   going to cheat ADT, right?

10  A    Correct.

11  Q    And nobody from the outside came to you proposing this

12  to you, correct?

13  A    No, Greg and I agreed.

14  Q    No, no, no.  I'm not talking about an agreement.

15  A    Okay.

16  Q    No one from the outside came to propose this to you,

17  correct?

18  A    Correct.

19  Q    The idea, lightbulb goes on, to cheat ADT is a lightbulb

20  that Larry Horton turned on himself, correct?

21  A    Originally, correct.

22  Q    Somebody else turned it off?

23  A    (Witness shaking head.)

24  Q    It was on, right?

25  A    Originally.

1  Q    Sir, from the moment that you made up your mind

2  somewhere in 2000 or early 2001, whenever it was, to cheat

3  your bosses, that was your idea?  You owned it.  You owned it

4  then and you own it today, right?

5  A    I owned it then, correct.

6  Q    And you own it today?

7  A    And I'm part of it today.

8  Q    Now, in making that idea to cheat your bosses and the

9  company, am I right, sir, that no one from the outside came

10  and twisted your arm, put a gun to your head, threatened you

11  to do that, correct, in 2000 or 2001 when the idea came to

12  cheat your bosses?

13  A    Nobody threatened me.

14  Q    And in deciding to cheat your bosses there was a reason

15  you did that, and it's one of the oldest reasons in the book,

16  isn't it, sir?  Greed.

17  A    Greed.

18  Q    High-octane, unabashed greed, right, sir?

19  A    Correct.

20  Q    And that's -- that greed thing, which is why when

21  talking about refinancing or maybe even selling some of the

22  properties later, you didn't like that because you liked that

23  monthly series of checks you were getting, right, sir?

24  A    It was after I had met with my attorney and there was a

25  concern, obviously, as far as the amount of money.  If

1  something was to happen as far as indictments or prosecution.

2  Q    Didn't you tell Mr. Shockley that you liked that monthly

3  check?

4  A    I did, but there were other reasons later.

5  Q    Well, am I right, sir, that in terms of whatever you did

6  inside of ADT, you did with the hope of maximizing the amount

7  of money that you could get, right?

8  A    Yes.

9  Q    Even if it meant acting against what you knew or thought

10  were ADT's interests, right?

11  A    Yes.

12  Q    Now, those first three properties, Pompano Beach, Palm

13  Harbor, Lancaster, they all closed in around February of

14  2002, right?

15  A    That's correct.

16  Q    Early part of February, right?

17  A    Correct.

18  Q    And in terms of the money that you, Larry Horton,

19  ultimately through KCGF, you and your wife, ended up getting,

20  am I right that you weren't making any money from the sales

21  price of those three properties?

22  A    Me personally from the sale price?

23  Q    Yes.

24  A    No, sir.

25  Q    Right.  Your money came from the lease side of the

1  transaction, right?

2  A    That's correct.

3  Q    So that 30 percent that ultimately turned out to be your

4  share, that's all 30 percent of payments that are coming in

5  from ADT every month on the leases on those properties,

6  right?

7  A    The profit, correct.

8  Q    So you really didn't need that kabuki play with regard

9  to the sales prices, did you?

10  A    The sale price was tied to the lease.  If the sale -- if

11  the outright sale was not approved, then the lease would not

12  be approved.

13  Q    Right.  But you could have, as a purchaser, bought that

14  property higher or lower and you would still end up making

15  the same amount of money if the lease payments remained the

16  same, right?

17  A    If you paid more for it, your loan would have been more

18  so your profit would have been less.  That's not true.

19  Q    Sir, in terms of the money you received, all that really

20  mattered was what the lease amounts were that ADT was

21  agreeing to pay, right?

22  A    That's not true.

23  Q    It is true, is it not, that it's those lease terms and

24  those lease amounts that you've told this jury those ADT real

25  estate lawyers were handling, right?

1    A    They were responsible for the contract language --

2    Q    Well --

3    A    -- and responding to bids that came from me as far as

4    pricing.

5    Q    Didn't you tell the ladies and gentlemen just a little

6    while ago in answering a question that Mr. Markus asked you

7    that, in fact, they were involved in the prices for the

8    leases, the amounts?  You didn't tell them that?

9    A    To take the prices in, correct.

10    Q    Now, when we talk about these lawyers, it was these two

11    people, Ms. Desporte and Mr. Joseph, right?

12    A    Correct.

13    Q    And did I hear you say they reported to the corporate

14    counsel who's this guy, Gray Finney, right?

15    A    That's correct.

16    Q    And an example of how you dealt with them is this

17    Government Exhibit 1.136.  Let me put it back up here for a

18    moment.  August 9, 2001, a letter gets sent to the attention

19    of Miss Desporte, correct?

20    A    Correct.

21    Q    And it comes from the law offices of this attorney who

22    you never met, Donald Spadaro, right?

23    A    Correct.

24    Q    And as the handwriting indicates on this document, there

25    is then an exchange of information back and forth between

1    Ms. Desporte and the attorney Spadaro, right?

2    A    As indicated, correct.

3    Q    Until ultimately the sale prices were agreed on,

4    correct?

5    A    Correct.

6    Q    And am I right, sir, that the only changes on the lease

7    amounts were really in the nature of explaining things,

8    right?

9    A    It went from 41,000 to 38,000, 24,000 to 21,000.

10   Q    They went down?

11   A    Yes, sir.

12   Q    Now, fair to say that since you never met or spoke to

13   this person Spadaro, you can't say to this jury what it was

14   Spadaro was telling his client, Efficient Realty, right?  You

15   don't know firsthand what Spadaro was saying to his client?

16   A    I do not.

17   Q    You just know what you were saying to Marjorie Desporte,

18   right?

19   A    Correct.

20   Q    And you wrote on this document to Ms. Desporte that

21   there was actually going to be a lot of savings being made by

22   doing this deal?  You see where you were saving over $300,000

23   and over $400,000 with regard to the leases?  You wrote that,

24   right?

25   A    That's correct.

1    Q    And you even wrote on the front of this document what

2    the proximate values went with these two properties here,

3    Pompano Beach and Lancaster, correct?

4    A    Right.

5    Q    And you were shown earlier how you even had had a form

6    that you -- spreadsheet that you filled out and sent up to

7    Mr. MacArthur, or upstairs, anyway, and those values on that

8    spreadsheet were consistent with what you wrote in

9    handwriting to Ms. Desporte, right?

10   A    For the sale price.

11   Q    But you're saying today that this information that you

12   were giving Ms. Desporte was false.  Is that your testimony?

13   A    I'm saying today that the 840 and the 1,000,290 is

14   agreed-upon prices that Greg and I had already agreed upon

15   that he would purchase and I would sell.

16   Q    My question is, when you told Ms. Desporte what the

17   approximate value of these properties were, 1.4 million or so

18   on Pompano, 900,000 or so on Lancaster, is it your testimony

19   to this jury that those were lies?

20   A    They were pricing for simple sales and not for

21   sale-leasebacks.  That's correct.  They were.  They were not

22   truthful statements.

23   Q    Ms. Desporte, I think you told us, one of these lawyers

24   in the real estate department, she had the appraisals?

25   A    Simple sale appraisals.

1    Q    She had the appraisals?

2    A    That's correct.  For a sale only.

3    Q    She's a lawyer, right?

4    A    A real estate attorney.

5    Q    And this document tells us that she knew that this

6    wasn't a simple sale, she knew there was a lease sale back,

7    right?

8    A    Correct.

9    Q    Or sale-leaseback.  I apologize.

10         So what you're telling this jury is that you lied

11    to Ms. Desporte and even though she had the documents to

12    figure it out, she never figured it out?

13    A    She didn't have the documents to figure it out.  She had

14    an appraisal for a simple sale only and not a sale-leaseback.

15    Q    She's a real estate lawyer handling for ADT every day

16    all these transactions that are going on in this time period,

17    and you're telling this jury that she didn't understand the

18    difference between a simple -- fee simple sale and a

19    leaseback sale?  Is that your testimony?

20    A    To my knowledge, this was the first sale lease-back that

21    she had handled at ADT, sir.

22    Q    You're telling this jury that she didn't understand the

23    difference?

24    A    I can't -- I can't explain to the jury that if she

25    understood the difference.  I'm just saying this is probably

1    the first one she handled.

2    Q    Sir, isn't it a fact that the values that you wrote on

3    this document that's in evidence and that you gave

4    Ms. Desporte and Mr. Joseph and Gray Finney and Scott

5    MacArthur and Mark Foley regarding what the range of fair

6    prices were on each of these four properties was, in fact,

7    the truth and that in this courtroom, starting on Thursday,

8    you have been telling a lie when you tell this jury that

9    those weren't fair values?

10   A    No, sir.  Those are clearly listed as simple sales by

11   the appraisal and by the broker's opinion of value.  Simple

12   sales.  Not sale-leaseback.  The documents were there.

13   Q    So then this document that you were shown both on direct

14   and briefly by Mr. Markus, which is in evidence and which is

15   your handwriting, Government Exhibit 1.137--

16   A    That's correct.

17   Q    -- is something you wrote on February 1, 2002, right,

18   sir?

19   A    Correct.

20   Q    And do I understand that you're now agreeing that while

21   these numbers that I'm circling under market value may be

22   accurate for fee simple, they're not accurate for a

23   sale-leaseback?  Is that your testimony?

24   A    They are not accurate for sale-leasebacks.

25   Q    And that somehow putting this up the chain of command,

1    no one figured it out.  Is that what you're saying?

2    A    They didn't review the documents, sir.

3    Q    But I thought in that typewritten statement --

4    A    That document was made for my attorney.

5    Q    Did you lie to your attorney?

6    A    That document was made for my attorney.

7    Q    Not my question, sir.  Did you lie to your attorney?

8    A    If you go back and look at the document, you can read

9    it.

10   Q    I have.  My question, sir, is, did you lie to your

11   attorney?

12   A    I did not include all the facts.

13   Q    Well, so what's there is accurate.  You just left out a

14   few things.  Is that what you're telling us now?

15   A    Sir?

16   Q    What's there is accurate.  You just left out a few

17   things.  Is that what you're telling us now?

18   A    I did not include all the facts.

19   Q    So when you said that ADT up and up and up and up

20   reviewed all these terms and all these values, like you typed

21   it and with your footnotes --

22   A    Correct.

23   Q    -- what you left out was "just kidding"?

24   A    The attorneys -- as I stated earlier, Mr. Scott

25   MacArthur probably never saw the documents.  He saw this

1    e-mail, along with Tyco Fire and Security.

2    Q    Now, a moment ago in terms of all the different people

3    who scrutinized the transactions, do you remember looking at

4    a document that Mr. Markus showed you, it was marked as a

5    Greg Orr exhibit, which mentioned Price Waterhouse?

6    October 7, 2003.  Do you remember seeing --

7    A    Yes.

8    Q    -- this document?

9    A    I do.

10   Q    And this person who worked in fixed assets, accountant,

11   for ADT Security Services wanted more information about Oak

12   Brook, right?

13   A    Correct.

14   Q    Within a month of the closing, right?

15   A    Correct.

16   Q    So you had not just your straight line up and not just

17   those dotted lines over, but you also had outside accountants

18   who began to look over these transactions as well, right,

19   sir?

20   A    Correct.

21   Q    Now, in that typed statement it indicated that you got

22   put in charge of real estate sales and leases after John

23   Curlew, C-U-R-L-E-W,left ADT somewhere in 2000 or 2001,

24   right?

25   A    Correct.

1    Q    And that was true, right, that statement there that you

2    typed?

3    A    That's correct.

4    Q    You didn't leave anything out of that part, right?

5    A    I don't think so.

6    Q    And then I think you were asked beginning around that

7    time and for a lot of years, ADT/Tyco was busy acquiring

8    assets and disposing of assets, right?

9    A    That's correct.

10   Q    And I think you've even agreed that because of the

11   bookkeeping needs that ADT/Tyco had -- they had to get rid of

12   properties within a year of acquiring them, right?

13   A    If they took a reserve on those assets.

14   Q    And one of your jobs once Mr. Curlew left, was to help

15   sell off properties that ADT/Tyco identified it wanted sold,

16   right?

17   A    Correct.

18   Q    And I think you were asked some questions about this.

19   We're talking about a whole lot of properties in these years

20   that ADT/Tyco wanted sold, correct?

21   A    These properties, the majority were leased properties.

22   Not owned properties.  So it was either a buyout of a lease

23   or a lease had to go away.

24   Q    Well, you were shown an exhibit that was received in

25   evidence on behalf of Greg Orr, this thing that was called

1   what, real estate reduction trend.  Do you remember that?

2   A    That's correct.

3   Q    And starting in the year 2001 and all the way into

4   projected 2005 was a steady decrease, which means sale or

5   disposal of assets, right?

6   A    95 percent of those were just leased properties that

7   went away, and then the others were sold.

8   Q    Whatever they were --

9   A    That's correct.

10  Q    Whatever they were, you were one of the people in ADT

11  who was handling them, right?

12  A    That's correct.

13  Q    And you were handling more than just the four properties

14  that we've been talking about in this trial, namely:  Pompano

15  Beach, Palm Harbor, Lancaster, and Oak Brook, correct, sir?

16  A    Correct.

17  Q    I mean, you talked about how there were seven or so

18  properties on an initial list, right?

19  A    Correct.

20  Q    But actually, there were, starting in 2001 and at least

21  through the end of 2003, a lot more properties than that,

22  whether they're sale-leaseback or straight sale, that you

23  were involved in, correct?

24  A    Correct.

25  Q    And some of them were sale-leasebacks, correct?

1    A    Correct.

2    Q    And whether it was a simple sale or a sale-leaseback,

3    what was driving the engine as you understood it was cash,

4    right?

5    A    Correct.

6    Q    Because cash was something that you knew your bosses had

7    told you ADT valued, correct?

8    A    Correct.

9    Q    And there were also, you understood it, accounting

10   advantages that ADT through your bosses had told you ADT

11   valued?

12   A    Correct.

13   Q    And that's what was driving the decisions that you and

14   others at ADT that were involved in in these years about what

15   to sell and at what prices, correct?

16   A    They determined what would sell, being senior

17   management.

18   Q    Well, and am I right that once it was determined what to

19   sell and you then got involved selling it, not just the four

20   properties but others, that there were times in these years

21   when offers were made but on your recommendation ADT didn't

22   accept the highest bidder?

23   A    That's possible.

24   Q    Bradenton, for example.  You remember ultimately when

25   the property gets sold, there were five people who submitted

1    written offers and it was the second highest offer that ADT

2    and you decided was the one to take, right?

3    A    The real estate company at that time had recommended

4    taking the second one because of possible closure

5    transactions on the deal.

6    Q    Right.  There were reasons --

7    A    And it was agreed to.

8    Q    So there are reasons sometimes that you saw in these

9    years that ADT and the properties that you were working with

10   would accept a price other than the highest price, correct?

11   A    Yes.

12   Q    And that Bradenton property, although it was on that

13   list, did I hear you say ultimately as it turns out, was not

14   a property that Greg Orr or the purchaser group got, right?

15   Somebody else ended up with Bradenton?

16   A    Greg Orr did not end up with Bradenton.

17   Q    You didn't end up with Bradenton?

18   A    No, I did not.

19   Q    Just so we're clear, do I understand that in all the

20   other properties that you were handling, Sassafras, Erie,

21   Pennsylvania; New York, Buffalo; Chelsea, Massachusetts; New

22   Hampshire; Aurora, Colorado; wherever they were, the only

23   time that you proposed getting involved on the buy side were

24   these four properties that you've been talking about in this

25   courtroom?

1   A    That's correct.

2   Q    So all the other properties, you weren't interested in

3   getting in on the buy side?

4   A    I was not.

5   Q    Didn't pay any kickbacks?

6   A    No, sir.

7   Q    Didn't throw any money back to yourself by moving the

8   deals somewhere else?

9   A    No, sir.

10  Q    So in all these years, in all those other deals you're

11  telling this jury you were an honest, loyal, faithful ADT

12  employee, and it's only in this momentary bad judgment,

13  greed, on these four properties that you decided to be a

14  crook?

15  A    Correct.

16          MR. PASANO:  All right.  At this time I would move

17  for the admission of a document we marked as JA-9 for ID.

18  It's an August 21, 2001, Tyco document.  I believe there is

19  no objection, your Honor.

20          THE COURT:  I need a list from you.

21          MR. PASANO:  I did, actually, this morning,

22  tendered it through the court security officer to the Court.

23  It should be the one that says "For John Artuso."

24          THE COURT:  Okay, thank you; I do have it.

25          MR. PASANO:  Thank you, your Honor.  JA-9.

1           THE COURT:  So 9 is admitted.

2       (Received in evidence Defendant JA Exhibit(s) 9.)

3    BY MR. PASANO:

4    Q    Sir, do you recall in August of 2001 writing an

5    interoffice memo to Scott MacArthur?

6    A    I do.

7    Q    And in that memo do you remember reporting to him

8    regarding various acquisition reserves and restructure

9    reserves, right?

10   A    Correct.

11   Q    And you were telling Mr. MacArthur the truth then,

12   correct?

13   A    Document of fact.

14   Q    I mean, my question is, is this one of those documents

15   that maybe you lied in or is this an honest document?

16   A    This is a document of facts.

17   Q    So it's an honest document, right?

18   A    It's a truthful document.

19   Q    Okay.  And you see where you're reporting that 34 ADT

20   locations are closing?

21   A    Correct.

22   Q    And there's five subleased locations and 11 vacant

23   locations, correct?

24   A    Correct.

25   Q    And leases will be reviewed for buyout, lease, sublease,

1    or sale.  Do you see that?  You say that there, right?

2    A    Yes.

3    Q    Now, did you tell this jury a moment ago that you didn't

4    know whether Scott MacArthur knew that with regard to these

5    properties, Pompano Beach, Lancaster, Palm Harbor in

6    particular, that these were sales and leasebacks?

7    A    What's the date of the document, sir?

8    Q    It's right in the middle of the thing, sir.  August 2,

9    2001.

10    A    He would have only seen the e-mail with the sale price

11    on those sales that were sent.

12    Q    But for sure, you're reporting to him and he's following

13    what's being closed and the amounts of money being generated,

14    what's being leased and what's vacant and trying to be sold,

15    correct, sir?

16    A    It's all related to sale, sublease, or lease buyout.

17    Q    And this report which you send in on August 2, 2001,

18    this was typical of the kinds of reports that you were making

19    throughout not just 2001, but later, correct, sir?

20    A    Correct.

21    Q    And on Page 2 of this Exhibit JA-9 now in evidence,

22    there's even a discussion of the acquisition reserve that we

23    were talking about a moment ago, right?

24    A    Correct.

25    Q    Because those are the ones where you've got to sell them

1    in a year because you've got these reserves, right?

2    A    Correct.

3    Q    86 locations closing, 3 subleased, 10 vacant lots, 43

4    locations staying open, right?

5    A    Correct.

6    Q    And the kind of financial analysis that's in this

7    document, JA-9 in evidence, this was what Mr. MacArthur was

8    regularly communicating with you about, and others, trying to

9    make sure that ADT could maximize the cash out of its

10   disposition of assets, correct?

11   A    This document was primarily sent on that date to open up

12   or get approval for the acquisition reserves or restructuring

13   reserves at that time.

14   Q    Because those accounting adjustments, along with the

15   cash that was going to be netted, was what was driving these

16   transactions, correct, sir?

17   A    They were part of the transactions, correct.

18   Q    And by the way, did you tell Mr. Shockley the other day,

19   Friday, toward the end of the questions that were being asked

20   of you, that you accept that you committed ethical violations

21   in your dealings with ADT?

22   A    Yes.

23   Q    And is it fair to say, sir, that what was the ethical

24   violation was your failure to disclose and get approval?

25   A    The ethical violation.

1  Q    Yes.  Because even if the purchasers had paid way above

2  market value and leased back to ADT way below market value,

3  any of these four properties, as long as you're a participant

4  in the purchaser group and haven't disclosed it to ADT,

5  you've committed an ethical violation, right?

6  A    Correct.

7  Q    Now, fair to say, sir, that if we were to go through the

8  various documents at ADT with regard to the different

9  properties that were on the market or for sale, that we would

10 see a number of instances where Randi Joseph or others were

11 actually asking about the sales prices and values and whether

12 or not the sales prices made sense?

13 A    You would see that they were involved.  That's correct.

14          MR. PASANO:  Okay.  For ID JA-12.  A document to

15 Mr. Orr and others, May 22, 2001.  I believe there is no

16 objection, your Honor.

17          MR. SHOCKLEY:  No objection, your Honor.

18          THE COURT:  12 is admitted.

19     (Received in evidence Defendant JA Exhibit(s) 12.)

20 BY MR. PASANO:

21 Q    Let me put this up on there.  So the top's saying

22 April 19, 2006.  You see that date?

23 A    Yes.

24 Q    But actually, the text of this is a series of e-mails in

25 May of 2001.  Do you see that, sir?

1    A    I do.

2    Q    Now, in May of 2001, you haven't even spoken to Greg Orr

3    further about whether he's interested in your proposition,

4    right?

5    A    Time line, it could have been May, it could be June, it

6    could be July, sir.

7    Q    But you see this is coming from Randi Joseph, right?

8    A    Correct.

9    Q    Sent to a number of people, including yourself, right?

10    A    Correct.

11    Q    And he's asking where he can find the book value of a

12    property in New Jersey, right?

13    A    Correct.

14    Q    And you see in the e-mail exchange that there's

15    references to the Grubb & Ellis broker opinions of value?

16    A    Correct.

17    Q    And it starts with this person, Lauren Gierman, actually

18    sending to Randi Joseph a response about, can you tell me

19    what the book value is currently?  Do you see that?

20    A    Yes.

21    Q    This e-mail is an example of how things worked within

22    ADT, correct?

23    A    Lauren Gierman was the general manager asking a question

24    about a building in her area that she's responsible for, and

25    she directed the question to Randi Joseph.

1  Q    And you were involved, in general, with this New Jersey

2  property, right?

3  A    I would totally involved in the property, correct.

4  Q    And there were questions being asked by the people in

5  the real estate department, the attorneys, about the value of

6  the property, right?

7  A    Correct.

8  Q    Because that's the kind of questions that they were

9  asking every day with regard to these different properties

10 that were being acquired and then sold off by ADT; isn't that

11 right?

12 A    They got involved in the operation, correct.

13 Q    And we're not just talking about a few properties.  Do

14 you remember being involved in a property in Gulfport,

15 Florida, sir?

16 A    Yes.

17 Q    Albuquerque -- was that Maryland or New Mexico?

18 A    I believe that's New Mexico.

19 Q    San Antonio, right, sir?

20 A    Simple sale.

21 Q    All of those back in February of 2002; isn't that right,

22 sir?

23 A    They were involved in all the sales.

24 Q    Well, in February of 2002, that's exactly when the

25 property at Pompano, at Lancaster, and in connection with the

```
1    property at Palm Harbor, those closed, correct, sir?

2    A    I'm sorry -- those closed.

3    Q    And that was in that same time period, is that not

4    right, sir?

5    A    That's correct.

6    Q    Let me show you a document that we've marked as JA-21

7    for ID.

8              MR. PASANO:  We'd move into evidence JA-21, your

9    Honor.

10             MR. SHOCKLEY:  No objection, your Honor.

11             THE COURT:  21 is admitted.

12        (Received in evidence Defendant JA Exhibit(s) 21.)

13   BY MR. PASANO:

14   Q    Let me put this up on the screen.  Mr. Markus showed you

15   a document similar to this but with regard to the Connecticut

16   and Massachusetts properties.  Do you remember that?

17   A    Yes.

18   Q    Now, this document involves Gulfport; Albuquerque; Erie,

19   Pennsylvania; and San Antonio, correct?

20   A    Correct.

21   Q    And it's a list of recommended sale, correct?

22   A    Correct.

23   Q    And were any of these sale-leasebacks --

24   A    No, sir.

25   Q    -- as best as you can recall?
```

1    A    None of them.

2    Q    And the second page of the document is you actually

3    reporting it to Scott MacArthur, properties for sale that

4    have hard offers on paper and others have verbal offers.  Do

5    you see where you tell him that?

6    A    That -- can you go back and show me the previous one?

7    Q    Absolutely.

8    A    It looks like the back sheet does not -- or the front

9    sheet doesn't go with the, with that sheet.

10   Q    Well, Albuquerque is on this February 13, and you see

11   the same date on the top, handwritten?  Is that your

12   handwriting?

13   A    It is.  Nashville is not included for some reason in

14   there.

15   Q    Right.

16   A    And you've got Santa Monica.  So I don't know if it's

17   just a misdate.

18   Q    So in February of '02, there's apparently a whole bunch

19   of properties that you're handling on which you have either

20   hard offers on paper or verbal offerings, right?

21   A    Correct.

22   Q    Of all those different properties, Gulfport,

23   Albuquerque, Erie, San Antonio, Santa Monica, Nashville, how

24   many of those was Greg Orr invited to make a bid on?

25   A    None.  In Nashville -- you'd asked me the question on

1    sale-leaseback?  Nashville was a sale-leaseback.

2    Q    So that's an example of at least one that was a

3    sale-leaseback; is that correct, sir?

4    A    That's correct.

5    Q    And am I right, sir, that there's other documents

6    besides the one that Mr. Markus showed you that we can dig

7    out of the ADT files where in those columns, there would even

8    be a column for anticipated loss, and there were other

9    properties where those columns were filled in, where

10    decisions were made to sell them, where the documents showed

11    anticipated losses, correct, sir?

12    A    There may be some.

13    Q    Any of those on your laptop?

14    A    Not to my knowledge.

15    Q    Now, you were shown some documents with regard to these

16    entities.  I want to put back up for a moment Government

17    Exhibit 30.5.  Do you remember the Government putting this up

18    on the screen while they were asking you questions?  It's the

19    various documents regarding Efficient Realty and Development

20    Corp.

21    A    Yes.

22    Q    You didn't form this company, right?

23    A    No.

24    Q    You never spoke to any lawyer who was forming that

25    company, right?

1    A    No.

2    Q    The documents you can see on -- reading sideways,

3    initially get filed August of 2001.  Do you see that, sir?

4    Right here.

5    A    Yes.

6    Q    And if we page through the Government Exhibit, there's

7    articles of incorporation.  And then as we look, we can find

8    the name of a lawyer who was involved in connection with the

9    document.  And that's a man named Mark Gaeta.  Do you

10    remember hearing his name?

11    A    Yes.

12    Q    And there's also another -- well, let me get the pages

13    in order.  So we see Law Offices of Mark Gaeta as one of the

14    lawyers involved with this entity, correct?

15    A    Yes.

16    Q    And then, the next page in the Government Exhibit we see

17    reference to another lawyer, Donald Spadaro, who we already

18    talked about, right?

19    A    Yes.

20    Q    And I think you told us you didn't talk to Spadaro, and

21    I think you also said you never spoke to or met with

22    Mr. Gaeta?

23    A    That's correct.

24    Q    So whatever Mr. Gaeta or Mr. Spadaro were saying to

25    whomever they were meeting with would be at meetings in which

1    you were not present, correct?

2    A    Correct.

3    Q    Can't tell us firsthand, correct?

4    A    Correct.

5    Q    But what we do know is that eventually these different

6    properties that Efficient has made an offer on, they

7    ultimately go to a closing, correct?

8    A    Correct.

9    Q    Now, you were at the closing, right?

10   A    I was not.

11   Q    You can't tell us firsthand who was at the closing,

12   correct?

13   A    I cannot.

14   Q    You certainly can't say that John Artuso was at any

15   closing, correct?

16   A    I cannot.

17   Q    But people had lawyers at the closing, right?

18   A    Yes.

19   Q    And this is in evidence as Government Exhibit 1.43.

20   Among the people that had lawyers at the closing was ADT,

21   right?

22   A    Yes.

23   Q    In fact, the ADT lawyers created most of the documents

24   for the closing, didn't they?

25   A    Yes.

1    Q    And that's that law firm, Broad and Cassel, right?

2    A    Yes.

3    Q    And the closing is, as we've established, February,

4    2002, right, sir?

5    A    Correct.

6    Q    So in those filings in the Government Exhibit that is

7    1.41 when later on we see a list of a resident agent for

8    Efficient Corp. and the names, John Artuso or Vince Artuso,

9    that's well after the closings, right?

10   A    Yes.

11            MR. PASANO:  Judge, I won't be super long, but I

12   will be a little bit longer.  What's the Court's preference?

13            THE COURT:  Take five more minutes, and then we'll

14   stop, if you can't finish within that period.

15            MR. PASANO:  I'll do my best, Judge.

16   BY MR. PASANO:

17   Q    I want to show you, sir -- one of the properties that

18   you were asked a lot of questions about by the Government was

19   the Palm Harbor property.  Do you remember being asked a

20   bunch of questions about that?

21   A    Yes.

22   Q    This is Government Exhibit 1.80.  This is the

23   sale-leaseback agreement on Palm Harbor.  Do you remember

24   looking at that?

25   A    Yes.

1    Q    And at Page 23 -- by the way, do you know who drafted

2    this document?

3    A    The final document?  (Witness shaking head.)

4    Q    Do you know whether it was ADT's lawyers or the

5    purchaser's lawyers, or do you know?

6    A    I'm not sure.

7    Q    Okay.  But what you are sure about is that you signed

8    it, right?

9    A    Yes.

10   Q    And at Page 23, sure enough, we see your signature for

11   ADT, right?

12   A    Correct.

13   Q    On 10/10, right?

14   A    Correct.

15   Q    And then we see what looks like John Artuso.  And I

16   think that was your testimony, wasn't it, it looks like John

17   Artuso?

18   A    Correct.

19   Q    And it's on a different day, right?

20   A    Correct.

21   Q    You weren't there when it was signed?

22   A    No.

23   Q    Don't know what Mr. Artuso was told?

24   A    No.

25   Q    Just know that you can look at a document and see that

1    he has signed it with a date of October 11, 2001?

2    A    Correct.

3    Q    And you're even assuming that's his signature because

4    you don't really know his signature, right, sir?

5    A    That's correct.

6    Q    Now, back in October of 2001 when this sale-leaseback

7    was executed, did you have occasion to speak to any lawyers

8    at a law firm in Fort Lauderdale and in Boca called Atlas

9    Pearlman?

10   A    The name is not familiar.

11   Q    Or a man named Adam Reese?

12   A    The name is not familiar.

13   Q    Or someone else named Ken Wurtenberger?

14   A    The name is not familiar.

15   Q    The attorneys who were representing Westmore Properties,

16   do you recall now whether you had any occasion to speak to

17   anybody on behalf of Westmore Properties?

18   A    No, sir.

19   Q    And am I right, sir, that back in October of 2001, if we

20   want to know what John Artuso knew about or thought about

21   this deal on Palm Harbor for which his company Westmore was

22   signing, you're not the person to ask, right?

23   A    Correct.

24   Q    Now, Mr. Shockley did ask you after the sale-leaseback

25   purchase agreement was signed, what was the next thing that

1   happened.  Do you remember being asked sort of those

2   questions by Mr. Shockley back Thursday or Friday of last

3   week?

4   A    Yes.

5   Q    And I think you told him more than once -- that after

6   these two different or three different offers were signed off

7   on and the sale-leasebacks executed, that there came a time

8   after that that you heard Greg Orr was having trouble finding

9   financing, right?

10  A    Greg Orr had stated he was having trouble finding

11  financing to me.

12  Q    And it's at that point that you come to figure out that

13  Mr. Orr is proposing to bring in additional partners, right?

14  A    In the conversation Mr. Orr stated he was bringing in

15  partners.

16  Q    And he identifies Vinnie and Johnny, correct?

17  A    That's correct.

18  Q    He doesn't use last names, right?

19  A    No.

20  Q    But you understand that these partners are going to come

21  in for two reasons, right?  Help find a lender and help pay

22  expenses on the deals, right?

23  A    Correct.

24  Q    Now, you had, on a regular basis, the paperwork for

25  these deals as things were getting signed off on, correct?

1    A    I didn't -- I wouldn't have any paperwork.

2    Q    Well, for instance, the sale-leaseback agreements, would

3    you see them at some time from the time that they were signed

4    until the closing?

5    A    They would be with their attorneys.

6    Q    Would you ever go over to either Ms. Desporte or

7    Mr. Joseph and ask to look at the documents?

8    A    I would have no reason to look at them.

9    Q    Maybe they were changing them.

10   A    They should let me know.

11   Q    If they were to let you know, would they tell you

12   anything about who they were dealing with?

13   A    Depends on what the change was, sir.

14   Q    Well, the reason I ask, sir, is that you say you didn't

15   know the name John Artuso at that point in time and yet, on

16   the sale-leaseback agreement, which is dated October 11th of

17   2001, for sure, his name is written on behalf of Westmore

18   Properties; isn't that correct, sir?

19   A    I think it was written on different dates.

20   Q    Right.  My question is --

21   A    I wasn't --

22   Q    -- are you sure that at no time between October and the

23   closing, did you ever look at any of the paperwork to see the

24   name John Artuso right there, clearly written, on behalf of

25   Westmore?

1    A    Once a side signed off on it, I didn't see the paperwork

2    after that.

3                THE COURT:  Is this a convenient time?

4                MR. PASANO:  It's a great time, your Honor.

5                THE COURT:  It's 12:30.  Let's stop and return at

6    1:30.

7         (Jury out at 12:30 p.m.)

8                THE COURT:  We'll see you at 1:30.

9                MR. PASANO:  Thank you, your Honor.

10        (Recess at 12:31 p.m.)

11               THE COURT:  Ready?  As soon as you find our

12   witness.

13               MR. PASANO:  And the prosecutors.

14               THE COURT:  Oh, we're missing them, too?

15               MR. PASANO:  Yes, sir.

16               THE COURT:  Well, have a seat then.  I guess I'm

17   actually a little early.  How much longer will you be?

18               MR. PASANO:  I'm hoping 15 minutes or less, your

19   Honor.

20        (Pause in Proceedings.)

21               MR. SHOCKLEY:  Am I late, Judge?

22               THE COURT:  I think you have a minute or two.

23   Although, our jury is ready to go.

24        (Pause in Proceedings.)

25        (Jury in at 1:28 p.m.)

```
 1                    THE COURT:  Welcome back.  Please be seated.

 2                    And please continue, Mr. Pasano.

 3                    MR. PASANO:  Thank you, your Honor.  Good

 4       afternoon, ladies and gentlemen.

 5                    Your Honor, at this time we move into evidence

 6       what's marked for ID JA-11.

 7                    MR. SHOCKLEY:  No objection, your Honor.

 8                    THE COURT:  11 is admitted.

 9            (Received in evidence Defendant JA Exhibit(s) 11.)

10       BY MR. PASANO:

11       Q    I was asking you before lunch, Mr. Horton, about

12       Mr. Joseph, for example, and the kinds of things that he was

13       involved in in connection with the legal work done on these

14       deals.

15                    Here is a January 16, 2001, e-mail from Mr. Joseph,

16       and you're one of the people that it's sent to.  Do you see

17       that, sir?

18       A    Yes.

19       Q    This one deals with that property on Franklin Street in

20       Buffalo.  Do you see that?

21       A    That's correct.

22       Q    Do you see where Mr. Joseph is writing Larry and

23       Warren -- and the Larry is you, right?

24       A    Correct.

25       Q    And he's talking about whether there's going to be a
```

1    leaseback required.  Do you see that?

2    A    Correct.

3    Q    And then with a sale price, which was low on this

4    property, 125, $125,000, he is asking, this is Mr. Joseph

5    asking you, does it make sense to sell the property.  And he

6    is looking forward to your input and direction.  This is an

7    example of the way the correspondences went back and forth

8    between you and the people in legal; isn't that correct, sir?

9    A    These are follow-up related questions on some of the

10   items that I wasn't totally involved in when Mr. Curlew was

11   over real estate.

12   Q    But something you were involved in were decisions

13   whether or not in selling property, to put the property out

14   for market; is that correct?

15   A    Once it had been determined that the property was going

16   to be sold --

17   Q    Correct.

18   A    -- then, obviously, I or somebody in my group, being

19   Maggie or somebody else, would contact Grubb & Ellis.

20   Q    And the choice that ADT had that you were involved with

21   was whether or not just to try to sell the property quickly

22   to whoever was making an offer on it, or to put it out to

23   marketing, which was a more time consuming and expensive

24   process; isn't that true?

25   A    If you look at our real estate sales, Grubb & Ellis --

1    the majority of them went out for real estate sales to Grubb

2    & Ellis.

3    Q    Different question.  My question is, sir, isn't it true

4    that in making a decision how to dispose of property, the

5    choice ADT had in which you were involved was, you could

6    either try to sell it quickly with the offer or offers you

7    had or you could put it out to marketing, which was a more

8    time-consuming and costly process?

9    A    I don't understand the difference.  I'm sorry.

10   Q    That's all right.  Let me break it down and show you

11   something in evidence.  It's Mr. Orr's Exhibit 13.  And I

12   think you were asked some questions about this memo, which

13   was January 30, 2003, and it had to do with the Sassafras,

14   Erie, Pennsylvania, property.  Do you recall that?

15   A    Correct.

16   Q    But the second page of the document and the beginning of

17   the e-mail string comes from this person, Jeffrey Read.  He

18   is at Grubb & Ellis, correct?

19   A    Our national account rep, correct.

20   Q    And you see here where he says, if the decision is made

21   to spend some time in marketing the property, I will be happy

22   to assist you.  And above that, we would be able to dispose

23   of the property without any marketing time or expenses, such

24   as getting the building into condition for sale.

25            And my question to you, really is, sir, isn't it

1    true that if the decision was made to market a piece of

2    property, it would both take more time to dispose of it and

3    it would cost money to market it?

4    A    We paid a flat commission as a national account rep for

5    Grubb & Ellis to market our properties.  That was fixed.

6    Only thing involved would be time.

7    Q    You don't pay them if they don't do the work, right,

8    sir?

9    A    Only if they sell the property.

10   Q    So is the answer to my question it's more time-consuming

11   and expensive to market; a yes or a no?

12   A    It depends on the situation.

13   Q    Didn't you tell us last week that one concern that you

14   knew ADT had in the disposition of its properties was

15   publicity?

16   A    I said there was a clause in the contracts that were, to

17   my knowledge, in all the contracts.

18   Q    And the reason that clause was there and the concern

19   that existed during this time period for ADT, was it didn't

20   want word to get out too broadly that it was disposing of

21   properties because that might trigger a run on the stock

22   price, right, sir?

23   A    Exposure of multiple locations going away could possibly

24   have an impact on the company.

25   Q    Right.  And when you market a property and broadly

1    publicize it for sale, aren't you doing exactly what ADT

2    feared and didn't want, which is putting it out into the

3    public domain that they're selling and disposing of

4    properties?  Yes or no?

5    A    That clause was in there for Grubb & Ellis not to expose

6    obviously more than what would be advertised locally in those

7    areas for sale of property.

8    Q    Sir, is that a yes or no to my question?

9    A    I don't know how to define your question.

10   Q    Let me move on.  A moment ago before we broke for lunch,

11   I was asking you about your understanding about Johnny and

12   Vinnie becoming partners on the purchaser end of these

13   transactions.

14   A    Correct.

15   Q    Do you remember I was starting to talk about that?

16   A    Yes.

17   Q    And I think you and I agreed that you understood two

18   reasons why they were coming in.  One was to help pay cost

19   and expenses and the other was to try to help with the

20   financing, correct?  Find financing?

21   A    Find financing.

22   Q    Let me show you a document that's in evidence.  It's

23   Government Exhibit 6.15.  This was a letter I think you told

24   Mr. Shockley you had not seen, which was January 7, 2001,

25   sent from GE Capital to this woman, Amy Stevens.  Do you see

1    it on the screen, the start of that letter?

2    A    Yes.

3    Q    Okay.  I think you've told us, and it's correct, is it

4    not, that you never spoke to Ms. Stevens, never met with

5    Ms. Stevens, had no dealings directly with Ms. Stevens,

6    correct?

7    A    That's correct.

8    Q    This document, which is a several-page document, had a

9    Page 7 out of the 8 pages that talked about deposit.  And do

10   you see here, sir, where it's talking about borrower has

11   previously paid GE Capital deposit, it's 20,000, and it's

12   going to have to come up with an additional 16,000, correct?

13   A    Yes.

14   Q    It's those kinds of costs, is it not, that you

15   understood was the reason why Johnny and Vinnie had gotten

16   involved, because they could help make those kinds of

17   payments, correct?

18   A    Greg stated to me in that conversation that he didn't

19   have the funds to continue on, so I'm not sure what the

20   funds --

21   Q    But that's not quite what you told Mr. Shockley.  I

22   mean, you told Mr. Shockley, did you not, that what was

23   needed was paying certain expenses and costs.  And is not

24   what I've just circled on this page in this Government

25   Exhibit an example of those kinds of --

1    A    Loan applications.  I'm not sure if this is a loan

2    application.

3    Q    Borrower, GE Capital.

4    A    Okay.

5    Q    Sounds like it, doesn't it?

6    A    Sounds like it.

7    Q    Okay.  Now, in addition to costs, you had mentioned and

8    we had agreed, that the other reason that these two

9    gentlemen, Messrs. Artuso, were asked to help with the

10    financing -- and there is another Government Exhibit, 6.176.

11    Do you remember seeing this document when the Government was

12    asking you questions?

13    A    Yes.

14    Q    And this is a GE Capital Credit authorization document

15    dated December 18, 2001.  Do you see that, sir?

16    A    Yes.

17    Q    And this one has to do with the borrower, Efficient

18    Realty Development, LLC.  Do you see that?

19    A    Yes.

20    Q    And on Page 2, you see where it's got an analysis with

21    regard to creditworthiness of the borrower and it talks about

22    John Artuso, right?

23    A    Yes.

24    Q    And it talks about Mr. Artuso's net worth, right?

25    A    Yes.

1    Q    And whether or not he has a clean or not clean credit

2    rating, correct?

3    A    Yes.

4    Q    It says it's clean, correct?

5    A    Yes.

6    Q    This is an example, is it not, of the other reason that

7    you understood Johnny and Vinnie were getting involved, to

8    help with things like getting the loans?

9    A    To get the loans, correct.

10   Q    Now, you say that sometime in 2001 after the approvals

11   and execution of the commitments had been done with regard to

12   the purchase of three projects, the sale-leaseback

13   agreements, you had a conversation with Mr. Orr in which he

14   told you that Johnny and Vinnie were coming in.  We had just

15   started talking about that when we broke for lunch, correct?

16   A    What period of time now are we talking about?

17   Q    Well, it's after the September and October, 2001,

18   sale-leaseback agreements have been executed, correct?

19   A    Sometime in that.

20   Q    But before the closing?

21   A    Before the closing.

22   Q    And we know that, in fact, as of October, 2001, Westmore

23   Properties, John Artuso, is involved in the purchase of these

24   properties, correct?  You may not have figured it out, but

25   that's what the documents said, right?

1    A    Okay.  Correct.

2    Q    And then you say you had this conversation at some point

3    with Mr. Gregory Orr, correct?

4    A    I believe the conversation was sometime in August or

5    September.  I'm not sure of the events that you're talking

6    about.  I'm not sure now.

7    Q    So when Mr. Shockley on Thursday asked you what happened

8    next, after showing you the documents, the September and

9    October, 2001 leaseback agreement documents, and then you

10   answered him you had a conversation with Mr. Orr, you're now

11   saying you had it wrong, that conversation happened months

12   earlier?

13   A    No.  What I'm saying is Greg in this conversation said

14   he needed help.  He couldn't get a loan.  He hadn't had a

15   loan.  He tried to get a loan.  And he also needed financing.

16   So I'm not sure where you're going on this, but I am not sure

17   that documents were signed exactly on that time.

18   Q    Try not to worry about where I'm going and listen to the

19   question.

20   A    I understand.  Yes, I'm trying.

21   Q    Okay.  My first question is, didn't you typewrite in the

22   document that Mr. Markus showed you a little bit ago that it

23   was in August of 2001 that you had the follow-up conversation

24   with Gregory Orr about acquiring properties?  That's what

25   your typewritten note said that you sent to your lawyer.

1    A    Okay.

2    Q    That's what you typed, right?

3    A    Correct.

4    Q    And that was accurate, right, back then?

5    A    That document was typed, and Greg was aware of this

6    document, and this document was going to be our defense if

7    this came to an indictment.  So this document was in

8    preparation for what could take place.  And Greg was aware of

9    this document.  So why don't we clear up this document.

10   Okay?

11   Q    My question to you now, sir, is, was it August of 2001,

12   as you typed in that document, that you came back to Greg Orr

13   and discussed further participating in the purchase of the

14   properties?  Is that the right date or the wrong date?

15   Simple question.

16   A    Again, that's my best recollection.  It could have been

17   July.  It could have been August.  It could have been June.

18   At that time when I wrote that document, I thought it was

19   August.

20   Q    And didn't you tell this jury that it was a while later

21   that you came to learn that Mr. Orr was having trouble

22   finding financing, so it had to be after August?

23   A    I believe it was September or October.  I'm not quite

24   sure.

25   Q    Now, whenever it was, there is, according to you, a

1   conversation where Mr. Orr supposedly tells you about Johnny

2   and Vinnie.  That's your testimony, right?

3   A    He's telling me that his partners are coming in, Johnny

4   and Vinnie, because of those two reasons and that my

5   percentage is going from 50 to 30.

6   Q    And you claim that you asked Mr. Orr, did they know,

7   meaning Johnny and Vinnie, and the response was, they know

8   everything?  That's your testimony, right?

9   A    That's my testimony.

10  Q    Now, where did this conversation occur?

11  A    It took place at his house.

12  Q    Anybody else present?

13  A    No.

14  Q    So it's just you and Mr. Orr, according to you?

15  A    As far as I know, we were the only two in the office.

16  Q    Okay.  So there's not a third party we can go to and

17  say, hey, what was really said in that conversation?  We're

18  going to at least for today in this moment, take your word

19  for it, correct?

20  A    Correct.

21  Q    Now, fair to say, because you told me no one else was

22  there, certainly John Artuso, he's not there, right?

23  A    No.

24  Q    And you never spoke to John Artuso about that

25  conversation, did you?

1    A    No.

2    Q    You never asked him, hey, you know, I was told you knew

3    everything.  Did you?  That never happened, right?

4    A    That's correct.

5    Q    So you can't firsthand tell this jury anything about

6    what John Artuso knew, right?

7    A    I cannot.

8    Q    And for sure, you know that John Artuso, he wasn't

9    working in that office next to you or on that floor above you

10   at ADT, right?

11   A    No.

12   Q    I mean, it wasn't John Artuso that's reporting to Scott

13   MacArthur or Mark Foley, right?

14   A    No.

15   Q    It wasn't John Artuso dealing with Gray Finney, right?

16   A    No.

17   Q    That was you?

18   A    Correct.

19   Q    Now, the three deals, Pompano, Palm Harbor, and

20   Lancaster, they closed February of 2002; is that right?

21   A    I believe so.

22   Q    And the fourth deal is September of 2003, right?

23   A    That's correct.

24   Q    And we've talked a bit about during this whole time

25   period there are other ADT properties being sold, including

1    some that were also leasebacks, right?

2    A    Correct.

3    Q    And you've agreed with me these are the only four

4    properties that you were involved with on the purchase side,

5    correct?  You were part of the purchaser group?

6    A    Correct.

7    Q    And that you didn't do anything like this with anybody

8    else, right?

9    A    Correct.

10   Q    And once each of the deals closed, they were set up for

11   this thing called automatic payments for lease, right?

12   A    Correct.

13   Q    And then every year as the increase would kick in, a

14   form would get submitted that people had to check off,

15   correct?

16   A    That's correct.

17   Q    But the form was really just, this is what the lease

18   payment contract says, the amounts are right, boom?

19   A    That's correct.

20   Q    So it wasn't a whole lot of thinking going forward,

21   right?

22   A    Pretty automatic.

23   Q    In this time period while you were working at ADT up

24   until the time that you were fired, sir, did you ever talk to

25   somebody named Lewis Kasman?

1    A    Lewis Kasman?

2    Q    Do you even know who he is?

3    A    Not offhand.

4    Q    Did you ever invite a Lewis Kasman to be a partner in

5    connection with any of the sales or purchases of ADT

6    property?

7    A    No, sir.

8    Q    Now, I asked you about Amy Stevens a moment ago.  And I

9    think you also in your direct examination had spoken about a

10   man named Tom Rossi.  Am I right, you never met or spoke to

11   Tom Rossi yourself either, did you?

12   A    I did not.

13   Q    And you certainly never talked to anybody at GE Capital;

14   is that right?

15   A    That's correct.

16   Q    But you did hear, according to you, the name Tommy

17   associated with trying to get the financing for these

18   properties, right?

19   A    I heard that from Greg.

20   Q    Did you hear anything about a man named Donald Race,

21   R-A-C-E?

22   A    Donald Race?

23   Q    Yes.

24   A    No, sir.

25   Q    Did you ever talk to a Donald Race?

1    A    Is it Donald?

2    Q    Donald.

3    A    Donald who?

4    Q    Race, R-A-C-E.

5    A    Not that I know of.

6    Q    Ever meet him?

7    A    Not that I know of.

8    Q    Ever see him over at Greg Orr's house?

9    A    Oh, Don.  I didn't know his last name.  I'm sorry.

10    Q    So you do remember a Donald?

11    A    I do.

12    Q    And Donald was involved in the financing, is that right?

13    He was also looking for financing?  Or is this a different

14    Donald?

15    A    It's a different Donald I think that I'm thinking of.

16    I'm sorry.

17    Q    So as you think about it, Donald Race, a guy that might

18    have been involved in financing, not a person you think you

19    ever met, talked to, or had dealings with, correct?

20    A    I don't think so.

21    Q    Now, you were shown by Mr. Shockley and then briefly

22    also shown by Mr. Markus this series of checks that gets sent

23    to KCGF.  It's the Government SI 28 series of exhibits.  And

24    I'll just put one up as an example on the screen.  I keep

25    taking away this thing.

1      Do you remember looking at these various checks

2  that you were asked about?

3  A    Yes.

4  Q    Now, did I hear you say that those checks were checks

5  that you were getting from either -- in this instance, J & G

6  Associates, right?

7  A    Yes.

8  Q    Or at some point later in time, GJO, correct?

9  A    I think so.  Correct.

10  Q    And those are the two places where you got checks

11  involving KCGF, right?

12  A    That's all I remember getting, is from those two

13  locations.

14  Q    Okay.  For sure, you didn't get any checks from John

15  Artuso, correct?

16  A    No, I did not.

17  Q    And these checks that you're receiving, you didn't get

18  any checks from Westmore Properties, right?

19  A    I believe I -- they came from those two locations that

20  you previously said.

21  Q    Not Westmore Properties?

22  A    I don't know.

23  Q    Not Longhill Holdings, right?  You didn't get checks

24  from them?

25  A    I don't -- no.

1    Q    These checks that came to you and your wife that then

2    got cashed were always either from J & G or from GJO, as best

3    you can remember?

4    A    That's correct.

5    Q    And not once in the entire time from 2002 until today as

6    best you can recall, have you ever received a check or

7    payment from Johnny Artuso, right?

8    A    That's correct.

9    Q    Now, you were also shown a bunch of the checks by

10   Mr. Markus where your wife then having received the check to

11   KCGF, goes to the bank and writes a check for cash?

12   A    Correct.

13   Q    And you said this was on your instruction?

14   A    That's correct.

15   Q    And oftentimes that amount of cash was large?

16   A    Correct.

17   Q    Sometimes $100,000?

18   A    That's correct.

19   Q    And did I hear you tell the jury that that money was

20   then being redeposited in one of three bank accounts?

21   A    Correct.  Two other than the company.

22   Q    And the purpose for that, was it not, sir, was when you

23   take out cash and deposit it in another bank account, that

24   disguises where the cash came from, right?

25   A    I don't know that it disguises it.

```
 1   Q    Sir, isn't it a fact --

 2   A    I --

 3   Q    -- month in and month out, year in and year out, at your

 4   direction your wife was cashing checks for cash and going to

 5   banks and depositing that cash in order to conceal from any

 6   wandering eye that you were, in fact, receiving cash in

 7   connection with these properties?

 8   A    No, sir.  Because the check would show up as a deposit

 9   or -- to the bank.  I mean it would be on the back of it, the

10   $100,000.

11   Q    It would be on the back of bank one, but the cash that

12   you take away and deposit into bank two or bank three would

13   just say "cash," right?  I mean, isn't that what crooks do?

14   They take cash, put it in other bank accounts, hide it, and

15   then use that to conceal their crimes, right?

16   A    This was just to move the money so that obviously it was

17   not more than $100,000 in one bank so . . .

18   Q    A couple of last questions.

19   A    Yes, sir.

20   Q    At any time, sir, up to the closing on the first three

21   properties in February of 2002, had you ever met with John

22   Artuso to discuss these deals?

23   A    No, sir.

24   Q    Had you ever talked to him, as of that point in time, to

25   discuss these dealings?
```

1    A    No, sir.

2    Q    You certainly can't say what he was thinking at that

3    time, correct?

4    A    No, sir.

5    Q    And on that fourth property, Oak Brook, up till

6    September of '03 had, you ever met with John Artuso to talk

7    about that deal?

8    A    No.

9    Q    Had you ever spoken to him about that deal?

10   A    No.

11   Q    Had any idea firsthand what was in his mind?

12   A    No.

13         MR. PASANO:  That's all I have, your Honor.  Thank

14   you.  Thank you, sir.

15         THE COURT:  Redirect.

16         MR. BIRCH:  Your Honor.

17         THE COURT:  Oh, I'm sorry, Mr. Birch.

18         MR. BIRCH:  We just changed the order.

19         MR. PASANO:  Probably my fault, your Honor.

20         MR. BIRCH:  I'll be brief.

21                    CROSS-EXAMINATION

22   BY MR. BIRCH:

23   Q    Good afternoon, Mr. Horton.

24   A    Good afternoon.

25   Q    I will be brief.  I just want to clarify a couple of

1    things, make sure I understand your direct and testimony

2    you've already said today.

3         You met Mr. Vincent Artuso, my client, you

4    mentioned at some sort of social function at Greg Orr's house

5    back in '98?

6    A    The best I can recall, that's correct.

7    Q    And he was introduced as a friend of Greg Orr's?

8    A    He was introduced as a friend of Greg Orr's.

9    Q    And do you have any recollection of meeting him at any

10   other time from the date back in 1998 when you saw him at

11   Greg Orr's house to the day you were arrested?

12   A    Possibly one other social function.

13   Q    But you're not sure?

14   A    I'm not sure.

15   Q    But you are sure when you saw him in 1998, he was

16   cooking fish?

17   A    I believe.  Yes, sir.

18   Q    And you are sure that at no time did you speak with

19   Mr. Vincent Artuso about these transactions, correct?

20   A    That's correct.

21   Q    Whether it be the sale of these buildings or the

22   leaseback of these buildings, you never talked to him at all

23   about it, correct?

24   A    That's correct.

25        MR. BIRCH:  That's all I have.  Thank you.

1          THE COURT:  Okay.  Now redirect.

2          MR. SHOCKLEY:  Thank you, your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. SHOCKLEY:

5    Q    Mr. Horton, a few questions to ask you based upon the

6    questions that were posed to you by defense counsel.

7               At the very end while you were being questioned

8    again by -- after lunch, by Mr. Pasano, you again had

9    occasion to talk about this document that was prepared, and

10   it was supposed to be your defense, or as you said, our

11   defense.

12              Could you explain the circumstances leading up to

13   the preparation of that document?

14   A    That was one of possibly several documents that I had

15   given a copy to Greg.  One was the handwritten questions

16   related to the FBI.  Mr. Orr had a copy of that.  And this

17   document was in preparation if we were later indicted, that

18   this would be our defense.

19   Q    Okay.  So then the document that you identified here in

20   court was a document that didn't tell the whole story, or did

21   it tell the whole story?

22   A    It did not tell the whole story.

23   Q    Well, for example, what did it leave out?

24   A    Well, several items.  The normal procedure as far as

25   approval, those procedures were not followed at ADT.  It

```
 1   didn't obviously show that I was guilty of committing a crime

 2   and Mr. Orr was my partner.

 3   Q    And so, by way of example --

 4        MR. SHOCKLEY:  If we could have the document,

 5   Mr. Markus.  Can I borrow the document?

 6   BY MR. SHOCKLEY:

 7   Q    Okay.  It's Greg Orr Exhibit No. 30.  I will put it back

 8   up here on the display screen.  Directing your attention to

 9   the first paragraph:  "In 1999, Tyco/ADT started aggressively

10   the acquisition of security companies.  These acquisitions of

11   security companies could include only revenue or revenue with

12   assets."

13        Is that true or false?

14   A    That's true.

15   Q    And as you went through it with defense counsel, many

16   things you said in here were true; is that right?

17   A    That's correct.

18   Q    And as a matter of fact, most of the things in there are

19   true; is that correct?

20   A    That's correct.

21   Q    So what was hidden was what?

22   A    My and Greg's part in this scheme to defraud ADT on the

23   sale and purchase and leaseback of properties.

24   Q    So in this document that you typed up -- by the way,

25   what attorney was representing you at that time?
```

1    A    At that time it was Mr. Mike Dutko.

2    Q    Mike Dutko.  So this is a document you typed up and gave

3    to Mr. Dutko?

4    A    Yes.

5    Q    Did you ever review this with Mr. Orr?

6    A    Yes.

7    Q    Describe the circumstances.

8    A    I'd given Greg a copy of this.  And I would like to

9    point out that my attorney came from Greg's recommendation.

10   In other words, his attorney had given him the name of Mike

11   Dutko, and that's the attorney that I went to.  So my

12   reference of attorneys was from Mr. Greg Orr.

13          Greg and I discussed this document as far as this

14   would be the foundation for our defense in case anything came

15   up in the future, which I certainly was hoping would not come

16   up.

17   Q    When -- time-wise, when was this document prepared, if

18   you recall?

19   A    It would have been sometime in '06, and I'm not sure

20   exactly of the time line.  It could have been February to

21   March to April or May.  I'm not sure.

22   Q    Okay.  Now, you were approached initially by the FBI on

23   January the 11th of 2006, if you recall?

24   A    Correct.

25   Q    Approximately how long after that initial approach was

1    this document prepared?

2    A    It would have been in a two or three-month period there

3    because I retained an attorney, Mr. Dutko, shortly after the

4    FBI came, and so I was certainly thinking about some type of

5    defense.

6    Q    Okay.  Go to the fourth paragraph.

7              "Late 2000, Scott reassigned the responsibility for

8    ADT's real estate group over to my department.  In the next

9    meeting, Scott said, these real estate properties must be

10   moved out by either buyout of leases, property sales, or

11   sale-leaseback, or SLB, of the identified locations."

12             And of course that was true; is that right?

13   A    That's true.

14   Q    And properties were being acquired by ADT as a result of

15   the actions of Tyco in gathering up other companies and

16   putting them into baskets, so to speak; is that correct?

17   A    That's correct.

18   Q    Now, you indicated that a number of these were not just

19   buildings to be sold, they were leases to be bought out.

20   Explain that.

21   A    The majority of the buildings that we got from the

22   security companies, because these were sales service offices,

23   were leased, anywhere from three to seven-year leases

24   originally.  That, we had the option of either letting the

25   lease run out if the owner would not consider a buyback or if

```
 1    he would consider a buyback, we negotiated with him to try to
 2    get out of the lease so we didn't have to maintain the
 3    property.
 4             Some of these were sale.  Like San Antonio with no
 5    leaseback.  And then as indicated there, CFO Scott MacArthur
 6    and his team had determined that we possibly were going to
 7    sale and leaseback some of these properties.
 8    Q    Now, the chart that you saw earlier, one of the defense
 9    exhibits, where it showed, you know, like 500 properties and
10    then going down over time.  Would these include leases as
11    well?
12    A    The majority of them.  If you look at SecurityLink, I
13    think it was 123 or 24 locations, give or take.  I think
14    there was 14 that was owned by SecurityLink.
15    Q    So a lot of this -- the properties going down were no
16    longer renewing leases or attempting to buy out leases; is
17    that correct?
18    A    Correct.
19    Q    Okay.  Now, go to the next paragraph, the cash is king
20    paragraph.
21    A    Right.
22    Q    Now, it is true that ADT was attempting to secure as
23    much cash as possible?  Is that correct?
24    A    That's correct.
25    Q    And how did that jibe with the strategy of trying to
```

1  raise cash, to sell properties at less than fair market

2  value?

3  A    We used Grubb & Ellis to list our properties, as has

4  been indicated here, by several locations.

5  Q    Was that in -- was actively marketing properties part of

6  the strategy to raise cash?

7  A    It was, to try to get the highest bidder price for these

8  properties.  And certainly, we wanted to sell them quickly.

9  But we wanted to try to get the best price.

10  Q    So the four properties that are the subject of this

11  case, none of those were marketed you said?

12  A    That's correct.

13  Q    So is this something that you had discussed, for

14  example, with Scott MacArthur, that you were not going to

15  market any of these properties?

16  A    No, I made that decision.

17  Q    So let's take a look at the middle sentence.

18        "After the acquisition and in the next meeting

19  Scott said, 'cash was king.' And he, Scott, would review any

20  offers, lease buyout, property sales, or SLB to move out

21  these properties.  Scott said, Tyco wants these properties

22  gone."

23        Now, directing your attention to the part where it

24  says "Scott would review any offers," is that what was taking

25  place?

1    A    As two documents that I've seen here, or three, showing

2    spreadsheets with asking for approval as I indicated in my

3    prior conversations, Scott got an e-mail and it would list

4    these properties on the spreadsheet and he would review with

5    Tyco Fire and Security that same document to get approval.

6    Q    And so on how many occasions, if any, did Scott come to

7    you to ask for appraisals and the underlying documentation to

8    see if this was, in fact, a good deal for Tyco, as opposed to

9    just another property to be sold?

10    A    Zero.

11    Q    So he did not?

12    A    He did not.

13    Q    So in this particular document where it says he, Scott,

14    would review any offers, and so on and so forth, was that

15    true or not?

16    A    That was false.

17    Q    Why did you want to put a false statement in this

18    particular document?

19    A    This was building a defense.  At that time, totally in

20    denial, obviously, looking not to be indicted, but if it

21    happened, this would be our foundation for defense.

22    Q    Directing your attention to the second page of the

23    document.  At the very top line it says:  "I also stated that

24    if he was lucky enough to get any of these properties, I

25    wanted a percentage of the profit."

1          Was there really any luck involved, Mr. Horton, in

2     the sale of these four properties?

3     A    There was no bids, just offers from Mr. Orr --

4     Q    That --

5     A    -- that we had agreed upon in a prior conversation.

6     Q    And was that the whole reason for not marketing the

7     properties, so there would be no other bidders?

8     A    That's correct.

9     Q    The next paragraph it says:  "Out of the seven or eight

10    offers sent in to ADT, only three properties, Palm Harbor,

11    Florida; Lancaster, Pennsylvania; and Pompano, Florida, were

12    negotiated based on prior appraisals that came with the

13    acquisition, along with brokers opinion of value provided by

14    Tyco's real estate company, Grubbs-Ellis.

15         Now, was there really any negotiation in the real

16    sense of the word?

17    A    No, there was -- it was already prepared as far as the

18    purchase price and lease price between Greg and I.

19    Q    So this was a lie as well?

20    A    That's correct.

21    Q    To prepare a defense?

22    A    That's correct.

23    Q    And the next paragraph:  "Once Margie finalized the

24    offers, all documentation was then forwarded to Scott

25    MacArthur, ADT CFO for his review and approval."

1       Was that true, that all documentation was

2   forwarded?

3   A     Only if he requested it.

4   Q     And did he ever request it on any one of these four

5   deals?

6   A     He did not.

7   Q     And you recall Government's Exhibit No. 28.8, that

8   series of e-mails that took about two hours and 45 minutes

9   back and forth, in that, was the approval gained without

10  having to disclose anything other than that basic

11  spreadsheet?

12  A     That's all the approval documents he requested.

13  Q     And that basic spreadsheet, even that, all the broker's

14  opinion of value and the appraisals, were all those values

15  higher or lower than what you put on the spreadsheet as far

16  as the market value of the properties?

17  A     The values should have been higher.  The numbers that

18  were in that spreadsheet were low.

19  Q     And you put in the lower numbers in order to do what?

20  A     To obviously be more profitable for Greg and I.

21  Q     And to -- and how would putting in the lower numbers on

22  the spreadsheet for the market value of the properties, how

23  would that assist you in getting the prices that you and

24  Mr. Orr had negotiated between yourselves?

25  A     Well, that would create a lower cost, which would mean

1    more profit on the lease.

2    Q    So this letter then represents the lie that you intended

3    to perpetrate back in 2006?

4            MR. MARKUS:  Objection, your Honor.  Leading.

5            THE COURT:  Sustained.  Please restate the

6    question.

7    BY MR. SHOCKLEY:

8    Q    So back in 2006, was this letter true or false?

9    A    This letter was false.

10    Q    And did you ever swear to the contents of this letter?

11    A    I did not.

12            MR. MARKUS:  Judge, objection.  He did earlier this

13    morning.

14            THE COURT:  Mr. Markus, that's not an objection.

15    That's an argument.  Whatever it is, it's overruled.

16    BY MR. SHOCKLEY:

17    Q    Now, during the course of cross-examination -- let me

18    just ask you, going back to last Friday when Mr. Markus first

19    started examining you, you recall that he showed you some

20    documents and asked you if it wasn't true that you had

21    illegally worked for a competitor when you first left ADT?

22            Do you recall that series of questions?

23    A    I do.

24    Q    And you had a severance package; is that correct?

25    A    I had a severance package with a noncompete.  As long as

1    I did not go to work for a competitor, my salary from ADT

2    would continue.  But if I chose to make that decision to go

3    to work for a competitor, which I did, that salary stopped,

4    which was part of the noncompete.

5    Q    And, in fact, once you went to work for a competitor,

6    the fact of the matter is you were not getting any payment

7    for -- pursuant to that severance package; is that correct?

8    A    That's correct.

9    Q    So you could have sat at home, propped up your feet, and

10   drawn the salary for 18 months?

11   A    Yes.

12   Q    But you chose not to do so?

13   A    Yes.  I went to work for SecurityLink.

14   Q    Did ADT ever sue you for any violation of a noncompete

15   clause?

16   A    No, sir.

17   Q    As a matter of fact, did they later hire you back --

18   A    Yes.

19   Q    -- and make you a vice president of planning and

20   implementation?

21   A    They did hire me back in November of 1997.

22   Q    Do you recall some conversations with or talking --

23   answering questions of Mr. Markus concerning what you said

24   was a misunderstanding at the bail hearing?  After your

25   attorney spoke, were you released on bail?

1    A    I was.

2    Q    Did that straighten out the misunderstanding?

3    A    Yes, it did.

4    Q    With respect to the Bradenton property, do you recall

5    some -- being shown some documents concerning various offers

6    to buy the Bradenton property?  Now, I believe -- did you

7    testify that it was a sale and a leaseback?

8    A    Yes, it was.

9    Q    Can you explain to us, first of all, the size of the

10   building, and secondly, the amount that was leased back?

11   A    Bradenton was a relatively new built property.

12   SecurityLink had constructed it.  It was 100,000 square feet,

13   which was sold, and 5,000 square feet was leased back, which

14   was a computer room.

15   Q    So the 5,000 feet that was leased back that was just a

16   computer room, what interest, if any, did you or anyone else

17   have in just leasing back 5,000 square feet?

18   A    No interest.

19   Q    Now, that was a sale and leaseback that took place in

20   what year?

21   A    I think it was in 2004.

22   Q    Okay.  Now I want to direct your attention earlier.  At

23   the point in time when Mr. Orr submitted his offer that you

24   and he had agreed upon, was that going to be a sale-leaseback

25   of the entire building?

1    A    It was.

2    Q    Okay.  Did ADT decide to sell or not to sell at the time

3    that that offer was made?

4    A    The decision was made not to sell at that time.

5    Q    Okay.  That was not a decision that you made; is that

6    correct?

7    A    That's correct.

8    Q    So that offer went nowhere because ADT did not sell?

9    A    That's correct.

10   Q    So it was later that ADT sold?

11   A    It was later that the building was vacated, only except

12   for the computer room, and they chose to sell it and lease it

13   back.

14   Q    And at that point in time, the later point in time when

15   it was actually sold, were there bidders on the property at

16   that time?

17   A    Yes, there were several bidders.

18   Q    The earlier time when Mr. Orr submitted his offer, were

19   there any other bidders?

20   A    No, sir.  There would -- there was not.

21   Q    Mr. Markus asked you about this phrase "cash was king."

22   Again, if cash is king, why would you be selling properties

23   for less cash than you could get?

24   A    You certainly wanted the most cash you could get.

25   Q    And, in fact, these deals, these four deals, were they

1    sold for as much cash as ADT could get?

2    A    No, sir.

3    Q    Do you recall Gregory Orr Exhibit No. 6?  That was the

4    e-mail from Laure Roy to Marjorie Desporte regarding the

5    approval process.  What can you tell us about whether that

6    was followed in these four cases involving these four

7    properties?

8    A    All steps were followed as far as ADT CFO giving

9    approval.  I think the e-mails were shown as exhibits.  They

10   went to Tyco Fire and Security, Tyco Fire and Security then

11   to Tyco, and then board certified, and then obviously, final

12   approval.

13   Q    So mechanically, generally, these steps were followed;

14   is that correct?

15   A    Mechanically, they were all followed.

16   Q    But your superiors did not know what?

17   A    They did not have the documentation to see the

18   appraisals of the properties to understand that these were

19   simple sales, not sale-leasebacks totally.  So they were

20   missing the documentation.

21   Q    And, in fact, did you ever tell them what the true facts

22   were as far as the value of these properties?

23   A    No, sir, I did not.

24   Q    Do you recall being shown documents concerning other

25   properties, other properties that were sold at losses?  What

1  can you advise the ladies and gentlemen of the jury about

2  some of those properties that were sold for losses?

3  A    These properties came from acquisitions.  They had been

4  sitting for months as the acquisition side was trying to sell

5  these properties also.  They were in bad shape.  They were

6  put out to Grubb & Ellis for the best price, and we received

7  the best price we could in the bidding process.

8  Q    So were these occupied premises, the ones that you

9  referred to as deteriorating, at least?

10  A    No, they were vacant or in bad repair, need of bad

11  repair.

12  Q    With respect to the question of Mr. Pasano about, would

13  you lie to protect your wife, do you really feel like your

14  wife needs protection?

15  A    Uhm, my wife -- these transactions was done at my

16  request.  I felt very comfortable that my wife would not be

17  indicted because she was innocent.

18  Q    Would there be any need to lie to protect her?

19  A    No, sir.

20  Q    Telling the truth, would that protect her?

21  A    Telling the truth?

22  Q    That you were the one that was involved, not her.

23  A    No, it wouldn't necessarily protect her because my wife

24  was innocent from any of these charges that may have come

25  about because I was the one that was involved.

1    Q    Do you recall Mr. Pasano asked whether or not you had to

2    satisfy Mr. McCormick and me, you had to convince us that

3    you're telling the truth in this case?  Do you remember those

4    questions?

5    A    I do.

6    Q    Now, is there someone else that may take an interest on

7    whether or not you're telling the truth, the truth in this

8    case?

9    A    Judge Middlebrooks.

10   Q    And are you going to appear before Judge Middlebrooks

11   for sentencing?

12   A    Yes, I will.

13   Q    If you were to lie in this case, how do you think that

14   your sentence would be affected by your lies?

15   A    It certainly wouldn't be good.

16   Q    Now, sir, you indicated that what you did started out as

17   an ethical violation.  What did it conclude as?

18   A    It turned into a crime.

19   Q    Did you cheat ADT out of money and property?

20   A    Yes, I did.

21   Q    Do you recall going over the plea agreement?  You came

22   in and pled guilty and exposed yourself to eight years and

23   one month to ten years and one month; is that correct?

24   A    That's correct.

25   Q    If this was just an ethical violation, would you have

```
 1   come in here and pled guilty to these crimes?

 2   A     No, sir.

 3   Q     What incentive do you have to come to court, plead

 4   guilty, face up to ten years of imprisonment just so that you

 5   can falsely accuse five innocent men?

 6   A     Zero.

 7   Q     Do you recall the questions of Mr. Markus about how

 8   these prosecutors -- do you recall he came over here and

 9   gestured, put his hand down on our table, "these

10   prosecutors," Mr. McCormick and I, we agreed to dismiss all

11   of those counts in the indictment, Counts 2 through 42, all

12   of these counts, what is your understanding about what

13   impact, if any, dismissing all of those counts will have on

14   your final sentence?

15   A     My attorney advised me that I --

16          MR. ENTIN:  Objection to what his attorney advised

17   him, Judge.  That's hearsay.

18          THE COURT:  Sustained as to what you were told.

19   BY MR. SHOCKLEY:

20   Q     What is your understanding of whether or not the

21   dismissal of those other counts will have any impact on your

22   final sentence?

23   A     They will have none.

24   Q     Did you plead guilty to the first count of the

25   indictment?
```

1    A    And the most serious.

2    Q    And that carries a penalty of 20 years, as was pointed

3    out in the plea agreement; is that correct?

4    A    That's correct.

5    Q    And your recommended sentencing guidelines were 97 to

6    121 months; is that correct?

7    A    Correct.

8    Q    Now, you hope to get less; is that correct?

9    A    I hope.

10    Q    As a result of your cooperation in this case; is that

11    correct?

12    A    Yes, I do.

13    Q    Rather than stick with the story that's in Greg Orr's

14    Exhibit 30, did you come in here and tell the truth during

15    the last several days of your testimony?

16    A    Yes, I have.

17            MR. SHOCKLEY:  Your Honor, I have no other

18    questions.

19            THE COURT:  All right.  Thank you, sir.  You may

20    step down.

21        (Pause in Proceedings.)

22            MR. SHOCKLEY:  Your Honor, the Government would ask

23    that --

24            THE COURT:  I'm sorry?

25            MR. SHOCKLEY:  Your Honor, the Government asks

1    again, pursuant to the Court's earlier ruling, that we have

2    an opportunity to recall him at a later time.

3           THE COURT:  Yes.  It may be that the Government may

4    recall the witness for further questions.  And that was

5    discussed earlier between the parties.

6           Next.

7           MR. SHOCKLEY:  Michael Cannon, your Honor.  Your

8    Honor, I know he is around.  I know he was on the second

9    floor here.

10      (Pause in Proceedings.)

11           MR. SHOCKLEY:  Mr. Cannon, you could step right up

12    here.

13         MICHAEL Y. CANNON, GOVERNMENT'S WITNESS, SWORN

14                      DIRECT EXAMINATION

15    BY MR. SHOCKLEY:

16    Q    Sir, would you please state your name and spell your

17    last name for the record.

18    A    Michael Y. Cannon, C-A-N-N-O-N.

19    Q    And your occupation, sir?

20    A    I'm a real estate analyst, evaluator, and consultant.

21    Q    Are you the manager and director of a local firm down

22    here in South Florida?

23    A    I was.  I'm currently executive director, and our firm

24    is Integra Realty Resources.  My office -- we have 52 offices

25    in 32 states.

1    Q    Could you give the ladies and gentlemen of the jury an

2    idea about your background and the education, training, and

3    experience in real estate appraisals and, you know, property

4    evaluations?

5    A    My practice of real estate valuation, consulting, and

6    analysis is, I hate to admit, 45 years.  My education in that

7    regard, after attending University of Miami, was through the

8    private organizations of the -- getting the educational

9    background to attain certain designations.  Through the

10   Appraisal Institute, I hold the MAI designation.

11   Q    What is the MAI designation?

12   A    MAI destination is a member of the Appraisal Institute,

13   which is a covenant designation after you take extensive

14   courses, examinations, and demonstrate that you have the

15   capabilities of performing evaluation services on all types

16   of real estate.

17   Q    Who actually awards this designation if you are lucky

18   enough to earn it?

19   A    The organization is the Appraisal Institute based out of

20   Chicago, Illinois.  And it's the oldest institution, formed

21   in 1934.

22   Q    And I also see behind your name some other designations.

23   There's an SRA.  What is that?

24   A    SRA is senior residential appraiser.  Similar, but it's

25   geared toward residential housing, where you are considered

1    an expert under single family homes up to four units.

2    Q    What is ASA after your name?

3    A    That's another appraisal organization that deals with

4    business valuations as well.  It's the American Society of

5    Appraisers, and that organization was founded in 1952.

6    Q    And now, what is FRICS?  What is that designation?

7    A    I was just awarded that.  Since we have international

8    clientele, that's a Fellow of the Royal Institution of

9    Charter Surveyors.  It's an international designation for

10    people that practice valuation consulting, like I do, with

11    clients throughout the world.

12    Q    Mr. Cannon, can you take that screen and just push it

13    down a little bit.  That thing will fold down forward.  Yes.

14    There we go.  That way you're not hiding behind the screen.

15    A    Sure.

16    Q    Now, directing your attention to the final letters after

17    your name, the designation, CRE, what is that?

18    A    CRE is by invitation only.  It's a Counselors of Real

19    Estate.  There's 1,100 of us in the world, and they select

20    you from your locale, being outstanding in your practice over

21    and above what you would normally give back to the community

22    as well as providing such services.  And I've been a

23    Counselor of Real Estate now for 20 years.

24    Q    Can you give us some idea over the course of time what

25    your training, education, and experience has contributed

1    toward your expertise here today?

2    A    Particularly, we have to be recertified, as lawyers and

3    accountants do, under State certification.  So I have the

4    State certified general license under the State of Florida.

5    And I continuously take continuing educational courses.  And

6    more recently over the last five years I've also been asked

7    by the legal profession to be a faculty in lawyers continuing

8    education.  So I'm a member of the faculty under CLA, which

9    is a continuing legal education for the legal profession as

10   well.

11   Q    And where have you lectured?

12   A    University of Miami Law School and seminars that are

13   conducted for continuous education for lawyers in Tampa,

14   Florida.  And I have one coming up in October for SAL, which

15   is another organization for legal continuing education in

16   Palm Beach.

17   Q    And did you -- do you have occasion to write any kind of

18   columns weekly?

19   A    Yes.  I write a column in the Miami Herald in the

20   Business Monday section called, Michael Cannon on Real

21   Estate.  And I have authored two papers on real estate

22   analysis.  One, the role of the real estate appraiser as

23   compared to the property assessors, and was published by the

24   Appraisal Institute in the Appraisal Journal back in 2001.

25            And then I prepared a paper called Market Analysis

1    For Valuation that appeared in the technical report by the

2    Appraisal Institute, and that was published in 1991.

3    Q    Okay.  What professional organizations are you a member

4    of?

5    A    I'm a member of the Urban Land Institute, which is the

6    oldest organization, and of the think tank.  Those of you who

7    heard Brooking's Institute, it's relates to real estate.  And

8    I am -- I serve on the executive committee of the southeast

9    chapter.  Very active in that organization.  We write papers.

10   Most recent one we're working on now is affordable housing.

11   Q    The Counselors for Real Estate that you mentioned

12   earlier, what kind of body is that?

13   A    Counselors of Real Estate is an international

14   organization that is somewhat now affiliated with the, what

15   they call RICS, the fellow chart surveyors, which performs

16   analysis of its members outside of the role of appraisal

17   work, where we do counseling.

18          If someone wants to build a development, they'll

19   hire a counselor to advise them and coordinate the

20   feasibility of a project.  And from my experiences in that

21   role, I've had the opportunity of being an asset manager for

22   international companies --

23   Q    Well --

24   A    -- in that regard as well.

25   Q    Backing up from international companies, let's just come

1    back down here to South Florida.  Tell us about how you got

2    your start.

3    A    My start was actually Miami-Dade County Property

4    Appraisers Office.  My mother wanted me to get into real

5    estate when I was young after school, and I got a job in the

6    reassessment program and it was a foundation.  I was there

7    for several years, and then got a job with a savings and

8    loan.  And they educated me, paid for my education through

9    appraisal.  And at the savings and loan when I was young, I

10   became chief loan officer at the age of 25.

11   Q    Chief loan officer of what entity?

12   A    It was known as Citizens Federal, which was subsequently

13   sold to Bank of America.  In 1973 I wanted to try something

14   on my own, and I formed several companies.  All under the

15   name AREEA, A-R-E-E-A.  One was Appraisal and Real Estate

16   Economics.  One was AREEA Assessment Consultants, and one was

17   AREEA, Inc.

18         And all of those were outside of the appraisal

19   faction.  It was all outside of appraisal, but affiliated

20   with it was implementation.  So we did a lot of consulting

21   work for various clients.

22         In 1999 we had the opportunity of merging the

23   appraisal company into Integra, which is the largest

24   appraisal evaluation counseling firm in North America.

25   Q    So -- your voice trails off a little bit.  I'm going to

1    ask you to make sure you speak into that microphone.

2            Now, you indicated you're an executive director of

3    Integra Realty Resources, Incorporated; is that correct?

4    A    Correct.  I was managing director and I wanted to get

5    out of the day-to-day practice so I can provide more work and

6    services to several public bodies that I'm consultant with.

7            I'm on retainer with the City of Hollywood in the

8    CRA district.  I'm on retainer with the West Palm Beach City

9    Commission and CRA district for redevelopment in downtown

10   West Palm Beach.  As well as other municipalities.  So it

11   gives me more time, more flexibility in that regard.

12   Q    Those three entities that you first mentioned that were

13   merged with Integra Realty back in 1999, all of those three

14   companies, how long did you run them?

15   A    25 years.

16   Q    And you've been with Integra ever since then, 1999; is

17   that correct?

18   A    That's correct.

19   Q    Initially when the merger was made, what was your

20   position with Integra?

21   A    I was managing director.

22   Q    So you remained managing director until recently and now

23   you are executive director?

24   A    Correct.  We have some younger fellows do the day-to-day

25   administration work.  Not that I'm that old.

1    Q    Did you have occasion to testify before in court?

2    A    I've appeared several times in the bankruptcy court of

3    the Southern District, Illinois District, circuit courts,

4    Dade, Broward, and Palm Beach County, and other circuit

5    courts of Florida.  I've testified in federal court, and I've

6    also appeared as an expert witness before the Banking -- US

7    Banking Senate in Washington in 1991 as an expert.

8    Q    Now, as appearing in the United States district court

9    for the Southern District of Florida, have you been qualified

10   as an expert before?

11   A    Yes, sir.  In all facets of real estate market analysis

12   and evaluation.

13            MR. SHOCKLEY:  Your Honor, we would tender the

14   witness as an expert.

15            THE COURT:  Is there any objection?

16            MR. PASANO:  Judge, there are some Rule 16 related

17   objections.  Other objections I think have already been

18   overruled.

19            THE COURT:  Well, in terms of his designation, do

20   you have any objection?

21            MR. PASANO:  No, your Honor.  We do request

22   consistent with the Rule, that those writings consistent with

23   his opinions be produced.

24            THE COURT:  You're saying you don't have a report?

25   Is that your --

1          MR. PASANO:  What I'm saying is we have nothing.

2     We have the underlying document prepared in this case, but

3     that's not an expert.  And what I'm saying is, that we made

4     repeated requests with regard to who the Government's going

5     to use as experts, and other than knowing his name and having

6     been given a CV, we have no report or other information about

7     him.

8          MR. SHOCKLEY:  Your Honor, that would be referred

9     to as Government's Exhibit No. 6.166, which is in evidence,

10    which is his appraisal report.  It carries within it his

11    qualifications.

12         THE COURT:  All right.  The objection is overruled.

13    Please proceed.

14         MR. SHOCKLEY:  Thank you, your Honor.

15    BY MR. SHOCKLEY:

16    Q    Showing you now Government's Exhibit No. 6.166, I ask if

17    you can identify what that is.  It's loose papers now,

18    so . . .

19    A    Sorry, I have a broken finger.

20         This is a photocopy of the original bound report

21    that was submitted to our client, GE Capital Business Asset

22    Funding, back in January 11, 2002.

23    Q    Is this an appraisal report that you personally did?

24    A    I supervised two associates that worked with me on the

25    appraisal assignment, yes.  Personally, I didn't do the

205

1    entire work myself, but I was responsible for it, I

2    supervised it, and signed the report as was being author.

3    Q    And before signing the report did you review all of the

4    report in its entirety?

5    A    I not only reviewed, I incorporated certain of my

6    phrases and commentary in the report, sir.

7    Q    And, well, let's -- this exhibit has already been

8    admitted into evidence.  I would like to take some time now

9    and review this with the ladies and gentlemen of the jury.

10          Showing you now the first page of Government's

11   exhibit No. 6.166.  It states on the cover, Complete

12   Appraisal and A Self-contained Appraisal Report, the ADT

13   Building, 2801 Gateway Drive, Broward County, Pompano Beach,

14   Florida.  And on the left-hand side there's the word Integra

15   in large print.  But it's Integra Realty Resources; is that

16   correct?

17   A    That's correct.

18   Q    And so if we can just call it Integra for short.  This

19   is -- you're director, managing director of Integra at the

20   time this report was filed with the effective date of January

21   11, 2002; is that correct?

22   A    That's correct.  And it's a self-contained report, which

23   means the addendum to the report contains additional

24   information that was utilized and considered in our

25   evaluation, including a pending purchase and sale agreement,

1   pending lease, and other relevant information that was very

2   important and germane to the appraisal.

3   Q    And showing you now the next page which bears Bates

4   label ending in 418, is this an introductory letter to the

5   appraisal, the main body of the appraisal?

6   A    Yes, sir.  It's what we would call a transmittal letter.

7   In there it summarizes who we address the appraisal to and

8   what we did, as an introduction to the appraisal itself.

9           And it talks about basically that we prepared the

10  report in conformity with Section 12CRF Part 34, to make it

11  simple, USPAP.  It's called Uniformed Standards of

12  Professional Appraisal Practices promulgated by the Congress.

13  And all appraiser that perform this type of report must

14  certify that the report complies with this certification of

15  that type, both from an ethical point of view as well as a

16  content point of view; and this report was prepared

17  accordingly.

18  Q    The first paragraph of the report says, as you stated,

19  it's a self-contained report of a complete appraisal.  And

20  later on it says:  "The purpose of this appraisal is to

21  derive an opinion of the market value of the leased fee and

22  fee simple estate of the property as of January 11, 2002."

23          Is that correct?

24  A    Yes, sir.  Those are technical terms that if you'd like

25  me to explain, I would be happy to.

1  Q    Well now is as good a time as any, why don't you go

2  ahead?

3  "A    Okay.  When someone buys a property, it's market price.

4  When someone analyzes that price and provides a qualified

5  documented opinion, it becomes market value.  So many times

6  people that would buy something may have paid below market

7  value, and sometimes you read in the paper today they pay

8  above market value.  It depends on the opinion given by

9  qualified appraiser.

10         In this instance we had two types of value.  We had

11  a pending contract between the two parties, in this case, ADT

12  and a purchaser under a contract term for 15 years with a

13  five-year option.  And with that 15-year period it called for

14  rent to be paid and conditions within the lease as to who

15  paid what expenses.

16         In this case the seller was ADT and they would

17  assume the obligations of all operating expenses.  So the

18  funds received by the buyer in this lease would have been

19  what we call a triple net.  They have no expenses.  Just like

20  if you had your money in a savings account, you have no

21  expenses.  You receive a dividend.

22         We would then analyze that by abstracting what a

23  market rate of return would be, and the conclusion would be

24  the market value of the lease fee estate, which is the

25  lessor's interest, or sometimes they call it the fee holder's

1    interest.  The person that owns the real estate.

2          When the property was sold it was no longer ADT, it

3    was the buyer.  So in this particular case there was a sale

4    and a leaseback.  So ADT was the tenant long term.  Instead

5    of the owner, they became a tenant.

6          We then also provided a second valuation, which is

7    called fee simple.  Fee simple is, what is market rent for

8    that property and was contract rent identical or similar or

9    close?  And in this case we found that it was different.  And

10   the valuation under fee simple is the same property, the

11   process is the same, but the rent was different.  And so we

12   provided two valuations.  I think we also provided a third

13   value, which is called go dark.  And we call that the net

14   realizable, as summarized on Page 2.

15   Q    Let's go forward then.  I'm going to put up on the

16   display device the page ending in Bates label 419.  You see

17   the leased fee estate, was it your opinion that as of

18   January 11, 2002, the leased fee estate was valued at

19   $3,770,000 for the property at 2801 Gateway Drive in Pompano

20   Beach, Florida?

21         MR. PASANO:  Judge, if I may rise.  Objection

22   cumulative.  We simply ask to have a continuing objection on

23   the basis of cumulativeness.

24         THE COURT:  The objection is overruled.

25

BY MR. SHOCKLEY:

Q    You may respond.

A    The answer is yes.  In this case we took the rent

payments that was being contracted for between the parties,

and utilized that income and capitalized it.  Capitalization

can be done in two methods.  One, on a single year direct

capitalization rate basis.  Meaning that if I had X dollars

and I want a rate of return, I would divide it by the

purchase price to see what that rate of return would be, like

you get in a savings account.

          Or we did what's called a discounted cash flow

method.  In this case we did both.  The discounted cash flow

method is, you take the rent each year as to be paid in the

future and discount that by the present worth of a dollar.

Q    Now --

A    And both of those reconciled to a value of 3,000,770

based upon the contract rent to be paid.

Q    Are you aware that the purchase and sale agreement

called for a price of 1,290,000?

A    I was aware of it and I made a statement in the report

about that as well to the client.  Our client was GE Capital.

Q    The second value, the fee simple estate, $2,250,000 was

your opinion of the value of just the selling an empty

building; is that correct?

A    No.  Based upon what it should have rented for.

1    Q    Should have what?

2    A    Should have rented for.

3    Q    Okay.

4    A    And it's a hypothetical number, but if ADT just came and

5    negotiated a lease arm's length, they would have paid the

6    rent that we stated and the buyer of that property, by the

7    same capitalization approach, would have paid $2.25 million.

8    So it's market rent versus contract rent.  Which means that

9    market rent was substantially lower than the contract rent

10    called for in the pending lease.

11    Q    What is this net realizable, or go dark value fee simple

12    estate?  Can you explain what that is?

13    A    That's that other valuation, where ADT would leave and

14    the creditworthiness of them were gone and how much someone

15    would pay for it under this theory that we will go into the

16    marketplace and a non creditworthy tenant or buyer would

17    purchase the property.  You'll see there is just a

18    differential there of about $130,000.

19    Q    What's the significance of that valuation?

20    A    That's if ADT being a creditworthy tenant gives you the

21    security that you know you're going to be paid, they've been

22    in business a long time and it's almost like an annuity, like

23    an insurance policy.  I'm going to get paid those payments.

24    And it's almost -- it's a lesser risk than someone that's

25    going to come in there of the unknown and pay the rent.  And

1    there, you play with risk in that regard.

2    Q    Directing your attention to the page bearing Bates label

3    420, which is Page 3 of that document, is that your signature

4    in the upper left-hand corner?

5    A    Yes, sir.  And those are my associates that participated

6    in the assignment.

7    Q    And your associates, their names are?

8    A    Jose Valera, who's now retired, and Barbara Johenning.

9    She is a one of our senior commercial appraisers.

10   Q    Directing your attention now to Page 1 of the

11   certification page.  It states at the top, "Certification:"

12           "We certify that to the best of our knowledge and

13   belief."

14           And then there's a number of certifications that go

15   down the length of this page and on to the next page.  So,

16   for example, the very first one is:  "We certify that to the

17   best of our knowledge and belief, the statements of fact

18   contained in this report are true and correct."

19           Let's go to the second one.  "The reported

20   analyses, opinions, and conclusions are limited only by the

21   reported assumptions and limiting conditions, and are our

22   personal, impartial, and unbiased professional analyses,

23   opinions, and conclusions."

24           Did you have a stake at all in this appraisal?

25   A    No, absolutely none.  As a matter of fact, if we

1    violated that, we would not only lose our degree and

2    certification, but we would get in big trouble with the

3    public officials.

4    Q    So you were just --

5    A    It's a very important certification and it's required in

6    all appraisal reports that we certify.  If we did have an

7    interest then, we must disclose that.  Because then you're

8    biased.  In this case we're not unbiased totally.

9    Q    So the very next paragraph states:  "We have no present

10   or prospective interest in the property that is the subject

11   of this report and we have no personal interest with respect

12   to the parties involved."

13            Is that also required language for your

14   certifications?

15   A    Absolutely.  And the reason for that is that you're with

16   a check and balance of somebody that's doing something and

17   it's an advisory opinion.  If we were -- had a prospective

18   interest and we had to disclose it and we didn't do it, we

19   would be in trouble as well.  So it's a very important

20   statement.

21   Q    As a matter of fact, if you had a hidden interest that

22   was not disclose in this case, how would that tend to affect

23   your opinion?

24   A    We would have no credibility.  No credibility at all.

25   Q    Directing your attention now to Page 3 of your

1    assumptions and limiting conditions, Paragraph 1, halfway

2    down.  It states:

3          "An appraisal is inherently subjective and

4    represents our opinion as to the value of the property

5    appraised."

6          And that's an opinion based upon how many years of

7    experience?

8    A    It my instance currently it's over 45.  But it's more

9    than just experience.  It's documentation.  And having

10   factors, as I stated earlier, when someone buys a property

11   that's defined as market price, when you get a qualified

12   appraisal that's supported with documentation, it becomes an

13   appraisal that has credence behind it.  It's not a guess.

14   It's not a broker's opinion.  And that's why that statement

15   is in there.

16   Q    Directing your attention to Page 5 of your report,

17   Paragraph 20.  It states:

18         "This appraisal report has been prepared for the

19   exclusive benefit of the GE Capital Business Asset Funding

20   Corporation."  That was your client; is that correct?

21   A    Yes, sir.

22   Q    Directing your --

23   A    I was just going to go on -- and what's meant by that

24   was the last part of it says, any other person uses this

25   report without written consent do so at their own risk.  The

1    main reason for that is that we have confidential

2    relationships, just like a lawyer and a doctor has with their

3    clients and patients.  And we cannot divulge this information

4    to any third party.  And if someone utilizes this report

5    without having us explain outside of the words in a report,

6    then they do so at their own risk and we have no liability.

7    That's the reason for that in there.

8    Q    So you had one and only one client in this case; is that

9    correct?

10   A    And that was GE Capital.  Yes.

11   Q    Directing your attention to Paragraph 23.  It says:

12          "The date of value in this assignment is subsequent

13   to September 11, 2001, the date of the attack on the World

14   Trade Center in New York City and on the Pentagon in

15   Washington, DC.  The scope of this appraisal assignment does

16   not include the measurement of any effect of these events on

17   the real estate market or on the value of the subject.  Any

18   effect on value at this point would be very difficult to

19   ascertain because the market is not sure of its own

20   reaction."

21          Now, at the bottom I see that you have stated:

22          "Therefore, the value opinion and other conclusions

23   expressed in this report are subject to the extraordinary

24   assumption that these events have had no effect on the

25   marketability or market value of the subject."

1          Now, could you explain that to the jury?

2    A    We were telling our client that we've gone through a

3    period of a crisis.  When the World Trade Center occurred on

4    9/11, no one knew what direction this country was going into

5    and how much more terrorism would come about.  There was

6    chaos in various parts of the market place.  It turned out to

7    be an is an anomaly.  Meaning a short-term period.  But to

8    advise the client accordingly, we made that statement stating

9    that we're not -- if we were that greater a predicter, I

10   wouldn't be sitting here.  I would driving a, you know, 300

11   foot boat.

12         But we had to put that statement in to advise them

13   that the 9/111 tragedy has not made affect, therefore, this

14   report assumes that it didn't happen.  No different than the

15   financial crisis that occurred in August of 2007, and we're

16   still going through a burden of that today, which we are

17   going to work it out because if you go back in history every

18   ten years we seem to have the same crisis repeat itself.  And

19   we'll work this out as well, with what happens in recent

20   Merrill Lynch, and you see it in the newspaper today.

21   America's a great country.

22   Q    Directing your attention to Page 6.  This page is

23   entitled, "Summary of Salient Facts and Conclusions.  And

24   directing your attention to the top, the property is

25   described as -- let's call it, if we could during the course

1    of your testimony, the Pompano Beach property, okay?

2    A    Yes, sir.

3    Q    Okay.  Now directing your attention on farther down, it

4    indicates net rentable area NRA, 28,764 square feet.  What is

5    net rentable area?  Can you explain that?

6    A    The rentable area is the square feet that's decided upon

7    between the landlord and tenant.  The gross building area is

8    the dimensional square feet of the perimeter of the building.

9    And in this case there was a differential.  Some people would

10   call it usable area, but it may not be.  But in this case the

11   description of the leasehold of the lease that we saw a copy

12   of, and the occupy-able space by ADT was 28,764, and we used

13   that as a unit of comparison rather than the 29,886 square

14   feet of gross building area.

15   Q    And right underneath that it says, current occupancy

16   100 percent.  That means what?

17   A    That means you had a single tenant in the building.  The

18   property was designed for a single tenant and they were

19   occupied and used it as a single tenant.  You didn't have

20   multiple tenants in the property.

21   Q    At the very bottom it says, "Stabilized Market Value

22   Indications, and there's a cost approach, a sales comparison

23   approach, and an income capitalization approach.  You're

24   going to define those a little bit later in your report; is

25   that correct?

1    A    I can summarize it along with the purchase price if you

2    like.

3    Q    If you could.

4    A    You want to roll the screen down.

5    Q    Excuse me.

6    A    I'll look through my report then.

7         We utilized two approaches or two methods.  One had

8    our people go in the marketplace and find properties that are

9    approximate, that are similar, similar design, similar use,

10   have similar utility and, hopefully, a similar tenancy.  And

11   we did.

12   Q    Is that the sales comparison approach?

13   A    And that's called the sales comparison approach.  And I

14   can go into further detail but we concluded an opinion of

15   value based upon that approach of $2,300,000.

16        We then also utilized the market rents, conducting

17   a market rent survey, what the property should have rented

18   for, if it was put to rent.  And the concluded valuation by

19   what we call capitalization, both direct capitalization or

20   discounted cash flow, came out to $2,230,000.

21        So the breakdown of that, we broke it into a fee

22   simple and then leased fee.  As you recall, I said earlier

23   you have a contract that's pending on here of a sale and

24   leaseback with a rent that ADT was to pay its new owner had a

25   higher than market rent.  And if you utilize that income

1    capitalization versus income capitalization of market rent,

2    you had an opinion from us of $2,250,000 versus a value of

3    $3,700,000.

4    Q    Given that lease that was actually signed or to be

5    executed; is that correct?

6    A    Yes.  And then we had a purchase contract which I didn't

7    divulge in the summary of salient facts, but it's in the

8    addendum of the report, of a property that was going to be

9    sold for $1,290,000.  So to give you a unit of comparison,

10   the fee simple value is $78.22 a square foot.  The leased fee

11   value under the contract is $131.07.  But it was selling for

12   $44.85.  And we disclosed that in the report.  There's a

13   disconnect someplace.

14   Q    Okay.  Showing you -- well, directing your attention to

15   Page 8 of your report.

16            "Current ownership, sales history, and status."  I

17   see that it's reported that according to the public records,

18   the subject is currently owned by Ameritech Monitoring

19   Service, Inc., who purchased the property as improved in

20   October, 1997, from KERS Security Systems, Inc, for

21   $1,500,000, as recorded in the Broward County records.

22            To the best of our knowledge no other sale or

23   transfer of ownership has occurred within the last three

24   years.  So this was in October of 1997 that the property was

25   sold for one and a half million dollars.

1    A    No.  It was a story behind that 1.5 million.

2    Q    If you could.

3    A    The KERS transaction was a 250 million-dollar sale of a

4    going concern business that ADT purchased.  And inside that,

5    the accountants, as we attempted to verify, allocated a

6    purchase price to the real estate in each one of the

7    locations in each one of the states.  And in this property

8    they utilized a $1.5 million number for a very obvious

9    reason.  And that's because the transfer tax in Florida is

10   greater than in other states.  And they want as low as

11   possible.

12          We see that in the paper all of the time where

13   they're adjusting our state laws to account for this because

14   in a way it was illegally cheating the system, where they

15   don't pay the documentary stamps, that doesn't pay for

16   schools and all of this other benefits that we get.  And

17   recent state legislation just several months ago put a stop

18   to the loophole of that.

19   Q    So then the tax and fees when is recorded in Florida

20   because they are high, what are you trying to explain to the

21   jury about the allocation of the costs or the value of the

22   building?

23   A    They'll use an accounting principal and they'll use book

24   value, which is not market value.  And they should have

25   reported a higher sales price, but they didn't.  Which is, I

1    found interesting.  In some instances they may not report any

2    sales price.  So I wouldn't give any credence to a 1997 sale

3    at 1.5 million.  Because it may not be, and I don't believe

4    it did, have anything to do with value.

5    Q    Okay.

6    A    It's an allocation of that price.  But it's part of the

7    $250 million transaction.

8    Q    I want to direct your attention to the second paragraph.

9    It says:  "As of the effective date of this appraisal, the

10   property is subject to a sale and leaseback agreement between

11   ADT Security Services, Inc., seller, lessee, and Efficient

12   Realty and Development Corp., buyer, lessor, for a price of

13   $1,290,000.

14          "The agreement is contingent upon the current owner

15   executing a 15-year lease, at a rent equivalent to $16.13

16   square foot on a net basis.  Given the motivation of the

17   parties, the pending transaction is not considered to reflect

18   a market oriented price."

19          Could you explain that?

20   A    It's a fairly sophisticated statement because we're

21   dealing with a fairly sophisticated lender.  But in practical

22   terms, the price was too low and the rent was too high, and

23   something is wrong.  But we just disclosed that from our

24   understanding, we're not underwriting it for a loan.  But

25   it's our job to be the eyes and ears of the lender of what we

```
 1   see.  Our client was GE Capital and we reported what we saw
 2   and gave them an opinion on it.
 3          They did not ask us why, what, and where, but it is
 4   a fact and a copy of that is in the addendum of the report.
 5   Q    Directing your attention to the next page it says, Scope
 6   of Appraisal.  And basically here you're indicating what
 7   steps you took in performing the appraisal; is that correct?
 8   A    Yes, sir.  It's required under standards of professional
 9   practice to outline why you're retained and what you're doing
10   when you are retained for professional services.
11   Q    So as part of the appraisal, what did you complete?
12   What steps did you complete?
13   A    Well, we describe what we did.  Obviously, we inspected
14   the property and we collected factual information about the
15   subject property and then its surrounding environment and
16   other competitive properties in the area.  Most important
17   aspect is, we had to determine what the highest and best use
18   of the property is.
19          Many times a property -- you know, land has value
20   and then the improvements on the land give contributory value
21   to the land.  And under highest and best use, there's four
22   stages.  You have legally permissible, physically possible,
23   financially feasible, marketably acceptable, and maximally
24   productive.  And that's very important.
25          How many times have you seen a single-family home
```

1    that's zoned for a high-rise condominium.  Would the property

2    sell for the single-family home price or would it sell for

3    the high-rise condominium future price.  Well, that had to be

4    determined.

5              So we conducted that highest and best use.  So we

6    concluded the highest and best use under legally permissible

7    was the existing use because it had restrictions under

8    zoning.  Physically, it was set on the land to its maximum

9    use.  Financially, it made sense, except for that pending

10   lease, in all due respect.  And then maximally productive

11   says it all ties together.  And that's -- we concluded the

12   highest and best use of the property in its existing

13   condition was its existing use.

14   Q    As an office building?

15   A    As a warehouse property.

16   Q    Warehouse?

17   A    More so known as flex space for office use as well,

18   which is different than an office building, in all due

19   respect.

20             THE COURT:  It's 3 o'clock, Mr. Shockley.  Is this

21   a convenient time.

22             MR. SHOCKLEY:  Yes, your Honor.  That's fine.

23             THE COURT:  Let's stop and take 15 minutes and

24   return at 3:15.

25        (Jury out at 3:00 p.m.)

 1                THE COURT:  Okay.  15 minutes.

 2          (Recess at 3:01 p.m.)

 3                THE COURT:  Okay.  I think we're missing a couple

 4     of people.  Mr. Birch, do you want us to --

 5                MR. BIRCH:  He needed to go to the restroom and

 6     Mr. Artuso said it was okay if the Court wanted to proceed

 7     without him.

 8                THE COURT:  Okay.  Now we've lost our CSO who I

 9     guess went to look for him.

10                Will you get the jury, please, Alison.

11          (Jury in at 3:16 p.m.)

12                THE COURT:  Welcome back.  Please be seated.

13                Please continue, Mr. Shockley.

14                MR. SHOCKLEY:  Thank you, your Honor.

15     BY MR. SHOCKLEY:

16     Q    Mr. Cannon, when we left, I believe we were all the way

17     up to Page 10.  Let's keep on going here.  We're just going

18     to go through your report, Mr. Cannon, because this is the

19     first time that this jury has seen one of these appraisals in

20     detail.  So if you could just kind of generally explain to

21     them some of the things that you take into consideration.

22                So for example, on Page 10 you have the appraisal

23     broken down.  There is a table of contents page.  But you

24     have the appraisal broken down into different sections where

25     you take a look at general information, you do a property

1    analysis, a neighborhood analysis, a Broward County

2    industrial market overview.  Things of that nature.

3            So we would like to just kind of go through here

4    and get an idea about the things that you take into

5    consideration.

6    A    Those are important essentials.  Some people call it

7    boilerplate, but it's not because you have to have an

8    economic base for a community.  Because we have a client

9    that's out of town.  They don't know.  And we describe the,

10   what we call the area analysis.  The population growth, the

11   economic levels of the people and industries that are coming

12   in.  And then we -- Page 26, we then talked about the

13   industrial sub market area.

14           And that's important on a macro base which means

15   the overall basis to discuss, is there a market.  And then

16   the office market as well.  So we discuss that as well to

17   show that there is a foundation for someone to want to rent

18   space in a warehouse building.

19   Q    So all of these things are taken into consideration.  So

20   the Broward County area analysis, just the very first

21   sentence of the introduction.  The economic vitality of the

22   surrounding area and the immediate neighborhood encompassing

23   the subject property, is an important consideration in

24   estimating future real estate demand and income potential.

25           So after that -- first of all, you take a look at

1    the population.  Why do you do that?

2    A    Well, people make value.  You know, you don't have

3    people, you don't have any value.  And the demographic

4    characteristics of people create increase value.  So if you

5    have an increased income level of a family household moving

6    into the area, you're going to build more expense product

7    type versus a lesser income basis.  And that's what the

8    purpose of that is.

9    Q    The following page, Page 11.  The top of the page deals

10   with more population, but farther on down you have

11   employment.  Just explain to the jury why you take this into

12   consideration?

13   A    Well, employment is very important because employment

14   creates jobs, jobs create industry, and industry, you know,

15   goes on.  And of course, you've seen employment figures in

16   today's marketplace where it's approaching, you know, a

17   little over 5 percent.  So we've changed, going through a

18   different economic period.

19         But back then we were talking about what the

20   employment growth was and that Broward County is a good place

21   for businesses to come, so the figures say.

22   Q    And then directing your attention to -- let's skip over

23   12.  Go to 13.  It says at the top, Broward County Employment

24   Sectors.  What are you talking about here, Mr. Cannon?

25   A    Well, there are several components of the employment

 1   sector.  And keep in mind that tenancy in this property is

 2   ADT.  And they provide security services for the various

 3   employers and if you don't have employers then they wouldn't

 4   be doing the business and if they don't do the business, they

 5   will not be paying the rent.  It's almost like a pyramid

 6   situation.  So our client wanted this type of information.

 7            So we broke out the employment sectors in

 8   construction, and the other FIRE, which is real estate,

 9   insurance, financial.  That's what FIRE means.  And then

10   Government, manufacturing, mining and other retail services.

11   TCPU and wholesale.  So those are the major sectors of our

12   employment in Broward County.

13   Q    TCPU, what's that?

14   A    I'm having a senior moment.  I think that's trade

15   services -- I have to go to my definition.  I apologize.

16   Q    That's all right, Mr. Cannon.  We'll come back to that

17   if we need to.  Go onto the next page, 14.  There's a grid

18   there.  It says, Historic and Projected Nonagricultural

19   Employment.  Again, you're looking at employment in the area;

20   is that correct?

21   A    Correct.

22   Q    Directing your attention to Page 15.

23   A    Continuation breakdown of.  GE was looking for that

24   information.

25   Q    Breaking down different kinds of employment in the

1  county, in the surrounding area?

2  A    Yes, then on Page 16 we summarize the major employers in

3  Broward County.

4  Q    And the major employers in Broward county are whom?

5  A    Miami Broward school board, Broward Government, American

6  Express, Publix, Memorial Healthcare.  Back then, Winn-Dixie,

7  Nova University, Eckerd, Sun-Sentinel.

8  Q    I didn't have that up high enough.  I'm sorry.  Okay.

9  So you basically were looking at the major employers.  Why

10  were you looking at major employers in the county?

11  A    Well, GE wanted to have that information in their files

12  for future understanding of growth so that they can continue

13  to be knowledgeable, not only for financing this project for

14  the tenant being in business but making for additional

15  information.

16  Q    And this was going to be a -- would the lender be making

17  decision about the length of the term and the amount of the

18  loan based upon things like this?

19  A    And the amount of the mortgage, which was substantial in

20  connection with the purchase price.  Yes.

21  Q    Directing your attention to Page 17.  Now you have a

22  page that says, Income.  What are you looking at there?

23  A    Well, those are household incomes.  And they came out of

24  what's called NPA, which comes to the US Census and it's

25  updated.  And there we break it down historically to see if

1    there is a progression of income growth.  Of course, income,

2    households and employment deals with the economic vitality of

3    a community.  And that's what that's all about.

4    Q    And how does Broward County look, at least back then?

5    A    It was doing well, and here we are today.

6    Q    Directing your attention to Page 18.  Again, briefly,

7    what does that depict?

8    A    Well, we're doing a comparison with the State of Florida

9    on the population and income growth projections.

10   Q    Page 19?

11   A    Nineteen is that household we just talked about, yes.

12   Q    And the conclusions at the bottom of Page 19.

13   A    Stated that the expected growth should provide an

14   economic base that supports demand for real estate.

15   Q    I'm sorry.  I couldn't hear the last part of --

16   A    I'm sorry.  The expected growth should provide an

17   economic base that supports the demand for real estate in the

18   subject neighborhood and for the subject property.  So the

19   economics, separate and apart from valuation, shows that

20   there is a foundation for this thing to exist.

21   Q    And, in fact, the last sentence is:  These conditions

22   should stimulate increases in general property values within

23   the foreseeable future.

24   A    Yes.  That was an important statement because this lease

25   and market rents had escalation clauses, that over time the

1    rent, annual rent payments increased.  So it has to increase

2    with some sort of a benchmark and these are the benchmarks

3    that are usually used, along with CPI's, consumer price

4    indexes that you hear about in the paper.

5    Q    The next page, Page 20, you actually have a map in there

6    which shows you exactly where the property is located; is

7    that correct?

8    A    In connection with Broward County's overall area, yes.

9    And we have another map on Page 21.

10   Q    Page 21, it is a neighborhood analysis.

11   A    Correct.

12   Q    Tell us about that.

13   A    The neighborhood boundaries are important and so we

14   describe for the client what the northern boundary is, what

15   the southern boundary is, what the eastern boundary is and

16   what the western boundary is, and we provide them a map on

17   that.

18   Q    Direct your attention to Page 22.

19   A    Accessibility is very important.  Transportation.  You

20   have to go to it.  It doesn't come to you.  Real estate is a

21   entity that is not just the sticks and bricks.  It's property

22   that it's very important where it's located so you can use

23   it.  It has to be maintained.  So here, we're talking about

24   access, transportation, employment, public services, and land

25   use.

1              And in this case we've dealing with the foundation

2     leading up to the highest and best uses, as I commented on

3     before.

4              On the next page we go into demographic factors in

5     that area, development trends, outlooks on our conclusions.

6     And locational attributes.

7     Q    It says, locational attribute ratings.  Explain that.

8     A    That's a quantified opinion by us based upon the factors

9     that we have assembled with data.

10    Q    Where it says, Outlook and Conclusions, it states:  "The

11    neighborhood is in the moderately growing and stable stage of

12    its life cycle.  Recent development activity has been strong

13    over the past few years.  Given the history of the

14    neighborhood and the growth of the trends, it is our opinion

15    that the values in this subject neighborhood are expected to

16    increase in the near future."

17             And that was your opinion; is that correct?

18    A    Yes.  And that's important too because of relationship

19    to price paid and rents paid.  You know, is the neighborhood

20    declining or going up.  We've seen neighborhoods that

21    increase.  You can just drive down the street and see it.

22    We're quantifying it.  You've seen neighborhoods decline.

23    You've seen it.  And we had to document that for the report.

24    Q    Directing your attention now to Page 24.  The top is,

25    Industrial Market Analysis.  Generally, what's that?

1    A    Well, we're talking about the marketability of the

2    industrial market.  You know, is there a market and how

3    vitality -- how vital is it, too?  There, we summarize from

4    our information assembled by stating that the marketability

5    of this asset is determined by the investor's prospective for

6    industrial office real estate corp investment.  And this fit

7    into that investment ratio package.

8    Q    And in Investment Trends at the bottoms states:  Because

9    of the size, design, tenancy, quality, and location of the

10   subject, it is likely to appeal to investors primarily on a

11   regional or local basis.  While a national -- while national

12   factors may or may not be indicative of the subject's market

13   area, the national trends exhibited are generally indicative

14   of movement in all sub markets.

15            And that means basically what?

16   A    We're telling the client this is a marketable property,

17   an investor would buy it prudently and a lender prudently

18   would lend on it.

19   Q    Page 25.  It looks like charts and graphs?

20   A    Yes, that complements the statement made in reference to

21   what the national office warehouse market was doing.  And we

22   then showed on the left side in first box a discount rate,

23   what we call a going in capitalization rate.  Upper left-hand

24   corner.  There we go.  The market rent change, expense growth

25   rate, and reversion.  That's very important for investments.

1          As I said, a discount rate is, you would -- someone

2     has a dollar today is worth more than a dollar you're going

3     to receive in the future.  So if I'm going to receive rent in

4     the future, I want a discount that to present worth.  Now,

5     depending on risk and stability, and yield by the

6     marketplace, you see it in the newspaper all the time, how

7     much-- what's the range by national surveys of this type of

8     product.

9          So that discount survey range was at that time in

10    '96 10.5 to 14, averaging 11.9.  And if you'll -- I'll just

11    say it.  In the year 2000, which was the latest part of the

12    survey, it declined to 10 percent.  The money market changes

13    all the time.

14         Going in cap rate, that's what you would -- it's a

15    unit of measure of where you would divide the value of the

16    property by the first year revenue.  Well, if I had something

17    I had the first year revenue and I wanted to get a 10 percent

18    return, I just divide that number and I'll get the value.  So

19    that's a unit of measure that's used in the industry.

20         And if you read the Wall Street Journal, the

21    papers, you'll see cap rates.  Sometime they have a hat on

22    them -- no, they don't.  But a cap rate is a capitalization

23    rate of a going in.

24    Q    Appraisal humor there, right?

25    A    You have to.  Sometimes it sounds so complex and if you

1    don't look at it with some humor, it can be very boring.

2         The difference between a discount rate and a cap

3    rate is, has to do with risk and growth.  And when you add

4    the two together, it's simple mathematics.

5         And then you talk about market rate change.  Market

6    range changes means is the economy going up or down and can I

7    get greater income tomorrow because of the erosion of the

8    dollar.  You know, that has to do with the economics of our

9    country, and so forth.  But is a dollar worth less in the

10    future.  So this survey says that.  And the same thing goes

11    with expenses.

12         And the purpose of this whole chart there is to

13    advise the client that this is what the industry sees for

14    this type of property and we're utilizing a similar unit of

15    measure to value it.  That's basically what it comes down to.

16    Q    Then Page 26.  It's entitled at the top, Broward County

17    Industrial Market Overview, and the first sentence is:

18    "According to a year-end 2001 report by Cushman Wakefield,

19    Broward's county's industrial market experienced another

20    exceptional year, despite worries about an economic

21    recession."

22         Can you explain to the ladies and gentlemen of the

23    jury what this section of the report is designed to convey?

24    A    Well, again, it is reporting factors because you hear so

25    many different pundit statements in the paper.  And based

1  upon our database and information that we abstracted from

2  other sources, I found that the Cushman Wakefield survey was

3  right on target in spite of what other people were talking

4  about, recession.  You've heard that in recent times, we're

5  having a recession, and then they say we're having no

6  recession.  It confuses us.

7          And it deals with consumer confidence.  And so here

8  we're summarizing that information stating, that don't read

9  everybody's commentary and believe it You know, sometimes it

10  may not be correct, and turns out most of the time it's not.

11  Q    What is the Cushman & Wakefield report?

12  A    They publish -- they're a large international brokerage

13  company and they do surveys similar to what our firm does in

14  certain sectors of the marketplace.  And I found that their

15  survey was very interesting.

16  Q    Page 27.

17  A    Again, we would disclose where we got the information

18  from, rather than just not identify it.  And that's why we

19  gave credit to them.

20  Q    What is -- it says, sub market analysis.  What is this

21  all about?

22  A    Well, here we're describing the neighborhood.  We have

23  our people drive down the streets and see what the

24  occupancies are, what the conditions of the properties are.

25  So we're now talking about the standard of the area.  What

1    does it look like.  What the rental rates are.  What's under

2    construction.  Is it a hundred percent developed or

3    remodeled?

4         And you have to go to the subsequent pages there,

5    where we have charts and graphs explaining that in further

6    detail.

7    Q    So before you go that far it says, existing competitive

8    supply.  What are you looking at there as far as the supply?

9    Is this -- what does it have to do with --

10   A    Supply and demand is a very important relationship.  If

11   you have excess supply, you're going to have lower prices.

12   If you have excess demand, you're going to have higher

13   prices.

14        Then there is a point in time somewhere in between,

15   called the equilibrium when buyers and sellers or tenants and

16   landlords are on a level playing field.  We seldom see that

17   because we're always going in one direction or the other.  As

18   you can see in the marketplace today, and that's what we're

19   describing there.

20   Q    So you look at the current inventory, occupancy and

21   rents and what's under construction and proposed construction

22   to see what the market is going to be like; is that correct?

23   A    Exactly.  Because we're dealing with a property that's

24   going to have a 15-year lease with a 5-year option, and

25   they're going to lend money for a long period of time and

1  they want to have safety for their investors.

2  Q    Page 28 is Market Highlights and Market Sub Market

3  Statistics.

4  A    This is an abstract of the Cushman Wakefield report.

5  Q    Okay.  Page 29?

6  A    29, we're talking about demand.  How the industrial

7  market is.  And then if you were to sell the property, how

8  long would it take.  And that's what exposure stands for

9  there.  So it's the marketing period and the exposure period

10  of selling that property.  Keep in mind that market value's

11  the price the buyer is going to pay.  And we, the appraiser,

12  is to include an opinion of what that buyer is going to pay

13  that a seller will accept.  And that's the definition of

14  market value.

15       So there, we have to say how long will it take.  If

16  it's an extraordinary long period, we then discount that

17  period or discount that value by indicators of units of

18  measure because of that.  And here, we summarized it, that it

19  was a fairly good marketplace.

20  Q    As a matter of fact, Demand Analysis, it states:  "The

21  prospects for the market area to have increased demand for

22  industrial users in the short-term is average because

23  employment in industrial prone enterprises is stable.

24  Likelihood of increased demand for industrial users in the

25  long-term is above average."

1           And then the very last sentence in that paragraph:

2    "This projection is based on historic absorption patterns and

3    increases in demand generated by long-term growth."

4           So again, you're looking at the demand right there?

5    A    Exactly.

6    Q    "Industrial Market Analysis Conclusions.  Historical

7    changes in leasing patterns are often the primary source for

8    projecting future activities.  Within the subject's market

9    area, the trend is positive.  Demand is strong from both

10   small and large space industrial users."  And -- tell us

11   about exposure time in marketing period.  What are we talking

12   about here?

13   A    The definition of value means that the property as of

14   that date, we have to conclude an opinion, which means it's

15   already on the market for sale.  The marketing period is how

16   long it's going to take for the property to sell.  So we

17   concluded in this area there, that it would be within 12

18   months.  And that's what -- we're just giving that general

19   information in that regard.

20          So we said, here's some examples of other

21   properties, how they went on the marketplace, and how long it

22   took them to sell.

23   Q    And directing your attention to Page 30.

24   A    That's where we have the conclusion of 12 months.  And

25   we said that's reasonable.  Because if it was more than 12

1   months we would have had to increase that discount rate,

2   keeping in mind the higher the rate, the lower the value.

3   The lower the rate, the higher the value.

4   Q    And in fact, the last paragraph:

5        "Based on a review of current investor expectations

6   for industrial investment property, a reasonable expectation

7   for the property as currently leased is that is a -- is that

8   it is a desirable income producing property that would

9   readily sell in the current market at a reasonable return on

10  investment within a reasonable period of time."

11        Is that correct?

12  A    Those are very important words, "reasonable return on

13  investment" versus what we subsequently found out.

14  Q    Directing your attention to the next page, Page 31.

15  A    Now we're describing the property.  What it is, how big

16  it is, what services the property, and that goes on for

17  several pages.  All the way through to real estate taxes and

18  assessments on Page 31.  So we now have provided the client

19  with enough information that they know what the property is,

20  they know where it's located.  And now we've given them a

21  description of the features of the property and now we have

22  to tell them the most important thing, which is property tax

23  and that's on Page 36.

24  Q    Well, let's go to Page 33 right now --

25  A    Oh, I'm sorry.  I moved ahead.

1    Q    -- if you could.

2          It says:  "Description and Analysis of the

3    Improvements.  Exterior Description."  It says, year built,

4    1981.  And then it says, estimated effective age, 15 years.

5    What does that mean?

6    A    The property was maintained to a degree that it only

7    looks like a 15-year old building than a 25-year old

8    property.  That's what that means.

9    Q    It says, estimated physical life, 35 years.

10   A    That at the end of -- from this day going forward all

11   things being equal, the improvements on that property may

12   change to an alternative use because physically, although the

13   concrete block would last, but the utility of the building,

14   the roof and the interiors and so forth, you'll change the

15   use.  It will be something else.  So we're telling them how

16   long.

17   Q    So that's 35 years then from the date of this appraisal?

18   A    From the date of this appraisal and inspection.  And

19   that's important for the term of the lease and the term of

20   the mortgage as well.

21   Q    And the term of the lease in this case was 15 years?

22   A    Plus five.  It had a five-year option.

23   Q    Directing your attention to the following page.  That

24   was the exterior.  The interior description.  What was the

25   condition, the bottom line condition of the interior?

1    A    It was average and good condition for its use.

2    Q    Directing your attention to Page 35.  Site Improvements

3    and Improvements Analysis.  Let's go to directly to

4    improvements analysis.  It says, Condition.  The condition of

5    the improvements is above average.  The property has been

6    reasonably well maintained.

7          What do you mean by improvements?  How do you

8    define that?

9    A    Anything that's not the land.

10   Q    So you're talking about the building now?

11   A    More than the building.  It could be the parking lot

12   area, it could be the walkways, landscaping.  It could be any

13   of we call appendages or appurtenances in addition to the

14   structure that's on the site.  That's what the determination

15   of improvements are.

16   Q    The bottom of Page 35.  It talks about office industrial

17   build-out.  What is that?

18   A    I'm sorry, what page?

19   Q    Bottom of Page 35.  It says, Improvement Attribute

20   Ratings.

21   A    Well, again, we're giving the client information, as

22   their eyes and ears as an inspector on its ---again, they're

23   doing a loan underwriting, on what the exterior appearances,

24   the clear height, the office industrial build-out, the base

25   size, the sprinklers, the low facilities.  And we're

1    summarizing those points to a basis of their underwriting

2    standards.

3    Q    What is a build-out?  The word itself build-out, that

4    means what?

5    A    That means it's -- the whole building is being used.

6    Q    Okay.

7    A    That's a simple way of saying it.

8    Q    The next page, 36.

9    A    It's not vacant.  It's not raw.  It's not unfinished.

10   Q    Okay.  Real Estate Tax Analysis.  What did you glean

11   from that?

12   A    We went to the public records and subsequently, I

13   believe we found it was a tectorial correction that was

14   needed because there was a third folio number.  There was a

15   minor parcel of land.

16          But the Broward County Property Appraiser's Office

17   utilized in this case two folio numbers and they assessed the

18   property for the year 2001 at 2,309,990.  We -- from that the

19   annual tax was $60,929,091.  If you paid it by November, you

20   would get a 4 percent discount off that number.  We then

21   compared that to other properties on what taxes would be to

22   use a unit of measure and what we call the comparable

23   properties.

24          They range from a dollar 76 per square foot, which

25   is taking the annual tax dividing it by the rentable square

1    feet and comparing it to the subject.  So it ranged from 1.76

2    to $2.37 per square foot, and we found that the agelorum

3    (phonetic) assessment and taxes of this property is

4    reasonable.  And the reason for that is is that if it was

5    overassessed, then -- and you thought the property was worth

6    less, you would appeal your tax.  Just like you do on your

7    home.  And we felt that that was fairly consistent with our

8    valuation as well.

9    Q    The assessed value of $2,309,990 was more consistent

10   with your valuation than what?

11   A    A sales price reported in a contract for $1,290,000.

12   Q    Directing your attention to the next page, 37.  Highest

13   and Best Use analyses.  You talked about that earlier in your

14   testimony.

15   A    Yes, sir.

16   Q    Again, it says at the beginning process before a

17   property's value can be concluded, the highest and best use

18   of the property must be determined for both the subject site

19   as though vacant, and for the property as currently improved,

20   if applicable.

21            So tell us what you're getting across to the --

22   A    Again, one cannot properly appraise a piece of real

23   estate unless you determine what the highest and best use

24   be -- is.  And you would look at it in those in-sequential

25   order.  Legally permissible, physically possible,

1    economically feasible, which includes marketably acceptable,

2    whether the market likes it.  And it has a lot to do with

3    design and use.

4              And then capable of producing it is called

5    maximally productive.  You took at it two ways.  One, as it

6    is and as if it was vacant.  If the zoning, as I said

7    earlier, was a greater use and the market would accept that

8    than the existing use, you would tear down the improvements

9    and build a higher use on it and, therefore, you would have a

10   higher value to the land.

11             The contributory value of the improvements don't

12   make it.  How many times have we seen properties that the

13   improvements are torn down under highest and best use.  And

14   that's where that comes from.

15   Q    So then you go through it legally permissible,

16   physically possible, financially feasible, and on the next

17   page -- under financially feasible on Page 38 you state in

18   the first paragraph, "supplied demand factors indicate that

19   in the short term the industrial market will reflect an

20   increase in the net absorption of industrial space.  This

21   should have a positive impact on the subject."

22             By the subject you're talking about the property?

23   A    Yes, sir.

24   Q    And later on in the paragraph, "Moreover, the office

25   market is also experiencing development at a moderate pace,

1    suggesting the office use is financially feasible."

2    A    That's correct, too.  It must be.  Again, they're going

3    to -- lending sizable dollars and we're giving those guide

4    points.

5    Q    So under maximally productive, it states,

6    "Industrial/office is the only use that meets the previous

7    three tests."  And that means what?

8    A    That means it works.  Very simple.

9    Q    As far as what it is?

10    A    At what it is is what it is.  And it's adequate for your

11    underwriting needs.

12    Q    And toward the bottom it says, "The existing

13    industrial/office building is currently 100 percent occupied.

14    Moreover, it produces a significant positive cash flow and

15    this can be reasonably expected -- can reasonably be expected

16    to continue."

17          And then underneath that, "There are no alternative

18    uses that could reasonably be expected to provide a higher

19    present value then the current office use."

20          So?

21    A    That's without giving the number, it is what it is.  And

22    it's okay for what it is.  In very simple words.

23    Q    Now, Page 39 you talk about the valuation analysis.  Can

24    you give us a quick overview, Mr. Cannon?

25    A    There are three basic methods or techniques that

1    appraisers utilize or a combination thereof in valuing a

2    property.  One, they call the cost approach or cost summation

3    approach, which comes under the theory of substitution.  No

4    one would pay more for something you can build.  The

5    reproduction of that or replacement of that by cost figures

6    would give you an indication of value, plus you would add the

7    market value of the land based upon sales comparisons of land

8    prices sold.

9         Sales comparison approach is the existing property

10    by --

11    Q    Before you leave the cost approach.  In other words,

12    you're going to look at how much it would cost you to build a

13    building on that land.

14    A    Hypothetically, yes.

15    Q    Okay.  Sales comparison approach?

16    A    Sales comparison approach is someone would -- wouldn't

17    warrant paying more than what they could buy in a substitute

18    property that's already there.  So we go investigate the

19    marketplace and find properties that are approximate to the

20    location of this, similar in size and use, that have sold.

21    And then we make adjustments for those dissimilarities to the

22    subject property.

23    Q    Then --

24    A    That will give us an indication of value by the sales

25    comparison approach.

1   Q    Then, income capitalization approach.

2   A    Very important when you're dealing with income producing

3   property.  You would conclude by market rent surveys or in

4   this case, contract rents, what the income is going to be,

5   the property is going to produce.  And then you capitalize

6   that under several methods to an indication of value.  And so

7   we're explaining that on the methodology on Page 39, what --

8   how it works.  And this is to a reader, to understand this is

9   what we did as part of the scope of work.

10  Q    And later on you actually go through the two different

11  approaches to value that's referred to as far as the various

12  capitalization methods and how you reached these numbers; is

13  that correct?

14  A    And that's called the appraisal process.  Yes, sir.

15  Q    Okay.  The next several pages, is there any reason to

16  stop.  Let's just go to Page 42.

17  A    Now we're dealing with the sales comparison approach

18  because we opt not to utilize the cost approach mainly

19  because the age of the property.  And it will be very

20  difficult to assimilate what costs would be of a 15 year old

21  property as of that moment in time, and it wouldn't give us a

22  good unit of comparison.

23  Q    So what you're saying, if the building had been newer,

24  only a few years old, you would have a better method of

25  comparison --

1    A      Correct.

2    Q      -- to build another new one?

3    A      Mainly because we couldn't calculate depreciation to

4    that degree of accuracy.  And that's not accounting

5    depreciation, that's physical depreciation.  Yes, sir.

6    Q      So now, the sales comparison approach.  That's kind of

7    obvious?

8    A      Yes.  If you go to 43, you'll see a little chart that

9    shows the seven comparables.  We investigated more than

10   seven, but we ended up concluding with seven.  And that shows

11   where they're located.  If you go to Page 44.

12   Q      Well if we can look, where is the -- okay.  Gateway

13   Drive is located where, what is that four?

14   A      Subject property is right above four and right below

15   seven.  We have a little thumb point.

16   Q      There we go.  It doesn't have its own box.  It just says

17   subject.  Right.

18   A      We're just showing where it is in relationship to the

19   other sales that we thought were comparable.

20   Q      So you went to the immediate area?

21   A      Yes, most important to -- you want to find as many

22   properties that sold, whether it's industrial property or

23   single-family home, that's close to you.  Because if it's in

24   a different neighborhood, it has entirely different

25   characteristics.  And that's why we have some problems in the

1    real estate market today.  Some comparables are not

2    necessarily comparable.  We felt that these were very

3    comparable mainly because they're nearby as well.  We also

4    have photographs of them in the report.

5    Q    Directing your attention to the next page, 44.  You have

6    summary of comparable sales.

7    A    Yes.  We went to the public records and we -- and then,

8    we -- our people inspected the properties also and we were

9    abstracted A, the sales price, what happened.  Is it a

10   pending sale, closed sale.  If it was a closes sale, when did

11   it happen.  Break down the size of property in this instance.

12   When it was built and then give a unit of comparison.  Which

13   in this case the price per square foot of rentable was the

14   best use of comparison.  And we summarized all of them in a

15   chart.

16   Q    So the price per square foot is in the far right-hand

17   column as you go down?

18   A    Yes.  And that's unadjusted to the subject property for

19   dissimilarities.  Because that's the second step in the

20   process.

21   Q    So right here we have -- well, there's no sense dealing

22   with these figures right now because they go through an

23   adjustment process?

24   A    Exactly.  It's just showing you this is the first step

25   of the appraisal process.

1    Q    Okay.   Page 45.

2    A    45, we're now telling them why we're going through this

3    process and we're taking into consideration the property

4    rights conveyed.  You know, real estate doesn't sell.  It's

5    the property rights that sell.  And if I sold a 50 percent

6    interest in a property, that is not the same as selling a

7    hundred percent interest in the property.  If I sold it

8    subject to a lease hold, it would have a different

9    characteristic than if I sold it to something that didn't

10   have a lease on the property.

11          So property rights are very, very important and

12   sometimes you get misinformation unless you disclose that.

13          Financing terms are very important.  If something

14   is financed a hundred percent on the dollar or more, we have

15   to bring it down to cash equivalency because market value is

16   on a cash basis.  So it's another adjustment we make.

17   Q    So what you're trying to do then is take all of these

18   other properties and adjust them based upon other factors

19   that you disclose here?

20   A    Correct.  And make them all on the same level of playing

21   field to the subject property so we can come up with a

22   supportable, credible opinion of value.  That's what the

23   bottom line is all when.

24   Q    Next page?

25   A    We're talking about how long it took on the marketplace,

1    the location, physical characteristics.

2    Q    Following page?

3    A    We discuss what we did with the building size, and these

4    are the units of measure that we had to change or make

5    adjustments for.  Age and condition.  And all of those

6    factors.

7             And now when you end up going to Page 49, you then

8    see the adjusted sales.  And there, we take all of them -- in

9    an ideal word, the answer should be the same on all of them.

10   But nothing is perfect.  So the concluded of these seven

11   comparables gave us an interesting range, which we concluded

12   at an indicated value of $2.3 million --

13   Q    Okay.  Let's --

14   A    -- without having to go through each individual

15   adjustment.

16   Q    Let's go to the bottom of Page 49.

17   A    Okay.

18   Q    At the bottom of Page 49, it looks like you have in the

19   very left-hand side, adjusted price?

20   A    Yes, sir.

21   Q    At the very bottom.  Adjusted price.

22   A    Correct.

23   Q    And as you go across in each column is one of the

24   different properties; is that right?

25   A    Yes, sir.

1   Q    Okay.  As you go across the bottom, the first figure is

2   $74.62.  What does that represent?

3   A    That's the unit of measure of the adjusted price.

4   Meaning after we take the sales price, make the adjustments

5   to the subject property, use the -- divided by the rentable

6   square feet, the adjusted price is $74.62.

7   Q    Per square foot?

8   A    Per square foot.

9   Q    On a sale?

10  A    On the sale.

11  Q    Okay.

12  A    To the subject property.

13  Q    The next column is $75.15?

14  A    Right.

15  Q    Next property is $61.37?

16  A    Correct.

17  Q    Next column, $70.20 per square foot?

18  A    Correct.

19  Q    And then the final column is $67.66 per square foot?

20  A    Correct.  But there's two more sales on Page 50.

21  Q    Which are?

22  A    One was $94.14 and one was $69.94.

23  Q    $94.14 cents, and $69.94?

24  A    Correct.  So we now have a level playing field and a

25  range that's more utilized for the subject property than just

1    taking a broad sales prices.  And then we analyze that on a

2    high and a low and obviously, we threw out the high and set a

3    pattern to a concluded opinion of what sales were most

4    similar to the subject after adjustment.

5            We concluded an opinion of $2.3 million from the

6    indicated value by the sales comparison approach.

7    Q    The lower right-hand corner of Page 49, indicated

8    subject value got 28,764 square feet, $80 per square feet.

9    Is that what you felt was the comparable --

10   A    The adjusted square foot unit of measure.  Yes.

11   Q    And then you just multiplied that $80 times 27,764

12   square feet; is that correct?

13   A    Calculated it and then rounded it.

14   Q    And then rounded it to $2,300,000 which you in your

15   opinion is that it represents what?

16   A    That would be the indicated value by the sales

17   comparison approach.

18   Q    $2,300,000 as opposed to the sale price of $1,290,000;

19   is that correct?

20   A    Yes, sir.

21   Q    Directing your attention now to page -- excuse me.

22   Actually, the preceding page, Page 48.  There, you actually

23   spell out your math; is that correct?

24   A    Correct.

25   Q    Go to page, if you could, 51.  That completes the sales

1    comparison, right?

2    A    Yes.  Now we're doing another approach.  We're going to

3    do more than one.  And in this case we used the income

4    approach, and we've already done the sales comparison

5    approach.

6    Q    Okay.  Let's go on to the income capitalization

7    approach.

8    A    There, we're describing what we're going to do on

9    Page 51.

10   Q    What are you going to do?

11   A    We're going to do a market rent survey to see whether

12   contract rent is above market or below market, which is

13   sometimes known as favorable or unfavorable.

14   Q    Directing your attention to Page 51.  Under

15   Introduction, it says following is an overview of the steps

16   used in the market -- in income capitalization approach.  It

17   says, estimate potential gross income.

18           So, this is something, income capitalization

19   approach, you were looking at what?

20   A    We were looking at two factors.  One, what the market

21   would pay for rent and what the contract says they're going

22   to pay in rent, and then do an analysis and convert that

23   income stream into an indication of value.

24   Q    And that's based upon the lease?

25   A    That would be the lease fee estate number.

1    Q    So --

2    A    Compared to the fee simple number, which is not the

3    lease.

4    Q    Okay.  So it says under, Estimate Potential Gross

5    Income:  "This involves analyzing the subject's current

6    leases to establish the potential income from leased space.

7    And, two, then estimating market rent to apply to the

8    subject's vacant space by surveying comparable rental

9    properties in the area."

10            Now, was there any vacancies --

11   A    No, in this case there wasn't.  That's a standard from

12   our template that goes in there.

13   Q    Okay.  So you've got -- at the bottom of the page it

14   says, Direct Capitalization.  You used both of them in this;

15   is that correct?

16   A    Yes.

17   Q    The direct capitalization and discounted cash flow?

18   A    Correct.

19   Q    So we have direct capitalization and discounted cash

20   flow.  How did the two differ?

21   A    Well, one is -- very simple method is, where you would

22   divide, as it states here, a single year's income or expected

23   income by an indicated value.  I sometimes call it IRV.  If

24   you did a circle and put "I" and draw an line, I-R-V.  And if

25   you had a chart brought in, I could show you how that works.

 1    Because you could do your own valuations without hiring me,

 2    if you would like to.

 3         Of where if you have a sale and you know the

 4    income, you would divide the income by the rate -- I mean by

 5    the income and you get the rate.  Or if you didn't have the

 6    sale price, you would multiply the income times the rate to

 7    get the sale price.  So it's a very simple process.  So we

 8    stated in here very simply:  "Direct capitalization is a

 9    method used to convert a single year's expected income into

10    an indication of value in a one direct step by dividing the

11    net income by an appropriate capitalization rate."

12         And that capitalization rate, again, deals with

13    surveys, what the marketplaces expecting as a rate of return,

14    comparing it to a Treasury bond as the safest rate or a CD

15    rate or a -- it comes from the financial community.  And

16    you'll see that in the report.

17         The discounted cash flow method is where you're

18    taking each income each year over a forecasted period, and

19    real estate usually is a ten-year holding period.  Investors

20    by nature overall will hold a property as an investment over

21    a ten-year period.  Sometimes it's more, sometimes it's less.

22    But for the purpose of valuations we use ten years.

23         And then you take each one of those income flows

24    and you discount at the present worth, keeping in mind that

25    the dollar you're going to receive in the future is worth

1   less today.  So you have to discount it.  Again, that

2   discount rate is a combination of the capitalization rate

3   plus the growth and risk added to that.

4          So it's a fairly simple mathematical process.  The

5   hard part is supporting that by getting that information from

6   market information and data and surveys.

7   Q    And for the discounted cash flow, you would have the

8   benefit of the actual lease that projects what the payments

9   are going to be over time; is that correct?

10  A    Of which we have that in the report.

11  Q    Next page.  Page 51.  If we could -- economic profile

12  subject.

13  A    Now there, we summarize that.

14  Q    So you're provided with an unsigned copy of the current

15  lease.  And that's attached as an addendum to your report; is

16  that correct?

17  A    Yes.

18  Q    And because you were basing your valuation on that lease

19  in part?

20  A    They wanted to know if that lease was executed and the

21  sale took place, what would be the indicated value.  Yes.

22  And that's called the leased fee estate value.

23  Q    Okay.  Directing your attention to -- well, what do you

24  do next, Page 53?

25  A    Well first, we told them on 52 that the contract rent

1    was for the first year $463,016 a square foot and during --

2    and also stated in there during that period of time the base

3    rent would increase by 2 and a half percent a year.  And at

4    the end period, it would grow another 3 percent.  So we

5    summarized what the lease said so that they can go back and

6    review the lease for their own satisfaction.

7    Q    So by looking at the lease in the very first year, the

8    lease would bring in rent payments $463,928.04.  And that

9    compares with the sale price of $1,290,000.  How does that

10   look for a good return?

11   A    Well, let me just get my calculator and I'll get that

12   fast for you.

13   Q    Could you give us an estimate?

14   A    About 35 percent return.

15   Q    That's close enough.  Let's take a look at Page 53.

16   A    As compared to the marketplace, which is 10 and 12.

17   Q    Summary of Comparable Leases.  Now you're not looking at

18   sales, you're looking at comparable leases; is that correct?

19   A    Correct.

20   Q    What did you find there?

21   A    We found what their paying rent, as again a unit of

22   measure of similar type properties within the neighborhood,

23   and the process is identical in most respects to the sales

24   comparison approach because we then have to adjust for

25   dissimilarities and all those items there.  Which we did on

1    those subsequent pages through to Page 58.

2    Q    Okay.  Can we just go then to Page 58.  Well, 57 is

3    actually the chart that you ended up with your analysis,

4    setting it out in a chart fashion; is that right?

5    A    Yes.  Of what market rent is.  But not for ADT paying

6    this rent, this is what the property will rent for, as

7    compared.  So it's favorable, unfavorable, higher or lower.

8    And this is the analysis.

9    Q    So at the very bottom where it says, adjusted rent per

10   square foot, by the adjustment, this is what -- reflects

11   what?

12   A    Again, it's a process very similar to the sales

13   comparison approach.  It shows the range.  And then we've

14   conclude, which is the most similar, based upon that range

15   and we provide our opinion as to what the market rent should

16   be --

17   Q    And you --

18   A    -- as summarized on 58, yes.

19   Q    Page 58.  Your summary, your conclusions.  Now your

20   conclusions about the market rental rate.

21   A    We concluded that $9 was the market rent for that

22   property for the first year.

23   Q    That would be a what?

24   A    Triple net basis, where the tenant pays all operating

25   expenses.

1    Q    Now, the second paragraph there -- you've already in the

2    first paragraph come up with your 9-dollar per square foot on

3    triple net lease.

4    A    Correct.

5    Q    The second paragraph, it reads:  "The property is

6    currently subject to a lease that is contingent on the

7    current agreement of sale.  We note that the unexecuted

8    contract rental rate of the pending lease is $16.13 per

9    square foot on a triple net basis, much higher than the

10   concluded market rental rate."

11            Where did you get the $16.13?

12   A    We took the first year income from the lease and divided

13   it by the rentable square feet to come up with the 16.13.

14   Q    And then it says, "As noted previously, the unadjusted

15   rents from the comparable leases and competitive project

16   surveys range from $6.50 to $12.50 per square foot on a net

17   basis."  Is a net basis the same as a triple net basis?

18   A    Yes.

19   Q    Okay.  "And the adjusted market rents range from $8.15

20   to $10 per square foot on a net basis.  It is not proper to

21   assume that a tenant would pay a contract rent that is

22   significantly above market.  It is also impractical to assume

23   that a landlord would be able to collect a contract rent that

24   is significantly above market for an extended period of time.

25            "Furthermore, traditional lending institutions

1    would not fund such activities.  For these reasons, the

2    contract rent is written down to market rent in our fee

3    simple analysis."

4              Can you explain that?

5    A    Well, because we had that, we were asked to appraise the

6    contract rent, which is the lease fee, we then had to provide

7    them with another valuation because we're under obligation of

8    standards of professional practice to provide the client with

9    what the property is worth.  Not what something selling pie

10   in the sky.  And we had to do what we had to do.  It is what

11   it is.  I mean, this is not rocket science.

12   Q    Directing your attention to Page 59.  Income

13   Reconstruction.  Tell us what you're about to do.

14   A    Well, what we're doing here is, first, we're doing the

15   leased fee estate.  We show what the --

16   Q    What page are you on?

17   A    59.  We're showing -- excuse me, this is the fee simple

18   estate.  I apologize.

19             We're showing the $9, what a landlord would have as

20   a nominal expense for vacancy and collection of 45 cents.

21   The right-hand column.  Yes, there it is.  He would, a

22   prudent investor would to set a little money aside in a

23   savings account for reserves so that when a problem occurs in

24   the future they would have the money to pay, which is an

25   appraisal theory.  Most people don't do it, but for appraisal

1    purposes we do.  It's no different than in a condominium

2    association where you set up a reserve for replacements in

3    the future.

4            There is a management fee, even though somebody

5    would be just collecting a check but someone that's an asset

6    manager would administer it.  And so we have total operating

7    expenses of 60 cents.  So the net income is $7.95.  And then

8    we go through the appraisal process of direct capitalization.

9    But we also in this case discussed what operating expenses

10   are, to give information of what the tenant would probably be

11   paying in addition to what the landlord is going to be

12   receiving.  And that's summarized on that page.

13   Q    The next page?

14   A    There, we're supporting our capitalization method by

15   utilizing a technique, although it may sound boring, it is

16   called a band of investment or mortgage equity formula.  And

17   that's one method other than surveys which is on 61, which

18   seemed to correlate each other, to come up with the proper

19   overall capitalization rate which we concluded at

20   10.2 percent.

21   Q    Where is that?

22   A    And there is a tectorial mistake in the report on that

23   Page 60 where they have Allentown area, and this property is

24   in Fort Lauderdale.  And how Allentown got on there, I do not

25   know.

1    Q     But on Page 61, the value indicated --

2    A     I apologize.

3    Q     -- value indication direct capitalization says, applying

4    a capitalization rate of 10.25 percent, and that was the cap

5    rate you came up with?

6    A     Yes.  GE Capital wanted more than just the surveys.

7    They say, can you find some properties that sold to abstract

8    the capitalization rate, and that's what you see on Page 61.

9    Q     And those calculations then at the bottom of the page

10   indicate what?

11   A     10.25.

12   Q     And it says, effective gross income less expenses and it

13   says rounded to.  What is that last figure represent?

14   A     $2,230,000 is the indicated value by the capitalization

15   income method.

16   Q     And then not content with that, you went to a different

17   kind of valuation; is that correct?

18   A     Yes.  That's called the discounted cash flow.

19   Q     Directing your attention to Page 63.  This is another

20   method of determining value based upon the income streams; is

21   that correct?

22   A     Yes.  One method is first year and the second is taking

23   all the income for each year and future and then discounting

24   it to present worth.

25   Q     Go to Page 65.  Is that the --

1    A    Yes, Page 65 summarizes that lease in the preceding

2    page -- I have a chart -- is the discounted cash flow layout

3    model.  We call it a cash flowchart.  Where we took the

4    rental rates in each one of the years and did the same

5    formula for going out to the year 2016.  And then on Pages 65

6    and throughout, we then discounted that to present worth.

7    And that indicated a value of $3,770,000 versus two million

8    three.

9    Q    Now let's go down that page then.  65.  It says, year

10   one February of 2002 and then to January of 2003.  You're

11   looking at a one-year period; is that right?

12   A    Yes, sir.

13   Q    It says, projection period 15 years.

14   A    Correct.

15   Q    Correct?

16        Income, occupancy, you're assuming a hundred

17   percent occupancy rate?

18   A    Single tenant, which is ADT.

19   Q    And then you've got market rental rate and that was the

20   $9 per square foot that you came up with triple net lease?

21   A    Oh okay, I'm sorry.  This page is doing market rents

22   rather than contract rent.  I apologize.  Not to confuse you.

23   Q    Okay.  And the typical lease term 60 months, vacancy,

24   renewable probability, you look at the likelihood that it's

25   going to be vacant?

1    A    The probability that they'll stay or probability that

2    they'll vacate.  That's through the market rent survey.

3    Q    You look at the expenses.  Then the reversion.  The

4    reversion is what?

5    A    Well, at the end of the lease term the fee owner, which

6    is the landlord lessor, gets it back.  So if somebody owns

7    the property and has the right to receive the rent but

8    doesn't have the right to use it, keep in mind the landlord

9    gives the possessionary rights to a tenant for the period of

10   the lease.  Tenant doesn't own anything.  The tenant has the

11   use of the property.

12        So at the end of the period the landlord gets it

13   back.  Well, what's it worth at the end of the period when

14   the landlord gets it back?  That's the future period.  You're

15   going to discount that to present worth, and that's what

16   that's saying.

17   Q    So the conclusion rounded, what does that reflect, the

18   $3,770,000?

19   A    Correct.

20   Q    That reflects what?

21   A    That would reflect the leased fee estate value.

22   Q    The value of that property?

23   A    That's correct.

24   Q    Based upon that method of calculation?

25   A    That's correct.

1   Q     Which takes into account the true lease terms or market

2   lease terms?

3   A     The contract lease terms.

4   Q     The contract lease terms.

5              Directing your attention now to Page 70.

6   A     Now we're summarizing the rental each year from the

7   lease.

8   Q     I'm on Page 70 now.  We skipped over that.

9   A     Oh, I'm sorry.  69.  Okay.  That was the discounting

10  method.  70 is the answer.

11  Q     And it says, direct capitalization not applicable and

12  discounted cash flow 3,770,000.  I thought we did a direct

13  capitalization?

14  A     Yes, $2 million.

15  Q     But that was with what?

16  A     That was with market rents.

17  Q     And this is done with what?

18  A     The DCF model of discounting the actual contract rent

19  because the landlord is obligated -- I mean the tenant is

20  obligated to make the payments.  So it's an encumbered

21  property.  You can't do it the same way as fee simple because

22  fee simple, I can change the rent the next year.  Here, I'm

23  locked in for 15 years plus five years.  I got to pay that

24  rent come hell or high water.

25              And if I'm a creditworthy tenant I'd still have to

```
1   pay it and -- the number is $3.7 million, one heck of a deal,

2   if you compared it to unencumbered.

3   Q   And so that does it on the very next page.  You've got a

4   page that says Reconciliation.  That's to reflect what?

5   A   You're now comparing the various methods and techniques

6   that you used and you utilized the most logical and

7   reasonable technique to concluded opinion of value.

8   Q   And in this case we have the cost approach which you

9   said was not applicable because why?

10  A   Correct.  Because it's an older building and it doesn't

11  mean anything.

12  Q   The sales comparison approach?

13  A   And doesn't deal with property rights either.

14  Q   Sale comparison approach, where you compared it with or

15  similarly situated properties in the area.

16  A   It came in as a good secondary choice in my opinion

17  because it was similar and it seemed to support the income

18  capitalization.

19  Q   And then the income capitalization approach for both fee

20  simple and leased fee.  So for example, the fee simple, based

21  on market rent, would be $2,230,000, the value of the

22  property?

23  A   That's the prudent buyer based upon market rents would

24  pay $2,230,000.  Yes.

25  Q   And this buyer under the leased fee with that lease
```

1    attached, the value is what?

2    A    He should be paying -- with that lease, a buyer should

3    pay 3,770,000.  But that buyer is not paying the 3,770,000.

4    Q    They're paying what?

5    A    One million two hundred and --

6    Q    $90,000?

7    A    $90,000.  And that's the quagmire that we had back then.

8    We submitted the report to GE Capital and never heard back

9    from them.

10   Q    So then on Page 72 you have your final conclusion of

11   value after going through all of these analyses; is that

12   correct?

13   A    Correct.

14          MR. SHOCKLEY:  Your Honor, I have no other

15   questions.  Thank you.

16          THE COURT:  Cross-examination.

17          MR. PASANO:  Ms. Kaplan is going to be doing this

18   cross-examination.

19                         CROSS-EXAMINATION

20   BY MS. KAPLAN:

21   Q    Good afternoon, Mr. Cannon.

22          Okay.  You were hired by GE Capital, correct?

23   A    Yes.

24   Q    And that's a financing company, right?

25   A    It was a lender.  Engagement was from our Philadelphia

1    office and there is a copy of the engagement in the addendum

2    of the report.

3    Q    I think at Page 8 in the general information section?

4    A    What page, please?

5    Q    Page 8.  That last paragraph, Intended Use of the

6    Appraisal, the intended use of this appraisal was only for GE

7    Capital for the use as possible collateral?

8    A    Absolutely.  Only.  Yes.

9    Q    Okay.  And you said earlier on your direct examination

10   that because of confidentiality, that this appraisal was only

11   given to GE?

12   A    It was only given, and that's standard of practice.  It

13   was only given to GE, yes, under standards of practice.

14   Q    It may seem repetitive.  So it was not given to ADT or

15   Tyco?

16   A    Not to my -- we did not.  And I received approval from

17   corporate counsel of GE Capital to divulge what I'm stating

18   here today prior to me testifying.

19   Q    Okay.

20   A    And I got that in writing from them as well, otherwise I

21   would be breaking my fiduciary with my client.

22   Q    But prior to today, this appraisal was only given to GE

23   Capital?

24   A    We submitted it to GE Capital only, yes.

25   Q    And nothing wrong with that.  That's actually the rules?

1    A    That's the practice of the rules.

2    Q    You only give it to your client?

3    A    Correct.

4    Q    Okay.  Do you agree that different appraisals have

5    different purposes?

6    A    Different appraisals can have different purposes.  Yes.

7    Q    For example, in any particular piece of property four

8    different people could appraise the property and come up with

9    four different values?

10   A    If they provided -- if they conducted the similar

11   research, had the similar documentation, the answers should

12   be within a very close range.

13   Q    But they would be different?

14   A    Pardon?

15   Q    But they could all be different?

16   A    Nothing is perfect in life, but they would be in very

17   close range.

18   Q    Appraisals are not exact science; they're opinions,

19   right?

20   A    They're opinions, either credible or non-credible, yes.

21   Q    And people have different motivations for doing

22   appraisals, right?

23   A    They should not.  They should have a single motivation,

24   is to give an unbiased.

25   Q    I mean your client.  Not you --

1    A    Oh, the intended user you mean?

2    Q    Right.

3    A    It could be utilized.  We performed appraisals for

4    partnership agreements, for condemnation, for financing.  For

5    various purposes, various uses.  But market value has a

6    specific definition, and that should be set forth in the

7    report.

8    Q    Okay.  And I actually think that -- I'm going to get to

9    that right now actually.  That's a good point.

10            Before we get to that, part of the definition of

11    market value is that, is it -- I'm trying to find that

12    portion.

13    A    It's in our addendum.

14    Q    That's on Page 3 of the definition section, right?  And

15    one of the things that affects the market value is the buyer

16    and seller's motivation to buy and sell, right?

17    A    Correct.

18    Q    So, for example, if the seller wants to sell quickly and

19    it has a model of cash is king, sell, sell, sell, they may be

20    willing to take below a market value price?

21    A    That's sometimes known as a quick sale, if that's what

22    you mean.

23    Q    A quick sale.  Is a quick sale -- quick sales are

24    common, correct?

25    A    In a super up market, quick sales could be a flip sale,

1    and I've seen prices go astronomically higher.  In a down

2    market, I've seen a quick sale be astronomically lower.  In

3    an equalized market, a quick sale may not occur.

4    Q    But quick sales happen?

5    A    They do occur.

6    Q    And in a quick sale --

7    A    Because that's where there is duress.

8    Q    And at a quick sale a seller could sell a property below

9    market value?

10   A    They could.

11   Q    Nothing wrong with that.  If that's what the seller

12   wants to do?

13   A    They could do that.  Yes.  But that's not market value.

14   Q    No.  It doesn't have to be market value.  A seller could

15   sell and that could just be the sales price, and it doesn't

16   have to be market value price, does it?

17   A    It could be.  Correct.

18   Q    And there's nothing wrong with that if the seller wants

19   to sell it?

20   A    If they want to be stupid, yes.

21   Q    If they want to be stupid they can be stupid, right?

22   A    Of course.

23   Q    Right.  Okay.  Let's talk about a sale-leaseback

24   quickly.  In a sale-leaseback there are other assumptions

25   that have to come in play, right?  Different than just a

1    sale?  You look at the lease?

2    A    The assumptions are what they are reported to be.  Yes.

3    Q    And the -- if it's a corporate tenant, the soundness of

4    that company or the health of that company is important?

5    A    We call that creditworthiness.  Yes.

6    Q    The creditworthiness of the company.

7    A    Yes.

8    Q    Okay.  So if the creditworthiness of that company of the

9    tenant is very low, that would affect the value?

10   A    Not necessarily.  It would affect the capitalization or

11   discount rate because it's a greater risk.

12   Q    But if it affects the cap rate, wouldn't that also

13   affect the value?

14   A    You can adjust that by the rent payments.  So someone

15   that's not necessarily creditworthy may have to pay a higher

16   rent.  And that happens commonly in the marketplace.

17   Q    Exactly.

18   A    But then also you would have a higher capitalization or

19   discounted rate for that risk.  So each transaction stands on

20   its own.

21   Q    I'm going to break that down a little bit for myself and

22   I think for the jury because --

23   A    It's a complex situation.

24   Q    This whole thing is a complex situation for me and I'm

25   guessing maybe for some of the jurors -- some of the things

```
 1   you talk about are complicated.  Right?

 2           So let's break that down to one sentence.  If the

 3   tenant is a company that is not financially sound, they would

 4   be subject to paying more rent?

 5   A    They could.

 6   Q    Okay.

 7   A    Or put up more security --

 8   Q    Okay.

 9   A    -- so that they would pay the rent.

10   Q    Or they would pay more rent?  Nothing wrong with that?

11   A    Depends on what the person that's receiving the rent

12   would like to do.

13   Q    So in this transaction involving Tyco/ADT, the problems

14   with Tyco/ADT, that their stock prices were dropping, their

15   CEO was indicted, they went from being on the triple A list

16   to the watch list, those things would affect the value here,

17   right?

18   A    Not necessarily.  That's accounting principal, not a

19   valuation principal.

20   Q    So the -- those problems with this tenant wouldn't

21   affect the value of the lease?

22   A    No, you're dealing with the stock market.  It has

23   nothing to do with the ability of a company to pay rent on a

24   particular property.  That's cash flow.  It's operating

25   costs.  It's an entirely different concept.  You have to be
```

```
1    housed into something, and does the business generate enough

2    revenue to pay rent.

3           That's entirely different than what goes on in Wall

4    Street.

5    Q    If the company's rating drops because they're having

6    cash flow problems, would that affect the tenant's ability to

7    rent and market value rent?

8    A    Not necessarily.  I'm involved with numerous

9    bankruptcies and the occupancy of a tenant is considered the

10   premiere or the highest level.  They have to receive their

11   money first.  Now, in bankruptcy, they can cancel a lease if

12   they want to.

13   Q    So if a company was to go bankrupt, they could cancel

14   the lease?

15   A    If a company goes bankrupt.  But it's a priority

16   position because you have to operate from someplace and --

17   but most of the time Wall Street's --

18   Q    Having --

19   A    You haven't finish the question.

20   Q    Sorry.  Having no guarantee with the lease in a

21   non-financially sound company would be risky?

22   A    Would you repeat the question?

23   Q    If there's no guarantee, the lease is not guaranteed,

24   and the company is not financially sound, that makes that

25   market value for that rent lower?
```

1    A    It depends on who the guarantor is.

2    Q    There is no guarantee.

3    A    Well, if a public corporation signed the lease, it's

4    guaranteed by the signature of the entity.  There is no

5    guarantee.  If it's a personal guarantee, I, as a person,

6    can't guarantee something of a public corporation.  If that's

7    what you're leaning towards.

8    Q    I'm going to move on.

9         Say a leasebacks in the commercial real estate are

10    common?

11    A    Very much so.

12    Q    And triple net leases are also common?

13    A    Yes.

14    Q    Nothing wrong with either of those?

15    A    No.

16    Q    Okay.  Did you personally inspect this property?

17    A    Not at the time we did the appraisal.  No.

18    Q    Did someone in your company personally inspect the

19    property?

20    A    Joe Valera, who is our senior commercial appraiser, and

21    Barbara Johenning who is our associate, inspected the

22    property.  And you'll see the photographs in the report.

23    Q    And the inspection of that property is important to the

24    ultimate opinion in this report, correct?

25    A    It's part of the appraisal process.  It's not required

1    under USPAP standards though.

2    Q    Okay.   In this particular property there was a bank

3    vault in the middle of the inside of the building.   That

4    makes that part of the property non-usable for rentable

5    space, correct?

6    A    Not necessarily.   I've taken -- I've managed buildings

7    all over the United States with banks in it.   I've taken out

8    vaults, and sometimes they've left the vaults in there.   It

9    depends.

10   Q    It's very expensive to take the vault out?

11   A    It can be very expensive.   Yes.

12   Q    That can affect the value of the building?

13   A    Not necessarily.   It depends.

14   Q    In this particular building there was a prior structural

15   fire.   Does that affect the value of the building?

16   A    Not in this triple net lease space no, because the

17   tenant's responsibility to take care of those items.   Not the

18   buyer.

19   Q    In this particular area of Pompano Beach there are

20   housing projects very close to this building.   And ADT

21   addressed concerns that it was unsafe.   Does that affect the

22   value of the building?

23   A    Not necessarily because you have a lot of industrial

24   properties in there and if you look at our comparable

25   pictures, that didn't affect that in our opinion.

1    Q    That neighborhood doesn't affect the value of the

2    building?

3    A    I didn't find that to be a negative factor.

4    Q    Okay.  Also in this property there was an FPL easement

5    right down the center of this property.  Is that reflected in

6    this report?

7    A    That's the third folio number that we didn't pick up,

8    but it did get picked up on the subsequent transaction.

9    Q    But is that --

10   A    -- when we did a title search.

11   Q    Can you point me to the page on that?

12   A    No, I did some additional -- I did subsequent research

13   on this.

14   Q    So the easement is not in this report?

15   A    I don't know if the title policy is in here.  No.  In

16   our limiting condition we stated, subject to marketable

17   title, though.  That would be an assumption that title can be

18   marketable and insurable.

19   Q    There's an assumption that there's no easements in this

20   report, correct?

21   A    No, no negative impact because if there was an

22   easement -- in other words, it wouldn't impair the use of the

23   property, is one of the basic assumptions.  So you can have

24   an easement.

25   Q    So also an easement down the center of this property

1    doesn't affect the market value?

2    A    It depends.

3    Q    That may affect the market value?

4    A    No, it depends if it is enforceable.  If it's not

5    enforceable, it has no negative impact.  So it really

6    depends.  But the assumption of the report was that there was

7    no impediment, if there was.

8    Q    But there actually is.

9    A    I don't know that.

10    Q    Let's talk about the value of the lease real quickly.

11    In this particular property there was a large parking lot,

12    correct?

13    A    Parking, adequate parking services the building yes.

14    Q    In fact, there was a large parking lot where ADT had

15    stored a fleet of their trucks?

16    A    Well, they have perfect right to use the parking lot for

17    their own use and their own -- they can park trucks there as

18    well.  Yes.  But it met the zoning code as to the parking

19    ratio.  Parking spaces per square foot, that's in the zoning

20    section of the report.

21    Q    This particular building has a very large parking lot?

22    A    I didn't -- as I stated earlier, the property was built

23    to its highest and best use, so I don't know what you mean by

24    large.  I apologize.

25    Q    There was enough space to have an entire fleet of ADT

1    vans parked there and stored there?

2    A    So be it.  Yes.

3    Q    And as far as the lease, ADT got the building and that

4    parking lot with all that space?

5    A    That's a great benefit.  Yes.

6    Q    Its a great benefit?

7    A    Correct.

8    Q    That can have an impact on the value of the lease to

9    ADT, right?

10   A    Correct.

11   Q    I got one.

12        Before you did this appraisal, the purchase

13   agreement was already negotiated between the parties,

14   correct?

15   A    I have to assume so, but we had an unsigned copy.

16   Q    You saw a purchase agreement?

17   A    It's in the addendum of the report.  Yes.

18   Q    Okay.  I would like you to go to Page 49 of your report,

19   if you wouldn't mind.  And I'll put it up on the screen.

20   Now, you said earlier that you placed this subject value at

21   $80 per square foot for the sales price --

22   A    That was the conclusion.

23   Q    -- in this method?

24   A    That's by the sales comparison approach.

25   Q    Right.

1    A    It's called indicated value.  Yes.  Two million three.

2    Q    And you list the net percent adjustment -- sorry -- the

3    adjusted price for each of the comparable sales, correct?

4    A    Correct.

5    Q    The first one is $74.62?

6    A    Yes.

7    Q    The second one is $75.15?

8    A    Correct.

9    Q    The third one is $61.37?

10   A    Correct.

11   Q    And the fourth one is $70.20; fifth is 67.66; 6th is

12   94.14; and the last one is 69.94.

13            Now, I was a gymnast and for me, we did an event,

14   they throw out the high, they throw out the low and we get

15   stuck with what's in the middle.  But here, you don't do

16   that.  If you throw out the high and throw out the low,

17   you're somewhere around $75 a square foot, right?  If we

18   throw out 94.14 and 61.37, each -- every adjusted price left

19   is below $80, correct?

20   A    That's what that math would say.  So you as an appraiser

21   would appraise the property at $143,000 less than I appraised

22   the property for, which is within a range of measurement, if

23   that's what you're doing.

24   Q    But if we took the full range, taking out the high and

25   low, we're at $67 to a maximum of $75?

1    A    Appraisers utilize the mathematics as a tool.  It's not

2    a mathematical science where you calculate it precisely.

3    That's accounting.  In the appraisal of this property is the

4    capitalization, the income stream, and the question really

5    lies what are similar properties selling for in that

6    neighborhood.

7              So let's go to the unadjusted price and you'll see

8    75, 58, 67, 53.  You don't see anything as low as the subject

9    property once you adjust them to the subject property, to the

10   best ability that we had.

11   Q    But the mean is still $73, and you set the value at $80?

12   A    That's correct.

13   Q    Okay.

14             THE COURT:  It's quarter till.  Unless you're

15   nearly finished, we should find a breaking point.

16             MS. KAPLAN:  May I just have one moment, your

17   Honor?

18        (Pause in Proceedings.)

19             MS. KAPLAN:  We can break.

20             THE COURT:  All right.  It's quarter to 5:00.

21   Let's stop for the day and start tomorrow morning at

22   9 o'clock.  Have a good evening.

23        (Jury out at 4:45 p.m.)

24             THE COURT:  Okay.  We'll start again tomorrow

25   morning at 9 o'clock.  We do have another hearing here in a

1    few minutes.

2         (Recess at 4:45 p.m., until 9:00 a.m., September 16,

3    2008.)

```
 1                          I N D E X

 2    WITNESS                                            PAGE

 3    WILLIAM LARRY HORTON, GOVT'S WITNESS, PREVIOUSLY SWORN .....8
      CROSS-EXAMINATION (RESUMED) BY MR. MARKUS ..................8
 4    CROSS-EXAMINATION BY MR. KAISER ..........................100
      CROSS-EXAMINATION BY MR. ENTIN ...........................110
 5    CROSS-EXAMINATION BY MR. PASANO ..........................111
      CROSS-EXAMINATION BY MR. BIRCH ...........................176
 6    REDIRECT EXAMINATION BY MR. SHOCKLEY .....................178

 7    MICHAEL Y. CANNON, GOVERNMENT'S WITNESS, SWORN ...........196
      DIRECT EXAMINATION BY MR. SHOCKLEY .......................196
 8    CROSS-EXAMINATION BY MS. KAPLAN ..........................267

 9

10

11    EXHIBITS                                        RECEIVED

12    DEFENDANT GREGORY ORR EXHIBIT(S) 20 .......................16
      DEFENDANT GREGORY ORR EXHIBIT(S) 21 .......................21
13    DEFENDANT GREGORY ORR EXHIBIT(S) 22 .......................23
      DEFENDANT GREGORY ORR EXHIBIT(S) 7 ........................24
14    DEFENDANT GREGORY ORR EXHIBIT(S) 4 ........................27
      DEFENDANT GREGORY ORR EXHIBIT(S) 9 ........................29
15    DEFENDANT GREGORY ORR EXHIBIT(S) 24 .......................39
      DEFENDANT GREGORY ORR EXHIBIT(S) 19 .......................42
16    DEFENDANT GREGORY ORR EXHIBIT(S) 2 ........................46
      DEFENDANT GREGORY ORR EXHIBIT(S) 27 .......................56
17    GOVERNMENT'S EXHIBIT(S) 1.157 .............................59
      DEFENDANT GREGORY ORR EXHIBIT(S) 6 ........................60
18    DEFENDANT GREGORY ORR EXHIBIT(S) 10 .......................63
      DEFENDANT GREGORY ORR EXHIBIT(S) 28 .......................65
19    DEFENDANT GREGORY ORR EXHIBIT(S) 11 .......................66
      DEFENDANT GREGORY ORR EXHIBIT(S) 13 .......................71
20    DEFENDANT GREGORY ORR EXHIBIT(S) 14 .......................74
      DEFENDANT GREGORY ORR EXHIBIT(S) 15 .......................77
21    DEFENDANT GREGORY ORR EXHIBIT(S) 16 .......................78
      DEFENDANT GREGORY ORR EXHIBIT(S) 26 .......................82
22    DEFENDANT GREGORY ORR EXHIBIT(S) 30 .......................91
      DEFENDANT JA EXHIBIT(S) 9 ................................141
23    DEFENDANT JA EXHIBIT(S) 12 ...............................144
      DEFENDANT JA EXHIBIT(S) 21 ...............................147
24    DEFENDANT JA EXHIBIT(S) 11 ...............................158

25
```

1               C E R T I F I C A T E

2       I, Karl Shires, Registered Professional Reporter, certify

3   that the foregoing is a correct transcript from the record of

4   proceedings in the above-entitled matter.

5       Dated this 5th day of February, 2009.

6

7   _____

    Karl Shires, RPR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25