```
 1                    UNITED STATES DISTRICT COURT
                      SOUTHERN DISTRICT OF FLORIDA
 2

 3   UNITED STATES OF AMERICA,        )  Case No.
                                      )  08-60014-CR-MIDDLEBROOKS
 4                    Plaintiff,      )
                                      )
 5          -v-                       )
                                      )
 6   VINCENT F. ARTUSO, JOHN VINCENT  )
     ARTUSO, GREGORY ORR, ROBERT M.   )
 7   GANNON, AND PHILIP EDWARD FORGIONE,)
                                      )
 8                    Defendants.     )  West Palm Beach, Florida
                                      )  September 18, 2008
 9   _____)  8:59 a.m.

10               Volume 7 of 17 - PAGES 1   303

11                TRANSCRIPT OF TRIAL PROCEEDINGS
             BEFORE THE HONORABLE DONALD M. MIDDLEBROOKS
12                U.S. DISTRICT JUDGE, AND A JURY

13
     Appearances:
14
     For the Government:        J. BRIAN MCCORMICK
15                              WILLIAM T. SHOCKLEY
                                Assistant United States Attorneys
16                              500 East Broward Boulevard
                                Fort Lauderdale, Florida  33394
17
     For the Defendant:         PETER VINCENT BIRCH
18   Vincent F. Artuso         Assistant Federal Public Defender
                                450 Australian Avenue, Suite 500
19                              West Palm Beach, Florida  33401

20   For the Defendant:         CARLTON FIELDS
     John Vincent Artuso       BY:  MICHAEL S. PASANO, ESQ.
21                              100 SE 2nd Street, Suite 4000
                                Miami, Florida  33131
22

23   Reporter:                  Karl Shires, RPR
     (561) 514-3728            Official Court Reporter
24                              701 Clematis Street, Suite 258
                                West Palm Beach, Florida  33401
25
```

STENOGRAPHICALLY RECORDED COMPUTER-AIDED TRANSCRIPT

```
 1    Appearances: (Continued)

 2

      For the Defendant:          DAVID OSCAR MARKUS, ESQ.
 3    Gregory Orr                 ROBIN ELLEN KAPLAN, ESQ.
                                  169 E. Flagler Street, Suite 1200
 4                                Miami, Florida  33131

 5    For the Defendant:          ALLAN B. KAISER PLLC
      Robert M. Gannon            BY:  ALLAN BENNETT KAISER
 6                                111 NE 1st Street, Suite 902
                                  Miami, Florida  33132
 7
      For the Defendant:          ENTIN & DELLA FERA
 8    Philip Edward Forgione      BY:  ALVIN ERNEST ENTIN, ESQ.
                                  110 SE 6th Street, Suite 1970
 9                                Fort Lauderdale, Florida  33301

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1           MR. PASANO:  Judge, if we can alert the Court at

2    some point after this witness, we then reach soon the

3    witness, Mr. Kasman, and there are a variety of objections

4    and motions, some of which the Court has ruled on and some of

5    which have not either been more articulated or need to be

6    addressed to the Court.

7           THE COURT:  -- well.

8           MR. PASANO:  If we have time.  I just wanted to

9    alert the Court to it.

10           THE COURT:  We could have done that yesterday

11    afternoon.  But Mr. Shockley, I'm concerned about your pace.

12           MR. SHOCKLEY:  We're just about, your Honor, we're

13    just about 15 minutes left with this witness and we'll be

14    done.

15           THE COURT:  Okay.  I've been leaving the issue of

16    your pace to you, but I do expect you to finish within the

17    time you outlined, as you know.

18           MR. SHOCKLEY:  Yes, your Honor.

19           THE COURT:  Okay.  Let's invite the jury in.

20        (Jury in at 9:00 a.m.)

21           THE COURT:  Mr. Pasano, I thought there were still

22    a couple more witnesses before?  Aren't there?

23           MR. PASANO:  One which is related, but I think we,

24    for instance, lunchtime, your Honor, perhaps we can take a

25    few minutes?

```
 1            THE COURT:  All right.

 2        (Pause in Proceedings.)

 3            THE COURT:  Welcome back.  Please be seated.

 4            And Mr. Shockley, please continue with your direct

 5    examination.

 6            MR. SHOCKLEY:  Thank, your Honor.  We would re-call

 7    Martin Genauer.

 8     MARTIN J. GENAUER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

 9                    DIRECT EXAMINATION (RESUMED)

10    BY MR. SHOCKLEY:

11    Q    Mr. Genauer, when we left yesterday I believe we were

12    toward the conclusion of your testimony in direct

13    examination.  To recap though, the attorney-client privilege

14    that was asserted in this case was a privilege that protects

15    whom, you or your client?

16    A    The client.

17    Q    Now -- and the client in this case would be Mr. Orr and

18    Mr. John Artuso; is that correct?

19    A    Those were the two gentlemen that I met with.  Yes.

20    Q    Now, earlier in your testimony we referred to

21    Government's Exhibit 3.44, which is now into evidence.  And

22    3.35?

23            MR. SHOCKLEY:  Your Honor, my recollection is both

24    of these exhibits are in evidence.

25            THE COURT:  What are the numbers again?
```

1              MR. SHOCKLEY:  3.44 and 3.35.

2              MR. PASANO:  They are, your Honor.

3              MR. SHOCKLEY:  Excuse me.

4         (Pause in Proceedings.)

5    BY MR. SHOCKLEY:

6    Q    3.44, if you recall, this was dated January the 27th of

7    2003.  It was a letter that was sent to Mr. Orr concerning

8    the operating agreement of Longhill Holdings, LLC.  It bears

9    the date at the top, entered into as of the 15th of March of

10   2002.  And that accompanied the letter of January 27th, 2003.

11             Do you recall that?

12             MR. SHOCKLEY:  Your Honor, permission to approach

13   the witness?

14             THE COURT:  Yes.

15   BY MR. SHOCKLEY:

16   Q    Do you recall that exhibit?

17   A    Yes, I do.

18   Q    And basically, that changed the ownership of Longhill in

19   what manner?

20   A    Essentially --

21             MR. PASANO:  Objection, your Honor, asked and

22   answered.

23             THE COURT:  Overruled.

24             THE WITNESS:  Essentially, it was an instruction

25   from our client that the ownership of Longhill Holdings, from

1    its inception, should have been 100 percent in the name of

2    John Artuso instead of 50 percent in the name of John Artuso

3    and 50 percent in the name of Efficient Realty and

4    Development, Inc.

5    BY MR. SHOCKLEY:

6    Q    And my recollection, and it could be faulty, is I just

7    don't recall if we covered Government as Exhibit 3.35.  Is

8    this --

9            MR. SHOCKLEY:  And I believe, your Honor, I did

10   offer it into evidence.

11           MR. PASANO:  It's in, your Honor.

12   BY MR. SHOCKLEY:

13   Q    Showing you this exhibit.  And that reflects what

14   ownership interest of --

15   A    This is -- this is the operating agreement of Longhill

16   Holdings, Inc. that was prepared based on the initial

17   instructions from the client and reflects the ownership that

18   I just mentioned, which was superseded, which is that John

19   Artuso would have 50 percent of Longhill Holdings, LLC and

20   Efficient Realty and Development, Inc. would have the other

21   50 percent.

22   Q    So one came first and then the 100 percent ownership by

23   Mr. Join Artuso came second; is that correct?

24   A    That's correct.

25   Q    This is Exhibit 3.47.  Directing your attention now

1    to -- did there ever come a time when there were any

2    discussions with Mr. Orr concerning his authority as manager

3    of KCGF to exercise that authority on behalf of KCGF

4    concerning any loans or financing?

5    A    Yes.

6    Q    Describe what happened.

7    A    I recall, I believe it was sometime in 2005 when Mr. Orr

8    called my office and asked for a memorandum that would

9    support his authority to act on behalf of KCGF Associates.

10   Q    And act on its behalf for what?

11   A    I believe it was in connection with some sort of a

12   financing that that company was going to be involved in, but

13   I don't recall what that financing would have involved, nor

14   was I consulted about that financing.

15   Q    Okay.  Directing your attention to 3.106.  It's in

16   evidence, bearing Bates label 1461.  These are your time and

17   billing records, correct?

18   A    Yes, they are.

19   Q    And it reflects on 5/9/2005, a conference with Mr. Orr

20   regarding the authority of the manager of KCGF and a memo was

21   sent to you concerning this; is that correct?

22   A    That's correct.

23   Q    And then on 5/10/2005, again, a conference between who?

24   Who are those initials?

25   A    SLK, who is the person who recorded the time, was an

1    attorney in my office named Stuart Kasner.  And the

2    conference on 5/10 would be KS, that would be Brad Saunders,

3    another associate in my office.  And I believe I was out of

4    town at the time that this occurred and so when Mr. Orr

5    called in, asking about these questions, my secretary

6    referred the matter to one of our associates, Mr. Kasner, and

7    then he wrote me a memo and then he also discussed it with my

8    other associate, Mr. Saunders.

9    Q    And it says it's regarding a pledge issue and

10   self-dealing.  Do you recall what that was about?

11   A    I believe that there was a memo that was written in

12   connection with that, and if you could perhaps show that

13   memo, it would refresh my recollection exactly.

14   Q    Where might that memo be?

15   A    It was in the documents I produced.

16   Q    Okay.  Directing your attention now to Government's

17   Exhibit 3.105.  These are the -- these are the notes that you

18   took initially on the interview.  And direct your attention

19   to page bearing Bates label G1047.  Under the heading, J & G

20   Associates, LLC there is a reference to manager, Gregory Orr

21   and members, plural, Janine and Gregory Orr as tenants by the

22   entireties, and then there is a 20?

23            MR. MARKUS:  Judge, objection.  We went over this

24   in great detail yesterday.  Asked and answered.

25            THE COURT:  Overruled.

BY MR. SHOCKLEY:

Q    And then for all companies and it says, Larry's company.
At that point in time you did not have KCGF, so that's why
you had to write Larry's company; is that correct?

A    I didn't know the name of the company that was going to
be used for Larry Horton.  That was given to me, I think, a
day later.  And so I just wrote Larry's company because after
the discussion I did understand that he was going to be using
a company to hold his interest, as opposed to individually.
And so I wrote Larry's company just to refer the unnamed --
the then unnamed company that we would be using.

Q    And the Larry's company relates to the 80 percent; is
that correct?

A    That's correct.

Q    So what was your understanding at that time concerning
what the final percentage split was going to be between all
the recipients of proceeds from payments by ADT through these
various companies?

A    If you flip to the next page, it will give me the names
of all of the partners and then I can go through that.

Q    Okay.  Are you referring to --

A    That's the page.

Q    Okay.  And this bears the Bates label G1045.

A    Right.

Q    I'll tell you what.  Let me make another exhibit here,

1    if I could.  We'll put an exhibit sticker on the photocopy of

2    that page.  TX1.

3              Now, on 3.105 it indicates above J & G Associates,

4    60 percent and 40 percent; is that correct?

5    A    That's correct.

6    Q    Now that's different than what you had initially been

7    told by Mr. Orr in the presence of John Artuso on the 14th of

8    March of 2002; is that correct?

9    A    Yes.  The chart that you're looking on that says 60/40

10   was prepared after that meeting and subsequent to different

11   instructions about ownership as to J & G Associates.

12   Q    Okay.  So then let's go to the chart, a chart that would

13   reflect what your initial instructions were.  And showing you

14   TX-1.  Is that a fair and accurate copy of the diagram that

15   you had prepared thereto thereafter?

16   A    Yes, this is --

17   Q    Okay.

18   A    -- exactly.

19   Q    If I can have the exhibit back then.

20   A    Sure.

21   Q    Directing your attention now, if we could take also a

22   look at the operating agreement of any one of the exhibits --

23   well, you probably remember it now.

24   A    I do.

25   Q    Okay.  Directing your attention now to -- first of all,

1    there's five entities that have an interest in Efficient

2    Realty and Development, LLC.  Is that correct?

3    A    That's correct.

4    Q    So let's start from the left-hand side.  Bayhill

5    Development would have what percentage interest?

6    A    10 percent.

7    Q    So I'm going to take a red pen and just write on here

8    10 percent.

9             What about CAE Enterprises LLC?

10   A    10 percent.

11   Q    What about the Property Futures Inc.?

12   A    9.9 percent.

13   Q    What about Longhill Holdings, the one on the far right?

14   A    20 percent.

15   Q    And J & G Associates was what?

16   A    The remainder.  50.1 percent.

17   Q    Now, initially on the first day, Mr. Orr told you that

18   the percentage ownership interest in J & G Associates was to

19   be what?

20   A    20 percent under the words, Gregory Orr, Janine Orr,

21   TBE.

22   Q    So I'll put an X through 40 percent and now write

23   20 percent.

24             And what about KCGF?

25   A    Instead of 60 percent, that should have been 80 percent.

1    Q    So marking an X through 60 percent.  Now we've got

2    80 percent.

3         So given this split, overall, John Artuso would be

4    getting what percentage of the total amount of distribution

5    through Efficient Realty and Development?

6    A    This is as of my initial instructions from John Artuso

7    where the split between Efficient Realty Development and John

8    Artuso was 50/50, as opposed to the later instructions where

9    that became 100 percent John Artuso.  I'm assuming that's

10   your question, right?

11   Q    Yes.

12   A    So John Artuso would in effect have 10 percent.

13   Q    So I'll write next to his name 10 percent.

14   A    Yes, and that's essentially 50 percent of 20 percent.

15   Q    So 50 percent of 20 percent --

16   A    Is 10 percent.  Right.  Half of 20 percent is

17   10 percent.

18   Q    And then half of 20 percent again for John Artuso's

19   father.  You have that written in.

20   A    Yes.

21   Q    That would also be 10 percent?

22   A    Correct.

23   Q    Let's go to Mr. Orr and his wife's tenancy by the

24   entirety share.  That's going to be 20 percent of roughly

25   50 percent?

1  A    That's right.

2  Q    So would that be then 10 percent?

3  A    That's 10 percent.  Approximately, 10 percent.  It's

4  10 percent plus a slight, very small fraction.

5  Q    And then Mr. -- going to the left-hand side.  Larry

6  Horton and his wife as tenants by the entireties, they would

7  have the remainder, so there's 10 percent --

8  A    It's 80 percent of 50 percent, which would be

9  40 percent.

10 Q    So at least as of that initial date the overall split

11 among all of the parties would be, John Artuso 10 percent;

12 his father 10 percent; Greg Orr 10 percent; Larry Horton

13 40 percent; Robert Gannon 10 percent -- 9.9 percent; CAE

14 Enterprises 10 percent; and Bayhill 10 percent; is that

15 correct?

16 A    That's correct.

17 Q    Now, that changed.  If we could mark another exhibit

18 TX-2.  I'm showing you TX-2.  Is that also a fair and

19 accurate copy of the first diagram that you had prepared

20 yourself?

21 A    That's correct.

22          MR. SHOCKLEY:  Your Honor, we would offer

23 Government's Exhibit TX-2.

24          MR. MARKUS:  No objection.

25          THE COURT:  TX-2 is admitted.

1          (Received in evidence Government's Exhibit(s) TX-2.)

2     BY MR. SHOCKLEY:

3     Q     Now, the math on this as for -- as to Bayhill, CAE, and

4     Property Futures would remain the same; is that correct?

5     A     That's correct.

6     Q     So it's still 10 percent for Bayhill, 10 percent for

7     CAE, 9.9 percent for Property Futures.  John Artuso would

8     remain at 10 percent, correct?

9     A     Correct.

10    Q     His father would remain at 10 percent?

11    A     That's correct.

12    Q     Gregory Orr --

13    A     Would be 20 percent.

14    Q     And Larry Horton would be what?

15    A     30 percent.

16    Q     And these are the percentages that were finally set

17    pursuant to the signed, executed operating agreements; is

18    that correct?

19    A     Yes, that is.

20    Q     All the legal services you provided to Gregory Orr and

21    John Artuso in setting up J & G Associates, KCGF Associates,

22    and Longhill Holdings and in preparing the amended and

23    restated operating agreements for the three entities

24    Efficient Realty and Development, LLC, one in Pennsylvania

25    and one in Florida, as well as Westmore Properties, LLC, were

```
 1    all of these services that you performed absolutely legal?

 2    A     Absolutely.

 3    Q     And the formation of these three companies and the

 4    amendment and restatement of the operating agreements, they

 5    were all carried out in a legal manner; is that correct?

 6    A     Completely.

 7    Q     And there was nothing absolutely whatsoever illegal

 8    about these actions in setting up those companies and

 9    changing the ownership interest; is that correct?

10    A     That's correct.

11    Q     And your clients, Gregory Orr and John Artuso, were

12    absolutely entitled to set up those companies and change

13    those operating agreements; is that correct?

14    A     That's correct.

15    Q     And those other persons who signed off on those amended

16    and restated operating agreements, it was nothing illegal in

17    taking an ownership interest in those entities, was there?

18    A     No.

19    Q     On the surface did it appear to you that there was

20    nothing whatsoever illegal or improper in what was occurring?

21    A     It did.

22    Q     And on the surface could one even say that perhaps it

23    was nothing untoward about these transactions?

24    A     Certainly.

25    Q     At the time did you consider these to be just fairly
```

1    routine legal services that you were providing on behalf of a

2    client?

3    A    Yes, I did.

4    Q    What involvement, if any, did you have in the three real

5    estate transactions in which ADT sold the Pompano Beach

6    property and Palm Harbor property and the Lancaster property

7    to the two Efficient Realties and Westmore Properties?

8    A    Those transactions occurred well before I met these

9    gentlemen, so I had no involvement whatsoever.

10    Q    And when preparing the amended and restating operating

11    agreements for the two Efficient Realties and Westmore

12    Properties, were you eventually provided with sales

13    agreements and lease agreements in which it was reflected

14    that Larry Horton was an ADT employee?

15    A    I was provided with the closing documents for those

16    transactions.  I did not -- I did not specifically review

17    those in connection with providing these services because

18    that -- the provision of those documents came after I had

19    done all this structuring work, and those documents came in

20    connection with a request for me to prepare a binder for

21    these clients that would essentially be a summary of the

22    important documents in those transactions that would include

23    the new operating agreement instead of the one that was done

24    at the time of the actual sale.

25    Q    So eventually, some of these documents were provided to

1    you, then to assemble and produce for the client; is that

2    correct?

3    A     Yeah, they were really provided for the purpose of

4    assembly into a binder that would also contain the document I

5    prepared.

6    Q     At the time you provided your legal services other than

7    what you were told by Gregory Orr, did you have any knowledge

8    of any of the circumstances surrounding the sale of these

9    three properties, the Pompano Beach, the Palm Harbor, and the

10   Lancaster properties by ADT to those three companies?

11   A     None whatsoever.

12   Q     At the time you provided your legal services, did you

13   have any knowledge concerning whether Larry Horton had

14   advised ADT officials about his own financial interest in

15   these three sale-leaseback transactions before, during, or

16   after those transactions were executed?

17   A     I had no knowledge of that.

18   Q     Now, do you remember testifying yesterday about those

19   remarks made by Gregory Orr on 3/14/02 when you were meeting

20   with Mr. Orr and Mr. John Artuso where Mr. Orr stated that

21   Larry Horton was his neighbor, that Horton worked at ADT, and

22   that Horton was not a decision maker in these real estate

23   transactions and that Orr and his partner had been awarded

24   the contracts based upon competitive bidding?

25   A     Yes.

1    Q    What actions, if any, did you take to investigate

2    whether these facts that Gregory Orr provided to you were, in

3    fact, true and accurate?

4    A    None.

5    Q    And so you were just accepting the word of your client

6    as far as the details of the transactions about which you

7    were not involved?

8    A    As I always do.

9    Q    And did Gregory Orr or John Artuso ever seek your legal

10   opinion or advice concerning the propriety or legality of

11   these three real estate transactions?

12   A    No.

13   Q    Were you even in a position to provide a legal opinion

14   or advice to either Mr. Orr or Mr. John Artuso concerning the

15   propriety or legality of those three real estate

16   transactions?

17   A    Not at all.

18   Q    If you had known that Horton did not disclose his

19   interest in the three deals to ADT, would you have provided

20   the legal services to Orr and John Artuso that you have

21   described during the course of your testimony?

22   A    No.

23   Q    And if you had known that Horton had arranged that there

24   would be no marketing of the three properties and no

25   competitive bidding of the properties, would you have

1   provided the legal services to Orr and John Artuso that you

2   have described in the course of your testimony?

3   A    No, I would not have had any involvement in any of those

4   transactions.

5   Q    And if you had known that Horton was one of the decision

6   makers and had arranged to sell the three properties at below

7   fair market value and lease them back collectively paying

8   rents above fair market value, deceiving ADT in the process,

9   would you have provided the legal services to Orr and John

10  Artuso that you described during the course of your

11  testimony?

12              MR. MARKUS:  Objection, your Honor.

13              THE COURT:  Basis?

14              MR. MARKUS:  Assumes facts not in evidence.

15  Leading.

16              THE COURT:  Overruled.

17  BY MR. SHOCKLEY:

18  Q    You may answer.

19  A    No.

20              MR. SHOCKLEY:  No other questions, your Honor.

21  Thank you.

22              THE COURT:  Cross-examination.

23              MR. MARKUS:  Good morning, ladies and gentlemen.

24                     CROSS-EXAMINATION

25

BY MR. MARKUS:

Q    Good morning, Mr. Genauer.

A    Good morning.

Q    I represent Greg Orr.  My name is David Markus.  I'm going to ask you a couple of questions about the things we've just gone over with the prosecution.  Let's start at the very beginning.

Greg Orr was referred to you, I think, by a lawyer named Mark Schechner?

A    That's correct.

Q    Okay.  And why was he referred to you?

A    Greg Orr had consulted Mark Schechner about some legal work unrelated to these transactions that are the subject of this case, and the kind of legal work that Greg Orr needed was beyond the scope -- some of the legal work that he needed was beyond the scope of Mark Schechner's expertise and was within my area of expertise.

Q    You've been doing -- you've been a lawyer for a long time?

A    Thank you very much.

Q    How many years, Mr. Genauer?

A    About 35.

Q    And you're an expert in corporate matters and corporations and LLCs, and those things that we've heard about?

1    A    I would like to consider myself one.

2    Q    You've worked at some of the best law firms in the

3    country?

4    A    Yes, I have.

5    Q    Okay.  And when Mr. Orr came to you, he certainly didn't

6    have that sort of expertise or sophistication, did he?

7    A    Of course not.

8    Q    Right.  And that's why people come to lawyers?

9    A    Exactly.

10    Q    And when he met with you, he explained -- when he was

11    talking about these transactions, he explained to you how --

12    who owned those buildings, right, those four buildings?

13    A    I'm not sure I understand your question.

14    Q    Okay.  When he came to you, he explained who had

15    actually -- which entities had purchased the real estate

16    transactions that are involved in this case?

17    A    Yes.

18    Q    Okay.  And he asked you how he could distribute the rent

19    payments in a legal fashion, correct?

20    A    Well, what he asked me to do was to, essentially,

21    correct the ownership that was on paper at the time of the

22    closing of the purchases of those properties.  As I testified

23    yesterday, at the time of the closing, each of the entities

24    which owned the three properties that we're talking about was

25    owned 100 percent by a particular individual.

1           Two of them in the case were owned 100 percent by

2    Robert Gannon and one was owned 100 percent by John Artuso.

3    And he explained to me that that was not the intention of

4    their group, their purchasing group, but rather, there were

5    several partners and there needed to be a proper legal

6    document to reflect the real ownership rather than the one

7    that had been put in place in haste at the time of the

8    closing.

9    Q    And one of the reasons was to reflect proper ownership,

10   as you say.  The other reason I think you explained to

11   Mr. Orr which was, if it wasn't restated correctly, you might

12   have to pay tax twice.  When it went to the first person and

13   then when it got distributed, the rent payments, you might

14   have to pay tax twice; it was better to have the ownership

15   properly reflected in an operating agreement?

16   A    Well, it's always better to have the correct ownership

17   because you know the ownership reflects -- the ownership

18   interests are ultimately what you base your tax returns on.

19   And so if somebody -- let's say a company, it shows that it

20   it's owned 100 percent by somebody, but it's really not, all

21   of the income from that property would be attributable to

22   that 100 percent owner.

23           Let's say there are really two owners who each have

24   50 percent.  Well, the one who owns 100 percent is

25   theoretically going to pay tax on 100 percent of the income,

1   even though he is really only entitled to receive 50 percent

2   of the income.  He is paying twice as much tax as he should

3   have.

4   Q    And just as you're explaining that to us now, you

5   explained that to Mr. Orr?

6   A    Of course.

7   Q    And when you explained that to Mr. Orr, the two of you

8   decided how to restate the correct ownership?

9   A    Of course.

10  Q    Okay.  And there's nothing unusual about closing first

11  and then basically cleaning up the ownership in an operating

12  agreement?

13  A    Not at all.

14  Q    That happens all the time?

15  A    Yeah.  When you close a real estate transaction, you're

16  really focusing much more on the buyer/seller relationship.

17  You're handling documents between the buyer and seller,

18  you're looking at title, you're working with the title

19  company.

20       And you often don't have, I would call it your own

21  house in order, which is your buying company isn't

22  necessarily -- it's formed, it exists.  But you clean up the

23  details of the arrangements between the partners themselves

24  after the closing.  That's not unusual.

25  Q    Okay.  That's what you did, you helped get the house in

1    order?

2    A    That was my job.

3    Q    Okay.  By the way, taking a step back for a second.  The

4    documents that you produced to the prosecution, I think we

5    mentioned they had some blackouts on them.  That was because

6    you blacked out what wasn't in response to their subpoena?

7    A    That's correct.

8    Q    Nothing illegal or wrong on the stuff you blacked out,

9    right?

10    A    Not at all.

11    Q    Those are just other corporations?

12    A    Correct.

13    Q    And, in fact, without getting into the specifics, some

14    of those corporations dealt with other bids and attempts to

15    purchase real estate from ADT?

16    A    I'd have to get the permission of my clients to answer

17    that and if they would give me permission, I would be happy

18    to.

19    Q    Okay.  We'll just move on.

20         I think you mentioned there were two general

21    reasons for setting up a corporation.  One is liability

22    protection.  Right?

23    A    Correct.

24    Q    And the other is confidentiality reasons?

25    A    Correct.

1   Q    When Greg Orr came to you he didn't say listen,

2   Mr. Genauer, I need to make sure nobody knows who I am, I

3   want to stay hidden?  He didn't say anything like that did

4   he?

5   A    No.

6   Q    In fact, on just about all the documents we saw, his

7   name is on those documents, his signature is on those

8   documents.  If anything, if anybody were to look, they would

9   see Greg Orr?

10  A    Of course.

11  Q    Okay.  In fact, I think the only person we saw taken off

12  any documents was Larry Horton?

13  A    Taken off any documents?

14  Q    Do you remember when your secretary deleted, she drew

15  the line to delete him off of one of those forms that would

16  show up on SunBiz?

17  A    Yes, that's because his name really didn't belong there.

18  Q    Right.  And nobody else, especially Greg Orr, didn't

19  take their own name off of any document, correct?

20  A    No.

21  Q    Okay.  By the way, Greg Orr, I think in 3.74 -- let me

22  put this on the screen for a second.  He was the one who sent

23  you the name and address for the Hortons, correct?

24  A    Correct.

25  Q    Okay.  And, in fact, when he sent that to you, that was

1    to set up the Hortons' LLC, correct?

2    A    Correct.

3    Q    And as far as Greg Orr knew, those names would go on to

4    the form to set up the LLC?

5    A    They would go -- they would go into the operating

6    agreement, which is where ownership interests are reflected.

7

8    Q    Greg Orr didn't write on that letter or any other

9    letters, "make sure to keep Larry Horton hidden"?

10    A    No.

11    Q    In fact, what happened was, after your assistant

12    mistakenly put the Hortons on one of those documents, Greg

13    Orr called you, correct?

14    A    He called my assistant.

15    Q    And explained that Horton did not want his name on those

16    documents, right?

17    A    That's correct.

18    Q    It was at Larry Horton's direction that those were taken

19    off?

20    A    That conversation happened between my secretary and Greg

21    Orr.  She reported it to me.  She didn't report it to me in

22    that detail.  So what I heard was that she had instructions

23    to remove those names because they were not supposed to be

24    there.

25    Q    Okay.  Mr. Shockley asked you a bunch of questions about

1    whether you've done anything illegal and what you knew and

2    what you didn't know.  You certainly didn't do anything

3    illegal in this case, right?

4    A    Certainly not.

5    Q    We agree on that.  And you didn't think Greg Orr was

6    doing anything illegal, correct?

7    A    I certainly didn't.

8    Q    You didn't think Larry Horton was doing anything

9    illegal?

10   A    Absolutely not.

11   Q    To take a step back, Mr. Genauer, you knew because Greg

12   Orr told you, that Larry Horton worked at ADT, correct?

13   A    Right.

14   Q    At the real estate department, right?

15   A    Correct.

16   Q    And that he was on the buy side as well of these

17   transactions, right?

18   A    I knew that.

19   Q    Okay.  I'm going to put on the screen Greg Orr

20   Exhibit 30, which has been admitted.  What he told you is

21   consistent with this statement that I'm going to show you on

22   the screen, is it not?  This is a statement written by Larry

23   Horton.

24   A    Do you want me to read --

25   Q    I'm going to point out a particular section for you.

1   A    Okay.

2   Q    And this is Larry Horton, when he says "I" referring to

3   Larry Horton.  What it says here, I, Larry Horton, did not

4   know when this would happen.  I do not make the decision on

5   which locations and I do not have the ability to prove any of

6   these transactions.  Approval will come from ADT and Tyco.

7          If we skip to the next paragraph, Larry Horton

8   explains the next time, I, Larry Horton, contacted Greg Orr

9   was in August '01 to discuss if he still wanted to bid on the

10  ADT properties.  Larry Horton gave Greg a spreadsheet that

11  had addresses, square footage, and age of seven or eight

12  locations.  These locations were a combination of sale and

13  sale-leaseback.

14         I, Larry Horton, stated that he needed to do -- he,

15  referring to Greg Orr -- needed to do his own research on the

16  properties, and then forward any written offer to Margie

17  Desporte at ADT.

18         I, Larry Horton, also stated that if he, Greg Orr,

19  was lucky enough to get any of these properties, I, Larry

20  Horton, wanted a percentage of the profit.

21         That was -- those statements are consistent with

22  what Greg Orr told you, correct?

23  A    Entirely.

24  Q    And I mean you don't know what Larry Horton told Greg

25  Orr about these transactions, do you?

1    A    Not at all.  I never met Larry Horton.

2    Q    And if Larry Horton would have told Greg Orr those

3    things, I think as you said, there would be nothing illegal

4    with the transaction, as you saw it?

5    A    As I saw them, no.

6    Q    Right.  And I think you mentioned with the prosecution

7    at the very beginning of your testimony that you had received

8    two immunity letters in this case, correct?

9    A    Correct.

10   Q    Okay.  Now, you have one of the finest lawyers around,

11   Hy Shapiro, who is here.  He got those letters for you,

12   correct?

13   A    Correct.

14   Q    Because he explained that even though you've done

15   nothing wrong, it's important to protect yourself from the

16   prosecution?

17   A    Correct.

18   Q    Because they may look at these documents and come up

19   with different interpretations, correct?

20   A    I don't really want to speculate on what Hy Shapiro's

21   reasoning was.  He advised me to get the immunity letters.  I

22   have been giving advice to clients for 35 years and I hope

23   that they will take my advice when they come to see me, and

24   I'm certainly not going to ignore the advice of my own

25   attorney when I go to see him.

```
 1    Q    We agree.  And so you followed Mr. Shapiro's advice and

 2    got those immunity letters, even though you've done

 3    absolutely nothing wrong?

 4    A    That's correct.

 5    Q    Okay.  Just to clear one thing up.  I think you've said

 6    you never met Larry Horton, right?

 7    A    Correct.

 8    Q    Do you remember whether Greg Orr was in your office once

 9    and you got Larry Horton on the phone to ask him some

10    details?

11    A    I believe that that happened.

12    Q    Okay.  So he was probably on the speaker phone or

13    something like that?

14    A    Correct.

15    Q    Okay.  So you probably did speak with Larry Horton once

16    or twice about the details of names of companies, tenancy by

17    the entirety, those sorts of things?

18    A    I think that's correct.

19    Q    Okay.  One last area, Mr. Genauer.  A man named Lewis

20    Kasman.  Ever meet that man?

21    A    I'm sorry?

22    Q    Ever meet a man named Lewis Kasman?

23    A    No.

24    Q    Has Greg Orr ever brought a man named Lewis Kasman to

25    your office?
```

```
 1    A    No.

 2    Q    Okay.  Did the Government -- did the prosecution team

 3    show you a picture of Lewis Kasman?

 4    A    Yes.

 5    Q    And they told you that --

 6              MR. SHOCKLEY:  Objection, your Honor.

 7              THE COURT:  Sustained as to what they said.

 8    BY MR. MARKUS:

 9    Q    Okay.  Based on them showing that picture, you told them

10    that this man has never been to your office, correct?

11    A    That's correct.

12    Q    Okay.  And if he had, you would have probably reflected

13    in your time records meeting with Greg Orr and Lewis Kasman

14    if he had been there?

15    A    Most likely.

16    Q    Just as you had done in your other time sheets?

17    A    Exactly.

18    Q    Right.  So if Lewis Kasman gets on the stand and says

19    that he met with you, he would be lying?

20              MR. SHOCKLEY:  Objection, your Honor.

21              THE COURT:  Basis?

22              MR. SHOCKLEY:  Speculation, assumes a fact not in

23    evidence.

24              THE COURT:  Overruled.

25
```

1    BY MR. MARKUS:

2    Q    So if Lewis Kasman gets on that stand later today and

3    says that he met with you in your office, that would be a

4    lie?

5    A    A total lie.

6              MR. MARKUS:  Thank you.

7              Nothing further, your Honor.

8              THE COURT:  Further cross-examination?

9              MR. KAISER:  No questions.

10             MR. ENTIN:  Judge, I have a couple.

11                        CROSS-EXAMINATION

12             MR. BIRCH:  Excuse me, your Honor.  May Mr. Artuso

13   use the restroom?

14             THE COURT:  Yes.  We can continue, correct?

15             MR. BIRCH:  Yes, your Honor.

16   BY MR. ENTIN:

17   Q    Mr. Genauer, my name is Alvin Entin and I represent

18   Philip Forgione.  You don't know Mr. Forgione?

19   A    No, I don't.

20   Q    Never met with Mr. Forgione?

21   A    No, I didn't.

22   Q    Let me show you the document the Government has shown

23   you a couple of times.  It's TX1 or 2 and it's also been

24   identified as 3.105, I think it is.  And going from the left

25   to the right on the bottom of that, there are some companies

1    there, Berryhill --

2    A    That's Bayhill.

3    Q    Bayhill Development LLC, CAE Enterprises LLC.  Those are

4    companies that I take it you didn't form; is that correct?

5    A    That's correct.

6    Q    You weren't asked to form those LLCs?

7    A    No, I wasn't.

8    Q    You never spoke to the person that was the manager or

9    member of either Bayhill or CAE?

10   A    I never did.

11   Q    You never prepared an operating agreement for either one

12   of them; is that correct?

13   A    No, I didn't.

14   Q    And your only contact with either of these gentlemen, I

15   believe, or the members or the managers of either of those

16   two companies were when you sent out operating agreements to

17   be signed, you received them back; one signed by a Mr. Rossi

18   for Bayhill, correct?

19   A    Correct.

20   Q    And the other signed by a Mr. Forgione for CAE?

21   A    Yes.

22   Q    Is that correct?

23   A    That's correct.  And just to correct you, I did not send

24   them to those gentlemen.  I sent them to Greg Orr.

25   Q    And then Greg circulated them?

1    A    Correct.

2    Q    Okay.  And then all you did was you got them back?

3    A    I received them back.

4    Q    You also indicated that you, at the end of the case, put

5    together binders of all this information.

6    A    That's correct.

7    Q    How many binders did you put together?

8    A    I believe I was instructed to put together one binder

9    for each party.  Each party at interest.  So I think I put

10   together seven binders.

11   Q    Did you deliver those binders?

12   A    I delivered six of them to Greg Orr, and I kept one in

13   my files.

14   Q    Okay.  And you don't know if they were distributed after

15   that?

16   A    I have no idea.

17   Q    In the operating agreements that were signed for the --

18   for either of the two larger entities, the Efficient entity

19   or Longhill entity which everybody signed off on --

20   A    I think you mean the two Efficient entities and the

21   Westmore entity.

22   Q    Right.  On any of those entities, were they signed

23   Mr. Horton as far as you recall?

24   A    No, he would not have been a signatory on those

25   entities -- on the operating agreements for those entities

1    because he had no direct interest in those entities.  His was

2    an indirect interest.

3    Q    Now, yesterday, you were shown an articles of

4    incorporation from Pennsylvania, do you recall, for CAE

5    Enterprises Inc.?

6    A    Yes.

7    Q    And did you notice when you were handed that -- first of

8    all, did you have anything to do with preparing those

9    articles of incorporation?

10   A    No.

11   Q    Did you notice that those articles of incorporation was

12   formed in 1999?

13   A    I did.

14   Q    Was that some three years before anybody came to you

15   with regard to this case?

16   A    It certainly was.

17   Q    And was that approximately two years before any property

18   involved in this case was purchased?

19   A    At least.

20   Q    And then my final question for you, sir, is --

21           MR. ENTIN:  Actually, that's all I need.  Thank you

22   very much.

23           THE COURT:  Is there further cross examination?

24           MR. PASANO:  May I, your Honor?

25           THE COURT:  Please.

1              MR. PASANO:  Thank you.

2          Good morning, ladies and gentlemen.

3                      CROSS-EXAMINATION

4    BY MR. PASANO:

5    Q    Good morning, Mr. Genauer.

6    A    Good morning.

7    Q    My name is Mike Pasano and I represent John Artuso.

8          Did I hear you just a moment ago tell Mr. Shockley

9    that all the legal services provided to either John Artuso or

10   Greg Orr in connection with the matters about which you've

11   testified were absolutely legal?

12   A    Yes.

13   Q    All carried out in a legal manner; is that right?

14   A    That's correct.

15   Q    The clients were entitled to change companies or make

16   amendments as they saw fit, right?

17   A    Correct.

18   Q    Nothing illegal in taking ownership interests as

19   occurred here, correct?

20   A    That's correct.

21   Q    And in particular, do I understand that the original,

22   call it Tier One or lower level ownership of the properties

23   by entities, the LLCs, Efficient Realty, Pennsylvania;

24   Efficient Realty, Florida; or Westmore, perfectly ordinary

25   and legitimate, right?

1  A    Correct.

2  Q    And as often happens when entities own properties,

3  issues then occur as to what happens when you get paid, who

4  has to pay taxes, what should I do to protect my assets, how

5  can I help my family, other kinds of issues that often

6  trigger the creation of other layers of ownership, correct?

7  A    Correct.

8  Q    And those I think you called the upper levels or upper

9  tiers of ownership, correct?

10  A    Correct.

11  Q    And that's what you saw and what you worked on here,

12  correct?

13  A    That's correct.

14  Q    And again, having a lower level tier, an upper level

15  tier, modifying or amending those tiers, absolutely ordinary,

16  perfectly legal, nothing untoward, to use that word, correct?

17  A    That's correct.

18  Q    Now, at the start of this morning, Mr. Shockley asked

19  you about the attorney-client privilege.  Do you remember him

20  asking that?

21  A    Yes.

22  Q    And he asked if the privilege protects clients and he

23  referred specifically to Mr. Orr and Mr. Artuso.  And I think

24  you said yes, right?

25  A    Yes.

1    Q    Mr. Genauer, actually, the attorney-client privilege

2    protects each and every one of us, right?

3    A    Each and every?

4    Q    Citizen.

5    A    Citizen.  Correct.

6    Q    I mean it's an important constitutional principal,

7    right?

8    A    Correct.

9    Q    I mean, the attorney-client privilege implicates how

10   lawyers and clients relate to each other and how duties of

11   loyalty and confidentiality apply, right?

12   A    Correct.

13   Q    It's the basic starting point for any relationship

14   between a lawyer like yourself and any client, whether it's

15   John Artuso or Greg Orr or anybody, right?

16   A    Correct.

17   Q    And that's -- that attorney-client privilege, it's not

18   the same thing as what we call the Fifth Amendment privilege,

19   is it?

20   A    It's entirely different.

21   Q    Here, we're simply talking about the ordinary notion of

22   how when a client comes in to talk to a lawyer, the parties

23   can relate, knowing that what they're talking about will be

24   treated as confidential, right?

25   A    That's absolutely correct.

1  Q    Now, in March and April of 2002, you worked on creating

2  various operating agreements and other documents, including

3  work on this company, Longhill Holdings, correct?

4  A    Correct.

5  Q    And did I hear you say that as you did your work

6  initially, you understood that Longhill was going to be owned

7  by John Artuso and his father, correct?

8  A    Well, his father through another entity called Efficient

9  Realty and Development, Inc.

10 Q    And it's in evidence as Government Exhibit 3.36.  With

11 that understanding as you've just described it and as

12 Mr. Shockley asked you about, you then created this -- you

13 created the operating agreement, Longhill Holdings, that's on

14 the screen, the first page.  That's Government Exhibit 3.36,

15 correct?

16 A    That's correct.

17 Q    And this document on its first page, Mr. Shockley sort

18 of walked you through these, it had an effective date as of

19 15 March, 2002, right?

20 A    Correct.

21 Q    And that language "dated effective as of," that's

22 standard language, correct?

23 A    Yes, it is.

24 Q    And the idea of making a date effective that's a date

25 earlier than when the documents actually finally get all

```
 1   prepared and signed, that happens every day in the business

 2   world, correct?

 3   A     In my practice, certainly.

 4   Q     And in your practice and in this instance drafting what

 5   you did here for Longhill, perfectly ordinary, normal, legal,

 6   correct?

 7   A     Correct.

 8   Q     And then this document, it had signatures on it.

 9   Page 27 of the document.  And after you had prepared this

10   document, you sent it out to get executed, right?

11   A     That's correct.

12   Q     You sent it to Mr. Orr?

13   A     Correct.

14   Q     Came back to you and it had signatures, right?

15   A     Correct.

16   Q     And you weren't present when it was signed, right?

17   A     No.

18   Q     You weren't advising either Mr. Artuso or Vincent Artuso

19   when it was signed, right?

20   A     No, I wasn't.

21   Q     But it had been drafted consistent with the discussions

22   you had had, including at that meeting on March 14, 2002,

23   when John Artuso was in your office, right?

24   A     That's correct.

25   Q     And as plain as day on the last page of the document
```

```
 1   that you prepared was the sharing ratios of the initial way

 2   that this was set up, correct?

 3   A    Correct.

 4   Q    And that had this company, you mentioned Efficient

 5   Realty and Development, Inc. and it had John Artuso, correct.

 6   A    That's correct.

 7   Q    And it also had addresses, right?

 8   A    Yes.

 9   Q    So if anybody wanted to know Vincent Artuso, they would

10   know an address.  If anybody wanted to know John Artuso, they

11   would have an address, right?

12   A    Provided that they looked at this document.

13   Q    Correct.  On the document --

14   A    On the document the address was there.

15   Q    -- it tells you where to go if you want to contact these

16   people, right?

17   A    Right.

18   Q    Putting addresses down and names down and dividing up

19   this ownership, that's all typical of the way this works,

20   right?

21   A    Yes.

22   Q    And even in the middle of the document when you were

23   being asked about it by Mr. Shockley, I think on Page 5, it

24   indicated the initial address of the company, and it gave

25   your address on Alhambra Circle, right?
```

1    A    Right.

2    Q    That's the way it happens normally all the time when you

3    create these kinds of documents, right?

4    A    Correct.

5    Q    Nothing untoward or improper about that?

6    A    No.

7    Q    And the whole idea of John Artuso sharing ownership

8    through a company with his father, as far as you knew, as far

9    as Longhill goes, perfectly ordinary, not out of the

10    ordinary, nothing wrong or improper as far as you knew?

11    A    I share ownership with my -- I shared ownership with my

12    father, may he rest in peace.  In many business real estate

13    transactions.  Of course, it's perfectly common.

14    Q    In fact, it's a good thing, right?

15    A    It's a family privilege.

16    Q    Now, another part of the work you did involved the work

17    on Westmore, and there's an operating agreement.  It's

18    Government's Exhibit 3.3.  This document.  And that was

19    something else you'd worked on, correct?

20    A    Yes.

21    Q    And, again, like in the other documents, these documents

22    had an effective as of date.  With regard to the work on

23    Westmore, it was effective as of the date of the closing,

24    which was February 5, 2002, right?

25    A    Correct.

1    Q    And again, even though these were documents you were

2    working on a month later, nothing improper, wrong, or should

3    be thought of as suggesting anything improper about the

4    manner in which the effective as of date was created, right?

5    A    No.  Nothing improper.

6    Q    Perfectly ordinary?

7    A    Nothing improper.

8    Q    And likewise with regard to this work at the end of all

9    the -- and by the way, the language in this agreement or the

10   other agreements, I mean there's a lot of pages here.  For

11   example, with regard to this particular document, it had 20

12   plus pages, do you remember?

13   A    Yes.  I'm very familiar with this type of document.

14   Q    And the reason is because the form of it and the

15   different paragraphs, the sections like powers and duties are

16   the things that somebody could or couldn't do in this

17   company, that language was standard language, right?

18   A    Yes.

19   Q    Language that you've used in your practice, which is a

20   specialty practice, every day for a lot of years?

21   A    Correct.

22   Q    And you didn't go out of the way to do anything

23   especially quote clever or different in the drafting of these

24   documents than you do every day when you're asked to work on

25   entities like these for other clients?

```
 1    A    That's correct.

 2    Q    And so when you do these documents, you'll always have

 3    like at Page 26 here, a signature page, right?

 4    A    Yes.

 5    Q    And again, this is an example and this is with regard to

 6    what is the upper tier company, Westmore, you'll have a place

 7    for all the different members to sign?

 8    A    Well, actually, it's the lower tier.

 9    Q    Sorry.  The lower tier, Westmore, all the members

10    signed, right?

11    A    Correct.

12    Q    And again, you set this out to get it executed and you

13    gave it to Mr. Orr -- sent it to Mr. Orr?

14    A    Correct.

15    Q    And it came back with signatures on it, right?

16    A    Yes.

17    Q    And again, these men weren't all together when they

18    signed it, right?

19    A    I don't know.

20    Q    You don't know whether they were signed in different

21    places, the same place, different days, the same day; you

22    don't know?

23    A    I have no idea.

24    Q    But you do know you got it back?

25    A    I knew I got it back.
```

1   Q    And one of the signatures on it when you got it back,

2   plain as day there, John Artuso, right?

3   A    Correct.

4   Q    Now, do you remember talking with Mr. Shockley about how

5   because of the changes in ownership that was occurring with

6   regard to entities that already owned property, that to move

7   to this other tier, you needed the consent and acknowledgment

8   of the original owner of the property?

9   A    Of course.

10  Q    And with Efficient Realty, Pennsylvania or Florida, you

11  needed that consent to make the changes in the operating

12  agreements for those entities, right?

13  A    Right, from Robert Gannon.

14  Q    And likewise for Westmore, you needed it from John

15  Artuso?

16  A    Correct.

17  Q    And you got it, and that was Page 27 of the document.

18  And again, plain as day, John Artuso's name, acknowledging

19  what was changing and going to be going forward the

20  organization of Westmore, right?

21  A    Well, actually, what he is acknowledging there is that

22  the original intention of these parties at the time of the

23  closing was for the ownership to be as set forth on those

24  pieces of paper, as opposed to the actual ownership that

25  showed at that time, which was 100 percent in his name.

1    Q    Right.

2    A    He is really saying, I wasn't the 100 percent owner at

3    the day of closing.  It may say that in a piece of paper, but

4    I'm acknowledging that as of that time these are the

5    ownership percentages.

6    Q    And when you're working on companies in your practice in

7    which you're changing an LLC and its composition from an

8    initial owner, as reflected originally on documents, to newer

9    or other members, sometimes it happens that you do exactly

10   what you did here, correct?

11   A    Correct.

12   Q    Nothing wrong about it?

13   A    Nothing wrong.

14   Q    Doesn't suggest anything was bad to begin with or going

15   forward.  It's just the way business is done, right?

16   A    Correct.

17   Q    And Mr. Artuso -- you get it back with his signature on

18   it, right?

19   A    Correct.

20   Q    And you also in this document, and it's the last page of

21   the document, Page 28, had again the sharing ratios, correct?

22   A    That's correct.

23   Q    And they would indicate again on this document the

24   different entities and what their percentages were, right?

25   A    Correct.

1  Q    And that was Government Exhibit 3.3.  And that same kind

2  of process was the process that you went through with regard

3  to those other two companies, the Efficient Realty of Florida

4  and the Efficient Realty of Pennsylvania, right?

5  A    That's correct.

6  Q    Now, you also talked with Mr. Shockley a bit about how

7  the bills got paid or how the bills got sent out and how you

8  wrote down your time in connection with your work on these

9  different tasks that you performed, correct?

10  A    Correct.

11  Q    And one of those tasks was with regard to the changes

12  from time to time that you had to make as time went on with

13  regard to the documents, correct?

14  A    Correct.

15  Q    And one of those -- let me sort of put it on with regard

16  to Longhill.  Mr. Shockley asked you briefly about it again

17  this morning, is this Government Exhibit 3.106.  It's this

18  note you got in which you were asked two things that we can

19  read.  Correct?

20  A    Uh-huh.

21  Q    One was, you need to make John Artuso 100 percent owner,

22  and you need to close Efficient Realty and Development, Inc.,

23  right?

24  A    Right.

25  Q    And while it was hard to read it, we have a stamp date

1    that looked like November of 2002, but then we saw your time

2    records and you can see on your time records the work was

3    done in November of 2002, do you remember that?

4    A    Uhm, I believe the work to implement the instruction was

5    actually done in January of 2003.

6    Q    Well, do you remember looking and it was in the billing

7    records for November of 2002, a billing entry, November 18

8    about restructuring Longhill?

9    A    Could you show that to me?

10   Q    I'll put it out as we're going through the bills in a

11   little while.  Whenever it happened --

12   A    Because I believe that I received instructions to do it

13   in November and then the actual implementation took place in

14   January.  We got busy with a year-end deal.

15   Q    And we'll see it in the bills when we pull them out in a

16   moment.  Whatever the dates of the work occurred in late 2002

17   or beginning of 2003, you then did that work, correct?

18   A    Correct.

19   Q    And you did draft a new Longhill operating agreement,

20   and Mr. Shockley showed it to you, correct?

21   A    Right.

22   Q    And again, you sent it out like all the others to get it

23   executed, right?

24   A    Correct.

25   Q    And in restructuring Longhill in the manner you were

1    asked to do, just like all the other work you did, nothing

2    improper or unusual, right?

3    A    No.

4    Q    And meaning correct, right?

5    A    Correct.

6    Q    And like so much of the other work, in doing this work,

7    you did not speak directly with John Artuso; is that right?

8    A    That's correct.

9    Q    Didn't meet with him about this, correct?

10   A    No, I didn't.

11   Q    And you weren't the one advising either John Artuso or

12   his father about estate planning type issues in connection

13   with this change, correct?

14   A    No, I wasn't.

15   Q    And you can't say one way or the other what advice they

16   got or why it was this change occurred, right?

17   A    That's correct.

18   Q    But fair to say in your experience often changes in the

19   ownership of LLCs or the manner in which percentages of

20   ownership are held are affected by issues such as taxes, or

21   family and estate planning?

22   A    Yes, they are.

23   Q    Now, you were asked a bit about that meeting that

24   occurred on March 14, 2002, in your office.  And I think you

25   told us that in your office on that day, as best you can

1  recall, were both John Artuso and Greg Orr, right?

2  A    Yes, they were.

3  Q    And one of the reasons that helps you recall it is you

4  can look at your billing records and you see in them a

5  reference that you met with both those men on that day,

6  correct?

7  A    That's correct.

8  Q    And during that conversation I think you've told us that

9  Larry Horton's name came up, right?

10  A    Yes.

11  Q    And this was while Greg Orr was talking, right?

12  A    Correct.

13  Q    And you were told that Mr. Horton was a neighbor of Greg

14  Orr's, correct?

15  A    That's correct.

16  Q    And he worked at some capacity at ADT, right?

17  A    Correct.

18  Q    And that as regards to the purchases of this real

19  estate, he was not a person who was a decision maker or a

20  controlling person?

21  A    That's correct.

22  Q    And you're sitting there behind your desk in your office

23  hearing this, right?

24  A    Right.

25  Q    You're looking at the man who is talking to you, right?

1    A    Correct.

2    Q    And sitting next to him on either side, there's John

3    Artuso and he's hearing it and listening to it the same,

4    right?

5    A    Of course.

6    Q    And then it's literally the next day after that meeting,

7    on March 15, 2002, that you begin filing these articles of

8    organization with regard to these other entities that you're

9    working on?

10    A    Correct.

11    Q    Now, you've been asked a bit of questions about these

12    notes that you prepared that were in your file that were

13    turned over to the Government, these handwritten notes that

14    are Government Exhibit 3.105.  Let me put the first page up

15    there for just a moment.  It's -- the first page is this

16    diagram.  Correct?

17    A    Correct.

18    Q    And at the top of it you had written down, and that's

19    your handwriting, correct?

20    A    That's correct.

21    Q    Basic structure for Efficient and below it, basic

22    structure for Westmore?

23    A    Correct.

24    Q    And the document, it doesn't have a date on it, right?

25    A    Correct.

1    Q    And fair to say as we looked through the different pages

2    of these handwritten notes that you turned over to the

3    Government, none of them have dates on them as to when they

4    were written, correct?

5    A    That's correct.

6    Q    And in connection with this first page, I think we heard

7    you say that you can't recall exactly when you wrote it, but

8    as you think about it, you know it was sometime after that

9    meeting on March 14?

10   A    Right.

11   Q    And when the Government subpoena arrived and you got a

12   lawyer and you worked on how to comply with your duties as a

13   lawyer, and ultimately produce documents, your lawyer took

14   the documents that you gave him in the order in which you

15   gave it to him, and put some numbers on them, right?

16   A    I believe that's correct.

17   Q    Well, take a look.

18   A    I see G1045.

19   Q    And my question is that back in the day when you were

20   first writing out these different notes and sticking them in

21   your file, they didn't have G1054 on them, right?

22   A    Certainly not.

23   Q    But the order in which these documents were produced was

24   the order in which they sat in your file, right?

25   A    I would assume so.  I don't know because I didn't do the

1    actual production.  I turned over the documents to my

2    attorney and he is the one who put these numbers and turned

3    them over to the Government.

4    Q    And I guess that's my question.  Do you recall now as

5    you sit here and are testifying, exactly in what order any of

6    these pages existed in the files that you maintained for this

7    client?

8    A    No, I don't recall exactly.

9    Q    And you can't say for sure as you sit here today, since

10   you passed a box onto your lawyer who then made copies and

11   stamped them and put numbers on them and passed them onto the

12   Government, whether or not this order that we have here today

13   is exactly the order in which it appeared in your file,

14   right?

15   A    That's correct.

16   Q    Do you even remember whether or not the notes that are

17   this Government Exhibit were consecutive pages in your file

18   or perhaps were they scattered around with other stuff and

19   pulled together for purposes of producing it to the

20   Government?

21   A    I would have no way of recalling that.

22   Q    But we know that the first of the documents in the

23   Government Exhibit got this stamp G1045 and then if we were

24   to page through, the next page would be G1046, and so on.  I

25   put that on a little fast.  But you can see the next page in

```
 1   the government exhibits, stamped the next number.  You see

 2   that?

 3   A    Right.

 4   Q    Now, one of the ways to help you remember when things

 5   happened for a practice like yours is your billing records,

 6   right?

 7   A    Correct.

 8   Q    And those are ultimately typed up from notes that you

 9   made contemporaneously with the work you did and it's

10   important for you that that be accurate because that's how

11   you're getting paid, right?

12   A    Correct.

13   Q    I mean with all respect, the truth is you're not getting

14   paid to write a bunch of notes to put in your file.  You'll

15   get paid when you summarize the work you did, send it to the

16   client and the client sends you back some money, right?

17   A    Correct.

18   Q    And years later when you have to look back on a

19   particular piece of work you did, one of the places you look

20   to try to remember when the things happened that you remember

21   happening is, you can look in your billing records and if you

22   see reference to it and a date and an amount of time you

23   spent, that helps you figure out exactly what you did when;

24   is that fair to say?

25   A    As a general rule, yes.
```

1    Q    And these notes for sure are notes that you write in and

2    around the year 2002, right?

3    A    The one I'm looking at?

4    Q    And the Government Exhibit that was shown you, these

5    handwritten notes.

6    A    Absolutely.

7    Q    And yet, six plus years later, am I right that it's hard

8    for you today to be absolutely certain as to exactly on what

9    day and at what time back in 2002 you would have written any

10   one of these pages?

11   A    Absolutely certain?  No, I can't be absolutely certain.

12   I can have a pretty good idea.  But not be absolutely

13   certain.

14   Q    You have it in your mind as to when these different

15   pages got written?

16   A    Uh-huh.

17   Q    But you can't be absolutely certain?

18   A    Correct.

19   Q    And with regard to these notes, am I right, sir, that

20   when we look again at the billing records in a moment and as

21   you've looked at them preparing for your testimony and as you

22   were shown them yesterday, that nowhere in your billing

23   records can we find a specific reference that will tell us

24   for sure when any one of these pages of notes was written?

25   A    I don't think you can tell that from the billing

1    records.

2    Q    So other than your best recollection, which is subject

3    to six plus years having passed --

4    A    Correct.

5    Q    -- and the sequence of other documents --

6    A    Correct.

7    Q    -- we're left to just try to figure it out.  Fair to

8    say?

9    A    Yes, that's fair to say.

10    Q    And -- I mean, for example, in these pages of this

11    government exhibit that are your handwritten notes, as we

12    move a little bit through them, we get these three pages that

13    are numbered together.  We have G1049.  And that's the one

14    for Westmore property.

15        Let me even back it up.  This is the one where you

16    have written ADT property in Palm Harbor.  John Artuso.  And

17    the information you write down here.  You see that, sir?

18    A    Yes, I do.

19    Q    And the next page stamped in the government exhibit,

20    which is G3050, is a reference to the Lancaster property?

21    A    Right.  That's 1050, not 3050.

22    Q    G1050.  I'm sorry.  And then the very next page in that

23    Government Exhibit 1048.  So we have 1048, 1049, 1050, and

24    this one is the Pompano Beach property, same thing?

25    A    Correct.

```
 1   Q     And those three notes you can be pretty sure, thinking

 2   about it, that you probably wrote them at the same time

 3   because they all related to the same basic issue, which was

 4   what was the ownership of these properties when they were

 5   acquired?

 6   A     Right.

 7   Q     But then you have some other notes.  And with regard to

 8   when they might have been written -- let me show you another

 9   exhibit for a moment.  It was briefly shown to you this

10   morning again by Mr. Markus.  It's Government Exhibit 3.74.

11   This is from Greg Orr to you and it's in reference to KCGF.

12   Do you remember looking at this a few times?

13   A     Yes.

14   Q     Okay.  And it's sent to you, and the fax, Mr. Shockley

15   showed it to you, March 15?

16   A     Correct.

17   Q     And that's the day after you had met with Mr. Artuso and

18   Mr. Orr?

19   A     Correct.

20   Q     And it asks you to do certain things, correct?

21   A     It gives me information I need to do -- to do something

22   that we had talked about the previous day.

23   Q     And it even refers to yesterday's conversation.  You see

24   that?

25   A     Right.
```

```
 1   Q    And one of the things it tells you is name of LLC, if

 2   available, KCGF Associates, right?

 3   A    Right.

 4   Q    So this is a document, this is an example of where if

 5   you couldn't remember exactly when you got the name, KCGF, to

 6   know to do work you were doing, you could look at this

 7   document and know that it looks likes you got it on March 15?

 8   A    Absolutely.

 9   Q    Not at the meeting that John Artuso was at but the next

10   day?

11   A    That's correct.

12   Q    Now, that meeting that John Artuso was at was a

13   discussion of the creation of entities to make the ownership

14   fit with what the parties wanted?

15   A    That's correct.

16   Q    And you have that chart that's the first page of the

17   other government exhibit in which you've actually written on

18   it, KCGF?

19   A    That chart was not prepared that same day.

20   Q    And one of the reasons we know that is we can look at

21   this other document that we just looked at and we realize

22   that, oh, wait a second, I got the information on KCGF on the

23   15th.  So I must have written that chart sometime after that?

24   A    Well, I also recall that I prepared that chart really

25   for my associate, who was being instructed by me to prepare
```

1    all these different operating agreements.  And in explaining

2    how she would put together operating agreements for six

3    entities, it would be obviously a lot easier for her as she

4    could see a picture of what had all been discussed.

5    Q    Now, by the way, when you meet with clients for the

6    first time and they give you lots of information, you're

7    trying to digest what they're telling you, correct?

8    A    Correct.

9    Q    You are trying to listen to them, correct?

10   A    Correct.

11   Q    It was not your practice, I take it, to literally

12   handwrite out notes of almost an interview so you would have

13   like their words in sort of a memo form, right?

14   A    That's not how I practice.

15   Q    And often after you've talked with clients and they

16   leave, you sit, collect your thoughts.  I think you bill it

17   as organization of files.  And that's often when you write

18   down notes?

19   A    Correct.

20   Q    The reason asked you that is, and again, it has been six

21   and a half years, but when for example you write down this

22   page that was 1049 for Palm Harbor, for example, and these

23   other pages I just showed you in these notes, for sure, you

24   talked about it during the meeting on the 14th.  But when you

25   actually got around to writing it down, is it possible, sir,

1    that that occurred after John Artuso and Greg Orr left the

2    office?

3    A    It's not only possible, it's probable.

4    Q    And by the way, sometimes these sort of notes that you

5    have in the file, am I right that over time as you learn

6    other or different information, you might actually write on

7    notes newer information?

8    A    It's possible.

9    Q    And if the note's not dated, years later it would be

10   tough to know what you heard on one day as opposed to what

11   you heard on another day, right?

12   A    That's possible.

13   Q    The reason I ask you is, let me show you what's another

14   page of those notes.  It's G106 and the pages of the

15   government exhibit that's your handwritten notes.  You

16   remember this page.  You see the page number, it's G1046.

17           And you've written some stuff down about Longhill

18   but you crossed out Westmore.  And as you're thinking about

19   it, probably that's a note you would have made and written

20   down after they left on the 14th, right?

21   A    I don't really know.  I don't remember.

22   Q    Okay.  Sometime thereafter, right?

23   A    It could have been contemporaneously.  It could have

24   been after.

25   Q    The reason I asked about whether over time as you learn

1    more information you might actually write more stuff on the

2    note, you see this note has that name, Peter Economos?

3    A    Yes.

4    Q    Do you know from your own firsthand knowledge whether as

5    to March 14th, 2002, Mr. Orr, Mr. Artuso, or anybody in

6    connection with the acquisition of any ADT properties had

7    even spoken to a lawyer in Chicago named Peter Economos?

8    A    No, I don't.

9    Q    And if we wanted to know when that got written, one of

10   the ways we could figure it out would be to figure out when

11   they, people, retained Mr. Economos to work on anything

12   related to these properties, right?

13   A    Or -- or other properties.

14   Q    Or other properties.  And if he wasn't working for these

15   people on March 14th, 2002, that would be a pretty clear

16   indication that that note wouldn't have been written on that

17   day, right?

18   A    Certainly.

19   Q    Okay.  Now, back to this exhibit I was showing you a

20   moment ago, which is Government 3.714.  In the instructions

21   that you got from Mr. Orr on the 15th he did more than just

22   give you the name of KCGF, right?

23   A    Correct.

24   Q    I want you to look at his language.  He talked about

25   yesterday's conversation.  And then he asks you, please open

1    up another LLC for me.  You see how he expressed that?  You

2    see that?

3    A    Yes, I do.

4    Q    Now, the reason I ask you is, he didn't say that company

5    that we talked about yesterday needs to be named KCGF.  He

6    said, please open up another company and its name will be

7    KCGF.  You see the distinction?

8    A    I do, but you're not reading the rest of the sentence.

9    Q    Well, let's look at it.  That will have an agreement

10   with J & G Associates.

11   A    And this will -- this is the LLC that will have an

12   agreement with J & G Associates.

13   Q    Yes.  Please -- let me get rid of my -- please open up

14   another LLC for me and this is the LLC that will have an

15   agreement with J & G Associates.  Its name is going to be

16   KCGF?

17   A    Correct.

18   Q    And what I'm asking is, between the day of March 14 when

19   you were meeting with Mr. Artuso and Mr. Orr, later that day

20   when you wrote notes and the next morning, do you recall

21   whether or not you had received any other information or

22   instructions regarding the structure?

23   A    I don't think I understand your question.

24   Q    My question is, for example, this idea of KCGF, we've

25   agreed as a name doesn't come to you till the next day?

1  A    That's correct.

2  Q    And the reason I'm asking, and actually, let me get

3  right to it, is this page that was -- the other page in these

4  handwritten notes, which is Page G1047.  Do you see that,

5  sir?

6  A    Yes.

7  Q    And first off, as you look at this document, does that

8  expression written up at the top, "Larry's company," does it

9  look to you like it's written either a little lighter or

10 slightly different on the copy at least than the rest of the

11 page?  Or can you tell?

12 A    I certainly can't tell.

13 Q    So as to whether you wrote that expression later or at

14 the same time you wrote the rest of the notes, can't quite be

15 sure, right?

16 A    I -- looks all the same to me.

17 Q    Okay.  And the reason that I'm asking these questions,

18 sir, is can you be certain that the discussion that you had

19 about Mr. Horton and KCGF as Larry's company is a discussion

20 that occurred in Mr. Artuso's presence or is it information

21 that you could have gotten later and written down as you

22 wrote these notes?

23 A    I can't recall.  I have no way of remembering whether or

24 not that happened.  It --

25 Q    Exactly.

```
 1    A    It appears that it was written contemporaneously, but I

 2    certainly can't be sure.

 3    Q    And it's tough, six and a half years later, to try to

 4    figure out minute by minute when anything happened, right,

 5    sir?

 6    A    Correct.

 7    Q    And the reason I ask is, that when you got around to

 8    writing this note on this page, and it says "ownership

 9    interest of Larry's company to be confidential from other

10    partners," well, one of the other partners in this deal was

11    John Artuso, right?

12    A    Correct.

13    Q    And one of the other partners as originally discussed

14    with you was this company, Efficient Inc. that was owned by

15    Vincent Artuso, right?

16    A    Well, that would certainly be one of the partners.

17    Q    John's father?

18    A    John's father.

19    Q    And so the instruction to keep the interest, the

20    percentages, confidential, and those are those percentages

21    that you're writing on the note above, would only make sense

22    if one of the people you're keeping it confidential from

23    pursuant to Greg Orr is John Artuso?

24    A    Maybe yes, maybe no.  "The other partners" could have

25    referred to, you know, the other partners in the transaction
```

1    who were the three people or the three partners who were on

2    the left-hand side.  I don't recall what this note --

3    Q    Right.  Could have been one thing, could have been

4    another?

5    A    Absolutely.

6    Q    Could have been written on the 14th, could have been

7    written later.  Six and a half years in a federal criminal

8    trial when people's liberties are at stake, you're not in a

9    position to say exactly when any of that happened, right?

10   A    That's true.

11   Q    Now, for sure -- I just have a couple more questions.

12   A    No problem.

13   Q    For sure, you opened the file in your office with regard

14   to Mr. Orr and others as of March 6th, 2006, correct?

15   A    Correct.

16   Q    And one of the reasons we know that is, again, because

17   we have an exhibit that was in your documents.  It was

18   Government Exhibit 3.109.  It was this form that triggers how

19   a file gets opened in your office, right?

20   A    Correct.

21   Q    That's why it's called a request, but actually you're

22   not asking your secretary if you feel like it, please do it.

23   That's just a nice way of saying, open this file?

24   A    Correct.

25   Q    Okay.  And the file is opened again on March 6, 2002, in

```
 1   the name of Greg Orr, and it's general corporate work, right?

 2   A    Correct.

 3   Q    And despite the questions that Mr. Shockley was asking

 4   you over and over again about, and John Artuso, can we at

 5   least agree that when you got around to listing who the

 6   client was on this document, you didn't list John Artuso?

 7   A    That's correct.

 8   Q    And when you got around to sending out or creating a

 9   contact list, it's a Government Exhibit in evidence, the

10   Bates number on it was G1395, that contacts information list?

11   A    Yes.

12   Q    You didn't list John Artuso?

13   A    No.

14   Q    And back on that Government Exhibit 3.109, when you had

15   to put the information down relating to the client and had to

16   write down a cell or an e-mail, again, you didn't list

17   anything about John Artuso, right?

18   A    That's correct.

19   Q    And when you prepared bills that had to be paid -- well,

20   actually, when you sent out documents, for example,

21   Government's Exhibit 3104 to get them executed again, this

22   for example April 11, 2002, when you sent out the operating

23   agreements for signature, you weren't sending them to John

24   Artuso?

25   A    No, I wasn't.
```

1    Q    And when you wrote your bills which is Government

2    Exhibit, the group of them 3.106, that I promised we would

3    get to, those bills month in month out, were sent out, but

4    not sent out to John Artuso?

5    A    They were sent to Greg Orr.

6    Q    And if we looked in these bills to try to see any

7    reference to John Artuso after that meeting on March 14th, we

8    could go month by month, year by year, page by page and we

9    won't see any reference to John Artuso, correct?

10   A    That's correct.

11   Q    And that's because the one time on matters relating to

12   this subpoena here, that you met with John Artuso and the

13   only time you talked to John Artuso as best you can recall

14   was that one instance on March 14, 2002, correct?

15   A    That's correct.

16   Q    And if -- if we wanted to examine the sort of

17   description of what you do and this bill that I've got on the

18   screen is one of the pages from the exhibit, it's your bill

19   May 6, 2002 that related to work done in April of 2002, you

20   see that, sir?

21   A    Yes.

22   Q    And we see research and we see conferences and we see

23   reviews, and it's fairly detailed as to the work you're doing

24   and the initials of the lawyer doing it, right?

25   A    Correct.

1  Q    And even that initial bill that was sent out, which was

2  on April 12th of 2002 for the work in March, when we get to

3  the second page, that's where we see the reference to the

4  March 14 meeting and the rest of the work that you did

5  throughout March, correct, sir?

6  A    Correct.

7  Q    And the reason that we don't see John Artuso mentioned

8  except that one time is that after March 14th of 2002, you're

9  not dealing with John Artuso directly, right?

10 A    That's my recollection.  I did not deal with him after

11 that.

12 Q    You don't speak to him, you don't contact him directly,

13 nothing, right?

14 A    My contact was with Greg Orr after that date.

15 Q    And on that March 14th, 2002, meeting for the most part

16 as you tried to remember six plus years later, what you

17 really remember is John Artuso sitting there, like you,

18 listening, fair to say?

19 A    That's fair to say.

20 Q    And certainly at no time in that meeting on March 14th,

21 2002, did John Artuso ever hear you say anything about any of

22 the work being done being improper?

23 A    That's correct.

24 Q    And at no time did he ever say to you at any time in

25 that meeting as you recall, that he thought any of the things

1    he had been doing or were being asked to do were improper?

2    A    He certainly didn't.

3    Q    And when he and Mr. Orr left that meeting as far as you

4    were concerned what had been done and what you were doing was

5    perfectly ordinary, legal, and proper; and you even indicated

6    the same to them, correct?

7    A    That's -- no, I don't believe we ever discussed whether

8    or not it was proper.

9    Q    You didn't -- okay.  Let me ask it a different way.  You

10   didn't tell them it was improper?

11   A    I did not tell them it was improper.

12   Q    You told them you were happy to do the work?

13   A    That's correct.

14   Q    And that the work that was going to be done would make

15   everything legal, correct, and be done right?

16   A    Right.  The documents that I would prepare would reflect

17   what they told me the true ownership position of those

18   companies was.

19   Q    Everything would be done correctly, right?  That's what

20   you promised them?

21   A    I would fix the incorrect ownership situation of the

22   three companies that had purchased the ADT properties.

23   Q    And that's the last thing, as best you know, that John

24   Artuso ever heard from you directly?

25   A    Correct.

```
 1              MR. PASANO:  That's all I have.  Thank you, sir.

 2              THE COURT:  Mr. Birch, do you have questions?

 3              MR. BIRCH:  No questions, your Honor.

 4              THE COURT:  Is there redirect?

 5              MR. SHOCKLEY:  Very briefly, your Honor.

 6              Your Honor, first of all, I would like to correct

 7    an error on my part.  Earlier, and you may have noticed the

 8    confusion on my face when I began the direct examination this

 9    morning.  I had referred to Government's Exhibit 3.35 and I

10    passed up to the witness mistakenly 3.35 with the other

11    operating agreement attached.

12              So he actually had two operating agreements up

13    there.  Government's Exhibit No. 3.35 runs from Bates Nos.

14    G-285 to G-289.  So I would like to pass this exhibit up to

15    the witness now so he can see what the correct one was.  I

16    mistakenly had the other one attached to the back.

17              THE COURT:  All right.

18              MR. SHOCKLEY:  And this is not stapled.  Could I

19    borrow the Court's stapler?  That way they won't get

20    separated again.

21                        REDIRECT EXAMINATION

22    BY MR. SHOCKLEY:

23    Q    Showing you Government's Exhibit 3.35 without the other

24    one attached, if you can flip to the next to the last page,

25    this was the actual executed copy of that second operating
```

 1    agreement that was sent out; is that correct?

 2    A     Correct.

 3    Q     And this is the one that reflects the 100 percent

 4    ownership interest in John Artuso?

 5    A     That's correct.

 6    Q     Okay.  Again, I apologize for my error.  Thank you.

 7              MR. SHOCKLEY:  And could I have Defense

 8    Exhibit letter, the other letter.  I don't know exactly what

 9    number.

10              MR. MARKUS:  430, I think it is.

11    BY MR. SHOCKLEY:

12    Q     You recall that Mr. Markus showed you a letter by Larry

13    Horton.  Had you ever seen that document before?

14    A     No.

15    Q     And so therefore, do you know whether or not that's a

16    complete document listing all pertinent facts?

17    A     I have no idea.

18    Q     So just as you were relying upon what Mr. Orr was

19    telling you in your meeting, you don't know if all the

20    pertinent facts were listed in that letter that you were just

21    shown today; is that correct?

22    A     I have no idea.

23    Q     And you were questioned by Mr. Pasano about the

24    attorney-client privilege, and he referred to that as being a

25    constitutional right.  But nevertheless, you came in here

```
 1   yesterday and today and actually testified about

 2   conversations you had had with your client and produced

 3   documents to this jury concerning matters that you had

 4   handled, legal matters that you had handled with them.  So,

 5   are there exemptions to the attorney-client privilege?

 6   A    Certainly.

 7   Q    And that's what allowed you to come in here yesterday

 8   and today and testify to these matters; is that correct?

 9   A    That's correct.

10   Q    And what doubt, if any, do you have that the first split

11   of J & G of 80 percent, 20 percent was provided to you first

12   as opposed to the 60/40 percent?

13   A    I have no doubt.

14   Q    Okay.  So then the first split was 80/20 and the later

15   split was actually what was placed in the operating

16   agreements?

17   A    That's correct.

18   Q    Okay.  And the later split was a 60/40?

19   A    Correct.

20   Q    Also with respect to the documents that you had

21   handwritten out, when you place things in your file, do you

22   place the more recent things in the front or back of the

23   file?

24   A    Typically, the more recent documents are placed in the

25   front and it goes chronologically backward.
```

```
1              MR. SHOCKLEY:  Your Honor, I have no other

2     questions.  Thank you.

3              THE COURT:  Thank you, sir.

4         (Pause in Proceedings.)

5              THE COURT:  Since this is a natural breaking point

6     and we're somewhat close to our break, let's go ahead and

7     stop and return at ten minutes until 11:00.

8         (Jury out at 10:36 a.m.)

9              THE COURT:  Okay.  We'll be in recess 15 minutes.

10             MR. MARKUS:  Your Honor, I just wanted to let you

11    know we released Mr. Genauer from the defense subpoena.

12             THE COURT:  Okay.  15 minutes.

13        (Recess at 10:36 a.m.)

14             THE COURT:  Okay.  Ready with your next witness?

15             MR. McCORMICK:  Yes, your Honor.

16             MR. BIRCH:  Excuse me, your Honor.  We're missing

17    Mr. Markus and Mr. Pasano.  And I think we also need to

18    address the testimony of the next witness.

19             THE COURT:  Well, have a seat.

20        (Pause in Proceedings.)

21             THE COURT:  Go ahead, Mr. Birch.

22             MR. BIRCH:  I may turn it over to Mr. Pasano.  I

23    was going to check.

24        (Pause in Proceedings.)

25             MR. PASANO:  Judge, I think that -- we were right
```

1    outside, I apologize.

2           We had previously objected and the Court had ruled

3    that Agent Hagarty as an expert witness could testify.  What

4    was a little unclear was whether he could go beyond general

5    structure and operation of an organized crime family and

6    start naming names or give specific facts, which we had

7    argued would be based on hearsay and improper.  We didn't

8    want to lose that thread of the objection.

9           We don't know if the Government is going to seek to

10   do that.  It may or may not be relevant, depending upon what

11   they present, but we wanted the Court to be aware that if we

12   stand up and object on the basis of relevance, that will the

13   basis for the objection.

14          THE COURT:  All right.

15          MR. McCORMICK:  Your Honor, I think that we stated

16   to the Court at the last hearing on this that we didn't

17   intend to go into that type of evidence unless the defense

18   chooses to cross-examine.

19          THE COURT:  All right.  Are we ready then for the

20   jury?

21          MR. McCORMICK:  Yes, sir.

22          THE COURT:  Get your witness ready and let's invite

23   them in.

24       (Jury in at 10:53 a.m.)

25          THE COURT:  Welcome back.  Please be seated.

1           Mr. McCormick.

2           MR. McCORMICK:  Yes, your Honor.  We call Special

3    Agent Gregory Hagarty to the stand.

4           GREGORY HAGARTY, GOVERNMENT'S WITNESS, SWORN

5           MR. McCORMICK:  Your Honor, if I may, Special Agent

6    Hagarty is being called as an expert witness in this case.

7    We are also calling him at the conclusion of his expert

8    witness testimony as a -- he is going to be asked to

9    authenticate certain videotapes from the Ravenite Social

10   Club.  But that's as a fact witness.

11          THE COURT:  Please proceed.

12                     DIRECT EXAMINATION

13   BY MR. McCORMICK:

14   Q    State your full name, sir.

15   A    Gregory Hagarty.

16   Q    Okay.  Mr. Hagarty, how long have you -- excuse me, who

17   are you employed by?

18   A    FBI.

19   Q    How long have you worked for the FBI?

20   A    19 years.

21   Q    19 years.  In what capacity are you employed by the FBI?

22   A    As an agent.

23   Q    A special agent?

24   A    Special agent.

25   Q    Let's talk about your history first, sir.  Where did you

1      graduate from college?

2      A    Baruch College, part of City University in New York.

3      Q    Could you spell that for the court reporter?

4      A    B-A-R-U-C-H.

5      Q    You're going to have to speak up just a little bit.

6      A    Okay.  I apologize.

7      Q    Okay.  When did you graduate from Baruch College?

8      A    I graduated twice.  So which time?

9      Q    Start with the first one and then the second.

10     A    '86 and then 2006.

11     Q    And in 2006 what degree did you achieve?

12     A    A master's.

13     Q    In what?

14     A    Tax.

15     Q    In tax?

16     A    (Witness nodding head.)

17     Q    Okay.  And after you graduated with a master's in tax,

18     what did you do then?  Did you take a CPA test?

19     A    That was in '86.

20     Q    Okay.  You were a CPA when you mastered in tax?

21     A    No.  I graduated in '86, worked for two years, I was a

22     CPA.  As a CPA.  And then continued to work for another year,

23     and then became an agent.  In '89.

24     Q    What year did you become an FBI agent?

25     A    1989.

1    Q    In 1989 you were assigned to a particular office?

2    A    Yes, the Queens office.  Queens, New York.

3    Q    Were you assigned to a specific squad in the Queens

4    office?

5    A    Yes, the Gambino squad.

6    Q    The Gambino squad?

7    A    The Gambino squad.

8    Q    Were there several squads of organized crime families,

9    that investigated organized crime families in Queens, New

10   York at that time?

11   A    Queens and Manhattan, yes, and Long Island and the

12   northern counties.

13   Q    And you were assigned to the one that investigated

14   Gambino crime activity?

15   A    Yes.

16   Q    And how long did you work in the Gambino squad?

17   A    Six years.

18   Q    And just generally, could you tell us please what types

19   of investigations that you conducted while you were in the

20   Gambino squad in Queens, New York?

21   A    We investigated members of Italian organized crime, the

22   mob.  We investigated extortions, murders, extortions of

23   industries.  For example, the construction industry; the

24   garment industry.  There was loan sharking.  There was

25   gambling.  There was a wide range of crimes that we

1    investigated.

2    Q    Did you investigate stock fraud and things of that

3    nature, too?

4    A    Yes.

5    Q    And you're just giving a small capsule of what you

6    investigated?

7    A    A thumbnail.  Yes.

8    Q    And after you worked in the Gambino squad for the five

9    years, where did you work then with the FBI?

10   A    Then was transferred to the Lucchese squad where I

11   worked the garment center case for a year.

12   Q    What is the Lucchese squad?  Could you just briefly

13   describe what that quad was?

14   A    Instead of focusing on members of the Gambino family, we

15   focused -- that squad focused on members of the Lucchese

16   family and their activities.

17   Q    And you mentioned two squads.  What were the other

18   squads that investigated the La Cosa Nostra in New York?

19   A    Well, there were five, what we call family squads.

20   There were the Gambino squad, the Lucchese squad, the Colombo

21   squad, the Genovese squad, and the -- wait.  And the Bonanno

22   squad.

23   Q    Did you exchange information among all of these squads?

24   A    Yes.  One of my roles on the Gambino squad later on was

25   as the, what they call an Intel officer.  So I dealt a lot

1    with all the other squads.

2    Q    So how long did you remain on the Lucchese squad, sir?

3    A    A year.

4    Q    One year?

5    A    Yeah.

6    Q    And from where -- where did you go from there?

7    A    I was transferred out to Long Island and I worked there

8    for seven years on an organized crime squad that investigated

9    all five families that operated within the Long Island area.

10   Q    Okay.  And the five families are the five families that

11   you just described to the Court?

12   A    Yes.  That's correct.

13   Q    And how long did you remain in the Long Island squad

14   working generically all of the organized crime families?

15   A    Seven years.

16   Q    Seven years?  Now that would be 2003?

17   A    Yes.

18   Q    Okay.  After 2003, could you tell the jury where you

19   were assigned?

20   A    I was assigned to a foreign counter intelligence squad.

21   Q    And on that squad, you've been on that squad since then

22   for the past five years?

23   A    Yes.

24   Q    Now let me ask you this.  When you were investigating

25   the organized crime families that you just indicated to the

1    jury, can you tell the Court and jury what you -- what types

2    of information you gathered during the period of time that

3    you were conducting those investigations?

4    A    I'm sorry?  Can you repeat the question.

5    Q    When you were investigating the organized crime families

6    you just described, could you indicate the sources of -- or

7    the types of investigations and sources of information that

8    you sought out in order to investigate cases?

9    A    You had a wide range of things.  You had records,

10   telephone records.  You had wiretaps.  You had bugs.  You had

11   informants, confidential informants.  You had cooperating

12   witnesses.  You had classic interviews.  Just your run of the

13   mill interviews.  There were surveillances that were done,

14   physical surveillances that were done.

15   Q    Okay.  Let's break that down then.  In terms of the

16   wire -- the wiretaps and things of that nature -- first of

17   all, what's a wiretap?  Could you tell the jury that?

18   A    A wiretap is a Court-authorized interception of

19   telephone conversations.

20   Q    Okay.  And what's a bug?

21   A    A bug is a Court-authorized interception of a

22   conversations going on, generally, in a room or a car.  It's

23   like a little microphone you would put in a room to capture

24   those conversations as they occur.

25   Q    All right.

1    A    Court-authorized.

2    Q    Could you explain what a consensual recording is to the

3    jury, please?

4    A    Consensual recording is, you would have someone that

5    agrees to wear what we call wear wire is -- what would most

6    commonly hear.  We would put a tape recorder on them.

7    They're going out, meeting with someone else, and they would

8    record the conversations.

9    Q    Okay.  And that would be a routine investigative

10   technique when you were with the FBI?

11   A    It was hard to come by back then.

12   Q    It was?

13   A    It's becoming a little more common now.

14   Q    Did you also interview confidential sources in terms of

15   gathering information about organized crime members and

16   associates?

17   A    Yes.

18   Q    And could you just very briefly explain what a

19   confidential source is and how it interfaces with

20   investigations that you conduct?

21   A    Okay.  Confidential informants or confidential sources

22   are people who agree to provide information with the

23   understanding that their identity will not be disclosed.

24   Q    And have you interviewed confidential informants or had

25   confidential informants that worked under your supervision?

1    A    Yes.

2    Q    On many occasions?

3    A    Yes.

4    Q    And you've interviewed and gathered information based

5    upon the information supplied by confidential informants?

6    A    Yes.

7    Q    How about gathering information supplied by cooperating

8    witnesses?

9    A    Yes.

10   Q    What is the -- could you distinguish the two,

11   cooperating witness -- I think they're called in FBI parlance

12   a CW; and a confidential informant, which is called a CI in

13   FBI parlance.  Could you distinguish between those two for

14   the jury, please?

15   A    CW, a cooperating witness is someone who agrees to

16   testify.  Whereas, a confidential informant from the name

17   alone, wants to remain confidential.  Does not want to be

18   disclosed.  Does not want to testify.  Whereas, a cooperating

19   witness agrees that at some point he may have to take the

20   stand.

21   Q    Now, if somebody wears a wire, as you stated earlier,

22   that would be which, a confidential informant or a CW?

23        If someone agrees to wear a wire and record,

24   consensually record someone else, what would they be called?

25   A    Cooperating witness.

1    Q    Now, in that regard with that background, Mr. Hagarty,

2    could you indicate to the jury some approximation of how many

3    intercepted conversations you have reviewed concerning

4    conversations among or between organized crime members while

5    you were doing those investigations?

6    A    Bugs and wiretaps?

7    Q    Yes.  Both.

8    A    Over a thousand hours.  It's a lot.

9    Q    A little bit louder, please?

10   A    Over a thousand hours.  A lot.

11   Q    And you would do that as a standard procedure in your

12   squad?

13   A    Yes.

14   Q    In your investigations?

15   A    Yes.

16   Q    Okay.  Have you spoken to -- first of all, what's the

17   administration in terms of organized crime parlance?

18           MR. PASANO:  Judge, at this point are they

19   tendering as an expert?

20           MR. McCORMICK:  No.

21           MR. PASANO:  Then I object to that question until

22   he is tendered as an expert.

23           THE COURT:  Overruled.

24   BY MR. McCORMICK:

25   Q    Go ahead.

1   A    The administration?

2   Q    Yes.

3   A    Is the top three people in the -- in a particular crime

4   family.

5   Q    Okay.  During the years that you were in those

6   particular squads did you interview people who were in that

7   position, as in the administration of an organized crime

8   family?

9   A    Yes.  I've interviewed the bosses, acting bosses,

10  sitting bosses, underbosses, consiglieri', people who held

11  all of those positions.

12  Q    And have you spoken to capos or captains in that regard

13  of the various organized crime families?

14  A    Yes.  The level below the administration.  Yes.

15  Q    Have you spoken to soldiers or made men who have

16  cooperated with the Government during your times that you

17  were doing investigations in those squads?

18  A    Yes.

19  Q    On approximately how many occasions?

20  A    The number of different people or the number of times?

21  Q    The number of different captains.  Number of different

22  made men or soldiers?

23  A    I'll guess five.  At least five.

24  Q    Have you spoken to associates of organized crime

25  families during these investigations?

1    A    Yes.

2    Q    These were all cooperating people; is that correct?

3    A    Yes.

4    Q    Tell me about the physical surveillance that you

5    conducted while you were doing organized crime

6    investigations?

7    A    You would follow people around.  It would be --

8    sometimes it would be just you and sometimes you could get

9    other people to help you and conduct surveillance.  Follow

10   them around.  Try and take pictures, discretely take pictures

11   and see who they're meeting with and where they're going.

12   Q    And that would be a large percentage of the work that

13   you did when you were investigating organized crime activity?

14   A    No, in not a large percentage.

15   Q    It would a percentage?

16   A    It was a percentage, substantial percentage.

17   Q    Let me ask you.  Have you been qualified in the past to

18   be an expert on the structure of organized crime?

19   A    Yes.  Twice.

20   Q    Tell the jury, please, when and where you were

21   qualified.

22   A    I was qualified both times in Eastern District, one time

23   out in Long Island, and one time in Brooklyn.

24   Q    Okay.  And your qualifications -- you were qualified

25   basically to explain the operations, structure, membership,

1    and terminology of organized crime?

2    A    That is correct.

3    Q    And there were two times and there was a third time you

4    were qualified?

5    A    It was a bail hearing.  It was a criminal bail hearing.

6    It wasn't a trial.

7    Q    Okay.  And your testimony went to exactly what I said,

8    the --

9    A    Structure and function.

10   Q    Operation, membership, terminology of organized crime?

11   A    Yes, that's correct.

12            MR. McCORMICK:  Your Honor, I would offer

13   Mr. Hagarty as an expert in this particular area.

14            MR. PASANO:  May I voir dire, your Honor?

15            THE COURT:  Yes.

16                    VOIR DIRE EXAMINATION

17   BY MR. PASANO:

18   Q    Good morning, Agent Hagarty.  My name is Mike Pasano; I

19   represent John Artuso.

20            I think you told us that you started with the FBI

21   in around December of 1989, right?

22   A    Correct.

23   Q    And you had graduated from Baruch College.  Is that the

24   City University of New York?

25   A    Yes.

1    Q    And then you worked as an accountant for a -- and a CPA

2    for about three years?

3    A    Yes.

4    Q    And that's when you became an FBI agent, right?

5    A    Correct.

6    Q    And you're an agent, but all FBI agents are called

7    Special Agents, so you're a Special Agent, right?

8    A    What?

9    Q    You're an agent of the FBI?

10   A    Correct.

11   Q    All FBI agents are called Special Agents.

12   A    Correct.

13   Q    So we call you Special Agent Hagarty?

14   A    Yes.  Agent Hagarty is just easier.

15   Q    Or Greg.

16   A    Yeah.  That's fine.

17   Q    Greg, while you were at the City University, did you

18   take any courses on the structure and organization of

19   organized crime groups?

20   A    No.

21   Q    Did you get any special degree in college regarding the

22   structure and organization of organized crime groups?

23   A    No.

24   Q    Did you even study law enforcement in college?

25   A    No.

```
 1   Q     Now, do you know whether or not at City University,

 2   Baruch College, they taught either sociology or anthropology?

 3   A     I assume so.

 4   Q     Now, those courses are how to study social customs of

 5   groups, right?

 6   A     Yes.

 7   Q     Did you ever take, while you were in college, any

 8   courses in either anthropology or sociology?

 9   A     Yes, I took one in sociology.

10   Q     Did you get a degree in either sociology or

11   anthropology?

12   A     No.

13   Q     I take it that you've never served on a faculty at a

14   college, teaching a course in organization and structure of

15   organized crime groups, right?

16   A     I taught in the academy.

17   Q     That's in --

18   A     In Quantico.

19   Q     I'm sorry.

20   A     In the FBI Academy on the mob.

21   Q     Published any articles on the organization and structure

22   of --

23   A     No.

24   Q     And fair to say that pretty much what you've learned --

25   and you've learned a lot over the years is in the time that
```

1    you've been an FBI Special Agent, right?

2    A    Correct.

3    Q    And that squad that was the Gambino squad, is that C16

4    is what they call it?

5    A    Yes, that's correct.

6    Q    And that was out of the Queens office and there were

7    what, 12, 13, 14 agents there?

8    A    Correct.  About.  It varied, but yeah.

9    Q    Six years there and then out to Long Island?

10   A    Six years there and then one year on the Lucchese squad,

11   which was the next squad over.  And then 7 years out in Long

12   Island.

13   Q    And some of that work on organized crime was interrupted

14   when you investigated a different kind of organized crime.

15   That was the Pagans.

16   A    The Pagans, yeah.

17   Q    They're a motorcycle gang, correct?

18   A    Yes.  Akin to the Hell's Angels.

19   Q    And in the years that you've been an agent with the FBI,

20   did you ever infiltrate the Gambino crime family to act as if

21   you were a member of that family?

22   A    That's a rare technique.

23   Q    Right.  Would have been great if you could have done it.

24   Dangerous, but you didn't do it?

25   A    Look at me.

1    Q    Well, okay.  Fair enough.

2    A    I don't think I would have blended in well.

3    Q    Okay.  So only Italians?

4    A    Yes.

5    Q    Are allowed to be working for organized crime?

6    A    No.

7    Q    Okay.

8         MR. McCORMICK:  This is going beyond voir dire

9    objection.

10        MR. PASANO:  Let me focus on his credentials.  I

11   apologize, your Honor.

12   BY MR. PASANO:

13   Q    Most of what you know and are going to be testifying

14   about, fair to say comes less from things you've seen

15   firsthand and more from things you've learned from other

16   people?  Fair to say?

17   A    Please repeat.  I apologize.

18   Q    What you've learned and are basing your expert testimony

19   on comes less from things you've seen firsthand and more from

20   things you've been told by other people.  Fair to say?

21   A    No.

22   Q    Well, let me break it down.

23        MR. McCORMICK:  Objection.  This is beyond voir

24   dire.

25        MR. PASANO:  It goes to the nature of --

```
 1              THE COURT:  Overruled.  Let's try to keep the voir

 2    dire a little shorter than the direct was.

 3              MR. PASANO:  I will, your Honor.

 4              THE COURT:  Thank you.

 5    BY MR. PASANO:

 6    Q    Well, by the way, much of what you know is based upon

 7    interviews, you've been asked about it already in connection

 8    with the beginning of your direct, from people who themselves

 9    have told you they were in organized crime?

10    A    Part of it.  Part of it has been, you know, the bugs.

11    Q    But the bugs, you're listening to what other people are

12    saying?  Right?

13    A    Correct.

14    Q    Okay.  Now -- and am I right that you've never worked in

15    an FBI office here in South Florida?

16    A    No.

17    Q    Meaning I'm right?

18    A    Yes, correct.  I'm sorry.

19    Q    Okay.  And in terms of the people that you've

20    interviewed, and the information that you've come to learn

21    about organized crime from them, sometimes those people have

22    lied to the FBI, correct?

23              MR. McCORMICK:  Objection.  This is beyond voir

24    dire.

25              THE COURT:  Overruled.
```

```
 1   BY MR. PASANO:

 2   Q    I'll wrap it up, your Honor.  Sometimes those people

 3   have lied to the FBI, correct?

 4   A    Yes.

 5   Q    Sometimes they've lied to you?

 6   A    No.

 7   Q    They've tried to mislead you?

 8   A    Yes.

 9   Q    And when you try to corroborate them, that's when you

10   know whether or not they've misled you?

11   A    Yes.

12   Q    But fair to say even if the information that you and

13   other agents have gathered, from time to time, people have

14   been labeled soldiers or other categories and it has turned

15   out to be based on misleading information?

16   A    On occasion.

17   Q    Okay.  And this is part of the source on which you base

18   what you know?

19   A    No.  See, we don't -- won't label a guy made, not made,

20   captain, unless you get more cooperating information.

21   Q    Okay.  So it's happened you've been mislead, but before

22   you make your judgments, you look to corroborate?

23   A    Yes.

24        MR. PASANO:  That's all I have, your Honor.  Other

25   than the prior objections we made, we have no additional
```

```
 1   objections.

 2           THE COURT:  All right.  Thank you.  Please proceed

 3   with your direct.

 4           MR. McCORMICK:  Thank you, your Honor.

 5                   DIRECT EXAMINATION (RESUMED)

 6   BY MR. McCORMICK:

 7   Q    All right.  Mr. Hagarty, let's start off with some

 8   terms, if you would.  Can you tell the jury what La Cosa

 9   Nostra refers to in the parlance of organized crime?

10   A    It's, this thing of ours.  It stands for this thing of

11   ours.

12   Q    This thing of ours?

13   A    This thing of ours.

14   Q    Where does La Cosa Nostra operate; can you tell us that?

15   A    Well, all over.  I mean, you're talking New York, Italy,

16   Sicily.

17   Q    Okay.

18   A    Throughout the United States.

19           Well, there is the mob, La Cosa Nostra, is over in

20   Sicily.  It's in Italy.  It's in New York.  It's all over.

21   It's all over the United States.

22   Q    Okay.  Let's deal with it domestically.  Where does the

23   LCN operate, the five families that you talked about, where

24   do they operate out of and where do they operate to?

25   A    Primarily in the New York northeast area.  But they have
```

1    branched out.  You know, guys go to Arizona, they come down

2    here.  They've gone to Atlanta.  They bounce around.  But

3    primarily, they dominate New York.

4    Q    When you say down here, what did you mean by that?

5    A    I'm sorry.

6    Q    That's all right.  We know where we're at, but . . .

7    A    Florida.

8    Q    Florida?

9    A    Yes.

10   Q    You say in Arizona, you're knowledgeable about that,

11   too?

12   A    Yes.

13   Q    Any other states that the New York mob goes to that

14   you're familiar with?

15   A    They've gone to New Orleans.  They've had dealings up in

16   Buffalo with the Buffalo family.  All over.  California.

17   They're out in LA.  A couple of guys have set up shop there.

18   Q    Now, can you recite again, if you would, the five

19   families that basically operate out of New York City and

20   elsewhere?

21   A    The Bonanno, the Columbo, the Genovese, the Gambino, and

22   the Lucchese.

23   Q    Okay.  Does that particular group of families, does that

24   group of families, do they have a structure that you can tell

25   the jury about?

1   A    Yes.  It's a very military structure.  I call it a

2   pyramid.  At the bottom you have your associates who are not

3   made.  The level above that, which there are fewer of, are

4   soldiers.  The level above that are captains who oversee the

5   soldiers and associates.  And then above that, in the very

6   top of the pyramid are the boss, the underboss, and the

7   consigliere.

8   Q    Okay.  And prior to coming to court today, you viewed a

9   chart that more or less sets forth what you're talking about;

10  is that correct?

11  A    Correct.

12  Q    Let me show you Government --

13          MR. McCORMICK:  May I approach the witness, your

14  Honor.

15          THE COURT:  Yes.

16  BY MR. McCORMICK:

17  Q    Proposed Exhibit 45A.  Ask you, is that the chart we

18  were just speaking of?

19  A    Yes.

20  Q    Does that fairly in general sense set forth the general

21  structure of the Gambino organized crime family?

22  A    Yes.

23          MR. McCORMICK:  Offer that in evidence as an aid to

24  the jury.  Government Exhibit 45A.

25          MR. BIRCH:  Your Honor, other than what's already

1    been stated, we have no objection.

2              THE COURT:  All right.  The witness asked for it

3    back, I thought.

4              MR. McCORMICK:  I didn't know that.  Sorry.

5              THE WITNESS:  Okay.

6              THE COURT:  45A is admitted.

7         (Received in evidence Government's Exhibit(s) 45A.)

8    BY MR. McCORMICK:

9    Q    I'm going to try this again, Judge.  See if it works for

10   me.

11             All right.  Mr. Hagarty, you'll see before you in

12   the prompter or on the monitor the chart that would be 45A,

13   and let's talk about that for a minute.  If you could be so

14   kind as to describe the boxes that are set forth in that

15   demonstrative aid and explain those to the jury.

16             Let's start at the top, okay?

17   A    Okay.

18   Q    Can you explain the boss' role and explain how the --

19   how the lines meet and what each particular category means in

20   this, in this structure?

21   A    I don't know whether the lines have any particular

22   significance.

23   Q    Okay.

24   A    The boss is at the top.  He runs the family.  And he

25   rules.  He is the ruler.  The king, if you want to call it

1  that.

2  Q    That's true in every organized crime family?

3  A    Yes.

4  Q    Okay.  Go on.

5  A    The underboss assists the boss in the running of the

6  family.  The consigliere is a buffer, acts as a buffer

7  between the skippers -- the captains and the boss.  So if the

8  skippers have a problem or a beef, they go to the consigliere

9  who resolves it.

10  Q    We'll get into some of those terms.  But the consigliere

11  doesn't have line authority; he's off to the right.  Is that

12  a correct position for him?

13  A    Yeah.  I guess.

14  Q    Okay.  Underneath that there's capo --

15  A    I'm not comfortable with the line thing, no.  The lines

16  going up like this.  No.

17  Q    Okay.  Well, just describe the boxes then, if you would.

18  A    Right.

19  Q    The capo, captain regime, could you explain that?

20  A    That's a captain; skipper is another name for a captain.

21  The capo, captain, skipper, they're all interchangeable.  It

22  depends on --

23  Q    What position do they have in the structure?

24  A    They're below the underboss and above soldiers.

25  Q    And is there -- in terms of an organized crime family,

1    are there the same number of captains in every family?

2    A    No.  Absolutely not.

3    Q    Does it vary?

4    A    Yes.  It varies within the family sometimes.

5    Q    Okay.  This particular exhibit, there's just three

6    there.  That's not to say there's only three capos in the --

7    A    No.  The Gambino family at one point I think had 20, 20

8    skippers.

9    Q    This is just an example, correct?

10   A    Yes.

11   Q    Underneath the capo, there are soldiers or made men.

12   A    Yes.

13   Q    Could you explain what a soldier or made men -- just

14   very -- we will get into more detail after we're finished

15   with this.

16   A    A soldier is a made guy.  He has been straightened out.

17   He's in the family.

18   Q    Okay.  And underneath that, there are associates or

19   nonmembers.  What are they, Mr. Hagarty?

20   A    They're not made but they're on record with either a

21   soldier or captain or someone in the family.

22   Q    And in this particular case I want to go back to

23   soldiers.  Are there a set number of soldiers in an organized

24   crime family?

25   A    No.

1    Q    That varies, too?

2    A    Yeah.

3    Q    Okay.  And how about associates or nonmembers?

4    A    That's not set either.  That number.  Certainly not.

5    Q    Now, could you explain to the jury, please, how captains

6    operate within the structure of the Gambino organized crime

7    family.

8    A    They run a crew.  They run a crew of soldiers,

9    associates.  You know, they administer and they act in

10   certain, you know, depending on the situation, if there is a

11   sit down and a skipper is required, they'll sit down on

12   behalf of the soldier or an associate.

13   Q    So a crew is under the supervision of a captain; is that

14   correct?

15   A    Yes.

16   Q    And how about an associate?  You mentioned associates

17   are also members of or associated with crews.  How does an

18   associate interplay with the, with the captains?

19   A    Well, it depends on the relationship.  Is he -- you

20   know, if he was an associate of the skipper when he was a

21   made guy, and you know then got bumped up in rank to a

22   captain, he is still with the captain.

23   Q    You mentioned on record.  Could you explain what on

24   record means to the jury, please, in organized crime

25   parlance?

1   A    I'm with someone, I'm on record with them means

2   you're -- if you have a problem, a wise guy problem, you have

3   to go to that person you're on record with to resolve the

4   issue.

5   Q    And how is that normally done to resolve an issue if

6   there is a problem within a family or within other families?

7   A    There is a sit down.  If there is a beef and that's what

8   they call it when there is a problem between either --

9   problem between people in the wise guy realm, there is a sit

10  down.

11  Q    You say wiseguy.  Are there other terms for soldier or

12  made person in organized crime families?

13  A    Soldier, made guy.  Some guys call them buttons.  That's

14  not really commonly used.

15  Q    You called them wise guys, too?

16  A    Yes.

17  Q    All that means the same thing?

18  A    Pretty much.

19  Q    Okay.  Are there other terms for captains used in

20  organized crime families?

21  A    Captain.  Capo regime.  Skipper.  Pretty much, that's

22  it.

23  Q    Explain if you would, I know you did a few minutes ago,

24  in a little more detail what the administration is in terms

25  of an organized crime family?

1    A    They run the day-to-day operations of the family.  They

2    oversee it.  They get money kicked up to them.  And if there

3    are big problems between the families, sometimes they will go

4    to the other -- the administration of other families to

5    resolve a dispute, a beef.

6    Q    What's the overall objective of each family?

7    A    To make money.

8    Q    That's it?

9    A    (Nodding.)  Pretty much.

10   Q    You mentioned kicking up.  Could you explain that a

11   little more detail to the jury, please?

12   A    When you make money it depends on, you know, how it's

13   made.  If you were, let's say running an extortion ring, and

14   you're shaking down a whole bunch of places, you kick up part

15   of your money to -- if you're a soldier, you kick up money to

16   your captain.  The captain takes a piece and kicks it up to

17   the administration.

18   Q    Is there another term used in organized crime parlance

19   other than kick up?

20   A    There's a whole lot.  Tribute.

21   Q    Tribute?

22   A    Tribute is another.

23   Q    Okay.  Now who -- could you please explain who pays

24   tribute to the administration directly?

25   A    It could be anybody.  It depends on the circumstances.

1  Q    Do captains pay tribute?

2  A    Yes.  Captains.  It depends on the relationships.  There

3  is no hard-and-fast rule.  There is generic rule.  But, you

4  know, associates, if they knew the boss when he was a nothing

5  . . .

6  Q    They pay it too?

7  A    Right.

8  Q    Is tribute sometimes paid on a yearly basis at the

9  holiday time?

10  A    Christmas.  Yes.

11  Q    Could you explain that to the jury, please.

12  A    They'll -- you know, they'll meet with, you know,

13  whoever -- the captain or the administration, and have a nice

14  big fat envelope.  Fatter the better.

15  Q    And that's done on a routine basis, too?

16  A    Holidays.

17  Q    Holidays?

18  A    Not like Arbor Day or Memorial Day.  But Christmas

19  and --

20  Q    Are there promotions on the structure that you

21  identified and use as an aid, are there promotions in terms

22  of different levels as a member of the family?

23  A    Sure.

24  Q    Explain how that happens.

25  A    Well, a soldier would get made a captain.  And then, you

1    know, if a captain might get made to a -- you know, they just

2    get bumped up.  Like consiglieri.

3    Q    Are there demotions within the family, too, Mr. Hagarty?

4    A    Yes.  A captain, a skipper can get broken down, taken

5    down.

6    Q    Broken down or taken down, that means what?

7    A    You are demoted.

8    Q    So you go from a captain to a soldier?

9    A    Yes.

10   Q    And does that happen on a regular basis or is it

11   infrequent?

12   A    It's pretty infrequent.

13   Q    Who makes the decision to take down or breakdown a

14   captain?

15   A    The boss.

16   Q    The boss?

17        Can you explain to the jury what happens when the

18   boss of an organized crime family becomes incapacitated, such

19   imprisonment or ill, or anything like that?

20   A    If he's on parole, that's another reason they will name

21   an acting, an acting boss.  There's acting positions for the

22   acting boss.  You can have an acting consigliere.  If the

23   consigliere is in jail or on parole and can't meet with

24   people.  There's an acting underboss.  There's acting

25   skippers.  You know, there is no acting soldiers.  But

```
 1    there's acting captains.

 2    Q     Everything above that is acting if somebody is in prison

 3    or otherwise incapacitated?

 4    A     Yes.  It's someone that speaks on your behalf with your

 5    authority.

 6    Q     And what is the acting boss?  You say he speaks for the

 7    boss, correct?

 8    A     Correct.

 9    Q     What else does the acting boss do?  Does he carry out

10    the function the boss normally would?

11    A     He runs the day-to-day operations of the family.

12    Q     Can you tell the jury how one becomes a made member of

13    an organized crime family?

14    A     You have to get proposed.  And you get proposed by a

15    captain.

16    Q     Okay.  And --

17    A     There's an induction ceremony.  You get made.

18    Q     You want to become a made member.  When does that occur

19    in an organized crime family, when one is proposed?  Does

20    something have to come to pass with the organized crime

21    family?  Do they have approve it?

22    A     Yes.

23    Q     And is there a term used when they're going to allow

24    people to become made members?

25    A     You open the books.  You're going to make guys.
```

1    Q    What does open the books mean?

2    A    The books of membership.  It's more a figurative term.

3    Q    And is there a set number of soldiers that a family

4    normally has in relation to opening the books?

5    A    Yes.  In other words, guys have to die, the made guys

6    have to die before they can replace him.  They don't have to

7    replace him.  They can.  So if you have, let's say three

8    guys, three guys just died.  You now have three slots that

9    you can fill.  You don't have to fill them.  Particularly, if

10   you don't think anybody is qualified.  You don't have to fill

11   them.

12   Q    So when you open the books somebody is -- who sponsors

13   somebody to take the place of a guy who died to become a

14   member or made member?

15   A    The captain.

16   Q    And?

17   A    Captain goes to the administration.

18   Q    And how is that filtered through the other five

19   families, if it is?

20   A    It is.  Let's say -- let's say you're the Gambino family

21   and you're looking to make three guys.  You write up a list

22   of the three guys' names and next to it, normally next to it,

23   you will have the three dead guys you're replacing.  You'll

24   circulate the list to the other five families and see if

25   anybody is going to knock who you're proposing, who you're

1  looking to make.

2  Q    Knock someone, is that what that means?

3  A    Knock means, you know, hey, this guy applied for a

4  police officer's job in the 1970's, that's no good.  That's a

5  knock.  You won't get made.

6  Q    It's similar to a blackball?

7  A    Yes.

8  Q    Now, are you familiar with the term making the books?

9  A    Yes.  Same thing.

10  Q    Same thing?  What are the qualifications one must have

11  to become a made member of an organized crime family?

12  A    You have to be a male and you have to be of Italian

13  descent, at least the father.  That has changed over the

14  years.  It used to be the father and the mother, but it has

15  kind of gone by the wayside.

16  Q    So now the only requirement is that the male, his father

17  be of Italian descent?

18  A    Correct.

19  Q    Can you describe, if you would, what the -- when someone

20  goes through the vetting process and they're about to be

21  made, what happens, what's the procedure?

22  A    Well, you mean, like the ceremony procedure?

23  Q    Yes.

24  A    Okay.  Normally, they're taken to a place they're

25  unfamiliar with.  Normally people are dressed in suits.  You

 1    go in.   There's somebody from the administration there.

 2    Sometimes, it depends on the circumstances, there'll be a gun

 3    there.   And sometimes -- you know, it depends.   But a gun.

 4    You walk in.   And someone from the administration will ask

 5    you, do you know why you're here?   You're supposed to say no.

 6    Even if you know you're going to get made, you're supposed to

 7    say no.

 8          The ceremony then kind of begins.   They prick your

 9    finger and you put a drop of blood on the picture of a saint.

10    This is generically because sometimes situations are a little

11    different than on the picture of a saint.   They'll put the

12    drop of blood on a picture of a saint.   They'll burn the

13    picture and they'll say, you know, do you take a vow of

14    omerta.

15          Omerta is a vow of silence.   In other words, you're

16    not going to talk organized crime stuff, you're not going to

17    become an informant or a cooperating witness.   And the

18    picture burns and you promise -- you take the vow of omerta,

19    and they ask you, you know, if you become an informant or a

20    cooperator, if you break the vow of omerta, your soul will

21    burn like the picture of the saint.

22    Q    And that's a general description of how a --

23    A    Very general.   And again, it depends on the

24    circumstances.   Guys have been made in jail.   They don't have

25    a gun to put on the table.

1    Q    Hopefully not.

2    A    Right.  And they don't always have a picture of a saint.

3         That's how it's supposed to occur.

4    Q    If somebody, if a member violates the oath of omerta,

5    what occurs?

6    A    They should get killed.

7    Q    And are there degrees of violating the oath of omerta?

8    A    Yes.

9    Q    Could you just give us both ends of the spectrum, if you

10   would?

11   A    If a made guy walked in here and got on the stand, he

12   broke it.  He broke the vow.  If a guy is talk -- if a made

13   guy is talking to an associate about, you know, this guy is a

14   captain, this is my under boss, that's breaking the vow.

15   That's -- you shouldn't be doing that.

16   Q    Is that violated more times than not?

17   A    Yes.

18   Q    What's a good reason why that would be violated, if you

19   can --

20   A    It depends.  Friendships among people.  You know if a

21   guy is tight with someone, knows him, trust him, they open

22   up.

23   Q    How about committing criminal acts together?

24   A    Right.  That's part of it.  They could have committed a,

25   you know, a bunch of murders together and, you know, they

1  trust each other.  The bond is there.

2  Q    Let me ask you, how long does one remain a member of

3  the, a made member of an organized crime family?

4  A    For life.  That's it.  You're in.  Unless you -- I mean

5  even if you get up on the stand, you're still technically a

6  made guy.

7  Q    The only way you can -- how can you -- how can you

8  terminated your membership in an organized crime family?

9  A    Die.  You die.

10  Q    And that's the only way you can leave the family?

11  A    Pretty much.  You can get put on the shelf, but you're

12  still made.

13  Q    I was going to ask you that.  What is being put on the

14  shelf mean?

15  A    If a guy is not up to par, he can get put on the shelf.

16  In other words, put aside.  Ignore this guy.  Don't talk to

17  him.

18  Q    And what type of offense or violation would he have to

19  commit to be put on the shelf?

20  A    It depends.  He could just be a jerk.

21  Q    He could be a jerk, did you say?

22  A    Yeah.

23  Q    Okay.

24  A    Excuse the terminology.

25  Q    So if you're a made member in 1988, 1989, you're a made

1    member until the day you die?

2    A    Yes.

3    Q    Tell us what the term commission means in organized

4    crime parlance, please?

5    A    Each family -- each of the five families are supposed to

6    have a seat on the commission.  It's kind of -- a good

7    analogy is like the board of directors for the five families.

8    So the boss normally goes to commission meetings, in the rare

9    instance that they actually occur.  And the five families

10   will sit down.  Most of the time.  Sometimes they have

11   commission meetings where, you know, a family's denied a

12   seat.

13   Q    Is there collaboration and cooperation among the various

14   members of the commission?

15   A    The commission and the five families, absolutely.  They

16   could be involved in extorting a particular industry, for

17   example, the construction industry.  And the Lucchese family

18   has the plasterers union; the Gambino family has the trucking

19   union that trucks in all the material.  The Genovese family

20   is, you know, the painters.  They all cooperate in extorting

21   a particular industry.  That's an example.

22   Q    Of how they work together in unified criminal activity?

23   A    Correct.

24   Q    I know you used this term a few minutes ago but can you

25   again define what beef means, B-E-E-F?

```
 1   A    Beef.  A dispute.  If you have a beef.  A problem.

 2   Q    And are there beefs between families and among families

 3   that you're aware of as an expert?

 4   A    Yes.

 5   Q    Could you describe how there can be a beef within the

 6   same family, that is, in the -- say, the Gambino organized

 7   crime family?

 8   A    Okay.  If you're both looking to shake down the same

 9   place and extort.  Shakedown is extort.  Extort the same,

10   let's say business.  You can have a beef, you know, hey, I

11   want to shake this guy down.  Another guy will say, no, it's

12   mine; I was there first.  And you wind up having a sit down

13   over it.

14   Q    Okay.  And who attends a sit down and what occurs there?

15   A    It depends.  But normally -- it could be just soldiers.

16   It could be the captain.  It could go all the way up.  The

17   captains really are the ones that sit down.

18   Q    And what occurs at a sit down?

19   A    They sit down, they each bring out their issues.  It's

20   like a negotiation.  And you work out the dispute.  The beef.

21   Q    Are you familiar with the term walk/talk?

22   A    Yes.

23   Q    Can you explain to the jury what a walk/talk means in

24   organized crime parlance?

25   A    A walk/talk is when two people of -- you know, in
```

1   organized crime, they don't have to be made, but associates

2   or whatever, will walk and talk about criminal activity.

3   They do it to avoid law enforcement detection.

4           Let's say there's a social club that the wise guys

5   are hanging out in, or whoever.  Associates as well.  And

6   they think or they fear that law enforcement has put a bug in

7   there.  They'll go outside, walk around the block, or walk

8   and talk about what they need to talk about.

9   Q    And you physically surveilled that in your experience as

10  an FBI agent?

11  A    Yes.

12  Q    In Queens and Long Island?

13  A    Yes.

14  Q    What other precautions do organized crime members and

15  associates take to avoid electronic surveillance detection?

16  A    They talk in code.  They'll whisper in each others ear.

17  They'll go to unique locations to speak.

18  Q    Do they use any type of language between themselves

19  that's difficult to understand?

20  A    Yes.

21  Q    Explain that.

22  A    They'll talk in code.  For example, if they're -- I'll

23  give you an example.  One wiretap -- one bug, they were

24  looking to kill a guy and they called him Jelly Belly.  We

25  couldn't figure out who Jelly Belly was until he was dead.

1    Q    And that was a code they used so they could use the

2    telephone?

3    A    No, they were in a club.

4    Q    There was a bug in the club?

5    A    Right.  Above the club.

6    Q    Are you familiar with the Ravenite Social Club?

7    A    Yes.

8    Q    Where is that located?

9    A    247 Mulberry Street.

10   Q    Is that in Manhattan?

11   A    Yes -- Little Italy.

12   Q    What kind of a place is that?  Could you just very

13   generally describe it to the jury, please?

14   A    It was.  It's closed.  It's a shoe store now.

15   Q    Okay.  When it did exist, can you describe it?

16   A    It was just a storefront that had, you know, tables and

17   whatnot in it.  And people would -- people who were invited

18   from the Gambino family would go there.

19   Q    Okay.  Now, you worked on the squad at the time that

20   there was a video surveillance of the Ravenite Social Club;

21   isn't that right?

22   A    Correct.

23   Q    And when did you -- I think your testimony was in 1990

24   you began working on the Gambino squad?

25   A    1989.

1    Q      '89.   Excuse me.

2    A      December.

3    Q      And could you explain to the jury, please, what you did

4    in terms of the surveillance and how the surveillance camera

5    operated in 1989 when you came, when you were assigned to

6    that squad?

7    A      Okay.  We had a plant, which is a -- a plant is a place

8    where we -- we rented an apartment, two or three blocks away,

9    and we were up on the sixth floor and we had a camera trained

10   on the front door of the Ravenite.

11   Q      How far away was the camera, if you can recall?

12   A      Two or three blocks.

13   Q      It was a telescope camera?

14   A      It was a four foot long camera.  It was a video camera

15   that was about four feet long.

16   Q      And it was in a fixed place?

17   A      It was in an apartment that we had rented to look out

18   onto the Ravenite.

19   Q      And that apartment was manned by FBI agents?

20   A      Yes.

21   Q      And the camera itself was on all the time, or just

22   describe how many times it was on, in a general way.

23   A      Okay.  Normally, the club opened up somewhere around

24   4 o'clock, closed anywhere from 8 to 9.  Usually not after

25   9:30.  So we would get there, you know, whatever 3,

1   4 o'clock.  More like 3 o'clock.  Set up.  At around -- when

2   we saw the caretaker, Norman Dupont, enter the club, we would

3   turn the camera on and the camera -- and also look through

4   binoculars.  So we would see what was displayed on the

5   monitor that the camera saw.  I would look through the

6   binoculars and look at the monitor.

7   Q    And it would be recording as you were doing that?

8   A    Yes.

9   Q    And how long were the video cassettes?  In those days it

10  was video cassettes?

11  A    It was VCR.  Yes.  State of the art.

12  Q    State of the art.  How long did the video cassettes --

13  A    We set it to two hours.

14  Q    And would you -- you or your brother agents would change

15  the videocassette as it ran out?

16  A    Yes.

17  Q    And somebody would be there when it was running, in

18  other words?

19  A    Yes, all the time.

20  Q    When you got on the Gambino squad, were you educated and

21  instructed on the FBI practice and procedures in how to

22  handle those video cassettes as they were completed and

23  finished recording?

24  A    Yes.  We would --

25  Q    Explain that the jury, please.

```
 1    A    -- pop out the VCR, break the tab on the back of the

 2    videocassette, and you had labeled it, you know, with the

 3    case number and the date and, you know, whether it was Tape 1

 4    of three from that day because sometimes, you know, if the

 5    club stayed open late you would wind up with three tapes.

 6    The last tape might only have 20 minutes on it, but you

 7    needed three tapes.

 8    Q    So --

 9    A    One of three, 2 of three, 3 of three.

10    Q    You said that normally it would be four hours or five

11    hours that it would be running anyhow?

12    A    It depends.

13    Q    And the agent who was there would be charged with that

14    responsibility of taking custody and retaining it to the FBI?

15    A    Yes, he would take it back to the Queens office.

16    Q    And you would do it on occasion and other agents would

17    do that on occasion, also?

18    A    Yes.

19    Q    And who instructed you as to how to employ the practices

20    and procedures that were in place?

21    A    The two -- two other agents that had done it before I

22    got there, they had been there -- they had been doing it

23    since I think mid '88.  Agent Tricorico (phonetic) and Spiro.

24    They were old-timers.

25    Q    They were old-timers?
```

 1    A    In other words, they were senior agents.

 2    Q    And they told you how to do it because they had done it

 3    that way, too?

 4    A    Yes.

 5    Q    And did you follow their instructions when you preserved

 6    this evidence?

 7    A    Yes.

 8    Q    What did you do with the -- what was done with the

 9    cassettes once the tabs were knocked out and they brought

10    back to the FBI?

11    A    You would bring them back and put them in the locked

12    cabinet.

13    Q    And that would be done on a daily basis?

14    A    Yes.

15    Q    By members of the squad?

16    A    Yes.

17    Q    And would the prior video cassettes also be in that

18    locked cabinet?

19    A    Yes.

20    Q    And that was done from 1988 to 1990; is that correct?

21    A    And after.

22    Q    And after.  '91?

23    A    And after.

24    Q    And after?

25    A    Yeah.

1    Q    Okay.

2    A    Yes.

3    Q    And once the cassettes were put into the locked cabinet,

4    did you have an occasion to view those cassettes yourself in

5    terms of cases that you were doing and cases that you were

6    making with the US Attorney's Office?

7    A    Yes.  I had to make a number of, I call them montages.

8    Q    Like a composite?

9    A    Yeah.

10   Q    It wasn't a CD; it was a tape in those days, right?

11   A    Yes.

12   Q    Okay.  Can you explain to the jury when the pictures

13   were taken of the people in front of the Ravenite Social

14   Club, was there any way of identifying a particular segment

15   by date or time or anything like that?

16   A    Oh sure.  The -- the screen and the VCR recorded the

17   date on the bottom and the time, military time, in the lower

18   right-hand corner.  And the date in the lower left-hand

19   corner.

20   Q    And these particular Ravenite videos, who were they

21   depicting generally?

22   A    Along with people -- people in front of the Ravenite.

23   Q    Correct.  But who were they -- who normally -- who

24   normally were depicted in front of the Ravenite?

25   A    Members of the Gambino or associates of the Gambino

```
 1    family, along with, there was pedestrian traffic.

 2    Q    So it's a free flowing sidewalk?

 3    A    That's it.

 4    Q    And your job was to review those videotapes?

 5    A    Yes.

 6    Q    And did you review most of them in your --

 7    A    And watch, you know.

 8    Q    And watch?

 9    A    As they were being taped.

10    Q    But did you review most of them during your career with

11    the Gambino squad?

12    A    Most of them?  Enough of them.

13    Q    Enough for a lifetime?

14    A    Yes.

15    Q    Okay.  Did the equipment that reproduced these

16    videotapes, was it -- did it reproduce it fairly and

17    accurately?

18    A    Yes.

19    Q    Were most of them -- were they easily viewed in terms of

20    recognizing individuals or persons in front of the Ravenite?

21    A    Yes.  There was some -- there was a tree growing that

22    kind of obstructed our view at some points.  But, yeah.

23    Q    At the time of the year there was a tree, that were

24    leaves on the tree?

25    A    Yes.
```

1    Q    And that was a problem?  Other than that?

2    A    Yes.

3    Q    Other than that, it was fine?

4    A    Yes.

5    Q    Let me show you first Government Exhibit marked for

6    identification two video cassettes.  Government Exhibit 47.13

7    and Government Exhibit 47.12, which are cassettes pertaining

8    to videos taken on April 25th of 1988.  Is the date borne

9    correctly on what?

10   A    4/25/'88.  Yes.  One of two and two of two tapes.

11   Q    All right.  Did you review those particular video

12   cassettes at my request?

13   A    Yes.

14   Q    And did you -- had you seen those before?

15   A    I may have.  I don't keep track.

16   Q    All right.  But you did review them at my request.

17   Okay.

18          Let me show you next, three video cassettes which

19   are for May 17, 1988.  And the number on -- the proposed

20   Exhibit No. 47.9, 47.10 and 47.11.

21   A    Okay.

22   Q    Did you review those particular video cassettes at my

23   request?

24   A    Yes.

25   Q    I should say -- let me back up a minute.

1     In terms of 43.12 and 43.13, were those, the images

2  and videos on these, on these particular cassettes, were they

3  correct and fair and accurate?

4  A    Yes.  I believe so.

5  Q    And they had the date and the time as you reviewed them;

6  is that correct?

7  A    Yes.

8  Q    How about in terms of Exhibits 47.9, .10, and .11 is

9  your answer the same for that?

10  A    Yes.

11  Q    Let me show you now Exhibit 47.14, .15, and .16.  Three

12  cassettes.  The date being April 21, 1988.  Did you review

13  those particular video cassettes at my request?

14  A    Yes.

15  Q    And when you reviewed them were the dates and times

16  accurate, as far as you know?

17  A    Yes.

18  Q    And they accurately depicted the scene at the Ravenite

19  Social Club?

20  A    I believe so.

21  Q    At the time we're speaking of?

22  A    I believe so.  Yes.

23  Q    Lastly -- well not lastly, second from lastly,

24  Exhibits 47.17 and 47.18 which are video cassettes for -- the

25  dates being September 12, 1989 and December 20, 1989.  Two

1    cassettes.  Did you review those two cassettes also?

2    A    Yes.

3    Q    And were the dates and times were set forth on those

4    video cassettes, were they accurate as far as you know?

5    A    Yes, I believe so.

6    Q    And fairly and accurately depict the scene of the

7    Ravenite Social Club?

8    A    Yes, I believe so.

9    Q    Let me show you now --

10   A    And just -- I'm sorry.

11   Q    Go ahead.

12   A    In answer to your question, I wasn't there.  I wasn't an

13   agent when some of those tapes were made.

14   Q    I realize that.  But when you reviewed the particular

15   cassettes, the video cassettes, the times and dates were

16   accurate?

17   A    Yes.

18   Q    And those -- let me show you now two composite exhibits,

19   which is Government Exhibit 47.19 and Government's

20   Exhibit 47.20.  And have you seen those particular exhibits

21   before?

22   A    Yes.

23   Q    And did you compare those -- those exhibits are a

24   composite of the various video cassettes that you've

25   identified, correct?

1   A     Yes, they're segments, a whole bunch of segments.

2   Q     And you examined those particular composite exhibits,

3   the videos that are on the composite with the videos that are

4   on the videocassettes that you've identified; is that

5   correct?

6   A     Correct.

7   Q     And they're a fair and reasonable depiction of what's on

8   the videocassettes?

9   A     Yes, they are.

10  Q     And the date and times are the same as they were on the

11  video cassettes that you've identified?

12  A     Correct.

13          MR. McCORMICK:  Your Honor, I would offer into

14  evidence Government Exhibit 47.19 and 47.20, which are

15  composites of the video cassettes that the agent has

16  identified.

17          MR. MARKUS:  Judge, as to Mr. Orr, we have 401 and

18  403 issues.  We object.

19          MR. KAISER:  Same with Mr. Gannon.

20          MR. ENTIN:  Same with Mr. Forgione.

21          MR. PASANO:  And Mr. John Artuso, your Honor.

22          MR. BIRCH:  Your Honor, if I may, I would also have

23  the additional objection there has been no proper predicate.

24  The agent's already said he wasn't working there at the time

25  that these videotapes were taken.

1      THE COURT:  A portion of them, I think.

2      MR. BIRCH:  Right.

3      THE COURT:  A portion.  The '88 ones were the ones

4  when he wasn't there.

5      MR. BIRCH:  I think they started in 19 -- yes, the

6  '88 ones.

7      THE COURT:  Make that clear in terms of when he was

8  there and when he wasn't.

9  BY MR. McCORMICK:

10  Q    Okay.  Mr. Hagarty, when were you working at the Gambino

11  squad in association with the taking of the Gambino tapes or

12  Ravenite tapes?

13  A    December of 1989.

14  Q    Okay.  And before that time you had access to the other

15  tapes that were being stored with the FBI; isn't that

16  correct?

17  A    When I got on the squad, there were -- there was

18  videotapes that predated my entrance into the bureau, into

19  the New York office were available.  Yes.

20  Q    And at the time you began -- became responsible for the

21  custody and control of these particular video cassettes in

22  your job, you were aware of the practice and the procedure

23  used by the FBI in order to maintain and store the videos

24  that were taken before you got on the squad; isn't that

25  correct?

1    A    Yes, it was consistent throughout the entire

2    investigation.

3    Q    You found nothing inconsistent about it; they were all

4    stored and kept in the same manner?

5    A    Yes.  Correct.

6    Q    Every one of the tapes that were there before you were

7    on the squad were dated and time stamped the very same way

8    you did when you were on the squad; is that correct?

9    A    Correct.

10           MR. McCORMICK:  Your Honor, I would offer them all

11   into evidence at this time.

12           MR. BIRCH:  Your Honor, I would make the same

13   objection, and I'd also make a Crawford objection in they're

14   violation of the Fifth Amendment -- Fifth Amends -- right to

15   confront witnesses.

16           THE COURT:  The objection is overruled.  47.19 and

17   47.20 are admitted.

18           MR. McCORMICK:  Thank you your Honor.

19       (Received in evidence Government's Exhibit(s) 47.19 and

20   47.20.)

21           MR. MARKUS:  Judge, we reserve a motion at this

22   time regarding severance.

23           MR. McCORMICK:  May I have one second?

24           THE COURT:  Yes.

25       (Pause in Proceedings.)

1           MR. McCORMICK:  Your Honor, so the record is clear,

2    I offered the composite tapes into evidence.  Mr. Shockley

3    wanted to know if I offered everything.  I did not.  I just

4    offered the composites.

5           THE COURT:  Which were 47.19 and 20, right?

6           MR. McCORMICK:  Yes, sir.

7           THE COURT:  Those are the two I admitted.

8           MR. McCORMICK:  Okay.

9           THE COURT:  You did not intent to admit the others?

10          MR. McCORMICK:  No, your Honor.

11          THE COURT:  Does that conclude your direct?

12          MR. McCORMICK:  Yes, sir.

13          THE COURT:  All right.  Cross-examination.

14          MR. PASANO:  Thank you, your Honor.

15          THE COURT:  Give us just a second.

16          Go ahead.

17          MR. PASANO:  Thank you, your Honor.

18                          CROSS-EXAMINATION

19   BY MR. PASANO:

20   Q    And now, it's good afternoon, Agent Hagarty.  When you

21   talk about organized crime, sir, you are, as you talk to this

22   jury, primarily addressing Italians and Italian-Americans,

23   correct?

24   A    Correct.

25   Q    There are other organized crime groups, right?

 1    A    Yes.

 2    Q    We talked briefly a little bit ago about motorcycle

 3    gangs, right?

 4    A    They're not so organized.

 5    Q    Asian groups?

 6    A    Yes.

 7    Q    Russian groups?

 8    A    Correct.

 9    Q    Irish groups?  The Westies?

10    A    Yes.

11    Q    Jamaican posses, Greek, Chinese.  Lots of organized

12    crime groups?

13    A    Correct.

14    Q    And the experience you have and what we're talking about

15    in terms of structure and how groups operate, those are

16    Italian-Americans, right?

17    A    Correct.

18    Q    And you agree with me, sir, not all Italian-Americans

19    are members of organized crime, right?

20    A    Oh, absolutely.

21    Q    And there are many-

22         THE WITNESS:  In other words, I agree with you.

23    Yes.

24    BY MR. PASANO:

25    Q    I ask my questions badly.

1              There are many hard-working, law-abiding

2    Italian-Americans, right?

3    A     Absolutely.

4    Q     And plenty of Italians who have nothing to with

5    organized crime, right?

6    A     Right.

7    Q     Even honest, hard-working Italians who know people who

8    are in organized crime that don't have anything to do with

9    those illegal things that people in organized crime do,

10   right?

11   A     Correct.

12   Q     Now, you indicated that on the job in December of 1989

13   and thereafter, one of the things you did and one of the

14   things that you learned about to testify about structure and

15   these terms was surveillances, right?

16   A     That was one of the things yes.

17   Q     And one of those acts and surveillances were social

18   clubs, right?

19   A     Correct.

20   Q     And you would get videos or photos, right?

21   A     Videos and photos.  Correct.

22   Q     The surveillances, you would even be filling out logs,

23   right?

24   A     Correct.

25   Q     And one of your jobs and other agents' jobs was to

```
 1    review all of that over periods of time to make sure you

 2    didn't miss anything or fail to capture something that was

 3    important, right?

 4    A    That's one of the things.  Yes.

 5    Q    And one of the clubs and it's one that I think

 6    Mr. McCormick was showing you a video about was the Ravenite

 7    Club, right?

 8    A    Correct.

 9    Q    There was also a place, Bergin Hunt & Fish Club?

10    A    Right.  In Queens.

11    Q    Our Friends Social Club?

12    A    Yes.

13    Q    Even something called the Liberty Cafe?

14    A    Yes, correct.

15    Q    And there was a -- was it a Ben Brooks Social Club, or

16    something like that?

17    A    That was out in the Island.  Yes.

18    Q    Okay.  And did I hear you say the overall purpose of an

19    organized crime family is to generated money from illegal

20    activities?

21    A    Yes, That's correct.

22    Q    And I think you told the ladies and gentlemen some of

23    the illegal activities over the years which you investigated

24    included murder, right?

25    A    Correct.
```

```
 1    Q      Extortion?

 2    A      Correct.

 3    Q      Loan sharking?

 4    A      Correct.

 5    Q      Gambling?

 6    A      Correct.

 7    Q      A whole array of illegal acts?

 8    A      Yes.

 9    Q      And I think you told us that at the top of the structure

10    in the Government Exhibit that's still on the screen in an

11    organized crime family, and, particularly, in the LCN, La

12    Cosa Nostra, is the boss?

13    A      Correct.

14    Q      And LCN means this thing of ours?

15    A      This thing of ours.

16    Q      Italian phrase?

17    A      Correct.

18    Q      And then the underboss and the consiglieri together, I

19    think you told us those are the administration?

20    A      Yes.

21    Q      And while you weren't comfortable with the lines,

22    captains, skippers, whatever you call them, they exist and

23    there's crews working under the captains, but money is what's

24    driving this whole structure, right?

25    A      Money.  Absolutely.  Money.
```

1    Q    And one of the terms you used in talking about money was

2    this expression, kicking up.  Right?

3    A    Correct.

4    Q    And to be successful as a mob family, Gambino or

5    otherwise, it's important that money kick up, right?

6    A    Correct.

7    Q    Because that's what drives the whole machine of

8    organized crime?

9    A    Correct.

10   Q    It doesn't do organized crime any good if money is just

11   kicking down; for it to work, money has to kick up?

12   A    Correct.

13   Q    And it doesn't just kick up without any structure.  The

14   members, nonmembers -- excuse me -- the nonmembers or the

15   associates and the soldiers, they're also supposed to kick up

16   to the captains or the skippers, right?

17   A    It depends on who they're with, correct.  Yeah,

18   associates.

19   Q    It could move a little bit?

20   A    Yes.  In other words --

21   Q    And then the captains for sure are expected to kick up

22   to the administration; ultimately, to the boss, correct?

23   A    Correct.

24   Q    And if the captain is taking money and fails to kick up

25   to the boss, that might be this thing that's called a beef,

1  there would be a problem?

2  A    He wouldn't have a beef.  He might get broken down.

3  Q    Or worse?

4  A    It's not -- well, if they think he is stealing, he could

5  get clipped.

6  Q    And you've explained that clipped means broken down?

7  A    No, clipped.

8  Q    Oh, dead.

9  A    If he's stealing --

10  Q    We're talking in the ground?

11  A    You don't steal from the boss.

12  Q    Okay.  So if the captain's not kicking up, but getting

13  money, there's a good chance that the captain will be viewed

14  as stealing and then the captain could get clipped, which

15  means put in the ground?

16  A    If he is stealing, yes.

17  Q    His wings are clipped, he's dead?

18  A    Yes.

19  Q    I think you told the ladies and gentlemen in answer to

20  Mr. McCormick's questions that in your experience over these

21  years, organized crime members do a lot to avoid detection,

22  right?

23  A    Correct.

24  Q    And one of those things you told us was walk and talks,

25  right?

1    A    One of the things.  Yes.

2    Q    And that's people out on the street walking and talking

3    in a way that they hope avoids interception of their

4    conversations, right?

5    A    Correct.

6    Q    Now, every day people in offices, clubs all around the

7    country, go outside and walk, right?

8    A    Sure.

9    Q    Not everybody who is out there on the street walking

10   around, whether they're smoking or otherwise, is engaged in

11   what you view as a walk and talk, right?

12   A    Correct.  Well, not for the same purposes, correct.

13   Q    Okay.  And I mean, said differently, not everybody who

14   is walking and talking is a member of organized crime, right?

15   A    No.

16   Q    And Italian-Americans, they getting to outside and get

17   some air and walk and talk, too.  Where you get involved is

18   if what they're walking and talking about involves crimes,

19   right?

20   A    Correct.

21   Q    And by the way, it's possible, is it not in your

22   experience, that sometimes even people in organized crime

23   might be outside on the street walking around and they're

24   talking about the Yankees; they're not talking about

25   organized crime?

1    A    Oh, absolutely.

2    Q    And you mentioned another way to conceal is codes,

3    right?

4    A    Correct.

5    Q    Is another way to conceal something that's called dry

6    cleaning?  Are you familiar with that term?

7    A    Well, dry cleaning -- what I know dry cleaning to be is

8    you dry clean -- you try to dry cleaning yourself for

9    surveillance.

10   Q    Right.  To avoid detection if you think you're being

11   surveilled, you run red lights and do all sorts of crazy

12   stuff in traffic?

13   A    Correct.  Or you'll take a route where you can smoke out

14   if you're being followed.

15   Q    And smoke out means figure out?

16   A    Yes, you can see, okay, that blue, you know Ford, and

17   that Crown Victoria behind you are police.

18   Q    And then you might dry clean, which is pedal to the

19   metal, run through lights, try to avoid the surveillance?

20   A    That's one -- you could do that yes.

21   Q    And you told the ladies and gentlemen --

22   A    It's rare.  That kind of crazy driving, a lot of

23   times -- they won't go where they were originally planned on

24   going.  They don't -- they're not crazy driving like that.

25   We would actually break off the surveillance if we saw that.

1    It's dangerous.

2    Q    Fair enough.  Now, in connection with your observations

3    about organized crime families operate, you've indicated that

4    one of the places where organized crime members congregate

5    are these social clubs, correct?

6    A    Correct.

7    Q    And I take it that you've noticed that around the

8    holidays, those social clubs get even more crowded than

9    usual; is that right?

10   A    Yes.

11   Q    And is that because one of the things that happens at

12   these social clubs in New York and wherever they are around

13   the holidays is, tribute or extra envelopes of cash are being

14   delivered, correct?

15   A    Correct.

16   Q    By capos, captains, skippers, and maybe by other people

17   depending on the circumstances?

18   A    Depending on the circumstances, depending on the club.

19   You know, the Ravenite was John Gotti, the boss' social club.

20   So, you know, a captain or someone else can have a social

21   club and different people are going to show up.  Different

22   level of people.

23   Q    And that's part of the kicking up process?

24   A    Yes.

25   Q    Because the way kicking up works is not just on a

1  regular basis as crimes occur and money is generated, but

2  sort of at the end of the year, a little extra is expected

3  for the boss or the administration, right?

4  A    Correct.

5  Q    And in your experience you've even observed in cases

6  you've investigated, moments when there was special efforts

7  made to bring in captains or otherwise to have that extra

8  tribute being paid, or not?

9  A    Be more specific.

10  Q    If you don't recall, it's not.

11  A    Well, I guess I'm not really sure what you're -- exactly

12  what you're asking.  I'm not trying to --

13  Q    No, no, no.  I'm not trying to trick you either.  There

14  are times in your experience where you've actually had

15  occasion to observe in surveillances that sort of activity?

16  A    The Christmas thing?

17  Q    The Christmas thing.

18  A    At the Ravenite, yeah, and other places, yes.  It

19  doesn't always have to happen that way but, you know, in that

20  case it does.

21  Q    Now, is there also a term that you're familiar with in

22  connection with the operation and structure of organized

23  crime that's called layout?  Laying out money?

24  A    Oh, that's different.  If you're laying out money?

25  Q    Yes.

1    A    I think it -- I don't think it's a particular term of

2    art.

3    Q    In organized crime, does it happen that organized crime

4    people will sometimes front or layout money to someone?

5    A    For what?  I think --

6    Q    It might be for a loan shark.

7    A    Then it's a loan shark.  Then that's a loan.

8    Q    Here is what I'm asking.  I don't mean to dance with

9    you, sir.  In your experience in the operation of organized

10   crime families, does it happen sometimes that organized crime

11   families will put out or lay out money to someone, but if

12   they do so they'll expect it to come back with a very, very

13   healthy interest?

14   A    That's call loan sharking.  Yes.

15   Q    Okay.  And am I right, sir, that if the person who has

16   gotten the money, to whom the money has been laid out,

17   doesn't --

18   A    It's not laid out.  In other words -- that, to me, is

19   not laying out.  That's --

20   Q    If the person who had been fronted the money?

21   A    Sorry.

22   Q    Is that okay?

23   A    No, I was speaking on top of you.  I apologize.

24   Q    No, I apologize.

25        If the person who has been fronted the money, given

1    the money, tendered the money, doesn't pay it back, there's

2    problems, right?

3    A    Yes.  Correct.

4    Q    And those problems could even end up with that person in

5    the ground, right?

6    A    Correct.  Could.  If you do that, you're not going to

7    get your money back.

8    Q    They'll do something to make sure they get their money

9    back, right?

10    A    They will try.

11    Q    But organized crime families, whether it's Gambino or

12    otherwise, they want money coming up, right?  And if they put

13    money down, they expect that money to come back up, fair to

14    say?

15    A    What?  I guess I'm not sure of the question.

16    Q    I didn't mean to throw circles and arrows at you.  Let

17    me stop.  Let me get rid of these.

18          Let me start with the first one.  This chart that's

19    Government Exhibit 45A, that's a structure of the Gambino

20    organized crime family, right?

21    A    Correct.

22    Q    And when this organization operates, it's operating with

23    the principal that it wants to make money and that money

24    should be moving up from the bottom, right?

25    A    Correct.

1   Q    Okay.  And then I asked if the crime family puts out

2   money to someone --

3   A    See, your use of put out is not my --

4   Q    Give money to someone?

5   A    Loans.

6   Q    Loans.  Or gives.  But if money is moving --

7   A    They don't give.

8   Q    -- to someone from the organized crime family, the

9   organized crime family is going to expect that money to come

10  back, right?

11  A    Yes, but why the arrows?

12  Q    We can go that way.  And that way.  It wouldn't matter.

13  The idea is, if money is being given or loaned, they expect

14  that money back, right?  That's how organized crime works, to

15  make money?  Loan sharking, if it's for high interest rates?

16          MR. McCORMICK:  The witness should be permitted to

17  answer.

18          THE WITNESS:  That's okay.  I guess your arrows --

19  who's doing the loaning?  It depends who's doing the loaning.

20  BY MR. PASANO:

21  Q    Fair enough.

22  A    It's --

23  Q    Suppose the administration decides to give money to a

24  capo.

25  A    He is loaning it?

1    Q    He is loaning it?

2    A    He is shying it.

3    Q    Shying?

4    A    Shylock.  Is what they call it.  Loan sharking, shylock.

5    Same thing.

6    Q    Shakespeare.

7    A    It is.

8    Q    And so if the money in this example is being given to a

9    captain, then they're going to expect that money -- and I'm

10   going to draw an arrow like this -- to come back, right?

11   A    Correct.

12   Q    With more money coming back than was given out?

13   A    In my experience, if a loan is going from the

14   administration to a captain, if, you know, if -- it's a

15   personal book.  You're shying it out at a percent a week.  So

16   it's one percent a week.  So if it's $100,000, just you get

17   an idea, if you're loaning a guy a hundred thousand dollars

18   in cash, you expect back 1 percent a week.  So you expect

19   $1,000 a week.

20        You are not paying down principal.  You still owe

21   the $100,000 two years later, despite having paid the $1,000

22   a week.

23   Q    And the way that an organized crime family operates,

24   they're not going to be too patient with the failure to pay

25   every month that $1,000?

1    A    Depends.

2    Q    Depending on the circumstances?

3    A    Depends on who's doing the loaning, how close he is to

4    the -- I don't know if you want to call him the victim.

5    But --

6    Q    Whoever it is?

7    A    Whoever it is.

8    Q    And the bottom line is, is that the way this family that

9    you've described survives is money moving up, ultimately, the

10    money needs to get to the boss?

11    A    Correct.

12    Q    Okay.

13            MR. PASANO:  And that's all I have.  Thank you,

14    sir.  Thank you, your Honor.

15            THE COURT:  Further cross-examination.

16                        CROSS-EXAMINATION

17    BY MR. BIRCH:

18    Q    Good afternoon, Agent Hagarty.  My name is Peter Birch;

19    I represent Mr. Vincent Artuso.

20            I just wanted to clarify a couple of things.  When

21    did you start working with the FBI?

22    A    September of '89 I arrived in New York.  December of

23    '89.

24    Q    In December of '89, and that's when you were assigned to

25    the investigation of organized crime?

```
 1   A     Correct.

 2   Q     And I think you said you were assigned to the C16 group?

 3   A     Yes.  The Gambino family.

 4   Q     That investigated the Gambino family?

 5   A     Yes.

 6   Q     And there were a number of agents investigating the

 7   Gambino family, were there not?

 8   A     Correct.

 9   Q     I think you said 13, or something?

10   A     The number varied.  But around there.  12, 13.

11   Q     And you talked about your sources of information.  And I

12   believe you included -- I think you used the term, records

13   search?

14   A     Yes.

15   Q     You can do that?

16   A     Telephone records.

17   Q     Telephone records.

18   A     That's one of the things.

19   Q     Right.  I understand that.  And that would enable you to

20   look through records to see what number is being dialed

21   where, that sort of thing?

22   A     Correct.

23   Q     And if you can match it up, then perhaps use that as

24   some sort of investigative tool.  That sort of thing?

25   A     Correct.
```

1    Q    Phone records would be one thing.  Would bank records be

2    another thing?

3    A    Correct.

4    Q    And if you -- you would have the authority, if you will,

5    to get authorization, court authorization, to subpoena

6    somebody's bank records to see where money's coming in,

7    money's going out.  That sort of thing?

8    A    Correct.

9    Q    And that's an investigative technique?

10   A    Correct.

11   Q    So we have phone records, bank records.  I believe back

12   then, pagers were being used?

13   A    Yes.  But those were -- that was a Title 3; you needed a

14   court authorization.  It was a fairly elaborate procedure.

15   Q    But you could get it?

16   A    Yes.

17   Q    And that would be -- that would enable you to keep track

18   of what -- you actually -- were you able to actually

19   intercept pages as they were being made?

20   A    Yes, it was called a clone beeper.

21   Q    Okay.  And you could get authorization to do that?

22   A    Yes.

23   Q    So you would know if someone was being paged and maybe

24   arranging some kind of meeting, something like that?

25   A    Correct.

1   Q    And that was something that was done way back then, I

2   suppose, between members of organized crime to arrange a

3   meeting?

4   A    Correct.  That was one of the means that they used to

5   communicate.

6   Q    Okay.

7   A    Back then.

8   Q    So you had a wide range of investigative tools available

9   to you; you simply had to get the authorization from the

10  Court in certain circumstances?

11  A    Correct.

12  Q    The videotaping that was done, would that require Court

13  authorization?

14  A    No.

15  Q    Okay.

16  A    Depends on where it was, but the videotapes that were

17  introduced here, no.

18  Q    And that's because you're videotaping a public place?

19  A    Correct.

20  Q    So you're simply videotaping something that anybody

21  could videotape if they wanted to?

22  A    That's correct.

23  Q    But you did that for a long time, right?

24  A    Correct.

25  Q    I mean it was done by the FBI, not you personally, for a

1    couple of years I think I heard?

2    A    Correct.

3    Q    I think you said from 1988 and then you said from --

4    Mr. McCormick said 1992.  But you said -- you then said

5    later?

6    A    It went later.

7    Q    How long did it go?

8    A    I think the club finally closed down around '94.  And

9    that was just the Ravenite.

10   Q    Right.

11   A    There were other places, obviously.

12   Q    Other clubs as well?

13   A    Sure.

14   Q    And your surveillance of these other clubs would have

15   included videotaping of those other clubs as well?

16   A    Occasionally.

17   Q    All right.

18   A    But the videotapes primarily were from the Ravenite.

19   Other ones were photographs.

20   Q    Photographs?

21   A    And, you know, written surveillance logs.

22   Q    You're talking 1998 at the Ravenite --

23   A    1998?

24   Q    Excuse me, 1988 to 1994.

25   A    Off and on, yes.

1    Q    Okay.

2    A    Depending on the circumstances.

3    Q    All right.  And after 1994, I mean to this day even

4    though you may not use videotape any more, photographs and

5    DVDs, whatever has replaced videotapes are still being used

6    for recordings surveillance, are they not?

7    A    Correct.

8    Q    Okay.  And also, you can get another authorization, bank

9    records, phone records, pagers.  You also mentioned you get

10    authorizations for placement of bugs?

11    A    Correct.

12    Q    And that's where you actually put a device in a room to

13    listen, secretively to what's going on in that room?

14    A    Correct.

15    Q    And you also could put a bug in, you can get

16    authorization to put it in someone's car?

17    A    Correct.

18    Q    And unknown to them, if two people were talking in a car

19    you would be recording that?

20    A    Correct.

21    Q    And that's been done?

22    A    That has been done in the past.  Yes.

23    Q    Okay.  And also as an FBI agent you have the ability to

24    actually tap a person's phone, correct, if you get Court

25    authorization?

1    A    Court authorization, yes.

2    Q    You could actually listen to the conversations while

3    they're occurring?

4    A    Correct.

5    Q    Which is also what a bug does, right?

6    A    A --

7    Q    It depends?

8    A    A bug is different in that it records what's going on in

9    a room, whereas a telephone is just, a tap is on a telephone.

10   Q    But that's another investigative tool that you use?

11   A    Correct.

12   Q    And a bug could be placed in a car, in a club, a home,

13   or an office, anyplace that you thought was a place of

14   interest once you got the Court authorization?

15   A    You make it sound very easy and very common.  It's not

16   very common.

17   Q    I understand that.  But it's done.

18   A    Yes.

19   Q    Okay.  Of course, it's not common because it's a severe

20   invasion of privacy.

21   A    Yes.  And it is a lot of work on our part.

22   Q    The bank records and phone records, they're a little

23   easier to subpoena, right?

24   A    Yes.

25   Q    Okay.  And I suppose in this day and age, e-mails as

1    well, right?

2    A    Yes.

3    Q    Okay.

4    A    Again, with -- through a subpoena or I don't if that

5    requires a -- a Court authorization for it or a subpoena.

6    Q    Okay.

7    A    I haven't done that.

8    Q    But they're a little easier than the bugs?

9    A    Yes.

10   Q    Okay.  And when were you reassigned to foreign

11   intelligence or counter intelligence?

12   A    Five years ago.  About five years ago.

13   Q    So your involvement in investigating organized crime

14   ended when?

15   A    In around October of 2003.

16   Q    2003.  So, the total number of years you committed to

17   investigating organized crime was what?

18   A    About 14 years.

19   Q    14 years?

20   A    Less the Pagans case.  When I was working the Pagans'

21   case I was still doing my wise guy assignments.

22   Q    Okay.  So you may have cut down your hours on organized

23   crime, but you were still involved?

24   A    Correct.

25   Q    Okay.

1    A    And I had one small -- after 9/11, I had a piece of the

2    terrorism case.

3    Q    Okay.  But from the time you started with the FBI in

4    1989 to the following 14 years, you were to a certain degree

5    involved in the investigation of organized crime; is that

6    right?

7    A    Yes.  Fair enough.

8              MR. BIRCH:  That's all I have.  Thank you.

9              THE COURT:  Is there further cross-examination?

10             MR. KAISER:  No questions.

11             MR. ENTIN:  No.

12             MR. MARKUS:  No questions.

13             MR. ENTIN:  None, your Honor.

14             THE COURT:  Is there redirect?

15                        REDIRECT EXAMINATION

16   BY MR. McCORMICK:

17   Q    Mr. Pasano was asking you about money being kicked up to

18   the administration.  Your answer didn't mean to imply that

19   all the money was kicked up that the captains make to the

20   administration, was it?

21   A    No.  Everybody takes a piece along the way.

22   Q    A piece.  What does that mean?

23   A    You take a cut.  I apologize.

24   Q    That's okay.

25   A    Everybody takes a piece along the way.  So if you give

1    ten grand to your skipper, he's taking a piece and kicking a

2    bulk of it up.  However, they might split it 60/40, 70/30.

3    It depends on the crime that generated the money.

4    Q    Could you give me an example of that and maybe make it

5    clearer.

6    A    Right.  Let's say you are shaking down a union and

7    you're getting ten grand a month from the union.  The union's

8    family property, technically.  So you're the soldier that

9    services, or goes and picks up the money from the union.  You

10   will give -- let's say you get ten grand.  You, the soldier,

11   will give maybe 8 or 9 to the captain.  The captain may take

12   a piece, then from that, and the rest would get kicked up.

13        So everybody along the way gets a cut.

14   Q    Let me ask you also, Mr. Birch talked about you being

15   able to get wiretaps, Court-authorized wiretaps, bugs and

16   things like that in organized crime cases and you started to

17   say that they're very difficult to obtain.  Could you explain

18   why they're so difficult to obtain?

19   A    Well, it's a lot of work to -- as -- to man the bugs,

20   the surveillances that are required and the information that

21   you have to gather.  It's -- it's a squad, a group effort.

22   So, you know, you can't have everybody, you know, running out

23   putting bugs in.  It takes a lot to staff it, to man it.

24        There's a lot of legal requirements that have to be

25   done -- made or met in, you know, maintaining the bug or the

1    wiretap.  It's very, very difficult.  People have a total

2    misconception about how often and how easy it is.  It's not

3    easy at all.

4    Q    Well, you need probable cause, don't you?

5    A    Correct.

6    Q    And you need probable cause to show that the phone is

7    being used or the place is being used for criminal activity?

8    A    Correct.

9    Q    Is that the difficult part you're talking about?

10   A    That's part of it.  Yeah.

11   Q    You talked about, earlier in your testimony, about the

12   fact that the organized crime figures normally employ various

13   techniques to avoid electronic surveillance.  Are you

14   factoring that into your answer also?

15   A    Yes.  Yes.  They learn from, you know, past experience.

16   You know, they saw, okay.  Social clubs are really kind of at

17   this point passe because they learned we bug them.  We're

18   going to bug them.  So they don't really -- they meet more on

19   the street.  We recently had to do a bug at a baseball field.

20   Two guys were meeting at a baseball field and we had to put a

21   mike there.

22        They're just -- they adapt to our methods.  They,

23   meaning the wise guys.

24   Q    In other words, if there is an investigation that's

25   successful, the next group will learn from that?

1    A    Yes.

2    Q    How about these social clubs that you're talking about

3    with Mr. Pasano.  Could any Italian-American just come in and

4    walk in when it was open, the Ravenite, and have a drink and

5    toast the New Year?

6    A    No.  Absolutely not.

7    Q    Why is that?

8    A    You had to be invited.

9    Q    And who was invited to the Ravenite during your

10   investigations?

11   A    Members and associates.  Various members and associates.

12   Q    Of the Gambino crime family?

13   A    Of the Gambino and other, other families as well.

14   Q    They could be invited there, too?

15   A    Sure.

16   Q    By not Mike Pasano, he couldn't walk in there and ask

17   for a drink, hopefully?

18   A    Well, there were attorneys.  John Gotti's attorney used

19   to show up all the time.

20   Q    By invite?

21   A    By invite only.  Correct.

22        MR. McCORMICK:  Thank you; I have nothing further.

23        THE COURT:  All right.  Thank you, sir.  Thanks.

24        THE WITNESS:  Thank you.

25        THE COURT:  Okay.  It's 20 after.  I've got to

1    spend a little time with the lawyers on a couple of issues,

2    so why don't we go ahead and stop now and return at 1:30.

3    That gives you almost an hour and ten minutes.  Live it up.

4        (Jury out at 12:22 p.m.)

5            THE COURT:  Okay.  Please have a seat.  Mr. Pasano,

6    you said you had an issue you were concerned about?

7            MR. PASANO:  I'll defer to Mr. Markus because

8    they're all related, Judge.

9            THE COURT:  All right.

10           MR. MARKUS:  This is the issue related to the

11   Kasman tapes that your Honor denied without prejudice to

12   raise at the time that they were going to come up.  I believe

13   there's a short witness that the prosecution is going to call

14   and then Mr. Kasman.  The prosecution wants to play a number

15   of tapes involving Mr. Kasman and others.  None of the tapes

16   involve any of the five defendants here.

17           And as we stated in our motion and reply, this is

18   hearsay that the Court should exclude.  The prosecution cited

19   a number of cases from the second circuit which actually

20   support our position.  I laid that out in the reply.  Two

21   cases specifically.  The Orena case.  I'm not sure how to

22   pronounce it.  And the Gigante case.

23           What both of those cases say are that you cannot

24   use statements to prove up just the general mob or general

25   mafia.  That they have to be linked not only to the crime

1    being alleged in the case, but it has to be linked in time as

2    well.   One of the interesting things in those cases is that

3    the district judge, Judge Weinstein from the Eastern District

4    of New York, excluded a number of statements after a point in

5    time, saying that after talking about what had occurred in

6    the past was not in furtherance of the conspiracy.   Even

7    though the Government argued that they could be used to prove

8    up some general mob, Judge Weinstein excluded them.

9            And in this case all of the statements occur long

10    after the ADT properties are purchased in '01 and '02 and

11    '03.

12            THE COURT:  Wait a minute.   Which conversations are

13    you talking about?   You're talking about the Kasman tapes

14    now?

15            MR. MARKUS:  That's right, Judge.   That's right.

16            THE COURT:  So what's the timing of those?   I

17    remember we had the discussion about some other conversations

18    after the -- tell me when these --

19            MR. MARKUS:  Mostly in '05 and '06, your Honor.

20            MR. McCORMICK:  And your Honor --

21            THE COURT:  But they're still within the time that

22    payments are being made --

23            MR. MARKUS:  Yes, they are.   But --

24            THE COURT:  -- and divided.

25            MR. MARKUS:  But they're discussing what had

1    occurred in the past.  They're not discussing the payments

2    coming in or anything like that.  They're discussing what had

3    occurred in the past.  And it's discussions between

4    Mr. Kasman and people who aren't at this table.  So the

5    statements on the tapes are hearsay.  They're not in

6    furtherance of the conspiracy.

7           What's being said on those tapes is Mr. Kasman

8    saying, I'm not going to participate in what's going on.

9    He's specifically disavowing what had occurred.  So they're

10   not in furtherance of the alleged conspiracy in this case,

11   Judge.

12          THE COURT:  I guess what depends on the definition

13   of -- in terms of the time, these are statements between

14   Kasman and others and it's before the FBI shows up and starts

15   questioning Horton; is that right?

16          MR. PASANO:  Actually, your Honor, most of them are

17   after the January '06 date.  I think the tapes start around

18   September of '05 and carry into '07.

19          MR. MARKUS:  That's right.

20          MR. McCORMICK:  That's correct.  I think the

21   problem is, your Honor, I think Mr. Markus is concerned that

22   Mr. Kasman is being painted as a coconspirator.  He is

23   speaking in various times to the hierarchy of the Gambino

24   crime family.

25          THE COURT:  Who is he talking to?

1          MR. McCORMICK:  He is talking to Joseph Corozzo,

2     who is going to be identified as a consigliere of the family

3     and he is speaking to Daniel Marino, who is a captain of the

4     family.  He is speaking to Emil Paulino, who's a high level

5     associate of the family.  He's speaking to Peter Gotti, who

6     is incarcerated at Butner.  He has a conversation with him

7     relative to the structure of the family.

8          THE COURT:  What's he talking about those?  Is he

9     talking about these deals, or is he just talking generally

10    about --

11         MR. McCORMICK:  In some he is.  In some he is not.

12    The example, Peter Gotti conversation.  Peter Gotti is

13    talking to Kasman in a recorded conversation obviously, and

14    in that conversation he tells Kasman who he should go to for

15    protection of the family.  It's pure structure evidence that

16    proves up the Gambino crime family, which is part of the

17    South Florida crew of the Gambino.  It's all related,

18    interrelated.  Our brief addressed that issue.

19         And all of the cases do say that the Government has

20    the -- should have the ability to prove the existence of the

21    enterprise.  And this is the enterprise.

22         THE COURT:  Well, how much of it is about this?

23         MR. McCORMICK:  Pardon me?

24         THE COURT:  What percentage of these calls is about

25    the ADT property in some fashion?

1          MR. McCORMICK:  Give you a percentage?  20 percent,

2     15 to 20 percent.  I don't know if that's -- I'm guessing at

3     that, Judge.

4          THE COURT:  Is the rest of it intermixed or are

5     these calls -- some calls have nothing to do with this

6     transaction or these transactions?

7          MR. McCORMICK:  Some have nothing to do with the

8     transactions.  I wrote up a summary or Mr. Shockley and I

9     wrote up a summary of these five different interceptions.

10          THE COURT:  Where is that?

11          MR. McCORMICK:  Unfortunately, I don't have it.

12     It's back at the office.  But it has been filed with the

13     Court.  In that summary we attached the five redacted

14     transcripts for the Court to review, plus we summarized the

15     transcripts in terms of explaining to the Court what our

16     position is.  I'm sure we have that in the office.  We could

17     run it off of the ECF, too, if we don't have the entire

18     thing.  But I can do that, if the Court please.

19          MR. MARKUS:  Judge, there was only one phone call,

20     one, that dealt with -- that mentions Tyco and ADT.  The

21     others are all just general talk, which is the problem

22     discussed in those cases.  The one that discusses Tyco and

23     ADT -- what Mr. McCormick says is interesting.  He says

24     Mr. Kasman is not a coconspirator.  That's specifically the

25     problem.  Neither are these other people.  And we should have

1    the ability to cross-examine them.

2            I mean, they can't try to back-door these tapes in,

3    especially with their admission that Kasman is not a

4    coconspirator and that these occur mostly in '06.  I mean, I

5    would ask the Court to look at these two cases that the

6    Government cites and that we address in our reply, Orena and

7    Gigante, because I think they really lay out why these tapes

8    are not admissible.

9            MR. McCORMICK:  The cases we cite we would

10   appreciate it, too, if the Court would view those cases

11   because we don't agree with Mr. Markus' interpretation at

12   all.  The overlapping conspiracy and introduction of those

13   coconspirators' statements is pretty well recognized

14   principal in the second circuit.

15           THE COURT:  Who in your view -- you say Kasman is

16   not a conspirator.  So who are the --

17           MR. McCORMICK:  No.

18           THE COURT:  If you're using the coconspirator

19   rules, who are they?

20           MR. McCORMICK:  Joe Corozzo would be a conspirator.

21   Daniel Marino has made statements that would make him a

22   conspirator.  You know, that is one of three bases that we're

23   arguing to the Court.  The first basis, they're not offered

24   for the truth.  They're offered to prove the structure of the

25   enterprise.

1                    The second was as coconspirator statements.  The

2        third is statements by these five people which are statements

3        against their penal interests, which can be used to establish

4        the structure.  It's admissible.  It's relevant.

5                    THE COURT:  Why?  I mean, under an admission

6        theory, or what theory -- I mean they're not -- they're --

7                    MR. McCORMICK:  8034 I think it is, your Honor --

8        or, no, 8043.  Reverse that.

9                    MR. MARKUS:  But they have to be unavailable.

10                   MR. McCORMICK:  I have letters from the five

11       defense attorneys who have notified the Government that they

12       intend to -- they will not testify.  They are going to take

13       the Fifth Amendment if they're called.  I can submit those to

14       the Court.  We've written a trial brief on that, too, which I

15       can submit to the Court.

16                   THE COURT:  Have you got that?  Have you already

17       submitted that trial brief?

18                   MR. McCORMICK:  No, I haven't.  I have it though.

19                   THE COURT:  Okay.  Were you going to give it to me

20       at some point?

21                   MR. McCORMICK:  Yes.  Right now?

22                   THE COURT:  That would be good.

23                   MR. McCORMICK:  I haven't filed it yet.  That's

24       why.  I wanted to --

25                   MR. MARKUS:  Judge, the key to these cases, and I

1   think the main principal, is that general mob related

2   testimony that is otherwise hearsay is not admissible on the

3   theories that Mr. McCormick says.  They're not admissible to

4   prove up general structure.  Because what the cases say and

5   what Judge Weinstein at the district court level said and

6   what the second circuit said, is that any statement becomes

7   admissible by a mob member to another mob member.

8           What those cases say and the fundamental

9   principals, that there has to be some link to conspiracy

10  alleged in this indictment.

11          THE COURT:  Was that a RICO case?

12          MR. MARKUS:  I'm sorry, your Honor?

13          MR. McCORMICK:  Yes, it is.

14          THE COURT:  And do you have it, a copy of it handy?

15          MR. MARKUS:  The cases that the Government cited, I

16  do not, Judge.

17          THE COURT:  I'm talking about your case.  I thought

18  you were citing one that you were talking about.

19          MR. MARKUS:  No, the Orena and Gigante are the two

20  that the Government cites.

21          MR. McCORMICK:  The Gigante case, your Honor,

22  was -- I believe it was affirmed.  However, the Court did

23  address the decision that Judge Weinstein made.  Judge

24  Weinstein said that all of the five families, any statements

25  made by those, if they are considered coconspirator

```
 1    statements, the Court of Appeals said that's going too far.

 2              But in our case, we've got, this is the Gambino

 3    crime family.  You've got people out there who are in the

 4    hierarchy level of the family making statements.  It's

 5    totally distinguishable from the outer limit that the Gigante

 6    Court said you shouldn't do.  And that was affirmed in any

 7    event.  I do have a copy it, Judge.  I just didn't file it.

 8              THE COURT:  Of what?  The trial brief?

 9              MR. McCORMICK:  It's captioned, Government's Notice

10    of Unavailability of Declarants in Support of Admissibility

11    of Tape-recordings Pursuant to Federal Rules of Evidence.

12              MR. MARKUS:  Judge, the Government has the ability

13    to immunize these witnesses.  So even under this theory -- I

14    would say there are two hurdles they have to overcome.  One,

15    they have to show some link of these statements to this

16    conspiracy.  And, No. 2, I don't think they've met the burden

17    of showing unavailability because the Government has the

18    ability to immunize these witnesses.

19              MR. McCORMICK:  I don't think counsel has any cases

20    to support that proposition?

21              MR. MARKUS:  That you can immunize a witness?

22         (Pause in Proceedings.)

23              THE COURT:  Which of these conversations are you

24    trying to get in as coconspirator statements?

25              MR. McCORMICK:  In my view, your Honor, Joseph
```

```
1    Corozzo interceptions are coconspirator statements.

2              THE COURT:  What does he discuss?

3              MR. McCORMICK:  I wish I had it in front of me.  He

4    discusses very things.  It's clear -- Lewis Kasman comes to

5    --

6              THE COURT:  Well, when is this coming up?  You're

7    saying you wish you had everything in front you.  Is this the

8    next witness or not?

9              MR. McCORMICK:  No.  It's the witness after the

10   next witness.  I don't have my brief in front of me is what

11   I'm saying, your Honor.  But I can summarize the Joseph

12   Corozzo statement in terms of the Tyco ADT part of it.

13   Joseph Corozzo is a consigliere.  And one of the jobs or

14   functions of the consigliere is to supervise and manage what

15   goes on in the organized crime family.

16             Lewis Kasman is stating a difficulty that he had

17   with Vincent Artuso, where Vincent Artuso was attempting to

18   convince Lewis Kasman to work with him, under him, you know,

19   be of record with him, and Lewis Kasman is complaining to

20   Joseph Corozzo about that.  And that's directly what, the

21   type of matter that --

22             THE COURT:  What does he say about the ADT

23   controversy?

24             MR. McCORMICK:  That was involved in the same

25   conversation, talking about the ADT thing.  And I think
```

1    Joseph --

2              THE COURT:  My question is, what does he say about

3    the ADT thing?

4              MR. McCORMICK:  What does Joseph Corozzo say or

5    Kasman?

6              THE COURT:  Well, whoever.  There's conversation

7    you say it involves the ADT thing.  I'm trying to figure out

8    what it says.

9              MR. McCORMICK:  He's complaining that Vincent

10   Artuso came to him and tried to get Kasman involved in a

11   money laundering scheme, tried to get him involved in his

12   restaurant, and also tried to get -- suggested to him that

13   the Tyco/ADT deal would be a good deal to get into.  There's

14   further comment by Joseph Corozzo that he wanted to know if

15   there was any, I think he said if there was any property he

16   could buy from Tyco.  Joseph Corozzo said.  It's an amalgam,

17   a long drawn out conversation.

18             MR. MARKUS:  Judge, I have the statement in front

19   of me.  I could tell the Court.  First of all, it occurs

20   after the FBI come to Larry Horton's house in '06.  Second of

21   all --

22             THE COURT:  What's the date of it?

23             MR. PASANO:  July of '06.

24             MR. MARKUS:  July 27, 2006.

25             Second, your Honor, what the person that

1  Mr. McCormick says is the coconspirator, Mr. Corozzo, is

2  responding to Lewis Kasman and he says, I don't know what a

3  Tyco deal is.

4          Kasman had just said, this guy goes, you know, he

5  came to me about a year ago with a Tyco deal.  Corozzo says,

6  I don't know what a Tyco deal is.

7          MR. McCORMICK:  There is further conversation.

8  That's pulling something out that isn't -- it's out of

9  context.

10         MR. MARKUS:  Okay, I'll read the next sentence.

11 Kasman says he's got a deal with Tyco where they say, listen,

12 we want this building.  He gets the building and then Tyco --

13 you heard of Tyco International?  Corozzo says no.

14         So how these statements are in furtherance of the

15 conspiracy?  They're not, Judge.  They're after the FBI come

16 and Corozzo saying he's never even heard of the company Tyco

17 or any of these deals.

18         MR. McCORMICK:  Your Honor, the entire statement

19 doesn't say that.  My summary doesn't say that.

20     (Pause in Proceedings.)

21         MR. MARKUS:  I can read the next line.  Kasman

22 says, so Vinnie had come to me a while ago, like two years

23 ago, and says, Lewis, you know, we could do some business

24 with this Tyco deal.  It can be kind of good.  He says the

25 guy tells us what kind of business.  And Corozzo says, just

```
 1    look, no.  I don't go there.

 2           I mean over and over again, here is Corozzo, the

 3    person that Mr. McCormick is saying is the coconspirator,

 4    saying no, he doesn't know what Tyco is; no, he doesn't want

 5    to go there.

 6           MR. McCORMICK:  On July 27th there's a

 7    conversation.  It is just pulling lines out.  But I'll read

 8    it to the Court.  They're talking about the Tyco deal.  And

 9    Lewis Kasman says, so you know what's going on with the Tyco

10    deal?  And Joseph Corozzo says, ask him if you can get me

11    some properties.  And this is on July 27.

12           MR. MARKUS:  What page?

13           MR. McCORMICK:  July 27.

14           Your Honor, the point is that one of the arguments

15    we make is the overarching conspiracy.  That's in our

16    response.  And that the case law is very strong in terms of

17    proving the enterprise through the overarching conspiracy.

18           THE COURT:  What's your best case?

19           MR. McCORMICK:  Orena.  There's a First Circuit

20    case.  If I could have just one minute, I'll get my

21    memorandum.

22           THE COURT:  All right.  Why don't you gather your

23    materials.  I'll get copies of -- do you have the cites for

24    what you want me to look at?

25           MR. MARKUS:  Yes, your Honor.  It's in the reply,
```

1    and I'll pull them right now.

2              THE COURT:  All right.  We'll get back together at

3    1:15 after he has had a chance to find his briefcase and

4    we -- and I'll look at these cases.  Will you give Angela the

5    cases you want me to look at.

6         (Recess at 12:39 p.m.)

7              THE COURT:  Okay.  Please have a seat.

8              Let me understand a little better, Mr. McCormick,

9    this -- your statement -- this 804B3 argument.  I'm not very

10   convinced that that gives you much traction.

11             MR. McCORMICK:  Well, your Honor, that particular

12   basis was very effective in the Toco (phonetic) case in the

13   Sixth Circuit.  I cited that case in my pleading.  I'm sure

14   the Court has read it.  What it is being offered for is

15   proof -- excepting the fact that it is a statement against

16   penal interest and we fulfill the requirements of the

17   statute, its relevancy, it's going to prove the structure.

18   It's precisely what it proved in the Toco case, and I think

19   the Barone (phonetic) case out of the Third Circuit.

20             All of the cases seem to say, your Honor, that --

21   where you have a RICO conspiracy or a RICO substantive,

22   proving up the enterprise is one of the requirements that the

23   Government must meet, and when this evidence is offered for

24   that purpose, it's admissible.

25             Your Honor, if I might just add something to that.

1           THE COURT:  Sure.

2           MR. McCORMICK:  One of the things the Court

3    inquired about was that -- whether this predated or didn't

4    predate the visitation by Special Agent Hopewell with

5    Mr. Horton.  Our position is that's totally irrelevant to

6    the -- to whether or not this evidence is admissible or not.

7    That's a -- it's off in left field.  The fact that the

8    visitation occurred has no effect whatsoever on the

9    conspiracy.  It certainly didn't end the conspiracy.  It was

10   in full bloom as the time that Special Agent Hopewell called

11   on Mr. Horton.

12          THE COURT:  Mr. Markus, let me ask you a question.

13   Your theory seems to be that I look only at the ADT

14   conspiracy, and you cite -- you cite Gigante and Orena don't

15   support their view.  But isn't the conspiracy, at least for

16   terms of this aspect of the case, basically the Gambino

17   family?  Why isn't that the -- isn't that the entity I ought

18   to be looking at?

19          MR. MARKUS:  No, your Honor.  First, I would say

20   that the Government's indictment charges the South Florida

21   crew of the Gambino crime family as the enterprise, not the

22   Gambino family.  Second, none of these statements go to show

23   a South Florida crew.  And third, I think what those cases

24   say is that --

25          THE COURT:  Well, why not?  I mean if they're

1  talking -- if this fellow is actually the consigliere or

2  somebody is a captain and they're discussing Artuso's

3  involvement, why isn't that an aspect of the Government's

4  proof, one, that they're -- this was an action by the South

5  Florida crew of the Gambino family?  Why doesn't that tend to

6  prove that?

7           MR. MARKUS:  Because I think the second step of

8  what I think those cases say, your Honor, is that there has

9  to be some link to the allegations in this case.  It's not

10 enough to --

11          THE COURT:  But not necessarily in that statement,

12 does it?

13          MR. MARKUS:  No, I think it does, your Honor.

14 Because if not, I think what those cases say is that

15 otherwise any sort of general mob statement can be used to

16 prove up this general idea of the Gambino crime family.

17          And so, you know, the fact that Kasman mentions to

18 somebody in New York, Vincent Artuso, because that's -- I

19 think that's the Government's argument.  That is -- I think

20 that falls below the line.  It would have to be something

21 more, something in furtherance of this particular indictment.

22 Not just a sort of general overarching mob talk.

23          THE COURT:  Well, I guess I agree with that part.

24 I mean, the language it seems particularly -- I'm looking at

25 the US versus Gigante, 166 F.3d 75.

1          And the Court says, a conspiracy may involve only

2     two or three individuals.  In the context of a RICO

3     prosecution of organized criminals, however, a relevant

4     conspiracy may grow quite large.

5          And then they used as an example here, they were

6     talking about an enterprise involving -- a sprawling criminal

7     enterprise involving both the Genovese and Columbo crime

8     families.

9          And then the Court goes on to say, the

10    conspiratorial ingenuity of La Cosa Nostra expands the normal

11    boundaries of a criminal enterprise and Rule 801(d)(2)(E)

12    must expand accordingly to encompass the full extent of the

13    conspiracy.  However, even in the context of organized crime,

14    there is a limit to the proper use of 801(d)(2)(E) to admit

15    coconspirators' testimony.  The district court in each

16    instance must find existence of a specific criminal

17    conspiracy beyond the general existence of the mafia.

18          Judge Weinstein basically says anything that has to

19    do with the mafia in the broadest sense can come in.

20          MR. MARKUS:  Right.

21          THE COURT:  And then when a RICO conspiracy is

22    charged, the defendant must be linked to an individual

23    predicate act by more than hearsay alone before a statement

24    related to that act is admissible against the defendant under

25    801(d)(2)(E).

```
 1              I mean it seems to me here they are not -- these

 2    statements aren't to prove there is a general thing such as

 3    the mafia.  They are at least confined to the Gambino family.

 4              Further, there is some evidence that there was a

 5    conspiracy to rip off ADT, and there has been evidence that

 6    ties one of the people that apparently these recordings

 7    discuss to that more specific conspiracy.

 8              MR. MARKUS:  I agree with everything up until the

 9    last statement, your Honor.

10              THE COURT:  What?  That there's no --

11              MR. MARKUS:  There is no link.  And, in fact --

12              THE COURT:  Well, I mean there is at least some

13    evidentiary link.  We've seen Vincent Artuso as part of --

14    receiving proceeds from this effort to rip off ADT.  Now I

15    guess his knowledge and all of that is something you're

16    arguing about, but there is that tie.

17              MR. MARKUS:  I guess what my point is is there is

18    no link with these tapes.

19              THE COURT:  Well, there is some discussion of this

20    deal on the tapes with people within the family.  So why

21    isn't that enough?

22              MR. MARKUS:  A discussion about the ADT deals in

23    the past.  And that these -- the speakers, one of which the

24    prosecutor says is not a coconspirator, the person we're

25    going to hear from, Kasman, along with the consigliere,
```

1    Corozzo.

2         THE COURT:  But then you're putting the weight on

3    ADT deals in the past.  So your argument rises or falls on

4    whether or not the ADT deal is over?  Is that your argument?

5         MR. MARKUS:  I think there are two sets of tapes.

6    One is this one particular call about the ADT/Tyco deal.  The

7    other calls are about general, I think, mob related talk.

8    Let's focus on the ADT Tyco call.

9         In that call -- and I think it's instructive to

10   look at the actual discussion on Pages 69 and 70.  Kasman is

11   basically saying, here is what I've heard about the deal and

12   he says, which occurred two years ago.  And Corozzo is saying

13   he didn't hear about it and didn't want to have anything to

14   do with it.

15        On the next page he says, in passing, when Kasman

16   says, so you know what's going on with the Tyco deal, meaning

17   now I've told you, Corozzo says, ask him if he can get me

18   some properties.  That's the line that the prosecutor

19   referred to.  That is not linked to the charges in this

20   particular indictment.

21        THE COURT:  Well, except -- I'm now looking at US

22   versus Orena, which is 32 F.3d 704, where they talk about,

23   and they're citing to Maldonado-Rivera, holds that Rule

24   801(d)(2)(E) encompasses statements that serve to foster

25   trust and cohesiveness among coconspirators and inform each

1    other as to the progress or status of the conspiracy, which

2    seems to say it might not need to be directly, well, you

3    know, how do we get this deal moving, to still fall within

4    801(d)(2)(E) if you confine it to the Gambino membership.

5         MR. MARKUS:  Judge, if at the time these defendants

6    were acquiring the buildings Kasman were to call someone up

7    north and say, listen, here is what we're doing down here.  I

8    need to inform of you what's going on.  I would agree.  That

9    statement would be admissible under that theory.

10        This is something very different.  This is Kasman

11   saying, hey, did you know what these guys have done two years

12   ago.  Corozzo says, no, he doesn't.  I think that's very

13   different than the general proposition you just read from

14   Orena.

15        THE COURT:  Although I guess the prosecutor would

16   say he says no, and then later on says he wants to

17   participate, according to his summary.  I haven't seen the

18   exact language of the tape.

19        MR. MARKUS:  Not in the four deals that had

20   occurred.  What Corozzo says is, ask him if he can get me

21   some properties.  Sort of -- I mean, we don't know the

22   context because Mr. Corozzo is not here.  But it sounds a lot

23   like sort of a joke -- get me some properties, too.  This is

24   a guy who had never heard of Tyco before, even though these

25   deals had occurred back in 2002, 2003, four years before this

1    tape recording was made.

2           MR. McCORMICK:  Your Honor, Mr. Kasman will also

3    testify that when he met with Mr. Orr and Mr. Artuso, he was

4    offered to get into the deal himself, he was -- he was also

5    offered the chance or opportunity to get involved in the

6    refinancing of the deal.  And according to Mr. Orr and

7    Mr. Artuso, they told him that they planned on getting more

8    properties.

9           Whether that was going to occur or not is a totally

10   different consideration.  But this was an on -- the Court has

11   already addressed the ongoing fraud in terms of the leases

12   being paid on a monthly basis.  But this is -- what counsel

13   is saying, he is trying to compartmentalize it and say, hey,

14   this thing was all over, and that's the RICO conspiracy.

15   It's not charged that way.  The evidence hasn't been

16   presented that way.

17          THE COURT:  All right.  Well, let's -- I'm inclined

18   at this point, and I will have to make some specific

19   findings, but I'm inclined to admit the tape-recordings under

20   801(d)(2)(E) to the degree they're among participants in the

21   Gambino family.  I'm not -- I'm not at this point convinced

22   that 803 provides any basis for admission.  Some of them may

23   come in for a non-hearsay purpose.  But I think we'll know

24   more about that once we get to -- as we move through the

25   Kasman testimony.

1          MR. PASANO:  Judge, there's two related issues, if

2     I could advise, and I'll defer to Mr. Markus.  One is

3     depending upon which tapes the Government seeks to play,

4     there are some derogatory references to Mr. Artuso in the

5     nature of the way that sometimes these people talk on tapes

6     about third parties.  To the extent that those references

7     prejudicially impact my client, John Artuso, I object to

8     those.

9          Again, I'm not sure of the snippets from the

10    excerpts we've got.  I know there is at least one in which

11    Mr. Kasman is critical of Vince Artuso.  A minor point.

12          I didn't want to lose that objection.

13          The second is the larger point.  The Government has

14    transcripts.  I believe the Government is intending to offer

15    them.  Those transcripts have been, I'll call it cleaned up,

16    which is to say the FBI or someone has done a hard job of

17    trying to listen and make better sense of what's said.

18          Having listened to tapes and having looked at

19    transcripts, I'm not in a position to agree that those

20    transcripts fairly represent what's on the tapes.  I think

21    there's lots of words that are subject to what the listener

22    hears and even the fact that the original transcriptions have

23    changed from later transcriptions suggests that if you know

24    more about the case, you can interpret words.  And I don't

25    think that's what transcripts should do.

1            So if you're going to let the tapes in, and I

2    understand the Court's ruling, I still object to the use of

3    transcripts during those tapes because of audibility issues.

4            MR. McCORMICK:  Your Honor, when we presented the

5    summary to the Court we attached the five transcripts we

6    would be using some time ago.  This is the first we've heard

7    that there is any question as to accuracy.  I might add that

8    there have only been minor changes to the transcripts since

9    we received them from the eastern district of New York, which

10   probably would have been about the last week in July.

11           But there haven't been any major, major changes.  I

12   think Mr. Pasano would concede that.

13           THE COURT:  Well, I would give the instructions

14   they can't rely on transcripts.  They have to rely on the

15   tape.

16           MR. McCORMICK:  Thank you, your Honor.

17           THE COURT:  Okay.  Who is your next --

18           MR. KAISER:  Judge, I'm sorry.  Just so that the

19   record is clear, in addition to the hearsay objection, we do

20   have 403 concerns as well because there are a lot of things

21   said on those tapes with 403 implications.

22           And just one last point, your Honor.  When

23   Mr. McCormick says that Kasman will be testifying about

24   certain -- certain conversations he has had with a particular

25   defendant or another defendant, that's exactly the sort of

```
1    evidence that does, I think, come in under a variety of

2    rules.

3              It's when there's a speaker with somebody whose not

4    present in the courtroom, that's our specific objection.

5    There is a big difference between Kasman getting on the stand

6    and saying X, Y, and Z.  Or him saying, I spoke to these

7    people on a tape recording.  That's, I think, a very big

8    difference and one we would preserve, your Honor.

9              THE COURT:  Okay.  Who is next?

10             MR. McCORMICK:  Special Agent Robert Herbster, your

11    Honor.  He's an FBI agent who will be testifying.  His

12    testimony shouldn't be very long.

13             THE COURT:  All right.

14        (Jury in at 1:34 p.m.)

15             THE COURT:  Welcome back.  Please be seated.

16             MR. McCORMICK:  I'll check outside.

17        (Pause in Proceedings.)

18        ROBERT HERBSTER, GOVERNMENT'S WITNESS, SWORN

19                      DIRECT EXAMINATION

20    BY MR. McCORMICK:

21    Q    State your full name for the record, please.

22    A    Robert Herbster.

23    Q    Spell it for the court reporter, please.

24    A    R-O-B-E-R-T H-E-R-B-S-T-E-R.

25    Q    Mr. Herbster, by whom are you employed?
```

1    A    Federal Bureau of Investigation.

2    Q    How long have you worked for the FBI?

3    A    Approximately six years.

4    Q    Are you a special agent?

5    A    I am.

6    Q    Okay.  Tell us a little bit about your educational

7    background.

8    A    I have a bachelor's of science degree in computer

9    systems.

10    Q    From where?

11    A    University of Connecticut.

12    Q    Okay.  And from -- where did you work after you got your

13    bachelor of science degree?

14    A    I worked as a computer consultant for various companies

15    in and around the New York area.

16    Q    And when did you -- when were you accepted with the FBI?

17    A    In 2002.

18    Q    And is this your -- what squad are you assigned to

19    presently, sir?

20    A    The Gambino Organized Crime Squad out of the New York

21    Division.

22    Q    Was that your first squad?

23    A    No, it wasn't.

24    Q    What was the first squad?

25    A    The Cyber Crime Squad.

1    Q    Cyber Crime?

2    A    Cyber Crime.

3    Q    Because of your computer background?

4    A    Correct.

5    Q    And now you're with the Gambino Squad?

6    A    That's correct.

7    Q    And, again, how long have you been with the Gambino

8    Squad?

9    A    Approximately three years.

10    Q    Since you've been with the Gambino Squad, what types of

11    investigations have you participated in, without naming the

12    particular investigations?

13    A    My squad is responsible for investigating all

14    racketeering-related investigations into the Gambino family,

15    which the predicate acts include most any federal violation

16    including white-collar crimes, mail fraud, wire fraud,

17    extortions, loan sharking, murder.  Pretty much any federal

18    violation that constitutes a predicate act.

19    Q    So everything in the Federal Code?

20    A    Pretty much.

21    Q    Can you distinguish for the jury the difference between

22    a confidential informant and a cooperating witness?

23    A    Yes, a confidential informant is an individual who has

24    not agreed to testify in court related to information

25    provided to the FBI.  A cooperating witness is someone who

1    agrees to testify related to information that they provided

2    to the FBI.

3    Q    When you became -- what month were you assigned to the

4    Gambino Squad?

5    A    I believe it was July of 2005.

6    Q    Okay.  When you became assigned, did you have a partner

7    or some agents that you worked with on a regular basis at

8    that time?

9    A    Yes, I worked with many different agents at that time on

10   different investigations.

11   Q    At that time were you assigned to be involved with an

12   individual by the name of Lewis Kasman?

13   A    Yes, I was.  That was in approximately September of

14   2005.

15   Q    You got on the squad first, and three or four months

16   later you were assigned to Lewis Kasman?

17   A    That's correct.

18   Q    Were you the only agent assigned to him?

19   A    No.

20   Q    Who else was?

21   A    Special Agent William Johnson, Special Agent Paul

22   Harris.

23   Q    In terms of the assignment, what exactly -- what were

24   you assigned to do in relation to Lewis Kasman?

25   A    At that point, Mr. Kasman was a cooperating witness with

1    the FBI.  So, I was assigned to assist in all aspects of that

2    investigation which included assisting with Mr. Kasman's

3    consensual recordings, conducting surveillance, conducting

4    other investigative techniques based on information gathered

5    by Mr. Kasman.

6    Q    And at that time in terms of people you were

7    investigating, who were you investigating in terms of the

8    level of the figures that you were -- that were involved?

9    A    At that point, Mr. Kasman had access to high-level

10   members of the Gambino crime family including members of the

11   administration and several captains.

12   Q    What type of investigative techniques did you employ

13   with Mr. Kasman in order to further the investigation along?

14   A    The primary technique was Mr. Kasman was fitted with

15   recording devices and conducted consensual recorded

16   conversations with various members and associates of the

17   Gambino family.

18   Q    Can you estimate for the jury, if you will -- you say

19   various members and associates of the Gambino family.  Strike

20   that.

21        How long did Mr. Kasman record various members and

22   associates of the Gambino family?

23   A    I believe his first recording was in July of 2005 and

24   his final recording was in March of 2008.

25   Q    About how many identified people did he record during

1   that period of time?

2   A    Approximately 40 different individuals were identified.

3   Q    40?

4   A    40.  Yes.

5   Q    And how many high-ranking individuals did Mr. Kasman

6   record during that period of time?

7   A    Approximately 20 of those individuals could be

8   classified as high-ranking members and associates of the

9   Gambino family.

10  Q    Who was the highest ranking person that Mr. Kasman

11  recorded?

12  A    Mr. Kasman did conduct consensual recordings with the

13  boss of the Gambino family.

14  Q    Who was that?

15  A    Peter Gotti.

16  Q    And did he record any other high-ranking members during

17  that period of time?

18  A    Yes, he did.

19  Q    Who was that?

20  A    Mr. Kasman conducted numerous recordings with Joseph

21  Corozzo who at the time was the consigliere of the Gambino

22  family.  He also conducted --

23  Q    Let me stop you there.  Did Joseph Corozzo have a

24  nickname?

25  A    He goes by Jo Jo Corozzo.

182

1   Q    Okay.  Go on.

2   A    Mr. Kasman conducted recordings with an individual known

3   as Jackie the Nose D'Amico, who was at the time the street

4   boss of the Gambino family.

5   Q    And in terms of the -- anybody else at that level?

6   A    As far as members of the administration, that was --

7   those were the only members of the administration that

8   Mr. Kasman recorded.  But he did record several captains,

9   including an individual named Danny Moreno and Carmine

10  Scianter (phonetic) are the two that come to mind.

11  Q    And did he meet with these individuals on several

12  occasions, at least some of them?

13  A    Yes.

14  Q    Okay.  And did you make -- were you one of the agents

15  that was responsible for maintaining the recordings, the CDs

16  or the recordings that were made of these individuals?

17  A    Yes, I was.

18  Q    Could you explain how the recording was put on Lewis

19  Kasman prior to meeting with the individual, the subject of

20  the surveillance?

21  A    Mr. Kasman -- we would generally meet with Mr. Kasman

22  sometimes several days or sometimes only several hours before

23  a scheduled meeting, and we would provide Mr. Kasman with a

24  recording device.  And generally we would record a short

25  preamble which is basically a summary of the meeting that we

1    were expecting to take place at a later time and then provide

2    Mr. Kasman with that recording device.

3    Q    And once he -- was he under surveillance normally when

4    he did do these interceptions for the FBI?

5    A    Yes, under many circumstances Mr. Kasman was under

6    surveillance during these meetings, but it wasn't always

7    feasible.

8    Q    When it was feasible, can you tell the jury why he was

9    under such surveillance?

10    A    Yes.  Well, if Mr. Kasman -- if it was ever discovered

11    that Mr. Kasman was cooperating with FBI, he would be in

12    grave danger from the individuals that he was meeting with.

13    Q    So you tried to surveil him whenever possible?

14    A    Yes.

15    Q    Once Mr. Kasman completed these recordings with the --

16    what would you call it?  A transmitter or recorder?

17    A    It was a recording device.

18    Q    Recording device.  What would occur in regard to that

19    recording device between you or other agents and the FBI and

20    Mr. Kasman?

21    A    At the conclusion of any consensual recorded

22    conversations, Mr. Kasman would meet with myself or other

23    agents of the FBI and provide us with that recording device.

24    Q    That always happened in terms of the recordings with

25    Mr. Kasman?

1    A    Yes.

2    Q    Okay.  Now, was there any way that Mr. Kasman could

3    change the recording device before he gave it back to the

4    FBI?

5    A    No.  The recording devices are designed in such a way

6    that the only way to access the recorded information is by

7    special software that is only -- only the FBI possesses.

8    Q    As a result of the 40-some-odd people that were

9    recorded, have several investigations been opened up?

10   A    Yes.

11   Q    As a result of these recordings, is Mr. Kasman due to

12   testify in at least one other criminal case?

13   A    Yes.

14   Q    And where is that at?

15   A    On the -- in Tampa, Florida.

16   Q    And who would that be against?

17        MR. BIRCH:  Objection.  Irrelevant.

18        THE COURT:  Sustained.

19   BY MR. McCORMICK:

20   Q    When you met Mr. Kasman was -- and Mr. Johnson -- you

21   and Mr. Johnson met Mr. Kasman, was there any arrangement for

22   financial expenses or fees to be given to Mr. Kasman in

23   return for his recording of the people that you just referred

24   to?

25   A    When Mr. Kasman agreed to cooperate with the FBI, he

1    conducted several proffer sessions with the Government,

2    during which time Mr. Kasman related all of his criminal

3    activity basically from his whole life and discussed with the

4    Government his abilities to conduct consensual recordings and

5    to assist the FBI in various investigations.

6          During that time it came to light that in order for

7    Mr. Kasman to be a successful cooperating witness, he must

8    maintain the appearance and lifestyle that he was currently

9    living.  Otherwise it would cause the individuals that he --

10   that were targets of the investigation to become very

11   suspicious.

12   Q    Was that decision made by you and other experienced FBI

13   agents?

14   A    Yes, that decision was reached by members of the FBI and

15   the US Attorney's Office.

16   Q    And what did you decide -- by "you" I mean the FBI and

17   US Attorney's Office -- in terms of what compensation or

18   reimbursement would be given to Mr. Kasman on a monthly

19   basis?

20   A    It was determined after discussing with Mr. Kasman his

21   financial situation, he was paid $12,000 a month to help

22   offset his living expenses, including his mortgage, various

23   insurance policies, and that sort of -- those sort of

24   expenses.

25   Q    Now, you indicated that it was -- the reason for the

1    decision was because of his lifestyle.  Could you elaborate

2    on that for the jury and what that meant in the investigation

3    that was about to be conducted?

4    A    Well, for over 20 years Mr. Kasman was a high-level

5    associate of the Gambino crime family, and through that

6    association he amassed a great deal of wealth from his

7    criminal activities with these various individuals.  And

8    Mr. Kasman was always held in a regard as a very wealthy man,

9    and he lived a lifestyle of a very wealthy man.  And in order

10   to maintain that persona being that Mr. Kasman wasn't going

11   to be receiving anymore illegal proceeds from any activities,

12   the FBI and the US Attorney's Office deemed that it was

13   necessary to supplement Mr. Kasman's income in order for him

14   to maintain his current lifestyle.

15   Q    So he had to show he lived the life?

16   A    Yes.

17   Q    Now, can you approximate the period of time that

18   Mr. Kasman did consensually record the various individuals

19   that you've alluded to in your testimony?

20   A    I'm sorry.  Could you repeat the question?

21   Q    Could you approximate the time period involved when

22   Mr. Kasman worked for the FBI as a cooperating witness

23   recording various individuals?

24   A    Yes, I believe the first recording was in July of 2005

25   and the last was in March of 2008.  So, a little under three

1    years.

2    Q    And during that period of time, did it come to light to

3    you as the investigator Mr. Kasman had violated at least some

4    of the terms of the agreement he made with the FBI?

5    A    Yes.

6    Q    And can you tell the jury what he did violate, what you

7    learned through your investigation in talking with Mr. Kasman

8    as well what he did violate?

9    A    Well, he violated his cooperation agreement in that he

10   attempted to warn a target of the investigation about -- that

11   this person was a subject of an investigation being conducted

12   by the FBI and other law enforcement agencies.

13   Q    Okay.  Did he do anything else that would have caused

14   you alarm during that period of time?

15   A    Yes.

16   Q    What was that?

17   A    Mr. Kasman -- at some point during late 2006 Mr. Kasman

18   was introduced to an associate of Joseph Corozzo's named

19   Harvey Shear.  Mr. Corozzo introduced Mr. Kasman to Mr. Shear

20   in the hopes of conducting a business transaction.  Mr. Shear

21   indicated to Mr. Kasman that he had a large sum of cash, I

22   believe 80 or $90,000, that was earmarked for an investment

23   that Mr. Corozzo wanted both Mr. Kasman and Mr. Shear to go

24   into.  And at that point that investment didn't come to pass.

25   So, Mr. Sheer approached Mr. Kasman about investing into some

1    sort of other business.  And at that point Mr. Kasman took

2    the money from Mr. Shear and then never invested it and

3    basically he just stole the money.

4    Q    So he stole the money by fraud?

5    A    He did.

6    Q    And did you question him about that?

7    A    Yes, we did.

8    Q    Did he deny doing that at first?

9    A    Yes.

10   Q    Eventually, he pled guilty to that and lying to the FBI

11   as well as obstructing the state investigation; is that

12   right?

13   A    Yes, he did.

14   Q    And he also pled guilty to another extortion, correct?

15   A    He did.  That's correct.

16   Q    And he's awaiting sentence on -- excuse me, on a

17   racketeering case.  He's awaiting sentencing on those two

18   cases in Brooklyn?

19   A    Yes, he is.

20   Q    I have a few things to show, sir.  Mr. Herbster, when

21   you said the United States Attorney's Office authorized the

22   payments, just so the record is clear, that was -- was that

23   the Eastern District of New York?

24   A    Yes, it was.

25   Q    And you were dealing with them during the course of this

1    investigation; is that correct?

2    A    That's correct.

3    Q    All right.

4             MR. McCORMICK:    It will be just one second, your

5    Honor.

6         (Pause in Proceedings.)

7    BY MR. McCORMICK:

8    Q    Let me show you, Mr. Herbster, Government's proposed

9    Exhibits 86.7 -- I'm sorry.  46.7.  Excuse me.  46.7A and

10   46.7B.

11        (Pause in Proceedings.)

12   BY MR. McCORMICK:

13   Q    First of all, I show you Government's proposed exhibit

14   46.7 and 46.7B.  And then I'll show you 46.7B (sic).

15            These appear to be recordings made on February 15,

16   2007; is that correct?

17   A    Yes, it is.

18   Q    On that date, February 17, 2007, (sic), were you a

19   surveilling agent in terms of recording of -- surveilling of

20   Mr. Kasman as he met with and recorded conversations?

21   A    The date I believe was February 15th.

22   Q    I'm sorry.

23   A    Yes, I was present for that consensual recording.

24   Q    Who did Mr. Kasman record on that particular day?

25   A    An individual named Emil Pellino.

1    Q    Who is Emil Pellino?

2    A    He's an associate of the Gambino family.

3    Q    And approximately how long did that meeting take, do you

4    know?

5    A    I don't recall.

6    Q    Okay.  Did you review the particular tape?

7    A    Yes, I did.

8    Q    Which the whole tape is 46.7.  Did you review that

9    entire tape before you came to court today?

10   A    Yes, I did.

11   Q    And did you review it when originally you were

12   surveilling Mr. Kasman?

13   A    Yes, shortly after the meeting.

14   Q    Was it accurate and fair and were the parties

15   identifiable that were speaking on that tape?

16   A    Yes, they were.

17   Q    Who was speaking on the tape again?

18   A    Mr. Kasman and Mr. Pellino.

19   Q    No deletions?  It was not altered?  It was as you heard

20   it months -- years ago when you originally reviewed it?

21   A    Yes, it was recorded in its entirety.

22   Q    Let me show you now Government's proposed Exhibit 47A,

23   which is a redacted version of that, of the other exhibit.

24   Did you review that also before coming to court?

25   A    I did.

```
 1   Q     Is that a proper -- is that a copy of the original

 2   lengthy tape or disk I mean?

 3   A     Yes, it's a redacted portion of the original.

 4   Q     And does that have any -- other than the -- what's

 5   redacted out of it, is it accurate and the speakers are

 6   identifiable and there's no alterations of the part of the

 7   disk that you have in front of you?

 8   A     That's correct.

 9   Q     How about the transcript which is Government Exhibit

10   46.7B, did you review that transcript as it relates to the

11   redacted tape?

12   A     Yes, I did.

13   Q     And is that accurate in terms of the identification of

14   the speakers and -- is that accurate in terms of the

15   identification of the speakers?

16   A     Yes, it is.

17   Q     And did you do that before coming to court also?

18   A     I did.

19   Q     Let me show you now Government's proposed Exhibit 46.4

20   and 46.4A and 46.4B which purports to be an original tape, a

21   redacted tape, and a transcript of a July 27, 2006,

22   conversation between Lewis Kasman and Joseph Corozzo, among

23   others.

24   A     I'm sorry.  Could you repeat the question?  Had I

25   reviewed that before we came to court today?  Yes.
```

1    Q     Let me show you Government's 46.4, 46.4A and 46.4B.  And

2    it appears to be a conversation that took place between Lewis

3    Kasman and Joseph Corozzo and others on July 27th of 2006.

4    Are you familiar with that particular tape and the

5    transcript?

6    A     I am.

7    Q     Were you present when Mr. Kasman did that consensual

8    recording?

9    A     I was.

10   Q     And did you review that particular tape in its entirety

11   at that time?

12   A     Shortly after the meeting, yes.

13   Q     And was it accurate and audible and were the speakers

14   easily identifiable?

15   A     They were.  Yes.

16   Q     And did you also review that particular full copy of

17   that that you have before you?

18   A     I did.

19   Q     And is your answer the same as that?

20   A     Yes.

21   Q     Okay.  Did you also review the redacted disk?

22   A     I did.

23   Q     You did?

24   A     I did.

25   Q     And is that accurate and audible and are the speakers

1    identifiable?

2    A    Yes.

3    Q    And is it a accurate copy of the original tape --

4    A    It is.

5    Q    -- or copy of the original tape?

6         How about the transcript, 46.4B?

7    A    I did review the transcript also.

8    Q    And is that accurate in terms of what the speakers

9    and -- as best as you know it's accurate as to the content of

10   the transcript?

11   A    It is.

12        THE COURT:  Let me ask you, your list here seems to

13   suggest this is D'Amico, not Corozzo.

14        MR. McCORMICK:  I'll ask the witness.

15   BY MR. McCORMICK:

16   Q    Mr. D'Amico is in that tape recording also, is he not?

17   A    Yes, he is.

18   Q    But the redacted version of it just has Joseph Corozzo,

19   correct?

20   A    That's correct.

21        MR. McCORMICK:  Maybe the list should have

22   eliminated D'Amico from that, your Honor.

23        THE COURT:  Well, there's another one, a Corozzo

24   one, 46.1.  That's what I'm trying to make sure I understand.

25   46.4 is Corozzo?

```
 1              MR. McCORMICK:  Yes.  That's correct.

 2              THE COURT:  All right.  Go ahead.

 3    BY MR. McCORMICK:

 4    Q    Now I'll show you Government proposed Exhibit 46.4,

 5    46.4A --

 6              THE COURT:  That's what you were just doing.

 7              MR. McCORMICK:  I had that on top.  I'm sorry.  I

 8    withdraw that.

 9    BY MR. McCORMICK:

10    Q    I'll show you Government's proposed Exhibit 46.7 and

11    46.7A and 46.7B which appears to be a transcript of a

12    February 15, 2007, conversation by --

13              THE COURT:  You dealt with that one earlier.

14         (Pause in Proceedings.)

15              MR. McCORMICK:  I'm sorry.  I better get rid of

16    these or I'll be repeating it all day.

17              THE COURT:  So far you haven't covered 46.1, as I

18    heard you.

19              MR. McCORMICK:  I know.  I don't think I'm going

20    to.

21    BY MR. McCORMICK:

22    Q    Sir, I show you now 46.3 and 46.3A and 46.3B which

23    appears to be, this time, a conversation that took place on

24    April 2, 2006, with Danny Marino.  Are you familiar with that

25    original tape?
```

1    A    I am.

2    Q    Did you -- were you one of the agents who were involved

3    in the supervision of Special Agent -- of Lewis Kasman for

4    the making of that tape?

5    A    Yes.  On this particular occasion agents of the FBI were

6    not present with Mr. Kasman when you conducted that

7    recording.  But the next time that we met with Mr. Kasman,

8    which was a few weeks later, he provided the recording device

9    which contained the consensual recorded conversation from

10   April 2nd.

11   Q    Was that tape device, was that also -- was it intact and

12   you had to use the program from the FBI to output it?

13   A    Yes, that's correct.

14   Q    Okay.  And you did that?

15   A    I did.

16   Q    And you listened to the tape?

17   A    I did.

18   Q    And at that time it was audible and the speakers were

19   identifiable and it was unaltered as far as you know?

20   A    Yes, that's correct.

21   Q    And did you also listen to the copy of that which is --

22   you have before you, the full tape?

23   A    Yes, I listened to the redacted portion.

24   Q    Are your answers the same on that too?

25   A    It is.

1   Q    And how about the redacted version of that which is

2   46.3A, did you listen to that?

3   A    I did.

4   Q    There's a certain redaction.  Is that also accurate and

5   the speakers identifiable?

6   A    Yes.

7   Q    Unaltered as far as you know?

8   A    Yes.

9   Q    And how about the transcript, April 2, 2006, did you

10  compare that with the tape and is that accurate, the speakers

11  as to what they're saying as far as you know?

12  A    Yes, it is.

13  Q    Let me show you now Government's proposed Exhibit 46.2

14  and 46.2A and 46.2B.  I'm showing you 46.2A and 46.2B.  And

15  46.2B appears to be a transcript with a conversation that was

16  recorded on 3/10 of ''06 and -- with Peter Gotti and

17  Mr. Kasman.  Are you familiar with that particular --

18  A    Yes, I am.

19  Q    And did you retrieve that particular listening device

20  from Mr. Kasman after he met with Mr. Gotti?

21  A    I did.

22  Q    And did you download that?

23  A    I did.

24  Q    And did you listen to the entire tape that you have

25  before you?

```
 1    A    I did.

 2    Q    Or disk, I should say.

 3          And was that accurate -- was it -- were the

 4    speakers identifiable?

 5    A    They were.

 6    Q    Was it unaltered as far as you know?

 7    A    Yes.

 8    Q    And did you also listen to the tape 46.2A?

 9    A    I did.

10    Q    And is that an accurate depiction of the original disk?

11    A    It is.

12    Q    How about the transcript, 46.2B?

13    A    Yes, I read it is.

14    Q    Is that accurate?  The speakers are identifiable?

15    A    Yes.

16    Q    And that transcript is of the redacted disk; is that

17    correct?

18    A    It is.

19    Q    Finally, 46.1.  Let me show you Exhibits 46.1, 46.1A,

20    and 46.1B.  Are you familiar with Government Exhibit 46.1?

21    A    I am.

22    Q    And have you reviewed in the FBI -- in your FBI office

23    the contents of a copy of that in close proximity to the

24    October 11, 2005, and following dates that it was made?

25    A    I did review that.  Yes.
```

1    Q    You did review it?  And did you review the copy of that

2    which is 46.1?

3    A    I did.

4    Q    Is it a fair and accurate copy of the disk that you did

5    review in New York?

6    A    I did.

7    Q    Are the speakers identifiable?

8    A    They are.

9    Q    And the disk is unaltered and no redactions?

10    A    That's correct.

11    Q    How about 46.1A, did you review that as compared with

12    46.1?

13    A    I did.

14    Q    And is it accurate as to the excerpts that are actually

15    on 46.1A?

16    A    Yes, it's accurate.

17    Q    And there is no alterations or deletions and the

18    speakers are identifiable?

19    A    Yes, That's correct.

20    Q    And how about the transcript which includes several

21    dates but I think 10/1 we're going to speak of 2005; is that

22    right?

23    A    October 11, 2005, was the -- is the date of this

24    particular recording.

25    Q    And that is a conversation between Lewis Kasman, Joseph

 1   Corozzo and others, correct?

 2   A    That's correct.

 3   Q    And redacted part is just Joseph Corrozo; is that

 4   correct?

 5   A    It is.

 6   Q    And did you check -- did you compare the transcript with

 7   the redacted disk, and is it accurate as to the speakers and

 8   the transcriptions in general?

 9   A    It is.

10         MR. McCORMICK:  Your Honor, at this time we'd offer

11   into evidence Government's Exhibit 46.1, 46.1A, 46.1B, 46.2,

12   46.2A, 46.2B, 46.3, 46.3A, 46.3B, 46.4, 46.4A, 46.4B.  And

13   lastly, 46.7, 46.7A, and 46.7B.

14         MR. BIRCH:  Your Honor, we would simply renew the

15   objections we made both pretrial and during this trial.  We

16   renew those and ask for a continuing objection.

17         THE COURT:  All right.  That objection is

18   overruled.  I will reserve -- on any specific 403 issues

19   you'll need to point to me to particular parts of the

20   recording or transcript.

21         MR. PASANO:  And whether the B exhibits are simply

22   secondary evidence, we do object to them being used.

23         THE COURT:  The transcripts?  Yes, as I said, I

24   will give -- allow the jury to consider the transcripts but

25   with a cautionary instruction.

1      (Received in evidence Government's Exhibit(s) 46.1,

2   46.1A, 46.1B, 46.2, 46.2A, 46.2B, 46.3, 46.3A, 46.3B, 46.4,

3   46.4A, 46.4B, 46.7, 46.7A and 46.7B.)

4            MR. McCORMICK:  I have no further questions.

5            THE COURT:  All right.  Is there cross-examination?

6            MR. BIRCH:  Yes, your Honor.  If I may have a

7   moment, your Honor.  I want to put these back so they don't

8   get lost.

9                     CROSS-EXAMINATION

10  BY MR. BIRCH:

11  Q    Good afternoon, Agent Herbster.

12  A    Good afternoon.

13  Q    My name is Peter Birch.  I represent Mr. Vincent Artuso.

14  I just want to ask you a few questions, if I may.

15  A    Of course.

16  Q    You've been with the FBI six years, you said?

17  A    That's correct.

18  Q    And you've been investigating organized crime, I believe

19  you said, three years?

20  A    That's correct.

21  Q    And specifically the Gambino crime family?

22  A    Yes.

23  Q    Now, when Mr. Lewis Kasman became an informant, you were

24  assigned to him, if you will, to use in whatever

25  investigation you thought appropriate?

1    A    At the time I was assigned to work with Mr. Kasman he

2    was actually a cooperating witness.

3    Q    Okay.

4    A    Just a difference in terms, but it's a significance

5    difference in terms related to how the FBI handles those

6    terms.

7    Q    All right.  Well, I understand.  But he's cooperating

8    with the FBI and you're assigned to him to utilize him in

9    whatever way you want to for your investigation, correct?

10   A    Yes, that's correct.

11   Q    All right.  And obviously, if I understand you

12   correctly, he started his cooperation in July of 2005?

13   A    Approximately, yeah, that's correct.

14   Q    And that was when he was recording these various

15   conversations that you've already testified to?

16   A    Yes.

17   Q    And the cooperation and the recording, if you will,

18   specifically the recording continued up until March of 2008,

19   correct?

20   A    That's correct.

21   Q    And obviously, you already testified to an incident in

22   which Mr. Kasman was less than truthful with you, correct?

23   A    That's correct.

24   Q    And it is important, though, if you're using somebody to

25   investigate something as serious as organized crime, to be

1    sure that this investigation is done accurately and

2    truthfully.  Would you not agree?

3    A    That's correct.

4    Q    And in order to not make mistakes or at least to

5    minimize mistakes -- obviously the idea would be to eliminate

6    mistakes.  But at least to minimize mistakes and to avoid

7    untruthfulness or inaccuracies, you would not just allow him

8    to do whatever he wanted, you would give him some direction,

9    correct?

10   A    I'm not sure I under stand the question.  I'm sorry.

11   Q    Let me back up for a second.  First of all, you at least

12   would -- or one of you -- you or your co-agents, somebody

13   would record -- by "record" I mean take notes -- of what's

14   going on, would you not?

15   A    On some occasions, yes.

16   Q    Well, let me ask you this.  When you went out and did

17   surveillance with Mr. Kasman, whenever he was using this

18   recording device was either you or a fellow agent conducting

19   surveillance?

20   A    On some occasions.  Not on all.

21   Q    Okay.  Well, if I heard you correctly, you testified

22   that given the nature of the investigation, the organized

23   crime, that if he were to be found out, he could be in

24   serious danger, correct?

25   A    Yes, that's correct.

1    Q    All right.  Consistent with that, was he not watched, if

2    you will, put under surveillance when conducting an

3    investigation or recording somebody?

4    A    Well, on some occasions it just wasn't feasible based

5    upon either lack of information from the individuals that

6    Mr. Kasman was meeting with as far as some of the individuals

7    were very clandestine as far as where meetings were going to

8    take place or when.  There were occasions where there were

9    concerns that if surveillance was detected while Mr. Kasman

10   was conducting a meeting that -- on repeated occasions,

11   individuals may become, you know, suspicious of Mr. Kasman as

12   to whether or not he was cooperating with the Government if,

13   you know, surveillance was detected on several occasions, you

14   know, while he was meeting with certain individuals.

15   Q    All right.  Well, let me put it to you this way.  You

16   did all the surveillance you could do, correct?

17   A    Yes.

18   Q    So it wasn't, well, today is Saturday, we don't want to

19   do it today so, Mr. Kasman, you're on your own?  It wasn't

20   that sort of thing, correct?

21   A    No.

22   Q    Okay.  So if surveillance were possible, it was done,

23   correct?

24   A    On some occasions.  It was on a case-by-case basis.

25   Q    So sometimes surveillance was possible but still not

1  don't?

2  A    I'm not -- you would have to ask me more specific on

3  particular meetings, sir.  I can't generalize like that.

4  Q    I wasn't there.  You told me -- or excuse me, you told

5  this jury that this recording by Mr. Kasman took over two --

6  excuse me, almost two years to -- actually, two and a half

7  years to complete, July of 2005 to March 2008, correct?

8  A    Yes.

9  Q    Okay.  What I'm trying to find out as simple as I can

10  make it, if the surveillance by FBI agents could be safely

11  accomplished, was it done?

12  A    I understand your question.  I'll explain it as best I

13  can.  Throughout the course of the investigation, especially

14  over one as long-term as this, we use multiple sources of

15  information to basically attempt to determine whether or not,

16  you know, a cooperating witness's identify has been

17  discovered by the targets of an investigation through

18  listening to recordings and, you know, other investigative

19  techniques.  So whenever it was possible and it was deemed

20  necessary, surveillance was conducted.  But it wasn't

21  conducted on every -- you know, during every meeting.

22  Q    Okay.  From July of 2005 to -- by the way, how many

23  agents were assigned to Lewis Kasman?  You and who else?

24  A    Myself and Special Agent William Johnson.

25  Q    And so was it just the two of you for this entire time

1    frame July of 2005 to March of 2008?

2    A    No, there were several agents involved during that time

3    period.

4    Q    Okay.  That's what I mean.  During that time period,

5    from July of 2005 to March of 2008, how many agents were

6    involved in the surveillance of Mr. Kasman?

7    A    I couldn't give you an accurate number.

8    Q    Okay.  Well --

9    A    Several.

10   Q    Several?  More than ten?

11   A    Well, there's -- we have agents that are assigned to my

12   squad in particular which is -- you know, varies anywhere

13   from 13 to 15 agents, and then there's also times where there

14   was actual surveillance squads that are doing full-time

15   surveillance that were assigned to surveil Mr. Kasman.

16   Q    Let me ask you this.  When surveillance was actually

17   conducted, would someone take notes of that surveillance?

18   A    On most occasions, yes.

19   Q    Okay.  Would it be fair to say -- when you say "most

20   occasions," would you say 90 percent?

21   A    I couldn't put a number on it, but, yes, on most

22   occasions notes would be taken.

23   Q    Okay.  Let me ask you this.  If you were the one

24   conducting surveillance, would you take notes?

25   A    On most occasions, yes.

1    Q    But whether it's 90 percent or more you can't say?

2    A    I couldn't put a number on it, no.

3    Q    How many times was Mr. Kasman put under surveillance

4    while recording some member of the Gambino family from July

5    of 2005 to March of 2008?

6    A    I couldn't possibly provide a number on that, sir.

7    Q    Would it more than a hundred times?

8    A    I'm not really sure I understand the question.

9    Q    Okay.

10   A    I couldn't give you an accurate number.

11   Q    Okay.  Let me try to help you out.  Okay.  I want to

12   make sure you understand the question.  If you did it once a

13   week for an entire week, surveillance one a day once a week,

14   that would be seven times, wouldn't it?  Seven days in a

15   week?

16   A    Yes.

17   Q    Okay.  If you did it every day of the year and it's not

18   a leap year, like this one, it would be 365, right?

19   A    Yes.

20   Q    Okay.  How many times from July of 2005 to March of 2008

21   was surveillance of Mr. Kasman conducted while he was tape

22   recording a member of organized crime?  In your is best

23   estimate.  Give me an estimate of any kind.

24   A    An estimate?

25   Q    Yes.  Or at least a figure.  At least a hundred.  At

1    least a thousand.  Whatever you want to say.  Assuming it's

2    as accurate as you can make it.

3    A    I really -- I couldn't even give you a guess, sir.

4    Q    Okay.

5    A    If there was a report, you know, completed, then it

6    would be -- you know, there would be surveillance documented.

7    But there was occasions where Mr. Kasman was meeting, you

8    know, individuals where there was no surveillance conducted

9    and then there was occasions --

10   Q    I'm not talking about that.  I want to know about the

11   times when surveillance what actually conducted.

12   A    Well, I'm trying to answer your question, sir.

13   Q    Okay.

14   A    But what I'm trying to say is that on certain occasions

15   where meetings were conducted there would be, you know,

16   surveillance in the area being that myself and other agents

17   of the FBI would be in the general vicinity of Mr. Kasman,

18   but we may or may not see, you know, individuals meeting with

19   Mr. Kasman.  So there was various scenarios where, you know,

20   sometimes surveillance would be conducted in that.  If we saw

21   Mr. Kasman meeting with individuals, there would be reports

22   prepared.  On other occasions where we would be in the

23   general vicinity so if Mr. Kasman a had problem, he could

24   phone us and we could respond, you know, in a timely manner,

25   we would do that.  But reports wouldn't be prepared on those

1    days.

2    Q    Okay.  Well, let's try to keep it simple, if I may.

3    When you or a fellow agent -- let me back up for a second.

4          You reviewed the tapes and the transcripts that you

5    just testified to, right?

6    A    Yes.

7    Q    You listened to them.  And I assume we're talking

8    several hours in duration, correct?

9    A    Yes.

10   Q    All right.  So you spent those hours listening to these

11   transcripts or tape-recordings knowing at that prosecutor

12   would be wanting to introduce those in evidence in the trial

13   of these gentlemen, correct?

14   A    Yes.

15   Q    You did take the several hours to do that, correct?

16   A    I did.

17   Q    Okay.  Did you take any time to review reports regarding

18   the surveillance of Mr. Kasman while he recorded these

19   people?

20   A    I didn't review them in great detail before this

21   hearing, no.

22   Q    Did you review them at all before this hearing?

23   A    When they were prepared, perhaps.  I don't review any in

24   particular for this hearing because there was nothing being

25   presented that I know of.

1  Q    So it's been at least six months since you've seen a

2  report regarding a surveillance of Mr. Kasman while recording

3  somebody allegedly in organized crime; is that right?

4  A    I may have reviewed a few 302s before this hearing, but

5  I don't recall which ones.

6  Q    Let's go back to the other question.  Whether you saw

7  anybody or not, how many times was the FBI involved in that

8  two and a half year, roughly two and a half year period where

9  Mr. Kasman was recording people?  How many times did the FBI

10  conduct surveillance of Mr. Kasman whether you saw somebody

11  or not; can you say?

12          MR. McCORMICK:  Objection.  Asked and answered,

13  your Honor.

14          MR. BIRCH:  It hasn't been answered.  It has been

15  asked.

16          THE COURT:  Let's try to avoid the argument.

17  Objection overruled.

18          THE WITNESS:  On most occasions Mr. Kasman would be

19  surveilled in one manner or another.

20  BY MR. BIRCH:

21  Q    Would or would not?

22  A    Would be.

23  Q    I'm just trying to find out how many in that two and a

24  half year period.

25  A    Like I said, some days there would be reports prepared.

1    If nothing happened, there wouldn't be a report prepared.  So

2    if you could ask me on particular date, I would probably have

3    a recollection as to whether or not I or other agents were

4    present.

5    Q    August 1, 2005.

6    A    Was there a recording on that date, sir?

7    Q    I'm asking.  You wanted a specific date.

8    A    If you have documentation for that date from a

9    consensual recording, I could that question for you, sir.

10   Q    Do you have documentation?

11   A    There was 302s created for each consensual recording

12   that was conducted.

13   Q    Do you have them?  Do you have those 302s?

14   A    In my possession right now, sir?

15   Q    Yes.

16   A    No, sir.

17   Q    Okay.  Now, let me ask you this.  Would it be fair to

18   say it was a number of times?

19   A    Yes.

20   Q    Okay.  A lot?

21   A    Yes.

22   Q    Okay.  And I believe you testified that over 40

23   different people were recorded by Mr. Kasman, correct?

24   A    Yes.

25   Q    Okay.  You yourself prepared reports of your

1    surveillance of people being recorded by Mr. Kasman, correct?

2    A    I did.

3    Q    And if you could identify that person, you would

4    identify that person by name, correct?

5    A    I would.

6    Q    And if you weren't able to identify that person but you

7    could provide a description, you would do that, correct?

8    A    I would.

9    Q    Okay.  Now, organized crime certainly from the

10   perspective of the FBI would be a very serious investigation,

11   would it not?

12   A    Yes.

13   Q    Okay.  Now -- and so this is something that you would

14   want to record as completely as you could with providing all

15   of the information that was significant that you could,

16   correct?

17   A    Yes.

18   Q    And significant information would include the people

19   that you observed in the recording by Mr. Kasman of members

20   allegedly of organized crime, correct?

21   A    I'm sorry.  Could you repeat the question, sir?

22   Q    Recording or making a record of the people that you

23   observed being recorded by Mr. Kasman, that would be

24   significant, correct?

25   A    Yes.

1    Q    And then so that would be something that you would write

2    in your report, correct?

3    A    Yes.

4    Q    Did you write in your report or to your knowledge did

5    anybody in the FBI write in their report of Lewis Kasman ever

6    recording Vincent Artuso?

7    A    No.

8    Q    So he is not one of the 40 identified people, correct?

9    A    Mr. Artuso?

10    Q    Mr. Vincent Artuso.

11    A    No, Mr. Artuso was never recorded.

12    Q    Now, did the surveillance of Mr. Kasman, was it ever

13    videotaped or recorded -- when I say "videotaped," I know

14    they don't use them anymore, but used a video recording

15    device.

16    A    I personally never used a video recording device to my

17    recollection.  But the Special Operations Group or our

18    surveillance teams on occasion will use video.  I don't

19    recall if Mr. Kasman was ever captured on video during a

20    meeting or not.

21    Q    All right.  Now, these meetings that Mr. Kasman had with

22    the recording device, you said -- you can't give me a

23    specific number, but you can say it was a lot.  He had a lot

24    of meetings with different people, right?  40 different

25    people anyway that we know of, right?

1    A    He had in excess of 130 different meetings.

2    Q    All right.  In excess of 130.  He had a recording device

3    provided to him by the FBI.

4         You mentioned that he didn't have the means of

5    altering what was recorded, correct?

6    A    That's correct.

7    Q    But he certainly could turn it off, could he not?

8    A    He could.

9    Q    Or turn it to on?

10   A    Correct.

11   Q    Now, and you mentioned that he was a high-ranking

12   member -- well, I use the -- let me rephrase that.

13        He was intimately familiar and intimately involved

14   with the Gambino crime family, correct?

15   A    Yes.

16   Q    I mean, this was a trusted individual by members of the

17   Gambino crime family, correct?

18   A    I couldn't answer as to whether he was trusted.  I just

19   know he associated with very high-level members of the

20   Gambino family.

21   Q    Okay.  We'll discard the trust.  We'll just ask, was he

22   able to -- you said record even the acting boss, correct?

23   A    Yes.

24   Q    And that was -- was that Peter Gotti?

25   A    I believe during this tenure that Mr. Kasman was making

```
 1    consensual recordings Peter Gotti was the boss of the family.

 2    The street boss or the acting boss was Jackie the Nose

 3    D'Amico.

 4    Q    And then there was this Joseph Corozzo?

 5    A    Yes, he at the time was the consigliere of the family.

 6    Q    All right.  So we know he recorded Corozzo, didn't he?

 7    A    I'm sorry.  Joseph Corozzo?

 8    Q    Yes.

 9    A    Yes.

10    Q    Lewis Kasman.  He recorded -- was it Peter Gotti that he

11    recorded?

12    A    He did.

13    Q    And he recorded -- you called him Jack the Nose.  That's

14    Jackie D'Amico?

15    A    Yes.

16    Q    Those are high-ranking members the Gambino family,

17    right?

18    A    Yes.

19    Q    I think D'Amico, was he the consigliere?

20    A    D'Amico is the street boss.

21    Q    The street boss.  Okay.

22         And then he also recorded, you said, several

23    captains, correct?

24    A    Yes.

25    Q    Now, it was decide you said to enable Mr. Kasman to --
```

```
1   while cooperating with the FBI to keep his cooperation

2   undercover, if you will, to provide him with money, correct?

3   A    Yes.

4   Q    He had to maintain his lifestyle?

5   A    Yes.

6   Q    So he got $12,000 a month; is that right?

7   A    For a period of time, yes.

8   Q    Okay.  How long a period of time, do you know?

9   A    Yes, I believe the first payment began around July of

10  2005.  I don't know if it was a month before or after.  And

11  continued up until, I believe, June or July of 2007.

12  Q    So it started in July of 2005 and it went to June or

13  July of 2007 you said?

14  A    Yes, I believe so.

15  Q    So that's about 24 months; is that right?

16  A    Approximately, yes.

17  Q    And he got 12,000 a month for each of those months

18  anyway, right?

19  A    I believe so.  Yes.

20  Q    So we know he got at least, correct me if I'm wrong,

21  $264,000?

22  A    24 months --

23  Q    For those 24 months.

24  A    If your math is correct, yes.  Somewhere in that

25  vicinity, yes.
```

1    Q    Well, let's do it this way.  He gets $12,000 a month,

2    right?  That's what he was getting, right?

3    A    Yes.

4    Q    And that would come out to -- actually, it would be

5    $144,000 a year, wouldn't it?

6    A    Yes, that's correct.

7    Q    And then 144,000 a year for two years, you actually get

8    $288,000 a month (sic), right?

9    A    Yes.  Over the whole duration I guess, if your math is

10   accurate, 288,000.

11   Q    That's for a two year period, right?

12   A    Two-year period, yes.

13   Q    Actually --

14            MR. BIRCH:  May I approach the witness, your Honor?

15            THE COURT:  Yes.

16   BY MR. BIRCH:

17   Q    I want to show you this document and see if you

18   recognize it.

19   A    I have never seen this document before, sir.

20   Q    Okay.  Let me ask you this.  Does someone keep a record

21   of what a cooperator, be it a witness or an informant, of

22   what that person is paid?

23   A    Yes.

24   Q    And did you yourself keep a record of what Mr. Kasman

25   was paid?

217

1    A    No.

2    Q    Do you know who did?

3    A    Yes, there's -- people in the office that handle -- as

4    you said, there's payments to confidential informants and

5    witnesses, and there's a Tally that's kept within those

6    records.

7    Q    Is there a specific person that we could go to to

8    inquire how much Mr. Kasman received?

9    A    Well, there's records that are kept computerized.  So, I

10   imagine several individuals can access that information.

11   Q    So it's not just one person?

12   A    No.

13   Q    So, what I just showed you though, you don't recognize

14   that yourself?

15   A    That document in that format, no, sir, I don't.

16   Q    Okay.  Let me ask you this.  Would it seem incorrect if

17   I were to tell you Mr. Kasman actually received $404,000?

18   A    Well, sir, that number is actually a total sum paid both

19   to Mr. Kasman and both paid for other expenses related to the

20   investigation.

21   Q    Okay.

22   A    Not all of the money would go to Mr. Kasman.  A lot of

23   the money would be for expenses incurred related to the

24   investigation, including operational expenses such as, you

25   know, airline travel, hotels --

1    Q    For Mr. Kasman?

2    A    -- car rental.  For Mr. Kasman and for other

3    confidential expenses.

4    Q    Well, of this figure, and I show you this listing,

5    404,000 plus, any idea how much Mr. Kasman received?

6    A    I have no way of determining that from this document,

7    but --

8    Q    Okay.  Well, we know he got 12,000 a month, right?

9    A    That's correct.

10    Q    And you were involved in the decision of giving him

11    $12,000 a month, were you not?

12    A    Actually, no, sir.  I was not involved.

13    Q    You were not.  Okay.  Who was involved in that decision?

14    A    There was members of the FBI and the US Attorney's

15    office in the Eastern District of New York.  At that point

16    when that number was determined, I was yet to be involved

17    with the investigation.

18    Q    Okay.  So you didn't have anything to do with that?

19    A    No.

20    Q    But you know he did get 12,000 a month?

21    A    Yes.

22    Q    For at least two years?

23    A    Yes.

24    Q    And you know he also stole $80,000 while getting this

25    $12,000 a month from this Harvey Shear or something?

1    A    Yes, that's correct.

2    Q    And do you know -- you mentioned that Lewis Kasman, he

3    was apparently talked to -- I guess you call them proffer

4    sessions; is that right?

5    A    I'm sorry, sir.  Could you repeat that?

6    Q    Mr. Kasman was interviewed by the FBI during or prior to

7    becoming a cooperating witness of some kind, was he not?

8    A    Yes, he was.

9    Q    And that's when -- you mentioned -- let's just narrow it

10   down -- that he had a significant history, correct, of

11   criminal activity, Mr. Kasman?

12   A    Yes, I would say it was significant.

13   Q    Okay.  And also given his familiarity with the Gambino

14   crime family he was considered a valuable witness, so it was

15   important to maintain that lifestyle given the value that he

16   could provide, correct, in the way of information?

17   A    Well, it was also important because, as I said earlier,

18   that in order to Mr. Kasman to maintain his credibility with

19   these other individuals that are involved with the Gambino

20   crime family, it was important that, you know, he maintain,

21   you know, his current lifestyle and, you know, his current

22   persona.

23   Q    Okay.  And he was recording people and providing this

24   information at the time he also stole $80,000 from this

25   Mr. Shear --

220

1    A    Yes.

2    Q    -- is that right?

3         And he was recording people and collecting his

4    12,000 a month and stealing $80,000 from Mr. Shear.  Did

5    anybody ever bother to see if he was paying a mortgage or how

6    much that mortgage was?

7    A    I don't know if there was ever discussions or

8    documentation provided at the outset when the $12,000 was

9    agreed upon, because I wasn't present.  But as far as, you

10   know, did I ever check up to see if Mr. Kasman was paying his

11   mortgage, no.

12   Q    Or any other expenses that he was incurring?

13   A    No.  That money was earmarked for -- you know, to offset

14   some of Mr. Kasman's expenses.  He was aware, you know, that

15   it was, you know, earmarked for his mortgage and health

16   insurance for his family and those sort of expenses, and it

17   was, you know, his responsibility to pay those expenses.

18   Q    $12,000 a month in cash, right?

19   A    Cash, correct.

20        MR. BIRCH:  That's all I have.  Thank you, Judge.

21        THE COURT:  Further cross-examination.

22        MR. PASANO:  Thank you, your Honor.

23        Good afternoon, ladies and gentlemen.

24                    CROSS-EXAMINATION

25

```
1   BY MR. PASANO:

2   Q    Good afternoon, Agent Herbster.  My name is Mike Pasano.

3   A    Good afternoon, sir.

4   Q    I represent John Artuso.

5        That 12,000 a month cash that the FBI was handing

6   to Lewis Kasman, to your knowledge did anybody at the FBI

7   ever ask Lewis Kasman for a receipt as to even one expense he

8   told you guys he was paying?

9   A    No, sir.

10  Q    Now, in the decision that Mr. Kasman made to begin to be

11  a cooperating witness and the decision that the FBI made to

12  provide him with financial expenses as you've described it,

13  do I understand that Mr. Kasman convinced you or other agents

14  that he needed to maintain this lifestyle, right?

15  A    No, sir, he didn't convince us of that.  It's clear that

16  when somebody comes in to be a cooperating witness with the

17  Government, that it's very important that nothing change

18  significantly in their lifestyle because that's generally a

19  red flag when it comes to trying to infiltrate a criminal

20  organization.

21  Q    And I think you told the jury that you understood that

22  Mr. Kasman had the persona of being a wealthy man, right?

23  A    That's correct.

24  Q    That persona was a fraud, right?

25  A    Not as far as I know, sir.  As far as I know, at some
```

```
 1    point or even when I first met Mr. Kasman I believe he still,

 2    you know, had a great deal of wealth.

 3    Q    The wealth he had was other people's money he was

 4    stealing, right?

 5    A    I don't know about that, sir.  But what I --

 6    Q    Did you investigate it, sir?

 7    A    Well, what I do know is that, you know, Mr. Kasman was

 8    an associate of the Gambino family for over 20 years, and I

 9    believe that wealth was gathered from his criminal activity

10    with other members of the Gambino family.

11    Q    Sir, while you were handling Mr. Kasman and watching him

12    receive $12,000 a month in cash, did you know he was involved

13    in divorce proceedings here in Palm Beach County?

14    A    At some point I became aware of that, yes.

15    Q    Did you know what financial disclosures he was making to

16    the Court and what he was telling the Court about his persona

17    of wealth?

18    A    I'm not familiar with the court proceedings.

19    Q    Did you check out whether he was telling the Court he

20    was penniless, couldn't pay his insurance, couldn't make his

21    mortgage?

22    A    I don't know about that, sir.

23    Q    Do you know the expression, "a man who could sells ice

24    to Eskimos"?

25    A    I'm sorry?
```

1    Q    Have you heard the expression "a man who could sell ice

2    to Eskimos"?

3    A    I'm familiar with similar expressions, sir.

4    Q    That's Lewis Kasman, right?

5    A    I wouldn't know about that, sir.

6    Q    Well, you do know that in the period that you were

7    working with Mr. Kasman you came to find out that he had

8    stolen 80,000 plus from a man named Harvey Shear, right?

9    A    Yes.

10   Q    Now, it turns out you learned that Mr. Kasman arranged

11   to meet Mr. Shear and have Mr. Shear give him the $80,000,

12   right?

13   A    Yes.

14   Q    It turns out that Mr. Kasman forgot to tell the FBI he

15   was going to such a meeting, right?

16   A    Yes, he didn't tell us at that time.

17   Q    And he did not bother to turn on his recorder to record

18   that meeting, correct?

19   A    No.

20   Q    Meaning I'm right?

21   A    No, he -- I'm sorry?

22   Q    He didn't record the meeting?

23   A    No, he did not record the meeting.

24   Q    And every day when you were debriefing, you or your

25   fellow agents, Mr. Kasman or meeting with him, you would

1    regularly be asking him, are you getting any money, are you

2    involved in any sort of illegal activity?  I mean, you were

3    very thorough in your questions of this man, right?

4    A    Yes.

5    Q    And day in and day out, month in and month out for a

6    long time he was lying to the FBI because of this

7    relationship and this theft that he had taken from this man

8    Shear, right?

9    A    Yeah, at the time when, you know, we discovered that

10   Mr. Kasman had been lying to us and had committed that crime,

11   then he was charged with those crimes.

12   Q    Different question.  For a long time he kept you in the

13   dark and lied to you literally every day?

14   A    Yes, he did.

15   Q    Worse, isn't it true, sir, that the only reason you

16   found out about this was because Mr. Kasman was recording a

17   conversation with the man who had introduced him to Shear, Jo

18   Jo Corozzo, and on the tape while you guys are listening you

19   hear Corozzo berating Mr. Kasman about the money he stole,

20   right?

21   A    It came to our attention after reviewing the recordings

22   with Mr. Corozzo, yes.

23   Q    You said, hey, Mr. Kasman, is this true, did you really

24   steal $80,000?  And only then did you come clean with you,

25   right?

```
 1    A    Yes, after we confronted him on several occasions he

 2    admitted to stealing the money.  Yes.

 3    Q    Now, in two and a half years that Lewis Kasman is going

 4    around with an FBI wire and tape recording people, how many

 5    taped conversations do you have of Mr. Kasman speaking with

 6    my client John Artuso?

 7    A    None, sir.

 8    Q    And in the 130 or so meetings that you're aware of that

 9    Mr. Lewis Kasman had with people who were involved in

10    organized crime, in how many of those meetings to your

11    knowledge did Mr. John Artuso participate?

12    A    I'm sorry.  How many meetings did he participate in?

13    Q    Yes.

14    A    He never met Mr. Kasman, sir.

15    Q    Zero meetings?

16    A    As far as I know, during that consensual recorded period

17    he never met Mr. Kasman.

18              MR. PASANO:  That's all I have.  Thank you.

19              THE COURT:  Mr. Markus.

20              MR. MARKUS:  Thank you, your Honor.

21              Good afternoon, ladies and gentlemen.

22                          CROSS-EXAMINATION

23    BY MR. MARKUS:

24    Q    Agent, my name is David Markus.  I represent Greg Orr.

25    A    Good afternoon, sir.
```

1  Q    Good afternoon.  When you first took the stand, you

2  raised your right hand, did you not?

3  A    Yes, sir.

4  Q    You took an oath?

5  A    I did.

6  Q    Took an oath to tell the truth?

7  A    Yes.

8  Q    The whole truth?

9  A    Yes.

10  Q    And nothing but the truth?

11  A    Yes.

12  Q    So help you God?

13  A    Right.

14  Q    And that's an important oath, right?

15  A    Very.

16  Q    I mean, that's what our criminal justice system is built

17  on, that oath, right?

18  A    Correct.

19  Q    A witness has to get into that stand and respect the

20  oath?

21          MR. McCORMICK:  Objection.

22          THE COURT:  Basis?

23          MR. McCORMICK:  The basis is he characterizing the

24  witness' testimony.

25          THE COURT:  Overruled.

1          MR. McCORMICK:  He's not asking questions.

2          THE COURT:  The objection is overruled.

3     BY MR. MARKUS:

4     Q    I mean, the basis, the foundation of our criminal

5     justice system is a witness gets in that chair and swears to

6     tell the truth, right?

7     A    Correct.

8     Q    If we can't trust the witness, we can't -- our criminal

9     justice system doesn't work, correct?

10    A    Correct.

11    Q    And Lewis Kasman has gotten into that chair before,

12    hasn't he?  Into a witness chair.

13    A    Well, a witness chair in a courtroom proceeding?

14    Q    Yes.  He has sworn to tell the truth just like you did

15    today, right?

16    A    I don't know if he's ever testified in court before.

17    Q    Okay.  Has he taken an oath to tell the truth like you

18    did today?

19    A    On what occasion, sir?

20    Q    On any occasion.

21    A    He has testified before in grand juries, I believe, and

22    deposition.

23    Q    And he didn't respect that oath, did he?

24          MR. McCORMICK:  Objection, your Honor.  Irrelevant.

25          THE COURT:  I think you've got to be more specific.

1    If you can restate your question in a different fashion.

2              MR. MARKUS:  Sure.

3    BY MR. MARKUS:

4    Q    He's a convicted perjurer, is he not?

5    A    Yes, he is.

6    Q    And a perjurer is someone who takes the oath and then

7    lies?

8    A    Correct.

9    Q    And Mr. Kasman has not only lied under oath, he's lied

10   to you, we've heard, correct?

11   A    Yes.

12   Q    He's lied to many people?

13   A    I don't know about that, sir.

14   Q    He's a criminal?

15   A    Yes.

16   Q    And Lewis Kasman isn't on any type recordings or audio

17   recordings or video recordings with Greg Orr, correct?

18   A    No, sir.

19   Q    So if he gets in that witness chair and says he had a

20   meeting with Greg Orr, we would have to take --

21             MR. McCORMICK:  Objection.  Improper

22   cross-examination.

23             MR. MARKUS:  I haven't asked the question yet.

24   BY MR. MARKUS:

25   Q    We'll have to take his word for it, won't we, sir?

1    A    Can you repeat the question, sir?

2    Q    Sure.  If Mr. Kasman gets in that chair and says that he

3    had a meeting with Greg Orr, we'll just have to take his word

4    for it?

5              MR. McCORMICK:  Objection.

6              THE COURT:  Sustained.

7              MR. McCORMICK:  Improper cross-examination.

8    BY MR. MARKUS:

9    Q    There's no taste comparing --

10             THE COURT:  I sustained your objection.  Please

11   let's not argue it.  Make an objection.  Let me rule on so we

12   can move on.

13   BY MR. MARKUS:

14   Q    Needless to say, there's no meetings on tape recording,

15   video or otherwise, with Mr. Kasman and Mr. Orr?

16   A    None that I was involved with, sir.  No.

17   Q    Well, none at all?  You reviewed them before coming here

18   today, right?

19   A    Like I said, through my investigation, no, to my

20   knowledge Mr. Kasman never recorded Mr. Orr.

21   Q    Okay.  And just so we're clear, the money that has been

22   paid to Mr. Kasman, that's more money than you make, correct?

23   A    Over the course of?

24   Q    $12,000 a month is more than you make?

25             MR. McCORMICK:  Objection.  Relevancy.

```
 1                    THE COURT:  Sustained.

 2    BY MR. MARKUS:

 3    Q    I mean, we're paying the bad guys more than we pay the

 4    good guys?

 5              MR. McCORMICK:  Objection, your Honor.

 6              THE COURT:  Sustained.

 7              MR. MARKUS:  I have nothing further.

 8              THE COURT:  Further cross-examination.

 9              MR. ENTIN:  No questions, Judge.

10              MR. KAISER:  No questions.

11              THE COURT:  Redirect?

12              MR. McCORMICK:  Just A few questions, your Honor.

13                         REDIRECT EXAMINATION

14    BY MR. McCORMICK:

15    Q    On cross-examination I believe with Mr. Birch he asked

16    you questions involving the type of danger that Mr. Kasman

17    was in or was he in danger in the surveillances that were

18    involved by you in terms of determining the danger; isn't

19    that right?

20    A    Yes.

21    Q    You started to answer a question about types of

22    predicaments that came up during those surveillance of

23    Mr. Kasman when he was working as a cooperating witness.  Can

24    you explain that, what type of danger existed at that time?

25    A    Well, Mr. Kasman was conducting recordings with, you
```

1    know, people who had been associated with organized crime for

2    several decades and, you know, had been known to commit acts

3    of violence in the past.  So, there was always the concern

4    that, you know, if Mr. Kasman's identity or the fact that he

5    was cooperating with the Government was, you know,

6    discovered, that, you know, he would be harmed.

7    Q    Were there any counter surveillance or counter measures

8    taken by people that Mr. Kasman was recording?

9    A    Yes, there was occasions where counter surveillance was

10   conducted by the targets of the investigation.

11   Q    Could you explain at that to jury, please?

12   A    Well, on occasion, you know, individuals will -- if they

13   believe that they're being surveilled, they will conduct

14   counter surveillance techniques as far as, you know, evasive

15   driving techniques or they'll position, you know, individuals

16   in a parking lot to observe who comes and goes from a

17   particular meeting place, add things like that, to see if the

18   location is under surveillance.

19   Q    So you're mindful of that at the time that you're

20   deciding whether you would surveil or not surveil?

21   A    Always.

22   Q    Were there any incidents with a cell phone?

23   A    Yes, there was occasion on recorded conversations

24   where -- I recall one in particular where Joseph Corozzo

25   instructed Mr. Kasman to leave his cell phone either in the

1  car or remove the battery because Mr. Corozzo's aware that

2  sometimes cell phones are used as recording devices.

3  Q    Now, I think it was Mr. Markus commented about -- no, I

4  don't think it was.  I think it was Mr. Pasano.  Excuse me.

5  Commented about the fact that the divorce -- on the divorce

6  proceeding that was going on and his assets that he was asked

7  about in his divorce proceedings, and he asked you various

8  questions about that?

9  A    Yes.

10  Q    When did you stop giving money to Mr. Kasman?  Was it

11  before or after those divorce proceedings?

12  A    I'm not sure, sir.

13  Q    You're not sure?

14  A    I'm not sure what the date of the divorce proceedings

15  that defense counsel was referencing.

16  Q    If he's referencing January of 2008.

17  A    No, at that point Mr. Kasman was no longer receiving

18  anymore money.  After July of 2007 Mr. Kasman received no

19  more monthly payments from the FBI.

20  Q    Why was the money cut off in July of 2007?

21  A    It was at that point that we had discovered that

22  Mr. Kasman had stolen the money from Mr. Shear, and at that

23  point Mr. Kasman agreed to plead guilty to all the crimes

24  that he had committed, including, you know, stealing money

25  and lying to the FBI.

1   Q    Now, he did plead guilty to making false statements to

2   the FBI?

3   A    Yes, he did.

4   Q    And the Harvey Shear wire fraud?

5   A    Yes, he did.

6   Q    And the obstruction of justice?

7   A    Correct.

8   Q    And he also pled guilty to yet another crime, that he

9   had confessed to the Brooklyn strike force to; is that right?

10  A    Yes, he pled guilty to restaurant extortion in the

11  Eastern District of New York, and also racketeering charges.

12          MR. McCORMICK:  Excuse me one second.

13      (Pause in Proceedings.)

14          MR. McCORMICK:  Thank you, sir.

15          THE COURT:  All right.  Thank you, sir.  This is

16  probably a natural time for us to take a break.  Let's return

17  at five minutes after 3:00.

18      (Jury out at 2:49 p.m.)

19          THE COURT:  Okay.  We'll be in recess 15 minutes.

20      (Recess at 2:50 p.m.)

21          THE COURT:  Okay.  Ready for the jury?

22          MR. McCORMICK:  Yes, your Honor.

23          THE COURT:  Please invite the jury in.

24      (Jury in at 3:08 p.m.)

25          THE COURT:  Welcome back.  Please be seated.

1           Okay.  Mr. McCormick, what's next?

2               MR. McCORMICK:  Lewis Kasman.

3           LEWIS KAZMAN, GOVERNMENT'S WITNESS, SWORN

4                       DIRECT EXAMINATION

5   BY MR. McCORMICK:

6   Q    Good afternoon.

7   A    Good afternoon.

8   Q    Could you state your full name for the jury, please; and

9   spell your last name.

10  A    Lewis Kasman, K-A-S-M-A-N.

11  Q    How old are you, Mr. Kasman?

12  A    51.

13  Q    Okay.  Tell the jury where you were born, please?

14  A    I was born in Brooklyn, New York.

15  Q    What's the extent of your education from high school on?

16  Could you tell us that, please?

17  A    One year at St. John's University.

18  Q    That's in New York?

19  A    Yes.

20  Q    Where did you go high school?

21  A    Richmond Town Prep in Staten Island, New York.

22  Q    And what, did you grow up on Staten Island?

23  A    For several years, yes.

24  Q    And are you married?

25  A    Yes, I am.

235

```
 1    Q    Are you in the process of divorce?

 2    A    Yes.

 3    Q    Let's talk a little bit about your employment history,

 4    Mr. Kasman.  Okay?  Where did you -- did you work for Nassau

 5    County for an executive?

 6    A    Yes, I did.

 7    Q    What year did you do that?

 8    A    In the '70s.

 9    Q    Would 1976 be accurate?

10    A    Approximately '76, '77.

11    Q    What did you do for them?

12    A    I handled his scheduling.

13    Q    What does that mean?

14    A    His appointments, his day-to-day itinerary.

15    Q    Was this the first adult job that you had in 1976?

16    A    Yes.

17    Q    How long did you work for the Nassau County executive?

18    A    Approximately two and a half years.

19    Q    After the two and a half years, where did you go?

20    A    I went to work for New York State Assemblyman Armand

21    D'Amato.

22    Q    Would you spell that for reporter, please?

23    A    D'Amato, D' A-M-A-T-O.

24    Q    Now he was an assemblyman.  Where did you work?

25    A    In Freeport, New York, out of his local district office.
```

236

1   Q    What was your job with Mr. D'Amato?

2   A    Constituent matters, constituent complaints.

3   Q    So if a voter called and he was upset, you'd handle it?

4   A    Yes.

5   Q    And Mr. D'Amato was an assemblyman; is that what it's

6   called in New York?

7   A    Yes, he was a legislator, a New York State Assemblyman.

8   Q    And for how long did work for Mr. D'Amato from 1978 on?

9   A    I was working in his legislative office for several

10  years and then he transferred me over to his law office in

11  Mineola, New York.

12  Q    What did you do in his law office when you transferred

13  over there?

14  A    Basically, the same function.  Legislative matters and

15  some personal affairs of his scheduling; things of that

16  nature.

17  Q    Virtually the same job you had when you worked for him

18  as an assemblyman, when he was an assemblyman?

19  A    Basically, yes.

20  Q    Who is Mike Coiro?

21  A    Mike Coiro was my immediate next-door neighbor who was a

22  criminal defense attorney in New York.

23  Q    Now you say he was your immediate next-door neighbor.

24  When did you meet Mike Coiro?  Am I saying that correctly?

25  A    Yes.  Michael Coiro.

1    Q    Could you spell it for the court reporter?

2    A    Sure C-O-I-R-O.   Coiro.

3    Q    Go ahead.

4    A    I met Mike in 1974.

5    Q    And he was your next-door neighbor, correct?

6    A    That's correct.

7    Q    You lived with your parents at that time?

8    A    Yes.

9    Q    For how long did you associate with Mike Coiro while you

10    lived next door to him?

11    A    He was my next-door neighbor so I saw Mike all the time.

12    It went on until he died.

13    Q    Now, you indicated that he was a criminal defense

14    attorney.

15    A    Yes.

16    Q    Did you get to know people that he was defending at his

17    house when you were growing up?

18    A    Yes, I did.

19    Q    How would that come about; could you explain that to the

20    jury, please?

21    A    Well, Mike was a kind of friendly guy so his clients and

22    people would come to his home and visit with him.   And I was

23    in his home quite a bit and that's how I would get to know

24    these different individuals.

25    Q    When you say different individuals, who did you meet

1    through Mike Coiro at his home?

2    A    I met John Gotti Senior, I met Gene Gotti, I met Angelo

3    Ruggiero, Mark Ryder, numerous, numerous people.

4    Q    What was the basis of your relationship with the

5    individuals that you just identified?

6    A    The first time I met Gene Gotti or John Gotti, it was

7    just a -- I was just introduced to them on that first instant

8    and then it progressed from there as their constant presence

9    at Mike's house.

10    Q    And who was John Gotti?

11    A    At that time John Gotti was a captain of the Gambino

12    family.

13    Q    How about Gene Gotti?

14    A    He was a soldier in the Gambino family.

15    Q    Now, you met some other people -- I forgot the name of

16    the third person you mention?

17    A    Angelo Ruggiero?

18    Q    Who was he?

19    A    He was a soldier in the Gambino family.

20    Q    And was this the first time you became aware of the

21    Gambino crime family at all?

22    A    Yes, it was through Mike Coiro, yes.

23    Q    Did Mr. Coiro represent these individuals?

24    A    Yes, he did.

25    Q    Did you become aware of any other organized crime family

1    in the same context when you were socializing with Mike

2    Coiro?

3    A    There were other individuals that would come by Mike's

4    house from other organized crime families, but primarily

5    Mike's focus was the criminal defense of members of the

6    Gambino organized crime family.

7    Q    Okay.  At that time, what time period are we speaking

8    about, the early 1980s?

9    A    Yes, around 1982.  Around that time period.

10   Q    And were you still working at Mr. D'Amato's law office

11   with constituency work?

12   A    Yes.

13   Q    Did there come a time that you talked with Mike Coiro

14   about other employment?

15   A    Yes.

16   Q    And would that be about the time we're speaking about,

17   the early 1980s?

18   A    Yes.

19   Q    Now, a lot of these dates, it's been so long you're

20   approximating the dates; is that a fair statement?

21   A    That's correct.

22   Q    What kind of a job did you, did Mr. Coiro get for you at

23   about that time?

24   A    Mike had come to me and indicated that a gentleman by

25   the name of Philip Basile, a Lucchese associate and also a

240

```
 1   client of the D'Amato law firm, needed someone to take over
 2   the operations of his nightclubs because he was under
 3   indictment at the time.
 4   Q    Okay.  Phil Basile, could you spell Basile for the court
 5   reporter?
 6   A    Sure.  B-A-S-I-L-E.
 7   Q    And did you meet with Phil Basile?
 8   A    Yes, I did.
 9   Q    Were you hired?
10   A    Yes, I was.
11   Q    In what capacity were you hired by Phil Basile in the
12   early 1980's?
13   A    Operations.
14   Q    What does that mean?
15   A    He was a major nightclub operator and promoter on Long
16   Island and he had four nightclubs, and I was running the
17   day-to-day operations of those clubs.
18   Q    Would you -- go ahead.
19   A    Sorry?
20   Q    Are you finished?
21   A    Yes.
22   Q    Were you given any instructions prior to commencing your
23   work with Phil Basile regarding those four nightclubs?
24   A    Yes.
25   Q    And who gave you instructions?
```

241

```
 1    A     I got instructions from Mike Coiro and Gene Gotti.

 2    Q     What did Gene Gotti tell you?

 3    A     Gene indicated to me that I'm with him and Phil Basile

 4    was with Paul Vario at the time.

 5    Q     Now who was Paul Vario?

 6    A     Paul Vario at the time -- he is deceased now -- at the

 7    time he was a captain in the Lucchese crime family.

 8    Q     Okay.  Now, what instructions were you given by Gene

 9    Gotti?

10    A     Before I could go to work there, they had to go -- there

11    was a meeting between Paul Vario and Gene Gotti to clear that

12    up, so that -- because I was a Gambino guy with Gene Gotti

13    and being that Phil was a Lucchese guy, they had to get that

14    approved and sanctioned, which they did.

15    Q     Now, you mentioned that you were with, you were told by

16    Gene Gotti that you were with him.

17    A     Right.

18    Q     Is that the first time you heard that type of

19    terminology?

20    A     At point in time, yes.

21    Q     Was it explained to you what that meant in terms of your

22    pursuing working for the Phil Basile?

23    A     Yes, I understood what that meant.

24    Q     Tell the jury how you understood that?

25    A     When you're with someone who is a member of organized
```

1   crime, if you have any problems with other members of

2   organized crime be it within your own family or other

3   families, you go to that individual who is a made member of

4   the organized crime family with who you are with.  So you go

5   to him for any issues or resolutions that you need done on

6   your behalf.

7   Q    And what was your day-to-day activity at the four clubs

8   owned by Phil Basile?

9   A    It was general operations.  Hiring, firing, ordering

10  liquor.  Things, you know, normal management

11  responsibilities.

12  Q    Were you involved in any illegal activity at that

13  particular time of your life?

14  A    No.

15  Q    And you were still with Gene Gotti though; is that

16  correct?

17  A    Correct.

18  Q    All right.  Now, did there come a time that you left

19  Phil Basile and his four nightclubs?

20  A    Yes.

21  Q    And do you remember when that date was, just

22  approximately?

23  A    I would say in the late '80s.

24  Q    Late 80's?

25  A    I would say late '80s.  Maybe mid to late '80s.

1    Q    Mid 80's or late 80's?

2    A    Around that time.

3    Q    What happened to cause you to change your business

4    activity?

5    A    Michael Coiro was indicted out of the Eastern District

6    of New York and he could no longer practice law.

7    Q    So who told you this?

8    A    Mike told me.  It was well publicized.

9    Q    What was proposed after Mike Coiro was indicted in the

10   Eastern District of New York?

11   A    We were to go to the garment center and open up a

12   business.

13   Q    Did you have any experience in the garment center at

14   that time?

15   A    Not me personally, no.

16   Q    Okay.  Did you speak with anybody else affiliated with

17   the Gambino crime family before you and Mike Coiro decided to

18   open a business in the garment center?

19   A    Yes, we did.

20   Q    Who did you speak to?

21   A    We spoke with Gene Gotti, Angelo Ruggiero.  At that

22   point those were the two people we spoke with.

23   Q    You were still with Gene Gotti at that time?

24   A    Yes.

25   Q    Okay.  Did you open a business in the garment center?

1    A    We did.

2    Q    Before we get into that, could you explain to the jury

3    what the garment center is, more appropriately was, in New

4    York in the mid 1980's?

5    A    It is about a ten-block radius, going east and west.

6    Maybe 12 blocks.  And it's different manufacturing houses

7    that manufacturer women's ware, men's ware and people pushing

8    push carts in the street, trucks going back and forth; and

9    things of that nature.  That was the heart of the garment

10    center before everything was now done offshore.

11    Q    Okay.  What type of a business did you and Mike Coiro

12    open in the garment center?

13    A    We opened up a company known as a trimming business.

14    Trimmings.

15    Q    Could you explain what trimming is to the jury, please?

16    A    Trimmings.  On the women's side, when a woman's product

17    is made, a blouse or a suit or whatever, there's buttons,

18    there's elastic, there's zippers, there's shoulder pads.

19    Plastics bags, hangars.  We sold all those products that went

20    into making the woman's garment.

21    Q    You say you and Mike Coiro did?

22    A    Correct.

23    Q    And for -- did that business, was that business

24    successful initially with Mike Coiro?

25    A    No.

1  Q    And did you go to anyone to complain about the lack of

2  business in the garment center?

3  A    Yes, I did.

4  Q    Did you talk with John Gotti or Gene Gotti about it?

5  A    I did.

6  Q    Did you talk to John Gotti about it?

7  A    After I spoke to Gene, he directed me to go see his

8  brother John.

9  Q    Did you go see his brother John?

10 A    Yes, I did.

11 Q    Is that in the mid 1980's, more or less?

12 A    Yes, it is.

13 Q    Where did you meet John Gotti when you were making your

14 complaint about the garment center?

15 A    I met John in the -- he was on trial before Judge

16 Nickerson in the Eastern District of New York in Brooklyn.

17 Q    What do you mean he was on trial?  Could you explain

18 that?

19 A    He was charged with various crimes and he was on trial

20 before the Court.  And I met him in the courthouse.

21 Q    And in the courthouse, did you make your complaint about

22 the garment center?

23 A    Yes, I did.

24 Q    And did you also meet John Gotti anywhere else about

25 complaints about the garment center?

1    A    Yes, I did.

2    Q    Where did you meet him?

3    A    At the Bergin Hunt & Fish Club.

4    Q    Would you just take a second and explain where the

5    Bergin Hunt & Fish Club was and what it was?

6    A    The Bergin Hunt & Fish Club is a social club, located on

7    101st Avenue in Ozone Park, Queens, New York.  And it's a

8    social club where -- a social club controlled by John Gotti

9    Senior and it's a club where his men, made members,

10    associates, captains, would, see him, pay respects to him,

11    talk to him, things of that nature, play cards, hang out,

12    just, you know, a social club filled with members of

13    organized crime and associates.

14    Q    Were you entitled to go there because of your

15    relationships?

16    A    Yes.

17    Q    Could anybody come into the Bergin Hunt & Fish Club off

18    the street and buy a drink?

19    A    No.

20    Q    No.  Was somebody at the door to prevent that?

21    A    I don't know if someone was at the door, but you knew,

22    you weren't going in there to buy a drink.

23    Q    All right.  Now, as a result of your conversations with

24    John Gotti at -- during this criminal trial and at the Bergin

25    Hunt & Fish Club, did business improve at the garment center?

1    A    Yes, after my final conversation with John at the Bergin

2    Hunt, business improved.

3    Q    By the way, what was the name of the business that you

4    and Mike Coiro had in the garment center?

5    A    Scorpio Marketing.

6    Q    Was that your business or Mike Coiro's?

7    A    That was Mike Coiro and John's business.

8    Q    So they incorporated that business?

9    A    Yes, they did.

10    Q    That was the business that you initially opened in the

11    garment center?

12    A    Scorpio Marketing was the business that John and Mike

13    owned jointly as president and vice president.

14    Q    Okay.  So when you opened the business in the garment

15    center, that was the corporation you used?

16    A    There was a business before that known as HJM

17    Industries, the business that was failing.  And then once I

18    went to John, that's when we made the switchover.

19    Q    You changed corporations so to speak?

20    A    Yes.

21    Q    And the owners of that corporation were?

22    A    John was the president and Mike was the vice president.

23    Q    When you say John, who are you referring to?

24    A    I'm referring to Join Gotti, Senior, and Mike Coiro was

25    the vice president.

1    Q    Okay.  Now, so Scorpio Marketing was the new

2    corporation, correct?

3    A    Yes.

4    Q    Okay.  Were you engaging in any criminal activity once

5    you returned to the garment center after your complaint to

6    John Gotti and after John Gotti and Mike Coiro opened this

7    new business?

8    A    Yes.

9    Q    Could you explain the types of criminal activity that

10   you and John Gotti and Mike Coiro were engaged in, in the mid

11   to mid 1980's?

12   A    We were money laundering, phoney invoicing, overbilling.

13   Q    Just very briefly, could you explain what overbilling

14   meant in the garment industry?

15   A    Overbilling is when you create a bill with a proof of

16   delivery and you're overcharging the customer.  If an item

17   cost a dollar, perhaps we would charge $3.  That's known as

18   overbilling.

19   Q    How about selling cash, did you engage in that with Mike

20   Coiro and John Gotti?

21   A    Yes, I did.

22   Q    Now, we're referring to John Gotti Senior, are we not?

23   A    Yes.

24   Q    Tell us about what selling cash meant in the garment

25   center?

1    A    Manufacturers in New York City that are in the garment

2    center, they have an inability to raise cash without writing

3    a check and going to the bank to cash a check.  So they come

4    to me, I would generate an invoice, let's say for $100,000,

5    and I would charge them 20 or 30 percent.  So I would give

6    them the difference of the 100,000 between whatever the

7    interest rate would be in cash.

8             And that's what you call selling cash.  So, on a

9    hundred thousand dollars if you were charging 20 percent,

10   it's -- that's what you would make on that.

11   Q    How did you get the cash yourself to engage in that type

12   of a transaction?

13   A    Through John Gotti Senior.

14   Q    And where was that money coming from, if you know?

15   A    The money was coming -- he was the boss of the family,

16   so it was coming from the Gambino organized crime family.

17   Q    Now, what kind of money laundering was going on beyond

18   what you've described already, Mr. Kasman?  Was there any

19   other money laundering going on in the garment center, do you

20   recall?

21   A    The selling of the cash, the money laundering, the

22   overbilling.  The other types of money laundering was, I was

23   writing checks on behalf of John in exchange for the cash.

24   So that would be the additional type of money laundering.

25   Q    Now, in 1986, can you tell the jury who the boss of the

1  Gambino crime family was?

2  A    In what year?

3  Q    1986.

4  A    John Gotti was the boss then.

5  Q    And had he just become boss?

6  A    Yes.

7  Q    And who was the prior boss?

8  A    Paul Castellano.

9  Q    And did he die?

10  A    Yes.

11  Q    Turning your attention to 1987, 1988, did you form any

12  new corporations in the garment center at that time, or

13  companies, let's say that?

14  A    Yes, we did.

15  Q    What did you form?

16  A    We formed that new company called Scorpio Marketing Inc.

17  Q    That was -- you already referred to that.  Did you form

18  any other companies?

19  A    There were two existing companies.  Albie Trimming

20  located at the same location as Scorpio Marketing and

21  Copymatic Corporation located on 35th Street in New York

22  City.

23  Q    So the operating -- the company, Scorpio, was operating

24  at full board before these two companies and your partners

25  got into this garment center?

1    A    Albie Trimming and Copymatic were in existence prior to

2    Scorpio Marketing.  Scorpio Marketing came after that.

3    Q    And who were your partners in Copymatic and Albie

4    Trimming?

5    A    Albie Trimming, I was a commissioned salesman.  I was

6    not a partner.  The owners of that company were Albie and

7    Robert Kula.  And Copymatic Corp, I was partners with Joseph

8    Rogavan (phonetic).

9    Q    Turning your attention to Scorpio Marketing again, did

10   you have any arrangement with John Gotti concerning no-show

11   jobs during this period of time?

12   A    Yes, I did.

13   Q    Explain to the jury what a no-show job was, if you

14   would -- or is?

15   A    Well, the boss of an organized crime family needs to

16   show legitimate income to substantiate some portion of his

17   lifestyle, and until we formed Scorpio Marketing, John had no

18   ability to have any legitimate income, except some minor

19   income coming in, and it really wasn't enough to

20   substantiate.  So we formed Scorpio Marketing for the sole

21   purpose of providing a no-show job to John Gotti Senior.

22   Q    How did you do that?

23   A    I took sales from accounts that I had and accounts that

24   John gotten me and I put X amount of sales into Scorpio

25   Marketing to cover John's paycheck and also one of John's

```
 1    associate's paychecks.

 2    Q    Who was the associate you were also covering on a

 3    no-show job?

 4    A    Jackie D'Amico.

 5    Q    Did either of those individuals work at Scorpio

 6    Marketing?

 7    A    No.

 8    Q    And you would give them checks how often?

 9    A    Weekly.

10    Q    And did John Gotti or Jackie D'Amico, did they fund any

11    of the checks that were given to them?

12    A    No.

13    Q    They all came from you in the manner you just described?

14    A    Yes.

15    Q    In about 1987, did you get married?

16    A    Yes.

17    Q    And did you have a big wedding?

18    A    Yes.

19    Q    And who did you invite to the wedding of the Gambino

20    people that you could describe?

21    A    Thomas Gambino, Joe Gambino, Danny Fattico (phonetic),

22    Mike Coiro, Jo Jo Corozzo, Jackie D'Amico.  I believe I

23    mentioned John.  I think that's about it.

24    Q    There may have been others though?

25    A    There might have been others.
```

1    Q    Let me show you Government's proposed Exhibit 4310.

2    43.10.

3              MR. McCORMICK:  May I approach the witness, your

4    Honor.

5              THE COURT:  Yes.

6    BY MR. McCORMICK:

7    Q    And ask just generally describe what that is?

8    A    Okay.  This is a wedding picture from my wedding.

9    Q    And is the scene there, does that accurately depict the

10   scene?

11   A    Yes.

12             MR. McCORMICK:  Your Honor, I offer 46.10 into

13   evidence.

14             THE COURT:  Was it 43.10?

15             MR. BIRCH:  I have no objection.

16             MR. MARKUS:  401 and 403.

17             MR. McCORMICK:  I'm sorry?

18             MR. MARKUS:  401 and 403, your Honor.

19             THE COURT:  All right.  43.10 admitted over

20   objection.

21        (Received in evidence Government's Exhibit(s) 43.10.)

22   BY MR. McCORMICK:

23   Q    That, obviously, was taken at a table at your wedding;

24   is that correct?

25   A    Yes.

1    Q    Can you identify the individuals, starting with the

2    individual in the far right in the back?

3    A    Yes.  That's Danny Fattico and his wife Margie.

4    Q    And who is Danny Fattico?

5    A    Danny Fattico was a soldier in the Gambino organized

6    crime family.

7    Q    And his wife Margie.  Who is next to his wife, Marjorie?

8    A    That's my father-in-law, Albert Kula.

9    Q    That's the individual you were in business with in the

10   garment center?

11   A    Yes.

12   Q    And who is next to that?

13   A    That's his wife, Sandy Kula.

14   Q    Who is next to her?

15   A    That's my wife.

16   Q    Is that your bride?

17   A    Yes.

18   Q    Okay.  And who is next to your wife?

19   A    Michael Coiro.

20   Q    That's the individual that you were partner with in the

21   garment center, correct?

22   A    Yes.

23   Q    Okay.  Down here, I guess that's you, isn't it?

24   A    That's me.

25   Q    Several years ago?

```
 1    A    A couple years younger.

 2    Q    And who is next to you?

 3    A    John Gotti Senior.

 4    Q    And who is next to John Gotti Senior?

 5    A    Jackie D'Amico.

 6    Q    Does he have a nickname?

 7    A    Jackie Nose.

 8    Q    And who is next to Jackie Nose?

 9    A    Jo Jo Corozzo.

10    Q    Who is next to him?

11    A    Stephanie Coiro, Mike' wife.

12    Q    Thank you.  In 1986 and 1987 while you were in business

13    in the garment center, and while you were socializing with

14    John Gotti in criminal acts, or I should say socializing and

15    committing criminal acts, did you ever meet an individual by

16    the name of Vinnie Artuso?

17    A    At that time I was never formally introduced to Vinnie,

18    but I did see him, yes.

19    Q    What do you mean by formally introduced?

20    A    I would see Vinnie at the Ravenite Social club.

21    Q    Is he in the courtroom today?

22    A    Yes, he is.

23    Q    Would you identify him for the Court and jury?

24    A    The gentleman in the blue suit jacket.

25         MR. McCORMICK:  Your Honor, the record should
```

1    reflect that he has identified Vincent Artuso.

2    BY MR. McCORMICK:

3    Q    What other individuals did you meet while you were --

4    strike that.

5         Can you describe to the jury how your relationship

6    with John Gotti changed, if it did, through the mid to late

7    1980s?

8    A    We became very close friends.  It developed into a

9    father/son relationship.

10    Q    Could you describe, if you would, how you interacted

11    with John Gotti or his family, with a small F?

12    A    Okay.  Members of the -- members of John's organized

13    crime family -- members of the Gambino family were not

14    permitted at his home or certain functions.  I was permitted

15    at his home.  I was invited to all of his family functions.

16         I made the wedding when his son got married, so I

17    was intimately involved with his family, his children,

18    et cetera.

19    Q    And through John Gotti did you meet other members of the

20    Gambino crime family?

21    A    Yes, I did.

22    Q    And some of those that are in the wedding picture,

23    correct?

24    A    Yes.

25         (Pause in Proceedings.)

```
 1    BY MR. McCORMICK:

 2    Q    Let me show you, first of all, photograph, proposed

 3    Government Exhibit 47.1.  Can you identify that person?

 4    A    Yes.

 5    Q    Who is it?

 6    A    That's Richard Gotti Senior.

 7    Q    And who is he?

 8    A    At some point in time he was a captain.  He is no longer

 9    a captain.

10    Q    47.2, can you identify whose picture that is?

11    A    That's Jo Jo Corozzo.  The consigliere of the Gambino

12    crime family.

13    Q    He wasn't then though?

14    A    No, he was not.  Currently, he is.

15    Q    How about 47.3?

16    A    That's Carlo Vaccarezza, an associate of the Gambino

17    crime family.

18    Q    How about 47.6.  47.4?

19    A    That is Jackie Nose, Jackie D'Amico.

20    Q    47.5?

21    A    This is Uncle Pete.  It's Peter Gotti Senior.

22    Q    You say Uncle Pete, what is that, a nickname?

23    A    That's what I referred to him over the years as, is

24    Uncle Pete.

25    Q    And that is John Gotti's brother?
```

1   A    That's John Gotti's brother.

2   Q    47.6.

3   A    This is Danny Marino, captain of the Gambino family.

4   Q    And 47.7.

5   A    That's Nickey Corrozo.

6   Q    Is he related to Joseph Corozzo?

7   A    That's his brother.

8   Q    How about 47.8?

9   A    This is Emil Pellino, an associate.

10  Q    What's an associate?

11  A    An associate is a non-made member, part of a crew that

12  belongs to a captain.

13  Q    And you were also an associate at this point in your

14  relationship with the Gambino crime family?

15  A    Yes.

16       MR. McCORMICK:  Your Honor, I would offer 47.1

17  through 47.8 into evidence at this time.

18       MR. BIRCH:  Your Honor, if I may clarify, other

19  than the objections previously raised as to Exhibit 43.10,

20  the wedding photograph that was just introduced, I have no

21  objection and I would say the same thing as for these

22  exhibits.

23       THE COURT:  I'm not sure I understood that.

24       MR. BIRCH:  The objections were raised previously

25  to this testimony in general.

```
 1                    THE COURT:  All right.

 2                    MR. BIRCH:  Our pretrial motion primarily.

 3                    THE COURT:  Okay.  Other than that, you have no

 4    objections to 47.1 through 8.

 5                    MR. BIRCH:  That's correct.

 6                    MR. MARKUS:  401 and 403, your Honor.

 7                    THE COURT:  47.1 through 8 are admitted over

 8    objection.

 9         (Received in evidence Government's Exhibit(s) 47.1

10    through 47.8.)

11    BY MR. McCORMICK:

12    Q    Again, 47.1 Mr. Kasman, would you identify that

13    individual for the jury, please?

14    A    Richard Gotti Senior.  Brother of John Gotti.

15    Q    And 47.2?

16    A    Jo Jo Corozzo.

17    Q    By Jo Jo, you mean Joseph Corozzo?

18    A    Yes.

19    Q    You mentioned that he was a consigliere.

20    A    He is the current consigliere.

21    Q    Current?

22    A    Yes.

23    Q    How about 47.3?

24    A    That's Carlo Vaccarezza.  He is an associate of the

25    family.
```

1    Q    47.4?

2    A    That's Jackie D'Amico, the street boss of the Gambino

3    family.

4    Q    Currently?

5    A    Currently.

6    Q    47.5?

7    A    That's Peter Gotti, the boss of the Gambino family.

8    Q    And what relationship is he to John Gotti and Gene

9    Gotti?

10    A    That's their brother.

11    Q    And Richard Gotti?

12    A    All brothers.

13    Q    How about 47.6?

14    A    That's Danny Marino.  A captain in the Gambino family.

15    Q    And 47.7?

16    A    Nickey Corozzo, a captain in the Gambino family.

17    Q    And finally 47.8?

18    A    That's Emil Pellino, an associate in the family with Jo

19    Jo Corozzo.

20    Q    Could you explain what you meant by that?

21    A    He's an associate and he is with, he's assigned to Jo Jo

22    Corozzo.  That's who he reports to.  That's who he goes to if

23    he has any problems or issues on the street, anything that

24    needs to be resolved on his behalf.

25    Q    Now, I think when we left off before we got into the

1    photographs, you were describing to the jury the nature of

2    your relationship with John Gotti Senior.

3    A    Yes.

4    Q    And in terms of that relationship, did you have any

5    dealings with John Gotti Senior concerning large amounts of

6    cash or money?

7    A    Yes, I would -- for years, I held substantial sums of

8    money for John Gotti Senior.

9    Q    When did that begin, Mr. Kasman?

10   A    I want to say that began probably around the late 1980s.

11   That started around the late 1980s.

12   Q    And can you describe to the jury how this came about in

13   terms of what you were asked to do and what you did?

14   A    In organized crime back in those days, there was just a

15   lot, a lot of money and John didn't have the ability where we

16   were going to keep all this money.  So the money was divided

17   up between -- some went to me, some went to his brother,

18   Peter, and some his son, John A. Gotti was entrusted to hold.

19   And that's how that -- that's how we did that.

20   Q    Where was this money coming from, Mr. Kasman, if you

21   know?

22   A    It was coming from organized crime.  As the boss of the

23   family, captains kick up money to the administration and the

24   boss; and that's where the money is derived from.

25   Q    Was there any other moneys coming from the garment

1    center that you were making with John Gotti at Scorpio?

2    A    Yes.

3    Q    I should say at Scorpio and the other two companies.

4    A    Yes.

5    Q    Describe how that money was being processed?

6    A    Well, on the money laundering and on the selling of the

7    cash, that money would just go into the -- into the pot so to

8    speak, the profits of the proceeds of the criminal activity

9    that was being done in the garment center by myself and John

10   and Mike.

11   Q    Could you estimate how much money during that period of

12   time '86, '87, '88, that you and John Gotti and the other

13   people who were involved in the operation were making at the

14   garment center, a ballpark figure?

15   A    Millions of dollars.

16   Q    And you were making it through the illegal activity that

17   you just described to the jury?

18   A    Yes.

19   Q    Selling cash?

20   A    That was our primary source.

21   Q    Double billing?

22   A    Double billing and things like that.  Yes.

23   Q    Getting back to the monies that John Gotti gave to you

24   to store for him, how did you store it?  Can you break that

25   down for the jury, please?

1    A    I stored it in the attic of my house in a toy chest, in

2    paper bags and shoe boxes.

3    Q    And in regular shoe boxes?

4    A    Yes.  It was given to me in shoe boxes.

5    Q    And what was the arrangement you had with John Gotti

6    about your keeping this money for him in your shoe boxes and

7    toy chest?

8    A    I was responsible for paying his personal bills, his

9    legal bills, private investigators, his clothing bills, and

10   anything that he directed me to pay.

11   Q    What types of payments did you make on behalf of John

12   Gotti from the money you were storing in the shoe boxes?

13   A    I would pay attorneys.

14   Q    What other payments?

15   A    Bookmakers.

16   Q    Did John Gotti gamble a lot when you were befriended by

17   him?

18   A    Yes.  John was a very big gambler.

19   Q    Can you describe that to the jury, what his gambling

20   habits were?

21   A    John was a degenerate gambler.  He would bet on horses,

22   on dogs, cats, any baseball game, football game.  Anything

23   you could think of, John liked the action, he liked betting.

24   Q    And you would pay for some of those amusements out of

25   the attic?

1    A    Yes.

2    Q    During that time period Mr. Kasman, did you make any

3    collections for John Gotti?

4    A    At times, certain times, certain captains would give me

5    an envelope with something to give to John.

6    Q    And so you did, yes?

7    A    Yes.

8    Q    And what would you do with the moneys that you collected

9    from the captains?

10    A    I would tell John the amount I collected and either he

11    would say, all right give it to me, or he would say put it

12    with the rest of the money.

13    Q    Did you do that very frequently?

14    A    The captains giving me money was not that frequently.

15    It was more, it was more infrequently.  Most of the money I

16    was getting was directly from the boss of the family.

17    Q    What's the term given to collecting money from the

18    captains for John Gotti or other members of the

19    administration?

20    A    Captains in the organized crime family have a

21    responsibility, and their responsibility is whatever money

22    they make from their crew, either from made members or

23    associates, X amount of dollars has to be kicked up to the

24    administration and to the boss of the family.

25    Q    So that's the money you would be picking up?

265

```
1    A    Yes.

2    Q    Did you kick up, too?

3    A    Yes.

4    Q    Who did you kick up to?

5    A    The boss.

6    Q    To John Gotti?

7    A    Yes.

8    Q    How did you kick up; explain that?  Excuse me, you're in

9    business together?

10   A    Yes, we're in business together.  And what would happen,

11   at the end of the month whatever the profits were, we would

12   just whack it up or split it, or he would take more.

13   Whatever it was.  It wasn't any -- it wasn't a formula.  We

14   just did it on a month to month basis at that point.

15   Q    And did you keep any records of the money that John

16   Gotti was giving you to store for him?

17   A    At the beginning I was keeping some records and then as

18   time went by, I started to keep more detailed records.  Yes.

19   Q    By the way, you know when you visited John Gotti in the

20   federal court where he was being tried, how did he make out

21   in that case?

22   A    He was found not guilty.

23   Q    Now, let's talk a little bit about these social clubs

24   that you've talked about before.  I think you spoke about the

25   Bergin Hunt & Fish Club?
```

1  A    Yes.

2  Q    And what's the other social club that you were aware of

3  or more familiar with?

4  A    The Ravenite is in the City on Mulberry Street and the

5  Bergin Hunt & Fish Club in Queens.

6  Q    Did you frequent both of those clubs?

7  A    Yes, I did.

8  Q    You say it is on Mulberry Street, correct?

9  A    Yes.

10  Q    Did you used to go to the club yourself or with other

11  people?

12  A    Sometimes myself, sometimes with other people.

13  Q    And when you -- was there a schedule of the Ravenite and

14  a schedule at the Bergin Hunt & Fish Club that John Gotti

15  met?

16  A    Yes.

17  Q    Could you explain that to the jury, please?

18  A    Sure.  The Bergin Hunt & Fish Club was the daytime club.

19  That's where friends of John, members, organized crime

20  fellows would come by during the day if they wanted to see

21  John.  John wouldn't get to the club until noon or one

22  o'clock or two o'clock.  He used to sleep in.

23         And then the evenings, Thursday or Friday, were

24  the, sometimes Wednesday, holidays, all of the holiday

25  parties and everything was done on Mulberry Street at the

1    Ravenite Social club.

2    Q    So you went to both with John Gotti or met him there?

3    A    I would either go with him or meet him there.  Yes.

4    Q    Okay.  Mr. Kasman, we have on the monitor certain video

5    clips from the Ravenite Social Club, which has already been

6    admitted as Exhibit 44.

7    A    Okay.

8    Q    And the first date we're going to be showing is

9    April 21, 1988.  And as this clip is playing I'm going to ask

10   you if you can identify the people that you can that are --

11   before we get into that, I want to ask one question I forgot

12   to ask you.

13          Are you aware or do you have knowledge about the

14   concept of walk/talk in relation to the Gambino crime family

15   or organized crime families?

16   A    Yes.

17   Q    What does that mean?

18   A    Walk/talk is -- when you walk in a location where you

19   might think that there is electronic surveillance or the

20   Government watching you or listening to you, you take a

21   walk/talk away from what you're thinking in your mind would

22   be the listening devices.  So you walk/talk down another

23   block.

24   Q    Okay.  And was that -- did you yourself participate in

25   that type of activity outside of the social clubs that were,

1    more particularly, the Ravenite Social club?

2    A    Yes.

3    Q    On a frequent basis?

4    A    Yes.

5    Q    Now, we're going to turn to April 21, 1988.  Now, when

6    that Ravenite clip is playing, I'm going to -- I'm going to

7    try not to stop it.  I'm going to see if you can identify the

8    individuals without stopping it.  If we can do that, it would

9    be obviously more useful time.

10   A    Okay.

11   Q    So we'll see if you can do that, okay?

12   A    Yes.

13   Q    The first date is April 21, 1988.  I'm sorry, it is

14   44.1.  And that would be April 21, 1988.  Now, that is a

15   picture outside of the Ravenite, is it not?

16   A    Yes, it is.

17   Q    Okay.  Do you recognize any of those people in that

18   group, the one with the back to you and the other people?

19   A    Yes, that one gentleman looking with the glasses, that's

20   Iggie Alongo (phonetic).  He is a soldier.

21   Q    Who is the individual shaking hands; do you recognize

22   him?

23   A    I believe that's Mr. Artuso.

24   Q    Which of them?  There are two Mr. Artusos?

25   A    I'm sorry, Vinnie Artuso.

1  Q    Okay.  Where is the entrance?  Is that the entrance

2  right here?

3  A    Yes.  That's Jackie D'Amico.  Nickey Corozzo.

4          MR. McCORMICK:  Could you just put that on pause

5  for a second, please.  Back it up just a hair.

6  BY MR. McCORMICK:

7  Q    Okay.  Now?

8  A    That's Jackie D'Amico shaking hands and kissing.  That's

9  Nickey Corozzo, the shorter fellow next to him.

10 Q    And anybody else that you recognize in that array?

11 A    No, not in that little array.  No.

12 Q    Okay.

13 A    Well, actually, that's Joe Acquirri (phonetic).

14 Q    Who is Joe Acquirri?

15 A    That's a captain of the Gambino family.  That's his

16 cousin, Sal Franco, behind him, that just walked into the

17 club.

18 Q    It's a very narrow entrance, is it not?

19 A    Yes.

20          That's Sammy Gravano.

21 Q    Which one is Sammy Gravano?

22 A    The short guy.

23 Q    Who was Sammy Gravano?

24 A    Sammy Gravano was the underboss at that time.  That's

25 Big Louie, one of Sammy's guys, a captain.  Eddie Garofalo,

1    Gravano's brother-in-law.  A soldier.  That's Sammy at the

2    doorway.

3    Q    In the archway?

4    A    Yes.

5    Q    Of course, there are normal people walking back and

6    forth, too; is that not true?

7    A    Yes.  This is on the street.  That heavyset guy with the

8    glasses, that's Frankie Gapalito (phonetic), a captain in the

9    family at the time.  Deceased now.

10   Q    When you describe them, we can put the pointer on them,

11   if you would.

12   A    He walked in already.

13   Q    Okay.

14   A    The gentleman in the baseball jacket is Bobby Boriello,

15   a soldier, against the wall, his back is to the wall.  That's

16   Gene Gotti standing next to Bobby Boriello, with the black

17   leather jacket on.

18   Q    Who is that in the left side there?

19   A    That's -- on left side, all the way over, that's

20   Mr. Artuso.  Vinnie.  That's Jo Jo Corozzo.

21   Q    What is he wearing?

22   A    I think, I believe he has a long raincoat.  He is

23   walking out of the picture and now, he is back in the

24   picture.

25   Q    Who is that in the doorway again?

1    A    That's Vinnie Artuso in the doorway, walking out.

2          Vinnie is talking to Iggie Alongo.

3    Q    Who is he again?

4    A    Iggie was a soldier in John's crew.

5    Q    By John you mean John Gotti?

6    A    John J. Gotti.  John Senior.

7    Q    And who is behind Vinnie Artuso?  Do you know?

8    A    In the doorway?

9    Q    Yes.

10   A    It looks like Nickey Corozzo or -- I believe that was

11   Nickey Corozzo that just walked in.  Vinnie is walking in now

12   with Boriello and Iggie.

13   Q    Do you know who's behind Vinnie Artuso in that sequence?

14   A    It looks a little like Carlo Vaccarezza.  I believe that

15   is -- it looks like Vaccarezza.  That's Arnold Scaterri

16   (phonetic).  His back against the wall, looking towards

17   Vinnie Artuso.

18   Q    Who is he?

19   A    The taller fellow.

20   Q    What is his rank?

21   A    His rank at the time, he was a made member.  His rank --

22   for a while, he was the acting boss of the family.

23          That's -- that picture again, that's Iggie again,

24   Vinnie Artuso.  I believe that looks like Gene Gotti.  I

25   really -- yeah, that is Gene Gotti.

1    Q    It is?

2    A    Yes.

3    Q    Which one is Gene Gotti?

4    A    He is in the leather jacket, shaking hands.

5    Q    On the far right?

6    A    Yes.

7    Q    Okay.

8    A    That's Joe Acquirri and Sal Franco leaving with Frank

9    Fappiano.

10   Q    Where are they?  What are they wearing?

11   A    Joe Acquirri is the white-haired man with the black

12   coat.  That's D'Amico saying hello to him.

13   Q    You mean Jackie D'Amico?

14   A    Jackie D'Amico and Nickey on the side of him, Nickey

15   Corozzo.  That's Gravano again.  And Big Louie.  Eddie

16   Garofalo.

17   Q    Which one is Eddie Garafalo?

18   A    Next to Big Louie.  And that's Bobby Boriello shaking

19   hands with the Yankee jacket on, or baseball jacket.  That's

20   Gravano in the doorway.

21   Q    Who is Bobby Boriello?

22   A    He was -- he was a soldier in the Gambino family and he

23   was John's driver.

24        MR. MARKUS:  Judge --

25        MR. PASANO:  Do we actually see a loop and see the

```
 1    same thing over and over.

 2              MR. MARKUS:  It looped a couple of times.

 3              MR. McCORMICK:  We'll move to the next exhibit

 4    44.2.

 5              MR. ENTIN:  Just so we can clarify what year that

 6    video was, if you could ask the witness?

 7    BY MR. McCORMICK:

 8    Q    That year was 1988; isn't that correct?

 9    A    That's correct.

10    Q    This is the next snippet, Mr. Kasman.

11    A    That's John Gotti, the boss of the family, in the

12    doorway.

13    Q    And who has his back to John Gotti?

14    A    I believe that looks like Vinnie Artuso.

15    Q    Can you tell what's going on between John Gotti and

16    Vinnie Artuso?

17    A    It looked like a hand-off of an envelope of some sort.

18    Q    Okay.

19    A    The shorter fellow, looking at it from my left, that's

20    Jackie or Jack Giordano.

21    Q    And who is Jack Giordano?

22    A    He is a captain in the Gambino family.

23    Q    How about the heavyset fellow, do you know him?

24    A    I don't know -- I don't recognize him.  No.

25    Q    Mr. Kasman, we're going to switch to the next snippets
```

1    on May 15 (sic) of 1988.  That's 44.3, I believe --

2    A    That looks like Joe Watts walking out of the club, an

3    associate of the Gambino family.

4    Q    This is a different time of year, with the leaves; is

5    that correct?

6    A    Yes.  Sitting down is Bobby Boriello.  That looks like

7    Tony Lee walking out of the door with the sunglasses on and

8    the white hair.  That is Tony Lee walking in, captain of the

9    Gambino family.  That is Carlo Vaccarezza, with the tie on,

10    walking on my left.

11    Q    Where the pointer is?

12    A    Yes.  That's Iggie Alongo on the right, extreme right.

13    Q    Who is he?

14    A    He is a soldier in the Gambino family, in John's crew.

15    Q    We're going to change to the next snippets, Mr. Kasman.

16    I believe it is June 30, 1998.  44.4.  We're going to switch

17    to 47.17 at this time.

18    A    Okay.  That's myself and John.  John, standing next to

19    me.

20    Q    You have a jacket on?

21    A    Yes, I have a jacket on.

22    Q    Now you're going inside the Ravenite?

23    A    Walking into the Ravenite.  Yes.

24    Q    47.18 now.

25         MR. McCORMICK:  That's the last one, your Honor.

1           THE WITNESS:  That's John and myself on a

2    walk/talk.

3    BY MR. McCORMICK:

4    Q    Getting back now to the amounts of money you were saving

5    for John Gotti, can you approximate for the jury the average

6    amount on a yearly basis that you were storing in your attic

7    for John Gotti?

8    A    It ranged between 2 to $4 million.

9    Q    And were you storing money for anybody else during these

10   years?

11   A    What year are you referring to?

12   Q    1987 to 1990.

13   A    No.  That would just be John's money.

14   Q    What would be the average balance on a month of the cash

15   that you were hoarding for John Gotti?

16   A    The lowest it would go would probably be around

17   $2 million.  But at times it was uncountable because it was

18   coming in and going out on a cicular basis and at very rapid

19   pace, so it was hard to tally all the time.

20   Q    I think you testified that you kept a few records on the

21   comings and going of the cash?

22   A    Yes.

23   Q    And you weren't religious about it?

24   A    No.

25   Q    Now, on April 10 of 1990, you testified in the Grand

```
 1   Jury, did you not?

 2   A    Yes.

 3   Q    The Grand Jury in Brooklyn, New York?

 4   A    Yes.

 5   Q    And the Grand Jury was investigating the --

 6   investigating your friend, John Gotti, correct?

 7   A    Yes.

 8   Q    And when you appeared as a witness, did you take the

 9   Fifth Amendment?

10   A    I did.

11   Q    And were you compelled to testify at that time?

12   A    Yes.

13   Q    What does compelled mean to you?  What did it mean?

14   A    I took the Fifth, and the Government got an immunity

15   order to force my testimony.

16   Q    So that's what -- you did testify?

17   A    I did testify.

18   Q    Did you tell the truth in the Grand Jury on April 10 of

19   1990?

20   A    No.

21   Q    What did you lie about?  Can you tell the jury that?

22   A    They asked me in the Grand Jury if John Gotti was the

23   boss of the family, who Jackie D'Amico was, and other members

24   of organized crime.  And I did not tell the truth.  I lied.

25   Q    And did you lie about everything about John Gotti?
```

1    A    Yes.

2    Q    Practically?

3    A    Yes.

4    Q    Turning your attention now to December of 1990.  What

5    occurred in regard to John Gotti that was monumental in your

6    life?

7    A    He was indicted.  He was indicted in the Eastern

8    District of New York.

9    Q    And who was indicted with him, if you recall?

10   A    He was indicted with Sam Gravano, the underboss of the

11   family at the time.  And Frank LoCascio, the consigliere of

12   the family.

13   Q    And what do they constitute in terms of the Gambino

14   crime family?

15   A    That's the administration.

16   Q    Did John Gotti get bail once he was indicted?

17   A    No, bail denied.

18   Q    Now, were you given any instructions by John Gotti

19   concerning his case and what to do with the cash that you

20   were hoarding in the -- in your attic?

21   A    Yes.

22   Q    What were you told?

23   A    I was told to retain lawyers, retain private

24   investigators, pay for transcripts, pay for any audio

25   copyings, anything to do with his criminal defense.  And at

1    one point in time he wanted me to assist Frank LoCascio in

2    paying some of Mr. LoCascio's bills.

3    Q    And how were you going about paying for lawyers with the

4    money that John Gotti had you keeping for him in the attic?

5    Could you explain that to the jury, please?

6    A    Yes.  The lawyers that would accept cash, I would give

7    them cash.  The lawyers that wouldn't accept cash, I would

8    launder the money and I would write my own check and pay

9    them.

10    Q    By launder the money, can you explain that to the jury,

11    please.

12    A    Yes.  I would write a check for, let's say $100,000 and

13    I would take the money back out of John's money, and

14    gradually either re-deposit into my account or just hold it

15    on the side because John had no ability to write any checks.

16    Q    And you couldn't make that kind of a deposit yourself

17    either; is that correct?

18    A    Correct.

19    Q    And did you do that commencing in 1990 -- how long did

20    you perform that function for John Gotti?

21    A    Till John died in 2002.

22    Q    Now, did -- were you spending the money for any other

23    purpose in or about 1990?

24    A    Yes.

25    Q    Could you explain that?

1    A     John's instructions to me were to help his family, his

2    daughters, whatever, if they need any help paying any bills.

3    But there was money coming in from the administration so the

4    money that I was holding was not really relegated for that.

5    But if an emergency existed other than John's own needs for

6    lawyers, et cetera, I was to help his family.

7    Q     Now, with John Gotti in jail as a result of this case

8    pending trial, who was the acting boss of the family, if I'm

9    using the right terminology?

10   A     When John was first incarcerated you're asking me?

11   Q     Yes.

12   A     I wanted to say --

13   Q     Or did he retain being the boss?

14   A     Well, John always retained being the boss.  John was the

15   boss of the family until he died.  There was no change in his

16   role or his status as the boss of the family.  There came a

17   time when John A. Gotti became the acting boss.  There came a

18   time when there was a committee.  And then there came a time

19   where Peter Gotti became the acting street boss.

20   Q     And that happened over a period of years?

21   A     Yes.

22   Q     Okay.  Now, what about the trial of John Gotti in New

23   York, what happened there?

24   A     He was found guilty.

25   Q     All the defendants were found guilty, as far as you

1    recall?

2    A    All of the defendants were found guilty.  Sam Gravano

3    became a cooperating witness.

4    Q    And was John Gotti sentenced after he was found guilty?

5    A    Yes, he was.

6    Q    What was he sentenced to?

7    A    Life in jail.

8    Q    And where was he imprisoned by the Bureau of Prisons;

9    can you tell us that?

10   A    He first started out in Marion, Illinois.

11   Q    So, did you visit him initially when he was imprisoned

12   by the Bureau of Prisons?

13   A    I visited him only when he was in the Metropolitan

14   Correctional Center in New York City.  Once he was convicted

15   and shipped out, the Bureau of Prisons would not permit me to

16   visit him.

17   Q    Why wouldn't they permit you to visit him?

18   A    They deemed me a threat to institutional security.

19   Q    And did you continue to pay money for John Gotti after

20   he was imprisoned in Marion?

21   A    Yes.

22   Q    How did you go about giving money to either family

23   members or lawyers at that time?

24   A    Well, we had our group of lawyers and I would pay them

25   as they needed to be paid.  As far as his family, if his

1  family came to me and requested money, I would find out what

2  it was for, and John left it up to me to either give it to

3  them or not give it to them.  But if it was a proper reason,

4  certainly, I gave it to them.

5  Q    Now, were you still working in the garment center when

6  all this was going on?

7  A    Yes.

8  Q    Who were you working with then?

9  A    The same companies were still in existence.

10 Q    Your father-in-law was still running with you?

11 A    Yes.

12 Q    Were you still involved in the various fraudulent

13 activities and financial frauds at the garment center?

14 A    Yes.

15 Q    Were you still making the huge illegal profits that you

16 were making before?

17 A    Yes.

18 Q    Did that continue?

19 A    Yes, for a while.  Yes.

20 Q    Was John Gotti still on Scorpio Marketing as a no-show

21 job?

22 A    For a while, yes, he was.  We kept him on.

23 Q    And do you recall taking him off eventually?

24 A    Yes, I did take him off.

25 Q    Did you put someone else in his place?

1   A   Yes.

2   Q   Who?

3   A   I put his wife on.

4   Q   And how long did that last?

5   A   About 8 to 12 months.

6   Q   Okay.  Now, there came a time that you had to answer for

7   your perjury in 1994; isn't that right?

8   A   Yes.

9   Q   What happened then?

10  A   I took a plea.  And I was jailed.

11  Q   So you pled guilty to perjury?

12  A   Yes.

13  Q   And it had to do with lying for John Gotti?

14  A   Yes.

15  Q   Why did you lie for John Gotti?

16  A   He was my friend.  I wasn't about to go in the Grand

17  Jury and tell the truth about John Gotti.

18  Q   So you -- you decided to plead guilty?

19  A   Yes.

20  Q   And were you sentenced shortly thereafter?

21  A   Yes.

22  Q   What were you sentenced to; do you remember that?

23  A   Yes.

24  Q   What?

25  A   Six months incarceration.

1   Q    And where were you imprisoned?

2   A    Lewisberg, Pennsylvania.

3   Q    And did you serve the six months?

4   A    Yes.

5   Q    Let me ask you, while you were at Lewisberg were you

6   engaged in any crime that you can tell the jury about at that

7   time?

8   A    Yes.

9   Q    What was that?

10  A    There was an inmate in there that disliked John

11  intensely and he was taking out his frustrations on me.  And

12  when I was about to leave, there was some gang members in

13  there that I had assault him prior to me -- you know, once I

14  left the institution.

15  Q    How badly was the person assaulted?

16  A    I believe he had a fractured nose.

17  Q    Okay.  Did he ever assault you?

18  A    He attempted to.  Yes.

19  Q    And after this transaction, did you get charged in the

20  prison for doing that?

21  A    No.

22  Q    And did you pay for it, or how did you handle the quid

23  pro quo, so to speak for the assaulter?

24  A    Out of commissary.  In prison, you get commissary for

25  food or whatever items you need, so I just did it that way.

1    Q    And then you were released on July 14, 1996?

2    A    Yes.

3    Q    Where did you go after you were released from prison?

4    A    The day?

5    Q    Not immediately.  Where did you go to resume your life?

6    A    Well, I went back to my family, back home, and went back

7    to the garment center.

8    Q    And what employment did you pursue after you were

9    released from prison?

10   A    Well, we were still in the garment center for a while

11   but the garment center wasn't doing good anymore because a

12   lot of the manufacturing went off shore to different parts of

13   the country -- different parts of the world, actually.

14   Q    Now, was the manufacturing consequential for you when

15   you were money laundering, selling cash, and doing things

16   like that?

17   A    Yes, because you needed the products to be made here and

18   you needed to have something to sell.  So once they started

19   to move all their production out of the New York metropolitan

20   area, it became harder to do business with the selling of the

21   cash.

22   Q    So you had to be there for at least a quasi legitimate

23   purpose to commit the criminal activity?

24   A    Correct.

25   Q    Now, was anybody on the Gambino or I should say the

1    Gotti family, a no-show?  Did they have no-show jobs with you

2    when you came back in July of '96?

3    A    When I --

4    Q    Let me rephrase that.  Were any of the Gotti family

5    associated with your business in the garment center after you

6    were released from prison?

7    A    Yes.

8    Q    Who was that?

9    A    Jackie D'Amico and Danny Fattico.  And I believe his

10   wife was off my payroll at that point.

11   Q    So you had two or three people that had no-show jobs?

12   A    Yes.

13   Q    How long did that last?

14   A    Probably, about a year.  About a year.

15   Q    Now, after you got out of prison in July of 1996, did

16   you have any contact with any member of the administration of

17   the Gambino crime family?

18   A    Yes, I did.

19   Q    Who did you have contact with?

20   A    John A. Gotti.

21   Q    And what position did John A. Gotti have with the family

22   at that particular time?

23   A    He was the acting boss.

24   Q    And his father was still the boss?

25   A    Yes.

```
 1  Q     Okay.  Now, let's turn your attention to October of
 2  1996.  At the time you were still operating the garment
 3  center; is that correct?
 4  A     Yes.
 5  Q     And you had these no-show jobs --
 6  A     Yes.
 7  Q     -- that you were assisting.
 8            Were you contacted by the FBI at that particular
 9  time?
10  A     Yes.
11  Q     And did you decide to become a confidential informant at
12  that time?
13  A     Yes, I did.
14  Q     And what was your understanding about what a
15  confidential informant was when you decided to do that?
16  A     You provide information to the FBI about criminal
17  activity going on.
18  Q     And did you reach a fee arrangement or anything like
19  that with the FBI to provide this type of information?
20  A     Not at that time.  No.
21  Q     So you were going to give that gratuitously?
22  A     Yes.
23  Q     Why did you decide to do that in 1996?
24  A     There were a lot of things -- issues going on with John
25  A. Gotti, issues with his father, issues with money, issues
```

1    with safety.  And once John was incarcerated and once John,

2    his appeals were exhausted, various captains and other

3    members of the family were acting very, very different and

4    there was a lot of chaos.

5    Q    Well, at that time how much money did you have left of

6    John Gotti's money?

7    A    What year is that?

8    Q    1996, between when you met with the FBI, which is

9    October, and you got out of prison in July.

10   A    Still holding several million dollars at that point.

11   Q    And were you -- you indicated that you had concern

12   because you were holding the money?

13   A    I was holding the money and I had responsibilities for

14   the money and what John Senior's wishes were for the money.

15   And it appeared to me that what his wishes were and what his

16   son's wishes were and what other people thought his wishes

17   were, were not his wishes.

18   Q    You made that value judgment?

19   A    Yes.

20   Q    You were having no contact with John Gotti at that time

21   though, is that correct?

22   A    Other than telephonic contact.  And some letter writing

23   back and forth.

24   Q    Did you discuss this issue with him?

25   A    No.  With John Senior?

1    Q    Yes.

2    A    No.

3    Q    So you decided to sign on with the FBI in October more

4    or less of 1996; is that fair?

5    A    Yes.

6    Q    And you were told about what the roles of engagement

7    were in terms of working with the FBI?

8    A    Yes.

9    Q    What did they tell you?

10   A    You can't lie, you have to tell us the truth.  Be

11   truthful with us.  Things of that nature.

12   Q    Did you commit within your own mind to do that?

13   A    No.

14   Q    What decision did you make, irrespective of what the FBI

15   said to you?

16   A    I was playing both ends.  I was going to play both ends.

17   Q    Okay.  Could you tell the jury what you mean by that?

18   What you meant by that, I should say.

19   A    I was caught between a rock and a hard place.  So that

20   was my avenue in case all hell was going to break loose on

21   the organized crime side, I had a place to go to.  So I was

22   playing both ends.  I was telling the FBI what I wanted to

23   tell them, not everything, and not about the crimes that I

24   was committing.

25   Q    So you were telling them the truth of what you told

1    them, but not the whole truth?

2    A    Correct.

3    Q    And so for how long did you continue to provide

4    information on that basis to the FBI?  Do you have any

5    recollection?

6    A    A couple, several years.

7    Q    A couple years?

8    A    Yeah.

9    Q    And you were reporting to an agent on a semi-regular

10   basis; is that correct?

11   A    Yes.

12   Q    But you're still engaging in criminal activity yourself?

13   A    Yes, I am.

14   Q    You were?

15   A    Yes.  At the time.

16   Q    Did you by any chance -- were you still working in the

17   garment center at that time?

18   A    What year is that?

19   Q    1996.  After you got out of prison.

20   A    Yes, we were still in the garment center at that point.

21   Q    So you were still money laundering?

22   A    Yes.

23   Q    You were still selling cash?

24   A    Yes.

25   Q    You --

290

```
 1              THE COURT:  Excuse me a minute.
 2         (Pause in Proceedings.)
 3              THE COURT:  Go ahead.
 4    BY MR. McCORMICK:
 5    Q    Now, in 1997, 1998, in that time frame did you leave the
 6    garment center?
 7    A    Yes.
 8    Q    Why?
 9    A    My friend, Philip Basile, was dying of cancer and he
10    asked me to take over, once again, the operations of his
11    nightclubs.
12    Q    And at that time, what did you do?  Did you take over
13    the operation?
14    A    Yes, I did.
15    Q    Now, at that time did you and others engage in criminal
16    activity on the nightclubs that the Basiles were operating?
17    A    Yes.
18    Q    Could you explain what that criminal activity was?
19    A    Okay.  The Basiles were with the Lucchese family.  I was
20    with the Gambino family.  So you had two organized crime
21    families in there.  You had me representing the Gambinos.
22    And then you had the Luccheses, which were on the outs,
23    basically with Philip Basile at the time, but a financial
24    arrangement was made whereby the Basiles were going to give
25    the Lucchese family a thousand dollars a month because I was
```

```
 1   operating and I was in control of the money.  And it was Pete
 2   and myself -- Peter Gotti and myself and the Basile brothers,
 3   and Pete and I were skimming money, giving the Luccheses
 4   their end, and we were taking basically what we wanted to
 5   take, and we gave the Basile brothers a little bit of the
 6   action as well.
 7   Q    So there was a skim going on of the proceeds at the four
 8   nightclubs that were owned by the Basiles?
 9   A    Yes.
10   Q    And the Lucchese crime family was taking a portion of
11   it?
12   A    Yes.
13   Q    And the Gambino family, through you and Peter Gotti,
14   were taking a portion of it?
15   A    Yes.
16   Q    And also, the Basiles were taking a portion of it?
17   A    Yes.
18   Q    You understand that that's an extortion against the
19   Basiles?
20   A    Yes.
21   Q    Why -- explain that to the jury why it is?
22   A    Well, they were the licensed owners.  Obviously, it was
23   their money.  And -- but when you're in the nightclub -- they
24   needed the protection of the Lucchese family, which they had.
25   And then they brought me into it -- the father brought me
```

1    into it to help them.

2            And what happened was Pete and I got together and

3    Pete said, let's get our end of the deal here as well.  So

4    that's what we proceeded to.

5    Q    And at that time what rank did Peter Gotti have in the

6    Gambino crime family?

7    A    What year is that?

8    Q    1997, 1998.  In that time frame.

9    A    Well, his brother was still the boss.  I would say -- I

10   think Pete was the acting boss at that point.

11   Q    You didn't tell the FBI about that, correct?

12   A    No.

13   Q    That was one of the things that you were alluding to in

14   your testimony what you weren't going to tell the FBI?

15   A    Yes.

16   Q    Now, how was the money divided up between you and Pete

17   Gotti?

18   A    Well, like I said, the Luccheses got their thousand, the

19   Basiles we used to give a couple of thousand to; and whatever

20   was left, Pete and I would, you know, split it or whatever we

21   had decided at that point in time.

22   Q    And what did you do with your money and what did Pete

23   Gotti do with his money, if you recall that?

24   A    My money I kept.  Pete did, I guess, what he did with

25   it.  I don't know what he did with it.

1    Q    Well, did you begin to store money for Pete Gotti, too?

2    A    Yes, that was a little bit further on though.

3    Q    How much further on?

4    A    Uhm, about eight months past that time.

5    Q    Okay.  Let's fast-forward eight months.  How did you

6    store money for Pete Gotti when you started to do that?

7    A    I stored it in the attic as well.  In the same location.

8    But I tried to keep it differentiated.

9    Q    So you had shoe boxes with Pete Gotti's money in it?

10   A    Yes.

11   Q    As well as John Gotti's money?

12   A    Yes.

13   Q    And you didn't merge them together?

14   A    No.

15   Q    Now, how long did the four clubs remain open with this

16   large skim that was going on?

17   A    Approximately, two years.  Two to two and a half years

18   we operated the club.

19   Q    What happened to the clubs?

20   A    Ultimately, they were sold and the family retained the

21   proceeds of the sales.

22   Q    And at the same time you were still making payments for

23   John Gotti to whomever you were directed or whatever you

24   thought should be paid; is that right?

25   A    Yes, that's correct.

1    Q    Were you keeping better records then about the

2    expenditures that you were making on behalf of John Gotti?

3    A    Yes.

4    Q    And what was the reason that you started to make better

5    records of what you were spending?

6    A    Because what started to develop was a lot of infighting

7    within his immediate family, which he warned me would happen

8    over the money; how much and who wanted what.  So I started

9    to keep, you know, better records.  Yes.

10   Q    Okay.  Now, after these four clubs closed, did you

11   continue your relationship with the Basile brothers?

12   A    Yes, I did.

13   Q    What happened next?

14   A    They came to me to open up a venture in Freeport, New

15   York.  A seafood restaurant.

16   Q    So they came to you even though you were extorting them?

17   A    Yes.

18   Q    Could you explain that to the jury?

19   A    They came from a very wealthy background and when the

20   father got sick -- the father was a gambler.  He blew most of

21   his money, but he had assets and properties.  So what

22   happened was they had no cash available to them, and the

23   father passed away in an untimely manner.  There were tax

24   liens, there were foreclosures.  So ultimately, we resolved

25   that, we sold the properties.  And then they had no assets to

1    open up this new restaurant, so they came to me to ask me if

2    I would fund the opening of this new restaurant in Freeport,

3    Long Island.

4              And we were all friends.  We all grew up together.

5    They knew what I was doing and they understood it.  I don't

6    know if they liked it too much, but they understood it.

7    Q    Okay.  And what role did you play in the restaurant

8    itself?

9    A    I was an undisclosed partner.

10   Q    Could you explain what that is?  A silent partner?

11   A    No.  I was involved there.

12   Q    You weren't on paper though, correct?

13   A    Not on paper.

14   Q    Why weren't you on paper?

15   A    Because of my conviction.

16   Q    The perjury conviction?

17   A    Yes.

18   Q    So you were one of the partners.  What happened?  Did

19   you last as a manager of this new restaurant?  You were the

20   manager, correct?

21   A    Well, we had a manager.  But I was there day to day.

22   Q    And how long did you stay at that restaurant?

23   A    I was there anywheres between 12 to 14, 12 to 16 months.

24   Q    And what was the name of the restaurant?

25   A    Hudson & McCoy.

1   Q    And did there come a time that you were thrown out of

2   the restaurant, management of the restaurant?

3   A    Yes.

4   Q    Who threw you out?

5   A    There was a conflict between the Luccheses and the

6   Gambinos, and that's how I was thrown out.

7   Q    Now, 2000, 2001, you were closed as a confidential

8   informant, correct?

9   A    Correct.

10  Q    It wasn't because of what we were talking about, was it?

11  A    No.

12  Q    Why were you closed, if you know?

13  A    What year is that?

14  Q    2000, 2001?

15  A    Just decided, you know, just -- I closed.

16  Q    Okay.  Now again you never told your FBI agent or

17  control agent that you were involved in the four clubs or the

18  Hudson & McCoy transactions?

19  A    (Witness shaking head.)

20  Q    You still maintained holding John Gotti's money.  At

21  this point, 2001, how much money were you holding?

22  A    Several.

23  Q    Approximately.

24  A    A million five.  It depended on how much was coming in,

25  what was going out, what bills I was paying.  I could have

1    had $2 million, I could have had a million five.  You know,

2    it varied.

3    Q    Okay.  Now, you were reopened again in 2002 as a

4    confidential informant; isn't that correct?

5    A    Yes.

6    Q    And you started -- you made the same arrangements with

7    the FBI?

8    A    Yes.

9    Q    What did the FBI tell you then, when they reopened you

10   as a confidential informant?

11   A    The same thing.  You know, you have to be truthful, tell

12   us what you know, any criminal conduct, things of that

13   nature.

14   Q    And did you tell them that you had a couple million

15   dollars of John Gotti's money in the attic?

16   A    No.

17   Q    And did you start reporting to the FBI?

18   A    Yes.

19   Q    The information you provided, was it truthful?

20   A    No.

21   Q    The information that you did provide, was it truthful?

22   A    Yes, that information was truthful.

23   Q    Did you withhold other parts of information?

24   A    Yes.

25   Q    Why?

1    A    Because again, I was playing both ends.  I was doing

2    what I was doing.  And that's just the way I did it.

3    Q    Let me ask you something.  In June of 2002, what

4    occurred?  In regard to John Gotti?

5    A    John Gotti passed away.

6    Q    And when John Gotti passed away, what, if anything, did

7    you do?

8         What did he die of?  Can you tell the jury that?

9    A    He died of head, neck, and throat cancer.

10   Q    And what institution was he at when he passed away?

11   A    Federal Medical Center in Springfield, Missouri.

12   Q    And how did you react to John Gotti's death, what did

13   you do?

14   A    I flew out there on a private jet prior to his death,

15   and he died a few hours later.

16   Q    And when you arrived at the institution, you couldn't

17   gain admittance; is that correct?

18   A    No.

19   Q    And when he died, what did you do?

20   A    I brought the body home.

21   Q    And who was with you when you brought John Gotti's body

22   home?

23   A    Peter Gotti, his son.

24   Q    So you leased a private jet and you brought back the

25   body of John Gotti with Peter Gotti's son -- I mean with

1   Peter Gotti?

2   A    With Peter Gotti and a funeral director.

3   Q    Where did you go with the body after you landed in New

4   York?

5   A    We landed in Long Island in a private airfield and from

6   there, we drove to Maspeth, Queens to the Papavero Funeral

7   Parlor.

8   Q    What was the name of that funeral parlor?

9   A    Papavero.  I couldn't spell it.  But it's got a lot of

10  P's in it.

11  Q    Papavero Funeral Parlor.  Did you attend the funeral or

12  memorial service for John Gotti?

13  A    Yes.

14  Q    Tell the jury about that.  Will you please?

15  A    It was a large funeral.  Hundreds and hundreds of flower

16  arrangements.  Hundreds and hundreds of people coming to pay

17  respects.  And ultimately on the last day, I delivered the

18  eulogy for John.

19  Q    So you gave the eulogy.  Did anybody else give a eulogy

20  for John Gotti?

21  A    No.

22  Q    And after you gave the eulogy, who paid for the funeral

23  service?

24  A    The funeral was to be paid for by his brother, Richard

25  Gotti Senior.  However, when it came to giving me the money,

1    Richie refused to give me the money, and I paid for the

2    funeral.

3    Q    Did you pay for it out of your own funds or John Gotti's

4    funds?

5    A    I paid for it out of my own funds and I took the money

6    back from the money I was holding of John's.

7    Q    Did that cause a rift between you and some of the Gotti

8    family?

9    A    The rift was between me and Richard Gotti because he

10   refused to pay for his brother's funeral, and the money was

11   already allocated by the administration for Richard to pay

12   for the funeral.

13   Q    And who told you that?

14   A    Peter Gotti Senior.  Before he was locked up -- Peter

15   Gotti gets locked up prior to John's death and Peter tells

16   me, he says, Lewis, with the funeral, my brother has $50,000.

17   Don't use my brother's money.  Get the money from Richard.

18   Q    You were acting on the instructions of Peter Gotti?

19   A    Yes.

20   Q    And what rank did Peter Gotti have once John Gotti

21   passed away?

22   A    He was the boss, the acting -- he was the boss.

23   Q    How did he become the boss?  Who made him the boss?  Was

24   there an official proclamation or anything like that?

25   A    There was a committee, but that role was directed by

1    John.  It was all planned.  This is how John wanted it, and

2    this is how it was going to be.

3    Q    Now, after you attended the funeral of John Gotti, which

4    would have been 2002, what did you do in New York -- backing

5    up a little bit, you had re-signed with the FBI at or about

6    that time as a confidential informant source, right?

7    A    What year is that?

8    Q    2002.

9    A    Yes.

10   Q    And so what did you do?  You remained in New York after

11   attending John Gotti's funeral, or what did you begin doing

12   for a living then?

13   A    Shortly -- or in 2003, I decided to move to Florida,

14   approximately.

15   Q    And when you moved to Florida, were you still in

16   association with the Gambino crime family?

17   A    Yes.

18   Q    And you mentioned several times --

19             THE COURT:  If you're moving to Florida, why don't

20   we stop.  It is 4:45.  We can start tomorrow morning at 9

21   o'clock.  Remember, tomorrow we're going to stop at 4:00.  So

22   in terms of your planning, we'll be finished at

23   4:00 tomorrow.

24       (Jury out at 4:45 p.m.)

25             THE COURT:  Okay.  We'll see you tomorrow morning

```
 1    at 9:00.  We do have a hearing in here shortly.

 2             MR. MARKUS:  Judge, just for the Court to know, we

 3    do have that agreement to call the witness out of turn first

 4    thing tomorrow.  The direct should be about a half hour.

 5             THE COURT:  Okay.

 6             MR. McCORMICK:  We agreed to it.

 7             THE COURT:  All right.

 8             MR. MARKUS:  Thank you, your Honor.

 9        (Recess at 4:45 p.m., until 9:00 a.m., September 19,

10    2008.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2  WITNESS                                              PAGE

 3  MARTIN J. GENAUER, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN ..4
    DIRECT EXAMINATION (RESUMED) BY MR. SHOCKLEY ...............4
 4  CROSS-EXAMINATION BY MR. MARKUS ...........................19
    CROSS-EXAMINATION MR. BIRCH ...............................32
 5  CROSS-EXAMINATION BY MR. PASANO ...........................36
    REDIRECT EXAMINATION BY MR. SHOCKLEY ......................70
 6
    GREGORY HAGARTY, GOVERNMENT'S WITNESS, SWORN ..............75
 7  DIRECT EXAMINATION BY MR. McCORMICK .......................75
    VOIR DIRE EXAMINATION BY MR. PASANO .......................86
 8  DIRECT EXAMINATION (RESUMED) BY MR. McCORMICK .............93
    CROSS-EXAMINATION BY MR. PASANO ..........................126
 9  CROSS-EXAMINATION BY MR. BIRCH ...........................141
    REDIRECT EXAMINATION BY MR. McCORMICK ....................149
10
    ROBERT HERBSTER, GOVERNMENT'S WITNESS, SWORN .............176
11  DIRECT EXAMINATION BY MR. McCORMICK ......................176
    CROSS-EXAMINATION BY MR. BIRCH ...........................200
12  CROSS-EXAMINATION BY MR. PASANO ..........................220
    CROSS-EXAMINATION BY MR. MARKUS ..........................225
13  REDIRECT EXAMINATION BY MR. McCORMICK ....................230

14  LEWIS KAZMAN, GOVERNMENT'S WITNESS, SWORN ...............234
    DIRECT EXAMINATION BY MR. McCORMICK ......................234
15


16


17  EXHIBITS                                          RECEIVED

18  GOVERNMENT'S EXHIBIT(S) TX-2 ..............................14
    GOVERNMENT'S EXHIBIT(S) 45A ...............................96
19  GOVERNMENT'S EXHIBIT(S) 47.19 AND 47.20 .................125
    GOVERNMENT'S EXHIBIT(S) 46.1, 46.1A, 46.1B, 46.2, .......200
20  46.2A, 46.2B, 46.3, 46.3A, 46.3B, 46.4, 46.4A,
    46.4B, 46.7, 46.7A AND 46.7B
21  GOVERNMENT'S EXHIBIT(S) 43.10 ...........................253
    GOVERNMENT'S EXHIBIT(S) 47.1 THROUGH 47.8 ...............259

22


23


24


25
```

1                C E R T I F I C A T E

2          I, Karl Shires, Registered Professional Reporter, certify

3     that the foregoing is a correct transcript from the record of

4     proceedings in the above-entitled matter.

5          Dated this 5th day of February, 2009.

6

7     _____

8     Karl Shires, RPR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25